FILED

APR 2 7 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHELBY COUNTY, ALABAMA
201 West College Street
Columbiana, AL 35051

              Plaintiff,

v.

ERIC H. HOLDER, JR.,
in his official capacity as
ATTORNEY GENERAL OF THE
UNITED STATES,
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

              Defendant.

Case: 1:10-cv-00651
Assigned To : Bates, John D.
Assign. Date : 4/27/2010
Description: General Civil

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    This is an action for a declaratory judgment that Section 4(b), 42 U.S.C. § 1973b(b), and Section 5, *id.* § 1973c, of the Voting Rights Act ("VRA"), which render Plaintiff Shelby County a "covered" jurisdiction and require Shelby County to obtain "preclearance" for all voting changes, are facially unconstitutional, and for a permanent injunction against Defendant Attorney General Eric H. Holder, Jr. enjoining the enforcement of these provisions of the VRA.

### THE PARTIES

2.    Plaintiff is a county in the State of Alabama and a "political subdivision" for purposes of Section 4 and Section 5 of the VRA. *Id.* §§ 1973b, 1973c, 1973*l*(c)(2).

3.    Defendant, acting in his official capacity as Attorney General of the United States, has his office in the District of Columbia and is charged with the enforcement of the VRA.

*J.*

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1973c, and 42 U.S.C. § 1973*l*.

5.     Plaintiff seeks a declaratory judgment and injunctive relief pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

6.     Venue is proper in this district under 42 U.S.C. § 1973*l* and 28 U.S.C. § 1391(b).

## BACKGROUND

### A.  The Voting Rights Act of 1965

7.     The Fifteenth Amendment to the United States Constitution provides, in relevant part, that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," U.S. Const. amend. XV, § 1, and grants to Congress the "power to enforce this article by appropriate legislation," *id.* § 2.

8.     Congress enacted the Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (1965), to enforce the substantive guarantee of the Fifteenth Amendment.

9.     Section 2 of the VRA enforced the substantive guarantee of the Fifteenth Amendment by outlawing any "voting qualification or prerequisite to voting, or standard, practice, or procedure … imposed or applied … to deny or abridge the right of any citizen of the United States to vote on account of race or color." *Id.* § 2, 79 Stat. at 437.  This prohibition applied nationwide. *Id.*

10.     Other provisions of the statute applied only to certain jurisdictions pursuant to a geographic "coverage" formula established by the VRA.

a.      Section 4(a) of the VRA foreclosed any "covered" jurisdiction from using a prohibited "test or device" in conducting elections. *Id.* § 4(a), 79 Stat. at 438. Section 4(c) defined a prohibited "test or device" as "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." *Id.* § 4(c), 79 Stat. at 438-39.

b.      Section 4(b) set forth the coverage formula: "[A]ny State or any political subdivision of a state which ... the Attorney General determine[d] maintained on November 1, 1964, any [prohibited] test or device, and with respect to which ... the Director of the Census determine[d] that less than 50 percentum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 percentum of such persons voted in the presidential election of November 1964." *Id.* § 4(b), 79 Stat. at 438.

c.      Under Section 4(b)'s coverage formula, seven States (Alabama, Alaska, Georgia, Louisiana, Mississippi, South Carolina, and Virginia), forty counties in North Carolina, as well as a few counties in Arizona, Hawaii, and Idaho, became "covered" jurisdictions. Determination of the Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897 (Aug. 7, 1965); Determination of the Director of the Census Pursuant to Section 4(b)(2) of the Voting Rights Act of 1965 (Public Law 89-110), 30 Fed. Reg. 9897 (Aug. 7, 1965); Determination of the Director Regarding Voting Rights, 31 Fed. Reg. 19 (Jan. 4, 1966); Determination of the Director Regarding Voting Rights, 31 Fed. Reg. 982 (Jan. 25, 1966); Determination of the Director Regarding Voting Rights, 31 Fed. Reg. 3317 (Mar. 2, 1966); Determination of the Director Regarding Voting Rights, 31 Fed. Reg. 5080-81 (Mar. 29, 1966).

11.    These "covered" jurisdictions also were subjected to the "preclearance" obligation of Section 5 of the VRA.

a.    Section 5 required covered jurisdictions to "preclear" any new law or any change to an existing law involving "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." Voting Rights Act of 1965, § 5, 79 Stat. at 439.

b.    The covered jurisdictions could obtain "preclearance" by submitting the proposed change to the Department of Justice ("DOJ") or by filing a declaratory-judgment action before a three-judge panel of the United States District Court for the District of Columbia ("DDC"). *Id.*

c.    Preclearance could be granted by DOJ or the DDC only if the voting change "[did] not have the purpose and [would] not have the effect of denying or abridging the right to vote on account of race or color." *Id.*

12.    Section 4(a) of the VRA included a so-called "bailout" provision that allowed a "covered" jurisdiction to terminate coverage subject to a "claw back" mechanism.

a.    A covered jurisdiction could bail out if a three-judge panel of the DDC "determined that no [prohibited] test or device ha[d] been used during the five years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color." *Id.* § 4(a), 79 Stat. at 438.

b.    Section 4(a) also provided, however, that "[t]he court shall retain jurisdiction of any action pursuant to th[e] subsection for five years after judgment and shall reopen the action upon motion of the Attorney General alleging that a test or device has been

used for the purpose or with the effect of denying or abridging the right to vote on account of race or color." *Id.*

13.     Congress intended for Section 4(b) and Section 5 of the VRA to be temporary provisions.

14.     In 1966, the Supreme Court rejected a constitutional challenge to several sections of the VRA, including the preclearance obligation that Section 5 imposed on those jurisdictions covered under the geographic formula set forth in Section 4(b). *South Carolina v. Katzenbach*, 383 U.S. 301 (1966).

a.     The Supreme Court explained that voting discrimination had "infected the electoral process in parts of our country for nearly a century." *Id.* at 308. "Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment." *Id.* at 309. The Supreme Court also concluded that the coverage formula and the preclearance obligation that followed from coverage targeted the "insidious and pervasive evil which had been perpetrated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *Id.* "Congress began work with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act." *Id.* at 329. These were "the geographic areas where immediate action seemed necessary." *Id.* at 328.

b.     The Supreme Court acknowledged, however, that the preclearance obligation of Section 5 represented an "uncommon exercise of congressional power" that was "appropriate" only because of the "exceptional conditions" and "unique circumstances" in the covered jurisdictions. *Id.* at 334-35. The Supreme Court highlighted the unresolved problem of

low African-American registration rates, explaining that the "registration of voting-age Negroes in Alabama rose only from 14.2% to 19.4% between 1958 and 1964; in Louisiana it barely inched ahead from 31.7% to 31.8% between 1956 and 1965; and in Mississippi it increased only from 4.4% to 6.4% between 1954 and 1964.  In each instance, registration of voting-age whites ran roughly 50 percentage points or more ahead of Negro registration." *Id.* at 313.

        c.      The Supreme Court ultimately concluded that Section 5 was necessary to defeat "the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." *Id.* at 335. Congress fairly determined that without Section 5 these "States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself." *Id.* "Under the compulsion of these unique circumstances, Congress responded in a permissibly decisive manner." *Id.*

### B. The 1970, 1975, and 1982 Reauthorizations of the Voting Rights Act

15.     In 1970, Congress reauthorized the VRA for another five years.  Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, 84 Stat. 314 (1970).

        a.      The 1970 reauthorization extended Section 4(a)'s bailout compliance period to ten years, *id.* § 3, 84 Stat. at 315, and extended Section 4(b)'s coverage formula—and thus Section 5's preclearance obligation—to any jurisdiction that had maintained a prohibited "test or device" on November 1, 1968, and had voter registration on that date or turnout in the 1968 presidential election of less than 50 percent, *id.* § 4, 84 Stat. at 315.

        b.      Congress also added Section 201 to the VRA.  *Id.* § 6, 84 Stat. at 315. Section 201 provided that "[p]rior to August 6, 1975, no citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State as to which the provisions of section

4(a) of this Act are not in effect by reason of determinations made under Section 4(b) of this Act." *Id.* Section 201 thus banned the use of any prohibited "test or device" in non-covered jurisdictions for a period of five years.

        c.     The Supreme Court upheld the reauthorization of the VRA against constitutional challenge. *Georgia v. United States*, 411 U.S. 526 (1973).

       16.     In 1975, Congress reauthorized the VRA for another seven years. Act of Aug. 6, 1975, Pub. L. No. 94-73, 89 Stat. 400.

        a.     The 1975 reauthorization extended Section 4(a)'s bailout compliance period to seventeen years, *id.* § 101, 89 Stat. at 400, and extended Section 4(b)'s coverage formula—and thus Section 5's preclearance obligation—to any jurisdiction that had maintained a prohibited "test or "device" on November 1, 1972, and had voter registration on that date or turnout in the 1972 presidential election of less than 50 percent, *id.* § 202, 89 Stat. at 401.

        b.     Congress also extended Section 5's preclearance obligation by expanding the definition of "test or device" to include the provision of election materials only in English by jurisdictions in which more than five percent of the voting age citizens were members of "a single language minority." *Id.* § 203, 89 Stat. at 401-02.

        c.     The 1975 reauthorization of the VRA also expanded Section 201's prohibition on "tests or devices" to provide that "[n]o citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State. *Id.* §102, 89 Stat. at 400. As amended, Section 201 thus permanently banned the use of any prohibited "test or device" nationwide irrespective of coverage under Section 4(b). As a result, while the VRA's key substantive provisions—Section 2 and Section 201—applied nationwide, Section 5 procedurally obligated

only "covered" jurisdictions to prove compliance with these provisions by submitting all voting changes to DOJ for preclearance prior to implementation.

d.    The Supreme Court upheld the 1975 reauthorization of the VRA against constitutional challenge. *City of Rome v. United States*, 446 U.S. 156 (1980).  The Supreme Court explained that "[s]ignificant disparity persisted between the percentages of whites and Negroes registered in at least several of the covered jurisdictions.  In addition, though the number of Negro elected officials had increased since 1965, most held only relatively minor positions, none held statewide office, and their number in the state legislatures fell far short of being representative of the number of Negroes residing in the covered jurisdictions.  Congress concluded that, because minority political progress under the Act, though 'undeniable,' had been 'modest and spotty,' extension of the Act was warranted." *Id.* at 180-81 (quoting H.R. Rep. No. 94-196, at 7-11 (1975); S. Rep. No. 94-295, at 11-19 (1975)).

17.    In 1982, Congress reauthorized the VRA for another twenty-five years.  Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, 96 Stat. 131 (1982).  The 1982 reauthorization amended Section 4(a)'s bailout provision in two ways.  First, it permitted a "political subdivision" within a fully-covered state to seek bailout. *Id.* § 2(b)(2), 96 Stat. at 131. Second, the 1982 reauthorization made the eligibility of the "State" or "political subdivision" seeking bailout contingent on its conduct over the previous ten years. *Id.*

18.    To be eligible for bailout under the 1982 amendments to Section 4(a) of the VRA, a covered "State" or "political subdivision" was required to prove to a three-judge panel of the DDC that during the preceding ten years:

   a. No prohibited "test or device has been used within such State or political subdivision for the purpose or with the effect of denying or abridging the right to vote on account of race or color," *id.* § 2(b)(4), 96 Stat. at 131;

   b. "[N]o final judgment of any court of the United States, other than the denial of declaratory judgment under this section, has determined that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the territory of such State or political subdivision ... and no consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds; and no declaratory judgment under this section shall be entered during the pendency of an action commenced before the filing of an action under this section and alleging such denials or abridgements of the right to vote," *id.* § 2(b)(4), 96 Stat. at 131-32;

   c. "[N]o Federal examiners or observers ... have been assigned to such State or political subdivision," *id.* § 2(b)(4), 96 Stat. at 132;

   d. "[S]uch State or political subdivision and all governmental units within its territory have complied with [Section 5], including compliance with the requirement that no change covered by [Section 5] has been enforced without preclearance ... and have repealed all changes covered by [Section 5] to which the Attorney General has successfully objected or as to which the [DDC] has denied a declaratory judgment," *id.*;

   e. "[T]he Attorney General has not interposed any objection (that has not been overturned by a final judgment of a court) and no declaratory judgment has been denied under [Section 5], with respect to any submission by or on behalf of the plaintiff or any governmental unit within its territory under [Section 5], and no such submissions or declaratory judgment actions are pending," *id.*; and

f.      "[S]uch State or political subdivision and all governmental units within its territory—(i) have eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process; (ii) have engaged in constructive efforts to eliminate intimidation and harassment of persons exercising rights protected under [the VRA]; and (iii) have engaged in other constructive efforts, such as expanded opportunity for convenient registration and voting for every person of voting age and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process," *id.*

19.    "To assist [DDC] in determining whether" to grant bailout, the covered jurisdiction was required to compile and present "evidence of minority participation, including evidence of the levels of minority group registration and voting, changes in such levels over time, and disparities between minority-group and non-minority-group participation." *Id.*

20.    The 1982 amendments also precluded bailout if the covered jurisdiction "and governmental units within its territory have, during the period beginning ten years before the date the judgment is issued, engaged in violations of any provision of the Constitution or laws of the United States or any State or political subdivision with respect to discrimination in voting on account of race or color … unless the plaintiff establishes that any such violations were trivial, were promptly corrected, and were not repeated." *Id.*

21.    The 1982 amendments also expanded the "claw back" provision in Section 4(a) that governed those jurisdictions that successfully bailed out of coverage. As amended, this provision provided that "the court shall retain jurisdiction of any action pursuant to the subsection for ten years after judgment and shall reopen the action upon motion of the Attorney General or any aggrieved person alleging that conduct has occurred which, had that conduct

occurred during the ten-year periods referred to in this subsection, would have precluded the issuance of a declaratory judgment under this subsection.  The court, upon such reopening, shall vacate the declaratory judgment issued under this section if, after the issuance of such declaratory judgment, a final judgment against the State or subdivision with respect to which such declaratory judgment was issued, or against any governmental unit within that State or subdivision, determines that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the territory of such State or political subdivision ... or if, after the issuance of such declaratory judgment, a consent decree, settlement, or agreement has been entered into resulting in any abandonment of a voting practice challenged on such grounds." *Id.* § 2(b)(5), 96 Stat. at 133.

### C. The 2006 Reauthorization of the VRA

22.     In 2006, Congress reauthorized the VRA for another twenty-five years without making any relevant amendments to Section 5's preclearance obligation, Section 4(a)'s bailout criteria, or Section 4(b)'s coverage formula.  Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577 (2006) ("2006 Reauthorization Act").

23.     Congress found "that the number of African-Americans who are registered and who turn out to cast ballots has increased significantly over the last 40 years, particularly since 1982.  In some circumstances, minorities register to vote and cast ballots at levels that surpass those of white voters."  H.R. Rep. No. 109-478, at 12 (2006).

24.     Congress also found that "the disparities between African-American and white citizens who are registered to vote have narrowed considerably in six southern States covered by the temporary provisions (Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia) and in the 40 counties covered in the State of North Carolina." *Id.*

25.     Congress likewise found that "presently in seven of the covered States, African-Americans are registered at a rate higher than the national average," that in two more covered States, African-American registration is "identical to the national average," and that in "California, Georgia, Mississippi, North Carolina, and Texas, black registration and turnout in the 2004 election ... was higher than that for whites." S. Rep. No. 109-295, at 10-11 (2006).

26.     Congress nevertheless extended these provisions for another twenty-five years based on its conclusion that "vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process" and "[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the [VRA] demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965." 2006 Reauthorization Act, § 2(b)(2)-(3), 120 Stat. at 577.

27.     According to Congress, "[p]resent day discrimination experienced by racial and language minority voters is contained in evidence, including the objections interposed by [DOJ] in covered jurisdictions; the section 2 litigation filed to prevent dilutive techniques from adversely affecting minority voters; the enforcement actions filed to protect language minorities; and the tens of thousands of Federal observers dispatched to monitor polls in jurisdictions covered by the Voting Rights Act of 1965." *Id.* § 2(b)(8), 120 Stat. at 578.

### C. Shelby County's Experience Under the Voting Rights Act

28.     The State of Alabama has been fully covered by Section 4(b) of the VRA since August 7, 1965, when: (a) the Attorney General determined that, as of November 1, 1964, Alabama was using one or more prohibited tests or devices; and (b) the Director of the Census

determined that less than 50 percent of the persons of voting age residing in Alabama voted in the presidential election of November 1964.

29.     As a result, for nearly 45 years Plaintiff Shelby County, a "political subdivision" of the State of Alabama for purposes of the VRA, has been obligated under Section 5 of the VRA to obtain preclearance for any changes in voting procedure different from those in effect on November 1, 1964.

30.     Plaintiff Shelby County and the State of Alabama would not be subject to coverage if the formula set forth in Section 4(b) were based on data from any of the last three presidential elections instead of data from November 1964.

31.     Because it is a "covered" jurisdiction, Shelby County regularly must seek preclearance for all voting practices and procedures.

32.     In the last ten years, Shelby County has filed for preclearance numerous times, expended significant taxpayer dollars, time, and energy to meet its obligations under Section 5, and has had at least one election delayed in order to ensure compliance with the preclearance obligation of Section 5.

33.     Because Section 5 requires that even the most minor voting changes must be precleared by DOJ, Shelby County reasonably anticipates that it will have to regularly seek preclearance in the near future.  Shelby County anticipates that, among other reasons, the districting changes triggered by the decennial census, as well as routine voting changes related to local elections and zoning, will require Plaintiff to seek preclearance in the near future.

34.     It would be futile for Shelby County to attempt to bail out of coverage and preclearance under Section 4(a) of the VRA because Plaintiff is ineligible for bailout under the terms of the statute.

a.      Plaintiff could not satisfy the requirement that it has complied during the past ten years with the obligation under Section 5 to seek preclearance before implementing any changes in voting procedure.  42 U.S.C. § 1973b(a)(1)(D).

i.      On April 9, 2002, Shelby County held a referendum election under a law that had not been precleared.  *See* Letter from Joseph D. Rich, Chief, Voting Section, U.S. Department of Justice Civil Rights Division, to Frank C. Ellis, Jr., Esq., and Dorman Walker, Esq. (Oct. 9, 2003).  In 1965, the Alabama Legislature passed Act 65-816 ("Planning Act"), which created the Shelby County Planning Commission ("Commission").  The Planning Act was replaced in 1982 by Act 82-693, which restated the text of the original legislation and also ratified, approved, validated, and confirmed the original legislation and all actions taken pursuant to it.  The Planning Act was then amended several times between 1982 and 1992.  Under the current version of the Planning Act, the Commission is responsible for zoning in many areas of Shelby County, including those unincorporated voting precincts of Shelby County where a majority of the qualified electors have voted in a special election to be subject to the Commission and its zoning regulations.

ii.     Numerous special elections were held under the authority of the Planning Act between 1965 and 2003.  In 2003, however, a federal lawsuit was filed to prevent a special election from being held to extend the Commission's jurisdiction to Precinct 14 of Shelby County on the ground that the Planning Act (both as originally enacted and as amended) had not been precleared by DOJ.  In response to this federal lawsuit, and although there was confusion as to whether the Alabama Attorney General or local officials were responsible for submitting these laws for preclearance, Shelby County submitted Act 65-816, each of the amendments, and each of the special elections to DOJ for preclearance.  Shortly thereafter, each of the laws, as well as

the elections held under them, were either precleared (Act Nos. 65-816, 82-693, 82-771, 84-454, 84-484, 85-465, and 92-417) or deemed not subject to any preclearance obligation (Act Nos. 87-771 and 89-673).

        iii.    Although Plaintiff ultimately obtained preclearance, a covered jurisdiction is ineligible for bailout unless "[a]ll changes affecting voting have been reviewed under Section 5 prior to their implementation." United States Department of Justice, Civil Rights Division, Section 4 of the Voting Rights Act, http://www.justice.gov/crt/voting/misc/sec_4.php (last visited Apr. 1, 2010). Because Shelby County held special elections in the last ten years under laws that were not precleared by DOJ prior to their implementation, Plaintiff is not eligible for bailout. 42 U.S.C. § 1973b(a)(1)(D).

        b.    Plaintiff also does not satisfy the requirement that the Attorney General not have interposed an objection under Section 5 during the past ten years to any change submitted for preclearance by "any governmental unit within its territory." *Id.* § 1973b(a)(1)(E).

        i.    On August 25, 2008, the Attorney General interposed an objection under Section 5 to certain voting changes submitted for preclearance by the City of Calera. *See* Consent Decree at 2-3, *United States of America v. City of Calera, Alabama*, No. 08-1982 (N.D. Ala. Oct. 29, 2008).

        ii.    The City of Calera had sought preclearance of 177 annexations to the district boundaries of Calera and a redistricting plan. DOJ objected to the reliability of the demographic data available to and/or supplied by Calera and ultimately agreed to an interim voting plan, which allowed Calera to develop and submit for preclearance a new voting plan based on the results of the 2010 Census. *See* Joint Motion to Modify Consent Decree, *United States of America v. City of Calera, Alabama*, No. 08-1982 (N.D. Ala. Oct. 9, 2009).

iii.    Because the City of Calera is a "governmental unit" within the territory of Shelby County, and because the Attorney General interposed an objection under Section 5 during the past ten years to a voting change made by the City of Calera, Plaintiff is not eligible for bailout.  42 U.S.C. § 1973b(a)(1)(E).

35.    Plaintiff Shelby County supports the vigorous enforcement of the Fifteenth Amendment and the many provisions of the VRA that appropriately enforce its substantive command.  However, it is no longer constitutionally justifiable for Congress to arbitrarily impose on Shelby County and other covered jurisdictions disfavored treatment by forcing them to justify all voting changes to federal officials in Washington, D.C. for another twenty-five years without a legislative record showing that these covered jurisdictions are still engaged in the type of "unremitting and ingenious defiance of the Constitution" that justified enactment of the VRA in 1965. *Katzenbach*, 383 U.S. at 309.

### COUNT I

36.    Paragraphs 1 through 35 are incorporated by reference as if fully realleged herein.

37.    The "preclearance" obligation of Section 5 exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments and, therefore, violates the Tenth Amendment and Article IV of the Constitution.

38.    Section 5 of the VRA exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments.

a.    Section 5 "goes beyond the prohibition of the Fifteenth Amendment by suspending *all* changes to state election law—however innocuous—until they have been precleared by federal authorities in Washington, D.C." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2511 (2009) *("NAMUDNO")*.

b.     Because Section 5 "imposes current burdens," it "must be justified by current needs." *Id.* at 2512. "Punishment for long past sins is not a legitimate basis for imposing a forward-looking preventative measure that has already served its purpose." *Id.* at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part).

c.     In reauthorizing the VRA for another twenty-five years in 2006, Congress lacked the evidence of intentional discrimination that warranted the enactment of the VRA in 1965 and its extensions in 1970, 1975, and 1982.  Congress produced no evidence that covered jurisdictions are engaging in the types of discriminatory voting practices that led to the VRA's enactment in 1965.  There also was no evidence that covered jurisdictions would resurrect these discriminatory voting practices if the preclearance obligation of Section 5 were eliminated. Evidence of "second-generation barriers" cannot be equated to the intentionally discriminatory voting practices on which Congress relied in enacting the VRA in 1965.

d.     Because there is neither "congruence and proportionality," *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), nor even a "rational" relationship between the evidence compiled in support of the latest extension of Section 5 and the burdens imposed by that provision, *Katzenbach*, 383 U.S. at 324, Section 5 is not "appropriate" enforcement legislation and thus exceeds Congress's authority under the Fourteenth and Fifteenth Amendments.

39.    Because Section 5 coverage exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments, it violates the Tenth Amendment and Article IV of the Constitution.

a.     Section 5 "authorizes federal intrusion into sensitive areas of state and local policymaking" and "imposes substantial federalism costs." *NAMUDNO*, 129 S. Ct. at 2511 (internal citations and quotations omitted).

b.      "The government of the United States is one of delegated powers alone. Its authority is defined and limited by the Constitution. All powers not granted to it by that instrument are reserved to the States or the people." *United States v. Cruikshank*, 92 U.S. 542, 551 (1876).

c.      "No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices." *Oregon v. Mitchell*, 400 U.S. 112, 125 (1970).

d.      Because the preclearance obligation of Section 5 intrudes upon a covered jurisdiction's authority and control over local elections, and exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments, it violates the Tenth Amendment and Article IV of the Constitution.

## COUNT II

40.     Paragraphs 1 through 39 are incorporated by reference as if fully realleged herein.

41.     The formula set forth in Section 4(b) of the VRA, under which Plaintiff is rendered a "covered" jurisdiction subject to the "preclearance" obligation of Section 5, exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments and, therefore, violates the Tenth Amendment and Article IV of the Constitution.

42.     The coverage formula of Section 4(b) of the VRA exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments.

a.      Congress's reliance, in reauthorizing the VRA in 2006, on voting practices, voter registration data, and presidential election data from 1964, 1968, and 1972 as the

trigger for the preclearance obligation of Section 5 is not an "appropriate" means of enforcing the Fifteenth Amendment.

        b.    In reauthorizing the VRA in 2006, Congress failed to establish that Section 4(b)'s coverage formula remains constitutionally justified under its Fourteenth and Fifteenth Amendment enforcement authority. The so-called "second-generation barriers" to voting on which Congress relied to justify the retention of Section 4(b)'s coverage formula for another twenty-five years generally exist to an equal or greater degree in non-covered jurisdictions. Congress had insufficient evidence to render it "appropriate" to single out these select jurisdictions for the preclearance obligation of Section 5 of the VRA.

        c.    Triggering coverage under Section 4(b) of the VRA on voting practices and Presidential election data from 1964, 1968, and 1972 establishes neither "congruence and proportionality between" coverage and enforcement of the Fifteenth Amendment, *Boerne*, 521 U.S. at 520, nor establishes that Section 4(b)'s coverage formula is a "rational means to effectuate the constitutional prohibition" embodied in the Fifteenth Amendment, *Katzenbach*, 383 U.S. at 324.

    43.    Because Section 4(b)'s coverage exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments, it violates the Tenth Amendment and Article IV of the Constitution.

        a.    Section 4(b) "differentiates between the States, despite our historic tradition that all the States enjoy 'equal sovereignty.'" *NAMUDNO*, 129 S.Ct. at 2512 (quoting *United States v. Louisiana*, 363 U.S. 1, 16 (1960) (other citations omitted)).

        b.    "Distinctions can be justified in some cases. 'The doctrine of the equality of States ... does not bar ... remedies for *local* evils which have subsequently appeared.'

*Katzenbach*, 383 U.S. at 328-29.   But a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *NAMUDNO*, 129 S. Ct. at 2512.

        c.      Because Section 4(b)'s coverage formula is not "sufficiently related to the problem that it targets" it violates the principle of equal sovereignty embodied in the Tenth Amendment and Article IV of the Constitution.

## PRAYER FOR RELIEF

44.     WHEREFORE, Plaintiff prays that the Court:

     (a)     Declare Section 4(b) and Section 5 of the VRA unconstitutional;

     (b)     Issue a permanent injunction against Defendant Attorney General Eric H. Holder, Jr. enjoining the enforcement of Section 4(b) and Section 5 of the VRA;

     (c)     Award Plaintiff its reasonable attorneys' fees and costs for bringing this action; and

     (d)     Order such other and further relief as the Court may deem just and proper.

Dated:  April 27, 2010                              Respectfully submitted,

_____          _____
Frank C. Ellis, Jr.                              Bert W. Rein (D.C. Bar No. 067215)
WALLACE, ELLIS, FOWLER & HEAD          William S. Consovoy* (D.C. Bar No. 493423)
113 North Main Street                         Thomas R. McCarthy (D.C. Bar No. 489651)
Columbiana, AL  35051                        WILEY REIN LLP
Tel.: (205) 669-6783                           1776 K Street, NW
Fax: (205) 669-4932                           Washington, DC  20006
                                                       Tel.: (202) 719-7000
                                                       Fax: (202) 719-7049


                                                       * Counsel of Record