## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHELBY COUNTY, ALABAMA

                Plaintiff,

v.

ERIC H. HOLDER, JR.,
in his official capacity as
ATTORNEY GENERAL OF THE
UNITED STATES,

                Defendant.

Civil Action No. 1:10-cv-00651-JDB

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## [ORAL ARGUMENT REQUESTED]

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Shelby County, Alabama ("Plaintiff") respectfully moves this Court for entry of an Order granting summary judgment to Plaintiff. In particular, Plaintiff moves for summary judgment that Section 4(b) and Section 5 of the Voting Rights Act of 1965, as amended, are unconstitutional. Plaintiff further requests that the Court issue a permanent injunction against Defendant Attorney General Eric H. Holder, Jr., enjoining the enforcement of Section 4(b) and Section 5 of the Voting Rights Act. There is no genuine issue as to any material fact, and Plaintiff is entitled to judgment as a matter of law.

Pursuant to Local Civil Rule 7, Plaintiff is filing a Memorandum of Points and Authorities, a Statement of Material Facts, the Declaration of Frank C. Ellis, Jr., a Proposed Order, and Exhibits in support of this Motion. Plaintiff also requests oral argument on this Motion.

Plaintiff respectfully prays that this Court enter an Order granting Plaintiff's Motion for Summary Judgment.


Dated:  June 8, 2010                              Respectfully submitted,


                                                  /s/ William S. Consovoy
                                                  _____
                                                  Bert W. Rein (D.C. Bar No. 067215)
                                                  William S. Consovoy* (D.C. Bar No. 493423)
                                                  Thomas R. McCarthy (D.C. Bar No. 489651)
                                                  Brendan J. Morrissey (D.C. Bar No. 973809)
                                                  WILEY REIN LLP
                                                  1776 K Street, NW
                                                  Washington, DC  20006
                                                  Tel.: (202) 719-7000
                                                  Fax: (202) 719-7049

                                                  Frank C. Ellis, Jr.
                                                  WALLACE, ELLIS, FOWLER & HEAD
                                                  113 North Main Street
                                                  Columbiana, AL  35051
                                                  Tel.: (205) 669-6783
                                                  Fax: (205) 669-4932

                                                  * *Counsel of Record*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHELBY COUNTY, ALABAMA | |
| Plaintiff, | |
| | Civil Action No. 1:10-cv-00651-JDB |
| v. | |
| ERIC H. HOLDER, JR., in his official capacity as ATTORNEY GENERAL OF THE UNITED STATES, | |
| Defendant. | |

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Shelby County, Alabama ("Shelby County") submits the following statement of material facts as to which Shelby County contends there is no genuine issue.

1. Shelby County is organized under the Constitution and laws of the State of Alabama. *See* 1818 Ala. Acts page no. 29 (establishing Shelby County); Ala. Const. art. II, § 38 (1901) (ratifying and confirming the boundaries of counties).

2. Shelby County is subject to coverage under Section 4(b) of the VRA because on August 7, 1965: (1) the Attorney General of the United States determined that, as of November 1, 1964, the State of Alabama was using a prohibited "test or device" as that term is defined in Section 4(c) of the VRA; and (2) the Director of the Census determined that less than 50 percent of the persons of voting age residing in Alabama voted in the presidential election of November 1964. *See* 42 U.S.C. § 1973b(b)-(c); Determination of the

1

Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed.

Reg. 9897 (Aug. 7, 1965); Determination of the Director of the Census Pursuant to

Section 4(b)(2) of the Voting Rights Act of 1965 (Pub. L. No. 89-110), 30 Fed. Reg.

9897 (Aug. 7, 1965).

3.      The voting tests identified in Section 4(c) of the Voting Rights Act were permanently

banned by Congress on a nationwide basis in 1975.  *See* Act of Aug. 6, 1975, Pub. L. No.

94-73, § 102, 89 Stat. 400 (1975).

4.      More than 50% of the voting age persons residing in Shelby County registered and voted

in the 2000 and 2004 presidential elections.  *See* Declaration of Frank C. Ellis, Jr. ("Ellis

Decl.") ¶ 11.

5.      More than 50% of the voting age persons residing in Alabama registered and voted in the

2000 and 2004 presidential elections.  *See* U.S. Census Bureau, Voting and Registration,

http://www.census.gov/hhes/www/socdemo/voting/publications/historical/index.html

(last visited June 7, 2010) (Tables A-5a and A-5b showing registration and voting totals).

6.      As a "covered" jurisdiction under Section 4(b) of the VRA, Shelby County must comply

with Section 5 of the VRA.  Section 5 prohibits Shelby County from "enact[ing] or

seek[ing] to administer any voting qualification or prerequisite to voting, or standard,

practice, or procedure with respect to voting different from that in force or effect on

November 1, 1964" unless the Department of Justice ("DOJ") or the United States

District Court for the District of Columbia ("DDC") determines that such "voting

qualification or prerequisite to voting, or standard, practice, or procedure with respect to

voting" does not have "the purpose . . . [or] effect of diminishing the ability of any

citizens of the United States on account of race or color, or [language minority], to elect their preferred candidates of choice[.]"  42 U.S.C. § 1973c.

7.   In the last ten years, Shelby County has filed for preclearance numerous times, expended significant taxpayer dollars, time, and energy to meet its obligations under Section 5, and has had at least one election delayed in order to ensure compliance with the preclearance obligation of Section 5.   Ellis Decl. ¶ 7.

8.   Shelby County reasonably anticipates that it will have to regularly seek preclearance in the near future.   Shelby County anticipates that, among other reasons, the districting changes triggered by the decennial census, as well as routine voting changes related to local elections and zoning, will require it to seek preclearance in the near future.   Ellis Decl. ¶ 8.

9.   A covered jurisdiction is ineligible for bailout under Section 4(a) of the VRA unless "[a]ll changes affecting voting have been reviewed under Section 5 prior to their implementation."   United States Department of Justice, Civil Rights Division, Section 4 of the Voting Rights Act, http://www.justice.gov/crt/voting/misc/sec_4.php (last visited June 1, 2010).   On April 9, 2002, Shelby County held a referendum election under a law that had not been precleared by DOJ or DDC.   *See* Ellis Decl. ¶ 9.   The referendum election was later precleared by DOJ.   *See id*.

10.   A covered "political subdivision" is ineligible for bailout under Section 4(a) of the Voting Rights Act if the Attorney General has interposed an objection under Section 5 of the Voting Rights Act during the past ten years to any change submitted for preclearance by "any governmental unit within its territory."   42 U.S.C. § 1973b(a)(1)(E).   On August 25, 2008, the Attorney General interposed an objection under Section 5 of the Voting

Rights Act to certain voting changes submitted for preclearance by the City of Calera, Alabama.  *See* Ellis Decl. ¶ 10.  The City of Calera is a "governmental unit" within the territory of Shelby County.  *See* 42 U.S.C. § 1973b(a)(1)(E).


Dated:  June 8, 2010                                        Respectfully submitted,


                                                            /s/ William S. Consovoy
                                                            _____
                                                            Bert W. Rein (D.C. Bar No. 067215)
                                                            William S. Consovoy* (D.C. Bar No. 493423)
                                                            Thomas R. McCarthy (D.C. Bar No. 489651)
                                                            Brendan J. Morrissey (D.C. Bar No. 973809)
                                                            WILEY REIN LLP
                                                            1776 K Street, NW
                                                            Washington, DC  20006
                                                            Tel.: (202) 719-7000
                                                            Fax: (202) 719-7049

                                                            Frank C. Ellis, Jr.
                                                            WALLACE, ELLIS, FOWLER & HEAD
                                                            113 North Main Street
                                                            Columbiana, AL  35051
                                                            Tel.: (205) 669-6783
                                                            Fax: (205) 669-4932

                                                            * *Counsel of Record*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SHELBY COUNTY, ALABAMA

                  Plaintiff,


v.

ERIC H. HOLDER, JR.,
in his official capacity as
ATTORNEY GENERAL OF THE
UNITED STATES,

                  Defendant.

Civil Action No. 1:10-cv-00651-JDB

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Bert W. Rein (D.C. Bar No. 067215)
William S. Consovoy* (D.C. Bar No. 493423)
Thomas R. McCarthy (D.C. Bar No. 489651)
Brendan J. Morrissey (D.C. Bar No. 973809)
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Tel.: (202) 719-7000
Fax: (202) 719-7049

Frank C. Ellis, Jr.
WALLACE, ELLIS, FOWLER & HEAD
113 North Main Street
Columbiana, AL  35051
Tel.: (205) 669-6783
Fax: (205) 669-4932

**TABLE OF CONTENTS**

**PAGE NO.**

I.   Preliminary Statement....................................................................................................1

II.  Summary of the Argument...........................................................................................3

III. The Evolution of the Congressional Rationale for Imposing Preclearance on the Covered Jurisdictions.....................................................................................................7

    A. The Voting Rights Act of 1965................................................................................8

    B. The 1970, 1975, and 1982 Reauthorizations of the Voting Rights Act.........................12

    C. The 2006 Reauthorization of the Voting Rights Act ......................................................14

IV.  Summary Judgment Standard ...................................................................................16

V.   Argument ..................................................................................................................17

    A. Congress May "Enforce" the Fifteenth Amendment Only "By Appropriate Legislation."...........................................................................................................17

    B. The Preclearance Obligation Imposed By Section 5 Is No Longer an "Appropriate" Means of Enforcing the Fifteenth Amendment......................................20

        1.  Section 5 Was an Appropriate Remedy for Intentional Discrimination That Was So Extensive It Could Not Be Addressed Through Case-By-Case Enforcement of the Fifteenth Amendment. ........................................................20

        2.  The Legislative Record Fails To Demonstrate the Existence of Pervasive Voting Discrimination and Electoral Gamesmanship That Necessitated the Enactment of Section 5. ..........................................................................23

        3.  The Evidence Congress Relied On in 2006 Does Not Demonstrate Widespread Intentional Discrimination On the Basis of Race in Violation of the Fifteenth Amendment. ...................................................................30

    C. The Coverage Formula of Section 4(b) Is No Longer an "Appropriate" Method For Determining Which States and Political Subdivisions Are Subject to the Preclearance Obligation of Section 5.........................................................................35

VI.  Conclusion ..............................................................................................................43

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. State Board of Elections*,
393 U.S. 544 (1969)............................................................................................11

*America Council of the Blind v. Wash. Metropolitan Area Transit Authority*,
133 F. Supp. 2d 66 (D.D.C. 2001) ......................................................................20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................16

\* *Board of Trustees of University of Ala. v. Garrett*,
531 U.S. 356 (2001).................................................................................... *passim*

*Beer v. United States*,
425 U.S. 130 (1976)....................................................................4, 11, 22, 32

*Black Political Task Force v. Galvin*,
300 F. Supp. 2d 292 (D. Mass. 2004) .................................................................39

\* *City of Boerne v. Flores*,
521 U.S. 507 (1997)..................................................................................... *passim*

*City of Mobile, Ala. v. Bolden*,
446 U.S. 55 (1980)..................................................................................6, 20, 31

\* *City of Rome v. United States*,
446 U.S. 156 (1980).................................................................................... *passim*

*Clark v. Martinez*,
543 U.S. 371 (2005)............................................................................................20

*Comcast v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) ...........................................................................20

*Ellinos, Inc. v. Austintown Twp.*,
203 F. Supp. 2d 875 (N.D. Ohio 2002)...............................................................17

*In re Executive Office of the President*,
215 F.3d 20 (D.C. Cir. 2000)..............................................................................20

*Fla. Prepaid Postsecondary Education Expense Board v. College Savings Bank*,
527 U.S. 627 (1999)............................................................................................18

*Georgia v. Ashcroft,*
  539 U.S. 461 (2003).........................................................................32

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991).....................................................................3, 18

*Hayden v. Pataki,*
  449 F.3d 305 (2d Cir. 2006)...............................................................7

*James v. Bowman,*
  190 U.S. 127 (1903).........................................................................31

*Katzenbach v. Morgan,*
  384 U.S. 641 (1966).........................................................................23

*Kimel v. Fla. Board of Regents,*
  528 U.S. 62 (2000).....................................................................17, 18

*Lopez v. Monterey County,*
  525 U.S. 266 (1999).....................................................................8, 26

*Marylanders For Fair Representation v. Schaefer,*
  849 F. Supp. 1022 (D. Md. 1994).....................................................39

*Miller v. Johnson,*
  515 U.S. 900 (1995)...............................................................4, 22, 34

*Murphy v. Tenn. Valley Authority,*
  559 F. Supp. 58 (D.D.C. 1983).........................................................20

*Nev. Department of Human Resources v. Hibbs,*
  538 U.S. 721 (2003).........................................................................17

* *Nw. Austin Municipal Utility District No. One v. Holder,*
  129 S. Ct. 2504 (2009)............................................................. *passim*

*Nw. Austin Municipal Utility District No. One v. Mukasey,*
  573 F. Supp. 2d 221 (D.D.C. 2008), *vacated sub. nom. by* 129 S. Ct. 2504
  (2009).............................................................................................20

*Oregon v. Mitchell,*
  400 U.S. 112 (1970).....................................................................17, 18

*Presley v. Etowah County Commission,*
  502 U.S. 491 (1992).........................................................................23

*Reno v. Bossier Parish Sch. Board,*
    520 U.S. 471 (1997)................................................................................20, 34

*Rice v. Cayetano,*
    528 U.S. 495 (2000)..................................................................................9

*Romeu v. Cohen,*
    265 F.3d 118 (2d Cir. 2001).....................................................................19

* *South Carolina v. Katzenbach,*
    383 U.S. 301 (1966)......................................................................... *passim*

*Terry v. Adams,*
    345 U.S. 461 (1953).................................................................................31

*United States v. Board of Comm'rs of Sheffield,*
    435 U.S. 110 (1978).................................................................................22

*United States v. Louisiana,*
    363 U.S. 1 (1960)....................................................................................43

*United States v. Oakar,*
    111 F.3d 146 (D.C. Cir. 1997)..................................................................20

*Wyo. Outdoor Council v. Dombeck,*
    148 F. Supp. 2d 1 (D.D.C. 2001)..............................................................16

## STATUTES, RULES, AND REGULATIONS

42 U.S.C. § 1973aa .......................................................................................37

42 U.S.C. § 1973b..............................................................................1, 37, 41, 42

42 U.S.C. § 1973c ...........................................................................................1

42 U.S.C. § 1973h...........................................................................................21

42 U.S.C. § 1973i............................................................................................21

Pub. L. No. 89-110, 79 Stat. 437 (1965)............................................... *passim*

Pub. L. No. 91-285, 84 Stat. 314 (1970)........................................................13

Pub. L. No. 94-73, 89 Stat. 400 (1975)...............................................13, 21, 37

Pub. L. No. 97-205, 96 Stat. 131 (1982)........................................................14

Pub. L. No. 109-246, 120 Stat. 577 (2006)................................................................*passim*

Fed. R. Civ. P. 56(c) ....................................................................................................16

30 Fed. Reg. 9897 (Aug. 7, 1965)................................................................................10

31 Fed. Reg. 19 (Jan. 4, 1966) ....................................................................................10

31 Fed. Reg. 982 (Jan. 25, 1966) ................................................................................10

31 Fed. Reg. 3317 (Mar. 2, 1966) ..............................................................................10

31 Fed. Reg. 5080-81 (Mar. 29, 1966) .......................................................................10

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XV, § 1...........................................................................................3

U.S. Const. amend. XV, § 2.......................................................................................3, 17

## LEGISLATIVE MATERIALS

H.R. Rep. No. 91-397 (1969)...................................................................................12, 13

H.R. Rep. No. 94-196 (1975)...................................................................................*passim*

H.R. Rep. No. 109-478 (2006).................................................................................*passim*

S. Rep. No. 94-295 (1975) ......................................................................................27, 28

S. Rep. No. 109-295 (2006) .....................................................................................*passim*

Edward Blum, *Section 5 of the Voting Rights Act: The Importance of Pre-
    Clearance*, Testimony Before the House Committee on the Judiciary,
    Subcommittee on the Constitution (Oct. 25, 2005) ....................................................38

*Reauthorizing the Voting Rights Act's Temporary Provisions: Policy Perspectives
    and Views from the Field*:  Hearing Before Subcommittee on the Constitution,
    Civil Rights and Property Rights of the Committee on the Judiciary United
    States Senate, 109th Cong. (2006) ......................................................................24, 25

Richard L. Hasen, *An Introduction to the Expiring Provisions of the Voting
    Rights Act and Legal Issues Relating to Reauthorization*, Testimony Before
    the Senate Committee on the Judiciary (May 9, 2006)...............................................34

*Voting Rights Act: Evidence of Continued Need*: Hearing Before Subcommittee
on the Constitution of the House Committee on the Judiciary, 109th Cong.
(2006)..................................................................................................................40

## MISCELLANEOUS

Abigail Thernstrom, *Section 5 of the Voting Rights Act: By Now, a Murky Mess*, 5
Geo. J. on Poverty L. & Pol'y 41 (2007)...................................................35

Ala. S. Journ. (1965).............................................................................................29

Ala. S. Journ. (1975).............................................................................................29

E. Blum & L. Campbell, Assessment of Voting Rights Progress in Jurisdictions
Covered Under Section Five of the Voting Rights Act (American Enterprise
Institute, 2006).............................................................................................38

Ellen Katz, *Documenting Discrimination in Voting: Judicial Findings Under
Section 2 of The Voting Rights Act Since 1982*, 39 U. Mich. J.L. Reform 643
(2006).............................................................................................................39

L. McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia*
(2003)..............................................................................................................8

Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of
the Voting Rights Act After Tennessee v. Lane*, 66 Ohio St. L.J. 177 (2005).............25

Webster's New World College Dictionary (4th ed. 2005) ................................31

William A. Banner, *Aid for Selma Negroes*, N.Y. Times, Mar. 14, 1965 ........28

## I.      PRELIMINARY STATEMENT

Section 5 of the Voting Rights Act ("VRA") forbids certain States and political subdivisions from implementing "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964," unless the change has been "precleared" by the Department of Justice ("DOJ") or the United States District Court for the District of Columbia ("DDC").   42 U.S.C. § 1973c(a). Section 4(b) of the VRA makes Shelby County a covered jurisdiction subject to the "preclearance" obligation of Section 5 because the State of Alabama was using a prohibited voting test in 1965 and less than 50% of the persons of voting age residing in Alabama voted in the presidential election of November 1964.  *See id.* § 1973b(b).  As a result, Shelby County must seek preclearance of all proposed voting changes; indeed, in the last ten years, Shelby County has filed for preclearance numerous times, expending significant taxpayer dollars, time, and energy to meet its obligations under Section 5.

In 2006, Congress reauthorized Section 5 for another twenty-five years under Section 4(b)'s outdated coverage formula.  *See* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577 (2006) ("VRARAA").  Shelby County thus remains subject to Section 5 based on voting data more than four decades old.  In fact, had Congress updated Section 4(b)'s formula to base coverage on voting data from either the 2000 or 2004 presidential elections, Shelby County would no longer be a covered jurisdiction subject to Section 5's onerous preclearance obligations.  There can be no question that the VRA ushered in long-overdue changes in electoral opportunities for minorities throughout the Deep South.  Shelby County continues to support vigorous enforcement of the Fifteenth Amendment and the many provisions of the VRA that appropriately enforce the Amendment's ban on voting discrimination; however, Shelby County

believes that Section 5's preclearance obligation and Section 4(b)'s stale coverage formula are no longer constitutionally justifiable.

Indeed, the Supreme Court recently noted that Congress's reauthorization of the VRA's "preclearance requirements and its coverage formula raise serious constitutional questions." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2513 (2009) ("*Nw. Austin*").  The Supreme Court did not definitively answer these important constitutional questions because resolution of an antecedent statutory dispute ended that controversy.  But there is no such statutory dispute in this case.  Accordingly, whether reenactment of Section 5's preclearance obligation and Section 4(b)'s coverage formula were constitutional in light of the legislative record before Congress in 2006 must now be resolved.

As explained below, Section 5 and Section 4(b) exceed Congress's enforcement authority under the Fifteenth Amendment.  It was not constitutionally permissible for Congress to continue to impose disfavored treatment on covered jurisdictions when the 2006 legislative record clearly demonstrated that the unrelenting defiance of the Fifteenth Amendment that justified enactment of these temporary provisions no longer existed.  For Congress to continue to interfere with Shelby County's electoral autonomy in 2010 based on conditions that existed in 1965 is both arbitrary and without constitutional justification.  By 2006, reauthorization of Section 5 under Section 4(b)'s obsolete coverage formula could "only be premised on outdated assumptions about racial attitudes in the covered jurisdictions.  Admitting that a prophylactic law as broad as § 5 is no longer constitutionally justified based on current evidence of discrimination is not a sign of defeat.  It is an acknowledgment of victory." *Nw. Austin*, 129 S. Ct. at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part).

2

## II.     SUMMARY OF THE ARGUMENT

The Fifteenth Amendment guarantees that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," U.S. Const. amend. XV, § 1, and empowers Congress "to enforce this article by appropriate legislation," *id*. § 2.  Congress enacted the Voting Rights Act of 1965 "to banish the blight of racial discrimination in voting, which ha[d] infected the electoral process in parts of our country for nearly a century."  *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966).  Many provisions of the VRA—including Section 2, which created a private cause of action, and Section 4(a), which prevented covered jurisdictions from using certain voting tests and devices—appropriately enforced the Fifteenth Amendment by directly confronting discriminatory voting practices.

Unlike these provisions, Section 5 did not outlaw discriminatory voting practices or directly confront voting discrimination in some other way.  Instead, it limited traditional state and local control over elections by prophylactically restraining *all* voting changes in "parts of our country" that had engaged in an "unremitting and ingenious defiance of the Constitution" until federal officials were satisfied that the changes did not undermine minority voting rights.  *Id*.  Section 5 thus imposes "substantial federalism costs."  *Nw. Austin*, 129 S. Ct. at 2511 (internal quotation marks omitted).  "[T]he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections."  *Gregory v. Ashcroft*, 501 U.S. 452, 461-62 (1991) (citations and internal quotation marks omitted).  From the beginning, therefore, Section 5 was viewed as an unprecedented use of federal enforcement power that was constitutionally justified only because of the "exceptional conditions" and "unique circumstances" that existed in the covered jurisdictions in 1965.  *Katzenbach*, 383 U.S. at 334-35.  Before the enactment of Section 5, those jurisdictions were able to "stay[] one step

ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down."  *Beer v. United States*, 425 U.S. 130, 140 (1976).  But "[t]hings have changed in the South.  Voter turnout and registration rates now approach parity.  Blatantly discriminatory evasions of federal decrees are rare.  And minority candidates hold office at unprecedented levels."  *Nw. Austin*, 129 S. Ct. at 2511.  Continuing to impose Section 5's preclearance obligations under Section 4(b)'s same outdated coverage formula thus is not an "appropriate" means of enforcing the Fifteenth Amendment.

In light of its continuing interference with authority delegated to the States under the Tenth Amendment, there "must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end" for Section 5 to remain "appropriate" enforcement legislation under the Fifteenth Amendment.  *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).  Importantly, the "injury to be prevented or remedied" by Section 5 does *not* arise from individual acts of voting discrimination directed at racial and language minorities.  The Fifteenth Amendment is self-executing and other provisions of the VRA directly respond to that problem.  Section 5 was instead enacted to counter the continuing and coordinated campaign of discrimination engaged in by the covered jurisdictions in their effort to circumvent the remedial effects of direct enforcement of Fifteenth Amendment voting rights.  "Section 5 was directed at preventing *a particular set of invidious practices* that had the effect of undo[ing] or defeat[ing] the rights recently won by nonwhite voters."  *Miller v. Johnson*, 515 U.S. 900, 925 (1995) (internal quotation marks omitted) (emphasis added).  Given the federalism costs of preclearance, allowing the federal government to prophylactically restrain all voting changes necessarily requires current evidence of "unremitting and ingenious defiance" of the Fifteenth Amendment by covered jurisdictions.  *Katzenbach*, 383 U.S. at 309.

4

Whether the injury identified by Congress can justify the means chosen to address that injury must be determined by evaluating the evidence of current discrimination in the legislative record on which Congress acted. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 368 (2001). "Past success alone . . . is not adequate justification to retain the preclearance requirements . . . . [T]he [VRA] imposes current burdens and must be justified by current needs." *Nw. Austin*, 129 S. Ct. at 2511-12. But the 2006 congressional record contains no evidence of a systematic campaign of voting discrimination and gamesmanship by the covered jurisdictions— the only evidence that could continue to justify preclearance. In fact, Congress acknowledged that "[s]ignificant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress, State legislatures, and local elected offices." VRARAA, § 2(b)(1), 120 Stat. at 577. Statistical evidence in the legislative record verified this conclusion. By 2006, a 50% disparity in voter registration between whites and African-Americans had been virtually eliminated. *See* S. Rep. No. 109-295, at 11 (2006). Moreover, African-American voter turnout in the 2004 presidential election was actually higher than white turnout in three fully-covered states and was within 5% in two others. *See id.* Congress also found that "the number of African-American elected officials serving in the original six [covered] States . . . increased by approximately 1000 percent since 1965, increasing from 345 to 3700." H.R. Rep. No. 109-478, at 18 (2006). Because the legislative record before Congress in 2006 lacked the current evidence of coordinated discrimination needed to justify reauthorization of the preclearance obligation, Section 5 exceeds Congress's enforcement authority under the Fifteenth Amendment.

Even while conceding that Section 5 had largely fulfilled its constitutional mission, Congress attempted to justify reauthorization as responsive to so-called "second generation barriers constructed to prevent minority voters from fully participating in the electoral process." VRARAA, § 2(b)(2), 120 Stat. at 577.  But second-generation barriers bear no resemblance to the unrelenting campaign of discrimination needed to "justify legislative measures not otherwise appropriate."  *Katzenbach*, 383 U.S. at 334.  For example, Congress relied on evidence of racially polarized voting, *see* VRARAA, § 2(b)(3), 120 Stat. at 577, which is not evidence of discrimination (much less *intentional* discrimination) by covered jurisdictions, *see City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 64-65 (1980).  Congress also relied on federal preclearance statistics, *see* VRARAA, § 2(b)(4)-(5), 120 Stat. at 578, that only undermine the case for reauthorization given DOJ's infinitesimal objection rate to preclearance submissions in recent years, *see* S. Rep. No. 109-295, at 13.  And Congress based reauthorization on the existence of Section 2 litigation, *see* VRARAA, §2(b)(4)(C)-(D), 120 Stat. at 578, even though the legislative record identified only twelve published cases between 1982 and 2006 finding intentional, race-based voting discrimination by any covered jurisdiction, half of which involved discrimination against white voters, *see* S. Rep. No. 109-295, at 13.  This kind of evidence plainly is insufficient to justify a measure as constitutionally intrusive as Section 5.  Indeed, if preclearance can be reauthorized based on the existence of second-generation barriers, then Congress's ability to interfere with state and local control over elections is limitless.

Finally, even if a prophylactic remedy like preclearance remains "appropriate" for *some* jurisdictions, the retention of Section 4(b)'s obsolete coverage formula is constitutionally indefensible.  "[A] departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that

it targets." *Nw. Austin*, 129 S. Ct. at 2512.  Here, Section 4(b)'s coverage formula is keyed to decades-old data that has no demonstrated connection to present-day circumstances.  Moreover, this coverage formula has no reasonable correlation with the evidence of so-called "second generation barriers" relied upon by Congress to justify reauthorization of Section 5.  Rather, the legislative record shows that "second generation barriers" are equally present in both non-covered and covered jurisdictions.  The coverage formula of Section 4(b) thus is unconstitutional under the Tenth Amendment and Article IV of the Constitution.

### III.   THE EVOLUTION OF THE CONGRESSIONAL RATIONALE FOR IMPOSING PRECLEARANCE ON THE COVERED JURISDICTIONS

The constitutionality of both Section 5's preclearance obligation and Section 4(b)'s coverage formula hinge on Congress's record basis for reauthorization in 2006.  *See Katzenbach*, 383 U.S. at 308-09; *City of Rome v. United States*, 446 U.S. 156, 180-82 (1980); *see also City of Boerne*, 521 U.S. at 530 (concluding that the Religious Freedom Restoration Act's "legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry"); *Garrett*, 531 U.S. at 368 ("The legislative record of the ADA . . . simply fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled.").  "Only in cases where Congress can point to evidence in the legislative record that establishes a pattern of unconstitutional discrimination involving the particular practices proscribed by the remedial scheme at issue has the Supreme Court upheld legislation as within Congress's enforcement power under the Reconstruction Amendments." *Hayden v. Pataki*, 449 F.3d 305, 331 (2d Cir. 2006) (Walker, J., concurring).  As explained below, the record compiled by Congress in 1965 and 1975 is significantly different from the legislative record at issue here.

A.     <u>**The Voting Rights Act of 1965**</u>

Following the Fifteenth Amendment's ratification in 1870, certain states and localities initiated a campaign to systematically circumvent its substantive guarantee.  "By 1872, the legislative and executive branches of state government . . . were once again firmly in the control of white Democrats, who resorted to a variety of tactics, including fraud, intimidation, and violence, to take away the vote from blacks, despite ratification of the Fifteenth Amendment in 1870[.]"  L. McDonald, A Voting Rights Odyssey: Black Enfranchisement in Georgia 34 (2003).  In particular, "Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Virginia enacted tests . . . specifically designed to prevent [African-Americans] from voting." *Katzenbach*, 383 U.S. at 310.  "At the same time, alternate tests were prescribed . . . to assure that white illiterates were not deprived of the franchise.  These included grandfather clauses, property qualifications, 'good character' tests, and the requirement that registrants 'understand' or 'interpret' certain matter."  *Id.* at 311.   Worse still, these tests were discriminatorily administered; white voters were "given easy versions, . . . received extensive help from voting officials, and [were] registered despite serious errors in their answers," while African-Americans were "required to pass difficult versions . . . without any outside assistance and without the slightest error."  *Id.* at 312; *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999) ("[B]lacks were given more difficult questions, such as the number of bubbles in a soap bar, the news contained in a copy of the *Peking Daily*, the meaning of obscure passages in state constitutions, and the definition of terms such as *habeas corpus*." (internal quotation marks omitted)).

Congress responded by passing laws to "facilitat[e] case-by-case litigation" and the Supreme Court responded by striking down discriminatory voting tests and devices in case after case.  *Katzenbach*, 383 U.S. at 313.  Widespread voting discrimination nevertheless persisted, and the chances of defeating this campaign of discrimination case-by-case appeared dim.  Voting

8

suits could require "as many as 6,000 man-hours spent combing through registration records in preparation for trial" and, even after favorable judgments were secured, these jurisdictions would adopt new discriminatory devices and local officials would defy court orders or simply close their registration offices.  *Id.* at 314; *see also* House Committee Hearings at 5 (1965) (Statement of the Honorable Nicholas deB. Katzenbach, Attorney General of the United States) ("Three times since 1956, Congress has responded.  Three times, it has adopted the alternative of litigation, of seeking solutions in our judicial system.  But three times since 1956, we have seen that alternative tarnished by evasion, obstruction, delay, and disrespect."); *Rice v. Cayetano*, 528 U.S. 495, 513 (2000) ("Progress was slow, particularly when litigation had to proceed case by case, district by district, sometimes voter by voter.").  It was clear to Congress that "a 'case by case' approach was ineffective in protecting the rights of minority citizens and had become too time-consuming, costly, and cumbersome, in some cases taking more than several years to resolve." H.R. Rep. No. 109-478, at 6.

The VRA thus was enacted to defeat the coordinated effort to nullify the Fifteenth Amendment that had "infected the electoral process in parts of our country for nearly a century." *Katzenbach*, 383 U.S. at 308.  "After enduring nearly a century of systematic resistance to the Fifteenth Amendment," *id.* at 328, Congress fairly determined that "sterner and more elaborate measures were required," *id.* at 309.  Most of these new measures directly confronted the problem.  Section 2 outlawed nationwide any "voting qualification or prerequisite to voting, or standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color."  Pub. L. No. 89-110, § 2, 79 Stat. 437 (1965).  Section 4(a) banned "covered jurisdictions" from using voting "tests and devices," *id.* § 4(a), 79 Stat. at 438, that included "any requirement that a person as a prerequisite

for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." *Id.* § 4(c), 79 Stat. at 438-39.

Section 4(b) established the coverage formula: "[A]ny State or in any political subdivision of a state which . . . the Attorney General determine[d] maintained on November 1, 1964, any [prohibited] test or device, and with respect to which . . . the Director of the Census determine[d] that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964." *Id*. § 4(b), 79 Stat. at 438.  Under that formula, Alabama, Alaska, Georgia, Louisiana, Mississippi, South Carolina, Virginia, forty counties in North Carolina, and a few counties in Arizona, Hawaii, and Idaho became covered jurisdictions.[1] The VRA also included a so-called "bail out" provision that allowed a covered jurisdiction to terminate coverage subject to a "claw back" mechanism.  *Id.* § 4(a), 79 Stat. at 438.  A covered jurisdiction could bail out if a three-judge panel of the DDC "determined that no [prohibited] test or device ha[d] been used during the five years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color."  *Id.*  The bailout mechanism also provided, however, that "[t]he court shall retain jurisdiction of any action pursuant to th[e] subsection for five years after judgment and shall reopen the action upon

---

[1]     *See* Determination of the Attorney General Pursuant to Section 4(b)(1) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897 (Aug. 7, 1965); Determination of the Director of the Census Pursuant to Section 4(b)(2) of the Voting Rights Act of 1965 (Public Law 89-110), 30 Fed. Reg. 9897 (Aug. 7, 1965); Determination of the Director Regarding Voting Rights, 31 Fed. Reg. 19 (Jan. 4, 1966); Determination of the Director Regarding Voting Rights, 31 Fed. Reg. 982 (Jan. 25, 1966); Determination of the Director Regarding Voting Rights, 31 Fed. Reg. 3317 (Mar. 2, 1966); Determination of the Director Regarding Voting Rights, 31 Fed. Reg. 5080-81 (Mar. 29, 1966).

motion of the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color."  *Id.*

In contrast to these provisions, Section 5 did not directly proscribe individual acts of voting discrimination.  "Section 5 . . . was enacted for a different purpose: to prevent covered jurisdictions from circumventing the direct prohibitions imposed by provisions such as §§ 2 and 4(a)."  *Nw. Austin*, 129 S. Ct. at 2520 (Thomas, J., concurring in the judgment in part and dissenting in part) (citations omitted).  Section 5 accomplished this goal by requiring covered jurisdictions to "preclear" any new law or any change to an existing law involving "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964."  Pub. L. No. 89-110, § 5, 79 Stat. at 439.  Congress reasonably "feared that the mere suspension of existing tests [in Section 4(a)] would not completely solve the problem, given the history some States had of simply enacting new and slightly different requirements with the same discriminatory effect."  *Allen v. State Bd. of Elections*, 393 U.S. 544, 548 (1969); *see also Beer*, 425 U.S. at 140 ("[Section 5] was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down. That practice had been possible because each new law remained in effect until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory.").  Section 5 "shift[ed] the advantage of time and inertia from the perpetrators of the evil to its victims."  *Katzenbach*, 383 U.S. at 328.

In light of this "historical experience," the Supreme Court rejected South Carolina's immediate challenge to Section 5.  *Id.* at 308.  "Congress began work with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected

by the new remedies of the Act." *Id.* at 329.  Indeed, "by 1965, Congress had every reason to conclude that States with a history of disenfranchising voters based on race would continue to do all they could to evade the constitutional ban on voting discrimination."  *Nw. Austin*, 129 S. Ct. at 2522 (Thomas, J., concurring in the judgment in part and dissenting in part).  "[B]lack voter registration rates ran approximately 50 percentage points lower than white voter registration in several States . . . [and] registration rate for blacks in Alabama 'rose only from 14.2% to 19.4% between 1958 and 1964; in Louisiana it barely inched ahead from 31.7% to 31.8% between 1956 and 1965; and in Mississippi it increased only from 4.4% to 6.4% between 1954 and 1964.'"  *Id.* at 2523 (quoting *Katzenbach*, 383 U.S. at 313).  Moreover, as the Court explained, "voter turnout levels in covered jurisdictions had been at least 12% below the national average in the 1964 Presidential election."  *Id.*

Given this legislative evidence of discrimination, "the specific remedies prescribed in the Act were an appropriate means of combating the evil."  *Katzenbach*, 383 U.S. at 328.  The Court fully understood that preclearance represented an "uncommon exercise of congressional power." *Id.* at 334.  But "legislative measures not otherwise appropriate" were deemed constitutional under those "exceptional conditions" and "unique circumstances."  *Id.* at 334.  The Supreme Court upheld Section 4(b)'s coverage formula on that same understanding: Congress had gathered evidence that these were "the geographic areas where immediate action seemed necessary," and Section 4(b)'s coverage formula did not violate the "doctrine of the equality of States" because it was responsive to "local evils which have . . . appeared."  *Id.* at 328-29.

### B.        The 1970, 1975, and 1982 Reauthorizations of the Voting Rights Act

Congress "expected that within a 5-year period Negroes would have gained sufficient voting power in the States affected so that special federal protection would no longer be needed." H.R. Rep. No. 91-397 (1969), reprinted in 1970 U.S.C.C.A.N. 3277, 3281.  In 1970, however,

Congress reauthorized the temporary provisions of the VRA for another five years.   Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, 84 Stat. 314 (1970).   The 1970 reauthorization expanded Section 4(b)'s coverage formula to include any jurisdiction that had maintained a prohibited "test or device" on November 1, 1968, and had voter registration on that date or turnout in the 1968 presidential election of less than 50 percent.  *Id.* § 4, 84 Stat. at 315. Congress concluded that an additional five years of preclearance were needed "to safeguard the gains in negro voter registration thus far achieved, and to prevent future infringements of voting rights based on color or race."  H.R. Rep. No. 91-397, 1970 U.S.C.C.A.N. at 3281.   Congress also added Section 201 to the VRA to ban the use of any prohibited "test or device" in non-covered jurisdictions for a period of five years.  Pub. L. No. 91-285, § 6, 84 Stat. at 315.

In 1975, Congress reauthorized the VRA for another seven years.  Act of Aug. 6, 1975, Pub. L. No. 94-73, 89 Stat. 400 (1975).  The 1975 reauthorization again expanded Section 4(b)'s coverage formula to include any jurisdiction that had maintained a prohibited "test or device" on November 1, 1972, and had voter registration on that date or turnout in the 1972 presidential election of less than 50 percent.  *Id.* § 202, 89 Stat. at 401.  Congress also expanded Section 5's preclearance obligation by extending coverage to certain States and political subdivisions that had provided election materials only in English.  *Id.* § 203, 89 Stat. at 401-02.   In addition, Congress made permanent Section 201's nationwide prohibition on discriminatory "tests or devices."  *Id.* § 201, 89 Stat. at 400.  As a result, every State and political subdivision throughout the nation was permanently forbidden from using any prohibited "test or device" irrespective of the coverage of Section 4(b).

The Supreme Court upheld the 1975 reauthorization of Section 5 against a constitutional challenge.  *See City of Rome*, 446 U.S. 156.  Congress had found that "[s]ignificant disparity

persisted between the percentages of whites and Negroes registered in at least several of the covered jurisdictions" and that "though the number of Negro elected officials had increased since 1965, most held only relatively minor positions, none held statewide office, and their number in the state legislatures fell far short of being representative of the number of Negroes residing in the covered jurisdictions."  *Id.* at 180-81.   The Supreme Court thus sustained Congress's determination that, a mere ten years after the enactment of these provisions, the "7-year extension of the Act was necessary to preserve the 'limited and fragile' achievements of the Act and to promote further amelioration of voting discrimination."  *Id.* at 182.

In 1982, Congress reauthorized the VRA for another twenty-five years.  Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, 96 Stat. 131 (1982).  Congress did not amend Section 5's preclearance obligation or Section 4(b)'s coverage formula, but it did alter Section 4(a)'s bailout provision in several ways.   First, Congress permitted a "political subdivision" within a fully covered state to seek bailout.  *See id.* § 2(b)(2), 96 Stat. at 131.  Second, Congress made the bailout eligibility of the "State" or "political subdivision" contingent on specific categories of conduct—and on the related conduct of "governmental units" within its territory— over the previous ten years.   *See id.* § 2(b)(4)(D), 96 Stat. at 131-32.   Third, the 1982 reauthorization expanded the "claw back" period of the bailout provision from five years to ten years.  *See id.* § 2(b)(5), 96 Stat. at 133.  The 1982 reauthorization of Section 5 and Section 4(a) was not subjected to a facial challenge.  *See infra* at 27 n.6.

C.       **The 2006 Reauthorization of the Voting Rights Act**

In 2006, Congress reauthorized the VRA for another twenty-five years without reducing the burden imposed by preclearance or updating Section 4(b)'s coverage formula.  VRARAA, Pub. L. No. 109-246, 120 Stat. 577 (2006).   Congress found "that the number of African-Americans who are registered and who turn out to cast ballots ha[d] increased significantly over

the last 40 years, particularly since 1982.  In some circumstances, minorities register to vote and cast ballots at levels that surpass[ed] those of white voters."  H.R. Rep. No. 109-478, at 12.  Congress also found that "the disparities between African-American and white citizens who are registered to vote ha[d] narrowed considerably in six southern States covered by the temporary provisions (Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia) and in the 40 counties covered in the State of North Carolina."  *Id.*  Congress thus concluded that "[t]he record reveal[ed] that many of the first generation barriers to minority voter registration and turnout that were in place prior to the VRA ha[d] been eliminated."  *Id.*

Congress nevertheless extended preclearance for another twenty-five years based on its determination that "vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process."  VRARAA, §2(b)(2), 120 Stat. at 577.  In Congress's view, "[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965."  *Id.* § (2)(b)(3), 120 Stat. at 577.  The evidence of "second generation barriers" also included "the number of requests for declaratory judgments denied by the United States District Court for the District of Columbia" as well as "objections interposed by the Department of Justice in covered jurisdictions; the section 2 litigation filed to prevent dilutive techniques from adversely affecting minority voters; the enforcement actions filed to protect language minorities; and the tens of thousands of Federal observers dispatched to monitor polls in jurisdictions covered by the Voting Rights Act of 1965."  *Id.* § 2(b)(4), (8), 120 Stat. at 577-78.

The constitutionality of the 2006 reauthorization of Section 5 and Section 4(b) was immediately challenged in the *Northwest Austin* litigation.   Although that litigation was ultimately resolved on statutory grounds, the Supreme Court nevertheless concluded that the VRA's "preclearance requirements and its coverage formula raise serious constitutional questions" in light of the dramatic changes in the covered jurisdictions since 1965.  *Nw. Austin*, 129 S. Ct. at 2513.  The Court made clear that "the [VRA] imposes current burdens and must be justified by current needs" and that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets."  *Id.* at 2512.  As the Court explained, "[t]he evil that § 5 is meant to address may no longer be concentrated in the jurisdictions singled out for preclearance. The statute's coverage formula is based on data that is now more than 35 years old, and there is considerable evidence that it fails to account for current political conditions.  For example, the racial gap in voter registration and turnout is lower in the States originally covered by § 5 than it is nationwide."  *Id.*

## IV.   SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Only those facts "that might affect the outcome of the suit under the governing law" are material.  *Id.* at 248.  Where, as here, "the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."  *Wyo. Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 7

(D.D.C. 2001); *Ellinos, Inc. v. Austintown Twp.*, 203 F. Supp. 2d 875, 878 (N.D. Ohio 2002)

("Summary judgment is particularly appropriate in a case challenging the facial constitutionality

of a statute.").[2]

## V.   ARGUMENT

### A.   Congress May "Enforce" the Fifteenth Amendment Only "By Appropriate Legislation."

The Fifteenth Amendment grants Congress the authority to "enforce" its substantive

guarantee by "appropriate legislation." U.S. Const. amend. XV, § 2.   Whether enforcement

legislation is "appropriate" is subject to judicial review.   *See City of Boerne*, 521 U.S. at 517.

"As broad as the congressional enforcement power is, it is not unlimited." *Oregon v. Mitchell*,

400 U.S. 112, 128 (1970) (Black, J.).   Congress's enforcement authority is "remedial"—not

substantive.  *Katzenbach*, 383 U.S. at 326; *see also City of Boerne*, 521 U.S. at 519.   "Congress

does not enforce a constitutional right by changing what the right is." *Id.*   As a consequence,

"the same language that serves as the basis for the affirmative grant of congressional power also

serves to limit that power." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000).   Although

"Congress may enact so-called prophylactic legislation that proscribes facially constitutional

conduct, in order to prevent and deter unconstitutional conduct," *Nev. Dep't of Human Res. v.

Hibbs*, 538 U.S. 721, 727-28 (2003), there remains a crucial difference between "purportedly

---

[2]      Few facts are material to this facial challenge.  Shelby County is a covered jurisdiction under Section 4(b) and thus subject to preclearance under Section 5.  Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment ("SMF") ¶¶ 1-2; Declaration of Frank C. Ellis, Jr. ("Ellis Declaration") ¶ 5.  Shelby County has sought preclearance many times in the past ten years and will have to do so many times in the near future.  *Id.* ¶¶ 6-8; Ellis Declaration ¶¶ 6-8.  Shelby County is ineligible to terminate coverage under the bailout mechanism of Section 4(a).  SMF ¶¶ 9-10; Ellis Declaration ¶¶ 9-10. Neither Alabama nor Shelby County would be covered jurisdictions if Section 4(b)'s coverage formula was based on registration and turnout data from either the 2000 or 2004 presidential elections. SMF ¶¶ 3-5; Ellis Declaration ¶ 11.

prophylactic legislation" and "substantive redefinition of the . . . right at issue," *Kimel*, 528 U.S. at 81.  That distinction "must be observed."  *City of Boerne*, 521 U.S. at 520.

Because prophylactic enforcement legislation runs the risk of trenching on the basic governmental functions delegated to the States by the Tenth Amendment, Congress must specifically "identify conduct transgressing the . . . substantive provisions" of the relevant amendment and "tailor its legislative scheme to remedying or preventing such conduct."  *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Savs. Bank*, 527 U.S. 627, 639 (1999). Congress must develop a "legislative record" that demonstrates a history and "pattern" of unconstitutional conduct by the States, *Garrett*, 531 U.S. at 368, and the prophylactic legislation must not be "so out of proportion to a supposed remedial or preventative object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior," *City of Boerne*, 521 U.S. at 532.  Indeed, the need for Congress to document the constitutional warrant for prophylactic enforcement legislation under the Reconstruction Amendments is particularly acute with respect to local election laws: "No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices."  *Mitchell*, 400 U.S. at 125 (Black, J.); *see also Gregory*, 501 U.S. at 461-62.

In light of the foregoing, the Supreme Court has established an orderly three-step process for evaluating whether Congress has appropriately exercised the enforcement authority granted to it by the Reconstruction Amendments.  First, a court must "identify with some precision the scope of the constitutional right at issue."  *Garrett*, 531 U.S. at 365.  Second, the court must "examine whether Congress identified a history and pattern of unconstitutional" government

action.  *Id.* at 368.   Third, the court must determine whether "[t]here [is] a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  *City of Boerne*, 521 U.S. at 520.  "Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one."  *Id.* at 530.

Although the Supreme Court set out this three-step process in the context of the Fourteenth Amendment, it applies just the same in Fifteenth Amendment cases.   The enforcement clauses of the Fourteenth and Fifteenth Amendments are co-extensive.  *See id.* at 518 (enforcement clauses are "parallel"); *Garrett*, 531 U.S. at 373 (enforcement clauses are "virtually identical"); *see also Romeu v. Cohen*, 265 F.3d 118, 133 n.3 (2d Cir. 2001) (Walker, J., concurring) ("[T]he fact that both § 5 [of the Fourteenth Amendment] and § 2 [of the Fifteenth Amendment] by their terms provide Congress with only the 'power to enforce' the substantive provisions of the Amendments strongly suggests that the limitations on Congress's authority under § 2 are similar to those under § 5.").  Indeed, the Supreme Court has identified the Voting Rights Act of 1965 (as originally enacted) as a paradigmatic example of congruent and proportional enforcement legislation.  *See City of Boerne*, 521 U.S. at 518; *Garrett*, 531 U.S. at 373.  The Supreme Court's deliberate reliance on *Katzenbach* in the *City of Boerne* and *Garrett* decisions would have been misplaced if the Fourteenth and Fifteenth Amendments were subject to different standards of judicial review.

Although *City of Boerne*'s "congruence and proportionality" framework clearly applies to Fifteenth Amendment enforcement legislation, the VRA's preclearance obligation and coverage formula are no longer "appropriate" enforcement legislation even under a rationality standard. Section 5 cannot be sustained as appropriately enforcing the Fifteenth Amendment unless Congress has identified a record of ongoing discrimination significant enough to justify the

severe intrusion of preclearance.  Section 5 "imposes current burdens and must be justified by current needs."  *Nw. Austin*, 129 S. Ct. at 2511-12.  Furthermore, Section 4(b)'s "departure from the fundamental principle of equal sovereignty" cannot be sustained unless the "disparate geographic coverage is sufficiently related to the problem that it targets."  *Id.*[3]  Section 5 and Section 4(b) simply are no longer "appropriate" enforcement legislation.[4]

### B.   The Preclearance Obligation Imposed By Section 5 Is No Longer an "Appropriate" Means of Enforcing the Fifteenth Amendment.

1.   Section 5 Was an Appropriate Remedy for Intentional Discrimination That Was So Extensive It Could Not Be Addressed Through Case-By-Case Enforcement of the Fifteenth Amendment.

Section 1 of the Fifteenth Amendment outlaws "purposefully discriminatory denial or abridgement by government of the freedom to vote."  *Bolden*, 446 U.S. at 65 (plurality opinion); *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 482 (1997) (explaining that the Fifteenth

---

[3]    These "'carefully considered'" statements in the *Northwest Austin* decision "'must be treated as authoritative.'"  *Comcast v. FCC*, 600 F.3d 642, 650 (D.C. Cir. 2010) (quoting *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997)).  Indeed, the Supreme Court's careful discussion of the legislative evidence needed to uphold Section 5 and Section 4(b) as "appropriate" enforcement legislation is particularly authoritative given its reliance on constitutional avoidance to resolve the statutory bailout claim.  *See Nw. Austin*, 129 S. Ct. at 2513; *see also id.* at 2517 (Thomas, J., concurring in the judgment in part and dissenting in part) ("The doctrine of constitutional avoidance factors heavily in the Court's conclusion that appellant is eligible for bailout as a 'political subdivision' under § 4(a) of the VRA.").  The Supreme Court's invocation of the avoidance canon as a justification for its broad construction of "political subdivision" was *a fortiori* preceded by a determination that the "preclearance requirements and its coverage formula raise serious constitutional questions."  *Id.* at 2513.  Once the doctrine of constitutional avoidance is invoked, the Supreme Court's construction of the statute under review governs all future cases.  *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).  As a result, the Supreme Court's authoritative determination that Section 5 and Section 4(b) raise serious constitutional questions, as well as the legal reasoning that served as the foundation for that conclusion, is binding here.

[4]    Although the three-judge district court in *Northwest Austin* reached a different conclusion, *see Nw. Austin Mun. Util. Dist. No. One v. Mukasey*, 573 F. Supp. 2d 221 (D.D.C. 2008), *vacated sub. nom. by* 129 S. Ct. 2504 (2009), that decision lacks controlling force because "one district court decision is not binding on another district court."  *Am. Council of the Blind v. Wash. Metro. Area Transit Auth.*, 133 F. Supp. 2d 66, 74 n.2 (D.D.C. 2001)); *see also In re Executive Office of the President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district.") (citations and internal quotation marks omitted).  In any event, a vacated judicial decision is not binding precedent.  *See Murphy v. Tenn. Valley Auth.*, 559 F. Supp. 58, 59 (D.D.C. 1983).

Amendment "requires a showing of intent").   The ban on voting discrimination is "self-executing" and not dependent on "further legislative specification." *Katzenbach*, 383 U.S. at 325.   Congress thus is empowered under Section 2 of the Fifteenth Amendment only to "remed[y]" violations of the ban on voting discrimination.   *Id.* at 326.   Many of the VRA's provisions appropriately "remedy" Fifteenth Amendment violations.   Section 2 of the VRA creates a private right of action for enforcement of the Fifteenth Amendment, and Section 4(a) suspended the use of discriminatory tests and devices in the covered jurisdictions.   Section 201 of the VRA likewise enforces the Fifteenth Amendment by making Section 4(a)'s suspension of discriminatory tests and devices permanent and by extending that ban to non-covered jurisdictions.   Pub. L. No. 94-73, § 102, 89 Stat. 400.   Other provisions of the VRA also directly enforce the Fifteenth Amendment.   *See* 42 U.S.C. § 1973h (outlawing poll taxes); *id.* § 1973i(a) ("No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote . . . or willfully fail or refuse to tabulate, count, and report such person's vote"); *Nw. Austin*, 129 S. Ct. at 2509 (noting that the VRA "empowered federal examiners to override state determinations about who was eligible to vote").

Unlike these provisions, Section 5 does not directly proscribe discriminatory voting practices.   Section 5 is a prophylaxis that "goes beyond the prohibition of the Fifteenth Amendment by suspending *all* changes to state election law—however innocuous—until they have been precleared by federal authorities in Washington, D.C." *Nw. Austin*, 129 S. Ct. at 2511.   Preclearance was an emergency solution to the drastic problem of certain state and localities systematically "'contriving new rules' to continue violating the Fifteenth Amendment 'in the face of adverse federal court decrees.'" *Id.* at 2509 (quoting *Katzenbach*, 383 U.S. at 335).   The evil that Section 5 targeted was *not* individual acts of voting discrimination; the Fifteenth

Amendment already outlawed that evil and other provisions of the VRA directly respond to that problem.  "Section 5 was directed at preventing a *particular set of invidious practices* that had the effect of undo[ing] or defeat[ing] the rights recently won by nonwhite voters."  *Miller*, 515 U.S. at 925 (internal quotation marks omitted) (emphasis added).  That "particular set of invidious practices" was the subtle and continuous alteration of discriminatory voting laws to circumvent the force and effect of hard-won victories in Fifteenth Amendment litigation.  *See Beer*, 425 U.S. at 140 (explaining that Section 5 responded to the "common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down").  Only a prior restraint on all voting changes while each proposed change was reviewed by DOJ or DDC could successfully combat this "insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution."  *Katzenbach*, 383 U.S. at 309.

Section 5 was "appropriate" enforcement legislation *only* because of the dire and intractable circumstances that confronted Congress in 1965.  Indeed, Section 5 has been described as "one of the most extraordinary remedial provisions in an Act noted for its broad remedies.  Even the Department of Justice has described it as a 'substantial departure . . . from ordinary concepts of our federal system'; its encroachment on state sovereignty is significant and undeniable."  *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 141 (1978) (Stevens, J., dissenting) (footnote omitted).  The "substantial federalism costs" of preclearance, *Nw. Austin*, 129 S. Ct. at 2524 (internal quotation marks omitted), thus are far too great to allow this onerous remedy absent legislative evidence of the "unremitting and ingenious defiance" of the Fifteenth Amendment that led Congress to enact Section 5 in the first place, *Katzenbach*, 383 U.S. at 309.  Such "an extraordinary departure from the traditional course of relations between

the States and the Federal Government" could only be constitutionally justified as a last resort. *Presley v. Etowah County Comm'n*, 502 U.S. 491, 500-01 (1992).

In fact, the *Katzenbach* Court was exceedingly clear that it considered Section 5 an "uncommon exercise of congressional power" that was "appropriate" enforcement legislation only because of the "exceptional conditions" and "unique circumstances" present at that time. 383 U.S. at 334-35.  "[T]o accommodate the tension between the constitutional imperatives of the Fifteenth and Tenth Amendments—a balance between allowing the Federal Government to patrol state voting practices for discrimination and preserving the States' significant interest in self-determination—the constitutionality of § 5 has always depended on the proven existence of intentional discrimination so extensive that elimination of it through case-by-case enforcement would be impossible."  *Nw. Austin*, 129 S. Ct. at 2524 (Thomas, J., concurring in the judgment in part and dissenting in part).  The Supreme Court understood that only such extreme conditions in the covered jurisdictions could "justify legislative measures not otherwise *appropriate*." *Katzenbach*, 383 U.S. at 334 (emphasis added).

> 2.  The Legislative Record Fails To Demonstrate the Existence of Pervasive Voting Discrimination and Electoral Gamesmanship That Necessitated the Enactment of Section 5.

Whether "remedial measures" adopted by Congress are appropriately responsive to the "evil presented" must be judged by the evidence in the legislative record.  *City of Boerne*, 521 U.S. at 530.  In *Katzenbach*, the Supreme Court closely examined the "voluminous" record Congress had assembled.  383 U.S. at 309; *see also id.* at 308 ("Before enacting the measure, Congress explored with great care the problem of racial discrimination in voting"); *Katzenbach v. Morgan*, 384 U.S. 641, 667 (1966) (Harlan, J., dissenting) ("Congress made a detailed investigation of various state practices that had been used to deprive Negroes of the franchise"). The *City of Boerne* decision also closely examined the factual record on which Congress relied

to support the enactment of the Religious Freedom Restoration Act ("RFRA") under the enforcement clause of the Fourteenth Amendment.  Of particular importance, the *City of Boerne* Court inquired as to whether the congressional record reflected any "modern instances" of unconstitutional conduct and contrasted the lack of factual evidence supporting RFRA with the wealth of contemporaneous evidence compiled by Congress in 1965 to support the need for the Voting Rights Act.  521 U.S. at 530-32.  The constitutionality of Section 5 likewise depends on a congressional record demonstrating that it remains necessary to prevent and deter a "modern" campaign of voting discrimination by covered jurisdictions.  "Past success alone . . . is not adequate justification to retain the preclearance requirements."  *Nw. Austin*, 129 S. Ct. at 2511. Section 5 "imposes current burdens and must be justified by current needs."  *Id*. at 2512.

Congress did not amass a legislative record demonstrating the existence of the ongoing, pervasive, and systematic campaign of voting discrimination needed to reauthorize the preclearance obligation of Section 5.  To the contrary, Congress acknowledged that "[s]ignificant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress, State legislatures, and local elected offices," and emphasized that such progress was "the direct result of the Voting Rights Act of 1965."  VRARAA, § 2(b)(1), 120 Stat. at 577; *see also* H.R. Rep. No. 109-478, at 12 (concluding that "many of the first generation barriers to minority voter registration and voter turnout that were in place prior to the VRA have been eliminated").  Several witnesses testified to Congress that it "would be hard-pressed to discover the same kinds of discriminatory voting practices that our predecessor[s] . . . encountered—the kinds of discriminatory practices documented in th[e] 1961 report and others like it."  *Reauthorizing the Voting Rights Act's Temporary Provisions: Policy Perspectives and*

*Views from the Field*:   Hearing Before Subcommittee on the Constitution, Civil Rights and Property Rights of the Committee on the Judiciary United States Senate, 109th Cong. 255-256 (2006) (Testimony of Gerald A. Reynolds); *see also* Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act After* Tennessee v. Lane, 66 Ohio St. L.J. 177, 189 (2005) (explaining that "these violations occurred at least decades ago").[5] These "first generation barriers" were the dominant evidence that Congress used to justify Section 5 in 1965, and such barriers are the main evidence needed to justify the retention of a federal regime as intrusive as preclearance today.  Yet as the record reflects, Congress concluded that "first generation barriers" could no longer provide a constitutional justification for imposing preclearance on the covered jurisdictions.

Statistical evidence verifies the seismic changes that have taken place in the covered jurisdictions in the last 45 years.  In 1964, the voter registration rate for African-Americans was 19.4% in Alabama, 31.8% in Louisiana, and 6.4% in Mississippi.  *See Katzenbach*, 383 U.S. at 313.  By 2004, those rates for Alabama, Louisiana, and Mississippi had jumped to 72.9%, 71.1%, and 76.1%, respectively.  *See* S. Rep. No. 109-295, at 11.  And while the "registration of voting-age whites ran roughly 50 percentage points or more ahead of Negro registration" in Alabama, Louisiana, and Mississippi in 1964, *Katzenbach*, 383 U.S. at 313, that gap was essentially eradicated by 2004.  The disparity had dropped to 0.9% in Alabama and 4% in

---

[5]     The legislative record includes scattered allegations of intentional discrimination throughout the covered jurisdictions since 1982.  *See, e.g.*, S. Rep. No. 109-295, at 14.  But this does not suffice.  S*ee Garrett*, 531 U.S. at 369-70 (concluding that "half a dozen examples from the record" of governmental discrimination fell "far short of even suggesting the pattern of unconstitutional discrimination on which § 5 [of the Fourteenth Amendment] legislation must be based").  "[T]he existence of discrete and isolated incidents of interference with the right to vote has never been sufficient justification for the imposition of § 5's extraordinary requirements . . . . Perfect compliance with the Fifteenth Amendment's substantive command is not now—nor has it ever been—the yardstick for determining whether Congress has the power to employ broad prophylactic legislation to enforce that Amendment."  *Nw. Austin*, 129 S. Ct. at 2526-27 (Thomas, J., concurring in the judgment in part and dissenting in part).

Louisiana; and in Mississippi, African-American voter registration actually exceeded white registration by 3.8%.  *See* S. Rep. No. 109-295, at 11.  Turnout statistics from the fully-covered jurisdiction tell a similar story.  In three fully-covered jurisdictions (Alabama, Georgia, and Mississippi), African-American voter turnout in 2004 was higher than white voter turnout and it was within 5% of white voter turnout in two others (Louisiana and South Carolina).  *See id.* Moreover, African-Americans have won a substantial number of local and statewide elections in the fully-covered States.  "[T]he number of African-American elected officials serving in the original six States . . . increased by approximately 1000 percent since 1965, increasing from 345 to 3700."  H.R. Rep. No. 109-478, at 18.  In Alabama, for example, the number of African-American elected officials jumped from 0% to 25%.  *See* S. Rep. No. 109-295, at 12.

There also have been dramatic changes in the covered jurisdictions since Congress's seven-year reauthorization of 1975—*i.e.*, the last time the Supreme Court upheld Section 5 against a facial constitutional challenge.  *See City of Rome*, 446 U.S. at 180-82.[6]  In upholding that legislation, the Supreme Court acknowledged the improvement in African-American voter registration since 1965 but emphasized that "[s]ignificant disparity persisted between the percentages of whites and Negroes registered in at least several of the covered jurisdictions."  *Id.* at 180.  Such significant disparity no longer exists.  In Alabama, for example, the registration disparity dropped from 19.3% in 1975 to .9% in 2006.  *See* S. Rep. No. 109-295, at 11.  There

---

[6]     The 1982 reauthorization of Section 5 was not subjected to a facial constitutional challenge. Rather, in the only case challenging the constitutionality of that legislation to reach the Supreme Court, the Court principally held that a non-covered State (California) must preclear voting-law changes that impact the covered political subdivisions in California.  *See Lopez v. Monterey County*, 525 U.S. 266 (1999).   California argued, in turn, that "§ 5 could not withstand constitutional scrutiny if it were interpreted to apply to voting measures enacted by States that have not been designated as historical wrongdoers in the voting rights sphere."  *Id.* at 282.  The Supreme Court rejected that argument.  *See id.* at 282-87.  But California did not raise—and the Supreme Court did not decide—the legal questions concerning the facial constitutionality of Section 5 at issue in *Katzenbach*, *City of Rome*, *Northwest Austin*, and the present case.

have been similar improvements in other fully-covered States.   Between 1975 and 2006, Louisiana's registration gap fell from 20.9% to 4.0%.   *See* H.R. Rep. No. 94-196, at 6 (1975); S. Rep. No. 94-295, at 14 (1975); S. Rep. No. 109-295, at 11 (2006).   In other states, the elimination of the registration gap was so dramatic that African-American registration actually outpaced white registration in 2006.   In 1975, African-American registration in Mississippi lagged behind white registration by 9.4%;  but, by 2006, it exceeded white registration by 3.8%. *See id.*   Similarly, African-American registration was 15.9% behind white registration in North Carolina in 1975 but surpassed white registration by 1.0% in 2006.  *See id.*

The Supreme Court also noted that while the number of African-American "officials had increased since 1965, most held only relatively minor positions, none held statewide office, and their number in the state legislatures fell far short of being representative of the number of Negroes residing in the covered jurisdictions."  *City of Rome*, 446 U.S. at 180-81.   By 2006, however, African-Americans composed approximately 25% of Alabama's legislature, which is roughly equal to the percentage of Alabamians who are African-American. *See* S. Rep. No. 109, 295, at 12.   Other fully-covered States have undergone a similar metamorphosis.   Overall, the number of African American elected officials in these jurisdictions jumped from 963 to 3700— an increase of about 372%—between 1975 and 2006. *See* S. Rep. No. 94-295, at 14; H.R. Rep. No. 109-478, at 18.   These elected African-American officials also were no longer relegated to "relatively minor positions."  *City of Rome*, 446 U.S. at 180.   Louisiana, for example, has elected not only the nation's first Indian-American governor, but also, as of 2001, 705 African-Americans, including "one Member of the United States House of Representatives; nine State Senators; and 22 State Representatives.   In addition, 131 African-Americans had been elected to positions on county bodies; 33 African-Americans had been elected mayor; 219 African-

Americans had been elected to municipal governing bodies; and one African-American had been elected to Justice of the State Supreme Court."  H.R. Rep. No. 109-478, at 18.  "Statistics from South Carolina reveal similar results: one Member of the United States House of Representatives has been elected, eight African-Americans have been elected to the State Senate; 23 African-Americans have been elected to the State Legislature; 99 African-Americans have been elected to county councils; and 164 have been elected to positions on local school boards."  *Id.*

Finally, the Supreme Court pointed to the "number and nature of [Section 5] objections interposed by the Attorney General" between 1965 and 1975.  *City of Rome*, 446 U.S. at 181.  Yet notwithstanding a massive increase in Alabama's preclearance submissions, DOJ objected to fewer submissions between 1982 and 2005 (45) than it did between 1965 and 1982 (59).  *See* H. Rep. No. 109-478, at 73.  Indeed, the percentage of Section 5 objections fell in Alabama from 6.64% in 1975 to .06% in 2006.  *See* S. Rep. No. 94-295, at 16.  The overall objection rate has similarly declined.  Between 1971 and 1974, DOJ's objection rate ranged from 3% to 4%.  *See* H. Rep. No. 94-196, at 8-9.  Between 1982 and 2005, the objection rate dropped to .071%.  *See* H.R. Rep. No. 109-478, at 22.  Strikingly, in 2005—the calendar year immediately preceding Congress's reauthorization of Section 5—DOJ objected to only one of 3,811 preclearance submissions.  *See id.*  For all these reasons, the evidence before the Supreme Court in *City of Rome* was materially different from the evidence presented to Congress in 2006.

Ultimately, however, the decision in *City of Rome* did not turn on this secondary evidence of discrimination.  Rather, the Supreme Court upheld Section 5 because it simply did not trust the changes suggested by the statistical evidence barely a decade removed from Bloody Sunday.  *See* William A. Banner, *Aid for Selma Negroes*, N.Y. Times, Mar. 14, 1965, at E11 ("We should remember March 7, 1965 as 'Bloody Sunday in Selma.'  It is now clear that the public officials

and the police of Alabama are at war with those citizens who are Negroes and who are determined to exercise their rights under the Constitution of the United States."). "Ten years later, Congress found that a 7-year extension of the Act was necessary to preserve the 'limited and fragile' achievements of the Act and to promote further amelioration of voting discrimination. When viewed in this light, Congress' considered determination that at least another 7 years of statutory remedies were necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable." *City of Rome*, 446 U.S. at 182. Given that recent history, Congress and the Supreme Court had good cause not to trust these electoral statistics as evidencing a dramatic change in the covered jurisdictions. In Alabama, for example, Governor George Wallace and 10 state legislators remained in the same positions of power that they held in 1965. *Compare* Ala. S. Journ. 2136-2142 (1965) *with* Ala. S. Journ. 3753-3765 (1975).

But constitutional justification can no longer be found in this high level of distrust. By any measure, the improvements in the covered jurisdictions are no longer limited and fragile. The legislative record includes no evidence that withdrawing the preclearance obligation of Section 5 from the covered jurisdictions would cause them to again seek to engage in a coordinated effort to deprive minorities of the right to vote. Reauthorization of Section 5 without such evidence amounts to a legislative conclusion that the citizens and elected officials of the covered jurisdictions have an incurable racial animus; that, more than 45 years after the enactment of the VRA, the covered jurisdictions harbor a potential to discriminate that does not exist elsewhere in the United States. But the discriminatory agenda of the covered jurisdictions that existed in 1965 has not been in hibernation—the legislative record reflects that it no longer exists. Congress is not entitled to blindly assume that racial attitudes from 45 years ago persist

today.   Congress is required to produce a legislative record of a continuing pattern of discrimination pervasive enough to justify preclearance.   It did not.

In sum, Congress lacked the evidence necessary to extend the preclearance obligation of Section 5.   "Covered jurisdictions are not now engaged in a systematic campaign to deny black citizens access to the ballot through intimidation and violence.   And the days of grandfather clauses, property qualifications, 'good character' tests, and the requirement that registrants 'understand' or 'interpret' certain matter,' are gone.   There is thus currently no concerted effort in these jurisdictions to engage in the 'unremitting and ingenious defiance of the Constitution,' that served as the constitutional basis for upholding the 'uncommon exercise of congressional power' embodied in Section 5."   *Nw. Austin*, 129 S. Ct. at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part) (quoting *Katzenbach*, 383 U.S. at 309, 311, 334) (citations omitted).   The "exceptional conditions" that warranted a legislative remedy "not otherwise appropriate" are no longer present.   *Katzenbach*, 383 U.S. at 334.   As a result, Congress's reauthorization of Section 5 exceeded its enforcement power under Section 2 of the Fifteenth Amendment.

    3.    <u>The Evidence Congress Relied On in 2006 Does Not Demonstrate Widespread Intentional Discrimination On the Basis of Race in Violation of the Fifteenth Amendment.</u>

Because the legislative record was devoid of the "widespread and persisting deprivation of constitutional rights," *City of Boerne*, 521 U.S. at 526, needed to constitutionally justify the reauthorization of Section 5, Congress instead rested its reauthorization of the preclearance obligation on the existence of so-called "second generation barriers constructed to prevent minority voters from fully participating in the electoral process," VRARAA, § 2(b)(2), 120 Stat. at 577.   But none of these alleged second-generation barriers approximates the "systematic resistance to the Fifteenth Amendment" that justified the enactment of Section 5 in 1965.

*Katzenbach*, 383 U.S. at 328.   Congress itself acknowledged that this evidence of "second generation barriers" reveals merely "vestiges of discrimination in voting," VRARAA, § 2(b)(2), 120 Stat. at 577, *i.e.*, no more than "trace[s]" of what "once existed but has passed away or disappeared," Webster's New World College Dictionary 1590 (4th ed. 2005) (defining "vestige").   Second-generation barriers cannot be either legally or factually equated to the relentless campaign of disenfranchisement that Congress confronted in 1965.

*First*, Congress claimed that evidence of racially polarized voting in covered jurisdictions, *see* VRARAA, § 2(b)(3), 120 Stat. at 577, was "the clearest and strongest evidence" of the need to reauthorize Section 5, H.R. Rep. No. 109-478, at 34.   Congress acknowledged, however, that racially polarized voting is only evidence that "voting blocs within the minority and white communities cast ballots along racial lines."   *Id*.   The existence of racially polarized voting is not even remotely indicative of a latent desire on the part of the covered jurisdictions to circumvent the Fifteenth Amendment in the absence of preclearance.   Indeed, because the Fifteenth Amendment "relates solely to action 'by the United States or by any state,' and does not contemplate wrongful individual acts," *James v. Bowman*, 190 U.S. 127, 135 (1903), racially polarized voting is not even governmental discrimination—the only type of discrimination Congress is empowered to remedy under the Fifteenth Amendment, *see Terry v. Adams*, 345 U.S. 461, 473 (1953) (Frankfurter, J.) ("The vital requirement is State responsibility—that somewhere, somehow, to some extent, there be an infusion of conduct by officials, panoplied with State power, into any scheme by which colored citizens are denied voting rights merely because they are colored.").   The Fifteenth Amendment also "prohibits only purposefully discriminatory denial or abridgment by government of the freedom to vote 'on account of race, color, or previous condition of servitude.'"   *Bolden*, 446 U.S. at 65.   Racially

polarized voting thus is not evidence of purposeful discrimination—state-sponsored or otherwise.  *See Bolden*, 446 U.S. at 64.  At base, evidence of racially polarized voting cannot be equated with the evidence of an intentional governmental campaign to disenfranchise minority voters chronicled by Congress in 1965.

*Second*, Congress relied on preclearance statistics as evidence of the need to reauthorize Section 5.  VRARAA, § 2(b)(4), 120 Stat. at 577.  This second-generation evidence included the number of Section 5 objections interposed by DOJ, requests for more information by DOJ with regard to preclearance submissions, Section 5 enforcement actions, and the requests for declaratory judgment denied by DDC.  *See id*.  But none of this evidence comes close to proving the existence of pervasive, intentional discrimination.  As a threshold matter, before the 2006 reauthorization, whether a voting change was entitled to preclearance under Section 5 turned on retrogression—not whether the change was motivated by discrimination.  *See Georgia v. Ashcroft*, 539 U.S. 461, 480 (2003) ("The standard in § 5 is simple—whether the new plan 'would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" (quoting *Beer*, 425 U.S. at 141)).  Indeed, many—if not most—of the preclearance objections highlighted in the legislative record were instances where DOJ objected for a variety of reasons other than evidence of intentional discrimination.  *See* H.R. Rep. No. 109-478, at 36-40.[7]  Evidence of objections by the DOJ, denials by the DDC, and other preclearance-related data thus are not legitimate proxies for the type of purposeful discrimination needed to justify reauthorization of Section 5.

---

[7]       The evidence of covered jurisdictions failing to comply with Section 5, *see* H.R. Rep. No. 109-478, at 41-44, proves no more than that certain jurisdictions disagreed with the idea of stifling federal oversight.  None of the noted examples of such non-compliance, including the "most egregious example" of the former South Dakota Attorney General describing preclearance as a "'facial absurdity,'" *id.* at 42, establishes that a covered jurisdiction's failure to comply with the preclearance obligation of Section 5 was driven by discriminatory intent.

Of this evidence, the "more information requests" sent by DOJ to covered jurisdictions seeking preclearance is perhaps the least probative of intentional discrimination.   A "more information request" is "used by the Department of Justice when insufficient information is submitted with a proposed voting change to enable the Department of Justice to make a [preclearance] determination."   *Id.* at 40.   Congress noted that, "since 1982, over 205 voting changes have been withdrawn as a result of Section 5's [more information request] tool."   *Id.* at 41.   But these statistics prove nothing beyond the fact that DOJ was insufficiently informed to approve or disapprove 205 proposed voting changes.   The one example of a "more information request" that the House Judiciary Committee specifically identified in its Report describes the effect of that request on what had been a proposed reduction in polling places for a special gubernatorial election, but includes no evidence that the proposed reduction had a discriminatory motive.  *See id.*   After all, the request for more information presumably would not have been sent if DOJ was already convinced that the proposed voting change would undermine minority voting rights.   The voluntary withdrawals after "more information" was requested, if anything, show an effort by jurisdictions to attempt to comply with constitutional guarantees or, far more likely, that the bureaucratic hurdles to preclearance erected by DOJ have deterred covered jurisdictions from making nondiscriminatory voting changes.

In any event, the statistical preclearance evidence actually undermines the case for reauthorizing Section 5.   Between 1982 and 2004, only 0.74% of all preclearance submissions resulted in an objection (752 of 101,440 submissions).  *See* S. Rep. No. 109-295, at 13.   Even more significantly, the objection rate has been steadily declining.   In 1982, the objection rate was 2.32% of all preclearance submissions.  *See id.*   By 2003, the rate had fallen to 0.17%, and the rates in 2004 and 2005 were 0.06% and 0.002%, respectively.  *See id.*   The only period that saw

an uncharacteristic increase was the 1990s, and that is entirely explained by the fact that DOJ had adopted the policy (later rejected by the Supreme Court) that it would object to any proposed change that failed to maximize the number of majority-minority districts.  *See id.* at 14 (citing *Miller*, 515 U.S. at 921); *see also* Richard L. Hasen, *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization* at 3, Testimony Before the Senate Committee on the Judiciary (May 9, 2006), *available at* http://electionlawblog.org/ archives/hasen-testimony-final.pdf.  Those objections were not made because DOJ had identified evidence of intentional discrimination.

*Third*, Congress relied on the evidence of "the continued filing of [S]ection 2 cases that originated in covered jurisdictions."  VRARAA, § 2(b)(4)(C)-(D), 120 Stat. at 578.  But the initiation of Section 2 litigation does not demonstrate widespread, purposeful discrimination on the basis of race.  The mere *filing* of a Section 2 action establishes nothing more than a plaintiff's decision to allege a Section 2 violation.  And even a court's finding of a Section 2 violation does not necessarily indicate the presence of intentional discrimination.  *See Bossier Parish*, 520 U.S. at 482 (noting that "§ 2 [does] *not* have an intent component" (emphasis added)).  Indeed, the evidence in the legislative record shows that Section 2 suits resulting in a finding of intentional discrimination are a rarity.  Congress identified only twelve published judicial decisions between 1982 and 2006 that found intentional voting discrimination on the basis of race by a covered jurisdiction, and half of those cases involved discrimination against white voters.  *See* S. Rep. No. 109-295, at 13.  And the fact that some of these Section 2 cases ended by settlement actually suggests that jurisdictions are looking to comply with the Fifteenth Amendment—not discriminate against voters on the basis of race.

*Fourth*, and last, Congress relied on the dispatching of election observes as evidence of intentional discrimination.  VRARAA, § 2(b)(5), 120 Stat. at 578.  But the dispatching of federal observers is a prophylactic measure aimed at a broad swath of potential conduct, including but certainly not limited to intentional voting discrimination.  As Congress readily acknowledged, the presence of a federal observer in a jurisdiction reflected no more than that there was "a reasonable belief that minority citizens [were] at risk of being disenfranchised."  H.R. Rep No. 109-478, at 44.  The evidence of federal observers, therefore, indicates only that it was predicted that there *might* be conduct with the effect of disenfranchising minority citizens, which *might* or *might not* be purposeful discrimination.  To conclude that this evidence proves the existence of pervasive intentional discrimination in the covered jurisdictions, at the very least, would be speculation.  Like the other second-generation barriers identified by Congress, the dispatching of election observers is not the kind of evidence that can justify a prior restraint on all voting changes in covered jurisdictions pending federal approval.  If it is, then there is nothing to prevent Congress from permanently requiring the covered jurisdictions to preclear voting changes with DOJ or DDC.

**C.**  **The Coverage Formula of Section 4(b) Is No Longer an "Appropriate" Method For Determining Which States and Political Subdivisions Are Subject to the Preclearance Obligation of Section 5.**

Even if the current legislative record could demonstrate the necessity of preclearance, which it cannot, Section 4(b)'s coverage formula is not "appropriate" enforcement legislation.  In designing the original coverage formula, Congress "worked backwards" from the evidence of widespread voting discrimination that it had compiled.  Abigail Thernstrom, *Section 5 of the Voting Rights Act: By Now, a Murky Mess*, 5 Geo. J. on Poverty L. & Pol'y 41, 49 (2007).  The formula covered any jurisdiction that maintained a prohibited "test or device" on November 1, 1964, and had voter registration on that date or turnout in the 1964 presidential election of less

than 50 percent.  Pub. L. No. 89-110, § 4(b), 79 Stat. at 438.  Not coincidentally, the areas "for which there was evidence of actual voting discrimination . . .  share[d] two [of these] characteristics . . . : the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average."  *Katzenbach*, 383 U.S. at 330.  The original coverage formula thus was closely tailored to the evidence that initially justified the imposition of preclearance.  Congress "began work with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions" that ultimately became covered jurisdictions under Section 4(b).  *Id.* at 329.  Those jurisdictions included all of Alabama, Georgia, Louisiana, Mississippi, South Carolina, Virginia, and much of North Carolina.  *Id.* at 310, 329-30.  The only other jurisdictions that became "covered" under the original formula were Alaska and a few counties in Arizona, Hawaii, and Idaho.

The constitutionality of the coverage formula has always turned on the formula's close tailoring to the targeted evils.  In *Katzenbach*, the Supreme Court rejected South Carolina's assertion that "the coverage formula exclude[d] certain localities which d[id] not employ voting tests and devices but for which there [was] evidence of voting discrimination by other means." *Id.* at 330-31.  The Supreme Court explained that the formula covered every jurisdiction for which there was evidence of the evil necessitating preclearance: "Congress had learned that widespread and persistent discrimination in voting during recent years ha[d] typically entailed the misuse of tests and devices, and *this was the evil for which the new remedies were specifically designed* . . . . There [were] no States or political subdivisions exempted from coverage under § 4(b) in which the record reveal[ed] recent racial discrimination involving tests and devices." *Id.* at 331 (emphasis added).  The Supreme Court also explained that Congress had accounted for possible overbreadth by allowing mistakenly covered jurisdictions to bail out

of coverage; therefore, "[i]t was . . . permissible to impose the new remedies on the *few* [additional] States and political subdivisions covered by the formula." *Id.* at 330 (emphasis added).

Whether Section 4(b)'s coverage formula remains constitutional likewise must turn on the formula's relationship to the evidence before Congress when it reauthorized the VRA in 2006.  The "disparate geographic coverage" of the formula must be "sufficiently related to the problem that it targets." *Nw. Austin*, 129 S. Ct. at 2512.  Yet as the Supreme Court recently explained, Section 4(b) is constitutionally problematic because "[t]he . . . formula is based on data that is now more than 35 years old" and "[t]he evil that §5 is meant to address may no longer be concentrated in the jurisdictions singled out for preclearance." *Id.*  Indeed, the current coverage formula is unchanged since 1975, and coverage is premised on whether states or political subdivisions maintained prohibited tests or devices in 1964, 1968, and 1972, and whether those jurisdictions had low voter registration or turnout in those election cycles.  42 U.S.C. § 1973b(b).  As a result, the most recent data is now 38 years old and will be 59 years old when the 2006 reauthorization expires in 2031.  The oldest data is 46 years old and will be 67 years old in 2031.  Section 4(b)'s coverage formula thus is blatantly unconstitutional for two independent reasons.

*First*, even without comparing the geographic reach of the coverage formula with the record evidence compiled in support of reauthorizing Section 5, the coverage formula lacks any connection to the current legislative record.  The decades-old data fossilized in the coverage formula bears no relation whatsoever to the present day.  The literacy tests and other prohibited devices have not been used for decades and, indeed, have been permanently banned nationwide since 1975.  Pub. L. No. 94-73, § 102, 89 Stat. at 400 (codified at 42 U.S.C. § 1973aa).

Moreover, as explained above, there have been spectacular changes in registration and turnout rates in covered jurisdictions over the past few decades. *See supra* pp. 24-31. For example, African-American registration rates that were once as low as 6.4% in Mississippi are dramatically higher now; in 2004, the registration rate in Mississippi was 76.1%. *See id.* And more broadly, "the racial gap in voter registration and turnout is lower in the States originally covered by § 5 than it is nationwide." *Nw. Austin*, 129 S. Ct. at 2512 (citing E. Blum & L. Campbell, Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act 3-6 (American Enterprise Institute, 2006)). Indeed, neither Shelby County nor the State of Alabama would be covered jurisdictions if Section 4(b)'s formula were based on data from any of the two presidential elections preceding reauthorization. *See* SMF ¶¶ 3-5; Ellis Declaration ¶ 11. The registration and turnout rates in 1964, 1968, and 1972 are simply meaningless today. S. Rep. No. 109-295, at 26-27. There is not even a rational connection—let alone congruence and proportionality—between any current need to subject certain jurisdictions to preclearance and Section 4(b)'s reliance on 1964, 1968, and 1972 election data as a basis for making the coverage determination.

*Second*, the coverage formula cannot reasonably be correlated with the evidence of "second generation barriers" relied upon by Congress to justify reauthorization of Section 5. The evidence before Congress in 2006 demonstrated that these "second generation barriers" generally exist to an equal or greater degree in non-covered jurisdictions. Congress made *no finding* that the "evidence of continued discrimination" was meaningfully greater in covered jurisdictions than in non-covered ones, VRARAA § 2(b)(4), 120 Stat. at 577, nor could it have, *see* Edward Blum, *Section 5 of the Voting Rights Act: The Importance of Pre-Clearance* at 2, Testimony Before the House Committee on the Judiciary, Subcommittee on the Constitution (Oct. 25, 2005)

("[A]pplying the same methods of analysis . . .  used on the covered jurisdictions to non-covered states such as Tennessee, Arkansas, and New Mexico . . . reveals no difference between them."). In particular, the legislative record shows that all three categories of evidence of "second generation barriers" that could potentially be present in both covered and non-covered jurisdictions—racially polarized voting, Section 2 actions, and federal observer coverage—are in fact present in both.

Racially polarized voting is national phenomenon; it is as likely to exist in non-covered jurisdictions as non-covered jurisdictions.  A study referenced by Congress and later published in a law review, analyzed 105 lawsuits that found racially polarized voting to exist and determined that more of those suits involved non-covered jurisdictions (53) than covered jurisdictions (52). *See* Ellen Katz et al., *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of The Voting Rights Act Since 1982*, 39 U. Mich. J.L. Reform 643, 665 (2006).  These lawsuits involved just as many non-covered states (7)—including states such as Massachusetts and Maryland—as fully covered states.  *See id.* at 654 and n.39.  Judicial decisions also establish that racially polarized voting is not peculiar to covered jurisdictions.  *See, e.g.*, *Black Political Task Force v. Galvin*, 300 F. Supp. 2d 292, 310 (D. Mass. 2004) ("The evidence establishes beyond peradventure[,] . . . taken as a whole, also suffices to show that white voters, who constitute a majority in most districts, vote sufficiently as a bloc to enable them, as a general rule, to defeat the black-preferred candidates."); *Marylanders For Fair Representation v. Schaefer*, 849 F. Supp. 1022, 1060 (D. Md. 1994) ("[T]he *Gingles* threshold inquiry clearly shows that a bloc-voting white majority on the Eastern Shore consistently defeats black candidates supported by a politically cohesive and geographically compact black community.").   If racially polarized voting truly is "the clearest and strongest evidence" of the need for preclearance, H.R. Rep. No.

109-478, at 34, Congress should have crafted Section 4(b)'s formula to cover all jurisdictions where that problem exists.  It did not.

In addition, the legislative record shows that Section 2 litigation is equally distributed between covered and non-covered jurisdictions.  The study discussed above reviewed all published opinions between 1982 and 2006 involving Section 2 claims and found that more than half of the cases (171 out 330) were filed in non-covered jurisdictions.  *See* Katz, *Documenting Discrimination in Voting*, 39 U. Mich. J.L. Reform at 654; *see also* S. Rep. No. 109-295, at 76. The legislative record further reflects that a roughly equal number of successful Section 2 actions during that time period took place in non-covered jurisdictions, and of those that ended with a finding of unconstitutional discrimination against minority voters, an equal number (6) occurred in non-covered jurisdictions and covered jurisdictions.  *See* S. Rep. No. 109-295, at 13, 65, 76. In fact, there were more federal judicial decisions finding Section 2 violations collectively in Arkansas, Illinois, and Tennessee than in Georgia, Louisiana, Texas, and Virginia combined. *See id.* at 77-80.

Finally, the legislative record suggests that Congress sent election observers to covered and non-covered jurisdictions alike.  In discussing the dispatch of federal observers, Congress highlighted that, "[i]n 2004 alone, more than 1,400 observers were sent to 105 jurisdictions in 29 States to protect the rights of minority citizens."  H.R. Rep. No. 109-478, at 44.  Even assuming that those 29 states included all 16 states fully or partially covered under Section 4(b), federal observers were sent to nearly as many non-covered states (13) as covered ones.  And, since 1982, more election observers have been sent to New Jersey, a non-covered state, than to three fully–covered states—Texas, Louisiana, and Virginia.  *See Voting Rights Act: Evidence of Continued*

*Need*: Hearing Before Subcommittee on the Constitution of the House Committee on the Judiciary, at 275, 109th Cong. (2006).

In sum, the "evils" identified by Congress as a basis for reauthorizing preclearance are "no longer . . . concentrated in the jurisdictions singled out for preclearance." *Nw. Austin*, 129 S. Ct. at 2512. The "disparate geographic coverage" of Section 4(b) thus is not "sufficiently related to the problem that it targets." *Id*. Moreover, the availability of bailout is insufficient to correct the total lack of a connection between Section 4(b)'s coverage formula and the "second generation" evidence allegedly justifying the continued application of Section 5. Although the Supreme Court in *Katzenbach* found the bailout provision relevant to the proper tailoring of the original coverage formula, 383 U.S. at 331-32, it was reviewing a coverage formula already closely tailored to the record evidence.[8] Bailout was a means of fine-tuning an already "permissible" coverage formula, not the primary tool for crafting a reasonable correlation between the formula and the targeted evil. *Id.* at 330. To rely on post-hoc bailout here to do essentially all the work of bridging the vast gap between the coverage formula and the evidentiary record would turn the *Katzenbach* reasoning on its head and allow Congress entirely to evade its responsibility to tailor its remedial legislation to the current identified wrong.

---

[8]      The bailout mechanism touted by the *Katzenbach* Court allowed DDC to terminate coverage if the covered jurisdiction met a simple test: the covered jurisdiction had to prove only that it had not used a prohibited "test or device . . . during the five years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color." 79 Stat. at 483. In 1982, however, Congress overhauled Section 4(a)'s bail out mechanism, which now requires a covered jurisdiction to meet six compulsory criteria. 42 U.S.C. § 1973b(a)(1)(a)-(f). The revised bail out mechanism, which includes a mix of objective and subjective elements, has rendered bailout unrealistic for most political subdivisions and impossible for any fully-covered State. Shelby County, for example, is ineligible for bailout because a voting change submitted by the City of Calera drew an objection from DOJ and because a change it submitted on its own behalf was precleared by DOJ after it was implemented. *See* SMF ¶ 9-10; Ellis Declaration ¶ 9-10. Neither of these preclearance issues is suggestive of intentional discrimination against minority voters by Shelby County. Yet Shelby County is now ineligible to seek bailout until 2018 at the earliest.

In any event, bailout could only partially close the gap between the coverage formula and the record evidence of "second generation barriers." At best, bailout could address "the possibility of overbreadth," *Katzenbach*, 383 U.S. at 331, but it could do nothing to rectify the vastly underinclusive nature of the coverage formula. Bailout cannot bring deserving, non-covered jurisdictions within the scope of preclearance coverage. And even as to overbreadth, bailout is far from a perfect solution. Under the bailout provisions, a political subdivision is held responsible not only for its own actions and compliance with Section 5 but also for the actions and compliance of each governmental unit within its territory. *See* 42 U.S.C. § 1973b(a)(1)(D)-(F). Thus, even if a State or political subdivision has had a perfect record of compliance since 1965, each failure by a governmental unit within its geographic boundaries resets the ten-year clock on that jurisdiction's ability to bailout. And for ten years after a State or political subdivision has bailed out, any failure by a governmental unit within its territory could result in resumed coverage. *Id.* § 1973b(a)(5). Thus, even a covered jurisdiction that successfully bails outs does not have its dignity fully restored. It remains subject to federal supervision that is not imposed on non-covered jurisdictions.

At bottom, unlike the original coverage formula, the coverage formula reauthorized in 2006 fails to target "the evil for which the [preclearance] remed[y] [is now] specifically designed," *Katzenbach*, 383 U.S. at 331, and thus no longer constitutes an "appropriate" method for determining which states and political subdivisions are subject to Section 5. The evidence of "second generation" discrimination advanced to justify preclearance is neither limited to the jurisdictions covered by the formula, nor is it necessarily present in those jurisdictions. Section 4(b)'s coverage formula is now both overinclusive and vastly underinclusive as evaluated against the second-generation barriers that Congress used to justify reauthorization of Section 5. Section

4(b) thus is not "sufficiently related to the problem that it targets." *Nw. Austin*, 129 S. Ct. at 2512.  Accordingly, even if the record of "second generation" discrimination could justify a preclearance obligation, which it cannot, the coverage formula exceeds Congress's power to enforce the Fifteenth Amendment.

For the same reasons, the coverage formula also violates the principle of equal sovereignty amongst the states embodied in the Tenth Amendment and Article IV of the Constitution.  *See id.* at 2512 (noting the "historic tradition that all the States enjoy 'equal sovereignty'" (quoting *United States v. Louisiana*, 363 U.S. 1, 16 (1960)).  Distinctions among the states are permitted to "remed[y] . . . local evils which have . . . appeared." *Katzenbach*, 383 U.S. at 329.  "But a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Nw. Austin*, 129 S. Ct. at 2512.  As explained above, because the coverage formula's disparate treatment of the states is unrelated to the evidence of "second generation" discrimination, the formula is no longer responsive to local evils.

## VI.    CONCLUSION

For the foregoing reasons, Shelby County respectfully requests that this Court grant its motion for summary judgment, declare Sections 5 and 4(b) of the Voting Rights Act unconstitutional, and issue a permanent injunction against Defendant Attorney General Eric H. Holder, Jr. enjoining the enforcement of Sections 5 and 4(b) of the Voting Rights Act.

Dated:  June 8, 2010

Respectfully submitted,

/s/ William S. Consovoy

Bert W. Rein (D.C. Bar No. 067215)
William S. Consovoy* (D.C. Bar No. 493423)
Thomas R. McCarthy (D.C. Bar No. 489651)
Brendan J. Morrissey (D.C. Bar No. 973809)
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Tel.: (202) 719-7000
Fax: (202) 719-7049

Frank C. Ellis, Jr.
WALLACE, ELLIS, FOWLER & HEAD
113 North Main Street
Columbiana, AL  35051
Tel.: (205) 669-6783
Fax: (205) 669-4932

*Counsel of Record*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2010, copies of the foregoing, along with a proposed order, declaration, and exhibits, were served by U.S. Mail on the following parties:

Attorney General Eric H. Holder, Jr.          U.S. Attorney for the District of Columbia
U.S. Department of Justice                    501 Third Street, NW
950 Pennsylvania Ave. NW                      Washington, DC 20001
Washington, DC 20530

/s/ William S. Consovoy
_____
William S. Consovoy