IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHELBY COUNTY, ALABAMA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case: 1:10-cv-00651 (JDB) |
| ) | |
| ERIC H. HOLDER, JR., ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and, ) | |
| ) | |
| BOBBY PIERSON, WILLIE GOLDSMITH ) | |
| SR., KENNETH DUKES, MARY ) | |
| PAXTON-LEE, and ALABAMA STATE ) | |
| CONFERENCE OF THE NAACP, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |

**MEMORANDUM OF DEFENDANT-INTERVENORS BOBBY PIERSON, ET AL., IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF DEFENDANT-INTERVENORS' CROSS MOTION FOR SUMMARY
JUDGMENT**

Laughlin McDonald
Nancy Abudu
American Civil Liberties Union Foundation, Inc.
230 Peachtree Street, NW, Suite 1440
Atlanta, GA 30303-1227

Arthur B. Spitzer (D.C. Bar. No. 235960)
American Civil Liberties Union of the
Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036

*Attorneys for Applicants*

Laura D. Blackburne
Interim General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297

Victor L. Goode
Assistant General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297

*Attorneys for Applicant Alabama State
Conference of the NAACP*

Allison E. Neal
American Civil Liberties Union of Alabama
207 Montgomery Street, Suite 910
Montgomery, AL 36104

*Of Counsel*

# TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Prior Challenges to the Constitutionality of Section 5 and Its Extensions Have Been
Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. South Carolina v. Katzenbach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. The Supreme Court Rejected a Challenge to the 1970 Extension of Section 5 . . . . . . 4

        (1) Alabama's Continued Violations of Minority Voting Rights . . . . . . . . . . . . . 5

    C. The Supreme Court Rejected a Challenge to the 1975 Extension of Section 5 . . . . . . 5

    D. The 1982 Amendments of the Voting Rights Act . . . . . . . . . . . . . . . . . . . . . . . . . 7

        (1) Courts Have Rejected Challenges to the 1982 Extension of Section 5 . . . . . . 9

III. The 2006 Amendments and Extension of the Voting Rights Act . . . . . . . . . . . . . . . . . . . . . 11

    A. Congressional Reliance Upon Section 5 Objections . . . . . . . . . . . . . . . . . . . . . . . . 11

        (1) Section 5 Objections in Alabama and Shelby County . . . . . . . . . . . . . . . . . 12

        (2) The Impact of Bossier II on Section 5 Objections . . . . . . . . . . . . . . . . . . . . 18

    B. Congressional Reliance Upon Requests for More Information and Section 5
Enforcement Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    C. Congressional Reliance Upon the Use of Federal Observers . . . . . . . . . . . . . . . . . 20

    D. Congressional Reliance Upon Continued Racial Bloc Voting . . . . . . . . . . . . . . . . 21

    E. Blacks Have Been Elected Mainly from Majority Black Districts . . . . . . . . . . . . . . 24

    F. Congressional Reliance Upon The Deterrent Effect of Section 5 . . . . . . . . . . . . . . 26

    G. Congressional Reliance Upon Section 2 Litigation . . . . . . . . . . . . . . . . . . . . . . . . 27

    H. Section 5 Plays an Important Role in Court Ordered Remedies . . . . . . . . . . . . . . . 30

IV. Post-2006 Extension Section 5 Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

V. The Coverage Formula Is Constitutional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VI. Specific Findings of Intentional Discrimination Are not Required . . . . . . . . . . . . . . . . . . . 36

    A. There Was In Fact Substantial Evidence of Intentional Discrimination . . . . . . . . . . 38

VII. "Gamesmanship" Is not Required, Although Evidence of It Was Found by Congress . . . 38

i

VIII.  <u>The Boerne Line of Cases Supports the Constitutionality of Section 5</u> . . . . . . . . . . . . . 41

<u>Conclusion</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 1

I.  Introduction

Plaintiff contends that Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, as extended by Congress in 2006, and the Act's coverage formula, Section 4(b), 42 U.S.C. § 1973b(b), are outdated and are no longer constitutionally justifiable.  To the contrary, the extension of Section 5 in 2006 was an appropriate exercise of congressional power to enforce the Fourteenth and Fifteenth Amendments, while the coverage formula is not a simple mathematical equation but was designed to identify those areas with significant problems of voting discrimination.

As appears more fully below, in 2005 and 2006 Congress held a total of 21 hearings, heard from more than 80 witnesses, and compiled a massive record of more than 16,000 pages of evidence.  At the conclusion of its deliberations, by a vote of 390 to 33 in the House and by a unanimous vote in the Senate, Congress amended and extended Section 5 for an additional 25 years.  Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Public Law 109-246, 120 Stat. 577.

The evidence upon which Congress relied included: more than 420 Section 5 objection letters from the Attorney General blocking voting changes that appeared to be intentionally discriminatory; requests by the Department of Justice (DOJ) for more information (RMIs) in order to evaluate Section 5 submissions that resulted in the modification of more than 800 proposed voting changes or their withdrawal from consideration; Section 5 enforcement actions that blocked implementation of an extraordinary array of devices that would otherwise have diluted minority voting strength; the continued filing of cases under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, in covered jurisdictions, many of which resulted in findings of intentional discrimination; efforts by DOJ to implement the minority language provisions of the Act; Federal observers dispatched to observe elections in covered jurisdictions; the deterrent effect of Section 5 that prevented covered jurisdictions from adopting discriminatory voting

1

changes; and the continued evidence of racially polarized voting in each of the jurisdictions covered by Section 5.  The legislative history plainly refutes Plaintiff's contention that the 2006 congressional record contains "no evidence" that could continue to justify preclearance. Plaintiff's Memorandum of Points and Authorities at 5 ("Plaintiff's Mem.").

Congress' considered judgment that racial and language minorities remained politically vulnerable warranting the continued protection of Section 5 is not only amply supported by the legislative history but is entitled to deference by the courts.  United States Dept. of Labor v. Triplett, 494 U.S. 715, 721 (1990) (noting "the heavy presumption of constitutionality to which a 'carefully considered decision of a coequal and representative branch of Government' is entitled");  Northwest Austin Municipal Utility District Number One v. Holder, 129 S.Ct. 2504, 2513 (2009) ("[t]he Fifteenth Amendment empowers 'Congress,' not the Court, to determine in the First instance what legislation is needed to enforce it"); Eldred v. Ashcroft, 537 U.S. 186, 208 (2003) (courts evaluating whether a statutory time period is rational "are not at liberty to second-guess congressional determinations and policy judgments of this order").

Under Rule 56 (c)(2), F.R.Civ.P., a party is entitled to summary judgment if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  Under the applicable standard, Plaintiff's motion for summary judgment should be denied and Defendant-Intervenors' cross motion for summary judgment should be granted.

II. Prior Challenges to the Constitutionality of Section 5 and Its Extensions Have Been Rejected

When first enacted in 1965, Section 5 was promptly challenged by six Southern states as being an unconstitutional exercise of congressional authority.  When Section 5 was extended in 1970, 1975, and 1982, it was also challenged as unconstitutional, and in each of those challenges, all of which were rejected, the plaintiffs made essentially the same arguments that the Plaintiff now makes in this case, i.e., that Section 5 had outlived its usefulness, is no longer appropriate, violates concepts of federalism, and is burdensome and costly.  See  Plaintiff's

2

Mem. at 3-6. For the reasons previously articulated by the Supreme Court and other federal courts, Section 5 as extended in 2006 remains a constitutional exercise of congressional authority.

    A.  <u>South Carolina v. Katzenbach</u>

    South Carolina, joined by Alabama, Georgia, Louisiana, Mississippi, and Virginia, all of which were covered jurisdictions, immediately challenged Section 5 and other provisions of the Act as exceeding Congress's authority to enforce the Fifteenth Amendment.  The Supreme Court, however, in <u>South Carolina v. Katzenbach</u>, 383 U.S. 301, 337 (1966), found Section 5, which it described as the "heart" of the Voting Rights Act, to be "a valid means for carrying out the commands of the Fifteenth Amendment."  The majority of the Court acknowledged that Section 5 was an uncommon exercise of congressional power, but found it was justified by the "insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." <u>Id</u>. at 309.  In doing so, the Court used the "rational means" standard for determining the constitutionality of a congressional act designed to enforce the Fifteenth Amendment's prohibition against vote denial or abridgement on account of race or color.  <u>Id</u>. at 324 ("Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting").

    The plaintiffs also challenged the coverage formula, as does the Plaintiff in this case, as being defective because it was "awkwardly designed . . . and that it disregards various local conditions which have nothing to do with racial discrimination." <u>Katzenbach</u>, 383 U.S. at 329.  The Court held "[t]hese arguments . . . are largely beside the point," and that Section 4(b) was not a mathematical formula but was designed "to describe these areas . . . relevant to the problem of voting discrimination."  <u>Id.</u>

    Congress assumed, or at least hoped, that once the formal barriers to registration were thrown down in states which had erected them, and once they were prohibited from enacting new discriminatory voting laws, blacks would participate in politics on a basis of equality with

whites.  Congress also thought, in retrospect too optimistically, that the five year "cooling-off" period originally prescribed by Section 5 was sufficient "to permit dissipation of the long-established political atmosphere and tradition of discrimination in voting because of color" that existed in the  covered jurisdictions.  H.R. Rep. No. 439, 89th Cong., 1st Sess., at 15 (1965), reprinted in 1965 USCCAN 2437, 2446.  But experience proved otherwise.

     B.  <u>The Supreme Court Rejected a Challenge to the 1970 Extension of Section 5</u>

In 1969 and 1970, Congress held 14 days of hearings in the House and Senate and examined the record of progress under Section 5 and the other provisions of the Voting Rights Act.  As the Senate Judiciary Committee reported: "If it had not been for Section 5 of the present Act, there is no telling to what extent the states and communities covered might have legislated and manipulated to continue their historical practice of excluding Negroes from the Southern political process."  Joint Views of Ten Members of the Judiciary Committee, 91st Cong., 2d Sess., at 116 Cong. Rec. S5521 (daily ed. March 2, 1970).

Citing the continued depressed levels of black voter registration and the significant noncompliance with Section 5 by the covered jurisdictions, and relying upon its enforcement powers under both the Fourteenth and Fifteenth Amendments, Congress extended the special coverage provisions for another five years.  Pub. L. No. 91-285, 84 Stat. 314 (1970).  In doing so it concluded that extension "is essential . . . in order to safeguard the gains in Negro voter registration thus far achieved, and to prevent future infringements of voting rights based on race or color."  H.R. Rep. No. 397, 91st Cong., 2d Sess. (1970), reprinted in 1970 USCCAN 3277, 3281.  Congress also made the suspension of tests or devices for voting effective nationwide, and revised the coverage formula to include the 1968 presidential election.

In 1972, the U.S. Attorney General sued the State of Georgia for failing to implement a new legislative reapportionment to replace a plan that had been objected to under Section 5.  The state argued that Section 5 was not applicable to its plan, but if so the statute was unconstitutional.  The Supreme Court disagreed, and held that "for the reasons stated at length in

South Carolina v. Katzenbach . . . we reaffirm that the Act is a permissible exercise of congressional power under § 2 of the Fifteenth Amendment."  Georgia v. United States, 411 U.S. 526, 535 (1973).

(1) Alabama's Continued Violations of Minority Voting Rights

Alabama was one of the covered jurisdictions that enacted legislation continuing its historical practice of excluding Negroes from the political process.  Despite the abolition of literacy tests and other tests or devices for voting by Section 4 of the Voting Rights Act of 1965, 42 U.S.C. § 1973b & aa.  Alabama subsequently enacted a law requiring an applicant for absentee registration to complete a written questionnaire without assistance.  DOJ objected to the change on March 13, 1970 on the ground that "this provision in effect imposes a literacy requirement for registration and that such a requirement, if enforced, would violate the provisions of Section 4 of the Voting Rights Act of 1965."  Voting Rights Act: Section 5 of the Act-History, Scope, and Purpose, Hearing before the Subcommittee on the Judiciary, House of Representatives, 109th Cong., 1st Sess., Vol. I, at 105 (October 25, 2005) ("House Hearing, History, Scope, and Purpose"); Letter from Jerris Leonard to MacDonald Gallion, March 13, 1970.[1]  DOJ objected to another change in 1972 that would have had an adverse impact upon voters who had difficulty reading or writing.  The Alabama law would restrict a person from giving assistance to more than one voter during an election.  DOJ concluded that: "Such restriction could have the effect of severely limiting the availability of persons who might be willing and able to provide assistance to voters as entitled."  House Hearing, History, Scope, and Purpose, Vol. I, at 106 (2005); Letter from David L. Norman to Leslie Hall, April 4, 1972.

C.  The Supreme Court Rejected a Challenge to the 1975 Extension of Section 5

Against a backdrop of continuing opposition to Section 5 and the adoption of new discriminatory voting practices, Congress in 1975 again considered legislation to extend and

---

[1]Legislative history documents involving extension and amendment of the Voting Rights Act from 1975 forward have been lodged with the court by Defendant and Defendant-Intervenors.

expand the coverage of the Voting Rights Act.  It conducted 20 days of hearings in the House

and Senate and concluded there had been widespread discrimination in the covered jurisdictions.

According to the Senate report:

> The recent objections entered by the Attorney General of the United States to
> Section 5 submissions clearly bespeak the continuing need for this preclearance
> mechanism.  As registration and voting of minority citizens increases, other
> measures may be resorted to which would dilute increasing minority voting
> strength.  Such other measures may include switching to at-large elections,
> annexations of predominantly white areas, or the adoption of discriminatory
> redistricting plans.

S. Rep. No. 295, at 16-17 (1975).

Congress concluded that progress under the act "has been modest and spotty in so far as

the continuing and significance deficiencies yet existing in minority registration and political

participation."  It noted that "[t]his past experience [of evading Section 5] ought not be ignored

in terms of assessing the future need for the Act."  It was "imperative," it said, that Section 5

protection apply to the redistricting that would take place after the 1980 census.  S. Rep. No.

295, at 15-18 (1975).  Accord Fullilove v. Klutznick, 448 U.S. 448, 502-03 (1980) (Congress

may properly consider "information and expertise that Congress acquires in the consideration

and enactment of earlier legislation") (Powell, J., concurring).

The record before Congress was "filled with examples of the barriers to registration and

voting that language minority citizens encounter in the electoral process."  In addition to

disparate treatment in voting, Congress found language minority citizens have been the targets of

discrimination in education, housing, the administration of justice, and employment, all of which

contributed to a depressed level of political participation.  S.Rep. No. 295, at 25, 28-30 (1975).

Accordingly, Congress passed legislation in 1975 that made the nationwide ban on tests

for voting permanent, extended Section 5 for an additional seven years, and broadened the reach

of the statute by including the 1972 presidential elections in the coverage formula.  Pub. L. No.

94-73, 89 Stat. 400 (1975).  It also extended coverage to language minorities, defined as

American Indians, Asian Americans, Alaskan natives, and those of Spanish heritage.  42 U.S.C.

§ 1973aa-1a(e).  The term "test or device" was amended to include English language registration procedures or elections where a single linguistic minority comprised more than 5% of the voting age population of the jurisdiction.  S. Rep. No. 295, at 47 (1975).

After the 1975 extension, the City of Rome, Georgia, filed an action to bail out from Section 5 coverage and further argued, as does the Plaintiff in this case, that the statute violated principles of federalism or states' rights, and that even if the preclearance requirements were constitutional when enacted in 1965, "they had outlived their usefulness by 1975."  City of Rome v. United States, 446 U.S. 156, 180 (1980).  Cf. Plaintiff's Mem. at 6 (the Section 4(b) formula is "obsolete" and "constitutionally indefensible").  The Supreme Court rejected the federalism argument, noting that the Fourteenth and Fifteenth Amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty."  Id. at 179.  As for the argument that Section 5 had outlived its usefulness,  the Court noted that black voter registration "had improved dramatically since 1965," and "the number of Negro elected officials had increased since 1965."  Id. at 180.  Nonetheless, it upheld the extension of Section 5 as "plainly a constitutional method of enforcing the Fifteenth Amendment."  Id. at 182.  In doing so, it applied the "rational means" standard articulated in Katzenbach, and relied upon Congress's conclusions that Section 5 "has become widely recognized as a means of promoting and preserving minority political gains in covered jurisdictions," that "recent objections entered by the Attorney General . . . to Section 5 submissions clearly bespeak the continuing need for this preclearance mechanism," and that Section 5 "serves to insure that that progress not be destroyed through new procedures and techniques."  Id. at 176-77, 181.  The Court concluded that "Congress' considered determination that at least another 7 years of statutory remedies were necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable."  Id. at 182.

D.  The 1982 Amendments of the Voting Rights Act

In 1981-1982, Congress again examined the record of voting rights to determine the

7

continued need for Section 5.  The Senate report concluded: "There is virtual unanimity among those who have studied the record that Section 5 preclearance should be extended."  S. Rep. No 417, 97th Cong., 2d Sess., at 9 (1982).  The testimony and evidence before the Senate was extensive and nationwide.  Congress acted based upon voluminous evidence, and listened "to over 100 witnesses and at least 27 days of testimony in the Senate alone."  United States v. Blaine County, 363 F.3d 897, 908 (9th Cir. 2004).  The Senate report concluded that:

> The extent of objections under Section 5 has remained substantial. . . . All too often, the background of rejected submissions--the failure to choose unobjectionable alternatives, the absence of an innocent explanation for the proposed change, the departure from past practices as minority voting strength reaches new levels, and in some instances, direct indications of racial considerations--serves to underline the continuing need for Section 5.

S.Rep. No. 417, at 10 (1982).

More than 500 Section 5 objections had been interposed since 1975.  H.Rep. No. 227, at 11 (1981).  The most frequently objected to changes from 1975-1980 were annexations, at-large elections, majority vote requirements, numbered posts, and redistricting plans, all of which have a recognized potential for diluting minority voting strength.[2]  Congress also found a pattern of noncompliance with Section 5, including the failure or refusal of jurisdictions to submit voting changes for preclearance, and continuing to implement changes after they had been objected to. S.Rep. No. 417, at 13-14 (1982).

Both the House and Senate hearing records also documented examples of blatant, direct efforts to exclude minorities from political participation, including: "physical violence and intimidation of voters and candidates, discriminatory manipulation of voters, reregistration requirements and purging of voters, changing the location of polling places and insistence on retaining inconvenient voting and registration hours."  S.Rep. No. 417, at 10 n.22 (1982) (citing

---

[2]See, e.g., City of Rome v. United States, 446 U.S. at 183-84 (a majority vote requirement can "significantly" decrease the electoral opportunities of a racial group); Rogers v. Lodge, 458 U.S. 613, 627 (1982) (invalidating at-large elections and finding that a numbered post provision disadvantages minorities because it "prevents a cohesive political group from concentrating on a single candidate").

H.R. Rep. No. 227, at 11-21 (1981)).

Congress extended Section 5 in 1982 for 25 years, the longest extension in the Act's history.  Pub. L. No. 97-205, 96 Stat. 131 (1982).  It acknowledged that progress had been made in minority political participation, but concluded that "racial and language minority discrimination affecting the right to vote persists throughout the jurisdictions covered by the Section 5 preclearance requirement," and that "[w]ithout the preclearance of new laws, many of the advances of the past decade could be wiped out overnight with new schemes and devices." S. Rep. No. 417, at 10 (1982).  The minority language provisions were also extended for ten years.  In 1992, Congress extended the minority language provisions for an additional 15 years. H. Rep. No. 655, 102nd Cong., 2d Sess., at 3 (1992).

Congress also altered the bailout formula so that jurisdictions down to the county level could bail out independently.  One of the main purposes of the new bailout was to provide local jurisdictions with an incentive to change their voting practices by eliminating structural and other barriers to minority political participation.  To bail out a jurisdiction must show that it has not used a discriminatory test or device within the preceding ten years, has fully complied with the Voting Rights Act, and has engaged in constructive efforts to facilitate equal access to the electoral process.  42 U.S.C. § 1973b(a); S. Rep. No. 417, at 43-62 (1982).

(1)  Courts Have Rejected Challenges to the 1982 Extension of Section 5

After the 1982 extension of Section 5, Sumter County, South Carolina, filed another challenge to the constitutionality of the statute.  It contended, as the Plaintiff does in this case, Plaintiff's Mem. at 1, 4,  that the 1982 extension was unconstitutional because the coverage formula was outdated.  The county pointed out that as of May 28, 1982, more than half of the age eligible population in South Carolina and Sumter County was registered, facts which it said "distinguish the 1982 extension as applied to them from the circumstances relied upon in South Carolina v. Katzenbach, supra, to uphold the 1965 Act."  County Council of Sumter County, S.C. v. United States, 555 F. Supp. 694, 707 (D.D.C. 1983).  The three-judge court, applying the

9

"appropriate"means standard of <u>Katzenbach</u> and <u>City of Rome</u>, rejected the argument concluding that Section 5 "had a much larger purpose than to increase voter registration in a county like Sumter to more than 50 percent."  555 F.Supp. at 707-08.  In support of its conclusion, the court noted "Congress held hearings, produced extensive reports, and held lengthy debates before deciding to extend the Act in 1982."  <u>Id</u>. at 707 n.13.

In 1999, the Supreme Court rejected yet another challenge to the constitutionality of Section 5, this time by the State of California.  The state argued "§ 5 could not withstand constitutional scrutiny if it were interpreted to apply to voting measures enacted by States that have not been designated as historical wrongdoers in the voting rights sphere."  <u>Lopez v. Monterey County</u>, 525 U.S. 266, 282 (1999).  The Court disagreed:

> Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the States.

<u>Id</u>. at 282-83.  The Court, reaffirming its ruling in <u>Katzenbach</u>, further held "once a jurisdiction has been designated, the Act may guard against both discriminatory animus and the potentially harmful <u>effect</u> of neutral laws in that jurisdiction."  <u>Id</u>. at 283.

<u>Giles v. Ashcroft</u>, 193 F.Supp.2d 258 (D. D.C. 2002), was still another challenge to the constitutionality of Section 5.  The plaintiff, making essentially the same arguments as the Plaintiff in ths case, <u>see</u> Plaintiff's Mem. at 16, 30, argued that Mississippi "no longer requires coverage under Section 5 because the vestiges of racism . . . no longer exist in the modern Mississippi today," and the "[c]onditions of the 1960s not only represent a different time and a different climate of public opinion but also were the result of the attitudes and represent actions of a different generation."  193 F.Supp.2d at 261.  The court rejected the claim as "entirely baseless," and held that "[t]he Supreme Court's previous decisions upholding the Voting Rights Act in effect foreclosed such challenges to Section 5."  <u>Id</u>. at 263.[3]

_____

[3]A month before the extension of Section 5 the Court decided <u>LULAC  v. Perry</u>, 548 U.S.
(continued...)

III.  The 2006 Amendments and Extension of the Voting Rights Act

Congress again conducted extensive hearings in 2005 and 2006 to consider the need for continuation of Section 5.  It held 21 hearings, heard from more than 90 witnesses, and compiled a massive record of more than 16,000 pages of evidence.  H.R. Rep. No. 478, 109th Cong., 2d Sess., at 5 (May 22, 2006); S. Rep. No. 295, at 2 (2006).  At the conclusion of its deliberations Congress, by a vote of 390 to 33 in the House and by a unanimous vote in the Senate, amended and extended Section 5 for an additional 25 years.  152 Cong. Rec. S8012 (daily ed. July 20, 2006); 152 Cong. Rec. H5143-5207 (daily ed. July 13, 2006); Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Public Law 109-246, 120 Stat. 577.

A.  Congressional Reliance Upon Section 5 Objections

The evidence showed that since 1982, the Department of Justice objected to more than 700 voting changes that were determined to be discriminatory, thus preventing them from being enforced by the covered jurisdictions.  H.R. Rep. 478, at 21  (2006).  From 1980 to 2000, the Attorney General issued objection letters blocking 421 voting changes that appeared to be intentionally discriminatory.  Voting Rights Act: Section 5 - Preclearance Standards, Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 1st Sess., at 180 tbl. 2 (November 1, 2005) ("House Hearing, Preclearance Standards") (Peyton McCrary, et al.).  As recently as the 1990s, 43% of all objections were based on intent alone, while another 31% were based on a combination of intent and effect.  Id.  See also Northwest Austin Municipal Utility District Number One v. Mukasey, 573 F.Supp.2d 221, 252 (D.D.C. 2008), rev'd and remanded on other grounds sub nom. Northwest Austin, 129 S.Ct. at

---

³(...continued)
399 (2006), which found a Texas redistricting plan diluted minority voting strength in violation of Section 2 of the Voting Rights Act.  In reaching its decision, all eight justices who addressed the issue agreed states had a "compelling state interest" in complying with the preclearance requirement.  Id. at 475 n.12, 485 n.2, 518.

2516-17.

There were also more objections between August 1982 and 2004 (626) than between 1965 and the 1982 reauthorization (490), and nine of the covered states received more objections after 1982 than before.  Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcommittee on the Constitution of the Committee on the Judiciary, House of Representatives, 109th Cong., 2d Sess., Vol. 1, at 172, 259 (March 8, 2006) ("House Hearing, Evidence of Continued Need") (report of National Commission on the Voting Rights Act).  Congress found that "such objections did not encompass minor inadvertent changes.  The changes sought by covered jurisdictions were calculated decisions to keep minority voters from fully participating in the political process."  H.R. Rep. 478, at 21 (2006).

Recent voting changes blocked by the statute included state restrictions on registration and voting, discriminatory annexations, voter purges, adoption of at-large elections, bilingual election procedures, high school diploma requirements for holding office, consolidations, anti-single shot provisions, majority vote requirements, re-registration procedures, redistricting, numbered post requirements, abolition of elected offices, residency requirements, staggered terms, deannexations, the elimination or relocation of polling places, and dual registration requirements.  H.R. Rep. 478, at 36 (2006); House Hearing, History, Scope, and Purpose, Vol. I, at 104-224 (2005) (complete list of Section 5 objections through October 17, 2005).

In addition to objections by DOJ, during the post-1982 period 25 requests for judicial preclearance of voting changes were either denied by the District of Columbia Court because the submitting jurisdiction failed to carry its burden of proof of no discriminatory purpose or effect, or were withdrawn.  House Hearing, Evidence of Continued Need, Vol.1, at 197, 270 (2006) (report of National Commission on the Voting Rights Act).  These judicial preclearance actions further document the need for Section 5 and the important role it continues to play.

(1) Section 5 Objections in Alabama and Shelby County

Since the last extension of Section 5 in 1982, DOJ has objected to 46 Section 5

12

submissions from Alabama, seven from the state and 39 from local jurisdictions.[4]  Many of the

objections from Alabama were based upon evidence of purposeful discrimination.  On May 6,

1982, DOJ objected to a reapportionment of the Alabama Legislature because the "plan clearly

would lead to a retrogression in the position of black voters."  House Hearing, History, Scope,

and Purpose, Vol. I, at 264 (2005) (Letter from Wm. Bradford Reynolds to Charles A. Graddick,

May 6, 1982).  The plan reduced the number of districts with black majorities and reduced the

black proportion in other districts.  DOJ concluded that: "Since these reductions do not appear to

have been necessary to any legitimate governmental interest, we are unable to conclude that they

are free of the racial purpose and effect proscribed by Section 5."  Id.  On August 2, 1982, DOJ

objected to another legislative redistricting plan for Alabama because it appeared intentionally to

fragment black voting strength in the western Black Belt counties.  Senate Hearing, Legislative

Options, at 383 (2006) (Voting Rights in Alabama 1982-2006, report of RenewtheVRA.org);

House Hearing, History, Scope, and Purpose, Vol. I, at 275 (2005) (Letter from Wm. Bradford

Reynolds to Charles A. Graddick, August 2, 1982)  ("The State has failed to explain

satisfactorily why it adopted . . . a configuration for the 'Black Belt' area that departs measurably

from the state's criteria and offers less prospect for the black voters in those districts to

participate fully in the electoral process.").

Also in 1982, DOJ objected to a change imposing new deadlines for a minor party to be

included on a general election ballot.  According to DOJ, the changes and "the inadequacy and

untimeliness of the publicity . . . has made it virtually impossible for the non-major parties,

including the NDPA [black National Democratic Party of Alabama], to field their candidates for

---

[4]See Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options
after LULAC v. Perry, Hearing before the Subcommittee on the Constitution, Civil Rights and
Property Rights of the Committee on the Judiciary, United States Senate, 109th Cong., 2d Sess.,
at 371 (July 13, 2006) ("Senate Hearing, Legislative Options") (Voting Rights in Alabama 1982-
2006, report of RenewtheVRA.org).  See also Understanding the Benefits and Costs of Section 5
Pre-Clearance, Hearing Before the Committee on the Judiciary, United States Senate, 109th
Cong., 2d Sess., at 90 (May 17, 2006) (response of Fred Gray to Written Questions from Sen.
John Cornyn).

the 1982 elections."  House Hearing, History, Scope, and Purpose, Vol. I, at 267 (2005) (Letter from Wm. Bradford Reynolds to Lynda F. Knight, July 19, 1982)  (the state failed to carry its burden of showing the "change has no discriminatory purpose and effect").  On December 1, 1989, DOJ objected to a change in the method of selecting members of the Alabama State Democratic Executive Committee based upon allegations that it "is a calculated effort to decrease black influence and participation in Party affairs."  House Hearing, History, Scope, and Purpose, Vol. I, at 350 (2005) (Letter from James P. Turner to Albert E. LaPierre, December 1, 1989).

In City of Pleasant Grove v. United States, 479 U.S. 462 (1987), the Court affirmed the district court's denial of Section 5 preclearance to two annexations by the City of Pleasant Grove, Alabama, on the grounds that the city had engaged in a racially selective annexation policy.  The Court found it "quite plausible to see appellant's annexation[s] . . . as motivated, in part, by the impermissible purpose of minimizing future black voting strength."  Id. at 471-72.

DOJ objected to another change on November 8, 1991, proving for the creation of an additional judgeship elected at-large from a numbered post.  The objection was based upon allegations that Alabama "has continued to maintain the at-large, numbered post electoral system with the knowledge that this election method minimizes minority electoral opportunities" and a study that "found that voting in the 20th Century has been characterized by extreme racial bloc voting."  House Hearing, History, Scope, and Purpose, Vol. I, at 377 (2005) (Letter from John R. Dunne to David R. Boyd, November 8, 1991).  A similar objection was entered on December 23, 1991 to the creation of additional judgeships elected at-large in two other circuits.  DOJ was "unable to conclude that the state has carried its burden of showing the absence of the proscribed purpose in creating those positions through expansion of an existing system."  Id., Vol. I, at 381 (2005) (Letter from John R. Dunne to David R. Boyd, December 23, 1991).  A third objection was entered by DOJ on November 16, 1993 to the creation of a judicial position in the Sixth Judicial Circuit to be elected at-large by numbered post with a majority vote requirement.

14

Again, DOJ in objecting relied upon "racial polarization" in voting and that the at-large system may have deterred black candidates from running for the circuit court. <u>Id.</u>, Vol. I, at 408 (2005) (Letter from James P. Turner to Lynda K. Oswald, November 16, 1993). A fourth objection was entered on April 14, 1994 to the creation of new judgeships in light of "racially polarized voting" and "in the context of the at-large method of electing these courts." <u>Id.</u>, Vol. I, at 419 (2005) (Letter from Deval L. Patrick to Jimmy Evans, April 14, 1994). The four objections were subsequently withdrawn on March 18, 1996, based on <u>State of Arizona v. Reno</u>, 887 F.Supp. 318, 321 (D. D.C 1995), which held that a covered jurisdiction did not have to show that a proposed change did not violate the results standard of Section 2 of the Voting Rights Act, to receive preclearance under Section 5. Letters from Isabelle Katz Pinzler to Lynda K. Oswald, March 18, 1996.

On March 27, 1992, DOJ objected to the congressional redistricting plan enacted by the Alabama legislature on the ground that the fragmentation of black population concentrations in the state was evidence of "a predisposition on the part of the state political leadership to limit black voting potential to a single district." Senate Hearing, Legislative Options, at 384 (2006); House Hearing, History, Scope, and Purpose, Vol. I, at 385 (2005) (Letter from John R. Dunne to Jimmy Evans, March 27, 1992). DOJ further noted that: "In light of the prevailing pattern of racially polarized voting throughout the state, it does not appear that black voters are likely to have a realistic opportunity to elect a candidate of their choice in any of the districts." <u>Id.</u>

DOJ objected on January 31, 1994 to a change in the procedure for ratifying local amendments to the state constitution submitted by Alabama. Under the new procedure a referendum could not be held unless it was unanimously approved by a Local Constitutional Amendment Commission consisting of five state officials. DOJ noted that "the amendment process may diminish the opportunity of black voters to obtain referenda on issues of importance to them" because the commission "is principally composed of officials elected in statewide elections where black voters exert less influence." House Hearing, History, Scope, and Purpose,

15

Vol. I, at 415 (2005) (Letter from James P. Turner to Lynda K. Oswald, January 31, 1994).
DOJ concluded that the state had not sustained its burden of showing that the "submitted change
has neither a discriminatory purpose nor a discriminatory effect." Id.

Shelby County has also had Section 5 objections. In 1975, DOJ objected to six
annexations by the City of Alabaster, Shelby County, which included 1,170 white people and no
black people. Because elections for the city council were at-large with a majority vote
requirement and a numbered post system, and because of "a pattern of racial bloc voting in city
elections," DOJ could not "conclude that the major annexations taken together will not have a
dilutive effect on voting in Alabaster." Id., Vol. I, at 107 (2005); Letter from J. Stanley
Pottinger to Harold L. Davenport, July 7, 1975. In 1977 DOJ objected to two more annexations
by the City of Alabaster and for the same reasons. The city elected its council members at-large
and there was a continuing "pattern of racial bloc voting in city elections." Id., Vol. I, at 108
(2005); Letter from Drew S. Days III to William T. Harrison, December 27, 1977. DOJ was
unable to conclude that "the instant annexations will not abridge the right to vote on account of
race [or] color." Id. The City of Alabaster subsequently adopted single member districts, or
wards, for election of its council members. Nonetheless, DOJ in August 2000 objected to two
annexations affecting Ward 1, the only majority black ward in the city. The annexations would
have reduced the percentage of black registered voters in the ward from 51.2% to 45.7%, which
DOJ concluded "would seriously threaten, if not eliminate, the only opportunity minority voters
currently have to elect candidates of their choice to city office." House Hearing, History, Scope,
and Purpose, Vol. I, at 435 (2005) (Letter from Bill Lann Lee to J. Frank Head, August 16,
2000). The city failed to carry "its burden of showing that the designation of Ward 1
annexations has neither a discriminatory purpose nor a discriminatory effect." Id.

Another Section 5 objection was made in 1987 to annexations by the City of Leeds, a
portion of which is located in Shelby County. The effect of the annexations was to reduce the
total black population of the city from 18.5% to 15.2%, which DOJ concluded would make it

16

more difficult for blacks to elect candidates of their choice given at-large elections for the city council and "a general pattern of racially polarized voting." Id., Vol. I, at 321 (2005) (Letter from Wm. Bradford Reynolds to Gladys D. Prentice, May 4, 1987).  Under the circumstances, the city had not met its burden of showing that the changes had "no discriminatory purpose or effect." Id.  The Section 5 objection was subsequently withdrawn, but only because Leeds adopted single member districts pursuant to the consent decree in Dilliard v. Crenshaw County, C.A. No. 85-T-1332-N (M.D. Ala.).  House Hearing, History, Scope, and Purpose, Vol. I, 333 (2005) (Letter from James P. Turner to Gladys D. Prentice, May 23, 1988).

On August 25, 2008, DOJ interposed an objection under Section 5 to 177 annexations by the City of Calera, which is located in Shelby County, that had been implemented between 1993 and 2008.  DOJ concluded the city "had failed to meet its burden of establishing that the proposed changes would not have a discriminatory purpose or effect on minority voters." Declaration of Frank C. Ellis, Jr., p. 3 and Ex. B (Consent Decree, p. 3, United States v. City of Calera, No. 08-1982 (N.D. Ala. Oct. 29, 2008)) (Doc. #5).  Despite the objection, the city proceeded with municipal elections on August 26 and October 7, 2008, using the objected-to annexations.  Id.[5]

Attached as Appendix A is a chart of all of the Section 5 objections to voting changes in Alabama prior to 2007.  Of these 94 objections: 46 contained findings of racial polarization or the presence of racial bloc voting in the jurisdiction; 10 indicated that the jurisdiction had failed to submit changes as required by Section 5; and 27 contained some reference to intentional discriminatory conduct, pretextual justifications, or discriminatory racial purpose by the submitting jurisdiction.

Congress correctly concluded that "[t]his increased activity shows that attempts to

---

[5]In addition to Section 5 objections, Shelby County held a referendum election in 2002 under a law that had not been precleared.  DOJ, however, subsequently precleared the change. Declaration of Frank C. Ellis, Jr., p. 3 and Ex. A (Letter from Joseph D. Rich to Frank C. Ellis Jr., October 9, 2003) (Doc. #5).

discriminate persist and evolve, such that Section 5 is still needed to protect minority voters in the future."  H.R. Rep. No. 478, at 21 (2006).

<div align="center">(2) <u>The Impact of Bossier II on Section 5 Objections</u></div>

Plaintiff argues that the decline in Section 5 objections in recent years "undermine[s] the case for reauthorization."  Plaintiff's Mem. at 6.  Plaintiff fails to take into account the impact the decision in <u>Reno v. Bossier Parish School Bd.</u>, 528 U.S. 320 (2000) (<u>Bossier II</u>), had on Section 5 objections.  Although there were in fact a significant number of Section 5 objections after 1982, <u>Bossier II</u> had the effect of allowing preclearance of changes that would have been objected to under the preexisting standard.  <u>Bossier II</u> held that the purpose prong of Section 5 "covers only retrogressive dilution."  <u>Id.</u> at 328.  Thus, a voting change adopted with an admittedly discriminatory purpose would not be objectionable under Section 5 unless it was adopted with the purpose of making minority voters worse off than they were under the preexisting system.  The legislative history contains a comprehensive study of Section 5 objections, one of whose authors, Peyton McCrary, is an employee of the Voting Section of the Department of Justice.  The "principal finding" of the study was:

> by the 1990s, the purpose prong of Section 5 had become the dominate legal basis for objections.  Almost half (45 percent) of all objections were based on purpose alone.  If we include objections based both on purpose and retrogressive effect, and those based both on purpose and Section 2, the Department's finding of discriminatory purpose was present in 78 percent of all decisions to interpose objections in the decade preceding <u>Bossier II</u>.

McCrary, Seaman & Valelly "The End of Preclearance As We Knew It:  How the Supreme Court Transformed Section 5 of the Voting Rights Act" (November 1, 2005), at 79, reprinted in Voting Rights Act: Section 5-Preclearance Standards: Hearing Before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 1st Sess., at 96-181 (November 1, 2005) ("House Hearing, Preclearance Standards").

The report further concluded that "a purpose finding was present in an astonishing 89 percent of all redistricting objections in that decade."  <u>Id.</u>  The decline in objections over the past decade can be laid in large measure to the limitation on objections imposed by <u>Bossier II</u>, rather

<div align="center">18</div>

than a decline in discriminatory behavior by covered jurisdictions or a decline in the need for Section 5.  In response to Bossier II, the 2006 amendments provide that the term purpose "shall include any discriminatory purpose."  120 Stat. 580, sec. 5(3)(c).

   B.  Congressional Reliance Upon Requests for More Information and Section 5
       Enforcement Actions

Aside from objections, the record also showed that requests by the Department of Justice for more information (RMIs) in order to evaluate Section 5 submissions resulted in the modification of more than 800 proposed voting changes or their withdrawal from consideration. H.R. Rep. No. 478, at 40-1 & n.92 (2006).  In Alabama alone Section 5 prevented 181 voting changes from being implemented through the RMI process.  Luis Ricardo Fraga and Maria Lizet Ocampo, "More Information Requests and the Deterrent Effect of Section 5 of the Voting Rights Act," in Voting Rights Act Reauthorization of 2006: Perspectives on Democracy, Participation, and Power, at 46, 61 tbl. 3.1, 64 (Ana Henderson ed., 2007), reprinted in House Hearing, Evidence of Continued Need, Vol. II, at 2537-75 (2006).  This was the third highest number of changes blocked by RMI in any state.  Id.

Plaintiff claims that MIRs are "perhaps the least probative of intentional discrimination." Plaintiff's Mem. at 33.  The claim is refuted by the study of Fraga and Ocampo included in the legislative history.  They concluded that MIRs advanced two significant goals.  First, since MIRs "are issued at far higher rates than are letters of objection . . . they have the potential to affect a wider range and larger number of changes, relative to objections, submitted to the DOJ for review."  House Hearing, Evidence of Continued Need, Vol. II, at 2555 (2006).  Second, "the impact of MIRs that were likely to serve as deterrents to the pursuit of procedures and practices that could have a discriminatory effect on African Americans and language minorities demonstrates that MIRs double the number of changes that did not have legal standing to be implemented under Section 5."  Id.

Section 5 enforcement actions also blocked implementation of an extraordinary array of devices that would otherwise have diluted minority voting strength.  From 1982 to 2004,

plaintiffs succeeded in 105 Section 5 enforcement actions against jurisdictions that had failed to comply with Section 5.  House Hearing, Evidence of Continued Need, Vol.  I, at 250 tbl. 4 (2006) (data compiled by the National Commission on the Voting Rights Act).  See also Northwest Austin, 573 F.Supp.2d at 257.

In Alabama alone there were 22 successful Section 5 enforcement actions filed from June 29, 1982 to December 31, 2004 by the Department of Justice or private plaintiffs.  This is the second highest state total.  House Hearing, Evidence of Continued Need, Vol.  I, at 250 (2006) (data compiled by the National Commission on the Voting Rights Act).  See also House Hearing, History, Scope, and Purpose, Vol.  II, at 3203-04 (2005) (statement of James U. Blacksher discussing two Section 5 enforcement actions, Boxx v. Bennett, 50 F.Supp.2d 1219 (M.D. Ala. 1999) (three-judge court), and Ward v. Alabama, 31 F.Supp.2d 968 (M.D. Ala. 1998) (three-judge court)).

Section 5 also played a major role in preventing several jurisdictions sued in Dillard v. Crenshaw County, 640 F.Supp. 1347 (M.D. Ala. 1986), from implementing racially unfair districting systems.  Blacksher, Still, Quinton, Brown, and Dumas, "Voting Rights in Alabama: 1982-2006," 17 So. Cal. Rev. Law & Soc. Just. 249, 260 (2008).  Section 5 played a decisive role in the re-drawing of congressional and state legislative districts in Alabama, following publication of the 2000 Census.  Id. at 275.  The governor twice was enjoined by separate three-judge federal courts for his refusal to submit changes in voting for § 5 preclearance.  The Supreme Court reversed the first injunction, not because the governor's exercise of appointment power did not affect voting, but because it concluded the voting change had never gone into effect.  Riley v. Kennedy, 553 U.S. 406, 424-25 (2008), reversing 445 F. Supp.2d 1333 (M.D. Ala. 2006) (3-judge court).  But the second injunction was not disturbed on appeal.  Plump v. Riley, 2008 WL 192826 (M.D. Ala.), appeal dismissed, 129 S.Ct. 98 (2008).

C.  Congressional Reliance Upon the Use of Federal Observers

The need for Section 5 was also evident from "the tens of thousands of Federal observers

that have been dispatched to observe elections in covered jurisdictions."  120 Stat. 577, sec.

2(b)(4)&(5).  Since 1982 the Attorney General has assigned between 300 and 600 observers each

year.  H.R. Rep. No. 478, at 44 (2006).  Congress found that federal observers were certified by

the Attorney General "only when there is a reasonable belief that minority citizens are at risk of

being disenfranchised," often through "harassment and intimidation inside polling locations."

Id.  Five of the six states originally covered by Section 5 - Louisiana, Georgia, Alabama, South

Carolina, and Mississippi - accounted for about 66% of all the observer coverages since 1982.

Id. at 24-5.  Since 1982 the Attorney General sent observers to monitor elections in Alabama 67

times.  Senate Hearing, Legislative Options, at 367, 371 (2006) (Voting Rights in Alabama

1982-2006, report of RenewtheVRA.org).  As Congress found, "[o]bserves have played a critical

role preventing and deterring 14th and 15th amendment violations by communicating to the

Department of Justice any allegedly discriminatory conduct for further investigation."  H.R. Rep.

No. 478, at 25 (2006).

      D.  <u>Congressional Reliance Upon Continued Racial Bloc Voting</u>

      In extending Section 5 in 2006, Congress expressly found that "[t]he continued evidence

of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the

Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically

vulnerable, warranting the continued protection of the Voting Rights Act of 1965."  Pub. Law

109-246, 120 Stat. 577, Sec. (b)(3).  The House Judiciary Committee said racial bloc voting was

"the clearest and strongest evidence the Committee has before it of the continued resistance

within covered jurisdictions to fully accept minority citizens and their preferred candidates into

the electoral process."  H.R. Rep. No. 478, at 34 (2006).

      Recent judicial decisions cited in the legislative history have confirmed the continuing

patterns of racially polarized voting throughout the State of Alabama.  <u>See</u> House Hearing,

History, Scope, and Purpose, Vol.  II, at 3198-99 (2005) (statement of James U. Blacksher,

discussing <u>Dillard v. Baldwin County Commission</u>, 222 F.Supp2d 1283, 1290 (M.D. Ala. 2003)

(finding "racially polarized voting"), and <u>Montiel v. Davis</u>, 215 F.Supp.2d 1279, 1283 (S.D. Ala. 2002) (citing a report documenting a statewide pattern of cohesive African American voting)). The legislative history notes that the "recent unsuccessful efforts in 2003 and 2004 to remove discriminatory aspects of Alabama's 1901 Constitution through voter referenda are indicative of the racial cleavage that exists in Alabama to this day."  Senate Hearing, Legislative Options, at 367, 372 (2006)  (Voting Rights in Alabama 1982-2006, report of RenewtheVRA.org).  The proposed amendments would have removed language requiring racial segregation of schools, repealed the poll tax provisions, and removed language inserted in 1956 as part of Alabama's campaign of massive resistance to school desegregation.  Blacksher, <u>et al.</u>, 17 <u>So. Cal. Rev. Law & Soc. Just.</u> at 278.  <u>See also</u> <u>id.</u> at 276-7 ("Highly racially polarized voting patterns persist in present-day Alabama.  The pattern has been found to exist on a statewide basis by the U.S. Attorney General, expert voting witnesses and federal courts.  Without exception, based on numerous analyses by expert witnesses, federal courts and the Department of Justice have found severe racial polarization at the county and municipal levels in Alabama.") (footnotes omitted).

The 2008 presidential election in Alabama was also sharply polarized along racial lines. According to exit poll data, Barack Obama received 98% of the black vote in Alabama, but only 10% of the white vote.  In addition, the white vote for the Democratic candidate declined compared to the 2004 presidential election.  John Kerry got 19% of the white vote in Alabama in 2004, compared to Obama's 10% in 2008.[6]  These figures show that voting in Alabama is even more racially polarized today than in prior years, and particularly where an election provides voters a racial choice among candidates.  Congress acted appropriately in extending Section 5 in light of its finding, among others, of racially polarized voting in Alabama and the other covered jurisdictions.

---

[6]The source for the 2004 exit poll data is National Election Pool, Edison Media Research, & Mitofsky International, National Election Pool General Election Exit Polls, 2004, available at http://dx.doi.org/10.3886/ICPSRO4181.  The source for the 2008 exit poll data is MSNBC, Politics, 2008 Results, Exit Polls, http://www.msnbc.msn.com/id/26843704.

Racial bloc voting may not be evidence of intentional "governmental discrimination" as Plaintiff contends, Plaintiff's Mem. at 6, 31, but in determining if a proposed voting change violates Section 5 it is appropriate for the courts and the Department of Justice to take into account the effect the change would have in the context of racially polarized voting.  In <u>City of Rome</u>, 446 U.S. at 183, for example, the Court affirmed the denial of preclearance to various voting changes after concluding the lower court correctly held "that the electoral changes . . . when combined with the presence of racial bloc voting and Rome's majority white population and at-large electoral system, would dilute Negro voting strength."  Other decisions are to the same effect.  <u>See</u> <u>City of Port Arthur v. United States</u>, 459 U.S. 159, 163 (1982) (affirming a denial of preclearance on the grounds, <u>inter alia</u>, of "severe racial bloc voting" in the jurisdiction); <u>Busbee v. Smith</u>, 549 F.Supp. 494, 499 (D. D.C. 1982) (denying preclearance to Georgia's 1980 congressional redistricting after finding, <u>inter alia</u>, "racially polarized voting").

In denying preclearance to a change under Section 5, neither the court nor the Attorney General bans racial bloc voting.  They are only prohibiting the implementation of a voting change that would have the purpose or effect of abridging minority voting strength.

Racial bloc voting is also one of the factors identified in the Senate Report that accompanied the 1982 amendment and extension of the Voting Rights Act as probative of vote dilution under Section 2.  <u>See</u> Sen. Rep. No. 417, at 28-9 (1982) (listing the "Senate factors").  As the Court explained in <u>Thornburg v. Gingles</u>, 478 U.S. 30, 47 (1986), "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  By the same token, in assessing the impact of a voting change under Section 5, it is equally appropriate, and necessary, to take into account the conditions under which the change would be implemented and how it would interact with social and historical conditions, including racially polarized voting.

It is appropriate for Congress to take into account social and historic conditions in

23

enacting legislation to enforce the Fourteenth and Fifteenth Amendments.  In <u>Nevada Department of Human Resources v. Hibbs</u>, 538 U.S. 721, 730-31 (2003), for example, in sustaining the constitutionality of a challenged provision of the Family and Medical Leave Act, the Court noted that Congress relied heavily upon evidence of employment practices in the private sector.  In sustaining the constitutionality of the public accommodations provisions of the Civil Rights Act of 1964, the Court similarly noted the extensive evidence before Congress of discrimination in privately owned hotels and motels.  <u>Heart of Atlanta Motel, Inc. v. United States</u>, 379 U.S. 241, 253 (1964); <u>Katzenbach v. McClung</u>, 379 U.S. 294, 299-301 (1964).  As the Court said in <u>South Carolina v. Katzenbach</u>, 383 U.S. at 330, "[i]n identifying past evils, Congress obviously may avail itself of information from any probative source."  Congress's application of Section 5 to jurisdictions with the worst histories of discrimination in voting was entirely appropriate.

      E. <u>Blacks Have Been Elected Mainly from Majority Black Districts</u>

      Congress found that "gains by minority candidates remain uneven, both geographically and by level of office."  H.R. Rep. No. 478, at 33 (2006).  In three of the six originally covered states - Mississippi, Louisiana, and South Carolina - no African American had ever been elected to state-wide office.  <u>Id</u>.  The committee also reported that African Americans accounted for only 21% of state legislators in six southern states where the black population averaged 35% - Alabama, Georgia, Louisiana, Mississippi, South Carolina, and North Carolina.  <u>Id.</u>  The committee further found that the number of Latinos and Asian Americans elected to office nationwide "has failed to keep pace with [the] population growth" of those two communities.  <u>Id.</u>  Congress concluded that "without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years."  120 Stat. 577, Sec. 2(b)(9).

      The Plaintiff argues that Section 5 is no longer needed because there has been a significant increase in the number of black elected officials.  Plaintiff's Mem. at 27.  There has been an

increase in black elected officials, but Plaintiff fails to note that the overwhelming majority have been elected from majority black districts.  As Congress found, in 2000 only 8% of African Americans were elected from majority white districts.  Language minority citizens fared much worse.  As of 2000, no Native Americans or Hispanics had been elected to office from a majority white district.  H.R. Rep. No. 478, at 34 (2006).

In Alabama, for example, and as noted in the legislative history, as of 2005 no African Americans held statewide office.  Two African Americans who were initially appointed to the state Supreme Court were defeated in 2000 by white opponents.  Every African American member of the Alabama Legislature was elected from a single member district with an effective black voter majority.  House Hearing, History, Scope, and Purpose, Vol. II, at 3199 (2005) (statement of James U. Blacksher).  See also Blacksher, et al., 17 So. Cal. Rev. Law & Soc. Just., at 249 ("voting remains largely racially polarized, and black candidates rarely are elected in majority-white districts").  And most of the majority black districts had to be ordered by federal courts.  Id. at 260 et seq.

Plaintiff cites figures from South Carolina and Louisiana to support its argument that black office holding in covered states has undergone a "metamorphosis."  Plaintiff's Mem. at 27-8.  But again, Plaintiff fails to note that the increased black office holding has occurred primarily in majority black districts.  As noted in the legislative history:

> No African American has been elected to statewide office [in South Carolina] since passage of the Voting Rights Act.  Governor Mark Sanford told a reporter in 2005 that he did not expect to see such an election '[i]n the foreseeable future.'  In state legislative and county council elections, black candidates have been successful almost exclusively in districts which are majority or near majority black.  Not one of South Carolina's 8 black Senators or 23 black House of Representatives members was elected in a district with less than 45 percent black voting age population.  Only three of the current 99 African-American county council members have been elected in districts with less than 45 percent black voter registration.

House Hearing, Evidence of Continuing Need, Vol. I, at 1931 (2006) (Voting Rights in South Carolina 1982-2006, report of RenewtheVRA.org (March 2006)).  Similarly, in Louisiana every current black member of Congress and the state legislature was elected from a majority black

district.  All of the 33 black mayors in the state were elected from majority black cities.  Id., Vol.

II, at 1601-02 (2006) (Voting Rights in Louisiana 1982-2006, report of RenewtheVRA.org

(March 2006)).  Further evidence of racially polarized voting is evident from elections in which

David Duke, a former Grand Wizard of the Ku Klux Klan, participated.  In the Louisiana Senate

race of 1990, Duke won a majority of the white votes.  In the 1991 election for governor he won

55% of the white vote.  Id.  at 1602.  Given the pervasive extent of racially polarized voting in

both Louisiana and South Carolina, it is not surprising that expansion of black representation is

linked to the creation of majority black districts.  A similar pattern of minority office holding

exists in other covered states.  See  To Examine the Impact and Effectiveness of the Voting

Rights Act: Hearing Before the Subcommittee on the Constitution of the Committee on the

Judiciary House of Representatives, 109th Cong., 1st Sess., at 1165-67, 1172 (October 18, 2005)

("House Hearing, Impact and Effectiveness") (McDonald, Binford & Johnson, "Georgia," in

Quiet Revolution in the South; The Impact of the Voting Rights Act, 1965-1990, eds. Davidson &

Grofman (Princeton; Princeton U. Press, 1994), at 77-81, 90).

     According to the report of the National Commission on the Voting Rights Act, which is

included in the legislative history, the continuing underrepresentation of black elected officials

was the result of two factors: "strong anti-black attitudes that continue to find expression in

virtually every aspect of American life, and racially polarized attitudes on a host of policy

questions that loom large in the American political universe."  House Hearing, Evidence of

Continued Need, Vol.  I, at 159 (2006).

     F.  Congressional Reliance Upon The Deterrent Effect of Section 5

     There was extensive evidence before Congress that Section 5 has a strong deterrent effect.

Congress described preclearance as a "vital prophylactic tool," and that "the existence of Section

5 deterred covered jurisdictions from even attempting to enact discriminatory voting changes."

H.R. Rep. No. 478, at 21 (2006).  Congress found that "[a]s important as the number of objections

that have been interposed to protect minority voters against discriminatory changes is the number

26

of voting changes that have never gone forward as a result of Section 5." Id. at 24.

Many of Plaintiff's arguments - e.g., that Congress did not "produce a legislative record of a continuing pattern of discrimination pervasive enough to justify preclearance," Plaintiff's Mem. at 30 - are rhetorical flourishes that ignore or deny the facts in the legislative history. As the Court concluded in Northwest Austin, 129 S.Ct. at 2513, "Congress amassed a sizable record in support of its decision to extend the preclearance requirements." Congress correctly concluded based on the abundant evidence before it that the continuation of Section 5 was warranted.

G.  Congressional Reliance Upon Section 2 Litigation

Congress concluded that the need for Section 5 was further evident from "the continued filing of section 2 cases that originated in covered jurisdictions," many of which resulted in findings of intentional discrimination. 120 Stat. 577, sec. 2(b)(4)&(5). See also Northwest Austin, 573 F.Supp. 2d at 258-62 (discussing Section 2 cases cited in the legislative history finding intentional racial discrimination in Alabama, South Carolina, Texas and Virginia). Plaintiff tries to minimize the significance of Section 2 litigation by noting that "the legislative record identified only twelve published cases between 1982 and 2006 finding intentional, race-based voting discrimination by any covered jurisdiction." Plaintiff's Mem. at 6, 34. Plaintiff further argues that "Section 2 litigation is equally distributed between covered and non-covered jurisdictions." Id. at 40. Plaintiff fails to note, however, that the great majority of Section 2 cases were unreported. A report cited in the legislative history estimates that more than 1600 Section 2 lawsuits may have been filed, with a majority in the covered jurisdictions. House Hearing, Impact and Effectiveness, at 974 (2005) (Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982 (2005) ) .

Plaintiff also fails to note that less than one-quarter of the U.S. population resides in a jurisdiction covered by Section 5. House Hearing, Impact and Effectiveness, at 974 (2005) (Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982 (2005) ) . Section 2 litigation thus had far more impact on residents of covered

jurisdictions than those of non-covered jurisdictions.  In addition, based only on published decisions, plaintiffs won more Section 2 lawsuits in Section 5 jurisdictions than they did in non-covered jurisdictions.  Of the 114 decisions favorable to the plaintiffs, 64 originated in covered jurisdictions.  Id.

Plaintiff also fails to take into account two other critical factors.  First, Section 5 preclearance has blocked hundreds of intentionally discriminatory voting changes in recent times in the covered jurisdictions reducing the need for Section 2 litigation.  Second, Section 5 has deterred many covered jurisdictions from attempting to implement intentionally discriminatory voting changes, further reducing the need for Section 2 litigation.

In any event, in nine of the covered southern states, from June 29, 1982 to December 31, 2004, there were 66 reported successful Section 2 cases.  During the same period there were 653 reported and unreported successful Section 2 cases.  House Hearing, Evidence of Continued Need, at 251 tbl. 5 (2006) (data compiled by the National Commission on the Voting Rights Act).[7]  These numbers are conservative and do not include cases in which Section 2 claims were raised but were decided on other grounds, e.g., one person, one vote violations.  In Alabama alone, during this period there were 12 successful reported Section 2 cases and a total of 192 successful Section 2 cases, reported and unreported.  Id.  As the National Commission on the Voting Rights Act concluded, the nine state data indicates "that there is still much serious vote discrimination against minorities in America today."  Id. at 208.  A study conducted by the Voting Rights Initiative of the University of Michigan Law School, which was included in the legislative history and which examined the reported Section 2 cases, similarly concluded:

> Four decades after the enactment of the Voting Rights Act, racial discrimination in voting is far from over.  Federal judges adjudicating Section 2 cases over the last twenty-three years have documented an extensive record of conduct by state and local officials that they have deemed racially discriminatory and intentionally so. Judicial findings under the various factors set forth in the Senate Report reveal determined, systematic, and recent efforts to minimize minority voting strength.

_____

[7]The nine states were Alabama, Arizona, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, Texas, and Virginia.  Id.

House Hearing, Impact and Effectiveness, at 975 (October 18, 2005) (Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982 (2005)).

As further appears from the legislative history, decisions since 1982 have found numerous examples of intentional discrimination in Alabama.  In 1988, the district court held that Alabama laws and processes related to appointing election officials were intentionally discriminatory. Senate Hearing, Legislative Options, at 372 (2006) (Voting Rights in Alabama 1982-2006, report of RenewtheVRA.org, June 2006; Harris v. Siegelman, 695 F.Supp. 517, 526 (M.D. Ala. 1988)). Black persons "are grossly underrepresented among poll officials, with the result that polling places across the state continue to be viewed by many blacks as areas circumscribed for whites and off-limits for blacks." Id. (Harris v. Graddick, 593 F.Supp. 128, 133 (M.D. Ala. 1984)).  In another decision the court concluded: "From the late 1800s through the present, the state has consistently erected barriers to keep black persons from full and equal participation in the social, economic, and political life of the state." Id. at 373 (Dillard v. Crenshaw County, 640 F.Supp. at 1360). See also Harris v. Graddick, 593 F.Supp. at 130 (racial discrimination in Alabama "has manifested itself in practically every area of political, racial, and economic life"); United States v. Alabama, 252 F.Supp. 95, 101 (M.D. Ala. 1963) ("from the Constitutional Convention of 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society").

The litigation in Dillard v. Crenshaw County, brought in 1985 and decided on Section 2 grounds, had a dramatic impact on elections in Alabama.  The court found that Alabama's laws governing at-large elections had been manipulated intentionally during the 1950s and 1960s to make them "more effective and efficient tools for keeping black voters from electing black candidates."  640 F.Supp. at 1356.  The rules imposed by general law on all at-large elections included anti-single shot provisions, numbered places, and majority vote requirements.  Id. at 1360.  As a result of the Dillard litigation a defendant class was created consisting of 17 county

commissions, 28 county school boards, and 144 municipalities who were using at-large election systems tainted by the state's racially motivated laws.  Senate Hearing, Legislative Options, at 373 (2006) (Voting Rights In Alabama, 1982-2006, A Report of RenewtheVRA.org, June 2006). Virtually all of the jurisdictions significantly modified their election systems to provide greater access to minority voters.  Id. at 374.[8]

Shelby County was one of the Dillard jurisdictions and subsequently adopted nine single member districts for the election of its commission.  Id. at 393.   Municipalities in Shelby County that were also required to change their discriminatory at-large systems were Calera, Columbiana, Harpersville, Vincent, Wilsonville, and Walton.  Id. at 395-97.[9]  The Dillard litigation underscores the wisdom of Congress in extending Section 5 to ensure that there will be no retrogression in minority voting rights in Alabama, Shelby County,  and the other covered jurisdictions.

H.  Section 5 Plays an Important Role in Court Ordered Remedies

Aside from objections and deterrence, Section 5 also continues to play an important role in court ordered remedies.  The cases below, which are discussed in the legislative history, are examples of that role.  House Hearing, Evidence of Continued Need, Vol. I, at 378-1269 (2006) (report of American Civil Liberties Union).

In Colleton County Council v. McConnell, 201 F.Supp.2d 618 (D. S.C. 2002), in implementing court ordered legislative and congressional redistricting in South Carolina, the three-judge court held that it must comply with Sections 2 and 5 of the Voting Rights Act. Accordingly, it rejected plans that had been proposed by the governor and the legislature because they were "primarily driven by policy choices designed to effect their particular partisan goals."

---

[8]Twelve of the county commissions changed to single member districts and one agreed to adopt cumulative voting.  Twenty-three of the school boards adopted single member districts and one adopted cumulative voting.  One-hundred-two of the municipalities changed to single member districts, five adopted cumulative voting, and two adopted plurality vote rules.  Id.

[9]Calera, Columbiana, Vincent, and Waton adopted single member districts, Harpersville multi-member districts, and Wilsonville a plurality vote rule.  Id.

Id. at 628.  Those "choices" included protecting incumbents and assigning the minority population to maximize the parties' respective political opportunities.  Id. at 659.  The governor had argued that districts with black populations as low as 44.61% provided black voters an equal opportunity to elect candidates of their choice within the meaning of the Voting Rights Act.  The court disagreed.  Noting the "high level of racial polarization in the voting process in South Carolina," it concluded that "a majority-minority or very near majority-minority black voting age population in each district remains a minimum requirement."  Id. at 643 and n.22.  The plan implemented by the court increased the number of majority black house districts from 25 to 29, maintained the existing nine majority black senate districts, and maintained the Sixth Congressional District as majority black.

In Larios v. Cox, 314 F.Supp.2d 1357 (N.D. Ga. 2004), following the failure of Georgia to redistrict its house and senate, the three-judge court appointed a special master to prepare plans.  The initial plan paired nearly half of all black house members (18 of 39), including long term incumbents and chairs of important house committees.  The Legislative Black Caucus moved to intervene and filed a brief arguing that the proposed plan would be retrogressive in violation of Section 5, and would also violate the racial fairness standard of Section 2.  The three-judge court, agreeing with the objections raised by the Black Caucus, instructed the special master to redraw the plan to avoid, where possible, the paring of incumbents.  The special master did so, and the plan as finally adopted by the court cured the pairing of minority incumbents, except in an area near Savannah where the paring was unavoidable.  The three-judge court held that complying with the population equality standard was "a paramount concern in redrawing the maps;" next in importance was "to insure full compliance with the Voting Rights Act."  314 F.Supp.2d at 1360.

Smith v. Clark, 189 F.Supp.2d 529 (S.D. Miss. 2002), involved Mississippi, which lost a congressional seat as a result of the 2000 census.  Both state and federal courts became involved in the redistricting process and drew plans relying upon the non-retrogression standard of Section 5, which maintained one of the districts as majority black.  Id. at 535, 540.

31

In <u>Bone Shirt v. Hazeltine</u>, 387 F.Supp.2d 1035, 1042 (D. S.D. 2005), the district court adopted a court ordered plan for the house and senate to cure a Section 2 violation after concluding that the plan "complies with 5 of the Voting Rights Act."  In creating new majority Indian districts, the court held it had adhered to the principles of "protection of minority voting rights consistent with the United States Constitution, the South Dakota Constitution, and federal statutes."  <u>Id.</u>

In drawing a remedial plan following a Section 5 objection to the plan proposed by the City of Albany, Georgia, the court  adopted a remedial plan prepared by the state reapportionment office, and directed that a special election for the mayor and city commission by held in February 2004.  The court emphasized that "[i]n drawing or adopting redistricting plans, the Court must also comply with Sections 2 and 5 of the Voting Rights Act."  Under the court ordered plan, blacks were 50% of the population of Ward 4, and a substantial majority in four of the other wards.  <u>Wright v. City of Albany, Georgia</u>, 306 F.Supp.2d 1228, 1235, 1238 (M.D.Ga. 2003), and Order of December 30, 2003.  But for Section 5, elections would have gone forward under a plan in which purposeful discrimination was "implicit," and which could only have been challenged in time consuming vote dilution litigation in which the minority plaintiffs would have borne the burden of proof and expense.

The cases cited and discussed in the legislative history demonstrate the critical role that Section 5 plays in court ordered redistricting.  In the absence of Section 5, the courts may well have adopted plans that subordinated minority voting rights to partisan goals or diluted minority voting strength.

IV.  <u>Post-2006 Extension Section 5 Challenges</u>

Within days of passage of the 2006 extension of Section 5, the Northwest Austin Municipal Utility District located within the City of Austin, Texas, filed suit in the District of Columbia Court arguing that it was eligible to bail out from Section 5 coverage, but if not Section 5 was now unconstitutional.  The three-judge court held the district was not eligible to bail out,

and that the extension of Section 5 was constitutional applying the requisite rational basis standard set forth Katzenbach, as well as the stricter standard of congruence and proportionality applied in City of Boerne v. Flores, 521 U.S. 507 (1997).  Northwest Austin, 573 F.Supp. 2d at 233-34, 245, 278-79.[10]

The utility district appealed and the Supreme Court reversed and remanded.  It held the district was in fact eligible to bail out from Section 5 coverage, and as a consequence the Court would "avoid the unnecessary resolution of constitutional questions" involving Section 5.  Northwest Austin, 129 S.Ct. at 2508.  The majority opinion underscored the vital role the Act has played in American politics: "The historic accomplishments of the Voting Rights Act are undeniable," and the improvements in minority political participation "are no doubt due in significant part to the Voting Rights Act itself, and stand as a monument to its success."  Id. at 2511.[11]

The State of South Dakota also challenged the constitutionality of the 2006 extension of Section 5.  As a result of the 1975 amendments extending coverage to language minorities, two

---

[10]After the 2006 extension, the Supreme Court decided Riley v. Kennedy, a case involving the application of Section 5.  Although the constitutionality of the statute was not at issue, none of the Justices suggested it was now unconstitutional.  The only member of the Court to reference the 2006 extension was Justice Stevens, who dissented and was joined by Justice Souter.  He wrote that while "it may well be true that today the statute is maintaining strict federal controls that are not as necessary or appropriate as they once were," that "since Congress recently decided to renew the VRA, and our task is to interpret that statute, we must give the VRA the same generous interpretation that our cases have consistently endorsed throughout its history."  553 U.S. at 430.

[11]Following remand, the utility district, the United States, and the defendant intervenors filed a proposed consent decree allowing the utility district to bail out from Section 5 coverage.  The consent decree was approved by the three-judge court on November 3, 2009, and the claim challenging the constitutionality of Section 5 was dismissed without prejudice.  Northwest Austin,  No. 1:06-cv-1384 (D. D.C. 2009).  As of November 3, 2009, 109 jurisdictions from 11 states were currently bailed out from Section 5 coverage.  See http://www.justice.gov/crt/voting/misc/sec_4.php.  Sandy Springs, Georgia, and Kings Mountain, North Carolina subsequently bailed out from Section 5 with DOJ consent.  City of Kings Mountain v. Holder, No. 1:10-cv-01153 (D. D.C. October 22, 2010) (consent decree allowing bailout); The City of Sandy Springs v. Holder, No. 1:10-cv-01502 (D. D.C. October 26, 2010) (consent judgment and decree granting bailout).  Given the decision in Northwest Austin, the number of Section 5 bailouts can be expected to increase, further undercutting the argument that Section 5 is unduly burdensome or that the coverage formula is unfair.

counties in South Dakota, Todd and Shannon, home to the Pine Ridge and Rosebud Indian

Reservations, became subject to Section 5.  The state was sued in 2009 by tribal members from

Shannon County for, among other things, failing to comply with Section 5.  The state, repeating

the arguments made in prior cases, claimed that Section 5 as applied to Shannon County was now

outdated and that the county was experiencing high voter registration rates and above national

average voter turnout rates.  In rejecting these arguments, the court relied upon prior Supreme

Court decisions upholding the constitutionality of Section 5 and concluded that: "South Dakota's

history of discriminating against Native Americans and the risk that such discrimination will

increase in the absence of the preclearance requirement set forth in Section 5 of the Voting Rights

Act compels the court to reject state defendants' argument that Section 5 of the Voting Rights Act

is unconstitutional as applied to Shannon County."  Janis v. Nelson, 2009 WL 5216902 *8 (D.

S.D.).  The parties subsequently submitted to mediation and the county and state defendants

agreed to comply with Section 5.

V.   The Coverage Formula Is Constitutional

As noted above, Plaintiff's argument that the Section 4(b) coverage formula is "obsolete"

and "constitutionally indefensible," Plaintiff's Mem. at 6, was rejected in Katzenbach, 383 U.S. at

329, City of Rome, 446 U.S. at 182, and Sumter County, 555 F. Supp. at 707.  Plaintiff also

contends that "the coverage formula lacks any connection to the current legislative record."

Plaintiff's Mem. at 37.  To the contrary, the legislative history of the 2006 extension of Section 5

discussed above demonstrates there was an ample basis for Congress's conclusion that "without

the continuation of the Voting Rights Act of 1965 protections, racial and language minority

citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes

diluted, undermining the significant gains made by minorities in the last 40 years."  120 Stat. 577,

Sec. 2(b)(9).  The current need for Section 5 is demonstrated and justified by: Section 5 objection

letters blocking voting changes that appeared to be intentionally discriminatory; RMIs fom DOJ

that resulted in the modification of more than 800 proposed voting changes or their withdrawal

34

from consideration; Section 5 enforcement actions that blocked implementation of an extraordinary array of devices that would otherwise have diluted minority voting strength; the continued filing of Section 2 cases in covered jurisdictions, many of which resulted in findings of intentional discrimination; efforts by DOJ to implement the minority language provisions of the Act; Federal observers dispatched to observe elections in covered jurisdictions; the deterrent effect of Section 5 that prevented covered jurisdictions from adopting discriminatory voting changes; and the continued evidence of racially polarized voting in each of the jurisdictions covered by Section 5.

Plaintiff further challenges the coverage formula as being "vastly underinclusive." Plaintiff's Mem. at 42. To the contrary, Section 5 applies to all jurisdictions which used a discriminatory test or device for voting and where minority registration was significantly depressed, and which had a history of "insidious and pervasive evil which had been perpetuated . . . through unremitting and ingenious defiance of the Constitution." Katzenbach, 383 U.S. at 309. But even assuming some uncovered jurisdictions should be covered, Plaintiff fails to note that Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), allows them to be subjected to Section 5 based upon a court finding that they have violated the Fourteenth or Fifteenth Amendment. Courts may "retain jurisdiction for such period as [they] may deem appropriate" and order that during that time no voting change take effect unless either approved by the court or unopposed by the Attorney General. Id. The judicial "bail-in" provision, known as the pocket trigger, addresses Section 5's potential under-inclusiveness.

Plaintiff also argues that Section 5 is underinclusive because racially polarized voting "is as likely to exist in non-covered jurisdictions" as covered jurisdictions, and that "Congress should have crafted Section 4(b)'s formula to cover all jurisdictions where that problem exists." Plaintiff's Mem. at 40. Plaintiff ignores the fact that the uncovered jurisdictions did not use a discriminatory test or device for voting, and did not have the kind of history of discrimination that would have justified the application of Section 5 to them. But if a jurisdiction should be

covered, it can be bailed-in under Section 3(c).

Plaintiff further argues that the Supreme Court in <u>Northwest Austin</u> held that "Section 5 and Section 4(b) raise serious constitutional questions" and that the Court's "legal reasoning that served as the foundation for that conclusion . . . is binding here."  Plaintiff's Mem. at 20 n.3 (citing <u>Comcast v. FCC</u>, 600 F.3d 642, 650 (D.C. Cir. 2010) ("carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative") (citation omitted)).  While the Court said "the Act's preclearance requirements and its coverage formula raise serious constitutional questions," 129 S.Ct. at 2513,  Plaintiff neglects to point out that the Court also said "[i]t may be that . . . conditions continue to warrant preclearance under the Act." <u>Id.</u> at 2511-12.  The Court further acknowledged that: "The Fifteenth Amendment empowers 'Congress,' not the Court, to determine in the first instance what legislation is needed to enforce it.  Congress amassed a sizable record in support of its decision to extend the preclearance requirements, a record the District Court determined 'document[ed] contemporary racial discrimination in covered states.'  573 F.Supp.2d, at 265." <u>Id.</u> at 2513.   Thus, the Supreme Court's carefully considered statements that conditions continue to exist that may warrant Section 5 preclearance and that Congress amassed a sizable record in support of its decision to extend the preclearance requirements must also be treated as authoritative here.

Equally to the point, the fact that the Supreme Court avoided adjudicating the constitutionality of Section 5 indicates its support of the 2006 extension.  As the Court held in <u>Clark v. Martinez</u>, 543 U.S. 371, 381 (2005), "[t]he canon [of avoiding adjudicating constitutional questions] is thus a means of giving effect to congressional intent, not of subverting it."

VI.  <u>Specific Findings of Intentional Discrimination Are not Required</u>

One of Plaintiff's principle arguments is that evidence of "purposeful discrimination [is] needed to justify reauthorization of Section 5."  Plaintiff's Mem. at  32.  The identical argument was rejected in <u>City of Rome</u> , 446 U.S. at 177, where the Court held "the Act's ban on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of

36

the Fifteenth Amendment, even if it is assumed that § 1 of the Amendment prohibits only intentional discrimination in voting."  The fact that Congress did not make particularized findings of intentional discrimination with respect to every jurisdiction covered by Section 5, including Shelby County, is immaterial.  The Supreme Court has recognized that Congress can exercise its enforcement powers under the Fourteenth and Fifteenth Amendments to reach even those jurisdictions with no proven history of discrimination.

In Oregon v. Mitchell, 400 U.S. 112 (1970), for example, the Court upheld the 1970 nationwide ban on literacy tests even though there were no findings of nationwide discrimination, let alone that literacy tests had been used to discriminate in every jurisdiction of the country.  The Supreme Court has recognized that in the interests of uniformity in the application of the law, Congress "may paint with a much broader brush" than the Court itself, which is confined to cases and controversies based upon particular factual records.  Id. at 284 (Stewart, J., concurring in part and dissenting in part).  In a concurring opinion, Justice Harlan explained that:

> Despite the lack of evidence of specific instances of discriminatory application or effect, Congress could have determined that racial prejudice is prevalent throughout the Nation, and that literacy tests unduly lend themselves to discriminatory application, either conscious or unconscious.  This danger of violation of  § 1 of the Fifteenth Amendment was sufficient to authorize the exercise of congressional power under § 2.

Id. at 216.  And see Lopez, 525 U.S. at 282 ("[Section] 5's preclearance requirement applies to a covered county's nondiscretionary efforts to implement a voting change required by state law, notwithstanding the fact that the State is not itself a covered jurisdiction").

Whether Alabama or Shelby County or any other covered jurisdiction has committed acts of intentional discrimination is immaterial.  Even in the absence of evidence of specific instances of discrimination, Congress determined that racial prejudice is prevalent throughout the covered jurisdictions, and that changes in voting practices could lend themselves to discriminatory application, either conscious or unconscious.  This danger of violation of § 1 of the Fifteenth Amendment was sufficient to authorize the exercise of congressional power under § 2.

A.   There Was In Fact Substantial Evidence of Intentional Discrimination

Plaintiff further argues that the evidence in the legislative history of Section 5 objections, MIR's, Section 5 enforcement actions, and the denial of requests for preclearance by the District Court for the District of Columbia does not "come[] close to proving the existence of pervasive intentional discrimination." Plaintiff's Mem. at 32. Although acts of intentional discrimination are not required, the legislative history discussed in detail above, including Section 5 objections and findings in Section 2 litigation, document the existence of continued intentional discrimination in the covered jurisdictions. Other voting practices from Section 5 jurisdictions identified in the House and Senate hearings that had the purpose or effect of discriminating against minority voters included:

> challenges by white voters or elected officials to majority minority districts; pairing black incumbents in redistricting plans; refusing to draw majority minority districts; refusing to appoint blacks to public office; maintaining a racially exclusive sole commissioner form of county government; refusing to designate satellite voter registration sites in the minority community; . . . refusing to allow registration at county offices; refusing to comply with Section 5 or Section 5 objections; transferring duties to an appointed administrator following the election of blacks to office; white opposition to restoring elections in a majority black town; . . . disqualifying black elected officials from holding office or participating in decision making; . . . refusing to hold elections following a Section 5 objection; maintaining an all white self-perpetuating board of education; . . . failure to provide bilingual ballots and assistance in voting; . . . packing minority voters to dilute their influence; and using discriminatory punch card voting systems.

House Hearing, Evidence of Continued Need, Vol. I, at 31-3 (2006) (statement of Nadine Strossen, President, American Civil Liberties Union).

VII.   "Gamesmanship" Is not Required, Although Evidence of It Was Found by Congress

Plaintiff further argues that Section 5 is now unconstitutional because "the 2006 congressional record contains no evidence of a systematic campaign of voting discrimination and gamesmanship by the covered jurisdictions - the only evidence that could continue to justify preclearance." Defendant's Mem. at 5. The argument fails for a number of reasons.

First, Plaintiff misinterprets South Carolina v. Katzenbach. The Court emphasized that Congress knew "some" covered states had "contriv[ed] new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees," but it

upheld Section 5 even though the record contained no evidence that all covered jurisdictions had engaged in such behavior.  383 U.S. at 335.  Moreover, the Court never stated that evidence of "gamesmanship" was essential to Section 5's constitutionality.  The critical factor, repeatedly stressed by the Court, was that "Congress had found that case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered in these lawsuits." Id. at 328; see also id. at 313-15 (explaining why case-by-case litigation had "proved ineffective").

Second, in City of Rome the Court upheld Section 5 as reauthorized in 1975 for similar reasons and without addressing any evidence of gamesmanship.  The Court cited instead evidence of disparities between the percentages of whites and blacks registered in several of the covered jurisdictions, the number of black elected officials and the extent to which they had been elected to statewide and legislative offices, the number and nature of Section 5 objections, and the findings of Congress supporting the 1970 extension of Section 5.  446 U.S. at 180-81.  The Court further noted that: "Case-by-case adjudication had proved too ponderous a method to remedy voting discrimination."  Id. at 174.  Accord, Georgia v. United States, 411 U.S. at 538 n.9 ("[t]he very effect of § 5 was to shift the burden of proof with respect to racial discrimination in voting"). The Supreme Court confirmed this interpretation of and justification for Section 5 in City of Boerne, 521 U.S. at 526: "The [Voting Rights Act's] new, unprecedented remedies were deemed necessary given the ineffectiveness of the existing voting rights laws, and the slow, costly character of case by-case litigation." (citations omitted); see also Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 373 (2001) ("In [the Voting Rights] Act . . . Congress also determined that litigation had proved ineffective."); Lopez, 525 U.S. at 266 (same with regard to Section 5 reauthorization in 1982); Sumter County, 555 F.Supp. at 707-08 (same).

In extending Section 5 in 2006, Congress again concluded that "failure to reauthorize the temporary provisions, given the record established, would leave minority citizens with the

39

inadequate remedy of a Section 2 action." H.R. Rep. No. 478, at 57 (2006). This conclusion was based on extensive testimony that Section 2 litigation places the burden of proof on the victims of discrimination rather than its perpetrators, imposes a heavy financial burden on minority plaintiffs, cannot prevent enactment of discriminatory voting measures, and allows them to remain in effect for years until litigation is concluded. See, e.g., House Hearing, History, Scope, and Purpose, Vol. I, at 92, 97, 101 (2005) (testimony of Nina Perales); id. at 79, 83-84 (testimony of Anita Earls); House Hearing, Evidence of Continued Need, Vol. 1, at 97 (2006) (testimony of Joe Rogers).[12]  The Court relied on similar findings in Tennessee v. Lane, 541 U.S. 509, 531 (2004), to sustain the constitutionality of a challenged statute: "Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this 'difficult and intractable proble[m]' warranted 'added prophylactic measures in response.'" (alteration in original) (quoting Hibbs, 538 U.S. at 737).

Finally, even if evidence of contemporary stratagems to evade court orders were necessary, the 2006 legislative record documents such behavior. As the House Committee Report concluded regarding the 1982-2006 period, "voting changes devised by covered jurisdictions resemble those techniques and methods used in 1965, 1970, 1975, and 1982 including: enacting discriminatory redistricting plans; switching offices from elected to appointed positions;

---

[12]In Large v. Fremont County, Wyo., 709 F.Supp.2d 1176 (D. Wyo. 2010), for example, plaintiffs filed their Section 2 complaint in October 2005, but did not get a decision on the merits until April 2010, some five years later.  In Levy v. Lexington County, South Carolina, 589 F.3d 708 (4th Cir. 2009), the plaintiffs filed their Section 2 complaint in September 2003, but did not get a decision on the merits until February 2009, which was subsequently vacated and remanded for consideration of two intervening election cycles.  Federal courts have rated voting cases among the most complex tried by federal courts.  According to a study conducted by the Federal Judicial Center measuring the complexity and time needed to handle matters by the district courts, voting rights cases were among the top five most complex cases and were given a weight of 3.86 compared to 1.0 for an "average" case.  Federal Judicial Center, "2003-2004 District Court Case-Weighting Study," Table 1, p. 5 (2005).  The only cases  given a higher weight were Civil RICO, Patent, Environmental Matters, and Death Penalty Habeas Corpus.  One of the reasons vote dilution cases are so complex is because of the factors identified by the legislative history and the Supreme Court as relevant to the "totality of circumstances" analysis required by Section 2.  Gingles, 478 U.S. at 36-8.  Section 2 litigation is without question time consuming and expensive, and does not provide a prompt remedy for denial of minority voting rights as does Section 5.

relocating polling places; enacting discriminatory annexations and deannexations; setting numbered posts; and changing elections from single member districts to at large voting and implementing majority vote requirements."  H.R. Rep. No. 478, at 36 (2006).

The 1960s-style gamesmanship is less common today, but that is because Section 5 has been effective in deterring overt discrimination in voting.  See H.R. Rep. No. 478, at 57 (2006) ("[d]iscrimination today is more subtle than the visible methods used in 1965").  Given Plaintiff's logic, Congress could only authorize Section 5 based upon findings that it had been ineffective. But the fact that Section 5 has been effective supports, rather than undermines, its appropriateness as a remedy.  The conclusion of Congress that without the continuation of Section 5 "racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted," 120 Stat. 578, sec. 2(b)(9), is amply supported by the legislative history.

VIII.  The Boerne Line of Cases Supports the Constitutionality of Section 5

The Boerne line of cases, upon which the Plaintiff relies, Plaintiff's Mem. at 4, 7, 17-9, 23-4, 30, does not call into question but supports the constitutionality of Section 5.  In City of Boerne the Court invalidated the Religious Freedom Restoration Act of 1993 (RFRA), which had been enacted by Congress based upon its enforcement powers under Section 5 of the Fourteenth Amendment.  In doing so, the Court concluded there was an absence of "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  521 U.S. at 520.  The Court defined "congruence and proportionality" as an agreement "between the means used and the ends to be achieved.  The appropriateness of remedial measures must be considered in light of the evil presented."  Id. at 530.  However, the Court repeatedly cited the Voting Rights Act as an example of congressional legislation that was constitutional.

Boerne cited the Voting Rights Act's suspension of literacy tests as an appropriate measure enacted under the Fifteenth Amendment "to combat racial discrimination in voting."  Id. at 518  It held the seven year extension of Section 5 in 1975 and the nationwide ban on literacy

41

tests were "within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States." Id. Section 5 was an "appropriate" measure "'adapted to the mischief and wrong which the [Fourteenth] [A]mendment was intended to provide against'." Id. at 532 (quoting The Civil Rights Cases, 109 U.S. 3, 13 (1883)).  Congress acted in light of the "evil" of "racial discrimination [in voting] which in varying degrees manifests itself in every part of the country." Id. at 526 (quoting Oregon v. Mitchell, 400 U.S. at 284).  The legislative record disclosed "95 years of pervasive voting discrimination," and "modern instances of generally applicable laws passed because of [racial] bigotry." Id. at 527, 530.  By contrast, the legislative history of RFRA, in the view of the Court, contained no such evidence, leading it to conclude that "RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Id. at 532.

Boerne further held that while legislation implementing the Fourteenth Amendment did not require "termination dates" or "geographic restrictions . . . limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate." Id. at 533.  As noted above, as of November 3, 2009, 109 jurisdictions from 11 states were currently bailed out from Section 5 coverage.  Two more jurisdictions, Sandy Springs, Georgia, and Kings Mountain, North Carolina, were granted bailout in October 2010.  And given the decision in Northwest Austin, the number of Section 5 bailouts can be expected to increase, further demonstrating that Section 5 is "proportionate to ends legitimate."  In addition to allowing bailout, Section 5 contains a number of other limitations on its coverage which further argue for the congruence and proportionality of the statute: confinement to those regions of the country where voting discrimination had been most flagrant; limitation to a discrete class of state laws, i.e., state voting laws; and, the existence of a coverage termination date.

The Court in Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank, 527 U.S. 627, 640 (1999), another case involving Section 5 enforcement of the Fourteenth

Amendment, invalidated the Patent Remedy Act, 35 U.S.C. §§ 271(h) & 296(a), allowing suits against a state because "Congress identified no pattern of patent infringement by the States, let alone a pattern of unconstitutional violations."  But as in <u>City of Boerne</u>, the Court in <u>Florida Prepaid</u> expressly noted the constitutionality "of Congress' various voting rights measures" passed pursuant to the Fourteenth and Fifteenth Amendments, which it described as tailored to "remedying or preventing" discrimination based upon race.  <u>Id</u>. at 639.

     <u>Kimel v. Florida Board of Regents</u>, 528 U.S. 62 (2000), another Fourteenth Amendment enforcement case, invalidated the provisions of the Age Discrimination in Employment Act of 1967 (ADEA), that subjected states to suit for money damages for age discrimination.  But nothing in the opinion suggests that any provision of the Voting Rights Act is unconstitutional.  First, the Court held that classifications based upon age were unlike those based upon race, and that "age is not a suspect classification under the Equal Protection Clause."  <u>Id</u>. at 83.  Second, the Court held that "States may discriminate on the basis of age if the classification is rationally related to a legitimate state interest."  <u>Id</u>.  Classifications based on race, however, are constitutional only if they are narrowly tailored to further a compelling governmental interest.  Age classifications, unlike racial classifications, are "presumptively rational."  <u>Id</u>. at 84.  Against this backdrop, the Court concluded that ADEA was not "responsive to, or designed to prevent, unconstitutional behavior."  <u>Id</u>. at 86.  In addition, according to the Court, in the legislative history of ADEA "Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation."  <u>Id</u>. at 89.

     In <u>United States v. Morrison</u>, 529 U.S. 598 (2000), the Court invalidated a section of the Violence Against Women Act of 1994, 42 U.S.C. §13981, which provided penalties against private individuals who had committed criminal acts motivated by gender bias.  The Court concluded that the disputed provision could not be upheld as a proper exercise of congressional power under Section 5 of the Fourteenth Amendment because "it is directed not at any State or

state actor, but at individuals."  Id. at 626.  Section 5, by contrast, is by its express terms directed

at states and state actors, i.e., at "any State or political subdivision."  Moreover, the Court cited as

examples of the proper exercise of congressional power under the Fourteenth and Fifteenth

Amendments the various voting rights laws found to be constitutional in Katzenbach v. Morgan,

383 U.S. 641, 658 (1966), and South Carolina v. Katzenbach.

 In Garrett, the Court invalidated a portion of Title I of the Americans with Disabilities Act

of 1990 (ADA) allowing state employees to recover money damages by reason of the state's

failure to comply with the statute.  The Court concluded there was no evidence of a "pattern of

unconstitutional discrimination on which § 5 [of the Fourteenth Amendment] legislation must be

based."  531 U.S. at 370.  However, the Court underscored the constitutionality of the Voting

Rights Act and singled it out as a preeminent example of appropriate legislation enacted to

enforce the race discrimination provisions of the Civil War Amendments in the area of voting.

Id. at 373.

 In sum, none of the recent federalism decisions of the Court cast doubt on the

constitutionality of Section 5 of the Voting Rights Act.  To the extent they discuss legislation

enacted by Congress pursuant to the enforcement provisions of the Fourteenth and Fifteenth

Amendments to redress the problem of racial discrimination in voting, they do so to affirm its

constitutionality.

 Two post-Boerne decisions, moreover, indicate the Court would not apply the strict

congruence and proportionality standard where Congress has legislated to prevent discrimination

on the basis of race or to protect a fundamental right, such as voting.  In Hibbs, 538 U.S. at 736,

the Court affirmed the constitutionality of the family leave provisions of the Family and Maternal

Leave Act, noting that "state gender discrimination . . . triggers a heightened level of scrutiny," as

opposed to the rational basis level of scrutiny that applies to age discrimination, as was the case in

Garrett.  Because of this difference, "it was easier for Congress to show a pattern of state

constitutional violations" in Hibbs.  Id.  The Court also cited with approval various decisions of

the Court which rejected challenges to provisions of the Voting Rights Act "as valid exercises of Congress' § 5 power [under the Fourteenth Amendment]."  Id. at 738.

And in Lane, 541 U.S. at 534, the Court held Title II of the Americans With Disabilities Act, as applied to the fundamental right of access to the courts, "constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment."  According to the Court, "the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent."  Id. at 523.

As the Court held in Katzenbach, 383 U.S. at 324, Congress may use "any rational means to effectuate the constitutional prohibition of racial discrimination in voting."  Congress thus acted appropriately in extending Section 5.

<div align="center">Conclusion</div>

Given the extensive record before it of continued discrimination in voting, Congress concluded with near unanimity that the extension and amendment of the Voting Rights Act was necessary "to ensure that the right of all citizens to vote, including the right to register to vote and cast meaningful votes, is preserved and protected as guaranteed by the Constitution."  120 Stat. 577, sec. 2(a).  The legislative record and the considered judgment of Congress are entitled to deference by this Court which should therefore affirm the constitutionality of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006.  The extension of Section 5, based upon the established precedents of the Supreme Court, was appropriate congressional action under both the Fourteenth and Fifteenth Amendments.  Plaintiff's motion for summary judgment should be denied and Defendant-Intervenors' motion for summary judgment should be granted.

Respectfully submitted,

s/Laughlin McDonald

_____
LAUGHLIN McDONALD
NANCY ABUDU
American Civil Liberties
Union Foundation, Inc.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303-1227
(404) 523-2721
(404) 653-0331 (fax)
lmcdonald@aclu.org
mbell@aclu.org

s/Arthur B. Spitzer

_____
Arthur B. Spitzer (D.C. Bar. No. 235960)
American Civil Liberties Union of the
Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel. (202) 457-0800
Fax (202) 452-1868
artspitzer@aol.com

*Attorneys for Applicants*

Laura D. Blackburne
Interim General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
(410) 580-5791
(410)358-9350 (fax)
lblackburne@naacpnet.org

Victor L. Goode
Assistant General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
(410) 580-5120
(410) 358-9350 (fax)
vgoode@naacpnet.org

*Attorneys for Applicant Alabama State
Conference of the NAACP.*

46

Allison E. Neal
American Civil Liberties Union of Alabama
207 Montgomery Street, Suite 910
Montgomery, AL 36104
(334) 265-2754
(334) 269-5666 (fax)
anaclual@bellsouth.net

*Of Counsel*

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| State (T6864) | Act No. 243 (1969), Garrett Act--Independent Candidate qualification deadline | 8/1/1969 | | | |
| Baldwin County (T6815) | Act No. 60 (1966)--poll list signature requirement | 11/13/1969 Withdrawal 10-21-75 (V8804-8808) | | | |
| Dale County (T6818) | Act No. 126 (1967)--poll list signature requirement | 11/13/1969 | | | |
| Morgan County (T6813) | Act No. 221 (1965)--poll list signature requirement | 11/13/1969 | | | |
| Montgomery County (T6816) | Act No. 112 (1966)--poll list signature requirement | 11/13/1969 | | | |
| Mobile County (T6814) | Act No. 812 (1965)--poll list signature requirement | 11/13/1969 | | | |
| Lee County (T6820) | Act No. 552 (1965)--poll list signature requirement | 11/13/1969 | | | |
| Escambia County (T6819) | Act No. 479 (1967)--poll list signature requirement | 11/13/1969 | | | |
| Russell County (T6817) | Act No. 119 (1967)--poll list signature requirement | 11/13/1969 | | | |
| Mobile County (T6833) | Act No. 1052 (1969)--poll list signature requirement | 12/16/1969 | | | |
| State (T6812) | Act No. 604 (1970)--absentee registration literacy requirement | 3/13/1970 | | | |
| Birmingham (Jefferson Cty.) (T7933) | Act No. 507 (1969)--numbered posts | 7/9/1971 | | | |
| Talladega (Talladega Cty.) (V3059) | Act No. 91 (1971)--anti-single shot | 7/23/1971 | | | |
| Autauga County School District (V3928) | Act No. 2268 (1971)--at-large elections; residency requirement | 3/20/1972 | | | |
| Autauga County (V4078-79) | Act No. 1451 (1971) at-large elections; majority vote requirement; residency requirement | 3/20/1972 | | | |
| State (V3871-72) | Act Nos. 2229 and 2230 (1972)--assistance to illiterates restricted | 4/4/1972 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| State (V4074) | Act No. 2324 (1971)--two independent candidate petition signature requirements | 8/14/1972 | | | |
| State (V4105) | Act No. 2445 (1971)--elected to appointed justices | 12/26/1972 | | | |
| Mobile (Mobile Cty.) (V5607) | Act No. 1483 (1971)--candidate qualification procedures | 8/3/1973 | | | |
| Pike County (V6511) | Act No. 156 (1969)--at-large elections, majority vote requirement; residency requirement; staggered terms | 8/12/1974 | "Our analysis reveals that even though blacks constitute over 34% of the population (1970 Census) in Pike County no black has ever been elected to the Court of County Commissioners in modern times.  We further note the existence of the majority vote requirement in primary elections, that commissioners are elected on a staggered basis and Act No. 156 requires a candidate to reside in and seek election from one of the four commissioner districts." | | |
| Sumter Cty. Democratic Executive Committee (V6901) | Anti-single shot | 10/29/1974 | | | |
| Talladega (Talladega Cty.) (V7125) | Ordinance No. 997--numbered posts | 3/14/1975 | "No black persons have been elected to the city council. The history of black participation in the electoral process of the city suggests a pattern of racial bloc voting." | | |
| Fairfield (Jefferson Cty.) (V6603) | Annexation | 4/10/1975 | "Pattern of racial bloc voting…narrow margins of victory by white over black candidates." | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| | | Withdrawn 10-8-76 | | | |
| Alabaster (Shelby Cty.) (V8168-69) | Six annexations | 7/7/1975 | | "As you know, the city's 11 annexations were submitted simultaneously under Section 5 despite the fact that the individual annexations were accomplished throughout the years 1971, 1972 and 1973." | |
| | | Withdrawn 5-3-83 upon change in method of election | | | |
| Bessemer (Jefferson Cty.) (X0910-16) (V7007) | Seven Annexations | 9/12/1975 | | | |
| | | Withdrawn 7-7-86 upon change in method of election | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Phenix City (Russell Cty.) (V9991) | Act No. 698 (1975)--staggered terms | 12/12/1975 | "The population of Phenix City, according to the 1970 Census, is 25,281, 37% of which is black.  The city's three-member governing body is elected on an at-large, majority vote basis, and single-shot voting is permissible.  No black person has ever been elected to the Phenix City Commission." | "Significant to that consideration is the fact that the adoption of the numbered post system authorized pursuant to Act No. 1173, 1971 Alabama Legislature, is unenforceable since the changes incorporated into that legislation has never met the preclearance requirements of Section 5. Thus the only presently enforceable method of electing the three city commissioners is on an at-large basis as resulting from the changes contained in Act No. 52, 1971 Alabama Legislature, which has met Section 5 requirements." | |
| State (X0521) | Act No. 1196, Sections 5, 43, 44-primary date | 1/16/1976 | | | |
| Pickens County (V6511) | Reapportionent of Democratic Party Executive Committee | 2/18/1976 | | | |
| State (X1121) | Act No. 1205 (1975)--combines Bibb and Hale Counties for judicial district | 2/20/1976 | | | |
| Mobile (Mobile Cty.) (V9335) | Act No. 823 (1965), Sections 2 and 12--form of city government and specified duties for commissioners | 3/2/1976 | "...Mobile has a history of racial discrimination in general and our information suggeststhat a pattern of racial block voting exists." | | |
| Pickens County School District (X2669) | Act No. 72 (1975)--redistricting | 3/5/1976 | | | |
| Chambers County (V9127, X1782B) | Act No. 475 (1973)--at-large nomination of county commissioners; Act No. 2001 (1971) | 3/8/1976 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Chambers County School District (X1840) | Act No. 843 (1975)--at-large elections; numbered posts; majority vote requirement | 3/10/1976 | "In a county such as Chambers, which we understand has a history of racial discrimination and a pattern of racial bloc voting, such a dilution denies blacks a realistic opportunity to participate in the political process." | | |
| Hale County (V6804) | Act No. 1092 (1969)--at-large elections | 4/23/1976 | "there is a pattern of racial bloc voting in Hale County and that no black has ever been elected to county-wide office" | | |
| Sheffield (Colbert Cty.) (V8341) | At-large method of election | 7/6/1976 | | | |
| Hale County (X8956) | Act Nos. 320 (1965), 2022 (1971) and 620 (1973)--at-large elections | 12/29/1976 | "Our investigation has resulted in the conclusion that the black population of Hale County has been prevented from entering the political process in a reliable and meaningful manner. This is evidenced by the fact that in Hale County no black has ever been elected to county-wide office." | | |
| | | Declaratory judgment denied in <u>Hale County v. United States</u>, 496 F. Supp. 1206 (D.D.C. 1980) | | | |
| Alabaster (Shelby | Two annexations | 12/27/1977 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Cty.) (A3009, A2991) | | Withdrawn 5-3-83 upon change in method of election | | | |
| Barbour County (A3381) | Act Nos. 10 (1965) and 171 (1967)--method of election--at-large elections; residency requirements; reduction in number of commissioners from seven to five; numbered posts for dual-member residency district | 7/28/1978 | "We also note that the at-large election system was adopted soon after the Voting Rights Act of 1965 enabled substantial numbers of blacks to participate in the electoral process for the first time... We also note that a majority vote is required for nomination, that numbered posts are used, and that terms are staggered, and our analysis indicates that voting in Barbour County is along racial lines." | | |
| Hayneville (Lowndes Cty.) (A6405) | Incorporation | 12/29/1978 | | | "it appears that the purpose of the incorporation was to reduce the influence over Hayneville of the majority black Lowndes County electorate and to prevent the possibility of control of the Town of Hayneville by blacks residing within the Town." |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Clarke County (C0017) | Act No. 2446 (1971)--at-large election of county commission | 2/26/1979 | "Although blacks constitute 44 percent of the population of the county (according to the 1970 census), blacks have not been elected to the commission… Finally, our analysis of precinct election returns for the 1972 and 1976 primary elections and the 1976 run-off primary indicates that voting in Clarke County follows racial lines." | | |
| Pleasant Grove (Jefferson Cty.) (80-1197) | Act No. 79-419 (1979)--annexation | 2/1/1980 | | | "We note that the City of Pleasant Grove today contains some 6,500 persons, all of whom are white; that areas adjacent to the annexed area have been developed for exclusively white residential use; that similar development is planned for the annexed areas, and that several identifiably black areas have petitioned for annexation to the City of Pleasant Grove, but that the city has taken no steps to annex those areas, despite the passage of a considerable length of time. We have also noted reports of activities indicating the presence of considerable antagonism toward black persons in the vicinity of Pleasant Grove." |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| | | Declaratory judgment denied in <u>City of Pleasant Grove</u> v. <u>United States</u>, 623 F. Supp. 782 (D.D.C. 1985), aff'd, 479 U.S. 462 (1987) | | | |
| Selma (Dallas Cty.) (80-1168 | Redistricting | 4/28/1980 | "Our analysis reveals that in addition to evidence of a general pattern of racially polarized voting in the City of Selma, a black candidate lost election from Ward Three by a slim margin under the existing plan and that one effect of the proposed plan is to reduce the black population percentage of Ward Three." | | |
| Sumter County (7X-0062) | Act No. 79-729 (1979)--voting machines; number of beats; polling places | 10/17/1980 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Barbour County (81-1085) | Redistricting | 7/21/1981 | Our analysis also reveals that the county's submitted plan divides the predominantly black population concentrations in the northern and western portions of the county among three districts (Districts 3, 5, and 6) and the areas of black population concentration within the City of Eufaula among three districts (Districts 1, 2 and 4). This fragmentation of black population concentrations results in a plan that contains no district in which a majority of the voters are black, even though the County is 44 percent black, according to the 1980 Census. … In addition, apparent racial bloc voting and the majority vote requirement further impinge on black voting strength. | Barbour County has a long history of failing to comply with the preclearance provisions of the Voting Rights Act.  This submission itself is the result of court action stemming from such a failure. | In addition, there is evidence pertinent to the question of an impermissible racial purpose. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Conecuh County (80-1151) | Act No. 2284 (1971)--method of election (two multi-member districts) | 9/14/1981 | The change has submerged into larger multi-member districts sizeable black concentrations so as to dilute the minority voting strength that those voters would have enjoyed under a continued single-member district plan. These circumstances, in the context of the racially polarized voting patterns that seem to exist in Conecuh County, raise at least an inference of a proscribed racially discriminatory purpose in the adoption and implementation of such a system and clearly results in a prohibited effect under the Act. | | The change has submerged into larger multi-member districts sizeable black concentrations so as to dilute the minority voting strength that those voters would have enjoyed under a continued single-member district plan. These circumstances, in the context of the racially polarized voting patterns that seem to exist in Conecuh County, raise at least an inference of a proscribed racially discriminatory purpose in the adoption and implementation of such a system and clearly results in a prohibited effect under the Act. |
| Perry County (81-1191) | Act No. 81-226--purge and reidentification of voters | 9/25/1981 | we have noted the history of resistance to black voting in Perry County and the resulting litigation in the 1960's, as well as the continuing racial polarization of voting patterns that seem to exist.  Our analysis shows that the likely effect of this reidentification and purge will be to effectively dilute the voting strength of the black electorate in Perry County. | | |
| Sumter County (81-1211) | Act No. 81-224--reidentification of voters | 10/2/1981 | | | |
| Perry County (81-1192) | Act No. 81-635--voting machines | 10/26/1981 Withdrawn 4-19-82 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Wilcox County (81-1224) | Act No. 81-383--purge and reidentification of voters | 10/26/1981 | "...our analysis shows that the right to vote in Wilcox County and in the State of Alabama historically has been denied or abridged on account of race or color and that the State of Alabama and Wilcox County have adopted and seek to implement the submitted practices over the strong opposition of black residents, who constitute 69 percent of the county's population." | | |
| Barbour County (81-1089) | Redistricting | 11/16/1981 | "Such a comparison necessarily must take into account the existence of racially polarized voting in Barbour County.  Also important to our analysis is the wide discrepancy in voting age population between blacks and whites in Barbour County. …"; fragmentation of black population. | | |
| Montgomery (Montgomery Cty.) (81-1180) | Redistricting | 1/5/1982 Withdrawn 2-23-82 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Conecuh Cty. Democratic Executive Committee (82-1336) | Method of election (two multi-member districts); size of committee | 4/23/1982 | | | We note that prior to 1971, members of the County Democratic Executive Committee were elected from 16 two-member districts, a number of which are predominantly black.  Under the submitted change, executive committee members are elected from two 15-member districts, both of which contain large white majorities.  The change was first enacted shortly after the first black candidacies in the county and since enactment of the change, no more than one member of the thirty-member committee has been a black person. The absence of black representation, moreover, appears to be a significant contributing factor in the racial disparities found to exist in the Conecuh County election process which we have previously brought to your attention. |
| State (82-1363) | Act No. 81-1049--House and Senate reapportionment | 5/6/1982 | significant packing and cracking of black population | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| State (82-1365) | Act Nos. 572 (H.B. No. 278) and 611 (H.B. No. 10) (1982)--candidate qualifying and nominating procedures for minor parties | 7/19/1982 | | | It is our understanding that the predominantly black National Democratic Party of Alabama is still one of the largest active minor parties in the State and that it, along with other minor parties available to minority voters, is subject to the provision of both of the submitted Acts…. Our conclusion is based, in part, on the inadequacy and untimeliness of the publicity which has made it virtually impossible for the non-major parties, including the NDPA, to field their conadidates *[sic]* for the 1982 elections. |
| Butler County (7X-0049) | Act No. 136 (1969)--method of electing county commissioners | 7/19/1982 | Our analysis has also revealed evidence of racially polarized voting, non-responsiveness on the part of commission members to the particularized needs of the black community, and other factors which, in the context of a history of racial discrimination in the county, indicate that the at-large election system enacted by Act No. 136 (1969) denies black voters equal access to the county government. | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Conecuh County (82-1339) | Redistricting | 7/26/1982 | We note that a high level of racial bloc voting obtains in county elections, and that even though much of the black population in Conecuh County is concentrated in the southeastern portion of the City of Evergreen (Beat II-3) and the adjacent southeastern portion of the County (Beats 7 and 16), none of the proposed districts has a black majority. | | The County has offered no satisfactory explanation for adopting, instead, a plan that needlessly fragments black communities in the southeast, leaving the minority population with no district in which its actual voting strength can be realized. |
| State (82-1366) | Act No. 82-629 (H.B. No. 19)--House and Senate reapportionment | 8/2/1982 | | | The State has failed to explain satisfactorily why it adopted, instead, a configuration for the "Black Belt" area that departs measurably from the stated criteria and offers less prospect for the black voters in those districts to participate fully in the electoral process. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Mobile County (81-1171) (82-1447) | Act No. 81-740 and No. 82-377--voter registration procedures | 10/19/1982 | "Given the large land area of Mobile County, the county's large voting age population, the failure of the county to provide deputy registrars, and the requirement of decennial reidentification, it would appear that a registration program that does not offer a continuing reasonable opportunity for county residents to register on a decentralized basis imposes a serious burden on persons not registered. Because the registration percentage of blacks in Mobile County appears to be substantially lower than that of whites, the burden of a change that will have the effect of reducing voter registration opportunities on a decentralized basis likely would fall more heavily on blacks than on whites." | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Tallapoosa County (83-1374) | Method of electing county commissioners from single-member districts to at-large | 5/10/1983 | our analysis of election returns for county commissioner and school board elections, as well as other information showing a racial consciousness in Tallapoosa County elections, indicates a pattern of racially polarized voting. Where such a phenomenon exists under an at-large system, coupled with a majority vote requirement as it is in Alabama elections, minorities have little chance of electing a candidate of their choice or significantly influencing the outcome of elections. | | |
| Monroe County (7X-0058) | Method of electing county commissioners from single-member districts to at-large election | 2/17/1984 | we note that under both the 1970 and 1980 Censuses, blacks constituted more than 42 percent of the population of Monroe County; yet no black has ever been successful in winning a seat on the council.  On the other hand, our analysis indicates that blacks are concentrated in the northern part of the county and appear to have constituted a significant majority in two of the four previously existing single-member districts…  In the context of racially polarized voting which appears to exist in the county.... | | |
| Adamsville | 1981 and 1982 annexations | 3/26/1984 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| (Jefferson Cty.) (84-1517) | (totaling 34) | Withdrawn 7-27-84 upon change in method of election | | | |
| Selma (Dallas Cty.) (83-1242) | Ordinance No. 83-05--redistricting (Councilmanic wards) | 4/20/1984 | "According to 1980 Census data, blacks constitute 52.6 percent of the city's population and 48.5 percent of the city's voting age population. It is conceded that racially polarized voting prevails in Selma elections." | | |
| Greene County (84-1505) | Act No. 507, H.B. No. 830 (1983)--changes the method of appointing the members of the county racing commission | 6/18/1984 Withdrawn 10-31-84--determined not to be a change affecting voting; subsequently enjoined under Section 5 from being implemented in Hardy v. Wallace, 603 F. Supp. 174 (N.D. Ala. 1985) | According to the 1980 Census, Greene County is 78 percent black. We note that, as a result of the latest reapportionment of the Alabama representative and senatorial districts in 1983 (Act No. 83-154), a unified Greene County has elected two blacks as its local delegation. Prior to that election, a divided Greene County had been represented by an all-white local delegation. | | |
| Eutaw (Greene Cty.) (84-1502) | Districting plan | 8/21/1984 | | | |
| Baldwin County (84-1416) | Act No. 84-734--purge and reidentification of voters | 12/11/1984 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Houston County (80-1180, 84-1513) | At-large elections with numbered posts and Act No. 84-571--at-large elections with four candidate residency districts; numbered positions | 10/15/1985 | We note that over 22 percent of Houston County's population is black and that black citizens began to register to vote in substantial numbers shortly before the county decided to adopt the at-large election structure. Under the at-large structure no black candidate has been elected to the county commission and a strong pattern of racial bloc voting in local contests seems to exist. At the same time, the county's black population is highly concentrated, so that under a neutrally apportioned single-member district election plan it is likely that in one district black citizens would constitute a substantial majority of the population. | | |
| Greensboro (Hale Cty.) (85-1532) | Deannexation | 10/21/1985 | "Information available to us indicates that there is a long history of discrimination against black citizens in Greensboro, that racial bloc voting in local elections exists, and that there is an absence of black elected officials in the municipality." | | Moreover, the city's decision apparently was made in direct response to resistance on the part of white voters to having the area rezoned for subsidized public housing and such racially motivated action is unacceptable.  You have not provided additional information which might establish a nonracial basis for the city's actions. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Marengo County (86-2012; 86-2013) | Increase in number of members from five to six; method of election--from at-large to mixed; districting plan (county commission districts and board of education) | 2/10/1986 | | | |
| Dallas County (86-1882) | Method of election--from at-large to single-member districts; districting plan (commissioners) | 6/2/1986 | | | We have received allegations that this fragmentation was designed to aid the white incumbent in that area by excluding from District 1 an announced black candidate, who resides at Craig Field, along with a sizeable, politically active, black population concentration that has developed there since the compilation of the 1980 Census.  No nonracial explanation for the seemingly illogical exclusion of this area from District 1 has been offered.  While efforts to protect incumbency do not conclusively evidence discriminatory purpose, the circumstances here suggest that the county commission's actions were motivated, at least in significant part, by racial considerations…. I cannot conclude that the county has met its burden of showing that the submitted election plan was not enacted with the intent to deny or abridge the right to vote of black citizens of Dallas County. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Bay Minette (Baldwin Cty.) (85-1442, 85-1443, 85-1445) | Three annexations | 10/6/1986 | "Our analysis of the information received concerning Bay Minette indicates that almost all of the persons living within the three annexed areas are white, and from all that we can determine, it would appear that the annexations decrease the black population percentage in the city by approximately five percent.  This decrease is significant because it occurs in the context of a city whose council is chosen through an at-large election system characterized by racially polarized voting.  In that regard, we note that since 1965 there have been nine black candidacies for municipal office but none have been successful." | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| | | Withdrawn 6-22-87, upon change in method of election | At the outset, we note that black voters have been unable, until 1984, to elect a candidate of their choice to the city council even though a number of such candidates have sought council positions over the years. This appears in substantial part to be the result of a general pattern of racially polarized voting occurring in the context of the city's electoral system which is characterized by at-large voting, numbered posts, and a majority vote requirement. | | |
| Alexander City (Tallapoosa Cty.) (86-2116) | 1986 annexation | 12/1/1986 Withdrawn 12-7-87 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Prichard (Mobile Cty.) (86-2037) | Act No. 58 (1971) and the 1971 deannexation | 2/3/1987 | | | "...according to information provided by you and other interested parties, the impetus behind this deannexation effort was in large part racially based and this information remains unrebutted....Act No. 58 was specially designed to restrict participation in the electoral phase of the deannexation to white voters desiring to leave Prichard, thus eliminating participation of the increasingly active black electorate as regularly allowed by Alabama law. This special election procedure has not been demonstrated to be free of racially discriminatory purpose or effect as required by Section 5." |
| Leeds (Jefferson, | Twenty-nine annexations | 5/4/1987 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| St. Clair, and Shelby Ctys.) (85-1578, 85-1579, 86-1960, 87-1615) | | Withdrawn 5-23-88, upon change in method of election | "...black candidates but have been unable, with one exception, to elect a candidate of their choice to the city council even though a number of such candidates have sought council positions over the years.  This appears in substantial part to be the result of a general pattern of racially polarized voting occurring in the context of the city's electoral system which is characterized by at-large voting, numbered positions, and a majority vote requirement.  With regard to the one successful black candidate, we note that, apparently as a result of that same bloc voting phenomenon, he was defeated for reelection in 1980 but that he was again successful in the 1984 election which, we understand, occurred after black residents indicated that they were considering a court challenge to the city's at-large election system.  Thus, the success of candidates preferred by black voters appears to be completely at the sufferance of the white majority." | | |
| Marion (Perry Cty.) (87-1706) | Implementation of the January 7, 1965, resolution creating the separate city school district | 5/5/1987 | | | Nevertheless, it appears that this method of selecting the school board is still less advantageous to blacks than the county-wide elections it replaced and the allegations of racial purpose in adoption have not been adequately rebutted. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Dallas County School District (87-1555) | Districting plan | 6/1/1987 | | | the plan submitted by the board overly concentrates blacks into District 4 and fragments the remaining black population in Selma between Districts 2 and 5 resulting in a plan that minimizes the opportunity for blacks to participate equally in the electoral process. Even so, you have declined to provide any nonracial justification for the submitted configuration. Finally, we understand that these districts were drawn to protect incumbent board members.  While efforts to protect incumbency do not, per se, evidence discriminatory purpose, the circumstances here suggest that the county school district's actions were motivated, at least in significant part, by racial considerations. |
| Roanoke (Randolph | Multimember district method of | 3/15/1988 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Cty.) (87-1722) | election; districting plan; two annexations; two referenda | Objection to annexations and referenda withdrawn upon change in method of election | Thus, the 3-2 plan seems calculated to operate to minimize the political influence of the growing black population in Roanoke by limiting it to the election of representatives whose effectiveness on the council would necessarily be nullified by the cohesive white majority which the plan itself assures." | | Finally, both the September 22, 1987, annexation referendum, which was limited to the racially restricted constituency, and the January 12, 1988, special election, in which residents of the annexed area were allowed to participate in violation of the Voting Rights Act, necessarily are infected by the discriminatory purpose on which the annexation itself appears to have been based. |
| Tallassee (Elmore and Tallapoosa Ctys.) (88-1891) | Ordinance No. 86-213--revised annexation requirements | 12/19/1988 | | | |
| State (89-1469) and Dothan (Dale, Henry, & HoustonCtys.) (89-1285, 89-4040) | Act No. 88-445, as amended by Act No. 88-331--insofar as it provides that a Class 5 municipality (such as Dothan) that adopts the mayor-commissioner-city manager form of government is required to utilize a four single-member district method of election and the districting plans (adopted by Dothan) which sought to implement that requirement | 6/12/1989 | | | Subsequently, certain white city officials met privately and resolved to have enacted the changes now submitted for Section 5 preclearance, including the four-district plan. When the commission endorsed these changes at its April 7, 1988, meeting, the mayor explained that there was "a strong feeling in the white community" that the six-district approach would allow blacks too much of an electoral opportunity (though blacks constitute at least 26 percent of the city's population, and the six-district proposal would give blacks the opportunity to elect 28 percent of the commission). |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Foley (Baldwin Cty.) (86-1811) | Three annexations | 11/6/1989 | | | However, the information furnished later by the city, after a protracted effort to obtain a complete and accurate response to our request for additional information, reveals no nonracial explanation for the rejection of the Mills Quarters petition. |
| | | Withdrawn 7-1-96 | | | |
| State Democratic Party (89-1264) | Amendment of the rules of the Alabama Democratic Party, which changes the method of selecting members of the State Democratic Executive Committee (SDEC); alters the method of selecting the Vice Chairman for Minority Affairs; and changes the method of selecting minority members of the Executive Board of the SDEC | 12/1/1989 | "The authority taken away from the ADC, a black constituent organization, is transferred to the entire SDEC, a body which foreseeably will, by Party rule, continue to be about 75 percent white.  Nor has it been demonstrated that this change is related to giving greater recognition to the existence of other black political organizations which may now be competing with the ADC.  In these circumstances, we are unable to certify that the Party has carried its burden under Section 5 with regard to the manner of selecting extra black members to the SDEC nor with respect to the change in method of choosing the Vice Chair for Minority Affairs and minority members of the Executive Board." | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Dallas County (90-1693) | Additional procedures for the 1990 implementation of the voter reidentification and purge program under Act No. 84-389, including the schedule and voter update program | 6/22/1990 | | | |
| Valley (Chambers Cty.) (89-1242) | Creation of the Valley School System | 10/12/1990 | | | Our investigation has revealed evidence that racially invidious considerations may have played a role in the decision to create a new city school system.  First, we note, with regard to the 1980 incorporation of the City of Valley, that despite assurances to the contrary made when the incorporation of Valley was before us for Section 5 review, present indications are that the incorporation was especially motivated by the desire to create a separate city school system.  That incorporation defined an irregularly shaped city which included the six schools intended for the Valley School System, but which excluded significant areas of black population concentration.  No satisfactory explanation has been provided for the city's ten-year delay in bringing within its boundaries these areas of black population concentration despite assurances that this would be done promptly.  Indeed, information has been brought to our attention that black citizens living in areas just outside the city limits had petitioned the city for annexation, |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| | | | | | but these petitions were unfavorably received. Second, it appears that one of the reasons for the proposal to create the Valley School System was to separate the predominantly white City of Valley area from the Chambers County School District because of a perception by Valley officials that black voters exercise significant political influence on the election of the county board and superintendent. We also note that black persons residing within the proposed school district limits will essentially be transferred from a governmental system (the Chambers County School District) in which blacks have an equal opportunity to participate in the political process and elect candidates of their choice to a governmental system (City of Valley) in which currently blacks have no such comparable opportunity. |
| | | Withdrawn 7-27-92 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Democratic Party (Perry Cty.) (90-1837) | 1989 Bylaws concerning the fair representation principle and the rule for equal division by gender (Article II, Section 2, fourth through seventh sentences) to elect executive committee members | 12/3/1990 | "Our investigation has revealed that elections where black candidates and white candidates oppose each other in the county and in Democratic Party primary elections are characterized by a pattern of racially polarized voting, a fact that is relevant in the Section 5 analysis, particularly given that black persons constitute a significant majority of registered voters in Perry County and, based on the information provided, a majority of Democratic voters." | "At the outset, we note that the CDEC adopted and implemented the instant voting changes, but failed to comply with the preclearance requirements of Section 5 regarding these changes until sued by minority citizens in Hawthorne v. Baker, No. CA 89-T-381-S (M.D. Ala.)" | |
| Valley (Chambers Cty.) (90-1663) | Annexation | 12/31/1990 Withdrawn 12-9-91 upon change in method of election | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Democratic Party (Lamar Cty.) (90-1769) | Increase in number of members from 23 to 49; change in the method of election from single-member districts to a mix of single-member districts and multimember districts with designated posts; a March 8, 1990, organizational plan, which provides, inter alia, for a decrease in the number of popularly elected members from 49 to 40, a change in the method of election from electing members from mixed single- and multi-member districts to four 10-member districts with plurality vote, a rule for equal division by gender by district, a districting plan, a change from an elective to an elective-appointive system with the priciple of fair representation, and the procedures for the appointment of additional members | 1/25/1991 | "It is thus apparent that any chances of electing a candidate of their choice by black voters in any of those multimember districts rest upon the fortuitous circumstances of single-shot voting and, accordingly, that the proposed change in the method of election is likely to have a retrogressive effect. In the context of the racially polarized voting patterns that seem to exist in Lamar County, it appears that the adoption of the county commission districts to serve as multimember districts for the CDEC will not afford black voters in the Lamar County Democratic electorate an opportunity equal to that of white voters to elect candidates of their choice to the CDEC." | "At the outset, we note that this submission contains a number of voting changes, adopted by the CDEC over the years, for which the CDEC has been unable to provide certain items of information due, in part, to the lapse of time between adoption and implementation of the changes and their submission for Section 5 review." | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Democratic Party (Limestone Cty.) (90-1789) | Increase in number of members from 25 to 32; the 1970 increase in number of members from 32 to 45, a change in method of election from single-member districts to 43 single-member districts and 1 two-member district, a redistricting plan, and adoption of numbered posts in the multi-member district; the 1982, 1983, and 1985 redistrictings; the 1985 increase in number of members from 45 to 48, the change in method of election to 9 single-member districts, 11 two-member districts, 3 three-member districts, and 2 four-member districts; and the September 7, 1989, Rules, as amended on March 1, 1990, which provide for a decrease in number of members from 48 to 40, a change in method of election to 4 ten-member districts by plurality vote, a redistricting, and a change from an elective to an elective-appointive system with the principle of fair representation and the procedures therefor to appoint additional members | 1/28/1991 | "It is thus apparent that any chances for black voters to elect candidates of their choice in any of the proposed multimember districts rest upon the fortuitous circumstance of single-shot voting and, accordingly, that the proposed change in the method of election is likely to have a  retrogressive effect. In the context of the racially polarized voting patterns that seem to exist in Limestone County, it appears that the adoption of the county commission districts to serve as multimember districts for the CDEC will not afford black voters in the Limestone County Democratic electorate an opportunity equal to that of white voters to elect candidates of their choice to the CDEC." | | |
| State (91-0518) | Act No. 90-539, which creates a | 11/8/1991 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| | fourth circuit judgeship in the 20th Judicial Circuit and the implementation schedule for that change | Withdrawn 3-18-96 | For example, we note that in the 20th Circuit, which has a 25 percent black population, no black persons have served as circuit court or district court judges.  In addition, an expert retained by the plaintiffs in <u>SCLC</u> has found that voting in the 20th Circuit has been characterized by extreme racial bloc voting.  Notwithstanding the evidence of racially polarized voting, black voters in Henry and Houston Counties have been able to elect candidates of their choice to county governing bodies when, as the result of litigation, alternatives to the at-large electoral system were implemented. | As a matter of background, we note that on April 27, 1987, the State of Alabama obtained preclearance under Section 5 for more than fifty voting changes affecting the expansion of the state's judicial system since November 1, 1964, including certain changes affecting the 20th Judicial Circuit that is comprised of Henry and Houston Counties.  The state also obtained preclearance of additional changes affecting the expansion of the state's judicial system on January 15, 1988, and September 11, 1989. | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| State (91-4215) | Act No. 91-640, which creates a 25th circuit judgeship in the Tenth Circuit for the Bessemer Division, and eighth circuit judgeship in the 15th Circuit, and the implementation schedule for those changes | 12/23/1991 | "Expert testimony also was presented concerning the presence of racially polarized voting in both the 10th and 15th Circuits.  We note that in the 10th Circuit (Jefferson County), which has a 35 percent black population based upon the 1990 Census, only three of the twenty four circuit judges are black, the third having been only recently appointed by the governor.  None of the eleven district court judges are black.  Similarly, in the 15th Circuit (Montgomery County), which has a 41.6 percent black population, only one of the seven circuit judges is black and none of the three district court judges is black.  Notwithstanding the evidence of racially polarized voting, black voters in both Jefferson and Montgomery Counties have been able to elect candidates of their choice to local governing bodies when alternatives to the at-large electoral system have been implemented." | | "For example, expert testimony was presented to show that the state has maintained the at-large, numbered post system, at least in part, for racially discriminatory reasons." |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| State (92-1176) | Act No. 92-63, which provides the redistricting plan for congressional districts | 3/27/1992 | In light of the prevailing pattern of racially polarized voting throughout the state, it does not appear that black voters are likely to have a realistic opportunity to elect a candidate of their choice in any of the districts. | | As you are aware, a concern has been raised that an underlying principle of the Congressional redistricting was a predisposition on the part of the state political leadership to limit black voting potential to a single district.  The proposed plan provides for one such district based on black population concentrations in Jefferson County, Montgomery County and intervening areas.  The remainder of the state's concentrated black population, however, is fragmented under the submitted plan among a number of districts none of which has a black population of as much as 30 percent. |
| Dallas County (92-1001) | Redistricting plan for the board of education | 5/1/1992 | In the context of the electoral history and the pattern of racially polarized voting in Dallas County, this reduction appears to minimize the opportunity afforded black voters to elect a candidate of their choice in this district. See United States v. Dallas County Commission, 850 F.2d 1433(11th Cir. 1988). | | Where, as here, the protection afforded an incumbent is provided at the expense of black voters, the school board bears a heavy burden of demonstrating that its choices are not tainted, at least in part, by an invidious racial purpose. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Dallas County (92-2503) | Redistricting plan for the board of education | 7/21/1992 | | | Analysis of the plan now under submission reveals that it, too, reduces the black share of the population in District 2 (from 65.3 percent to 61.6 percent) and fails to address the overconcentration and fragmentation of black population identified in our previous objection.  As we noted in our May 1, 1992, objection letter, this kind of reduction in black population in District 2 is not necessary to comply with the one person, one vote requirement of the United States Constitution. Moreover, the school board has continued to reject alternative plans that balanced the county's population among the districts without reducing the black percentage in District 2.  The board suggests that the changes from the existing plan are motivated by a desire on the part of the board's majority to create a swing" district, i.e., a district in which the white incumbent in District 2 will have a greater chance of reelection. This result may not be accomplished at the expense of minority voting potential. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Selma (Dallas Cty.) (92-4187) | Redistricting plan for the city council | 11/12/1992 | Despite the increase in the city's black population proportion, the proposed plan continues to concentrate black population in four districts at percentages that are 78, 95, 92, and 92 percent black while fragmenting black populations in other districts.  In the context of the electoral history and the pattern of racially polarized voting in the City of Selma, it appears that this plan will limit black voters to an opportunity to elect no more than four members of council, as black voters repeatedly have been unable to elect candidates of their choice in citywide elections. | | While the Selma city council was not required to adopt a particular plan advocated by the black community, the city is required to show that the proposed plan was not adopted, at least in part, by a desire to deny or abridge the right to vote on account of race or color.  In this regard, the reasons presented to us for rejecting this alternative plan appear to be pretextual, motivated by the desire to confine black population concentrations into a predetermined number of districts, and thus ensure a continuation of the current white majority on the council. |
| Greensboro (Hale Cty.) (92-3376) | Districting plan for the city council | 12/4/1992 | Our analysis reveals that elections in Greensboro and Hale County are characterized by racially polarized voting and that no black candidates were elected to office under the city's at-large election system.  Moreover, in 1987, the city conceded in a consent decree that its present at-large method of election violates Section 2 of the Voting Rights Act, 42 U.S.C. 1973. | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Dallas County (92-4848) | Redistricting plan for the board of education | 12/24/1992 | "We have considered carefully the information you have provided, as well as Census data, information contained in your submissions of two earlier redistricting plans following the 1990 Census, and information and comments received from other interested parties.  As you know, we interposed Section 5 objections to the school board's two previous redistricting plans because of the unjustified and unnecessary retrogression in minority voting strength in proposed District 2.  Moreover, the school board's redistricting decisions as to both plans appeared to be motivated, in part, by a desire to protect the incumbent board member from District 2.  Analysis of the plan now under submission reveals that it, too, reduces the black share of the population in District 2 (from 65.3 percent to 63.0 percent).  As we noted in our previous letters, no reduction in black population percentage in District 2 is necessary to comply with the one person, one vote requirement of the United States Constitution.  Moreover, the school board has continued to reject alternative plans that | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| | | | balanced the county's population among the districts without any reduction in the black percentage of District 2.  The school board has articulated no legitimate nonracial justification for its latest choice of a plan which, like its predecessors, effects a retrogression in the position of minority voters given the county's electoral history and pattern of polarized voting." | | |
| Selma (Dallas Cty.) (93-0110) | Redistricting plan for the city council | 3/15/1993 | But against the backdrop of the history of racial discrimination and racially polarized voting in the city, the new plan still exhibits some of the same pattern of fragmenting black population concentrations, as that identified previously, in an apparent effort to limit the opportunity for black voters to elect more than four councilmembers. | | Indeed, the latest redistricting proposal tends only to underscore the absence of legitimate nonracial reasons for the city's failure to adopt available or easily discernible alternative redistricting plans or approaches that would address the concerns about the fragmentation of black population concentrations. The minutes of the December 28, 1992, council meeting reveal that the vote to adopt the submitted plan was along racial lines.  For one councilmember the identity of the author of the plan preferred by the black members of the council was sufficient reason to reject it. Another councilmember noted that the alternative plan was unacceptable because it places him in a district with another incumbent.  But our review of the rejected alternative plan indicates that it was readily discernible that incumbents could have been placed in separate districts without decreasing the black population percentage in the fifth black majority district.  While the city was not required to adopt a particular redistricting plan or approach |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| | | | | | advocated by the black community, the city's proffered reasons, for rejecting such alternative proposals appear to be pretextual. |
| Foley (Baldwin Cty.) (93-1106) | Ordinance No. 472-93-residential annexation | 8/30/1993 Withdrawn 7-1-96 | | | As you know, on November 6, 1989, the Attorney General interposed a Section 5 objection to the city's proposal to annex three predominantly white residential areas.  Our analysis of the information available at that time indicated that the city's annexation policy was not being applied in a nondiscriminatory manner towards predominantly black and predominantly white residential areas whose residents desired annexation to the city.  The city offered no legitimate nonracial explanation for its willingness to encourage the petitions for annexation of majority white residential areas while discouraging and rejecting petition efforts by a majority black residential area known as Mills Quarters.  Our analysis of the submitted annexation reveals that it, like the annexations objected to in 1989, reflects a continuation of the city's previously noted practice of annexing areas that can be expected to contain predominantly white population, while discouraging the annexation of areas of predominantly black population. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| | | | | | The city has provided no new information since our 1989 objection that suggests that its continued failure to annex majority black areas, such as Mills Quarters or the area of Beulah Heights not already within the city limits, is based on legitimate, nonracial criteria. |
| State (93-3476) | Act No. 93-882: Establishment of sixth position for the sixth Judicial Circuit | 11/16/1993 | Our review of the election analyses and other evidence in the SCLC case leads us to conclude that voting in interracial contests in Tuscaloosa County is characterized by racial polarization.  In addition, it appears that potential candidates of choice of black voters may have been deterred from running for the circuit court due in part to this polarization and the existing at-large election system. Indeed, prior to a recent appointment to the bench, no black person had served as a circuit court judge in the Sixth Circuit | | |
| | Withdrawn 3-18-96 | | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Greensboro (Hale Cty.) (93-4223) | Districting plan for the city council | 1/3/1994 | Our analysis of the 1992 districting plan showed unnecessary fragmentation of black population concentrations in several areas of the city.  Information made available to us indicated that the city configured its boundary lines with the express purpose of keeping District 2 under the objected-to plan to a predetermined black population percentage designed to reflect the black population percentage in the city as a whole.  Within the context of the polarized voting patterns that appear to be prevalent in Greensboro city elections, and virtually a closed districting process, the objected-to plan appeared unnecessarily to limit black voters to an opportunity to elect only two of the five councilmembers.  On June 15, 1993, we declined to withdraw our objection based upon the city's failure to provide new factual information or legal arguments in support of its reconsideration request.  The 1993 districting plan makes minimal changes to the objected-to plan. | | The city has provided no satisfactory explanation for limiting black electoral opportunities in this manner.  Indeed, the city was aware of several alternative plans that created three districts in which black voters constituted a greater majority of the voting age population in a third district than in proposed District 2.  While the city was not required under the Voting Rights Act to adopt any specific alternative plan, it is not free to adopt a districting plan which, as would appear here, is calculated to limit black voting strength. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| | | | With regard to District 2, which had been the focus of our concern, the 1993 plan adds one block to the district and removes another block from the district.  While the plan provides for slight increases in the black population percentages in District 2, the opportunity for black voters to elect a representative of their choice in that district appears to have been constrained deliberately, taking into account the continued fragmentation of black population concentrations, the pattern of racially polarized voting and the reduced electoral participation by black persons, which is traceable to a history of discrimination | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| State (89-1439) | Amendment 425 to the Alabama Constitution, insofar as it provides that a referendum on a local constitutional amendment may not be held unless it is first approved by the Local Constitutional Amendment Commission | 1/31/1994 | | In 1982, the state made a limited Section 5 submission with respect to then-proposed Amendment 425 (which was awaiting approval in the statewide referendum).  The state's submission letter specified that the only change that would be occasioned by the amendment would be the change in the constituency that votes on local constitutional amendments.  The submission letter made no mention of the creation of the Commission and the role that it would play in determining whether local amendment referenda are held. Accordingly, this latter change was not submitted for preclearance in 1982, and was not precleared when the Attorney General responded to the 1982 submission by granting preclearance.  Clark v. Roemer, 111 S.Ct. 2096 (1991); McCain v. Lybrand, 465 U.S. 236 (1984).  Nevertheless, the state proceeded to implement the Commission review procedure. | According to the available information, a number of vetoes have been cast by the Commission against proposed local amendments that would have changed the procedure for filling vacancies in certain local offices in several majority-black counties.  The state has not provided any information as to why these vetoes were cast but it does not appear that these amendments were blocked for failure to comply with other requirements of Amendment 425.  On the other hand, we have received allegations that, at least in part, the vetoes were racially motivated. |
| State (93-3195-96) | The changes for the courts of | 4/14/1994 | | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| (93-2322) | criminal and civil appeals and the supreme court occasioned by Act Nos. 602 and 987 (1969), 75 (1971), and 346 (1993) in the context of the at-large method of electing these courts | Withdrawn 3-18-96 | Elections at all levels in the state generally are characterized by racially polarized voting.  We have repeatedly found this to be the case in past Section 5 reviews, most recently on a statewide basis in interposing an objection, on March 27, 1992, to the state's 1992 congressional redistricting plan.  As reflected in the stipulations filed by the plaintiffs and defendants in White as an attachment to the proposed consent judgment, courts also have found polarized voting in numerous Section 2 and Fourteenth Amendment dilution lawsuits.  Most black elected officials in the state are elected from black majority districts. Our analysis indicates that polarized voting extends to judicial elections. | Finally, we note that the Section 5 court in White is poised to address the question whether injunctive relief should be granted based on the unprecleared status of appellate court judgeships that are up for election this year.  See Clark v. Roemer, 111 S. Ct. 2096 (1991). | |
| | | | In 1991 and 1993, the Attorney General interposed Section 5 objections to the establishment of additional circuit court judgeships in four circuits based on the conclusion that the at-large method of electing these judgeships, in the context of polarized voting and other electoral factors, denied black voters an equal opportunity to elect candidates of their choice. | | |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Tallapoosa County (97-1021) (pdf) | Redistricting plan | 2/6/1998 | Our analysis of the proposed plan indicates that the reduction in the black voting age population in the majority black district, in the context of the county's electoral history and pattern of racially polarized voting, is likely to affect adversely the ability of black voters to elect a candidate of their choice to the county commission.  Furthermore, alternative five-member plans prepared before and after the adoption of the existing six-member plan demonstrate that such a large reduction in black population percentage is not necessary in order to achieve a fairly apportioned, constitutional five-member plan. The county has provided no information that would support a conclusion that the county's minority voters would have a fair opportunity to elect a candidate of choice under the proposed plan. | Our review of the submitted changes is also informed by a history of noncompliance on the part of the county with legal requirements (constitutional, statutory, and court mandated) designed to protect the right to vote and to ensure minority voters, in particular, an equal electoral opportunity. For example, during most of the 1970's the county implemented an unprecleared at-large method of election, in the absence of a fairly apportioned redistricting plan for its five single-member districts.  In response to a Section 5 enforcement action brought by minority residents, the county in 1983 submitted for Section 5 review the change to an at-large method of election.  Holly v. Sharpe, C.A. No. 82-17-E (M.D. Ala. 1982). We interposed an objection due largely to the retrogressive effect the change would have on minority electoral opportunity. | Taken together, the history of the instant redistricting process and its results raise serious concerns that the county, in reducing the black voting age population in the proposed majority black district, purposely impaired the ability of black voters to elect a candidate of choice in order to protect the reelection opportunities of a white incumbent.  While we recognize that the desire to protect incumbents is not in and of itself an inappropriate consideration, it may not be accomplished at the expense of minority voting potential. |

| Jurisdiction | Submission Description | Date | Racial Polarization | Noncompliance | Intentional Discrimination |
|---|---|---|---|---|---|
| Alabaster (Shelby Cty.) (2000-2230) (pdf) | Annexations (Ordinance Nos. 94-338 and 96-410) | 8/16/2000 | In 1975, the Attorney General found "a pattern of racial bloc voting [to be present] in city elections" in Alabaster when he objected to annexations which diluted minority voting strength under the city's then at-large election system.  In our July 10, 2000, letter, we asked the city to provide state, county, school district, and municipal election returns, and related voter registration information in order to assess whether elections in Alabaster continue to be characterized by racially polarized voting.  As of this time, we have not received all of the requested election returns or complete voter registration data, although you informed us on August 15, 2000, that we would be receiving them shortly. | This refers to 42 annexations (adopted between March 19, 1992, and March 16, 2000) and their designation to council wards of the City of Alabaster in Shelby County, Alabama, submitted pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your partial responses to our July 10, 2000, request for additional information on numerous dates between July 13 and August 16, 2000. | |
| | | | As a result, a current racial bloc voting analysis could not be completed at this time as we have not had the opportunity to review and analyze the documents.  Based on our review of the records submitted, we have no basis to believe that racial bloc voting does not continue to exist in the city.  Therefore, it appears that the retrogression caused by the proposed Ward 1 annexations would seriously threaten, if not eliminate, the only opportunity minority voters currently have to elect candidates of their choice to city office. | | |
| Mobile County (2006 6792) (pdf) | Change in method of election for filling vacancies occurring on the Mobile County Commission from special election to gubernatorial appointment | 1/8/2007 | | | |