IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHELBY COUNTY, ALABAMA, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. |
| ERIC H. HOLDER, Jr., | ) 1:10-cv-00651-JDB |
| in his official capacity as | ) |
| Attorney General of the | ) |
| United States, | ) |
| | ) |
| Defendant | ) |
| | ) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

RONALD C. MACHEN, JR.
  United States Attorney
  District of Columbia

THOMAS E. PEREZ
  Assistant Attorney General
  Civil Rights Division

SAMUEL R. BAGENSTOS
JULIE A. FERNANDES
  Deputy Assistant Attorneys General

T. CHRISTIAN HERREN, JR.
DIANA K. FLYNN
RICHARD DELLHEIM (lead counsel)
LINDA F. THOME
ERNEST A. MCFARLAND
JARED M. SLADE
JUSTIN WEINSTEIN-TULL
  Civil Rights Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, N.W.
  NWB-Room 7264
  Washington, D.C. 20530
  Telephone: (202) 305-1734
  Facsimile: (202) 307-3961

**TABLE OF CONTENTS**

**PAGE**

BACKGROUND ...................................................................................................1

    A.    The Voting Rights Act ........................................................................1

    B.    Plaintiff ...............................................................................................6

ARGUMENT .....................................................................................................9

    I    SECTION 5 OF THE VOTING RIGHTS ACT IS A VALID EXERCISE OF CONGRESS'S AUTHORITY TO ENFORCE THE FIFTEENTH AMENDMENT ...........................................................................................11

        A.    Section 5 Is Subject To Rational Basis Review ........................................12

        B.    Congress Rationally Determined That Section 5 Preclearance Is Necessary .............................................................................................20

            1.    *Evidence Of Ongoing Voting Discrimination By Covered Jurisdiction Justified Previous Reauthorizations* .........................20

            2.    *Evidence Of Ongoing Voting Discrimination By Covered Jurisdictions Justified The 2006 Reauthorization* .........................23

                a.    *In 2006, Congress Found Evidence of Voting Discrimination In The Same Evidentiary Sources As Did Previous Congresses* ...............................................24

                    i.    *Section 5 Enforcement Since 1982* ...........................25

                        (a)    *Section 5 Objections* ...............................25

                        (b)    *More Information Requests And Submission Withdrawals* ......................35

                        (c)    *Section 5 Injunctive Actions* ....................35

                        (d)    *Judicial Preclearance Actions* ..................37

                   ii.    *Federal Observer Coverage Since 1982* ...............38

                   iii.    *Section 2 Litigation* ...............................40

                   iv.    *Registration And Turnout Of Minority Voters* ...................................................42

**TABLE OF CONTENTS (continued):**                                        **PAGE**

     b. *In 2006, Congress Found Ample Evidence That The Same Types And Patterns Of Voting Discrimination That Supported Enactment And Reauthorization Of Section 5 In The Past Continue Today*................................44

       i. *Evidence Of Vote Suppression*................................44

       ii. *Evidence Of Vote Dilution*....................................47

         (a) *Employment Of Dilutive Techniques* .........47

         (b) *Widespread Racially Polarized Voting*...........................................................49

    3. *Section 5 Is An Effective Remedy*....................................53

     a. *Section 5 Effectively Deters Covered Jurisdictions From Adopting Discriminatory Voting Changes*...............53

     b. *Section 2 Alone Is Inadequate*............................................55

  C. The Evidence Before Congress Demonstrates That The 2006 Reauthorization Of Section 5 Is Justified By Current Needs ...................57

 II SECTION 4(b) IS CONSTITUTIONAL...............................................................65

CONCLUSION...................................................................................................................75

## TABLE OF AUTHORITIES

**CASES:**                                                                      **PAGE**

*Allen* v. *State Bd. of Elections*, 393 U.S. 544 (1969) ........................................................ 22, 58-59

*Board of Trs. of the Univ. of Ala.* v. *Garrett*,
    531 U.S. 356 (2001) ............................................................................................ 16, 20

*Bone Shirt* v. *Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004) ......................................... 36, 48, 51

*Buskey* v. *Oliver*, 565 F. Supp. 1473 (M.D. Ala. 1983) ................................................ 52

*Campos* v. *City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) ........................................ 52

*Chisom* v. *Roemer*, 501 U.S. 380 (1991) ........................................................................ 49

*Citizens For a Better Gretna* v. *City of Gretna*,
    834 F.2d 496 (5th Cir. 1987) ......................................................................... 52

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) ................................................... *passim*

*City of Rome* v. *United States*, 446 U.S. 156 (1980) .......................................... *passim*

*City of Rome* v. *United States*, No. 78-1840 (May 2, 1979) ...................................... 61

*Civil Rights Cases*, 109 U.S. 3 (1883) .......................................................................... 13, 19

*Clark* v. *Calhoun Cnty.*, 88 F.3d 1393 (5th Cir. 1996) ................................................ 51

*Clark* v. *Marengo Cnty.*, 623 F. Supp. 33 (S.D. Ala. 1985) ....................................... 52

*Clark* v. *Roemer*, 777 F. Supp. 445 (M.D. La. 1990) ................................................... 52

*Cofield* v. *City of LaGrange*, 969 F. Supp. 749 (N.D. Ga. 1997) ................................ 52

*Colleton Cnty. Council* v. *McConnell*,
    201 F. Supp. 2d 618 (D.S.C. 2002) .............................................................. 51

*Collins* v. *City of Norfolk*, 883 F.2d 1232 (4th Cir. 1989) ......................................... 52

*Dillard* v. *Baldwin Cnty.*, 686 F. Supp. 1459 (M.D. Ala. 1988) .............................. 7, 52

*Dillard* v. *Crenshaw Cnty.*, 640 F. Supp. 1347 (M.D. Ala. 1986) ...................... *passim*

**CASES** (continued):                                                    **PAGE**

*Dillard* v. *Town of N. Johns*, 717 F. Supp. 1471 (M.D. Ala. 1989) ...............................47

*Dunn* v. *Blumstein*, 405 U.S. 330 (1972) ...................................................................17

*East Jefferson Coal. for Leadership & Dev.* v. *Jefferson Parish*,
    926 F.2d 487 (5th Cir. 1991) ...........................................................................51

*Eldred* v. *Ashcroft*, 537 U.S. 186 (2003) ...................................................................63

*Employment Div. of Human Res. of Or.* v. *Smith*,
    494 U.S. 872 (1990)..........................................................................................15

*Ewing* v. *Monroe Cnty.*, 740 F. Supp. 417 (N.D. Miss. 1990) ....................................52

*Ex parte Virginia*, 100 U.S. (10 Otto) 339 (1879) ........................................... 12-13, 18

*Fitzpatrick* v. *Bitzer*, 427 U.S. 445 (1976)...................................................................18

*Georgia* v. *United States*, 411 U.S. 526 (1973) ....................................................4, 12, 61

*Gomillion* v. *Lightfoot*, 364 U.S. 339 (1960).........................................................58-59

*Griffin* v. *Breckenridge*, 403 U.S. 88 (1971) ..............................................................10

*Gunn* v. *Chickasaw Cnty.*, 705 F. Supp. 315 (N.D. Miss. 1989)...................................52

*Harper* v. *Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ..................................17

*Harris* v. *Siegelman*, 695 F. Supp. 517 (M.D. Ala. 1988)............................................45

*Hines* v. *Mayor & Town Council of Ahoskie*,
    998 F.2d 1266 (4th Cir. 1993) .........................................................................52

*Houston* v. *Lafayette Cnty.*, 20 F. Supp. 2d 996 (N.D. Miss. 1998)...............................52

*Jackson* v. *Edgefield Cnty.*, 650 F. Supp. 1176 (D. S.C. 1986)....................................52

*James* v. *Bowman*, 190 U.S. 127 (1903)...............................................................13-14

*Jones* v. *City of Lubbock*, 727 F.2d 364 (5th Cir. 1984)...............................................52

*Jordan* v. *City of Greenwood*, 599 F. Supp. 397 (N.D. Miss. 1984) .............................52

*Jordan* v. *Winter*, 604 F. Supp. 807 (N.D. Miss. 1984)...............................................52

**CASES (continued):** **PAGE**

*Katzenbach* v. *Morgan*, 384 U.S. 641 (1966) .................................................................. 12, 17-19

*Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62 (2000) ............................................................16, 20

*Louisiana House of Representatives* v. *Ashcroft*, No. 1:02-cv-62 (D.D.C.)..................................37

*Lopez* v. *Monterey Cnty.*, 525 U.S. 266 (1999) ........................................................... *passim*

*LULAC* v. *North East Independent Sch. Dist.*,
    903 F. Supp. 1071 (W.D. Tex. 1995)....................................................................52

*LULAC* v. *Perry*, 548 U.S. 399 (2006) ...............................................................................48, 52

*Major* v. *Treen*, 574 F. Supp. 325 (E.D. La. 1983)................................................................52

*Martin* v. *Allain*, 658 F. Supp. 1183 (S.D. Miss. 1987)...........................................................52

*McCulloch* v. *Maryland*, 17 U.S. (4 Wheat) 316 (1819) ...................................................18

*McDaniels* v. *Mehfoud*, 702 F. Supp. 588 (E.D. Va. 1988).....................................................52

*McLaughlin* v. *Florida*, 379 U.S. 184 (1964) .......................................................................13

*Mississippi State Chapter, Operation PUSH* v. *Allain*,
    674 F. Supp. 1245 (N.D. Miss. 1987) .................................................................42

*Neal* v. *Coleburn*, 689 F. Supp. 1426 (E.D. Va. 1988)............................................................52

*Nevada Dep't of Human Res.* v. *Hibbs*,
    538 U.S. 721 (2003)............................................................................... 9, 16-17

*Northwest Austin Mun. Util. Dist. No. One* v. *Holder*,
    129 S. Ct. 2504 (2009) .................................................................... *passim*

*Northwest Austin Mun. Util. Dist. No. One* v. *Mukasey*,
    573 F. Supp. 2d 221 (D.D.C. 2008) ..................................................... *passim*

*Oregon* v. *Mitchell*, 400 U.S. 112 (1970) .......................................................................12

*Perkins* v. *Matthews*, 400 U.S. 379 (1971) .....................................................................58-59

*Political Civil Voters Org.* v. *City of Terrell*,
    565 F. Supp. 338 (N.D. Tex. 1983) ....................................................................52

**CASES (continued):**                                                                                      **PAGE**

*Reno* v. *Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000)................................................27

*Saint Bernard Citizens For Better Gov't* v.
  *Saint Bernard Parish Sch. Bd.*, No. Civ. A. 02-2209,
  2002 WL 2022589 (E.D. La. Aug. 26, 2002) ..................................................52

*Salazar* v. *Buono*, 130 S. Ct. 1803 (2010) ....................................................9

*Sierra* v. *El Paso Indep. Sch. Dist.*,
  591 F. Supp. 802 (W.D. Tex. 1984)................................................................52

*Slaughter House Cases*, 83 U.S. (16 Wall) 36 (1872) ....................................12

*Smith* v. *Allwright*, 341 U.S. 649 (1944)........................................................7

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) ........................... *passim*

*Teague* v. *Attala Cnty.*, 92 F.3d 283 (5th Cir. 1996) ....................................52

*Tennessee* v. *Lane*, 541 U.S. 509 (2004) ..............................................9, 12, 14, 17

*Turner Broad. Sys., Inc.* v. *F.C.C.*, 520 U.S. 180 (1997) ..............................19

*United States* v. *Board of Comm'rs of Sheffield, Ala.*,
  435 U.S. 110 (1978)................................................................................65, 67

*United States* v. *Charleston Cnty.*,
  316 F. Supp. 2d 268 (D.S.C. 2003), aff'd, 365 F.3d 341 (4th Cir.),
  cert. denied, 543 U.S. 999 (2004) ..................................................................34

*United States* v. *Charleston Cnty.*, 365 F.3d 341 (4th Cir. 2004)................51

*United States* v. *Georgia*, 546 U.S. 151 (2006) ....................................9, 17

*United States* v. *Long Cnty.*, No. 2:06cv40 (S.D. Ga.) ..............................46

*United States* v. *Reese*, 92 U.S. (2 Otto) 214 (1875) ..................................13

*United States* v. *Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978),
  aff'd, 439 U.S. 1105 (1979)......................................................................44

*Walters* v. *National Ass'n of Radiation Survivors*,
  473 U.S. 305 (1985)....................................................................................20

CASES (continued):                                                                    PAGE

*Washington State Grange* v. *Washington State Republican Party*,
    552 U.S. 442 (2008) ....................................................................................9

*Westwego Citizens For Better Gov't* v. *City of Westwego*,
    946 F.2d 1109 (5th Cir. 1991) ..................................................................52

*Williams* v. *City of Dallas*, 734 F. Supp. 1317 (N.D. Tex. 1990)...................................52

*Young* v. *Fordice*, 520 U.S. 273 (1997) .......................................................................42

CONSTITUTION:

United States Constitution
    U.S. Const. Amend. XIV, § 1 ................................................................14, 71
    U.S. Const. Amend. XIV, § 2 ........................................................................14
    U.S. Const. Amend. XV, § 1 .........................................................................14
    U.S. Const. Amend. XV, § 2 .........................................................................11

STATUTES:

Alabama Code (1975)
    § 11-3-1 ........................................................................................................71
    § 11-43-2 ......................................................................................................71
    § 17-1-3 ........................................................................................................71
    § 17-1-3(a) ...................................................................................................71
    § 17-3-2 ........................................................................................................72
    § 17-8-1 ........................................................................................................72

Voting Rights Act of 1965 (VRA), 42 U.S.C. 1973 *et seq.*.............................................1
    42 U.S.C. 1973b(a) .......................................................................................4
    42 U.S.C. 1973b(a)(1)..............................................................................69-70
    42 U.S.C. 1973b(a)(1)(F)..............................................................................70
    42 U.S.C. 1973b(a)(3)...................................................................................70
    42 U.S.C. 1973b(a)(9)...................................................................................72
    42 U.S.C. 1973b(b) ....................................................................................1-2
    42 U.S.C. 1973c .......................................................................................1-3, 35
    42 U.S.C. 1973j(f)........................................................................................35

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act
    Reauthorization and Amendments Act of 2006,
        Pub. L. No. 109-246, 120 Stat. 577 ...................................................2
        § 2(b), 120 Stat. 577-578 ..................................................6, 64
        § 2(b)(1), 120 Stat. 577 ...........................................................43
        § 2(b)(3), 120 Stat. 577 ...................................................50, 67

**STATUTES (continued):**                                                                          **PAGE**

          § 2(b)(4) ...............................................................................67
          § 2(b)(4)(B), 120 Stat. 577-578 ............................................37
          § 2(b)(4)(C), 120 Stat. 577......................................................40
          § 2(b)(5) ...............................................................................67
          § 2(b)(8) ...............................................................................67
          § 2(b)(9), 120 Stat. 578 ...........................................10, 43, 57
          §4, 120 Stat. 580 .....................................................................2
          §4(a)(7) .................................................................................63
          §4(a)(8) .................................................................................63

Religious Freedom Restoration Act (RFRA), 42 U.S.C. 2000bb *et seq*.......................................14

Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, 84 Stat. 315 .................................4
      Tit. I, 84 Stat. 315 ........................................................................4
      § 3, 84 Stat. 315 .........................................................................69

Voting Rights Act Amendments of 1975, Pub. L. No. 94-73, 89 Stat. 400 ...................................4
      § 101, 89 Stat. 400 ....................................................................69
      Tit. II, 89 Stat. 401 ......................................................................4
      Tit. II, 89 Stat. 401-402 ...............................................................4

Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, 96 Stat. 131 .................................4
      § 2(b)(2), 96 Stat. 131 ................................................................4
      § 2(b)(4), 96 Stat. 131-133...........................................................4
      § 2(b)(5)(B), 96 Stat. 131-133 ...................................................69

Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437....................................................2
      § 4(b), 79 Stat. 438....................................................................3
      § 4(a), 79 Stat. 438........................................................3, 67, 69

**REGULATIONS:**

40 Fed. Reg. 43,746 (Sept. 23, 1975) .........................................................................4

**LEGISLATIVE HISTORY:**

*An Introduction to the Expiring Provisions of the Voting Rights Act and*
    *Legal Issues Relating to Reauthorization:  Hearing Before the Senate Comm. on*
    *the Judiciary,* 109th Cong., 2nd Sess. (2006) ......................................................37, 41, 64

*Appendix* to *Voting Rights Act:  Evidence of Continued Need:*
    *Hearing Before the Subcomm. on the Constitution of the*
    *House Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) ................................ *passim*

**LEGISLATIVE HISTORY (continued):**                                **PAGE**

*Modern Enforcement of the Voting Rights Act:*
    *Hearing Before the Senate Comm. on the Judiciary*,
    109th Cong., 2d Sess. (2006) ............................................................................29, 31, 53

*Reauthorization of the Voting Rights Act's Temporary Provisions:*
    *Policy Perspectives & Views from the Field:  Hearing Before the Senate Comm.*
    *on the Judiciary*, 109th Cong., 2d Sess. (2006) ....................................................37, 56, 64

*Renewing the Temporary Provisions of the Voting Rights Act:*
    *Legislative Options After LULAC v. Perry:  Hearing Before the Subcomm. on the*
    *Constitution, Civil Rights, and Property Rights of the Senate Comm. on the*
    *Judiciary*, 109th Cong., 2d Sess. (2006).................................................................. *passim*

*To Examine the Impact and Effectiveness of the Voting Rights Act:*
    *Hearing Before the Subcomm. on the Constitution of the House Comm. on the*
    *Judiciary*, 109th Cong., 1st Sess. (2005) ................................................................ *passim*

*Voting Rights Act:  An Examination of the Scope and Criteria for*
    *Coverage Under the Special Provisions of the Act:  Hearing*
    *Before the House Comm. on the Judiciary*,
    109th Cong., 1st Sess. (2005) ....................................................................... 46, 51, 72-73

*Voting Rights Act:  Evidence of Continued Need:*
    *Hearing Before the Subcomm. on the Constitution of the House Comm. on the*
    *Judiciary*, 109th Cong., 2d Sess. (2006).................................................................. *passim*

*Voting Rights Act:  Section 5 – Preclearance Standards,*
    *Hearing Before the Subcomm. on the Constitution of the House Comm. on the*
    *Judiciary*, 109th Cong., 1st Sess. (2005) ............................................................ 27, 53-54

*Voting Rights Act:  Section 5 of the Act – History, Scope, and Purpose:*
    *Hearing Before the Subcomm. on the Constitution of the House*
    *Comm. On the Judiciary*, 109th Cong., 1st Sess. (2005) .......................................... *passim*
    Letter from Bill Lann Lee to James M. Skipper, Jr. (Jan. 11, 2000) ................................29
    Letter from Bill Lann Lee to T.H. Freeland IV (Aug. 17, 1998)......................................30
    Letter from Deval L. Patrick to James R. Lewis (Oct. 11, 1994) ....................................32
    Letter from Deval L. Patrick to Sandra Murphy Shelson (Feb. 6, 1995) ........................31
    Letter from Isabelle Katz Pinzler to Sandra M. Shelson (Sept. 22, 1997).......................42
    Letter from J. Michael Wiggins to Al Grieshaber, Jr. (Sept. 23, 2002)............................28
    Letter from James P. Turner to Garry C. Mercer (Mar. 10, 1986) ..................................32
    Letter from James P. Turner to Hon. Gregory N. Marcantel (Mar. 8, 1993)....................32
    Letter from James P. Turner to Jesse Bowles III (June 28, 1993) ....................................34
    Letter from James P. Turner to John P. Fox (Feb. 27, 1990)...........................................32
    Letter from James P. Turner to Nicholas H. Cobbs (Jan. 3, 1994)...................................32

**LEGISLATIVE HISTORY (continued):**                                    **PAGE**

Letter from James P. Turner to Philip Henry Pitts (Mar. 15, 1993) ................................32
Letter from John R. Dunne to Hon. Charlotte Beall (Oct. 28, 1992)................................30
Letter from John R. Dunne to Hon. Hainon A. Miller (July 2, 1991) ..............................29
Letter from John R. Dunne to Hon. Jimmy Evans (Mar. 27, 1992) ................................32
Letter from John R. Dunne to Hubbard T. Saunders, IV (Aug. 23, 1991) .......................32
Letter from John R. Dunne to John B. Farese (Sept. 9, 1991)........................................32
Letter from John R. Dunne to John E. Pilcher (July 21, 1992)........................................28
Letter from John R. Dunne to Tommy M. McWilliams (Oct. 25, 1991)..........................32
Letter from Loretta King to Guy Kenner Ellis, Jr. (Nov. 17, 1995) ................................31
Letter from Ralph F. Boyd, Jr. to Hon. Geoffrey Connor (Nov. 16, 2001).....................32
Letter from Ralph F. Boyd, Jr. to Hon. John M. McKay (July 1, 2002) ..........................33
Letter from Ralph F. Boyd, Jr. to J. Lane Greenlee (Dec. 11, 2001)...............................29
Letter from Ralph F. Boyd, Jr. to Lisa T. Hauser & Jos de Jess Rivera
    (May 20, 2002).........................................................................................32
Letter from Ralph F. Boyd, Jr. to William D. Sleeper (Apr. 29, 2002)............................31
Letter from William Bradford Reynolds to W. Leslie Johnson, Jr. (Nov. 2, 1987) ..........30
Letter from John R. Dunne to Don Graf (Mar. 19, 1991)................................................31

*Voting Rights Act:  The Continuing Need for Section 5:*
    *Hearing Before the Subcomm. on the Constitution of the House Comm. on the*
    *Judiciary*, 109th Cong., 1st Sess. (2005) ................................................... *passim*

H.R. Rep. No. 196, 94th Cong., 1st Sess. (1975) ................................................ *passim*

H.R. Rep. No. 397, 91st Cong., 1st Sess. (1969)...................................................21, 24

H.R. Rep. No. 439, 89th Cong., 1st Sess., (1965) ............................................... *passim*

H.R. Rep. No. 478, 109th Cong., 2d Sess. (2006) ............................................... *passim*

H.R. Rep. No. 227, 97th Cong., 1st Sess. (1981) ................................................ *passim*

S. Rep. No. 162 (Pt. 3), 89th Cong., 1st Sess. (1965)....................................... 21, 24-25

S. Rep. No. 295, 94th Cong., 1st Sess. (1975).......................................... 21, 24-25, 38

S. Rep. No. 295, 109th Cong., 2d Sess. (2006) ..................................................24, 44

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) .......................................... 22-24, 71

152 Cong. Rec. 14,303-14,304 (2006)........................................................20

152 Cong. Rec. 15,325 (2006)...................................................................20

**MISCELLANEOUS:**                                                                                                    **PAGE**

Peyton McCrary et al., *The End of Preclearance As We Knew It: How
        the Supreme Court Transformed Section 5 of the Voting Rights Act,*
        11 Mich. J. Race & Law 275(2006)....................................................................................27

Plaintiff Shelby County alleges that Sections 4(b) and 5 of the Voting Rights Act, 42 U.S.C. 1973b(b), 1973c, are unconstitutional.  Plaintiff filed a motion for summary judgment and the Attorney General filed a cross motion for summary judgment.  Defendant is entitled to summary judgment because Sections 4(b) and 5 of the Voting Rights Act are constitutional.

## BACKGROUND

**A.     The Voting Rights Act**

1.  Congress enacted the Voting Rights Act of 1965 (VRA), 42 U.S.C. 1973 *et seq.*, "to banish the blight of racial discrimination in voting, which ha[d] infected the electoral process in parts of our country for nearly a century."  *South Carolina* v. *Katzenbach*, 383 U.S. 301, 308 (1966).  The Fifteenth Amendment, which prohibits racial discrimination in voting, was ratified in 1870.  *South Carolina*, 383 U.S. at 310.  "The first century of congressional enforcement of the Amendment, however, can only be regarded as a failure."  *Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 129 S. Ct. 2504, 2508 (2009) (*Northwest Austin II*).  Initial federal enforcement of the Amendment was short-lived, and in 1894, most of the federal enforcement provisions were repealed.  *South Carolina*, 383 U.S. at 310.  Beginning in 1890, Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Virginia began systematically disenfranchising black citizens by adopting literacy tests applicable to black citizens, while using alternate devices such as the grandfather clause, property qualifications, and good character tests to enable illiterate whites to vote.  *Id.* at 310-311.

Over the following decades, the Supreme Court struck down a variety of techniques "designed to deprive Negroes of the right to vote," including the grandfather clause, procedural roadblocks, the white primary, improper voter challenges, racial gerrymandering, and discriminatory application of tests.  *South Carolina*, 383 U.S. at 311-312 (citations omitted).

Congress enacted voting rights legislation in 1957, 1960, and 1964.  *Id.* at 313.  But "these new laws," the Court explained in *South Carolina*, did "little to cure the problem of voting discrimination."  *Id*. at 314.  Voting rights litigation was "unusually onerous" and "exceedingly slow."  *Ibid.*  And, even when litigation was successful, voting officials "merely switched to discriminatory devices not covered by the federal decrees," "enacted difficult new tests," or "defied and evaded court orders."  *Ibid.*

In 1965, Congress enacted the VRA to address the deficiencies in earlier legislation designed to enforce the Fifteenth Amendment.  Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (1965 Act).  The VRA includes both temporary provisions, applicable only to certain "covered jurisdictions," and other provisions applicable to the nation as a whole.  This case concerns two of the temporary provisions of the VRA – Sections 4(b) and 5, 42 U.S.C. 1973b(b), 1973c, as they were reauthorized in 2006.  Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, §4, 120 Stat. 580; 42 U.S.C. 1973b(b), 1973c (2006 Reauthorization).

Section 4(b) contains the coverage formula that defines the jurisdictions covered by Section 5 and the other temporary provisions.  Congress designed this formula to capture States for which the legislative record demonstrated "evidence of actual voting discrimination," and where "federal courts ha[d] repeatedly found substantial voting discrimination."  *South Carolina*, 383 U.S. at 329-330.  Evidence before Congress revealed that the worst records of discrimination existed in certain southern States that "share[d] two characteristics:  * * * the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average."  *South Carolina*, 383 U.S. at 330; see H.R. Rep. No. 439, 89th Cong., 1st Sess. 13-14 (1965) (1965 House Report).  Thus, as originally enacted, Section 4(b)

included any jurisdiction that: (1) maintained a test or device on November 1, 1964; and (2) had registration or turnout rates below 50% of the voting age population in November 1964. 1965 Act, § 4(b), 79 Stat. 438. The formula covered Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia, and 39 counties in North Carolina. 28 C.F.R. Pt. 51 App.

Section 5 provides that "[w]henever" a covered jurisdiction "enact[s] or seek[s] to administer any * * * standard, practice, or procedure with respect to voting different from that in force or effect" on its coverage date, it must first obtain administrative preclearance from the Attorney General or judicial preclearance from a three-judge panel of this court. 42 U.S.C. 1973c. In either case, preclearance may be granted only if the jurisdiction demonstrates that the proposed change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" or membership in a language minority group. *Ibid.*

Covered jurisdictions may seek to terminate their coverage under Section 5 by bringing a declaratory judgment action in this court. See 1965 Act, § 4(a), 79 Stat. 438. As originally enacted, this "bailout" mechanism was available only to covered States and to jurisdictions, such as counties, "with respect to which such [coverage] determinations have been made as a separate unit." *Ibid.* The purpose of the provision was to remedy overbreadth in the coverage formula, to enable jurisdictions that had not discriminated to escape coverage. 1965 House Report 15; *South Carolina*, 383 U.S. at 331. To terminate coverage, such a jurisdiction was required to prove it had not used a prohibited test or device "for the purpose or with the effect of denying or abridging the right to vote on account of race or color" during the previous five years. *Ibid.*

The Supreme Court upheld the constitutionality of Sections 4(b) and 5 of the 1965 Act in *South Carolina*, 383 U.S. at 323-335, finding that these and other temporary provisions of the Act were valid exercises of Congress's authority under Section 2 of the Fifteenth Amendment.

3

2.   Congress reauthorized Section 5 in 1970 for five years, in 1975 for seven years, and in 1982 for 25 years.  Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, 84 Stat. 315 (1970 Reauthorization); Voting Rights Act Amendments of 1975, Pub. L. No. 94-73, 89 Stat. 400 (1975 Reauthorization); Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, 96 Stat. 131 (1982 Reauthorization).[1]  The Supreme Court reaffirmed the constitutionality of Section 5 after each.  *Georgia* v. *United States*, 411 U.S. 526, 535 (1973); *City of Rome* v. *United States*, 446 U.S. 156, 172-182 (1980); *Lopez* v. *Monterey Cnty.*, 525 U.S. 266, 282-285 (1999).

In 1982, Congress amended the bailout provision of the VRA, substantially expanding the opportunity for covered jurisdictions to terminate coverage to include "any political subdivision of [a covered] State" even if the coverage determination had not been made "with respect to such subdivision as a separate unit."  1982 Reauthorization, § 2(b)(2), 96 Stat. 131. The 1982 Reauthorization also changed the substantive requirements for bailout.  Under the revised bailout provision, which is currently in effect, jurisdictions must demonstrate that they have fully complied with Section 5 and other voting rights provisions during the previous ten years.  1982 Reauthorization, § 2(b)(4), 96 Stat. 131-133; see 42 U.S.C. 1973b(a).

---

[1]  The 1970 Reauthorization amended the coverage formula in Section 4(b) to include jurisdictions that maintained a prohibited test or device on November 1, 1968, and had voter registration or turnout of less than 50% of eligible residents in the Presidential election of 1968. Tit. I, 84 Stat. 315.  The 1975 Reauthorization amended the coverage formula to include jurisdictions that maintained a prohibited test or device on November 1, 1972, and had voter registration or turnout of less than 50% of voting age residents in the Presidential election of 1972.  Tit. II, 89 Stat. 401.  The 1975 reauthorization also expanded the definition of "test or device" to include a practice of providing voting materials only in English in jurisdictions in which at least 5% of the voting age population were members of a single-language minority.  Tit. II, 89 Stat. 401-402; see 40 Fed. Reg. 43,746 (Sept. 23, 1975).

3.  In 2006, Congress again reauthorized Section 5 for 25 years, finding that although progress had been made, the temporary provisions of the Act were still necessary to overcome nearly 100 years of voting discrimination perpetrated in defiance of Fifteenth Amendment. Congress made the following statutory findings:

(1) Significant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress, State legislatures, and local elected offices.  This progress is the direct result of the Voting Rights Act of 1965.

(2) However, vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process.

(3) The continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965.

(4) Evidence of continued discrimination includes—

(A) the hundreds of objections interposed, requests for more information submitted followed by voting changes withdrawn from consideration by jurisdictions covered by the Voting Rights Act of 1965, and section 5 enforcement actions undertaken by the Department of Justice in covered jurisdictions since 1982 that prevented election practices, such as annexation, at-large voting, and the use of multimember districts, from being enacted to dilute minority voting strength;

(B) the number of requests for declaratory judgments denied by the United States District Court for the District of Columbia;

(C) the continued filing of section 2 cases that originated in covered jurisdictions; and

(D) the litigation pursued by the Department of Justice since 1982 to enforce sections 4(e), (f)(4), and 203 of such Act to ensure that all language minority citizens have full access to the political process.

(5) The evidence clearly shows the continued need for Federal oversight in jurisdictions covered by the Voting Rights Act of 1965 since 1982, as demonstrated in the counties certified by the Attorney General for Federal

examiner and observer coverage and the tens of thousands of Federal observers that have been dispatched to observe elections in covered jurisdictions.

\* \* \* \* \*

(7) Despite the progress made by minorities under the Voting Rights Act of 1965, the evidence before Congress reveals that 40 years has not been a sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment and to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution.

(8) Present day discrimination experienced by racial and language minority voters is contained in evidence, including the objections interposed by the Department of Justice in covered jurisdictions; the section 2 litigation filed to prevent dilutive techniques from adversely affecting minority voters; the enforcement actions filed to protect language minorities; and the tens of thousands of Federal observers dispatched to monitor polls in jurisdictions covered by the Voting Rights Act of 1965.

(9) The record compiled by Congress demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years.

2006 Reauthorization, § 2(b), 120 Stat. 577-578.

**B.**     **Plaintiff**

Shelby County has been subject to Section 5 since 1965, when the State of Alabama was designated for coverage pursuant to Section 4(b)(1).  Def. SMF ¶ 6.[2]  The Department of Justice has received at least 682 Section 5 submissions involving jurisdictions located in whole or in part in Shelby County, including at least 69 submissions from the County itself.  Def. SMF ¶¶ 9-10. The County's most recent submission, a polling place change, was precleared in April 2010, while submissions from the Cities of Birmingham, Calera, Chelsea, and Helena, jurisdictions

---

[2]  "Def. SMF" refers to Defendant's Statement of Undisputed Material Facts.  "Pl. Mem." refers to Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment.  "Pl. SMF" refers to Plaintiff's Statement of Material Facts.

located in whole or in part within Shelby County, are currently pending.  Def. SMF ¶¶ 11-12.

The Attorney General has interposed five objections in jurisdictions located wholly or partially

in Shelby County:  a July 1975 objection to six annexations to the City of Alabaster; a December

1977 objection to two municipal annexations in the City of Alabaster; a May 1987 objection to

annexations to the City of Leeds, an August 2000 objection to designation of two municipal

annexations to a council district in Alabaster (at the same time 42 annexations adopted between

1992 and 2000 were precleared); and an August 2008 objection to 177 municipal annexations

and a redistricting plan in the City of Calera.  Def. SMF ¶ 13.

   Shelby County and jurisdictions within the County, including Calera, were defendants in

statewide litigation under Section 2 of the Voting Rights Act filed in the late 1980's.  Def. SMF

¶ 14.  The *Dillard* litigation initially challenged at-large election systems used to elect county

commissioners in nine Alabama counties.  *Dillard* v. *Crenshaw Cnty.*, 640 F. Supp. 1347 (M.D.

Ala. 1986).  The case later was expanded to include 183 counties, cities, and county school

boards throughout the State of Alabama.  See *Dillard* v. *Baldwin Cnty.*, 686 F. Supp. 1459, 1461

(M.D. Ala. 1988).

   The district court in *Dillard* found that the Alabama legislature had adopted at-large

voting systems for the counties with the intent to deprive black citizens of their voting rights.

*Dillard*, 640 F. Supp. at 1356-1360.  In the 1950's and 1960's, the court found, the Alabama

legislature took a number of actions to discriminate against African-American voters in response

to the Supreme Court's decision in *Smith* v. *Allwright*, 341 U.S. 649 (1944), (striking down the

all-white primary), and to the enactment of federal voting rights legislation.  These legislative

actions included authorizing counties to switch from single-member districts to at-large voting,

prohibiting single-shot voting in municipal, at-large elections, and requiring numbered posts in at-large elections.  *Dillard*, 640 F. Supp. at 1356-1357, 1359.

In 1990, both Shelby County and the City of Calera resolved the claims against them in the *Dillard* litigation by entering into consent decrees providing for elections from single-member districts.  See Def. SMF ¶ 19.  In 2007, both cases were dismissed after the State enacted legislation providing state-law authority for the voting changes.  Def. SMF ¶ 20.

Less than a year after the Section 2 case against it was dismissed and the injunction dissolved, Calera adopted a redistricting plan that eliminated the only majority-black single-member district in the City, a district that had been adopted pursuant to the City's consent decree in *Dillard*.  Def. SMF ¶ 21.  The City submitted the redistricting plan for Section 5 review on March 13, 2008, along with 177 annexations that the City had made between 1995 and 2007, but had not previously submitted.  Def. SMF ¶ 21.  The Attorney General objected to the changes in August 2008.  Def. SMF ¶ 22.  Citing *City of Rome*, the Attorney General concluded that the City had failed in its obligation to provide reliable, current population data to enable proper examination of the effect of the annexations and the redistricting plan, and that the City had failed to consider alternatives to the redistricting plan that would have provided African-American voters a better opportunity to elect a candidate of their choice.  Def. SMF ¶ 23.[3]

Despite the Attorney General's objection, the City conducted an election in August and a run-off election in October, 2008, using the objected-to voting changes and including the electorate of the objected-to annexed territory.  Def. SMF ¶ 25.  The election resulted in the defeat of the lone African-American member of the City Council.  Def. SMF ¶ 26.  The United

---

[3]  The Attorney General denied the City's requests to withdraw the objections on November 17, 2008, and March 24, 2009.  Def. SMF ¶ 24.

States then brought a Section 5 enforcement action against the City.  Def. SMF ¶ 27.  The

dispute was temporarily resolved through a consent decree that provided for an interim change in

the method of election, pending the results of the 2010 Census, and for a new municipal special

election.  Def. SMF ¶ 28.  The Attorney General subsequently withdrew the objection to the 177

annexations, but did not withdraw his objection to the redistricting plan or the designation of the

annexed territory to districts.  Def. SMF ¶ 29.

## ARGUMENT

"[J]udging the constitutionality of an Act of Congress is 'the gravest and most delicate

duty that [a court] is called on to perform.'"  *Northwest Austin Mun. Util. Dist. No. One* v.

*Holder*, 129 S. Ct. 2504, 2513 (2009) (*Northwest Austin II*); *Salazar* v. *Buono*, 130 S. Ct. 1803,

1820 (2010) ("Respect for a coordinate branch of Government forbids striking down an Act of

Congress except upon a clear showing of unconstitutionality").  In this case, plaintiff seeks to

mount the most difficult of all constitutional challenges, contending that 2006 Reauthorization of

the VRA is unconstitutional on its face – that is, that it is unconstitutional in all its applications.

See *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 449-450

(2008); compare, *Tennessee* v. *Lane*, 541 U.S. 509, 531 (2004) (declining to consider validity of

Title II of the Americans with Disabilities Act in all its applications "[b]ecause we find that Title

II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the

accessibility of judicial services") (citing *United States* v. *Raines*, 362 U.S. 17, 26 (1960));

*United States* v. *Georgia*, 546 U.S. 151, 157-159 (2006) (upholding Title II as applied to prohibit

actual violations of the Fourteenth Amendment).  Thus, this Court must reject plaintiff's

challenge if *either* of two circumstances obtains:  (1) Sections 4(b) and 5 of the VRA are

"appropriate prophylactic legislation" that may be upheld in their entirety, *Nevada Dep't of*

*Human Res.* v. *Hibbs*, 538 U.S. 721, 728 (2003); *or* (2) Sections 4(b) and 5 appropriately

respond to a sufficient record in Shelby County or Alabama that the statute may be upheld as

applied to the plaintiff, even if the application of those provisions to other jurisdictions might not

be proper.  See *Griffin* v. *Breckenridge*, 403 U.S. 88, 104 (1971) (court need not find statute

"constitutional in all its possible applications in order to uphold its facial constitutionality and its

application to the complaint in this case" but rather need only "identify[] a source of

congressional power to reach the [facts] alleged by the complaint in this case").  Because *both* of

these circumstances obtain, plaintiff cannot satisfy its heavy burden.

As the Supreme Court emphasized in *Northwest Austin II*, "[t]he Fifteenth Amendment

empowers 'Congress,' not the Court, to determine in the first instance what legislation is needed

to enforce it."  129 S. Ct. at 2513; see *South Carolina* v. *Katzenbach*, 383 U.S. 301, 326 (1966)

("Congress [is] to be chiefly responsible for implementing the rights created by" the Fifteenth

Amendment.).  In 2006, Congress "amassed a sizable record in support of its decision to extend

the preclearance requirements."  *Northwest Austin II*, 129 S. Ct. at 2513.  Based upon that record,

Congress correctly concluded that, without the preclearance requirement for covered

jurisdictions, "racial and language minority citizens will be deprived of the opportunity to

exercise their right to vote, or will have their votes diluted, undermining the significant gains

made by minorities in the last 40 years."  2006 Reauthorization, § 2(b)(9), 120 Stat. 578.  See

*Northwest Austin Mun. Util. Dist. No. One* v. *Mukasey*, 573 F. Supp. 2d 221, 265-268 (D.D.C.

2008) (*Northwest Austin I*) (Congress rationally determined that reauthorization was

appropriate); *id.* at 268-278 (finding reauthorization congruent and proportional response to

evidence of continued voting discrimination).

Plaintiff nonetheless contends that the legislative record was insufficient to support the 2006 Reauthorization because the types of voting discrimination documented by Congress in 2006 are unlike the type of discrimination that led to enactment of the VRA in 1965.  But the kinds of dilutive mechanisms and other means of minimizing the effectiveness of minority voters identified by Congress in 2006 were not new and had been used by the covered jurisdictions to discriminate against minority voters long before 1965.  Congress meant to provide a means of preventing the implementation of *all* these types of mechanisms in Section 5.  Indeed, the whole purpose of Section 5 is to provide a flexible remedy capable of responding to new and "ingenious" methods of voting discrimination as they emerge.  *South Carolina*, 383 U.S. at 309. If the use of tests and similar devices were the only evils to be addressed, there would have been no need for Section 5, since such tests were banned by another provision of the Act.

Plaintiff's challenge to Section 4(b) is similarly without merit.  In crafting the coverage formula, Congress defined the geographic reach of Section 5 by using objective criteria that it knew would capture the jurisdictions it had found to be the most egregious discriminators (including Alabama). Because Congress found that voting discrimination was still occurring in the covered jurisdictions in 2006, the coverage formula remains valid.  Moreover, the bailout provision provides ample opportunity for covered jurisdictions to terminate coverage.  The Supreme Court made it clear that the bailout provision should be interpreted broadly, see *Northwest Austin II*, 129 S. Ct. at 2513-2517, and the Attorney General intends to do just that, applying the provision so as to permit jurisdictions to bail out when they no longer require the strictures of Section 5.

## I.      SECTION 5 OF THE VOTING RIGHTS ACT IS A VALID EXERCISE OF CONGRESS'S AUTHORITY TO ENFORCE THE FIFTEENTH AMENDMENT

A.      **Section 5 Is Subject To Rational Basis Review**

Congress is empowered to "enforce" the provisions of the Fifteenth Amendment through "appropriate legislation."  U.S. Const. Amend. XV, § 2.  The Supreme Court's construction of this provision has been consistent:  when Congress is legislatively enforcing the Fifteenth Amendment's prohibition on race discrimination with respect to voting, the Court reviews the appropriateness of that legislation under a deferential rationality standard.  *South Carolina* v. *Katzenbach*, 383 U.S. 301, 324 (1966); *City of Rome* v. *United States*, 446 U.S. 156, 175-177 (1980); *Georgia* v. *United States*, 411 U.S. 526, 535 (1973) (upholding validity of Section 5 "for the reasons stated at length in *South Carolina*"); cf. *Lopez* v. *Monterey Cnty.*, 525 U.S. 266, 282-285 (1999) (relying on *South Carolina* and *City of Rome* to uphold application of Section 5 to legislation enacted by a non-covered State).  Legislation that prohibits race or national origin discrimination and that is enacted pursuant to Congress's authority under Section 2 of the Fourteenth Amendment is similarly subject to rational basis review.  *E.g.*, *Katzenbach* v. *Morgan*, 384 U.S. 641, 652-656 (1966).

Plaintiff nonetheless contends that Section 5 should be subject to a "congruence and proportionality" test.  Pl. Mem. 17 (citing *City of Boerne* v. *Flores*, 521 U.S. 507, 520 (1997)).  But the Court has applied the congruence and proportionality analysis developed in *Boerne* only to legislation enacted to enforce Fourteenth Amendment rights outside the context of race or national origin.  Because Section 5 enforces the Fifteenth Amendment's core prohibition on race discrimination in voting, it is subject to rational basis review.

1.  "Above all else, the framers of the Civil War Amendments intended to deny to the States the power to discriminate against persons on account of their race."  *Oregon* v. *Mitchell*, 400 U.S. 112, 126 (1970) (plurality); see *Ex parte Virginia*, 100 U.S. (10 Otto) 339, 344-345,

347 (1879); *Slaughter House Cases*, 83 U.S. (16 Wall) 36, 71-72 (1872); see also *Tennessee* v. *Lane*, 541 U.S. 509, 561 (2004) (Scalia, J., dissenting).  During the first century after the adoption of the Civil War Amendments, Congress's efforts to enforce the guarantees of the Fourteenth and Fifteenth Amendments were largely limited to laws enforcing the ban on racial discrimination, both in voting and otherwise.  See, *e.g.*, *United States* v. *Reese*, 92 U.S. (2 Otto) 214 (1875); *Ex parte Virginia*, 100 U.S. 339; *Civil Rights Cases*, 109 U.S. 3 (1883); *James* v. *Bowman*, 190 U.S. 127 (1903); *South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966); *McLaughlin* v. *Florida*, 379 U.S. 184, 191-192 (1964).  In those cases, it was easy to determine whether Congress was in fact enforcing the protections of the amendments.  As long as the laws in question were directed at race discrimination by state actors, the Court upheld them.  *E.g.*, *Ex parte Virginia*, 100 U.S. at 349; *South Carolina*, 383 U.S. at 337.  Where the laws were directed solely at private actors or where they were intended to facilitate the right to vote generally, rather than preventing voting discrimination on the basis of race specifically, the Court found them invalid.  *James*, 190 U.S. at 139; *Civil Rights Cases*, 109 U.S. 3, 18-19; *Reese*, 92 U.S. at 218.

Race discrimination perpetrated or effectuated by state actors rarely, if ever, passes constitutional muster.  Whereas most governmental classifications are entitled to a presumption of constitutionality, classifications based on race or national origin are presumed to be unconstitutional.  See, *e.g.*, *McLaughlin*, 379 U.S. at 191-192.  It follows that Congress has substantial authority to enact legislation aimed at preventing or remedying discrimination based on race or national origin.  Thus, in *South Carolina*, the Court began its analysis with "one fundamental principle.  As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." 383 U.S. at 324.  And, in *City of Rome*, the Court made it clear that Congress's authority to

enforce the Fifteenth Amendment permits it to "outlaw voting practices that are discriminatory in effect."  446 U.S. at 173.

2.  To be sure, more recent Fourteenth Amendment cases are not irrelevant in determining how this Court should evaluate the constitutionality of Section 5.  Although the substantive provisions of the Fourteenth and Fifteenth Amendments differ, the wording of their enforcement clauses is essentially identical, empowering Congress to "enforce" the amendments' provisions "by appropriate legislation."  U.S. Const. Amend. XIV, § 2.  The Supreme Court has found that the nature of the enforcement authority in Section 5 of the Fourteenth Amendment is the same as that in Section 2 of the Fifteenth Amendment.  See, *e.g.*, *Boerne*, 521 U.S. at 518; *James* v. *Bowman*, 190 U.S. at 136-139.  Thus, although the amendments in many respects govern different substantive spheres, the terms "enforce" and "appropriate legislation" have the same meaning in each amendment.

The substantive scope of the two Amendments, on the other hand, differs significantly. The Fifteenth Amendment simply prohibits race discrimination in voting, and nothing more. U.S. Const. Amend. XV, § 1.  The Fourteenth Amendment reaches much more broadly and covers a diverse array of rights, prohibiting States from infringing citizens' privileges and immunities; from denying them life, liberty, or property; and from denying them equal protection of the laws.  U.S. Const. Amend. XIV, § 1.  This broader reach of the Fourteenth Amendment, combined with the very different levels of constitutional scrutiny applied to the different rights secured by the Amendment, means that legislation enacted to enforce the Fourteenth Amendment, outside the core prohibitions on race discrimination, may be subjected to closer juridical scrutiny to ensure that it is appropriate enforcement legislation.  Cf. *Lane*, 541 U.S. at 561-562 (Scalia, J., dissenting).

14

It was in this context that the Supreme Court articulated the "congruence and proportionality" standard in *Boerne*, 521 U.S. at 520, which invalidated the Religious Freedom Restoration Act (RFRA), 42 U.S.C. 2000bb *et seq*.  Congress enacted RFRA "in direct response to" the Supreme Court's decision in *Employment Division of Human Resources of Oregon* v. *Smith*, 494 U.S. 872 (1990), which held that the First Amendment does not exempt citizens from adhering to neutral, generally applicable laws that impose a substantial burden on their exercise of religion.  *Boerne*, 521 U.S. at 512-516.  Through RFRA, Congress sought to overturn the constitutional result in *Smith* by providing a statutory remedy for those alleging that their religious rights were burdened by such neutral laws.  *Id*. at 515-516.  *Boerne* recognized that Congress may do more in exercising its Fourteenth Amendment authority than merely prohibit what the amendment itself prohibits.  *Id.* at 517-518.  But it also reiterated the constitutional norm that it is for the Court, not Congress, to determine what constitutional provisions mean.  *Id.* at 519.  Acknowledging that the line between enforcement of a constitutional right and its substantive redefinition is not always "easy to discern," the Court for the first time described legislation falling on the appropriate enforcement side of that line as exhibiting "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  *Id.* at 519-520.

The *Boerne* Court's inquiry into whether RFRA was congruent and proportional was simply its way of determining whether the statute "enforc[ed]" the provisions of the Fourteenth Amendment.  521 U.S. at 519 ("In assessing the breadth of § 5's enforcement power, we begin with its text.  Congress has been given the power 'to enforce' the 'provisions of this article.'").  Because RFRA targeted practices that were presumed valid under the Constitution, the Court did not afford RFRA the same presumption of validity it had afforded to earlier legislation enacted to

enforce the provisions of the Fourteenth and Fifteenth Amendments.  Instead, the Court applied a

less deferential standard, including more exacting scrutiny of the legislative record documenting

a pattern of violations of the right Congress sought to protect.  The Court found that record

lacking.  "In contrast to the record which confronted Congress and the Judiciary in the voting

rights cases," the Court wrote, "[t]he history of persecution in this country detailed in the

hearings mentions no episodes occurring in the past 40 years."  *Id.* at 530.

   Following *Boerne*, the Court applied the congruence and proportionality analysis when

reviewing other legislation through which Congress sought to protect Fourteenth Amendment

rights not subject to heightened constitutional review.  In *Kimel* v. *Florida Board of Regents*, 528

U.S. 62 (2000), and *Board of Trustees of the University of Alabama* v. *Garrett*, 531 U.S. 356

(2001), the Court closely scrutinized the evidence Congress had amassed of State-sponsored

employment discrimination on the basis of age or disability, respectively, because States have

leeway to make rational distinctions on these bases.  In both cases, the Court found the

evidentiary record to be lacking.  See *Kimel*, 528 U.S. at 89 ("Congress never identified any

pattern of age discrimination by the States, much less any discrimination whatsoever that rose to

the level of constitutional violation."); *Garrett*, 531 U.S. at 368 ("The legislative record of the

ADA, however, simply fails to show that Congress did in fact identify a pattern of irrational state

discrimination in employment against the disabled."); *id.* at 369 (citing "half a dozen examples

from the record" involving employment discrimination by States).

   The Supreme Court has also made it clear, however, that such an exacting review of the

record of discrimination before Congress is not necessary where Congress enforces a right at or

near the core of the Fourteenth Amendment's protections.  In *Nevada Department of Human*

*Resources* v. *Hibbs*, 538 U.S. 721 (2003), the Court upheld the family leave provisions of the

Family and Medical Leave Act (FMLA) as an appropriate means of enforcing the Fourteenth

Amendment's prohibition of sex discrimination.  Because Congress was enforcing a right subject

to heightened constitutional review, the Court stated that it was "easier" for Congress to

demonstrate the need for the legislation, just as it had been when Congress enacted Section 5 of

the VRA to remedy and prohibit race discrimination in voting.  *Id*. at 736 (citing *South Carolina*,

383 U.S. at 308-313).  The same was true in *Tennessee* v. *Lane*, 541 U.S. at 528, where the Court

upheld the application of Title II of the Americans with Disabilities Act to protect the right of

citizens with disabilities to access the courts, a right subject to heightened constitutional

protection; and in *United States* v. *Georgia*, 546 U.S. at 157-159, where the Court upheld the

application of Title II to prohibit violations of the Eighth Amendment without applying or even

mentioning the congruence and proportionality test.

3.  Section 5 of the Voting Rights Act enforces the protections at the core of the Fifteenth

Amendment and Fourteenth Amendments.  The primary purpose of both amendments was to

prohibit race discrimination, and both Amendments protect the right to vote.  The right to vote is

"fundamental" and is "preservative of all rights."  *Harper* v. *Virginia State Bd. of Elections*, 383

U.S. 663, 667 (1966); see *Dunn* v. *Blumstein*, 405 U.S. 330, 337 (1972).

Section 5 operates at the intersection of a citizen's most fundamental right and the most

constitutionally invidious form of governmental discrimination.  Since the target of Section 5 is

also the primary target of the Fourteenth and Fifteenth Amendments, Congress is entitled "to

exercise its discretion in determining whether" legislation is needed to secure the guarantees of

the amendments.  *Morgan*, 384 U.S. at 651.  Where a statute enforces the core prohibition on

race discrimination found in both amendments, a court's role in assessing the appropriateness of

the means of enforcement is limited to inquiring whether Congress's choice is rational.  *South*

*Carolina*, 383 U.S. at 326; *Morgan*, 384 U.S. at 650; *City of Rome*, 446 U.S. at 175.  As the

Supreme Court declared in *Ex parte Virginia*:  "Whatever legislation is appropriate, that is,

adapted to carry out the objects the [Civil War] amendments have in view, whatever tends to

enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of

perfect equality of civil rights and the equal protection of the laws against State denial or

invasion, if not prohibited, is brought within the domain of congressional power."  100 U.S. at

345-346.  Within the sphere of enforcing the amendments' provisions, Congress's legislative

authority "is complete."  *Id.* at 348; see also *Fitzpatrick* v. *Bitzer*, 427 U.S. 445, 455 (1976)

(Congress's legislative authority "is plenary within the terms of the constitutional grant.").

The Supreme Court has made clear that the standard of "appropriate[ness]" under the

amendments is the same as that under the "necessary and proper" clause of Article I.  In *South*

*Carolina*, the Court explicitly adopted this standard as the "basic test to be applied in a case

involving § 2 of the Fifteenth Amendment":

> Let the end be legitimate, let it be within the scope of the constitution, and all
> means which are appropriate, which are plainly adapted to that end, which are not
> prohibited, but consist with the letter and spirit of the constitution, are
> constitutional.

383 U.S. at 326 (quoting *McCulloch* v. *Maryland*, 17 U.S. (4 Wheat) 316, 421 (1819)); see also

*Katzenbach* v. *Morgan*, 384 U.S. 641, 650 (1966) (same); *City of Rome*, 446 U.S. at 175 (same).

Notably, in *Lopez* v. *Monterey County*, 525 U.S. 266, 282-285 (1999), a majority of the Court

relied upon *South Carolina* and *City of Rome* in upholding the 1982 Reauthorization of Section

5, without suggesting that its intervening decision in *Boerne* required a different analysis.  525

U.S. at 282-285; compare *id*. at 293-298 (Thomas, J., dissenting) (doubting the constitutionality

of Section 5 as interpreted by the majority, in light of *Boerne*); see *id.* at 288-289 (Kennedy, J., concurring) (noting "constitutional concerns").[4]

In "determining whether and what legislation is needed to secure the guarantees" of the Fourteenth and Fifteenth Amendments, the Constitution assigns to Congress the task of "assess[ing] and weigh[ing] the various conflicting considerations." *Morgan*, 384 U.S. at 653. Where Congress endeavors to enforce the core protections of the amendments, "[i]t is not for [the Court] to review the congressional resolution of these factors.  It is enough that [the Court] be able to perceive a basis upon which the Congress might resolve the conflict as it did." *Id.* at 653; see also *Civil Rights Cases*, 109 U.S. at 14; *South Carolina*, 383 U.S. at 325-326 (the declaration in Section 2 of the Fifteenth Amendment that "Congress shall have the power to enforce this article by appropriate legislation," indicates "that Congress was to be chiefly responsible for implementing the rights created in [Section] 1" of the Amendment).  "The power to interpret the Constitution in a case or controversy remains in the Judiciary." *Boerne*, 521 U.S. at 524.  But the courts give "substantial deference" to Congress's determination of factual matters underlying its legislative judgments. *Turner Broad. Sys., Inc.* v. *F.C.C.*, 520 U.S. 180, 195-196 (1997); *id.* at 195 (court's "sole obligation is to assure that, in formulating its

---

[4]  Plaintiff seeks to discount the significance of *Lopez* because it presented an as-applied, rather than a facial challenge to the constitutionality of Section 5.  Pl. Mem. 26 n.6.  But the Court's holding that it was constitutional to apply Section 5 to "States that have not been designated as historical wrongdoers in the voting rights sphere," *Lopez*, 525 U.S. at 282, presupposes its constitutionality when applied to States that have been so designated and, *a fortiori*, defeats a *facial* challenge.  The Court stated "that Congress has the constitutional authority to designate covered jurisdictions and to guard against changes that give rise to a discriminatory effect in those jurisdictions." *Id.* at 283; see *Northwest Austin II*, 129 S. Ct. at 2510 ("We upheld each of these reauthorizations against constitutional challenges, finding that circumstances continued to justify the provisions.") (citing *Georgia*, *City of Rome*, and *Lopez*).

judgments, Congress has drawn reasonable inferences based on substantial evidence"); see also *Walters* v. *National Ass'n of Radiation Survivors*, 473 U.S. 305, 330 n.12 (1985).

**B.      Congress Rationally Determined That Section 5 Preclearance Is Necessary**

In 2006, Congress went to extraordinary lengths to carefully "assess and weigh the various conflicting considerations" associated with reauthorizing Section 5.  An overwhelming majority of the people's elected representatives voted to reauthorize the law.  See 152 Cong. Rec. 14,303-14,304, 15,325 (2006) (recording that the 2006 Reauthorization passed by a vote of 390-33 in the House and unanimously in the Senate).  In so doing, Congress appropriately enforced core constitutional protections against racial discrimination in voting.  Congress looked in 2006 to the same evidentiary sources relied upon by previous Congresses and found to be adequate by the Supreme Court.  The 2006 Congress found that the same types and patterns of discriminatory behavior found by previous Congresses continue today.  This extensive record of voting discrimination, including intentional discrimination, stands in stark contrast to the very minimal records of discrimination that the Court found inadequate to support legislation in other cases. See *Boerne*, 521 U.S. at 530; *Kimel*, 528 U.S. at 89; *Garrett*, 531 U.S. at 368.  Thus, the 2006 Reauthorization not only satisfies the rational basis test, but also meets the congruence and proportionality test.  See *Northwest Austin I*, 573 F. Supp. 2d at 268-279.

> 1.    *Evidence Of Ongoing Voting Discrimination By Covered Jurisdictions Justified Previous Reauthorizations*

Congress concluded in 1965 that covered jurisdictions had engaged in a pattern of suppressing participation of minority voters through discrimination, intimidation, misinformation, and outright exclusion.  In the century between the Fifteenth Amendment and the Voting Rights Act, southern States employed a variety of discriminatory devices including grandfather clauses, white primaries, discriminatory procedural hurdles, discriminatory

challenges and purges, and racial gerrymandering, as well as discriminatory tests.  1965 House

Report 8-12; S. Rep. No. 162 (Pt. 3), 89th Cong., 1st Sess. 9-12 (1965) (1965 Senate Report).

These States also restricted the times and locations of registration sites so as to prevent minority

citizens from registering, H.R. Rep. No. 196, 94th Cong., 1st Sess. 11 (1975) (1975 House

Report).  In upholding Section 5 in *South Carolina*, the Supreme Court found that this history of

voting discrimination identified by Congress justified the remedy of Section 5.  383 U.S. at 308.

When Congress reauthorized Section 5 in 1970, and again in 1975, it concluded that

covered jurisdictions continued to employ discriminatory devices and to engage in other

discriminatory behavior in order to suppress the participation of minority voters.  H.R. Rep. No.

397, 91st Cong., 1st Sess. 6-8 (1969) (1969 House Report); 1975 House Report 16-18.  In both

years, Congress learned that as barriers to minority registration and voting fell, covered

jurisdictions turned to other devices, such as at-large elections, restrictive requirements for

candidates, consolidations, and annexations, to "diminish the Negro's franchise and defeat Negro

and Negro-supported candidates."  1969 House Report 7; see 1975 House Report 10.  In 1975 in

particular, the Committees studying the legislation emphasized the importance of Section 5

review of redistricting plans and noted that one-third of the objections interposed by the Attorney

General involved redistricting.  1975 House Report 10; S. Rep. No. 295, 94th Cong., 1st Sess. 18

(1975) (1975 Senate Report).

When the Supreme Court upheld the 1975 Reauthorization in *City of Rome*, 446 U.S. at

173-183, the Court acknowledged that black voter registration rates had dramatically improved,

but recognized that "a bleaker side of the picture yet exist[ed]," *id.* at 180.  The Court thus

rejected the contention that Section 5 had "outlived [its] usefulness" and "decline[d] * * * to

overrule Congress' judgment that the 1975 extension was warranted."  *Id.* at 180.  The Court

noted that Congress had examined "information on the number and types of submissions made by covered jurisdictions and the number and nature of objections interposed by the Attorney General," before concluding that Section 5 was both responsible for the progress made to date and still necessary to protect the "limited and fragile success." *Id*. at 181 (quoting 1975 House Report 10-11). Notably, *City of Rome* concerned changes in the way the City elected its City Commission and Board of Education, as well as a series of annexations to the City's territory, mechanisms that would have diluted the effectiveness of the minority vote, rather than restrictions designed to suppress the participation of minority voters. *Id.* at 160-161. And, in addition to upholding Section 5 itself, the Court upheld the district court's ruling that the City had failed to prove that the electoral changes and annexations, together with racial bloc voting in the City, would not have a dilutive effect. *Id.* at 183-187.

When Congress reauthorized Section 5 in 1982, it again found actions by covered jurisdictions that suppressed the participation of and limited the effectiveness of minority voters. Congress found that a pattern of intimidation and harassment accompanied the use of discriminatory voting practices. S. Rep. No. 417, 97th Cong. 2d Sess. 14 (1982) (1982 Senate Report); H.R. Rep. No. 227, 97th Cong. 1st Sess. 6, 15 (1981) (1981 House Report). Congress also found that, as registration and participation rates among minority voters improved through enforcement of the VRA, covered jurisdictions shifted their focus from preventing participation to diluting the voting strength of minority voters. Congress noted that the "right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot," 1981 House Report 17 (quoting *Allen* v. *State Bd. of Elections*, 393 U.S. 544, 569 (1969)), and found that "covered jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices that dilute minority voting strength," 1982 Senate

Report 10.  Those devices included racial gerrymandering, at-large elections, annexations, shifts from elective to appointive offices, majority vote requirements, numbered posts, staggered terms, and full slate voting requirements.  1981 House Report 17-20.  In reviewing the Act as amended in 1982, the Supreme Court again upheld Section 5 and held that, although "the Voting Rights Act, by its nature, intrudes on state sovereignty[, t]he Fifteenth Amendment permits this intrusion."  *Lopez*, 525 U.S. at 284-285.  *Lopez* concerned a series of changes in the County's method of electing municipal judges, resulting in a transition from nine districts to a single, countywide district.  *Id.* at 271-273.

2. *Evidence Of Ongoing Voting Discrimination By Covered Jurisdictions Justified The 2006 Reauthorization*

The voluminous record supporting the 2006 reauthorization reveals three important facts: (1) in 2006, Congress relied on the same types and sources of evidence it had relied upon in previous reauthorizations; (2) Congress concluded that, despite progress, covered jurisdictions continue to discriminate against racial and language minority voters through concerted efforts to suppress the participation of such voters and to dilute their voting strength; and (3) Congress concluded that Section 5 works and must continue to work to stamp out discrimination in voting.

The reauthorizing Congress held extensive hearings to study the effect and operation of the Voting Rights Act.  The House of Representatives held ten oversight hearings and two legislative hearings to examine both "the effectiveness of the temporary provisions of the VRA over the last 25 years" and the effect reauthorization of those provisions would have "on continuing the progress that minority groups have made in the last forty years and on protecting racial and language minority voters over the next 25 years."  H.R. Rep. No. 478, 109th Cong., 2d Sess. 5 (2006) (2006 House Report).  The House heard from 46 witnesses and assembled over 12,000 pages of testimony and documentary evidence.  *Ibid.*; *id.* at 11.  The Senate held ten

hearings featuring testimony from 40 witnesses, and gathered thousands of pages of evidence.  S. Rep. No. 295, 109th Cong., 2d Sess. 2 (2006) (2006 Senate Report).

While the House Committee recognized that "[s]ubstantial progress has been made over the last 40 years," the Committee also found that "[d]iscrimination today is more subtle than the visible methods used in 1965" and continues to result in "a diminishing of the minority community's ability to fully participate in the electoral process and to elect their preferred candidates of choice."  2006 House Report 6.  The Committee found that the evidence before it "resembles the evidence before Congress in 1965 and the evidence that was present again [when Congress reauthorized Section 5] in 1970, 1975, 1982, and 1992," and amounts to "abundant evidentiary support for reauthorization of VRA's temporary provisions."  *Ibid*.

a.      *In 2006, Congress Found Evidence Of Voting Discrimination In The Same Evidentiary Sources As Did Previous Congresses*

In enacting and reauthorizing Section 5, Congress has repeatedly examined the state of voting rights in covered jurisdictions, and has repeatedly found that jurisdictions covered by Section 5 have engaged in a pattern of suppressing and diluting the voting strength of minority citizens.  In making these findings, previous Congresses relied first on the number and types of Section 5 objections interposed by the Attorney General.  See, *e.g*., 1982 Senate Report 10-12; 1981 House Report 11-13; 1975 House Report 9-10; 1975 Senate Report 16-18; 1969 House Report 6-8.  Second, they relied on the Justice Department's deployment of observers to monitor elections in covered jurisdictions.  1981 House Report 20-21; 1975 House Report 12; 1975 Senate Report 20-21; 1969 House Report 6.  Third, they examined the inadequacies of other legislative remedies for voting discrimination.  1965 Senate Report 5-9; 1965 House Report 8-11.  Fourth, they relied on direct evidence of discrimination:  anecdotal evidence and evidence from litigation demonstrating that racial and language minority citizens faced discrimination in

24

voting in covered jurisdictions.  See, *e.g.*, 1981 House Report 17-20, 26-28; 1975 House Report 16-24; 1975 Senate Report 25-30; 1965 Senate Report 3-5, 9-12; 1965 House Report 11-13. Finally, they found that registration rates of racial and language minority citizens lagged behind those of white citizens, and continued to do so in some covered jurisdictions long after Section 5 went into effect.  See, *e.g.*, 1981 House Report 7-8; 1975 House Report 7; 1975 Senate Report 13-15.  In 2006, Congress relied on these same five sources of evidence – the same sources the Supreme Court found to be reliable in *South Carolina* and *City of Rome*.

i.  *Section 5 Enforcement Since 1982*

(a)  *Section 5 Objections*

*(1) Rate And Types Of Objections*:  In 2006, Congress relied on the volume and substance of Section 5 objections.  Since the 1982 amendments to the Act went into effect, the Attorney General had interposed objections to more than 700 discriminatory voting changes.[5]  2006 House Report 21-22, 36.  Although the annual rate of objections from 1968-1982 was slightly higher than the rate after 1982, *Appendix* to *Voting Rights Act:  Evidence of Continued Need:  Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess. 172 (2006) (*H. Appx.*), the rate in several southern states increased in the post-1982 time period.  *Voting Rights Act:  Evidence of Continued Need:  Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess. 54, 60 (2006) (*Evidence of Continued Need*) (statement of Wade Henderson); *H. Appx.* 259; 2006 House Report 37; *Voting Rights Act:  Section 5 of the Act – History, Scope, and Purpose:  Hearing*

---

[5] For a list of the Attorney General's objection letters and copies of some of them, see http://www.justice.gov/crt/voting/sec_5/obj_activ.php; see also *Voting Rights Act:  Section 5 of the Act – History, Scope, and Purpose:  Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 105-2295 (2005).

25

*Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 86 (2005) (*History, Scope, & Purpose*) (testimony of Nina Perales).[6]

Throughout the post-1982 period, the Justice Department has interposed objections to a wide variety of voting changes, including annexations, education requirements, election dates, polling locations, majority vote requirements, statewide and local redistricting, staggered terms, and numbered posts. *H. Appx.* 402-404; see also *id.* at 335; see also *History, Scope, & Purpose* 1686-2595 (copies of objection letters sent from 1982 through mid-2003).[7] In Alabama, the Justice Department interposed 46 objections between 1982 and 2004, including objections to a state legislative redistricting plan, a congressional redistricting plan, and three other statewide enactments. *H. Appx.* 259-260; Def. SMF ¶ 30. In Louisiana, "since 1965, not one single Louisiana State House of Representatives redistricting plan as initially submitted to the Justice Department for review, has been precleared." *To Examine the Impact and Effectiveness of the Voting Rights Act:  Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 16 (2005) (*Impact & Effectiveness*) (testimony of Marc Morial); see also *H. Appx.* 335 (noting that, in Louisiana, objections have been interposed to voting changes "at every level of government, including the state legislature, the state court system, the state board of education, parish councils, school boards, police juries, city councils, and boards of aldermen"). In Georgia, the 92 objections interposed between 1982 and 2004 covered a variety of election changes, including many that "had been illegally implemented for

[6] See also http://www.justice.gov/crt/voting/sec_5/tx_obj2.php; http://www.justice.gov/crt/voting/sec_5/la_obj2.php; http://www.justice.gov/crt/voting/sec_5/ms_obj2.php

[7] Congress also learned that Section 5 objections "aid small as well as large scale elections, shielding as few as 208 and as many as 215,406 voters with a single objection." *The Continuing Need for Section 5 Pre-clearance:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 58 (2006) (testimony of Anita Earls).

years, or even decades, without Section 5 preclearance." *Evidence of Continued Need* 62
(statement of Henderson).  In Texas, the Attorney General objected to redistricting plans at all
levels of government, changes in local voting procedures, and changes related to the system of
representation.  *Id*. at 63-64 (statement of Henderson).  In South Carolina, the "objected-to
discriminatory practices have covered a wide variety of changes that affected nearly every aspect
of black citizens' participation in South Carolina's electoral processes, including redistricting,
annexations, voter assistance, changing county boundaries, eliminating offices, reducing the
number of seats on a public body, majority vote requirements, changing to at-large elections,
using numbered posts or residency requirements, staggering terms, scheduling of elections,
changing from nonpartisan to partisan elections and limiting the ability of African-American
citizens to run for office."  *Id.* at 65-66 (statement of Henderson).

     *(2) Findings Of Discriminatory Intent*:  Congress heard testimony that "the clear trend
line from the 1970's to the 1980's to the 1990's was that discriminatory purpose increasingly
was the basis on which the Department was interposing objections," and that a majority of
objections by the Attorney General in 2000 were based on discriminatory purpose.  *Voting
Rights Act:  Section 5 – Preclearance Standards, Hearing Before the Subcomm. on the
Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 8 (2005)
(*Preclearance Standards*).[8]  Similarly, a recent study of Attorney General objections found a
"consistent increase over time of objections based on the purpose prong of Section 5."  Peyton
McCrary et al., *The End of Preclearance As We Knew It:  How the Supreme Court Transformed
Section 5 of the Voting Rights Act*, 11 Mich. J. Race & Law 275, 297 (2006).  The study found

_____

[8]  This trend was reversed following the Supreme Court's decision in *Reno* v. *Bossier Parish
School Board*, 528 U.S. 320 (2000), which held that Section 5 did not prohibit electoral changes
that were enacted with discriminatory purpose unless the purpose was retrogressive.

that 43% of all objections interposed by the Attorney General in the 1990's were based on intent alone and another 31% were based on a combination of intent and effect.  *Ibid*.

For example, the Attorney General objected to the post-2000 census redistricting plan of the City of Albany, Georgia, because there was evidence that the plan "was animated by purposeful discrimination to limit the opportunities of minorities."  *Voting Rights Act:  The Continuing Need for Section 5:  Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 80 (2005) (*The Continuing Need for Section 5*) (testimony of Laughlin McDonald); 2006 House Report 37-38; Letter from J. Michael Wiggins to Al Grieshaber, Jr. (Sept. 23, 2002), in *History, Scope, & Purpose* 845-848.  In 1992, the Attorney General refused to preclear a redistricting plan for Selma, Alabama, because the plan "exhibited a purpose to prevent African Americans from electing candidates of their choice by fragmenting the black voting population."  *Evidence of Continued Need* 54 (statement of Henderson); see also Letter from John R. Dunne to John E. Pilcher (July 21, 1992), in *History, Scope, & Purpose* 397-399.  In 1993, the Attorney General objected to a school board election change in Monterey County, California, because the change "was motivated, at least in part, by a discriminatory animus."  *H. Appx.* 351 (describing testimony of Robert Rubin); Letter from Ralph F. Boyd, Jr. to William D. Barr (Mar. 29, 2002), available at http://www.justice.gov/crt/voting/sec_5/ltr/l_040102.php.  See also 2006 House Report 23 ("Section 5 has been instrumental in preventing covered jurisdictions from intentionally reenacting and enforcing changes to which the Department of Justice had previously objected.").

In one stark example, the Attorney General interposed an objection to Mississippi's 1991 statewide legislative redistricting plan after concluding that the proposed plan was "calculated not to provide black voters in the Delta with the equal opportunity for representation required by

the Voting Rights Act," and noting that legislative debate about the proposed plan and

alternatives was "characterized by overt racial appeals."  Letter from John R. Dunne to Hon.

Hainon A. Miller (July 2, 1991), in *History, Scope, & Purpose* 1410-1413.  Congress heard

testimony that, when state legislators defeated an alternative plan that would have increased the

number of black majority districts, some of them referred to the alternative plan as the "black

plan" when speaking on the floor, and as the "n *** plan" privately.  *Modern Enforcement of the*

*Voting Rights Act:  Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 22

(2006) (*Modern Enforcement of the Voting Rights Act*) (testimony of Robert B. McDuff).

  In many instances, the Attorney General found that a jurisdiction enacted a voting change

with the specific intent to limit minority voting strength.  For instance, in 2001, the Attorney

General objected to a Mississippi town's cancellation of an election because the evidence

demonstrated that the cancellation was intended to reduce minority voting strength.  Letter from

Ralph F. Boyd, Jr. to J. Lane Greenlee (Dec. 11, 2001) (re:  Kilmichael, MS), in *History, Scope,*

*& Purpose* 1616-1619.  No black citizen had ever been elected mayor of the town, and only one

black person had ever served on the Board of Aldermen, although black citizens had recently

become a majority of the town's population.  The town opted to cancel the election, with no

notice to the community, after the incumbent all-white town governance learned that the

minority community had a chance to win the mayoral election and four out of the five aldermen

seats.  *Ibid.*; see also *Modern Enforcement of the Voting Rights Act* 22.  In 2000, the Attorney

General objected to a redistricting plan for the Webster County, Georgia, Board of Education,

after finding that the redistricting was undertaken to "intentionally decreas[e] the opportunity of

minority voters to participate in the electoral process."  Letter from Bill Lann Lee to James M.

Skipper, Jr. (Jan. 11, 2000), in *History, Scope, & Purpose* 830-833.  The plan was initiated by a

state legislative act after voters elected a majority black school board for the first time.  And the

Attorney General objected in 1998 to a redistricting plan for the City of Grenada, Mississippi,

because the Attorney General found "a purpose to maintain and strengthen white control of a

City on the verge of becoming majority black."  Letter from Bill Lann Lee to T.H. Freeland IV

(Aug. 17, 1998), in *History, Scope, & Purpose* 1606-1612.  The Attorney General also objected,

in 1987, to a change in the method of election for the board of commissioners of Bladen County,

North Carolina, finding that "the board undertook extraordinary measures to adopt an election

plan [that] minimizes minority voting strength" in order to "maintain white political control to

the maximum extent possible."  Letter from William Bradford Reynolds to W. Leslie Johnson,

Jr. (Nov. 2, 1987), in *History, Scope, & Purpose* 1760-1763.[9]

A number of the Attorney General's objections highlight significant discrimination in

changes to polling place locations.  In 1992, the Attorney General interposed an objection to the

relocation of a polling place in Johnson County, Georgia, from the county courthouse to the

American Legion.  Letter from John R. Dunne to Hon. Charlotte Beall (Oct. 28, 1992), in

*History, Scope, & Purpose* 726-728.  The Justice Department noted that:  "[T]he American

Legion in Johnson County has a wide-spread reputation as an all-white club with a history of

refusing membership to black applicants.  Moreover, the American Legion hall, itself, is used for

functions to which only whites are welcome to attend."  *Id.* at 727.  This information led to the

unsurprising conclusion that "the atmosphere at the American Legion is considered hostile and

---

[9] In 2006, after the 2006 Reauthorization, the Attorney General objected on discriminatory-purpose grounds to Randolph County, Georgia's reassignment of the African-American chair of the Board of Education out of his incumbent district.  Letter from Wan J. Kim to Tommy Coleman (Sept. 12, 2006), available at http://www.justice.gov/crt/voting/sec_5/ltr/l_050506.php.

intimidating to potential black voters, and it appears that locating a polling place there has the effect of discouraging black voters from turning out to vote." *Ibid*.

In another objection to a polling place change, the Attorney General found the proposed change to be "designed, in part, to thwart recent black political participation." Letter from Deval L. Patrick to James P. Finstrom (Apr. 18, 1994) (re: Marion County, TX), in *History, Scope, & Purpose* 2427-2429. In another instance, the Attorney General concluded that the proposed change was "calculated to discourage turnout among minority voters and, accordingly, to undermine the electoral opportunities created by" a new election system put in place in response to a Section 2 suit, Letter from John R. Dunne to Don Graf (Mar. 19, 1991) (re: Lubbock County, TX), in *History, Scope, & Purpose* 2300-2303. And, shortly before the adoption of the 2006 VRA reauthorization, the Attorney General objected to a community college district's proposal to eliminate 86% of its polling places. Letter from Wan J. Kim to Renee Smith Byas (May 5, 2006) (re: North Harris Montgomery Community College District), available at http://www.justice.gov/crt/voting/sec_5/ltr/l_050506.php; see also *Modern Enforcement of the Voting Rights Act* 83-84 (testimony of McDuff). Under the change, the site with the smallest proportion of minority voters served only 6,500 voters total while the site with the largest proportion of minority voters served more than 67,000 voters.[10]

---

[10] See also *Northwest Austin I*, 573 F. Supp. 2d at 289-301 (examples of objection letters based on discriminatory or retrogressive intent, 1982-2005); see also, *e.g.*, Letter from R. Alexander Acosta to David A. Creed (Apr. 25, 2005) (re: Town of Delhi, LA), available at http://www.justice.gov/crt/voting/sec_5/ltr/l_042505.php; Letter from R. Alexander Acosta to Hon. Phillip A. LeMoine (June 4, 2004) (re: City of Ville Platte, LA), available at http://www.justice.gov/crt/voting/sec_5/ltr/l_060404.php; Letter from Ralph F. Boyd, Jr. to William D. Sleeper (Apr. 29, 2002) (re: Pittsylvania County, VA), in *History, Scope, & Purpose* 2588-2591; Letter from Loretta King to Guy Kenner Ellis, Jr. (Nov. 17, 1995) (re: City of Greenville, MS), in *History, Scope, & Purpose* 1516-1521; Letter from Deval L. Patrick to Sandra Murphy Shelson (Feb. 6, 1995) (re: State of Mississippi), in *History, Scope, & Purpose*

(3) Preventing Back-Sliding:  Congress also heard evidence that Section 5 has prevented hundreds of voting changes since 1982 that would have eroded the progress minority voters have made since 1965.  In Texas, for example, Latinos reached one-third of the State's total population by 2001.  The state legislative redistricting board proposed a redistricting plan for the state House of Representatives that would have minimized Latino voting strength by eliminating four existing majority-Latino districts, while adding only one such district.  The Attorney General objected to the proposed plan, and Latino voters in Texas accordingly maintained four majority districts and the opportunity to elect representatives of their choice.  *Impact & Effectiveness* 19 (testimony of Ann Marie Tallman); Letter from Ralph F. Boyd, Jr. to Hon. Geoffrey Connor (Nov. 16, 2001), in *History, Scope, & Purpose* 2518-2523.

Similarly, the Attorney General objected to the House and Senate redistricting plans in Arizona in 2002 because the state "pared down Latino majority districts so they no longer provided the opportunity to elect Latino candidates of choice."  *History, Scope,  & Purpose* 87 (testimony of Perales); Letter from Ralph F. Boyd, Jr. to Lisa T. Hauser & José de Jesús Rivera

---

1570-1571; Letter from Deval L. Patrick to James R. Lewis (Oct. 11, 1994) (re:  City of LaGrange, GA), in *History, Scope, & Purpose* 798-800; Letter from James P. Turner to Nicholas H. Cobbs (Jan. 3, 1994) (re:  Hale County, AL), in *History, Scope, & Purpose* 412-414; Letter from James P. Turner to Philip Henry Pitts (Mar. 15, 1993) (re:  City of Selma, AL), in *History, Scope, & Purpose* 402-405; Letter from James P. Turner to Hon. Gregory N. Marcantel (Mar. 8, 1993) (re:  City of Jennings, LA), in *History, Scope, & Purpose* 1034-1036; Letter from John R. Dunne to James E. Nelson (Mar. 30, 1992) (re:  Monahans-Wickett-Pyote Independent School District in Ward County, TX), in *History, Scope, & Purpose* 2352-2354; Letter from John R. Dunne to Hon. Jimmy Evans (Mar. 27, 1992) (re:  State of Alabama), in *History, Scope, & Purpose* 385-387; Letter from John R. Dunne to Tommy M. McWilliams (Oct. 25, 1991) (re:  Sunflower County, MS), in *History, Scope, & Purpose* 1468-1470; Letter from John R. Dunne to John B. Farese (Sept. 9, 1991) (re:  Benton County, MS), in *History, Scope, & Purpose* 1435-1437; Letter from John R. Dunne to Hubbard T. Saunders, IV (Aug. 23, 1991) (re:  Amite County, MS), in *History, Scope, & Purpose* 1428-1430; Letter from James P. Turner to John P. Fox (Feb. 27, 1990) (re:  Chickasaw County, MS), in *History, Scope, & Purpose* 1388-1390; Letter from James P. Turner to Garry C. Mercer (Mar. 10, 1986) (re:  Wilson County, NC), in *History, Scope, & Purpose* 1730-1732.

(May 20, 2002), in *History, Scope, & Purpose* 496-501.  He also objected to Florida's 2002

statewide House redistricting plan because the plan would have made it "impossible" for

Hispanic voters in a covered county to elect their candidate of choice.  Letter from Ralph F.

Boyd, Jr. to Hon. John M. McKay (July 1, 2002), in *History, Scope, & Purpose* 524-529.

Section 5 also played an important role in 2003 in preventing Chilton County, Alabama,

from repealing changes it had adopted in 1988 to resolve its part of the *Dillard* litigation.

*Evidence of Continued Need* 53; *Renewing the Temporary Provisions of the Voting Rights Act:*

*Legislative Options After LULAC v. Perry:  Hearing Before the Subcomm. on the Constitution,*

*Civil Rights, and Property Rights of the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess.

379-380 (2006) (*Renewing the Temporary Provisions)*; see *Dillard* v. *Crenshaw Cnty.*, 640 F.

Supp. 1347, 1356-1360 (M.D. Ala. 1986).  The County had agreed in 1988 to enlarge its County

Commission from four to seven members, and to add cumulative voting in place of its existing

at-large election method.  *Renewing the Temporary Provisions* 379.  Under the cumulative

voting plan, the County had elected one African-American commissioner.  *Id.* at 380.  In 2003,

the County Commission asked the state legislature to enact a local act to reduce the size of the

Commission from seven to four members, repeal the cumulative voting provision, and restore the

probate judge as chair, thereby "ending any opportunity for African Americans to elect a

candidate of their choice."  *Ibid.*  The Attorney General refused to consider the plan for

preclearance unless the County was released from its obligations under the 1988 consent decree

in *Dillard*.  *Ibid.* (citing letter from Joseph D. Rich to John Hollis Jackson and Dorman Walker

(Oct. 29, 2003)).  In the words of the lone African- American commissioner in the County, "We

would be at ground zero without Sec[tion] 5."  *Ibid.*  Even more recently, in 2008, the Attorney

General objected when the City of Calera, in Shelby County, adopted a redistricting plan, shortly

33

after it was released from its obligations under its consent decree in *Dillard*, that would have eliminated the sole predominantly black ward in the City.  See p. 8, *supra*.

In many instances, a covered jurisdiction adopted an election change knowing that the change would diminish the ability of minority voters to elect their candidate of choice.  On the heels of a federal court decision finding that the at-large method of electing members of the Charleston County Council violated Section 2 of the Voting Rights Act, *United States* v. *Charleston Cnty.*, 316 F. Supp. 2d 268 (D.S.C. 2003), aff'd, 365 F.3d 341 (4th Cir.), cert. denied, 543 U.S. 999 (2004), the South Carolina legislature (by local act), proposed adopting the same at-large system for electing members of the County's school board.  The Attorney General objected, concluding that it "would significantly impair the present ability of minority voters to elect candidates of choice to the school board and to participate fully in the political process," a retrogressive effect well understood in the County.  Letter from R. Alexander Acosta to Havird Jones, Jr. (Feb. 26, 2004), available at http://www.justice.gov/crt/voting/sec_5/ltr/l_022604.php; see *Evidence of Continued Need* 25 (statement of Nadine Strossen); 2006 House Report 39-40.

The Attorney General has frequently objected when a jurisdiction has attempted to implement a voting change that perpetuated past discrimination.  In 1993, the Attorney General objected to a proposed change to the candidacy requirements for election to the School Board in Randolph County, Georgia.  See Letter from James P. Turner to Jesse Bowles III (June 28, 1993), in *History, Scope, & Purpose* 739-742.  The change would have required that school board members possess a high school diploma or GED.  Census data demonstrated that 65% of black residents age 25 or older did not possess a high school diploma or GED, compared to only 36% of the relevant white population.  *Id*. at 741.  The Attorney General found that the change would have a "pronounced disparate impact" on black voters, that a number of black voters'

34

candidates of choice from previous elections would have been barred from serving on the Board, and that the disparate impact of the change was "well-known" before its adoption.  *Ibid*.

### (b)  More Information Requests And Submission Withdrawals

"Efforts to discriminate over the past 25 years were not just demonstrated by objection letters issued under Section 5 but were also reflected by an administrative mechanism, known as a 'more information request.'"  2006 House Report 40.  In some such cases, the Department's request for more information causes the jurisdiction to alter its proposed change after concluding "that the change would be objected to as violating the Act if it were not withdrawn."  *H. Appx.* 124; see *History, Scope, & Purpose* 93-94 (testimony of Perales); 2006 House Report 40.   The House Committee found that the covered jurisdictions' responses to requests from the Department for more information "are often illustrative of a jurisdiction's motives."  *Ibid.*  Since 1982, more than 205 voting changes had been withdrawn in response to such information requests.  2006 House Report 41; see also *Northwest Austin I*, 573 F. Supp. 2d at 254-255.  And Congress received a study finding that, between 1990 and 2005, requests for more information "affected more than 800 additional voting changes that were submitted for preclearance, compelling covered jurisdictions to either alter the proposal or withdraw it from consideration altogether."  2006 House Report 40-41; see *Evidence of Continued Need* 1847-1848.

### (c)  Section 5 Injunctive Actions

Congress also considered the recent history of judicial actions seeking injunctive relief under Section 5.  The VRA permits both the Justice Department and private citizens to bring Section 5 actions for injunctive relief to compel covered jurisdictions to submit voting changes for preclearance.  42 U.S.C. 1973c, 1973j(f).  More than 100 such cases had been brought since

1982.  *Evidence of Continued Need* 13 (testimony of Lee); *H. Appx.* 124-125; see also *History, Scope, & Purpose* 2839-2841, 2848-2850.

Witnesses testified that Section 5 enforcement actions often signify that the defendant jurisdiction is resistant to complying with the Act, refusing to submit covered changes for preclearance.  *Evidence of Continued Need* 87 (testimony of Rogers).  As the House Committee noted, "[p]erhaps the most egregious example of non-compliance" with Section 5 occurred in South Dakota.  2006 House Report 42.  In the mid-1970s, when two South Dakota counties were newly covered under Section 5, the State's Attorney General described the preclearance requirement as "a facial absurdity" and advised against compliance with the law.  *Ibid*.  Despite enforcement actions by the Department of Justice in 1978 and 1979, the State enacted or implemented more than 600 voting changes but submitted fewer than ten for preclearance between 1976 and 2002.  *H. Appx.* 172-173; 2006 House Report 42.  The result was a series of electoral changes that adversely affected the voting rights of Native Americans.  *Ibid*.  It was not until members of local tribes brought a Section 5 enforcement action in 2002 that the State agreed to comply with the law by submitting election changes affecting voters in the covered counties for preclearance.  *Ibid*.  A court subsequently found, in a Section 2 action, that the State had systematically discriminated against Native American voters for many years.  *Bone Shirt* v. *Hazeltine*, 336 F. Supp. 2d 976, 1023-1024 (D.S.D. 2004); see p. 48, *infra*.[11]

Congress heard other examples of defiant noncompliance with Section 5 as well.  Such examples involve covered jurisdictions from California, 2006 House Report 42; Texas, *H. Appx.* 351; Louisiana, 2006 House Report 43; and South Carolina, *ibid*.  In addition, Congress was

---

[11]  Thus, contrary to plaintiff's contention (Pl. Mem. 32 n.7), the State's refusal to comply with Section 5 was likely motivated by more than its disagreement "with the idea of stifling federal oversight."

"made aware that unofficial changes to voting practices are routinely made by local elections officials" without preclearance, and that "[l]ocal election officials and poll workers often make arbitrary decisions in polling locations that effectively change voting procedures."  *Ibid.*

*(d) Judicial Preclearance Actions*

Congress also found additional evidence of the continued need for Section 5 in the number of times judicial preclearance of electoral changes was denied.  2006 Reauthorization, § 2(b)(4)(B), 120 Stat. 577-578.

The State of Louisiana, for example, sought judicial preclearance for its 2001 state House of Representatives redistricting plan.  The United States opposed preclearance based on the undisputed evidence that, in drawing the new plan, Louisiana had intentionally eliminated a majority black district in Orleans Parish to advantage white voters in another part of the parish.  *Louisiana House of Representatives* v. *Ashcroft*, No. 1:02-cv-62 (D.D.C.) (three-judge).  The State, in fact, admitted that its intent was to diminish black electoral opportunity in order to increase the electoral opportunity of white voters.  Def.'s Mot. Summ. J. 34-40, *Louisiana House of Representatives* v. *Ashcroft*, No. 1:02-cv-62 (D.D.C. Jan. 17, 2003); see also *Reauthorization of the Voting Rights Act's Temporary Provisions:  Policy Perspectives & Views from the Field: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 43-44 (2006) (*Policy Perspectives & Views From the Field*) (statement of Debo P. Adegbile).  The case ultimately was resolved when the State withdrew its proposed plan and submitted an alternative plan to the Attorney General for preclearance.  See *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization:  Hearing Before the Senate Comm. on the Judiciary,* 109th Cong., 2nd Sess. 152-153 (2006) (*Introduction to the Expiring Provisions*) (statement of Theodore M. Shaw).  See also *Northwest Austin I*, 573 F. Supp. 2d at 256.

37

* * * * *

In summary, Congress heard evidence that, since 1982, more than 1,100 voting changes contained in 650 Section 5 submissions were denied either judicial or administrative preclearance, and 200 submissions were withdrawn; and that, during just part of this period, between 1990 and 2005, more than 855 submissions were affected by requests for more information.  *Evidence of Continued Need* 13 (testimony of Lee); 2006 House Report 40-41; *Evidence of Continued Need* 1847-1848.  This level of Section 5 activity exceeds that which the Supreme Court found to be more than sufficient to justify the reauthorization of Section 5 in 1975.  See *City of Rome*, 446 U.S. at 181; 1975 House Report 10-11 (163 objections interposed by Attorney General between 1965 and 1975); 1975 Senate Report 15-19.  As the district court found in *Northwest Austin I*, the legislative record demonstrated that Section 5 had blocked the implementation of discriminatory electoral changes throughout the covered jurisdictions.  573 F. Supp. 2d at 256, 288 (citing *Evidence of Continued Need* 273).

*ii.*        *Federal Observer Coverage Since 1982*

Congress also learned that "[y]et another indicator of actual or potential vote discrimination is * * * 'observer coverage,' whereby the Attorney General sends federal observers on Election Day to a locale because racial tensions are high and efforts to discriminate may occur."  *H. Appx.* 124.  The House Committee found that "observers are assigned to a polling location only when there is a reasonable belief that minority citizens are at risk of being disenfranchised."  2006 House Report 44.  Between 1965 and 1982, the Justice Department sent observers to monitor a total of 520 elections.  *H. Appx.* 124.  Since 1982, the Justice Department has sent several thousand observers to monitor elections in more than 600 jurisdictions. *Evidence of Continued Need* 13 (testimony of Lee); *H. Appx.* 124.  In each year between 1984

38

and 2000, the Justice Department sent out between 300 and 600 individual observers.  *Evidence of Continued Need* 13 (testimony of Lee).  Two-thirds of the elections covered during this period were in five of the six States originally covered by Section 5:  Alabama, Georgia, Louisiana, Mississippi, and South Carolina.  2006 House Report 44.  The Department of Justice has sent observers to cover 250 elections in Mississippi since 1982, accounting for approximately 40% of the monitor coverage in that time.  *H. Appx.* 124; *Evidence of Continued Need* 80 (statement of Henderson).  During the same period, Alabama had observers for 67 elections and Georgia had observers for 57.  *Id.* at 79 (statement of Henderson).  In many covered States, the rate of observer coverage since 1982 has met or exceeded the rate of coverage prior to 1982:  for example, 62% of the elections in which South Carolina had monitors occurred after 1982; 66% of the elections in which Georgia had monitors occurred after 1982; and 100% of the elections in which North Carolina had monitors occurred after 1982.  *Id.* at 78-80.

Observers are often sent to covered jurisdictions precisely because minority voters have faced discrimination in such jurisdictions in recent elections.  For example, observers were sent to Greensboro, Alabama, after white election officials attempted, in 1992, to close the doors of polling places to prevent black voters from entering.  *H. Appx.* 182-183, 302.  In 1990, the Attorney General sent observers to Pike County, Georgia, for a special election because the originally scheduled election was enjoined after the city held an illegal after-hours voter registration session open to white voters only.  *H. Appx.* 3533.  In 1993, the Attorney General sent monitors to Humphreys County, Mississippi after finding that polling place officials had harassed black voters and denied illiterate black voters assistance from a person of their choice. *H. Appx.* 3578.  In 1996, the Attorney General sent observers to Galveston and Jefferson Counties in Texas because minority voters had been harassed by white poll watchers at previous

elections.  *H. Appx.* 3642-3643; see also *Northwest Austin I*, 573 F. Supp. 2d at 262-263.[12]  And

the observers themselves reported numerous voting rights problems, including failure to provide

minority language ballots in jurisdictions required to do so, harassment of voters, instances in

which minority voters were required to provide identification when white voters were not, and

outright discriminatory statements by poll workers.  *H. Appx.* 184.

iii.    *Section 2 Litigation*

Congress found that "[e]vidence of continued discrimination includes * * * the continued

filing of section 2 cases that originated in covered jurisdictions."  2006 Reauthorization, §

2(b)(4)(C), 120 Stat. 577; see also *id.* § 2(b)(8), 120 Stat. 578 ("Present day discrimination

experienced by racial and language minority voters is contained in evidence, including * * * the

section 2 litigation filed to prevent dilutive techniques from adversely affecting minority

voters.").  The House Committee also emphasized the importance of reauthorization to protect

the gains minority voters had won through Section 2 litigation.  2006 House Report 53.

The record includes a study that compiled a non-comprehensive list of both reported and

unreported Section 2 cases with outcomes favorable to minority voters in the eight southern

states fully covered by Section 5, plus North Carolina.  *H. Appx.* 125-126.  The study identified

653 such successful cases affecting 825 different jurisdictions.  *Ibid.*; Def. SMF ¶ 71; cf. *History,*

*Scope, & Purpose* 2835-2839, 2846, 2848 (Section 2 cases in which United States has

---

[12] See also *H. Appx.* 3532 (1996 Johnson County, GA); *id.* at 3534 (1994 Taliaferro County, GA); *id.* at 3536 (1999 Twiggs County, GA); *id*. at 3551 (1994 East Carroll County, LA); *id.* at 3569 (1995 Carroll County, MS); *id*. at 3576 (1993 Holmes County, MS); *id.* at 3583 (1993 Leflore County, MS); *id.* at 3586 (1999 Monroe County, MS); *id.* at 3589 (1995 Noxubee County, MS); *id.* at 3591 (1993 Quitman County, MS); *id*. at 3592 (1993 Scott County, MS); *id*. at 3593 (1993 Sunflower County, MS); *id*. at 3596 (1993 & 1995 Tallahatchie County, MS); *id.* at 3598 (1995 Tunica County, MS); *id.* at 3601 (1992 & 1995 Wilkinson County, MS); *id.* at 3622 (1996 Chester County, SC); *id.* at 3623 (1996 Williamsburg, SC); *id.* at 3641 (1984 Dallas County, TX); *id.* at 3643 (2004 Waller County, TX).

participated).  Texas had the largest number, with 206 Section 2 cases with outcomes favorable to minority voters, affecting 197 jurisdictions and 274 county-level voting practices.  *H. Appx.* 207, 251.  Alabama followed with 192 such cases affecting 275 jurisdictions.  *Id.* at 251.

Reported Section 2 cases include widespread judicial findings of serious voting discrimination by whites against minorities in the covered jurisdictions.  *H. Appx.* 208.  Congress heard testimony that the use of at-large election schemes to dilute minority votes lasted well into the 1980's and 1990's.  *The Continuing Need for Section 5* at 11 (statement of McDonald).  Witnesses testified about Section 2 cases in which courts found unlawful discrimination against minority voters throughout covered jurisdictions.  See, *e.g.*, *H. Appx.* 340 (South Dakota); *The Continuing Need for Section 5* at 4-5 (South Carolina); *History, Scope, & Purpose* 78 (Texas, North Carolina, Alabama); *Evidence of Continued Need* 14 (North Carolina); *H. Appx.* 251, 283-287 (maps and table showing number of county-level voting practices altered as a result of Section 2 litigation in, *e.g.*, Alabama (275), Texas (274), Georgia (76), Mississippi (74), and North Carolina (56)); see also *Northwest Austin I*, 573 F. Supp. 2d at 259-262 (summarizing Section 2 decisions in the legislative record with findings of intentional discrimination).

As Congress heard, this record of reported Section 2 cases understated the extent of ongoing voting discrimination.  First, the reported decisions did not include cases that may have had favorable settlements.  *Introduction to the Expiring Provisions* 159 (statement of Shaw).  Second, the Section 5 preclearance requirement prevented many instances of discrimination in covered jurisdictions, thereby *reducing* the need for Section 2 litigation.  *Impact & Effectiveness* 21 (Statement of Ann Marie Tallman); *id.* at 23 (testimony of Rogers).

An example of the interplay between Section 5, Section 2, and other voting laws involved Mississippi's dual registration system, which required citizens to register separately for state and

41

federal elections.  The dual system was a relic of the State's 1890 constitutional convention and was adopted "for the purpose of disfranchising blacks."  *H. Appx.* 176.  In 1987, a federal court found that the system violated Section 2 of the Voting Rights Act because it was "adopted for a discriminatory purpose and had a discriminatory effect, accounting, in part, for the 25 percentage-point difference in the registration rates of blacks and whites."  *Ibid.*; *Evidence of Continued Need* 87-88 (testimony of Rogers); *Mississippi State Chapter, Operation PUSH* v. *Allain*, 674 F. Supp. 1245, 1263-1268 (N.D. Miss. 1987).  In the early 1990's, after enactment of the federal National Voter Registration Act, Mississippi reinstituted a dual registration system and refused to submit the change for preclearance.  *H. Appx.* 176, 367-368.  Private citizens filed a Section 5 enforcement action, and ultimately, a unanimous Supreme Court held that the State was required to submit the change for preclearance.  *Id.* at 368; see also *Young* v. *Fordice*, 520 U.S. 273 (1997).  When the State finally submitted the change, the Department of Justice objected, "finding that the state's new dual system was racially discriminatory both in purpose and effect."  *H. Appx.* 368; Letter from Isabelle Katz Pinzler to Sandra M. Shelson (Sept. 22, 1997), in *History, Scope, & Purpose* 1599-1605.  When the state legislature passed a bill to restore a unitary registration system, the Governor vetoed the bill, leading to further private litigation.  *H. Appx.* 368.  It was not until 1998 – more than a decade after a federal court struck down the first dual registration system – that Mississippi's new dual registration system was abolished by federal court order.  *Ibid.*

*iv.*     *Registration And Turnout Of Minority Voters*

Congress acknowledged that "[s]ignificant progress has been made in eliminating first generation barriers experienced by minority voters," and that this progress was manifested by increased minority voter registration and turnout, and the election of minority officials.  2006

42

Reauthorization, § 2(b)(1), 120 Stat. 577.  "This progress," Congress found, "is the direct result of the Voting Rights Act of 1965."  *Ibid.*  Based on the record before it, Congress concluded that Section 5 was still needed to protect "the significant gains made by minorities in the last 40 years."  *Id.* § 2(b)(9), 120 Stat. 578.

The House Committee found that, while disparities between white and minority registration and turnout had narrowed or even been eliminated in some covered states by 2004, disparities persisted in others.  2006 House Report 12-17, 25-31.  In Virginia, white voter registration exceeded black voter registration by 11 points; the gap between white and black turnout was 14 points.  *Id.* at 25.  In Texas, white voter registration exceeded Hispanic registration by 20 points.  *Id.* at 29.  In Florida, white registration exceeded Hispanic registration by 31 points; in turnout, the gap was 24 points.  *Ibid.*

Moreover, as the district court found in *Northwest Austin I*, the data in the House Report understated the disparities because it compared registration and turnout rates for blacks to rates for whites, rather than for *non-Hispanic* whites.  573 F. Supp. 2d at 248; see Def. SMF ¶¶ 65-68.  Including Hispanic turnout in the white turnout rate lowers the white turnout rate because of very low Hispanic turnout.  Def. SMF ¶ 65, 68.  When the correct data are used, 2004 black registration and turnout rates in the covered States exceed the rates for whites only in Mississippi.  Def. SMF ¶ 66.  In Texas, for example, according to the House Report, black registration and turnout exceeded white registration and turnout by 7 and 5 percentage points, respectively.  2006 House Report 12.  But use of the correct data reverses the gap:  white

registration and turnout exceeded black registration and turnout by 5 and 8 points, respectively.

Def. SMF ¶ 67.[13]

> b.     *In 2006, Congress Found Ample Evidence That The Same Types*
> *And Patterns Of Voting Discrimination That Supported Enactment*
> *And Reauthorization Of Section 5 In The Past Continue Today*

The evidence before Congress reveals continuing patterns of discrimination in voting against racial and language minorities in covered jurisdictions.  The examples encompass numerous covered jurisdictions, minority populations, aspects of the voting system, and methods of discrimination.

> i.     *Evidence Of Vote Suppression*

The record before Congress is replete with examples of intimidation, harassment, and misinformation leveled against minority voters in covered jurisdictions.  For example, voting officials in Waller County, Texas, went to great lengths to prevent students at the historically black Prairie View A&M University from voting.  In the 1970's, a federal court held that students of the school were entitled to vote in local elections.  *United States* v. *Texas*, 445 F.

---

[13]  In addition, because many covered jurisdictions fail to comply with the VRA's language-minority provisions, "there remains an enormous gap in political participation" between language minority citizens and citizens whose primary language is English.  *Evidence of Continued Need* 13 (testimony of Lee); see *id.* at 68 (statement of Henderson) (violations of language-minority provisions in Florida); *H. Appx.* 309 (Texas); *id*. at 348 (California); *id.* at 1313 (Alaska); *id*. at 1379 (Arizona); *id*. at 4090 (New York).  In 1996, only 29% of Latino voters in Texas cast ballots, compared to 52.7% of white voters.  Indeed, turnout among Latino citizens in Texas actually decreased slightly between 1980 and 1996.  And in 2004, only 41.5% of Latino citizens in Texas were registered to vote, compared to 61.5% of white citizens.  2006 House Report 29; see also 2006 Senate Report 11.  Even when citizenship is taken into account, the gap between white and Hispanic registration rates is 16 points.  See *Northwest Austin I*, 573 F. Supp. 2d at 248.  The situation in Florida, which contains five covered counties, is similar:  in 2004, only 38.2% of Latino citizens in Florida were registered to vote, compared to 64.8% of white citizens; and among registered voters, only 34% of Latinos cast a vote in the 2004 election, compared to 58.6% of whites.  2006 House Report 30.

Supp. 1245 (S.D. Tex. 1978), aff'd, 439 U.S. 1105 (1979).  In 2004, when two students from

Prairie View A&M decided to run for local office, the white district attorney threatened the

predominantly black student body with felony prosecution for illegal voting if they voted.  *H.*

*Appx.* 185.  The district attorney relented after the campus NAACP chapter and several students

brought suit.  A month before the election, however, county election officials drastically reduced

the availability of early voting at the polling place near campus, without submitting the change

for preclearance.  *Id.* at 185-186.  The county officials abandoned the change only after the

campus NAACP chapter filed a Section 5 enforcement action.  *Id.* at 186.

Alabama adopted state election policies and procedures in the late nineteenth and early

twentieth centuries with the intent of preventing black citizens from voting, including a state

policy of poll workers' harassing and intimidating black voters, and a state policy of appointing

only whites as poll workers.  *Renewing The Temporary Provisions* 368-369, 371-372; *Harris* v.

*Siegelman*, 695 F. Supp. 517, 522-526 (M.D. Ala. 1988).  A district court found that Alabama

counties continued to enforce those policies well into the 1980's.  *Id*. at 525.

In 2003, a district court found "significant evidence of intimidation and harassment" at

the polls in Charleston County, South Carolina, as late as the 2000 election.  *United States* v.

*Charleston Cnty.*, 316 F.Supp. 2d at 287 n.23.  The court based its finding on testimony by a

member of the County Election Commission that she received "complaints from African-

American voters concerning rude or inappropriate behavior by white poll officials at every

election between 1992 and 2002," as well as first person testimony from this and other witnesses

about certain poll managers' intimidating or condescending behavior toward African-American

voters and poll managers' interference with African-American voters' right to assistance.  *Ibid.*

45

Congress learned that other minority voters continue to face overt discrimination and harassment at their polling places. Testimony recounted examples in which Asian-American voters were told at polling places, "[i]f you can't speak English, you shouldn't be voting." *H. Appx.* 350. A Latina voter in Arizona was told in 2000 to "go back to Mexico and learn English" and was prevented from voting when she told a poll worker that she did not speak English. *H. Appx.* 3980.[14]

The record also includes many examples of efforts to keep minority voters from the polls. In 2004, at some voting precincts in Maricopa County, Arizona, trucks with megaphones warned Latino voters that they would be deported if they had wrongfully registered to vote. *H. Appx.* 3979. Also in 2004, in Charleston County, South Carolina, letters falsely stating they were from the NAACP warned voters that they could be arrested when they attempted to vote if they had outstanding parking tickets or overdue child support payments. *H. Appx.* 3619-3620. And in two Georgia counties, "there were efforts to wrongfully challenge Latino voters en masse in the 2004 election cycle." *Evidence of Continued Need* 93 (statement of Rogers).[15] Witnesses also testified about campaigns to disseminate misinformation to minority voters to prevent them from

---

[14] See, *e.g.*, *Voting Rights Act: An Examination of the Scope and Criteria for Coverage Under the Special Provisions of the Act: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 12-13 (2005) (*Scope & Criteria for Coverage*) (testimony of Jose Garza) (Latino); *The Continuing Need for Section 5* at 8 (statement of McDonald) (Native American); *Voting Rights Act: Section 203 – Bilingual Election Requirements* (Part I): *Hearing Before the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 18 (2005) (testimony of Margaret Fung) (*Section 203*)(Asian American); *H. Appx.* 140 (Arab American); *H. Appx.* 138 (African American). The House Committee concluded that "Latinos, Asian Americans, Alaska Natives, and Native Americans continue to suffer from discrimination in voting." 2006 House Report 45. Congress heard testimony that many of the same sorts of discriminatory activities that have occurred throughout the South to prevent black citizens from voting also "occurred in Texas, but w[ere] targeted to the Mexican-American community." *Scope & Criteria for Coverage* 12 (testimony of Garza).

[15] See *United States* v. *Long Cnty.*, No. 2:06cv40 (S.D. Ga.).

voting.  In Louisiana in 2002, fliers were distributed in African-American neighborhoods

advertising the wrong date for a runoff election for a United States Senate seat.  *H. Appx.* 3548.

Congress also heard evidence that covered jurisdictions have sometimes attempted to

prevent minority voters' candidates of choice from becoming candidates at all.  In one example,

a district court found that an Alabama town intentionally discriminated on the basis of race, in

violation of Section 2 of the Act, by refusing to provide candidate forms to black candidates

while providing them to white candidates.  *Renewing the Temporary Provisions* 376; see *Dillard*

v. *Town of N. Johns*, 717 F. Supp. 1471, 1476 (M.D. Ala. 1989).

*ii.    Evidence Of Vote Dilution*

*(a)  Employment Of Dilutive Techniques*

Congress heard multiple examples of discriminatory voting practices implemented to

dilute the voting strength of minority citizens, including "[d]iscriminatory annexations and

deannexations; pairing Black incumbents in redistricting plans; refusing to draw majority

minority districts; * * * refusing to hold elections following a section 5 objection; * * * packing

Native American and African-American voters to dilute their influence; and discriminatory voter

identification requirements."  *Evidence of Continued Need* 20 (testimony of Strossen).  Other

examples include "racial gerrymandering, at-large (as distinct from district) election systems,

anti-single-shot rules, staggered terms, the majority run-off requirement, [and] annexing

predominantly white suburbs while excluding minority areas."  *H. Appx.* 123.

In 2006, the Supreme Court found that part of a congressional districting plan adopted by

the State of Texas in 2003 bore "the mark of intentional discrimination that could give rise to an

equal protection violation" by purposefully diluting the voting strength of a cohesive minority

community.  *LULAC* v. *Perry*, 548 U.S. 399, 440 (2006).  The Court found that Texas divided a

cohesive Latino community precisely because that community had become "more politically active," with greater "Spanish-surnamed registration," and was "poised to elect their candidate of choice." *Id.* at 438-439.  The State's intentional splitting of that cohesive minority population "undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive." *Id.* at 439.

In another example, "a federal court determined [in 2004] that South Dakota discriminated against Native-American voters by packing them into a single district to remove their ability to elect a second representative of their choice to the state legislature." *The Continuing Need for Section 5* at 8 (statement of McDonald).  The court found that Native-American voters in South Dakota had long been subjected to discrimination, including "efforts on the part of South Dakota political subdivisions to deny Indians the right to participate in the political process" as recently as 1999 and 2003.  *Bone Shirt*, 336 F. Supp. 2d at 1023-1024.

In 1982, the Justice Department objected to a Louisiana state house redistricting plan that reduced the number of majority black districts in Orleans Parish from 11 to 7, even though the proportion of black residents in the Parish had increased from 45% to 55% since the previous redistricting.  *Evidence of Continued Need* 58-59 (statement of Henderson).  In the Ninth Ward of New Orleans, moreover, the proposed plan contained only one majority black district out of five districts total, although the population of the ward was 61% black.  *Id.* at 59.  Similarly, through the 1980's and early 1990's, five of the seven justices on the Louisiana Supreme Court were elected from single-member districts.  The remaining two justices were elected at large from a majority white district comprising Orleans Parish and three surrounding parishes, although the population of Orleans Parish alone was sufficient to create a district equal in size to the other districts in the State.  Orleans was the only majority black parish in the district, and the

48

three surrounding parishes were more than 75% white.  Until that system was abandoned in the early 1990's in response to a Section 2 suit, not a single black person was elected to the Supreme Court of Louisiana.  See *Chisom* v. *Roemer*, 501 U.S. 380, 384-386 (1991).

Even where many years have elapsed since the adoption of an intentionally discriminatory election system, courts have found that the maintenance of such systems perpetuates the intended discrimination.  In 1986, in Alabama, for example, a district court enjoined the continued use of at-large election schemes adopted in the 1960's for discriminatory reasons.  *Dillard* v. *Crenshaw Cnty.*, 640 F. Supp. at 1360.  Alabama counties employed numbered place laws that had been enacted "with the specific intent of making at-large election systems more effective and efficient instruments for keeping black voters from electing black candidates."  *Ibid*.  The court found that these laws were "still having their intended racist impact."  *Ibid*.  Significantly, on at least two recent occasions, Section 5 objections were instrumental in preserving the gains made as a result of the *Dillard* litigation.  See pp. 33-34, *supra*.

### (b)  Widespread Racially Polarized Voting

Congress heard testimony that racially polarized voting is a necessary element of vote dilution, and that, because of polarized voting, majority minority districts are essential to enable minority voters to elect candidates of their choice.  See *H. Appx.* 126 (racial bloc voting is "a necessary precondition for vote dilution to occur"); *Evidence of Continued Need* 18 (explaining that because of polarized voting, "minority voters usually cannot elect candidates of choice unless they are a majority or near majority of the electorate") (prepared statement of Lee); *id.* at 88-89 (polarized voting persists and most minority legislators are elected from majority minority districts) (testimony of Rogers); *id.* at 95 (redistricting, gerrymandering, annexations, combined

49

with racially-polarized voting result in vote dilution) (testimony of Lee); see also *City of Rome*, 446 U.S. at 183-184 (explaining interplay between racial bloc voting, at-large elections, and majority vote requirement).  Congress also heard that, in 2006, most minority legislators, both state and federal, had been elected from majority-minority districts.  *Evidence of Continued Need* 89 (testimony of Rogers).  Without those districts, drawn as a result of the VRA, many of the limited gains in the number of elected minority officials would not have been realized.  See *H. Appx.* 365; *The Continuing Need for Section 5* at 49 (testimony of Richard Engstrom).  In Mississippi, no black candidate was elected to Congress for the first 85 years of the 20th century, and the "only reason" a black citizen was finally elected to Congress was "the enforcement of Section 5 of the Voting Rights Act by the Justice Department and litigation under" Section 2.  *H. Appx.* 365.

Congress found "continued evidence of racially polarized voting in each of the [covered] jurisdictions."  2006 Reauthorization, § 2(b)(3), 120 Stat. 577.  The House Committee found that racially polarized voting ranked as "the clearest and strongest evidence the Committee has before it of the continued resistance within covered jurisdictions to fully accept minority citizens and their preferred candidates into the electoral process."  2006 House Report 34.  The Committee found that "the degree of racially polarized voting in the South is increasing, not decreasing," and that it "shapes electoral competition" in covered jurisdictions.  *Ibid*.  The Committee noted that in some States covered by Section 5, such as Mississippi, Louisiana, and South Carolina, which have large African-American populations, African-American voters have yet to elect an African American to an at-large statewide office, despite several serious attempts.  *Id.* at 33.

Congress also heard that racially polarized voting takes place in both partisan and nonpartisan elections, *H. Appx.* 355 (describing testimony of Rep. Melvin Watt), and at every

level of government, *id.* at 210 (statement of Engstrom).  Congress heard that the existence of

racial polarization among voters has not abated in the years since the Voting Rights Act was

enacted.  *Voting Rights Act:  An Examination of the Scope and Criteria for Coverage Under the*

*Special Provisions of the Act:  Hearing Before the House Comm. on the Judiciary*, 109th Cong.,

1st Sess. 84 (2005) (*Scope & Criteria for Coverage*) (statement of Armand Derfner).

      The prevalence of racial bloc voting has also been documented in numerous judicial

decisions throughout covered jurisdictions.  See generally *H. Appx.* 404-409.  For example, in

2006, the Supreme Court noted the lower court's finding of racially polarized voting "throughout

the State" of Texas.  *LULAC*, 548 U.S. at 427 (citation omitted).  In South Carolina, a three-

judge panel found in 2002 that "[v]oting in South Carolina continues to be racially polarized to a

very high degree, in all regions of the state and in both primary elections and general elections."

*Colleton Cnty. Council* v. *McConnell*, 201 F. Supp. 2d 618, 641 (D.S.C. 2002).  And in 2004, a

federal court concluded that "substantial evidence, both statistical and lay, demonstrates that

voting in South Dakota is racially polarized among whites and Indians" in some districts.  *Bone*

*Shirt* v. *Hazeltine*, 336 F. Supp. 2d at 1036.  In addition to these and other examples, Congress

heard voluminous testimony about trends in racial bloc voting.  Witnesses testified that racially

polarized voting not only exists between black and white voters, but encompasses Latino voters,

Asian American voters, and Native American voters as well.  See, *e.g.*, *The Continuing Need for*

*Section 5* at 50 (testimony of Richard Engstrom); *H. Appx.* 213-214 (describing testimony of

Joaquin Avila); *Evidence of Continued Need* 96 (testimony of Rogers); *id*. at 27-28 (statement of

Strossen); 2006 House Report 34.[16]

---

[16] See also *United States* v. *Charleston Cnty.*, 365 F.3d 341, 343 (4th Cir. 2004); *Teague* v.
*Attala Cnty.*, 92 F.3d 283, 291 (5th Cir. 1996); *Clark* v. *Calhoun Cnty.*, 88 F.3d 1393, 1397 (5th

The House Committee also found continued disparities between the numbers of white and minority elected officials. 2006 House Report 32-34. As in 1982, the numbers of black state legislators did not reflect the representation of blacks in the populations of the covered States. *Id.* at 32-33. "For example, in States such as Alabama, Georgia, Louisiana, Mississippi, South Carolina, and North Carolina, where African Americans make up 35 percent of the population, African Americans made up only 20.7 percent of the total number of State legislators." *Id.* at 33. As the Committee noted, the Supreme Court relied upon such disparities in upholding the 1975 Reauthorization of Section 5. *Id.* at 32; see *City of Rome*, 446 U.S. at 180-181 ("[T]hough the number of Negro elected officials had increased since 1965, most held only relatively minor positions, none held statewide office, and their number in the state legislatures fell far short of

_____

Cir. 1996); *Hines* v. *Mayor & Town Council of Ahoskie*, 998 F.2d 1266, 1269 (4th Cir. 1993); *Westwego Citizens For Better Gov't* v. *City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991); *East Jefferson Coal. for Leadership & Dev.* v. *Jefferson Parish*, 926 F.2d 487, 493 (5th Cir. 1991); *Collins* v. *City of Norfolk*, 883 F.2d 1232, 1237 & n.6 (4th Cir. 1989); *Campos* v. *City of Baytown*, 840 F.2d 1240, 1249 (5th Cir. 1988); *Citizens For a Better Gretna* v. *City of Gretna*, 834 F.2d 496, 499, 504 (5th Cir. 1987); *Jones* v. *City of Lubbock*, 727 F.2d 364, 380 (5th Cir. 1984); *Saint Bernard Citizens For Better Gov't* v. *Saint Bernard Parish Sch. Bd.*, No. Civ. A. 02-2209, 2002 WL 2022589, at *9 (E.D. La. Aug. 26, 2002); *Houston* v. *Lafayette Cnty.*, 20 F. Supp. 2d 996, 1002 (N.D. Miss. 1998); *Cofield* v. *City of LaGrange*, 969 F. Supp. 749, 776 (N.D. Ga. 1997); *LULAC* v. *North East Indep. Sch. Dist.*, 903 F. Supp. 1071, 1081 (W.D. Tex. 1995); *Clark* v. *Roemer*, 777 F. Supp. 445, 456 (M.D. La. 1990); *Ewing* v. *Monroe Cnty.*, 740 F. Supp. 417, 421-424 (N.D. Miss. 1990); *Williams* v. *City of Dallas*, 734 F. Supp. 1317, 1388-1400 (N.D. Tex. 1990); *Gunn* v. *Chickasaw Cnty.*, 705 F. Supp. 315, 320 (N.D. Miss. 1989); *McDaniels* v. *Mehfoud*, 702 F. Supp. 588, 594 (E.D. Va. 1988); *Neal* v. *Coleburn*, 689 F. Supp. 1426, 1431 (E.D. Va. 1988); *Dillard* v. *Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1464 (M.D. Ala. 1988); *Martin* v. *Allain*, 658 F. Supp. 1183, 1202 (S.D. Miss. 1987); *Jackson* v. *Edgefield Cnty.*, 650 F. Supp. 1176, 1198 (D. S.C. 1986); *Dillard* v. *Crenshaw Cnty.*, 640 F. Supp. at 1353; *Clark* v. *Marengo Cnty.*, 623 F. Supp. 33, 37 (S.D. Ala. 1985); *Jordan* v. *Winter*, 604 F. Supp. 807, 812-813 (N.D. Miss. 1984); *Jordan* v. *City of Greenwood*, 599 F. Supp. 397, 402 (N.D. Miss. 1984); *Sierra* v. *El Paso Indep. Sch. Dist.*, 591 F. Supp. 802, 807 (W.D. Tex. 1984); *Major* v. *Treen*, 574 F. Supp. 325, 351-352 (E.D. La. 1983); *Buskey* v. *Oliver*, 565 F. Supp. 1473, 1482 (M.D. Ala. 1983); *Political Civil Voters Org.* v. *City of Terrell*, 565 F. Supp. 338, 348-349 (N.D. Tex. 1983).

being representative of the number of Negroes residing in the covered jurisdictions.").  The

Committee found that in 2000, only 35 African Americans held statewide office, and many of

these officials had been initially appointed to their offices.  2006 House Report 32.  The

Committee also found substantial disproportions between the numbers of language-minority

elected officials and the language-minority populations.  *Id.* at 32-33.

3.    *Section 5 Is An Effective Remedy*

a.    *Section 5 Effectively Deters Covered Jurisdictions From
      Adopting Discriminatory Voting Changes*

The full measure of Section 5's effectiveness must take into account the strong deterrence

provided by the statute.  See 2006 House Report 24.  The House Committee found that this

deterrent effect was "[a]s important as the number of objections that have been interposed

to protect minority voters against discriminatory changes."  *Ibid.*  Congress heard substantial

testimony that Section 5 has a vital deterrent effect with respect to retrogressive election

changes.  One witness testified that "one of the most astonishing things about section 5

preclearance * * * [is] its ability to nudge public officials to act in a positive way and to be more

inclusive as they go about reaching a consensus in that decision-making process."  *Preclearance*

*Standards* 44-45 (testimony of Gray); see also *Northwest Austin I*, 573 F. Supp. 2d at 264-265. [17]

Congress heard numerous specific examples of Section 5's deterrent effect.  A witness

from Alabama, for instance, testified about three recent incidents in which the existence of

Section 5 had led local officials to avoid restricting minority voting rights.  In 2005, the Barbour

County Commission sought the witness's support in obtaining Section 5 preclearance for a new

---

[17] See also *Evidence of Continued Need* 88 (statement of Rogers); *H. Appx.* 127; *The
Continuing Need for Section 5* at 81 (testimony of Engstrom); *History, Scope, & Purpose* 84
(statement of Earls); *Modern Enforcement of the Voting Rights Act 8* (testimony of Wan Kim).

redistricting plan and for earlier electoral changes that it had not previously submitted.

*Preclearance Standards* 45 (testimony of Gray).  The proposed plan had seven single-member

districts, including three with a majority of African-American voters, one of which had a white

incumbent.  *Ibid.*  The Commission initially considered reducing the African-American voting

age population in the district with a white incumbent by 8%, but the witness was able to persuade

the Commission not to do so because of its need to obtain Section 5 preclearance.  *Ibid.*  In

Lanett, Alabama, in 2004, a voter complained to the witness that the city clerk had been denying

voters the right to pick up absentee ballots, in violation of Alabama voting procedures.  *Ibid.*

The clerk relented when the witness advised her that her refusal constituted a change in voting

procedures that would require preclearance under Section 5.  *Ibid.*  Afterward, the City elected its

first African-American mayor.  *Ibid.*  And in Evergreen, Alabama, in 2004, the clerk failed to

produce a complete and fair voters list until reminded of the city's obligations under the VRA.

*Id.* at 46.  Evergreen also subsequently elected its first black mayor.  *Ibid.*

     In Alabama in 2001, Section 5's non-retrogression mandate "was at the top of the list of

the legislative guidelines for redistricting."  *H. Appx.* 303 (describing testimony of James

Blacksher).  African-American legislators, using the Section 5 mandate in negotiations with their

white colleagues in the Alabama legislature, were able to "maintain the overall electoral power

of blacks, while working with white legislators to consciously balance both racial and partisan

interests with fair, neutral districting criteria."  *Renewing the Temporary Provisions* 385.  As a

result, Alabama enacted redistricting statutes for its congressional delegation, state legislature,

and state board of education without court supervision for the first time since 1901.  *Ibid.*  In

Georgia's 2005 congressional redistricting, the State adopted resolutions recognizing its need to

comply with Section 5 and drew a new plan that maintained the black voting age population in

the two majority black districts in the State as well as in the two other districts that had elected black members of Congress.  *H. Appx.* 417.  In Alaska, the State's post-1990 redistricting plans for its state house and senate were found to violate Section 5 because they reduced the voting strength of Alaska Natives.  After the 2000 census, Alaska officials "took specific measures to ensure that [they] did not reduce Alaska Native voting strength in districts where Alaska Natives had a reasonable opportunity to elect candidates of their choice."  *Evidence of Continued Need* 92 (statement of Rogers).  Similarly, the Fredericksburg, Virginia, City Council was preparing to dismantle the only majority African-American district in the city in 2002 until the City Attorney warned the Council that such an action would violate Section 5.  *Ibid.*; *H. Appx.* 362-363 (describing testimony of Kent Willis).

### b.    *Section 2 Alone Is Inadequate*

Congress also heard extensive testimony that Section 2 alone is an inadequate remedy to address discrimination in voting.  Section 2 and Section 5 "are meant to work hand in hand," *History, Scope, & Purpose* 92 (testimony of Perales), and neither is sufficient by itself.  In upholding the enactment of Section 5, the Supreme Court explained that other legislative remedies had proved inadequate at protecting the voting rights of racial and language minority citizens.  See *South Carolina*, 383 U.S. at 309; *City of Rome*, 446 U.S. at 174.  The limitations of Section 2 similarly demonstrate the continued need for Section 5's preclearance device.

Witnesses identified three major shortcomings of Section 2 litigation that are not present in Section 5 preclearance.  First, Section 2 is purely an after-the-fact remedy, available only to challenge voting practices and procedures that are already in place.  Cf. *South Carolina*, 383 U.S. at 314 (case-by-case litigation ineffective); *City of Rome*, 446 U.S. at 174 (same).  Most Section 2 actions take two to five years to make their way through the court system, during which time

the challenged practice remains in place.  *History, Scope, & Purpose* 101 (testimony of Earls).

If, during that time, a candidate is elected under what turns out to be an illegal voting scheme,

that person nevertheless will enjoy the significant advantage that comes with incumbency.

*Impact & Effectiveness* 13-14 (testimony of Jack Kemp); *Evidence of Continued Need* 97

(testimony of Rogers).  In some cases, an illegal voting practice must remain in effect for several

election cycles before a Section 2 plaintiff can gather enough evidence to demonstrate its

discriminatory effect.  *History, Scope, & Purpose* 92 (testimony of Perales).  In contrast, under

Section 5, discriminatory voting practices are forestalled through a system that takes at most

several months.  See *id.* at 101 (testimony of Perales).

Second, Section 2 places a heavy financial burden on minority voters challenging illegal

election practices and schemes.  See *History, Scope, & Purpose* 97 (testimony of Perales); *id*. at

92 (testimony of Perales).  Section 5, on the other hand, places the comparatively small financial

burden associated with preclearance on covered jurisdictions.  See *id.* at 79 (testimony of Earls).

This shifting of financial burden is especially important "in local communities and particularly in

rural areas, where minority voters are finally having a voice on school boards, county

commissions, city councils, water districts and the like."  *Id.* at 84 (statement of Earls).  In such

areas, voters generally "do not have access to the means to bring litigation under Section 2 of the

Act, yet they are often the most vulnerable to discriminatory practices."  *Ibid.*  Moreover, the

General Counsel of North Carolina's Board of Elections testified that complying with Section

5's preclearance scheme is much less burdensome in terms of "costs, time, and labor" for

covered jurisdictions than defending against Section 2 claims.  *Policy Perspectives & Views from

the Field* 120 (statement of Donald M. Wright).

Finally, Section 2 leaves the burden of proof on minority plaintiffs with respect to
demonstrating discriminatory effect, while Section 5 places the burden on jurisdictions to
demonstrate that a proposed change will not have a discriminatory effect and was not animated
by a discriminatory purpose.  *History, Scope, & Purpose* 83 (statement of Earls); *Evidence of
Continued Need* 97 (testimony of Rogers).  Jurisdictions are in a much better position than
individual citizens to amass information about the potentially discriminatory effect or purpose of
voting procedures or systems, without incurring undue expense.

**C.    The Evidence Before Congress Demonstrates That The 2006 Reauthorization Of
       Section 5 Is Justified By Current Needs**

As set forth above, the legislative record plainly supports Congress's finding that the
Section 5 preclearance requirement for covered jurisdictions remains necessary.  See 2006
Reauthorization, § 2(b)(9) (finding that "without the continuation of the Voting Rights Act of
1965 protections, racial and language minority citizens will be deprived of the opportunity to
exercise their right to vote, or will have their votes diluted, undermining the significant gains
made by minorities in the last 40 years").  Plaintiff's contentions to the contrary are wrong.

1.  First, plaintiff erroneously argues that the "second generation barriers" that Congress
found are nothing like the voting discrimination that led Congress to enact the VRA in 1965.  Pl.
Mem. 6.  This argument misconstrues the very purpose of Section 5 – to prevent the
implementation of all manner of electoral devices with the purpose or effect of restricting
minority voting rights.  Moreover, there is nothing new about the dilutive techniques and other
means of minimizing the effectiveness of minority voters that Congress relied upon in 2006.  To
be sure, discriminatory administration of voting tests was "the principal method used to bar
Negroes from the polls" when the VRA was enacted.  *South Carolina*, 383 U.S. at 312.  But, as
the Court recognized in upholding the Act, southern States had long used a broad range of

techniques, including racial gerrymandering and manipulation of boundaries, to restrict the

voting rights of black citizens. *Id.* at 311-312 (citing, *inter alia*, *Gomillion* v. *Lightfoot*, 364 U.S.

339 (1960)). And the Court soon rejected efforts to limit the reach of Section 5 to laws affecting

voter registration or turnout. In *Allen*, 393 U.S. 544, the Court ruled that Section 5 applied to a

Mississippi statute, enacted in January 1966, that permitted counties to institute at-large election

of county supervisors, provided for appointment of previously elected superintendents of

education, and imposed restrictions on candidates' ability to run as independents. *Id.* at 550-551,

563-569; see also *Perkins* v. *Matthews*, 400 U.S. 379, 387-395 (1971) (holding that Section 5

applies to changes in polling place locations, changes in municipal boundaries effected by

annexations, and changes from ward to at-large elections).

In *Dillard* v. *Crenshaw County*, 640 F. Supp. at 1358, the district court explained how

Alabama counties switched back and forth between at-large and district elections in the

nineteenth and twentieth centuries, depending on the strength of the black vote. In 1894, after

white Democrats had regained power and "redeemed" the State, but black voters had not yet

been fully disenfranchised, many Alabama counties adopted at-large elections in order to dilute

the black vote. *Ibid.* Later, the district court found, after the State's 1901 Constitutional

Convention had completed the process of disenfranchising black voters, Alabama "counties

increasingly moved toward single-member districts; since most black persons could no longer

vote, the use of single-member districts was obviously fairly 'safe.'" *Ibid.* Even later, after the

white primary was eliminated and Congress enacted voting rights legislation in 1957, 1964, and

1965, Alabama counties, with the authorization of the State legislature, once again adopted at-

large election schemes. *Id.* at 1359. "Since black voters once again posed a threat to total

control of the electoral process by white persons, single-member districts were abandoned and

at-large systems were put into place." *Ibid.* During this same era, the Alabama legislature authorized the City of Tuskegee to redefine its municipal boundaries through annexations and de-annexations in order to eliminate all but a few of the black voters in the City. *Gomillion* v. *Lightfoot*, 364 U.S. at 340-341; see *Renewing The Temporary Provisions* 372-373 (describing *Dillard* court's findings); *id.* at 370 (explaining how the City of Mobile used at-large elections to dilute the black vote in 1911).

Similarly, in 1966, in the wake of the enactment of the VRA, both the Mississippi and Georgia legislatures adopted statutes that facilitated vote dilution by local jurisdictions in their respective States. See *Allen*, 393 U.S. at 550 (describing legislation authorizing Mississippi counties to change from single-member districts to at-large election of County Commissioners); *City of Rome*, 446 U.S. at 160 (describing state legislation altering the method of electing the City Commission by reducing the number of wards, imposing a majority vote requirement, and adopting staggered terms and numbered posts); see *Perkins*, 400 U.S. at 389 (noting testimony before Congress that "State legislatures and political party committees in Alabama and Mississippi have adopted laws or rules since the passage of the [VRA] which have had the purpose or effect of diluting the votes of newly enfranchised Negro voters") (quoting *Hearings on Voting Rights Act Extension before Subcomm. No. 5 of the House Comm. on the Judiciary*, 91st Cong., 1st Sess. 17 (1969) (remarks of Mr. Glickstein).

Moreover, Congress relied upon evidence of such dilutive techniques in reauthorizing Section 5 in 1970, 1975, and 1982, finding that such techniques became more common as minority registration and turnout rates increased. See pp. 21-23, *supra*. The Supreme Court expressly relied upon these findings in *City of Rome*: "As registration and voting of minority citizens increases [*sic*], other measures may be resorted to which would dilute increasing

59

minority voting strength.  The Committee is convinced that it is largely Section 5 which has contributed to the gains thus far achieved in minority political participation, and it is likewise Secton [*sic*] 5 which serves to insure that that progress not be destroyed through new procedures and techniques."  446 U.S. at 181 (quoting 1982 House Committee Report 10).  Indeed, each of the cases in which the Court upheld the 1970, 1975, and 1982 Reauthorizations involved dilutive mechanisms.  See *Georgia*, 411 U.S. at 528-529 (State legislative redistricting plan with multi-member districts and numbered posts); *City of Rome*, 446 U.S. at 160 (reduction in number of districts, numbered posts, majority vote requirement, staggered terms, annexations); *Lopez*, 525 U.S. at 271-273 (change from multiple districts to single district).

Plaintiff also rejects the significance of Congress's finding that racially polarized voting persists in the covered jurisdictions, arguing that polarized voting is not evidence of state-sponsored intentional discrimination.  Pl. Mem. 31.  But this contention misses the point; racially polarized voting is significant because it enables vote dilution.  See pp. 49-50, *supra*.  Correspondingly, the enactment of dilutive mechanisms by covered jurisdictions effectuate and enforce the private discrimination evidenced by racial bloc voting.

Thus, the evidence Congress heard in 2006 that covered jurisdictions continued to use dilutive techniques; that vote dilution continued to be the subject of Section 5 objections, declaratory judgment actions, and Section 2 litigation; and that racially polarized voting persists in the covered jurisdictions (see pp. 25-30, 32-34, 36-37, 47-53, *supra*), supports its finding that Section 5 remains necessary to protect the voting rights of minority citizens in covered jurisdictions.

2.  Second, plaintiff discounts the significance of the Attorney General's objections to voting changes submitted for Section 5 review between 1982 and 2006.  Pl. Mem. 28, 31-34.

Plaintiff notes that the number and rate of objections for Alabama declined during the period 1982 to 2004, compared to 1965 to 1982, and that the rate of objections has declined overall.  Pl. Mem. 28.  But, as the district court pointed out in *Northwest Austin I*, 573 F. Supp. 2d at 249, the Supreme Court rejected a similar argument when it upheld the 1975 Reauthorization in *City of Rome*.  There, the City informed the Court that the objection rate in 1978 had fallen to 0.8%, compared to a rate of 3 to 4% between 1965 and 1970.  *Ibid.* (citing Appellant's Jurisdictional Statement, *City of Rome* v. *United States*, No. 78-1840 (May 2, 1979)).  The Court nonetheless concluded that the Attorney General's recent objections documented the continued need for preclearance. *City of Rome*, 446 U.S. at 181.  Further, while there were fewer objections to submissions originating in Alabama since 1982, in nine States, the rate of objections increased after 1982.  2006 House Report 73; see pp. 25-26, *supra*.

Moreover, as Congress learned, the number of Attorney General objections alone does not provide a complete picture of the need for or effectiveness of Section 5.  See pp. 35-38, *supra*.  Each objection may encompass several voting changes; other discriminatory changes are blocked by declaratory judgment actions; and many voting changes are withdrawn or altered by jurisdictions following requests for more information by the Department of Justice.  Thus, between 1982 and 2004, more than 1,100 discriminatory voting changes were blocked by the Department of Justice and by three-judge panels of this court, and another 200 voting changes were withdrawn by the submitting jurisdictions.  See pp. 38, *supra*.  Between 1990 and 2005, more than 800 submissions were affected by requests for more information.  See p. 35, *supra*.  Whatever the *rate* of objections, Section 5 prevented the implementation of an enormous number of discriminatory voting changes during this period.

Finally, Congress heard testimony that Section 5 effectively deters covered jurisdictions from adopting discriminatory electoral changes, including testimony about specific, recent, examples in which the mere existence of the Section 5 non-retrogression standard prevented the denial of voting rights to minority citizens.  See pp. 53-55, *supra*.  In fact, the House Committee found that this deterrent effect was "[a]s important as the number of objections that have been interposed to protect minority voters against discriminatory changes."  2006 House Report 24.

Thus, Congress's determination that Section 5 remains necessary is supported by the extensive evidence that discriminatory voting practices have been prevented not only by objections interposed by the Attorney General, but also by changes blocked by declaratory judgment actions, changes withdrawn or altered by jurisdictions, and changes that were never adopted at all because of the existence of Section 5.

3.  Third, plaintiff contends that the legislative record lacks sufficient evidence of intentional voting discrimination.  Pl. Mem. 30-35.  To the contrary, the record included abundant evidence of intentional discrimination.  Many of the Attorney General's objections to voting changes were based on findings of intentional discrimination.  Indeed, testimony and studies demonstrate that the number of objections based on discriminatory purpose *increased* during the 1980's and 1990's.  See pp. 27-31, *supra*.

Similarly, Congress heard evidence of the number of Section 2 cases that resulted in favorable outcomes for minority plaintiffs, including many with findings of intentional discrimination.  See pp. 40-42, 44-49, *supra*.  Plaintiff notes that Congress identified only 12 published decisions finding intentional racial discrimination by covered jurisdictions between 1982 and 2006.  Pl. Mem. 34.  But there is no reason to limit consideration to *reported* decisions.  Congress also received the results of a study of 651 successful, reported and unreported Section

2 decisions from eight covered States and North Carolina, affecting 825 different jurisdictions, including 192 cases from Alabama. *H. Appx.* 125-126; see p. 40-41, *supra*. As plaintiff notes, a Section 2 violation does not necessarily require a finding of intentional discrimination. Pl. Mem. 34. But, as Congress heard, many of the identified cases did involve such findings. See also *Northwest Austin I*, 573 F. Supp. 2d at 258-262. Plaintiff also seeks to minimize the significance of the unreported cases that were resolved through settlements by suggesting that jurisdictions that enter into such settlements "are looking to comply with the Fifteenth Amendment – not discriminate against voters on the basis of race." Pl. Mem. 34. Of course, if these jurisdictions truly had wished to avoid discrimination, they would have done so before being sued.

4. Finally, Section 5 is limited in significant ways. First, Section 5 has always had, and continues to have, a built-in expiration date. That Congress has extended its life on four separate occasions demonstrates that the temporal limit works, ensuring that Section 5 remains in effect only as long as necessary for securing the voting rights of minority citizens in this country. The 2006 Reauthorization extended the temporary provisions for 25 years, and also directed Congress to reconsider the provisions after 15 years. 2006 Reauthorization, § 4(a)(7) and (8). In 2006, after reexamining the state of voting rights in the last few years, Congress found that Section 5 preclearance was still necessary to preserve minority voting rights. 2006 House Reauthorization, § 2(b); see 2006 House Report 6. That finding was rational and is entitled to deference. *South Carolina*, 383 U.S. at 324; cf. *Eldred* v. *Ashcroft*, 537 U.S. 186, 204-205 (2003) ("defer[ring] substantially" to Congress's judgment on appropriate length of copyright protection). Moreover, Congress understood that directing reconsideration after 15 years and extending Section 5 for an additional 25 years would permit Congress to rely on data from two more decennial redistricting rounds in evaluating whether to further extend the Act. *Introduction*

*to the Expiring Provisions* 167 (statement of Shaw).  After Congress determined that there

remains a vital need for Section 5, it was reasonable to extend the provision for a period of time

long enough to allow Congress to collect sufficient information to make a careful determination

about whether the need for Section 5 continues.

Second, the evidence presented to Congress demonstrates that compliance with Section 5

is not unduly burdensome.  Congress heard that the "the task of preparing the [Section 5]

submission is usually a fraction of the work involved in making the voting change," and that the

preclearance process itself "is probably the most streamlined administrative process known to the

federal government."  *Understanding the Benefits and Costs of Section 5 Pre-clearance:*

*Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. 182 (2006) (statement

of Armand Derfner) (*Benefits & Costs of Section 5 Pre-clearance*); see also *Policy Perspectives*

*& Views from the Field* 12 (statement of Wright) ("[T]he way preclearance is administered by

the Department of Justice is very efficient.").  The Department of Justice has taken a number of

steps to make the administrative preclearance process as easy as possible for covered

jurisdictions, providing assistance to submitting officials on the submission process, considering

submissions on an expedited basis when requested to do so by jurisdictions, and receiving

submissions by overnight mail, by fax, and by email, and most recently through a completely

web-based submission process.  See Def. SMF ¶¶ 31-41.

The General Counsel of the North Carolina Board of Elections testified that the

preclearance process is not a burden on the average covered jurisdiction; that he "never had any

difficulty getting expedited pre-clearance or any reasonable cooperation from the U.S.

Department of Justice," *Policy Perspectives & Views from the Field* 11 (statement of Wright);

that he "could probably knock out a pre-clearance on a routine matter in a half an hour," *id.* at

12; and that, in his "national meetings with other election administrators," he had "never heard a complaint" about the Department's handling of "the day-to-day submissions," *Ibid*.; see also *History, Scope, & Purpose* 79 (testimony of Earls).

Third, as explained in more detail below, Section 5 is applicable only to those jurisdictions with the worst historical records of voting discrimination.  See *South Carolina*, 383 U.S. at 328.  And the bailout mechanism permits jurisdictions to terminate their coverage when there is no longer a need for preclearance.  *Id.* at 332; see pp. 69-74, *infra*.

## II.    SECTION 4(b) IS CONSTITUTIONAL

1.  Congress designed the coverage formula in the 1965 Act to encompass the jurisdictions with the worst records of voting discrimination.  See p. 2, *supra*.  In *South Carolina*, the Court specifically upheld the formula because it encompassed the States and political subdivisions for which there was "reliable evidence of voting discrimination" and because the formula "was relevant to the problem of voting discrimination."  *South Carolina* v. *Katzenbach*, 383 U.S. 301, 329 (1966).  "Congress was therefore entitled to infer a significant danger of the evil in the few remaining States and political subdivisions covered by s 4(b) of the Act.  No more was required to justify the application to these areas of Congress' express powers under the Fifteenth Amendment."  *Ibid.*; see *id.* at 330 (coverage formula is "rational in both practice and theory" because both the use of tests and other devices as prerequisites for voter registration and low rates of registration and turnout are "relevant to voting discrimination"); see *United States* v. *Board of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 119 (1978) (coverage formula was based on Congress's finding that "that there was a high probability of pervasive racial discrimination in voting in areas that employed literacy tests or similar voting qualifications and that, in addition, had low voter turnouts or registration figures").

65

The Court found it "irrelevant" that the formula omitted some jurisdictions for which there was evidence of voting discrimination, but that had not used tests or devices to discriminate. *South Carolina*, 383 U.S. at 331. "[W]idespread and persistent discrimination in voting during recent years," the Court explained, "has typically entailed the misuse of tests and devices, and this was the evil for which the new remedies were specifically designed." *Ibid.* (footnote omitted). The Court also noted the availability of the bailout mechanism as a remedy for possible overbreadth, permitting jurisdictions that were covered by the formula, but that had not used tests or other devices to discriminate, to avoid coverage. *Ibid.*

As explained above (pp. 57-60, *supra*), although the use of tests and devices to limit directly the ability of minority citizens to register and vote had been the primary means of voting discrimination when the VRA was passed, covered jurisdictions had long used and continued to adopt other means of limiting minority voting rights. Thus, the Court soon held that the preclearance requirements of Section 5 extended more broadly to include electoral practices such as at-large elections, redistricting, annexations, changes in polling places, and other mechanisms that might limit or dilute minority voting rights. Similarly, the Court reaffirmed the constitutionality of Section 5 in *City of Rome* and *Lopez*, without any suggestion that the coverage formula was deficient, even though in both instances the legislative record indicated that minority registration and turnout – the indicia most directly related to the coverage formula – had increased "dramatically." *City of Rome* v. *United States*, 446 U.S. 156, 180 (1980); see *Lopez* v. *Monterey Cnty.*, 525 U.S. 266, 282-285 (1999); see pp. 21-23, 59-60, *supra*.

2. When Congress reauthorized the VRA in 2006, Congress simply continued to apply Section 5 to the same covered jurisdictions that had been designated pursuant to the 1965 Act and the 1970 and 1975 Reauthorizations. This extension was appropriate Fifteenth Amendment

legislation for two reasons.  First, it applies Section 5 to the jurisdictions where, historically,

"voting discrimination has been most flagrant."  *South Carolina*, 383 U.S. at 315.  Second, when

it reauthorized Section 5 in 2006, Congress heard abundant evidence and specifically found that

Section 5 preclearance was still necessary in the covered jurisdictions.  See 2006

Reauthorization, § 2(b)(3), (4), (5), and (8); pp. 23-56, *supra*.  Moreover, studies in the

legislative record demonstrated, and a recent study confirms (p. 68, *infra*), that voting

discrimination, as measured by successful Section 2 litigation, is much more prevalent in

covered than in non-covered jurisdictions.

     Plaintiff nonetheless argues that the coverage formula is not appropriate enforcement

legislation because the evidence before Congress in 2006 is not sufficiently related to the two

factors in the coverage formula:  the use of discriminatory tests and devices, and low turnout and

registration.  Pl. Mem. 35-39.  But, as the above discussion indicates, the original coverage

formula simply identified those jurisdictions where "there was a high probability of pervasive

racial discrimination in voting."  *Sheffield*, 435 U.S. at 119.  When the VRA was enacted, and

when the Court first upheld it, there was a close correlation between the coverage formula and

"the principal method used to bar Negroes from the polls."  *South Carolina*, 383 U.S. at 312.

But that correlation had become attenuated as Congress extended the Act and as the Court

upheld it.  That should be no surprise, since the VRA banned the use of discriminatory tests in

the covered jurisdictions.  1965 Act, § 4(a), 79 Stat. 438.  Moreover, the purpose of Section 5

was to prohibit covered jurisdictions from enacting "new rules of various kinds for the sole

purpose of perpetuating voting discrimination."  *South Carolina*, 383 U.S. at 335.  Indeed,

Congress proved prescient in its expectation that these jurisdictions "might try similar maneuvers

in the future in order to evade the remedies for voting discrimination contained in the Act itself."

*Ibid.*  In the wake the enactment of the VRA, Alabama, Mississippi, and Georgia all enacted electoral changes that would have diluted minority voting rights.  See p. 59, *supra.*  Thus, when Congress reauthorized the VRA in 1970, 1975, and 1982, and when the Court upheld those Reauthorizations, both relied upon evidence of a wide variety of discriminatory voting practices in the covered jurisdictions.  See *City of Rome*, 446 U.S. 156, 180-181 (1980); pp. 20-23, 59-60, *supra*.  Congress relied upon similar evidence in 2006.  And that evidence justifies continued application of Section 5 to the jurisdictions covered under the formula in Section 4(b).

Plaintiff erroneously argues that the legislative record fails to support a finding that voting discrimination is more prevalent in covered than in non-covered jurisdictions.  Pl. Mem. 39-41.  In particular, plaintiff contends that "Section 2 litigation is equally distributed between covered and non-covered jurisdictions."  Pl. Mem. 40.  In fact, the legislative record revealed proportionally *more* successful Section 2 litigation in covered jurisdictions than in non-covered jurisdictions.  Congress examined a study, conducted by the University of Michigan Voting Rights Initiative, of reported decisions in Section 2 suits filed throughout the country between 1982 and 2005.  *Impact & Effectiveness* 964-1124.  The study revealed that 64, or 56% of the 114 cases with outcomes favorable to minority voters were filed in jurisdictions covered by Section 5, although those jurisdictions comprised less than one-quarter of the nation's population in 2000.  *Impact & Effectiveness* 974; *H. Appx.* 202-203.  Thus, covered jurisdictions were subject to more than twice their proportional share of plaintiffs' successful suits in reported Section 2 decisions.  A more comprehensive study conducted since the 2006 Reauthorization indicates that this differential is even greater when unreported outcomes are included:  81% of the successful Section 2 cases resolved between 1982 and 2005 occurred in the covered jurisdictions.  Def. SMF ¶¶ 69-76.  Moreover, such studies of Section 2 actions do not account

for discriminatory voting practices in the covered jurisdictions that were deterred, blocked, or withdrawn as a result of the Section 5 preclearance process.  See pp. 25-38, 53-55, *supra.* The very existence of the Section 5 preclearance process, in other words, inevitably reduces the need for Section 2 litigation in the covered jurisdictions.

3.  The bailout mechanism provides a remedy for any overbreadth in the coverage formula.  See *South Carolina*, 383 U.S. at 331-332.  Initially, bailout was only available to jurisdictions that could prove they had not used tests or devices for a discriminatory purpose or with a discriminatory effect during the previous five years.  See 1965 Act, § 4(a), 79 Stat. 438. When the VRA was reauthorized in 1970 and 1975, the time period was extended to 10 and 17 years, respectively.  See 1970 Reauthorization, § 3, 84 Stat. 315; 1975 Reauthorization, § 101, 89 Stat. 400.  In 1982, Congress rewrote the bailout provision to enable jurisdictions to bail out if they had complied fully with the VRA and had not engaged in voting discrimination for a period of ten years.  1982 Reauthorization, § 2(b)(5)(B), 96 Stat. 131-133.  The 1982 Reauthorization also significantly expanded the jurisdictions eligible to bailout to include subjurisdictions within covered States.  *Ibid.*  These changes were enacted to provide "incentives to the covered jurisdictions to comply with laws protecting voting rights of minorities, and to make changes in their existing voting practices and methods of election."  1981 House Report 32.

Covered jurisdictions wishing to terminate their coverage under Section 5 may do so by bringing a declaratory judgment action in this court.  42 U.S.C. 1973b(a)(1).  To obtain a declaratory judgment, the jurisdiction must show that it and all governmental units within its boundaries have met the following requirements during the previous ten years:

-   No test or device has been used within the jurisdiction for the purpose or with the effect of voting discrimination;

- All changes affecting voting have been reviewed under Section 5 prior to their implementation;

- No change affecting voting has been the subject of an objection by the Attorney General or the denial of a Section 5 declaratory judgment from the District of Columbia district court;

- There have been no adverse judgments in lawsuits alleging voting discrimination;

- There have been no consent decrees or agreements that resulted in the abandonment of a discriminatory voting practice;

- There are no pending lawsuits that allege voting discrimination;

- Federal examiners have not been assigned;

- There have been no violations of the Constitution or federal, state or local laws with respect to voting discrimination unless the jurisdiction establishes that any such violations were trivial, were promptly corrected, and were not repeated.

See 42 U.S.C. 1973b(a)(1) and (3).  In addition, the jurisdiction must demonstrate that it has eliminated any voting procedures and methods of elections that inhibit or dilute equal access to the electoral process; that it has made constructive efforts, *e.g.*, to eliminate intimidation and harassment of persons seeking to register and vote, to expand opportunities for voter participation, and to appoint minority officials throughout the jurisdiction and at all levels of the stages of the electoral process.  42 U.S.C. 1973b(a)(1)(F); see Def. SMF ¶¶ 46-52 .

    The Supreme Court has indicated that the bailout provision should be interpreted broadly to enable jurisdictions that have complied with the VRA to terminate their coverage under Section 5.  *Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 129 S. Ct. 2504, 2514 (2009) (*Northwest Austin II*) (adopting "a broader reading of the bailout provision" in light of "specific precedent, the structure of the Voting Rights Act, and underlying constitutional concerns").  Since the *Northwest Austin* decision, the Attorney General has faithfully applied the bailout

criteria with that directive in mind, and has consented to bailout by three smaller jurisdictions including the Northwest Austin District itself.   Def. SMF ¶¶ 62-63.

The bailout criteria correspond closely to the very purpose of the Section 5 preclearance requirement.  The absence for ten years of discriminatory tests or devices, Section 5 objections, unprecleared electoral changes, the assignment of federal examiners or observers, and other discriminatory voting practices are good indicators that preclearance is no longer necessary.  Moreover, the criteria include an exception for violations that were "trivial, were promptly corrected, and were not repeated."  42 U.S.C. 1973b(a)(3).

Requiring jurisdictions to demonstrate that governmental units within their boundaries have fully complied with Section 5 and have not discriminated is a reasonable requirement.  As the Senate Committee Report on the 1982 Reauthorization explained, States retain "significant statutory and practical control" over the election practices of counties and other subjuridictions. 1982 Senate Report 56.  In Alabama, for example, both the structure of county and municipal governments and the election procedures for counties and municipalities are governed by state statutes. See, *e.g.*, Ala. Code § 11-3-1 (1975) (establishing county commissions); *id.* § 11-43-2 (providing for election of mayors and city councilmen); *id.* § 17-1-3(a) (designating Secretary of State as chief election official for the State); *id.* § 17-3 (establishing standards and procedures for voter registration).  Moreover, "the Fifteenth Amendment places responsibility on the states for protecting voting rights."  1982 Senate Report 56; see U.S. Const. Amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by * * * any *State* on account of race, color, or previous condition of servitude.") (emphasis added).  Counties also often have substantial control over the conduct of elections within their boundaries, including municipal elections.  In Alabama, for example, voter registration and elections are conducted by

71

county officials.  See, *e.g.*, Ala. Code § 17-3-2 (1975) (registration conducted by county board of registrars); *id.* § 17-8-1 (appointment of election officials by county appointing board).

Further, the bailout provision creates a workable process for jurisdictions seeking to terminate coverage.  The statute authorizes the Attorney General to consent to entry of a declaratory judgment if "he is satisfied that the State or political subdivision has complied with the requirements of" the bailout provision.  42 U.S.C. 1973b(a)(9).  Since 1965, 57 (6.04%) of the approximately 943 county, parish and township-level jurisdictions that were originally covered by Section 4, have successfully bailed out and maintained their bailed out status.  Def. SMF ¶ 53.   One state and several other jurisdictions also successfully bailed out and were later re-covered by new coverage determinations or by new court findings.  Def. SMF ¶ 53.  Overall, since 1965, there have been 44 cases filed in which bailout was sought under Section 4(a), and 36 cases have resulted in a grant of bailout, all with the consent of the United States (with one having been rescinded by court order).  Def. SMF ¶ 53.  Since the new bailout standard went into effect in 1984, the United States has consented to bailout in 21 cases – including 18 cases involving county level jurisdictions (with 51 subjurisdictions) and 3 cases involving smaller jurisdictions, for a total of 72 jurisdictions granted bailout since 1984.  Def. SMF ¶ 54.  The Attorney General has consented to every bailout action filed by a political subjurisdiction since 1984, the effective date of the revised bailout provision.  Def. SMF ¶ 55.  The Attorney General is currently reviewing the informal bailout requests of numerous jurisdictions.  Def. SMF ¶ 56.

Congress heard testimony from an attorney who, at the time of his testimony, had represented nine of the political jurisdictions that had successfully terminated coverage under the revised bailout provisions since 1984.  *Scope & Criteria for Coverage* 87-89 (testimony of Hebert); *id*. at 90 (statement of Hebert).  The attorney reported that the average cost of obtaining

72

bailout was approximately $5,000, and that most of the bailout criteria "are easily proven for jurisdictions that do not discriminate in their voting practices."  *Id.* at 90; *H. Appx.* 2683.  He testified that proving compliance with Section 5 was believed to be the most difficult criterion, but that this requirement had not been a barrier in most cases because of the Attorney General's use of the exception for trivial violations.  *Scope & Criteria for Coverage* 91.  Where a jurisdiction or one of the governmental units within its territory had inadvertently neglected to submit a voting change or changes, he explained, the Department of Justice would nonetheless consent to bailout once the changes had been submitted and cleared.  *Ibid.*  While this process was sometimes time-consuming, "it ensures full compliance with the Act and is faithful to the language and spirit of the law."  *Ibid.*; see *H. Appx.* 2677-2682 (describing the bailout process).  In an article submitted for the record, the attorney described the experience of Shenandoah County, Virginia, which discovered, in the process of seeking to bailout, that a number of municipalities within the County had implemented about two dozen voting changes without first submitting them for Section 5 preclearance.  *H. Appx.* 2679.  Once the municipalities submitted the changes and they were cleared, the Attorney General consented to bailout and the County successfully terminated its coverage.  *Ibid.*  The Attorney General has consented to bailout by at least two other Virginia counties where jurisdictions had implemented isolated voting changes prior to submitting them for Section 5 review.  Def. SMF ¶ 60.

Plaintiff contends that it is ineligible to bailout because it conducted a referendum election under a law that had not been precleared, and because the Attorney General objected to electoral changes submitted by the City of Calera.  Pl. Mem. 41 n.8.  Because the Attorney General did not conduct discovery in this case, and has not conducted the usual investigation that occurs when a jurisdiction seeks to bail out, the Attorney General does not have sufficient

information to state definitively whether he would consent if plaintiff sought to terminate coverage.  The Attorney General precleared the law providing for the referendum election once it was submitted.  Def. SMF ¶ 59.  Based upon the facts known to the Attorney General at this time, that isolated instance could fall within the exception for trivial violations and thus would not be sufficient, by itself, to bar plaintiff from terminating coverage.

The City of Calera's failure to comply with Section 5, on the other hand, is far from trivial and would prevent the City from terminating its coverage.  The City failed to submit 177 annexations adopted over a period of 12 years.  Def. SMF ¶ 21.  In 2008, the City conducted a municipal election in defiance of an objection from the Attorney General to a redistricting plan that eliminated the only majority black district in the City.  Def. SMF ¶¶ 21-25.  Moreover, it adopted that redistricting plan shortly after it was released from an injunction in the *Dillard* litigation, pursuant to which it had adopted the majority black district.  Def. SMF ¶¶ 20-21.

It is not clear, however, what, if any, involvement Shelby County had in any of these events or whether they should prevent plaintiff from bailing out.  For example, did plaintiff consent to the annexations?  Did it have any knowledge of, or input into, Calera's failure to submit these changes over the fifteen year period?  Did the County have any involvement in Calera's adoption of the redistricting plan or its decision to implement the plan in the face of the Attorney General's objection?  The answers to these questions would be relevant to the Attorney General's determination whether the County is eligible to bail out.

4.  Finally, plaintiff  contends that the coverage formula violates the principle of equal sovereignty among the States because it treats some States differently from others.  Pl. Mem. 43 (citing *Northwest Austin II*, 129 S. Ct. at 2512).  Congress found that voting discrimination continues to be a problem in the covered jurisdictions.  The legislative record supports a

conclusion that the problem of voting discrimination is more common in those jurisdictions, with the covered States subject to more than twice their proportional share of successful Section 2 lawsuits.  "In acceptable legislative fashion," *South Carolina*, 383 U.S. at 328, Congress chose, as it did in 1965, 1972, 1975, and 1982, to limit the requirements of Section 5 to those jurisdictions.  Thus, the "statute's disparate geographic coverage is sufficiently related to the problem that it targets."  *Northwest Austin II*, 129 S. Ct. at 2512.  As the Court held in *South Carolina*, "[t]he doctrine of equality of States * * * does not bar this approach."  383 U.S. at 328.

## CONCLUSION

The Attorney General's cross-motion for summary judgment should be granted and plaintiff's motion for summary judgment should be denied.

Date:  November 15, 2010

RONALD C. MACHEN, JR.
  United States Attorney
  District of Columbia

Respectfully submitted,

THOMAS E. PEREZ
  Assistant Attorney General
SAMUEL R. BAGENSTOS
JULIE A. FERNANDES
  Deputy Assistant Attorneys General

*/s/ Linda F. Thome*
T. CHRISTIAN HERREN, JR.
DIANA K. FLYNN
RICHARD DELLHEIM (lead counsel)
LINDA F. THOME
ERNEST A. MCFARLAND
JARED M. SLADE
JUSTIN WEINSTEIN-TULL
  Civil Rights Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, N.W.
  NWB-Room 7264
  Washington, D.C. 20530
  Telephone: (202) 305-1734
  Facsimile: (202) 307-3961