IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHELBY COUNTY, ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. |
| ERIC H. HOLDER, Jr., | ) | 1:10-cv-00651-JDB |
| in his official capacity as | ) | |
| Attorney General of the | ) | |
| United States, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

Declaration of Dr. Peyton McCrary

Pursuant to 28 U.S.C. § 1746, I, Peyton McCrary, make the following declaration:

1.  My name is Peyton McCrary.  I am an historian employed since August, 1990 by the Voting Section, Civil Rights Division, of the Department of Justice.  My responsibilities include the planning, direction, coordination, and performance of historical research and statistical analysis in connection with litigation.  On occasion I am asked to provide written or courtroom testimony on behalf of the United States.

2.  I received B.A. and M.A. degrees from the University of Virginia and obtained my Ph.D. from Princeton University in 1972.  My primary training was in the history of the United States, with a specialization in the history of the South during the 19th and 20th centuries.  For 20 years I taught courses in my specialization at the University of Minnesota, Vanderbilt University, and the University of South Alabama.  In 1998-99 I took leave from the Department of Justice to serve as the Eugene Lang Professor in the Department of Political Science,

1

Swarthmore College.  For the last four years I have co-taught a course on voting rights law as an adjunct professor at the George Washington University Law School.

3.  I have published a prize-winning book, *Abraham Lincoln and Reconstruction: The Louisiana Experiment* (Princeton, N.J., Princeton University Press, 1978), six law review articles, six articles in refereed journals, and four chapters in refereed books.  Over the last quarter century my published work has focused on the history of discriminatory election laws in the South, evidence concerning discriminatory intent or racially polarized voting presented in the context of voting rights litigation, and the impact of the Voting Rights Act in the South.  Over the last three decades I have published numerous reviews of books in my areas of specialization and served as a scholarly referee for numerous journals and university presses.  I continue to publish scholarly work on these topics while employed by the Department of Justice.  A detailed record of my professional qualifications is set forth in the attached curriculum vitae (Attachment A), which I prepared and know to be accurate.

4.  My publications most relevant to the issues discussed in this declaration include: *The End of Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act*, 11 Mich. J. Race & L. 275 (2006) (co-authored with Christopher Seaman and Richard Valelly), *reprinted in Voting Rights Act: Section 5 Preclearance and Standards: Hearings Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 96-181 (2005); *How the Voting Rights Act Works: Implementation of a Civil Rights Policy, 1965-2005*, 57 S.C. L. Rev. 785 (2006); *Bringing Equality to Power: How the Federal Courts Transformed the Electoral Structure of Southern Politics, 1960-1990*, 5 U. Pa. J. Const. L. 665 (2003); *Alabama*, in *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990*, at 38 (Chandler Davidson and Bernard Grofman eds., 1994) (co-authored with

2

Jerome A. Gray, Edward Still, and Huey Perry);  *South Carolina*, *in Quiet Revolution in the South*, *supra*, at 397 (co-authored with Orville Vernon Burton, Terence R. Finnegan, and James W. Loewen); *Racially Polarized Voting in the South: Quantitative Evidence from the Courtroom*, 14 Soc. Sci. Hist. 507 (1990); *Discriminatory Intent: The Continuing Relevance of "Purpose" Evidence in Vote-Dilution Lawsuits*, 28 How. L.J. 463 (1985); and *History in the Courts: The Significance of City of Mobile v. Bolden*, *in Minority Vote Dilution* 47 (Chandler Davidson ed., 1984).

5.  I have presented courtroom testimony as an expert witness in 15 voting rights cases, for the most part before joining the staff of the Civil Rights Division.  In one instance, however, I testified on behalf of the United States as amicus curiae.  In addition, I have presented sworn written testimony in seven cases, including three since my employment by the Department of Justice.  I was retained as an expert in another 19 cases prior to my employment with the Civil Rights Division that settled before trial; 14 of these were Section 2 lawsuits.  I was retained in two other Section 2 cases that settled after a trial court granted a preliminary injunction.   In these cases my testimony has often dealt with legislative intent in adopting or maintaining at-large elections, numbered place or majority vote requirements, and methods of appointing local governing bodies, as well as with the history of racial discrimination in regard to voting.  I have not testified in cases during the past four years.

6.  The cases in which I testified that are most relevant to this declaration include: *Dillard* v. *Crenshaw County*, 640 F. Supp. 1347 (M.D. Ala. 1986);  *Harris* v. *Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984); *Brown* v. *Board of School Commissioners of Mobile County*, 542 F. Supp. 1078 (S.D. Ala. 1982), *aff'd* ,706 F.2d 1103 (11th Cir. 1983); and *Bolden* v. *City of Mobile*, 542 F. Supp. 1050 (S.D. Ala. 1982).  In each of these cases brought under Section 2 of the Voting

Rights Act I testified as an expert witness for the plaintiffs.  The trial court decided the two *Mobile* cases before the 1982 revision of Section 2 of the Voting Rights Act and thus under the intent standard applied in constitutional challenges after *City of Mobile* v. *Bolden*, 446 U.S. 55 (1980).

7.  I have been asked by attorneys for the Department of Justice: 1) to describe some basic characteristics of Shelby County, Alabama, and 2) to investigate factual evidence relevant to the allegations by Shelby County as to the coverage formula for Section 5 of the Voting Rights Act.  In my investigation I have drawn on my familiarity with the record assembled by House and Senate committees during the hearings preceding passage of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577, which I first examined when assisting attorneys for the United States in *Northwest Austin Municipal Utility District Number One* v. *Mukasey*, 573 F. Supp. 2d 221 (D.D.C. 2008), *vacated sub. nom. Northwest Austin Municipal Utility District Number One* v. *Holder*, 129 S. Ct. 2504 (2009).

## Shelby County: Background

8.  Shelby County is located south of Alabama's largest county, Jefferson County, and the State's largest municipality, the City of Birmingham, in the northern part of the state.  A small portion of the state's largest municipality, Birmingham, is located within Shelby County and the county is included, in part, within the Birmingham Standard Metropolitan Statistical Area.  There are also numerous towns and small cities within the county that have existed as separate municipalities for many years.

9.  According to the 2000 Census, Shelby County had a total population of 143,293, including 126,951 whites (88.6%), 10,570 African Americans (7.4%), 2,910 Hispanics (2.0%),

and 1,465 Asians (1.0%).  U.S. Census Bureau, PL 94-171 (2000), Shelby County, Alabama.

10.  According to the 2006-2008 estimates provided by the Census American Community Survey ("ACS"), Shelby County's total population was 183,014, of which 153,649 were white (84.0%), 17,621 were African American (9.6%), 6,674 were Hispanic (3.6%), and 2,894 were Asian (1.6%).  U.S. Census Bureau, American Community Survey (ACS) 2006-2008 (3-year estimates), Shelby County, Alabama.

11.  Comparing the 2006-2008 estimates provided by the American Community Survey with 2000 Census results, the total population of Shelby County has increased significantly from 2000 to 2008, from 143,293 to 183,014, an increase of 39,721 (27.7%) from its 2000 population.

12.  According to the 2000 Census, Shelby County had within its borders the following municipalities: 1) Alabaster (city); 2) Birmingham (city, part); 3) Calera (city, part); 4) Chelsea (town); 5) Childersburg (town, part), 6) Columbiana (city); 7) Harpersville (town); 8) Helena (city, part); 9) Hoover (city, part); 10) Indian Springs Village (town); 11) Leeds (city, part); 12) Montevallo (city); 13) Pelham (city); 14) Vestavia Hills (city, part); 15) Vincent (town, part); 16) Wilsonville (town); and 17) Wilton (town).  U. S. Census Bureau, American Fact Finder, Alabama, GCT-Pl. Race and Hispanic or Latino: 2000.  In 2001 the municipality of Westover was incorporated.

13.  Shelby County and six of its municipalities, including the City of Calera, were among the defendants in the complex *Dillard* litigation, and each agreed to alter its at-large election system in favor of an election plan fair to minority voters.  *See, e.g., Dillard* v. *Crenshaw County*, 748 F. Supp. 819 (M.D. Ala. 1990); *Dillard* v. *Town of Calera*, No. 2:87cv1167, 2007 WL 1607656 (M.D. Ala. May 9, 2007); *Dillard* v. *Town of Columbiana*, No. 2:87cv1189 (M.D. Ala.); *Dillard* v. *Town of Harpersville*, No. 2:87cv1228 (M.D. Ala.); *Dillard*

v. *Town of Vincent*, No. 2:87cv1305 (M.D. Ala.); *Dillard* v. *Town of Wilsonville*, No. 2:87cv1315 (M.D. Ala.); *Dillard* v. *Town of Wilton*, No. 2:87cv1316 (M.D. Ala.).

### Settlements in Section 2 Litigation, Covered vs. Non-covered Jurisdictions

14.  I have examined the evidence in two studies considered by Congress when it reauthorized Section 5 of the Voting Rights Act in 2006: (1) Ellen Katz, et. al., *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982* (2005), *reprinted in To Examine Impact and Effectiveness of the Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 16, 964-1124 (2005) [hereinafter *Documenting Discrimination in Voting*]; and (2) Nat'l Comm'n on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005* (2006), *reprinted in Voting Rights Act: Evidence of Continuing Need: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 109th Cong. 104-289 (2006) [hereinafter *Protecting Minority Voters*].[1]  The study by Professor Katz and law students working under her direction at the University of Michigan assembled data regarding all reported decisions in Section 2 litigation from 1982 to 2005.  Among other evidence provided in its report, the staff of the National Commission gathered data regarding Section 2 litigation other

---

[1] In its analysis the National Commission report utilized a version of the Michigan study directed by Professor Katz – known as the Voting Rights Initiative (VRI) – available on the VRI website as of Jan. 16, 2006.  Thus the numbers in *Protecting Minority Voters, supra,* at 251 tbl. 5, drawn from the Michigan study, differ slightly from the numbers on the record before Congress.  In my analysis I have relied on the numbers from the Michigan study on the record before Congress and the numbers calculated by the National Commission staff. *Id.*  Because I use the number of reported decisions favorable to minority voters in covered jurisdictions reported to the House (64) instead of the 66 such favorable outcomes identified in *Protecting Minority Voters*, at 251 tbl. 5, my total for reported decisions and court-ordered settlements is 651, rather than the 653 used by the National Commission.  The slight differences in the numbers reported in different versions of the Michigan study do not affect the conclusions to be drawn from the data.  A finalized set of numbers, which I believe are the most accurate, appeared in the version of the study published at 39 U. Mich. J.L. Reform 643 (2006).

than in reported decisions.  The Commission's research utilized docket information contained on

Lexis and the federal courts' Public Access to Court Electronic Records ("PACER") system;

cases cited in the tables of *Quiet Revolution in the South*, *supra*; data supplied from the files of

voting rights attorneys; and a search of the Department of Justice's Submission Tracking and

Processing System ("STAPS") database, which records every Section 5 submission involving a

change in the method of election since 1980.  *See Protecting Minority Voters*, *supra*, at 240

n.280.

15.  The Michigan study of reported decisions permits a detailed comparison of the

enforcement of Section 2 in jurisdictions covered by Section 5 and enforcement in the rest of the

country.  Thus it provides useful evidence regarding the degree to which the Section 5 coverage

formula captures jurisdictions in which racial discrimination in voting is most serious.  On the

other hand, as the Michigan study points out, many Section 2 cases have been settled by the

parties to the advantage of minority voters in court-entered settlement agreements that are not

reported by the courts.  Professor Katz and her colleagues gathered lists of settled cases from

various voting rights attorneys that suggested that the total volume of Section 2 litigation was at

least four times as great as reflected in reported decisions.  *See Documenting Discrimination in

Voting*, *supra*, at 974.

16.  The National Commission staff sought to collect data regarding the large volume of

"all Section 2 claims – reported and unreported – resolved in a manner favorable to minority

voters since 1982."  *Protecting Minority Voters*, *supra*, at 205.  Their search was, however,

restricted to jurisdictions covered by Section 5 (excluding one covered state, Alaska).  *See id.*

The Commission staff recognized that this list of unreported settlements was incomplete but

offered it as a "best effort" at a comprehensive accounting.  *Id.*

17.  A more comprehensive picture of the total volume of successful enforcement of Section 2 would include a similar list of settlements since 1982 for all jurisdictions *not* covered by Section 5.  In order to obtain a more comprehensive assessment, I undertook a systematic search for Section 2 settlements in non-covered jurisdictions, utilizing the following methodology:  I began with a list of all lawsuits catalogued in PACER as concerning "Civil Rights: Voting" (Code No. 441).  I used LexisNexis CourtLink to search by docket number for all cases in non-covered jurisdictions.  Four staff members working under my direction reviewed docket sheets to screen for possible Section 2 lawsuits and to print them for my review.  After my initial review, two staff attorneys examined additional information from PACER about particular lawsuits suspected of being Section 2 settlements.  In my final review, I did not include any case for which the docket sheet or case documents electronically linked to the dockets failed to provide some evidence that the case was resolved under Section 2 of the Voting Rights Act, whether by reference to the federal code section or by reference to "voting rights issues" or similar language.  I also required some reference to settlement of the case, whether by consent decree, consent judgment, consent order, or a simple reference to "settlement."

18.  In addition, I used certain publicly available documents to supplement information from the electronic docket sheets.  Laughlin McDonald & Daniel Levitas, *Vote: The Case for Extending and Amending the Voting Rights Act* (2006*), reprinted in Voting Rights Act: Evidence of Continuing Need: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 109th Cong. 378-1269 (2006), provides detailed information about the outcome of Section 2 cases brought by the American Civil Liberties Union.  The Voting Section of the Civil Rights Division of the Department of Justice maintains a routinely updated list of voting rights cases brought by it from 1976 to the present.  Similar lists were made part of the record before

8

Congress when the Voting Rights Act was amended in 1970, 1975, and 1982.[2]

19.  My goal was to identify all Section 2 settlements in non-covered jurisdictions.  I recognize, however, that because of the limitations of PACER and CourtLink – which did not begin receiving documents from district courts until the late 1980s – my list of Section 2 settlements may be under-inclusive.  The Michigan study documents that reported decisions in Section 2 cases were most numerous in the first decade following the creation of the Section 2 results test in 1982.  *Documenting Discrimination in Voting*, *supra*, at 975.  The studies of Section 5 covered jurisdictions in *Quiet Revolution in the South* indicate that Section 2 lawsuits in Southern states generated numerous orders and settlements during the 1980s requiring the adoption of single-member districts or cumulative or limited voting plans.  Some docket sheets are available in the PACER database beginning in 1985, but not consistently until the early 1990s.  Until the last decade, moreover, few docket sheets included links to complaints or consent decrees, either in CourtLink or in PACER.  The under-inclusiveness of CourtLink and PACER also necessarily affects the study of Section 2 settlements in covered jurisdictions conducted by the National Commission staff.  *Protecting Minority Voters*, *supra*, at 204-08, 239-40, and 251 tbl. 5.

20.  I can think of no plausible reason why district courts in covered jurisdictions, mostly in the South, would have been *more likely* to send information about voting cases to PACER than district courts in the rest of the country.  Counting each jurisdiction equally and rounding to the nearest year, the average jurisdiction covered by Section 5 began reporting to PACER in 1992.  The average non-covered jurisdiction began reporting in 1991.  The average partially

_____

[2] I drew on the personal knowledge of Department of Justice attorneys in determining that two New Mexico cases, *United States v. Chaves County* and *United States v. Roswell Indep. Sch. District*, were settled by changing the method of election in the defendant jurisdictions.

covered jurisdiction began reporting in 1989.  Thus, to the extent that dates at which reporting began reflect the availability of information in PACER, non-covered jurisdictions should be over-represented, if anything.

21.  I found a total of 99 Section 2 settlements in non-covered jurisdictions.  Twenty-four of these cases were in Arkansas alone; thirteen were in California; eleven were in the non-covered counties of Florida; thirteen in the non-covered counties of North Carolina; and the rest scattered around the country.  Evidence concerning 61 of the 99 settlements I found in non-covered jurisdictions (62%) was on the record considered by Congress in adopting the 2006 Reauthorization Act.  *Voting Rights Act: Section 5 of the Act – History, Scope, and Purpose: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 2835-57 (2005), 2835-39; *Voting Rights Act: Evidence of Continuing Need: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 109th Cong. 321-22, 487-91, 500-02, 923-24, 953-54, 1150, 1171-73, 1200-03, 1246, 1252, 1484-85, 1491-92, 1763, 1773-74, 1779, 1782-89, 1794-95, 1875, 1889, 1986, 1999-2000, 4014-15, 4026-35, 4058-59, 4064, 4067-68, 4072-73, 4080-82, 4086, 4099, 4118-21, 4127, 4129, 4133-34, 4138, 4313-25, 4348, 4359-60, 4373, 4384, 4391-92, 4403-04, 4425, 4438, 4451-56, 4462, 4479, 4505-06, 4512-14, 4552, 4564-81, 4583, 4594, 4726, 4731-34, 4747, 5536-5544 (2006).  *See* Attachment B to this declaration.

22.  The 99 settlements in non-covered jurisdictions contrasts with the 587 cases resolved favorably to minority voters in covered jurisdictions found in the National Commission report.[3] Even if the under-inclusiveness of my research protocol led me to find only *half* of the Section 2

---

[3]  Calculated from the numbers in *Protecting Minority Voters*, *supra*, at 251 tbl. 5 (*see* footnote 1, *supra)*.

settlements in non-covered jurisdictions – a hypothetical 194 settlements – there would still be *393 more* settlements resolved favorably for minority voters in areas covered by the preclearance requirements of the Voting Rights Act than in the rest of the country.  Based on my training and experience as a historian and 30 years of experience doing research for voting rights litigation, I am confident that the number of court-ordered settlements in non-covered jurisdictions is unlikely to be greater than twice the number I have identified here.  Furthermore, jurisdictions covered by Section 5 account for less than a quarter of the nation's population, a number that highlights the disparity in court-ordered settlements.  *Id.* at 83.

23.  I have compared the number of Section 2 settlements in non-covered jurisdictions with the consent decrees resulting from the court decision in *Dillard* v. *Crenshaw County*, 640 F. Supp. 1347 (M.D. Ala. 1986), where the trial court enjoined further use of at-large elections in nine Alabama counties, one of which was Shelby County.  The court found, relying in part on my expert testimony, that the *Dillard* plaintiffs had shown a substantial likelihood of prevailing on the merits by producing evidence that the Alabama legislature "has engaged in a pattern and practice of using at-large systems as an instrument of race discrimination."  *Crenshaw County*, 640 F. Supp. at 1361.

24.  The *Dillard* plaintiffs subsequently amended their complaint to add municipalities and local school boards, so that the number of defendants eventually totaled 183.  Of these defendants, 176 entered into interim consent decrees with the plaintiffs.  The parties agreed to have the court deal with 165 of the defendants in separate lawsuits, with separate files and civil action numbers, with the remaining 18 jurisdictions treated as defendants in *Dillard v. Crenshaw County*.  See *Dillard* v. *Baldwin County*, 686 F. Supp. 1459, 1461 (M.D. Ala. 1988).  In short, the number of Section 2 settlements in the *Dillard* litigation alone was 1.8 times as great as the

99 settlements I have identified in non-covered jurisdictions.

Conclusions

25.  Considering cases resolved not only by reported decisions but also by court-ordered settlements gives a more comprehensive picture of the scope of litigation enforcing Section 2 of the Voting Rights Act than simply looking at reported decisions in Westlaw or Lexis.  Once the number of court-ordered settlements is added to the reported decisions, it becomes clear that the vast majority of racially discriminatory election practices ended by enforcement of Section 2 during the past quarter century has taken place in jurisdictions covered by Section 5 of the Act. The pattern is in fact quite stark.

26.  The study of reported decisions by Ellen Katz and law students at the University of Michigan included in the House record identified 64 Section 2 cases in covered jurisdictions in which plaintiffs were successful.  *Documenting Discrimination in Voting*, *supra*, at 974-75.[4]  The National Commission report found 587 cases which it characterized as resolved in a manner favorable to minority voters in covered jurisdictions where there were no reported decisions. *Protecting Minority Voters*, *supra*, tbl. 5.[5]  These cases, some of which were statewide in impact,

---

[4]  While the version of the Michigan study before the House identified 64 Section 2 cases in covered jurisdictions in which minority plaintiffs were successful, and 50 cases in non-covered jurisdictions in which plaintiffs prevailed, the finalized, published version of the study concludes that there were 68 cases with successful outcomes for minority plaintiffs in covered jurisdictions and 55 such cases in non-covered jurisdictions (44.7% of the total).  *See* 39 U. Mich. J.L. Reform 643, 656 (2006).  The list of Section 2 cases identified in the published Michigan study is available at http://sitemaker.umich.edu/votingrights/final_report.  In both the initial and finalized versions of the Michigan study, more than half of all Section 2 cases in which minority plaintiffs prevailed were in covered jurisdictions.

[5]  The National Commission identified 66 reported cases that it characterized as being resolved favorably for plaintiffs, rather than the 64 in the Michigan data on the record before Congress. As noted in Footnote 1, supra, the Commission relied on an interim dataset from the Michigan study.  *See Protecting Minority Voters*, *supra*, tbl. 5.

affected voting practices in 825 counties, parishes, or independent cities covered by Section 5. *Id.*

27.   Looking at jurisdictions not covered by Section 5, the University of Michigan study before the House found only 50 reported cases with outcomes that the authors characterized as favorable for minority voters.  *Documenting Discrimination in Voting*, *supra*, at 974-75.  Even though more than three-fourths of the nation's population lives in non-covered jurisdictions, *id.*, only 50 (44%) of the 114 reported decisions before Congress that were favorable for minority voters came from these non-covered jurisdictions.  Looking at unreported cases, I found only 99 Section 2 settlements in non-covered jurisdictions, as compared with the 587 in areas covered by Section 5 identified in the National Commission report.  *Protecting Minority Voters*, *supra*, tbl. 5.  Evidence regarding 61 of the 99 Section 2 settlements was on the record before Congress. Adding the settlements in covered and non-covered jurisdictions gives a total of 686 successful outcomes in cases without reported decisions, of which 86% fall within jurisdictions covered by Section 5, as demonstrated in the following Table:

|  | Covered Jurisdictions | Non-Covered Jurisdictions | Total |
|---|---|---|---|
| Favorable Reported Decisions | 64       (56%) | 50       (44%) | 114 (100%) |
| Court-Ordered Settlements | 587      (86%) | 99       (14%) | 686 (100%) |
| Total | 651      (81%) | 149      (19%) | 800  (100%) |

28.   Based on the record before Congress when it adopted the 2006 Reauthorization Act, 61 Section 2 cases settled favorably for minority voters in non-covered jurisdictions.  *See* Paragraph 21, *supra*.  According to the National Commission report provided to Congress in 2006, 587 Section 2 lawsuits resulted in favorable outcomes for minority voters in jurisdictions

covered by Section 5.  Thus the record before Congress shows that 91% of all Section 2

unreported cases settled favorably for minority voters were in covered jurisdictions.

29.  Combining all successful outcomes in both reported and unreported cases – including

those on the record before Congress in 2006 and those I have identified in the study reported

here – shows that 81 percent of all successful outcomes in Section 2 cases occurred in covered

jurisdictions. *See* Table in paragraph 28, above.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

15th day of November, 2010.

Peyton McCrary
Peyton McCrary

# ATTACHMENT  A

# CURRICULUM VITAE: PEYTON McCRARY

Historian, U.S. Department of Justice, 1990-        (202) 307-6263 (O)
Civil Rights Division, Voting Section              (202) 307-3961 (FAX)
1800 G Street, N.W, Room 7267
Washington, D.C. 20006                            peyton.mccrary@usdoj.gov

> Principal Functions: Research in connection with voting rights litigation; identifying consultants and expert witnesses to be used in cases; working with attorneys and experts to prepare for direct testimony and cross-examination; supervising the preparation of contracts and processing the reimbursement of consultants and expert witnesses; drafting presentation of factual evidence in memoranda, briefs, and proposed findings of fact; legislative history research.

231 North Fillmore Street                        (703) 527-6278 (H)
Arlington, Virginia  22201                       pmccrary@verizon.net

PERSONAL:    Born, Danville, Virginia, 1943.

EDUCATION:   University of Virginia:    B.A. (Honors), 1965
                                        M.A., History, 1966

             Princeton University:    Ph.D., History, 1972

FIELDS:      Minority Voting Rights; Law and the Political Process;  U.S. History; History of the South; Southern Politics; Civil War and Reconstruction; American Political Parties and Voting Behavior; Theory and Methods of Historical Analysis

ACADEMIC APPOINTMENTS:

Adjunct Professor, George Washington University Law School, Washington, D.C., 2006 -

Eugene Lang Professor [Visiting], Department of Political Science, Swarthmore College, Swarthmore, Pennsylvania, 1998-1999.

Distinguished Scholar, Joint Center for Political and Economic Studies, Washington, D.C., 1987-1988.

Associate Professor of History, 1978-82, Professor of History, 1982-90, University of South Alabama, Mobile, Alabama..

Assistant Professor of History, 1976-1978, Vanderbilt University, Nashville, Tennessee

Instructor, Assistant Professor of History, 1969-1976, University of Minnesota, Minneapolis, Minnesota

BOOK:
*Abraham Lincoln and Reconstruction: The Louisiana Experiment* (Princeton, N.J., Princeton University Press, 1978), 423 pages.  Winner, Kemper Williams Prize, Louisiana Historical Association, 1979.

BOOK CHAPTERS:

"The Law of Preclearance: Enforcing Section 5," co-authored with Christopher Seaman and Richard Valelly, in David Epstein, et.al. (eds.), *The Future of the Voting Rights Act* (New York, Russell Sage Foundation, 2006), 20-37.

"Alabama," co-authored with Jerome A. Gray, Edward Still, and Huey Perry, and "South Carolina," co-authored with Orville Vernon Burton, Terence R. Finnegan, and James W. Loewen, in Chandler Davidson and Bernard Grofman (eds.), *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990* (Princeton, N.J., Princeton University Press, 1994), 38-66, 397-409.  Winner, Richard Fenno Prize, American Political Science Association.

"History in the Courts: The Significance of *City of Mobile v. Bolden*," in Chandler Davidson (ed.), *Minority Vote Dilution* (Washington, D.C., Howard University Press, 1984), 47-65.

LAW REVIEW ARTICLES:

"How the Voting Rights Act Works: Implementation of a Civil Rights Policy, 1965-2005," *South Carolina Law Review*, 57 (Summer 2006), 785-825.

"The End of Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act," co-authored with Christopher Seaman and Richard Valelly, *Michigan Journal of Race & Law*, 11 (Spring 2006), 275-323.  [An unpublished version was printed in *Voting Rights Act: Section 5 Preclearance and Standards: Hearings Before the Subcomm. On the Constitution, H. Comm. On the Judiciary, 109th Cong., 96-181 (2005)(Serial No. 109-69).]*

"Bringing Equality to Power: How the Federal Courts Transformed the Electoral Structure of Southern Politics, 1960-1990," *University of Pennsylvania Journal of Constitutional Law*, 5 (May 2003), 665-708.

"Yes, But What Have They Done to Black People Lately? The Role of Historical Evidence in the Virginia School Board Case," *Chicago-Kent Law Review*, 70 (No. 3, 1994), 1275-1305.

"Keeping the Courts Honest: The Role of Historians as Expert Witnesses in Southern Voting Rights Cases," co-authored with J. Gerald Hebert, *Southern University Law Review*, 16 (Spring 1989), 101-28.

"Discriminatory Intent: The Continuing Relevance of 'Purpose' Evidence in Vote-Dilution Lawsuits," *Howard Law Journal*, 28 (No. 2, 1985), 463-93.

JOURNAL ARTICLES:

"The Struggle for Minority Representation in Florida, 1960-1990," *Florida Historical Quarterly*, 86 (Summer 2007), 93-111.

"Race and Reapportionment, 1962: The Case of Georgia Senate Redistricting," co-authored with Steven F. Lawson, *Journal of Policy History*, 12 (No.3, 2000), 293-320.

"The Dynamics of Minority Vote Dilution: The Case of Augusta, Georgia, 1946-1986," *Journal of Urban History*, 25 (Jan. 1999), 199-225.

"Racially Polarized Voting in the South: Quantitative Evidence from the Courtroom," *Social Science History*, 14 (Winter 1990), 507-31.

"The Party of Revolution: Republican Ideas About Politics and Social Change, 1862-1867," *Civil War History*, 30 (December 1984), 330-50.

"Class and Party in the Secession Crisis: Voting Behavior in the Deep South, 1856-1861," co-authored with Clark Miller and Dale Baum, *Journal of Interdisciplinary History*, VIII (Winter 1978), 429-57.

2

REVIEW ESSAYS:

"Race and Misrepresentation: Review of Maurice T. Cunningham, *Maximization, Whatever the Cost: Race, Redistricting, and the Department of Justice*," H-Net, Feb. 2002.  www.h-net.msu.edu/reviews/showrev.cgi?path=214111015008351.

"Review of David Lublin, *The Paradox of Representation: Racial Gerrymandering and Minority Interest in Congress*," H-Net, May 1998.
www.h-net.msu.edu/reviews/showrev.cgi?path=23313895266679.

"Without Fear and Without Research: Abigail Thernstrom on the Voting Rights Act," co-authored with Pamela S. Karlan, *Journal of Law and Politics*, IV (Spring 1988), 751-77.

"The Political Dynamics of Black Reconstruction," *Reviews in American History*, 12 (March 1984), 51-57.

ENCYCLOPEDIA ARTICLE:

"The Reconstruction Myth," in Charles Reagan Wilson and William Ferris (eds.), *Encyclopedia of Southern Culture* (Chapel Hill, University of North Carolina Press, 1989), 1120-21 [reprinted in Jonathan Birnbaum and Clarence Taylor (eds.), *Civil Rights Since 1787: A Reader on the Black Struggle* (New York, New York University Press, 2000), 150-53.]

BOOK REVIEWS: American Historical Review, Journal of Interdisciplinary History, Journal of Southern History, Social Science History, American Review of Politics.

COURTROOM TESTIMONY AS AN EXPERT WITNESS:

(United States as Amicus Curiae), *SCLC v. Evans*, M.D.Ala. (Montgomery), December 1991.  [Challenge to the method of electing certain circuit judges in Alabama]

(Plaintiffs), *Vereen v. Ben Hill County*, M.D.Ga. (Macon), December 1989.  [Challenge to the state law requiring appointment of county school boards by the local grand jury, as applied in more than a dozen counties]

(Plaintiffs), *Hall v. Holder*, M.D.Ga. (Macon), December 1989.
[Challenge to the sole commissioner form of government in Bleckley County, Georgia.

(Plaintiffs), *Irby v. Fitzhugh*, E.D.Va. (Richmond), June 1988.
[Challenge to the appointment of all school boards in the Commonwealth of Virginia]

(Plaintiffs), *Dillard v. Crenshaw County, et.al.*, M.D.Ala. (Montgomery), Preliminary Injunction Hearing, March 1986.  [Challenge to the at-large election of public officials in more than 180 Alabama counties, municipalities, and school boards]

(Plaintiffs), *Whitfield v. Clinton*, E.D.Ark. (Helena), March 1988.  [Challenge to the use of the statewide majority vote requirement in Phillips County, Arkansas]

(Plaintiffs), *Dent v. Culpepper*, M.D.Ga. (Macon), Preliminary Injunction Hearing, November 1987.
[Challenge to the at-large election of the City Commission in Cordele, Georgia]

(Plaintiffs), *Jackson v. Edgefield County, School District*, D.S.C. (Columbia), April 1986.  [Challenge to the at-large election of the Edgefield County School Board]

3

(Plaintiffs), *Harris v. Graddick*, M.D.Ala. (Montgomery), February 1985.  [Challenge to the procedures by which election officials are selected and elections conducted in Alabama]

(Plaintiffs), *Woods v. Florence*, N.D.Ala. (Birmingham), August 1984.  [Challenge to the method of appointing the Jefferson County Personnel Board]

(Plaintiffs), *Collins v. City of Norfolk*, E.D.Va. (Norfolk), May 1984.  [Challenge to the at-large election of the Norfolk City Council]

(United States), *County Council of Sumter County, S.C. v. U.S.*, D.D.C., February 1983.  [Defense of Section 5 Objection to the at-large election of the Sumter County Council]

(United States), *U.S. v. Dallas County Commission*, S.D.Ala. (Selma), October 1981.  [Challenge to the at-large election of the Dallas County Commission]

(Plaintiffs), *Bolden v. City of Mobile*, S.D.Ala. (Mobile), May 1981.  [Challenge to the at-large election of the Mobile City Commission]

(Plaintiffs), *Brown v. Board of School Commissioners of Mobile County*, S.D.Ala. (Mobile), April 1981.  [Challenge to the at-large election of the Mobile County School Board]

SWORN WRITTEN TESTIMONY AS AN EXPERT WITNESS:

(United States as Defendant-Intervenor) July 31, 1996, *Cook v. Marshall County, Mississippi, and United States*, C.A. No. 3:95 CV 155-D-A, N.D. Miss. [Defense of Marshall County's redistricting plan]

(United States as Defendant-Intervenor) July 19, 1994, *Hays v. State of Louisiana*, C.A. No. 92-1522S, W.D. La. (Shreveport).  [Defense of Louisiana's congressional redistricting plan]

(United States) March 25, 1991, *State of Georgia v. Thornburg* C.A. No. 90-2065, D.D.C.  [Defense of Section 5 Objection to the method of electing certain superior court judges in Georgia]

(Plaintiffs) January 20, 1988, *Irby v. Fitzhugh*, C.A. No. 87-0633-R, E.D.Va. (Richmond).  [Challenge to the appointment of all school boards in the Commonwealth of Virginia]

(United States) June 25, 1984, *U.S. v. Halifax County, N.C.*, C.A. No. 83-88-CIV-8, E.D.N.C. (Wilson).  [Challenge to the at-large election of the Halifax County Commission]

(Plaintiffs) April 22, 1983, *Wilson v. Powell*, C.A. No. 383-14, S.D.Ga. (Dublin).  [Challenge to the appointment of the Johnson County School Board by the county grand jury]

(United States) September 28, 1982, *County Council of Sumter County, S.C. v. U.S.*, C.A. No. 82-0912, D.D.C.  [Defense of Section 5 Objection to the at-large election of the Sumter County Council]

CONGRESSIONAL TESTIMONY:

"Written Testimony of Dr. Peyton McCrary," in *Extension of the Voting Rights Act: Hearings Before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, U.S. House of Representatives*, 97th Cong., 1st Sess., Serial No. 24 (3 vols., Washington, D.C., G.P.O., 1982), III, 2749-76.

"Testimony Before the Subcommittee of National Parks and Public Lands, Committee on the Interior, U.S. House of Representatives, June 14, 1988.

4

UNPUBLISHED CONFERENCE PAPERS:

"From *Gomillion v. Lightfoot* to *City of Pleasant Grove v. United States*: Annexations, De-annexations, and the Voting Rights Act." Constitution Day Conference, San Francisco State University, September 2010.

"Two Kinds of Vote Dilution: From *Baker v. Carr* to *White v. Regester*." Organization of American Historians, April 2010.

"How the Voting Rights Act Works: Implementation of a Civil Rights Policy, 1965-2005," University of South Carolina School of Law, October 2005; [revised version, Southern Historical Association, November 2005].

"Bringing Equality to Power: Federal Courts and the Transformation of Southern Electoral Politics, 1960-2000." Organization of American Historians, April 2002.

"Why the Voting Rights Act Worked: A Judicial Model of Policy Implementation." Social Science History Association, October 1997; [revised version, Association of Public Policy Analysis and Management, November 1997].

"Yes, But What Have They Done to Black People Lately? The Role of Historical Evidence in the Virginia School Board Case." Southern Historical Association, November 1992.

"The Impact of the Voting Rights Act in Alabama," co-authored with Jerome Gray, Edward Still, and Huey Perry.  American Political Science Association, 1989 [revised version presented at a Conference on the Impact of the Voting Rights Act, Rice University, Houston, Texas, May 1990].

"Taking History to Court: The Issue of Discriminatory Intent in Southern Voting Rights Cases."  Joint Center for Political and Economic Studies, Washington, D.C., June 13, 1988.

"Keeping the Courts Honest: Expert Witnesses in Voting Rights and School Desegregation Cases," co-authored with J. Gerald Hebert.  Southern Historical Association, November 1986.

"Discriminatory Intent: The Continuing Relevance of 'Purpose' Evidence in Vote-Dilution Lawsuits." Conference on Voting Rights Law, Howard University School of Law, Washington, D.C., January 1985.

"The Subtle Gerrymander: Discriminatory Purposes of At-large Elections in the South, 1865-1982." Organization of American Historians, April 1983.

"The Party of Revolution: Republican Ideas About Politics and Social Change, 1861-1868."  Southern Historical Association, November 1980.

"After the Revolution: American Reconstruction in Comparative Perspective." American Historical Association, December 1979.

"The Civil War Party System, 1854-1876: Toward a New Behavioral Synthesis?" Southern Historical Association, November 1976.

CHAIRPERSON, PANELIST, OR COMMENTATOR:

Alabama Association of Historians, 1983.
Alabama Department of Archives and History, 1988.
American Political Science Association, 1987, 2003.
Brookings Institution, 1990.

5

National Association of Secretaries of State, 1983.
Organization of American Historians, 1979, 1995.
Social Science History Association, 1981, 1987, 1996, 1997, 1999.
Southern Historical Association, 1973, 1985.
University of Alabama, 1983.
University of Utah, 2007.

ACADEMIC REFEREE:

Book-length manuscripts: Princeton University Press, University of North Carolina Press, University of Tennessee Press, University of Alabama Press, Louisiana State University Press, University of Georgia Press.

Article-length manuscripts: Journal of American History, American Historical Review, Sociological Spectrum, Gulf Coast Historical Review, Social Science History.

CONSULTANT:

Test Design: College Board Achievement Test, American History; Educational Testing Service, Princeton, N.J., 1979-1983

Archival: Re-organization of Section 5 Objection Files, Civil Rights Division/Voting Section, U.S. Department of Justice, Washington, D.C., January-July, 1989.

Litigation Research: Civil Rights Division/Voting Section, U.S. Department of Justice, Washington, D.C., August 1989 to August 1990.

FELLOWSHIPS AND GRANTS:

John D. and Catherine T. MacArthur Foundation, 1987-1988: Distinguished Scholar, Joint Center for Political and Economic Studies, Washington, D.C.

American Philosophical Society, 1983: Research Travel Grant.

Rockefeller Foundation, 1982-1983: Research Fellowship.

Carnegie Corporation of New York, 1982-1983: Research Fellowship.

National Endowment for the Humanities, 1980: Summer Research Stipend.

University of South Alabama, 1978-1987: Faculty Research Grants; Research Council Grant.

Vanderbilt University, 1976-1978: Manuscript Preparation Grant.

University of Minnesota, 1969-1976: Faculty Research Grants.

Princeton University, 1966-69: University Fellow; Herbert Osgood Fellow; NDEA Fellow.

University of Virginia, 1961-1966: Echols Scholar; Du Pont Scholar; Ford Foundation Fellow.

# ATTACHMENT  B

**Attachment B: Section 2 Cases Settled by Consent Decrees in Non-Covered Jurisdictions**

The following *99* cases are confirmed Section Two settlements in non-covered jurisdictions.

The *61* settlements in Section 2 cases listed in bold are identified in the record of congressional hearings.  Citations are to the following hearing volumes: *Voting Rights Act: Section 5 of the Act – History, Scope, and Purpose: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 2835-57 (2005) [hereinafter *History, Scope, and Purpose*]; *Voting Rights Act: Evidence of Continuing Need: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 109th Cong. 104-289 (2006) [hereinafter *Evidence of Continuing Need*].

Settlements in cases that had minority language claims under Section 203 or 4(e) as well as Section 2 claims are listed in italics.  Because these cases are identified in the record of congressional hearings, they are also listed in bold.

Where a civil action number is unknown, the date of filing is listed in brackets.

## <u>Arkansas</u> (24)

United States v. Mississippi County, E.D. Ark. [10-15-1986]

Townsend, et al v. Watson, 1:89cv1111 (W.D. Ark. 1998)

James v. Snowden, 2:89cv54 (E.D. Ark. 1990)

Hunt v. Arkansas, 5:89cv406 (E.D. Ark. 1991)

Baxter v. Smith, 5:89cv416 (E.D. Ark. 1990)

Blunt v. Knight, 5:89cv417 (E.D. Ark. 1991)

**U.S. v. City of Magnolia,** W.D. Ark. [4-26-1990] [*History, Scope, and Purpose*, **2837**]

Penn v. Hazen Education Bd., 4:90cv793 (E.D. Ark. 1991)

Teal v. Womack, 5:90cv364 (E.D. Ark. 1990)

Hill v. Rochelle, 5:90cv602 (E.D. Ark. 1992)

Bell, et al v. Galloway, 6:90cv6089 (W.D. Ark. 1991)

Jones v. City of Camden, 1:91cv1110 (W.D. Ark. 1992)

Govan v. Huttig School District, 1:91cv1153 (W.D. Ark. 1993)

Reed v. Coles, 2:91cv12 (E.D. Ark. 1991)

Henderson v. Pickens, 4:91cv4025 (W.D. Ark. 1992)

Brown v. Grumbles, 5:91cv628 (E.D. Ark. 1993)

Childs v. Diemer, 5:91cv646 (E.D. Ark. 1993)

Jones v. City of Lonoke, 4:92cv539 (E.D. Ark. 1992)

Kemp, et al v. Hope Ar, City Of, et al., 4:92cv4124 (W.D. Ark. 1993)

Montgomery v. Mcgehee School District, 5:92cv18 (E.D. Ark. 1993)

Montgomery v. City of Mcgehee, 5:92cv25 (E.D. Ark. 1992)

Norman v. Dumas School District, 5:92cv345 (E.D. Ark. 1993)

Gordon v. City of Hot Springs, 6:93cv6070 (W.D. Ark. 1993)

Cox v. Donaldson, 5:02cv319 (E.D. Ark. 2003)

**<u>California</u>** **(13)**

**United States v. City of Los Angeles**, C.D. Cal. [11-26-1985] [*History, Scope, and Purpose*, **2836**]

Reyes v. Alta Hosp. Dist., No. 1:90cv620 (E.D. Cal.)

Reyes v. City of Dinuba, No. 1:91cv168 (E.D. Cal.)

Espino v. Cutler-Orosi Unified Sch. Dist., No. 1:91cv169 (E.D. Cal.)

Reyes v. Dinuba Elementary Sch. Dist., No. 1:91cv170 (E.D. Cal.)

Elizondo v. Dinuba Joint Union High School, No. 1:91cv171 (E.D. Cal.)

Martinez v. City of Bakersfield, No. 1:91cv590 (E.D. Cal.)

Mendoza v. Salinas Valley Mem. Hosp., No. 5:92cv20462 (E.D. Cal.)

***United States v. Alameda County***, N.D. Cal. [4-13-1995] – Also a Sec. 203 Case [*History, Scope, and Purpose*, **2838**]

Garcia v. City of Los Angeles, No. 2:96cv7661 (C.D. Cal.)

**United States v. City of Santa Paula**, No. 2:00cv3691 (C.D. Cal.) [*History, Scope, and Purpose*, **2838**]

**United States v. Upper San Gabriel Valley Municipal Water District**, No. 2:00cv7903 (C.D. Cal.) [*History, Scope, and Purpose*, **2838**]

Common Cause v. Jones, No. 2:01cv3470 (C.D. Cal.)

<u>Colorado</u> **(1)**

Martinez v. Romer, No. 1:91cv1972 (D. Colo.)

<u>Connecticut</u> **(1)**

**Bridgeport Coalition for Fair Representation v. City of Bridgeport**, No. 3:93cv1476 (D.Conn.). [*Evidence of Continuing Need*, **4064, 4067-68**]

<u>Florida</u> **(11)**

**Williams v. City of Leesburg**, No. 83-66-CIV-OC-14 (M.D. Fla. 1985).  [*Evidence of Continuing Need*, **1484**]

**Madison Co. Chapter NAACP v. Madison County**, No. TCA-84-7234 (M.D. Fla. 1986)[*Evidence of Continuing Need*, **1484**]

**Potter v. Washington County**, 653 F. Supp. 121 (N.D. Fla. 1986) [*Evidence of Continuing Need*, **1484, 4565**]

**Bradford Co. Branch NAACP v. Bradford Co. School Board**, No. 86-4-CIV-J-12 M.D.Fla.1986). [*Evidence of Continuing Need*, **1484-85**]

**Bradford Co. Branch NAACP v. Bradford Co. Commissio**n, No. 86-4-CIV-J-14 (M.D.Fla.1986). [*Evidence of Continuing Need*, **1484-85**]

**Tallahassee Branch NAACP v. Leon County**, 827 F.2d 1436 (11th Cir. 1987). [*Evidence of Continuing Need*, **1484, 4566**]

**Coleman v. Fort Pierce City Council**, No. 2:92cv14157 (S.D. Fla.) [*Evidence of Continuing Need*, **487-91**]

**Anderson v. West Palm Beach City**, No. 9:94cv8135 (S.D. Fla.) [*Evidence of Continuing Need*, **500-02**]

**George v. City of Cocoa**, No. 6:93cv257 (S.D. Fla.). [*Evidence of Continuing Need*, **477-81, 4575**]

**NAACP v. Harris**, No. 1:01cv120 (S.D. Fla.) [*Evidence of Continuing Need,* **1200-03, 1491-92**]

***United States v. Osceola County*, Fla**., M.D. Fla. [6-28-2002] – Also a Sec. 203 Case  [*Evidence of Continuing Need,* **4581;** *History, Scope, and Purpose, **2839***]

<u>**Illinois**</u> **(2)**

Banks v. City of Peoria, No. 2:87cv2371 (C.D. Ill.)

**Black v. McGuffage**, No. 1:01cv208 (N.D. Ill.). [*Evidence of Continuing Need,* **4462, 4348**]

<u>**Indiana**</u> **(3)**

**Dickinson v. Indiana State Election Bd**., 817 F. Supp. 737 (S.D. Ind. 1992). [*Evidence of Continuing Need,* **4359-60**]

Anderson v. Morgan, No. 1:94cv1447 (S.D. Ind.)

**Hines v. Marion Co. Election Bd**., 166 F.R.D. 402 (S.D. Ind. 1995).  [*Evidence of Continuing Need,* **4359**]

<u>**Maryland**</u> **(3)**

**United States v. City of Cambridge**, D. Md. [12-5-1984]. [*Evidence of Continuing Need,* **5540;** *History, Scope, and Purpose*, **2836**]

**United States v. Dorchester County**, D. Md. [12-5-1984] [*History, Scope, and Purpose*, **2836**]

Conaway v. Maryland, No. 1:90cv610 (D. Md.)

<u>**Massachusetts**</u> **(2)**

***United States v. City of Lawrence***, D. Mass. [11-5-1998] – Also Sec. 203 [*Evidence of Continuing Need,* **4072-73, 4080**; *History, Scope, and Purpose, **2838***]

***United States v. City of Boston***, No. 05-11598 (D. Mass. 2005) – Also Sec. 203 [*History, Scope, and Purpose*, **2839**]

<u>**Michigan**</u> **(1)**

**United States v. City of Hamtramck**, No. 2:00-73541 (E.D. Mich.)  [*Evidence of Continuing Need,* **321-22, 4373;** *History, Scope, and Purpose*, **2838**]

**Missouri (1)**

**Rojas v. Moriarty**, 1994 Lexis 4033 (W.D. Mo. 1994) [*Evidence of Continuing Need,* **4384**]

**Montana (3)**

**Matt v. Ronan School District**, No. 99-94 (D. Mont.) [*Evidence of Continuing Need,* **1150, 1252**]

**Alden v. Bd. of County Comm'rs of Rosebud County**, 1:99cv148 (D. Mont.) [*Evidence of Continuing Need,* **1150, 1246**]

**United States v. Roosevelt County**, No. 1:00cv50 (D. Mont.) [*History, Scope, and Purpose,* **2838**]

**New Jersey (1)**

**United States v. Passaic City and Passaic County**, D.N.J. [6-2-1999] – Also Sec. 203, 208 [*Evidence of Continuing Need,* **4133-34, 4138,** *History, Scope, and Purpose,* **2838**]

**New Mexico (7)**

**United States v. Chaves County**, D.N.M. [1-10-1985] [*History, Scope, and Purpose,* **2836**]

**United States v. Roswell Independent School District**, D.N.M. [3-12-1985] [*History, Scope, and Purpose,* **2836**]

**United States v. McKinley County**, No. 86-0028 (D.N.M.1986) – Also Sec. 203 [*Evidence of Continuing Need,* **4026-28, 4035;** *History, Scope, and Purpose,* **2836**]

**United States v. State of New Mexico and Sandoval County**, No. 88-1457 (D.N.M. 1990) – Also Sec. 203 [*Evidence of Continuing Need,* **4029-30, 4035;** *History, Scope, and Purpose,* **2837**]

**United States v. Cibola County**, No. 93-1134 (D.N.M. 2004) – Also Sec. 203 [*Evidence of Continuing Need,* **4033-35;** *History, Scope, and Purpose,* **2837**]

**United States v. Socorro County**, No. 93-1244 (D.N.M. 1994) – Also Sec. 203 [*Evidence of Continuing Need,* **4030-31;** *History, Scope, and Purpose,* **2837**]

**United States v. Bernalillo County**, No. 98-156 (D.N. M. 1998) [*History, Scope, and Purpose,* **2838**]

**New York** (3)

**United Parents Association v. Bd. Of Elections**, No. 89 CIV 0612 (E.D.N.Y.)  [*Evidence of Continuing Need,* **1889**]

Arbor Hill Concerned Citizens Neighborhood Ass'n, No. 1:03cv502 (N.D.N.Y.)

Montano v. Suffolk County Legislature, No. 2:03cv1506 (E.D.N.Y.)

**North Carolina** (13)

**NAACP v. City of Statesville**, 606 F. Supp. 569 (W.D.N.C. 1985) [*Evidence of Continuing Need,* **1763, 1785-86**]

**NAACP v. Forsyth County**, No. 6:86cv803 (M.D.N.C.) [*Evidence of Continuing Need,* **1764, 1787**]

**NAACP v. City of Thomasville**, No. 4:86cv291 (M.D.N.C. 1987) [*Evidence of Continuing Need,* **1764, 1786**]

**NAACP of Stanley Co. v. City of Albemarle**, No. 4:87cv468 (M.D.N.C.) [*Evidence of Continuing Need,* **1784**]

**NAACP v. Richmond County**, No. 3:87cv484 (M.D.N.C.) [*Evidence of Continuing Need,* **1788**]

**NAACP v. Duplin Co.**, No. 88-5-CIV-7 (E.D.N.C.) [*Evidence of Continuing Need,* **1786**]

**Hall v. Kennedy**, No. 88-117-CIV-3 (E.D.N.C.) [*Evidence of Continuing Need,* **1773-74**]

**Johnson v. Town of Benson**, No. 88-240-CIV-5 (E.D.N.C.) [*Evidence of Continuing Need,* **1779**]

**Patterson v. Siler City**, No. C-88-701 (M.D.N.C.) [*Evidence of Continuing Need,* **923-24**]

**Sewell v. Town of Smithfield**, No. 89cv360 (E.D.N.C.) [*Evidence of Continuing Need,* **1794**]

**Montgomery County Branch of the NAACP v. Montgomery County**, No. 3:90cv27 (M.D.N.C.) [*Evidence of Continuing Need,* **1782-83**]

**NAACP v. Rowan-Salisbury Bd. of Educ.**, No. 4:91cv293 (M.D.N.C.) [*Evidence of Continuing Need,* **1789**]

**Rowsom v. Tyrrell County Bd. of Comm'rs**, No. 2:93cv33 (E.D.N.C.) [*Evidence of Continuing Need,* **953-54**]

**North Dakota (1)**

**United States v. Benson County**, D.N.D. [3-6-2000] [*History, Scope, and Purpose*, **2838**]

**Pennsylvania (1)**

***United States v. Berks County***, E.D. Pa. [2-25-2003] – Also Sec. 4(e), 208 [*Evidence of Continuing Need*, **4118, 4120-21, 4127;** *History, Scope, and Purpose*, **2839**]

**Rhode Island (1)**

**Metts v. Almond**, No. 1:02cv204 (D.R.I.) [*Evidence of Continuing Need*, **4081-82, 4086**]

**Utah (1)**

***United States v. San Juan County***, No. C-83-1286 (D. Utah, 1984) – Also Sec. 203 [*Evidence of Continuing Need*, **4058-59;** *History, Scope, and Purpose*, **2835**]

**South Dakota (4)**

**Buckanaga v. Sisseton Independent School District, South Dakota**, 804 F.2d 469 (8th Cir. 1986) [*Evidence of Continuing Need*, **1999, 4514, 4731**]

**United States v. Day County and Enemy Swim Sanitary Dist.**, No. 1:99cv1024 (D.S.D.) [*Evidence of Continuing Need*, **2000, 4403-04, 4425;** *History, Scope, and Purpose*, **2838**]

**Weddell v. Wagner Community School District**, No. 4:02-4056 (D.S.D.) [*Evidence of Continuing Need*, **1172-73**]

**Kirkie v. Buffalo County**, No. 3:03cv3011 (D.S.D.) [*Evidence of Continuing Need*, **1171-72, 4734**]

**Tennessee (2)**

**United States v. City of Memphis**, W.D. Tenn. [2-15-1991] [*History, Scope, and Purpose*, **2838, 2837**]

**United States v. Crockett County**, No. 1:01cv1129 (W.D. Tenn.) [*History, Scope, and Purpose*, **2839**]