IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHELBY COUNTY, ALABAMA, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. |
| ERIC H. HOLDER, Jr., in his official capacity as Attorney General of the United States, | ) 1:10-cv-00651-JDB |
| Defendant | ) |

**DEFENDANT'S STATEMENT OF UNCONTESTED MATERIAL FACTS**

RONALD C. MACHEN, JR.
  United States Attorney
  District of Columbia

THOMAS E. PEREZ
  Assistant Attorney General

SAMUEL R. BAGENSTOS
JULIE A. FERNANDES
  Deputy Assistant Attorneys General

T. CHRISTIAN HERREN, JR.
DIANA K. FLYNN
RICHARD DELLHEIM (lead counsel)
LINDA F. THOME
ERNEST A. MCFARLAND
JARED M. SLADE
JUSTIN WEINSTEIN-TULL
  Civil Rights Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, N.W.
  NWB-Room 7264
  Washington, D.C. 20530
  Telephone: (202) 305-1734
  Facsimile: (202) 307-3961

Pursuant to Local Civil Rule 7(h)(1), Defendant Attorney General of the United States submits the following statement of material facts as to which the United States contends there is no genuine issue.

Plaintiff's Background Information

1. Plaintiff, Shelby County, is a county in the State of Alabama. *See* Compl. ¶ 2 (Dkt. 1).

2. Shelby County is located just south of Alabama's largest county (Jefferson County) and the State's largest municipality (Birmingham). A portion of the City of Birmingham is located within Shelby County. *See* Declaration of Dr. Peyton McCrary ("McCrary Decl.") ¶ 8 (Ex. 1).

3. According to the 2000 Census, Shelby County had a total population of 143,293, including 126,951 white (88.6%), 10,570 African American (7.4%), 2,910 Hispanic (2.0%), and 1,465 Asian (1.0%). *See* McCrary Decl. ¶ 9 (Ex. 1).

4. According to the 2006-2008 Census American Community Survey (ACS) estimates, Shelby County's population is 183,014, including 153,649 white (84.0%), 17,621 African American (9.6%), 6,674 Hispanic (3.6%), and 2,894 Asian (1.6%). *See* McCrary Decl. ¶ 10 (Ex. 1).

5. Shelby County's population has grown dramatically since the 2000 Census (an increase of 39,721 persons or 27.7% from its 2000 population). *See* McCrary Decl. ¶ 11 (Ex. 1).

Plaintiff's Section 5 History and Voting Rights Litigation

6. The State of Alabama became wholly covered by the temporary provisions of the Voting Rights Act, based on a coverage determination made by the Attorney

General and the Director of the Census dated August 7, 1965, and published in the Federal Register on August 7, 1965. *See* 30 Fed. Reg. 9897 (Aug. 7, 1965).

7. The State of Alabama and all of its political subunits, such as Shelby County, must receive administrative or judicial preclearance under Section 5 of the Voting Rights Act for all changes affecting voting enacted or implemented after November 1, 1964. *See* 28 C.F.R. part 51, Appendix.

8. At least 31 subjurisdictions located in whole or in part in Shelby County have submitted voting changes for administrative review under Section 5. *See* Declaration of Robert S. Berman ("Berman Decl.") ¶ 3 (Ex. 2).

9. Since Shelby County was first required to comply with Section 5, the Department of Justice has received at least 682 submissions for review involving Shelby County or jurisdictions located in whole or in part in Shelby County. *See* Berman Decl. ¶ 4 (Ex. 2). Of the 682 submissions, 291 were received from 19 jurisdictions located wholly within Shelby County. *See* Id.

10. The Attorney General has received at least 69 submissions for Section 5 review on behalf of Shelby County. *See* Berman Decl. ¶ 5 (Ex. 2).

11. On April 8, 2010, the Department informed county officials that no objection would be interposed to Shelby County's most recent submission, a polling place change. *See* Berman Decl. ¶ 6 (Ex. 2).

12. Section 5 submissions from the Cities of Birmingham, Calera, Chelsea, and Helena, all subjurisdictions located in whole or in part in Shelby County, are currently pending the Attorney General's administrative review. *See* Berman Decl. ¶ 7 (Ex. 2).

13. The Attorney General has interposed five objections to changes affecting voting in jurisdictions wholly or partially contained within Shelby County: a July 7, 1975, objection to six annexations to the City of Alabaster; a December 27, 1977, objection to two annexations to the City of Alabaster; a May 4, 1987, objection to annexations to the City of Leeds; an August 16, 2000, objection to the designation of two annexations to Ward 1 of the City of Alabaster (at the same time 42 annexations adopted between 1992 and 2000 were precleared); and an August 25, 2008, objection to 177 annexations, their designation to districts, and a redistricting plan for the City of Calera. *See* Berman Decl. ¶ 8 (Ex. 2).

14. Shelby County and some jurisdictions within the County, including the City of Calera, were defendants in statewide litigation under Section 2 of the Voting Rights Act filed in the late 1980s. *See Dillard v. Crenshaw Cnty.*, 748 F. Supp. 819 (M.D. Ala. 1990); *Dillard v. City of Calera*, No. 2:87 cv 1167, 2007 WL 1607656 (M.D. Ala. May 9, 2007).

15. The *Dillard* litigation initially challenged at-large election systems used to elect county commissioners in nine Alabama counties. *See Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347 (M.D. Ala. 1986).

16. The case later was expanded to include 183 counties, cities, and county school boards throughout the State of Alabama. *See Dillard v. Baldwin Cnty.*, 686 F. Supp. 1459, 1461 (M.D. Ala. 1988).

17. The district court in *Dillard* found that the Alabama legislature had adopted the at-large voting systems for the counties with the intent to deprive black citizens of

their voting rights.  *See Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1356-1360 (M.D. Ala. 1986).

18. The *Dillard* court found that in the 1950's and 1960's, the Alabama legislature took a number of actions to discriminate against African-American voters in response to the Supreme Court's decision in *Smith v. Allwright*, 341 U.S. 649 (1944) (striking down the all-white primary), and to the enactment of federal voting rights legislation.  These legislative actions included authorizing counties to switch from single-member districts to at-large voting, prohibiting single-shot voting in municipal, at-large elections, and requiring numbered posts in at-large elections.  640 F. Supp. at 1356-1357, 1359.

19. In 1990, both Shelby County and the City of Calera resolved the claims against them in the *Dillard* litigation by entering into consent decrees providing for elections from single-member districts.  *See Dillard v. Crenshaw Cnty.*, 748 F. Supp. at 822; *Dillard v. City of Calera*, 2007 WL 1607656.

20. In 2007, both cases were dismissed after the State enacted legislation providing state-law authority for the voting changes.  *Dillard v. City of Calera*, 2007 WL 1607656; *Dillard v. Crenshaw Cnty.*, No. 2:85cv1332-MHT, 2007 WL 4289862 (M.D. Ala. Oct. 1, 2007).

21. On March 13, 2008, the City of Calera, a subjurisdiction of Shelby County, submitted a redistricting plan, along with 177 annexations that the City adopted between 1995 and 2007 but had not previously submitted, and their designation to districts to the Attorney General for administrative review under Section 5.  *See* Berman Decl. ¶ 9 (Ex. 2).  That redistricting plan eliminated the only majority-

        black single-member district in the City, a district that had been adopted pursuant to the City's consent decree in *Dillard*. *See* Letter dated August 25, 2008, Attachment A to Berman Decl. (Ex. 2).

22. On August 25, 2008, the Attorney General objected to the voting changes occasioned by the City of Calera's proposed redistricting plan and 177 annexations. *See* Berman Decl. ¶ 10 (Ex. 2) and Attachment A, thereto.

23. Citing *City of Rome*, the Attorney General concluded that the City of Colera had failed in its obligation to provide reliable, current population data to enable proper examination of the effect of the annexations and the redistricting plan, and that the City had failed to consider alternatives to the redistricting plan that would have provided African-American voters a better opportunity to elect a candidate of their choice. *See* Letter dated August 25, 2008, Attachment A to Berman Decl. (Ex. 2).

24. On November 17, 2008 and March 24, 2009, the Attorney General denied the City of Calera's requests to withdraw his objections. *See* Berman Decl. ¶ 14 (Ex. 2) and Attachments D and E thereto (Letters dated Nov. 17, 2008 and Mar. 24, 2009).

25. Despite the Attorney General's objection, the City of Calera conducted an election on August 26, 2008 and a runoff election on October 7, 2008, using the objected to redistricting plan and including the electorate of the objected-to 177 annexations. *See United States v. City of Calera*, CV-08-BE-1982-S (N.D. Ala. 2008); Berman Decl. at ¶ 11 (Ex. 2) and Attachment C thereto, at 4 (Oct. 29, 2008

Consent Decree in *United States v. City of Calera*, CV-08-BE-1982-S (N.D. Ala. 2008)).

26. The August 26 and October 7, 2008, elections in the City of Calera resulted in the defeat of the lone African-American member of the City Council. *See* Attachment D to Berman Decl. (Ex. 2), at 4 (Oct. 29, 2008 Consent Decree).

27. On October 24, 2008, the United States filed an action against the City of Calera under Section 5 seeking to enjoin further implementation of changes affecting voting that had not received the requisite Section 5 determination. *United States v. City of Calera*, CV-08-BE-1982-S (N.D. Ala. 2008); s*ee* Berman Decl. ¶ 12 (Ex. 2) and Attachment B thereto (Complaint, *United States v. City of Calera*, CV-08-BE-1982-S (N.D. Ala. 2008)).

28. On October 29, 2008, the court temporarily resolved this City of Calera matter through a consent decree that provided for an interim change in the method of election to an interim limited voting election plan, pending the results of the 2010 Census, and for a new special municipal election. *See* Berman Decl. ¶ 13 (Ex. 2) and Attachment C thereto.

29. On September 25, 2009, after the adoption of the interim limited voting election plan, the Attorney General withdrew his objection to the 177 annexations to the City of Calera and also informed city officials that no objection would be interposed to the city's proposed interim voting plan for the 2009 municipal election in Calera. The Attorney General's September 25, 2009, letter did not, however, withdraw his objection to the 2008 redistricting plan or the designation

of annexations to districts. *See* Berman Decl. ¶ 15 (Ex. 2) and Attachment F thereto (Letter dated September 25, 2009).

30. According to the Congressional Record, with regard to voting changes submitted by the State of Alabama and subjurisdictions therein between 1982 and 2004, the Attorney General has interposed 46 objections including objections to a state legislative redistricting plan, a congressional redistricting plan, and three other statewide enactments. *Appendix* to *Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess. 259-260 (2006) (*H. Appx.*).

**Section 5 Process**

31. The Attorney General endeavors to comply with Congress's intent that the administrative review of voting changes submitted to him or her pursuant to Section 5 be an efficient, convenient, and affordable alternative to seeking a declaratory judgment from a three-judge court in the United States District Court for the District of Columbia. *See* Berman Decl. ¶ 16 (Ex. 2).

32. To that end, the Attorney General has a long-standing policy of providing information to covered jurisdictions concerning the administrative review process by publishing the Procedures for the Administration of Section 5 of the Voting Rights Act of 1965 in the Code of Federal Regulations. 28 C.F.R. part 51. These procedures were first promulgated in 1971. 36 Fed. Reg. 18186 (Sept. 10, 1971), and are revised when necessary. *See, e.g.*, 75 Fed. Reg. 332050 (June 10, 2010). *See* Berman Decl. ¶ 17 (Ex. 2).

33. The Attorney General also has created a website that provides information concerning the Section 5 process (http://www.usdoj.gov/crt/voting/).  *See* Berman Decl. ¶ 18 (Ex. 2).

34. Section 5 allows submissions to be made by the "chief legal officer" or "other appropriate official" of a jurisdiction.  42 U.S.C. 1973c.

35. The Attorney General's procedures likewise provide that submissions can be made by the "chief legal officer," "other appropriate official of the submitting authority," or "any other authorized person on behalf of the submitting authority."  28 C.F.R. § 51.23.

36. The Attorney General provides a toll-free telephone number for submitting officials to contact Department of Justice staff members, who are available to guide those officials through the submission process.  *See* Berman Decl. ¶ 19 (Ex. 2).

37. The Attorney General's procedures have always provided covered jurisdictions the ability to request expedited consideration of voting changes.  28 C.F.R. § 51.34  The Attorney General makes every effort to accommodate covered states and local jurisdictions that experience emergencies prior to elections that require expedited consideration of voting changes.  Situations calling for expedited consideration can include events such as fires or natural disasters that affect which polling places can be used in an election, or pre-election litigation that threatens to stop the conduct of an election.  In appropriate circumstances the Attorney General has made determinations within 24 hours or less of receipt of a submission.  *See* Berman Decl. ¶ 20 (Ex. 2).

38. The Attorney General also allows covered jurisdictions the option of sending Section 5 submissions by overnight delivery. Shelby County availed itself of this option in a 2007 submission, which the jurisdiction sent by overnight delivery to the Attorney General. *See* Berman Decl. ¶ 21 (Ex. 2).

39. For some years, the Department has allowed jurisdictions to make submissions and submit additional information on pending Section 5 submissions by telefacsimile. Shelby County availed itself of these options in 2004 and 2007, respectively, when it faxed a submission and additional information on a pending Section 5 submission to the Attorney General. *See* Berman Decl. ¶ 22 (Ex. 2).

40. The Attorney General allows jurisdictions to make Section 5 submissions through a web-based application (http://wd.usdoj.gov/crt/voting/sec_5/evs/). *See* Berman Decl. ¶ 23 (Ex. 2).

41. The Attorney General allows jurisdictions to submit additional information on pending Section 5 submissions by electronic mail. *See* Berman Decl. ¶ 24 (Ex. 2).

Bailout Administration and History

42. Section 5 covered jurisdictions may seek to terminate their coverage under Section 5 by bringing a "bailout" action, a declaratory judgment action in the United States District Court for the District of Columbia. *See* 1965 Act, § 4(a), 79 Stat. 438.

43. As originally enacted, the "bailout" mechanism was available only to covered States and to jurisdictions, such as counties, "with respect to which such [coverage] determinations have been made as a separate unit." *Ibid.*

44. To terminate Section 5 coverage, a jurisdiction was required to prove it had not used a prohibited test or device "for the purpose or with the effect of denying or abridging the right to vote on account of race or color" during the previous five years. *Ibid.*

45. In 1982, Congress amended the bailout provision of the Voting Rights Act, substantially expanding the opportunity for covered jurisdictions to terminate coverage. In 1982, Congress added a third category of eligible jurisdictions, "any political subdivision of [a covered] State" even if the coverage determination had not been made "with respect to such subdivision as a separate unit." 1982 Reauthorization, § 2(b)(2), 96 Stat. 131; *see* 42 U.S.C. 1973b(a).

46. The 1982 Reauthorization also changed the substantive requirements for bailout. Under the revised bailout provision, currently in effect, jurisdictions must demonstrate that they have fully complied with Section 5 and other voting rights provisions during the previous ten years. 1982 Reauthorization, § 2(b)(4), 96 Stat. 131-133; *see* 42 U.S.C. 1973b(a).

47. To demonstrate compliance with the Voting Rights Act during the ten-year period preceding the filing of the declaratory judgment action under Section 4(a), a jurisdiction seeking bailout must prove the following five conditions: (1) it has not used any test or device with the purpose or effect of denying or abridging the right to vote on account of race or color; (2) no final judgment of any court of the United States has determined that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the jurisdiction and no consent decree, settlement, or agreement has been entered into before or during

    the pendency of the declaratory judgment action that results in the abandonment of such a practice; (3) no Federal examiners or observers under the Voting Rights Act have been assigned to the jurisdiction; (4) the jurisdiction has complied with Section 5 of the Voting Rights Act, including the preclearance of all changes covered by Section 5 prior to implementation and the repeal of all covered changes to which the Attorney General has successfully objected or for which the District Court for the District of Columbia has denied a declaratory judgment; and (5) the Attorney General has not interposed any objection not overturned by final judgment of a court and no Section 5 declaratory judgment action has been denied, with respect to any submissions by the jurisdiction, and no such submissions or declaratory judgment actions are pending.  42 U.S.C. 1973b(a)(1)(A)-(E).

48. In addition, a jurisdiction seeking bailout must demonstrate the steps it has taken to encourage minority political participation and to remove structural barriers to minority electoral influence by showing the following: the elimination of voting procedures and election methods that inhibit or dilute equal access to the electoral process; constructive efforts to eliminate intimidation and harassment of persons exercising rights protected under the Voting Rights Act; and other constructive efforts, such as convenient registration and voting for every person of voting age and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process. 42 U.S.C. 1973b(a)(1)(F)(i)-(iii).

49. To assist the court in determining whether to issue a declaratory judgment, the jurisdiction also must present evidence of minority voting participation, including the levels of minority group registration and voting, changes in those levels over time, and disparities between minority-group and non-minority-group participation.  42 U.S.C. 1973b(a)(2).

50. The jurisdiction must demonstrate that during the ten years preceding judgment, it has not violated any provision of the Constitution or federal, state, or local laws governing voting discrimination, unless it shows that any such violations were trivial, promptly corrected, and not repeated.  42 U.S.C. 1973b(a)(3).

51. The jurisdiction must also publicize its intent to commence a declaratory judgment action and any proposed settlement of the action.  42 U.S.C. 1973b(a)(4).

52. If the jurisdiction shows "objective and compelling evidence" that it has satisfied the foregoing requirements, as confirmed by the Department's independent investigation, the Attorney General is authorized to consent to entry of a judgment granting an exemption from coverage under Section 5 of the Voting Rights Act.  42 U.S.C. 1973b(a)(9).

53. Since 1965, of the approximately 943 county, parish and township-level jurisdictions that conduct voter registration that were originally covered by Section 4, 57 of these jurisdictions (around 6.4%) have successfully bailed out and maintained their bailed out status.  One state and several other jurisdictions also successfully bailed out and were later re-covered by new coverage determinations or by new court findings.  Overall, since 1965, there have been 44

cases filed in which bailout was sought under Section 4(a), and the United States consented to bailout in 36 cases and bailout was granted (and in one of these cases bailout was later rescinded), there were 3 cases in which the United States opposed bailout and the court denied bailout, and 5 cases in which the jurisdiction dismissed its bailout action voluntarily after the United States opposed the bailout request.  *See* Berman Decl. ¶ 26 (Ex. 2).

54. Since the new bailout standard enacted in 1982 went into effect in 1984, the United States has consented to bailout in 21 cases.  This included 18 cases involving county level jurisdictions (with 51 subjurisdictions) and 3 cases involving smaller jurisdictions.  Hence, a total of 72 jurisdictions have been granted bailout since 1984.  *See* Berman Decl. ¶ 27 (Ex. 2).

55. The Attorney General has consented to every bailout action by a political subdivision filed since 1984, the effective date for the revised bailout provision. *See* Berman Decl. ¶ 29 (Ex. 2).

56. Currently, the Attorney General is reviewing the informal requests of numerous jurisdictions to consent to terminate coverage under Section 4.  *See* Berman Decl. ¶ 30 (Ex. 2).

57. If a jurisdiction requests termination of Section 4 coverage, the Attorney General conducts an independent investigation concerning whether the jurisdiction can meet the statutory requirements.  *See* Berman Decl. ¶ 28 (Ex. 2).

58. The Attorney General's independent investigation includes interviews with minority contacts, reviewing electoral behavior within the jurisdiction, and researching whether there are any unsubmitted voting changes—including

reviewing a jurisdiction's minutes for the last 10 years to see if the jurisdiction has implemented any changes affecting voting that have not received the requisite Section 5 preclearance. *See* Berman Decl. ¶ 32 (Ex. 2).

59. Shelby County advises that it has implemented at least one voting change prior to submitting the change for review. The County admits that it held a referendum election on April 9, 2002, prior to obtaining Section 5 preclearance. *See* Compl. ¶14 (Dkt. 1); Pl.'s Statement of Material Facts 3-4 (Dkt. 5). The County subsequently submitted for review and the Attorney General ultimately precleared under Section 5 the law providing for the April 9, 2002, referendum election. *See* Berman Decl. ¶ 33 (Ex. 2).

60. The Attorney General has entered into consent decrees allowing bailout under Section 4 with other jurisdictions including, but not limited to, Roanoke County, Virginia, Shenandoah County, Virginia, and Frederick County, Virginia, where the jurisdictions had implemented isolated voting changes prior to submitting them for Section 5 review. *See* Berman Decl. ¶ 34 (Ex. 2).

61. The Attorney General has neither conducted discovery in this case nor conducted the statutorily-required independent investigation as to Shelby County's eligibility to terminate Section 4 coverage. Accordingly, the Attorney General is unable to make a determination at this time as to whether Shelby County is eligible to terminate Section 4 coverage. *See* Berman Decl. ¶ 35 (Ex. 2).

62. The Supreme Court has made it clear that the bailout provision should be interpreted broadly. *See Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2513-17 (2009).

63. The Attorney General has consented to bailout by three smaller jurisdictions, including the NW Austin district itself, following the Supreme Court's decision in *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504 (2009).  *See* Berman Decl. ¶ 31 (Ex. 2).

Clarification of Legislative Record

64. Plaintiff points to the Congressional Record in asserting that "African-American voter turnout in the 2004 presidential election was actually higher than white turnout in three fully-covered states and was within 5% in two others."  Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. at 5 (citing S. Rep. No. 109-295, at 11 (2006)) (Dkt. 5).

65. The 2006 House Report included data on disparities between white and black turnout and registration.  The data in the House Report understated the disparities because it compared registration and turnout rates for blacks to rates for whites, including Hispanics, rather than for white non-Hispanics.  Including Hispanic turnout in the white turnout rate lowers the white turnout rate because of very low Hispanic turnout.  *See Northwest Austin Municipal Utility District No. One v. Mukasey*, 573 F. Supp. 2d 221, 248 (D.D.C. 2008) (*Northwest Austin I*), rev'd on other grounds, 129 S. Ct. 2504 (2009); *see* May 17, 2006, Senate Hearing, at 131-132 (supplemental testimony of Nathaniel Persily); *see* U.S. Census Bureau, Current Population Survey tbl. 4a (Nov. 2004) (Census Bureau Survey), available at http://www.census.gov/population/socdemo/voting/cps2004/tab04a.xls.

66. When the correct data are used, 2004 black registration and turnout rates in the covered States exceed the rates for whites only in Mississippi.  *Ibid.*

67. In Texas, for example, according to the House Report, 2004 black registration and turnout exceeded white registration and turnout by 7 and 5 percentage points, respectively. H.R. Rep. No. 478, 109th Cong., 2d Sess. 12 (2006). When the correct data is used, the gap is reversed: white registration and turnout exceeded black registration and turnout by 5 and 8 points, respectively. *See Northwest Austin I*, 573 F. Supp. 2d at 248; *see* Census Bureau Survey available at http://www.census.gov/population/socdemo/voting/cps2004/tab04a.xls.

68. In Texas, 2004 Hispanic turnout rate was 29.3% and Hispanic registration rate was 41.5%. The white non-Hispanic turnout rate was 63.4% and the white non-Hispanic registration rate was 73.6%. The white alone (which includes Hispanic population) turnout rate was 50.6% and the white alone registration rate was 61.5%. Thus, adding the Hispanic turnout and registration rates to the white non-Hispanic turnout and registration rates results in an undercounting of the white non minority turnout and registration rates. *See* Census Bureau Survey available at http://www.census.gov/population/socdemo/voting/cps2004/tab04a.xls.

69. The vast majority of racially discriminatory election practices remedied by enforcement of Section 2 during the past quarter century has taken place in jurisdictions covered by Section 5 of the Voting Rights Act. McCrary Decl. ¶ 25 (Ex. 1).

70. The study of reported decisions by Ellen Katz and law students at the University of Michigan working under her direction identified 64 Section 2 cases in covered jurisdictions in which plaintiffs were successful. McCrary Decl. ¶ 26 (Ex. 1).

71. The National Commission report, *Protecting Minority Voters*, found a total of 653 cases resolved in a manner favorable to minority voters in covered jurisdictions where there were no reported decisions. *H. Appx.* 125-126; *Voting Rights Act: Section 5 of the Act – History, Scope, and Purpose: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess. 2835-2839, 2846, 2848 (2005); McCrary Decl. ¶ 27 and n.1 (Ex. 1). These cases, some of which were statewide in impact, affected voting practices in 825 counties, parishes, or independent cities covered by Section 5. *Ibid.*

72. Looking at jurisdictions not covered by Section 5, the University of Michigan study found only 50 successful reported outcomes for minority voters (44 percent of the 114 successful reported cases nationwide). *See* McCrary Decl. ¶ 27 (Ex. 1). Thus even in reported decisions a significant majority of successful outcomes were in jurisdictions covered by Section 5. *See id.*

73. Once data for Section 2 settlements are included, however, the disparity between covered and non-covered areas increases dramatically. Looking at unreported decisions, research demonstrates 99 Section 2 settlements in non-covered jurisdictions, as compared with the 587 in areas covered by Section 5 identified in the National Commission report. *See* McCrary Decl. ¶ 28 (Ex. 1). The record before Congress during the 2006 reauthorization of Section 5 demonstrates that at least 61 of these 99 unreported successful settlements in noncovered jurisdictions. *See* McCrary Decl. ¶ 27 (Ex. 1).

74. Eighty six percent of all successful outcomes in cases without reported decisions occurred within jurisdictions covered by Section 5. *See* McCrary Decl. ¶ 27 (Ex. 1).

75. Based on the record before Congress when it adopted the 2006 Reauthorization Act, there were 61 Section 2 cases settled favorably for minority voters in non-covered jurisdictions. *See* McCrary Decl. ¶ 27-28 (Ex. 1). According to the National Commission report provided to Congress in 2006, there were 587 Section 2 lawsuits resulting in favorable outcomes for minority voters in jurisdictions covered by Section 5. Thus the record before Congress shows that 91% of all Section 2 cases settled favorably for minority voters were in covered jurisdictions. See McCrary Decl. ¶ 28 (Ex. 1).

76. Combining all successful outcomes in both reported and unreported cases -- including those on the record before Congress and those identified in the study reported in the McCrary Declaration attached as Exhibit 1 hereto -- shows that 81 percent of all successful outcomes in Section 2 cases occurred in covered jurisdictions. *See* McCrary Decl. ¶ 29 (Ex. 1).

Respectfully submitted,

RONALD C. MACHEN, JR.  THOMAS E. PEREZ
  United States Attorney    Assistant Attorney General
  District of Columbia    Civil Rights Division

                                                SAMUEL R. BAGENSTOS
                                              JULIE A. FERNANDES
                                                Deputy Assistant Attorneys General

                                              */s/ Richard Dellheim*
                                              T. CHRISTIAN HERREN, JR.
                                              DIANA K. FLYNN
                                              RICHARD DELLHEIM (lead counsel)
                                              LINDA F. THOME
                                              ERNEST A. MCFARLAND
                                              JARED M. SLADE
                                              JUSTIN WEINSTEIN-TULL
                                                Civil Rights Division
                                                U.S. Department of Justice
                                                950 Pennsylvania Avenue, N.W.
                                                NWB-Room 7264
                                                Washington, D.C. 20530
                                                Telephone: (202) 305-1734
                                                Facsimile: (202) 307-3961