**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHELBY COUNTY, ALABAMA<br><br>            Plaintiff,<br><br>        v.<br><br>ERIC H. HOLDER, JR., in his official capacity<br>as Attorney General of the United States of<br>America, *et al.*,<br><br>            Defendants. | Civil Action No. 1:10-CV-651<br>(JDB) |

**MEMORANDUM IN SUPPORT OF DEFENDANT-INTERVENOR
BOBBY LEE HARRIS' MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

LEGISLATIVE BACKGROUND ...................................................................................4

  I.    THE VOTING RIGHTS ACT .......................................................................4

    A.    The Enactment of the Voting Rights Act ......................................................4

    B.    The Operation of Section 5 ........................................................................6

    C.    2006 Reauthorization of Section 5 .............................................................10

ARGUMENT ...............................................................................................................12

  I.    SUPREME COURT DECISIONS UPHOLDING SECTION 5 CONSTRAINT THIS COURT'S REVIEW .................................................................13

    A.    The Supreme Court Has Upheld the Constitutionality of the Section 5 Remedy and the Section 4 Coverage Provisions ..............................................13

    B.    The Supreme Court Has Held That Section 5 Does Not Violate Federalism Principles 15

    C.    The Supreme Court Has Held That Congress' Has Broad Authority to Reauthorize Section 5 .............................................................................17

    D.    The Supreme Court Has Held That Section 5 Addresses Both  "First-Generation" and "Second-Generation" Discrimination ........................................................17

    E.    *NAMUDNO v. Holder* ..............................................................................18

  II.    THIS COURT SHOULD ACCORD SUBSTANTIAL DEFERENCE TO CONGRESS' PREDICTIVE JUDGMENT IN REAUTHORIZING SECTION 5 .................................19

    A.    Congress' 2006 Reauthorization Must Be Accorded Substantial Deference ..............20

    B.    Plaintiff's Arguments Cannot Bypass or Overcome *Katzenbach and Rome* ...............24

  III.    CONGRESS' 2006 REAUTHORIZATION OF SECTION 5 WAS FULLY SUPPORTED BY THE LEGISLATIVE RECORD ........................................................32

    A.    The Record Before Congress Provided Ample Basis for Congress to Conclude That Section 5 Still Is Needed to Combat and Deter Voting Discrimination by Covered Jurisdictions ...........................................................................32

    B.    Section 5 Continues to Target the Areas With the Greatest Risk of Racial Discrimination in Voting .............................................................................42

i

C.      Section 5 Does Not Occasion Excessive Race Conscious Decisionmaking................44

The Voting Rights Act stands at the forefront of our Nation's civil rights laws, bringing long-overdue force to the constitutional right of citizens to vote free from racial discrimination. Plaintiff Shelby County seeks to strike down what the Supreme Court aptly has described as the very "heart" of the Act, *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966), the preclearance requirement contained in Section 5.  42 U.S.C. § 1973c.  Plaintiff also challenges Section 5's geographic coverage provisions, contained in Section 4 of the Act.  42 U.S.C. § 1973b.  For the reasons set forth herein, Defendant-Intervenor Bobby Lee Harris respectfully urges this Court to hold that these provisions remain constitutional on their face.

The tensions between the expansion and restriction of the electoral franchise are a defining thread of our Nation's history.  The grant of citizenship and voting rights to former slaves following the Civil War enabled widespread registration, voting, and election to public office among African-American citizens.  Those gains proved ephemeral, however, as the federal government, beginning in the 1870s, stood down and permitted States to openly and systematically defy the Fifteenth Amendment's guarantees.

Nearly a century later, amid a rising tide of protest and after the failure of piecemeal legislative efforts to remedy the problem, Congress enacted the Voting Rights Act of 1965 to "rid the country of racial discrimination in voting."  *Katzenbach*, 383 U.S. at 315.  Through a "complex scheme of stringent remedies," *id.*, Congress sought both to break the back of discriminatory voter registration practices, and to ensure that the electoral opportunity gained thereby would not be undone through the adoption of new "maneuvers" by jurisdictions with an egregious history of discrimination in voting.  *Id.* at 335.

1

Section 5 of the Voting Rights Act is the safeguard Congress enacted against future acts of voting discrimination.  With a limited geographic scope and a limited term, Section 5 requires that voting changes within covered States, counties, and political subunits undergo federal review prior to implementation.

In the years since the statute's enactment, Section 5 has served as an indisputably successful protection against discriminatory manipulation of state election systems.  Both before and after the reauthorization of Section 5 in 1982, preclearance reviews blocked covered jurisdictions from implementing numerous racially discriminatory voting changes, and other changes were abandoned or left unadopted because a preclearance denial was likely.  Thus, as minority voter registration and turnout have increased dramatically in most covered jurisdictions, Section 5 has enabled minority electoral opportunity and the election of minority candidates to steadily rise as well, and also, importantly, has served to protect minority voters' hard-won gains against any backsliding that might be attempted.  Congress has reauthorized Section 5 on four occasions, in 1970, 1975, 1982, and, most recently, in 2006, relying both on Section 5's success and the determination that there is an ongoing, present need for the preclearance mechanism to combat a continuing risk of racial discrimination in voting in the covered jurisdictions.

Shelby County, nonetheless, contends that this Court must override Congress' 2006 reauthorization determination and strike down Section 5 on its face.  The County argues that Congress was empowered to reauthorize Section 5 only if it determined that voting discrimination in 2006 was of the same nature and scope as the discrimination that prompted Congress to enact Section 5 in 1965, specifically, discrimination relating to voter registration and the ability to cast ballots on election day.  The County further argues that the record presented to Congress did not support such a conclusion.

For the reasons respectfully presented below, this Court must reject Shelby County's challenge and affirm Congress' Fifteenth Amendment authority to continue this successful discrimination remedy for an additional period of years.  This result is compelled by four reasons. *First*, as has been repeatedly determined by the Supreme Court, the Section 5 remedy itself is constitutional, and does not violate principles of federalism.  *Second*, the same Supreme Court decisions require this Court to uphold Congress' 2006 reauthorization of Section 5 so long as Congress acted *rationally*, and therefore appropriately.  *Third*, pursuant to these same Supreme Court decisions, Congress, in 2006, was allowed to base its legislative determination both on the successes achieved by Section 5 and the ongoing acts of voting discrimination and threat of discrimination in the covered jurisdictions.  Congress was not prevented from acting simply because the Act has brought our Nation far beyond the dire conditions that existed in 1965. *Fourth,* the record amassed by Congress, consisting of more than 20 hearings and more than 15,000 pages of testimony and reports, demonstrates that it "gave careful consideration to the propriety of readopting § 5's preclearance requirement," *City of Rome v. United States*, 446 U.S. 156, 181 (1980), and that it acted rationally and appropriately.

In sum, this Court must uphold Section 5 because Congress properly concluded that the implementation of discriminatory voting practices in the Section 5 jurisdictions *would meaningfully worsen in the absence of Congress' chosen remedy*.  This Court must defer to Congress' predictive judgment and should sustain the 2006 reauthorization of Section 5.

**LEGISLATIVE BACKGROUND**

I.    **THE VOTING RIGHTS ACT**

A.    **The Enactment of the Voting Rights Act**

Congress enacted the Voting Rights Act, Pub. L. No. 89-110, 79 Stat. 437 (1965), to

enforce the Fifteenth Amendment's prohibition on racial discrimination in voting.  Congress

acted after nearly a century of state-enforced disenfranchisement of African-Americans and other

racial minorities, principally in the former Confederate States, and the failure of case-by-case

litigation to dismantle the regime of discrimination.[1]  Congress' goal was, and still is,

uncompromising:  "to banish the blight of racial discrimination in voting."  *Katzenbach*, 383

U.S. at 308.

The Voting Rights Act of 1965 has three essential components.  First, Congress sought to

address the urgent and immediate need in 1965 to swiftly and certainly, at long last, ensure that

African-Americans would be able register to vote and cast ballots on election day.  To that end,

the Act suspended for five years the use of discriminatory tests and devices for registration and

voting in the jurisdictions where egregious voting discrimination had prevailed for decades (*i.e.*,

the jurisdictions covered by Section 4 of the Act).  Pub. L. No. 89-110, 79 Stat. 437, 438, § 4.  In

---

[1]  Within a few years following ratification of the Fifteenth Amendment in 1870, many States and local governments
– particularly those in the former Confederacy – undertook a systematic and pervasive campaign to disfranchise their
racial minority citizens and deny them any opportunity to participate in our Nation's democratic processes.  The
instruments of discrimination were varied, and included literacy and understanding tests, "good character" tests,
voucher requirements, grandfather clauses, property qualifications, white primaries, and racial gerrymanders.
*Katzenbach*, 383 U.S. at 310-13.  As a result of these stratagems, African-American voting rates in the former
Confederate States dropped precipitously.  *See, e.g.*, *Louisiana v. United States*, 380 U.S. 145, 147-149 (1965)
(noting that beginning with the adoption of the Louisiana Constitution of 1898, the State implemented a policy of
denying African-American citizens the right to vote such that, from 1898 to 1944, the percentage of registered
African-American voters declined from 44% to 0.2%); *United States v. Mississippi*, 380 U.S. 128, 144 (1965).

In the years preceding the enactment of the Voting Rights Act, Congress "repeatedly tried to cope with the
problem by facilitating case-by-case litigation," enacting a series of remedies contained in the Civil Rights Acts of
1957, 1960, and 1964.  *Katzenbach*, 383 U.S. at 313.  These efforts, however, accomplished little.  *Id.*

1975 Congress made this a nationwide, permanent prohibition.  Pub. L. No. 94-73, 89 Stat. 400, § 102 (1975), *codified at* 42 U.S.C. § 1973aa.  Congress also authorized the Attorney General to send federal examiners to the specially covered jurisdictions to register African-American voters, and to send federal observers to these jurisdictions to monitor elections.  Pub. L. No. 89-110, 79 Stat. 437, 439-41, §§ 6, 8.[2]

Second, Congress concluded that that there was an ongoing risk of new discriminatory practices being enacted by the specially covered jurisdictions, because of their long history of voting discrimination and their documented propensity for finding new mechanisms to discriminate when old mechanisms were struck down.  Congress further concluded this ongoing risk could not adequately be monitored and remedied through the usual method of case-by-case litigation.  *Katzenbach*, 383 U.S. at 313-15.  Congress therefore decided to "shift the advantage of time and inertia from the perpetrators of the evil to its victims," *id.* at 328, and enacted Section 5 of the Act, to require certain jurisdictions obtain to federal preclearance whenever they "enact or seek to administer" any new voting practice or procedure.  42 U.S.C. § 1973c(a).

Finally, Congress strengthened the nationwide remedies for voting discrimination. Section 2 of the Act, 42 U.S.C. § 1973, sets forth a general prohibition on discriminatory voting practices, enforced through litigation.  *See generally Thornburg v. Gingles,* 478  U.S. 30 (1986). Section 2 both addresses voting discrimination outside of the Section 5 jurisdictions, and complements Section 5 where the preclearance remedy applies.[3]  In addition, in Section 3 of the

---

[2]  In 2006, Congress repealed the examiner authority, but retained the Attorney General's authority to send federal observers into the Section 4 jurisdictions.  Pub. L. No. 109-246, 120 Stat. 577, § 3.

[3]  In the jurisdictions subject to Section 5, the two provisions work in tandem and reinforce each other.  For example, when, as a consequence of Section 2 litigation or the threat of such litigation, a Section 5 covered jurisdiction changes its pre-Section 5 method of electing its governing body, Section 5 ensures that the new election system is nondiscriminatory and that subsequent voting changes do not undo the progress achieved through the adoption of the new election system.

Act , 42 U.S.C. § 1973a, Congress expanded the remedies available in voting rights litigation, specifying that a jurisdiction may be required to temporarily preclear its voting changes, 42 U.S.C. § 1973a(c), or that the Attorney General temporarily may be authorized to send election observers to monitor elections in the jurisdiction.  42 U.S.C. § 1973a(a).[4]

### B.   The Operation of Section 5

### 1.   The Section 5 Preclearance Requirement

Section 5 requires covered jurisdictions to obtain federal preclearance for changes made to "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting."  42 U.S.C. § 1973c(a).  Pending preclearance, voting changes are unenforceable.  *Clark v. Roemer*, 500 U.S. 646, 654-55 (1991); 28 C.F.R. § 51.10.

Preclearance is obtained by demonstrating, either to the United States District Court for the District of Columbia or to the Attorney General, that a voting change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or [language minority status]."[5]  The Section 5 "effect" test specifically guards against any backsliding, by prohibiting the implementation of any changes "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *Beer v. United States*, 425 U.S. 130, 141 (1976).

---

[4]  Prior to the 2006 amendments, a court also could include as a remedy that the Attorney General was authorized to send federal examiners to the jurisdiction.  Pub. L. No. 89-110, 79 Stat. 437, § 3(a)(1965) , *repealed by* Pub. L. No. 109-246, 120 Stat. 577, § 3.  Also, in 1975, Congress amended the Voting Rights Act to include another significant nondiscrimination requirement, embodied in Sections 4(f)(4) and 203 of the Act, 42 U.S.C. §§ 1973b(f)(4), 1973aa-1a, which compels certain jurisdictions located throughout the country to provide voting materials in languages other than English.

[5]  The Act defines "language minority group" to include "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage."  42 U.S.C. § 1973*l*(c)(3).  Preclearance is obtained from the district court by filing a declaratory judgment action.  Typically, however, jurisdictions use the more expeditious alternative of submitting proposed changes to the Attorney General for administrative preclearance.  The Attorney General must interpose any objection to a submitted voting change within a sharply limited time period – 60 days after a submission is completed – or else the change is deemed precleared by operation of law.  42 U.S.C. § 1973c(a).  The

The preclearance obligation extends to a wide range of voting practices, from polling place and registration changes to redistrictings and election method changes.  *See generally* 28 C.F.R. §§ 51.12, 51.13.  Depending upon a jurisdiction's coverage date, Section 5 applies to voting changes which covered jurisdictions have "enact[ed] or [sought] to administer" after November 1 of 1964, 1968, or 1972.  42 U.S.C. § 1973c(a).

### 2.    Geographic Scope and Term of Coverage

Section 5 applies to jurisdictions with particularly egregious histories of, and ongoing problems with, racial discrimination in voting.  Section 5's geographic coverage is defined in Section 4 of the Act, which includes a flexible and multifaceted set of provisions aimed at tailoring Section 5 coverage to the jurisdictions where the preclearance remedy is needed. Section 4 (as amended by the four reauthorizations of Section 5) further specifies the coverage period, which, as discussed *infra*, reflects Congress' several determinations that there has been, and still is, a current need for the preclearance mechanism as to the Section 4 jurisdictions.

Section 4's specification of coverage begins with a formula which relies on two historical indicia of voting discrimination.  42 U.S.C. § 1973b(b).  First, to be covered, a jurisdiction must have maintained a "test or device" for registration or voting at the time of the 1964, 1968, or 1972 presidential election.[6]  Second, the jurisdiction must have evidenced an extremely low level of political participation at the same presidential election, *i.e.*, less than 50 percent of the voting age population was registered or voted in the 1964 or 1968 election, or less than 50 percent of the citizen voting age population registered or voted in the 1972 election.

---

Attorney General's detailed procedures for processing Section 5 submissions are set forth in 28 C.F.R. pt. 51.

[6]  This included the use of such mechanisms as a literacy test or a "good moral character" test, 42 U.S.C. § 1973b(c).  This also included the use of English-only election procedures at time of the 1972 presidential election where a language minority citizen group constituted more than five percent of the citizen voting age population of the jurisdiction.  42 U.S.C. § 1973b(f)(3).

To guard against any potential overbreadth of this formula (*i.e.*, that it might include jurisdictions lacking a history of discrimination), Congress provided in Section 4(a) that jurisdictions could exempt themselves from coverage ("bail out") by demonstrating that the particular voting test or device they had maintained in 1964, 1968, or 1972, had in fact not been implemented in a discriminatory manner.[7]  Several jurisdictions made this showing and bailed out from Section 4 coverage.[8]

In 1982, as part of its reauthorization of Section 5 that year, Congress concluded that this corrective process was complete.  Congress, therefore, amended the bailout procedure so that it no longer looks backward at jurisdictions' pre-coverage history of voting discrimination.  Instead, the revised procedure now focuses upon recent events and current conditions, allowing covered jurisdictions the opportunity to end coverage by demonstrating that their electoral processes are free of discrimination. *See generally* S. Rep. No. 97-417, at 43-46 (1982).  The new bailout procedure became effective in 1984 and, since then, it is Defendant-Intervenor's understanding (based on discussions with the Department of Justice) that all jurisdictions that have initiated bailout actions have, with the Attorney General's consent, been successful.

The Section 4 geographic coverage provisions – and thus, Section 5 – originally were enacted for a five-year period.  Pub. L. No. 89-110, 79 Stat. 437, 438, § 4(a) (1965).  As indicated, Congress four times has determined that there is a continuing need for Section 5, in

---

[7]  Pub. L. No. 89-110, 79 Stat. 438, § 4(a)(1965), as amended by Pub. L. No. 91-285, 84 Stat. 314, 315, § 3 (1970); Pub. L. No. 94-73, 89 Stat. 400-01, § 201 (1975); Pub. L. No. 97-205, 96 Stat. 131, § 2(a) (1982).  In addition, even if a jurisdiction implemented a discriminatory test or device, it nonetheless was allowed to bail out if it could demonstrate that such use was de minimus.  42 U.S.C. § 1973b(d).

[8]  S. Rep. No. 97-417, at 45 (1982).

1970, 1975, 1982, and 2006, and so has extended Section 5 for an additional period of time by amending the Section 4 geographic coverage provisions.[9]

In sum, therefore, the jurisdictions now covered by Section 5 are covered for three reasons:  they had a history of egregious voting discrimination; they have not exercised the opportunity afforded to bail out; and Congress, in its periodic reviews, has determined that Section 5 remains an appropriate remedy for voting discrimination.[10]

As a result of these interconnected provisions, there currently are nine States that are subject to the Section 5 preclearance requirement – Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia.  Portions of seven other States also currently are covered – California (four counties), Florida (five counties), Michigan (two townships), New Hampshire (ten towns), New York (three counties), North Carolina (40 counties), and South Dakota (two counties).  28 C.F.R. pt. 51, app.  The political subunits that have bailed out since 1984 are located in Georgia (one city), North Carolina (one city), Texas (a municipal utility district), and Virginia (14 counties and four independent cities, encompassing 50 subjurisdictions).  http://www.justice.gov/crt/voting/misc/sec_4.php#bailout (last visited on Nov. 15, 2010).[11]

---

[9] Pub. L. No. 91-285, 84 Stat. 314, 315, § 3 (1970); Pub. L. No. 94-73, 89 Stat. 400-01, § 201 (1975); Pub. L. No. 97-205, 96 Stat. 131, 133, § 2(b) (1982).  The 2006 reauthorization, like its predecessor in 1982, is for 25 years.  42 U.S.C. § 1973b(a)(8).  However, Congress is required to "reconsider" the reauthorization after 15 years.  42 U.S.C. § 1973b(b)(7).

[10] Accordingly, Shelby County is wrong when it asserts that it "remains subject to Section 5 [solely] based on voting data more than four decades old."  Memorandum, at 1 [Doc. 5].

[11] As noted previously, when  Section 4 was enacted in 1965 it not only identified those jurisdictions subject to the preclearance requirement, but also identified the jurisdictions where the use of any voting "test or device" was suspended, and where the Attorney General was authorized to send federal registration examiners and election observers.  The "test or device" facet of Section 4 coverage was superseded by the 1975 amendment to the Voting Rights Act, the examiner provision continued in effect until 2006, and the observer provision remains in effect today.  42 U.S.C. § 1973f.  Shelby County fails to acknowledge, however, in either its Complaint or its Motion, that the challenged Section 4 coverage provisions apply to both Section 5 and the observer authority.  Accordingly, the County does not provide any basis on which this Court may hold Section 4 unconstitutional insofar as it relates to

### 3.   Expansion of the Preclearance Requirement to Additional Jurisdictions

As noted above, Congress from the start has structured the Voting Rights Act to complement Section 4 coverage so as to avoid potential underbreadth.  Jurisdictions not covered under Section 4 may be ordered by a federal court, pursuant to Section 3(c) of the Act, 42 U.S.C. § 1973a(c), to submit voting changes for preclearance as part of the equitable relief that is granted.  *See Jeffers v. Clinton*, 740 F. Supp. 585, 599-601 (E.D. Ark. 1990); 28 C.F.R. § 51.8.

### C.   2006 Reauthorization of Section 5

In 2005 and 2006, Congress considered whether to reauthorize the Act's temporary provisions, including Section 5, which were scheduled to expire in 2007.  The House held 12 hearings and received oral testimony from 46 witnesses, written testimony from the Department of Justice and other organizations and witnesses, and 11 extensive reports analyzing voting-related discrimination that had occurred since the 1982 reauthorization of Section 5.  H.R. Rep. No. 109-478, at 5 (2006).  The Senate also conducted an extensive investigation, holding nine hearings and considering the testimony of 46 witnesses.  S. Rep. No. 109-295, at 10 (2006).  In total, Congress compiled a record "of over 15,000 pages."  *Id.*

Following its examination of the record, and taking into consideration the multiple Supreme Court decisions that have sustained Section 5's constitutionality (*see infra*), Congress made the predictive judgment that "without the continuation of the Voting Rights Act of 1965 protections, racial and language minorities citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains

---

election observers.  For this reason, Defendant-Intervenor will not treat this issue as being presented by the instant litigation.

made by minorities in the last 40 years."  Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, § 2(b)(9), 120 Stat. 577, 578.

Congress found repeated instances in which Section 5 has blocked discriminatory voting changes.  "[S]uch objections did not encompass minor inadvertent changes.  The changes sought by covered jurisdictions were calculated decisions to keep minority voters from fully participating in the political process."  H.R. Rep. No. 109-478, at 21.

Congress also cited other evidence for its finding that the need for the preclearance remedy remained, including: 1) preclearance requests denied by the District Court for the District of Columbia; 2) preclearance requests withdrawn after the Attorney General sent a "more information" request; 3) Section 5 enforcement actions based on covered jurisdictions failing to obtain preclearance before implementing a voting change; 4) Section 2 litigation in covered jurisdictions; 5) the ongoing prevalence of racially polarized voting in these  jurisdictions; 6) the repeated dispatch of federal observers to monitor elections in covered jurisdictions; and 7) racial disparities in registration rates, and uneven and disproportionately low minority electoral representation.  Pub. L. No. 109-246, § 2(b)(3), (4), (5), 120 Stat. 577, 577-578.  Congress also found that Section 5 has been a "vital prophylactic tool[]" that has "deterred covered jurisdictions from even attempting to enact discriminatory voting changes."  H.R. Rep. No. 109-478, at 21.

The 2006 reauthorization legislation received decisive bipartisan support.  The Senate passed the legislation unanimously.  152 Cong. Rec. S7949, S8012 (July 20, 2006).  The vote in the House was 390 to 33.  152 Cong. Rec. H5143, H5207 (July 13, 2006)**.**  On July 27, 2006, President George W. Bush signed the legislation into law.

**ARGUMENT**

The Fifteenth Amendment to the Constitution provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  Section 2 of the Amendment provides that Congress "shall have power to enforce this article by appropriate legislation."

Section 5 of the Voting Rights Act remains "appropriate legislation" for enforcing the Fifteenth Amendment.  The validity of the Section 5 remedy itself has been repeatedly upheld by the Supreme Court, as has Congress' authority to reauthorize Section 5, and neither is open to question here.  Instead, the more limited issue for this Court's decision is whether Congress acted appropriately in utilizing its reauthorization authority, by concluding in 2006 that Section 5's "current burdens [are] justified by current needs," and that Section 5's "disparate geographic coverage is sufficiently related to the problem that it targets."  *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2512 (2009) ("*NAMUDNO*").

Pursuant to the Supreme Court's holdings in *City of Rome*, 446 U.S. at 174-78, and *Katzenbach*, 383 U.S. at 324, 326, Section 5 remains a constitutional exercise of Congress' enforcement powers so long as Congress *rationally* concluded that the covered jurisdictions, but not other areas of the country, present a heightened risk of implementing racially discriminatory voting changes.  This standard is in harmony with the Supreme Court's recent "congruence and proportionality" doctrine, *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997), which Shelby County, in its argument, misapplies to this case.

The substantial record upon which Congress relied to reauthorize Section 5 fully supports the constitutionality of the 2006 legislation.  This record demonstrates that Congress had more than ample basis for concluding that "improvements [in the covered jurisdictions] are . . . due in

significant part to the Voting Rights Act itself," and that "conditions continue to warrant preclearance under the Act." *NAMUDNO*, 129 S. Ct. at 2511-12.  Likewise, Congress had ample basis for concluding that Section 5's geographic coverage remains properly tailored to the problem of voting discrimination in our Nation.

## I.      SUPREME COURT DECISIONS UPHOLDING SECTION 5 CONSTRAINT THIS COURT'S REVIEW

The Supreme Court repeatedly and unambiguously has sustained the constitutionality of Section 5 as a proper exercise of Congress' Fifteenth Amendment enforcement powers.  Both the suspension of new election practices pending federal review and the targeted geographic coverage specifically have been considered and upheld.  The Court also specifically has considered and upheld Congress' authority to reauthorize Section 5 based upon a congressional determination of continued need and continued proper tailoring.  In addition, the Court has rejected the claim that Section 5 violates principles of federalism.  Finally, the Court long has held that the "needs" addressed by Section 5 concern the full spectrum of voting and election-related changes.  Thus, the constitutional issue presented here, while of great weight and import, is limited in these important respects.

### A.      The Supreme Court Has Upheld the Constitutionality of the Section 5 Remedy and the Section 4 Coverage Provisions

In *South Carolina v. Katzenbach*, the Supreme Court – acting just seven months after President Johnson signed the Voting Rights Act into law – upheld the Section 5 preclearance remedy and its Section 4 coverage provisions.

The Court held that Section 5 is a "permissibly decisive" remedy for addressing Congress' determination that covered jurisdictions might, and most likely would, "try . . . maneuvers in the future" to minimize or cancel out the electoral opportunity of minority citizens.

383 U.S. at 335.  *See also Allen v. State Board of Elections*, 393 U.S. 544, 548 (1969)

("Congress apparently feared that the mere suspension of existing tests would not completely

solve the problem, given the history some States had of simply enacting new and slightly

different requirements with the same discriminatory effect.").  Congress properly concluded that

the alternative of case-by-case litigation was inadequate since, as the Supreme Court observed:

"Voting suits are unusually onerous to prepare . . . Litigation has been exceedingly slow, in part

because of the ample opportunities for delay afforded voting officials and others involved[.]"

*Katzenbach*, 383 U.S. at 314.  Congress therefore properly decided to "shift the advantage of

time and inertia from the perpetrators of the evil to its victims." *Id.* at 328.

The Supreme Court also upheld the Section 4 coverage provisions.  The Court found that

the "coverage formula is rational in both practice and theory." *Id.* at 330.  Congress had before it

"reliable evidence of actual voting discrimination in a great majority of the States and political

subdivisions" which it covered under Section 4, *id.* at 329, and the coverage formula Congress

devised "was relevant to the problem of voting discrimination," *id.*, since voting tests and

devices had long been used to perpetuate discrimination and a low participation rate is tangible

evidence of disenfranchisement.

The Court rejected the argument that Congress, through Section 4, inappropriately

selected certain States and political subdivisions for a special set of remedial measures.  The

Court discounted any reliance on "[t]he doctrine of the equality of States" since "that doctrine

applies only to the terms upon which States are admitted to the Union, and not to the remedies

for local evils which have subsequently appeared." *Id.* at 328-29.  The Court also found it

"irrelevant" that Section 4 did not result in the coverage of jurisdictions that had engaged in

voting discrimination but had done so in a less widespread, persistent, and pernicious manner.

14

*Id.* at 330.  Congress, notably, had not ignored the problem of voting discrimination in the non-covered areas since, in the Act, it "strengthened existing remedies" that applied nationwide.  *Id.* at 331.  Moreover, Section 4 addressed "the possibility of overbreadth" by including a mechanism by which covered areas may bail out.  *Id.*  In sum, because the geographic "distinctions drawn [by Congress] have some basis in practical experience," *id.*, they are proper and constitutional, and Congress was not required to match geographic coverage to the precise contours of the problem.[12]

*Katzenbach* therefore decisively upheld the fundamental congressional determinations undergirding Section 5:  that covered jurisdictions have a significant history of voting discrimination; that this history of discrimination creates a cognizable risk of renewed discrimination by these jurisdictions; and that an appropriate means for addressing this future risk of voting discrimination is the preclearance mechanism.[13]

### B.   The Supreme Court Has Held That Section 5 Does Not Violate Federalism Principles

The principal intrusion of Section 5 into state policymaking is to prohibit covered jurisdictions from implementing new voting practices that have a discriminatory purpose or

---

[12] Although the Supreme Court has not revisited the Section 4 coverage provisions subsequent to the 1970 or 1975 expansions of coverage, the Court has recognized that the 1975 expansion, which amended the definition of "test or device" to include the use of English-only elections in certain jurisdictions as of the 1972 presidential election, reflected Congress' conclusion "after extensive hearings that there was 'overwhelming evidence' showing 'the ingenuity and prevalence of discriminatory practices that have been used to dilute the voting strength and otherwise affect the voting rights of language minorities.'"  *Briscoe v. Bell*, 432 U.S. 404, 405-406 (1977); *see also* S. Rep. No. 94-295, at 25-27 (1975).

[13] The Supreme Court also has upheld Section 5's remedial framework after each of the Section 5 reauthorizations that preceded the 2006 renewal.  *Georgia v. United States*, 411 U.S. 526, 535 (1973) (1970 reauthorization); *City of Rome*, 446 U.S. at 172-180 (1975 reauthorization); *Lopez v. Monterey County*, 525 U.S. 266, 282-285 (1999) (1982 reauthorization).  Furthermore, Congress' judgments in devising Section 5 have been validated by experience.  As to whether covered jurisdictions have the predicate history of voting discrimination, the Section 4 bailout provision worked to weed out jurisdictions that were inappropriately identified by the coverage formula as having a history of voting discrimination.  *See supra* at 9.  And the Attorney General has found it necessary to interpose hundreds of objections to new discriminatory enactments by the covered jurisdictions.  *See infra* at 34.

effect.  This intrusion, however, flows directly from the Fifteenth Amendment, and thus is fully

within Congress' authority, so long as the means selected by Congress are "appropriate."  The

impact of Section 5 on State policymaking is otherwise minimal.  Section 5 does not require

States to employ or refrain from employing any particular election procedures, unlike other

portions of the Voting Rights Act which prohibit certain election-related tests and devices.

Similarly, Section 5 does not authorize federal review into any otherwise sovereign aspect of a

State's election process, since any State enactment subject to Section 5 preclearance also is

subject to federal court review under Section 2 of the Voting Rights Act and the Constitution.

Although Section 5 does, for purposes of voting, modify the relationship between the

federal government and certain States, the Supreme Court repeatedly has rejected the contention

that this renders Section 5 unconstitutional.  In *Katzenbach*, the Supreme Court strongly endorsed

Congress' broad authority under the Fifteenth Amendment to alter or affect state voting practices

and procedures.  Although the States ordinarily exercise plenary authority over matters "wholly

within the domain of state interest," that authority must give way when state power is "'used as

an instrument for circumventing a federally protected right.'" *Katzenbach*, 383 U.S. at 325.  In

*Rome*, the Court rejected the City's attempt to reargue that Section 5 violates principles of

federalism, reaffirming that "principles of federalism that might otherwise be an obstacle to

congressional authority are necessarily overridden by the power to enforce the Civil War

Amendments 'by appropriate legislation.'  Those Amendments were specifically designed as an

expansion of federal power and an intrusion on state sovereignty."  446 U.S. at 179.  And, nearly

two decades later, the Supreme Court once again rejected a federalism challenge, fully embracing

its rulings in *Katzenbach* and *Rome*.  *Lopez v. Monterey County*, 525 U.S. 266, 282-285 (1999).

Section 5's "federalism burdens" require Congress to base reauthorization upon "current needs." *NAMUDNO*, 129 S. Ct. at 2512.  However, these "burdens" do not themselves provide a basis upon which to invalidate the preclearance remedy.

### C.   The Supreme Court Has Held That Congress Has Broad Authority to   Reauthorize Section 5

The Supreme Court also has specifically upheld Congress' authority to determine that the preclearance remedy should be extended for an additional period of time.  *Rome*, 446 U.S. at 180-82.  As discussed *infra*, the Court in *Rome* held that Congress' authority in this regard is broad.  *Rome* is the only case in which the Supreme Court has undertaken a detailed analysis of Congress' reauthorization authority, and thus the Court's decision in *Rome* is particularly relevant to this case and is binding on this Court.

### D.   The Supreme Court Has Held That Section 5 Addresses Both "First-Generation" and "Second-Generation" Discrimination

The Supreme Court, from the outset, has held that Section 5 addresses the full range of "maneuvers in the future" that jurisdictions might undertake to minimize or cancel out minority electoral opportunity.  *Allen v. State Board of Elections*, 393 U.S. at 566 ("Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way.").  In particular, the Court long has held that the so-called "second-generation" of discriminatory devices, *i.e.*, voting changes that may minimize or dilute minority voting strength when racially polarized voting is present (redistrictings, election method changes, and annexations), are among the types of voting changes that Section 5 addresses.[14]

---

[14] *Georgia v. United States*, 411 U.S. at 531 (redistrictings and changes from single-member to multi-member districts must be precleared since "Section 5 is not concerned with a simple inventory of voting procedures, but rather with the reality of changed practices as they affect Negro voters"); *Perkins v. Matthews*, 400 U.S. 379, 388 (1971) (annexations must be precleared since they "dilute[] the weight of the votes of the voters to whom the franchise was limited before the annexation"); *Allen v. State Board of Elections*, 393 U.S. at 569 (election method changes, such as a change from district-based to at-large voting, must be precleared since "[t]he right to vote can be

### E.       *NAMUDNO v. Holder*

In *Northwest Austin Municipal Utility District Number One v. Holder*, *supra*, the

Supreme Court considered, but did not decide, the constitutionality of Congress' 2006

reauthorization of Section 5.  The Court instead relied on the doctrine of constitutional avoidance

to conclude that the plaintiff (a Texas municipal utility district) was entitled to the alternative

relief it requested: a ruling construing the Section 4 bailout provisions as permitting all covered

political subunits to separately file for bailout.[15]

Although the Supreme Court did not reach the merits of the constitutional question, the

Court did identify several issues for consideration in any future challenge to the constitutionality

of Section 5.  In sum, the Court indicated that the focus in a future challenge, such as the instant

case, must be on whether or not conditions have changed in the covered jurisdictions such that

Congress did or did not appropriately conclude that Section 5 continues to be a discrimination

remedy that is needed.

First, the Court stated that Section 5 "imposes current burdens [*i.e.*, federalism costs] and

must be justified by current needs."  129 S. Ct. at 2512.  In this regard, the Court noted that, on

the one hand, "[s]ome of the conditions that we relied upon in upholding this statutory scheme in

*Katzenbach* and *City of Rome* have unquestionably improved.  Things have changed in the

South."  *Id.* at 2511.  However, on the other hand, "[t]hese improvements are no doubt due in

---

affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot").  Accordingly,
Shelby County is wrong when it claims that Section 5's "constitutional mission" relates only to "first generation"
barriers to registering and voting.  Memorandum, at 6.

[15] The Court remanded the case to the district court for a determination as to whether the plaintiff satisfied the
substantive bailout standard.  Bailout was granted by consent, ending the litigation. Consent Judgment and Decree,
*NAMUDNO v. Holder*, No. 1:06-cv-1384 (Nov. 3, 2009) [Doc. 171].  Previously, a three-judge panel of this Court
held that the plaintiff was not eligible to seek bailout, and that Section 5 continues to be a constitutional exercise of
Congress' Fifteenth Amendment authority.  *NAMUDNO v. Mukasey*, 573 F. Supp. 2d 221 (2008).

significant part to the Voting Rights Act itself" and "[i]t may be that these improvements are

insufficient and that conditions continue to warrant preclearance under the Act."  *Id.* at 2511-12.

Second, the Court observed that "the fundamental principle of equal sovereignty requires

a showing that [Section 5's] disparate geographic coverage is sufficiently related to the problem

that it targets", *id.* at 2512, noting the possibility that voting discrimination "may no longer be

concentrated in the jurisdictions singled out for preclearance."  *Id.*  In this regard, the Court also

noted a concern as to whether Section 5 may involve geographically-disparate, race-based

decisionmaking (*i.e.*, in the covered jurisdictions but not elsewhere), which would engender a

tension between Section 5 and the nondiscrimination requirements of Section 2 of the Voting

Rights Act and the Fourteenth Amendment.  *Id.*

Finally, the Court noted, but did not decide, the issue of the standard of review to be

applied in reviewing the 2006 reauthorization.  The Solicitor General argued for the "rational

means" standard; the plaintiff argued for the *Boerne* "congruence and proportionality" test.  In

response, the Court observed only that "[t]he Act's preclearance requirements and its coverage

formula raise serious constitutional questions under either test."  *Id.* at 2513.

## II.   THIS COURT SHOULD ACCORD SUBSTANTIAL DEFERENCE TO CONGRESS' PREDICTIVE JUDGMENT IN REAUTHORIZING SECTION 5

Congress' decision to reauthorize Section 5 in 2006 is entitled to substantial deference.

So long as Congress could rationally conclude that the expiration of Section 5 would result in

heightened voting discrimination within the covered jurisdictions, its judgment must be affirmed.

The Supreme Court built its *Boerne* "congruence and proportionality" analysis upon *Katzenbach*

and *Rome*, and did not praise these cases only to bury them.  As recognized by the Supreme

Court, the *Boerne* analysis is fully consistent with the "rational means" standard applied in

*Katzenbach* and *Rome*.

### A.   Congress' 2006 Reauthorization Must Be Accorded Substantial Deference

#### 1.   *Katzenbach* and *Rome* Dictate the Standard of Review Here

In both *Katzenbach* and *Rome*, the Supreme Court applied a deferential, "rational means" standard of review in assessing whether "Congress [had] exercised its powers under the Fifteenth Amendment in an appropriate manner with relation to the States." *Katzenbach*, 383 U.S. at 324. These holdings compel the same level of review here.  In particular, this Court must follow *Rome* and accord the same level of deference to the 2006 reauthorization determination as the Supreme Court accorded to Congress' 1975 determination.

In *Katzenbach*, the Supreme Court held that "the ground rules for resolving [a challenge to Congress' Fifteenth Amendment authority] are clear." *Id.* at 324.  "As against the reserved powers of the States, Congress may use *any rational means* to effectuate the constitutional prohibition of racial discrimination in voting." *Id.* (emphasis added).  The Court further explained that "[t]he basic test to be applied in a case involving § 2 of the Fifteenth Amendment is the same as in . . . cases" involving legislation under the Necessary and Proper Clause. Specifically, as expressed by Chief Justice Marshall in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819), "'[L]et the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.'" *Id.* at 326 (quoting *McCulloch*, 4 Wheat. at 421).  In sum, it is Congress, not the judiciary, that is "chiefly responsible for implementing [Fifteenth Amendment] rights," and Congress, accordingly, "has full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting." *Id.*

In *City of Rome*, the Supreme Court reaffirmed its holding in *Katzenbach* that any review of Section 5's constitutionality is governed by the "rational means" standard.  The Court also once again emphasized that Congress' Fifteenth Amendment authority is as broad as Congress' authority under the Necessary and Proper Clause.  *Rome*, 446 U.S. at 174-75.  In so holding, the Court further relied on its 1970 decision in *Oregon v. Mitchell*, 400 U.S. 112 (1970), where it unanimously upheld Congress' determination that a nationwide five-year ban on literacy tests (adopted as part of the 1970 amendments to the Voting Rights Act) was a rational, and therefore an appropriate, remedy for voting discrimination.  *Id*. at 176-77.

Applying this standard to Congress' 1975 reauthorization of Section 5, the Supreme Court held that Congress had acted within its Fifteenth Amendment authority because it had given "careful consideration to the propriety of readopting § 5's preclearance requirement."  *Id*. at 181.  The Court cited with approval Congress' reliance on three factual determinations: the continuing "[s]ignificant disparity . . . between the percentages of whites and Negroes registered in at least several of the covered jurisdictions"; continuing problems with the number of African-Americans elected in the Section 4 jurisdictions (particularly to statewide offices and state legislatures); and "the number and types of submissions made by covered jurisdictions and the number and nature of objections interposed by the Attorney General . . . ."  *Id.* at 180-81.  Consistent with its deferential standard of review, the Court undertook no independent analysis of these determinations in assessing whether "current needs" merited Congress' 1975 reauthorization.

The *Rome* Court also upheld Congress' inclusion of an effect test in Section 5 because Congress had acted "rationally" and therefore "appropriate[ly]."  *Id.* at 177.  The Court explained that Congress rationally could conclude that prohibiting changes with a discriminatory impact is

an effective method of ensuring that "jurisdictions with a demonstrable history of intentional

racial discrimination in voting" do not further minimize minority electoral opportunity.  *Id.* at

177-178.[16]

## 2. Significant Constitutional Considerations Further Support Deference by this Court

Two significant constitutional considerations further buttress the conclusion that this

Court should employ a deferential standard of review.  These involve the fundamental nature of

the rights at issue, and the fact that this Court is asked to review the reauthorization of what

already has been determined to be a constitutionally valid remedy.

Congress acted at the zenith of its constitutional enforcement authority in reauthorizing

Section 5, because Section 5 addresses *both* the quintessential suspect classification (race) *and*

the quintessential civil right (the franchise).  *See Johnson v. California*, 543 U.S. 499, 509 (2005)

(racial discrimination by state actors goes to the core of the Reconstruction Amendments, and

receives the strictest judicial scrutiny); *Village of Arlington Heights v. Metropolitan Hous. Dev.

Corp.*, 429 U.S. 252, 266 (1977) (same); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (the right

to vote is "preservative" of all other rights).

Moreover, Section 5 not only targets conduct that requires heightened scrutiny in two

respects, but it targets conduct that is prohibited by two separate constitutional amendments – so

strong is the constitutional imperative to eradicate racial discrimination in voting.  *See, e.g.*,

*Rogers v. Lodge*, 458 U.S. 613, 624-628 (1982) (applying the Fourteenth Amendment to protect

against racial discrimination in voting); *Hunter v. Underwood*, 471 U.S. 222 (1985) (same).

---

[16] In its two other rulings on the constitutionality of Section 5, *Georgia* and *Lopez*, the Supreme Court did not specifically address the question of the appropriate standard of review.  However, in both cases the Court specifically embraced its rulings in *Katzenbach*  and *Rome*.  Thus, these decisions also support reliance on a deferential standard here.  *Georgia*, 411 U.S. at 535; *Lopez*, 525 U.S. at 282-83.

Second, the 2006 reauthorization of Section 5 required a quintessentially legislative judgment about the effectiveness of and continuing need for an existing and constitutional discrimination remedy, as opposed to the more fundamental and threshold determinations involved when Congress adopts a remedy for the first time. As discussed above, the preclearance remedy, and Congress' factual and policy determinations that underlie it, are plainly constitutional, and Shelby County does not seek to revisit these settled issues. Moreover, it is undisputed that Congress has the authority, in appropriate circumstances, to extend Section 5 beyond its previous sunset date, by enacting reauthorizing legislation. *Rome,* 446 U.S. 156 *supra*.

Within the bounds of rational decisionmaking, the length of time that a discrimination remedy should remain in place is a matter for Congress to decide. For Section 5, this determination necessarily centers upon the nature and significance of current social and political conditions in the Section 4 jurisdictions and, ultimately, the extent to which those conditions indicate a risk of future voting discrimination. Congress is best positioned to resolve these issues through its ability to conduct hearings, receive written submissions, and bring to bear the diverse experiences of its members.

### 3.     Deference Regarding the Types of Evidence Congress Relied Upon

This Court also should defer to Congress' determination as to the types of information that are relevant and probative to the reauthorization question. The Supreme Court's decision in *Rome* once again is controlling.

In *Rome*, the Court accorded Congress wide latitude regarding the types of information pertinent to whether Section 5 "had outlived [its] usefulness . . . ." 446 U.S. at 180. This Court, therefore, should presumptively credit the types of information Congress found relevant in 2006.

23

Although the Court in *Rome* focused on three particular types of evidence Congress reviewed in 1975, the Court did not suggest that this evidence was exclusive of other types of relevant evidence, or that Congress was in any way constrained in conducting its evidentiary inquiry.  As discussed below, Congress in 2006 relied on the three types of information it cited in 1975 and, in addition, identified other types of information relevant to its reauthorization decision.  This Court, in conducting its review of Congress' 2006 action, should give full credit to this additional relevant evidence as well.  *See also Katzenbach*, 383 U.S. at 330 ("In identifying past evils, Congress obviously may avail itself of information from any probative source.").

### B.    Plaintiff's Arguments Cannot Bypass or Overcome *Katzenbach and Rome*

Shelby County builds its case by avoiding the *Katzenbach* and *Rome* rational means standard of review and by misapplying *City of Boerne v. Flores*, 521 U.S. 507 (1997), as well as several Supreme Court related decisions.  The County errs badly by failing to acknowledge both the fundamental distinctions between this case and the *Boerne* line of decisions, and the continuing force of *Rome* and *Katzenbach* in governing this Court's review.  The standards for assessing "congruence and proportionality" in the context of racial voting discrimination are, in effect, contained in *Katzenbach* and *Rome*, which explains the Supreme Court's repeated favorable references to Section 5 in the *Boerne* cases.

If the *Boerne* analysis were modified to take into account the fact that a reauthorization is at issue, the fact that Section 5 enforces rights of the utmost constitutional importance, and the fact that the constitutionality of the preclearance remedy is well-settled, the result would be to recapitulate the rationality standards set forth in *Katzenbach* and *Rome*.  In any event, *Boerne* cannot be applied in the rote fashion Shelby County attempts in this case.  The County's case amounts to a demand that the Court turn logic on its head and hold that Congress can reauthorize

24

enforcement legislation only if that legislation has left the underlying pattern of discrimination untouched in its original form.  Neither *Boerne* nor any other Supreme Court decision establishes such an absurd decision rule.

### 1.    City of Boerne v. Flores Did Not Supplant Katzenbach or Rome

In *Boerne*, the Supreme Court held that when Congress adopts remedial ("prophylactic") legislation to enforce the Fourteenth Amendment, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted [by Congress] to that end."  521 U.S. at 520[17]  In so holding, the Supreme Court, in *Boerne* and in its subsequent cases applying the *Boerne* standard, has repeatedly pointed to Section 5 as a model for how Congress may constitutionally exercise its enforcement authority under the Reconstruction Amendments, citing *Katzenbach* and *Rome*.  521 U.S. at 525-527, 532-33.[18]

The first fundamental difference between this case and the *Boerne* cases upon which Shelby County relies is the weak grounding for Congress' legislation in those cases, versus the unquestioned and powerful constitutional protections that Congress acted to enforce via Section 5.  In *Boerne* and three later cases, the Supreme Court invalidated congressional legislation that sought to substantively redefine the scope of the Fourteenth Amendment.  *Boerne*, 521 U.S. at

---

[17] In *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court summarized the basic *Boerne* analysis as: first, a court must identify the constitutional right or rights that Congress sought to enforce, *id.* at 522; second, a court must examine the "gravity of the harm [the legislation] seeks to prevent," *i.e.*, whether there is a sufficiently recent and extensive pattern of conduct that violates the constitutional guaranty or prohibition at issue, *id.* at 523-24; and third, a court must determine whether the statute in question is "an appropriate response" to the harms identified in the first two steps.  *Id.* at 530.  In the next most recent post-*Boerne* case, *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003), however, the Supreme Court did not structure its analysis around this three-part formulation.

[18] "After *South Carolina v. Katzenbach*, the Court continued to acknowledge the necessity of using strong remedial and preventive measures to respond to the widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination." *Boerne*, 521 U.S. at 526 (citing *City of Rome*, 446 U.S. at 182).  "The ADA's constitutional shortcomings are apparent when the Act is compared to Congress' efforts in the Voting Rights Act of 1965 to respond to a serious pattern of constitutional violations." *Bd. of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 373 (2001).  *See also Lane*, 541 U.S. at 519 n.4; *Hibbs*, 538 U.S. at 736-38; *United States v. Morrison*, 529 U.S. 598, 626-27 (2000).

532 (challenged legislation "attempt[s] a substantive change in constitutional protections" concerning the right of free exercise of religion).[19]  Section 5, on the other hand, enforces the undisputed constitutional right to vote free from racial discrimination, for which Congress has explicit enforcement authority.  It was well-established that the types of conduct Congress sought to deter in 2006 implicated unconstitutional racial voting discrimination.  Therefore, this case does not present the question of whether Congress attempted to substantively redefine constitutional rights, which occupied most of the Court's analyses in the *Boerne* cases upon which Shelby County relies.[20]

Furthermore, Shelby County ignores critical aspects of the *Boerne* decisions which establish that the nature of the constitutional protection being enforced (that is, whether the protection is rational-basis or heightened scrutiny) substantially affects the Court's analysis.  The Supreme Court rejected *Boerne*-based challenges to legislation that enforced heightened-scrutiny constitutional protections in *Tennessee v. Lane*, *supra* (concerning the due process right to be free from disability discrimination in courtrooms and other public services), and *Nev. Dep't of Human Res. v. Hibbs*, *supra* (concerning the right to be free from unconstitutional gender-based discrimination in the workplace).

In *Lane*, which Plaintiff fails to cite, the Court found that Congress acted not only to

---

[19]  *See also Garrett*, 531 U.S. at 374 (concerning right of disabled persons to be free from unconstitutional employment discrimination); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91 (2000) (concerning right to be free from unconstitutional age discrimination in employment); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 647-648 (1999) (concerning patent infringement).

[20]  What may appear to be different approaches between *Katzenbach/Rome* and *Boerne* have been described as a distinction between Congress' authority under the Fourteenth and Fifteenth Amendments.  *NAMUDNO*, 573 F. Supp.2d  at 243-45.  However, that is not entirely accurate since (as noted above) Section 5 enforces core guarantees of both Amendments.  It is true that the concern expressed by the Court in the *Boerne* decisions is most likely to arise when Congress legislates to enforce rights secured against the States only by the Fourteenth Amendment.  The Fourteenth Amendment encompasses a nearly limitless variety of constitutional challenges to state action; it not only contains primary prohibitions on discrimination, but also "functions as the vehicle through which various [other] rights . . . apply to the states."  *Id.* at 242.

enforce rational-review Fourteenth Amendment protections against disability discrimination, but also "a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review."  541 U.S. at 522-23.  The *Lane* Court found that "the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent", *id*. at 523, and quoted *Hibbs* to reinforce the significance of congressional legislation to enforce constitutional rights that trigger heightened review: "We explained that because the FMLA was targeted at sex-based classifications, which are subject to a heightened standard of judicial scrutiny, 'it was easier for Congress to show a pattern of state constitutional violations' than in *Garrett* or *Kimel*, both of which concerned legislation that targeted classifications subject to rational-basis review." *Id*. at 528-29 (citation omitted).

Because racial discrimination in voting is subject to the highest level of scrutiny, *Lane* and *Hibbs* show that even under the *Boerne* standard this case would require substantial deference to Congress' judgment of what constitutes appropriate remedial legislation. *See also Tennessee v. Lane*, 541 U.S. 509, 562, 564 (2004) (Scalia, J., dissenting) (arguing that Congress' enforcement authority under the Reconstruction Amendments should be given "more expansive scope with regard to measures directed against racial discrimination by the States," and that, accordingly, "the permissive *McCulloch* standard [should be applied] to congressional measures designed to remedy racial discrimination by the States").

The fact that this case concerns the reauthorization of valid remedial legislation is another, critical difference between this and any of the Supreme Court's *Boerne* cases.  Each of those cases addressed the question of Congress' authority to enact remedial legislation in the first instance.  This Court faces the analytically distinct and limited question of whether Congress acted appropriately in extending the life of an existing, constitutional discrimination remedy.

27

Accordingly, even if this Court were to conclude that a new congressional enactment grounded on the Fifteenth Amendment would have to be evaluated strictly in terms of a three-step *Boerne* analysis for its "congruence and proportionality," it does not follow at all that this analysis must apply to reauthorization legislation.  The reauthorization of preventive remedies necessarily requires a different set of considerations – in particular, whether the existing statute has prevented or deterred unconstitutional conduct from taking effect.  Congress made specific findings about this deterrent effect in 2006 that cannot be brushed aside.

Thus, the *Boerne* cases are best understood as providing a generalized analysis for assessing enforcement legislation whose initial enactment has an uncertain constitutional grounding.  The *Boerne* cases did not purport to overrule, alter or otherwise displace *Katzenbach* or *Rome* as setting the standards for evaluating whether Section 5 remains appropriate enforcement legislation.  Nothing in any of the *Boerne* cases requires or permits this Court to depart from the standards set forth in *Katzenbach* and *Rome*.

> **2.     Plaintiff's Proposed Legal Arguments are Contravened by *Rome* and Would Yield Nonsensical Results**

Relying on *Boerne*, Shelby County argues that the 2006 reauthorization may be upheld if, and only if, the covered jurisdictions engaged in a pattern of intentionally discriminatory conduct after 1982 that violates the Fifteenth Amendment.  Memorandum, at 30.  The only evidence of such conduct that the County appears willing to credit would be judicial findings of "intentional discrimination."  Memorandum, at 34.  The County further argues that such post-1982 intentional discrimination must have been of the same nature and scope as the discrimination that Congress relied upon in 1965, and which the Supreme Court recognized in *Katzenbach*, *i.e.*, the discrimination must have involved "'unremitting and ingenious defiance' of the Fifteenth

Amendment by covered jurisdictions."  Memorandum, at 4; *see also* Memorandum at 22.

Finally, the County asserts that only evidence of intentionally discriminatory conduct involving

so-called "first generation" barriers, *i.e.*, barriers to registration and voting, may satisfy these

requirements, but Congress instead relied heavily on evidence of "second generation" barriers,

*i.e.*, voting practices that dilute minority voting strength and restrict the opportunity of minority

voters to elect their preferred candidates.  Memorandum, at 6, 25, 30-32.

 None of these three arguments can be reconciled with the Supreme Court's controlling

holding in *Rome* as to the circumstances under which Congress may reauthorize Section 5.

Indeed, the County does not discuss the standard of review applied in *Rome*, notwithstanding

*Rome's* specific precedential relevance to this case.[21]  Each of these three arguments also rests

upon the mistaken assertion that the "congruence and proportionality" of the 2006 Section 5

reauthorization requires a literal application of the *Boerne* analysis which, as discussed above, is

analytically distinct from this case.

 The County's first argument – that a pattern of intentional discrimination must persist

notwithstanding the prophylactic remedy – is belied by *Rome's* analysis of the circumstances

Congress relied upon in reauthorizing Section 5 in 1975.  *Rome* did not discuss whether, or to

what extent, the circumstances present in 1975, or the Attorney General's implementation of

Section 5, evidenced a continuing pattern of intentional discrimination.  *Rome*, 446 U.S. at 180-

81.  Instead, what was important was that evidence placed before Congress demonstrated a

pattern of ongoing inequality and that this inequality, when viewed in conjunction with the

intentional discrimination that *pre-dated* the adoption of the Voting Rights Act, supported

---

[21] Shelby County relies instead on  *Katzenbach*  but *Katzenbach*, of course, did not address, and could not have
addressed, the circumstances that justify a reauthorization of Section 5.

Congress' conclusion that there was a continuing, cognizable risk that covered jurisdictions might "enact or seek to administer" new discriminatory voting practices.  *Id.* at 182 ("at least another 7 years of [the Section 5] statutory remedies were necessary to counter the perpetuation of 95 years of [pre-Act] pervasive voting discrimination").  The third circumstance Congress relied upon for the 1975 reauthorization – "the number and nature of objections interposed by the Attorney General," 446 U.S. at 181 – contained relatively little direct evidence of intentional discrimination, since the overwhelming majority of those objections had been based upon the Section 5 "effect" prohibition, not the Section's "purpose" prohibition.  Defendant-Intervenors' Joint Statement of Material Facts As to Which There is No Genuine Issue, at ¶ 44 (report submitted by Peyton McCrary et al., *November 1, 2005 Hearing*, at 180 tbl.2).[22]

*Rome* likewise shows that the County's second argument – that reauthorization must be based on constitutional violations of the same nature and scope as existed in 1965 –  offers a patently incorrect standard.  The voting problems Congress relied upon in 1975 clearly differed from those relied upon in 1965.  Indeed, as the Court noted in *Rome*, significant progress had occurred since 1965, largely "as a result of the [Voting Rights] Act," shown by the fact that "Negro voter registration had improved dramatically since 1965."  446 U.S. at 180.

Finally, Shelby County's third contention – that only "first-generation barriers" are cognizable, rather than "second-generation" dilutive measures – also is contradicted by *Rome*.  Rather than indicating that Section 5 no longer is needed when voting problems are "second generation," the Court affirmed that the precise opposite is true:  in reviewing Congress' reauthorization decision, the Court found particularly persuasive Congress' conclusion that there

---

[22] Notwithstanding that a continuing pattern of intentional discrimination need not be present, it also is important to note that, in 2005 and 2006, Congress did receive substantial evidence that covered jurisdictions had engaged in numerous acts of intentional voting discrimination subsequent to the 1982 reauthorization.  *See infra* 34-36.

was a "'continuing need for this preclearance mechanism'" because "'[a]s registration and voting

of minority citizens increases *[sic]*, other measures may be resorted to which would dilute

increasing minority voting strength.'" *Id.* at 181 (citation omitted).  Similarly, as discussed *supra*

at 17, the Supreme Court long has held that a central concern of Section 5 is that covered

jurisdictions may adopt measures whose purpose or effect is to dilute minority voting strength.[23]

Perhaps the most serious problem with Shelby County's analysis is that, if adopted, the

continuing validity of any civil rights remedy enacted by Congress pursuant to the

Reconstruction Amendments would paradoxically depend upon the unremitting presence of an

extensive pattern of unconstitutional conduct.  Thus, Congress would be powerless to reauthorize

or keep in effect a remedy that acted to moderate or abate the targeted discrimination, regardless

of whether Congress concluded that, without the remedy, the targeted discrimination would

increase.  Under Shelby County's topsy-turvy decision rule, only ineffective remedies that

allowed the original problem to persist unabated could constitutionally be reauthorized.  Needless

to say, the Fifteenth Amendment's grant of authority to Congress to enact "appropriate"

legislation to enforce its strictures cannot, and does not, mean that Congress is empowered only

to keep ineffective legislation in place while being prevented from retaining successful measures.

---

[23] The County also mistakenly contends that the provisions of the Section 4 coverage test define the nature and scope
of the problems Section 5 seeks to address.  Thus, the County places great weight on the assertion that, if the Section
4 coverage test were applied to recent presidential elections, Alabama and Shelby County would not be covered,
since it is no longer the case that less than 50 percent of the voting age populations in the State and in the County are
registered or vote.  But, as explained above, the Section 4 coverage provisions serve only to identify the jurisdictions
with a history of egregious discrimination in voting, not the purpose or scope of the preclearance mechanism, nor
whether there is a continuing need for the Section 5 remedy.  Indeed, Congress was aware in 1975 that Alabama (and
at least four of  the other six southern states wholly or partially covered) had already exceeded the 50 percent
registration and voting benchmark, H.R. Rep. 94-196, at 6 (1975), but this posed no barrier to reauthorization or to
the Supreme Court upholding Congress' reauthorization decision.

III.     **CONGRESS' 2006 REAUTHORIZATION OF SECTION 5 WAS FULLY
         SUPPORTED BY THE LEGISLATIVE RECORD**

   A.    **The Record Before Congress Provided Ample Basis for Congress to
         Conclude That Section 5 Still Is Needed to Combat and Deter Voting
         Discrimination by Covered Jurisdictions**

As the 2007 expiration approached for the 1982 reauthorization of Section 5, Congress

undertook a searching examination of whether this provision should be allowed to expire.

Congress conducted more than 20 hearings, heard testimony from dozens of witnesses, and

compiled a highly detailed factual record.  This record is summarized in detail in Defendant-

Intervenors' Joint Statement of Material Facts As to Which There is No Genuine Issue ("Joint

Statement") filed on this date by the three groups of Defendant-Intervenors.  Defendant-

Intervenor respectfully refers this Court to that Statement for a comprehensive annotated review

of the "careful consideration [Congress gave] to the propriety of readopting § 5's preclearance

requirement."  *Rome*, 446 U.S. at 181.

Based upon its extensive review, Congress concluded that allowing Section 5 to lapse

would endanger the voting rights of minorities in covered jurisdictions.  In this regard, Congress

properly "avail[ed] itself of information from [a variety] of "probative source[s],"  *Katzenbach*,

383 U.S. at 330, including, but not limited to, the types of information it relied upon in 1975 and

which were cited with approval by *Rome*.  Congress' reauthorization was rational, and therefore

constitutionally appropriate.

   1.    **Registration Rates and Election of Minority Candidates**

As the Supreme Court found in *Rome*, disparate minority registration and election rates

are relevant, but still limited, indicia of the continued need for Section 5.  While increased

minority registration clearly is a positive result, it also may enhance the importance of  subjecting

measures such as redistrictings and election method changes to preclearance, particularly in the

context of racially polarized voting.  In addition, minority electoral success may largely be the product of Voting Rights Act enforcement.  In 2006, Congress found that, due in substantial part to enforcement of Section 5 and other provisions of the Act, minority registration and election rates have continued to improve, while, at the same time, problems remain.

Congress found that minorities have achieved parity in voter registration in several of the covered States.  However, Congress also found significant registration disparities in other covered and partially covered jurisdictions, as it had in 1975.  H.R. Rep. No. 109-478, at 25, 29 (2006).  In particular, gaps between Hispanic and non-Hispanic white citizens remain particularly large in several covered States, including a 16 percentage-point gap in Texas.  *Nw. Austin Mun. Util. Dist. No. One v. Mukasey,* 573 F. Supp. 2d 221, 248 (D.D.C. 2008) ("*NAMUDNO*") (explaining the appropriate data analysis).  Congress also received evidence indicating that "in most of the covered Southern States, . . . black turnout continues to lag turnout of nonhispanic whites."  Joint Statement, at ¶ 320 (quoting *Understanding the Benefits and Costs of Section 5 Pre-Clearance,* Hearing Before the Committee on the Judiciary, United States Senate, 109th Cong. (May 17, 2006), at 131); *see also NAMUDNO,* 573 F. Supp. 2d at 248.

Congress also found in 2006, as it had in 1975, that progress in the election of minority preferred candidates remains uneven, geographically and by level of office.  For example, no African-American had ever been elected to statewide office in Mississippi, Louisiana, or South Carolina, despite the significant African-American populations in those States.  H.R. Rep. No. 109-478, at 33.  And in many fully covered jurisdictions, minority representation, even for lower offices, lags well behind proportional levels.  *Id.* at 32-33.

Congress further concluded that, "[f]or minority voters, there is effectively an election ceiling," and generally speaking "[t]he only chance minority candidates have to be successful are

in districts in which minority voters control the elections," *i.e.*, majority-minority districts.  *Id.* at 34.  The record established by Congress is replete with instances where Section 5 objections interposed by the Attorney General prevented covered jurisdictions from eliminating or diluting majority-minority districts, or led to the establishment of additional such districts, *see generally* Joint Statement, at ¶¶ 55-157, and thus the increase in the number of minority elected officials since 1982 is attributable, in large part, to the Voting Rights Act.

### 2. Section 5 Objections

During the 2006 reauthorization, Congress also closely examined "the number and nature of objections interposed by the Attorney General."  *Rome*, 446 U.S. at 181.  This examination revealed that the Attorney General interposed objections to more than 700 voting changes between 1982 and 2004.  H.R. Rep. No. 109-478, at 21.  Indeed, more objections were interposed during this period than between 1965 and 1982.  *Id.*  Objections were interposed to least one statewide change in every fully covered State and in most partially covered States and, between 1980 and 2000, over 400 objections were interposed on the basis of the Attorney General's determination that the jurisdiction had acted with a discriminatory purpose.  *NAMUDNO,* 573 F. Supp. 2d at 251-52 (citing to the legislative record); *see also* Joint Statement, at ¶ 44.

These objections preempted a wide variety of attempted discriminatory actions, including racially gerrymandered redistricting plans, switching offices from elected to appointed positions, racially discriminatory annexation policies and dilutive annexations, anti-single-shot provisions such as numbered posts, and switching from district-based elections to at-large voting systems while implementing majority vote requirements.  H.R. Rep. No. 109-478, at 36.  Overall, the record of objections demonstrated that "attempts to discriminate persist and evolve, such that Section 5 is still needed to protect minority voters in the future."  *Id.* at 21.

Shelby County attempts to downplay this evidence of hundreds of attempted acts of official discrimination, including intentional discrimination, by claiming that, prior to the 2006 reauthorization of Section 5, discriminatory purpose was not a basis for denying preclearance and that preclearance only could be denied if a voting change had a discriminatory (retrogressive) effect.  Memorandum, at 32.  But Section 5 has always, by its plain terms, prohibited voting changes having a discriminatory "purpose," as well those changes having a discriminatory "effect."  42 U.S.C. § 1973c; Pub. L. No. 89-110, 79 Stat. 437, 439, § 5 (1965).  Moreover, the Section 5 "purpose" test always has prohibited voting changes motivated by an intent to discriminate that would violate the Fifteenth Amendment, except for the six-year period, between 2000 and the reauthorization in 2006, when the test was limited to addressing changes motivated by an intent to cause a retrogression in minority voting strength.[24]  The corollary of this is that there have been few judicial findings in the Section 5 jurisdictions of voting changes having been adopted with a discriminatory purpose.[25]

---

[24]  In *Reno v. Bossier Parish*, 528 U.S. 320, 341 (2000), the Supreme Court held that "§ 5 does not prohibit preclearance of a [voting change] enacted with a discriminatory but nonretrogressive purpose."  In 2006, Congress determined that, prior to this decision, Section 5, as enforced by the Attorney General and the District of Columbia District Court, had broadly prohibited the implementation of voting changes motivated by any racial animus.  H.R. Rep. No. 109-478, at 66-67.  *See City of Richmond v. United States*, 422 U.S. 358, 378 (1975) ("An official action, whether an annexation or otherwise, taken for the purpose of discriminating against Negroes on account of their race has no legitimacy at all under our Constitution or under [Section 5]."); s*ee also Pleasant Grove v. United States*, 479 U.S. 462, 471 n.11 (1987); *Busbee v. Smith*, 549 F. Supp. 494, 516 (D.D.C. 1982), *aff'd mem.*, 459 U.S. 166 (1983).  Congress further concluded that the *Bossier* decision had severely limited the reach of Section 5.  Congress therefore included in the reauthorization legislation an amendment to Section 5 to restore the pre-*Bossier* purpose standard. 42 U.S.C. § 1973c(c).

[25]  During the six-year period that the "retrogressive purpose" standard applied, the Texas legislature adopted a congressional redistricting plan, which the Supreme Court found "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation."  *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440 (2006).  This decision was issued while Congress was considering Section 5 reauthorization.  Two cases in Alabama that found intentional discrimination after 1982 concerned voting practices beyond the reach of Section 5.  *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1356-60 (M.D. Ala. 1986), a district court found that the State had engaged in pre-Act intentional discrimination concerning the methods of electing local governmental bodies that had a widespread, continuing discriminatory effect.  The same court also found intentional discrimination in another case concerning the appointment of poll workers, a practice that is not reviewed under Section 5.  *Harris v. Siegelman,* 695 F. Supp. 517, 526 (M.D. Ala. 1988).

Shelby County also mistakenly attempts to discount the number of objections interposed by generalizing from a single Supreme Court decision in 1995, *Miller v. Johnson*, 515 U.S. 900 (1995), where the Court found that a Georgia congressional redistricting was unconstitutionally drawn based on race, and that the plan had resulted from Section 5 objections that improperly required the State to "maximize" minority voting strength.  Memorandum at 34.  Based on these few problematic objections, the County claims that the increase in objections in the 1990s "is entirely explained by" the *Miller* finding.  But the County provides no basis for this "explanation," which is refuted by the record Congress developed in support of reauthorization.[26]

In the end, it was Congress' prerogative to resolve disputed factual questions arising from the record before it.  And Congress concluded that the Attorney General's post-1982 Section 5 objections provided substantial evidence showing ongoing intentional discrimination by the covered jurisdictions.  H.R. Rep. No. 109-478, at 36.

Finally, Shelby County argues that that the ratio of Section 5 objections to submissions in recent years (and the absolute number of objections) is low.  Memorandum at 28, 33.  While it is accurate to note that the objection ratio is low, and that the annual numbers of objections fell from the late 1990s to 2005, H.R. Rep. No. 109-478, at 22, these facts did not, and could not, compel Congress to conclude that voting discrimination in the covered jurisdictions is no longer a threat.  Except in the early years, Section 5 objections consistently have represented a very small percentage of the total number of voting changes submitted for review.  *Id.*  But this ratio

---

[26] The County relies solely upon testimony submitted to Congress by a law professor to make its evidentiary leap. Memorandum at 34.  But, as Congress was informed, numerous objections were interposed in the 1990s based upon retrogression which, by definition, could not have been based on "maximization."  Joint Statement, at ¶ 44 (report submitted by Peyton McCrary et al., *November 1, 2005 Hearing*, at 180 tbl.2) (40% of 1990s objections based on retrogression).  Similarly, the County does not (and cannot) establish a relationship between the asserted maximization analysis regarding redistrictings and non-redistricting objections.  Finally, the County offers no basis for concluding that the Attorney General's review of local redistricting plans (which constituted the overwhelming majority of plans reviewed) was affected by the reputed maximization analysis concerning a few statewide plans.

of objections to submissions has not been used as a threshold for justifying past reauthorizations and there is no reason to begin using it for that purpose here.  For example, the Supreme Court sustained the 1975 reauthorization of Section 5 in its 1980 *Rome* decision even though it was informed that the objection rate in 1978 had dropped to 0.8% percent.  *NAMUDNO,* 573 F. Supp. 2d at 249.

As indicated in *Rome*, evidence of continuing discrimination reflected in the absolute volume and nature of attempted discriminatory acts to which objections have been interposed is the most pertinent information.  *Rome*, 446 U.S. at 181.  And the hundreds of attempted acts of voting discrimination since the 1982 reauthorization – including numerous changes motivated by a discriminatory purpose – gave Congress ample basis on which to conclude that Section 5 remains needed to protect minority voters.[27]

### 3.    "More Information" Requests and Section 5 Deterrence

Congress also determined that Section 5 objections provide an incomplete picture of the extent to which covered jurisdictions sought, after 1982, to implement discriminatory voting changes.  There were two aspects to this Congress' determination in this regard.

First, Congress noted that several hundred proposed voting changes were withdrawn, not acted upon, or superseded following "more information" requests by the Attorney General.  H.R. Rep. No. 109-478, at 40-41.[28]  The proposed voting changes that were withdrawn following these requests came "primarily" from jurisdictions in southern States with a substantial concentration

---

[27] In addition, Congress received testimony that the number of objections fell between 2000 and 2006 at least in part because of the Supreme Court's decision, in *Reno v. Bossier Parish School Board*, *supra*, where the Court substantially narrowed the scope of Section 5's purpose prohibition.  *See supra* n.24.  Joint Statement, at ¶¶ 44, 50-51, 397-403.

[28] *See* 28 C.F.R. § 51.37 (authorizing the Attorney General to respond to a submitted voting change by sending a written request for additional items of information).

of African-American voters. *Id.* at 41. Congress reasonably concluded that these withdrawals were "often illustrative of a jurisdiction's motives." *Id.* at 40.

In other words, jurisdictions abandoned hundreds of proposed voting changes in mid-review after the Attorney General signaled specific concerns that the changes might have a discriminatory purpose or effect. Congress was well-justified to conclude that many if not most of these abandoned submissions would have resulted in objections if they had not been abandoned, and that they included a substantial number of thwarted discriminatory actions. Second, Congress heard and credited substantial testimony that Section 5 often has *deterred* discrimination in covered jurisdictions. H.R. Rep. No. 109-478, at 36 (Section 5 is responsible for many "discriminatory voting changes . . . hav[ing] never materialized"). Congress, in part, relied on a comprehensive report prepared by the National Commission on the Voting Rights Act, which found that "'[o]nce officials in covered jurisdictions become aware of the logic of preclearance, they tend to understand that submitting discriminatory changes is a waste of taxpayer time and money and interferes with their own timetables, because the chances are good that an objection will result." H.R. Rep. No. 109-478, at 24; *see also* Joint Statement, at ¶¶ 158-81.

Congress therefore reasonably concluded that the effectiveness of Section 5 in preventing discriminatory changes from even being adopted masks the extent to which covered jurisdictions would discriminate in the absence of the preclearance mechanism. H.R. Rep. No. 109-478, at 36; *see Rome*, 446 U.S. at 182 (holding that a legitimate basis for reauthorization is to "preserve the . . . achievements" of the Voting Rights Act). Shelby County has cited to nothing in the congressional record to impeach Congress' findings specifically or to demonstrate generally that Section 5 has merely an insignificant deterrent effect.

### 4.       Deployment of Federal Observers

Congress further found that the credible threat of election-related discrimination and misconduct has led the Attorney General to assign 300-600 election observers to covered jurisdictions annually since 1982.  H.R. Rep. No. 109-478, at 44.  Congress appropriately concluded that the continuing deployment of federal observers in the covered jurisdictions by the Justice Department is relevant and probative evidence of continuing problems of voting discrimination in those jurisdictions:  "The assignment of Federal officials to these jurisdictions demonstrates that the discriminatory conduct experienced by minority voters is not solely limited to tactics to dilute the voting strength of minorities but continues to include tactics to disenfranchise, such as harassment and intimidation inside polling locations. Under Section 8, observers are assigned to a polling location only when there is a reasonable belief that minority citizens are at risk of being disenfranchised."  *Id.*

### 5.       Ongoing Prevalence of Racially Polarized Voting

Congress found that racially polarized voting remains a significant phenomenon in covered jurisdictions.  *Id.* at 34.  Congress further determined that "[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965."  Pub. L. No. 109-246, 120 Stat. 577, § 2(b)(3).

Although racially polarized voting is not, by itself, state action, it is highly relevant in evaluating both the purpose and effect of voting changes adopted by the covered jurisdictions. For one, it is necessary that a pattern of racially polarized voting be present in order to conclude

that a redistricting plan or a method of election will dilute minority electoral opportunity.[29]   And

a determination of a dilutive effect is a necessary precondition for concluding that a change had a

retrogressive effect and/or a discriminatory purpose.  Accordingly, when Congress in 2006, as in

1975, examined whether covered jurisdictions are continuing to resort to "'other measures . . . to

dilute increasing minority voting strength,'" *Rome*, 446 U.S. at 181, it was incumbent on

Congress to take a hard look at the extent to which racially polarized voting continues to play a

prominent role in the electoral processes of covered jurisdictions.

Furthermore, the presence of racially polarized voting may provide circumstantial

evidence that a voting change which imposes a heavier burden on minority voters was adopted in

response to racially discriminatory sentiment or pressures in the electorate.  *See Rogers*, 458 U.S.

at 623 (racial bloc voting "allows those elected to ignore black interests without fear of political

consequences").

Thus, Congress properly considered the continuing prevalence of polarized voting in the

covered jurisdictions in analyzing the need for reauthorizing Section 5, and its finding that

polarized voting remains a significant factor provided further support for its decision to

reauthorize Section 5.

### 6.      Section 5 Enforcement Suits and Section 2 Suits

The record before Congress included evidence of "at least 105 successful Section 5

enforcement actions," since 1982.  Joint Statement, at ¶  33.  A Section 5 enforcement action is a

lawsuit brought to enjoin implementation by a covered jurisdiction of an unprecleared change.

---

[29] *League of United Latin American Citizens*, 548 U.S. at 427,  438-40 (discussing racially polarized voting in
Texas, and its impact on Latino electoral opportunity in the context of a congressional redistricting plan); *Thornburg
v. Gingles*, 478 U.S. at 49 n.15 ("in the absence of significant white bloc voting it cannot be said that the ability of
minority voters to elect their chosen representatives is inferior to that of white voters"); *Rome*, 446 U.S. at 183
(proposed "electoral changes . . . when combined with the presence of racial bloc voting and *Rome*'s majority white

Furthermore, the record indicated that there had been over 650 successful Section 2 suits in the nine fully covered States since 1982.  *Id.*  While most of the practices challenged in Section 2 cases (such as at-large election systems) predated Section 5 coverage, even in those cases the plaintiffs  were required to present evidence of present-day discriminatory effects.

### 7.    Post-Implementation Lawsuits as an Alternative to Preclearance

In reauthorizing Section 5, Congress specifically considered whether litigation under Section 2 now would provide a sufficient alternative to the preclearance remedy.  Congress reasonably concluded that post-implementation litigation remains "inadequate."  H.R. Rep. No. 109-478, at 57.

First, without preclearance, discriminatory voting practices would go into effect immediately, placing the burden of "time and inertia" on minority voters, *Katzenbach*, 383 U.S. at 328, rather than on jurisdictions with an established history of voting discrimination.  Second, Congress noted that this would "reverse the burden of proof" in voting reviews, since Section 5 places the burden on submitting jurisdictions, not the historical victims of discrimination, to demonstrate that voting changes are nondiscriminatory.  H.R. Rep. No. 109-478, at 66.  And third, Section 5's prescreening of voting changes typically spares minority groups from the substantial cost involved in pursuing after-the-fact litigation.  Congress heard testimony establishing that Section 2 cases are particularly resource-intensive to litigate and difficult to win. Joint Statement, at ¶¶ 352-358.

---

population and at-large electoral system, would dilute Negro voting strength").

**B.      Section 5 Continues to Target the Areas With the Greatest Risk of Racial Discrimination in Voting**

Congress decided that it was unnecessary to expand, constrict or otherwise recalibrate the Section 4 geographic coverage provisions because Section remains aimed at the jurisdictions where the ongoing risk of voting discrimination is most pronounced.  Congress reasonably concluded that the Section 4 bailout procedure and the Section 3(c) bail-in procedure remain appropriate means for adjusting coverage on a case-by-case basis.  Congress' determinations in this regard were the result of careful review, and rested well within its Fifteenth Amendment enforcement authority.  *See Katzenbach*, 383 U.S. at 331 (holding that the geographic coverage of Section 5 is constitutional so long as the "distinctions drawn [by Congress] have some basis in practical experience").

Congress received evidence that there are a disproportionate number of successful Section 2 suits in the covered jurisdictions. H.R. Rep. No. 109-478, at 53; *see also* Joint Statement, at 330-338.  This evidence also indicated that polarized voting is more prevalent and pronounced in covered areas.  *Id.*  These findings are particularly notable given that, as Congress recognized, hundreds of voting changes in the covered jurisdictions also were blocked by Section 5 objections.  Thus, the quantum of discriminatory voting provisions in the covered jurisdictions far outweighed the amount in the non-covered areas of the country.  Furthermore, since, as noted, Congress also concluded that Section 5 has a significant deterrent value, this also must be considered in comparing the two sets of jurisdictions.  In short, the evidence before Congress strongly supported a conclusion that voting discrimination is a substantially greater phenomen in the covered areas of the country.

In addition, comparisons between the covered and non-covered areas of the country can misconstrue the purpose that Section 5 plays in the covered areas.  As noted by the Supreme Court in *NAMUDNO*, the argument that there are no meaningful differences between the two sets of jurisdictions often is based upon an examination voter registration and turnout rates in various parts of the country.  129 S. Ct. at 2512.  However, as discussed *supra*, Section 5 long has been understood to address far more than disparate registration and turnout rates, *see generally Allen v. State Board of Elections*, 393 U.S. at 566, and as the Court emphasized in *Rome*, increased minority registration and turnout rates do not establish that Section 5 is no longer needed.  *Rome*, 446 U.S. at 181.  At bottom, Section 5 coverage is founded on determinations by Congress of a continuing risk of voting discrimination in areas of the country that have an egregious history of discrimination in voting.  Jurisdictions lacking that history may not properly be compared to the covered jurisdictions based simply on the relative presence or absence of disparities in registration and turnout.

Consequently, Shelby County has failed to demonstrate that Congress unreasonably overlooked a pattern of widespread voting discrimination in the non-covered States, and has otherwise failed to demonstrate that there is no meaningful difference in the risk of voting discrimination between the covered and non-covered jurisdictions.

The present-day distinction between the covered and non-covered jurisdictions is not ineluctable.  As circumstances such as those reviewed by Congress in 2006 continue to moderate, the country can anticipate the day when the preclearance remedy is no longer needed.  But, in 2006, Congress correctly concluded that Section 5's "current burdens [are] justified by current needs."

**C.     Section 5 Does Not Occasion Excessive Race Conscious Decisionmaking**

Finally, the Supreme Court questioned in *NAMUDNO* whether jurisdictions tasked by Section 5 with designing voting changes that lack both a discriminatory purpose and a discriminatory effect may respond by placing a heavy emphasis on race in crafting their voting changes.  129 S. Ct. at 2512.

To the contrary, however, Section 5 does not occasion any excessive race-conscious decisionmaking; nor does Section 5 create any geographic disparity in this regard between covered and non-covered areas.  In general, state and local officials throughout the country must be cognizant of the nondiscrimination command of the Fifteenth Amendment and, as well, as the nondiscrimination requirements of Section 2 of the Voting Rights Act, whenever they enact or seek to administer a voting change.  The Section 5 remedy is a constitutional application of the Fifteenth Amendment, which itself is a clearly race-conscious provision.  Furthermore, it clearly is to be expected that officials in jurisdictions where elections are racially polarized will consider the racial implications of their actions, regardless of whether they are located in a Section 5 jurisdiction.  *See Shaw v. Reno*, 509 U.S. 630, 646 (1993) ("redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, just as it is aware of . . . a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.").

Ultimately, the concern must be whether Congress appropriately concluded that Section 5 remains a necessary remedy for ongoing problems of racial discrimination in voting.  For the reasons set forth above, Congress' conclusion, that Section 5 continues to be an appropriate discrimination remedy, provides the necessary response to any concern regarding Section 5 and race-conscious decisionmaking.

## CONCLUSION

For the reasons set forth above, Defendant-Intervenor Bobby Lee Harris respectfully urges this Court to grant summary judgment that Congress' 2006 reauthorization of Section 5, and the Section 4 coverage provisions that apply to Section 5, are a constitutional exercise of Congress' Fifteenth Amendment Authority.  For this reason, Plaintiff Shelby County's motion should be denied.

November 15, 2010                                    Respectfully submitted,

*/s/ Mark A. Posner*
Jon M. Greenbaum (D.C. Bar No. 489887)
Robert A. Kengle
Marcia Johnson-Blanco
Mark A. Posner (D.C. Bar No. 457833)
Lawyers' Committee for Civil Rights
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
Tel. (202) 662-8325
Fax (202) 783-0857
jgreenbaum@lawyerscommittee.org
bkengle@lawyerscommittee.org
mblanco@lawyerscommittee.org
mposner@lawyerscommittee.org

John M. Nonna (pending pro hac vice admission)
Autumn Katz (pending pro hac vice admission)
Daniel Stabile (pending pro hac vice admission)
David Cooper  (pending pro hac vice admission)
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Tel. (212) 259-8311
Fax (212) 649-9461

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2010, I served a true and correct copy of the

foregoing via the Court's ECF system, on counsel of record.

*/s/ Mark A. Posner*