**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHELBY COUNTY, ALABAMA<br><br>                 Plaintiff,<br><br>         v.<br><br>ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States of America<br><br>                 Defendant,<br><br>EARL CUNNINGHAM, HARRY JONES, ALBERT JONES, ERNEST MONTGOMERY, ANTHONY VINES and WILLIAM WALKER,<br><br>                 Defendant-Intervenors,<br><br>BOBBY PIERSON, WILLIE GOLDSMITH SR., KENNETH DUKES, MARY PAXTON-LEE, and ALABAMA STATE CONFERENCE OF THE NAACP,<br><br>                 Defendant-Intervenors,<br>and<br><br>BOBBY LEE HARRIS,<br><br>                 Defendant-Intervenor. | Civil Action No. 1:10-CV-651<br>(JDB) |

**DEFENDANT-INTERVENORS' JOINT STATEMENT OF
MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

## TABLE OF CONTENTS

I.   **Procedural History of the 2006 Voting Rights Act Reauthorization** .............................2

II.  **Evidence Before Congress Regarding the 2006 Reauthorization of Section 5** ...........11

   A.   The Effect of Section 5 ...............................................................................11

      1.   Congressional Findings....................................................................11

      2.   Testimony to Congress ....................................................................17

   B.   Evidence Before Congress:  Section 5 Preclearance Reviews.....................22

      1.   Objections Interposed .....................................................................22

         a.   Congressional Findings........................................................22

         b.   Testimony to Congress – Summary Evidence ...............................26

         c.   Objections by State .............................................................33

            i.   Alabama....................................................33

            ii.   Alaska......................................................36

            iii.   Arizona.....................................................36

            iv.   California..................................................38

            v.   Florida......................................................39

            vi.   Georgia.....................................................40

            vii.   Louisiana..................................................43

            viii.   Mississippi................................................48

            ix.   New York..................................................52

            x.   North Carolina...........................................52

            xi.   South Carolina...........................................55

            xii.   South Dakota.............................................58

            xiii.   Texas........................................................59

            xiv.   Virginia....................................................65

      2.   Section 5 Deterrence, Including the Impact of DOJ Requests for More Information......................................................................67

      3.   Requests for Declaratory Judgments Withdrawn or Denied.....................76

   C.   Evidence Before Congress:  Section 5 Enforcement Actions...............................78

      1.   Congressional Findings....................................................................78

      2.   Enforcement Actions in Covered Jurisdictions...........................................79

   D.   Evidence Before Congress:  Observer Coverage and Interference with Minority Voters' Right to Vote.....................................................................82

      1.   Congressional Findings....................................................................82

      2.   Testimony to Congress ....................................................................84

   E.   Continuing Prevalence of Racially Polarized Voting ...........................................94

      1.   Congressional Findings Regarding Racially Polarized Voting .................94

      2.   Testimony to Congress ....................................................................96

   F.   Evidence Before Congress:  Voting Discrimination in Section 2 Cases ............100

   G.   Evidence Before Congress: Voter Registration, Voter Turnout, and the Number of Minority Elected Officials ................................................107

|  |  | 1. | Gains in Minority Participation and Representation Attributable to Section 5 and the VRA ....................107 |
|  |  | 2. | Continuing Problems in Election of Minority Officials ........................111 |
|  |  |  | a.   Congressional Findings.................111 |
|  |  |  | b.   Testimony to Congress .................112 |
|  |  | 3. | Continuing Problems in Minority Voter Participation ...........115 |
|  |  |  | a.   Congressional Findings.................115 |
|  |  |  | b.   Testimony to Congress .................115 |
|  | H. | | Evidence Before Congress:  Comparison of Covered and Non-Covered Areas ..............117 |
|  | I. | | Evidence Before Congress: the "Bailout" Provision .................119 |
|  |  | 1. | Congressional Findings.....................119 |
|  |  | 2. | Testimony to Congress .....................120 |
|  | J. | | Evidence Before Congress:  Inadequacy of Section 2 Litigation as a Substitute for the Preclearance Process ..................123 |
|  | K. | | Evidence Before Congress: the Minimal Administrative Costs and Burdens Imposed by Section 5 ...................126 |
| **III.** | | | **Sufficiency of the 2006 Legislative Record for Reauthorization of Section 5 ..........129** |
|  | A. | | Reauthorization Is Supported by the Record ....................129 |
|  | B. | | The Difference Between Enactment and Reauthorization...................132 |
|  | C. | | The Sufficiency of the Record Compared to 1982 .................133 |
|  | D. | | Congressional Consideration of the Coverage Formula ................134 |
|  | E. | | The Length of the Renewal Period .................137 |
| **IV.** | | | **Amendments to the Section 5 Preclearance Standard.................138** |
|  | A. | | Overview.................138 |
|  | B. | | Reno v. Bossier Parish School Board (Bossier II), 528 U.S. 320 (2000) ...........138 |
|  | C. | | *Georgia v. Ashcroft*, 539 U.S. 461 (2003) .................141 |

In support of their respective accompanying Motions for Summary Judgment, and pursuant to Local Civil Rule 7(h), Defendant-Intervenors Earl Cunningham, Harry Jones, Albert Jones, Ernest Montgomery, Anthony Vines, William Walker, Bobby Pierson, Willie Goldsmith Sr., Kenneth Dukes Mary Paxton-Lee, the Alabama State Conference of the NAACP, and Bobby Lee Harris, hereby file the following Joint Statement of Material Facts as to Which There Is No Genuine Issue.

The Joint Statement summarizes the determinations and findings of fact made by Congress in support of its enactment of the Fannie Lou Hamer, Rosa Parks and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006.  Pub. L. No. 109-246, 120 Stat. 577.  The Joint Statement also describes the testimony, written reports, and written statements on which Congress relied.  Defendant-Intervenors do not aver that this is, or should, constitute a complete summary of the legislative history. Defendant-Intervenors are lodging with the Court an electronic copy of the complete legislative history.

**I.      Procedural History of the 2006 Voting Rights Act Reauthorization**

1.      At the May 10, 2006 markup by the House Judiciary Committee, the Committee voted to report H.R. 9, as amended, favorably by a vote of 33 to 1.  H.R. Rep. No. 109-478, at 171-173.

2.      On July 13, 2006, the House of Representatives voted 390-33 to pass H.R. 9, the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006.  152 Cong. Rec. H5207.

3.      Prior to voting to pass H.R. 9, the House of Representatives rejected four substantive amendments to the legislation:

  a.  Representative Norwood (GA) offered an amendment that would have based the coverage formula on data from the last three presidential elections.  H.R. Rep. 109-554 at 2. Congress rejected the amendment by a vote of 318 to 96.  152 Cong. Rec. H5204.

  b.  Representative Gohmert (TX) proposed an amendment that would have made the reauthorization period 10 years.  H.R. Rep. 109-554 at 2.  Congress rejected the amendment by a vote of 288 to 134.  152 Cong. Rec. H5205).

  c.  Representative King (IA) offered an amendment that would have eliminated sectiosn of the bill relating to multilingual ballots and the use of American Community Survey census data.  H.R. Rep. 109-554 at 2.  Congress rejected the amendment by a vote of 238 to 185.  152 Cong. Rec. H5205.

  d.  Representative Westmoreland (GA) proposed an amendment that would have required the Department of Justice to notify jurisdictions eligible for bailouts. H.R. Rep. No. 109-554 at 2.  Congress rejected the amendment by a vote of 302-118.  152 Cong. Rec. H5206.

4.      Congress received a statement from Senator Patrick Leahy (VT), Chairman of the Senate Judiciary Committee, regarding the record available to the Senate at the time of its consideration

of the reauthorization bill since the Senate Judiciary Committee had not completed its report at that time: "Of course, at the time of floor debate and consideration of H.R. 9 in the Senate, no Senate Committee Report on S.2703 was available to Senators.  Fortunately at the time of Senate floor debate and consideration of H.R. 9 in the Senate last week, Senators had available to them an extensive record to inform their votes.  We had the voluminous Senate Judiciary Committee record, including thousands of pages of testimony.  We had the full record before the House of Representatives, including thousands of pages of testimony.  We had the House Committee Report; and the full debate on the floor of the House of Representatives, including debate surrounding four substantive amendments to H.R. 9 that were all rejected."  152 Cong. Rec. S8372.

5.      The "Report of the Senate Judiciary Committee on the Fannie Lou Hamer, Rosa Parks, Coretta Scott King, and Cesar E. Chavez Voting Rights Act Reauthorization and Amendments Act of 2006" was not signed by a majority of the Senate Judiciary Committee.  Nine of the eighteen members of the Senate Judiciary Committee signed the report.  *Id*.  Eight members of the Senate Judiciary Committee objected to the Committee report.  S. Rep. No. 109-295, at 54.

6.      On July 20, 2006, the Senate voted 98-0 to pass H.R. 9, the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006. 152 Cong. Rec. S8012.

7.      Congress held 21 hearings on the Voting Rights Act, heard or received information from over 90 witnesses, and created a record consisting of over 16,000 pages.  The following is a list of the hearings conducted  by Congress regarding reauthorization of Section 5 of the Voting Rights Act and related issues:

   a.   The Subcommittee on the Constitution of the House Judiciary Committee held twelve
        hearings, on October 18, 20, and 25 (two hearings), November 1, 8, 9, 10, and 15, 2005,

and March 8 and May 4, 2006 (two hearings).  The Committee heard from 42 witnesses. The hearing record consists of 14,034 pages.

b.  On April 27, June 21, and July 13, 2006, the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Judiciary Committee held hearings.  The Committee heard from 14 witnesses.  The hearing record consists of 857 pages.

c.  On May 9, 10, 16, and 17, June 13, and July 10, 2006, the Senate Judiciary Committee held hearings.  The Committee heard from 32 witnesses.  The hearing record consists of 1,355 pages.

8.    The following, in alphabetical order, is a partial list of the individuals who testified before Congress regarding the reauthorization of Section 5, or who testified before the National Commission on the Voting Rights Act (*see infra*) and whose testimony then was entered into the congressional record.  The affiliations of the witnesses are set forth as they existed at the time of their testimony.

a.  Debo Adegbile, Associate Director of Litigation at the NAACP Legal Defense and Educational Fund Incorporated.

b.  Theodore S. Arrington, Chair of the Department of Political Science at the University of North Carolina-Charlotte, Charlotte, North Carolina.

c.  Joaquin Avila, Assistant Professor of Law at Seattle University School of Law in Seattle, Washington.

d.  James Blacksher, a civil rights lawyer in Birmingham, Alabama, who served as counsel of record in over 90 reported cases mainly in voting rights.

e.  Edward Blum, a visiting fellow at the American Enterprise Institute and a co-director of the Project on Fair Representation.

4

f.   Tyrone Brooks, a Georgia State Representative and President of the Georgia Association of Black Elected Officials.

g.   Vernon Burton, a Professor of History and Sociology at the University of Illinois.

h.   Juan Cartagena, General Counsel for the Community Service Society.

i.   Roger Clegg, Vice President and General Counsel for the Center for Equal Opportunity and former Assistant to the Solicitor General at the U.S. Department of Justice.

j.   Rena Comisac, Principal Deputy Assistant Attorney General for Civil Rights at the U.S. Department of Justice.

k.   Chandler Davidson, Professor at Rice University, and the Tsanoff Chair of Public Affairs Emeritus, and member of the National Commission on the Voting Rights Act.

l.   Drew S. Days, Alfred M. Rankin Professor of Law at Yale Law School, former Solicitor General of the United States and former Assistant Attorney General for Civil Rights at the U.S. Department of Justice.

m.   Alexander Keyssar, Matthew Stirling, Jr. Professor of History and Social Policy and Chair of the Democratic Institutions and Politics at the Kennedy School of Government at Harvard University.

n.   Armand Derfner, a civil rights attorney in Charleston, South Carolina.

o.   Hazel Dukes, President of the New York State Conference of NAACP Branches.

p.   Anita Earls, Director of Advocacy at the University of North Carolina Center for Civil Rights and  a former Deputy Assistant Attorney General for Civil Rights at the U.S. Department of Justice.

q.   Richard Engstrom, Resource Professor of Political Science and endowed Professor of African Studies at the University of New Orleans.

r.   Margaret Fung, Executive Director of the Asian American Legal Defense and Education Fund.

s.   Ronald Gaddie, Professor of Political Science at the University of Oklahoma.

t.   Jose Garza, a voting rights attorney in San Antonio, Texas, who represents the League of United Latin American Citizens.

u.   Fred Gray, an Alabama civil rights attorney, who defended Rosa Parks and Dr. Martin Luther King, Jr., in the Montgomery bus boycott.

v.   Jerome Gray, State Field Director for the Alabama Democratic Conference.

w.   Frank Jackson, mayor of Prairie View, Texas.

x.   Richard Hasen, Hannon Distinguished Professor of Law at Loyola University in Los Angeles, California, and co-author of a leading case book on election law.

y.   Gerald Hebert, a solo practitioner focusing on election law and redistricting, previously Acting Chief, Deputy Chief, and Special Litigation Counsel in the Voting Section of the Civil Rights Division at the U.S. Department of Justice.

z.   Wade Henderson, Executive Director of the Leadership Conference on Civil Rights and counsel to the Leadership Conference on Civil Rights Education Fund.

aa.   Robert Hunter, former chairman of the North Carolina Board of Elections and a partner in the law firm of Hunter, Higgins, Miles, Elam and Benjamin located in Greensboro, North Carolina.

bb.   Sherrilyn Ifill, Associate Professor of Law at the University of Maryland Law School in Baltimore.

cc.   Jacqueline Johnson, Executive Director of the National Congress of American Indians.

dd. Pamela S. Karlan, Kenneth and Harle Montgomery Professor of Public Interest Law, Co-Director of the Supreme Court Litigation Clinic, and Associate Dean for Research and Academics at Stanford University School of Law.

ee. Jack Kemp, former Member of Congress and former Secretary of Housing and Urban Development.

ff. Wan J. Kim, Assistant Attorney General for Civil Rights at the U.S. Department of Justice.

gg. Victor Landa, Central Region Director of the Southwest Voter Registration Education Project.

hh. Natalie Landreth, attorney with the Native American Rights Fund.

ii. Bill Lann Lee, Chair of the National Commission on the Voting Rights Act., former Assistant Attorney General for Civil Rights at the U.S. Department of Justice.

jj. Anne Lewis, partner at the Georgia law firm Strickland Brockington Lewis LLP.

kk. K.C. McAlpin, Executive Director of ProEnglish.

ll. Laughlin McDonald, Director of the ACLU's Voting Rights Project and Executive Director of the Southern Regional Office of the ACLU.

mm. Robert McDuff, a civil rights attorney in Jackson, Mississippi, and Vice Chair of the Board of Directors of the Mississippi Center for Justice.

nn. Nina Perales, Regional Counsel for the Mexican American Legal Defense and Educational Fund.

oo. Nathaniel Persily, Professor of Law at the University of Pennsylvania Law School.

pp. Penny Pew, Apache County, Arizona Elections Director.

qq. Mark Posner, Adjunct Professor of Law at the University of Maryland's School of Law and at American University's Washington College of Law, formerly Special Section 5 Counsel in the Voting Section of the U.S. Department of Justice's Civil Rights Division.

rr. Joe Rich, former Chief of the Voting Section at the Civil Rights Division.

ss. Joe Rogers, former Lieutenant Governor of Colorado and a commissioner on the National Commission on the Voting Rights Act.

tt. Bradley J. Schlozman, Acting Assistant Attorney General for Civil Rights at the U.S. Department of Justice.

uu. Theodore Shaw, Director-Counsel and President of the NAACP Legal Defense and Educational Fund.

vv. Bobby Singleton, member of Alabama Senate.

ww. Constance Slaughter-Harvey, a lawyer and a former Mississippi state election official.

xx. Nadine Strossen, professor of law at New York Law School and President of the American Civil Liberties Union.

yy. John Trasviña, President and General Counsel of the Mexican American Legal Defense and Education Fund.  .

zz. James Thomas Tucker, consultant for the National Association for Latino Elected and Appointed Officials Education Fund, and a former senior trial attorney at the Voting Section of the U.S. Department of Justice's Civil Right Division.

aaa. Barry Weinberg, a former Deputy Chief and Acting Chief of the Voting Section in the Civil Rights Division.

bbb. Brenda Wright, Managing Attorney for the National Voting Rights Institute.

ccc. Donald Wright, General Counsel of the North Carolina State Board of Elections.

9.      During his testimony, Bill Lann Lee, Chair of the National Commission on the Voting

Rights Act, submitted to the House Judiciary Committee the Commission's report, supplement,

and entire record.  The report is entitled, "Protecting Minority Voters: The Voting Rights Act At

Work, 1982-2005."  *March 8, 2006 Hearing Vol. I*, at 104-290. The supplement is entitled

"Highlights of Hearings of the National Commission on the Voting Rights Act, 2005." *Id.* at

291-377. Pursuant to the written request of House Judiciary Committee Chairman Sensenbren-

ner, the National Commission provided the Judiciary Committee "its entire record of several

thousand pages." *March 8, 2006 Hearing Vol. I,* at 12-14.  The National Commission was

created by the Lawyers' Committee for Civil Rights Under Law and its members included Hono-

rary Chair (and former Senator) Charles Mathias, Chair Bill Lann Lee, John Buchanan, Chandler

Davidson, Dolores Huerta, Elsie Meeks, Joe Rogers and Charles Ogletree.  The National Com-

mission's charge was to evaluate discrimination in voting since Congress reauthorized the tem-

porary provisions of the Voting Rights Act of 1982.  *March 8, 2006 Hearing Vol. I,* at 12.  The

National Commission on the Voting Rights Act held ten hearings during 2005.

10.     Nadine Strossen of the ACLU submitted into the House record a report by the ACLU's

Voting Rights Project, "The Case for Extending and Amending the Voting Rights Act, Voting

Rights Litigation, 1982-2006" (hereinafter "ACLU Report").  The report summarizes the 293

voting rights cases in 31 States litigated by the ACLU's Voting Rights Project since 1982. *Id.* at

19-20; 378-1269.

11.     Wade Henderson of the Leadership Conference on Civil Rights submitted into the House

record reports on the states wholly or partially subject to Section 5 of the Voting Rights Act:

"As part of the Leadership Conference's role in assessing the effectiveness of the Voting Rights

Act and its continuing need, our sister organization, the LCCR Education Fund, commissioned

an educational and research collaborative, *renewtheVRA.org,* to draft a series of reports that have

been requested by Congress examining the impact of the Voting Rights Act over the past 25

years." *Id*. at 45.

12.     The reports prepared by renewtheVRA.org  and submitted into the House record were:

- "Voting Rights in Alabama, 1982-2006," a report of RenewTheVRA.org.  *July 13, 2006 Hearing* at 365-402.
- "Voting Rights in Alaska, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. I*, at 1308-1362.
- "Voting Rights in Arizona, 1982-2006," a report of RenewTheVRA.org. *Id.* at 1363-1453.
- "Voting Rights in California, 1982-2006," a report of RenewTheVRA.org. *July 13, 2006 Hearing* at 103-109.
- "Voting Rights in Florida, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II*, at 1456-1498.
- "Voting Rights in Georgia, 1982-2006," a report of RenewTheVRA.org. *Id.* at 1499-1591.
- "Voting Rights in Louisiana, 1982-2006," a report of RenewTheVRA.org. *Id.* at 1592-1708.
- "Voting Rights in Mississippi, 1982-2006," a report of RenewTheVRA.org. *Id.* at 1709-1727.
- "Voting Rights in New York, 1982-2006," a report of RenewTheVRA.org. *Id.* at 1836-1927.
- "Voting Rights in North Carolina, 1982-2006," a report of RenewThe-VRA.org. *Id.* at 1728-1835.
- "Voting Rights in South Carolina, 1982-2006," a report of RenewThe-VRA.org. *Id.* at 1928-1985.
- "Voting Rights in South Dakota, 1982-2006," a report of RenewTheVRA.org. *Id.* at 1986-2029.
- "Voting Rights in Texas, 1982-2006," a report of RenewTheVRA.org. (Appended to the Statement of Nina Perales, July 13, 2006) *available at* http://judiciary.senate.gov/pdf/7-13-06ninaperales.pdf (last visited November 9, 2010).
- "Voting Rights in Virginia, 1982-2006," a report of RenewTheVRA.org. *March 8, 2006 Hearing Vol. II*, at 2030-2092.

13.     On October 18, 2005, *Documenting Discrimination in Voting:  Judicial Findings*

*Under Section 2 of the Voting Rights Act Since 1982*, by Ellen Katz *et al.*, was submitted into the

congressional record by Representative Steve Chabot.  This study was conducted by the Voting

Rights Initiative of University of Michigan Law School, 39 U. Mich. J.L. Reform 643 (2006).  It

identified 323 lawsuits, encompassing 748 decisions that addressed Section 2 claims since 1982. *October 18, 2005 Hearing*, at 964-1124.

14.     On March 8, 2006, *The Deterrent Effect of the Section 5 of the Voting Rights Act: The Role of More Information Requests*, by Luis Ricardo Fraga and Maria Lizet Ocampo, was submitted into the congressional record.  This study examined the effect of Justice Department Section 5 "more information requests" in deterring discrimination in covered jurisdictions.  *March 8, 2006 Hearing Vol. II*, at 2537.  An updated version of this report subsequently was submitted to the Senate Judiciary Committee on June 9, 2006.  *June 13, 2006 Hearing*, at 210; 152 Cong. Rec. S7746.

15.     On October 5, 2005, Acting Assistant Attorney General for Civil Rights, Bradley Schlozman, submitted copies of all Section 5 objection letters issued by the Attorney General since 1982.  *October 25, 2005 Scope Hearing Vol. I*, at 225-1684, *October 25, 2005 Scope Hearing Vol. II*, at 1686-2595.

## II.     Evidence Before Congress Regarding the 2006 Reauthorization of Section 5

### A.     The Effect of Section 5

#### 1.     Congressional Findings

16.     Congress concluded that the evidence before it "reveal[ed] that 40 years has not been sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution . . . [and that] [t]he record compiled by Congress demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years."  Pub. L. No. 109-246, § 2(b)(7), (9), 120 Stat. 577, 578.

17.    Congress found, the evidence supporting the continuing need for Section 5 included:

(1) Significant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress, State legislatures, and local elected offices. This progress is the direct result of the Voting Rights Act of 1965.

(2) However, vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process.

(3) The continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965.

(4) Evidence of continued discrimination includes--

(A) the hundreds of objections interposed, requests for more information submitted followed by voting changes withdrawn from consideration by jurisdictions covered by the Voting Rights Act of 1965, and section 5 enforcement actions undertaken by the Department of Justice in covered jurisdictions since 1982 that prevented election practices, such as annexation, at-large voting, and the use of multi-member districts, from being enacted to dilute minority voting strength;

(B) the number of requests for declaratory judgments denied by the United States District Court for the District of Columbia;

(C) the continued filing of section 2 cases that originated in covered juris-

dictions; and

(D) the litigation pursued by the Department of Justice since 1982 to en-

force sections 4(e), 4(f)(4), and 203 of such Act to ensure that all language

minority citizens have full access to the political process.

(5) The evidence clearly shows the continued need for Federal oversight in juris-

dictions covered by the Voting Rights Act of 1965 since 1982, as demonstrated in

the counties certified by the Attorney General for Federal examiner and observer

coverage and the tens of thousands of Federal observers that have been dispatched

to observe elections in covered jurisdictions.

Pub. L. No. 109-246, § 2(b)(1-5), 120 Stat. 577, 577-78.

18.     The House Judiciary Committee stated that the strength of Section 5 also "lies, in part, in

its burden-shifting remedy that requires covered jurisdictions to prove to the Federal Government

or United States District Court for the District of Columbia that a voting change 'does not have

the purpose and will not have the effect of denying or abridging the right to vote' before such

voting change can be enforced."  According to the Committee "[t]he two-pronged shield af-

forded by Section 5 has enabled the Federal Government and court to stay one step ahead of

covered jurisdictions that have a documented history of denying minorities the protections guar-

anteed by the Constitution."  H.R. Rep. No. 109-478, at 65.

19.     The House Judiciary Committee stated that Section 5's "strength lies not only in the

number of discriminatory voting changes it has thwarted, but can also be measured by the sub-

missions that have been withdrawn from consideration, the submissions that have been altered by

jurisdictions in order to comply with the VRA, or in the discriminatory voting changes that have never materialized." *Id.* at 36.

20.     The House Judiciary Committee found that "[t]he record compiled by Congress demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years." *Id.* at 2.

21.     The House Judiciary Committee reached the following determination regarding the necessity of reauthorizing the temporary provisions:  "[T]he Committee believes that a failure to reauthorize the temporary provisions, given the record established, would leave minority citizens with the inadequate remedy of a Section 2 action.  The Committee knows from history that case-by-case enforcement alone is not enough to combat the efforts of certain States and jurisdictions to discriminate against minority citizens in the electoral process."  The Committee found that "Section 2 would be ineffective to protect the rights of minority voters, especially in light of the increased activity under Sections 5 and 8 over the last 25 years.  It is against this backdrop that the Committee finds it necessary to extend the temporary provisions for an additional 25 years." *Id.* at 57.

22.     The House Judiciary Committee found that, "if not for the temporary provisions of the VRA the gains made by minorities would not have been made.  But as Congress found in 1982, the gains are fragile.  The Committee is not willing to jeopardize 40 years of progress made by minority citizens by allowing the temporary provisions to expire, especially in the face of the evidence of discrimination compiled in the record."  *Id.* (internal footnote omitted).

23.     During the floor debate in the House of Representatives, Representative F. James Sensenbrenner of Wisconsin, Chairman of the House Judiciary Committee, described some of the statistics on Voting Rights Act enforcement to support his view of the need for reauthorization of Section 5:  "We need the Voting Rights Act, and we need the Voting Rights Act because in the last 25 years the covered jurisdictions have not come clean. Let's look at Georgia. Since 1982, there have been 91 objections, 91 objections submitted by the Department of Justice. And since 2002, there have been seven voting rule changes that were withdrawn by the State because of DOJ objections. Texas, 105 objections imposed by DOJ since 1982, and 14 voting rule proposals were withdrawn by the State because of voting rights concerns in the last 4 years. Mississippi, 112 objections since 1982, and Federal observers have been sent to this State 14 times to monitor elections since 2002, most recently last year.  Louisiana, 96 objection[s] since 1982, eight Department of Justice objections to voting rules have been lodged since 2002, most recently in 2005, and 10 voting rule proposals withdrawn by the State in the last 4 years.  South Carolina, 73 objections since 1982.  North Carolina in the covered jurisdictions, 45 objections since 1982. And Alabama, 46 objections, and Federal observers have been assigned to the State 65 times since 2000 to monitor elections.  Arizona, 17 objections since 2002, and Federal observers have been assigned to that State 380 times since 2000 to monitor elections, including 107 since 2004."  152 Cong. Rec. H5164-H5165.

24.     Congress received a statement supporting reauthorization from Senator Patrick Leahy, Chairman of the Senate Judiciary Committee, that "based on the record established in hearings before the Senate Judiciary Committee and the Subcommittee on the Constitution, Civil Rights, and Property Rights, which builds on the extensive record established in the House of Representatives, there remains a compelling need for section 5.  The Judiciary Committee received three

categories of evidence supporting the continuation of this remedy.  First, there is evidence that even with section 5 in place, covered jurisdictions have continued to engage in discriminatory tactics.  Often, this recurring discrimination takes on more subtle forms than in 1965 or 1982, such as vote dilution, which relies on racially polarized voting to deny the effectiveness of the votes cast by members of a particular race.  Second, there is evidence of the effectiveness of section 5 as a deterrent against bad practices in covered jurisdictions.  Finally, there is evidence of the prophylactic effect of section 5, preserving the gains that have been achieved against the risk of backsliding."  152 Cong. Rec. S7745.

25.   Senator Leahy added that:  "Today, I would like to provide some of the evidence received in the Judiciary Committee about the persistence of discriminatory practices in covered jurisdictions that supports reauthorization of this crucial provision."  *Id*.  The examples Senator Leahy provided involved the following categories (with identified jurisdictions in parentheses):

- "VOTE SUPPRESSION" (Kilmichael, Mississippi; Prairie View, Texas; State of South Dakota; North Johns, Alabama) *Id*. at S7746.

- "DISCRIMINATORY REDISTRICTING" (Seguin, Texas; St. Bernard School Parish, Louisiana; State of Georgia; State of Louisiana; Point Coupee Parish, Louisiana; Morehouse Parish, Louisiana; Randolph County, Georgia; State of Mississippi; Northampton County, Virginia; Chickasaw County, Mississippi; Galveston County, Texas; Terrell County, Texas; Delhi, Louisiana; State of Florida; State of Arizona; Merced County, California) *Id*. at S7746-S7748.

- "DISCRIMINATORY POLLING PLACE CHANGES" (Wrightsville, Georgia; Jenkins Parish, Louisiana; Apache County, Arizona; St. Landry Parish, Louisiana; Dinwiddie County, Virginia) *Id*. at S7748.

- "METHODS OF ELECTIONS" (State of Mississippi; Effingham County, Georgia; Freeport, Texas; Washington Parish, Louisiana; Charleston County, South Carolina; McComb, Mississippi; Concordia Parish Police Jury, Louisiana)  *Id*. at S7748-7749.

- "ANNEXATIONS" (Monroe, Louisiana; Pleasant Grove, Alabama; North, South Carolina) *Id*. at S7749.

26.     Senator Leahy further stated that Section 5 should not be "a victim of its success."  "In my view, abandoning a successful deterrent just because it works defies logic and common sense.  Why risk losing the gains we have made?  When this Congress finds an effective and constitutional way to prevent violations of the fundamental right to vote, we should preserve it. Now is no time for backsliding."  *Id*. at S7745.

### 2.     Testimony to Congress

27.     Congress heard testimony from Assistant Attorney General for Civil Rights Wan Kim that "the Voting Rights Act has widely been recognized as one of the most successful pieces of civil rights legislation ever passed by Congress, if not the most successful.  It has, during its course of history, significantly narrowed gaps in electoral participation by all Americans, and that is certainly a proud history and one that we are proud to enforce."  Assistant Attorney General Kim added that "the very fact of submission is an important detail that prevents retrogression and prevents harming minority voting strength and prevents backsliding, the very types of evils that Congress sought to prevent in passing Section 5."  *May 10, 2006 Hearing*, at 8.

28.      Congress received information from a report commissioned by the Leadership Conference on Civil Rights regarding the "unmistakable" role of section 5 as both "remedy for, and as a deterrent to, voting discrimination."  The report stated that "[t]he record of enhanced African-American voter registration, participation and minority office-holding, of Section 5 objections to retrogressive voting changes, deterrence of others, and of Section 2 litigation resulting in judgments or settlements, collectively paints a picture of a civil rights act that has been effective and whose protections remain vital."  *March 8, 2006 Hearing Vol. II*, at 1596.

29.     Congress received testimony from Drew Days, stating that "I really think the central issue before this Congress is at heart whether 40 years after the Act's passage, the time has come to shift this advantage of time and inertia back to the jurisdictions covered by Section 5.  My an-

swer is that it has not. Instead, the Voting Rights Act and Section 5, in particular, should be reauthorized in order to promote further progress in achieving truly equal participation in the political process free of racial discrimination and exclusion or to prevent backsliding that may result in undermining what success the Act has already achieved.  Now, I have not had a chance to review all of the testimony and statements of witnesses or the studies that have been submitted to the Committee and to the House Committee with respect to reauthorization, but based upon my 4 years administering Section 5 and other provisions of the Act, I believe that this record offers ample evidence of contemporaneous and continuing problems of electoral practices discriminatory in both purpose and effect sufficient to support renewal.  I have in mind especially the reports prepared by the National Commission on the Voting Rights Act and by the Voting Rights Project of the American Civil Liberties Union."  *May 17, 2006 Hearing*, at 5.

30.     Congress heard testimony from civil rights attorney Armand Derfner regarding the "genius of section 5."  Specifically, Derfner testified that:  "[A]fter literacy tests were banned and federal examiners put an end to outright denial of the right to register and vote, the tactics shifted to methods of abridgement, sometimes called dilution, which aimed at limiting the effectiveness of black voters.  Much of this was what could be called 'rigging' elections, such as shifting to at-large elections so that black voters who were a majority in some areas of the city or county but a minority overall would be unable to win any seats on the city or county council.  The Supreme Court took note of the shift in approach in the early Voting Rights Act cases, including *Allen v. State Board of Elections* (1969), and *Perkins v. Matthews* (1971).  In those cases, the Supreme Court held that Section 5 was broad enough to cover these methods, which could be just as effective in limiting minority voters' rights as outright denial. That is the genius of Section 5.  It did not aim at specific tactics, but was a broad prophylactic measure.  In effect, Congress said 'we

don't know exactly what you will try next, but whatever it is, we'll be ready.' That is why Section 5 has adapted to meet new methods of discrimination, and what we have learned under Section 5 has been of great value in other areas of the law. Earlier voting laws, such as the Civil Rights Acts of 1957 and 1960, were ineffective because they dealt only with specific problems, and it was easy for state and local officials to come up with new tactics to sidestep the laws." *May 17, 2006 Hearing*, at 79.

31.     Congress heard testimony from Wade Henderson that "[t]he Voting Rights Act, including its temporary provisions, section 5, sections 6 through 9, and section 203, has been the pivotal force behind the Nation's progress toward protecting the right to vote." Henderson further testified that these provisions of the VRA "ha[ve] empowered large numbers of minority citizens to register and vote and to elect candidates of their choice to local, State, and Federal offices. The Act has been successful in removing direct and indirect barriers to voting for African-Americans, Asian-Americans, Hispanic-Americans, and Native Americans." *March 8, 2006 Hearing Vol. I*, at 45.

32.     Congress received a report from the National Commission on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work 1982-2005*, stating its finding that: "Taken as a whole, the evidence presented at the hearings strongly suggests that the two major problems the Act has focused on solving—restricted ballot access and minority vote dilution— continue in twenty-first century America. Efforts to suppress the minority vote, while not as systematic and pervasive as those of the pre-Act South, are still encountered in every election cycle in many venues across the country. The location of polling places for minority voters is changed, often on short notice. Citizens with English-language difficulties are sometimes discouraged from voting. Requirements to register and vote are sometimes unduly burdensome on

minority voters.  Racially polarized voting continues in many venues across the country, with the result that qualified minority candidates often have difficulty winning election unless from majority-minority districts.  Appeals to voters' racial prejudice are sometimes made by candidates, increasing the polarization.  Several people who gave testimony stressed that problems encountered by minorities are the work of both white Democrats and Republicans.  In short, both the evidence from the hearings and the additional data relied on in this Report indicate that while the Voting Rights Act has accomplished much during its first forty years, more remains to be done in order to protect the rights of racial and ethnic minorities to fully and equally participate in the electoral process." *March 8, 2006 Hearing Vol. I*, at 222-223; *see also id.* at 209.

33.    Congress heard testimony from Chandler Davidson summarizing the findings of the National Commission on the Voting Rights Act: 1) Since 1982, "[t]he Justice Department sent 626 letters objecting to one or more proposed discriminatory election changes in Section 5 jurisdictions;" in addition, "[t]here were at least 225 withdrawals of one or more proposed changes"; 2) While jurisdictions seldom submitted changes to the U.S. District Court for the District of Columbia, since 1982, the court "refused to approve 25 such proposals"; 3) "The Commission identified 105 successful enforcement suits in nine states."; 4) "The Justice Department sent several thousand federal observers in 622 separate Election Day 'coverages' when it had reason to expect racial discrimination."; 5) There have been 19 enforcement actions relating to assistance for language minorities since 1982.  "While few in number, these suits have played an important role in changing the way voting officials do business in the jurisdictions where they have been filed."; 6)  "[R]esearch by the National Commission's staff revealed 653 successful Section 2 suits, reported and unreported, in nine Section 5 states alone." *May 9, 2006 Hearing*, at 210-212.

34.     Congress received testimony from Nadine Strossen, ACLU President, that the report de-

scribing the ACLU's 293 voting cases since 1982 demonstrated the need for reauthorizing the

temporary provisions of the Voting Rights Act:  "These cases clearly demonstrate the need to

extend the act's expiring provisions because they extensively document ongoing voting discrim-

ination problems in the covered jurisdictions.  In support of that conclusion, our litigation report

prevents evidence substantiating five key findings.  I am just going to list them now. . . .  First,

section 5 has blocked implementation of discriminatory voting changes.  Two, there is a continu-

ing pattern of blocked [sic] voting and racial polarization in the covered jurisdictions, as Lee al-

luded to.  Third, there is continuing hostility to minority political participation.  Four, there is a

continued need for section 5, especially its deterrent effect.  Five, the courts routinely apply sec-

tion 5 to protect minority voting rights."  *March 8, 2006 Hearing Vol. I*, at 19.

35.     Congress received testimony from Nina Perales that "Section 5 mitigates discriminatory

election practices not only in congressional redistricting but also at the State and local levels.  By

blocking discriminatory election practices before they go into effect, section 5 protects Latino

voters from local jurisdictions that seek to limit their political participation by developing new

exclusionary voting schemes."  *October 25, 2005 Scope Hearing Vol. I.,* at 86.

36.     During the floor debate, a letter from the Council of State Governments, the National

Conference of State Legislatures, the National Association of Secretaries of State, the National

Association of Counties, the National League of Cities, and the U.S. Conference of Mayors to

Speaker Dennis Hastert and Minority Leader Nancy Pelosi, dated June 6, 2006, was entered into

the record.  The letter urged Congress to reauthorize the expiring provisions of the VRA:

> Three key provisions of the Voting Rights Act are set to expire on August 6,
> 2007. . . .  These sections have had the cumulative effect of reducing and prevent-
> ing racial and language discrimination against a significant number of citizens and
> have helped increase minority participation in elections for candidates at all levels

21

of government.  While substantial progress has been made since passage of the Voting Rights Act in 1965, it has not yet resulted in the elimination of voting discrimination.  Congress must renew the enforcement provisions of the Voting Rights Act.

152 Cong. Rec. H5146.

> **B.**   **Evidence Before Congress:  Section 5 Preclearance Reviews**
>
> > **1.**   **Objections Interposed**
> >
> > > **a.**   **Congressional Findings**

37.   The House Judiciary Committee Report states:  "The Committee received testimony that more Section 5 objections were lodged between 1982 and 2004 than were interposed between 1965 and 1982 and that such objections did not encompass minor inadvertent changes. . . . This increased activity shows that attempts to discriminate persist and evolve, such that Section 5 is still needed to protect minority voters in the future."  H.R. Rep. No. 109-478, at 21.

38.   The House Judiciary Committee Report states: "[V]oting changes devised by covered jurisdictions resemble those techniques and methods used in 1965, 1970, 1975, and 1982 including: enacting discriminatory redistricting plans; switching offices from elected to appointed positions; relocating polling places; enacting discriminatory annexations and deannexations; setting numbered posts; and changing elections from single member districts to at large voting and implementing majority vote requirements.  The Committee received testimony indicating that these changes were intentionally developed to keep minority voters and candidates from succeeding in the political process."  *Id.* at 36.

39.   The House Judiciary Committee Report includes discussion of several specific objections interposed by the Attorney General, including:

- City of Monroe, Louisiana, 1990, DOJ objected to the city's attempt to annex "white suburban wards to its city court jurisdiction" noting, in part, that "there had been no interest in annexing them until just after the first African-American candidate ran for a seat on the Monroe city court."  *Id.* at 23.

- Concordia Parish, Louisiana Police Jury, 1991, DOJ objected to the reduction in size from nine seats to seven noting, in part, that the parish had only introduced the "cost-saving" proposal after an "influx of African-American residents transformed . . . a majority-white district [] into a majority African-American district." *Id.*.

- Lancaster County, South Carolina School District, 1984, DOJ prevented the school district from attempting to enforce at-large voting systems, to which objections previously had been interposed. *Id.*.

- Kilmichael, Mississippi, 2001, DOJ objected when the town's mayor and the all-white five-member Board of Aldermen cancelled an election in which "an unprecedented number of African-Americans [sic] candidates were running for office." *Id.* at 36.

- City of Albany, Georgia, 2002, DOJ objected when the city adopted a new redistricting plan that "'forestall[ed] the creation of a majority black district.'" *Id.* at 37.

- Washington Parish, Louisiana School Board, 1995, DOJ objected when the school board added a second majority-African American district but also "created a new at-large seat to ensure that no white incumbent would lose his seat and to reduce the impact of the two African American members." *Id.* at 38.

- City of Lancaster, South Carolina, 1989, DOJ objected when "the city adopted a redistricting plan that changed a system of seven members elected at large by plurality vote to a nine-member council with six members elected from single member districts and three, including the mayor, elected at large by plurality vote in staggered terms. DOJ observed that the original system provided black citizens the opportunity to elect a city council that "mirrored the 41 percent African American population." *Id.*

- Pittsylvania County, Virginia, 2002, DOJ objected when the county adopted a redistricting plan for its board of supervisors and school board members that "would have reduced the African American population in the only majority-minority district in the county." *Id.*.

- State of Mississippi, 1995, DOJ objected when the State of Mississippi sought to implement the National Voter Registration Act of 1993 by implementing a dual voter registration system, one for federal elections and one for local elections (the state historically had implemented a different type of dual registration system which had been struck down by a federal court as discriminatory). *Id.* at 39.

- Charleston County, South Carolina School District, 2003, DOJ denied preclearance to the school district's adoption of the same method of election that previously had been found by a federal court to dilute minority voting strength in a case involving the Charleston County Council. *Id.*

- Northampton County, Virginia, 2001, DOJ objected to a proposed change in the method of electing the board of supervisors which would have collapsed six districts into three larger districts, finding that three of the previous six districts were majority-minority districts. *Id.* at 40.

40.     The House Judiciary Committee Report contains a table listing the number of Section 5

submissions to the Department of Justice and Department of Justice Section 5 objections per year

from 1965 to July 11, 2005.*Id*. at 22.

Chart E: Administrative Review of Voting Changes
ADMINISTRATIVE REVIEW OF VOTING CHANGES

| Year | 1965–2005 (By Calendar Year) | | | |
|------|--------|--------|--------|--------|
| | ALL SUBMISSIONS | | REDISTRICTING PLANS | |
| | Number | Objections | Number | Objections |
| 1965 | 1 | 0 | 0 | 0 |
| 1966 | 2 | 0 | 2 | 0 |
| 1967 | 6 | 0 | 4 | 0 |
| 1968 | 6 | 6 | 0 | 0 |
| 1969 | 15 | 5 | 12 | 0 |
| 1970 | 60* | 4 | 25 | 1 |
| 1971 | 331* | 66 | 201 | 32 |
| 1972 | 362 | 30 | 97 | 11 |
| 1973 | 345 | 32 | 47 | 6 |
| 1974 | 414* | 76 | 55 | 5 |
| 1975 | 1046* | 79 | 53 | 11 |
| 1976 | 2685* | 124 | 335 | 11 |
| 1977 | 1817* | 42 | 79 | 3 |
| 1978 | 1946* | 74 | 48 | 12 |
| 1979 | 1914* | 54 | 53 | 2 |
| 1980 | 2226 | 32 | 85 | 9 |
| 1981 | 2240 | 24 | 387 | 8 |
| 1982 | 2848 | 66 | 452 | 47 |
| 1983 | 3203 | 52 | 386 | 40 |
| 1984 | 3975 | 49 | 274 | 16 |
| 1985 | 3847 | 37 | 235 | 10 |
| 1986 | 4807 | 41 | 256 | 14 |
| 1987 | 4478 | 29 | 258 | 8 |
| 1988 | 5155 | 39 | 322 | 9 |
| 1989 | 3920 | 30 | 180 | 8 |
| 1990 | 4809 | 37 | 164 | 6 |
| 1991 | 4592 | 75 | 916 | 66 |
| 1992 | 5307 | 77 | 974 | 67 |
| 1993 | 4421 | 69 | 512 | 40 |
| 1994 | 4661 | 61 | 325 | 10 |
| 1995 | 3999 | 19 | 213 | 7 |
| 1996 | 4729 | 7 | 116 | 3 |
| 1997 | 4047 | 8 | 105 | 2 |
| 1998 | 4021 | 8 | 65 | 3 |
| 1999 | 4012 | 5 | 67 | 1 |
| 2000 | 4638 | 4 | 49 | 1 |
| 2001 | 4222 | 7 | 985 | 4 |
| 2002 | 5910 | 21 | 1138 | 19 |
| 2003 | 4628 | 8 | 400 | 5 |
| 2004 | 5211 | 3 | 241 | 1 |
| 2005 | 3703 | 1 | 88 | 1 |

Notes:
*Indicates fiscal year totals
One submission may contain more than one change.
This list does not reflect withdrawals of objections
See Complete Listing of Objections as of July 11, 2005

### b.      Testimony to Congress – Summary Evidence

41.      Congress received testimony from Anita Earls in the form of a table showing the types of changes to which objections were interposed, by decade.  The types of changes included annexations, at-large elections, enhancing devices, districting and ballot access.  In the 1980's DOJ objected to 431 proposed changes.  In the 1990's DOJ objected to 402 proposed changes.  Earls noted that "[t]he number of change types to which objections were interposed is greater than the total number of objections, because numerous objections affected two or more change types." *May 16, 2006 Hearing*, at 150.

42.      Congress received testimony through the National Commission on the Voting Rights Act that "[o]ne important measure of the extent of voting discrimination of both types is the number of Section 5 objections interposed by the Department of Justice. Of the 1,116 objections from 1968 through 2004, prohibiting 1,589 proposed election changes submitted for preclearance, 626, or 56 percent of the total, occurred after August 5, 1982." *March 8, 2006 Hearing Vol. I*, at 219-220.

43.      Congress received testimony from Anita Earls that more than one-half million voters have been aided by Section 5 enforcement:  "DOJ objections since 2000 have protected 8,764 voters in Virginia, 10,518 voters in Georgia, and 12,756 voters in North Carolina.  During the same time period, nine objections to South Carolina submissions protected 96,143 African-American voters, two objections to Arizona submissions protected 163,647 Hispanic and American Indian voters, and six objections to Texas submissions protected 359,978 African American and Hispanic voters.  Approximately thirteen school board members, twenty-seven local legislators, and six state legislators have been determined by this activity.  In total, 663,503 minority voters in the last six years have been aided by Section 5 objections."  *May 16, 2006 Hearing*, at 58.

44.     Congress received an article entitled "*The End of Preclearance as We Knew It: How the Supreme Court Transformed Section 5 of the Voting Rights Act*," that was co-authored by Peyton McCrary, the historian at the Voting Section of the Civil Rights Division of the Department of Justice. *November 1, 2005 Hearing*, at 96.  The article analyzed the basis of Department of Justice objections from 1970 to 2005.  According to the article, of the 722 separate objections lodged by DOJ from 1980 to 2005, 436 of DOJ's objections—equal to greater than 60% of the total during that period—included discriminatory intent as a basis for the objection. *Id.* at 180-181.  The following are the tables reflecting findings of this study:

**TABLE 2: LEGAL BASES FOR OBJECTION DECISIONS, BY DECADE**

| Legal Bases | 1970s | % | 1980s | % | 1990s | % | Totals |
|---|---|---|---|---|---|---|---|
| *Exclusive Categories* | | | | | | | |
| Intent | 9 | 2% | 83 | 25% | 151 | 43% | 243 |
| Dilution | 34 | 9% | -- | | -- | | 34 |
| Retrogression | 297 | 77% | 146 | 44% | 73 | 21% | 516 |
| Technical | 17 | 4% | 15 | 5% | 1 | 0% | 33 |
| Section 2 | -- | | 2 | 1% | 6 | 2% | 8 |
| Minority Languages | 2 | 1% | 2 | 1% | 5 | 1% | 9 |
| *Combined Categories* | | | | | | | |
| Intent/Retrogression | 22 | 6% | 73 | 22% | 67 | 19% | 162 |
| Intent/Dilution | 5 | 1% | -- | | -- | | 5 |
| Intent/Section 2 | -- | | 6 | 2% | 41 | 12% | 47 |
| Other | -- | | 3 | 1% | 5 | 1% | 8 |
| *Totals* | 386 | 100% | 330 | 100% | 349 | 100% | 1065 |

TABLE 4: LEGAL BASES FOR OBJECTIONS SINCE BOSSIER II

| Change Type | Retrogres-sive Intent | % | Retrogres-sive Effect | % | Both | % | Totals |
|---|---|---|---|---|---|---|---|
| Annexations | 1 | 50% | 1 | 4% | 1 | 8% | 3 |
| At-large | 0 | | 2 | 7% | 1 | 8% | 3 |
| Enhancing Devices | 0 | | 6 | 21% | 0 | | 6 |
| Districting | 1 | 50% | 15 | 54% | 10 | 77% | 26 |
| Other | 0 | | 4 | 14% | 1 | 8% | 5 |
| | | | | | | | |
| *Totals* | 2 | 100% | 28 | 100% | 13 | 101% | 43 |

Note: Totals do not always equal 100 percent, due to rounding.

*Id.* "Bossier II" refers to the Supreme Court's decision in *Reno v. Bossier Parish*, 528 U.S. 320, 341 (2000).

45.     Congress received testimony that, "[f]rom April 1991 through June 1995, the Attorney General interposed Section 5 objections to 153 redistricting plans (for 122 different elected bodies) for counties, cities, and school districts, as well as plans used to elect certain other local officials.  These included objections to the plans for the three largest cities covered in whole or in part by Section 5, New York City and Dallas and Houston, Texas. Preclearance was granted to 2,279 local plans." *October 18, 2005 Hearing*, at 1410.

46.     Congress received a prepared statement from Jon Greenbaum stating that from the "extensive research" conducted by the National Commission on the Voting Rights Act, "it is apparent that not only is the record of recent discrimination in voting massive, but that many of the places that inspired the creation of the Voting Rights Act or that engaged in extensive voting discrimination during the early years of the Act continue to discriminate against those the Voting Rights Act aims to protect."  Greenbaum identified ten counties covered by section 5 that "demonstrate the link between historic and present day voting discrimination." *June 13, 2006 Hear-*

*ing*, at 235.  Nine of those counties are listed below, along with the discrimination Greenbaum

described:

- Charleston County, South Carolina (Section 5 objections to annexations in the City of Charleston from the 1960s and 1970s; Section 5 objection to post-2000 redistricting in the City of Charleston; Section 5 objection in 2004 to proposed change in method of election for Charleston County School Board that had been held by federal district court in 2003 to violate Section 2 in case involving Charleston County Council);

- Cochise County, Arizona (Section 5 objections in 1970s and 1980s to Cochise County College Board; 2006 lawsuit alleging inadequate election assistance in Spanish that county did not contest);

- Dallas County, Alabama (pre-1965 litigation involving disenfranchising devices; violent assault on unarmed marchers in Selma in 1965); two Section 5 objections in the 1980s to proposed redistricting for Selma City Council; at-large elections for Dallas County Commission and Board of Education found to violate Section 2 in the 1980s; objections to redistricting plans for Selma City Council and Dallas County Board of Education in the 1990s);

- DeSoto Parish, Louisiana (1971 Section 5 objection to proposed change from ward to at-large elections for parish police jury; 1991 Section 5 objection to police jury redistricting plan; 1992 Section 5 objection to school board redistricting plan; 2002 Section 5 objection to school board redistricting plan);

- Dougherty County, Georgia (1971 Section 5 objection to polling place changes; 1973 Section 5 objection to changes that included "substantial filing fees and deposits as a prerequisite to qualification for candidacy"; 1982 Section 5 objection to redistricting for county board of commissioners; Section 5 objection to State House of Representatives 1981 redistricting plan regarding Dougherty County districts; Section 5 objection to 1992 House redistricting plan for Georgia based in part on district in Dougherty County; 2002 Section 5 objection to redistricting plan for City of Albany);

- Grenada County, Mississippi (1971 Section 5 objection to at-large elections, numbered posts, and multi-member districts in Grenada County; 1972 Section 5 objection to at-large elections, numbered posts, and a majority vote requirement; 1976 and 1987 Section 5 objections to redistrictings for Grenada County Supervisors; 1988 Section 5 objection to moving from elective to appointive positions for school district; 1997 Section 5 objection to City of Grenada municipal election where the city placed new limits on voter assistance; federal court finding in 1998 that City of Grenada violated Section 5; 1998 Section 5 objection to a proposed annexation, cancellation of a general election, and redistricting plan for the City of Grenada; 171 observers sent to Grenada County since 1967);

- Hale County, Alabama (four days after Voting Rights Act was enacted, legislation was passed changing the method of electing county commissioners from districts to at-large that was not submitted for preclearance until 1974—the change was objected to by the Attorney General and the county's request for declaratory judgment was denied; Section 5 objection to attempted deannexation of property from the city of Greensboro where subsidized housing was going to be built; Section 2 litigation challenging the at-large method of election from Greensboro city council in 1987—the Department of Justice objected to the first two remedial plans proposed by the city and the plan ultimately adopted was drawn as a court-appointed special master; observers sent to elections twenty-two times from 1966 to 2006);

- Lancaster County, South Carolina (Section 5 objections in the 1970s and 1980s to staggered terms for at-large county board of education and area boards of trustees; 1982 Section 5 objection to a majority vote requirement for judicially contested elections in the city of Lancaster; Section 5 objection to a redistricting plan for the city of Lancaster drawn to settle a Section 2 action); and

- Waller County, Texas (attempts in the 1970's by the county registrar to prevent students at Prairie View A&M University, a historically black university, from registering to vote that were struck down by the federal courts as constitutional violations; indictments of Prairie View students in 1990s for "illegal voting" that were later dropped; 2001 Section 5 objection to redistricting plan, voting precinct changes, polling place switching and elimination, and early voting changes; threats made by the local criminal district attorney to prosecute Prairie View students for illegal voting before the 2004 primary election that were withdrawn after a lawsuit by the NAACP's student chapter; attempt to reduce the hours of early voting at the precinct closest to campus was rescinded after the NAACP student chapter filed a Section 5 enforcement action).

*June 13, 2006 Hearing*, at 235-252.

47.    Congress received information that after 1990, DOJ increased the number of objections interposed on the basis of discrimination against Hispanic voters.  "Objections were interposed on this basis to statewide plans in Arizona, New Mexico, New York, and Texas, and to local plans for three counties and a community college district in Arizona, two counties in California, the New York City Council, and, in Texas, 11 counties, two cities (Dallas and Houston), four school districts, a water district, and plans for justices of the peace and constables in five counties. In contrast, during the same time period in the 1980s, objections based on discrimination against Hispanic voters were interposed to statewide plans in New York and Texas, and to local

plans only for the New York City Council and one county in Texas." *October 18, 2005 Hearing*, at 1408-1409.

48.     Congress received testimony from the Mexican American Legal Defense and Educational Fund (MALDEF), the National Council of La Raza (NCLR), the National Association of Latino Elected Officials (NALEO) and the League of United Latin American Citizens (LULAC) that "[t]oday, Latinos comprise the minority in a substantial number of single-member election districts across the country but have great difficulty exercising political influence in such districts or affecting the outcome of elections in these districts.  It is exactly at the point at which Latino voters can exercise political power by electing their preferred candidate that many jurisdictions respond with discriminatory measures.  For Latinos, the greatest number of election changes blocked by the Justice Department under Section 5 deal with jurisdictions in which Latino voters have become numerous enough to elect their preferred candidate in one or more districts." *November 9, 2005 Hearing*, at 133.

49.     Wan Kim, Assistant Attorney General, presented testimony regarding the recent decline in the number of objections.  Kim stated that the objection rate reflects the wide-spread compliance with the Voting Rights Act on the part of covered jurisdictions.  *May 10, 2006 Hearing*, at 8.

50.     Congress received testimony from Anita Earls  that "[e]ven in light of the severe limitations on Section 5 review that occurred as a result of *Bossier II* . . . the Department of Justice has objected to fifty-four submissions since 2000 for changes to voting procedures from Alabama, Arizona, California, Georgia, Louisiana, North Carolina, South Carolina, Texas, and Virginia. These objections have ranged in subject from state and local redistricting, annexations, voting methods, voting time, poll place location, and in at least one occasion the absolute cancellation

of an election. Section 5 objections have functioned to aid small as well as large scale elections,

shielding as few as 208 and as many as 215,406 voters with a single objection." *May 16, 2006*

*Hearing*, at 58.

51.     Congress received testimony through the National Commission on the Voting Rights Act

that the decline in objections since the mid-1990s is attributable to a variety of causes (*Bossier*

*Parish II*, politicization of the Voting Section, jurisdictions having learnt their lesson).  Never-

theless, the Commission noted that despite a general decline in objections beginning in the early

nineties, there continues to be an appreciable number of interventions of various kinds by the

Department of Justice and by private plaintiffs to prevent vote discrimination.  *March 8, 2006*

*Hearing Vol. I*, at 200.  *See also* testimony of Chandler Davidson (same), *May 9, 2006 Hearing,*

at 62; Anita Earls ("[a]n analysis of the DOJ's activity pre and post-*Bossier II* shows how [the

decision] has functioned to hinder voting equality.  Between 1982 and 1999, the DOJ objected to

an average of 124 submissions a year.  Following *Bossier II*, that average dropped to 9 objections

a year."), *May 16, 2006 Hearing*, at 70); Armand Derfner ("the number of objections has been

artificially reduced by the Supreme Court's misreading of the Act in *Bossier Parish v. Reno*,

which blocked objections even to changes that are [g]rossly discriminatory in purpose."), *May*

*17, 2006 Hearing*, at 75.

52.     Congress received testimony from Anita Earls that "[t]he lower number of objections

from 2005 is consistent with past patterns of the ebb and flow associated with decennial redi-

stricting.  Section 5 submissions and resulting objections are greatest in years immediately prior

to and after redistricting cycles.  In a mid-decade year, such as 2005, you would expect to see a

smaller number of submissions and objections because there are significantly fewer redistrict-

ings." *May 16, 2006 Hearing*, at 54.

53.     Congress heard testimony from Anita Earls that "[t]here are also some issues of under-enforcement of Section 5, in circumstances where the Department should have objected, but failed to.  Because affected communities do not have the right under the statute to appeal the grant of preclearance, there are many examples of minority community groups opposing voting changes as retrogressive where the Department ha**s** granted preclearance.  In the Georgia Voter ID case, the submission of a law later enjoined by a federal district court on the grounds that the plaintiffs were likely to prevail on their claims that the law was an unconstitutional poll tax and that it lacked a rational basis, was precleared against the advice of career attorneys in the Department." *Id*.

54.     Congress received evidence from Mark Posner that, "[w]hereas the Department objected to about seven percent of the redistricting plans adopted following the 1980 Census and about eight percent of the post-1990 plans, the Department has objected to just one percent of the post-2000 redistricting plans."  Posner further stated that, "Interestingly, the number of redistricting plans submitted to the Department for preclearance was almost exactly the same after both the 1990 and 2000 Censuses, and the number of retrogression objections to post-1990 and post-2000 plans also remained the same.  Accordingly, the sharp drop in the post-2000 objection percentage, and the corresponding sharp shop in the actual number of redistricting objections, occurred entirely because the purpose-based objections disappeared."  *November 1, 2005 Hearing*, at 14.

### c.     Objections by State

### i.     Alabama

55.     Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were forty-six objections in Alabama and that there were seventeen counties in Alabama where objections had been interposed against the county or a political unit located in the county.  H.R. Rep. No. 109-478, at 73-74.

56.     Congress received a report, *Voting Rights in Alabama, 1982-2006*, which stated that "The 1982 reauthorization of Section 5 had an immediate impact on the ability of African Americans in Alabama to elect their favored candidates to the Alabama Legislature. . . . The Department of Justice, through Assistant Attorney General William Bradford Reynolds, had denied preclearance to the redistricting plan the Legislature had enacted in 1981, because it had reduced the number of majority-black districts and the size of black majorities in other districts. On June 1, 1982, the Alabama Legislature, sitting in an emergency special session, adopted a second redistricting bill, Act No. 82-629. . . . [O]n August 2, 1982, Mr. Reynolds also objected to Act No. 82-629, even though it arguably cured the retrogression problems, because it appeared intentionally to fragment black voting strength in the western Black Belt counties. . . . And there is no doubt this federal mandate [of the 1982 Voting Rights Act] of full equal access, under both Section 2 and Section 5, strengthened the negotiating hand of African-American legislators and political leaders in the Legislature's next attempt to obtain Section 5 preclearance prior to the federal court's 1983 deadline. The result was Act No. 83-154, a compromise plan to which black legislators agreed, an historic first for Alabama. The legislative leaders, black and white, flew to Washington, D.C. to attend a congratulatory press conference called by Assistant Attorney General Reynolds after the plan received § 5 preclearance." *July 13, 2006 Hearing*, at 382-383 (internal footnotes omitted).

57.     The same report stated that "[a]fter publication of the 1990 Census, the battle to preserve white control in the Black Belt focused on Selma and Dallas County, the city and county where the Voting Rights Act was born in 1965 after the assault of peaceful marchers on the Edmund Pettus Bridge. The black population of Selma had increased from 52.1 percent to 58.4 percent, and the black population of the entire county had increased from 54.5 percent to 57.8 percent.

The Department of Justice refused to grant Section 5 preclearance to three different redistricting plans submitted by the Dallas County Board of Education and two different redistricting plans submitted by the city of Selma on the ground that they exhibited a purpose to prevent African Americans from electing candidates of their choice to a majority of the seats on both bodies. All the plans packed as many black voters as possible into a minority of districts, then fragmented the remainder of the black population. The plans that eventually were precleared at last provided black citizens an equal opportunity in these racially polarized constituencies and resulted in the election of black majorities on the Dallas County School Board and Selma City Council." *Id.* at 378-379 (internal footnote omitted).  *See also* testimony of Wade Henderson (Selma redistricting objections), *March 8, 2006 Hearing*, at 54.

58.     The report further stated that, in 2003, in Chilton County Alabama, the Chilton County Commission, under pressure from an all white group Concerned Citizens of Chilton County, sought to reduce the size of the Commission, restore the probate judge to an ex official chair and repeal cumulative voting in an effort to end the opportunity for African-Americans to elect candidates of choice.  The U.S. Attorney General refused to preclear this scheme.  *March 8, 2006 Hearing Vol. I*, at 53.

59.     Congress received testimony from Fred Gray, civil rights attorney, about objections issued by the Department of Justice to voting changes in Alabama: "the Department of Justice has objected to redistricting plans as purposefully preventing African Americans from electing candidates of choice to a majority of the seats on the city council and county board of education. The Department objected to the Alabama Legislature's 1992 congressional redistricting plan on the ground that fragmentation of black populations was evidence of a 'predisposition on the part of the state political leadership to limit black voting potential to a single district.'  In 1998, the

Department objected to a redistricting plan for Tallapoosa County commissioners on the ground that it impaired the ability of black voters to elect a candidate of choice in order to protect a white incumbent.  In 2000, the Department objected to annexations by the City of Alabaster, which would have eliminated the only majority black district . . . ."  *May 17, 2006 Hearing*, at 189-190.

60.     Through a report submitted to Congress by Nadine Strossen, Congress received information that in 1992, the Attorney General objected to a voting change in Wrightsville, Alabama which proposed the relocation of a precinct from the county courthouse to the racially segregated American Legion Hall.  *March 8, 2006 Hearing Vol. I*, at 732.

### ii.      Alaska

61.     Wade Henderson submitted a report to Congress ("*Voting Rights in Alaska, 1982-2006*") which stated: "[C]ontinuing attempts by the state to dilute the Alaska Native vote speak to the need for reauthorization of Section 5 of the VRA. Following the 1990 census, the state adopted a legislative redistricting plan that was harshly criticized on the grounds that it diluted Native votes, disregarded the differences between Alaska Native groups, and was prepared in secret under the influence of some questionable dealings. A coalition of Native interests appealed to the U.S. Department of Justice (DOJ) imploring DOJ not to preclear the plan under Section 5 of the VRA and identified some of the discriminatory components of the proposed "anti-Native" plan. DOJ requested more information and ultimately declared the plan legally unenforceable because of its negative effects on Alaska Native voters." *March 8, 2006 Hearing Vol. I*, at 1312.

### iii.     Arizona

62.     Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were nineteen objections in Arizona and there were seven counties in Arizona

where objections had been interposed against the county or a political unit located in the county. H.R. Rep. No. 109-478, at 73, 75.

63.     Senator Patrick Leahy provided the following example from the record before Congress: "In 2002, the Department of Justice objected to Arizona's state legislative redistricting plan because it fractured Hispanic voters and reduced Hispanic voting age population in 5 districts below their 1994 benchmarks, despite the growth of the State's Hispanic population and the ability to draw three compact majority-Hispanic districts. The State court responded by accepting an interim plan recommended by a Special Master that restored one district to its benchmark level and created 2 new Hispanic-majority districts in metropolitan Phoenix to replace some of the other four majority Hispanic-majority districts that had been eliminated." 152 Cong. Rec. S7748.

64.     Senator Leahy provided the following example from the record before Congress:  "In 1985, the Apache County Board of Supervisors proposed to eliminate the last remaining polling place on Arizona's Fort Apache Reservation, reduce the daily hours of operation for those voting stations that remained open, and implement a rotating polling place system that would make it even harder for Navajo voters to reach the polls.  Yet, absentee voting opportunities were not provided to Indian voters. Pointing to the clear discriminatory purpose and effect of the proposed changes, the Department of Justice objected." *Id*.

65.     During reauthorization, Congress considered a report which found the following regarding the effect of the Voting Rights Act in Arizona: "The Justice Department has objected to four statewide redistricting plans because of their discriminatory impact on language minority voting-age citizens, including one in the 1980's, two in the 1990's, and one in 2002. Over 80 percent of all Section 5 objections in Arizona have occurred since 1982. The Justice Department has inter-

posed Section 5 objections to discriminatory voting changes in seven of Arizona's 15 counties

since 1982. Several of the post-1982 Section 5 objections have been directed at discriminatory

practices with the purpose or effect of denying language assistance and other basic election

access to limited-English proficient (LEP) American Indian voting-age citizens, such as discri-

minatory practices remedied in 1989 and 1994 cases brought by the Department of Justice."

*March 8, 2006 Hearing Vol. I*, at 1366-1367 (internal formatting omitted).

### iv.    California

66.     Through the National Commission on the Voting Rights Act, Congress received a pre-

pared statement from voting rights attorney, Joaquin Avila, Assistant Professor of Law at Seattle

University School of Law, referencing a 1993 DOJ objection to a proposed redistricting plan in

Monterey County, CA.  He noted that DOJ concluded that the proposed redistricting plan "ap-

pears deliberately to sacrifice federal redistricting requirements, including a fair recognition of

Hispanic voting strength, in order to advance the political interests of the non-minority residents

of northern Monterey County."  *October 25, 2005 Scope Hearing Vol. II*, at 3310.

67.     The Senate Committee on the Judiciary received the report "*Voting Rights in California,*

*1982-2006*" discussing the positive impact of an objection interposed to a 1990 redistricting plan

in Merced County that sought to fragment the Latino Community.  As a result of the objection

"the county submitted for Section 5 approval a redistricting plan that avoided the fragmentation

of the Latina/o community in the city of Merced and included significant Latina/o communities

within a majority Latina/o supervisor district. The new plan was approved and resulted in the

election of a Latina supervisor." *July 13, 2006 Hearing*, at 107-108.

68.     Through the National Commission on the Voting Rights Act, Congress received the pre-

pared statement of Robert Rubin, referencing the Justice Department's objection to Chualar Un-

ion Elementary School District's attempt to re-institute at-large elections.  Rubin states that DOJ

"found evidence that the petition drive to make the change to at-large elections 'was motivated, at least in part, by a discriminatory animus.'  The cover letter for the petiti*on drive 'attacked the credibility of the trus*tees from that district, citing the language skills of one trustee and making unfavorable references to the language preferences of another.'  The DOJ also found that 90% of the persons who signed the petition were non-Spanish surnamed people who lived outside the district." *October 25, 2005 Scope Hearing Vol. II*, at 3326.

### v.   Florida

69.     Wade Henderson submitted a report to Congress ("*Voting Rights in Florida, 1982-2006*") which stated that "[a]s a result of the Section 5 objection to Florida's 1992 state reapportionment plan, the state created a majority-minority state senate district in the Tampa Bay/Hillsborough County area where previously none had existed even though black and Hispanic persons consti-tuted more than 40.1 percent of the voting-age population in the area and the legislative record showed that the redistricting had been undertaken with the purpose of protecting white incum-bents." *March 8, 2006 Hearing Vol. II*, at 1458.

70.     The same report indicated that the "Department of Justice interposed an objection to the 2002 redistricting plan for the Florida House of Representatives, stating that the plan reduced 'the ability of Collier County Hispanic voters to elect their candidate of choice [and] the drop in Hispanic population in the proposed district will make it impossible for these Hispanic voters to continue to do so.  As a result of the DOJ's Section 5 objection to the 2002 reapportionment plan, the Hispanic minority-majority district was preserved in Collier County and its existence is attributable solely to the Department of Justice's Section 5 review." *Id.* at 1466.

71.     The report also analyzed Section 5 objections to Florida's administration of elections: "the Department of Justice [objections] to Florida election procedures was directed at three of thirty-seven changes proposed by Florida to the administration of absentee ballots in 1998. . . .

The three provisions to which DOJ objected placed heavy emphasis on literacy skills, ability to provide a Social Security number and a witness's signature." *Id.* at 1467.

### vi.  Georgia

72.     Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were eighty-three objections in Georgia and there were forty-seven counties in Georgia where objections had been interposed against the county or a political unit located in the county.  H.R. Rep. No. 109-478, at 73, 76.  Most of the objections were directed at methods of election changes including: at-large elections, numbered posts, staggered terms, majority vote requirements, and redistrictings.  Other categories of voting changes receiving objections included annexations, and deannexations and consolidations.  *March 8, 2006 Hearing Vol. II*, at 1503-1506.

73.     Wade Henderson submitted a report to Congress ("*Voting Rights in Georgia, 1982-2006*") which indicated that the Department of Justice objections in Georgia between 1982 and 1995 included objections to statewide redistricting plans in each of the redistricting cycles since 1982, 14 objections to local redistricting plans (including county, board of education, and municipal redistricting plans), proposed election schedules, candidate educational requirements, voter registration procedures and polling place changes.  Henderson presented testimony that DOJ found a number of these objections were based on evidence that state and local election officials acted for racially discriminatory reasons.  *Id.* at 1512-13, 1515-1518.

74.     The same report noted:  "It is critical to recognize circumstantial evidence of intentional discrimination by state and local officials, inasmuch as the days of overt public statements of racial antipathy (largely) have passed.  For example, several methods of election objections involved efforts to add at-large seats to single-member district plans under circumstances that strongly suggested a discriminatory purpose."  *Id.* at 1507.

75.     Senator Patrick Leahy provided the following example from the record before Congress: "In the post-1990 redistricting cycle, the Department of Justice objected to Georgia's Senate re-districting bill twice and to Georgia's House redistricting bill three times.  The newly adopted plans were then challenged by litigation in which the state admitted to constitutional violations. After losing the lawsuit, the state claimed to remedy the problem.  However, its newly adopted plans reduced the black populations of numerous districts, thereby drawing DOJ objections to both plans yet again in March 1996.  This is from Robert Kengle, 'Voting Rights in Louisiana [sic]: 1982-2006,' RenewTheVRA.org at 14."  152 Cong. Rec. S7746-S7747.

76.     The report "*Voting Rights in Georgia, 1982-2006*" discussed vote discrimination in the City of Augusta, Georgia, where, in addition to two Section 2 lawsuits settled in 1988, in 1987, the DOJ objected to "eight annexations [that were] enacted with a 'racial quota' policy[.]"  The DOJ also lodged "a 1988 objection to [a] referendum election schedule and a 1989 objection to the city's consolidation with Richmond County.  The series of racially-charged political battles as the city of Augusta developed a black population majority exemplify the tensions that can arise when jurisdictions approach majority-black status and how the Voting Rights Act checks the unfortunate impulse to frustrate black political empowerment that regularly has arisen in Georgia (as it has elsewhere)."  *March 8, 2006 Hearing Vol. II*, at 1503.

77.     Through a report submitted to Congress by Nadine Strossen, Congress received informa-tion that the Attorney General objected to a de-annexation of 196 acres in Jones County from the city of Macon, Georgia because the Attorney General found that the city's alleged goal of re-moving a state legislator from the delegation "could have been accomplished through alternate and much less drastic means," and "that race may well have been not only a factor, but a princip-al factor, in the de-annexation decision." *March 8, 2006 Hearing Vol. I*, at 602-604.

78.     Nadine Strossen testified before Congress that following the 2000 Census, the City of
Albany, Georgia, adopted a new redistricting plan for its mayor and commission to replace an
existing mal-apportioned plan, but DOJ rejected it under Section 5.  Ms. Strossen presented tes-
timony that DOJ noted that while the black population had steadily increased in Ward 4 over the
past two decades, subsequent redistricting had decreased the black population "in order to fores-
tall creation of a black district."  *Id.* at 1291; *see also id.* at 24 (testimony of Nadine Strossen).

79.     Congress received testimony from Wade Henderson that in 1992, "DOJ objected to a pol-
ling place change for Johnson County, Georgia, in which the officials sought to move a polling
place for the Wrightsville precinct from the county courthouse to an American Legion Hall,
which had a well-known reputation in the county for racial hostility and exclusion." *Id.* at 63.

80.     The report *"Voting Rights in Georgia, 1982-2006"* indicated that the Department of Jus-
tice objected to a redistricting plan in January 2000 for Webster County, Georgia.  Local officials
tried to redraw the plan because a third black member had recently been elected to the school
board for the first time.  Local officials made the pretextual claim the plan had to be redrawn be-
cause it was malapportioned, yet the plan had only a 5% deviation and so was well within consti-
tutional limits, while the new plan had a 13% deviation.  *March 8, 2006 Hearing Vol. II*, at 1514.

81.     Through a report submitted to Congress by Nadine Strossen, Congress received informa-
tion that, in 1987, the City of Rome, Georgia sought to implement staggered terms for school
board members, but was stopped from doing so by an objection of the Attorney General.  *March
8, 2006 Hearing Vol. I*, at 698.

82.     Through the same report submitted by Nadine Strossen, Congress received information
that the Attorney General approved the districting plan for Millen, Georgia, but objected to the
schedule of elections on the grounds that the new plan would not be fully implemented until

1995.  The Attorney General further noted that the city had not carried its burden of showing that the delay "has neither a discriminatory purpose nor a discriminatory effect."  *Id.* at 728.

83.     Through the same report, Congress received information that the Attorney General objected to the city of LaGrange, Georgia's plan to retain two at-large city council seats because "the City had not shown that the retention of two at-large seats for the council would not cause dilution of minority voting strength. . . ."  *Id.* at 851.

84.     Congress received into evidence a May 23, 1994 Section 5 objection rejecting the City of Waynesboro's plan to reinstitute a majority vote requirement.  Waynesboro had previously instituted a majority vote requirement without preclearance in 1977, despite rejection of preclearance for the same requirement in 1972.  The objection also noted the history of and continued prevalence of racial polarization in voting in Burke County, where Waynesboro is located.  *October 25, 2005 Scope Hearing Vol. I*, at 788-789.

### vii.     Louisiana

85.     Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were 103 objections in Louisiana and that there were 37 parishes in Louisiana where objections had been interposed against the county or a political unit located in the county.  H.R. Rep. No. 109-478 at 73, 77.

86.     Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there was a total of 129 objections, submission withdrawals and declaratory judgment actions favorable to minorities in Louisiana between 1982 and 2004.  *March 8, 2006 Hearing Vol. I*, at 273.

87.     The report, "*Voting Rights in Louisiana, 1982-2006*," stated that "attempts to dilute African-American voting strength in Louisiana have been widespread.  Thirty-three—more than half—of Louisiana's 64 parishes and 13 of its cities and towns have proposed discriminatory vot-

43

ing changes since 1982, many more than once.  Between 1982 and 2003, the DOJ was compelled

to object to 33 parish school board redistricting and expansion plans proposed by 23 parishes and

one city, 31 parish police jury redistricting and reduction plans proposed by 20 parishes, 7 parish

council redistricting and reduction plans proposed by 6 parishes, 11 city and town council redi-

stricting plans proposed by 10 cities and towns, 2 board of alderman redistricting plans proposed

by two cities, and 6 annexations proposed by the city of Shreveport alone.  The DOJ was also

compelled to object 17 times to attempts by the state itself to make changes that would have di-

minished minority voting rights in congressional, state legislative, state board of education, and

state court elections. And, in a stark illustration of the persistence of the hostility to equal Afri-

can-American participation in Louisiana's political process with statewide consequences, in

every decade since the VRA was passed in 1965, the proposed Louisiana State House of Repre-

sentatives redistricting plan was met with a DOJ objection including three since 1982." *March

8, 2006 Hearing Vol. II*, at 1612.

88.     The same report stated that between 1982 and 2003, 10 parishes in Louisiana proposed

objectionable voting changes multiple times, and "13 times the DOJ noted that local authorities

were merely resubmitting objected-to proposals with cosmetic or no changes." *Id.* at 1619.

89.     Through the National Commission on the Voting Rights Act, Congress received the writ-

ten statement of voting rights attorney, Debo Adegbile, stating that "[i]n 1991 the DOJ objected

that the [Louisiana] House redistricting plan prioritized compactness when that meant fragment-

ing an African-American population concentration among three districts in the north-central part

of the state, but had no problem abandoning compactness to fragment African-American popula-

tion southward in the Delta Parishes.  Assistant Attorney General John R. Dunne wrote in his

objection letter that 'the decision to apply or deviate from the criteria in each instance tended to

result in the plan's not providing African-American voters with a district in which they can elect a candidate of their choice.'" *March 8, 2006 Hearing Vol. IV*, at 4542.

90.     In testimony regarding an objection to a St. Landry, Louisiana voting change, Debo Adegbile observed that "[i]n 1994, the St. Landry Parish Police Jury was advised by a white al-derman in the town of Sunset that whites were uncomfortable walking into an African-American neighborhood to vote at the Sunset Community Center. Without holding a public hearing, seek-ing any further public input, or advertising the change in any way, the police jury moved the pol-ling place to the Sunset Town Hall.  African-American leaders in Sunset did not hear of the change until informed of it by DOJ officials performing a Section 5 preclearance review, at which time they 'expressed vehement opposition' to the change, because the proposed new Town Hall had been the site of historical racial discrimination and many African-American citi-zens did not feel welcome there.  As the DOJ pointed out in its objection letter, 'the decision-making process considered the presumed desires of white voters, but made no effort to consider the desires of African-American voters.'"  *March 8, 2006 Hearing Vol. II*, at 1623.

91.     Senator Patrick Leahy provided the following example from the record before Congress: "In 1995, Jenkins Parish, LA, attempted to relocate a polling place from a predominately black community easily accessible to many voters by foot to a location outside the city limits in a pre-dominately white neighborhood which had no sidewalks, curving roads, and a speed limit of 55 mph.  The Attorney General rejected the change, concluding, 'the county's proffered reasons for the selection of this particular polling site appear to be pretextual, as the selection of this location appears to be designed, in part, to thwart recent black political participation.'  This is Deval L. Patrick, Assistant Attorney General, to William E. Woodrum, Jenkins County Attorney, March 20, 1995."  152 Cong. Rec. S7748.

92.     Senator Leahy also provided the following example from the record before Congress:
"After finding Point Coupee Parish, Louisiana's redistricting plans retrogressive, the Department
of Justice objected 3 decades in a row: in 1983, 1992, and 2002.  After the first 2 census cycles,
the parish attempted to pack minority voters into a single district while fragmenting the remain-
ing African-Americans into majority-white districts.  In 2002, without explanation, the parish
eliminated one majority African-American district, despite an increase in the African-American
population of the parish.  Unfortunately, the experience in Point Coupee Parish is typical in Lou-
isiana: '[b]etween 1982 and 2003, 10 other parishes were 'repeat offenders,' and 13 times the
DOJ noted that local authorities were merely resubmitting objected-to proposals with cosmetic or
no changes.'  This is Debo P. Adegbile, 'Voting Rights in Louisiana: 1982-2006,' RenewThe-
VRA.org at 27."  *Id.* at S7747.

93.     Senator Leahy provided the following additional example from the record before Con-
gress:  "In 1991 and 1992, the Morehouse Parish, Louisiana, Police Jury drew district lines in an
attempt to pack African-American voters in the city of Bastrop multiple times in defiance of DOJ
objections.  After a 1991 section 5 objection to its attempt to draw the same districting plan sev-
eral times the Morehouse Parish Police Jury made cosmetic changes and resubmitted the same
plan.  After DOJ lodged another objection, the police jury resubmitted the same plan with only
cosmetic changes.  Only after DOJ objected a third time in 1992 did the police jury address the
substance of the first objection and draw district lines that did not result in an over-concentration
of African-American voters."  *Id.*

94.     Senator Leahy also reported that:  "In 2005, DOJ objected to the redistricting plan for the
Town of Delhi, LA, which eliminated an African-American opportunity district, rejected an al-
ternative plan which would have been better for minority voters, and was adopted with the intent

to worsen the position of minority voters.  According to the 2000 Census, Delhi's population was

majority African-American, yet local officials attempted to reduce minority voting strength in

the town.  DOJ denied pre-clearance after determining that town officials sought to worsen the

position of minority voters by looking first to the historical background of the city's decision,

which revealed that the plan was adopted despite steadily increasing growth in the town's Afri-

can-American population.  In its April 25, 2005, objection letter, DOJ stated, '[w]ithout question,

Black voters are worse off under the proposed plan,' which was adopted despite the counsel of

the Town's demographer, who noted the retrogressive effect of the plan.  This is from a Letter

from R. Alexander Acosta, Assistant Attorney General, Civil Rights Division, U.S. Department

of Justice, to David Creed, Executive Director, North Delta Regional Planning and Development

District, April 25, 2005."*Id*. at S7747-S7748.

95.     The report, *Voting Rights in Louisiana: 1982-2006*, indicated that Section 5 blocked the

following discriminatory voting changes in Louisiana:

- In 1990, the city of Monroe attempted to annex white suburban wards to its city court jurisdiction.  The DOJ noted in its objection that the wards in question had been eligible for annexation since 1970, but that there had been no interest in annexing them until just after the first-ever African-American candidate ran for Monroe city court.

- Annexation of white suburban wards to the Shreveport city court jurisdiction would have changed that at-large jurisdiction from 54 percent African-American to 45 percent African-American.  After the DOJ objected to the first attempt at annexation in 1994, the city tried a total of five more times, twice in 1995, in 1996 and twice in 1997.  Each time the DOJ informed the city that it would have no objection to the annexation if the city changed its method of electing judges from at-large to single-member districts, and each time the city refused to make that change.

- After the Washington Parish School Board finally added a second majority-African-American district in 1993 (bringing the total to two out of eight, representing an African-American population of 32 percent), it immediately created a new at-large seat to ensure that no white incumbent would lose his seat and to reduce the impact of the two African-American members (to 2 out of 9). The DOJ objected.

- In 1992, the year after Franklin Parish added a second majority-African-American district to its police jury, it attempted to cut the size of the jury in half, eliminating the new African-American seat over protests by the African-American community, and inviting a DOJ objection.

- In 1991 the Concordia Parish Police Jury announced that it would reduce its size from nine seats to seven, with the intended consequence of eliminating one African-American district.  The parish made the pretextual claim that the reduction was a cost-saving measure, but the DOJ noted in its objection that the parish had seen no need to save money until an influx of African-American residents transformed the district in question—originally drawn as a majority-white district—into a majority African-American district.

*March 8, 2006 Hearing Vol. II*, at 1615-1616.

### viii.    Mississippi

96.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were 120 objections in Mississippi and there were 44 counties in Mississippi where objections had been interposed against the county or a political unit located in the county. H.R. Rep. No. 109-478, at 73, 78.

97.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were was a total of 155 objections, submission withdrawals and declaratory judgment actions favorable to minorities in Mississippi between 1982 and 2004. *March 8, 2006 Hearing Vol. I*, at 273.

98.    Congress received testimony that in Mississippi:  "Acts passed by the state legislature that had a statewide impact drew 21 objections—10 of them since the Act was reauthorized in 1982.  In addition, the legislature passed five laws, each of which affected a specific group of localities, which also drew objections, all of them prior to the reauthorization. Ninety-nine objections were interposed to voting changes involving Mississippi's counties—79 of them since the Act was reauthorized in 1982.  These objections covered 48 of Mississippi's 82 counties.  Twenty-five of the 48 counties were repeat offenders, drawing two or more objections. Sunflower and Tate Counties had six each, Bolivar County had five, and Grenada, Leflore, Monroe, and Yazoo

Counties had four each.  Objections were imposed 36 times to actions affecting Mississippi municipalities—18 of those since reauthorization of the Act.  The 36 objections involved 28 different municipalities."  *May 10, 2006 Hearing*, at 137.

99.     Congress received a report on the effect on the Voting Rights Act in Mississippi which discussed the breadth and significance of objections in Mississippi, both pre and post 1982:  "Of the 169 objections [in Mississippi] since enforcement of the Act began, 104 relate to redistricting.  Of the 112 objections since the Act was reauthorized in 1982, 86 relate to redistricting.  Other objections were imposed because of changes involving at-large elections, annexations of territory, numbered post requirements, majority vote requirements, candidate qualification requirements, changes from election to appointment of certain public officials, drawing of precinct lines, polling place relocations, open primary laws, repeal of assistance to illiterate and disabled voters, and a variety of other measures.  Most of these are classic weapons in the arsenal of racial discrimination."*Id.* at 136.

100.    The House Judiciary Committee Report contains the following example of a change that "was intentionally developed to keep minority voters and candidates from succeeding in the political process:"  In 2001, the new Census data revealed that Kilmichael, Mississippi was majority African-American.  A number of African-American candidates ran for city office later that year.  Three weeks before the election the white mayor and the five-member, all-white Board of Aldermen cancelled the election.  The Department of Justice objected to the cancellation and compelled the city to reschedule the election.  When the election was held, African-Americans were elected mayor and to three city council aldermanic positions.  H.R. Rep. No. 109-478, at 36-37.

101.    Senator Patrick Leahy provided the following example from the record before Congress:  "In 1991, Mississippi legislators rejected proposed House and Senate redistricting plans that

would have given African-American voters greater opportunity to elect representatives of their choice, referring to one such alternative on the House floor as the 'black plan' and privately as 'the n-plan.' DOJ objected, concluding that a racially discriminatory purpose was at play. In the 1992 elections, the cured redistricting plans boosted the percentage of African-American representatives in the legislature to an all time high: 27 percent of the House and 19 percent of the Senate—up from 13 percent and 4 percent respectively in a state where 33 percent of the voting age population is African-American. This is Robert McDuff, 'Voting Rights in Mississippi: 1982-2006,' RenewTheVRA.org at 9-10." 152 Cong. Rec. S7747.

102.    Mark Posner testified that in the 1990's about one-fifth of the redistricting objections based on discriminatory purpose were filed against plans enacted by Mississippi counties. *November 1, 2005 Hearing*, at 15.

103.    Congress received information from a report commissioned by the Leadership Conference on Civil Rights that the Department of Justice denied preclearance of Mississippi's state legislature redistricting plans in 1991, finding significant indications of a racially discriminatory purpose. The Department also concluded that the legislature had rejected alternatives under which, "reasonably compact and contiguous districts could be drawn in a number of additional areas of the State in which black voters usually would be able to elect representatives of their choice." DOJ subsequently objected to the state's new Senate redistricting plans in 1992. As a result of DOJ's objections, the new plans resulted in significant increases in the numbers of blacks elected to the House and Senate in the 1992 special elections. *March 8, 2006 Hearing Vol. II*, at 1718-1719.

104.    Congress received written testimony prepared by Rob McDuff discussing Mississippi's congressional redistricting plans: "No black person served in the U.S. House of Representatives

from Mississippi between 1883 and 1986.  During much of this time, the majority-black area of the Mississippi Delta was contained within a single congressional district in the northwest part of the state.  That district was almost 60 percent black as of 1962.  But, in 1966, less than a year after passage of the Voting Rights Act, the Mississippi legislature carved the Delta up among three of the state's five congressional districts, resulting in no districts with a black majority. This basic configuration was adopted again in 1971 and 1981.  When the 1981 plan was submitted under Section 5, DOJ imposed an objection." *May 10, 2006 Hearing*, at 140**.**

105.    Congress received testimony indicating that Section 5 played a crucial role in increasing number of Black elected officials at county level in Mississippi:  "The fruits of enforcement of the Voting Rights Act are reflected in the fact that Mississippi now has 127 black county supervisors, which is 31 percent of the total number of 410 supervisors. . . .  Those 127 supervisors come from 67 different counties.  Of those 67 counties, Section 5 objections were lodged one or more times against redistricting plans for supervisors in 43 of them.  Two others were the subject of successful Section 2 lawsuits.  (Some of the counties with Section 5 objections were also the subject of successful Section 2 litigation).  Thus, most of the current plans under which black supervisors were elected in Mississippi are the legacy of direct enforcement of the Act, particularly the preclearance provision of Section 5.  Even for those counties that never encountered a Section 5 objection or a Section 2 lawsuit, it is safe to say that most designed their plans lawfully because of a recognition that discrimination likely would be met by a Section 5 objection." *Id*.

106.    Congress received testimony about the effect of Section 5 at the local level in Mississippi:  "New municipal redistricting plans led to 13 more objections, 10 of them since the reauthorization.  And municipal annexations of property that changed the voting populations were met with another 13 objections, seven since reauthorization." *Id.* at 143.

### ix.    New York

107.    Wade Henderson submitted a report to Congress ("*Voting Rights in New York, 1982-2006*") which noted that since 1982, the Department of Justice has interposed 14 objections under Section 5 to voting changes submitted by New York's three covered counties (Bronx, Brooklyn and New York). *March 8, 2006 Hearing Vol. II*, at 1840.

108.    The same report noted that "[i]n 1994, DOJ denied preclearance to Chinese-language election procedures in Kings and New York counties [due to] the failure to translate candidates' names on machine ballots . . . and the failure to translate operating instructions for voting machines." As Assistant Attorney General Deval Patrick noted, the translation of candidates' names was critical because "it would be extremely difficult, if not impossible, for these voters to understand names written in English." *Id.* at 1842-1843.

109.    The report also discussed the Attorney General's objection to New York's City Council redistricting plan following the 1990 Census, which found that the plan had a discriminatory effect on Latino voters in at least two separate areas of the city. *Id* at 1840-1841.

110.    Congress received testimony from Wade Henderson that the Attorney General objected in 1992 to a New York State Assembly's redistricting plan, concluding that the plan knowingly fractured the Latino community with the intent and effect of reducing the community's ability to elect candidates of choice. DOJ found that the Assembly was aware that the plan would minimize Hispanic voting strength. Following the issuance of the objection, Adriano Espaillat won a 1996 election and became the first Dominican ever elected to the NY Legislature. *March 8, 2006 Hearing Vol. I*, at 67.

### x.    North Carolina

111.    Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were 43 objections in North Carolina and there were 23 counties where ob-

jections were interposed against the county or a political unit located in the county.  H.R. Rep. No. 109-478, at 73, 82.

112.    Congress received a table from Anita Earls that there were a total of 56 objections, submission withdrawals and enforcement actions favorable to minorities in North Carolina between 1982 and 2004.  *May 16, 2006 Hearing*, at 149.

113.    The report, "*Voting Rights in North Carolina, 1982-2006*," stated that: "[L]egislators took special pains in 1965-66 and 1981-82 to dilute black voting strength in order to diminish the political leverage of black voters and the political prospects of potential black candidates. In both instances, the issue was where to place the large and politically active black population in Durham County so that black voters would not have too much influence in the district. . . . In 1981, the solution passed by the legislature was 'Fountain's Fishhook', a strangely shaped district that curved around Durham to exclude it from L. H. Fountain's second district. The Justice Department denied that plan preclearance on the grounds that the plan had the purpose and effect of diluting minority voting strength." *March 8, 2006 Hearing Vol. II*, at 1759.

114.    The report "*Voting Rights in North Carolina, 1982-2006*" stated that "Section 5 has . . . forced county and local officials to implement fair voting systems in response to Section 2 suits." For example, Congress had information that, in Pasquotank County, North Carolina, black voters and the NAACP filed suit, which resulted in a consent decree preventing Elizabeth City's use of an at-large district that diluted minority voting strength.  *See NAACP v. Elizabeth City*, No. 83-39-CIV-2 (E.D.N.C. 1984).  When the city subsequently attempted to implement at-large districts, the attorney general objected and noted that the plan contained the "very features that characterized the plan abandoned by the consent decree" and was enacted "with knowledge of the

disparate impact it would have."  There are currently four black members on the city council. *Id.* at 1733-1734.

115.   The same report stated that in 1987, DOJ interposed Section 5 objections to voting plans adopted by Pitt and Bladen counties in North Carolina.  Henderson stated that DOJ found that the plans were calculated to "minimize minority voting strength."  *Id.* at 1734.

116.   Congress received testimony from Wade Henderson that Section 5 has been used in North Carolina to protect against proposed dilutive proposals including staggered terms, residency requirements, annexation of predominately white areas, majority vote and runoff requirements, unfair drawing of districts, and the maintenance of at-large voting.  Between 1982 and 1987, Section 5 enabled the Attorney General to interpose objections to residency districts in Beaufort, Bertie, Camden, Edgecombe, Guilford, Martin, Onslow, and Pitt counties.  These requirements limit minority voters' ability to use single shot voting to elect candidate of choice. *March 8, 2006 Hearing Vol. I*, at 68.

117.   Through a report submitted to Congress by Nadine Strossen, Congress received information that in 1989 the Department of Justice objected to the annexation of several predominantly white neighborhoods in Ahoskie, North Carolina.  The Attorney General found that "even though the town is close to 50 percent black in total population, black candidates have had extremely limited success in winning seats on the five-member town council." *Id.* at 933.

118.   The same report indicated that over a period of two decades, the Department of Justice found that the City of Rocky Mount, North Carolina repeatedly tried to dilute black voting strength through different election changes including annexations.  In 1983, in conjunction with an ACLU lawsuit, the DOJ objected to a proposed annexation saying:  "[E]ven though blacks constitute over 42 percent of *the city's population, at no* time has more than one black been

elected to the city council, which appears to be the result of a general pattern of racially polarized

voting occurring in the context of Rocky Mount's at-large election system with its residency and

majority vote requirements." *Id.* at 927.

119.    The report submitted by Nadine Strossen also discussed the Section 5 objection to a new

method of election in Mt. Olive, North Carolina.  The Attorney General concluded that "given

the presence of polarized voting and the limited success that black voters have enjoyed when five

at-large seats are elected, there is considerable doubt as to whether black voters would have a

significant opportunity to elect any at-large member under the proposed election method." *Id.* at

959.

### xi.    South Carolina

120.    Two maps appended to the House Judiciary Committee Report show that from August 5,

1982 to 2004 there were 126 objections in South Carolina and 32 counties in South Carolina

where objections had been interposed against the county or a political unit located in the county.

H.R. Rep. No. 109-478, at 73, 79.

121.    Congress received testimony from Wade Henderson that since 1982, DOJ objections in

South Carolina have concerned redistrictings, annexations, voter assistance, changing county

boundaries, elimination of offices, reductions in the number of seats on a public body, majority

vote requirements, changes to at-large elections, use of numbered posts and residency require-

ments, staggered terms, scheduling of elections, changes from nonpartisan to partisan elections,

and limit ability of African-Americans to run for office.  *March 8, 2006 Hearing Vol. I*, at 65-66.

122.    Congress received testimony from attorney Armand Derfner that there have been nine

objections in the last five years to proposed voting changes in South Carolina.  They include:

four discriminatory county redistricting plans and a majority vote requirement that would have

prevented the election of the only successful black candidate.  *May 17, 2006 Hearing*, at 75.

123.    The House Judiciary Committee received reports and testimony that "[i]n 2003, South

Carolina, enacted legislation adopting the identical method of elections for the board of trustees

of the Charleston County School District that had earlier, in a case involving the county council,

been found to dilute minority voting strength in violation of Section 2."  According to the House

Judiciary Committee report, the Department of Justice objected to the change because it "would

significantly impair the present ability of minority voters to elect candidates of choice to the

school board and to participate fully in the political process."  H.R. Rep. No. 109-478, at 39-40.

124.    The House Judiciary Committee Report states that "examples were reported [to the

Committee] showing Section 5 was instrumental in preventing covered jurisdictions from inten-

tionally reenacting and enforcing changes to which the Department of Justice had previously ob-

jected."  The report states that the Department of Justice objected to three different acts of the

South Carolina General Assembly to impose staggered terms for the Lancaster County School

District.  According to the report, the Department of Justice found that staggered terms, when

combined with at-large elections and racial bloc voting, limited the potential of "black voters to

participate effectively in the electoral process by reducing the ability of those voters to use single

shot voting."*Id*. at 23.

125.    Through a report submitted to Congress by Nadine Strossen, Congress received informa-

tion that in Batesburg, South Carolina, DOJ objected to a majority vote requirement stating that

"[o]ur analysis of elections in Batesburg raises a clear inference that voting in elections involving

black candidates is polarized along racial lines and that this voting pattern has hampered the abil-

ity of black voters to elect candidates of their choice."  *March 8, 2006 Hearing Vol. I*, at 1030.

126.    The same report indicated that the Department of Justice denied preclearance in 2002 a

redistricting plan for Sumter County, South Carolina.  The objection letter noted that "[u]nder

2000 census data, four of the seven districts in the current, or benchmark plan have both total and voting-age populations that are majority black.  In three of these four, black voters will continue [in the new plan] to have the ability to elect candidates of their choice.  Our analysis, however, shows that this is not true for the fourth district, District 7[.]"  *Id.* at 1058.

127.    The Strossen report indicated that the Department of Justice also objected in 2002 to a proposed voting change by the City of Clinton, South Carolina, because the proposed "reduction in the voting strength of African Americans was avoidable."  Ms. Strossen's report further showed that, in 1993, the Justice Department had objected to Clinton adoption of a majority vote requirement.  *Id.* at 1028, 1031.

128.    Congress received a January 5, 1993 Section 5 objection to a redistricting plan for Marion County, South Carolina.  The objection noted that, from 1980 to 1990, the county's black population increased from 50% to 55%, and that, in the context of "a persistent pattern of racially polarized voting," the county had placed a quota into its plan allowing "for no more than three districts with substantial black population majorities plus one district that would have a black population percentage no higher than the black population percentage in the county as a whole." *October 25, 2005 Scope Hearing Vol. II*, at 1992-1993.

129.    Congress received a June 5, 1992 Section 5 objection to a Johnston, South Carolina redistricting that would allow black voters the opportunity to elect their preferred candidates in only three of six council districts, though blacks constituted 61% of the population of the town.  DOJ found that the town's geography did not compel having two districts comprised of over 80% black voters, and that "a plan could easily be drawn … which more fairly reflected the town's black majority."  *Id.* at 1980-81.

130.    Congress received a 1994 Section 5 objection to a plan to abolish the elected county school board in Spartanburg County, South Carolina and to replace it with an appointed committee.  The Attorney General found that change was motivated by a discriminatory intent to negate the implementation of a new method of election for the school board, which offered black voters, for the first time, an equal opportunity to elect their preferred candidates.  *March 8, 2006 Hearing Vol. II*, at 1964-1965.

131.    Senator Patrick Leahy provided the following example from the record before Congress of jurisdictions changing their boundaries in order to diminish the voting power of minorities by selectively changing the racial composition of a district:  "In 2003, the Department of Justice interposed an objection to a proposed annexation in the Town of North, SC, because the town had 'been racially selective in its response to both formal and informal annexation requests.'  DOJ found that 'white petitioners have no difficulty in annexing their property to the town' while 'town officials provide little, if any, information or assistance to black petitioners and often fail to respond to their requests, whether formal or informal, with the result that the annexation efforts of black persons fail.'  Though the town argued that no formal attempts had been made by African-Americans to be annexed into the town, DOJ's investigation revealed that at least one petition had been signed by a significant number of African-American residents who sought annexation."  152 Cong. Rec. S7749.

### xii.    South Dakota

132.    Congress received testimony from Wade Henderson that DOJ objected to South Dakota's proposed changes regarding voter registration and driver's license applications; voter purging every four years; and changes in mail-in voter registration dates, citing a lack of evidence that they were not discriminatory in purpose against Native American voters.  *March 8, 2006 Hearing Vol. I*, at 67.

### xiii.    Texas

133.    A map appended to the House Judiciary Committee Report shows that from August 5, 1982 to 2004, there were 74 objections interposed in Texas to non-statewide changes, involving 46 Texas counties.  H.R. Rep. No. 109-478, at 80.

134.    Congress heard testimony from Wade Henderson that since 1982, 107 Section 5 objections to preclearance have been interposed in Texas.  Henderson also testified that racially discriminatory election changes increased after 1982 and repeat offenses have been common.  Further, of the 196 objections since 1975, 59 have been related to the districting or redistricting plans proposed at various levels of government, including seven statewide plans.  *March 8, 2006 Hearing Vol. I*, at 63.

135.    Congress received testimony through the National Commission on the Voting Rights Act that "Section 5 has helped prevent discrimination against those voters when statewide changes are at issue.  For example, the Department of Justice objection to the Texas State House redistricting plan in 2001 was predicated on the state's attempt to eliminate effective districts for Latino voters in heavily Latino South and West Texas."  *Id.* at 174.  In particular, DOJ found that the proposed plan would have resulted in a net loss of three districts in which minority voters would have the opportunity to elect candidates of choice.  The plan accomplished this by reducing Spanish surname registration levels in three districts; "fragment[ing] the core of majority Hispanic districts; and packing Hispanic voters into neighboring districts."  DOJ concluded that the resulting fragmentation was both "unnecessary" and in contradiction with the state's traditional redistricting principles.  *October 25, 2005 Scope Hearing Vol. II*, at 2518-2523.

136.    Congress received testimony regarding an October 4, 1991 DOJ objection to the redistricting plan for the City of Houston, Texas.  "As discussed in the objection letter, from 1980 to 1990 the city's Hispanic population grew by 60 percent, increasing from 18 to 28 percent of the

total city population, while the black population percentage remained essentially unchanged and the white percentage decreased from 52 to 41 percent.  Although the city claimed that it sought to recognize the growing Hispanic population in drawing its new districts, the submitted plan—like the existing plan—provided only one district in which Hispanic voters would have the opportunity to elect a candidate of their choice and fragmented the remainder of the community into a number of adjoining districts. Alternative plans developed during the redistricting process demonstrated that, by avoiding such fragmentation, the plan would contain two districts in which Hispanics would constitute a majority of the voting age population. The objection letter concluded that the goal of recognizing the Hispanic growth appeared to have been subordinated by the city to a concern for drawing districts that would protect the re-election chances of white incumbent councilmembers." *October 18, 2005 Hearing*, at 1418.

137.    Senator Patrick Leahy provided the following example from the record before Congress: "In 1992, DOJ objected to a Justice of the Peace and Constable redistricting plan in Galveston County, Texas, that fractured geographically compact African-American and Hispanic voters and provided no opportunity districts among the 8 districts in the plan, even though African Americans and Hispanic comprised 31 percent of the county's population.  This is from Nina Perales, Luis Figueroa and Criselda G. Rivas, 'Voting Rights in Texas, 1982-2006', RenewTheVRA.org, at 17-18."  152 Cong. Rec. S7747.

138.    Senator Leahy provided the following additional example from the record before Congress:  "In 1992, DOJ objected to the Terrell County Commissioners Court redistricting plan. Although the Hispanic population in the county had increased from 43 percent to 53 percent, the proposed redistricting plan cracked the Hispanic population by substantially decreasing the number of Hispanic voters in one of the two Hispanic majority districts and packing them into the

other to create a district with an 83 percent Hispanic district.  This is from Nina Perales, Luis Fi-

gueroa and Criselda G. Rivas, 'Voting Rights in Texas, 1982-2006,' RenewTheVRA.org, at 19."

*Id*.

139.    Congress received testimony from Jose Garza discussing a 2002 DOJ objection to Waller

County's proposed county redistricting plan.  The objection letter noted that the proposed plan

would reduce the black voting age population of one of the two majority black districts from

52.5 percent to 29.7 percent.  The DOJ noted that "[o]ur statistical analysis also shows that white

voters do not provide significant support to candidates sponsored by the minority community,

and that interracial elections are closely contested."  DOJ rejected the county's rationale that this

was necessary to reduce minority voting strength in one district in order to preserve minority vot-

ing strength in another.  DOJ determined that the reduction would have worsened the position of

minority voters, and objected to the submitted redistricting plan.  *October 20, 2005 Hearing*, at

69-70.

140.    Congress received testimony from Anita Earls that "[e]arlier this year in Texas, the DOJ

issued a Section 5 objection when the North Harris and Montgomery Community College Dis-

trict, comprised of an area of over 1000 square miles, reduced the number of polling places from

84 to 12. . . .  The Department's objection letter noted specifically that under the proposed

change, the site with the smallest proportion of minority *v*oters served just 6,500 voters, while

the site that served a population that was 79.2% black and Hispanic served over 67,000 voters."

*May 16, 2006 Hearing*, at 60-61.

141.    Congress received testimony from Jose Garza regarding a 1997 DOJ objection to pro-

posed annexation by Baytown (Harris County, TX) that among other things "failed to annex an

area with a significant minority population, while [the city] was simultaneously annexing an all-

white area that when added to the city's population will reduce the minority proportion" and contrary to the concerns of representatives of the minority community "voted in favor of annexing only the all-white area." *October 20, 2005 Hearing*, at 47-48.

142.     Congress received testimony from Jose Garza citing a 1999 DOJ objection to a proposed deannexation plan presented by Lamesa (Dawson County, TX) which sought to remove a significant number of minority residents from the jurisdictions' boundaries.  The DOJ found that the deannexation was primarily motivated by racial animus.  *Id.* at 50-51.

143.     Congress received testimony from Jose Garza referencing a 2001 DOJ objection to Haskell Consolidated ISD's (Haskell, Knox, and Throckmorton Counties, Texas) proposed change from single-member districts to at-large elections.  The single member districts had resulted from the settlement of litigation asserting that the at-large system violated Section 2 of the VRA.  DOJ determined that "[g]iven the demographics of the school district and apparent voting patterns within it, the jurisdiction has not carried its burden that the proposed change will not significantly reduce the ability of minority voters to elect candidates of their choice to the school board."  *Id.* at 60.

144.     Congress received testimony from Jose Garza referencing a 2002 DOJ objection to the city of Freeport's (Brazoria County, TX) proposed change from a single-member district system back to an at-large system.  The DOJ noted that until 1992, the City elected its four-member council on an at-large basis, after which the City began to use a single-member district system, adopted to settle litigation challenging the at-large system as violative of Section 2.  The DOJ further noted that, under the district method of election, minority voters had demonstrated the ability to elect candidates of choice in at least two districts.  DOJ concluded that "a return to an

electoral system where all council offices are elected on an at-large basis will result in a retrogression in their ability to exercise the electoral franchise that they enjoy currently." *Id.* at 62.

145.    Congress received evidence that on June 26, 1995, the Attorney General interposed an objection to the proposed use of staggered terms and numbered posts for the City of Andrews in Andrews County, Texas.  In its objection letter, DOJ found that the city's justifications for staggered terms and numbered post appeared pretextual.  In addition, DOJ observed that "[t]he electoral history of the city and within the county suggests that voting is polarized along racial and ethnic lines to such a degree that no person of Hispanic heritage has ever served as a councilmember." *October 25, 2005 Scope Hearing Vol. II*, at 2477-2481.

146.    Congress received evidence that on February 17, 1995, DOJ interposed an objection to bilingual procedures to be used in the implementation of the National Voter Registration Act of 1993 for the State of Texas.  In particular, DOJ found that "its examination of the proposed Spanish language materials reveals that some portions of the Spanish language translations are inconsistent with the English version, that there are numerous instances of misspelled Spanish words, and that there are instances of poor or incorrect Spanish word choice."  DOJ concluded that "[a]s a result, persons relying on the proposed Spanish language translations have an increased likelihood of having their registration forms rejected." *Id.* at 2469-2472.

147.    Congress received evidence that on October 31, 1994, DOJ interposed an objection to a redistricting plan for the Gonzales County Underground Water Conservation District.  DOJ determined that the proposed redistricting plan was "grossly malapportioned."  In particular, DOJ observed that the City of Gonzales comprised a single district in the plan that was two and a half times the size of any other district.  DOJ also observed that this particular district contained nearly half of the minority population in the entire water district but still had an Anglo majority.  Fi-

nally, DOJ also noted that "the minority community appears effectively to have been frozen out of the process which produced the redistricting plan" and observed that "none of the public hearing or meeting notices were posted in Spanish." *Id.* at 2457-2459.

148.   Congress received evidence that on October 21, 1994, DOJ interposed an objection to bilingual election procedures for the City of San Antonio in Bexar County, Texas.  DOJ observed that the city provided assistance and many bilingual materials for the August 13, 1994, special referendum election, but provided the document concerning the substance of the referendum election in English only.  DOJ noted that the city justified distribution of the document on the basis that it was "important for voters to know the components of the plan of which the project is a part."  DOJ observed that once the city provided this critical document to the public, "it had an obligation to provide it so that all voters would benefit from its distribution, not only those who are proficient in English." *Id.* at 2451-2453.

149.   Congress received evidence that on June 13, 1994, DOJ interposed an objection to the method of election for trustees for the Mexia Independent School District in Limestone County, Texas.  DOJ determined that the proposed plan provided protection to incumbents at the expense of minority voters and noted an "apparent of racially polarized voting in school district elections." *Id.* at 2437-2439.

150.    Congress received evidence that on April 18, 1994, DOJ interposed an objection to the polling place change for the Jefferson Volunteer Fire Department Building in Marion County, Texas.  DOJ determined that the location of the polling place at issue "has divided the county along racial lines for some years."  DOJ observed that the proposed polling place change was made after a racially polarized election in which a white challenger unseated a Black incumbent.  DOJ concluded that the justification proffered for the change appeared "pretextual" and noted

that the change appears to be "designed to thwart recent black political participation." *Id.* at 2427-2429.

151.     Congress received evidence that on June 4, 1993, the DOJ interposed an objection to proposed redistricting plan for the county commission in McCulloch County, Texas.  DOJ observed that the redistricting plan was adopted "[d]espite the significant increase in the percentage of Hispanic residents in the City of Brady" resulting in "unnecessary fragmentation" of the Hispanic population.  Moreover, the plan was adopted in the face of "an apparent pattern of racially polarized voting." *Id.* at 2413-2415

152.     Congress received evidence that on May 10, 1993, the DOJ interposed an objection to the redistricting plan for the commissioner court districts in Castro County, Texas.  The DOJ found unnecessary fragmentation of Hispanic voters and efforts to promote incumbency protection that were accomplished at the expense of minority voters. *Id.* at 2410-2412.

### xiv.     Virginia

153.     Two maps appended to the House Judiciary Committee Report show that from August 5, 1982 to 2004 there were 15 objections in Virginia and there were eight counties or independent cities in Virginia where objections had been interposed against the county or independent city or a political unit located in the county.  H.R. Rep. No. 109-478, at 73, 81.

154.     Congress received testimony from Wade Henderson that Section 5 objections in Virginia since 1982 have included redistrictings, and changes to voting procedures, election schedules, and the structure of elected bodies. *March 8, 2006 Hearing Vol. I*, at 64.

155.     Congress received testimony from Wade Henderson that in 1991, DOJ objected to the redistricting plan for the Virginia House of Delegates because the proposed configuration minimized black voting strength in Charles City County, James City County, and the Richmond/Henrico areas. The plan placed large concentrations of African-Americans in majority

white districts.  DOJ concluded that protection of incumbents, which was the commonwealth's defense, could not be at the expense of minorities.  *Id.*.

156.    Congress received testimony from Wade Henderson that, in 2001 and 2003, Northampton County, Virginia proposed collapsing six districts for its board of supervisors into three larger districts. Three of the six benchmark districts were majority-minority districts that regularly elected candidates of choice.  DOJ objected to the 2001 plan based on the retrogression in minority electoral opportunity.  DOJ then objected to a new six district plan that still had the same retrogressive effect.  *Id.*.

157.    Senator Patrick Leahy provided the following example from the record before Congress: "In 1999, after the Davills Precinct polling center burned down and the County Board of Supervisors of Dinwiddie County, Virginia moved the polling place to the Cut Bank Hunt Club (a privately owned club with a large African-American membership), one hundred and five citizens submitted their signatures to have the precinct moved to the Mansons United Methodist Church, located three miles southeast of the Hunt Club.  The petition's stated purpose for moving the precinct was for a 'more central location.'  Before the board's meeting to discuss moving the polling place, the Mansons United Methodist Church withdrew its name as a possible location. The board then placed an advertisement for a public hearing on changing the polling place which stated that if any 'suitable centrally located location [could] be found prior to July 15, 1999,' they would consider moving it there.  On July 12, 1999, the Bott Memorial Presbyterian Church members offered their facilities for polling.  On August 4, 1999, the board approved changing the polling place to Bott Memorial Presbyterian Church.  The church is located at the extreme east end of the precinct, however, and 1990 Census data showed that a significant portion of the black population resides in the western end of the precinct.  DOJ objected to the change, finding

that the polling place was moved for discriminatory reasons.  This is a letter from Bill Lann Lee,

Acting Assistant Attorney General, Civil Rights Division, U.S. DOJ., to Benjamin W. Emerson

of Sands, Anderson, Marks & Miller, October 27, 1999."  152 Cong. Rec. S7748.

> **2.**     **Section 5 Deterrence, Including the Impact of DOJ Requests for More Information**

158.    The House Judiciary Committee stated that "Section 5's reach in preventing discrimina-

tion is broad. Its strength lies not only in the number of discriminatory voting changes it has

thwarted, but can also be measured by the submissions that have been withdrawn from consider-

ation, the submissions that have been altered by jurisdictions in order to comply with the VRA,

or in the discriminatory voting changes that have never materialized."  H.R. Rep. No. 109-478, at

36.

159.    The House Judiciary Committee found that "the existence of Section 5 deterred covered

jurisdictions from even attempting to enact discriminatory voting changes."  *Id.* at 24.

160.    The House Judiciary Committee found that "[t]he increased number of objections, re-

vised submissions, and withdrawals over the last 25 years are strong indices of continued efforts

to discriminate."  *Id.* at 36.

161.    The House Judiciary Committee found that: "Efforts to discriminate over the past 25

years were not just demonstrated by objection letters issued under Section 5 but were also re-

flected by an administrative mechanism, known as a 'more information request (MIR).'  MIRs

are used by the Department of Justice when insufficient information is submitted with a proposed

voting change to enable the Department of Justice to make a determination whether a voting

change has the 'purpose or effect of denying or abridging the right to vote.'  The use of MIRs

force covered jurisdictions to take action when seeking to preclear voting changes that may be

discriminatory, including deciding whether to: (1) submit additional information to prove a change is non-discriminatory; (2) withdraw a proposed change from consideration because it is discriminatory; (3) submit a new or amended non-discriminatory voting plan; or (4) make no change.  The actions taken by a jurisdiction are often illustrative of a jurisdiction's motives."  *Id.* at 40 (footnotes omitted).

162.    Congress received a report by Luis Ricardo Fraga and Maria Lizet Ocampo titled "The Deterrent Effect of Section 5 of the Voting Rights Act:  The Role of More Information Requests" arguing that: "The sum of the outcomes of withdrawals, superseded changes, and no responses, resulting from an MIR, is 855.  This means that MIRs have resulted in directly affecting 855 additional changes, making their implementation illegal, in addition to the 792 changes that resulted in objections."  Thus, MIRs "increased the impact of the DOJ on submitted changes by 110%, i.e., doubling the number of changes that were not precleared by the DOJ."  *March 8, 2006 Hearing Vol. II*, at 2553.

163.    The version of the Fraga/Ocampo report received by the House of Representatives studied MIRs from 1990-2005 and found 855 MIRs that resulted in a withdrawn or superseded submission or no response.  *Id.* at 2537, 2565.  This figure was included in the House Judiciary Committee Report.  H.R. Rep. No. 107-478, at 40-41.  Subsequently, the authors expanded their study to MIRs from 1982 to 2005, and found 1162 MIRs that resulted in a withdrawn or superseded submission or no response.  This version was provided to the Senate.  *June 13, 2006 Hearing*, at 210, 225.  The table setting forth the MIR results by state is set forth here:

**Table 3**
**Number of Changes, Objections, and MIR-Induced Outcomes by State, 1982-2005**

| State | All Submissions | | MIRs Issued | | Outcomes for Changes Receiving a MIR | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Changes | Objections | # of MIR | More Info Foll | No Objection | Objection | Withdraw | Superseded | No Response | Total MIR-Induced Outcome (WS, NR) | MIR-Induced Outcome and Objections | MIR-Induced Outcome/All Objections |
| ALABAMA | 24428 | 198 | 1159 | 301 | 743 | 58 | 64 | 24 | 93 | 181 | 379 | 0.91 |
| ALASKA | 5537 | 2 | 315 | 115 | 311 | 0 | 3 | 0 | 1 | 4 | 6 | 2.00 |
| ARIZONA | 26773 | 32 | 534 | 149 | 454 | 12 | 9 | 4 | 15 | 28 | 60 | 0.88 |
| ARKANSAS | 7 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| CALIFORNIA | 3374 | 60 | 186 | 9 | 114 | 2 | 4 | 1 | 0 | 5 | 65 | 0.08 |
| COLORADO | 132 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| FLORIDA | 3514 | 14 | 196 | 242 | 177 | 4 | 8 | 0 | 0 | 8 | 22 | 0.57 |
| GEORGIA | 53646 | 370 | 3274 | 539 | 2528 | 102 | 156 | 12 | 25 | 193 | 563 | 0.52 |
| HAWAII | 289 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| ILLINOIS | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| LOUISIANA | 23903 | 274 | 1512 | 400 | 1047 | 159 | 45 | 15 | 13 | 73 | 347 | 0.27 |
| MASSACHUSETTS | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| MICHIGAN | 365 | 0 | 24 | 1 | 19 | 0 | 5 | 0 | 0 | 5 | 5 | - |
| MISSISSIPPI | 11753 | 151 | 874 | 126 | 499 | 123 | 58 | 14 | 21 | 93 | 244 | 0.62 |
| NEW HAMPSHIRE | 227 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| NEW MEXICO | 201 | 1 | 59 | 57 | 55 | 0 | 0 | 1 | 3 | 4 | 5 | 4.00 |
| NEW YORK | 4217 | 14 | 121 | 75 | 34 | 4 | 51 | 0 | 2 | 53 | 67 | 3.79 |
| NORTH CAROLINA | 12305 | 142 | 832 | 96 | 582 | 75 | 22 | 4 | 3 | 29 | 171 | 0.20 |
| SOUTH CAROLINA | 23594 | 796 | 1188 | 234 | 856 | 77 | 36 | 3 | 64 | 103 | 899 | 0.13 |
| SOUTH DAKOTA | 2011 | 1 | 51 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 1 | 0.00 |
| TEXAS | 162397 | 194 | 3034 | 760 | 2038 | 129 | 185 | 120 | 61 | 366 | 560 | 1.89 |
| VIRGINIA | 28768 | 31 | 337 | 15 | 271 | 18 | 10 | 0 | 7 | 17 | 48 | 0.55 |
| WYOMING | 201 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | - |
| Totals | 387673 | 2280 | 13697 | 3120 | 9778 | 763 | 656 | 198 | 308 | 1162 | 3442 | 0.51 |

Id. at 225.

164.    Congress received testimony through the National Commission on the Voting Rights Act that "[w]hile no data on submission withdrawals prior to 1982 were available for the Commission's analysis, the post-1982 data revealed 205 withdrawals, compared with 626 objections and 25 declaratory judgment actions favorable to minorities in the same period." *March 8, 2006 Hearing Vol. I*, at 220.

165.    Congress heard testimony from Anita Earls that stressed the importance of tallying jurisdictions' withdrawals of their submissions to the Department of Justice as a measure of their attempt to discriminate when measuring the DOJ's impact under Section 5.  "Below the surface [of DOJ objections], what you don't see are all the times the Justice Department writes letters requesting more information on a submission, and as a result of that, the jurisdiction changes its plans and brings them into compliance. . . .  It doesn't even have to rise to the level of a written letter for more information.  [The Justice Department] gets a submission; they make phone calls;

make inquiries; the jurisdiction says, 'Oh, you're right.'. . . They change what they're planning to do." *Id.* at 300.

166.    Congress heard testimony from Chandler Davidson about the sources showing "the need for kind of extensive legislation" that Congress was considering for the Voting Rights Act including Department of Justice data such as objections and more information requests resulting in withdrawals.  Davidson concluded that "I think the inference that could be made is that they saw the handwriting on the wall that those would be changed that would be objected to if they did not withdraw them." *May 9, 2006 Hearing*, at 32.

167.    The House Judiciary Committee quoted the report authored by the National Commission on the Voting Rights Act that "'the deterrent effect of Section 5 is substantial.  Once officials in covered jurisdictions become aware of the logic of preclearance, they tend to understand that submitting discriminatory changes is a waste of taxpayer time and money and interferes with their own timetables, because the chances are good that an objection will result." H.R. Rep. No. 109-478, at 24.

168.    The House Judiciary Committee also quoted the testimony from Laughlin McDonald regarding the deterrent effect of preclearance: "'In 2005, the Georgia legislature redrew its congressional districts, but before doing so it adopted resolutions providing that it must comply with the non-retrogression standard of Section 5.  The plans that it drew maintained the black voting age population in the two majority black districts (represented by John Lewis and Cynthia McKinney) at almost exactly their pre-existing levels, and it did the same for the two other districts (represented by Sanford Bishop and David Scott) that had elected black members of congress.  There was no objection by the Department of Justice when the plan was submitted for preclearance.  That does not mean that Section 5 did not play a critical role in the redistricting

process.  Rather, it means that Section 5 likely encouraged the legislature to ensure that any vot-

ing changes would not have a discriminatory effect on minority voters.'"  *Id.*

169.    Congress received information from a report commissioned by the Leadership Confe-

rence on Civil Rights, which indicated that election officials in jurisdictions covered by Section 5

make an effort to consult with the NAACP and other local African-American leaders before

making voting changes, and are generally more conscious of the impact that such changes will

have on black voter participation.  *March 8, 2006 Hearing Vol. II*, at 1729.  The report also noted

that, one of the benefits of Section 5 is that it presents "all interested parties—state legislative

and administrative officials, Justice Department officials, and interested groups and individuals

in the state—with a vital opportunity to take a 'second look' at electoral changes and how they

will be implemented, which focuses exclusively on how those changes may affect minority vot-

ers.  This process often provides the public with its only opportunity to review and comment on

the new law's fairness to minorities.  On some occasions, this 'second look' occasioned by the

Section 5 review process has resulted in substantive changes that protect minority voting rights

without the necessity of a Department of Justice objection."  *Id.* at 1471.

170.    In response to questions from Senator Cornyn (TX), Theodore Shaw stated that "Con-

gress should not measure the utility and need for Section 5 through objection rates alone as these

rates have decreased in recent years given the impact of two major Supreme Court rulings and

the natural reduction in the number of submitted changes in the middle of a decade."  Shaw fur-

ther testified that "Section 5 has had a well-documented deterrent effect within covered jurisdic-

tions that is not reflected" the number of objections, and objection statistics "do not account for

those jurisdictions that unsuccessfully seek judicial preclearance in the D.C. District Court or

those jurisdictions that alter a particular voting change as a result of a pre-litigation settlement or

71

in response to a request for more information issued by the Justice Department." *May 9, 2006 Hearing*, at 166.

171.    Congress received evidence from Anita Earls who observed that "[a]s a practicing attorney litigating Section 2 voting rights cases, I saw a different benefit to Section 5 coverage.  In negotiating with local officials to change from an at-large system to single-member districts, local officials could use Section 5 preclearance as a justification for doing the right thing when some constituents did not want them to create avenues for minority voter participation.  Thus, Section 5 was a shield for local officials when they were negotiating settlements in Section 2 cases." *May 16, 2006 Hearing*, at 64-65.  *See also* May 10, 2006 Hearing, at 26 (testimony of Robert McDuff) (noting that one of the benefits of Section 5 is that it can provide cover for policymakers who "want to do what is right").

172.    Congress received evidence from Gerald Hebert who observed that "[a] lot of jurisdictions like section 5 preclearance and like to get a stamp of approval from the Justice Department that their voting system is non-retrogressive.  And I've heard a number of officials say that." *May 4, 2006 Hearing Part I*, at 66.

173.    Congress received information in the form of a report commissioned by the Leadership Conference on Civil Rights explaining that "Section 5 of the Voting Rights Act played a decisive role in the redrawing of congressional and state legislative districts in Alabama following publication of the 2000 Census.  For the first time since 1901, without supervision of a federal court, the Alabama Legislature passed, and the Governor signed into law, redistricting statutes for congressional, House, Senate and state Board of Education seats.  All four of these statutes received Section 5 preclearance and survived court challenges by white voters contending that they systematically discriminated against whites by overpopulating their districts and that they violated

the *Shaw v. Reno* racial gerrymandering standards.  Black legislators were able to leverage the no-retrogression command of Section 5 successfully 'to pull, haul, and trade to find common political ground' with their white Democratic and Republican colleagues.  Instead of attempting to maximize the number of seats black voter majorities control, African-American legislators were able to maintain the overall electoral power of blacks, while working with white legislators to consciously balance both racial and partisan interests with fair, neutral districting criteria.  Without the protection of Section 5, in Alabama's racially polarized environment, there would be little or no incentive for white legislators to bargain with the African-American minority in the Alabama Legislature." *July 13, 2006 Hearing*, at 385-386.

174.    Congress received testimony and information from Fred Gray about the continuing need for Section 5 and about Section 5's deterrent effect. *May 17, 2006 Hearing*, at 192 ("Section 5 provides a powerful deterrent force in preventing discrimination.  As a civil rights practitioner and one of Alabama's first African-American state legislators, I have worked with countless state office-holders and officials, city councils, county commissions, and their counsel.  Based on these experiences, I strongly believe that continued Section 5 coverage in Alabama is not only necessary but imperative to prevent the backsliding that history has demonstrated will occur when it comes to full enfranchisement of African Americans. Simply put, Senators we have come too far to affirmatively invite retreat by changing and weakening the protections of the Voting Rights Act."); *id.* at 92 ("I have helped provide assistance to a number of jurisdictions that file submissions with the Justice Department pursuant to the preclearance requirements of Section 5.  I know from my work with these jurisdictions that Section 5 has a strong deterrent effect and helps ensure that officials in these areas consider the impact of a particular change on the minority community before adopting it).

175.    Congress received testimony from Joe Rogers that the "mere existence of Section 5 had the deterrent effect of stopping jurisdictions from enacting discriminatory changes."  Rogers testified that the post-1990 redistricting plans for the Alaska House and Alaska Senate were found to violate section 5 by reducing the voting strength of Alaska Natives.  In comparison, Rogers testified that "in the post-2000 redistricting cycle, Alaska took specific measures to ensure that it did not reduce Alaska Native voting strength districts where Alaska Natives had a reasonable opportunity to elect candidates of their choice."  *March 8, 2006 Hearing Vol. I*, at 92.

176.    Congress heard testimony from civil rights attorney Robert McDuff who stated that Section 5 "provide[s] a tremendous deterrent. I cannot tell you how many times I have talked to legislators, city council members, lawyers in the State Attorney General's Office, or lawyers for localities who have really now internalized sort of the goals of Section 5, and who, when voting changes are being made, assess the impact on all groups, all racial groups, and reach out to all groups, to try to determine if a solution can be developed that satisfies everyone's concerns in light of the very deep racial fault line that still exists in the south and in other parts of the country due to the history of discrimination."  *May 10, 2006 Hearing*, at 26.

177.    The Senate Judiciary Committee received testimony from Anita Earls that, in a recent public hearing held to gather information about the VRA at the local level, "Ms. Bobbie Taylor, President of the Caswell County, North Carolina NAACP explained how the views of minority voters on issues ranging from polling place location to the composition of election districts were taken into account because of the requirements of Section 5."  *May 16, 2006 Hearing*, at 141.

178.    Congress received testimony from Anita Earls that jurisdictions frequently altered how they planned to implement a voting change based on preliminary discussions with the Justice Department, before they even made a preclearance submission.  Specifically, Professor Earls tes-

tified that "[t]he Department [of Justice] also has a deterrent impact by routinely conferring with jurisdictions before they make a submission, explaining how the retrogression standard is applied and how changes affecting voting, including measures such as majority vote requirements, annexations, polling place changes, changes to appointed from elected office, and numerous other non-redistricting changes are reviewed by the Department." *Id.* at 53-54.

179.   Congress received testimony from the National Commission on the Voting Rights Act describing the testimony of Victor Landa about the difference made by Section 5:  During one election in San Antonio, Texas "'where early voting places were [going to be] changed in the west side and south side . . . . that's predominantly Latino. . . . Early voting places were taken from there and put in the other part of town.  The reasoning [given] for this was that more people vote in the other parts of town than they do on the south side and the west side.'  But because the changes had not been submitted to the Department of Justice for Section 5 preclearance, 'it was easy to stop it before it even happened, while it was still in the planning stages[.]'"  *March 8, 2006 Hearing Vol. I*, at 299.

180.   Congress heard testimony from Joe Rogers that "in Fredericksburg, Virginia, the city council was preparing to dismantle its only majority African American district until the city attorney simply 'warned' the council that doing so would violate Section 5." *Id.* at 92.

181.   Congress received testimony from Joseph Rich which stated that "[t]he number of times that the Attorney General objects to voting change is very small—less than one percent of the Section 5 submissions are objected to.  But that is not a good indicator of the importance of Section 5.  Rather, the most important impact of Section 5 is its deterrent effect on discriminatory voting changes.  Jurisdictions, particularly local jurisdictions, that are required to get preclearance must always be aware of Justice Department review.  Because the Department has built a

tradition of excellence and meticulousness in its Section 5 review process, jurisdictions will think long and hard before passing laws with discriminatory impact or purpose." *October 18, 2005 Hearing*, at 66.

### 3.      Requests for Declaratory Judgments Withdrawn or Denied

182.    The evidence of continued discrimination found by Congress included "the number of requests for declaratory judgments denied by the United States District Court for the District of Columbia." H.R. Rep. No. 109-478, at 2.

183.    Congress heard testimony through the National Commission on the Voting Rights Act that the majority of declaratory judgments adverse to Section 5 jurisdictions handed down by the U.S. District Court for the District of Columbia occurred after August 5, 1982 (25 as opposed to 17 from 1965 to 1982). *March 8, 2006 Hearing Vol. I*, at 177-178.

184.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there was one declaratory judgment action with a ruling favorable to minorities in Alabama since 1982. *Id.* at 270.

185.    Congress received the following information as part of the report "*Voting Rights in Alabama, 1982-2006*":

> In *City of Pleasant Grove v. U.S.*, 479 U.S. 462 (1987), the United States Supreme Court affirmed the district court's denial of Section 5 preclearance to two annexations to the city of Pleasant Grove on the ground that the city had engaged in a racially selective annexation policy. Pleasant Grove was [at that time] an all-white city with a long history of discrimination located in an otherwise racially mixed part of Alabama. The Supreme Court stated that "in housing, zoning, hiring, and school policies [the city's] officials have shown unambiguous opposition to racial integration, both before and after the passage of the civil rights laws. The city sought preclearance for two annexations, one for an area of white residents who wanted to attend the all-white Pleasant Grove school district instead of the desegregated Jefferson County school district, the other for a parcel of land that was uninhabited at the time but where the city planned to build upper income housing that would likely be inhabited by whites only.  At the same time, the city refused to annex two predominantly black areas. The district court held "that the city failed to carry its burden of proving that the two annexations at issue did not

have the purpose of abridging or denying the right to vote on account of race."  In affirming the district court's decision, the Supreme Court stated:

> It is quite plausible to see appellant's annexation [of the two par-cels] as motivated, in part, by the impermissible purpose of mini-mizing future black voting strength[.]

*July 13, 2006 Hearing*, 381-82 (internal citations omitted).

186.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were two declaratory judgment actions with rulings favorable to minorities in Georgia since 1982.  *March 8, 2006 Hearing Vol. I*, at 270.

187.    Through a report submitted to Congress by Nadine Strossen, Congress received informa-tion that a three-judge court of the United States District Court for the District of Columbia in *Busbee v. Smith*, "denied preclearance to Georgia's infamous [post-]1980 congressional redi-stricting plan finding that it was adopted with 'a discriminatory purpose in violation of section 5,' the decision was affirmed by the Supreme Court."  *Id.* at 26.

188.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were four declaratory judgment actions with rulings favora-ble to minorities in Louisiana since 1982.  *Id.* at 270.

189.    Theodore Shaw presented Congress with testimony that Louisiana recently "unsuccess-fully sought judicial preclearance of its statewide redistricting plan for the State House of Repre-sentatives" that "would likely have gone into effect and placed minority voters in a worse posi-tion but for the deterrent effect of the Section 5 review process."  *May 9, 2006 Hearing*, at 173.

190.    Congress received testimony from Theodore Arrington who noted that "[i]n redistricting after the 2000 US Census, the Louisiana Legislature had to deal with population loss in the New Orleans region.  This loss dictated that the City area would have one less State House district. The legislature chose to reduce the number of black districts and maintain the same number of

white districts. . . .  The US Census for 2000 indicated that the loss of population in New Orleans was in the white population . . . .  I drew several district plans for the region that had lower population deviations, had more compact districts, and treated incumbents equally as well as the districts proposed by the State. . . .  Louisiana could not justify their arrangement and the Attorney General did not pre-clear their original proposal.  They finally adopted something similar to my district plans."  *May 16, 2006 Hearing*, at 28.

191.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were there were six declaratory judgment actions with rulings favorable to minorities in Mississippi since 1982.  *March 8, 2006 Hearing Vol. I*, at 270.

192.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were three declaratory judgment actions with rulings favorable to minorities in North Carolina since 1982.  *Id.*.

193.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were two declaratory judgment actions in with rulings favorable to minorities in South Carolina since 1982.  *Id.*.

194.    Congress received testimony through the National Commission on the Voting Rights Act in the form of a map showing there were six declaratory judgment actions with rulings favorable to minorities in Texas since 1982.  *Id.*.

<h3 style="text-align:center">C.    Evidence Before Congress:  Section 5 Enforcement Actions</h3>

<h3 style="text-align:center">1.    Congressional Findings</h3>

195.    The House Judiciary Committee found that "covered jurisdictions continue to resist submitting voting changes for preclearance, as required by Section 5."  The Committee found that the ability of the federal government and private citizens to file Section 5 enforcement actions

"played a critical role" in ensuring that full compliance was achieved.  H.R. Rep. No. 109-478, at 41-42.

### 2.        Enforcement Actions in Covered Jurisdictions

196.    Congress received testimony through the National Commission on the Voting Rights Act that there have been the following number of successful Section 5 enforcement actions in covered states since 1982: Alabama, 22; Arizona, three; Georgia, 17; Louisiana, five; Mississippi, 15; North Carolina, 3; South Carolina, ten; Texas, 29; and Virginia, one.  *March 8, 2006 Hearing Vol. I*, at 250.

197.    It was reported to the House Judiciary Committee that in California "there is a significant problem relating to the enforcement of the Section 5 preclearance provisions."  The Committee noted that in *Lopez v. Monterey County*, the Supreme Court found that the California county had not submitted changes pursuant to Section 5: "[t]he County, although covered by Section 5 of the Act, failed to seek Federal preclearance for any of its six consolidation ordinances.  Nor did the State preclear its 1979 law[.]"  H.R. Rep. No. 109-478, at 42.

198.    Congress received testimony from Laughlin McDonald about the role that a Section 5 enforcement action played in undermining the efforts of local officials to attempt to move Henry Cook, an African-American and Chairman of the  Randolph County (Georgia) School Board, out of his district.  In 2002, the DOJ precleared the school board's redistricting plan after receiving confirmation that Cook would remain in his prior district, District 5 (he lived on the border of District 4 and District 5 in the precleared plan), and Cook received a registration card identifying him as a resident of District 5.  His white opponent in District 5 in 2002 challenged him on residency grounds and lost.  Before the 2006 election, Cook received a registration card identifying him as a resident of District 4 even though he had not changed residency since 2002.  Local citizens filed a Section 5 enforcement action requesting that the court enjoin Randolph County from

reassigning Cook to District 4 unless the county submitted and received preclearance.  *May 9,*

*2006 Hearing*, at 243-47.  On September 12, 2006, less than two months after the 2006 reautho-

rization was signed into law, the Department of Justice objected to the proposed reassignment of

Cook on discriminatory purpose grounds.  See http://www.usdoj.gov/ crt/voting/sec_5/

ltr/l_091206.html.

199.    Congress was presented with testimony that "Louisiana's record of complying with Sec-

tion 5 for local elections is even worse than its record for state elections, which is precisely why

Section 5 arguably plays such an important role in Louisiana in preventing voting discrimination

for local office."  Congress was presented with testimony that the Western District Court of Lou-

isiana, which has enjoined multiple elections in jurisdictions that failed to preclear voting

changes, enjoined in 1991 the city of Monroe "from holding elections in Wards 1, 2, and 4 until

obtaining preclearance for elections to the City Court, in a jurisdiction of approximately 18,000

African Americans."  *March 8, 2006 Hearing Vol. II*, at 1627 (internal footnotes omitted).

200.    Wade Henderson presented Congress with testimony regarding the voting problems that

led to the Supreme Court decision in *Young v. Fordice*.  Henderson testified that when the State

began implementing procedures to conform to the National Voter Registration Act, some voters

were registered for only federal elections while others who used the form provided by the State

were registered for both state and federal elections.  Henderson further testified that only after

the Supreme Court's decision did Mississippi submit these changes for preclearance and DOJ

subsequently objected.  *May 10, 2006 Hearing*, at 148-149

201.    The House Judiciary Committee received testimony involving Lee County, South Caroli-

na where, in 1994, the county attempted to hold special elections under an unprecleared redi-

stricting plan instead of using its precleared 1993 plan.  The Department of Justice and NAACP

sued and the three-judge court vacated the results of the special primary election that had already

been held and enjoined further use of the unprecleared plan.  H.R. Rep. No. 109-478, at 43.

202.    The House Judiciary Committee received testimony that "between 1976 and 2002, South

Dakota enacted more than 600 statutes and voting changes, seeking preclearance in less than five

cases."  This was after former South Dakota Attorney General William Janklow described the

preclearance requirement as a "facial absurdity" and advised against compliance, stating "I see

no need to proceed with undue speed to subject our State laws to a 'one-man veto' by the United

States Attorney General."  In 2002, members of the Oglala and Rosebud Sioux Tribes in Shan-

non and Todd counties sued the State of South Dakota to enforce Section 5.  This resulted in a

consent decree under which the State agreed to fulfill its preclearance obligations.  H.R. Rep. No.

109-478, at 42.

203.    Congress heard testimony through the National Commission on the Voting Rights Act

describing the testimony of Claude Foster of NAACP that "alluded to the events in 2004 at pre-

dominantly black Prairie View A&M University, mentioned above, whereby efforts by white

officials to suppress black students' votes were thwarted by a Section 5 enforcement action - a

suit brought by the student NAACP chapter to prevent Waller County from implementing un-

precleared voting changes."  *March 8, 2006 Hearing Vol. I*, at 307-08.

204.    Congress received testimony from Nina Perales, describing how in Bexar County (San

Antonio), "in the spring of 2003 a 'very large number' of early polling places were closed in

heavily populated Latino areas, without a timely submission of the changes for preclearance.

Only after MALDEF filed an enforcement action under Section 5 were these changes enjoined."

*March 8, 2006 Hearing Vol. 1*, at 309.

205.    Congress received information in an essay authored by Mark Posner that, after the 1990

Census, "[n]early all local jurisdictions complied with Section 5 by not implementing [redistrict-

ing] plans to which objections were interposed.  There were a few exceptions to this record of

Section 5 compliance, notably involving jurisdictions in Arizona and Texas.  In response to these

violations, lawsuits were filed by the United States and private plaintiffs to enforce Section 5,

and the district courts generally enjoined the violations."  *October 18, 2005 Hearing,* at 1410.

> **D.    Evidence Before Congress:  Observer Coverage and Interference with Mi-
> nority Voters' Right to Vote**

> **1.    Congressional Findings**

206.    In reauthorizing Section 5, Congress concluded that:  "The evidence clearly shows the

continued need for Federal oversight in jurisdictions covered by the Voting Rights Act of 1965

since 1982, as demonstrated in the counties certified by the Attorney General for Federal ex-

aminer and observer coverage and the tens of thousands of Federal observers that have been dis-

patched to observe elections in covered jurisdictions."  Pub. L. No. 109-246, § 2(b)(5), 120 Stat.

577, 578.

207.    The House Judiciary Committee found that "Section 8, the Federal observer provision,

has played a critical role in preventing and deterring discrimination inside polling locations over

the last 25 years" and "by communicating to the Department of Justice any allegedly discrimina-

tory conduct for further investigation."  H.R. Rep. No. 109-478, at 24, 25.

208.    The House Judiciary Committee found "that observers have played a critical role in law

enforcement efforts to protect minority citizens. These observations often become the foundation

of Department of Justice enforcement efforts."  *Id.*

209.    The House Judiciary Committee stated that "[u]nder Section 8, observers are assigned to a polling location only when there is a reasonable belief that minority citizens are at risk of being disenfranchised." *Id.* at 44.

210.    The House Judiciary Committee found that "indicia of discrimination are reflected in the continued need for Federal observers to monitor polling places located in covered jurisdictions. The assignment of Federal officials to these jurisdictions demonstrates that the discriminatory conduct experienced by minority voters is not solely limited to tactics to dilute the voting strength of minorities but continues to include tactics to disenfranchise, such as harassment and intimidation inside polling locations." *Id.*

211.    The House Judiciary Committee found that "observers were able to identify and report back to the Department of Justice instances in which language minority voters fell victim to the harassment and intimidation of polling officials.  For example, observers were recently assigned to covered jurisdictions, such as in Georgia, Alabama, and Texas, to protect Latino and Asian American voters." *Id.* at 45.

212.    The House Judiciary Committee report states that "[s]ince 1965, more than 22,000 Federal observers have been assigned to protect minority voters in polling places." *Id.* at 44.

213.    The House Judiciary Committee report states that "[i]n the last 25 years, between 300 and 600 observers have been assigned annually to covered jurisdictions to protect minority voters." *Id.*.

214.    The House Judiciary Committee report states that in 2004, "more than 1,400 observers were sent to 105 jurisdictions in 29 States to protect the rights of minority citizens." *Id.*

215.    The House Judiciary Committee received documentation indicating that "five of the six States originally covered by the VRA (Louisiana, Georgia, Alabama, South Carolina, and Mis-

sissippi) accounted for approximately 66 percent of all the observer coverages since 1982." *Id.* at 24-25; *see id.* at 44.

### 2.      Testimony to Congress

216.      In his testimony before Congress, Assistant Attorney General for Civil Rights Wan Kim made the following statement: "[W]e think that sending observers and monitors to help assist local election officials conduct the elections is enormously important because they help to prevent problems before there is a real problem, and they help to make sure that no one at the polls is denied access to the polls consistent with Federal law and constitutional law.  The decision on when to appoint observers and monitors is one based upon the facts and circumstances on the ground with respect to any particular election." *May 10, 2006 Hearing*, at 8.

217.      Congress received testimony from Barry Weinberg, former Deputy Chief in the Civil Rights Division's Voting Section (where he managed the observer program for decades), that the existence of federal observers is "crucial" and "irreplaceable in the Voting Rights Act."  According to Weinberg, this is because "there's no other way for the law enforcement function of the Justice Department to be able to be performed with regard to harassment and intimidation and disenfranchisement of racial and language minority group members in the polling place on Election Day." *November 15, 2005 Hearing*, at 18.  Weinberg testified that federal observers are only sent to jurisdictions where "the facts show that African American [and other minority] voters are likely to be victimized on election day." *Id.* at 39.

218.      Barry Weinberg testified about the discrimination witnessed by federal observers:  "The discriminatory treatment of racial and minority language voters witnessed by the federal observers . . . runs the gamut from actions that make those voters feel uncomfortable by talking rudely to them, or ridiculing their need for assistance in casting their ballot, to actions that bar them from voting, such as failing to find their names on the lists of registered voters and refusing to

allow them to vote on provisional ballots, or misdirecting them to other polling places." *Id.* at 24.

219.    Mr. Weinberg further testified that:  "Minority language voters suffer additional discriminatory treatment when people who speak only English are assigned as polling place workers in areas populated by minority language voters.  The polling place workers fail to communicate the voting rules and procedures to the voters, or fail to respond to the voters' questions." *Id.*

220.    The report by the National Commission on the Voting Rights Act received by Congress included the following finding:  "[Observer] coverage is related to potential vote discrimination: observers are sent because there are reasonable grounds in the opinion of the Department of Justice to expect discrimination on Election Day.  However, it is obvious that an observer coverage does not represent the same type of phenomenon as does an objection, a withdrawal, or a declaratory judgment. . . . Nonetheless, as an indicator of at least potential (and sometimes actual) vote discrimination, the list of observer coverages is an important data set." *March 8, 2006 Hearing Vol. I,* at 180-181.

221.    The National Commission's report included the following statement about the continued need for observers: "[O]bservers have played a major role for decades in deterring race-based discrimination on Election Day, and evidence in numerous cities across the nation indicates the observers have served a useful role in the current century. . . . The presence of these observers on Election Day has 'consistently . . . had a calming effect curing highly charged elections in which there have been allegations of possible Voting Rights Act violations and has helped deter discriminatory acts[.]'" *Id.* at 184 (footnote omitted).

222.    The same report included statements from Alabama State Senator Bobby Singleton about the importance of federal observers in preventing discrimination at the polls in Hale County, Al-

abama.  Singleton stated that the presence of observers helped enable black candidates to get elected.  *Id.* at 182-183.

223.     Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received information that in a 2004 Alabama election, the Department of Justice had sent observers after some local county leaders feared racial unrest at the polls on election day and a black commissioner had received harassing phone calls and personal threats because of his role in a new redistricting plan.  *March 8, 2006 Hearing Vol. III*, at 3505.

224.     In response to a written question from Congress, Anita Earls submitted the following testimony:  "[I]n Bayou La Batre, Alabama during the 2004 election Asian Americans constituted a third of the electorate and fielded a candidate for city council.  Supporters of the Caucasian candidate engaged in systematic voter intimidation through legal challenges to Asian American voters.  Allowed by state law, the challenges required voters to fill out a paper ballot and have a registered voter vouch for them.  The Department of Justice was able to use the VRA to prevent purely racially targeted challenges from occurring during the general election."  *May 16, 2006 Hearing*, at 66-67.

225.     Barry Weinberg presented to Congress a portion of the United States' responses to interrogatories in *United States v. Conecuh County, Alabama*, No. 83-1201-H (S.D. Ala., June 12, 1984).  That response contained the following information noted by observers:

> While providing assistance to a black voter, white poll official Albrest asked, "'Do you want to vote for white or niggers?"  The voter stated that he wanted to give everyone a fair chance.  Albrest proceeded to point out the black candidates and, with respect to one white candidate, stated, "This is who the blacks are voting for."  Poll official Albrest made further reference to black citizens as "niggers" in the presence of federal observers, including a statement that "niggers don't have principle enough to vote and they shouldn't be allowed.  The government lets them do anything."

*November 15, 2005 Hearing*, at 30.

226.     Wade Henderson presented Congress with the following information regarding federal observers in Arizona:  "Federal observers were assigned to 40 elections between 1966 and 2004; all 40 of those elections occurred after 1982."  *March 8, 2006 Hearing Vol. I*, at 79-80; *see also id.* at 275.

227.     Congress received the following evidence from the report *Voting Rights in Arizona 1982-2006*:  "Northern Arizona has a lengthy history of discrimination against Navajo, Apache, and Hopi voters.  In 1989 and 1994, successful cases were brought against Coconino, Navajo, and Apache Counties for denying American Indian voters access to the political process.  Those same three counties account for nearly half of all of the post-1982 Section 5 objections in Arizona.  Prior to 1998, all of the federal observers and monitors deployed to Arizona were sent to observe elections in Apache and Navajo Counties.  As recently as 2002, the Department of Justice identified significant deficiencies in the availability and quality of language assistance offered to American Indian voters in Apache County."  *March 8, 2006 Hearing Vol. I*, at 1379.

228.     Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from various reports about the 2004 election cycle in Arizona:  "[I]n Pima county, men wearing black t-shirts that said 'U.S. Constitutional Enforcement' and military or tool belts and carrying a variety of equipment harassed Latinos waiting in line to vote. These men would approach potential voters with video and photo cameras and harass them for proof of citizenship.  Others would stand outside of polling places and videotape or photograph voters as they would enter and leave."  *March 8, 2006 Hearing Vol. III*, at 3976.

87

229.    Wade Henderson presented Congress with the following information regarding federal observers in California:  "Federal observers were assigned to 9 elections between 1966 and 2004; seven of those elections occurred after 1982."  *March 8, 2006 Hearing Vol. I*, at 80.

230.    Congress received the following evidence from the report *Voting Rights in Georgia 1982-2006*:  "Federal observers were present for a total of 87 elections in twenty-eight different Georgia counties since 1965, among which 65.5 percent occurred from 1982 onward.  Eleven of the twenty-eight counties that had elections covered by federal observers post-1982 had not previously been covered, nine had elections covered both before and after 1982 and eight had elections covered only before 1982."  *March 8, 2006 Hearing Vol. II*, at 1529; *see also March 8, 2006 Hearing Vol. I*, at 79 (statement of Wade Henderson).

231.    As part of the supplement to the report of the National Commission on the Voting Rights Act, Congress received the following information:  "Apparent discrimination against Latinos, a growing segment of Georgia's population, was described by Tisha Tallman, regional counsel for MALDEF.  This discrimination is part of a larger negative response to the rapid influx of Latino immigrants in the South.  She spoke of individuals who, prior to the 2004 primary elections, challenged the citizenship of Latino registered voters at the Registrar's office in Long County, Georgia, on the basis of nothing more than their Spanish surname, so far as MALDEF could determine.  The office required that the voters attend a hearing for the purpose of establishing their citizenship.  Tallman believed this had a 'chilling effect' on Latino turnout in the primary.  'We believe that this process was in violation of Georgia law and potentially in violation of Section 2 of the Voting Rights Act,' Tallman said.  She had protested this behavior to the State Election Board a week before her testimony to the Commission, but, she said, 'nothing has been done to

date in regard to action by the State of Georgia.'  The Department of Justice was still investigating."  *March 8, 2006 Hearing Vol. I*, at 327-28.

232.    Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from an October 2000 article:  "On the official website for the Georgia Republican Party, poll watchers were encouraged to take a still or video camera with them on Election Day to the polls in an attempt to discourage African-Americans from voting.  The state's Republican Chairman argued that those web instructions were four years old and were ordered removed from the site, where they were left inadvertently."  *March 8, 2006 Hearing Vol. III*, at 3528.

233.    Wade Henderson presented Congress with the following information regarding federal observers in Louisiana:  "Federal observers were assigned to 67 elections between 1966 and 2004; 15 of those elections occurred after 1982."  *March 8, 2006 Hearing Vol. I*, at 80.

234.    Robert McDuff provided the following information to Congress about federal observers in Mississippi.  "In Mississippi, federal observers have been sent to various locations in the state to monitor elections on 540 separate occasions since 1966 - 250 times since the 1982 reauthorization.  Both figures are more than in any other state.  In fact, Mississippi accounts for 40 percent of the overall elections to which federal observers have been sent since the 1982 reauthorization.  Since 1982, observers were sent to 48 of the state's 82 counties. Many of these counties were the subject of repeat visits during that time period.  For example, observers monitored 19 elections in Sunflower County, 17 in Noxubee County and 16 in Bolivar County since 1982."  *May 10, 2006 Hearing*, at 147-148.

235.    Through an appendix to the record of the National Commission on the Voting Rights Act, Congress received the following information taken from an article concerning a 1991 election in

Mississippi: "In the state's primary election for state governor, numerous complaints of voter intimidation were reported to the voter-fraud unit of the U.S. Justice Department.  Counties throughout the state reported instances of candidate representative, 'hawking' nursing home halls and other polling locations on the day of the election." *March 8, 2006 Hearing Vol. III*, at 3562.

236.    The House Judiciary Committee "received testimony revealing that more than 800 Federal observers were assigned to covered counties in New York City from 1985 through 2004 to protect Asian American and Latino voters' full participation in the electoral process."  H.R. Rep. No. 109-478, at 44-45.

237.    Wade Henderson presented Congress with the following information regarding federal observers in North Carolina:  "Federal observers were assigned to 6 elections between 1966 and 2004; all six of those elections occurred after 1982." *March 8, 2006 Hearing Vol. I*, at 80.

238.    Congress received the following evidence from the report *Voting Rights in North Carolina 1982-2006*:  "[I]n 1990, just days before the general election in which Harvey Gantt, an African-American, was running against Jessie Helms for U.S. Senate, post cards headed 'Voter Registration Bulletin' were mailed to 125,000 African-American voters throughout the state.  The bulletin suggested, incorrectly, that they could not vote if they had moved within 30 days of the election, and threatened criminal prosecution.  The postcards were sent to black people who had lived at the same address for years.  As a result of the postcard campaign, black voters were confused about whether or not they could vote and some went to their local board of election office to try to vote there.  Considerable resources were devoted to trying to clear up the confusion." *March 8, 2006 Hearing Vol. II*, at 1755 (internal citation omitted); *see also May 16, 2006 Hearing*, at 18 (testimony of Anita Earls) (testifying the postcards caused great confusion and discouraged people from voting).

239.    The same report recounted that black voters were the targets of deceptive election prac-
tices in North Carolina during the November 2004 election, including signs posted in predomi-
nately black districts stating that the voting would occur on Wednesday, November 5 (the day
after Election Day).  *March 8, 2006 Hearing Vol. II*, at 1753.

240.    Wade Henderson testified that "[f]ederal observers have been assigned to 37 elections in
South Carolina since 1966," and "[o]f those 37 elections, 23 occurred after 1982."  *March 8,
2006 Hearing Vol. I*, at 78, 275; *see also* H.R. Rep. No. 109-478, at 44.

241.    Wade Henderson testified to the following before Congress regarding observer coverage
in South Carolina:  "Most of the communities to which observers have been sent have repeatedly
requested assistance under the Act to protect the ability of African-American voters fully to par-
ticipate in the electoral process.  Those include Bamberg County (1984, 1985); Calhoun County
(1984, 1988); Chester (twice in 1990, twice in 1991, 1993 and 1996); Dorchester (1990, 1996
and 2001); Marion (1984 and 1996); and Williamsburg (1984, 1988 and twice in 1996)."  *March
8, 2006 Hearing Vol. I*, at 78-79.

242.    Congress received evidence from Armand Derfner who submitted a prepared statement
referencing a 2002 Supreme Court decision overturning Charleston County's at-large elections
on the ground that it discriminated against black voters on account of their race.  Derfner noted
"powerful evidence of intimidation and harassment of blacks at the polls" in the 1980s and
1990s, and during the 2000 general election.  In particular, Derfner observed that "[i]n addition
to demographic factors that are relevant in judging voting discrimination, there was powerful
evidence of intimidation and harassment of blacks at the polls during the 1980s and 1990s and
even as late as the 2000 general election.  There was also evidence of race baiting tactics used by

political strategists." *October 20, 2005 Hearing*, at 84-85.  *See also* Derfner testimony, *May 17, 2006 Hearing,* at 17 (discussing racial appeals in South Carolina elections).

243.    Wade Henderson presented testimony to Congress that in Texas "[f]ederal observers were assigned to 22 elections between 1966 and 2004; 10 of those elections occurred after 1982." *March 8, 2006 Hearing Vol. I*, at 80.

244.    Congress was presented with the following testimony from Barry Weinberg:  "In Texas and Southern Arizona polling places Hispanic voters were admonished not to use Spanish when talking in the polling places and when giving assistance to voters who needed help when voting. Moreover, the citizenship of Hispanic voters was questioned at the polls, with voters being re-quired to somehow provide on-the-spot evidence of their citizenship before being given a ballot; such evidence was not required of Anglo voters." *November 15, 2005 Hearing*, at 34.

245.    Congress *received evidence from t*he National C*ommission* on the Voting Rights Act that Vernon Burton, a historian at the University of Illinois who specializes in southern history and voting rights issues, testified before the National Commission's South*ern Regional Hearing re-gardi*ng overt racial appeals in Texas.  Professor Burton testified that, in the 2000 and 2002 elec-tions, intimidation and misinformation were directed at African-American Texans, as well as re-ports of "late change of polling places; dropping individuals from poll lists without cause; [and] not allowing individuals to file challenge ballots."  The campaign staff treasurer for a black can-didate for treasurer was also the victim of a hate crime when her home was set on fire and she received threatening phone calls.  *March 8, 2006 Hearing Vol. I*, at 298.

246.    Congress was presented with sworn testimony by C.G. Walwyn before a panel investigat-ing voter irregularities conducted by the Texas State Conference of the NAACP in December 2000.  Walwyn testified that he was the first African-American in 102 years to be on the ballot

for the November election in Wharton County, Texas.  He also said that Linda Nichols told him that she "was getting phone calls from someone saying to get off [his] campaign or we're going to burn a cross in [her] yard, string up [her] dogs and gut them," and that her house was later burned.  *March 8, 2006 Hearing Vol. III*, at 2998-2999.

247.    Congress was presented with a statement from Gary Bledsoe, president of the Texas State Conference of NAACP Branches, that included the following allegation from the November 2000 election:  "We were made aware early on of a number of irregularities, intimidation efforts in [Fort] Worth through calls to individuals trying to suggest that they needed to be sure that they were registered to vote, trying to raise issues that would suppress the African American vote."  *Id.* at 2977.

248.    Congress was presented with evidence of the selective stationing of police officers outside predominantly minority polling sites in Texas. Congress was presented with evidence of police officers demanding that minority voters show identification in order to vote.  S. Rep. No. 109-295, at 343-344.

249.    Congress was presented testimony of a racial slur directed at a minority voter by an election judge and an election judge who demanded that Latino voters present identification contrary to Texas law.  In addition, Congress was presented with testimony of poll workers in Texas questioning minorities more intensely.  *Id.*

250.    Congress was presented with sworn testimony by Elizabeth Lentz before a panel investigating voter irregularities conducted by the Texas State Conference of the NAACP in December 2000.  Ms. Lentz, a volunteer election-day monitor for the Harris County Democratic Party, testified to receiving "[a] lot of calls about people being sent back for multiple ID's, even if they had

the[ir] voter registration cards."  Ms. Lentz testified that these calls were "predominantly [from]

minorities."  *March 8, 2006 Hearing Vol.III*, at 3044-3045.

251.    Congress was presented with the following summary of the testimony of Bernadine

Thorn taken as part of a NAACP Voter Irregularity Hearing conducted on December 12, 2001 in

Harris County, Texas:  "Bernadine Thorn testified that when she went to vote she presented her

driver's license and she was told that she could not vote in the mayor's election because she was

out of city limits.  She has been at the same address for 12 years and voted at the same location

for the duration of that time."  *Id.* at 3061.

252.    Congress received evidence from the National Commission on the Voting Rights Act that

Frank Jackson, the mayor of Prairie View, Texas, testified at the Commission's Southern Re-

gional Hearing about the efforts of the white District Attorney to disqualify black students from

voting during the 2004 presidential election year, on the grounds they were not legal residents of

the county.  This was in spite of lawsuits in the late 1970s growing out of vote-suppression ef-

forts in the surrounding county that settled the question of whether students were county resi-

dents.  Prairie View, Texas is the site of Prairie View A& M - a historically black university.

The Commission's report indicated that Mayor Jackson asserted that the Voting Rights Act

"provides us with some necessary safeguards, because if it was not for that looking-over-the-

shoulder, somebody watching the process, then we would have been at the mercy of the powers

that still advocate states rights."  *March 8, 2006 Hearing Vol. I*, at 300.

      **E.**      **Continuing Prevalence of Racially Polarized Voting**

                  **1.**      **Congressional Findings Regarding Racially Polarized Voting**

253.    Congress found that "[t]he continued evidence of racially polarized voting in each of the

jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates

94

that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965."  Pub. L. No. 109-246, § 2(b)(3), 120 Stat. 577.

254.    In its findings, the House Judiciary Committee determined that:  "The breadth of racially polarized voting and its impact on minority voters represent a serious concern to the Committee."  The Committee noted that, "[t]estimony presented indicated that 'the degree of racially polarized voting in the South is increasing, not decreasing . . . [and is] in certain ways re-creating the segregated system of the Old South, albeit a de facto system with minimal violence rather than the de jure system of late."  The House Judiciary Committee's findings of racially polarized voting include the finding that, "in 2000, only 8 percent of African Americans were elected from majority white districts."  The Committee's findings further note that, "[l]anguage minority citizens fared much worse.  As of 2000, neither Hispanics nor Native Americans candidates have been elected to office from a majority white district."  H.R. Rep. No. 109-478, at 34.

255.    The House Judiciary Committee stated that "[r]acially polarized voting occurs when voting blocs within the minority and white communities cast ballots along racial lines and is the clearest and strongest evidence the Committee has before it of the continued resistance within covered jurisdictions to fully accept minority citizens and their preferred candidates into the electoral process."  *Id.*

256.    The House Judiciary Committee quoted a federal court's finding that: "Voting in South Carolina continues to be racially polarized to a very high degree, in all regions of the State and in both primary elections and general elections.  Statewide, black citizens generally are a highly politically cohesive group and whites engage in significant white-bloc voting.  Indeed, this fact is not seriously in dispute."  *Id.* at 35.

257.    The House Judiciary Committee cited to several examples in states fully or partially covered under Section 5 where federal courts have found racially polarized voting.  The cases before Congress included *DeGrandy v. Wetherell,* 794 F. Supp 1076 (N.D. Fla. 1992) *aff'd in part and rev'd in part on other grounds sub nom. Johnson v. DeGrandy*, 512 U.S. 997, 1079 (1994);  *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 641 (D.S.C. 2002);  *Major v. Treen*, 574 F. Supp. 325, 351-52 (E.D. La. 1983);  *Session v. Perry*, 298 F. Supp. 2d 451, 492 (E.D.Tex. 2004) *vacated and remanded on other grounds, Jackson v. Perry*, 125 S. Ct. 351 (2004); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d. 976, 1036 (D.S.D. 2004).  *Id*., at 34-35, notes 71-75.

258.    The House Judiciary Committee quoted a federal court finding that "the parties agree that racially polarized voting exists throughout Florida to varying degrees.  The results of Florida's legislative elections over the past 10 years established the presence of racially polarized voting." *Id.* at 35, citing *DeGrandy v. Wetherell,* 794 F. Supp 1076 (N.D. Fla. 1992) *aff'd in part and rev'd in part on other grounds sub nom.*, *Johnson v. DeGrandy*, 512 U.S. 997, 1079 (1994).

259.    The House Judiciary Committee recognized the following finding of a South Dakota court regarding racially polarized voting: "The court concludes that substantial evidence, both statistical and lay, demonstrates that voting in South Dakota is racially polarized among whites and Indians in Districts 26 and 27."  *Id*., citing *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d. 976, 1036 (D.S.D. 2004).

## 2.    Testimony to Congress

260.    The Attorney General's Section 5 objections subsequent to Congress's 1982 reauthorization of Section 5 – received into the congressional record (see par. 15, *supra*) – include a large number of objections to redistrictings, election method changes, and dilutive annexations.  These objections typically and almost universally include a finding by the Attorney General that elec-

tions in the subject jurisdiction were characterized by racially polarized voting. *October 25, 2005 Scope Hearing Vol. I*, at 225-1684, *October 25, 2005 Scope Hearing Vol. II*, at 1686-2595.

261.    Congress received a report entitled *Voting Rights in Alabama, 1982-2006*, which concluded: "Highly racially polarized voting patterns persist to the present day in Alabama. The pattern has been found to exist on a statewide basis by the U.S. Attorney General, expert voting witnesses and federal courts. Without exception, based on numerous analyses by expert witnesses, federal courts and the Department of Justice have found severe racial polarization at the county and municipal levels in Alabama. Federal courts in Alabama have acknowledged the causal connection between racial bloc voting and the history of *de jure* segregation" (internal footnotes omitted). *July 13, 2006 Hearing*, at 386-387.

262.    Congress received a report entitled *Voting Rights in California, 1982-2006*, which concluded: "In California, this voting discrimination often occurs within the context of racially polarized voting. When a Section 5-covered jurisdiction seeks to implement a voting change and elections are characterized by racially polarized voting, the potential for a discriminatory impact on minority voting strength is enhanced." *Id.* at 103.

263.    Congress received a report entitled *Voting Rights in Florida 1982-2006*, which concluded that the "strong evidence of racially-polarized voting, persistent use of at-large election schemes that adversely affect minority voters and the discriminatory practices discussed below all illustrate why the piecemeal approach to ensuring electoral fairness contemplated by Section 2 alone, without the additional protections offered by Sections 5 and 203, is simply inadequate in a state as large, diverse, and problematic as Florida." *March 8, 2006 Hearing Vol. II*, at 1490.

264.    Congress received a report entitled *Voting Rights in Georgia 1982-2006*, which concluded: "With the continued presence of racially polarized voting and other racial tensions, the

97

record since 1982 makes clear that Georgia and its political subdivisions have not progressed beyond the need for the temporary provisions of the Voting Rights Act." *Id.* at 1503.

265.    Congress received a report entitled *Voting Rights in Louisiana 1982-2006*, which concluded: "Racially polarized voting patterns continue to characterize political life in Louisiana and like Henry Ford's theory of consumer freedom, which allowed customers to choose any color car they preferred so long as it was black, in the absence of VRA protected opportunity to elect districts, '[c]andidates favored by blacks can win [in Louisiana], but only if the candidates are white.'" *Id.* at 1602-1603.

266.    Congress received a report entitled *Voting Rights in Mississippi 1982-2006*, which concluded: "Elections are still driven by racially polarized voting, and most white voters do not vote for black candidates in black-white elections no matter their qualifications." *Id.* at 1711.

267.    Congress received a report entitled *Voting Rights in New York 1982-2006*, which concluded: "New York City, like so many jurisdictions benefiting from protections of Section 5, Section 203, and Section 8, has a long road ahead to overcome the episodic, but still critically important and debilitating, episodes of polarized voting today." *Id.* at 1862-1863.

268.    Congress received a report entitled *Voting Rights in North Carolina 1982-2006*, which concluded: "Racial bloc voting still persists throughout the state with sufficient force normally to prevent the candidate of choice of black voters from being elected in both local and statewide elections. The choices of black voters and the hopes of black candidates continue to be frustrated by persistent racially polarized voting." *Id.* at 1754.

269.    Congress received a report entitled *Voting Rights in South Carolina 1982-2006*, which concluded: "High levels of racially polarized voting across South Carolina provides the predicate

condition making Section 2 and Section 5 so critical to the growth of black representation and its maintenance in the face of continued resistance by public officials." *Id.* at 1974.

270.     Congress received a report entitled *Voting Rights in South Dakota 1982-2006*, which concluded: "The testimony . . . illustrates the polarization that continues to exist between the Indian and white communities in South Dakota, which manifests itself in many ways, including in patterns of racially polarized voting." *Id.* at 2010.

271.     Congress received testimony that racially polarized voting in Texas is an ongoing problem.  In 2006, the Supreme Court characterized the racially polarized voting in one district as "particularly severe." *July 13, 2006 Hearing*, at 232.  A 2004 federal district court case also recognized the existence of racially polarized voting. *March 8, 2006 Hearing Vol. I*, at 216.  A 2001 export report found statistically significant racial bloc voting in congressional districts with higher than average Hispanic or black populations. *March 8, 2006 Hearing Vol. IV*, at 5359. Racially polarized voting is also present in primary contests within the same party. *March 8, 2006 Hearing Vol. I*, at 211.

272.     Congress received a report entitled *Voting Rights in Virginia 1982-2006*, which concluded: "Racially polarized voting continues to dominate elections in Virginia and, with a few notable exceptions, most successful candidates of choice of black voters are elected in districts that are majority-black. Virginia residents themselves believe that retrogressive changes in districting and other aspects of elections will occur if the protections of the Section 5 preclearance process are removed at this time." *March 8, 2006 Hearing Vol. II*, at 2053-2054.

273.     Congress received additional testimony concerning racially polarized voting in covered jurisdictions.  Professor Theodore Arrington, *May 15, 2006 Hearing*, at 27, 37-39 (South Carolina).  Professor Theodore Arrington, *May 16, 2006 Hearing*, at 130 (covered jurisdictions, Flori-

da).  Joaquin Avila, *October 25, 2005 Scope Hearing Vol. II*, at 3296.  Professor Drew S. Days,

*May 17, 2006 Hearing*, at 69.  Anita Earls, *May 16, 2006 Hearing*, at 141 (North Carolina).  Dr.

Richard Engstrom, *October 25, 2005 Need Hearing Vol. III*, at 50 (Louisiana).  Dr. Richard

Engstrom, *March 8, 2006 Hearing Vol. I*, at 301 (Louisiana).  Fred Gray, *May 17, 2006 Hearing*,

at 92 (Alabama).  Gerald Hebert, *October 20, 2005 Hearing*, at 97 (Alabama).  Wade Henderson,

*March 8, 2006 Hearing Vol. I*, at 53-54 (Alabama).  Sherilynn Ifill, *July 13, 2006 Hearing*, at

232 (Texas).  Professor Ellen Katz, *October 18, 2005 Hearing,* at 981.  Bill Lann Lee, former

Assistant Attorney General for Civil Rights, *March 8, 2006 Hearing Vol. I*, at 18.  Allan J.

Lichman, *March 8, 2006 Hearing Vol. I*, at 211 (Texas).  Nathaniel Persily, *May 17, 2006 Hear-

ing*, at 132.  Nadine Strossen, *March 8, 2006 Hearing Vol. I*, at 20, 27 (covered jurisdictions,

South Carolina).

> **F.**      **Evidence Before Congress:  Voting Discrimination in Section 2 Cases**

274.    Congress found evidence of continued discrimination, including "the continued filing of

Section 2 cases that originated in covered jurisdictions."  H.R. Rep. No. 109-478, at 2.

275.    Congress found that "[p]resent day discrimination experienced by racial and language

minority voters is contained in evidence, including . . . section 2 litigation filed to prevent dilu-

tive techniques from adversely affecting minority voters[.]"  *Id.*

276.    The House Judiciary Committee found that "[t]ogether with Section 5, Section 2 has been

a driving force in achieving the gains made by minorities over the last several decades in the

covered jurisdictions."  *Id.* at 10-11.

277.    Congress received the Report of the National Commission on the Voting Rights Act,

which found that 653 reported and unreported successful Section 2 cases in Section 5 covered

and partially covered jurisdictions since 1982, and provided the following table:

**TABLE 5**
**SUCCESSFUL SECTION 2 CASES**
**AND THEIR EFFECTS ON COUNTIES,**
**NINE STATES, JUNE 29, 1982-DECEMBER 31, 2005**

| State | Reported Cases Only | All Cases, Reported & Unreported | County Voting Populations Affected |
|---|---|---|---|
| Alabama | 12 | 192 | 275 |
| Arizona | 0 | 2 | 3 |
| Georgia | 3 | 69 | 76 |
| Louisiana | 10 | 17 | 14 |
| Mississippi | 18 | 67 | 74 |
| North Carolina | 9 | 52 | 56 |
| South Carolina | 3 | 33 | 36 |
| Texas | 7 | 206 | 274 |
| Virginia | 4 | 15 | 17 |
| TOTAL | 66 | 653 | 825 |

*March 8, 2006 Hearing Vol. I*, at 251.

278.   Congress received a statement from Senator Arlen Specter of Pennsylvania regarding

three Alabama examples of discrimination found by courts:

- *Hunter v. Underwood*, 730 F.2d 614 (11th Cir. 1984), affirmed 471 U.S. 222 (1985) (ACLU Rep., p. 51).  The ACLU represented two voters who were disenfranchised under a nearly 80 year-old law that prohibited those who had committed a 'crime of moral turpitude' from voting.  *Id.* at p. 52.  The court struck down the law because there was evidence that when it was adopted in the early 1900s, the legislators intended to disenfranchise black voters.  The Supreme Court unanimously affirmed that, in view of the proof of racial motivation and continuing racially discriminatory effect, the state law violated the Fourteenth Amendment.

- *Dillard v. City of Foley*, 926 F. Supp. 1053 (M.D. Ala. 1995) (ACLU Rep., p. 57).  African American plaintiffs in the City of Foley, Alabama, filed a motion to require the City to adopt and implement a nondiscriminatory annexation policy and to annex Mills Quarters and Beulah Heights.  Plaintiffs also claimed that the City had violated section 5 and section 2.  As a result of negotiations, the parties entered into a consent decree.  The decree found plaintiffs had established 'a prima facie violation of section 2 of the Voting Rights Act and the United States Constitution.' ( *Id.* at p. 59).

- *Brown v. Board of School Comm'rs*, 706 F. 2d 1103 (11th Cir. 1983) (U Mich. L. Rep., http://www.votingreport.org.). A class of African American voters challenged Mobile County's at-large system for electing School Board members. In 1852, Mobile County created at-large school board elections of 12 commissioners. In 1870, the election procedures changed; instead of selecting all 12 commissioners, voters would select 9 of the 12 and the other 3 would be appointed. This system had the effect of ensuring minority representation on the school board. In 1876, the Alabama state legislature eliminated the Mobile County school board system and returned the County to the 1852 at-large election scheme which remained in effect until this suit was brought. The district court found that by re-instating the at-large election system, the Alabama state legislature intended to discriminate against African Americans in Mobile County in violation of the Fourteenth and Fifteenth Amendment. The Eleventh Circuit affirmed.

152 Cong. Rec. S7951.

279.   Congress received a report entitled *Voting Rights in Alabama, 1982-2006* that "[s]hortly after the 1982 reauthorization, black citizens in Alabama challenged the method of appointing poll officials under Section 2 of the Voting Rights Act. By means of a preliminary injunction, the federal court ordered 65 of Alabama's 67 counties to institute programs aimed at appointing more African Americans as poll officials." *July 13, 2006 Hearing*, at 372.

280.   The same report described the successful *Dillard v. Crenshaw County* litigation: "By far the biggest advance in equal access for African Americans came after May 28, 1986, when a federal district court made findings that, in the century following Reconstruction, the Alabama Legislature had purposefully switched from single-member districts to at-large election of local governments as needed to prevent black citizens from electing their candidates of choice, and that the general laws of Alabama governing all at-large election systems throughout the state had been manipulated intentionally during the 1950s and 1960s to strengthen their ability to dilute black voting strength. . . . Based on these findings, the district court expanded the *Dillard v. Crenshaw County* litigation to include a defendant class of 17 commissions, 28 county school boards, and 144 municipalities who were then employing at-large election systems tainted by the

racially motivated general laws. . . .  Most of the local jurisdictions in the defendant class entered into consent decrees negotiated by state and local black political leaders, although a few proceeded to trial and judgment." *Id.* at 372-74.

281.    Congress received a statement from Senator Arlen Specter regarding a Georgia example of discrimination found by courts as:

> *Common Cause v. Billups:* 4:05-CV-201 HLM (N.D. Ga.) (ACLU Rep., 185-191).  The Department of Justice precleared the photo ID bill on August 26, 2005. The ACLU filed suit in federal district court, charging the law violated the state and federal constitutions, the 1965 Voting Rights Act, and the 1964 Civil Rights Act.  The district court issued a preliminary injunction holding plaintiffs had a substantial likelihood of succeeding on several grounds, including claims that the photo ID law was a poll tax and violated the equal protection clause of the Constitution.  The state appealed to the Eleventh Circuit, which refused to stay the injunction. In an attempt to address the poll tax burden cited by the district court in its injunction, the Georgia legislature passed a new photo ID bill providing for free photo identification cards . . . .

152 Cong. Rec. S7952; *see also March 8, 2006 Hearing Vol. I*, at 84 (testimony of Wade Henderson).

282.    Congress received information presented by Laughlin McDonald that "[f]rom 1974 to 1993, more than 100 lawsuits were brought against no fewer than 40 cities (in 41 lawsuits) and 62 counties (in 67 law suits) in Georgia alone, challenging at-large election plans as discriminatory violations of either the constitution, the Voting Rights Act, or both. Of the 188 lawsuits during this 19 year period in Georgia, more than three-quarters (72) were not resolved until 1983 or later. Of these 72 cases, all but approximately five were resolved by the creation of single member districts, which allowed blacks the opportunity to elect candidates of their choice. *October 25, 2005 Hearing Vol. III*, at 11.

283.    The report, *Voting Rights in Mississippi 1982-2006*, stated that a federal district court in 1987 ruled in favor of black voters in Mississippi in a Section 2 action challenging the state's

dual registration provision requiring voters to register separately for state and municipal elections.  The court in *Operation PUSH v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987), held that the law was originally adopted in 1890 for a racially discriminatory purpose and a revised version enacted in 1984 had a discriminatory result.  *March 8, 2006 Hearing Vol. II*, at 1725.

284.    Congress received additional information regarding the *Charleston County, South Carolina* Section 2 litigation from:

- Laughlin McDonald, who cited facts ascertained by the court of appeals, 365 F.3d at 351-53, and the district court, 316 F. Supp.2d. at 286 n.23, 294-95, in *Charleston County* regarding vote dilution, including that "[o]ther factors contributing to minority vote dilution found by the courts included: "fewer financial resources" available to minority candidates to finance campaigns; 'past discrimination that has hindered the present ability of minorities to vote or to participate equally in the political process;' '[t]he on-going racial separation that exists in Charleston County-socially, economically, religiously, in housing and business patterns-[which] makes it especially difficult for African-American candidates seeking county-wide office to reach out to and communicate with the predominantly white electorate;' 'significant evidence of intimidation and harassment' of blacks 'at the polls during the 1980s and 1990s and even as late as the 2000 general election."  *October 25, 2006 Need Hearing Vol. III*, at 9.

- Armand Derfner, noting that: "Perhaps the most telling sign of voting discrimination in Charleston County elections was the Court's finding that racial appeals of a subtle or not-so-subtle (i.e., overt) nature were used in election campaigns.  The most telling of these examples were white candidates running ads or circulating fliers with photos of their black opponents—sometimes even darkened to leave no mistake—to call attention to the black candidates' race in case any white voter happened to be unaware of it."  *October 20, 2005 Hearing*, at 85.

285.    Congress received a statement from Senator Arlen Specter regarding a Virginia example of discrimination found by courts as:

*Pegram v. City of Newport News*, 4:94cv79 (E.D.Va. 1994) (ACLU Rep., p. 714).
In July 1994, the ACLU filed suit on behalf of African American voters challenging the at-large method of city elections in the City of Newport News. On October 26, 1994, a consent decree was entered in which the City admitted that its at-large system violated section 2 as well as the Fourteenth and Fifteenth Amendments. The consent decree required the City to implement a racially fair election plan."

152 Cong. Rec. S7952.

286.    Congress received information from Walter Fields, Director of Political Development at the Community Service Society (CSS), "The Community Service Society has used legal advocacy to ensure full and fair representation of the City's poorest neighborhoods, especially Black and Latino voters. In 1989 CSS successfully used the Voting Rights Act to stop the discriminatory purge of over 320,000 voters in *United Parents Associations v. New York City Board of Elections*. Subject to the State's non-voting purge, CSS proved that the law's application had an unlawful, discriminatory effect as black and Latino voters were 32 percent  more likely to be purged for non-voting. The federal National Voter Registration Act of 1993 eventually superseded and eliminated New York's non-voting purge." *October 25, 2005 Scope Hearing Vol. II*, at 3264.

287.    Congress received the Report of the National Commission on the Voting Rights Act which stated that, compared to other states, Texas has largest number of Section 2 suits resolved on behalf of minority plaintiffs since 1982. In Texas, 206 such suits, both reported and unreported, were identified. As a result of these 206 cases, 197 jurisdictions changed their discriminatory voting procedures. The map shows that 110 of Texas' 254 counties were affected at least once by the suits, for a total of 274 times.  *March 8, 2006 Hearing Vol. I*, at 206-207.  *See also* H.R. Rep. No. 109-478, at 35 (noting that Federal courts reached the merits of a Section 2 claim in 26 reported cases from Texas and identified Section 2 violations in seven cases.).

288.    Congress received a statement from Senator Arlen Specter of Pennsylvania regarding a Texas example of discrimination found by courts as:

> *League of United Latin American Citizens v. Midland Indep. Sch. Dist.*, 648 F. Supp. 596 (W.D. Tex. 1986) (U Mich. L.Rep., *http://www.votingreport.org)*.  Latino plaintiffs argued that the at-large election system diluted their votes.  The par-

ties agreed to a court order that eliminated the election scheme and defendants submitted a proposal in which four trustees would be elected from single-member districts and three would be elected at large.  Plaintiffs objected and filed a plan in which all seven trustees would be elected from single-member districts.  The court, applying *Gingles* and the totality-of-circumstances tests, held that defendants' plans violated section 2 and the Fourteenth and Fifteenth Amendment.  The court ordered that a seven-member district plan for electing trustees be immediately implemented according to district boundaries drawn by the court.

152 Cong. Rec. S7952.

289.   The House Judiciary Committee cited to Citizens for a *Better Gretna v. City of Gretna*, as an example of Section 2 litigation.  In that case, African-American voters brought a Section 2 action challenging the city's pre-Act at-large aldermanic elections. The court found that African-Americans had been excluded from the slating process, no African-American had ever been elected alderman though they comprised 28% of the population, the city had a majority vote requirement, and there was "persistent, and often violent, intimidation visited by white citizens upon black efforts to participate in Louisiana's political process."  H.R. Rep. No. 109-478, at 53.

290.   Congress received the a report authored by Professor Ellen Katz, which stated that, in the *City of Dallas, Tex.* litigation, 734 F. Supp. 1317, 1324, 1368 (N.D. Tex. 1990), the court found that "the city's attempts to keep a partially at-large election system after minority voters petitioned for its change and city officials recognized the existing system 'denied both blacks and Hispanics access to any of the 3 at-large seats.'" The report stated that "a 1989 newspaper column warning that a vote for the African-American candidate running against the incumbent white mayor 'could lead to racial violence and white flight' was classified as a racial appeal." The report noted the court's finding that "an organization known as the Citizen's Charter Association had denied black and Latino candidates access to slating through 1977." *October 18, 2005 Hearing,* at 990, 1000, 1006.

291.    Through a report submitted to Congress by Nadine Strossen, Congress received information regarding the district court finding that South Dakota's post-2000 legislative redistricting plan violated Section 2.  In *Bone Shirt v. Hazeltine*, 200 F. Supp. 2d 1150 (D.S.D. 2002), "[t]he district court . . . invalidated the state's 2001 legislative plan as diluting Indian voting strength. The court found the plaintiffs had established the three *Gingles* factors.  Turning to the totality of circumstances analysis, the court found there was 'substantial evidence that South Dakota [had] officially excluded Indians from voting and holding office.'"  *March 8, 2006 Hearing Vol. I*, at 1163.

G.    **Evidence Before Congress: Voter Registration, Voter Turnout, and the Number of Minority Elected Officials**

1.    **Gains in Minority Participation and Representation Attributable to Section 5 and the VRA**

292.    The House Judiciary Committee found that as a "direct result of the Voting Rights Act of 1965," "[s]ignificant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress, State legislatures, and local elected offices." H.R. Rep. No. 109-478, at 2.

293.    The House Judiciary Committee further concluded that the protections afforded by Section 5 against the implementation of voting changes that would have discriminatorily diluted minority voting strength, along with the increased number of African-American citizens registered to vote and voting, have resulted in significant increases in the number of African-Americans elected to office.  *Id.* at 18.

294.    The House Judiciary Committee found that "the number of African-Americans who are registered and who turn out to cast ballots has increased significantly over the last 40 years, particularly since 1982."  *Id.* at 12.

295.    The House Judiciary Committee found that significant increases in voter registration and turnout among language minority citizens, including Hispanics, Asians, and American Indians and Alaskan Natives, are a direct result of the language assistance provisions of the Voting Rights Act.  *Id.* at 20.

296.    According to the House Report, since 1982 electoral participation among African-American citizens in Texas has increased due to the Voting Rights Act.  The House Report provided the following statistics:

Chart B1: Reported Registration by Race in Texas and Outside the South
1980–2004

| | 1980 | 1982 | 1984 | 1986 | 1988 | 1990 | 1992 | 1994 | 1996 | 1998 | 2000 | 2002 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TEXAS** | | | | | | | | | | | | | |
| Black | 56.4 | 56.6 | 65.3 | 66.6 | 64.2 | 60.0 | 63.5 | 58.5 | 63.2 | 62.1 | 69.5 | 65.1 | 68.4 |
| White | 61.4 | 59.4 | 66.0 | 58.2 | 66.5 | 61.1 | 66.1 | 59.7 | 62.7 | 59.7 | 61.8 | 57.7 | 61.5 |
| Latino | 39.3 | 43.2 | 45.2 | 43.1 | 45.5 | 40.0 | 42.9 | 39.2 | 42.7 | 39.7 | 43.2 | 39.1 | 41.5 |
| **NON–SOUTH** | | | | | | | | | | | | | |
| Black | 60.6 | 61.7 | 67.2 | 63.1 | 65.9 | 58.4 | 63.0 | 58.3 | 62.0 | 58.5 | 61.7 | 57.0 | NA |
| White | 69.3 | 66.7 | 70.5 | 66.2 | 68.5 | 64.4 | 70.9 | 65.6 | 68.1 | 63.9 | 65.9 | 63.0 | NA |
| Latino | 35.5 | 33.9 | 39.0 | 33.2 | 32.4 | 30.4 | 32.9 | 29.1 | 33.8 | 31.9 | 32.7 | 30.6 | NA |

Source: Various post-election reports by the U.S. Bureau of the Census

Chart B2: Reported Turnout by Race in Texas and Outside the South
1980–2004

| | 1980 | 1982 | 1984 | 1986 | 1988 | 1990 | 1992 | 1994 | 1996 | 1998 | 2000 | 2002 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TEXAS** | | | | | | | | | | | | | |
| Black | 40.7 | 37.8 | 51.2 | 39.8 | 47.0 | 38.7 | 50.1 | 33.1 | 47.1 | 35.5 | 57.5 | 44.3 | 55.8 |
| White | 52.7 | 40.6 | 55.5 | 37.5 | 55.2 | 42.5 | 57.2 | 39.4 | 46.7 | 33.5 | 48.1 | 35.0 | 50.6 |
| Latino | 29.7 | 26.8 | 32.7 | 23.6 | 33.2 | 22.5 | 33.1 | 18.9 | 27.9 | 15.3 | 29.5 | 19.1 | 29.3 |
| **NON–SOUTH** | | | | | | | | | | | | | |
| Black | 52.8 | 48.5 | 58.9 | 44.2 | 55.6 | 38.4 | 53.8 | 40.2 | 51.4 | 40.4 | 53.1 | 39.3 | NA |
| White | 62.4 | 53.1 | 63.0 | 48.7 | 60.4 | 48.2 | 64.9 | 49.3 | 57.4 | 44.7 | 57.5 | 44.7 | NA |
| Latino | 25.8 | 25.8 | 32.8 | 23.8 | 26.8 | 20.5 | 27.4 | 20.8 | 26.3 | 21.4 | 26.8 | 18.2 | NA |

Source: Various post-election reports by the U.S. Bureau of the Census

*Id.* at 12, 14.

297.    Assistant Attorney General Wan Kim testified that dramatic gains in black registration and turnout in Alabama and Mississippi, and in black elected officials, including in covered states such as Alabama and Georgia, are "fruits of" DOJ's "vigorous enforcement of voting rights."  *May 10, 2006 Hearing*, at 123.

298.     Congress heard testimony from Professor Chandler Davidson that "[t]he [Voting Rights] Act has had a major impact in incorporating racial and language minorities into the polity.  Perhaps the most striking evidence is the extraordinary increase in black elected officials in the South.  In 1970 there were 565.  In 2000, there were 5,579.  *May 9, 2006 Hearing*, at 6.

299.     Congress received a report commissioned by the Leadership Conference on Civil Rights which concluded that the Voting Rights Act, including Section 5, has "had a substantial impact on the number of Hispanic and American Indian candidates elected to public office in Arizona."  Specifically, the report credited Section 5 with having "eliminated barriers [to voter participation] and prevented their implementation."  *March 8, 2006 Hearing Vol. I*, at 1442.

300.     In his testimony before the Senate Judiciary Committee, Drew Days explained that "[f]rom the end of the Nineteenth Century until the mid-1980s or in some states the early 1990s, well past the time of the most recent renewal of the Voting Rights Act, not a single black was elected to Congress from Louisiana, Mississippi, Alabama, South Carolina, North Carolina, or Virginia."  Additionally, Days testified that, "[i]n many of the rest of the Southern states covered in their entirety by Section 5, it was not until after the most recent VRA reauthorization [in 1982] that a single black representative was elected.  For most of a century, and in some states for over a century, racially discriminatory practices thwarted the ability of black voters to elect even a single black representative."  *May 17, 2006 Hearing*, at 66.

301.     Congress received testimony from Laughlin McDonald about the impact of majority-minority districts on the electoral opportunity of minority voters.  He noted that "[a]s late as 1988, no black had been elected from a majority white district in Alabama, Arkansas, Louisiana, Mississippi, or South Carolina.  The number of blacks elected to state legislatures increased after

the 1990 redistricting, but again, the gain resulted from an increase in the number of majority black districts. *May 9, 2006 Hearing*, at 92.

302.    Congress received a report commissioned by the National Commission on Civil Rights indicating that, since the passage of the Voting Rights Act, there has been an increase in the number of black elected officials in Mississippi.  The report shows that, in 2005, there was 1 U.S. Representative, 11 state senators and 120 state representatives—all of whom are African-American—in Mississippi.  *March 8, 2006 Hearing Vol. I*, at 365**.**

303.    Congress received information from the National Commission on the Voting Rights Act that the "only reason for" the election of the first African-American member of Congress from Mississippi in 1986 was the "enforcement of Section 5 of the Voting Rights Act by the Justice Department and litigation under . . . Section 2." *Id*.

304.    Congress received testimony from Wade Henderson that "[t]hirty-six percent of Mississippi's population is black, the highest percentage of the fifty states.  33 percent of the voting age population is black.  But no black person has been elected to a statewide office since Reconstruction."  Henderson further testified that, "[i]n 2001, the last year covered by its study of black elected officials, the Joint Center for Political and Economic Studies reported that Mississippi had 892 black elected officials.  While this is the highest number of any of the fifty states, the Center's report states that this represents less than 19 percent of the state's elected officials.  Nearly all of the black officials were elected from black majority districts, and most of those districts were created as a result of the Voting Rights Act." *Id.* at 56.

305.    Through the National Commission on the Voting Rights Act, Congress was presented with information from Kent Willis, executive director of the ACLU in Virginia, that, "'[b]y 1991, after a series of voting rights cases filed under Section 2 and after dramatic changes with

redistricting' thanks to Section 5, 'Virginia moved from 75 to 150 African-American elected officials by the mid-'90s.  By the late '90s, that had moved to about 300.'" *Id.* at 362.

306.    Through the National Commission on the Voting Rights Act, Congress received testimony from Jose Garcia noting the increase in Latino representation at the local, state and federal levels, particularly in the covered jurisdictions in New York City.  *October 25, 2005 Scope Hearing Vol. II*, at 3256.

### 2.    Continuing Problems in Election of Minority Officials

#### a.    Congressional Findings

307.    The House Judiciary Committee found that, due to the continuing prevalence of racially polarized voting in the jurisdictions covered by Section 5, generally "[t]he only chance minority candidates have to be successful [in these jurisdictions] are in districts in which minority voters control the elections." H.R. Rep. No. 109-478, at 34.  Thus, "[f]or minority voters, there is effectively an election ceiling." *Id.*

308.    The House Judiciary Committee found that "[a]s in 1982, the number of African Americans elected to State legislatures failed to reflect the number of African Americans in the general population.  For example, in States such as Alabama, Georgia, Louisiana, Mississippi, South Carolina, and North Carolina, where African Americans make up 35 percent of the population, African Americans made up only 20.7 percent of the total number of State legislators." *Id.* at 33.

309.    The House Judiciary Committee found that "[a]s of 2000, only 35 African Americans held a statewide elected office."  The Committee further found it notable that some of these officials originally were not elected to their position but were appointed.  In this regard, the Committee cited to the report of the National Commission on the Voting Rights Act, that "'often it is only after blacks have been first appointed to a vacancy that they are able to win statewide office as

incumbents.  Moreover, in order for a black to win statewide election, a prior appointment to fill a vacancy is not always sufficient.'"  *Id.*

310.    The House Judiciary Committee also found that "[i]n certain covered States, such as Mississippi, Louisiana, and South Carolina, African Americans have yet to be elected to any Statewide office."  *Id.*

311.    The House Judiciary Committee similarly found that "[t]he number of language minority officials elected to office has failed to keep pace with population growth among the minority communities."  *Id.*

312.    The House Judiciary Committee found that, as of 2000, neither Latinos nor Native Americans have been elected to the House of Representatives from majority-white districts, and only 8% of African-Americans elected to the House represent majority-white districts.  *Id.* at 34.

### b.    Testimony to Congress

313.    The Senate received testimony from Professor Ronald Gaddie comparing legislative representation of African Americans to the African American voting age population in nine southern covered states and in the United States at-large.  Each of the compared covered states— except Georgia and Florida—are under-represented by African American representatives and every covered state other than Georgia and Florida is below proportionality and below the U.S. average.  *May 16, 2006 Hearing,* at 173.

314.    Congress received a statement of James Blacksher, at a hearing conducted by the National Commission on the Voting Rights Act, stating that not a single African-American currently holds statewide office in Alabama.  *October 25, 2005 Scope Hearing Vol. II*, at 3198-3199.

315.    Congress received the following evidence from the report *Voting Rights in Mississippi 1982-2006*:

- "Thirty-six percent of Mississippi's population is black, the highest percentage of the fifty states.  Thirty-three percent of the voting age population is black.  Despite that, no black person has been elected to a statewide office in Mississippi since Reconstruction." *March 8, 2006 Hearing Vol. II*, at 1717.

- "No black candidate has won election to Congress or the state legislature from a majority-white district in Mississippi."  *May 10, 2006 Hearing*, at 145.

- "No black person served in the U.S. House of Representatives from Mississippi between 1883 and 1986," despite the existence of a "majority-black area in the Mississippi Delta" which was "almost 60% black as of 1962."  However, until the 1980s this area was "carved" up among three different districts, thus depriving the black majority of political power, according to the report.

*March 8, 2006 Hearing Vol. II*, at 1717-18 (internal footnotes omitted).  *See also May 10, 2006 Hearing*, at 22 (testimony of Robert McDuff).

316.    Congress received testimony from Robert McDuff stating that: "In 2003, in the most recent statewide election in Mississippi, a 46-year-old black candidate for State treasurer, who had served as the State's Director of Finance Administration, who had a wealth of public finance and private sector experience, was defeated in an election marked by racially polarized voting by a 29-year-old white candidate, whose only experience was that he had worked as a mid-level bank employee, demonstrating that it is still difficult for a black person, no matter how qualified, to be elected to statewide office in Mississippi." *Id.* at 22.

317.    Congress received information from Debo Adegbile that Louisiana "has never elected a black governor, although Cleo Fields and William Jefferson ran for that office in 1995 and 1999, respectively.  In the Fields/Foster race, exit polls indicated that Fields received 96 percent of the African-American vote while Foster received 84 percent of the white vote. Moreover, the political climate in Louisiana, not only in 1965 but just last decade, was such that the nation's most infamous modern day Klansman, David Duke ran for the state's highest elected offices.  In the 1991 governor's race, Duke — a former grand wizard of the Ku Klux Klan . . . garnered 39 per-

113

cent of the state's vote, winning 55 percent, a majority, of the white vote, though he eventually lost to Edwin Edwards.  Nor was Duke's strong gubernatorial showing a fluke.  In the Senate race of 1990, Duke won 44 percent of the vote against a long-time incumbent, and again won the support of the majority of whites."  *March 8, 2006 Hearing Vol. II*, at 1602.

318.    The report "*Voting Rights in Louisiana, 1982-2006*" stated that "in the face of persistent racially polarized voting," electoral gains made by blacks "have come about largely through the existence and protection of majority-minority districts."  For example, "every black representative currently holding office in Congress from Louisiana, or in the Louisiana State Legislature, has been elected from a majority black district."  *Id.* at 1601.

319.    The report of the National Commission on the Voting Rights Act discussed the case of *Colleton County v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002), where expert testimony "found that no black candidate of choice of black voters was elected in contested general elections to the General Assembly from a district that was less than 43% nonwhite.  Indeed South Carolina Republican Governor Mark Sanford was asked in May about the prospects of blacks winning statewide office in South Carolina; he responded, 'I think there never will be.'  The State, May 10, 2005.  This was said with the recognition that South Carolina has one of the highest percentages of black population in the nation at just less than one-third of all residents."  *October 25, 2005 Scope Hearing Vol. II*, at 3282.

320.    Congress received a report by the Chief Justice Earl Warren Institute stating that, "Latinos and African Americans are underrepresented in elected bodies in Texas on the statewide, county, and local level."  *May 4, 2006 Hearing Part I*, at 275.

### 3.      Continuing Problems in Minority Voter Participation

#### a.      Congressional Findings

321.    The House Judiciary Committee found that disparities in registration and turnout between white and language minority citizens continue to be particularly significant: "In Florida, 36.7 percent of Hispanic citizens were registered to vote in 1996 compared to 67.8 percent of white citizens. Turnout among Hispanics was also substantially lower in 1996 with 29 percent of Hispanic voters turning out to cast ballots compared to 52.7 percent of white voters. In fact, statistics revealed that turnout among Hispanics decreased between the years 1980 and 1996, with 29.3 percent of Hispanics turning out to vote in 1980 compared to the 29 percent of Hispanics who turned out to vote in 1996. In the State of Texas, 41.5 percent of Hispanic citizens were registered to vote in 2004 compared to 61.5 percent of white citizens." H.R. Rep. No. 109-478, at 29.

322.    The House Judiciary Committee also found that there are "continued registration and turnout disparities between African-American and white citizens in Virginia and South Carolina." *Id.* at 25-28.

#### b.      Testimony to Congress

323.    Congress received written testimony from Nathaniel Persily regarding census voter data, stating that:  "Moreover, as the supplement to Professor Ronald Gaddie's report makes clear and as the House Report erroneously suggests otherwise, in most of the covered Southern states, like the rest of the country, black turnout continues to lag turnout of non-Hispanic whites.  The House Report, like Professor Gaddie's original report, states differences in voter turnout and registration between blacks, whites, and Hispanics; however, the white category also includes Hispanics, thereby lowering the turnout of whites (due to the very low turnout of Hispanics) and reducing the black-white differences in turnout.  When comparing the estimates of turnout of blacks and non-Hispanic whites in the 2004 election, the only two covered Southern states where black turnout

appears to exceed non-Hispanic white turnout are Alabama (where the difference is within the confidence interval) and Mississippi (where the estimates differ by 6.8 percentage points).  So while it would be wrong to suggest that racially differential rates of turnout have not shrunk over time or to suggest that the South is qualitatively different in this regard than the rest of the country, blacks tend to lag non-Hispanic whites in the covered jurisdictions in their registration and turnout rates and sometimes do so to a significant degree." *May 17, 2006 Hearing*, at 131-132.

324.    Congress received testimony from Debo Adegbile that there are stark socioeconomic disparities along racial lines in Louisiana in the areas of education, employment, income and housing. *March 8, 2006 Hearing Vol. II*, at 1600.

325.    The report "*Voting Rights in Arizona, 1982-2006*" stated that "other barriers to voting persist for American Indians. Polling places and registration sites can be few and far between. Geographical isolation and long travel distances make it difficult for many Indian people living on reservation to register and to vote.  Disparate education opportunities for American Indians enrolled in BIA schools have also led to high illiteracy rates.  Socio-economic barriers have heightened the crippling effect of illiteracy, resulting in voter registration and turnout rates that continue to lag far behind non-Hispanic white voters."*March 8, 2006 Hearing Vol. I*, at 1379.

326.    Congress heard testimony from Nina Perales: "According to the Census Bureau, in the November 2004 presidential election, 58.5 percent of Latino voting age citizens reported that they were registered to vote, compared to 74.7 percent of all non-Hispanic white voting age citizens. Latino turnout also lagged 15.5 percent behind non-Hispanic white turnout in that election." *Voting Rights in Texas, 1982-2006*, at 5 (Appended to the Statement of Nina Perales, July 13, 2006) *available at* http://judiciary.senate.gov/pdf/7-13-06ninaperales.pdf (last visited November 9, 2010).

327.    Congress received a report by the Chief Justice Earl Warren Institute stating that,
"[u]pdating some evidence Congress considered when passing and renewing the temporary pro-
visions of the Act, witnesses noted that socio-economic disparities between Latinos and African
Americans and the Anglo population in Texas persist, including significantly lower levels of
educational attainment and income for Latino and black Texans." *May 4, 2006 Hearing Part I*, at
275.

328.    A report presented to Congress from Orville Vernon Burton states: "White Texans show
significantly higher levels of important socioeconomic indicators (such as education and eco-
nomic prosperity) than their African American and Latino counterparts.  These socioeconomic
disadvantages experienced by African Americans and Latinos constitute a clear hindrance to the
effective participation of those groups in the political process."  *March 8, 2006 Hearing Vol. III*,
at 3077.

329.    A report presented to Congress from Orville Vernon Burton lists the following socioeco-
nomic disparities affecting minority participation: disparity in elementary education, *March 8,
2006 Hearing Vol. III*, at 3078; high school education, *March 8, 2006 Hearing Vol. III*, at 3079;
public university education, *March 8, 2006 Hearing Vol. III*, at 3079; income, poverty, housing,
*March 8, 2006 Hearing Vol. III*, at 3077-3078, 3080; unemployment rate, *March 8, 2006 Hear-
ing Vol. III*, at 3078; health insurance, *March 8, 2006 Hearing Vol. III*, at 3080.

**H.    Evidence Before Congress:  Comparison of Covered and Non-Covered Areas**

330.    The House Judiciary Committee, citing a report submitted by Professor Ellen Katz, stated
that "it was shown that of all the successful litigation undertaken in the last 25 years pursuant to
Section 2, more than half of the cases were filed in covered jurisdictions"  H.R. Rep. No. 109-
478, at 53.

331.     The report authored by Professor Ellen Katz and received by Congress states that 56 per-
cent of successful Section 2 cases were filed in jurisdictions covered by Section 5, which in 2000
contained 39 percent of the national African-American population, 32 percent of the Hispanic
population, and 25 percent of the Native American population (and less than one-quarter of the
nation's total population).  *March 8, 2006 Hearing Vol. I*, at 202-03; *see also May 9, 2006 Hear-
ing*, at 47 (Chandler Davidson); *March 8, 2006 Hearing Vol. I*, at 203 (Commission Report); *see
also May 9, 2006 Hearing*, at 160 (Theodore Shaw).

332.     The Katz report stated that "85 [Section 2 cases] found a lack of minority candidate suc-
cess," and that "[f]orty-nine (57.6%) of the[se] findings were in covered jurisdictions, while 36
(42.4%) were in non-covered jurisdictions."  *October 18, 2005 Hearing,* at 1008.

333.     The Katz report stated: "Of the lawsuits analyzed, 186 considered the extent of racially
polarized voting, 91 found the factor to exist, and 65 of these identified a violation of Section 2
(another 3 granted a preliminary injunction).  In covered jurisdictions, 44 lawsuits found racial
bloc voting; 47 in non-covered."  *Id* at 981.

334.     The Katz report stated that "[n]early ninety percent of the specific minority v. white elec-
tions documented in covered jurisdictions involved white bloc voting rising to at least 80 per-
cent, meaning that 80 percent of white voters voted exclusively for white candidates in these
elections. Virtually all of the elections (96%) analyzed by courts in covered jurisdictions since
1982 exhibited white polarized voting at a level of seventy percent or more. In non-covered ju-
risdictions, by contrast, only forty percent of the elections documented involved white polariza-
tion of 80 percent or higher, and about 60 percent involved white polarization rising to seventy
percent."  *See May 16, 2006 Hearing*, at 48.

335.    The Katz report stated that there were "[f]ifty-three [Section 2] lawsuits" finding that a jurisdiction used "voting practices or procedures that may enhance the opportunity for discrimination against the minority group," such as "unusually large election districts, majority vote requirements, anti-single shot provisions," and that  ... "[t]hirty-four (64.2%) of the lawsuits finding" these practices "arose in covered jurisdictions." *October 18, 2005 Hearing,* at 998.

336.    The Katz report stated that there were "[t]hirty-one" Section 2 cases featuring racial appeals, and that "[s]eventeen (or 54.8%) of these 31 lawsuits were in covered jurisdictions, while 14 were in non-covered jurisdictions. Eighteen also held that Section 2 was violated and another issued a preliminary injunction. Of the successful lawsuits finding this factor, 12 (or 63.2%) occurred in covered jurisdictions." *Id.* at 1003.

337.    The Katz report stated that there were 84 Section 2 lawsuits finding that "members of the minority group bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process," and that "[f]orty-five lawsuits finding [this] [f]actor," or 53.6%, "originated in jurisdictions covered by Section 5 of the VRA." *Id.* at 1001 (internal quotation marks omitted).

338.    Congress received testimony from Anita Earls that "there is a clear differentiation between covered and non-covered jurisdictions, and . . . in my experience of litigating voting rights cases around the country over the past 18 years, including cases in covered jurisdictions and non-covered jurisdictions I have found important differences between those jurisdictions. . ." *May 16, 2006 Hearing*, at 55.

## I.    Evidence Before Congress: the "Bailout" Provision

### 1.    Congressional Findings

339.    The House Judiciary Committee found that use of the bailout provisions demonstrates that "covered status has been and continues to be within the control of the jurisdiction such that

those jurisdictions that have a genuinely clean record and want to terminate coverage have the ability to do so."  H.R. Rep. No. 109-478, at 25.

340.    The House Judiciary Committee found "that the success and effectiveness of the VRA's temporary provisions were also reflected by those jurisdictions that successfully terminated their covered status.  Since 1982, 11 counties from the covered State of Virginia have successfully bailed out from coverage under Section 4."  *Id.* at 93.

341.    The House Judiciary Committee found that "[b]ailout, available through Section 4(a), while for the most part has gone unused until recently, has proven to be achievable to those jurisdictions that can demonstrate an end to their discriminatory histories."  *Id.* at 61.

### 2.    Testimony to Congress

342.    Congress received testimony from Drew Days who explained that "the current bailout provisions balance concerns that jurisdictions that continue to abridge or deny the voting rights of minorities remain covered by the Act while encouraging compliance.  Congress should not relax the bailout requirements in view of the fact that no jurisdiction has demonstrated that the current provisions present unreasonable obstacles.  For Congress to do so in light of hearing evidence of serious VRA violations in the twenty-first century would send an unfortunate message."  *May 17, 2006 Hearing*, at 46.

343.    Congress received written testimony from Assistant Attorney General Wan Kim that "[i]t appears that the Department of Justice has, consistent with congressional intent, taken a commonsense approach to satisfying the bailout criteria by agreeing to allow cities and counties to bail out although there had been some oversights in compliance, provided those oversights were cured before bailout was granted."  *May 10, 2006 Hearing*, at 61.

344.    Congress received written testimony from Assistant Attorney General Wan Kim regarding the Department of Justice's approach to bailout, stating that:  "The Department of Justice has

worked closely with each individual jurisdiction that has expressed an interest in obtaining a bailout.  Our assistance has focused on helping the jurisdiction to fully develop a factual record on which a bailout could be based." *Id.* at 71.

345.     Congress received testimony from Gerald Hebert who, at the time of his testimony,  had "represented all nine of the jurisdictions that have bailed out since the '82 amendments" that "[t]he bailout provisions are really an incentive for the covered jurisdictions, which have a presumption that they discriminate, to show that, in fact, they have a clean record.  That's what you intended when you enacted the bailout provisions; and thus far, they've worked very well." *October 20, 2005 Hearing*, at 88-89.

346.     Congress received information from Mr. Hebert that "not a single jurisdiction that has sought bailout since 1982 has been denied a bailout." *March 8, 2006 Hearing, Vol. II*, at 2684.

347.     Mr. Hebert testified that, in his opinion, around 90% of covered jurisdictions meet some of the bailout requirements.  He stated that "[y]ou have to show that within the last 10 years you have used no test or device; that there have been no final judgments or settlements that you've entered into as a jurisdiction because it's been alleged that you discriminated on the basis of race, color, or membership in a language minority group in your voting and election practices; that there haven't been any Federal examiners assigned to your jurisdiction; that you've timely submitted all the voting changes to the Justice Department for preclearance; that the Justice Department has not objected to any of your changes, or the D.C. court denied any of your changes." *October 20, 2005 Hearing*, at 88.

348.     Congress received a paper from Mr. Hebert, *An Assessment of the Bailout Provisions of the Voting Rights Act,* regarding the way bailout works.  Hebert cited the 1982 Senate Report, S. Rep. No. 97-417, at 53, stating that "[t]he legislative history anticipated that '[t]his safeguard

will permit evidence to be presented of voting rights infringements which have not previously been the subject of a judicial determination . . . .  However, such violations would not bar bailout if 'the plaintiff establishes that any such violation were trivial, were promptly corrected, and were not repeated.'"  Hebert further stated that, "[w]hat this means in practice is that a jurisdiction that inadvertently failed to submit a voting change for preclearance but implemented the change anyway will not be barred from obtaining a bailout even though such failures are technical violations of the preclearance provisions.  Such 'violations,' if inadvertent, would fall into the 'trivial' category."  *March 8, 2006 Hearing Vol. II,* at 2676.

349.    Mr. Hebert's paper stated that, "[i]n sum, the current standards for bailout are practical and are drafted in such a way as to require covered jurisdictions to prove the absence of those conditions which led to coverage in the first place. . . .  For the most part, jurisdictions subjected to the Act's special remedial provisions, such as the preclearance provisions, have an effective and reasonable opportunity to bailout today.  Moreover, the bailout provisions are tailored in such a way as to require a covered jurisdiction to prove nondiscrimination in voting and elections on the very issues that Congress intended to target when it enacted the special remedial provisions in the first place."  *Id.* at 2689.

350.    Congress received testimony from Pamela Karlan stating, "[t]hat the jurisdictions that have pursued bailout have been successful in obtaining it suggests that the actual process strikes an appropriate balance."  She noted the "rarity of bailout" is due "first . . . [to the fact] that jurisdictions have not sought bailout because they have not satisfied all the conditions — including the important 'constructive efforts' detailed in section 4(a)(1)(F) — and see no point in a futile effort to bail out, an effort that might lead to scrutiny over whether the jurisdiction has even fully complied with section 5."  She further testified that "jurisdictions appreciate either the 'seal of

approval' that preclearance accords or the political cover it provides." She also testified that "local jurisdictions are unaware of the bailout process." *May 16, 2006 Hearing*, at 93.

351.    Congress received testimony from Theodore Shaw that, "evidence in the record demonstrates that the bailout process is reasonable and that the 1982 Amendments sufficiently readjusted the requirements of the bailout mechanism.  Moreover, the evidence shows that the Justice Department has generally provided assistance to those jurisdictions that have sought bail out and routinely offered joint consent to an entry of judgment granting bailout as permitted under the Act.  Given these facts, . . . the bailout provisions adequately prevent Section 5 from applying too broadly by providing eligible jurisdictions an effective and accessible tool to terminate their covered status." *May 9, 2006 Hearing*, at 177.

### J.    Evidence Before Congress:  Inadequacy of Section 2 Litigation as a Substitute for the Preclearance Process

352.    The House Judiciary concluded that case-by-case litigation under Section 2 continues to be an "inadequate remedy" for addressing discriminatory voting changes in the Section 5 jurisdictions, especially given the number of objections interposed by the Attorney General since 1982.  H.R. Rep. No. 109-478, at 57.

353.    As part of his response to written question from Senator Specter, Armand Derfner stated: "Section 2 is not an adequate substitute [for Section 5] because it puts the burden on the victim. Unlike Section 5, Section 2 allows the discriminatory voting change to go into effect. In addition, Section 2 cases are expensive and time-consuming to litigate and hard to win. The Federal Judicial Center studies the complexity of different types of cases, and has reported that voting cases rank near the top of all civil cases in complexity. . . .  In my recent Charleston County case, the County spent over $2,000,000 defending the case, and we had to put in over 2000 hours representing the plaintiffs, in addition to many more hours that the Justice Department put in.

Lay persons may not be fully aware of the realities and burdens of litigation, but they are real. . . . Those who would narrow or do away with Section 5 often claim, without support, that Section 5 is not needed because other litigation will do the job." *May 17, 2006 Hearing*, at 80; *see also id.* at 20.

354.    As part of her response to a written question from Senator Leahy, Anita Earls stated: "[I]n all Section 5 objections, the DOJ was able to stop the problematic voting alteration *before* it was put in place.  If section 5 were not renewed, then violations would have to be dealt with re-troactively under section 2 of the VRA.  A Section 2 lawsuit is a more burdensome method of protection as it must retroactively stop voting legislation after it has already been implemented. It takes time to assemble plaintiffs with standing, file a case and engage in discovery, and even on an expedited schedule, trial will be months and possibly over a year after the new law is put in place.  Section 2 is also more difficult as it shifts the burden of proving the violation to the plain-tiffs, where Section 5 requires the submitting authority to preemptively show no such violation would occur." *May 16, 2006 Hearing*, at 61 (emphasis in original).

355.    Congress heard testimony from Gerald Hebert, in response to questions from Representa-tive Robert Scott regarding what would happen to an illegal election scheme if Section 5 were not renewed.  He said that without Section 5, a discriminatory scheme would immediately take effect, have a negative impact on minority voting rights, and "it might be too little too late to bring a suit even if you could muster the resources to file it."  He also explained that, "[b]ringing vote dilution cases . . . is a very, very costly enterprise.  You need expert witnesses, you need skilled lawyers. . . .  I would estimate that the cost of a vote dilution case, to bring a vote dilution case through trial and appeal, runs close to half a million dollars."  He also stated that even if a Section 2 suit is ultimately successful, candidates who won under an election scheme eventually

found to be illegal were likely to have gained advantages from incumbency. *May 4, 2006 Hearing Part I*, at 65-66.

356.    Congress received statements from Pamela Karlan regarding the continued need for Section 5. *May 16, 2006 Hearing*, at 15 ("Section 2 is not an adequate substitute for Section 5 because it allows the changes to go into effect, and that means you can go through several election cycles while the litigation is going on where the discriminatory change is in effect.  It requires the minority community to find a lawyer who will bring these cases.  And let me tell you, from having litigated the cases and having litigated the attorneys' fees issues after the cases, this is not a way of getting rich.  It is not even a way of making a living.  And it requires that huge amounts of resources in the litigation process be used, both by the jurisdictions and by the individual citizens.  So I don't think of it as an adequate substitute in any way."); *id.*, at 6 ("I know from my own experience doing compliance in California, dealing with covered jurisdictions there, that the Voting Rights Act has a huge deterrent effect, and it has a huge effect in telling jurisdictions that the concerns of racial minorities should not be at the bottom of the list.").

357.    Congress received written testimony from Robert McDuff, responding to a question from Senator Leahy regarding whether alternate remedies would be enough in the absence of Section 5.  McDuff stated that, "In my experience, litigation under Section 2 will not be sufficient to prevent the discriminatory voting changes that would likely reemerge in the absence of the Section 5 preclearance requirement.  Adequate legal, financial and human resources did not exist in Mississippi in the past 40 years to bring a lawsuit in lieu of every one of the 169 objections that have been issued.  Those resources do not exist today, and given persistent socio-economic disparities between Blacks and whites, I have little hope that this reality will change in the near future.  Voting rights is intensely complex litigation that is both costly and time-consuming.  To be appro-

priately presented, these cases require costly experts including historians, social scientists and statisticians, among others.  Having litigated a great number of voting rights matters in the State of Mississippi, I know that there are not enough lawyers who specialize in this area to carry the load." *May 10, 2006 Hearing*, at 96; *see id. at* 92. (Without Section 5, I fear backsliding would result.  In the 19th century, many of the gains of Reconstruction were eliminated when the federal government stopped enforcing civil rights.  The protections of Section 5 should not be withdrawn now.").

358.    Congress received the report of the National Commission on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work 1982-2005*, which found that the value of Section 5 was demonstrated by the interplay of Section 2 and Section 5 remedies recently in Charleston County, South Carolina. "At the time of the county council trial, a majority of the school board, elected by a different method from that used by the county council, was black. In 2003, while the county council case was on appeal, the South Carolina General Assembly, led by legislators from Charleston County, enacted a law changing the method of electing the school board to that which had been successfully challenged in the county council case. The Department of Justice objected to the change on the ground that it would decrease minority voting strength. The Section 5 process thus prevented the implementation of a discriminatory voting change that could have taken several years and millions of dollars to invalidate in a Section 2 lawsuit." *March 8, 2006 Hearing Vol. I*, at 176.

### K.    Evidence Before Congress: the Minimal Administrative Costs and Burdens Imposed by Section 5

359.    Congress received testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who testified that "[f]rom [his] first contact with USDOJ to the present, all my dealings as to Voting Rights Act issues have been prompt, efficient, and handled

in a friendly, yet professional matter by their attorneys and staff." *June 21, 2006 Hearing*, at 310.

360.    Mr. Wright testified that "[i]n my experience, Section 5 works effectively and efficiently. Generally, any delays in preclearance fall into four areas attributable to actions by the submitting jurisdiction: local governmental units not submitting voting changes or submitting them on a tardy basis; submissions that fail to provide the information required by state law or USDOJ regulations/guidelines to facilitate the Section 5 review process; failure to identify relevant circumstances or evidence that may delay consideration of the submission; and failure to promptly communicate with USDOJ in response to a request for additional information." *Id*. at 312.

361.    Mr. Wright further testified that "[t]he 'average' submission using the form guidelines in Subpart B of Part 51 of the CFR usually takes less than an hour to prepare and mail.  The ease and cost of such submissions also improves with the use of previous submissions in an electronic format to prepare new submissions.  In my experience, most submissions are routine matters that take only a few minutes to prepare using electronic submission formats readily available to me." *June 21, 2006 Hearing*, at 313.  In other words: "So is the current set-up a burden upon the average State or jurisdiction in regards to submission?  I would contend that it is not . . . [as shown by an informal survey in which comments were received such as:] 'preclearance requirements are routine and do not occupy an exorbitant amount of time, energy or resources'[.]" *Id.* at 12-13.

362.    Mr. Wright also stated that "[t]he costs of preclearance submissions are insignificant, except for redistricting submissions, which entail a large amount of detailed demographic information and election data.  These redistrictings generally occur on a state, county, or municipal level once every ten years since they follow the release of the new census data.  So even if they are large submissions, they are very infrequent." *Id.* at 313.

363.    Finally, Mr. Wright testified that "[p]rior to a 2005 conference on the Voting Rights Act, I communicated with election officials in a dozen North Carolina counties about their opinions of the benefits and any burdens of Section 5 preclearance. Out of the dozen, only one county elections director stated that he desired that Section 5 not be renewed.  The remainder of the directors viewed Section 5 as a manageable burden providing benefits in excess of costs and time needed for submissions." *Id.*

364.    Congress received testimony from Anita Earls that Section 5 preclearance is not a particularly burdensome process.  Ms. Earls testified that, during her tenure with the Department of Justice, the government "went to great lengths to make sure that the technology and internal operating procedures in place would facilitate electronic submission of much of the required information.  [The Department] conferred with state and local officials so we could take their concerns into account as we structured our processing of submissions.  [The Department] also modified the Section 5 regulations to make the process technically easier for jurisdictions." *May 16, 2006 Hearing*, at 64.

365.    Congress heard testimony from Armand Derfner that, based on his experience preparing Section 5 preclearance submissions, "[t]he administrative burden is not great."  Derfner testified that preparing Section 5 preclearance submissions is "a task that is typically a tiny reflection of the work, thought, planning, and effort that had to go into making the [election] change to begin with.  For example, even a polling place change, it is a small change, but the submission is also small, and typically the work involved in submitting a polling place change is less than the work it took to find a new polling place to begin with. . . . [I]f there is a sudden need for a new polling place, that can be pre-cleared very swiftly if there is an election coming up." *May 17, 2006 Hearing*, at 10-11.

366.    Congress received evidence from Fred Gray who noted that the deterrent effect of Section 5 is very important, and outweighs the "small administrative act" which covered jurisdictions submit themselves to and are now used to doing.  Gray offered a cost-benefit analysis in support of reauthorization finding that Section 5 had a very low burden but relatively high value—cost-benefit analysis favors reauthorization.  *Id.* at 25.

367.    Congress received evidence from Debo Adegbile that the Department of Justice "applies the preclearance standard with a degree of flexibility that takes into account the nature of the electoral change being reviewed, and the time before the proposed change would take effect." As Adegible testified, "[f]or example, last minute polling place changes will be reviewed quickly before elections, whereas for more complex changes, the DOJ will be more likely to use its statutorily given 60-day review period.  The DOJ's actions following Hurricanes Katrina and Rita further illustrate the flexible nature of preclearance review.  After the hurricanes, the DOJ immediately sent a letter to the Secretaries of State in Mississippi and Louisiana acknowledging that they would be ready to expedite voting changes."  *June 21, 2006 Hearing*, at 141-142.

III.    **Sufficiency of the 2006 Legislative Record for Reauthorization of Section 5**

        A.    **Reauthorization Is Supported by the Record**

368.    The House Judiciary Committee stated that "[i]n reauthorizing the temporary provisions for an additional 25 years, the Committee is aware that it is again acting under its broadest power—to remedy continued discrimination." H.R. Rep. No. 109-478, at 53.  Citing the Supreme Court's decision in *South Carolina v. Katzenbach*, the House Committee further stated that Congress has broad powers to remedy discrimination in voting and that "[l]egislation need not deal with all phases of a problem in the same way, so long as the distinctions drawn have some basis in practical experience."  *Id.* at 54-55.

369.   The House Judiciary Committee stated that "in reauthorizing the temporary provisions for an additional 25 years, the Committee looks to related Supreme Court decisions, such as *Tennessee v. Lane*, to address constitutional concerns about continued reauthorizations of the VRA.  In *Tennessee v. Lane*, the Court noted that 'The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination.'  Similar circumstances are true of the VRA: despite previous reauthorizations, the problem of voting discrimination justified reauthorization.  In light of the considerable record before it, the Committee has a duty to maintain the protections afforded by the temporary provisions by reauthorizing these vital provisions."  *Id.* at 56.

370.   The House Judiciary Committee found that evidence supporting renewal of the temporary provisions of the Voting Rights Act "far exceeds the quantum of evidence found adequate in other contexts (in which Congress's power is less broad) to justify Congressional action to remedy discrimination."  The Committee cited to the evidence supporting a provision in the Family and Medical Leave Act that the Supreme Court found constitutional in *Nevada Department of Resources v. Hibbs*.  *Id.* at 57.

371.   The House Judiciary Committee stated that "[t]he record before the Committee reveals that extending the VRA's temporary provisions is necessary to protect racial and language minority citizens located in covered jurisdictions from discrimination.  As a result, the gains achieved by minority voters over the last 40 years are vulnerable without the protections afforded by the temporary provisions.  It is in light of this reality that the Committee concludes that the temporary provisions of the VRA must be reauthorized, including Section 4(a)(8) and the provisions it triggers, as well as Section 203, for an additional 25 years."  *Id.* at 56.

372.     Representative John Conyers of Michigan testified before the Senate Judiciary Committee that the inquiry conducted by the House Judiciary Committee "broke down into two fundamental questions: Is there an adequate record of discrimination to justify reauthorization of the expiring provisions, and are the expiring provisions, as interpreted by the courts, still adequate to protect the rights of minority voters.  While there is so much to celebrate over the last 40 years, our record indicates that we have not yet reached the point where the special provisions of the Act should be allowed to lapse.  As some might have you believe, efforts to suppress or dilute minority votes, I report to you sadly, are still all too common." *April 27, 2006 Hearing*, at 8.

373.     Congress received testimony from Armand Derfner explaining that the question before Congress is "not whether passing the Act in the first instance today would be justified, but whether the covered jurisdictions . . . have changed enough to allow Congress to remove its protections."  Derfner further testified that "the evidence on which Congress has acted in previous reauthorizations, and which it must judge now, is the evidence of continuing voting discrimination in the present and the very recent past (namely, since the last reauthorization in 1982).  There is abundant evidence since 1982 of a need to continue protecting minority citizens in the covered jurisdictions from their own governments.  Therefore, the evidence here is not 40 years old." *May 17, 2006 Hearing*, at 74.

374.     Congress received testimony from Nadine Strossen that Section 5 of the Voting Rights Act satisfies the congruence and proportionality standard set forth in the *City of Boerne* case.  Ms. Strossen stated that the preclearance requirement of Section 5 is congruent to preventing on-going voting rights abuses, particularly in light of the availability of bailout, the "extensive record of continued voting rights discrimination developed in the congressional record to-date," and the provision's limited duration.  Ms. Strossen further testified that the preclearance re-

quirement of Section 5 is proportional to the injury because it "does not apply nationally, but on-ly to limited jurisdictions with histories of voting discrimination; the bailout provisions allow jurisdictions to avoid preclearance by demonstrating they have been free of discriminatory voting practices; and Section 5 contains a sunset provision under which it lapses without reauthorization from Congress." *March 8, 2006 Hearing Vol. I*, at 1286; *see also id.* at 1285 (testimony of Na-dine Strossen) (noting that the Supreme Court in *Boerne* "explicitly pointed to the Voting Rights Act as an example of appropriate congruent and proportional remedial action by Congress.").

375.     Congress heard testimony from Professor Pamela Karlan who testified that, in reauthoriz-ing the Voting Rights Act, "Congress's power here is, if anything, at its absolute peak. . . . [T]he post-*Boerne* cases all cite the Voting Rights Act of 1965 as the example of a statute that meets the *Boerne* test of being congruent and proportional." *May 16, 2006 Hearing*, at 21; *see also May 9, 2006 Hearing*, at 158 (testimony from Theodore Shaw endorsing the same points).

**B.      The Difference Between Enactment and Reauthorization**

376.     Congress received testimony from Anita Earls that "[s]ome scholars suggest that the Constitutional standard under *City of Boerne* is somewhat different when Congress is enacting a new law rather than simply continuing an existing remedial program." *Id.* at 49.

377.     Congress heard testimony from Professor Pamela Karlan that the constitutionality of the Section 5 reuauthorization is "unlike all of the previous *Boerne* line of cases that have come be-fore the Court, [because it] deals with a renewal of an act that is already in place." Professor Karlan further testified that "[t]he analogy is if you have a really bad infection and you go to the doctor, they give you a bunch of pills, and they tell you, 'Do not stop taking these pills the minute you feel better.  Go through the entire course of treatment because, otherwise, the disease will come back in a more resistant form.'  And the Voting Rights Act is strong medicine, but it

needs to finish its course of treatment, and that has not yet happened for reasons that you have heard from other witnesses." *Id.* at 5.

378.    In her responses to questions submitted by Senator Patrick Leahy, Professor Pamela Karlan noted that, in reauthorizing Section 5, "Congress can rely on the evidence in the legislative history underlying the Act's original passage as well as its amendment and extension in 1970, 1975, and 1982, as well as evidence of discrimination during the past 24 years.  That is, the justification for the Act rests not only on examples of discrimination that have occurred since the last renewal, but also on Congress's understanding that the discrimination occurred against a backdrop of prior pervasive discrimination and efforts to eradicate it." *Id.* at 92.

### C.    The Sufficiency of the Record Compared to 1982

379.    The House Judiciary Committee noted that "more Section 5 objections were lodged between 1982 and 2004 than were interposed between 1965 and 1982 and that such objections did not encompass minor inadvertent changes."  The House Judiciary Committee concluded that "[t]his increased activity shows that attempts to discriminate persist and evolve, such that Section 5 is still needed to protect minority voters in the future."  H.R. Rep. No. 109-478, at 21.

380.    The House Judiciary Committee cited the report of the National Commission on the Voting Rights Act, finding that "in nine of the sixteen Section 5-covered states, more objections were interposed after 1982 than before." *Id.* at 37, 92-93.

381.    Congress received testimony from Drew Days, that, "while not identical to that of 1982, [the current legislative record] shares many critical features: there is progress side-by-side with continuing discrimination; there are many egregious examples of violations of voting rights; last minute, drastic polling place changes, and familiar dilutive tactics through methods of 'cracking' and 'packing'; and racial campaign appeals but also a more carefully considered record on Section 5's deterrent effects, and the operation of Section 203.  Overall I believe that the record is

consistent with that assembled in 1982.  Both the quantity and quality of the evidence is strong." *May 17, 2006 Hearing*, at 54.

### D.   Congressional Consideration of the Coverage Formula

382.   The House Judiciary Committtee found that reauthorization of Section 5 generally is "necessary to protect racial and language minority citizens located in covered jurisdictions from discrimination," but that "termination of covered status has been and continues to be within the reach of compliant covered jurisdictions and [the Committee] hopes that more covered States and political subdivisions will take advantage of the process."  H.R. Rep. No. 109-478, at 56, 58.

383.   Representative Norwood offered an amendment to H.R. 9 to alter the coverage trigger based on "a rolling test based off of the last three presidential elections. Any state would be subject to Section 5 if it currently has a discriminatory test in place or voter turnout of less than 50% in any of the three most recent presidential elections."  H.R. Rep. 109-516 at 2.  Congress rejected the amendment by a vote of 318 to 96.  152 Cong. Rec. H5204 (July 13, 2006).

384.   Representative Norwood stated that, under his proposal, "there would be a minimum of 1,010 covered jurisdictions all across the country in 39 States."  *Id*. at H5179-81 (July 13, 2006).

385.   Representative Sensenbrenner stated that Representative Norwood's proposal "guts the Voting Rights Act. … [O]nly the State of Hawaii in its entirety would be covered, along with random scattershot jurisdictions across the country that do not have the century-long history of discrimination that the covered States do, and which the Supreme Court requires for the application of the preclearance and Federal observer conditions contained in the VRA.  The amendment not only guts the bill, but turns the Voting Rights Act into a farce."  *Id*.

386.   Representative Westmoreland proposed an amendment "for an expedited, proactive procedure to bail out from coverage under the preclearance portions of the Voting Rights Act, by requiring the Department of Justice to assemble a list of all jurisdictions eligible for bailout and

to notify the jurisdictions. The Department of Justice is then required to consent to the entry of a declaratory judgment allowing bailout if a jurisdiction appears on the list." H.R. Rep. No. 109-554 at 2.  Congress rejected the amendment by a vote of 302-118.  152 Cong. Rec. H5206.

387.    Representative Conyers stated that the Westmoreland Amendment "has some huge problems. . . .  There is no way the existing staff can possibly do what this calls for and make a binding determination of eligibility for bailout. And plus, we do not include one dime in this proposal to take care of all of this.  We turn section 5 on its head, and we will not be stopping voting discrimination.  This amendment would cripple the Voting Section at the Department of Justice, making enforcement of the Act nearly impossible. There are 900 jurisdictions covered by section 5. How could we do a report on them every year?"  152 Cong. Rec. at H5202-03 (July 13, 2006).

388.    In the House Judiciary Committee, Representative Lundrgen proposed an amendment which would have modified the coverage provision by exempting three California counties "where U.S. military bases constituted a substantial portion of the county's resident population." H.R. Rep. No. 109-478, at 155.  He subsequently withdrew his amendment.  *Id.* at 165.

389.    Congress received testimony from Anita Earls that the Section 4 trigger is neither under-inclusive nor over-inclusive.  Ms. Earls testified that the trigger is not under-inclusive because the Voting Rights Act "also gives a court the power to initiate Section 5 coverage by court order in any proceeding instituted by the Attorney General or an aggrieved person where the court finds that violations of the fourteenth or fifteenth amendment justify equitable relief. . . .  Thus, coverage can be expanded to include jurisdictions where there are serious constitutional violations and the risk is great of continued barriers to minority political participation."  Ms. Earls further testified that the trigger is not over-inclusive because of "the more than ample 'bailout' provisions[.]"  *May 16, 2006*, at 42.

390.    Congress received testimony from Drew Days, that "[a]s in 1982 . . . I believe Congress should preserve the use of the presidential elections of 1964, 1968, and 1972 in the reauthorized formula, given the past reliability of the formula in appropriately targeting jurisdictions for pre-clearance with a historical pattern of voting discrimination that Congress must consider.  The original coverage formula considered whether a jurisdiction had employed a test or device and the level of voter turnout and registration. Accordingly, it bears emphasis that the depressed turnout and registration levels were an indicator of the larger problem of entrenched discrimination in voting that Congress intended to address and not the end itself."  He further testified that "the current trigger formula still works in most instances to correctly identify those jurisdictions where preclearance is necessary given past and current patterns of discrimination[.]" *May 17, 2006 Hearing*, at 32-34.

391.    Congress received testimony from Armand Derfner that he would not support updating the coverage formula to refer to the presidential elections of 2000 and 2004.  Derfner testified that "[b]ased on the records before Congress at those times, the litmus test was remarkably accurate in pinpointing those places where the malignancy existed and in generally leaving alone those places where it did not.  Thus, the purpose of the original triggers has no logical connection with mere showings of low voter participation in a particular recent election in a given jurisdiction." *May 17, 2006 Hearing*, at 73.

392.    Congress heard testimony from Professor Pamela Karlan that the current coverage formula is neither unconstitutionally over- nor under-inclusive.  With regard to the issue of over-inclusiveness, Professor Karlan cited the bailout provision, whereby "jurisdictions that ought not be covered, but that are brought within the trigger, can get out."  With regard to the issue of under-inclusiveness, Professor Karlan cited the "pocket trigger" (or bail-in), which allows a court

to order that a jurisdiction exhibiting pervasive intentional discrimination against minority voters be brought within Section 5 coverage.  Professor Karlan testified that the pocket trigger was used in an Arkansas jurisdiction, "which . . . is one of the worst States in the south because it wasn't brought within the Voting Rights Act in 1965."  *May 16, 2006 Hearing*, at 13.

### E.   The Length of the Renewal Period

393.    Citing *City of Rome v. Untied States*, 446 U.S. 156, 182 (1990), the House Judiciary Committee stated that, "[i]n upholding the 1975 VRA extension, the Supreme Court noted that a 7-year extension was 'plainly constitutional' in light of the 95-year period of pervasive discrimination it was attempting to remedy."  The Committee concluded that extending the temporary provisions until 2032 is appropriate "given the near century of discrimination the Act is designed to combat."  H.R. Rep. No. 109-478, at 57-58.

394.    Congress received testimony from Drew Days stating that "[t]he period of time between congressional review of the Voting Rights Act's temporary provisions is a policy choice soundly committed to Congress to be determined in light of the evidence presented in this renewal process, as well as previous ones.  When it enacted the Voting Rights Act in 1965, Congress hoped that issues of racial discrimination in elections would be resolved quickly.  The four occasions on which Section 5 of the VRA previously was considered arguably make it the most carefully reviewed civil rights measure in our nation's history.  Each time the duration of the law was weighed in light of Congress's assessment of the persistence of discrimination that it sought not to lessen, but to eradicate.  Today, as in 1982, we have learned that voting discrimination is more entrenched than we had hoped.  In fact, though some historical means of discrimination are less pervasive, new and creative methods of discrimination in the political process continue to emerge.  Consequently, a Congressional policy decision to apply a renewed Section 5 provision

for another 25 years should be based on the full record of Congressional experience under the Act." *May 17, 2006 Hearing*, at 42.

## IV.   Amendments to the Section 5 Preclearance Standard

### A.   Overview

395.    Congress determined that:  "The effectiveness of the Voting Rights Act of 1965 has been significantly weakened by the United States Supreme Court decisions in Reno v. Bossier Parish II and Georgia v. Ashcroft, which have misconstrued Congress' original intent in enacting the Voting Rights Act of 1965 and narrowed the protections afforded by section 5 of such Act." Pub.L. No. 109-246 § 2(b)(6), 120 Stat. 577, 578.

396.    The House Judiciary Committee found that in these cases "the Supreme Court has inter- preted Section 5 to allow preclearance of voting changes that would have previously drawn ob- jections."  The Committee also found "that Congress did not intend for the burden of proof to be placed on covered jurisdictions to be weakened in the way that the Supreme Court rulings in these cases permit."  H.R. Rep. No. 109-478, at 65.

### B.   Reno v. Bossier Parish School Board (Bossier II), 528 U.S. 320 (2000)

397.    The House Judiciary Committee Report stated that the Supreme Court in *Bossier II* "se- verely limited the reach of Section 5's 'purpose' requirement, announcing that 'Section 5 pre- vents nothing but backsliding,' such that a jurisdiction must prove only that its purpose in enact- ing a voting change is not retrogressive."  *Id.* at 66.

398.    The House Judiciary Committee Report stated that "[t]hrough the 'purpose' requirement, Congress sought to prevent covered jurisdictions from enacting and enforcing voting changes made with a clear racial animus, regardless of the measurable impact of such discriminatory changes." It further stated that "[t]he Committee heard testimony revealing that for more than 30

years [prior to *Bossier II*], the purpose standard has been unbroken, barring those plans that were motivated by a discriminatory intent." *Id.* at 66-67.

399.    The House Judiciary Committee Report stated that "[v]oting changes that 'purposefully' keep minority groups 'in their place' have no role in our electoral process and are precisely the types of changes Section 5 is intended to bar. To allow otherwise would be contrary to the protections afforded by the 14th and 15th amendment and the VRA." *Id.* at 68.

400.    The House Judiciary Committee received testimony that the discriminatory purpose requirement in place prior to *Bossier II* was the basis for 83 objections that were interposed during the 1980's and 151 objections interposed in the 1990's.  These "objections accounted for 25 percent and 43 percent of all objections interposed, respectively."  The House Judiciary Committee found that, "[s]ince *Bossier II* . . . less than 1 percent of the objections that have been interposed have been on the basis of the purpose prong alone, supporting the perception that only an 'incompetent retrogressor' can be caught and denied preclearance under Section 5." *Id.* at 67.

401.    The House Judiciary Committee acknowledged concerns by some that by amending the purpose prong of Section 5 to bar "any discriminatory purpose," would make Section 5 "standardless" and "unadministerable."  The Committee found the concerns to be unfounded because the amendment was "intended to restore the 'discriminatory purpose' standard that was in place and administered until 2000" and that "the factors set out in *Village of Arlington Heights et al. v. Metropolitan Housing Development Corporation et. al.* provide an adequate framework for determining whether voting changes submitted for preclearance were motivated by a discriminatory purpose." *Id.* at 68.

402.    Congress received testimony from several voting rights attorneys that *Bossier II* reversed decades of legal interpretation and practice, under which any voting change that involved inten-

tional racial discrimination, whether or not it was retrogressive, violated Section 5. *November 1, 2005 Hearing*, at 7, 10 (statement of former Department of Justice voting rights attorney Mark Posner that, "[f]or over 34 years prior to . . . [*Bossier II*], section 5 prohibited the implementation of voting changes adopted with a racially discriminatory purpose."); *May 4, 2006 Hearing Part I*, at 44 (statement of Debo Adegbile referencing several Supreme Court cases which stand for the proposition that any purposeful discrimination should not be precleared, and noting that "nothing in the text of Section 5 or the Constitution was understood to require the rule of *Bossier II*."); *November 1, 2005 Hearing*, at 19 (statement of Brenda Wright, pointing to the 1975 case *City of Richmond v. U.S.*, 422 U.S. 358 (1975), in which the Court held that a voting change which had no unlawfully discriminatory effect was still barred by Section 5 because the voting change was made with the intent to discriminate against black voters and this violated both the Voting Rights Act and the Constitution); *May 9, 2006 Hearing*, at 182 (statement of Theodore Shaw that, "[p]rior to *Bossier II*, in over 30 years of enforcement of the Voting Rights Act . . . [DOJ] had consistently interpreted § 5 to require covered jurisdictions to show that their voting changes were enacted without an unconstitutionally discriminatory purpose").

403.    Congress received evidence from Mark Posner who stated that the Department of Justice had long used the *Arlington Heights* factors to determine whether a change was based on unconstitutional purpose.  Posner provided evidence regarding the origins of DOJ's purpose-based objections in the 1980s and 1990s.  Posner stated that, "[t]he 1980s increase in the number of purpose objections to non-retrogressive changes began in the Reagan Administration under the leadership of then Assistant Attorney General William Bradford Reynolds.  These objections first took full flower in the Department's reviews of post-1980 redistrictings by Mississippi counties. During Mr. Reynolds' tenure, the Department interposed about twenty-five objections to nonre-

trogressive Mississippi plans based on discriminatory purpose."  Posner further noted that, in the

1990s, "[t]he modes of analysis forged under Mr. Reynolds then were applied by the Justice De-

partment to the post-1990 redistrictings and to the continuing submission of election method

changes.  For example, about a fifth of the total number of 1990s purpose redistricting objections

were again to plans enacted by Mississippi counties.  The other states in which a large number of

purpose redistricting objections were interposed were Louisiana and Texas.  The Texas objec-

tions were particularly notable as the Section 5 concern often was that jurisdictions were seeking

to limit the growing political power of Hispanic voters."  *November 1, 2005 Hearing*, at 8, 15-

16.

### C.    *Georgia v. Ashcroft*, 539 U.S. 461 (2003)

404.    The House Judiciary Committee stated that *Georgia v. Ashcroft* "construed Section 5 to

narrow its reach, significantly restricting the scope of the 'effect' prong and weakening Section

5's protection of minority groups from voting changes that diminish their ability to elect their

preferred candidates of choice." H.R. Rep. No. 109-478, at 68.

405.    The House Judiciary Committee found the holding in *Georgia v. Ashcroft* to be "incon-

sistent with the original and current purpose of Section 5."  The Committee stated, "[t]he prec-

learance provisions in Section 5 were and are intended to put the burden of proof on covered ju-

risdictions to demonstrate they are not enacting voting changes that diminish the ability of mi-

norities to elect their preferred candidates of choice.  Directly contrary to that proposition, *Geor-

gia v. Ashcroft* appears to hold that courts should defer to the political decisions of States rather

than the genuine choice of minority voters regarding who is or is not their candidate of choice."

The Report interpreted *Georgia v. Ashcroft* to mean that  "the Supreme Court would allow the

minority community's own choice of preferred candidates to be trumped by political deals struck

by State legislators purporting to give 'influence' to the minority community while removing that community's ability to elect candidates." *Id.* at 69.

406.    The House Judiciary Committee stated that "[o]ver the last 30 years, Section 5's 'effect' prong has served to protect the minority communities' ability to elect candidates of choice in covered jurisdictions. In particular, the Committee heard testimony describing the 'judicial development of the retrogression standard' and the importance of the standard in protecting minority voters and their ability to elect candidates of their choice.  Since the Supreme Court's decision in *Beer v. United States*, it was accepted that if 'the ability of minority group's ability to elect candidates of choice to office is diminished, Section 5 requires the denial of preclearance.'" *Id*.

407.    The House Judiciary Committee Report stated that "[t]he Committee believes that the gains made by minority communities in districts represented by elected officials of the minority communities' choice would be jeopardized if the retrogression standard, as altered by the Supreme Court in *Georgia*, remains uncorrected."  Specifically, the Committee noted that it "is concerned by testimony indicated that '[m]inority influence is nothing more than a guise for diluting minority voting strength.'"  The Committee further noted that it heard evidence "that Section 5, if left uncorrected, would now allow 'States to turn black and other minority voters into second class voters who can influence elections of white candidates, but who cannot elect their preferred candidates, including candidates of their own race.'" *Id.* at 70.

408.    The House Judiciary Committee "was persuaded by testimony revealing that the current interpretation 'permits a jurisdiction to choose among different theories of representation, introduces a substantial uncertainty for minority communities into a statute that was specifically intended to block persistent and shifting efforts to limit the effectiveness of minority political participation.'" *Id.*

409.    In amending Section 5 to add a new subsection (b), the House Judiciary Committee clari-

fied "that in making preclearance determinations under Section 5, the comparative 'ability [of the

minority community] to elect preferred candidates of choice' is the relevant factor to be eva-

luated when determining whether a voting change has a retrogressive effect."  The intent of the

Committee was to restore the "standard of analysis articulated by the Supreme Court in *Beer v.*

*United States*, the retrogression standard of analysis on which the Court, the Department of Jus-

tice, and minority voters relied for 30 years."  *Id.* at 70-71.

410.    Congress received evidence that the standard enunciated by the Supreme Court in *Geor-*

*gia v. Ashcroft* is vague and difficult to apply.  Voting rights attorney Laughlin McDonald ob-

served that, "[t]he opinion of the majority introduced new, vague and difficult to apply, and con-

tradictory standards.  According to the Court, the ability to elect is 'important' and 'integral,' but

a court must now also consider the ability to 'influence' and elect 'sympathetic' representatives.

The Court took a standard that focused on the ability to elect candidates of choice, that was un-

derstood and applied, and turned it into something subjective, abstract, and impressionistic." *No-*

*vember 9, 2005 Hearing*, at 53 (internal citations omitted).  *See also May 16, 2006 Hearing*, at 9

(Theodore Arrington:  "[t]here are no clear guidelines for measuring influence districts or subs-

tantive representation.");  *May 4, 2006 Hearing Part I*, at 50 (Debo Adegbile: "[t]he influence

theory eradicates any meaningful benchmark analysis because it invites wholly incongruous

comparisons"); *November 9, 2005 Hearing*, at 136 (Robert Kengle: "the *Ashcroft* decision does

not provide a judicially manageable standard for making the comparisons that it requires"); *May*

*16, 2006 Hearing*, at 193  (Pamela Karlan:  "nebulous and speculative standard").

411.    Congress received testimony from Laughlin McDonald that, "[t]he inability of blacks to

exercise the franchise effectively in so-called influence districts is apparent from the lack of elec-

toral success of black candidates in majority white districts.  As of 2002, of the ten blacks elected

to the state senate in Georgia, all were elected from majority black districts (54% to 66% black

population).  Of the 37 blacks elected to the state house, 34 were elected from majority black dis-

tricts.  Of the three who were elected from majority white districts, two were incumbents.  The

third was elected from a three-seat district." *November 9, 2005 Hearing*, at 53 (internal citations

omitted).

412.     Congress received evidence from Drew Days who, drawing on his experience administer-

ing Section 5, stated that "[t]he problem with the *Georgia v. Ashcroft* 'influence' test is not that

there could never be a situation where minority influence is discernible and important, but as a

former DOJ official responsible for administering the Voting Rights Act it seems clear to me that

ferreting out such instances consistently is simply unrealistic.  Furthermore, I believe that such a

standard in many ways constitutes an open invitation to mischief.  For instance, the pursuit of an

influence trade-off theory could be used to cloak purposefully retrogressive or discriminatory

actions from effective Section 5 review."  Days stated that, "left unchecked, the *Georgia* deci-

sion may allow jurisdictions to return to intentional discrimination when redistricting, with no

viable check on their ability to do so."  *May 17, 2006 Hearing*, at 40, 58-59; *see also*, *May 4,

2006 Hearing Part I*, at 50 (Debo Adegbile: "[t]he pursuit of an influence theory will likely be

used to cloak and protect intentionally discriminatory or retrogressive acts from meaningful Sec-

tion 5 review."); *May 17, 2006 Hearing*, at 93 (testimony of Fred Gray that the influence district

standard may invite elimination of majority black districts, particularly where there is severe ra-

cially polarized voting as in Alabama).

413.     Congress received testimony from Professor Nathaniel Persily, explaining that districts

that can elect "the 'preferred candidate of choice' of the minority community does not mean [that

a] minority candidate [will be elected].  Minorities can prefer particular white candidates, just as white communities can prefer particular minority candidates . . . [Thus,] districts that happen to be majority-minority, even substantially so, [can] still elect white candidates . . .. [Persily went on to explain that] it [was] important to make this point in case the ability to elect standard be seen as affirmative action for minority candidates.  It is not.  Its focus is on minority voters and ensuring that their ability to elect their preferred candidates, whatever their race, is not diminished by changes in voting laws." *May 17, 2006 Hearing*, at 119.

November 15, 2010                                    Respectfully submitted,

                                                     */s/ Mark A. Posner*
                                                     JON M. GREENBAUM (D.C. Bar No.
                                                     489887)
                                                     ROBERT A. KENGLE
                                                     MARCIA JOHNSON-BLANCO
                                                     MARK A. POSNER (D.C. Bar No. 457833)
                                                     Lawyers' Committee for Civil Rights
                                                       Under Law
                                                       1401 New York Avenue, NW
                                                       Suite 400
                                                       Washington, DC 20005
                                                       Tel. (202) 662-8325
                                                       Fax (202) 783-0857
                                                       jgreenbaum@lawyerscommittee.org
                                                       bkengle@lawyerscommittee.org
                                                       mblanco@lawyerscommittee.org
                                                       mposner@lawyerscommittee.org

                                                     JOHN M. NONNA (pending pro hac vice
                                                     admission)
                                                     AUTUMN KATZ(pending pro hac vice admission)
                                                     DANIEL STABILE (pending pro hac vice
                                                     admission)
                                                     DAVID COOPER  (pending pro hac vice
                                                     admission)
                                                     DEWEY & LEBOEUF LLP
                                                       1301 Avenue of the Americas
                                                       New York, NY 10019
                                                       Tel. (212) 259-8311

145

Fax (212) 649-9461

Attorneys for Defendant-Intervenor Harris

*Filed with permission*
LAUGHLIN MCDONALD
NANCY ABUDU
American Civil Liberties Union
  Foundation, Inc.
  230 Peachtree Street, NW
  Suite 1440
  Atlanta, GA 30303-1227
  (404) 523-2721
  (404) 653-0331 (fax)
  lmcdonald@aclu.org

ARTHUR B. SPITZER (D.C. Bar. No.
  235960)
  American Civil Liberties Union of the
  Nation's Capital
  1400 20th Street, N.W., Suite 119
  Washington, DC 20036
  Tel. (202) 457-0800
  Fax (202) 452-1868
  artspitzer@aol.com

LAURA D. BLACKBURNE
Interim General Counsel
NAACP
  4805 Mt. Hope Drive
  Baltimore, MD 21215-3297
  (410) 580-5791
  (410)358-9350 (fax)
  lblackburne@naacpnet.org

VICTOR L. GOODE
Assistant General Counsel
NAACP
  4805 Mt. Hope Drive
  Baltimore, MD 21215-3297
  (410) 580-5120
  (410) 358-9350 (fax)
  vgoode@naacpnet.org

146

ALLISON E. NEAL
American Civil Liberties Union of Alabama
207 Montgomery Street, Suite 910
Montgomery, AL 36104
(334) 265-2754
(334) 269-5666 (fax)
anaclual@bellsouth.net

Attorneys for Defendant-Intervenors Pierson, et al.


*Filed with permission*
JOHN PAYTON
Director-Counsel
DEBO P. ADEGBILE
KRISTEN M. CLARKE (D.C. Bar No. 973885)
RYAN P. HAYGOOD
DALE E. HO
NAACP Legal Defense and
Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, New York 10013
(212) 965-2200

SAMUEL SPITAL
Squire, Sanders & Dempsey L.L.P.
30 Rockefeller Plaza
New York, NY 10112
(212) 872-9800

Attorneys for Defendant-Intervenors Cunningham, et al.

147

Certificate of Service

I hereby certify that on November 15, 2010, I served foregoing document through the

District Court's ECF system on all counsel of record.

*/s/ Mark A. Posner*

Counsel for Defendant-Intervenor Harris