**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHELBY COUNTY, ALABAMA

*Plaintiff,*

v.

ERIC H. HOLDER, JR., in his official capacity
as Attorney General of the United States of
America

*Defendant*,

EARL CUNNINGHAM, HARRY JONES,
ALBERT JONES, ERNEST MONTGOMERY,
ANTHONY VINES and WILLIAM WALKER;
BOBBY PIERSON, WILLIE GOLDSMITH
SR., KENNETH DUKES, MARY PAXTON-
LEE, and the ALABAMA STATE
CONFERENCE OF THE NAACP; and BOBBY
LEE HARRIS,

*Defendant-Intervenors*.

Civil Action No. 1:10-CV-651
(JDB)

**CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF CUNNINGHAM DEFENDANT-INTERVENORS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................1

I.   THE SUBSTANTIAL LEGISLATIVE RECORD OF SEVERE AND PERSISTENT
     VOTING   DISCRIMINATION   IN   THE   COVERED   JURISDICTIONS
     DEMONSTRATES THAT SECTION 5 PRECLEARANCE IS CONSTITUTIONAL .........4

     A. The 2006 VRA Reauthorization Record Reveals Widespread and Intentional
        Discrimination Throughout the Covered Jurisdictions, and Amply Supports the
        Exercise of Congress's Expressly Granted Remedial Powers .............................................5

          1.   The Congressional Record Contains Numerous Examples of Repeated and
               Intentional Violations of Minority Voting Rights in the Covered
               Jurisdictions ................................................................................10

               a.  *Mississippi's Dual Registration* ..............................................................10

               b.  *Recent Discriminatory Methods of Election Adopted by South
                   Carolina* ..........................................................................11

               c.  *Discriminatory Statewide Redistrictings in Louisiana, Mississippi,
                   Alabama, Arizona, Texas and South Dakota* .............................................12

               d.  *Discriminatory Methods of Election at the Local Level* ..........................15

               e.  *Discrimination When Minorities Are on the Verge of Exercising
                   Political Power* .........................................................................17

               f.  *Discriminatory Barriers to Registration and Polling Place Access* ..........19

          2.   The Record Demonstrates that Case-by-Case Litigation Is Inadequate to
               Resolve the Problem of Ongoing Voting Discrimination.....................................21

     B. The 2006 Reauthorization Is Constitutional Under *City of Rome* .....................................22

     C. The 2006 Reauthorization Is Constitutional Under the Court's *Boerne* Precedents .........26

II.  CONGRESS'S DECISION TO RETAIN THE EXISTING GEOGRAPHIC SCOPE
     OF SECTION 5 COVERAGE WAS WELL-SUPPORTED BY THE LEGISLATIVE
     RECORD   AND   REMAINS   WITHIN   CONGRESS'S   CONSTITUTIONAL
     AUTHORITY ....................................................................................29

     A. Congress's Decision to Maintain the Existing Geographic Scope of Section 5
        Coverage was Reasonable......................................................................33

i

1.      Successful Section 2 Suits ........................................................................33

2.      Racially Polarized Voting; Discrimination-Enhancing Electoral Devices; Racial Appeals; and the Lack of Minority Electoral Success...............................36

3.      Federal Observers ...................................................................................38

4.      The State Reports Before Congress Confirm that Congress Made a Reasonable Distinction Between the Covered and Non-Covered Jurisdictions ...........................................................................................40

B.  The VRA Contains Built-In Features That Confirm Its Constitutionality........................41

1.      The Bailout Provision Allows Covered Jurisdictions To End Section 5 Coverage When It Is No Longer Appropriate ........................................42

        a.   The Requirements for Bailout Are Reasonable and Easy to Satisfy ..........42

        b.   Shelby County's Ineligibility for Bailout Is Irrelevant to this Action ........44

2.      The Section 3(c) "Bail-In" Provision Allows Non-Covered Jurisdictions to Come Within the Scope of Section 5 Coverage When Appropriate.....................45

CONCLUSION...............................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Alden v. Maine*,
527 U.S. 706 (1999)..................................................................................................28

*Allen v. State Board of Elections*,
393 U.S. 544 (1969) ................................................................................................23

*Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977)................................................................................................7, 10

*Board of Trustees of the University of Alabama v. Garrett*,
531 U.S. 356 (2001)..................................................................................................30

*Bone Shirt v. Hazeltine*,
336 F. Supp. 2d 976 (D.S.D. 2004), *aff'd*, 461 F.3d 1011 (9th Cir. 2006)................15

*City of Boerne v. Flores*,
521 U.S. 507 (1997)......................................................................................... *passim*

*City of Pleasant Grove, Alabama v. United States*,
479 U.S. 462 (1987)..................................................................................................44

*City of Rome v. United States*,
446 U.S. 156 (1980)......................................................................................... *passim*

*Clark v. Putnam County*,
168 F.3d 458 (11th Cir. 1999) ................................................................................34

*County Council of Sumter County v. United States*,
No. 82-0912, 1983 U.S. Dist LEXIS 20145 (D.D.C. 1983) .......................................32

*Dillard v. City of Foley*,
926 F. Supp. 1053 (M.D. Ala. 1995)..........................................................................20

*Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*,
527 U.S. 627 (1999)................................................................................................27, 30

*Georgia v. United States*,
411 U.S. 526 (1973)....................................................................................................5

*Jeffers v. Clinton*,
740 F. Supp. 585 (E.D. Ark. 1990) ..........................................................................45

*Lopez v. Monterey County*,
525 U.S. 266 (1999)............................................................................................5, 27, 33

*League of United Latin American Citizens ("LULAC") v. Perry*,
548 U.S. 399 (2006)................................................................................13, 14, 34, 37

*Miller v. Johnson*,
515 U.S. 900 (1995)................................................................................................7, 34

*Mississippi State Chapter, Operation PUSH v. Allain*,
    674 F. Supp. 1245 (N.D. Miss. 1987) ............................................................................10

*Mississippi State Chapter, Operation PUSH v. Mabus*,
    932 F.2d 400 (5th Cir. 1991) .......................................................................................10

*Moon v. Meadows*,
    952 F. Supp. 1141 (E.D. Va. 1997) .............................................................................34

*Nevada Department of Human Resources v. Hibbs*,
    538 U.S. 721 (2003).........................................................................................5, 27, 28

*Northwest Austin Municipality Utility District Number One v. Holder*,
    129 S. Ct. 2504 (2009).......................................................................................... *passim*

*Northwest Austin Municipality Utility District Number One v. Mukasey*,
    573 F. Supp. 2d. 221 (D.D.C. 2008) ................................................................. *passim*

*Oregon v. Mitchell*
    400 U.S. 112 (1970).....................................................................................................27

*Rice v. Cayetano*,
    528 U.S. 495 (2000).....................................................................................................27

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
    490 U.S. 477 (1989).....................................................................................................26

*Rogers v. Lodge*,
    458 U.S. 613 (1982)...............................................................................................34, 37

*Shaw v. Reno*,
    509 U.S. 630 (1993).....................................................................................................34

*Smith v. Beasley*,
    946 F. Supp. 1174 (D.S.C. 1996)................................................................................34

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966)............................................................................................. *passim*

*Tennessee v. Lane*,
    541 U.S. 509 (2004)..................................................................................................5, 29

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)................................................................................................34, 37

*United States v. Charleston County*,
    316 F. Supp. 2d 268 (D.S.C. 2003), *aff'd*, 365 F.3d (4th Cir. 2004) ..........................11

*United States v. Hays*,
    515 U.S. 737 (1995).....................................................................................................34

*United States v. Georgia*,
    546 U.S. 151 (2006).....................................................................................................28

*United States v. Morrison*,
    529 U.S. 598 (2000).....................................................................................................30

*United States v. Salerno*,
    481 U.S. 739 (1987)...................................................................................4, 31

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008)........................................................................................4

*White v. Regester*,
    412 U.S. 755 (1973)......................................................................................37

*Williamson v. Lee Optical Company*,
    348 U.S. 483 (1955) .....................................................................................30

*Young v. Fordice*,
    520 U.S. 273 (1997)......................................................................................10

## DOCKETED CASES

*City of Kings Mountain v. Holder*,
    No. 10-cv-01153 (D.D.C. Oct. 22, 2010) ....................................................43

*City of Sandy Springs v. Holder*,
    No. 10-cv-01502 (D.D.C. Oct. 26, 2010) ....................................................43

*League of United Latin American Citizens ("LULAC") v. Perry*,
    No. 2:03-00354 (E.D. Tex. Dec. 1, 2006).....................................................14

*Louisiana House of Reps., et al., v. Ashcroft*,
    No. 02-0062 (D.D.C. Feb. 13, 2003) ...........................................................12

*Sanchez v. Anaya*,
    No. 82-0067M (D.N.M. Dec. 17, 1984) .......................................................45

Tr. Oral Arg. at 48, *Nw. Austin,*  129 S. Ct. 2504 (No. 08-322) (April 29, 2009)

## STATUTES

42 U.S.C. § 1973a(a)..........................................................................................38

42 U.S.C. § 1973a(c)..........................................................................................45

42 U.S.C. § 1973d..............................................................................................38

120 Stat. 577 ......................................................................................................23

Pub. L. No. 109-246 § 2(b)(4) (2006)..................................................................6

Pub. L. No. 109-246 § 2(b)(5) (2006)..................................................................6

Pub. L. No. 109-246 § 2(b)(9) (2006)..................................................................3

## LEGISLATIVE MATERIALS

S. Rep. No. 97-417 (1982) ................................................................................23

S. Rep. No. 109-275 (2006) ........................................................................34, 35

H.R. Rep. No. 109-478 (2006) ................................................................. *passim*

H.R. Rep. No. 109-554 (2006) ..........................................................................32

H.R. Rep. No. 91-137 (1990) ............................................................................23

152 Cong. Rec. S7967-68 (daily ed. July 20, 2006) ..........................................2

152 Cong. Rec. S7747 (daily ed. July 18, 2006) ...............................................9

152 Cong. Rec. S8010 (daily ed. July 20, 2006) .............................................32

152 Cong. Rec. S8372 (daily ed. July 27, 2006) .............................................34

152 Cong. Rec. H5181-82 (daily ed. July 13, 2006) ...........................................

152 Cong. Rec. H5143 (daily ed. July 13, 2006) ..........................................3,29

## OTHER AUTHORITIES

Mason Adams, *Roanoke Seeks "Bailout" from Voting Rights Act*, Roanoke Times,
    Aug. 8, 2010, available at http://www.roanoke.com/news/roanoke/wb/256275 .........43

Ellen D. Katz et al., *Documenting Discrimination in Voting: Judicial Findings Under*
    *Section 2 of the Voting Rights Act Since 1982, Final Report of the Voting Rights*
    *Initiative*, 39 U. Mich. J.L. Reform 643 (2006) ....................................................33, 35

Ellen Katz, *Not Like the South? Regional Variation and Political Participation Through*
    *the Lens of Section 2*, Democracy, Participation and Power: Perspectives on
    Reauthorization of the Voting Rights Act (ed. Ana Henderson 2007), *available at*
    http://www.sitemaker.umich.edu/votingrights/files/notlikethesouth.pdf. ..................36

U.S. Dep't of Justice, Civil Rights Division, *About Federal Observers and Election*
    *Monitoring*, Sept. 7, 2010 *available at* http://www.justice.gov/crt/voting/
    examine/activ_exam.php. ...........................................................................................39

U.S. Dep't of Justice, Civil Rights Division, *Section 5 Covered Jurisdictions*,
    July 25, 2008, *available at* http://www.justice.gov/crt/voting/sec_5/covered.php......39

U.S. Dep't of Justice, Civil Rights Division, Voting Section Home Page, Section 4 of
    the Voting Rights Act, http://www.justice.gov/crt/voting/misc/sec_4.php ................42

Transcript of Oral Argument, *Nw. Austin Mun. Util.Dist. No. 1 v. Holder*,
    129 S. Ct. 2504 (No. 08-322) (April 29, 2009)....................................................22

Transcript of Motion Hearing, *Nw. Austin Mun. Util. Dist. No. 1 v. Mukasey*,
    573 F. Supp. 2d 221 (No. 06-1384) (D.D.C. Sept. 17, 2007) ...............................22

Brief for *Amici Curiae* North Carolina, Arizona, California, Louisiana, Mississippi
    and New York, *Nw. Austin Mun. Utility Dist. No. 1 v. Holder*,
    129 S.Ct. 2504 (2009), No. 08-322, 2009 WL 815239 (Mar. 25, 2009) ..............29

## INTRODUCTION

Unchecked racial discrimination in voting erodes our Constitution's promise of equality, sharply undermines the integrity of our democratic processes, and imposes significant harms on our citizens and nation. With that in mind, in 2006, Congress determined that racial discrimination in voting remains a substantial threat in certain parts of the nation, and appropriately decided to stay the course in eradicating it by reauthorizing the preclearance provision of the Voting Rights Act of 1965.

It is well settled that Congress possesses not just the power but the affirmative responsibility to respond aggressively and meaningfully to voting discrimination under the Reconstruction Amendments. For more than forty-five years, Section 5, which lies at the "heart" of the Voting Rights Act, *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966), has served as the primary tool for remedying voting discrimination that has proven especially difficult to uproot in certain regions of the country. Section 5 was not the first response to the problem, but it was the first effective one, enacted only after case-by-case litigation and less stringent legislative remedies failed. Geographically, substantively, and temporally limited, Congress periodically reviews the extent of progress under Section 5 to determine if the remedy is still necessary to block and deter voting discrimination. In 2006, that process revealed *both* gradual progress and persisting racial discrimination in voting in the Section 5-covered jurisdictions, even in the face of decades old and powerful remedial measures. The quantum and nature of the persisting discrimination led Congress to a broad consensus that, progress notwithstanding, remedial safeguards are still necessary to prevent our citizens from being denied their right to vote on account of race. That carefully considered predictive judgment goes to the essence of the

legislative function, and is entirely consistent with the enforcement powers expressly granted to Congress under the Reconstruction Amendments.

From its inception, the constitutionality of the preclearance provision has faced constitutional attacks. Indeed, there have been four unsuccessful challenges in the Supreme Court, and in each, the Court forcefully affirmed Section 5's constitutionality faced with attacks that closely track those asserted here. These precedents conclusively establish that Congress can enact and subsequently reauthorize Section 5 consistent with the Constitution.

Against this backdrop, Plaintiff Shelby County, Alabama ("Plaintiff") mounts the latest broad facial attack on Sections 4(b) and 5 of the Voting Rights Act ("VRA" or "Act"). Contrary to cases where the Supreme Court has invalidated newly enacted Congressional enforcement legislation that tests the boundaries of Congressional power in new spheres, however, Section 5 employs familiar powers to address a longstanding, demonstrable, and persisting problem. The question here is not whether Congress has the constitutional power to enact Section 5. Rather, it is whether voting discrimination has diminished to such a degree that a tested and effective approach must now be abandoned. Congress answered that question in the negative, and there is no reason for this Court to displace that well-supported judgment.

Congress, in determining whether Section 5 remains appropriate enforcement legislation, discharged its duty with care. The House and Senate Judiciary Committees held a combined 21 hearings over 10 months, receiving testimony from over 90 witnesses who presented testimony both for and against reauthorization. H.R. Rep. No. 109-478, at 5 (2006); 152 Cong. Rec. S7967-68 (daily ed. July 20, 2006); SMF ¶ 7.[1] Representative James Sensenbrenner, then-Chair of the House Judiciary Committee, explained that the 2006 reauthorization of the VRA was based on

---

[1] References to *Defendant-Intervenors' Joint Statement of Material Facts As To Which There Is No Genuine Issue* are cited herein as "SMF ¶ _."

"one of the most extensive considerations of any piece of legislation that the United States Congress has dealt with in the 27 1/2 years that I have been honored to serve as a Member of this body." 152 Cong. Rec. H5143 (daily ed. July 13, 2006). Governmental entities at all levels supported the reauthorization of Section 5, and none advocated the drastic remedy that Plaintiff now seeks. Congress concluded—by a 390-33 vote in the House and a 98-0 vote in the Senate— that, although certain provisions of the Voting Rights Act were no longer needed, Section 5 remains necessary to prevent minority citizens from being "deprived of the opportunity to exercise their right to vote, or [having] their votes diluted, undermining the significant gains made by minorities in the last 40 years." Pub. L. No. 109-246 § 2(b)(9) (2006); *see also* SMF ¶¶ 2, 6, 16.

Shelby County's attempt to strike Sections 5 and 4(b) are premised on its unsupported theories about the limits of Congressional power, not upon the facts that justified its exercise in 2006. But this is not a theoretical case. The reality is that Section 5 is called upon today, just as it was when it was originally enacted in 1965, to block and deter voting discrimination. Plaintiff simply fails to grapple with this reality, and the evidence that makes it so. That evidence of ongoing discrimination, much of it intentional and adaptive in scope, made plain the inadequacy of the case-by-case method of litigation which Congress expressly and reasonably rejected, but which Plaintiff now embraces as a substitute for Section 5. This brief juxtaposes Plaintiff's theories against tangible legislative facts, which establish the reasonableness of both Congress's determination that the preclearance remedy remains necessary, and its decision to retain the Section 4(b) geographic coverage provision. Measured against the high showing required to sustain a facial challenge, and either of the prevailing standards for Congressional enforcement

3

legislation, Section 5 remains constitutional. Accordingly, this Court should grant Defendant-Intervenors' motion for summary judgment and deny Plaintiff's.

## I. THE SUBSTANTIAL LEGISLATIVE RECORD OF SEVERE AND PERSISTENT VOTING DISCRIMINATION IN THE COVERED JURISDICTIONS DEMONSTRATES THAT SECTION 5 PRECLEARANCE IS CONSTITUTIONAL

Facial challenges to the constitutionality of laws duly enacted by Congress or a state legislature are disfavored. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Facial challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (citations and internal quotation marks omitted). Moreover, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.

Plaintiff's burden is therefore a demanding one: it must "establish[] that no set of circumstances exists under which [Section 5] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Alternatively, Plaintiff must show that the statute lacks "a plainly legitimate sweep." *Wash. State Grange,* 552 U.S. at 449 (citations and internal quotation marks omitted). Here, Shelby County cannot satisfy either showing. Instead, Plaintiff advances to this Court policy arguments about the wisdom and appropriateness of the Congressional judgment to reauthorize Section 5, with only the most cursory treatment of the 16,000-page legislative record and the facts within it. Plaintiff's arguments are not new—they were raised, considered, and reasonably rejected by Congress.

These arguments have also been considered and rejected in four Supreme Court decisions upholding Section 5 against constitutional challenges. *See Katzenbach*, 383 U.S. 301; *Georgia v. United States*, 411 U.S. 526 (1973); *City of Rome v. United States*, 446 U.S. 156 (1980); *Lopez v. Monterey Cnty.*, 525 U.S. 266 (1999).[2] As we explain below, in light of the widespread, persisting discrimination revealed by the 2006 reauthorization record, these controlling precedents conclusively establish that Section 5 is constitutional. Moreover, the 2006 reauthorization record far exceeds the record in support of any other remedial legislation considered by the Supreme Court, including the two statutes the Court has upheld in recent years. *See Tennessee v. Lane*, 541 U.S. 509 (2004); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003). Whether considered under rationality review, as set forth in *Katzenbach* and *City of Rome*, or under the elaboration of that standard set forth in *City of Boerne v. Flores*, 521 U.S. 507 (1997), and its congruence-and-proportionality progeny, Section 5 remains constitutional. For these reasons, Plaintiff's facial challenge must fail, and Defendant-Intervenors' motion should be granted.

A. **The 2006 VRA Reauthorization Record Reveals Widespread and Intentional Discrimination Throughout the Covered Jurisdictions, and Amply Supports the Exercise of Congress's Expressly Granted Remedial Powers**

Resolution of Plaintiff's facial challenge turns in large part on the gravity of the harm Congress seeks to address through Section 5. *See, e.g.*, *Lane*, 541 U.S. at 523. This brief speaks to that question. Although Shelby County mounts a broad facial challenge to the most effective and important civil rights Act in the nation's history, its review of the record supporting it does

---

[2] Notwithstanding Plaintiff's assertion to the contrary, *see* Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl. Mem.") at 26 n.6, Dkt. No. 5 (June 8, 2010), the Supreme Court has made clear that *Lopez* upheld the constitutionality of the 1982 reauthorization. *See Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2510 (2009) (noting that the Court "upheld" the 1982 reauthorization of Section 5, "finding that circumstances continued to justify" the statute); *see also Lopez*, 525 U.S. at 283-85 (reaffirming facial constitutionality of Section 5 in the course of rejecting a claim that a particular voting change was not subject to preclearance).

not match its bold ambition. But the legal and factual analysis must meet the case, and require

rigor. Accordingly, Defendant-Intervenors provide an overview and analysis of the extensive

record before Congress in 2006, which revealed that Section 5's protections remain necessary

given the substantial invidious discrimination, which persists in the covered jurisdictions. As

Congress explained in the statutory text,

> (4) Evidence of continued discrimination include[d]—(A) the hundreds of
> objections interposed, requests for more information submitted followed by
> voting changes withdrawn from consideration … and Section 5 enforcement
> actions …. in covered jurisdictions since 1982 that prevented election practices,
> such as annexations, at-large voting, and the use of multi-member districts, from
> being enacted to dilute minority voting strength; (B) the number of requests for
> declaratory judgments denied by the United States District Court for the District
> of Columbia; (C) the continued filing of section 2 cases that originated in covered
> jurisdictions; and (D) the litigation pursued by the Department of Justice since
> 1982 to enforce sections 4(e), 4(f)(4), and 203 of such Act to ensure that all
> language minority citizens have full access to the political process [as well as]
> (5)…Federal oversight in [covered] jurisdictions …as demonstrated in the
> counties certified by the Attorney General for Federal examiner and observer
> coverage and the tens of thousands of Federal observers that have been dispatched
> to observe elections in covered jurisdictions.

Pub. L. No. 109-246 §§ 2(b)(4), (5) (2006); *see also* SMF ¶ 17.

These findings were amply supported by the legislative record, which showed that there

had been over 600 Section 5 objections, over 650 successful Section 2 suits, over 800

submissions withdrawn due to more information request letters (MIRs) submitted by DOJ, and

over 100 Section 5 enforcement actions in the covered jurisdictions since the 1982

reauthorization. SMF ¶¶  33, 162. In nine of the 16 covered states, more objections were

interposed since the 1982 reauthorization than during the previous reauthorization period. SMF ¶

37. Between 1982 and 2004, each of the nine fully-covered states drew at least two statewide

objections, with most fully-covered states drawing many more. *March 8, 2006 Hearing*, at 260. [3]

---

[3]  Defendant-Intervenors refer to the hearings where Congress considered the appropriateness of
reauthorizing Section 5 by citing the hearing date and page number.

Moreover, the evidence of intentional discrimination in the record was palpable: at least 2/3 of all Section 5 objections included evidence of discriminatory purpose. *See November 1, 2006 Hearing*, at 129-30[4]; SMF ¶ 181 (finding that as recently as the 1990s, 43% of all objections were based on intent alone, while another 31% were based on a combination of intent and effect). Plaintiff emphasizes the low rate of objections compared to the total number of changes submitted.  *See* Pl. Mem. at 28. But that rate, which has always been low, in no way undermines the fact that these objections reveal widespread, persistent discrimination against minority voters in the covered jurisdictions. *See Nw. Austin Mun. Util. Dist. No. 1 v. Mukasey*, 573 F. Supp. 2d 221, 250 (D.D.C. 2008) (observing "the objection rate has always been low, and the sharpest decline occurred before *City of Rome*" and while these rates have declined, "that hardly means section 5 has outlived its usefulness.") There were over 620 objections lodged between 1982 and 2006, greater than the number of objections lodged between 1965 and 1982. *Id.;* SMF ¶¶ 33, 37.[5] And, as noted, over 2/3 of those objections, or over 400, revealed that the voting change was intentionally discriminatory.[6]

A sobering amount of intentional discrimination persists in the covered jurisdictions: "the 2006 legislative record is far more powerful than those supporting the only two statutes sustained

---

[4]  Defendant-Intervenors refer to the hearings where Congress considered the appropriateness of reauthorizing Section 5 by citing the hearing date and page number.

[5] Plaintiff seeks to undermine the evidence yielded by Section 5 objection statistics by arguing that some objections resulted from DOJ's enforcement of a "max-Black" policy during the 1990 round of redistricting. A careful review of all Section 5 objections interposed by DOJ between 1982 and 2006, however, reveals that an exceedingly small percentage of objections (almost all of which are from the early 1990s) even arguably implicate the concerns raised by the Court in *Miller v. Johnson*, 515 U.S. 900, 927 (1995). *See October 25, 2005 (History) Hearing*, at 225-2595.

[6] Although Section 5 places the burden of proof on the covered jurisdiction, a review of all objection letters since 1982 reveals almost no discriminatory-purpose objections interposed because the Department of Justice ("DOJ") lacked evidence about the jurisdiction's motive or because that evidence was in equipoise. *See October 25, 2005 (History) Hearing*, at 225-2595; *see also* n.8 *infra* (discussing use of *Arlington Heights* analysis by DOJ).

in the *City of Boerne* cases: the FMLA (*Hibbs*) and ADA Title II (*Lane*)." *Nw. Austin*, 573 F.

Supp. 2d at 271. Moreover, as discussed below, the vast majority of Section 5 objections deter

discrimination not against individual minority voters, but against hundreds or thousands of

voters, who, because of their race or ethnicity, would have otherwise been deprived of a fair

opportunity to participate in the political process in the state, county, or city in which they reside.

And, as powerful as they are, the sheer numbers of Section 5 objections and voters affected by

them, understate the true deterrent effect of Section 5, because the statute also "deters covered

jurisdictions from even attempting to implement intentionally discriminatory changes." *Nw.*

*Austin*, 573 F. Supp. 2d at 258.

Strong evidence regarding Section 5's deterrent effect arises from the DOJ's More

Information Request Letters ("MIRs"). While Plaintiff argues that this evidence only

demonstrates that DOJ was "insufficiently informed" and that any efforts by jurisdictions to

withdraw a voting change following a MIR merely represent "an effort by jurisdictions to

comply," Pl. Mem. at 33, the evidence before Congress shows otherwise. Jurisdictions that

receive MIRs can respond by providing information that establishes that the change is non-

discriminatory, *or* they can (1) withdraw the requested change "because it is discriminatory"; (2)

file a "new or amended non-discriminatory voting plan"; or (3) offer no response. H.R. Rep. No.

109-478, at 40. In all three instances, the "MIR-induced outcome" is highly probative of

discrimination—discrimination blocked by Section 5 because the submitting jurisdiction may not

implement the proposed change. *See June 13, 2006 Hearing*, at 210-226 (Report of Luis Ricardo

Fraga and Maria Lizet Ocampo).  Congress reasonably found that these outcomes are significant

because they "are often illustrative of a jurisdiction's motives." H.R. Rep. No. 109-478, at 40.

One study showed that MIRs had deterred six times as many discriminatory changes as Section 5

8

objection letters. *June 13, 2006 Hearing*, at 226 (reporting ratio of MIR outcomes to objections from 1982 to 2005).  Moreover, Congress concluded that the increased number of revised submissions and withdrawals during the last 25 years represents "strong [evidence] of continued efforts to discriminate." H.R. Rep. No. 109-478, at 36. In sum, MIRs clearly deter retrogressive or discriminatory voting changes and have a substantial impact independent of objection letters.

Plaintiff can only claim that the extensive record of discrimination before Congress contains no more than "scattered allegations of discrimination," Pl. Mem. at 25 n.5, by disregarding the statistical data summarized above.  Nor does Plaintiff undertake any meaningful analysis of the nature of the ongoing discrimination in the covered jurisdictions, much of it blocked by Section 5. In what follows, Defendant-Intervenors discuss illustrative but not exhaustive examples of discrimination against minority voters in the covered jurisdictions that Congress considered. Any close analysis of that record shows that voting discrimination in covered jurisdictions has been difficult to dislodge because of its adaptive and persistent nature. This is particularly well-illustrated through the substantial number of examples in which it took multiple Section 5 objections, or at least one Section 5 objection along with Section 2 or constitutional litigation, to remedy or deter discrimination in voting. This is precisely the serial voting rights violation evidence or "gamesmanship" that Plaintiff itself acknowledges is sufficient to sustain Section 5. Pl. Mem. at 5.[7]

---

[7] For additional, recent examples of intentional discrimination blocked by Section 5, Defendant-Intervenors respectfully refer the Court to the Appendix to Judge Tatel's opinion in *Nw. Austin,* 573 F. Supp. 2d at 289-301 (Appendix: Examples of Objection Letters Based on Discriminatory or Retrogressive Intent, 1982-2005); *see also March 8, 2006 Hearing*, at 4527 (Voting Rights in Louisiana, 1982-2006); 152 Cong. Rec. S7747 (daily ed. July 18, 2006) (Voting Rights in Texas, 1982-2006); *October 18, 2005 Hearing*, at 1125-1357 (Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990).

1.  **The Congressional Record Contains Numerous Examples of Repeated and Intentional Violations of Minority Voting Rights in the Covered Jurisdictions**

   a.  *Mississippi's Dual Registration*

Nearly 100 years after Mississippi enacted a dual-registration requirement for municipal and non-municipal elections as part of the post-Reconstruction "Mississippi Plan" to deny Blacks the right to vote, that requirement continued to discriminate against Blacks. *See Miss. State Chapter, Operation PUSH v. Allain*, 674 F. Supp. 1245, 1251-55 (N.D. Miss. 1987). Black voters brought a lawsuit challenging the system, and, in 1987, a federal district court found that the dual-registration law had been enacted for a discriminatory purpose, continued to have a discriminatory effect, and violated Section 2 of the VRA. *See id.* at 1268. The Fifth Circuit affirmed in 1991. *See Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991). Then, just four years later, Mississippi again established a dual-registration system (this time for state vs. federal elections), ostensibly for the purpose of complying with the National Voter Registration Act, and refused to seek preclearance. Individual voters brought a Section 5 enforcement action, and a unanimous Supreme Court held that preclearance was required. *See Young v. Fordice*, 520 U.S. 273 (1997).

In the wake of *Young*, the State finally submitted its dual-registration system for preclearance, and DOJ applied the *Arlington Heights* test to interpose a discriminatory-purpose objection. *See October 25, 2005 (History) Hearing*, at 1603-04.[8] DOJ noted that the racially discriminatory effects of this system "were not just foreseeable but almost certain to follow." *Id.* at 1603. Moreover, proposals supported by election officials that would have mitigated this

---

[8] The *Arlington Heights* test governs lawsuits where the plaintiff, who has the burden of proof, seeks to demonstrate that the defendant-state actor engaged in intentional, and therefore unconstitutional, racial discrimination. That test requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

discriminatory impact were "rejected under somewhat unusual circumstances," with state officials offering "insubstantial" reasons for their opposition that was, in certain instances, couched in racially charged terms. *Id*. Thus, the systematic discrimination illustrated by Mississippi's dual-registration system lasted over a century and was only remedied by a combination of the protections provided by Sections 2 and 5.

> b.   *Recent Discriminatory Methods of Election Adopted by South Carolina*

In 2004, the South Carolina legislature enacted a law effectively prohibiting single-shot voting and adding a majority-vote requirement to Charleston County's at-large school board elections notwithstanding: (1) a judicial finding only months earlier that this method of electing Charleston's county council illegally diluted minority voting strength; and (2) evidence that elected officials understood the retrogressive nature of the change. *See March 8, 2006 Hearing*, at 175-76. This was the culmination of a series of efforts by the Charleston County state legislative delegation to alter the method of election for, or reduce the powers of, the Charleston County school board following a 2000 election in which Blacks gained a majority of seats on the board for the very first time in the county's history. *See United States v. Charleston County*, 316 F. Supp. 2d 268, 290 n.23 (D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004). DOJ interposed a Section 5 objection to block the change. Notably, while Sections 5 and 2 were both necessary to remedy discrimination, the Section 5 objection had immediate impact but the Section 2 suit lasted several years and cost millions of dollars. *March 8, 2006 Hearing*, at 175-76.

Another example of Sections 5 and 2 working in tandem involved the South Carolina legislature's effort in 1994 to abolish the elected Spartanburg County Board of Education after Section 2 litigation resulted in a consent decree requiring the board to switch from at-large elections to single-member districts. *See October 25, 2005 (History) Hearing*, at 2041-43. In

interposing a Section 5 objection to the State's effort to abolish the elected school board, DOJ found that "[t]he sequence of events surrounding the adoption of [the state law] gives rise to an obvious inference of discriminatory purpose." *Id*. at 2042. Nonetheless, the South Carolina legislature effectively attempted to abolish the school board again just one year later by, *inter alia*, de-funding it. *See id*. at 2049-52. Noting that the same legislator who sponsored the objected-to 1994 law sponsored this new law de-funding the local school board, and that the State could not offer a tenable nonracial justification for the law, DOJ again interposed a discriminatory-purpose objection. *See id*. at 2051.

### c. *Discriminatory Statewide Redistrictings in Louisiana, Mississippi, Alabama, Arizona, Texas and South Dakota*

Strong evidence of the ongoing need for preclearance comes from statewide redistrictings, as the majority of fully-covered states have repeatedly attempted to discriminate against minority voters through the crucial redistricting process, only to have their efforts deterred because of Section 5. Congress learned that not a single redistricting plan for the Louisiana House of Representatives had ever been precleared as originally submitted. *October 18, 2005 Hearing*, at 16.  After the 2000 Census, Louisiana sought judicial preclearance for its House redistricting plan, but acknowledged that it intentionally increased electoral opportunities for white voters at the expense of such opportunities for African-American voters. During the litigation, a three-judge panel of this Court criticized the State for "blatantly violating important procedural rules" and for a "radical mid-course revision in [its legal] theory"; the Court noted that it would entertain a discovery sanctions motion as a result of the State's conduct. *La. House of Reps., et al., v. Ashcroft*, No. 02-0062 at 1, 3 (D.D.C. Feb. 13, 2003) (three-judge court). On the eve of trial, the State withdrew the preclearance action and restored an African-American opportunity district—that is, a district where Black voters have an opportunity to elect a

candidate of choice—after evidence emerged that the State's initial plan violated the State's own redistricting principles. *See March 8, 2006 Hearing*, at 1608.

Arizona has drawn Section 5 objections to its statewide legislative redistricting plans after each decennial census since it was first covered. In 2001, DOJ concluded that the legislative redistricting plan not only had a retrogressive effect on Latino voters, but also found that aspects of the plan were drawn with an apparent retrogressive intent. *Id*. at 500. DOJ similarly concluded that Arizona's redistricting plan following the 1990 Census discriminated against Latino voters, and that the State provided pretextual reasons for rejecting non-discriminatory alternatives. *Id*. 476, 481-82. Likewise, after the 1980 Census, the State could not offer a plausible non-discriminatory reason for enacting a redistricting plan that was retrogressive for American Indian voters. *Id*. 454-55.

Like Arizona, Texas has also drawn objections to each of its state legislative redistricting maps since the time it became covered in 1975. *October 25, 2005 (History) Hearing*, at 2177-89, 2319-23, 2518-23. During the post-2000 Census redistricting cycle, Texas drew an objection for its state house redistricting plan which sought to eliminate three opportunity districts for Latino voters in the southern and western sections of the state. DOJ concluded that the resulting fragmentation of cores of majority Hispanic districts and the packing of Hispanic voters into neighboring districts ran afoul of the state's own traditional redistricting principles. *Id*. at 2521. Then, in Section 2 litigation concerning the state's mid-cycle 2003 Congressional reapportionment, the Supreme Court observed that the state's redistricting plan, which dismantled a Latino-opportunity district just as Latino voters were on the verge of electing a candidate of choice, "bears the mark of intentional discrimination [against Latino voters] that could give rise to an equal protection violation," and violated Section 2. *League of United Latin*

*American Citizens ("LULAC") v. Perry*, 548 U.S. 339, 440 (2006). In reaching its ruling, the Court also noted the well-documented history or voting discrimination in Texas and the "especially severe" level of racially polarized voting. *Id.* at 427. Notably, because of the slower pace of the Section 2 remedy, the 2004 congressional elections had already taken place under the illegal plan.  Even after the Court's decision, Latino voters were forced to bring a successful Section 5 enforcement action when state officials, without seeking preclearance, attempted to curtail early voting in the special election held in the remedial district.  *See LULAC v. Perry*, No. 2:03-00354 (E.D. Tex. Dec. 1, 2006).

Mississippi drew a discriminatory-purpose objection to its redistricting plan for the state senate following the 1990 Census, which was similar to an objection DOJ interposed to its congressional redistricting plan following the 1980 census. *See March 8, 2006 Hearing*, at 1183-86 (Testimony of Robert McDuff). In both circumstances, DOJ concluded that the plans were calculated to minimize Black voting strength in the Delta region. Notably, after the 1990 census, legislators privately referred to an alternative plan that would have increased the number of Black-opportunity districts as the "nigger plan." *Id.* at 1718-19 (Mississippi Report).

Like Mississippi, Alabama drew statewide redistricting objections from DOJ after both the 1980 Census and 1990 Census. *October 25, 2005 (History) Hearing*, at 264-65, 385-86.  In 1991, the State failed to provide a plausible, nonracial explanation for fragmenting concentrated Black populations, and the evidence showed that the "underlying principle of the Congressional redistricting was a predisposition on the part of the state political leadership to limit Black voting potential to a single district." *Id.* at 385-86. After the 1980 Census, the State "systematically reduc[ed] the influence which Black voters …. enjoy" in ten urban legislative districts and eliminated entirely four Black-majority districts in rural counties. *See id*. at 264-65. DOJ

14

determined that the State's districting choices "do not appear to have been necessary to any legitimate governmental interest" and were not applied neutrally throughout the State. *Id*. at 265.

Congress also learned of South Dakota's efforts to minimize American Indian voting strength in its 2001 legislative redistricting plan, packing Indian voters into a single district where they constituted 90 percent of the voting-age population. *See May 9, 2006 Hearing*, at 86. After rejecting the State's argument that "non-tenuous policies" supported this packing, and noting that the state legislature's redistricting committee received almost no input from the Indian community, a federal court held that the statewide redistricting violated Section 2. *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1084 (D.S.D. 2004), *aff'd* 461 F.3d 1011, 1047-48 (9th Cir. 2006). Tellingly, only two years earlier, American Indians in the State's covered counties successfully sued South Dakota for enacting hundreds of voting changes between 1976 and 2002 and failing to submit them for preclearance. *October 25, 2005 (Need) Hearing*, at 131. This is the same type of open defiance that animated the need for Section 5 in 1965; although South Dakota officials may of course have personal views about Section 5, *cf.* Pl. Mem. at 32 n.7, our laws and constitution do not permit a state to reject unilaterally civil rights laws.

### d. *Discriminatory Methods of Election at the Local Level*

The evidence of intentional discrimination in covered jurisdictions was not limited to states. Counties, cities, and other localities used a wide array of tactics designed to discriminate against minority voters, often enabled or reinforced by state governments. *See, e.g.*, *March 8, 2006 Hearing,* at 1624-25 (Louisiana Report). Once again, that discrimination frequently was deterred only through repeated Section 5 objections, or a mix of Section 5 and Section 2 litigation.

15

One common discriminatory tactic employed by local jurisdictions in which racial minorities are a minority of eligible voters is to prevent minority voters from electing candidates of choice through the adoption of at-large elections and majority-vote requirements. *See*, *e.g.*, *July 13, 2006 Hearing*, at 372-81 (Alabama Report, describing how, in response to increasing Black voter registration, numerous counties in Alabama "purposefully switched from single-member districts to at-large election of local governments as needed to prevent black citizens from electing their candidates of choice"). Two examples from the 1990s reveal how Sections 2 and 5 can work together to remedy such discrimination. In 1993, Newport News, Virginia drew a Section 5 objection based on discriminatory purpose when it attempted to implement at-large elections for its school board—its second method-of-election objection in four years. *October 25, 2005 (History) Hearing*, at 2573. The next year, the city entered into a consent decree in parallel suits brought by Black residents and the United States, in which the city acknowledged discriminating against African Americans in violation of Section 2 and the Fourteenth and Fifteenth Amendments through its system of at-large city council elections. S. Rep. No. 109-295, at 68 (2006).

Similarly, in July 1993, plaintiffs agreed to settle a Section 2 lawsuit challenging Mt. Olive, North Carolina's use of at-large elections for the town's board of commissioners. Two months later, the board abandoned the redistricting plan to which the parties had agreed, and promulgated a new discriminatory plan. DOJ interposed a Section 5 objection based on discriminatory purpose, concluding that the board's justification for adopting the new plan appeared pretextual. *October 25, 2005 (History) Hearing*, at 1823-24. The racial animus underlying the board's conduct was confirmed by its extraordinary efforts to limit participation by the only Black member of the board: "the board petitioned [a] court to prohibit her from

16

participating in board discussions or voting on the method of election issues raised by the Section 2 litigation." *Id*. at 1824.

    *e.  Discrimination When Minorities Are on the Verge of Exercising Political Power*

As was true of the State of Texas in *LULAC*, local jurisdictions also frequently adopt discriminatory voting changes when minorities are on the verge of truly exercising political power for the first time. Kilmichael, Mississippi provides a stark example where, in 2001, the white mayor and the all-white Board of Aldermen cancelled local elections when an "unprecedented number" of African Americans qualified to run for office. H.R. Rep. No. 109-478, at 21, 36-37; SMF ¶¶ 39, 100. In rejecting the proposed cancellation, the Justice Department observed that, according to the most recent census, African Americans had recently become a majority in Kilmichael. The town refused to reschedule the election, but after DOJ forced it to do so, the election proceeded and Kilmichael elected three African-American aldermen and its first African-American mayor. *Id.*

Similarly, after resolution of a Section 2 suit led Millen, Georgia to modify its method of election, *see March 8, 2006 Hearing*, at 1524 n.120, the city proposed delaying the election in the Black-opportunity district that would permit Black voters to elect a majority of candidates of choice to the city council for two years, leaving that district unrepresented in the interim. *See October 25, 2005 (History) Hearing*, at 743-45. Section 5 blocked this discrimination. *Id.*

Another notable example arises from Webster County, Georgia. Shortly after the 1996 elections, in which a third black member was elected to the five-seat school board for the first time, the County advised the board members that their district lines would have to be redrawn, ostensibly because the plan was malapportioned. The five percent population deviation of the existing districting plan, however, was well within constitutional limits, "while the plan that

ostensibly was enacted to cure its [purported] malapportionment instead had a thirteen percent deviation." SMF ¶ 80. DOJ concluded that the County's reasons for adopting a new districting plan were "merely pretexts for intentionally decreasing the opportunity of minority voters to participate in the electoral process." *October 25, 2005 (History) Hearing,* at 831.

The birthplace of the Voting Rights Act, Selma, Alabama, witnessed this same phenomenon when the 1990 Census revealed that Selma's Black population had grown to 58.4%. SMF ¶ 57. The city responded by packing Black voters into four council districts (three of which were over 90% Black) and fragmenting Black neighborhoods across the remaining five districts. *Id.* In a 1992 objection letter, DOJ found that the city's reasons for rejecting a nondiscriminatory alternative "appear[ed] to be pretextual," and that the city was actually "motivated by the desire to confine black population concentrations into a predetermined number of districts, and thus ensure a continuation of the current white majority on the council." *October 25, 2005 (History) Hearing,* at 392. Selma then submitted a new redistricting plan that drew an objection in 1993. The new plan continued to "fragment[] black population concentrations … in an apparent effort to limit the opportunity for black voters to elect more than four councilmembers." *Id.* at 403. Minutes from a council meeting when the plan was adopted confirmed that the city was motivated by intentional discrimination. *Id.*

Johnston, South Carolina and East Carroll Parish, Louisiana likewise each drew multiple discriminatory-purpose objections in the 1990's for intentionally packing African-American voters, who represented a majority of the electorate, into a minority of districts. *See id.* at 1980-82, 2003-05; 1013-15, 985-86. Similarly, Marion County and Lee County, South Carolina each drew an objection in 1993 when, faced with increases in Black population, the counties placed a

quota on how many Black residents could be included in the districts that would determine majority control of the county council and school board. *See id*. at 1992-95; 1996-99.

### f.   *Discriminatory Barriers to Registration and Polling Place Access*

Congress also learned in 2006 of ongoing efforts to suppress minority turnout in the covered jurisdictions, sometimes through changes that at first blush may appear *de minimis*. For example, applying *Arlington Heights*, DOJ prevented a purposefully discriminatory polling place change in 1999 when the council in Dinwiddie County, Virginia chose an all-white church in the extreme eastern (and predominately white) part of a rural precinct as a polling place, thus disregarding both the recommendation of the county electoral board and abandoning the council's stated goal of finding a more centrally located polling site. *See October 25, 2005 (History) Hearing*, at 2579-83.

In another example, in 2004, Long and Atkinson Counties in Georgia required Latino registered voters, whose citizenship had been challenged because of their Spanish surnames, to attend a hearing to establish citizenship; the registrar in Atkinson facilitated the challenge process by supplying a segregated list of registered voters with Spanish surnames. *See October 18, 2005 Hearing*, at 474-78. Long County later entered into a settlement agreement with DOJ based on the county's handling of these mass challenges. *March 8, 2006 Hearing*, at 1531. Latinos in Arizona also experienced widespread discrimination when attempting to vote in 2004; poll workers asked Latinos (but not Anglos) for identification, trucks with megaphones were parked outside of heavily-Latino precincts and the drivers warned residents that they would be deported if they wrongfully registered to vote, and police cars circled around and parked within view of polling places. *See id*. at 3979-80.

The examples discussed above demonstrate a clear pattern of widespread and adaptive discrimination in voting, in a wide variety of contexts, throughout the covered jurisdictions between 1982 and 2005. They only represent a relatively small sample, however. Even considering only serial violators of voting rights laws, numerous other jurisdictions had their efforts to discriminate against minority voters deterred either by multiple objections under Section 5 or at least one Section 5 objection and one Section 5 enforcement action.[9] Similarly, in a number of jurisdictions, a combination of Section 2 (or constitutional) litigation and at least one Section 5 objection or enforcement action, was necessary to remedy discrimination.[10]

---

[9] These jurisdictions, with the year of the most recent Section 5 action in parenthesis, include McComb, MS (2005); Iberville Parish, LA (2003); DeSoto Parish, LA (2002); Minden, LA (2002); Point Coupee Parish, LA (2002); Alabaster, AL (2000); St. Martinville, LA (1997); Shreveport, LA, (2002); Monroe County, MS (1995); Chickasaw County, MS (1995); Barnwell, SC (1994); St. Landry, LA (1994); Madison Parish, LA (1993); West Feliciana Parish, LA (1993); Lafayette Parish, LA (1993); East Carroll Parish, LA (1993); Batesburg, SC (1993); Sunflower County, MS (1992); Bolivar County, MS (1991); Leflore County, MS (1991); Morehouse Parish, LA (1992); Yazoo County, MS (1986). Since the VRA was reauthorized in 2006, Randolph County, Georgia and Fayetteville, North Carolina have joined this group of jurisdictions with multiple Section 5 actions since the 1982 reauthorization. *See October 25, 2005 (History) Hearing*, at 435-39 (Alabama example); *March 8, 2006 Hearing*, at 1618-20, 1667-69, 1651-54; *October 25, 2005 (History) Hearing*, at 1027, 1058-60, 1074-76, 1132 (Louisiana examples); *March 8, 2006 Hearing*, at 714-15; *October 25, 2005 (History) Hearing*, at 159-72; *May 10, 2006 Hearing*, at 91 (Mississippi examples); *March 8, 2006 Hearing*, at 1030-31; *October 25, 2005 (History) Hearing*, at 188-91, 1873-75, 2032-48 (South Carolina examples).

[10] These jurisdictions include Albany, Georgia (2003); Harnett County, NC (2002); Washington Parish, LA (1999); Tallapoosa, AL (1998); Granville County, NC (1996); Chickasaw County, MS (1995); Foley, AL (1995); Hemingway, SC (1994); Clay County, GA (1993); Calhoun County, GA (1992); Orangeburg, SC (1992); Edgefield County, SC (1992); Navajo and Apache Counties, AZ (1989); Richland County, SC (1988); Pitt County, NC (1988); Bladen County, NC (1987); Wilson County, NC (1986); Marengo County, AL (1986); Elizabeth City, NC (1986). *See October 25, 2005 (History) Hearing*, at 429-34; 310-12; *Dillard v. City of Foley*, 926 F. Supp. 1053 (M.D. Ala. 1995) (Alabama examples); *March 8, 2006 Hearing*, at 1407-08 (Arizona example); *March 8, 2006 Hearing*, at 634-35, 652-56, 686-90, 1526 n.129; *October 25, 2005 (History) Hearing*, at 138 (Georgia examples); *March 8, 2006 Hearing*, at 1616, 1653 (Louisiana examples); *March 8, 2006 Hearing*, at 1715-16 (Mississippi example); *March 8, 2006 Hearing*, at 1790-91; 1752-53, 1797-98; 1773-77; 1748; 1733-34 (North Carolina examples); *March 8, 2006 Hearing*, at 1970, 1033-39; 1015-17; 1964-65 (South Carolina examples).

Finally, other jurisdictions drew a Section 5 objection or were successfully sued under Section 2, and then later withdrew a separate preclearance submission.[11]

### 2. The Record Demonstrates that Case-by-Case Litigation Is Inadequate to Resolve the Problem of Ongoing Voting Discrimination

Plaintiff contends that victims of racial discrimination in voting throughout the covered jurisdictions must resort to the laborious, expensive, case-by-case method that Congress has long recognized as inadequate: bringing suit under Section 2 of the VRA or the Fifteenth Amendment. *See*, *e.g.*, *Boerne*, 521 U.S. at 526, (observing that remedies in the 1965 VRA, including preclearance, were "were deemed necessary given the ineffectiveness of the existing voting rights laws, and the slow costly character of case-by-case litigation."). In 2006, Congress again made findings regarding the inadequacy of "case-by-case enforcement," and concluded that, without Section 5, "Section 2 would be ineffective to protect the rights of minority voters[.]" H.R. Rep. No. 109-478, at 57; SMF ¶ 21.

*First*, Congress learned that Section 2 suits are among the most complex and resource-intensive of all litigation brought in federal court, taking an average of at least two to five years, with costs running into the millions of dollars. *See*, *e.g.*, SMF ¶ 357; *October 18, 2005 Hearing*, at 42; *October 25, 2005 (History) Hearing*, at 101; *May 9, 2006 Hearing*, at 141; *May 17, 2006 Hearing*, at 20, 80. The record demonstrated that minority voters at the local level (especially in rural communities) generally lack access to the resources and expertise necessary for successful Section 2 litigation. *October 25, 2005 (History) Hearing*, at 79. The inadequacy and attendant costs associated with case-by-case litigation were most recently recognized and described by

---

[11] These jurisdictions include Beaufort County, NC (2002); Edgecombe County, NC (2001); Pitt County, NC (1996); Prince Edward County, VA (1993); Halifax County, NC (1991); North Martin County, NC (1991). *See March 8, 2008 Hearing*, at 1750, 2049, 2089. A list of all objections, organized by State, is available at http://www.usdoj.gov/crt/voting/sec_5/obj_activ.php.

Justice Kennedy during oral argument in *Northwest Austin*. *See* Tr. Oral Arg. at 48, *Nw. Austin*, 129 S. Ct. 2504 (No. 08-322) (April 29, 2009) ("Section 2 cases are very expensive. They are very long. They are very inefficient.").

*Second*, Section 2 is a post-enactment remedy, allowing discriminatory practices to go into effect (often for several election cycles), and permitting candidates who win elections under discriminatory plans to gain the substantial advantages of incumbency. *See October 18, 2005 Hearing*, at 13; 43-44; *May 16, 2006 Hearing*, at 6.

*Third*, the ongoing, widespread evidence of serial violations in the covered jurisdictions chronicled before Congress and summarized above leaves no doubt that the case-by-case method is inadequate. *See* Part I.A.1, *supra*. Indeed, even Plaintiff appears to acknowledge that serial violations of voting rights laws justify Section 5. Plaintiff simply ignores the fact, fatal to its position, that widespread serial violations persist in the covered jurisdictions. *See* Pl. Mem. at 5, 23.[12]

### B.  The 2006 Reauthorization Is Constitutional Under *City of Rome*

In light of the expansive record before Congress, only a snapshot of which was summarized above, the Supreme Court's decision in *City of Rome*, upholding the 1975 re-authorization of Section 5, *see* 446 U.S. at 180-82, conclusively establishes the constitutionality of Section 5. As this Court has recently recognized, "the 2006 record is quite comparable to the record Congress compiled in its 1975 reauthorization of section 5." *Nw. Austin.*, 573 F. Supp. 2d

---

[12] While the record abounds with evidence of ongoing gamesmanship in the covered jurisdictions, it is important to note that "gamesmanship" is a manifestation of persistent voting discrimination and the inadequacy of the case-by-case method, not a prerequisite for congressional use of its broad enforcement powers under the Reconstruction Amendments. *See, e.g.*, *City of Rome*, 446 U.S. 156 (upholding Section 5 as reauthorized in 1975 without addressing evidence of gamesmanship); *see also* Tr. Mot. Hr'g. at 31, *Nw. Austin*, 573 F. Supp. 2d 221 (No. 06-1384) (D.D.C. Sept. 17, 2007) (in a hearing before a three-judge panel of this Court, Judge Emmet Sullivan observed that "The Supreme Court [has] never used that term 'gamesmanship.'   It's discrimination.   It's new forms of discrimination on top of 40 years of discrimination.  It's the same old discrimination. . . It hurts; it's painful.").

at 270; *see also id*. (noting that the Supreme Court has made clear the 1975 reauthorization record was "more than sufficient" to sustain Section 5). Plaintiff's efforts to distinguish *City of Rome* are meritless.

*First*, in *City of Rome*, the Supreme Court explicitly relied on evidence of "second-generation" voting barriers to sustain Section 5's constitutionality, noting that "[a]s registration and voting of minority citizens increases[,] other measures may be resorted to which could dilute increasing minority voting strength." 446 U.S. 180-181 (internal quotation marks omitted). Plaintiff's claim that "second-generation barriers bear no resemblance to the unrelenting campaign of discrimination needed to justify" Section 5, Pl. Mem. at 6, reflects a fundamental misunderstanding of the nature of "second-generation" evidence. In response to progress made under the Voting Rights Act, Congress learned as early as the very first re-authorization that jurisdictions had abandoned "first-generation" barriers to the ballot itself in favor of "unlawful ways to diminish the Negroes' franchise and to defeat Negro and Negro-supported candidates." H.R. Rep. No. 91-137 at 7 (1970); *see also* S. Rep. No. 97-417, at 10 (1982) (noting that "covered jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices to dilute minority voting strength").

These second-generation barriers include techniques such as: "enacting discriminatory redistricting plans; switching offices from elected to appointed positions; relocating polling places; enacting discriminatory annexations and deannexations; setting numbered posts; and changing … single member districts to at-large voting and implementing majority vote requirements." H.R. Rep. No. 109-478, at 36; 120 Stat. 577 (discussing first and second generation barriers). Second-generation barriers are no less discriminatory or unconstitutional than first-generation barriers. *See generally Allen v. State Bd. of Elections*, 393 U.S. 544, 565-

566 (1969) ("[t]he Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race [and,] compatible with the decisions of this Court, the Act gives a broad interpretation to the right to vote, recognizing that voting includes all action necessary to make a vote effective.") (citation and internal quotation marks omitted). Indeed, second-generation barriers, by definition, represent precisely the type of gamesmanship that Plaintiff claims is absent from the 2006 record, because they involve jurisdictions responding to progress in eliminating barriers to ballot access with new discriminatory measures designed to minimize or cancel out minority voting strength.

*Second*, contrary to Plaintiff's assertions, although there has been noteworthy progress, as was true at the time of *City of Rome*, minorities remain significantly underrepresented among elected officials in the covered jurisdictions, and minority voters' candidates of choice continue to struggle with a lack of electoral success. As of 2006, *no* minority candidate had ever been elected to statewide office in Louisiana, Mississippi, or South Carolina. *See* H.R. Rep. No. 109-478, at 33; *see also* SMF ¶ 319 (Governor Sanford observing that no African American has been elected to statewide office in South Carolina since passage of the VRA and noting that he "never" expects to see such an election.).[13]

In addition, Plaintiff also references the raw number of Black elected officials in Louisiana and South Carolina, Pl. Mem. at 27-28, and suggests that this evidences "seismic

---

[13] Plaintiff points to a post-reauthorization event, the 2007 election of Bobby Jindal in Louisiana, as evidence of minority electoral success on a statewide level, but, as Plaintiff has conceded and this Court has recognized "the constitutionality of the VRA must rise or fall on the record that Congress created *when it extended that act* in 2006." *See* Disc. Order at 8, Dkt. No. 41 (Sept. 16, 2010) (emphasis added); *see also* Pl.'s Reply to Defendant-Intervenors' Rule 56(f) Mem. at 4, Dkt. No. 40 (Sept. 10, 2010); Tr. of Status Hr'g at 39-40 (Sept. 10, 2010). Moreover, Defendant-Intervenors are aware of no evidence, and Plaintiff offers none, showing that Governor Jindal was the candidate of choice among minority voters in Louisiana.

change" since the Court's ruling in *City of Rome*. Yet, although there has been undeniable progress due to the Voting Rights Act, stark disparities persist. The record before Congress showed that "[i]n States such as Alabama, Georgia, Louisiana, Mississippi, South Carolina, and North Carolina, where African-Americans make up 35 percent of the population, African-Americans made up only 20.7 percent of the total number of State legislators." H.R. Rep. No. 109-478, at 33. The statistics from the 2006 record also revealed a disproportionately low number of Latino and Asian-American elected officials. H.R. Rep. No. 109-478, at 33-34. Moreover, Plaintiff fails to acknowledge that the vast majority of minority elected officials in the covered jurisdictions are elected from majority-minority districts, many of which owe their existence to or have been protected by the Voting Rights Act. *See*, *e.g.*, H.R. Rep. 109-478 at 34 ("For minority voters, there is effectively an election ceiling," because, where there is racially polarized voting, "[t]he only chance minority candidates have to be successful are in districts in which minority voters control the elections."); *March 8, 2006 Hearing*, at 222-223 (Report of the National Commission on the Voting Rights Act); *June 21, 2006 Hearing*, at 183-87 (Testimony of David Canon, noting that "only 49 of 8,047 [or 0.61%] elections in white-majority U.S. House districts have provided black winners since 1966").

*Third*, contrary to Plaintiff's claim, Pl. Mem. at 27-28, the passage of additional time since the 1965 enactment of the VRA does not undermine *City of Rome*'s precedential value. As discussed in detail above, in 2006, Congress learned that, notwithstanding measurable progress, racial discrimination in voting remains widespread in the covered jurisdictions. That such discrimination persists even four decades after passage of the 1965 Act illustrates just how intractable the problem has proven, and why a powerful remedy remains necessary; it surely

does not support Plaintiff's second-guessing Congress's "careful[ly] consider[ed]" judgment to retain Section 5, *City of Rome*, 446 U.S. at 181.

In sum, the records developed by Congress during both the 1975 and 2006 reauthorizations are remarkably similar in substance and content. The voluminous body of evidence before it in 2006 makes plain that despite progress in the covered jurisdictions, "Congress could rationally have concluded" that Section 5's protections remain necessary. *Id.* at 177.

**C.   The 2006 Reauthorization Is Constitutional Under the Court's *Boerne* Precedents**

As the foregoing makes clear, Section 5 clearly passes muster under *City of Rome*'s standard of rationality review. And, as a three-judge panel of this Court has recognized, rationality review is the proper standard here; any argument for a different standard must be directed to the Supreme Court. *See Nw. Austin*, 573 F. Supp. 2d at 242-46 (explaining why *City of Rome* and *Katzenbach* apply in evaluating the constitutionality of Section 5, and why their reasoning has not been undermined by later decisions; and further noting that the Court would be bound to apply *City of Rome* and *Katzenbach* even if the Court thought their reasoning had been undermined by later decisions, because, "as the Supreme Court has warned, '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [district courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions'") (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (alteration by Court)).

But, in any event, Congress's decision to reauthorize Section 5 also satisfies the three-part congruence-and-proportionality analysis set forth by the Supreme Court in the *Boerne* line of cases. In this context, the Supreme Court has consistently identified Section 5 as an exemplar

of appropriate remedial legislation. *See, e.g.*, *Boerne*, 521 U.S. at 530-33; *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 639, 640 (1999); *Hibbs*, 538 U.S. at 737-38; *id.* at 756-57 (Kennedy, J., dissenting).

Under *Boerne* step one (the nature of the constitutional right), Congress acted at the zenith of its enforcement powers in reauthorizing Section 5 because the statute is targeted at the intersection of a suspect classification (race) and a fundamental right (voting). *See Rice v. Cayetano*, 528 U.S. 495, 512 (2000). The fact that, in reauthorizing Section 5, Congress sought to enforce an express constitutional prohibition, distinguishes this case from situations where the Court has struck down legislation under *Boerne* as attempting to substantively redefine the scope of constitutional protections. *Boerne*, 521 U.S. at 519-29 (citing, *inter alia*, *Oregon v. Mitchell*, 400 U.S. 112 (1970)); *see also Katzenbach*, 383 U.S. at 326 (recognizing this same distinction.). Here, where Congress acts "within its sphere of power and responsibilities," *Boerne*, 521 U.S. at 535, it enjoys substantial latitude to fashion remedies, even when those remedies "intr[ude] into areas traditionally reserved to the States," *Lopez*, 525 U.S. at 282 (citing *City of Rome*, 466 U.S. at 179); *see also Nw. Austin*, 573 F. Supp. 2d at 270.

Under *Boerne* step two (the adequacy of the legislative record), the record described above clearly demonstrates a "pattern of constitutional violations on the part of the States in this area," *Hibbs*, 538 U.S. at 729. As noted, the breadth and scope of the 2006 reauthorization record is consistent with the record underlying the 1975 re-authorization, upheld in *City of Rome*, and far exceeds the records underlying the Family Medical Leave Act or Title II of the Americans with Disabilities Act, two statutes that have been upheld under *Boerne*. *See Nw. Austin* 573 F. Supp. 2d at 271 (discussing *Hibbs* and *Lane*).

Finally, under *Boerne* step three, Section 5 is congruent and proportional to ongoing deprivations of constitutionally-protected rights throughout the covered jurisdictions. *See Boerne*, 521 U.S. at 520, 533. Section 5, as reauthorized, forbids intentionally discriminatory (and thus unconstitutional) election laws, as well as a subset of laws with a racially discriminatory effect (those that are retrogressive). These are reasonable responses to widespread evidence of unconstitutional conduct. *See United States v. Georgia*, 546 U.S. 151, 158 (2006) (unconstitutional discrimination); *Boerne*, 521 U.S. at 529 (effects discrimination) (citing, *inter alia*, *City of Rome*). Furthermore, Section 5 includes numerous features that appropriately minimize its breadth, including a bail-out and bail-in provision, limited application (applying only to laws related to voting); and a sunset provision. *See Boerne*, 521 U.S. at 533. And, because Section 5 does not include a private damages remedy, Congress plainly has not enacted a benefit program in the guise of remedial legislation. *See Hibbs*, 538 U.S. at 744-45 (Kennedy, J., dissenting); *see also Alden v. Maine*, 527 U.S. 706, 751 (1999).

This is not to deny that Section 5's proactive remedy has federalism costs. But Congress carefully considered those costs as well during the reauthorization, learning that the administrative burden imposed by Section 5 is a modest one. *See*, *e.g.*, *May 16, 2006 Hearing*, at 64-65; *May 17, 2006 Hearing*, at 9-11, 25. As Don Wright, General Counsel of the North Carolina State Board of Elections testified, county officials he has worked with find that "preclearance requirements are routine and do not occupy an exorbitant amount of time, energy or resources[.]" SMF ¶ 361. Wright continued: "I could probably knock-out a pre-clearance on a routine matter in a half hour." *June 21, 2006 Hearing* at 12. Indeed, Congress learned that Section 5 is viewed by many election officials in the covered jurisdictions as a tool that enhances the integrity of the political process and helps avoid litigation. *Id.* at 12-13; *May 17, 2006*

*Hearing*, at 1415. A joint letter to Congress by the Council of State Governments, the National Conference of State Legislatures, the National Associations of Secretaries of State, the National Association of Counties, the National League of Cities, and the U.S. Conference of Mayors, stated: "While substantial progress has been made since passage of the Voting Rights Act in 1965, it has not yet resulted in the elimination of voting discrimination. Congress must renew [Section 5 and the other temporary] provisions of the Voting Rights Act." 152 Cong. Rec. H5143. A number of covered states also filed a brief in *Northwest Austin* explaining that they *favor* the existing scope and application of Section 5 coverage. *See* Br. for *Amici Curiae* North Carolina, Arizona, California, Louisiana, Mississippi and New York, *Nw. Austin Mun. Utility Dist. No. 1 v. Holder*, 129 S. Ct. 2504 (2009), No. 08-322, 2009 WL 815239, at *13-17 (describing how "the preclearance process substantially benefits covered jurisdictions").

The ultimate question under *Boerne* is whether since its prior reauthorizations, Section 5 has become "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Boerne*, 521 U.S. at 532. The record of ongoing discrimination in the covered jurisdictions and the tailored nature of Section 5 leave no doubt that the statute remains responsive to unconstitutional discrimination against minority voters, and is therefore valid enforcement legislation.

## II. CONGRESS'S DECISION TO RETAIN THE EXISTING GEOGRAPHIC SCOPE OF SECTION 5 COVERAGE WAS WELL-SUPPORTED BY THE LEGISLATIVE RECORD AND REMAINS WITHIN CONGRESS'S CONSTITUTIONAL AUTHORITY

The Section 4(b) geographic coverage provision is within Congress's "'broad power,'" to enforce the Reconstruction Amendments, *Lane*, 541 U.S. at 518 (citations omitted), because it "is sufficiently related to the problem [of voting discrimination] that [Section 5] targets." *Nw. Austin*, 129 S. Ct. at 2512. In 2006, Congress received comparative evidence of discrimination in

covered and non-covered jurisdictions, and made a reasonable determination to maintain Section 5 coverage in those jurisdictions where voting discrimination has remained a long and entrenched problem, while also maintaining those features of the VRA that, when appropriate, allow covered jurisdictions to be removed from Section 5 coverage and non-covered jurisdictions to come within the purview of the preclearance remedy.

Three propositions frame the analysis of the constitutionality of Congress's decision to retain the existing geographic scope of Section 5 coverage. *First*, the Supreme Court has consistently pointed to the fact that Section 5 is targeted to a limited set of jurisdictions as one of the factors weighing heavily *in favor* of its constitutionality. *See Boerne* 521 U.S. at 533; *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 (2001); *United States v. Morrison*, 529 U.S. 598, 626-27 (2000); *Fla. Prepaid*, 527 U.S. at 647. And, notwithstanding Plaintiff's assertion that the coverage provision violates principles of equal sovereignty amongst the states embodied in Article IV and the Tenth Amendment, Pl. Mem. at 43, "[d]istinctions [among the States] can be justified in some cases. 'The doctrine of equality of the States … does not bar … remedies for local evils….'" *Nw. Austin*, 129 S. Ct. at 2512 (quoting *Katzenbach*, 383 U.S. at 328-29).

*Second*, the Constitution requires that the "geographic coverage [provision be] *sufficiently* related to the problem" of voting discrimination. *Nw. Austin*, 129 S. Ct. at 2512 (emphasis added). Surgical precision is not the standard for determining the validity of Congress's exercise of its remedial powers. "Legislation need not deal with all phases of a problem in the same way, so long as the distinctions drawn have *some basis* in practical experience." *Katzenbach*, 383 U.S. at 331 (emphasis added). It is therefore not sufficient for Plaintiff simply to identify a few non-covered jurisdictions that, according to Plaintiff, also have

voting problems today. *See id.* at 330-31 (finding it "irrelevant that the coverage formula excludes certain localities" in which there was some "evidence of voting discrimination"); *see also Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.") (cited in *Katzenbach*, 383 U.S. at 331). Nor can Plaintiff prevail merely by asserting that, in its view, there are a few covered jurisdictions that should not have been covered by Section 5. The Supreme Court has "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment," *Salerno*, 481 U.S. at 745 (citation omitted), and the appropriate remedy for any such jurisdiction would be to seek a bailout from this court or to pursue a limited, as-applied challenge—both of which Plaintiff has expressly waived here. Plaintiff acknowledges that, to prevail on its facial challenge, it must demonstrate that the current coverage provision "lacks *any* connection to the current legislative record." Pl. Mem. at 37 (emphasis added).

*Third*, the Constitution does not require that Congress base its Section 5 coverage decisions on any particular *type* of evidence. *See Katzenbach*, 383 U.S. at 330 ("Congress obviously may avail itself of information from any probative source" in determining which jurisdictions should be covered by Section 5). During the 2006 reauthorization, Congress undertook an extensive study of current conditions with respect to voting discrimination, *see Nw. Austin*, 129 S. Ct. at 2512, which revealed ongoing and continuing discrimination in the covered jurisdictions, but no comparable circumstances in the non-covered jurisdictions. Thus, although disparities in registration and turnout rates persist in some covered jurisdictions,[14] these rates did

---

[14] "[T]he 2006 legislative record looks much like the evidence Congress compiled in 1975. As then, '[s]ignificant disparit[ies]' remain in registration rates 'in at least several of the covered jurisdictions.'" *Nw. Austin*, 573 F. Supp. 2d at 265-66 (quoting *City of Rome,* 446 U.S. at 180).

not form the basis for Congress's decision to maintain the Section 4(b) coverage provision. *See* 152 Cong. Rec. H5181-82 (daily ed. July 13, 2006) (statement of Rep. Sensenbrenner, Chair of the House Judiciary Committee) ("[C]overage is not, and I repeat 'not' predicated on [participation] statistics alone…. [T]he reauthorization …. is based on recent and proven instances of discrimination in voting rights compiled in the Judiciary Committee's 12,000-page record.").[15] Indeed, from the initial enactment of Section 5 through subsequent reauthorizations, discriminatory voting practices themselves, and not disparities in participation rates, have been the evil that Congress has sought to remedy. *See County Council of Sumter County v. United States*, No. 82-0912, 1983 U.S. Dist. LEXIS 20145, at *32 (D.D.C. Jan. 10, 1983) ("Obviously, the preclearance requirements of the original act and its 1982 amendment had a much larger purpose than to increase voter registration…"); *see also* SMF ¶ 390 (Testimony of Drew Days) ("the depressed turnout and registration levels were an indicator of the larger problem of entrenched discrimination in voting that Congress intended to address and not the end itself"); *May 17, 2006 Hearing,* at 73 (Testimony of Armand Derfner). In sum, contrary to Plaintiff's assertion, in 2006, Congress decided to re-authorize Section 5 in the covered jurisdictions because of widespread evidence of ongoing, persistent and adaptive discrimination, *not* because of participation rates in prior presidential elections.[16]

---

[15] Indeed, Congress considered an alternative to the existing coverage provision based on recent participation rates, *see* H.R. Rep. 109-554, at 2 (2006), but learned the resulting coverage would *not* have been sufficiently related to the problem of voting discrimination. The formula would have resulted in Hawaii becoming the only state covered in whole, while leaving out jurisdictions where the record showed persisting discrimination, *see* 152 Cong. Rec. H5181 (statement of Rep. Sensenbrenner); *see also* 152 Cong. Rec. S8010 (daily ed. July 20, 2006) (statement of Sen. Kennedy).

[16] Plaintiff's claim that registration and turnout rates in Shelby County and the State of Alabama have improved, *see* Compl. ¶ 30; Pl. Mem. at 1; Pl.'s Stmnt. of Mat. Facts ¶¶ 3-5; Ellis Decl. ¶ 11, is therefore irrelevant. Moreover, Plaintiff improperly relies on facts from outside of the 2006 legislative record, *see* note 13, *supra*, and improperly relies on Shelby County-specific evidence when, as noted, it has explicitly waived any as-applied challenge.

**A. Congress's Decision to Maintain the Existing Geographic Scope of Section 5 Coverage was Reasonable**

The Supreme Court has never held that a detailed, jurisdiction-by-jurisdiction comparison of the covered and non-covered jurisdictions is necessary to sustain Section 5. *See City of Rome*, 446 U.S. at 180-82 (upholding 1975 reauthorization without such a comparison); *Lopez*, 525 U.S. at 283-85 (same with respect to 1982 re-authorization).   Nevertheless, during the 2006 reauthorization, Congress received comparative evidence of discrimination, which revealed ongoing, widespread, and repeated violations of minority voting rights in the covered jurisdictions, but no such comparable record within the non-covered jurisdictions. In light of this evidence, Congress reasonably determined to keep the existing coverage formula.

Plaintiff discusses three categories of evidence comparing discrimination in covered and non-covered jurisdictions: (1) Section 2 litigation; (2) racially polarized voting; and (3) the deployment of federal observers. *See* Pl. Mem. at 38-39. Plaintiff, however, fails to grapple with the full extent of the record. These categories of evidence, as well as others completely ignored by Plaintiff, demonstrate that Congress acted reasonably in retaining the existing geographic scope of Section 5 coverage.

**1. Successful Section 2 Suits**

Plaintiff principally relies on a study of Section 2 litigation conducted by the Voting Rights Initiative (a research project at the University of Michigan Law School) (herein "Michigan Study"). *See* Pl. Mem. at 39-40; *October 18, 2005 Hearing*, at 964-1017 (copy of the study submitted to Congress).[17] Far from supporting Plaintiff's position, the Study leaves no doubt that the existing coverage provision is constitutional because it is rational, *see Katzenbach*,

---

[17] The final version of the Michigan Study was published after reauthorization. *See* Ellen D. Katz et al., *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982, Final Report of the Voting Rights Initiative*, 39 U. Mich. J.L. Reform 643 (2006).

383 U.S. at 324, or, put differently, is "sufficiently related" to the problem of voting discrimination, *Nw. Austin*, 129 S. Ct. at 2512.

The most significant data point revealed by the Michigan Study concerns successful Section 2 suits, because Section 2 is the principal vehicle by which minority voters litigate claims of voting discrimination. And, although Section 2 does not require a finding of unconstitutional discrimination, much of the evidence relevant to a finding of Section 2 liability is also probative of unconstitutional conduct. *Compare Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (setting forth test for vote dilution under Section 2) *with Rogers v. Lodge*, 458 U.S. 613, 616-28 (1982) (setting forth test for unconstitutional vote dilution); *see also LULAC*, 548 U.S. at 440 (in finding a Section 2 violation, noting that a statewide redistricting plan "bears the mark of intentional discrimination that could give rise to an equal protection violation").[18]

---

[18] In support of the argument that Section 2 cases resulting in a finding of intentional discrimination are "a rarity," Plaintiff makes the incorrect assertion that, "Congress identified only twelve published judicial decisions between 1982 and 2006 that found intentional voting discrimination on the basis of race by a covered jurisdiction, and half of those cases involved discrimination against white voters," and cites an appendix to the "Senate Report" to support that proposition. Pl. Mem. at 34. As a preliminary matter, the "Senate Report" in question was compiled *after* reauthorization (and therefore lies outside the scope of the relevant Congressional record). *See* note 13, *supra*; *see also* S. Rep. 109-295, at 55 (2006) (Statement of Sens. Leahy, Kennedy, Biden, Kohl, Feinstein, Feingold, Schumer and Durbin noting that "[n]othing written by a Member of Congress after final passage can diminish the force of those findings contained within the enacted legislation itself or the Member's vote supporting them. As several courts have suggested, post-passage legislative history is a contradiction in terms.") Moreover, this so-called "Senate Report" was not joined by a majority of the Senate Judiciary Committee. *See* 152 Cong. Rec. S8372 (daily ed. July 27, 2006) (statement of Sen. Leahy) (noting that the report "does not reflect the views of a majority" of the Committee, as only nine members of the committee, less than a majority, endorsed the report). In any event, this court in *Northwest Austin* recognized that the Senate Report understates the number of Section 2 cases involving findings of intentional discrimination against minority voters, *see Nw. Austin*, 573 F. Supp. 2d at 258, and neither Plaintiff nor this Senate Report identifies a single case involving allegations of "intentional" discrimination against white voters. All of the cases referred to by Plaintiff actually involved claims under *Shaw v. Reno*, 509 U.S. 630 (1993), which are "analytically distinct" from claims of intentional racial discrimination against a particular voter or group; instead, *Shaw* claims are based on the conclusion that *all* voters, of all races, may be harmed when race is unnecessarily the predominant factor in districting decisions. *Miller*, 515 U.S. at 911-13; *see Clark v. Putnam County*, 168 F.3d 458 (11th Cir. 1999); *Moon v. Meadows*, 952 F. Supp. 1141 (E.D. Va. 1997); *Smith v. Beasley*, 946 F. Supp. 1174 (D.S.C. 1996); *see also United States v. Hays*, 515 U.S. 737 (1995) (dismissing case for lack of standing).

The Michigan Study identified 114 electronically available Section 2 suits in which plaintiffs succeeded between 1982 and 2005,[19] *October 18, 2005 Hearing,* at 974, and found that, of those 114 suits, a majority (56%), 64, originated in the covered jurisdictions. *Id.* That fact is remarkable given that less than one quarter of the nation's population lives in a jurisdiction covered by Section 5. *Id.* Put another way, when adjusted for population, there were *more than three times* as many successful Section 2 suits in the covered jurisdictions than there were in the non-covered jurisdictions.[20] Rather than address this fact, which leaves no doubt that Section 5's geographic coverage is reasonable, Plaintiff simply ignores the population differences between the covered and non-covered jurisdictions.

And even this fact significantly understates the differences between the covered and non-covered jurisdictions, because the covered jurisdictions, unlike the non-covered jurisdictions, were subject to Section 5, which both blocked and deterred hundreds of discriminatory changes, thereby eliminating some need for Section 2 litigation.[21] In other words, it is because the preclearance mechanism exists only in the covered jurisdictions that one would expect

---

[19] Because the Michigan study considers only electronically reported cases, the numbers in that study, as its authors recognized, dramatically understate the total universe of Section 2 suits. *See October 18, 2005 Hearing,* at 974. In 2006, Congress learned that—including cases that were not reported electronically— there were a total of over 650 successful Section 2 suits between the 1982 re-authorization and 2004 in the nine states principally covered by Section 5. *See March 8, 2006 Hearing,* at 2008; *May 9, 2006 Hearing,* at 212; *May 9, 2006 Hearing,* at 158-59 (Testimony of Theodore Shaw noting that the Study "does not account for the vast number of Section 2 suits that are resolved through pre-trial settlement or those suits that are dismissed because the jurisdiction adopted a remedial plan").

[20] Although Plaintiff tries to cherry pick jurisdictions and asserts that there "were more federal judicial decisions finding Section 2 violations collectively in Arkansas, Illinois, and Tennessee than in Georgia, Louisiana, Texas, and Virginia combined," the very source relied on by Plaintiff (which is outside of the reauthorization record, see note 17, *supra*) contradicts that assertion, showing that there were more successful Section 2 suits against the covered jurisdictions named by Plaintiff (15), than against the non-covered jurisdictions listed (12). *See* S. Rep. No. 109-295, at 77-80.

[21] *See* Katz, 39 U. Mich. J.L. Reform at 655 ("[T]he record 'demonstrat[ed] that section 5 prevents discriminatory voting changes' by 'quietly but effectively deterring discriminatory changes") (alterations in original, quoted by *Nw. Austin,* 573 F. Supp. 2d at 264).

significantly *fewer* successful Section 2 suits in the covered jurisdictions.  Instead, there were *three times more* successful Section 2 suits in the covered jurisdictions.

### 2.   Racially Polarized Voting; Discrimination-Enhancing Electoral Devices; Racial Appeals; And The Lack of Minority Electoral Success

Plaintiff claims that racially polarized voting "is as likely to exist in non-covered jurisdictions as non-covered [*sic*] jurisdictions," Pl. Mem. at 39, noting that the Michigan Study identified almost an identical number of Section 2 decisions with findings of racially polarized voting in the covered as the non-covered jurisdictions. As discussed above, however, this means that, adjusted for population, there were roughly three times as many cases with findings of racially polarized voting in the covered jurisdictions as there were in the non-covered jurisdictions. *See also May 17, 2006 Hearing*, at 74-75 (Testimony of Pamela Karlan); *March 8, 2006 Hearing*, at 1754 (North Carolina Report); *October 25, 2005 (Need) Hearing*, at 50 (Testimony of Dick Engstrom).

Moreover, data from the Michigan Study also reveal that the *extent* of polarization is far more severe in covered jurisdictions. In covered jurisdictions, nearly 90% of the biracial elections analyzed by courts since 1982 involved white bloc voting of 80% or more; by contrast, in the non-covered jurisdictions, only 40% of the biracial elections involved white bloc voting of 80% or higher. *See May 16, 2006 Hearing*, at 48 (citing data from the Michigan Study).[22] This finding is consistent with other testimony before Congress which confirmed that racial polarization is more extreme in the covered jurisdictions. *See May 17, 2006 Hearing*, at 48 (Testimony of Anita Earls).

---

[22] These conclusions were published in a separate report. For the final version, *see* Ellen Katz, *Not Like the South? Regional Variation and Political Participation Through the Lens of Section 2*, Democracy, Participation and Power: Perspectives on Reauthorization of the Voting Rights Act 14 (ed. Ana Henderson 2007), *available at* http://www.sitemaker.umich.edu/votingrights/files/notlikethesouth.pdf.

Racially polarized voting is significant not because it represents discrimination by state actors, *cf.* Pl. Mem. at 6, but because, where there is racially polarized voting, government officials can employ electoral systems, such as at-large elections in majority-white jurisdictions, which "cancel out or minimize the voting strength of [minority voters]." *White v. Regester*, 412 U.S. 755, 765 (1973); *see also Gingles*, 478 U.S. at 48-50; *LULAC*, 548 U.S. at 438 (connecting racially polarized voting with "the possible submergence of minority votes—throughout Texas"). Indeed, officials in jurisdictions that implement voting changes are highly likely to be aware of, and are sometimes motivated by, the expected discriminatory impact. *See, e.g.*, *Rogers*, 458 U.S. at 623 (explaining that the existence of racially polarized voting, "bear[s] heavily on the issue of purposeful discrimination [and v]oting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race").

And, with respect to the key intersection between racially polarized voting and discriminatory election schemes, Plaintiff simply ignores that electoral devices that capitalize on racially polarized voting to discriminate against minority voters remain far more prevalent in the covered as opposed to the non-covered jurisdictions. Almost two-thirds of Section 2 cases finding the existence of such discrimination-enhancing electoral devices originated in the covered jurisdictions even though, to reiterate, those jurisdictions have less than one-quarter of the nation's population. *See October 18, 2005 Hearing*, at 998.

Plaintiff also ignores that racial appeals during campaigns[23] are more common in covered than non-covered jurisdictions. Notwithstanding the much smaller population of the covered

---

[23] Racial appeals are a factor for determining liability under Section 2. *See Gingles*, 478 U.S. at 40 (noting that the effect of racial appeals "is to lessen to some degree the opportunity of black citizens to participate effectively in the political processes and to elect candidates of their choice").

jurisdictions, a majority of Section 2 cases with judicial findings of racial appeals originated in the covered jurisdictions. *See id.* at 1003. Indeed, Congress learned from other sources that such racial appeals—including candidates' emphasizing their opponent's race by disseminating campaign literature with their *opponent's* picture, sometimes darkened—remain common in biracial elections in certain covered jurisdictions. *See, e.g.*, *May 17, 2006 Hearing*, at 17 (Testimony of Armand Derfner); *May 10, 2006 Hearing*, at 22-23 (Testimony of Robert McDuff); *May 9, 2006 Hearing*, at 44-45 (Testimony of Chandler Davidson); *October 20, 2005 Hearing*, at 85 (Testimony of Armand Derfner).

In light of the persistence of discriminatory-enhancing election devices and racial campaign appeals, it is unsurprising that the Michigan Study discovered that minority candidates find it much more difficult to succeed in the covered, as opposed to the non-covered jurisdictions. *See October 18, 2005 Hearing*, at 1008 (noting that 49 of 85 Section 2 cases finding a lack of minority electoral success originated in the covered jurisdictions).

### 3. Federal Observers

Section 5 covered jurisdictions—which, as noted above, are home to roughly one-quarter of the nation's population—have accounted for the vast majority of federal observer deployments between 1982 and 2006. Indeed, just five of the six states originally covered by Section 5 (Alabama, Georgia, Louisiana, Mississippi, and South Carolina) accounted for 66% of all observer coverage nationwide since 1982. *See* H.R. Rep. No. 109-478, at 24-25.

Moreover, nearly every jurisdiction that is currently certified for federal observers[24] is a Section 5 covered jurisdiction. At present, there are 164 counties located in 16 states that are

---

[24] Jurisdictions can become certified for federal observer coverage in only one of two ways: (1) based on meritorious complaints received by the Attorney General, *see* 42 U.S.C § 1973d; or (2) pursuant to a court order as part of a final judgment resolving a voting discrimination case, *see id.* § 1973a(a).

certified for federal observers.[25] The vast majority of those observer-certified counties—149 total—are located in one of the states fully covered by Section 5,[26] and five other counties are also Section 5 covered jurisdictions.[27] In all, 154 out of the 164 observer-certified counties, or 93.9%, are Section 5 jurisdictions. If we exclude those jurisdictions that were not certified for observers until after 2006, then 150 out of 152 observer-certified counties, or 98.7%, are found in Section 5 covered jurisdictions.[28]

Observer deployments are probative of discrimination, as observers are only deployed to locations where "the facts show that African American [and other minority] voters are likely to be victimized on election day." SMF ¶ 217 (Testimony of Barry Weinberg). *Cf.* Pl. Mem. at 35 (asserting that observers do not categorically prove the existence of discrimination but apparently not disputing that their deployment is probative). Indeed, Congress heard substantial testimony concerning the vital role that observers have played in blocking and deterring voting discrimination in elections in Alabama and elsewhere, *see, e.g.*, *March 8, 2006 Hearing*, at 182-

---

[25] A total of 16 states contain counties or parishes that have been certified for federal election observer coverage. One hundred fifty-one counties and parishes in 11 states have been certified by the Attorney General: Alaska (1), Alabama (22), Arizona (3), Georgia (29), Louisiana (12), Mississippi (50), New York (3), North Carolina (1), South Carolina (11), South Dakota (1) and Texas (18). Thirteen additional counties in 9 states (4 of which overlap with the preceding list) have been certified by a federal court: California (2), Illinois (1), Louisiana (1), New Jersey (1), New Mexico (2), New York (1), Ohio (1), South Dakota (2), and Texas (2). *See* U.S. Dep't of Justice, Civil Rights Division, *About Federal Observers and Election Monitoring*, Sept. 7, 2010 *available at* http://www.justice.gov/crt/voting/examine/activ_exam.php.

[26] The fully covered Section 5 states, with their total number of observer-certified jurisdictions, are as follows: Alaska (1); Alabama (22); Arizona (3); Georgia (29); Louisiana (13); Mississippi (50); South Carolina (11); Texas (20); and Virginia (0). For a list of states wholly-covered by Section 5, *see* U.S. Dep't of Justice, Civil Rights Division, *Section 5 Covered Jurisdictions*, July 25, 2008, *available at* http://www.justice.gov/crt/voting/sec_5/covered.php.

[27] These are: Edgecombe, NC; Shannon, SD; Bronx, Kings, and New York, NY.

[28] There are 12 currently certified counties that did not first become certified until after 2006. Eight are jurisdictions not covered by Section 5: Walnut, CA; Riverside, CA; Kane, IL; Penns Grove, NJ; Port Chester, NY; Cuyahoga, OH; Buffalo, SD; Charles Mix, SD. Four are Section 5 covered jurisdictions: Shannon, SD; Williamson, TX; Fort Bend; TX; Galveston, TX. *See* U.S. Dep't of Justice, Civil Rights Division, *About Federal Observers and Election Monitoring*, *supra*.

183 (Testimony of Bobby Singleton); *March 8, 2006 Hearing*, at 3505 (Report of the National Commission on the Voting Rights Act). As the House Report explains: "[o]bservers have played a critical role preventing and deterring 14th and 15th amendment violations by communicating to the Department of Justice any allegedly discriminatory conduct for further investigation." H.R. Rep. 109-478, at 24-25; *see also id*. at 45.

### 4. The State Reports Before Congress Confirm that Congress Made a Reasonable Distinction Between the Covered and Non-Covered Jurisdictions

In addition to the evidence discussed above, Congress also received evidence regarding discrimination in the covered jurisdictions in the form of extensive state reports that included each of the principally covered jurisdictions, and from non-covered jurisdictions, including Arkansas, Oklahoma, Tennessee, and Wisconsin. *See May 4, 2006 Hearing*, at 132-176, 235-257; *October 25, 2005 (History) Hearing*, at 3145-3148. State reports for the covered jurisdictions revealed ongoing and widespread discrimination against minority voters, including numerous "repeat offenders." *See generally* Part I.A.1, *supra*. In stark contrast, the state reports for the non-covered jurisdictions contained no such comparable evidence of discrimination. *See May 4, 2006 Hearing*, at 132-176, 235-257; *October 25, 2005 (History) Hearing*, at 3145-3148

Notwithstanding the absence of evidence in the Congressional record of barriers to political participation ("second generation" or otherwise) in the non-covered jurisdictions like those in the covered jurisdictions, Plaintiff asserts—without any evidentiary basis—that such practices "generally exist to an equal or greater degree in non-covered jurisdictions." Pl. Mem. at 38. Plaintiff places reliance for its claim on a single witness whose analysis turned primarily upon current participation rates in a single state (Georgia), and a limited discussion of racially polarized voting in isolated elections. *See October 25, 2005 (History) Hearing*, at 14 (Testimony of Ed Blum). That witness simply ignored the record of widespread, persistent and adaptive

40

discrimination that exists in the covered jurisdictions, but not in the non-covered jurisdictions; the starker levels of racial polarization throughout the covered jurisdictions relative to non-covered jurisdictions; the far more frequent use of electoral devices that capitalize on racially polarized voting to diminish minority voting strength, as well as more frequent racial campaign appeals, and a comparative lack of minority electoral success, in the covered jurisdictions. *See* Parts I.A.1., II.A.1-3, *supra*.

The record instead supported the conclusion of one experienced voting rights litigator, who noted that there is a "clear differentiation between the covered and non-covered jurisdictions," with respect to the need for the Section 5 remedy. SMF ¶ 338 (Testimony of Anita Earls, relying on her "experience of litigating voting rights cases around the country over the past 18 years [including as Deputy Assistant Attorney General], including cases in covered and non-covered jurisdictions."). Put simply, in contrast to the record of entrenched, widespread discrimination that persists in the covered jurisdictions, "there is no evidence of significant and continuing violations of minority voting rights at the state and local level in the non-covered jurisdictions." *Id.* at 47-48; *see also May 9, 2006 Hearing*, at 44-45 (Testimony of Chandler Davidson); *May 9, 2006 Hearing*, at 159 (Responses by Theodore Shaw).

### B.  The VRA Contains Built-In Features That Confirm Its Constitutionality

For the foregoing reasons, the legislative record clearly establishes that Congress acted reasonably in opting to maintain Section 5 coverage in those jurisdictions where voting discrimination has proven the most persistent and entrenched. In addition, the so-called "bailout" and "bail-in" provisions confirm the constitutionality of the statute by allowing eligible jurisdictions to terminate their Section 5 covered-status, and allowing for an extension of Section 5's reach to non-covered jurisdictions with a record of intentional discrimination.

1. **The Bailout Provision Allows Covered Jurisdictions to End Section 5 Coverage When It Is No Longer Appropriate**

    a. *The Requirements for Bailout Are Reasonable and Easy to Satisfy*

Congress heard substantial testimony concerning bailout and concluded that the existing provision is workable and provides a relatively easy way for jurisdictions that have satisfied their Section 5 obligations to exempt themselves from future coverage. *See, e.g.*, H.R. Rep. No. 109-478, at 61; *October 20, 2005 Hearing*, at 163. As was the case in 1965, "the relevant facts relating to the conduct of voting officials are peculiarly within the knowledge of the States and political subdivisions themselves." *Katzenbach*, 383 U.S. at 332; *see also* H.R. Rep. No. 109-478 at 25. Moreover, the cost of bailout is minimal: less than $5,000 on average. *October 20, 2005 Hearing*, at 106; *see also id.* at 90 (Testimony of J. Gerald Hebert). Finally, the Justice Department provides substantial support and is not mechanical in its approach to determining a jurisdiction's bailout-eligibility. *See May 10, 2006 Hearing*, at 61 (Testimony of Wan Kim (citing *See* S. Rep. No. 97-417, at 48 (1982)); *October 20, 2005 Hearing*, at 104 (Testimony of Armand Derfner); *March 8, 2006 Hearing*, at 2664 (Report by J. Gerald Hebert).

Wholly unsupported by any evidence from the legislative record or otherwise, Plaintiff asserts that bailout became an "unrealistic" option after the 1982 amendments. Pl. Mem. at 41 n.8. But the majority of jurisdictions that have bailed out successfully did so after 1982.[29] And, unlike the period prior to 1982, when some bailouts were denied, *see October 20, 2005 Hearing*, at 87-88 (Testimony of J. Gerald Hebert), every jurisdiction that has sought bail out after 1982 has been approved. *See May 9, 2006 Hearing,* at 161 (Testimony of Theodore Shaw); *March 8, 2006 Hearing*, at 2684 (Report by J. Gerald Hebert). It is also noteworthy that no jurisdiction

---

[29] For a list of jurisdictions that have bailed out, *see* U.S. Dep't of Justice, Civil Rights Division, Voting Section Home Page, *Section 4 of the Voting Rights Act*, http://www.justice.gov/crt/voting/misc /sec_4.php.

that bailed out after 1982 has been subject to re-coverage, which was not the case during the pre-1982 period. *See March 8, 2006 Hearing*, at 2684 (Report by J. Gerald Hebert).

Finally, the current bailout provision allows a far broader range of jurisdictions to bailout than ever before. Congress's 1982 amendments "substantial[ly] liberalize[d]" the bailout statute by making over 900 jurisdictions separately eligible, and this number of bailout-eligible jurisdictions has expanded multi-fold following the Supreme Court's 2009 ruling in *Northwest Austin*, which permits all covered jurisdictions, including political subunits, to seek bailout from this Court. *See* 129 S. Ct. at 2516-17.

During the 2006 reauthorization, Congress considered proposed amendments to the bailout provision,[30] and, in light of the foregoing, made a rational determination to leave the current bailout provision intact.[31]

### b.  Shelby County's Ineligibility for Bailout Is Irrelevant to this Action

Contradicting its own position that Shelby County-specific facts are irrelevant to this action, *see* Pl.'s Reply to Defendant-Intervenors' Rule 56(f) Mem. at 4, Plaintiff points to its own experience, stating that Shelby County is ineligible for bailout in part because of an objection

---

[30] Congress considered two proposals to modify the bailout provision: one that would automatically bail out several jurisdictions that hold large concentrations of military personnel, *see* H.R. Rep. No. 109-478, at 130, 151-65 (2006), and another that would have directed DOJ to conduct an annual review and proactively bail out eligible jurisdictions. *See* H.R. Rep. No. 109-554, at 2 (2006). The former was withdrawn after it was pointed out that at least one of those jurisdictions had a Section 5 objection, *see* H.R. Rep. No. 109-478, at 162 (2006); the latter was rejected as impractical and as granting DOJ too much authority to direct the bailout process, *see* 152 Cong. Rec. H5201-06 (daily ed. July 13, 2006) (statements of Reps. Chabot, Watt, and Sensenbrenner).

[31] Shortly after the 2006 reauthorization, numerous jurisdictions obtained bailout, including six counties and one city in Virginia. *See* U.S. Dep't of Justice, Civil Rights Division, Voting Section Home Page, Section 4 of the Voting Rights Act, *supra*. Additional jurisdictions continue to bail out. Last month, this Court approved bailout applications by Kings Mountain, North Carolina and Sandy Springs, Georgia. *See City of Kings Mountain v. Holder*, No. 10-cv-01153 (D.D.C.), Dkt. No. 7 (Oct. 22, 2010); *City of Sandy Springs v. Holder*, No. 10-cv-01502 (D.D.C.), Dkt. No. 7 (Oct. 26, 2010). Another application for bailout is currently pending, *see* Mason Adams, *Roanoke Seeks "Bailout" from Voting Rights Act*, Roanoke Times, Aug. 8, 2010, *available at* http://www.roanoke.com/news/roanoke/wb/256275.

drawn by one of its jurisdictions, the City of Calera (the "Calera objection"), and asserts that this objection was not "suggestive of intentional discrimination against minority voters by Shelby County." Pl. Mem. at 41 n.8.

In fact, Calera's failure to report discriminatory annexations was no small matter—annexations were at issue in *City of Rome*, where the Court held that Rome had diluted the vote of African Americans by engaging in annexations that had a clear "discriminatory effect." *City of Rome*, 46 U.S. at 172; *see also id.* at 185-87; *City of Pleasant Grove, Alabama v. United States*, 479 U.S. 462, 470 (1987) ("[T]he failure to annex [black] areas, while the city was simultaneously annexing non-black areas, is highly significant in demonstrating that the city's annexation here was purposefully designed to perpetuate Pleasant Grove as an enlarged enclave of white voters.") (citation and internal quotation marks omitted).

The annexations at issue in Calera had precisely the same effect, diluting African-American voting strength in the lone city council district in Calera that had afforded African Americans an opportunity to elect candidates of their choice. *See* Montgomery Decl. ¶¶ 7-8. One of the City's five single-member city council districts—District 2—is majority African-American, and is the only district that has ever elected an African American to Calera's city council. *Id.* ¶¶ 2, 4. The 2008 election in Calera took place after 177 annexations and a redistricting, none of which were precleared. These unprecleared voting changes resulted in a decline in District 2's African-American registered voter population from 70.9% to 29.5%, and the electoral defeat of Ernest Montgomery, the city council's lone African-American member. *Id.* ¶¶ 6-8. Only after DOJ interposed an objection was a new redistricting plan drawn and a new election conducted, after which Councilmember Montgomery won his seat back. *Id.* ¶¶ 9-10.

**2.   The Section 3(c) "Bail-In" Provision Allows Non-Covered Jurisdictions to Come Within the Scope of Section 5 Coverage When Appropriate**

Plaintiff also fails to recognize the existence of Section 3(c) of the VRA, known as the "bail-in" or "pocket trigger" provision, which provides a statutory mechanism that allows an expansion of Section 5 to non-covered jurisdictions when appropriate. Specifically, Section 3(c) allows courts to "retain jurisdiction for such period as [they] may deem appropriate" and to order that no voting change take effect unless either approved by the court or unopposed by the Attorney General. 42 U.S.C. § 1973a(c).

Plaintiff's apparent suggestion that the geographic coverage provision should have included Arkansas and New Mexico, *see* Pl. Mem. at 38-39, is ironic given that those states were at various times subject to preclearance obligations pursuant to the bail-in provision. *See Jeffers v. Clinton*, 740 F. Supp. 585, 594, 600 (E.D. Ark. 1990); *Sanchez v. Anaya*, No. 82-0067M ¶ 8 (D.N.M. Dec. 17, 1984) (judgment). Congress was well aware of the bail-in provision during the 2006 reauthorization, and reasonably concluded that Section 3(c) adequately resolves concerns regarding any potential under-inclusiveness in Section 4(b). *See May 16, 2006 Hearing*, at 13 (Testimony of Pamela Karlan); *id.* at 42 (Testimony of Anita Earls).

## CONCLUSION

For the reasons set forth above, the Plaintiff's motion for summary judgment should be denied and summary judgment should be granted to the Defendant-Intervenors in this case.

November 15, 2010

Respectfully submitted,

/s/ Kristen Clarke_____
John Payton
 *Director-Counsel*
Debo P. Adegbile
Kristen M. Clarke (D.C. Bar No. 973885)

45

Ryan P. Haygood
Dale E. Ho
NAACP Legal Defense and
   Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, New York 10013
(212) 965-2200

Samuel Spital
Squire, Sanders & Dempsey, L.L.P.
30 Rockefeller Plaza
New York, New York 10112
(212) 872-9800

*Counsel for Cunningham Defendant-Intervenors*