**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHELBY COUNTY, ALABAMA, | |
| Plaintiff, | |
| v. | Civil Action No. 1:10-CV-651 (JDB) |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States of America, | |
| Defendant, | |
| EARL CUNNINGHAM, HARRY JONES, ALBERT JONES, ERNEST MONTGOMERY, ANTHONY VINES and WILLIAM WALKER; BOBBY PIERSON, WILLIE GOLDSMITH SR., KENNETH DUKES, MARY PAXTON-LEE, and the ALABAMA STATE CONFERENCE OF THE NAACP; and BOBBY LEE HARRIS, | |
| Defendants-Intervenors. | |

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT AND DEFENDANTS-
INTERVENORS**

Judith E. Schaeffer[*] (D.C. Bar # 273177)
David H. Gans (D.C. Bar # 461002)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, NW, Suite 1002
Washington, D.C. 20036
Tel.: (202) 296-6889
Fax: (202) 296-6895

[*]*Counsel of Record*

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Table of Authorities ............................................................................................................ ii

Introduction .........................................................................................................................1

Argument .............................................................................................................................3

    I.    THE FIFTEENTH AMENDMENT GIVES CONGRESS BROAD
        ENFORCEMENT POWER TO ERADICATE RACIAL DISCRIMINATION IN
        VOTING ...................................................................................................................3

    II.   THE TEXT OF THE FIFTEENTH AMENDMENT WAS INTENDED AND
        UNDERSTOOD TO GIVE CONGRESS THE SAME BROAD LEGISLATIVE
        POWERS RECOGNIZED IN *McCULLOCH v. MARYLAND* ...................................7

    III.  THE HISTORY OF THE FIFTEENTH AMENDMENT DEMONSTRATES
        THAT "APPROPRIATE" ENFORCEMENT LEGISLATION INCLUDES
        BROAD, PROPHYLACTIC REGULATION TO PROTECT THE RIGHT TO
        VOTE......................................................................................................................13

    IV.  THE SUPREME COURT HAS CONSISTENTLY HELD THAT *McCULLOCH*'S
        BROAD CONSTRUCTION OF CONGRESSIONAL POWER APPLIES TO
        LEGISLATION ENFORCING THE FIFTEENTH AMENDMENT .......................15

Conclusion .........................................................................................................................19

Certificate of Service .........................................................................................................20

# TABLE OF AUTHORITIES

**Page**

Cases

*Ableman v. Booth*, 62 U.S. (21 How.) 506 (1859)........................................................................10

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ..............................................................2, 17, 18

*City of Rome v. United States*, 446 U.S. 156 (1980).................................................... 2, 15, 16-17

*Civil Rights Cases*, 109 U.S. 3 (1886) .........................................................................17

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857)............................................................13

*Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) ..................................................................18

*Georgia v. United States*, 411 U.S. 526 (1973) ...............................................................2

*James Everard's Breweries v. Day*, 265 U.S. 545 (1924) .......................................................17

*Jones v. Alfred Meyer Co.*, 392 U.S. 409 (1968) ...............................................................17

*Legal Tender Cases*, 79 U.S. 457 (1870) ....................................................................12

*Lopez v. Monterey County*, 525 U.S. 266 (1999).............................................................2, 18

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ...............................................*passim*

*Northwest Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504 (2009) ..........................16, 18

*Oregon v. Mitchell*, 400 U.S. 112 (1970) .....................................................................18

*Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 539 (1842)..........................................................10, 11

*Rice v. Cayetano*, 528 U.S. 495 (2000)........................................................................3

*Smith v. Moody*, 26 Ind. 299, 1866 WL 2473 (Ind.) ..........................................................12

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966)........................................................2, 16, 17

*Tennessee v. Lane*, 541 U.S. 509 (2004).......................................................................17

*United States v. Reese*, 92 U.S. 214 (1875) ...................................................................3

*United States v. Rhodes*, 27 F.Cas. 785 (C.C.D. Ky. 1866).....................................................11, 12

*Yick Wo v. Hopkins,* 118 U.S. 356 (1886) .....................................................................17

**TABLE OF AUTHORITIES (continued)**

Page

Constitutional Provisions, Statutes, and Legislative Materials

U.S. Const. art. IV, § 2, cl. 3 ................................................................................10

U.S. Const. amend. XV, § 1 ...................................................................................3

U.S. Const. amend. XV, § 2 ...................................................................................3

Cong. Globe:

    39th Cong., 1st Sess. (1866):

        475 ....................................................................................................11

        586 ......................................................................................................8

        1093 ..................................................................................................12

        1118 ............................................................................................9, 11, 12

        1124 ....................................................................................................9

        1292 ..................................................................................................12

        1294 ..............................................................................................11, 12

        2765 ....................................................................................................8

        2766 ....................................................................................................8

    40th Cong., 3rd Sess. (1869):

        642 ......................................................................................................5

        672 ......................................................................................................3

        697 ......................................................................................................5

**TABLE OF AUTHORITIES (continued)**

Page

40th Cong., 3rd Sess. (1869) (cont'd):

708.................................................................................................................5

709.............................................................................................................3, 4

724.................................................................................................................3

725...............................................................................................................14

727.................................................................................................................4

981.................................................................................................................6

983.................................................................................................................4

989.................................................................................................................5

1625...............................................................................................................4

1626...............................................................................................................6

41st Cong., 2nd Sess. (1870):

3563...............................................................................................................4

3608.......................................................................................................1, 6, 15

3655...............................................................................................................4

3657...............................................................................................................15

3658.......................................................................................................14-15, 15

3663.............................................................................................................4-5

3670..........................................................................................................4, 14

3680.............................................................................................................11

3882...............................................................................................................9

42nd Cong., 1st Sess. (1871):

app. 70...........................................................................................................11

**TABLE OF AUTHORITIES (continued)**

Page

42nd Cong., 2nd Sess. (1872):

    525................................................................................................................13

    728..................................................................................................................9

43rd Cong., 1st Sess. (1874):

    414..................................................................................................................9

    4084................................................................................................................9

    4085............................................................................................................5, 9


<u>Books, Articles, and Other Materials</u>

JAMES KENT, COMMENTARIES ON AMERICAN LAW (1826)............................................13

JOHN T. NOONAN, NARROWING THE NATION'S POWER: THE SUPREME COURT SIDES WITH THE
    STATES (2002)....................................................................................................7

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833) ........ 12-13

Akhil Reed Amar, *Intratextualism*, 112 HARV. L. REV. 747 (1999) ...............................7

Evan Caminker, *"Appropriate" Means-Ends Constraints on Section 5 Powers,* 53 STAN. L.
    REV. 1127 (2001) ...............................................................................................7

Steven A. Engel, *Note, The* McCulloch *Theory of the Fourteenth Amendment:* City of Boerne
    v. Flores *and the Original Understanding*, 109 YALE L.J. 115 (1999) ....................................7

Robert J. Kaczorowski, *The Supreme Court and Congress' Power to Enforce Constitutional
    Rights: An Overlooked Moral Anomaly*, 73 FORDHAM L. REV. 153 (2004)............................10

Michael W. McConnell, *Institutions and Interpretation*,
    111 HARV. L. REV. 153 (1997) ............................................................7, 7-8, 13-14

## INTRODUCTION

On July 27, 2006, President George W. Bush signed into law the Fannie Lou Hamer, Rosa Parks, & Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 ("2006 Reauthorization").  Congress had presented President Bush with the legislation the day before, with the Senate having passed the Act by a vote of 98-0 and the House 390-33.  In an extraordinary display of bipartisan unity, the elected branches of the federal government reauthorized the preclearance provision in Section 5 of the historic Voting Rights Act for another twenty-five years.  The question in this case is whether the courts should set aside the determination of the elected branches that the 2006 Reauthorization is "appropriate legislation" for purposes of enforcing the Fifteenth Amendment.  The text and history of the Fifteenth Amendment provide a clear answer supporting the constitutionality of the 2006 Reauthorization of the Voting Rights Act: when Congress acts to prevent discrimination in voting on account of race, its authority is broad and entitled to great deference.

Plaintiff Shelby County argues that the preclearance provision in Section 5 of the Voting Rights Act raises concerns over "continuing interference with authority delegated to the States," Pl.'s Mem. Supp. Summ. J. at 4, positing that Section 5 is unconstitutional because it "intrudes upon a covered jurisdiction's authority and control over local elections," Compl. ¶ 39(d).  These state sovereignty concerns echo the same rejected arguments opponents of the Fifteenth Amendment made in challenging the Amendment's adoption by Congress and its ratification by the States; they also ignore the historical reality that the Amendments ratified immediately after the Civil War were "the result of [a] great constitutional revolution" that "ended with the vindication of individual rights by the national power."  Cong. Globe, 41st Cong., 2nd Sess. 3608 (1870) (Sen. Schurz).  History shows that the Fifteenth Amendment gave Congress broad power

– no less sweeping than Congress' Article I powers – to ensure that the right to vote free from racial discrimination would be fully enjoyed by all Americans.

Supreme Court precedent dictates a constitutionally faithful interpretation of Congress' broad power to enforce the Fifteenth Amendment's prohibition on racial discrimination in voting.  On four separate occasions, the Supreme Court has upheld the preclearance and coverage provisions of the Voting Rights Act – the same provisions Shelby County challenges – concluding that Congress has broad power to enact prophylactic regulation to prevent and deter unconstitutional racial discrimination in voting by state and local governments.  *See South Carolina v. Katzenbach*, 383 U.S.  301 (1966); *Georgia v. United States*, 411 U.S. 526 (1973); *City of Rome v. United States*, 446 U.S. 156 (1980); *Lopez v. Monterrey County*, 525 U.S. 266 (1999).  While the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997), held that Congress' power to enforce the Fourteenth Amendment's open-ended guarantees of liberty and equality does not permit Congress to create new constitutional rights, that concern does not justify limiting Congress' power to enforce the specific terms of the Fifteenth Amendment, which expressly secures the right to vote free from racial discrimination and gives Congress the power to ensure that right is fully enjoyed by all Americans.  Congress' nearly unanimous decision to reauthorize the preclearance provision of the Voting Rights Act falls squarely within Congress' broad power to enforce the Fifteenth Amendment.

**ARGUMENT**

I. **THE FIFTEENTH AMENDMENT GIVES CONGRESS BROAD ENFORCEMENT POWER TO ERADICATE RACIAL DISCRIMINATION IN VOTING.**

Proposed in 1869 and ratified in 1870, the Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. CONST. amend. XV, § 1. To make this guarantee a reality, the Amendment then provides that "[t]he Congress shall have power to enforce this article by appropriate legislation." *Id.* § 2. As the Supreme Court recognized just five years after the Fifteenth Amendment's ratification, "the amendment has invested citizens of the United States with a new constitutional right which is within the protecting power of Congress. That right is exemption from discrimination of the elective franchise on account of race, color, or previous condition of servitude." *United States v. Reese*, 92 U.S. 214, 218 (1875). "Previous to this amendment, there was no constitutional guaranty against this discrimination: now there is." *Id. See also Rice v. Cayetano*, 528 U.S. 495, 522 (2000) (explaining that the "Fifteenth Amendment has independent meaning and force").

In adding to the Constitution a protection for the right to vote for all citizens free from racial discrimination and giving Congress the lead role in enforcing this new constitutional right, the Framers explained that the Fifteenth Amendment would be "the capstone in the great temple of American freedom," Cong. Globe, 40th Cong., 3rd Sess. 724 (1869) (Rep. Ward), that would "crown the great work" of emancipation, and "make every citizen equal in rights and privileges." *Id.* at 672 (Sen. Wilson). Observing that "[t]he irresistible tendency of modern civilization is in the direction of the extension of the right of suffrage," *id.* at 709 (Sen. Pomeroy), the Framers emphasized that the right to vote was a fundamental right, indispensable to ensuring freedom for

3

African Americans.  Indeed, without protection for the right to vote free from discrimination, the Constitution's promise of equality was "incomplete" and "radically defective."  *Id.*  "The ballot is as much the bulwark of liberty to the black man as it is to the white. . . . No class, no race is truly free until it is clothed with political power sufficient to make it the peer of its kindred class or race." *Id.* at 983 (Rep. Ross).

During the debates on the Fifteenth Amendment, the Framers made clear that the Amendment's Enforcement Clause, like that of the Thirteenth and Fourteenth Amendments, gave Congress a broad "affirmative power" to secure the right to vote.  Cong. Globe, 40th Cong., 3rd Sess. 727 (1869) (Rep. Bingham); *id.* at 1625 (Sen. Howard) ("Congress . . . under the second clause of this amendment" has the power to "impart by direct congressional legislation to the colored man his right to vote.  No one can dispute this.").

In 1870, the same year the Fifteenth Amendment was ratified, Congress invoked the Amendment's Enforcement Clause in support of voting rights legislation, reflecting the Framers' judgment that the Fifteenth Amendment is "ample and full and clothes Congress with all the power to secure the end which it declares shall be accomplished."  Cong. Globe, 41st Cong., 2nd Sess. 3563 (1870) (Sen. Carpenter).  The Amendment's Enforcement Clause, Senator Oliver Morton explained, "intended to give Congress the power of conferring upon the colored man the full enjoyment of his right.  We so understood it when we passed it. . . .[T]he second section was put there . . . for the purpose of enabling Congress to take every step that might be necessary to secure the colored man in the enjoyment of these rights."  *Id.* at 3670; *id.* at 3655 (Sen. Howard) (explaining that the "intention and purpose" of the Fifteenth Amendment's Enforcement Clause was to "secure to the colored man by proper legislation the right to go to the polls and quietly and peacefully deposit his ballot there"); *id.* at 3663 (Sen. Sherman) ("Congress has a right by

appropriate legislation to prevent any state from discriminating against a voter on account of his race . . . ."). *See also* Cong. Rec., 43rd Cong., 1st Sess. 4085 (1874) (Sen. Carpenter) (observing that the Enforcement Clause of the Fifteenth Amendment was added to allow Congress "to act affirmatively" and ensure that "the right to vote should be enjoyed").

Both supporters and opponents alike recognized that the Fifteenth Amendment's Enforcement Clause radically altered the balance of powers between the federal government and the states, giving Congress broad authority to secure the right to vote to African Americans and to eradicate racial discrimination in state elections. Congressional opponents of the Fifteenth Amendment challenged it as "radical and revolutionary," arguing that allowing Congress to restrict the authority of states to set their own voter qualifications "strikes at the power of the States to determine and establish, each for itself, the qualification of its own voters," Cong. Globe, 40th Cong., 3rd Sess. 708 (1869) (Sen. Dixon), and "invade[s] the jurisdiction of State authority and subject[s] all the States of the Union to Federal control." *Id.* at 642 (Rep. Elridge). Opponents of the Fifteenth Amendment were vehemently against conferring on Congress "all power over what our Constitution regards as the proper subject of State action exclusively." *Id.* at 697 (Rep. Burr). As Sen. Thomas Hendricks put it, "when the Constitution of the United States takes away from the State the control over the subject of suffrage it takes away from the State the control of her own laws upon a subject that the Constitution of the United States intended she should be sovereign upon." *Id.* at 989.

These concerns over state sovereignty were flatly rejected by the Framers of the Fifteenth Amendment, who explicitly conferred on Congress the power to secure the right to vote free from racial discrimination. During the debates on the Fifteenth Amendment, Sen. George Edmunds explained that it was necessary to "withdraw from the States of this Union who have

hitherto exercised it the entire power over the political question of the right of suffrage" because "in many of these States there are large classes of citizens who are practically ostracized from the Government . . . ."  Cong. Globe, 40th Cong., 3rd Sess. 1626 (1869).  "The time has arrived," Sen. Joseph Abbott declared, "when the power of the General Government should be felt within every foot of its territory. . . .  [T]he time has come when it is the duty of the Government to assert its supremacy and protect life and property everywhere in the United States."  *Id.* at 981.  "[T]his Government was founded on the idea that all political power was vested in the people – not a third of a half or any fraction, but all the people."  *Id.*

In short, the Fifteenth Amendment radically altered the constitutional balance between the states and the federal government, giving to Congress broad power to prevent and deter racial discrimination in voting.  As Sen. Carl Schurz explained during debates over Congress' first attempt to enforce the Fifteenth Amendment:

> [T]he Constitution of the United States has been changed in some most essential points, that change does amount to a great revolution . . . . The revolution found the rights of the individual at the mercy of the States, it rescued them from their arbitrary discretion, and placed them under the shield of national protection.  It made the liberty and rights of every citizen in every State a matter of national concern.  It grafted upon the Constitution of the United States the guarantee of national citizenship, and it empowered Congress, as the organ of the national will, to enforce that guarantee by national legislation.

Cong. Globe, 41st Cong., 2nd Sess. 3608  (1870).

## II.   THE TEXT OF THE FIFTEENTH AMENDMENT WAS INTENDED AND UNDERSTOOD TO GIVE CONGRESS THE SAME BROAD LEGISLATIVE POWERS RECOGNIZED IN *McCULLOCH v. MARYLAND*.

The language that the Framers used to define the scope of Congress' authority under the Thirteenth, Fourteenth, and Fifteenth Amendments — "appropriate legislation" — reflects a decision to give Congress wide latitude to enact legislation for the purpose of protecting the

constitutional rights guaranteed by those Amendments.  In giving Congress the power to enact

"appropriate legislation," the Framers of each of the three Amendments added to the Constitution

after the Civil War (collectively the "Civil War Amendments"), including the Fifteenth, granted

Congress the sweeping authority of Article I's "necessary and proper" powers as interpreted by

the Supreme Court in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), a seminal case

well known to the Framers of those Amendments.  *See, e.g.*, JOHN T. NOONAN, NARROWING THE

NATION'S POWER: THE SUPREME COURT SIDES WITH THE STATES 28-31 (2002); Evan Caminker,

*"Appropriate" Means-Ends Constraints on Section 5 Powers*, 53 STAN. L. REV. 1127, 1158-66

(2001); Akhil Reed Amar, *Intratextualism*, 112 HARV. L. REV. 747, 822-27 (1999); Michael W.

McConnell, *Institutions and Interpretation*, 111 HARV. L. REV. 153, 178 n.153 (1997); Steven A.

Engel, *Note, The* McCulloch *Theory of the Fourteenth Amendment:* City of Boerne v. Flores *and

the Original Understanding*, 109 YALE L.J. 115, 131-34 (1999). When Congress acts to enforce

the Civil War Amendments, including the Fifteenth Amendment, its authority is broad and

entitled to great deference.

In *McCulloch*, Chief Justice Marshall laid down the fundamental principle determining

the scope of Congress' powers under the Necessary and Proper Clause: "Let the end be

legitimate, let it be within the scope of the constitution, and *all means which are appropriate*,

which are plainly adapted to that end, which are not prohibited, but consist with the letter and

spirit of the constitution, are constitutional."  17 U.S. at 421 (emphasis added).  Chief Justice

Marshall used the word "appropriate" — the same word used in the Fifteenth Amendment's

Enforcement Clause — to describe the scope of congressional power no fewer than six times.  *Id.*

at 408, 410, 415, 421, 422, 423.  *See also* McConnell, 111 Harv. L. Rev. at 178 n.153 ("In

*McCulloch v. Maryland*, the terms 'appropriate and 'necessary and proper' were used interchangeably.").

This broad construction of congressional power requires great deference by the courts in reviewing legislation enacted by Congress pursuant to an affirmative grant of power, such as the enforcement power in the Fifteenth Amendment.  For the courts to substitute their own judgment regarding the necessity of measures enacted by Congress pursuant to its express powers would be to violate the separation of powers between the courts and Congress, "to pass the line which circumscribes the judicial department and to tread on legislative ground."  *McCulloch*, 17 U.S. at. 423.

The Framers of the three Civil War Amendments, like Chief Justice Marshall in *McCulloch*, used the terms "appropriate" and "necessary and proper" interchangeably.  Early in 1866, the Framers interpreted an initial draft of the Fourteenth Amendment — which used the phrase "necessary and proper" rather than "appropriate" — to mean that "Congress shall have the power to enforce *by appropriate legislation* all the guarantees of the Constitution."  Cong. Globe, 39th Cong., 1st Sess. 586 (1866) (Rep. Donnelly) (emphasis added).  Later that year, when Sen. Jacob Howard introduced the Fourteenth Amendment in the Senate, he explained that the Fourteenth Amendment brought the power to enforce the Constitution's guarantees "within the sweeping clause of the Constitution authorizing Congress to pass all laws *necessary and proper*."  *Id.* at 2765-66 (emphasis added).

Throughout Reconstruction, the Framers repeatedly made the point that *McCulloch* was the measure of congressional power under the Enforcement Clauses of the three Civil War Amendments, including the Fifteenth Amendment, entrusting to the discretion of Congress a

broad power to enforce constitutional rights.  *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 1118 (1866) (Rep. Wilson) (invoking "the celebrated case of *McCulloch* vs. *the State of Maryland*" to explain why Congress had authority to pass the Civil Rights Act of 1866); *id.* at 1124 (Rep. Cook) ("When Congress was clothed with power to enforce . . . by appropriate legislation, it meant . . . that Congress should be the judge of *what is necessary* for the purpose of securing to [the freemen] those rights.") (emphasis added); Cong. Globe, 41st Cong., 2nd Sess. 3882 (1870) (Rep. Davis) ("Congress is clothed with so much power as is *necessary and proper* to enforce the two amendments to the Constitution, and is to judge from the exigencies of the case what is necessary and what is proper.") (emphasis added); Cong. Globe, 42nd Cong., 2nd Sess. 728 (1872) (Sen. Sumner) ("When I assert that Congress has ample power over this question, I rely on a well known text . . . *McCulloch vs. State of Maryland* . . . .  The Supreme Court will not sit in judgment on the means employed by Congress in carrying out a power which exists in the Constitution."); Cong. Rec., 43rd Cong., 1st Sess. 414 (1874) (Rep. Lawrence) ("The power to secure equal civil rights by 'appropriate legislation' is an express power; and Congress, therefore, is the exclusive judge of the *proper means* to employ. This has been settled in *McCulloch vs. Maryland.*") (emphasis added).  Indeed, even opponents of the Civil War Amendments conceded that congressional enforcement power under the Amendments was equivalent to congressional power under Article I's Necessary and Proper Clause.  *See, e.g.*, *id.* at 4084-85 (Sen. Thurman) ("[W]hence comes these words 'appropriate legislation'?  They come from the language of Marshall in deciding the case *McCulloch vs. The State of Maryland*.").

In drafting the Enforcement Clauses of the Civil War Amendments, the Framers were also acutely aware of several pre-Civil War Supreme Court decisions that gave a broad construction to Congress' power to enforce what the Court viewed as a constitutional "right" to

the return of slaves, as recognized by the Fugitive Slave Clause, U.S. Const. art. IV, § 2, cl. 3. — one of the few provisions of the antebellum Constitution that limited state action.  *See* Robert J. Kaczorowski, *The Supreme Court and Congress' Power to Enforce Constitutional Rights: An Overlooked Moral Anomaly*, 73 FORDHAM L. REV. 153, 221-30 (2004).  In *Prigg v. Pennsylvania*, the Court upheld the constitutionality of the Fugitive Slave Act of 1793, concluding that it was justified as "appropriate" legislation to enforce the entitlements of slaveholders under the Fugitive Slave Clause.  41 U.S. (16 Pet.) 539, 615 (1842).  Relying on *McCulloch*, Justice Joseph Story expressed this conclusion using language that the Framers of the Civil War Amendments would later adopt: "the natural inference" from the existence of the right of recapture was that Congress was "clothed with the *appropriate* authority and functions to *enforce* it."  *Id.* at 615 (emphasis added).  *See also Ableman v. Booth*, 62 U.S. (21 How.) 506, 517, 526 (1859) (stating that Congress had power to "protect and guard the rights of all by *appropriate* laws" and upholding the Fugitive Slave Act of 1850 (emphasis added)).  Under *Prigg*, Congress had the same broad discretion to choose "appropriate" means for enforcing rights as it did when it acted to "carry into execution" its Article I powers, even when the Constitution provided no explicit textual authority for an enforcement power.[1]

The Framers of the Civil War Amendments, though they abhorred the "right" the Court had upheld in *Prigg*, made sure to incorporate the *Prigg* Court's understanding of congressional power, and enlisted in support of racial equality.  Throughout Reconstruction, the Framers of the

---

[1] Under *Prigg*, Congress would have had the power to enforce the Civil War Amendments even if they did not include such express provisions granting Congress the power to enforce the newly established constitutional rights, "by appropriate legislation."  The fact that the Framers of these Amendments chose to include express provisions granting Congress enforcement power highlights the important role they intended Congress to play in enforcing their constitutional guarantees.

Civil War Amendments invoked *Prigg* "as fixing the interpretation of the Constitution as authorizing affirmative legislation in protection of the rights of federal citizenship under federal law . . . ."  Cong. Globe, 42nd Cong., 1st Sess. app. 70 (1871) (Rep. Shellabarger).  *See* Cong. Globe, 41st Cong., 2nd Sess. 3680 (1870) (Sen. Carpenter) (invoking *Prigg* in support of legislation to "secure the right of the man to cast his ballot").  The Framers often made the point that *Prigg*'s broad understanding of the congressional enforcement power, previously a weapon against liberty, could now be applied in equality's service: "We will turn the artillery of slavery upon itself."  Cong. Globe, 39th Cong., 1st Sess. 1118 (1866) (Rep. Wilson).  Under the Enforcement Clauses in the Civil War Amendments, they argued, "[s]urely we have the authority to enact a law as efficient in the interests of freedom . . . as we had in the interests of slavery."  *Id.* at 475 (Sen. Trumbull).  *See also id.* at 1294 (Rep. Wilson) ("And now, sir, we are not without light as to the power of Congress in relation to the protection of these rights.  In the case of *Prigg vs. Commonwealth of Pennsylvania* — and this it will be remembered was uttered in behalf of slavery — I find this doctrine, and it is perfectly applicable to this case.").

At the time of the drafting and ratification of the Fifteenth Amendment, courts interpreted "appropriate legislation" to be consistent with the full sweep of congressional powers described in *McCulloch* and *Prigg*.  Courts considering the meaning of the Enforcement Clause of the three Civil Rights Amendments — primarily that of the Thirteenth Amendment — drew upon the judicial understandings of *McCulloch* and *Prigg*.  Tracing these decisions by the Supreme Court, Justice Noah Swayne concluded in an 1866 Circuit Court opinion that "by appropriate legislation" is "a phrase which ha[s] been enlightened by well-considered judicial opinion."  *United States v. Rhodes*, 27 F.Cas. 785, 793 (C.C.D. Ky. 1866).  In concluding that "[w]e entertain no doubt of the constitutionality of the [Civil Rights Act of 1866] in all its provisions,"

Justice Swayne explained that "any exercise of legislative power within its limits involves a legislative, and not a judicial question. It is only when the authority given has been clearly exceeded, that the judicial power can be invoked." *Id.* at 793-94. *See also Smith v. Moody*, 26 Ind. 299, 1866 WL 2473 (Ind.) at 5 (concluding based upon the Enforcement Clause of the Thirteenth Amendment that "[t]here can be no doubt of the power of congress to pass [the 1866 Civil Rights Act]").   Supreme Court cases of the era interpreting Article I, too, used "appropriate" interchangeably with "necessary and proper."   *See Legal Tender Cases*, 79 U.S. 457, 542 (1870) ("Is it our province to decide that the means selected were beyond the constitutional power of Congress, because we may think that other means to the same ends would have been more appropriate . . . ? That would be to assume legislative power, and to disregard the accepted rules for construing the Constitution.").

Finally, the influential treatise-writers of the age also read *McCulloch* as embracing congressional power to take "appropriate" measures to implement its powers, a point not lost on the Framers of the Civil War Amendments.  The accounts of congressional power authored by Justice Story and Chancellor Kent, for example, were cited repeatedly during the debates over the Civil War Amendments. *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 1093 (1866) (Rep. Bingham) (quoting Story); *id.* at 1118 (Rep. Wilson) (quoting Kent); *id.* at 1292 (Rep. Bingham) (quoting Kent); *id.* at 1294 (Rep. Shellabarger) (quoting Story).   Story used the word "appropriate" to emphasize that Congress "must have wide discretion as to the choice of means." 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 417 (1833) ("[T]he only limitation upon the discretion would seem to be, that the means are *appropriate* to the end. And this must naturally admit of considerable latitude; for the relation between the action and the end … is not always so direct and palpable, as to strike the eye of every

observer.") (emphasis added).  Chancellor Kent likewise invoked *McCulloch* when stressing the importance of Congress' power to adopt any means "which might be *appropriate* and conducive" to a permissible end.  1 JAMES KENT, COMMENTARIES ON AMERICAN LAW 238 (1826) (emphasis added).

By using the phrase "by appropriate legislation," the Framers were clear in their intent to incorporate the broad construction of congressional power in *McCulloch* into the Enforcement Clause of the Fifteenth Amendment.

## III.  THE HISTORY OF THE FIFTEENTH AMENDMENT DEMONSTRATES THAT "APPROPRIATE" ENFORCEMENT LEGISLATION INCLUDES BROAD, PROPHYLACTIC REGULATION TO PROTECT THE RIGHT TO VOTE.

The Framers of the Civil War Amendments, including the Fifteenth Amendment, chose broad, sweeping language conferring on Congress the power to enforce the new constitutional guarantees of liberty, equality, and the right to vote free from racial discrimination by all "appropriate legislation" because they were understandably reluctant to leave the judiciary with the sole responsibility for protecting against racial discrimination in voting and other violations of constitutional rights.  In the aftermath of the Supreme Court's decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), the Framers were determined to give Congress the lead role in securing the constitutional guarantees of the three Civil War Amendments.  As Sen. Oliver Morton explained, "the remedy for the violation" of the Fifteenth Amendment, like the remedies for violation of the other Civil War Amendments, "was expressly not left to the courts. The remedy was legislative, because . . . the amendment itself provided that it shall be enforced by legislation on the part of Congress."  Cong. Globe, 42nd Cong., 2nd Sess. 525 (1872).  *See also* McConnell, 111 HARV. L. REV. at 182 (explaining that the Enforcement Clauses of the Civil War

13

Amendments were "born of the fear that the judiciary would frustrate Reconstruction by a narrow interpretation of congressional power.").  Against this backdrop, it is no surprise that the congressional debates surrounding the Amendments stressed the importance of a broad federal *legislative* power to protect constitutional rights — with corresponding deference from the courts to respect this new authority.

Congress' broad legislative power was particularly important to secure the right to vote free from racial discrimination.  Because states extensively regulate elections, states hostile to the Fifteenth Amendment could easily use their power over the election system to frustrate the right to vote free from discrimination, as they often did.  For that reason, the Framers of the Fifteenth Amendment specifically recognized that a broad legislative power to protect the right to vote against all forms of racial discrimination — both heavy-handed and subtle — was critical to ensuring "the colored man the full enjoyment of his right."  Cong. Globe, 41st Cong., 2nd Sess. 3670 (1870) (Sen. Morton).  As the debates over the Fifteenth Amendment and congressional enforcement legislation show, the Framers were well aware that Congress needed broad authority to enact prophylactic legislation to root out all forms of racial discrimination in voting.

For example, Rep. William Pile observed that "[i]t is difficult by any language to provide against every imaginary wrong or evil which may arise in the administration of the law of suffrage in the several States," emphasizing that "[w]hat we desire to reach . . .  is . . . to insure by constitutional enactment . . . the right of suffrage" to newly freed slaves.  Cong. Globe, 40th Cong., 3rd Sess. 725 (1869).  In the months following ratification of the Fifteenth Amendment, Congress recognized the grim reality that many states would pursue novel methods to disenfranchise Americans on account of their race.  Highlighting the importance of providing "proper machinery . . . for enforcing the fifteenth amendment," Sen. William Stewart explained

that "it is impossible to enumerate over-specifically all the requirements that might be made as prerequisites for voting . . . .  The States can invent just as many requirements [for voting] as you have fingers and toes.  They could make one every day."  Cong. Globe, 41st Cong., 2nd Sess. 3658 (1870) (emphasis added).  "There may be a hundred prerequisites invented by the States," *id.*, "a hundred modes whereby [the colored man] can be deprived of his vote."  *Id.* at 3657 (Sen. Stewart).  *See also id.* at 3658 (Sen. Sherman) (noting "it is our imperative duty . . . to pass suitable laws to enforce the fifteenth amendment" because, without them, "the fifteenth amendment will be practically disregarded in every community where there is a strong prejudice against negro voting").

The Framers recognized that the right to vote would actually be enjoyed by the newly freed slaves only if Congress had the authority to stamp out and deter the full range of racial discrimination in voting, including by enacting prophylactic regulation to ensure the right to vote was actually enjoyed.  As Sen. Carl Schurz commented, under the Fifteenth Amendment, "[a] State shall have full power to do that which is right in its own way; but it is prohibited from doing *that which is wrong in any way*."  Cong. Globe, 41st Cong., 2nd Sess. 3608 (1870) (emphasis added).

## IV.  THE SUPREME COURT HAS CONSISTENTLY HELD THAT *McCULLOCH'S* BROAD CONSTRUCTION OF CONGRESSIONAL POWER APPLIES TO LEGISLATION ENFORCING THE FIFTEENTH AMENDMENT.

Consistent with the text and history discussed above, the Supreme Court has consistently held that *McCulloch*'s broad interpretation of Congress' power under Article I's Necessary and Proper Clause applies equally to legislation enforcing the Fifteenth Amendment.  "Congress' authority under § 2 of the Fifteenth Amendment . . . [is] no less broad than its authority under the Necessary and Proper Clause."  *City of Rome v. United States*, 446 U.S. 156, 174-75 (1980).

Under these cases, broad *McCulloch*-style deference applies to the means Congress adopts to enforce the constitutional right to vote free from racial discrimination.   The preclearance requirement contained in Section 5 of the Voting Rights Act seeks to enforce the core purpose of the Fifteenth Amendment, and the nearly unanimous, bipartisan decision of Congress to re-authorize it falls squarely within Congress' broad power to enforce the Fifteenth Amendment.

In *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), the Supreme Court applied *McCulloch* deference in holding that the preclearance and coverage provisions of the Voting Rights Act — the same provisions Shelby County attacks here — were "appropriate legislation" within Congress' Fifteenth Amendment enforcement powers.   "As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition on racial discrimination in voting." *Id.* at 324.   The *Katzenbach* Court analyzed the history of the Fifteenth Amendment, noting that "[b]y adding th[e] authorization [for congressional enforcement in Section 2], the Framers indicated that Congress was to be *chiefly responsible* for implementing the rights created. . . . Congress has full remedial powers to effectuate the constitutional prohibition on racial discrimination in voting." *Id.* at 325-26 (emphasis added).

Based on this text and history, the Court held that the "basic test" set forth by Chief Justice Marshall in *McCulloch* applied and rejected "South Carolina's argument that Congress may do no more than to forbid violations of the Fifteenth Amendment in general terms. . . . Congress is not circumscribed by any such artificial rules under § 2 of the Fifteenth Amendment." *Id.* at 326, 327.   *See also Northwest Austin Mun. Util. Dist. No. 1 v. Holder*, 129 S. Ct. 2504, 2513 (2009) ("The Fifteenth Amendment empowers Congress, not the Court, to determine . . . what legislation is necessary to enforce it."); *City of Rome*, 446 U.S. at 177 ("[U]nder § 2 of the Fifteenth Amendment Congress may prohibit practices that . . . do not

16

violate § 1 of the Amendment, so long as the prohibitions attacking racial discrimination in voting are 'appropriate' as that term is defined in *McCulloch*"); *cf. Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 439 (1968) (explaining that the Enforcement Clause of the Thirteenth Amendment "clothed 'Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States.'") (quoting *Civil Rights Cases*, 109 U.S. 3, 20 (1886)); *James Everard's Breweries v. Day*, 265 U.S. 545, 558-559 (1924) (applying *McCulloch* to analyze constitutionality of congressional action under the Enforcement Clause of the Eighteenth Amendment).

While the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997), announced a congruence and proportionality test to limit Congress' power to enforce the broadly-worded, open-ended guarantees of the Fourteenth Amendment in order to ensure that Congress does not invent new constitutional rights and erode principles of federalism, these concerns do not have the same force when it comes to the Fifteenth Amendment's focused and express prohibition on racial discrimination in voting.  Supreme Court precedent dictates that Congress has broad leeway in protecting against discrimination based on race — the most constitutionally suspect form of discrimination — in order to protect the right to vote, which has always been recognized as a fundamental right of the highest order, "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  "As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition on racial discrimination in voting." *South Carolina*, 383 U.S. at 324.  As Justice Scalia has recognized, "[g]iving [Congress] . . . more expansive scope with regard to measures directed against racial discrimination by the States accords to practices that are distinctly violative of the principal purpose of the [Civil War] Amendment[s] . . . ." *Tennessee v. Lane*, 541 U.S. 509, 561 (2004) (Scalia, J., dissenting); *see*

17

*also Oregon v. Mitchell*, 400 U.S. 112, 129 (1970) (opinion of Black, J.) ("Where Congress attempts to remedy racial discrimination under its enforcement powers, its authority is enhanced by the avowed intentions of the framers of the Thirteenth, Fourteenth, and Fifteenth Amendments.").

*Boerne* itself recognized that when Congress enforces recognized fundamental constitutional rights — such as the right to vote — rather than, in the Court's view, inventing new ones, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *Boerne*, 521 U.S. at 518 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)). As history shows, the Fifteenth Amendment was designed to radically alter constitutional principles of federalism, giving to Congress a broad sweeping power to ensure that the right to vote free from racial discrimination was actually enjoyed by all Americans. While "the Voting Rights Act, by its nature, intrudes on state sovereignty," "the Fifteenth Amendment permits this intrusion." *Lopez v. Monterey County*, 525 U.S. 266, 284-85 (1999).

In reauthorizing the preclearance requirement of the Voting Rights Act in 2006, Congress, "a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States," *Northwest Austin*, 129 S. Ct. at 2513, acted to protect against racial discrimination in voting – the single core purpose of the Fifteenth Amendment. Acting within its wide discretion to select appropriate means, Congress permissibly determined that prophylactic measures were "current[ly] need[ed]," *id.* at 2512, to protect against unconstitutional racial discrimination in the administration of elections. By an overwhelming margin — 98-0 in the Senate and 390-33 in the House — bipartisan majorities agreed that the

18

preclearance provision of the historic Voting Rights Act continued to serve the critical purpose of preventing and deterring racial discrimination in voting in state and local elections.  Pursuant to the original understanding of the Fifteenth Amendment's Enforcement Clause — that Congress would have broad power to determine what is appropriate to protect the right to vote free from racial discrimination – the Court should defer to Congress' near-unanimous judgment.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment should be denied, and Defendant's and Defendants-Intervenors' cross-motions for summary judgment should be granted.

Respectfully submitted,

   /s/ Judith E. Schaeffer
Judith E. Schaeffer (D.C. Bar # 273177)
*Counsel of Record*
David Gans (D.C. Bar # 461002)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 1002
Washington, D.C. 20036
Tel.: (202) 296-6889; Fax: (202) 296-6895
email: judith@theusconstitution.org

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system on _____, ___, 2010.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Executed this ___ day of _____, 2010.

_____
Judith E. Schaeffer (D.C. Bar #273177)

*Counsel for amicus curiae*
*Constitutional Accountability Center*