**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHELBY COUNTY, ALABAMA, | |
| Plaintiff, | |
| v. | Civil Action No. 1:10-cv-00651-JDB |
| ERIC H. HOLDER, JR.,<br>in his official capacity as<br>ATTORNEY GENERAL OF THE<br>UNITED STATES, | |
| Defendant, | |
| EARL CUNNINGHAM, BOBBY PIERSON,<br>BOBBY LEE HARRIS, *et al.*, | |
| Defendant-Intervenors. | |

**PLAINTIFF'S CONSOLIDATED REPLY MEMORANDUM IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANT'S AND DEFENDANT-INTERVENORS' CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Bert W. Rein (D.C. Bar No. 067215)
William S. Consovoy* (D.C. Bar No. 493423)
Thomas R. McCarthy (D.C. Bar No. 489651)
Brendan J. Morrissey (D.C. Bar No. 973809)
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Tel.: (202) 719-7000
Fax: (202) 719-7049

Frank C. Ellis, Jr.
WALLACE, ELLIS, FOWLER & HEAD
113 North Main Street
Columbiana, AL  35051
Tel.: (205) 669-6783
Fax: (205) 669-4932

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

I.   INTRODUCTION .......................................................................................... 1

II.  ARGUMENT .................................................................................................. 3

    A.   Section 4(b) and Section 5 Are Subject to Congruence and Proportionality Review Under the *City of Boerne* Framework .................................................... 3

        1.   The Supreme Court Has Adhered to the *City of Boerne* Framework in Every Subsequent Case Evaluating a Federal Law Enacted Under Congress's Fourteenth and Fifteenth Amendment Enforcement Authority .................................................................................... 5

        2.   *City of Boerne* and Its Progeny Make Clear that the Voting Rights Act Is Subject to Congruence and Proportionality Review ..................... 11

        3.   The Attorney General's Argument Cannot Be Reconciled with the *City of Boerne* Framework ..................................................................... 15

        4.   The Unique Federalism Concerns Raised by Preclearance Demands Adherence to the *City of Boerne* Framework ......................... 16

    B.   Section 4(b) and Section 5 Are No Longer Constitutional Under the *City of Boerne* Framework ..................................................................................... 17

    C.   Section 4(b) and Section 5 Are Equally Unconstitutional Under Any Other Proposed Standard of Review ............................................................................ 22

        1.   Section 4(b)'s Coverage Formula Is No Longer an "Appropriate" Means of Enforcing the Fifteenth Amendment ....................................... 23

        2.   Section 5's Preclearance Obligation Is No Longer an "Appropriate" Means of Enforcing the Fifteenth Amendment ................ 33

            a.   Section 5 Can Only Be Justified as Constitutionally Necessary To Combat Pervasive Discrimination and Electoral Gamesmanship Given the Extreme Nature of the Preclearance Obligation ................................................................... 34

            b.   The Legislative Record Does Not Contain the Direct Evidence of Pervasive Discrimination and Electoral Gamesmanship Needed To Reauthorize Section 5 ...................... 39

                i.   Direct Evidence of Intentional Discrimination ............... 39

                ii.  Election Statistics ............................................................ 44

                iii. Vote Dilution Evidence .................................................... 46

                iv.  Section 5's Past Success and Deterrent Effect ................ 52

**TABLE OF CONTENTS**
(continued)

**Page**

c.    The Second Generation Barriers Relied on by Congress Are
Not Evidence of Intentional Discrimination ............................... 53

i.    Racially Polarized Voting ................................................ 54

ii.   Preclearance Statistics .................................................... 55

iii.  Section 2 Litigation ........................................................ 62

iv.   Election Observers ......................................................... 64

III.  CONCLUSION ............................................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen v. State Board of Elections*,
  393 U.S. 544 (1969)................................................................................. 48-49

*Bartlett v. Strickland*,
  129 S. Ct. 1231 (2009)..................................................................................52

*Beer v. United States*,
  425 U.S. 130 (1976).......................................................................................43

*Board of Trustees of University of Alabama v. Garrett*,
  531 U.S. 356 (2001)............................................................................. *passim*

*\*City of Boerne v. Flores*,
  521 U.S. 507 (1997)............................................................................. *passim*

*City of Mobile v. Bolden*,
  446 U.S. 55 (1980)...........................................................................17, 48, 54

*\*City of Rome v. United States*,
  446 U.S. 156 (1980)............................................................................ *passim*

*Dillard v. Crenshaw County*,
  640 F. Supp. 1347 (M.D. Ala. 1986) .........................................................48

*Ex Parte Virginia*,
  100 U.S. 339 (1879) ....................................................................................12

*Fayetteville v. Cumberland County*,
  No. 90-2029, 1991 WL 23590 (4th Cir. 1991) .........................................29

*Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*,
  527 U.S. 627 (1999).............................................................................5, 11, 20

*Georgia v. Ashcroft*,
  539 U.S. 461 (2003)................................................................................50, 58

*Gomillion v. Lightfoot*,
  364 U.S. 339 (1960)......................................................................................48

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)................................................................16

*Horne v. Flores*,
    129 S. Ct. 2579 (2009)..........................................................16

*James v. Bowman*,
    190 U.S. 127 (1903)..............................................................54

*Katzenbach v. Morgan*,
    384 U.S. 641 (1966)..............................................................12

*Kimel v. Florida Board of Regents*,
    528 U.S. 62 (2000)...............................................5, 11, 19, 38

*League of United Latin American Citizens v. Perry*,
    548 U.S. 399 (2006)..........................................................46, 50

*Lopez v. Monterey County*,
    525 U.S. 266 (1999)..............................................................61

*MBI Group, Inc. v. Credit Foncier Du Cameroun*,
    616 F.3d 568 (D.C. Cir. 2010)...............................................47

*McCulloch v. Maryland*,
    17 U.S. 316 (1819)................................................................12

*Miller v. Johnson*,
    515 U.S. 900 (1995).....................................................*passim*

*Nevada Department of Human Resources v. Hibbs*,
    538 U.S. 721 (2003).....................................................*passim*

*\*Northwest Austin Municipal Utility District Number One v. Holder*,
    129 S. Ct. 2504 (2009).................................................*passim*

*Northwest Austin Municipal Utility District Number One v. Mukasey*,
    573 F. Supp. 2d 221 (D.D.C. 2008)....................................44, 46

*Oregon v. Mitchell*,
    400 U.S. 112 (1970)..............................................................16

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Personnel Administrator of Massachusetts v. Feeney,*
    442 U.S. 256 (1979) ...................................................................................................9

*Presley v. Etowah County Commission,*
    502 U.S. 491 (1992)..................................................................................................17

*Reno v. Bossier Parish School Board,*
    520 U.S. 471 (1997)............................................................................................18, 62

*Reno v. Bossier Parish School Board,*
    528 U.S. 320 (2000).......................................................................................... *passim*

*Reynolds v. Sims,*
    377 U.S. 533 (1964)..................................................................................................48

*Riley v. Kennedy,*
    553 U.S. 406 (2008)............................................................................................41, 43

*Rodgers v. Lodge,*
    458 U.S. 613 (1982)............................................................................................48, 54

*Shelby County v. Holder,*
    --- F.R.D. ---, No. 10-0651, 2010 WL 3700839 (D.D.C. Sept. 16, 2010) ....................1

*\*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966)........................................................................................... *passim*

*Tangipahoa Citizens for Better Government v. The Parish of Tangipahoa,*
    No. 03-2710, 2004 WL 1638106 (E.D. La. July 19, 2004) ........................................29

*Tennessee v. Lane,*
    541 U.S. 509 (2004).......................................................................................... *passim*

*United States v. Georgia,*
    546 U.S. 151 (2006)..................................................................................................10

*United States v. Morrison,*
    529 U.S. 598 (2000)..................................................................................................11

*United States v. Board of Commissioners of Sheffield, Alabama,*
    435 U.S. 110 (1978)............................................................................................16, 56

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Vieth v. Jubelirer,*
   541 U.S. 267 (2004)..............................................................................46

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
   429 U.S. 252 (1977)..............................................................................49

*Washington v. Davis,*
   426 U.S. 229 (1976)................................................................................9

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. XV, § 1......................................................................17

**STATUTES AND REGULATIONS**

28 C.F.R. § 51.52 ....................................................................................58

29 U.S.C. § 2612 .....................................................................................19

42 U.S.C. § 1973b....................................................................................32

42 U.S.C. § 1973c....................................................................................50

Pub. L. No. 94-73, 89 Stat. 400 (1975)....................................................24

Pub. L. No. 109-246, 120 Stat. 577 (2006)........................................ *passim*

**LEGISLATIVE MATERIALS**

149 Cong. Rec. S5411 (daily ed. Apr. 28, 2003)....................................38

*To Examine the Impact & Effectiveness of the Voting Rights Act: Hearing Before
   the Subcomm. on the Constitution of the House Comm. on the Judiciary,*
   109th Cong., 1st Sess. (Oct. 18, 2005) .................................................27

*Voting Rights Act: Section 5 of the Voting Rights Act – History, Scope, and
   Purpose: Hearing Before the Subcomm. on the Constitution of the House
   Comm. on the Judiciary,* 109th Cong., 1st Sess. (Oct. 25, 2005) ........27, 45

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Voting Rights Act: Section 5 – Preclearance Standards, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong., 1st Sess. (Nov. 1, 2005) ..................................................................58, 60

*Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess. (Mar. 8, 2006) ........................................................................... *passim*

*Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess. (May 4, 2006) ...............26, 46

*An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization, Hearing Before the S. Comm. on the Judiciary*, 109th Cong., 2d Sess. (May 9, 2006) ...........................................56, 58, 59

*The Continuing Need for Section 5 Preclearance: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. (May 16, 2006) ....................... *passim*

*Understanding the Benefits and Costs of Section 5 Pre-Clearance, Hearing Before the Senate Committee on the Judiciary*, 109th Cong., 2d Sess. (May, 17, 2006) ....................................................................................................45, 60

*Continuing Need for Section 203's Provisions for Limited English Proficient Voters, Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess. (June 13, 2006) ................................................................................44

*H.R. Rep. No. 109-478 (2006)................................................................. *passim*

*S. Rep. No. 109-295 (2006) ................................................................... *passim*


**MISCELLANEOUS**

Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation & Dynamic Preclearance*, 119 Yale L.J. 1992 (2010) ...................................................................28, 32

Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act After* Tennessee v. Lane, 66 Ohio St. L.J. 177 (2005) ............................................................................56

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Ellen Katz et al., *Documenting Discrimination in Voting: Judicial Findings*
 *Under Section 2 of the Voting Rights Act Since 1982*,
 39 U. Mich. J.L. Reform 643 (2006) ........................................................29

Overview of Race and Hispanic Origin, U.S. Census (2000)............................................44

U.S. Census Bureau, Current Population Survey (Nov. 2004) ........................................45

## I.     INTRODUCTION

As Shelby County previously demonstrated, Section 4(b) and Section 5 of the Voting Rights Act ("VRA") no longer appropriately enforce the Fifteenth Amendment because "the 2006 legislative record [does not] contain[] sufficient evidence of contemporary discrimination in voting to justify Congress's decision to subject covered jurisdictions to section 5 preclearance for another twenty-five years." *Shelby County v. Holder*, --- F.R.D. ---, No. 10-651, 2010 WL 3700839, at *3 (D.D.C. Sept. 16, 2010) (citation omitted).[1]   Both provisions lack "congruence and proportionality" to the sparse evidence of intentional voting discrimination relied upon by Congress in 2006. *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).   But they also would fail under a more deferential standard of review.   Section 4(b)'s archaic coverage formula is no longer "sufficiently related to the problem that it targets." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2512 (2009).   And the "current burdens" imposed on the covered jurisdictions by Section 5 are no longer "justified by [the] current needs." *Id*.   Neither the

---

[1]     The Attorney General continues to insist that Sections 4(b) and 5 can be upheld as applied to Shelby County "even if the application of those provisions to other jurisdictions might not be proper." AG Opp. at 9-10; Consol. Mem. of Points & Auths. in Opp. to Pl.'s Mot. for Summ. J & in Supp. of Cunningham Def.-Intervenors' Cross-Mot. for Summ. J. ("Cunningham Opp.") at 4-5 (same).   However, this issue is foreclosed as Shelby County's lawsuit "is properly deemed a facial challenge." *Shelby County*, 2010 WL 3700839, at *3.   In any event, the argument is incorrect.   Congress has not imposed preclearance on Shelby County because of any evidence of intentional discrimination particular to it or Alabama.   Section 4(b) triggers coverage under a formula predicated on 1964, 1968, and 1972 registration and turnout data. *See infra* at 23-25.   That formula raises a constitutional question that cannot be answered by scouring the legislative record to try to prove that Congress *could have* targeted a particular jurisdiction for coverage even though it never did. *See Nw. Austin*, 129 S. Ct. at 2512.   The decision in *Tennessee v. Lane*, 541 U.S. 509 (2004), does not indicate otherwise. *Lane* upheld Title II of the ADA as to a particular *class* of government facilities—*i.e.*, courthouses.   But Title II was not upheld merely as applied to one courthouse in Tennessee. *See id.* at 530-31.   The Attorney General has not argued that Section 5 is constitutional as applied to one class of covered jurisdictions—*i.e.*, local government units, counties, or states—even if unconstitutional as to others.   The attempt to analogize to *Lane* thus is misplaced.

Attorney General's brief nor the largely repetitive briefs submitted by Defendant-Intervenors undermine this conclusion.

First, the Attorney General argues that Section 4(b) and Section 5 are not subject to review under the *City of Boerne* framework because they protect "core" constitutional rights. *See* Mem. in Opp. to Pl.'s Mot. for Summ. J. & In Supp. of Def.'s Mot. for Summ. J. ("AG Opp.") at 12-20.   That is plainly incorrect.   The Supreme Court has made clear that all enforcement legislation is subject to congruence and proportionality review, and it has specifically relied on the voting rights cases in adopting and applying this test.   The Attorney General's novel argument finds no support in the law, conflicts with *City of Boerne* itself, and fails to account for the unique federalism concerns raised by the preclearance obligation.   But even if these provisions were subject to more deferential review, the Attorney General's response still cannot save Section 4(b) and Section 5.

Second, the Attorney General defends Section 4(b)'s coverage formula as responding to the evidence in the legislative record because it punishes jurisdictions with historical records of intentional discrimination and responds to the evidence of intentional discrimination relied on by Congress.   AG Opp. at 65-75.   But retaining this archaic coverage formula is irrational "in both practice and theory."   *South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966).   It is irrational in practice because the evidence of discrimination in the legislative record is no longer concentrated in the covered jurisdictions.   It is irrational in theory because a coverage formula predicated on registration and turnout statistics is responsive to "first generation" interference with an individual's ability to register and cast a vote—not "second generation" barriers that allegedly dilute the weight of that vote.   In short, "[t]he statute's coverage formula is based on data that is

now more than 35 years old, and there is considerable evidence that it fails to account for current political conditions." *Nw. Austin*, 129 S. Ct. at 2512.

Third, the Attorney General argues that preclearance remains appropriate based on isolated examples of intentional discrimination, vote dilution evidence, and the existence of the "second generation barriers" to voting. AG Opp. at 44-53. But this is not the contemporary evidence of "unremitting and ingenious defiance" of the Fifteenth Amendment needed to reauthorize Section 5. *Katzenbach*, 383 U.S. at 309. Congress failed to establish that the "burden" of the sweeping preclearance obligation can be "justified" by the "need" to counteract second-generation voting barriers. *Nw. Austin*, 129 S Ct. at 2512. "The extensive pattern of discrimination that led the Court to previously uphold § 5 as enforcing the Fifteenth Amendment no longer exists. Covered jurisdictions are not now engaged in a systematic campaign to deny black citizens access to the ballot through intimidation and violence." *Id.* at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part).

## II.   ARGUMENT

### A.   Section 4(b) and Section 5 Are Subject to Congruence and Proportionality Review Under the *City of Boerne* Framework.

*City of Boerne* provides the framework for evaluating the constitutionality of Section 4(b) and Section 5. *See* Mem. of Points and Auth. in Supp. of Pl.'s Mot. for Summ. J. ("Mot.") at 17-20. Under that framework, the court must first "identify with some precision the scope of the constitutional right at issue." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001). Second, the court must "examine whether Congress identified a history and pattern of unconstitutional" state action affecting that right. *Id.* at 368. And third, the court must determine whether "[t]here [is] a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may

become substantive in operation and effect" and thereby exceed the bounds of "the remedial, rather than substantive, nature of the Enforcement Clause." *City of Boerne*, 521 U.S. at 520.  In other words, "[t]he appropriateness of remedial measures must be considered in light of the evil presented.  *See Katzenbach*, 383 U.S. at 308.  Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one.  *Id.* at 334."  *Id.* at 530.

Despite this clear directive, the Attorney General argues that the constitutionality of Sections 4(b) and 5 must be evaluated under a "rational basis" standard.  AG Opp. at 12-20. Importantly, the Attorney General concedes that the *City of Boerne* framework applies to both Fourteenth and Fifteenth Amendment enforcement legislation.  *Id.* at 14 ("[T]he terms 'enforce' and 'appropriate legislation' have the same meaning in each amendment");[2] Mem. in Supp. of Def.-Intervenor Bobby Lee Harris' Mot. for Summ. J & In Opp. to Pl.'s Mot. for Summ. J. ("Harris Opp") at 26 n.20 (same).  But instead of defending Sections 4(b) and 5 under *City of Boerne*, the Attorney General advocates a novel exception under which "exacting review of the record of discrimination before Congress is not necessary where Congress enforces a right at or near the core" of either "Amendment's protections."  AG Opp. at 16.  In his view, "[w]here a statute enforces the core prohibition of race discrimination found in both amendments, a court's role in assessing the appropriateness of the means of enforcement is limited to inquiring whether Congress's choice is rational."  *Id*. at 17; Harris Opp. at 22, 25-26 (same); Mem. of Def.-

---

[2]       The Attorney General's views on this subject are ever-changing.   In the *Northwest Austin* litigation, the Attorney General agreed that the *City of Boerne* framework was the controlling test.  Mem. in Supp. of Def.'s Mot. for Summ. J., *Nw. Austin Mun. Util. Dist. No. One v. Gonzales*, No. 06-1384, at 11 n.11 (D.D.C. filed May 15, 2007) ("Although, in upholding Section 5 in *South Carolina* and in *City of Rome*, the Supreme Court did not describe its analysis in these terms [of congruence and proportionality], the Court has made clear the '*Boerne* test' is intended to describe the analysis undertaken in those earlier cases." (citing *Boerne*, 521 U.S. at 530-536; *Hibbs*, 538 U.S. at 726-40)).   When the case reached the Supreme Court, however, the Attorney General reversed course and argued that the *City of Boerne* framework did not control because it only applied to Fourteenth Amendment enforcement legislation. Brief of Federal Appellee at 20-24, *Nw. Austin*, 129 S. Ct. 2504 (S. Ct. filed March 18, 2009).  As noted above, however, the Attorney General has since abandoned that argument.

Intervenors Bobby Pierson, et. al., in Opp. to Pl.'s Mot. for Summ. J. & in Supp. of Def.-Intervenors' Cross Mot. for Summ. J. ("Pierson Opp.") at 44-45 (same).

This argument is unavailing.  First, the Supreme Court has never applied a different standard of review in enforcement clause cases involving "core" Fourteenth and Fifteenth Amendment rights.  The Supreme Court decisions on which the Attorney General relies directly refute his argument.  Second, *City of Boerne* and its progeny make clear that the Voting Rights Act, in particular, is subject to its standard of review.  Third, the Attorney General's novel two-track approach is irreconcilable with the *City of Boerne* inquiry.  Instead of identifying the scope of the constitutional right as the first step in that framework, the Attorney General asks this Court to ignore binding precedent and determine whether the law protects "core" rights as a means of avoiding *City of Boerne* review altogether.  Fourth, the unique federalism concerns raised by preclearance demand the close scrutiny guaranteed by the *City of Boerne* framework.  As explained below, however, the Court need not resolve this dispute to grant Shelby County's summary judgment motion.  Section 4(b) and Section 5 are not "appropriate" enforcement legislation under either standard of review.

       1.     The Supreme Court Has Adhered to the *City of Boerne* Framework in Every Subsequent Case Evaluating a Federal Law Enacted Under Congress's Fourteenth and Fifteenth Amendment Enforcement Authority.

Contrary to the Attorney General's argument, AG Opp. at 15-17, the Supreme Court has *never* suggested that the "congruence and proportionality" test applies only to a fragment of enforcement legislation.  Since *City of Boerne*, the Court has applied this framework to *every* suit challenging enforcement legislation.  *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 637 (1999) ("[T]he legislation must . . . be 'appropriate under § 5 as that term was construed in *City of Boerne*.");  *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 82-83

(2000) ("Applying the . . . 'congruence and proportionality' test . . . we conclude that the ADEA is not 'appropriate legislation' under § 5 of the Fourteenth Amendment."); *Garrett*, 531 U.S. at 365 ("§ 5 legislation reaching beyond the scope of § 1's actual guarantees must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" (quoting *City of Boerne*, 521 U.S. at 520)); *Nev. Dep't. of Human Res. v. Hibbs*, 538 U.S. 721, 728 (2003) ("We distinguish appropriate prophylactic legislation from 'substantive redefinition of the . . . right at issue,' by applying the test set forth in *City of Boerne*: Valid § 5 legislation must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" (quoting *City of Boerne*, 521 U.S. at 20) (internal citations omitted)); *Lane*, 541 U.S. at 520 ("In *Boerne*, we recognized that [there is a] line between remedial legislation and substantive redefinition . . . and set forth a test for so observing it: Section 5 legislation is valid if it exhibits 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" (quoting *City of Boerne*, 521 U.S. at 520) (internal citations omitted)).

Despite this unbroken line of precedent, the Attorney General insists that *Hibbs* and *Lane* support his novel theory.  AG Opp. at 16-17.  In particular, he contends that instead of holding Congress to the "exacting review" of *City of Boerne* in those cases, the Court upheld the Family Medical Leave Act ("FMLA") and Title II of the Americans with Disabilities Act ("ADA") under a more deferential standard on the ground that they protected "core" Fourteenth Amendment rights.  *Id.*; Harris Opp. at 25-28 (same); Pierson Opp. at 44-45 (same); *but see* Cunningham Opp. at 27 (acknowledging that *Hibbs* and *Lane* were resolved "under *Boerne*").  But neither decision supports this assertion.

6

The Court clearly applied the *City of Boerne* framework in *Lane*. The Court identified the constitutional right at issue: "The first step of the *Boerne* inquiry requires us to identify the constitutional right or rights that Congress sought to enforce when it enacted Title II." *Lane*, 541 U.S. at 522 (citation omitted). After concluding that Title II was principally grounded in due process, the Court examined the legislative record to determine whether it justified the prophylactic remedy chosen by Congress because "the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent." *Id.* at 523. The Court concluded that the legislative record supported Congress's determination that a "pattern of [state and local] disability discrimination persisted despite several federal and state legislative efforts to address it." *Id.* at 526. Finally, the Court held that Title II was congruent and proportional to the pattern of disability discrimination identified in the legislative record: "Congress' chosen remedy for the pattern of exclusion and discrimination described above, Title II's requirement of program accessibility, is congruent and proportional to its object of enforcing the right of access to the courts." *Id.* at 531. The Attorney General's contention that *Lane* did not apply the *City of Boerne* framework thus is unsustainable.

The analytical approach was the same in *Hibbs*. The Court identified the constitutional right as "the right to be free from gender-based discrimination in the workplace." *Hibbs*, 538 U.S. at 728. The Court then found that "the States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation." *Id.* at 735. Last, the Court held that "Congress' chosen remedy, the family-care leave provision of the FMLA, is congruent and proportional to the targeted violation . . . . [A]s in *Katzenbach*, Congress confronted a difficult and intractable proble[m],' where previous legislative attempts had failed." *Id.* at 737 (internal

7

quotation marks and citations omitted).  Thus, like *Lane*, *Hibbs* adhered to the *City of Boerne* framework even though Congress was protecting a constitutional right "subject to heightened constitutional review."  AG Opp. at 17; *see also Hibbs*, 538 U.S. at 736.

The Attorney General is correct that, with respect to Title II and the FMLA, "it was easier for Congress to show a pattern of state constitutional violations"—the second-step in the *City of Boerne* inquiry—because of the nature of the constitutional rights being protected.  AG Opp. at 17 (citing *Hibbs*, 538 U.S. at 736); *Lane*, 541 U.S. at 529.  But that acknowledgement did not alter the mode of analysis mandated by *City of Boerne*—let alone signal the Supreme Court's intention to abandon it.  Because disability and gender-based classifications "are presumptively invalid, most of the States' acts of . . . discrimination violated the Fourteenth Amendment."  *Hibbs*, 538 U.S. at 736.  Thus, when Congress was amassing the record of discrimination necessary to support exercise of its enforcement authority, it was more easily able to document a pattern of *unconstitutional* discrimination sufficient to justify a prophylactic remedy.  In other words, it was "easier" for Congress to show the need for prophylactic legislation targeting disability and gender-based discrimination than it would have been for "legislation that targeted classifications subject to rational-basis review."  *Lane*, 541 U.S. at 529.

But the fact that it was "easier" to identify acts of unconstitutional discrimination in some instances does not advance the Attorney General's cause.  In those cases, Congress justified prophylactic enforcement legislation as appropriate by documenting overt discrimination.  *See, e.g., Hibbs*, 538 U.S. at 729 ("State laws frequently subjected women to distinctive restrictions, terms, conditions, and benefits for those jobs they could take."); *Lane*, 541 U.S. at 521 (explaining that "a number of States have prohibited and continue to prohibit persons with disabilities from engaging in activities such as marrying and serving as jurors").  In contrast,

Congress justified the reauthorization of Section 5 based on evidence documenting race-neutral state action that allegedly had a discriminatory purpose and effect.   AG Opp. at 25-52.   But unlike overt racial classifications, facially neutral laws are not presumptively unconstitutional. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Washington v. Davis*, 426 U.S. 229, 240-41 (1976).   Therefore, it is not "easier" for Congress to establish an unconstitutional pattern of voting discrimination here.   The present case parallels *City of Boerne*.   Free exercise of religion is a "core" constitutional right.   But it was not easier for Congress to document a pattern of unconstitutional discrimination because the Religious Freedom Restoration Act of 1993 ("RFRA") targeted "laws of general applicability which place incidental burdens on religion." *City of Boerne*, 521 U.S. at 530-31; *see also id.* at 531 ("It [was] difficult to maintain that they [were] examples of legislation enacted or enforced due to animus or hostility to the burdened religious practices or that they indicate[d] some widespread pattern of religious discrimination in this country.   Congress' concern was with the incidental burdens imposed, not the object or purpose of the legislation.").

In any event, even in those instances where it is "easier" for Congress to establish a pattern of unconstitutional discrimination, the *City of Boerne* framework has not been displaced *sub silentio*.   A legislative record that documents a pattern of unconstitutional discrimination makes that right "an appropriate subject for prophylactic legislation."   *Lane*, 541 U.S. at 529. But merely because a constitutional right is an "appropriate subject for prophylactic legislation" does not resolve the key question presented in this litigation: whether there is congruence and proportionality between the gravity of the injury identified in the legislative record and the *particular* prophylactic remedy chosen by Congress.   Indeed, even after recognizing that the nature of the constitutional right at issue made it easier for Congress to establish a pattern of

unlawful discrimination, the *Hibbs* and *Lane* decisions still demanded congruence and proportionality between Congress's chosen prophylactic remedy and the evidence of unconstitutional discrimination documented in the legislative record.  *See Lane*, 541 U.S. at 530-34; *Hibbs*, 538 U.S. at 737-40.

Finally, the Attorney General mistakenly relies on *United States v. Georgia*, 546 U.S. 151 (2006), to support his argument.  AG Opp. at 17.  In *Georgia*, it was "not clear precisely what conduct [the *pro se* petitioner] intended to allege" in support of his Title II ADA claim.  546 U.S. at 159.  Finding that the allegations "evidently [were] based, at least in large part, on conduct that independently violated the provisions of § 1 of the Fourteenth Amendment," the Court expressly distinguished them from claims in the *City of Boerne* cases.  *Id.* at 157 (citation omitted).  The Court further noted that, in any event, such claims would fall within Congress's Fourteenth Amendment enforcement authority regardless of any dispute over the precise "scope of Congress's 'prophylactic' enforcement powers" because "no one doubts that . . . Congress [has] the power to 'enforce . . . the provisions' of the Amendment by creating private remedies against the States for *actual* violations of those provisions."  *Id.* at 158 (emphasis in original).  The Court thus remanded the case for a determination as to whether the complaint solely alleged *actual* violations of the Fourteenth Amendment or whether it also alleged violations of Title II's prophylactic provisions.  *See id.* at 158-59; *id.* at 163 (Stevens, J., concurring) (remanding the case "provide[s] the District Court and the Court of Appeals the opportunity to apply the *Boerne* framework properly").  Here, there is no such dispute; the Attorney General has neither argued that Section 5 of the VRA is directed only at conduct that would independently violate Section 1 of the Fifteenth Amendment nor argued that the provision could be upheld as merely creating a

private right of action for *actual* violations of the Fifteenth Amendment.  The Supreme Court's

decision in *Georgia*, therefore, is wholly inapposite.

>    2.    *City of Boerne* and Its Progeny Make Clear that the Voting Rights Act Is
>          Subject to Congruence and Proportionality Review.

Contrary to the Attorney General's assertion, *see* AG Opp. at 12-13, 17-18; Harris Opp.

at 20-22 (same), the Supreme Court has specifically determined that the VRA is subject to

review under the *City of Boerne* framework.  Indeed, if there is a common thread in the Supreme

Court's "congruence and proportionality" decisions, it is the Court's reliance on the Voting

Rights Act of 1965 as the quintessentially congruent and proportional remedy given the

extraordinary circumstances then existing in the country.  In *City of Boerne* itself, the Court

referenced *Katzenbach* no fewer than eleven times, *see* 521 U.S. at 518-19, 524-26, 530, 532-33,

and specifically relied on it as supporting the constitutional necessity of "congruence and

proportionality" review, *see id.* at 530.  Moreover, in the course of reviewing RFRA, the Court

explained that "[a] comparison between RFRA and the Voting Rights Act is instructive."  *Id.* at

530.  To that end, the Court engaged in a detailed comparison of RFRA and the VRA to illustrate

why the former failed this exacting review and the latter passed.  *See id*. at 530-33.

The decisions applying *City of Boerne* made the same point.  In *Florida Prepaid*, the

Court explained that the *City of Boerne* framework followed from "the history of the Fourteenth

Amendment and *case law examining the propriety of Congress' various voting rights measures*."

527 U.S. at 638-39 (emphasis added); *see also id.* at 639 (explaining that "unlike the measures in

the voting rights cases, RFRA's provisions were 'so out of proportion to a supposed remedial or

preventive object' that RFRA could not be understood 'as responsive to, or designed to prevent,

unconstitutional behavior'").  The *Garrett* Court held that Title I's "constitutional shortcomings

are apparent when the Act is compared to Congress' efforts in the Voting Rights Act of 1965 to

respond to a serious pattern of constitutional violations." 531 U.S. at 373. Other cases also pointed to the voting rights cases as evidencing the constitutional heritage of the *City of Boerne* framework. *See Kimel*, 528 U.S. at 89; *Hibbs*, 538 U.S. at 738; *Lane*, 541 U.S. at 523; *United States v. Morrison*, 529 U.S. 598, 625-26 (2000).

It is impossible to reconcile this reliance on *Katzenbach* and the other voting rights cases with the Attorney General's argument. After all, the Court's reliance on these decisions as providing the doctrinal foundation for the *City of Boerne* framework would have been unusual if the VRA were subject to a different standard of review. *See* Harris Opp. at 19 ("The Supreme Court built its *Boerne* 'congruence and proportionality' analysis upon *Katzenbach* and *Rome*"). And the Court's point-by-point factual comparison of the legislative record amassed in support of the VRA in 1965 to the records under review in *City of Boerne* and *Kimel* likewise would not have been "instructive" if the voting rights cases were to be judged against an entirely different constitutional metric. The Court relied on these decisions for a straightforward reason: all enforcement legislation is subject to the same standard of review. *City of Boerne*, 521 U.S. at 520 (explaining that the need for congruence and proportionality review is "apparent from the text of the Amendment" and supported by "[h]istory and [our] case law").

To be sure, the Court's early voting rights decisions rely on *Ex Parte Virginia*, 100 U.S. 339 (1879), and *McCulloch v. Maryland*, 17 U.S. 316 (1819), in setting forth the applicable legal standard. *See City of Rome v. United States*, 446 U.S. 156, 177 (1980) (concluding that "'appropriate'" should be defined "as that term is defined in *McCulloch v. Maryland* and *Ex parte Virginia*"); *Katzenbach*, 383 U.S. at 326-27; *Katzenbach v. Morgan*, 384 U.S. 641, 650-51 (1966).[3] The Attorney General seizes on this as proof that review of Fourteenth and Fifteenth

---

[3]     Having expressly abandoned the argument that Fourteenth and Fifteenth enforcement clauses have different meanings, *see supra* at 4 n.2, the Attorney General acknowledges that he must show that

Amendment legislation enforcing "the core prohibition on race discrimination found in both amendments" is "the same as that under the 'necessary and proper' clause of Article I."  AG Opp. at 17-18; Harris Opp. at 20 (same); Pierson Opp. at 45 (same).  But *City of Boerne* made clear that the congruence and proportionality framework was an elaboration on *Ex Parte Virginia* and *McCulloch*.  As the Court explained, those decisions described Congress's enforcement authority in "broad terms."  *City of Boerne*, 521 U.S. at 517.  But the Court was exceedingly clear "that as broad as the congressional enforcement power is, it is not unlimited."  *Id.* at 518 (citation and quotation marks omitted).  The congruence and proportionality test strikes the balance: "While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed.  There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  *Id.* at 519-20.

In particular, the Court rejected the argument that "the standard of 'appropriate[ness]' under the amendments is the same as that under the 'necessary and proper' clause of Article I," AG Opp. at 18; Pierson Opp. at 45 (same), as inconsistent with the text and framing history of the Reconstruction Amendments.  The first draft of the Fourteenth Amendment provided: "The Congress shall have power to make all laws which *shall be necessary and proper* to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all

---

the provision of the VRA upheld in *Morgan* under the Fourteenth Amendment was, in fact, "similarly subject to rational basis review," AG Opp. at 12.  But the Supreme Court has expressly rejected that argument because it is "not a necessary . . . or even the best" interpretation of that decision.  *City of Boerne*, 521 U.S. at 528.  The Court instead characterized *Morgan* as hewing to the same constitutional line as the more recent enforcement clause decisions: Congress must have a compelling factual basis for imposing a sweeping prophylactic remedy on the States under its enforcement authority.  *See id.* at 526-27.  The Attorney General's dissatisfaction with the Court's treatment of the early voting rights decisions, including *Morgan*, as progenitors to *City of Boerne* is not reviewable here.

persons in the several States equal protection in the rights of life, liberty, and property." *City of Boerne*, 521 U.S. at 520 (quoting Cong. Globe, 39th Cong., 1st Sess. 1034 (1866) (emphasis added)). "The proposal encountered immediate opposition, which continued through three days of debate. Members of Congress from across the political spectrum criticized the Amendment, and the criticisms had a common theme: The proposed Amendment gave Congress too much legislative power at the expense of the existing constitutional structure." *Id.* As a consequence, it was revised to its current form, "passed both Houses and was ratified in July 1868 as the Fourteenth Amendment." *Id.* at 523.

As *City of Boerne* thus explained, the Attorney General's construction of "enforcement" would negate the changes made to the Fourteenth Amendment and by extension the Fifteenth Amendment. *See* 521 U.S. at 522-24.[4] Moreover, the Supreme Court's refusal to equate "appropriate" to "necessary and proper" was not limited to Congress's enforcement of rights at the periphery of the these amendments. Race was the central focus of the Reconstruction Amendments. *See id.* at 523; AG Opp. at 13-14. The Court's determination that their text and history prevented the judiciary from broadly deferring to Congress *a fortiori* applies to legislation concerning racial classifications. In short, there is no indication that the *City of Boerne* Court viewed *Katzenbach*, *Rome*, and *Morgan* as out of step with its interpretation of the drafting and ratification history of the Fourteenth and Fifteenth Amendments. Absent such evidence, there is no support for the Attorney General's argument that "core" rights are subject to the deferential standard of review specifically rejected in that decision.

---

[4]     Amicus also argues that the Fifteenth Amendment "granted Congress the sweeping authority of Article I's 'necessary and proper' powers[.]" Brief of Constitutional Accountability Ctr. as *Amicus Curiae* in Support of Def. & Def.-Intervenors at 7. But it too ignores that "necessary and proper" was deliberately removed from the Fourteenth Amendment because it unwisely "vest[ed] in Congress primary power to interpret and elaborate on the meaning of the new Amendment through legislation." *City of Boerne*, 521 U.S. at 524. This is not the proper forum for relitigating the Supreme Court's interpretation of the Reconstruction Amendments' original meaning.

3.   The Attorney General's Argument Cannot Be Reconciled with the *City of Boerne* Framework.

The Attorney General's proposed two-track test for evaluating the constitutionality of Fourteenth and Fifteenth enforcement legislation also would render the first step of the *City of Boerne* framework meaningless.  "The first step in applying [*City of Boerne*] is to identify with some precision the scope of the constitutional right at issue."  *Garrett*, 531 U.S. at 365; *see, e.g.*, *Lane*, 541 U.S. at 522 ("The first step of the *Boerne* inquiry requires us to identify the constitutional right or rights that Congress sought to enforce when it enacted Title II.").  Indeed, only after determining "the metes and bounds of the constitutional right in question" can a court adequately conduct the remaining steps of the *City of Boerne* inquiry—*i.e.*, determine whether the legislative record supports *any* exercise of Congress's enforcement authority and, if it does, whether the *particular* prophylactic remedy chosen by Congress is congruent and proportional to the evidence of discrimination in the legislative record.  *Garrett*, 531 U.S. at 368.

The Attorney General nevertheless asks this Court to identify the contours of "the constitutional right at issue" as a precondition to engaging in the *City of Boerne* inquiry at all.  Only those rights not "at or near the core" of the relevant Amendment's "protections" would be subjected to *City of Boerne*'s "exacting review."  AG Opp. at 16.  The so-called "core" rights would avoid congruence and proportionality review altogether.  *Id.* at 17-19.  Thus, the Attorney General would recast the *City of Boerne* framework as a two-step process applicable only to "non-core" rights.  But this is not the path the Supreme Court has chosen.  Every decision in the *City of Boerne* line has identified the "scope of the constitutional right at issue" in order to conduct "congruence and proportionality review"—not as a means of evading it.  *See supra* at 5-10.  The Attorney General cannot replace the *City of Boerne* framework with a newly-minted test

15

for evaluating the constitutionality of a segment of Fourteenth and Fifteenth Amendment enforcement legislation.

> 4. The Unique Federalism Concerns Raised by Preclearance Demands Adherence to the *City of Boerne* Framework.

Last, the Attorney General argues that application of *City of Boerne* would be particularly inappropriate because this litigation implicates the right to vote.  AG Opp. at 12, 17-18; Harris Opp. at 22-23, 27-28 (same).  But the Attorney General has it exactly backwards.  Section 5 is far more problematic from a federalism perspective than the laws previously subjected to review under the *City of Boerne* framework.  *See Nw. Austin*, 129 S. Ct. at 2511; *Miller v. Johnson*, 515 U.S. 900, 926-27 (1995); *United States v. Sheffield Bd. of Comm'rs*, 435 U.S. 110, 141 (1978) (Stevens, J., dissenting).  Section 5 uniquely interferes with the machinery of local government and targets a function of governance that the Constitution specifically insulated from federal encroachment: the regulation of state and local elections.  *See Oregon v. Mitchell*, 400 U.S. 112, 125 (1970) ("[T]he whole Constitution reserves to the States the power to set voter qualifications in state and local elections, except to the limited extent that the people through constitutional amendments have specifically narrowed the powers of the States."); *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991) (explaining that "the authority of the people of the States to determine the qualifications of their most important government officials . . . lies at the heart of representative government") (internal citations and quotation marks omitted).  Adhering to the *City of Boerne* framework ensures that Congress's enforcement authority is not "stretched to nullify the States' powers over elections which they had before the Constitution was adopted and which they have retained throughout our history."  *Mitchell*, 400 U.S. at 126; *see also Nw. Austin*, 129 S. Ct. at 2519-20 (Thomas, J., concurring in the judgment in part, dissenting in part).

Moreover, the federalism concerns are graver here because the laws previously reviewed under *City of Boerne* were almost all otherwise justifiable as an exercise of Congress's Article I authority over interstate commerce (but for the Fourteenth Amendment question triggered by the attempt to expose state and local governments to civil actions for monetary damages). *See, e.g.*, *Hibbs*, 538 U.S. at 726-27; *Lane*, 541 U.S. at 516. Even if Congress exceeded its enforcement authority by invoking the Fourteenth Amendment to abrogate sovereign immunity, it still retained the authority to govern the conduct of private industry. But that is not the legal paradigm from which Section 4(b) and Section 5 arose. In requiring all state and local voting laws to be precleared by federal officials, Congress has not relied on its enforcement authority merely to round out a legal regime that primarily regulates private commercial activity. And Congress has not attempted to target state and local governments in their capacity as employers. Congress instead has chosen to reauthorize an obligation that represents an "extraordinary departure from the traditional course of relations between the States and the Federal Government[.]" *Presley v. Etowah County Comm'n*, 502 U.S. 491, 500-501 (1992). If any legal regime called for congruence and proportionality review, it is one with the "substantial federalism costs" of Section 5. *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 336 (2000) (citation and internal quotation marks omitted) ("*Bossier Parish II*").

**B.     Section 4(b) and Section 5 Are No Longer Constitutional Under the *City of Boerne* Framework.**

The Attorney General resists review under the *City of Boerne* framework because Section 4(b) and Section 5 are clearly unconstitutional under this test. *First*, the constitutional right enforced by these provisions is the right to vote free from discrimination "on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1; *see also infra* at 47-48; AG Opp. at 12-14. Section 1 of the Fifteenth Amendment outlaws "purposefully discriminatory

denial or abridgment by government of the freedom to vote." *City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (plurality opinion); *id.* at 85 n.3 (Stevens, J., concurring in the judgment).  "The Fifteenth Amendment thus renders unconstitutional any federal or state law that would limit a citizen's access to the ballot on one of the three bases enumerated in the Amendment." *Nw. Austin*, 129 S. Ct. at 2520 (Thomas, J., concurring in the judgment in part and dissenting in part). Although the Attorney General argues that vote dilution—as opposed to vote interference—also is protected by Section 4(a) and Section 5, *see* AG Opp. at 57-60, the Supreme Court has never held that vote dilution violates the Fifteenth Amendment, *see infra* at 47-51.  The Attorney General also suggests that these provisions respond to voting laws with a discriminatory effect, *see* AG Opp. at 11, 57, but the Supreme Court has held that the Fifteenth Amendment "requires a showing of intent," *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 482 (1997) ("*Bossier Parish I*"); *see also infra* at 49 n.16.

*Second*, Congress has failed to identify a pattern of discrimination respecting the Fifteenth Amendment's right to vote.  The Attorney General incorrectly argues that the "record of voting discrimination, including intentional discrimination, stands in stark contrast to the very minimal records of discrimination that the Court found inadequate to support legislation in [*City of Boerne*, *Kimel*, and *Garrett*]."  AG Opp. at 20.  The Attorney General's argument proceeds from the mistaken assumption that Congress bears the same burden here that it bore in those cases.  That assumption ignores the important differences in the type of prophylactic remedies imposed by Congress under its enforcement authority.

In all of those cases, the Supreme Court was judging the strength of the legislative record against a remedy that was far narrower than the preclearance obligation.  Each of these statutes imposed affirmative anti-discrimination obligations on state and local governments and, in

several instances, created private rights of action for money damages. Statutes such as Title II of the ADA and the FMLA thus followed in the path of Sections 4(a) and 201 of the VRA, which directly outlawed discriminatory voting tests and devices, as well as Section 2 of the VRA, which created a private right of action. *See* Mot. at 20-22. Each statute thus permissibly targeted "a somewhat broader swath of conduct" to directly enforce a constitutional anti-discrimination command. *Kimel*, 528 U.S. at 81; *City of Boerne*, 521 U.S. at 533 (explaining that the VRA's ban on literacy tests "attacked a particular type of voting qualification . . . with a long history as a 'notorious means to deny and abridge voting rights on racial grounds'") (quoting *Katzenbach*, 383 U.S. at 355 (Black, J., concurring in part and dissenting in part)).

But Section 5 does not prophylactically ban any particular state law or practice in order to enforce the Fifteenth Amendment. Indeed, the preclearance obligation is a prophylaxis in a category all its own. *See Nw. Austin*, 129 S. Ct. at 2511. In the FMLA, for example, Congress prohibited employers, including state and local governments, from denying employees "12 work weeks of unpaid leave annually for any of several reasons, including the onset of a 'serious health condition' in an employee's spouse, child, or parent." *Hibbs*, 538 U.S. at 724 (quoting 29 U.S.C. § 2612(a)(1)(C)). But Congress did not suspend the right of state and local governments to make any changes to their employee leave policies "until they have been precleared by federal authorities in Washington, D.C." *Nw. Austin*, 129 S. Ct. at 2511. Congress instead created a private right of action allowing individuals to seek both equitable relief and monetary damages for violations of the statute's anti-discrimination mandate.

Similarly, in Title II of the ADA, Congress created a private right of action for equitable relief and monetary damages to enforce the statute's ban on disability discrimination "in the provision or operation of public services, programs, or activities." *Lane*, 541 U.S. at 517. But

Congress did not suspend the right of state and local governments to make physical changes to their public facilities until the blueprints and architectural drawings had been precleared by federal officials.  The Attorney General thus cannot defend this legislative record by comparing it to the records reviewed in *City of Boerne*, *Kimel*, and *Garrett*.  The vast difference in the nature and breadth of the prophylactic remedy makes the comparison inapt.

In any event, the legislative record shares many of the same shortcomings of the laws previously held to have exceeded Congress's enforcement authority.  Congress relied on isolated and outdated examples of intentional discrimination, vote dilution evidence, and statistical studies of "second generation barriers" to reauthorize Section 4(b) and Section 5.  *See* AG Opp. at 25-38.  Such evidence does not amount to a pattern of Fifteenth Amendment voting discrimination.  *See infra* at 53-65.  Virtually none of the evidence in the legislative record shows any attempt by state and local government to prevent minorities from exercising the right to vote.  *See id.* at 47-52.  Indeed, Congress acknowledged that the "first generation barriers experienced by minority voters" had largely been eradicated.  *See* Voting Rights Act Reauthorization and Amendments Act of 2006 ("VRARAA"), Pub. L. No. 109-246, § 2(b)(1), 120 Stat. 577, 577 (2006); *see also* Mot. at 24-25.  In other words, the "legislative record lacks examples of modern instances" of voting discrimination needed to identify a pattern of voting discrimination.  *City of Boerne*, 521 U.S. at 530; *see also Fla. Prepaid*, 527 U.S. at 645-46 (explaining that the "handful" of violations identified by Congress amounted to "scant support" for the prophylactic enforcement legislation).  Thus, "even if it were to be determined that each incident" in the legislative record "showed unconstitutional action on the part of the States, these incidents taken together fall far short of even suggesting the pattern of unconstitutional discrimination on which [enforcement] legislation must be based."  *Garrett*, 531 U.S. at 370.

*Third*, even if Congress identified a pattern of discrimination, Section 4(b) and Section 5 are not congruent and proportional to the evidence of intentional voting discrimination in the legislative record.   Section 4(b)'s formula is not proportional because coverage is no longer "placed only on jurisdictions" in which there is "intentional racial discrimination in voting." *City of Boerne*, 521 U.S. at 533 (citing *City of Rome*, 446 U.S. at 177).   As explained below, the evidence of voting discrimination is no longer concentrated in the covered jurisdictions.   *See infra* at 27-31.   And the coverage formula also is incongruent because there is a complete mismatch between the triggers for coverage and the kind of evidence relied on by Congress to reauthorize the preclearance obligation.   *See id.* at 27.   The coverage formula continues to rely on voting registration and turnout data, which corroborate the existence of interference with the right to exercise the franchise.   *See id.* at 26.   Yet, in reauthorizing these provisions, Congress focused on "dilutive tactics" and "second generation barriers" that do not interfere with the right to vote, but instead limit the effectiveness of that vote.   AG Opp. at 67-68; *see also infra* at 25-26.   Congress is required to ensure that there is a close fit between the reasons for imposing the preclearance obligation and the formula employed for choosing the jurisdictions subject to that obligation.   Because Congress clearly failed to do so here, Section 4(b)'s coverage formula fails congruence and proportionality review.

Finally, there can be no question that the preclearance obligation lacks congruence and proportionality to the prophylactic suspension of "all changes to state election law—however innocuous—until they have been precleared by federal authorities in Washington, D.C." *Nw. Austin*, 129 S. Ct. at 2511; *see also infra* at 33-34.   Like RFRA, Section 5's "sweeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions" regarding any change in voting laws.   *City of Boerne*, 521 U.S. at 532.   Moreover, there

is no "reason to believe that many of the laws" subject to preclearance have a "significant likelihood of being unconstitutional." *Id.* And it is plainly insufficient that Section 5 "avoid[s] the difficulty of proving" that race-neutral voting laws have "the unconstitutional object" of interfering with the Fifteenth Amendment right to vote. *Id.* at 529. "In most cases, the state laws to which [Section 5] applies are not ones which will have been motivated by [voting discrimination.]" *Id.* at 534-35. As a consequence, Section 5 "cannot be considered remedial, preventive legislation, if those terms are to have any meaning. [It] is so out of proportion to a supposed remedial or preventative object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.*

C.   **Section 4(b) and Section 5 Are Equally Constitutional Under Any Other Proposed Standard of Review.**

Even if the VRA were not to be evaluated under the *City of Boerne* framework, Congress's reauthorization of both Section 4(b) and Section 5 would still be subject to more searching judicial review than suggested by the Attorney General. Irrespective of the standard of review, the Supreme Court recently made clear that the legislative record amassed by Congress must establish: (1) that the "current burdens" imposed on the covered jurisdictions are "justified by the current needs" and (2) that the coverage formula "is sufficiently related to the problem it targets." *Nw. Austin*, 129 S. Ct. at 2511-12.[5] In other words, the legislative record must demonstrate: (1) that the "exceptional conditions" that "can justify legislative measures not otherwise appropriate" remain present in the covered jurisdictions and (2) that the coverage formula accurately captures those jurisdictions that "share [the] . . . characteristics incorporated

---

[5]   The Supreme Court's decision in *Northwest Austin* definitively refutes the suggestion made by the several Intervenors that the standard of review for reauthorization of Section 5 is lower than the standard for the statute's original enactment. *See, e.g.,* Cunningham Opp. at 2; Harris Opp. at 23. The Court could not have been clearer: the "*current* burdens" of Section 5 "must be justified by *current* needs." *Nw. Austin*, 129 S. Ct. at 2512 (emphasis added).

by Congress into the coverage formula." *Katzenbach*, 383 U.S. at 330, 334. The legislative record does not even come close to meeting either benchmark.

> 1. Section 4(b)'s Coverage Formula Is No Longer an "Appropriate" Means of Enforcing the Fifteenth Amendment.

As Shelby County has explained, Section 4(b)'s coverage formula is no longer an "appropriate" method for determining which States and political subdivisions are subject to Section 5's preclearance obligation. Mot. at 35-43. Section 4(b) is unconstitutional for two reasons. First, in light of the spectacular increases in minority registration and turnout rates in covered jurisdictions, the decades-old data fossilized in the coverage formula bear no relation whatsoever to "current political conditions" in those jurisdictions, especially when compared to political conditions outside of the covered jurisdictions. *Nw. Austin*, 129 S. Ct. at 2512. Second, the "evils" identified by Congress as a basis for reauthorizing Section 5 are not "concentrated in the jurisdictions singled out for preclearance." *Id*.

The Attorney General's principal response is nothing more than blind reliance on *Katzenbach*. AG Opp. at 65-67 ("Section 5 is applicable only to those jurisdictions with the worst historical records of voting discrimination."); Harris Opp. at 13-15 (same); Pierson at 34-35 (same). But the decision to uphold the coverage formula in 1966 does not support upholding it 45 years later. Nor does the mere desire to continue to punish those jurisdictions whose historical record at the time of the original enactment "ha[d] been most flagrant." AG Opp. at 67 (quoting *Katzenbach*, 383 U.S. at 315). Indeed, were that a legitimate basis for upholding the coverage formula, the formula would exist in perpetuity, even if every last "second generation barrier" in the covered jurisdictions were eradicated. Reliance on decades-old evidence of discrimination cannot justify imposing coverage under this formula until 2031. It is irrelevant that the coverage formula is the functional equivalent of the same formula that served as a

constitutionally adequate proxy for those jurisdictions in which voting discrimination was widespread in 1965.  "The statute's coverage formula is based on data that is now more than 35 years old, and there is considerable evidence that it fails to account for current political conditions."  *Nw. Austin*, 129 S. Ct. at 2512.

Indeed, actually applying the *Katzenbach* Court's analysis highlights the constitutional defects in the newly reauthorized coverage formula.  The *Katzenbach* Court found the coverage formula constitutional only after reviewing the legislative record and concluding that the formula appropriately enforced the Fifteenth Amendment "in both *practice* and *theory*."  383 U.S. at 330 (emphasis added).  The Court found the coverage formula constitutionally sound as a theoretical matter because its inputs—"the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average"—tied coverage to the specific problem to be addressed by the Fifteenth Amendment: the "widespread and persistent" use of intentionally discriminatory tactics to prevent minorities from voting.  *Id*. at 330-31.  In particular, tying coverage to "the use of tests and devices for voter registration" was appropriate because "of their long history as a tool for perpetrating the evil"; tying it to low registration and voting rates was appropriate "for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters."  *Id*. at 330.  And the Court found the coverage formula constitutionally sound in practice because it accurately captured those states and localities with respect to which there was "*reliable evidence of actual voting discrimination*."  *Id*. at 329 (emphasis added).

Applying the *Katzenbach* analysis to the reauthorized coverage formula yields the opposite result; the coverage formula is constitutionally *un*sound in both theory and practice. Tests and devices are no longer a relevant consideration as they have been banned for over 45

years and are now banned permanently, *see* Voting Rights Act Amendments of 1975, Pub. L. No. 94-73, § 102, 89 Stat. 400 (codified at 42 U.S.C. § 1973aa); and the rates of registration and voting in 1964, 1968, and 1972 bear no relation to the "current political conditions" across the country, *Nw. Austin*, 129 S. Ct. at 2512; *see also* Mot. at 37.  Indeed, the Attorney General concedes that the correlation between the coverage formula and current political conditions is "attenuated."  AG Opp. at 67-68.  Yet he ignores the significance of this attenuation problem, notwithstanding the Supreme Court's admonition that "the Act imposes current burdens and must be justified by current needs."  *Nw. Austin*, 129 S. Ct. at 2512.  One Intervenor actually suggests that the spectacular changes in registration and voting rates are irrelevant.  *See* Cunningham Opp. at 31-32 ("[R]egistration and turnout rates . . . did not form the basis for Congress's decision to maintain the Section 4(b) coverage provision.").  It is a curious defense of the coverage formula to argue that the Court should disclaim the relevance of the only statutory factors upon which the coverage formula is actually based.

The Attorney General's defense of the coverage formula suffers from another defect at the theoretical level.  He has chosen to defend the coverage formula based upon evidence of vote dilution, *i.e.*, voting changes that affect minority voting *strength*, rather than upon evidence of voting changes that deny *access to the ballot box* in the first place.  *See, e.g.*, AG Opp. at 57-62 (emphasizing the "dilutive techniques and other means of minimizing the effectiveness of minority voters that Congress relied upon in 2006").  This tactic is flawed as a doctrinal matter— the Fifteenth Amendment is directed at the problem of actual *disenfranchisement*, not minority vote *dilution*, which is a Fourteenth Amendment concern that implicates the weight of the vote, not the ability to cast it.  *See infra* at 47-48.  Neither "dilutive techniques" nor any effort to remedy them bears on whether minorities are able to freely register and vote.  As a consequence,

there is a serious mismatch between the conduct targeted by Congress and the factors that determine coverage under Section 4(b).  This should be quite obvious, given that the coverage formula is tied to "first generation barriers" and the Attorney General's defense is based on evidence of "second generation barriers."  His defense is in essence an admission that Congress chose to attack a new foe under the reauthorized Section 5 even though the coverage formula— which has long been acknowledged as having been reverse-engineered to attack the problem of disenfranchisement—is still aimed at the old targets.  In short, the "second generation" evidence upon which the Attorney General principally relies to defend Section 5 bears no rational connection to the formula Congress retained for triggering coverage.

In practice, the coverage formula fares no better.  As the Supreme Court has emphasized, "there is considerable evidence that [the coverage formula] fails to account for current political conditions."  *Nw. Austin*, 129 S. Ct. at 2512.  Indeed, there have been massive changes in registration and turnout rates in covered jurisdictions over the past few decades.  Mot. at 24-31.  At the time of reauthorization, "the racial gap in voter registration and turnout [wa]s lower in the States originally covered by § 5 than it [wa]s nationwide."  *Nw. Austin*, 129 S. Ct. at 2512.[6] Although the Attorney General has chosen to essentially ignore this damning statistical evidence, one Intervenor has conceded that, if coverage were based upon "recent participation rates," Hawaii would be the "only State covered in whole."  Cunningham Opp. at 32 n.15.  Clearly then,

---

[6]      So-called "state reports" in the legislative record highlight state voter registration and turnout statistics that confirm this point.  *See, e.g., Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the House Committee on the Judiciary*, 109th Cong., 2d Sess., at 154 (May 4, 2006) ("*May 4, 2006, House Hearing*") ("[I]n the two most critical 'voting assessment' categories—voter registration and election participation—blacks in the majority of section 5 states are more successful than blacks in [non-covered] Oklahoma."); *id.* at 177 ("By the beginning of the 21st century, proportionally more blacks than whites were registered to vote in Mississippi, and for two decades Mississippi blacks have registered to vote at higher rates than African-Americans outside the South."); *id.* at 235 ("[Non-covered] Tennessee ranks behind Mississippi and the median southern state among the seven originally subject to section 5 in terms of black voter participation.").  Intervenors are thus incorrect to suggest that these "state reports" support the coverage formula.  Cunningham Opp. at 40.

the "disparate geographic coverage" of the formula is not "sufficiently related to the problem that it targets." *Nw. Austin*, 129 S. Ct. at 2512.

Because the Attorney General is unable to defend the coverage formula on its own terms, he attempts to switch gears and defend the coverage formula based upon evidence of "second generation barriers" to voting.  AG Opp. at 23-56, 67; Cunningham Opp. at 33-41 (same).  Even assuming that these barriers can support the exercise of Fifteenth Amendment enforcement authority, *but see infra* at 35-38, the evidence in the legislative record reveals that the coverage formula does not actually single out for coverage those jurisdictions for which there is "reliable evidence of actual voting discrimination."  *Katzenbach*, 383 U.S. at 329.  The record of "second generation barriers" relied upon by Congress in 2006 is nothing like the record of first-generation barriers supporting the original act, *see* Mot. at 29-30; *infra* at 33-34; indeed, the overwhelming majority of the record evidence is not "reliable evidence of actual voting discrimination" at all. Mot. at 36 (quoting *Katzenbach*, 383 U.S. at 329); *see also infra* at 34-65.

Importantly, Congress made *no finding* that this evidence was meaningfully greater in covered jurisdictions than in non-covered ones. *See* VRARAA, § 2(b)(4), 120 Stat. at 577.  Nor could it have.  The coverage formula "cannot reasonably be correlated with the evidence of 'second generation barriers' relied upon by Congress" because "these 'second generation barriers' generally exist to an equal or greater degree in non-covered jurisdictions."  Mot. at 38; 1 *Voting Rights Act: Section 5 of the Voting Rights Act – History, Scope, and Purpose: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess., at 14 (Oct. 25, 2005) ("*History, Scope, and Purpose*") (testimony of Edward Blum) ("[A]pplying the same methods of analysis . . . used on the covered jurisdictions [to non-covered states] such as Tennessee, Arkansas, and New Mexico . . . reveals no differences between

27

them."). More specifically, as Shelby County explained, the "second generation" evidence of racially polarized voting, Section 2 actions, and federal observer coverage is not meaningfully greater in covered jurisdictions that in non-covered ones.  Mot. at 38-41.[7]

No doubt aware of the weakness of the legislative record, the Attorney General has declined to address Shelby County's points regarding the insufficiency of the evidence of racially polarized voting and federal observer coverage.  The Attorney General seeks to defend the coverage formula almost solely on the basis of the evidence of Section 2 actions.  But in doing so, the Attorney General distorts and otherwise overstates the evidence of actual voting discrimination represented by Section 2 suits.  AG Opp. at 67-68; Cunningham Opp. at 33-35 (same).  First, the Attorney General relies on admittedly extra-record evidence of Section 2 suits, *see* AG Opp. at 68 (citing a "study conducted since the 2006 Reauthorization"), despite the fact that the statute must be tested against the legislative record compiled by Congress and nothing more, *see infra* at 53 n.18.  Second, the Attorney General cites a study indicating that 56% of reported Section 2 suits "with outcomes favorable to minority voters" were in covered jurisdictions.  AG Opp. at 68.  Even if the Attorney General had accurately characterized this

---

[7]      Even supporters of reauthorization doubted the constitutionality of the coverage formula:

Congress heard warnings from supporters of extending § 5 that the evidence in the record did not address "systematic differences between the covered and the non-covered areas of the United States[,] . . . and, in fact, the evidence that is in the record suggests that there is more similarity than difference."  *The Continuing Need for Section 5 Pre-Clearance: Hearing before the Senate Committee on the Judiciary*, 109th Cong., 2d Sess., 10 (2006) (statement of Richard H. Pildes); *see also* Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 Yale L.J. 174, 208 (2007) ("The most one can say in defense of the [coverage] formula is that it is the best of the politically feasible alternatives or that changing the formula would . . . disrupt settled expectations").

*Nw. Austin*, 129 S. Ct. at 2512; Travis Crum, Note, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation & Dynamic Preclearance*, 119 Yale L. J. 1992, 2024 (2010) ("[T]he coverage formula looks to the past and does not cover the counties in Ohio and Florida with the most notorious voting rights violations in recent elections.  Section 5's coverage formula is both under- and over-inclusive of today's voting rights violators." (citations and quotation marks omitted)).

evidence, it is a stretch to suggest that such a narrow covered-versus-non-covered split among Section 2 suits could support a "departure from the fundamental principle of equal sovereignty." *Nw. Austin*, 129 S. Ct. at 2512.  The Attorney General's own preferred study acknowledges that a "significant" number of Section 2 cases "resolved favorably to plaintiffs" occurred in non-covered jurisdictions.  1 *Voting Rights Act: Evidence of Continued Need: Hearing. Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess., at 208 (Mar. 8, 2006) ("*Evidence of Continued Need*").

In any event, the Attorney General overstates the significance of this study.  Many of these cases involved no finding of intentional discrimination, were not resolved on the merits, or both.  Ellen Katz, et al., 39 U. Mich. J.L. Reform 643, 653-54 n.35 (2006) ("Suits coded as a successful plaintiff outcome include . . . lawsuits where . . . the only published opinion indirectly documented plaintiff success [such as] where the only—or most recently—published case granted a preliminary injunction, considered a remedy or settlement.").  Moreover, some cases deemed "outcomes favorable to minority voters" actually did *not* have favorable outcomes, but merely indicated that voting laws had been changed.  *See* Ellen Katz & The Voting Rights Initiative, VRI Database Master List, *available at* http://sitemaker.umich.edu/votingrights/files/ %20masterlist.xls ("*VRI Database Master List*") (cited in *To Examine the Impact & Effectiveness of the Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the House Comm. On the Judiciary*, 109th Cong., 1st Sess. 974, 1019-20 (Oct. 18, 2005)); *see, e.g., Fayetteville v. Cumberland County*, No. 90-2029, 1991 WL 23590, at *2 (4th Cir. Feb. 28, 1991) (affirming dismissal because district court "had before it a complaint which challenged the lawfulness of a system which was no longer viable; motions without supporting memoranda; and a scant amount of evidence in support of the claims"); *Tangipahoa Citizens for Better Gov't v.*

*The Parish of Tangipahoa*, No. 03-2710, 2004 WL 1638106, at *1-2 (E.D. La. July 19, 2004) (dismissing complaint as moot because the parish adopted a new voting plan and thus "never implemented the original 2003 Redistricting Plan").

Third, the Attorney General attempts to inflate the difference in the number of Section 2 suits in covered jurisdictions versus non-covered jurisdictions by emphasizing that the total population of covered jurisdictions was "less than one-quarter of the nation's population in 2000." AG Opp. at 68; Cunningham Opp. at 35 (same). According to the Attorney General, this means that covered jurisdictions were subject to more than twice their proportional share of successful Section 2 suits. *Id*. However, if any measure of comparative population were relevant, it would be the minority population, not total citizens. And the nation's minority population is about evenly divided between covered and non-covered jurisdictions. *The Continuing Need for Section 5 Preclearance: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d. Sess. at 13-14 (May 16, 2006) ("*Continuing Need for Section 5 Preclearance*") (testimony of Richard H. Pildes) ("[T]he right denominator would have to be the minority population in different jurisdictions . . . . [A]bout half of African-Americans live in the south in covered areas, half do not. . . . And so the fact that the pattern shows about half of the problems are in covered States and half in non-covered States, does I think suggest something that is more general in the United States."). And, given that federal observers more closely watch elections in covered jurisdictions, *see* AG Opp. at 6; Cunningham Opp. at 38, one would expect that more evidence of intentional discrimination would be discovered, and more Section 2 suits filed, there than in non-covered jurisdictions.

Stripping away the Attorney General's flawed attempts to inflate the evidence of Section 2 suits, there are very few Section 2 suits that constitute "reliable evidence of actual voting

discrimination," *see Katzenbach*, 383 U.S. at 329, and they have occurred in roughly equal numbers in covered and non-covered jurisdictions, *see* Mot. at 40.  Indeed, the Michigan Voting Rights Initiative study that the Attorney General repeatedly cites, *see, e.g.*, AG Opp. at 68, indicates that more Section 2 suits were maintained in non-covered jurisdictions (171) than in covered jurisdictions (160) between 1982 and 2004.  *See VRI Database Master List*.  More importantly, more of those cases resulted in Section 2 violations with findings of discriminatory intent in non-covered jurisdictions (8) than in covered jurisdictions (7).  *Id*.  Similarly, the legislative record reflects that the Report of the National Commission on the Voting Rights Act, which compiled evidence of both reported and unreported cases, found more cases with findings of intentional discrimination in non-covered jurisdictions (13) than in covered jurisdictions (11) since 1982.  *See Continuing Need for Section 5 Preclearance* at 10 (testimony of Richard H. Pildes).  Thus, the relative frequency of Section 2 suits in covered jurisdictions as compared with non-covered jurisdictions is an inadequate basis for "depart[ing] from the fundamental principle of equal sovereignty."  *Nw. Austin*, 129 S. Ct. at 2512.

Last, the Attorney General argues that the VRA's bailout provision saves the otherwise ill-fitting formula.  AG Opp. at 69; Cunningham Opp. at 38 (same); Harris Opp. at 42 (same).  But bailout cannot solve the formula's severe underinclusiveness—an issue the Attorney General fails to address.  Mot. at 42-43.  Intervenors suggest that the bail-in or "pocket trigger" provision can solve this problem.  *See* Harris Opp. at 42.  However, bail-in can only solve coverage issues at the margins.  By Intervenors' logic, Congress could dispense entirely with its obligation to build a legislative record upon which to tailor its exercise of enforcement authority and randomly select jurisdictions for coverage, but then immunize such random selection from constitutional scrutiny through bail-in.  This cannot be the law.  The "fundamental principle" of "equal

31

sovereignty" is surely more than a mere platitude.  *Nw. Austin*, 129 S. Ct. at 2512.  The pocket

trigger cannot relieve Congress of its duty to demonstrate that Section 4(b)'s "disparate

geographic coverage is sufficiently related to the problem that it targets."  *Nw. Austin*, 129 S. Ct.

at 2512.  In any event, to the extent the pocket trigger effectively targets jurisdictions that should

be covered, it actually undermines the constitutionality of Section 4(b) because it constitutes a

narrower, and more appropriate, means of imposing preclearance.  *See* Crum, *supra*, at 1992

("The pocket trigger is more likely to survive the congruence and proportionality test because it

replaces an outdated coverage formula with a perfectly tailored coverage mechanism—a

constitutional trigger.").

But even setting aside the underinclusiveness problem, the bailout provision is incapable

of solving the ill-fitting coverage formula's overbreadth.  To be sure, *Katzenbach* noted that the

bailout mechanism helped alleviate potential overbreadth concerns related to the original

coverage formula.  However, as noted above, the coverage formula was a far more precise fit to

the conditions that existed at the time of the VRA's initial enactment.  *See Katzenbach*, 383 U.S.

at 330.  Like the bail-in provision, bailout thus is an appropriate means of alleviating overbreadth

problems only at the margins of an otherwise permissible coverage formula; it cannot possibly

resolve the massive overreach of the VRA's archaic coverage formula when compared with

current political conditions.

Moreover, bailout is incapable of solving the gross overbreadth of Section 4(b) as a

practical matter.  First, it does not actually terminate coverage because of the "clawback"

provision that subjects a bailed-out jurisdiction to continued federal oversight for ten years.  42

U.S.C. § 1973b(a)(5).  Second, the bailout mechanism endorsed in *Katzenbach* was effectuated

via a much simpler and more straightforward test (proof of no "test or device" in the preceding

five years) than the present test for bailout, which involves the satisfaction of several objective and subjective criteria.  Mot. at 41 n.8.  The Attorney General asserts that bailout remains a realistic option, but his own figures actually confirm that bailout is, at best, capable of working at the margins.  AG Opp. at 72 (57 of 943—or only 6%—of the *originally* covered jurisdictions have successfully bailed out of coverage).[8]  In short, bailout is incapable—both theoretically and practically—of alleviating the constitutional infirmities of the coverage formula.

        2.    <u>Section 5's Preclearance Obligation Is No Longer an "Appropriate"</u>
              <u>Means of Enforcing the Fifteenth Amendment.</u>

The imposition of the preclearance obligation on the covered jurisdictions was an "uncommon exercise" of Congress's Fifteenth Amendment enforcement authority that was "appropriate" legislation only because of the "unique circumstances" that existed at that time. Mot. 20-23 (quoting *Katzenbach*, 383 U.S. at 334).  Preclearance was needed to combat "a particular set of invidious practices that had the effect of undo[ing] or defeat[ing] the rights recently won by nonwhite voters."  *Miller*, 515 U.S. at 925 (citation omitted).  The intractable problem of state and local governments systematically "'contriving new rules' to continue violating the Fifteenth Amendment 'in the face of adverse federal court decrees'" thus provided the constitutional warrant for this sweeping remedy.  *Nw. Austin*, 129 S. Ct. at 2509 (quoting *Katzenbach*, 383 U.S. at 335)).  Only such "exceptional conditions" could "justify legislative

---

[8]      The Attorney General's bailout figures also are misleading.  The Attorney General relies upon extra-record statistics to support his argument that the bailout provision "creates a workable process for jurisdictions seeking to terminate coverage."  AG Opp. at 72.  Moreover, although the Attorney General asserts that 72 jurisdictions have been granted bailout since 1984, *see id.*, the Supreme Court found otherwise.  In *Northwest Austin*, the Court emphasized that "[s]ince 1982, only 17 jurisdictions—out of the more than 12,000 covered political subdivisions—have successfully bailed out of the Act."  129 S. Ct. at 2516.  In addition, the Attorney General's bailout statistics contradict the statistics he submitted to this Court in *Northwest Austin*.  *See* Def's Statement of Uncontested Material Facts at ¶ 115, *Nw. Austin*, No. 06-cv-1384 (D.D.C. May 15, 2007) ("To date, 14 . . . jurisdictions have successfully bailed out under Section 4(a) since 1984, with the agreement of the Attorney General.  All of these 14 jurisdictions were counties and independent cities in Virginia.").

measures not otherwise appropriate." *Katzenbach*, 383 U.S. at 334.  To justify reauthorization of Section 5, then, Congress needed to document the persistence of "unremitting and ingenious defiance" of the Fifteenth Amendment.  *Id.* at 309.  Because Congress failed to do so, Section 5 is no longer "appropriate" enforcement legislation.  Mot. at 23-35.

Instead of squarely responding to this argument, the Attorney General essentially ignores the unprecedented nature of the preclearance obligation and defends Section 5 as if it were just another enforcement tool useful in combating voting discrimination.   AG Opp. at 53-55.  However, preclearance is different in kind from *every* other prophylactic measure enacted by Congress under its enforcement authority.  *See supra* at 19-20.  The Attorney General's refusal to measure the legislative record against the extreme nature of Section 5 thus leaves a chasm in his argument.  And, his attempt to defend the legislative record as containing sufficient evidence of intentional discrimination falls short.  The record compiled by Congress does not even come close to documenting pervasive discrimination and gamesmanship.  Last, the Attorney General weakly argues that the indirect evidence of intentional discrimination that Congress specifically relied upon is sufficient to reauthorize the preclearance obligation.  However, this evidence does not signal the existence of intentional discrimination at all, let alone the evidence of pervasive discrimination and gamesmanship needed to uphold Section 5.

> a.     Section 5 Can Only Be Justified as Constitutionally Necessary To Combat Pervasive Discrimination and Electoral Gamesmanship Given the Extreme Nature of the Preclearance Obligation.

In the Attorney General's view, Section 5 is constitutional for two main reasons: (1) Congress relied on the "same evidentiary sources" previously relied upon to uphold Section 5; and (2) "Congress went to extraordinary lengths" to amass a voluminous record.  Both of these arguments are misplaced.  Congress did not rely on the same kind of evidence used to

uphold Section 5 in *Katzenbach* and *City of Rome* and the record does not contain such evidence notwithstanding its size.  In any event, the Attorney General is asking the wrong questions.  It is immaterial whether Congress examined the same sources or whether the record is voluminous.  The pertinent question is whether the legislative record contains enough reliable evidence of intentional discrimination to justify the continued imposition of a prophylactic remedy as uniquely broad as Section 5.  *See supra* at 18-20.

*First*, the Attorney General asks this Court to focus on the "sources" of the evidence Congress previously relied on to uphold Section 5.  AG Opp. at 24-25; Cunningham Opp. at 22-25 (same).  But the "source" of the evidence is immaterial as "Congress obviously may avail itself of any information from any probative source."  *Katzenbach*, 383 U.S. at 330.  The material question is whether these "sources" include the *kind* of reliable evidence of intentional discrimination that is needed to impose a prophylactic remedy that would otherwise exceed Congress's enforcement authority.  That Congress previously cited to some or all of these "sources" is irrelevant; if the Attorney General is intent on defending Section 5 as consistent with the previous occasions on which it has been upheld, he must rely on the kind of evidence that the Supreme Court considered essential in *Katzenbach* and *City of Rome*.[9]

There can be no dispute that *Katzenbach* involved a legislative record that contained overwhelming evidence of systematic discrimination that deprived minorities of the right to vote.  "Congress concluded in 1965 that covered jurisdictions had engaged in a pattern of suppressing

---

[9]      Although Congress may rely on any probative source, the Supreme Court has never suggested that the judiciary will defer to Congress's judgment as to *whether* the evidence contained in that source is "probative to the reauthorization question."  Harris Opp. at 23.  Such deference would result in the termination of judicial review altogether.  If Congress can dictate the probative value of the evidence in the legislative record, "it is difficult to conceive of a principle that would limit congressional power."  *City of Boerne*, 521 U.S. at 529.  Congress may draw evidence from any source.  But the court must independently determine if that evidence is probative of intentional discrimination.

participation of minority voters through discrimination, intimidation, misinformation, and outright exclusion." AG Opp. at 20. To meet its obligation, Congress relied on evidence that provided direct proof of this coordinated campaign of voting discrimination. The legislative record showed that: (1) "tests still in use . . . were specifically designed to prevent Negroes from voting"; (2) facially neutral voter registration laws were being discriminatorily administered throughout the South; (3) prior remedies had "done little to cure the problem of voting discrimination" given "registration of voting-age whites ran roughly 50 percentage points or more ahead of Negro registration"; and (4) the case-by-case adjudication was ineffective given that "[e]ven when favorable decisions have finally been obtained, some of the States affected . . . merely switched to discriminatory devices not covered by the federal decrees" and engaged in other forms of gamesmanship. *Katzenbach*, 383 U.S. at 310-14. This was "reliable evidence of actual voting discrimination." *Id.* at 329.

*City of Rome* focused on this same kind of evidence; indeed, the Court clearly saw the very evidence in the 1965 legislative record as highly probative barely a decade removed from the VRA's passage. The Court reiterated that, in 1965, Congress had compiled massive evidence that the covered jurisdictions had engaged in a "century of obstruction" and "'unremitting and ingenious defiance of the Constitution.'" *City of Rome*, 446 U.S. at 182 (quoting *Katzenbach*, 383 U.S. at 309). The Court also focused on the registration and turnout statistics, as well as the number of minority elected officials. *See id.* at 180. The Court acknowledged that there had been improvement in these areas, but that Congress had correctly concluded that "a bleaker side of the picture yet exists." *Id.* (citation and quotation marks omitted)). "[V]iewed in this light, Congress' considered determination that at least another 7 years of statutory remedies were necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both

unsurprising and unassailable." *Id.* at 182. In other words, judged against the backdrop of recent history, Section 5 was constitutionally justified for seven more years to "preserve the limited and fragile" gains that had been made since 1965. *Id.* (internal quotation marks omitted).[10] In this way, *City of Rome* is unique as the Court was able to rely on the 1965 legislative record given that many of the perpetrators of the massive discrimination that permeated the South were still in office. Mot. at 28-29. More than forty-five years removed from the VRA's enactment, however, relying on the need to preserve "limited and fragile" success can no longer constitute a valid defense of Section 5. Preclearance "imposes current burdens and must be justified by current needs." *Nw. Austin*, 129 S. Ct. at 2512.

Thus, contrary to the Attorney General's assertion, Shelby County's principle quarrel is not with the "source" of the evidence in the legislative record. The quarrel is with the thrust of the evidence contained in those sources. The Supreme Court has made clear that only certain kinds of evidence can establish the constitutional necessity of Section 5: (1) direct evidence of widespread, intentional voting discrimination and gamesmanship; and (2) registration data, turnout statistics, and the election of minorities to public office, all of which the Court has considered reasonable barometers for verifying the pervasive nature of the voting discrimination and gamesmanship identified in the legislative record. *See Katzenbach*, 383 U.S. at 330. The 2006 legislative record does not include this kind of evidence. Indeed, the Attorney General likely focused on the "sources" of evidence because Congress has acknowledged that this kind of

―――――――――

[10]     The Attorney General correctly notes that *City of Rome* referenced preclearance objections, *see* AG Opp. at 61, but he overstates its significance. The Supreme Court never suggested the mere lodging of a preclearance objection showed that Section 5 remained constitutional. Rather, the Court made clear that the preclearance objections were relevant because the types of changes being rejected showed that the covered jurisdictions continued to invent "new procedures and techniques" to avoid compliance with the Fifteenth Amendment. *City of Rome*, 446 U.S. at 181. As noted above, it might have been legitimate to rely on modern preclearance evidence in reauthorizing Section 5 if it reliably provided this kind of direct evidence of intentional discrimination. But it clearly did not. *See infra* at 51-52.

37

evidence is virtually nonexistent given the massive changes in the covered jurisdictions, *see infra* at 44-45, and because the "second generation barriers" Congress relied on in its place do not measure up, *see infra* at 53-65.

*Second*, contrary to the Attorney General's suggestion, the mere fact that Congress amassed a voluminous record is not a basis for upholding Section 5.  AG Opp. at 23-24; Cunningham Opp. at 2-3, 26-29 (same).  It is the quality of the evidence that matters—not the quantity of evidence.  *See Kimel*, 528 U.S. at 89-91.  The legislative record assembled in support of Title I of the ADA, for example, included 17 hearings, 5 committee markups, 63 public forums across the country, 8,000 pages of transcripts, oral and written testimony by the Attorney General of the United States, Governors, State attorneys general, State legislators, and 300 examples of discrimination by State governments.  *See* 149 Cong. Rec. S5411, S5427 (daily ed. Apr. 28, 2003) (remarks of Sen. Tom Harkin), *available at* http://www.gpo.gov/fdsys/pkg/ CREC-2003-04-28/pdf/CREC-2003-04-28.pdf; *see also Garrett*, 531 U.S. at 377 (Breyer, J., dissenting) (describing the "vast legislative record").  The Supreme Court nevertheless held that subjecting state and local government employers to monetary liability for violations of Title I exceeded Congress's Fourteenth Amendment enforcement authority.  *See Garrett*, 531 U.S. at 374.  Despite the voluminous record, Congress had "assembled only . . . minimal evidence of unconstitutional state discrimination in employment against the disabled."  *Id.* at 370.

The present case is no different.  Section 5 cannot be defended on the ground that Congress amassed a "voluminous record" and held "extensive hearings to study the effect and operation of the Voting Rights Act."  AG Opp. at 20, 23.  Rather, the record must be reviewed to determine whether it contains only "minimal evidence of unconstitutional state discrimination" or instead contains the "kind of evidence" that provided the constitutional basis for upholding

Section 5 in *Katzenbach* and *City of Rome*.  *Garrett*, 531 U.S. at 370, 374.  As explained below, the legislative record does not contain evidence that state and local governments continue to systematically deny minorities the right to vote or that they would reinitiate such a campaign in the absence of Section 5.  *See infra* at 47-52, 53-65.  Neither the size of the legislative record nor the number of hearings held by Congress can overcome this fatal defect.

> b.  The Legislative Record Does Not Contain the Direct Evidence of Pervasive Discrimination and Electoral Gamesmanship Needed To Reauthorize Section 5.

In addition to the general defense of Section 5 discussed above, the Attorney General argues that the legislative record contains the kind of "direct" evidence of intentional discrimination that could constitutionally justify reauthorization of the preclearance obligation.  AG Opp. at 24-25.  In particular, the Attorney General: (1) sporadically references isolated and anecdotal examples of intentional discrimination; (2) attempts to dispute the massive improvements in minority registration and turnout data in the covered jurisdictions; (3) heavily relies on dilution claims as providing direct evidence of intentional voting discrimination; and (4) promotes Section 5's historical success as a basis for reauthorizing it for another twenty-five years.  Each of these arguments fails.

> i.  Direct Evidence of Intentional Discrimination

The Attorney General argues that the legislative record contains sufficient direct evidence of intentional discrimination to uphold Section 5.  AG Opp. at 60-61; Cunningham Opp. at 10-22 (same); Pierson Opp. at 38-41 (same).  At most, however, the legislative record contains isolated examples of such behavior.  Documenting "anecdotal evidence" of voting discrimination, AG Opp. at 24-25, is insufficient given the extreme nature of the preclearance obligation, *see supra* at 16-17.  Congress was required to establish the existence of an ongoing, pervasive, and systematic campaign of voting discrimination in the covered jurisdictions.  Mot. at 20-24;

*Katzenbach*, 383 U.S. at 328, 335 (explaining that the legislative record documented "widespread and persistent discrimination in voting" and "the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees"); *City of Rome*, 446 U.S. at 182 (describing Congress as responding to "95 years of pervasive voting discrimination"); *City of Boerne*, 521 U.S. at 526 (defending Section 5 as responding to "widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination"); *Garrett*, 531 U.S. at 373 (explaining that the Voting Rights Act of 1965 was supported by "abundant evidence of States' systematic denial of" the right to vote). In short, the "constitutionality of [Section] 5 has always depended on the proven existence of intentional discrimination so extensive that elimination of it through case-by-case enforcement would be impossible." *Nw. Austin*, 129 S. Ct. at 2524 (Thomas, J., concurring in the judgment in part and dissenting in part).

The isolated examples of intentional discrimination relied on by the Attorney General, *see* AG Opp. at 27-31, 40-42, 44-47, thus are not responsive to the question this Court must answer: whether Congress documented the pervasive evidence of intentional discrimination and gamesmanship needed to reauthorize "legislative measures not otherwise appropriate." *Katzenbach*, 383 U.S. at 334. A prophylactic remedy as sweeping as Section 5 could never be sustained on the ground that *some* intentional discrimination remains in the covered jurisdictions. *See id.* at 309, 334-35. "Perfect compliance with the Fifteenth Amendment's substantive command is not now—nor has it ever been—the yardstick for determining whether Congress has the power to employ broad prophylactic legislation to enforce that Amendment." *Nw. Austin*, 129 S. Ct. at 2526 (Thomas, J., concurring in the judgment in part and dissenting in part).

Paradoxically, the Attorney General simultaneously argues that both the evidence in the legislative record *and* the absence of evidence of intentional discrimination in the record support the reauthorization of Section 5.  According to the Attorney General, the anecdotal evidence shows that Section 5 is still needed, *see* AG Opp. at 63, and the absence of compelling evidence shows that Section 5 works, *see id.* at 53-55; Harris Opp. at 29-31 (same).  In reality, Section 5 was reauthorized neither because of the isolated instances of discrimination documented by Congress nor because of any neutral examination of voting statistics.  It was reauthorized in 2006 because its proponents believe it has the "ability to nudge public officials to act in a positive way and to be more inclusive as they go about reaching a consensus in that decision-making process." AG Opp. at 53 (citation and quotation marks omitted).  This is not a constitutional basis for imposing the most far-reaching prophylactic remedy ever enacted by Congress.

In any event, the Attorney General wisely declined to argue that these isolated instances amounted to a systematic attempt to deny minorities the right to vote: Congress concluded that the "first generation" barriers relied on in *Katzenbach* and *City of Rome* largely have been eradicated.  AG Opp. at 5.  "Things have changed in the South.  Voter turnout and registration rates now approach parity.  Blatantly discriminatory evasions of federal decrees are rare.  And minority candidates hold office at unprecedented levels." *Nw. Austin*, 129 S. Ct. at 2511; *see also id.* at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part) ("There is . . . currently no concerted effort in these jurisdictions to engage in the 'unremitting and ingenious defiance of the Constitution' that served as the constitutional basis for upholding the 'uncommon exercise of congressional power' embodied in [Section] 5.") (quoting *Katzenbach*, 383 U.S. at 309) (citations omitted)); *Riley v. Kennedy*, 553 U.S. 406, 429 (2008) (Stevens, J., dissenting) ("[I]t may well be true that today [Section 5] is maintaining strict federal controls that

41

are not as necessary or appropriate as they once were."). In light of Congress's findings and the indisputable improvements in the covered jurisdictions independently verified by the legislative record, it would have been impossible for the Attorney General to credibly argue that the deplorable conditions that existed in 1965 and 1975 persist today.[11]  But without such evidence there is no constitutional warrant for reauthorizing this emergency measure.

Finally, instead of showing that the legislative record documented systematic voting discrimination and electoral gamesmanship so pervasive that case-by-case adjudication would be impossible, the Attorney General argues that case-by-case enforcement of the Fifteenth Amendment would be impracticable for other reasons.  AG Opp. at 55-57.  In particular, the Attorney General contends that Section 2 litigation takes place after-the-fact, takes too long, places a financial burden on the plaintiff, and requires the plaintiff to prove discrimination instead of forcing the covered jurisdiction to disprove it.  *Id.*; Cunningham Opp. at 21-22 (same); Pierson Opp. at 39-40 (same); Harris Opp. at 40-41 (same).  But the fact that Section 2 litigation shares the attributes of traditional civil litigation does not make case-by-case enforcement impossible or Section 5 preclearance of all voting changes appropriate.   Section 5 is a constitutionally suspect remedy that is justifiable only as a last resort.  *See Nw. Austin*, 129 S. Ct. at 2508-09; *Katzenbach*, 383 U.S. at 328.

Thus, absent evidence that the systematic disenfranchisement of minority voters that made case-by-case enforcement futile still exists, Congress's interest in the sheer efficiency of

---

[11]     One Intervenor argues that these examples are "illustrative but not exhaustive" and that the there are a "substantial number of examples" of "serial voting rights violation evidence or 'gamesmanship'" in the legislative record.  Cunningham Opp. at 9.  To be sure, there are other examples of allegations of intentional discrimination in the record.  But neither the Attorney General nor any of the Intervenors have highlighted evidence that shows a systematic attempt across the covered jurisdictions to deny minorities the right to vote.  This is the evidence that is needed to sustain Section 5.  As Congress conceded, and the Supreme Court strongly suggested in *Northwest Austin*, the legislative record lacks it.

Section 5 is not a basis for upholding it.  If it were, Section 5 would be a constitutionally appropriate remedy irrespective of the level of evidence in the legislative record; Congress's reasons for preferring it would apply regardless of whether the legislative record demonstrated the existence of minimal or massive voting discrimination.  Indeed, under the Attorney General's theory, a preclearance requirement could be imposed to counteract any manner of Fourteenth and Fifteenth Amendment constitutional violations.  The Supreme Court has never suggested that preclearance could be justified on these terms.  *See supra* at 16-17.  Section 5 has always been justified as responsive to a unique problem that existed in the covered jurisdictions.  *See, e.g.*, *Riley*, 553 U.S. at 411-12; *Miller*, 515 U.S. at 925-26; *Beer v. United States*, 425 U.S. 130, 140 (1976); *Katzenbach*, 383 U.S. at 335.  Congress's preference for requiring state and local governments to submit all voting changes to federal officials for preclearance cannot substitute for proof that such a problem still exists.

In sum, if isolated examples of intentional discrimination are held constitutionally sufficient, Section 5 will have been transformed from an emergency response to a permanent deprivation of the basic right of self-government afforded to the covered States by our federal system.  Such permanent interference with the administration of state and local elections could never be seen as appropriately enforcing the Fifteenth Amendment. The Attorney General responds that Section 5 "continues to have . . . a built-in expiration date."  AG Opp. at 63.  But Section 5's twenty-five year expiration date is meaningless if isolated instances of discrimination or the so-called "second generation barriers," *see infra* at 53-65, provide a sufficient basis for upholding the preclearance obligation.  The covered jurisdictions will remain in federal receivership forever if this is the standard they must meet to be freed of the preclearance obligation.

ii.    Election Statistics

The Attorney General also discounts the massive statistical improvement in minority registration and turnout in the covered jurisdictions.  AG Opp. at 42-44, 52-53; Harris Opp. at 32-34 (same).  But he cannot plausibly deny that the covered jurisdictions have seen a dramatic rise in African-American voter registration and turnout rates.  Mot. at 25-28; *see Continuing Need for Section 5 Preclearance* at 169-70; S. Rep. No. 109-295, at 11 (2006) ("*Senate Report*").[12]  Indeed, covered states generally outperform the rest of the country; in 2004, five of the seven originally-covered states had African-American registration and turnout rates higher than the national average.  *See Continuing Need for Section 5 Preclearance* at 169-70; *Senate Report* at 11; *Nw. Austin*, 129 S. Ct. at 2512.  Moreover, in three of the covered states (Alabama, Georgia, and Mississippi) African-American turnout in 2004 was higher than white turnout and it was within five percentage points of white turnout in two other states (Louisiana and South Carolina).  Mot. at 26;[13] *Nw. Austin*, 129 S. Ct. at 2511 ("Today, the registration gap between

---

[12]    The Cunningham Intervenors criticize Shelby Country's reliance on this particular Senate report. Cunningham Opp. at 34 n.18.  But the Attorney General and every one of the Intervenors (including the Cunningham Intervenors) relies on this same report.  *See, e.g.*, AG Opp. at 44 n.13; Cunningham Opp. at 16; Harris Opp. at 15 n.12; Pierson Opp. at 6.  More importantly, this Court relied upon it in *Northwest Austin* no fewer than eight times.  *Nw. Austin Mun. Util. Dist. No. One v. Mukasey*, 573 F. Supp. 2d 221, 229, 247-48, 258, 261 (D.D.C. 2008).  In any event, almost all of the evidence in this report upon which Shelby County relies is available elsewhere in the legislative record.

[13]    The Attorney General is incorrect in claiming that Congress understated the disparity by comparing rates for whites, rather than for non-Hispanic whites, and provides new figures from the Census.  AG Opp. at 43.  First, the constitutionality of the VRA is limited to the legislative record, and Congress's figures compare whites and African-Americans.  *See infra* at 53 n.18.  Second, comparing whites and African-Americans is the relevant historical comparison as the Census did not begin reporting estimates for non-Hispanic whites until 1998.  *See Continuing Need for Section 203's Provisions for Limited English Proficient Voters, Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d Sess., at 147 (June 13, 2006).  Third, comparing "race" registration and voting disparities in this manner aligns with federal definitions.  *See* Overview of Race and Hispanic Origin, U.S. Census (2000), *available at* http://www.census.gov/prod/2001pubs/cenbr01-1.pdf ("The federal government considers race and Hispanic origin to be two separate and distinct concepts.").  Finally, even using the Attorney General's Census figures, the result barely changes.  African-American turnout was higher than non-Hispanic white turnout in Alabama and Mississippi and only slightly lower in Louisiana, Georgia, and South Carolina.

white and black voters is in single digits in the covered States; in some of those States, blacks

now register and vote at higher rates than whites.  Similar dramatic improvements have occurred

for other racial minorities.") (internal and other citations omitted)).

The Attorney General largely ignores these improvements, devoting barely a page to

voter registration and turnout rates.  AG Opp. at 42; Harris Opp. at 33 (same).  The short shrift

given to this issue differs markedly from the government's brief in *Katzenbach*, in which the vast

registration and turnout gaps was a key argument for sustaining the VRA.  *See* Brief of the

Defendant at 61-63, *South Carolina v. Katzenbach*, No. 22 (Original) (S. Ct. filed Jan. 5, 1966).

As Attorney General Katzenbach then explained, "in six of the seven [covered] States 63% of the

adult whites but only 25% of the adult Negroes were registered in 1964" and, as a consequence,

"it was certainly permissible for Congress to infer that the low voter participation probably

resulted from racial discrimination."  *Id.*  Moreover, in his discussion of the current registration

and turnout statistics, the Attorney General fails to acknowledge that the seismic improvements

since 1975 likewise distinguish this case from *City of Rome*.  *See* Mot. at 26-27 (citing *Senate

Report* at 11); *Continuing Need for Section 5 Preclearance* at 169-70.

Instead, the Attorney General attempts to prove that meaningful disparities remain by

citing voting gaps in Florida, Texas, and Virginia.  AG Opp. at 43.  But these statistics provide

little support.   In Texas, while there is a registration and turnout gap between whites and

Hispanics, Texas's Hispanic registration and turnout rates are higher than the national average

and its registration rate is more than ten points higher than in California, a non-covered state with

a large Hispanic population.  *See Senate Report* at 11; 2 *History, Scope, and Purpose* at 3056;

*May 4, 2006, House Hearing* at 121.  Likewise, in Florida, most of which is not covered by

_____

*See* U.S. Census Bureau, Current Population Survey tbl. 4a (Nov. 2004), *available at*
http://www.census.gov/hhes/www/socdemo/voting/publications/p20/2004/tables.html.

Section 5, the Hispanic registration and turnout rate is higher than the national average.  *Senate Report* at 11; *see also Understanding the Benefits and Costs of Section 5 Pre-Clearance, Hearing Before the Senate Committee on the Judiciary*, 109th Cong., 2d Sess., at 155  (May, 17, 2006) ("*Understanding the Benefits and Costs*").  The fact that perhaps one fully-covered state, Virginia, has registration and turnout data that lags slightly behind cannot provide a constitutional basis for reauthorizing Section 5 in its current form, especially absent a contention that the current disparity "probably resulted from racial discrimination."  Just as the massive statistical disparity that existed in 1965 verified Congress's judgment that systematic discrimination was occurring, the fact that "turnout and registration rates now approach parity" in the covered jurisdictions compels the opposite conclusion.  *Nw. Austin*, 129 S. Ct. at 2511.

The Attorney General also minimizes the extraordinary gains in the election of minority officials.  AG Opp. at 52-53; Pierson Opp. at 24-26 (same).  Here too, however, the improvement is undeniably significant.  Mot. at 27-28; *Senate Report* at 9 ("The covered jurisdictions that once sponsored violence against minority voters now elect hundreds of minorities to elected office.").  The Attorney General responds that nationwide "only 35 African Americans held statewide office" in 2000, and that African Americans in some covered states "make up 35 percent of the population, [but] only 20.7 percent of the total number of State legislators."  AG Opp. at 52-53; Harris Opp. at 33 (same).  But proportional representation is not a constitutional aim.  *See League of United Latin Am. Citizens ("LULAC") v. Perry*, 548 U.S. 399, 419 (2006); *Vieth v. Jubelirer*, 541 U.S. 267, 288 (2004).  The issue is whether minority elected officials remain relegated to "relatively minor positions."  *City of Rome*, 446 U.S. at 180.  The legislative record definitively proves that they are not.  *See* H.R. Rep. No. 109-478, at 18 (2006) ("*House Report*") ("As of 2004, 43 African-Americans currently serve in the United States Congress . . . .

46

At the State level, more than 482 African-Americans serve in State legislatures, with thousands more African-Americans serving in county, township, and other locally elected positions.").

iii.   <u>Vote Dilution Evidence</u>

In the place of direct evidence of intentional voting discrimination and corresponding election statistics, the Attorney General incorrectly relies on vote dilution evidence. AG Opp. at 47-49. Yet as the Attorney General acknowledges, claims alleging purposeful vote dilution are cognizable under the Equal Protection Clause of the Fourteenth Amendment—not under the Fifteenth Amendment. *Id.* at 47-48. At the same time, he concedes that Section 5 enforces the Fifteenth Amendment. *Id.* at 2, 3, 5, 11-12, 63, 66, 71; Harris Opp. at 12-13 (same). The Attorney General thus argues that "Section 5 of the Voting Rights Act is a valid exercise of Congress's authority to enforce the Fifteenth Amendment" without also clearly defending it as enforcing the Fourteenth Amendment. AG Opp. at 11; *id.* at 12 (arguing that Section 5 "enforces the Fifteenth Amendment's core prohibition on race discrimination in voting"); *id.* at 66-67 (arguing that the 2006 "extension was appropriate Fifteenth Amendment legislation for two reasons"). Having declined to defend Section 5 on Fourteenth Amendment grounds, the Attorney General cannot rely on vote dilution evidence he deems irrelevant to the Fifteenth Amendment issue; nor could he attempt to do so on reply. *See MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 575 (D.C. Cir. 2010).

However, to the extent that he is defending Section 5 under the Fourteenth Amendment, *see* AG Opp. at 17, the Attorney General asks this Court to enter uncharted territory. The Fifteenth Amendment has been the exclusive basis for upholding Section 5. *See Katzenbach*, 383 U.S. at 308-10, 324-29; *City of Rome*, 446 U.S. at 180-82; *Nw. Austin*, 129 S. Ct. at 2508-09, 2511-13. The Fifteenth Amendment protects the right to freely *cast* a vote. *See supra* at 2. In contrast, vote dilution does not interfere with a citizen's access to the ballot; it undermines the

47

weight of the vote.  *Miller*, 515 U.S. at 937-38 (explaining that, under "the Equal Protection Clause, [the Supreme Court] undertook to ensure that apportionment plans do not dilute minority voting strength").  Accordingly, the Supreme Court has "never held that vote dilution violates the Fifteenth Amendment."  *Bossier Parish II*, 528 U.S. at 334 n.3; *see also Rogers v. Lodge*, 458 U.S. 613, 617 (1982); *Bolden*, 446 U.S. at 66.

The Attorney General argues that "there is nothing new about the dilutive techniques and other means of minimizing the effectiveness of minority votes that Congress relied upon in 2006."  AG Opp. at 57.  But he confuses "dilutive mechanisms" with the "'ingenious'" methods "used by the covered jurisdictions to discriminate against minority voters long before 1965."  *Id.* at 11 (quoting *Katzenbach*, 383 U.S. at 309); Cunningham Opp. at 23-26 (same).  The cases that the Attorney General relies on to support his theory were not decided on vote dilution grounds.  AG Opp. at 58-59.  As the Supreme Court has explained, *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), "involved a proposal to redraw the boundaries of Tuskegee, Alabama, so as to exclude all but 4 or 5 of its 400 black voters without excluding a single white voter.  Our conclusion that the proposal would deny black voters the right to vote in municipal elections, and therefore violated the Fifteenth Amendment, had nothing to do with racial vote dilution, a concept that does not appear in our voting-rights opinions until nine years later."  *Bossier Parish II*, 528 U.S. at 334 n.3.[14]  The shameful practices catalogued in *Dillard v. Crenshaw County*, 640 F. Supp.

---

[14]      The Attorney General also relies on *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969).  AG Opp. at 58; Harris Opp. at 17 (same).  But *Allen* did not address the kind of evidence that could support the enactment or reauthorization of Section 5.  Instead, the Court held that districting changes are subject to preclearance and that "[t]he right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot."  *Allen*, 393 U.S. at 833 (citing *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).  *Allen* thus does not support the Attorney General's argument.  First, by relying on *Reynolds*, the Court was indicating that vote dilution claims are cognizable under the Fourteenth Amendment.  *See* 377 U.S. at 566 (holding that "[d]iluting the weight of votes because of place of residence" violates the Fourteenth Amendment).  Second, the fact that *Allen* held that redistricting is subject to preclearance does

1347, 1358-59 (M.D. Ala. 1986), fit this same pattern.   These jurisdictions were using redistricting, annexation, and other subtle techniques "to disenfranchise black persons."   *Id.* at 1358.   That these practices may give rise to both disenfranchisement and vote dilution claims does not mean that the claims are interchangeable or that the latter is evidence that can sustain the reauthorization of Section 5 under the Fifteenth Amendment.

Thus, to decide this case on Fourteenth Amendment grounds, this Court would need to decide a question of first impression: whether evidence of purposeful vote dilution could sustain the sweeping preclearance obligation under the Fourteenth Amendment.   *See Nw. Austin*, 573 F. Supp. 2d. at 243-44 (explaining that "at its core, this is a Fifteenth Amendment case").[15] Although the Supreme Court has never suggested that it could, there is no need to resolve the issue in this case.   The kind of vote dilution evidence relied on by the Attorney General does not parallel the tactics recounted in *Gomillion* and cataloged in *Dillard*; none of it approximates the systematic and manipulative use of redistricting, annexation, and other techniques widely employed by state and local governments decades ago to intentionally undermine minority voting rights.[16]   Moreover, many of the examples do not relate to modern instances of voting

_____

not mean that vote dilution evidence can support the reauthorization of Section 5.   All voting changes are subject to preclearance.   *See Nw. Austin*, 129 S. Ct. at 2511.

[15]      Congress cited the Fourteenth Amendment when reauthorizing Section 5 only as support for its use of evidence regarding "language minorities."   *See Nw. Austin*, 573 F. Supp. 2d at 245.   Reliance on the Fourteenth Amendment, therefore, would raise the additional question of whether there is sufficient evidence of pervasive discrimination against language minorities to support the reauthorization—a question that the Attorney General has made no attempt to answer.

[16]      The Attorney General also incorrectly relies on evidence of voting changes with a dilutive effect. AG Opp. at 56-57; Pierson Opp. at 36-37 (same).   The Supreme Court held that neutral voting changes with a discriminatory effect can be denied preclearance because banning them "is an appropriate method of promoting the purposes of the Fifteenth Amendment, even if it is assumed that § 1 of the Amendment prohibits only intentional discrimination in voting."   *City of Rome*, 446 U.S. at 177.   But the Court has deemed preclearance constitutional only because "[t]he requirement was placed only on jurisdictions with a history of *intentional* racial discrimination in voting."   *City of Boerne*, 521 U.S. at 533 (citing *City of Rome*, 446 U.S. at 177) (emphasis added)).   Discriminatory effect evidence is equally irrelevant if preclearance is defended under the Fourteenth Amendment.   *See Vill. of Arlington Heights v. Metro.*

discrimination.  AG Opp. at 30, 59.  And the remaining evidence, at most, amounts to isolated examples of vote dilution.  *Id.* at 29-30, 47-48.  Thus, even if the Attorney General's vote dilution evidence is cognizable, it does not add significantly to the case for reauthorizing Section 5.  As explained above, outdated and isolated evidence of voting discrimination is insufficient to sustain the preclearance obligation.  *See supra* at 41-44.

Moreover, almost all of the modern vote dilution evidence is aimed at voting changes that reportedly undermine minorities' "ability to elect" the candidate of their choice.  AG Opp. at 28, 32-35, 45.  But equating the inability of minorities to elect the candidate of their choice with intentional discrimination raises constitutional problems.  Under this test, which Congress has now codified as the preclearance standard, *see* 42 U.S.C. § 1973c(b), it would be unlawful to "break up districts where minorities form a clear majority of voters and replace them with vague concepts such as influence, coalition, and opportunity" districts.  *Senate Report* at 19-20.  The "relevant analysis" under this standard is "a comparison between the minority community's ability to elect their genuinely preferred candidate of choice before and after a voting change." *House Report* at 71.  In adopting this standard, Congress was signaling its intention to overrule *Georgia v. Ashcroft*, 539 U.S. 461 (2003).  *See House Report* at 93-94.

But a legal standard for enforcing the Fifteenth Amendment dominantly focused on guaranteeing "electoral success for minority-preferred candidates" instead of "equality of opportunity" is constitutionally problematic.  *LULAC*, 548 U.S. at 428; *id.* at 446 (explaining that "unnecessarily infus[ing] race into virtually every redistricting, rais[es] serious constitutional questions").  As Justice Kennedy has succinctly explained: "Race cannot be the predominant factor in redistricting under our decision in *Miller v. Johnson*, 515 U.S. 900 (1995). Yet

_____

*Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

considerations of race that would doom a redistricting plan under the Fourteenth Amendment or § 2 seem to be what save it under § 5." *Ashcroft*, 539 U.S. at 491 (Kennedy, J., concurring); *see also Nw. Austin*, 129 S. Ct. at 2511.  By overruling the Supreme Court's attempt to navigate this concern through the use of influence, coalition, and opportunity districts, Congress has forced this confrontation.  Indeed, the issue has been raised in a companion case.  *See* Pl.'s Mot. for Summ. J. at 38-41, *Laroque v. Holder*, No. 10-00561 (D.D.C. filed Aug. 18, 2010).  Thus, the Court would need to decide this antecedent question before even considering whether the Attorney General's examples of vote dilution claims implicating minorities' "ability to elect" their preferred candidate are probative evidence of intentional voting discrimination supporting the reauthorization of Section 5.

In the end, even if the vote dilution evidence in the legislative record can provide some support for reauthorization, *see City of Rome*, 446 U.S. at 181, it could never replace wholesale evidence implicating interference with the right to register and cast a vote.  Yet that is essentially the position the Attorney General has taken.  The legislative record, as well as the Attorney General's defense of it, disproportionally relies on vote dilution evidence because of the absence of direct evidence of intentional voting discrimination.  *See* VRARRA, Pub. L. No. 109-246, § 2(b)(4)(A), (8), (9), 120 Stat. 577, 577-78; AG Opp. at 40-41 (discussing Section 2 vote dilution cases); *id.* at 47-49 (discussing other evidence of vote dilution); *id.* at 49-50 (describing racially polarized voting as a "necessary element of vote dilution").  The Attorney General thus summarized his defense of Section 5 as follows: "[T]he evidence Congress heard in 2006 that covered jurisdictions continued to use dilutive techniques; that vote dilution continued to be the subject of Section 5 objections, declaratory judgment actions, and Section 2 litigation; and that racially polarized voting persists in the covered jurisdictions (see pp. 25-30, 32-34, 36-37, 45-53,

*supra*), supports its finding that Section 5 remains necessary to protect the voting rights of minority citizens in covered jurisdictions." AG Opp. at 60. But this is not the principal evidence that the Supreme Court relied on in *Katzenbach* and *City of Rome*. *See supra* at 35-37. Thus, it is not the principal evidence the Court can rely on to uphold Section 5's reauthorization here.[17]

### iv.   Section 5's Past Success and Deterrent Effect

Having failed to establish that systemic voting discrimination still exists in the covered jurisdictions, the Attorney General retreats to Section 5's past successes as showing "the strong deterrence provided by the statute." AG Opp. at 53.; Cunningham Opp. at 8-9 (same); Harris Opp. at 38 (same); Pierson Opp. at 26-27 (same). But this argument suffers from two flaws. First, "[p]ast success alone . . . is not adequate justification to retain the preclearance requirements." *Nw. Austin*, 129 S. Ct. at 2511; *see also id.* at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part) ("Punishment for long past sins is not a legitimate basis for imposing a forward-looking preventative measure that has already served its purpose."). The Attorney General was required to prove that Section 5 remains necessary based on current conditions in the jurisdictions subject to preclearance, *see id.* at 2511-12, and he has failed to do so. Second, arguments predicated on Section 5's "deterrent effect," AG Opp. at 53, necessarily proceed from the assumption that the covered jurisdictions have a latent desire to discriminate that does not exist elsewhere in the country. *See* Mot. at 29-30. But the legislative record does not substantiate this assumption. *See supra* at 39-44. Congress is not entitled to reauthorize

---

[17]       The fact that vote dilution evidence relied on by Congress in 2006 cannot support reauthorizing the sweeping preclearance obligation of Section 5 does not mean that it is beyond the scope of the VRA's protection. Vote dilution is redressable under Section 2. *See, e.g.*, *Bartlett v. Strickland*, 129 S. Ct. 1231 (2009). As previously noted, Section 2 is not being challenged here. Section 2 appropriately enforces voting rights because it creates a private right of action for the direct challenge to discriminatory voting laws, applies nationwide, and provides for a remedy only after a violation has been proven. *See* Mot. at 21; *supra* at 18-19; *see also Nw. Austin*, 129 S. Ct. at 2509.

Section 5 for another twenty five years based "on outdated assumptions about racial attitudes in the covered jurisdictions." *Nw. Austin*, 129 S. Ct. at 2525 (Thomas, J., concurring in the judgment in part and dissenting in part).

c.     <u>The Second Generation Barriers Relied on by Congress Are Not Evidence of Intentional Discrimination.</u>

Last, the Attorney General argues that indirect evidence of intentional discrimination relied upon by Congress can sustain Section 5. AG Opp. at 57-60; Harris Opp. at 28-31 (same). That is incorrect. Mot. at 30-35. These so-called "second generation barriers" to voting— unaccompanied by evidence of coexistent first generation barriers to voting—cannot render Section 5 appropriate enforcement legislation under the Fifteenth Amendment. Moreover, even if second generation evidence could sustain Section 5 in theory, the Attorney General still has not shown that they establish "'abundant evidentiary support for reauthorization of VRA's temporary provisions.'" AG Opp. at 24 (quoting *House Report* at 6). Instead, this evidence amounts to a compilation of legally irrelevant, inapposite, or anecdotal information.[18] It is not evidence that in any way approximates the "systematic resistance to the Fifteenth Amendment" that is needed to reauthorize Section 5. *Katzenbach*, 383 U.S. at 328.

---

[18]     Some of this evidence is legally irrelevant because it is not contained in the legislative record. *See supra* at 1. *See, e.g.*, AG Opp. at 6-9, 33-34, 73-74 (describing submissions, objections, and elections in Shelby County and Calera, Alabama from 2007-2009); Pierson Opp. at 17 (same); Cunningham Opp. at 44 (same); AG Opp. at 30 (citing a Georgia objection made after the 2006 Reauthorization); *id.* at 68 (citing a post-reauthorization study as evidence of successful Section 2 cases in covered jurisdictions); *id.* at 11, 70-71 (asserting that DOJ has adopted a broad interpretation of the bailout requirement since 2009 and has consented to bailout by three jurisdictions since then); *id.* at 64 (claiming that DOJ has recently made an effort to make preclearance as easy as possible); Pierson Opp. at 33 n.11, 42 (describing bailouts as of November 3, 2009 and bailouts that occurred in 2010); *id.* at 34 (claiming that South Dakota was sued in 2009 for failing to comply with Section 5); *id.* at 40 n.12 (listing 2009 and 2010 cases as evidence of typical Section 2 cases); Cunningham Opp. at 14 (referencing a lawsuit in Texas brought after the 2006 Reauthorization); *id.* at 43 n.31 (listing jurisdictions that have obtained bailout after the 2006 Reauthorization); *id.* (describing 2010 bailouts and an application for bailout that is currently pending).

i.      Racially Polarized Voting

Congress referred to racially polarized voting as the "clearest and strongest evidence" of the need to reauthorize Section 5.  *House Report* at 34; VRARAA, § 2(b)(3), 120 Stat. at 577. But racially polarized voting provides *no* evidence supporting Congress's reauthorization of the preclearance obligation.  *See* Mot. at 31-32.  If anything, the compilation of data about racially polarized voting shows that Section 5 has succeeded and that minorities are now able to "register and vote without hindrance" as required by the Fifteenth Amendment.  *Bolden*, 446 U.S. at 65. And, as a legal matter, racially polarized voting cannot serve as the justification for Section 5 because the Fifteenth Amendment "relates solely to action 'by the United States or by any state.'"  *James v. Bowman*, 190 U.S. 127, 136 (1903); *Bolden*, 446 U.S. at 55; *Rogers*, 458 U.S. at 647 n.30 (Stevens, J., dissenting).  Racially polarized voting is neither.  It is entirely the result of private free choice.  Cunningham Opp. at 37 (racially polarized voting does not "represent[] discrimination by state actors"); Harris Opp. at 39 ("racially polarized voting is not, by itself, state action.").  The fact that some "voting blocs within the minority and white communities cast ballots along racial lines," *House Report* at 34, cannot in any way be equated with the campaign of violence and intimidation that was waged to prevent certain voting blocs from casting ballots at all.

Perhaps in recognition of the inadequacies associated with evidence of racially polarized voting, the Attorney General attempts to revamp its role.  Rather than constituting the "clearest and strongest evidence" of Section 5's need, *see House Report* at 34, the Attorney General argues that it is mere background information that shows why States can successfully engage in vote dilution.  *See* AG Opp. at 49 (citing 1 *Evidence of Continued Need* at 126); Harris Opp. at 39-40 (same); Pierson Opp. at 20-24 (same).  Of course, "had Congress truly understood" that racially polarized voting was pertinent because it served as a predicate for "unconstitutional

behavior by the States, one would expect some mention of that conclusion in the Act's legislative findings." *Garrett*, 531 U.S. at 371.  There is none.  *See, e.g., House Report* at 34 (relying on racially polarized voting as evidence "of the continued resistance within covered jurisdictions to fully accept minority citizens and their preferred candidates into the electoral process" without referencing its role in establishing a vote dilution claim).

In any event, even if Congress had relied upon the Attorney General's newly-minted theory, it would not make racially polarized voting valid evidence of intentional discrimination. There is still no evidence of State action; at most, it is evidence that certain voting trends are susceptible to manipulation by State actors.  In other words, racially polarized voting is secondary evidence supporting the existence of a "second generation" barrier.  That is hardly compelling evidence of intentional voting discrimination.  Moreover, the feared vote dilution itself is, at best, very weak evidence of current and intentional discrimination.  *See supra* at 47-52.  As a result, the existence of racially polarized voting is neither "strong[] evidence," *House Report* at 34, nor even legally-relevant evidence in the analysis of Section 5's constitutionality. Its existence simply does not support the extraordinary federal oversight imposed on covered jurisdictions by Section 5.

ii.     Preclearance Statistics

The Attorney General devotes substantial attention to Congress's reliance on preclearance statistics as proving the continued need for Section 5.  AG Opp. at 25-38; Harris Opp. at 35-37 (same); Pierson Opp. at 11-18 (same). These statistics include the number of Section 5 objections interposed by the DOJ, requests for more information issued by DOJ, Section 5 enforcement actions, and the requests for declaratory judgment denied by the United States District Court for the District of Columbia.  VRARAA, Pub. L. No. 109-246, § 2(b)(4), 120 Stat. 577, 577.  As Shelby County has explained, however, none of this evidence comes

close to proving the existence of pervasive and intentional discrimination by State actors.  Mot. at 32-34.  The Attorney General's arguments fail to alter this conclusion.

The Attorney General first relies on Section 5 objections interposed by DOJ.  AG Opp. at 25; Cunningham Opp. at 6-7 (same).   But Section 5 objections are a "poor prox[y] for intentionally discriminatory state action in voting, for a number of reasons."  Richard L. Hasen, *Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act after Tennessee v. Lane*, 66 Ohio St. L.J. 177, 190 (2005).   As an initial matter, there is no real "volume" of objections to rely upon despite the Attorney General's argument to the contrary. AG Opp. at 25.  Instead, the number of objections has become exceedingly small.  "In the most recent 1998-2002 period, DOJ objected to a meager 0.05% of preclearance requests.  Updating these data, DOJ interposed just *two* objections overall in 2004 and *one* objection in 2005." *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization, Hearing Before the S. Comm. on the Judiciary*, 109th Cong., 2d Sess., at 216 (May 9, 2006) ("*Introduction to the Expiring Provisions*") (testimony of Richard L. Hasen) (emphasis in original).  Moreover, in the entirety of the 1982 to 2004 period, of the 101,440 submissions made, the DOJ objected to just 752 submissions, or 0.74%.  *See House Report* at 22; *Senate Report* at 13.[19]   In determining whether requiring the continued submission of preclearance requests is justified, it is telling that so few of the thousands of submissions have been objectionable during the past thirty years.  *Cf. Garrett*, 531 U.S. at 370 ("It is telling, we

---

[19]       The sheer number of submissions contradicts the suggestion that the legislative record establishes that covered jurisdictions have acted in "defiant noncompliance with Section 5."  AG Opp. at 36-37.  To the contrary, the preclearance data shows that state and local governments have been endeavoring to comply with Section 5 and submit all voting changes for preclearance regardless of their seeming "insignificance."  *Sheffield*, 435 U.S. at 148 n.11 (Stevens, J., dissenting).

think, that given these large numbers, Congress assembled only such minimal evidence of . . . state discrimination."). [20]

The Attorney General responds that the preclearance objection rate "does not provide a complete picture" because, among other reasons, "[e]ach objection may encompass several voting changes."  AG Opp. at 61.  But the same would be true of preclearance submissions that receive no objection.  The Attorney General has offered no evidence from the legislative record that this phenomenon would change the miniscule objection rate.  The Attorney General also argues that "[w]hatever the *rate* of objections, Section 5 prevented the implementation of an enormous number of discriminatory voting changes" since 1982.  *Id.*; Harris Opp. at 36 (same). But relying on the absolute number of voting changes denied preclearance does not make the Attorney General's case any stronger given the 101,440 submissions made during that time period.  Mot. at 33-34.  And the most recent evidence in the legislative record undermines the argument ever further.  Between 2003 and 2006, DOJ objected to 13 preclearance submissions, including only *one* objection in each of the two years preceding Section 5's reauthorization.  *See Senate Report* at 13; *House Report* at 22.  This is not the kind of evidence that justifies a continued requirement for preclearance of all voting changes.  Indeed, even if all of these objections prevented intentionally discriminatory voting changes, which is highly unlikely, this is exactly the type of problem that can be resolved case-by-case.

---

[20]    Intervenors rely on evidence that more objections were lodged by DOJ between 1982 and 2004 than between 1965 and 1982.  *See* Pierson Opp. at 12 (citing 1 *Evidence of Continued Need* at 172); Cunningham Opp. at 6 (same); Harris Opp. at 34 (same).  The source document clarifies that the comparison is misleading because "the two time periods are unequal" and because some jurisdictions were not covered by Section 5 in the early years.  *See* 1 *Evidence of Continued Need* at 172.  Moreover, there were more than six times as many submissions between 1982 and 2004 (101,400) than between 1965 and 1982 (15,416).  *See House Report* at 22.  For this reason, annual objection rates are a much more appropriate comparison, and they clearly show the precipitous decline in objections.  And once legally flawed objections are taken into account, the objection rate approaches nil.

However, "[t]he problem with using objections as evidence of intentional state discrimination is . . . even worse" than simply their virtual nonexistence.  *Introduction to the Expiring Provisions* at 216 (testimony of Richard L. Hasen).  Contrary to the Attorney General's unsupported assertion, *see* AG Opp. at 61, objection rates do not represent the relative number of submissions that involve actual intentional discrimination.  Instead, the Attorney General is required to object "to a submitted change if [he] *is unable to determine* that the change is free of discriminatory purpose and effect."  28 C.F.R. § 51.52(c) (emphasis added).  The existence of an objection, therefore, may simply represent the fact that "the evidence as to the purpose or effect of the change is conflicting."  *Id.*  And, even where the Attorney General concludes that the voting change does have a discriminatory purpose, it is really only "one side's opinion" about that fact because there is no opportunity for "a trial or a formal hearing."  *Section 5 – Preclearance Standards, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong., 1st Sess., at 29-30 (Nov. 1, 2005) ("*Preclearance Standards*") (testimony of Roger Clegg).  Reliance on objection rates, accordingly, requires the assumption that if "the Justice Department thinks that a jurisdiction acted with discriminatory purpose, that is proof that it acted with discriminatory purpose."  *Id.*  Such assumptions are not accepted "as a general matter [in] our legal system."  *Id.* at 30.

Moreover, for many years during the relevant time period, the Attorney General objected to voting changes based purely on retrogression—and not based on whether the change was motivated by discrimination.  *Ashcroft*, 539 U.S. at 480 ("The standard in § 5 is simple—whether the new plan 'would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" (quoting *Beer*, 425 U.S. at 141)).  Therefore, the objection rates include objections that were based on the mere fact that a change was

proposed that unintentionally and inadvertently reduced the strength of the minority vote.  Mot. at 32.  Thus, the Attorney General's assertion that all objections amounted to the prevention of "discriminatory voting changes" is unsustainable.  AG Opp. at 61; Harris Opp. at 35 (same).

Complicating matters further, recent objection rates encompass objections that were premised on legal standards later invalidated by the Supreme Court.  As noted above, before the Supreme Court put an end to the practice, "a majority of the Justice Department's objections" to redistricting plans under Section 5 were based on its finding that the plan had a "discriminatory, non-retrogressive purpose."  *Preclearance Standards* at 13 (testimony of Mark Posner). Rejecting this construction, the Supreme Court held that Section 5 requires objections to be based on a discriminatory, retrogressive purpose, and noted that DOJ's broad construction raised "concerns about [its] constitutionality."  *Bossier Parish II,* 528 U.S. at 336.  Contrary to the Attorney General's suggestion, Section 5 cannot be upheld based on preclearance objections that themselves raise constitutional concerns.  *See* AG Opp. at 27.

Also in the 1990s, the Department of Justice followed another "policy of objecting to certain state actions that were perfectly constitutional."  *An Introduction to the Expiring Provisions* at 216 (testimony of Richard L. Hasen).  In *Miller v. Johnson*, the Supreme Court rejected DOJ's "'black-maximization' policy," under which it "implicit[ly] command[ed] that States engage in presumptively unconstitutional race-based districting."  515 U.S. at 921, 927. The immediate and precipitous decline in objections is evidence of the unreliability of pre-*Miller* objection statistics.  In 1994, the year before *Miller*, DOJ issued 61 objection letters; in 1996, the year after *Miller*, DOJ issued just 7.  *See Senate Report* at 13; *House Report* at 22.  Since *Miller*, objection rates have continued to decline, reaching lows of 0.06% in 2004 and 0.002% in 2005. *See Senate Report* at 13; *House Report* at 22.  These rates are "so low" that, rather than support

reauthorization, they "warrant the exact opposition conclusion—section 5 should be allowed to expire." *Understanding the Benefits and Costs* at 158 (printing Edward Blum & Lauren Campbell, *Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act*, at 11 (May 17, 2006)).

Beyond objection statistics, the Attorney General relies on "more information requests." AG Opp. at 35; Cunningham Opp. at 8-9 (same); Harris Opp. at 37-38 (same); Pierson Opp. at 19 (same). They are sent by DOJ to covered jurisdictions in order to "enhance[] the information that it has available to assess a proposed change." 2 *Evidence of Continued Need* at 2546. By definition, then, "more information requests" are not evidence of intentional discrimination; they are evidence that "the Department of Justice [has] *insufficient information* . . . to enable the Department of Justice to make a [preclearance] determination." *See House Report* at 40 (emphasis added). If DOJ had sufficient proof that the proposed change was intentionally discriminatory, there would be no reason to request more information. Mot. at 33.

Likely for this reason, the Attorney General essentially disregards Congress's reliance on these requests themselves and argues that the Court should instead focus on the various responses to them by covered jurisdictions. AG Opp. at 35. If a jurisdiction withdraws its submission in response to the request, the Attorney General argues, it is evidence of the jurisdiction's belief "that the change would be objected to as violating the Act if it were not withdrawn." *Id.* (citation omitted). But it is at least equally likely that a jurisdiction's voluntary abandonment of a change after a more information request evidences an attempt to comply with Section 5 as opposed to evasion of it. After all, if the covered jurisdiction were truly attempting to evade DOJ review, it presumably would not have submitted its proposal in the first place. Where the jurisdiction has instead committed the time and expense required for submission of its

proposed change, it is much more likely that the voluntary withdrawal results either from an effort at compliance or from a desire to forgo the heavy burden of this bureaucratic process. In any event, unfounded speculation about the reasons why jurisdictions have withdrawn preclearance requests is not the kind of reliable evidence of intentional discrimination that can sustain Section 5.

The third type of preclearance evidence relied upon by the Attorney General relates to Section 5 enforcement actions—"more than 100" of which, he argues, have been filed since 1982. AG Opp. at 35-37 (citing 1 *Evidence of Continued Need* at 13 (testimony of Bill Lann Lee));[21] Cunningham Opp. at 6 (same); Harris Opp. at 40-41 (same); Pierson Opp. at 19-20 (same). But the mere fact that a Section 5 enforcement action was *filed* is not evidence of intentional discrimination. Moreover, even a successful action is not evidence of intentional discrimination. A Section 5 enforcement action is one "for injunctive relief to compel covered jurisdictions to submit voting changes for preclearance." AG Opp. at 35. The most that a Section 5 enforcement action can establish, therefore, is that a voting change—and quite possibly a nondiscriminatory voting change—should have been submitted for preclearance. The reason for the failure may result from a mistaken understanding of the VRA's requirements, *id.* at 36-37, a good faith belief that the change was not subject to preclearance, *see Lopez v. Monterey County*, 525 U.S. 266, 278 (1999), or a principled objection to Section 5's federal oversight, *see House Report* at 41-44. It certainly need not result from an intention to evade Section 5 for racially discriminatory reasons.

---

[21]     The data underlying Mr. Lee's testimony indicates that the number of Section 5 enforcement actions is subject to dispute as the "number of such actions either filed by the Department or in which it joined as a plaintiff intervenor or *amicus curiae*" between 1966 and 2004 was just 107. *See* 1 *Evidence of Continued Need* at 186. Also, "it is not known how many *successful* Section 5 enforcement actions have been filed, either by the Department of Justice or private citizens." *Id.* (emphasis in original).

The final preclearance evidence that the Attorney General relies on is judicial preclearance actions in which "judicial preclearance of electoral changes was denied."  AG Opp. at 37.  As support, the Attorney General points to *one case* and even it did not result in a denial of judicial preclearance.  *See id.* (noting that the preclearance action "was resolved when the State withdrew its proposed plan and submitted an alternative plan to the Attorney General for preclearance").  This is not evidence of widespread and pervasive voting discrimination.  If anything, then, the preclearance litigation confirms that covered jurisdictions have complied with Section 5 and sought preclearance, and that case-by-case litigation *is* capable of uncovering and addressing current voting discrimination.

### iii.   Section 2 Litigation

The Attorney General also relies on Section 2 litigation as proving the need to reauthorize Section 5.  AG Opp. at 62-63; Cunningham Opp. at 20-22 (same); Harris Opp. at 40-42 (same); Pierson Opp. at 27-30 (same).  But evidence of Section 2 litigation is insufficient to justify a measure as constitutionally intrusive as Section 5.  Mot. at 34.  Because "§ 2 [does] not have an intent component," *Bossier Parish I*, 520 U.S. at 482, this evidence is simply incapable of demonstrating the persistence of systematic voting discrimination on the basis of race.  The Attorney General concedes that Section 2 violations do "not necessarily require a finding of intentional discrimination."   AG Opp. at 63; Cunningham Opp. at 34 (acknowledging that "Section 2 does not require a finding of unconstitutional discrimination").  This is an important concession because the vast majority of Section 2 cases do not involve findings of intentional discrimination.   Indeed, the number of Section 2 violations with findings of intentional discrimination are miniscule.  Mot. at 34.  This is hardly the kind of evidence that could provide constitutional justification for such "an uncommon exercise of congressional power." *Katzenbach*, 383 U.S. at 334.

The Attorney General responds that reliance on reported decisions is misleading because it excludes unreported decisions generally and "unreported cases . . . resolved through settlement[]" specifically.  AG Opp. at 63.  Neither argument is persuasive.  The Attorney General relies on the Report of the National Commission on the Voting Rights Act, which found 653 reported and unreported Section 2 cases "with outcomes favorable to minority voters" to argue that "many" of these cases involved findings of intentional discrimination.  *Id.* at 40-41 (citing 1 *Evidence of Continued Need* at 125-26).   But the record reveals that of these 653 cases, only 11 involved findings of intentional discrimination in covered jurisdictions since 1982.  *See Continuing Need for Section 5 Preclearance* at 10 (testimony of Richard H. Pildes); *Senate Report* at 102.   Reliance on unreported cases with "favorable settlements" likewise is both speculative and irrelevant.  AG Opp. at 41.  Unspecified "favorable settlements" do not constitute probative evidence of intentional discrimination.  Mot. at 34.

The Attorney General also responds that the evidence of Section 2 violations is meaningful because "[r]eported Section 2 cases include widespread judicial findings of serious voting discrimination by whites against minorities in the covered jurisdictions."  AG Opp. at 41 (citing 1 *Evidence of Continued Need* at 208).  But a review of the record source the Attorney General relies on indicates quite the opposite.  The House Report in question relies on the Michigan Voting Rights Initiative study, *see* 1 *Evidence of Continued Need* at 208, which found only *seven* reported decisions resulting in Section 2 violations with findings of intentional discrimination in covered jurisdictions between 1982 and 2004.  *See VRI Database Master List*. This evidence cannot possibly support reauthorization of Section 5, especially considering that *six* reported Section 2 decisions during the same time frame found intentional voting discrimination against white voters by covered jurisdictions.  *See Senate Report* at 13.

The remainder of the Attorney General's argument relating to Section 2 litigation relies upon anecdotal and isolated evidence mostly relating to vote dilution claims.  AG Opp. at 40-42, 62-63.  Indeed, the Attorney General devotes nearly half of his entire discussion of Section 2 litigation to one anecdote—the striking down of Mississippi's dual registration system.  *Id.* at 41-42; Cunningham Opp. at 10-18 (recounting specific Section 2 cases).  But such isolated evidence is of little if any value in determining whether there is systematic discrimination across the covered jurisdictions.  *See supra* at 39-44.

### iv.   Election Observers

Finally, the Attorney General points to its dispatching of election observers as support for Section 5.  AG Opp. at 38-40; Harris Opp. at 39 (same); *see also* VRARAA, Pub. L. No. 109-246, § 2(b)(5), 120 Stat. 577, 578.  But he concedes that the dispatching of federal observers to a covered jurisdiction reflects no more than the fact that the Attorney General had "'a reasonable belief that minority citizens [were] at risk of being disenfranchised.'"  AG Opp. at 38 (quoting *House Report* at 44).  Evidence about the number of federal observers dispatched, therefore, indicates only that the Attorney General speculated that there *might* be conduct that *might* result in voting discrimination.  It establishes neither that such discrimination occurred nor that any discrimination constituted purposeful disenfranchisement.  The existence of federal observers, therefore, also fails to provide any evidence that can be equated to the pervasive campaign of intentional discrimination faced by Congress in the 1960s.

*         *         *

In the end, none of the second generation evidence establishes the constitutional necessity of the exceptionally intrusive federal oversight mandated by Section 5.  But if these "second generation barriers" to voting were to provide a sufficient basis for reauthorizing Section 5 for another twenty five years, then preclearance could no longer be considered an "uncommon

64

exercise" of Congress's Fifteenth Amendment enforcement authority. *Katzenbach*, 383 U.S. at 334. The Supreme Court repeatedly has made clear that Congress was permitted to exercise its enforcement authority in this unprecedented manner because of the "unique" circumstances in the covered jurisdictions. *Id.* at 335. The second-generation barriers are not reliable evidence that these unique circumstances still exist.

## III.   CONCLUSION

For the foregoing reasons, Shelby County respectfully requests that this Court grant its motion for summary judgment, and deny the Attorney General's and Defendant-Intervenors' cross-motions for summary judgment. Shelby County further requests that the Court declare Section 5 and Section 4(b) of the Voting Rights Act unconstitutional, and issue a permanent injunction against Defendant Attorney General Eric H. Holder, Jr., enjoining the enforcement of Section 5 and Section 4(b) of the Voting Rights Act.

Dated:  December 13, 2010                    Respectfully submitted,

/s/ William S. Consovoy
Bert W. Rein (D.C. Bar No. 067215)
William S. Consovoy* (D.C. Bar No. 493423)
Thomas R. McCarthy (D.C. Bar No. 489651)
Brendan J. Morrissey (D.C. Bar No. 973809)
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Tel.: (202) 719-7000
Fax: (202) 719-7049

Frank C. Ellis, Jr.
WALLACE, ELLIS, FOWLER & HEAD
113 North Main Street
Columbiana, AL  35051
Tel.: (205) 669-6783
Fax: (205) 669-4932

*Counsel of Record*