IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHELBY COUNTY, ALABAMA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. |
| ERIC H. HOLDER, Jr., | ) | 1:10-cv-00651-JDB |
| in his official capacity as | ) | |
| Attorney General of the | ) | |
| United States, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**ATTORNEY GENERAL'S CONSOLIDATED REPLY MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

RONALD C. MACHEN, JR.
  United States Attorney
  District of Columbia

THOMAS E. PEREZ
  Assistant Attorney General
  Civil Rights Division

SAMUEL R. BAGENSTOS
JULIE A. FERNANDES
  Deputy Assistant Attorneys General

T. CHRISTIAN HERREN, JR.
DIANA K. FLYNN
RICHARD DELLHEIM (lead counsel)
LINDA F. THOME
ERNEST A. MCFARLAND
JARED M. SLADE
JUSTIN WEINSTEIN-TULL
  Civil Rights Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, N.W.
  NWB-Room 7264
  Washington, D.C. 20530
  Telephone: (202) 305-1734
  Facsimile: (202) 307-3961

## TABLE OF CONTENTS

**PAGE**

ARGUMENT

I     SECTIONS 4(b) AND 5 OF THE VOTING RIGHTS ACT ARE SUBJECT TO RATIONAL BASIS REVIEW ........................................................1

II    CONGRESS RATIONALLY DETERMINED THAT SECTION 5 PRECLEARANCE REMAINS APPROPRIATE .................................................12

III   CONGRESS RATIONALLY DECIDED TO CONTINUE APPLICATION OF SECTION 5 TO THE JURISDICTIONS DESIGNATED IN SECTION 4(b) ........................................................................29

CONCLUSION...................................................................................................35

# TABLE OF AUTHORITIES

**CASES:**                                                                     **PAGE**

*Allen* v. *State Bd. of Elections*, 393 U.S. 544 (1969) ............................................................. *passim*

*Board of Trs. of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356 (2001) .............................................10

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) ................................................................... *passim*

*City of Mobile* v. *Bolden*, 446 U.S. 55 (1980) .............................................................................18

*City of Richmond* v. *Croson*, 488 U.S. 469 (1988) .....................................................................24

*City of Rome* v. *United States*, 446 U.S. 156 (1980) ............................................................ *passim*

*Dillard* v. *Baldwin Cnty. Comm'n*, 694 F. Supp. 836 (M.D. Ala. 1988) ....................................19

*EEOC* v. *Wyoming*, 460 U.S. 226 (1983) .....................................................................................18

*Ex Parte Virginia*, 100 U.S. (10 Otto) 339 (1879) ................................................................. 3-4, 10

*Fitzpatrick* v. *Bitzer*, 427 U.S. 445 (1976) .....................................................................................7

*Georgia* v. *United States*, 411 U.S. 526 (1973) .................................................................... *passim*

*Gingles* v. *Edmisten*, 590 F. Supp. 345 (C.D.N.C. 1984) ............................................................19

*Gomillion* v. *Lightfoot*, 364 U.S. 339 (1960) ..............................................................................20

*Gonzales* v. *Raich*, 545 U.S. 1 (2005) .........................................................................................27

*Gray* v. *Sanders*, 372 U.S. 378 (1963) ........................................................................................20

*Groome Res., Ltd.* v. *Parish of Jefferson*, 234 F.3d 192 (2000) ...................................................28

*Jones* v. *Alfred H. Mayer Co.*, 392 U.S. 409 (1968) ................................................................2, 10

*Katzenbach* v. *McClung*, 379 U.S. 294 (1964) ............................................................................31

*Katzenbach* v. *Morgan*, 384 U.S. 641 (1966) ....................................................................... *passim*

*Lassiter* v. *Northampton Cnty. Election Bd.*, 360 U.S. 45 (1959) ..................................................9

*Lodge* v. *Buxton*, 639 F.2d 1358 (5th Cir. 1981) .........................................................................19

**CASES (continued):** **PAGE**

*Lopez* v. *Monterey Cnty.*, 525 U.S. 266 (1999) ....................................................2, 5, 12

*Miller* v. *Johnson*, 515 U.S. 900 (1995) ..............................................................22

*Nevada Dep't of Human Res.* v. *Hibbs*, 538 U.S. 721 (2003) ....................................28

*Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 129 S. Ct. 2504 (2009) .......................4, 34

*Oregon* v. *Mitchell*, 400 U.S. 112 (1970) ........................................................ 3-4, 7

*Perkins* v. *City of West Helena*, 675 F.2d 201 (8th Cir.),
  aff'd, 459 U.S. 801 (1982) ........................................................................19

*Reno* v. *Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000)......................................18, 21

*Reynolds* v. *Sims*, 377 U.S. 533 (1964)................................................................20

*Rogers* v. *Lodge*, 458 U.S. 613 (1982) ...................................................... *passim*

*Smith* v. *Allwright*, 321 U.S. 649 (1944)..............................................................20

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) ....................................... *passim*

*Tennessee* v. *Lane*, 541 U.S. 509 (2004) ........................................................ 3-4, 28

*Terry* v. *Adams*, 345 U.S. 461 (1953) ..................................................................20

*Thornburgh* v. *Gingles*, 478 U.S. 30 (1986)................................................ 19, 23, 25-27

*United States* v. *Marengo Cnty. Comm'n*, 731 F.2d 1546 (11th Cir.),
  cert. denied & appeal dismissed, 469 U.S. 976 (1984)....................................18

*United States* v. *Morrison*, 529 U.S. 598 (2000) ..........................................................31

*United States* v. *Reese*, 92 U.S. (2 Otto) 214 (1875) ......................................................4

*Village of Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*,
  429 U.S. 252 (1977)..........................................................................22, 26

*Washington* v. *Davis*, 426 U.S. 229 (1976) ...........................................................22

*White* v. *Regester*, 412 U.S. 755 (1973) ...............................................................19

*Woods* v. *Cloyd W. Miller Co.*, 333 U.S. 138 (1948) ............................................18, 28

**CASES (continued):**                                                      **PAGE**

*Wright* v. *Rockefeller*, 376 U.S. 52 (1964) ................................................................20

**STATUTES:**

Voting Rights Act of 1965, 42 U.S.C. 1973 *et seq.*
      42 U.S.C. 1973.........................................................................................25, 27
      42 U.S.C. 1973a(c)..........................................................................................32
      42 U.S.C. 1973b(a)(1).....................................................................................33
      42 U.S.C. 1973b(a)(5).....................................................................................33
      42 U.S.C. 1973b(b) ...........................................................................................1
      42 U.S.C. 1973b(e) ...........................................................................................9
      42 U.S.C. 1973c ...........................................................................................1, 13

**LEGISLATIVE HISTORY:**

*Joint View of 10 Members of the Judiciary Committee*
    *Relating to the Extension of the Voting Rights Act of 1965,*
    116 Cong. Rec. 5517 (1970) ...........................................................................15

H.R. Rep. No. 196, 94th Cong., 1st Sess. (1975) ..........................................................15

H.R. Rep. No. 227, 97th Cong., 1st Sess. (1981) ...................................................17, 24

H.R. Rep. No. 397, 91st Cong., 1st Sess. (1969) ..........................................................15

H.R. Rep. No. 478, 109th Cong., 2d Sess. (2006) .................................................. 22-24

S. Rep. No. 295, 94th Cong., 1st Sess. (1975)...................................................... 15-16

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ......................................... 17-18, 26, 34

**MISCELLANEOUS:**

U.S. Comm'n on Civil Rights, *Political Participation* (1968) .....................................15

U.S. Comm'n on Civil Rights, *The Voting Rights Act: Ten Years After* (1975) ..........................23

U.S. Comm'n on Civil Rights, *The Voting Rights Act: Unfulfilled Goals* (1981).................. 23-24

**ATTORNEY GENERAL'S CONSOLIDATED REPLY MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

As explained in the Attorney General's opening brief, Congress acted within its broad

authority to enforce the constitutional prohibitions on discrimination in voting based on race or

national origin when it reauthorized Section 5 of the Voting Rights Act (VRA), 42 U.S.C. 1973c.

Similarly, Congress's decision to continue to apply Section 5 to the covered jurisdictions

designated under the coverage formula in Section 4(b) of the VRA, 42 U.S.C. 1973b(b), was

constitutional.  Plaintiffs' arguments to the contrary are simply wrong.

**I**

**SECTIONS 4(b) AND 5 OF THE VOTING RIGHTS ACT
ARE SUBJECT TO RATIONAL BASIS REVIEW**

1.  Plaintiff contends that Sections 4(b) and 5 are subject to the congruence and

proportionality analysis set forth in *City of Boerne* v. *Flores*, 521 U.S. 507, 520, 529-536 (1997),

rather than the rational basis review the Supreme Court applied each time it previously examined

the constitutionality of Section 5.  See Pl.'s Reply Mem. 3-17.[1]   As explained previously (AG

Mem. 12), the Supreme Court expressly applied rational basis review when it upheld Section 5

as appropriate enforcement legislation enacted pursuant to Congress's authority to enforce the

Fifteenth Amendment in *South Carolina* v. *Katzenbach*, 383 U.S. 301, 324 (1966) ("As against

the reserved powers of the States, Congress may use any rational means to effectuate the

---

[1] "Pl.'s Reply Mem." refers to Plaintiff's Consolidated Reply Memorandum In Support
Of Its Motion For Summary Judgment And In Opposition To Defendant's And Defendant-
Intervenors' Cross-Motions For Summary Judgment.  "Pl.'s Mem." refers to Plaintiff's
Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment.
"Pl.'s SMF" refers to Plaintiff's Statement of Material Facts.  "AG Mem." refers to the Attorney
General's Memorandum Of Law In Opposition To Plaintiff's Motion For Summary Judgment
And In Support Of Defendant's Motion For Summary Judgment.  "Def. SMF" refers to
Defendant's Statement of Undisputed Material Facts.

constitutional prohibition of racial discrimination in voting"); *Georgia* v. *United States*, 411 U.S. 526, 535 (1973) (upholding the Act "for the reasons stated at length in *South Carolina*"); and *City of Rome* v. *United States*, 446 U.S. 156, 177 (1980) ("Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact.") (footnote omitted).  And the Court implicitly applied rational basis review in *Lopez* v. *Monterey County*, 525 U.S. 266, 282-285 (1999) (relying on *South Carolina* and *City of Rome* to uphold application of Section 5).

Similarly, the Supreme Court uniformly has applied deferential review in examining whether Congress acted within its authority to enact "appropriate legislation" to enforce the prohibitions of race and national origin discrimination in the Thirteenth and Fourteenth Amendments.  AG Mem. 12-14, 17-20; see *e.g.*, *Jones* v. *Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968) ("Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation.");  *Katzenbach* v. *Morgan*, 384 U.S. 641, 651-656 (1966) (Section "5 [of the Fourteenth Amendment] is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment"); *Ex Parte Virginia*, 100 U.S. (10 Otto) 339, 345-346 (1879) ("Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.").

2

In *Boerne* and its progeny, in contrast, the Court examined the constitutionality of statutes enacted pursuant to Congress's authority to enforce the Fourteenth Amendment outside the context of race discrimination.  See AG Mem. 14.  Because the Fourteenth Amendment protects a broad range of rights, subject to differing levels of scrutiny, it is more difficult outside the context of race and national origin discrimination to determine whether legislation is appropriate enforcement legislation.  AG Mem. 14-17; cf. *Tennessee* v. *Lane*, 541 U.S. 509,  555 (2004) (Scalia, J., dissenting) ("the Fourteenth Amendment, unlike the Fifteenth, is not limited to denial of the franchise and not limited to the denial of other rights on the basis of race").  Thus, the Court examined the legislative records more closely to determine whether the legislation at issue could "be considered enforcement legislation under § 5 of the Fourteenth Amendment." *Boerne*, 521 U.S. at 529.  Notably, however, in articulating the congruence and proportionality analysis, the *Boerne* Court did not disturb the "fundamental principle" underlying the Court's analysis of Section 5 and other provisions of the VRA in *South Carolina*:  "As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting."  *South Carolina*, 383 U.S. at 324.

Contrary to plaintiff's contention (Pl.'s Reply Mem. 4), there is nothing "novel" about this distinction between the level of scrutiny applied to laws enacted to enforce the Reconstruction Amendments' prohibition on race discrimination on the one hand and laws enacted to enforce other rights protected by the Fourteenth Amendment on the other.  The Court repeatedly has recognized that the prohibition of race discrimination is central to the purpose of all three Amendments.  "Above all else, the framers of the Civil War Amendments intended to deny to the States the power to discriminate against persons on account of their race."  *Oregon* v. *Mitchell*, 400 U.S. 112, 126 (1970) (opinion of Black, J.); see *Ex Parte Virginia*, 100 U.S. at 345

(the Thirteenth and Fourteenth Amendments "were intended to take away all possibility of oppression by law because of race or color"); *United States* v. *Reese*, 92 U.S. (2 Otto) 214, 217 (1875) ("The Fifteenth Amendment does not confer the right of suffrage upon any one.  It prevents the States * * * from giving preference, in this particular, to one citizen of the United States over another on account of race, color, or previous condition of servitude.").  This distinction necessarily carries over to the scope of Congress's authority to enforce the Amendments.  See *Oregon*, 400 U.S. at 127 ("The Fourteenth Amendment was surely not intended to make every discrimination between groups of people a constitutional denial of equal protection.  Nor was the Enforcement Clause of the Fourteenth Amendment intended to permit Congress to prohibit every discrimination between groups of people.  On the other hand, the Civil War Amendments were unquestionably designed to condemn and forbid every distinction, however trifling, on account of race."); cf. *Lane*, 540 U.S. at 561 (Scalia, J., dissenting) ("*South Carolina* and *Morgan*, all of our later cases except [*Nevada Department of Human Resources* v.] *Hibbs*[, 538 U.S. 721 (2003),] that give an expansive meaning to "enforce" in § 5 of the Fourteenth Amendment, and all of our earlier cases that even suggest such an expansive meaning in dicta, involved congressional measures that were directed exclusively against, or were used in the particular case to remedy, *racial discrimination*.").[2]

Thus, the correct question in this case is not whether the Congress assembled a record of pervasive, unconstitutional voting discrimination and "electoral gamesmanship" in the covered

---

[2]  Contrary to plaintiffs' contention (Pl's Reply Mem. 4 n.2) the Attorney General's argument here is the same as that made to the Supreme Court in *Northwest Austin Municipal Utility District No. One* v. *Holder*, 129 S. Ct. 2504 (2009).  See Brief for the Federal Appellee, No. 08-322, at 23 (distinguishing between legislation enacted to ensure the rights of minorities protected by the Thirteenth, Fourteenth, or Fifteenth Amendments, and legislation enacted "outside the heartland of the Reconstruction Amendments").

jurisdictions, or whether the continued application of Section 5 to those jurisdictions is a congruent and proportional remedy for such discrimination.  See Pl.'s Reply Mem. 17-22, 33-39. Rather, the question is whether Congress had a rational basis for concluding that the preclearance requirements of Section 5 remain an appropriate means of protecting minority voting rights in the covered jurisdictions.  AG Mem. 12-20; see *South Carolina*, 383 U.S. at 324-327; *City of Rome*, 446 U.S. at 173-178, 180-182.

The resolution of that question must be informed by certain basic principles established by the Court's decisions upholding Section 5.  First, the Court has held, on four separate occasions, that the preclearance requirement of Section 5 is appropriate legislation to enforce the Fifteenth Amendment.  *South Carolina*, 383 U.S. at 334-335; *Georgia*, 411 U.S. at 535; *City of Rome* 446 U.S. at 173-182; *Lopez*, 525 U.S. at 282-285.  In particular, it is clear that Section 5's "ban on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of the Fifteenth Amendment."  *City of Rome*, 446 U.S. at 177; see *Lopez*, 525 U.S. at 283 ("[r]ecognizing that Congress has the constitutional authority to designate covered jurisdictions and to guard against changes that give rise to a discriminatory effect in those jurisdictions").  Second, the Court has upheld Section 5 against claims that it unduly intrudes upon state and local prerogatives.  *South Carolina*, 383 U.S. at 324, 334-335; *City of Rome*, 446 U.S. at 178-180; *Lopez*, 525 U.S. at 282-285.  Third, the Court has upheld Congress's decision to apply Section 5 only to certain jurisdictions, *South Carolina*, 383 U.S. at 330-331, and affirmed the coverage formula in Section 4(b) as "rational in both practice and theory," *id.* at 330; see *Lopez*, 525 U.S. at 284.

2.  In light of the clear directive in *South Carolina* and the subsequent decisions upholding Section 5, plaintiff's contention that Section 5 is subject to congruence and

proportionality analysis depends upon an assumption that *Boerne* implicitly overruled *South Carolina* in this regard. All of plaintiffs' arguments in support of this contention, however, are without merit.

First, plaintiff's assertion that the Court has applied congruence and proportionality analysis in "*every* suit challenging enforcement legislation" since its decision in *Boerne* is simply incorrect. Pl.'s Reply Mem. 5. In *Lopez*, decided two years after *Boerne*, the Court rejected the State of California's argument that it would be unconstitutional to require preclearance of election laws applicable to covered jurisdictions that were enacted by non-covered states. 525 U.S. at 282-284. The Court acknowledged that Section 5 "authorizes federal intrusion into sensitive areas of state and local policymaking [and] imposes substantial federalism costs." *Id.* at 282 (internal quotation marks & citation omitted). But it explained that it had previously upheld the statute "against a challenge that this provision usurps powers reserved to the States." *Id.* at 283 (citing *South Carolina*, 383 U.S. at 334-335; *City of Rome*, 446 U.S. at 178-183). The Court cited *Boerne* only for the principle that Congress's authority to enforce the Fourteenth Amendment encompasses legislation that "deters or remedies constitutional violations * * * even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the States." *Id.* at 282-283 (quoting *Boerne*, 521 U.S. at 518). The Court did not mention congruence and proportionality analysis, but rather relied upon its previous decisions in *South Carolina* and *City of Rome* to hold that the application of Section 5 to the legislation enacted by California was constitutional and to reaffirm the statute's constitutionality: "Recognizing that Congress has the constitutional authority to designate covered jurisdictions and to guard against changes that give rise to a discriminatory effect in those jurisdictions, we find no merit in the claim that Congress lacks

Fifteenth Amendment authority to require federal approval before the implementation of a state law that may have just such an effect in a covered county."  *Id.* at 283-284.[3]

Plaintiff next contends that *Boerne* and its progeny "make clear" that congruence and proportionality, rather than rational basis, is the applicable standard of review for Section 5. Pl.'s Reply Mem. 11.  In support of this contention, plaintiff notes that the Court cited *South Carolina* numerous times in *Boerne* and compared the legislative record underlying the enactment of the Voting Rights Act favorably to the record underlying the statutes at issue in *Boerne* and subsequent cases.  *Id.* at 11-12.  But the Court's reliance on the voting cases certainly does not suggest that the Court silently overruled these cases with respect to their application of the rational basis test.  A better explanation is that the Court recognized the common threads in both lines of cases:  that Congress's broad power to enforce the Reconstruction Amendments includes the power to "deter[] or remedy[] constitutional violations," *Boerne*, 521 U.S. at 518 (citing *Fitzpatrick* v. *Bitzer*, 427 U.S. 445, 455 (1976) and *South Carolina*, 383 U.S. at 308); that the enforcement power is "remedial," not substantive, *id.* at 519 (citing *South Carolina*, 383 U.S. at 326); and that "strong remedial and preventive measures" were permissible "to respond to the widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination,"  *id.* at 526 (citing *Oregon*, 400 U.S. at 132; *City of Rome*, 446 U.S. at 182).

---

[3] Plaintiff also misunderstands the significance of *Hibbs* and *Lane*.  See Pl.'s Reply Mem. 6-8.  As explained in the Attorney General's opening brief (AG Mem. 16-17), these cases illustrate that, even when congruence and proportionality analysis is applied, the Court's scrutiny of legislation is less exacting when Congress legislates to protect rights subject to heightened constitutional protection.  Contrary to plaintiff's contention, the Attorney General did not argue that these decisions did not apply congruence and proportionality analysis at all.

Plaintiff next relies upon *Boerne's* discussion of the legislative history of the Enforcement Clause of the Fourteenth Amendment.  Pl.'s Reply Mem. 12-14.  As *Boerne* recounted, an initial draft of the Enforcement Clause would have authorized Congress "to make all laws which shall be necessary and proper" to secure the rights protected by the Amendment. 521 U.S. at 520.  This provision was withdrawn and replaced by the final version authorizing Congress "to enforce, by appropriate legislation, the provisions of this article."  *Id.* at 522. Plaintiff contends (Pl.'s Reply Mem. 12-14 & n.2) that the Court's discussion of this history necessarily overruled its previous statements that the scope of Congressional authority under the Enforcement Clause of the Fourteenth Amendment is the same as under the Necessary and Proper Clause.  See *South Carolina*, 383 U.S. at 326; *Morgan*, 384 U.S. at 650; *City of Rome*, 446 U.S. at 175.  But the Court's decision in *Boerne* made no such proclamation.  Its discussion of the legislative history of the Enforcement Clause merely supported its conclusion that Congress's enforcement authority is remedial, rather than substantive.  *Boerne*, 521 U.S. at 520 ("The Fourteenth Amendment's history confirms the remedial, rather than substantive, nature of the Enforcement Clause."); *id.* at 522 ("Under the revised Amendment, Congress' power was no longer plenary but remedial.").  Indeed, the Court had cited *South Carolina* for the same proposition.  *Id.* at 519.  Moreover, *Boerne* reiterated the "broad" scope of Congress's enforcement authority, as articulated more than a century before in *Ex Parte Virginia*: "Whatever legislation is appropriate, that is, adapted to carry out the objects the [Civil War] amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power."  *Id.* at 517-518 (quoting 100 U.S. at 345-346).

Nor does *Boerne's* discussion of *Morgan* indicate that the Court intended to overturn its previous application of rational basis review to legislation enacted to enforce prohibitions on race discrimination.  See Pl.'s Reply Mem. 12-13 n.3.  *Morgan* upheld Section 4(e) of the VRA, which prohibited the use of English literacy tests as a prerequisite for voting by citizens who had been educated in certain schools "in which the predominant classroom language was other than English."  42 U.S.C. 1973b(e).  In *Boerne*, the Court wrote that there was "language" in *Morgan* that "could be interpreted as acknowledging a power in Congress to enact legislation that expands the rights contained in § 1 of the Fourteenth Amendment."  521 U.S. at 527-528.  *Boerne* did not specify the language to which it referred.  But in the view of the *Morgan* dissent, the majority's affirmance of the statute at issue there depended upon a Congressional determination that New York's English literacy requirement constituted "an unconstitutional deprivation of equal protection," 384 U.S. at 669 (Harlan, J., dissenting), notwithstanding the Court's previous holding that literacy requirements, as a general matter, do not violate equal protection, see *id.* at 661 (citing *Lassiter* v. *Northampton Cnty. Election Bd.*, 360 U.S. 45 (1959).  The *Boerne* Court rejected this reading of *Morgan*, explaining that this was "not a necessary interpretation, however, or even the best one."  *Boerne*, 521 U.S. at 528.  Rather, the Court examined the rationales set forth by the majority in *Morgan* to justify Congress's prohibition of an English literacy requirement, concluding that "[b]oth rationales for upholding § 4(e) rested on unconstitutional discrimination by New York and Congress' reasonable attempt to combat it."  *Ibid.*  Nothing in this discussion implies, let alone requires, a conclusion that the Court intended to overturn its previous holdings that legislation enacted to enforce the Fourteenth Amendment's prohibition of race discrimination is subject to rational basis review.

Plaintiff protests that the application of rational basis review to Section 5 and other statutes enacted to enforce the prohibition of race discrimination cannot be reconciled with the three-step *Boerne* framework. Pl.'s Reply Mem. 15-16. To be sure, the rational basis analysis is *different* from the congruence and proportionality analysis. But it is not irreconcilable. Indeed, the first step is exactly the same: the identification of "the scope of the constitutional right at issue." *Board of Trs. of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 365 (2001). Where the statute at issue protects a right to be free from race discrimination protected by one of the Reconstruction Amendments, rational basis applies. See *South Carolina*, 383 U.S. at 324; *City of Rome*, 446 U.S. at 175-177; *Jones*, 392 U.S. at 440; *Morgan*, 384 U.S. at 652-656; *Ex Parte Virginia*, 100 U.S. at 345-346. As these citations make clear, contrary to plaintiff's characterization, this is not "a newly-minted test" (see Pl.'s Reply Mem. 15), but rather a standard that predates the cases upon which plaintiff relies. Moreover, the purpose of the congruence and proportionality analysis is to draw the line between legislation that merely remedies or prevents constitutional violations and legislation that substantively redefines the contours of a constitutional right. *Boerne*, 521 U.S. at 519-520. In this instance, however, the Court already has determined that Section 5 is appropriate enforcement legislation that remedies or prevents unlawful voting discrimination. See pp. 1-2, *supra*; see also *Boerne*, 521 U.S. at 525 (explaining that *South Carolina* "upheld various provisions of the Voting Rights Act of 1965, finding them to be "remedies aimed at areas where voting discrimination has been most flagrant") (citing *South Carolina*, 383 U.S. at 315); see *id.* at 526 ("Congress' considered determination that at least another 7 years of statutory remedies were necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable.") (quoting *City of Rome*, 446 U.S. at 182).

Finally, plaintiff contends that federalism concerns require application of congruence and proportionality analysis to Section 5, claiming that "Section 5 is far more problematic from a federalism perspective than the laws previously subjected to review under the *City of Boerne* framework."  Pl.'s Reply Mem. 16; see also Pl.'s Reply Mem. 19-20, 33-34.  But this contention is directly contradicted by the *Boerne* decision itself, which emphasized that the Religious Freedom Restoration Act (RFRA) was far *more* intrusive than the Voting Rights Act: "Sweeping coverage ensures [RFRA's] intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter. * * * RFRA has no termination date or termination mechanism. Any law is subject to challenge at any time by any individual who alleges a substantial burden on his or her free exercise of religion." *Boerne*, 521 U.S. at 532.  "The reach and scope of RFRA," the Court wrote, "distinguish it from other measures passed under Congress' enforcement power, even in the area of voting rights." *Ibid.*  The special provisions of the VRA upheld in *South Carolina*, the Court explained, "were confined to those regions of the country where voting discrimination had been most flagrant, * * * and affected a discrete class of state laws."  *Id.* at 532-533.  And the bailout provision allowed for termination of coverage for jurisdictions "in which the danger of substantial voting discrimination has not materialized."  *Id.* at 533.  Moreover, the Court wrote, the substantive standards imposed by RFRA were more stringent than the discriminatory effects test in Section 5:  "If a state law disproportionately burdened a particular class of religious observers, this circumstance might be evidence of an impermissible legislative motive.  * * * RFRA's substantial-burden test, however, is not even a discriminatory effects or disparate-impact test."  *Id.* at 535 (citation omitted).

Moreover, plaintiff's contention is inconsistent with the Court's approach in each of the previous cases concerning the constitutionality of Section 5.  In each of those cases, the Court has acknowledged that the preclearance obligation intrudes into traditional state functions.  *South Carolina*, 383 U.S. at 325, 334-335; *Georgia*, 411 U.S. at 535; *City of Rome*, 446 U.S. at 178-180; *Lopez*, 525 U.S. at 282-284.  And each time, the Court applied rational basis analysis.  See *South Carolina*, 383 U.S. at 324; *Georgia*, 411 U.S. at 535; *City of Rome*, 446 U.S. at 175-177; *Lopez*, 525 U.S. at 282-285; see pp. 1-2, *supra*.

## II

## CONGRESS RATIONALLY DETERMINED THAT SECTION 5 PRECLEARANCE REMAINS APPROPRIATE

As set forth in detail previously, Congress compiled an extensive record of voting discrimination in the covered jurisdictions before reauthorizing Section 5 in 2006.  AG Mem. 20-65.  That record included evidence of intentional discrimination in the covered jurisdictions, evidence that voting discrimination was more prevalent in the covered jurisdictions than in the non-covered jurisdictions, and evidence that Section 5 preclearance is still needed to protect minority voting rights in the covered jurisdictions.  The 2006 Reauthorization thus satisfies the congruence and proportionality test as well as the rational basis test.  See AG Mem. 10, 20.  Plaintiff's arguments to the contrary are mistaken.

Plaintiff's contention that the legislative record is inadequate to sustain Section 5 is inconsistent with the Court's previous decisions upholding the statute.  First, as explained in Part I, above, those decisions make it clear that the 2006 Reauthorization must be upheld if Congress could have rationally concluded that the preclearance process remains appropriate to protect minority voting rights in the covered jurisdictions.  Second, when measured against the records compiled by Congress before the previous reauthorizations of Section 5 and the Court's previous

decisions upholding the statute, it is plain that the 2006 Reauthorization is well within Congress's enforcement authority.  As explained previously, Congress relied in 2006 on the same evidentiary sources and found the same types and patterns of discriminatory voting behavior found by previous Congresses. [4]  See AG Mem. 20-23 (describing evidence relied upon by Congress in 1965, 1970, 1975, and 1982), *id.* at 23-65 (describing Congress's sources and findings in 2006).

1.  Plaintiff contends, however, that the legislative record is inadequate because Congress relied upon evidence of so-called "second generation" barriers to minority voting rights. According to plaintiff, only evidence identical to that found in 1965 – that is, evidence that covered jurisdictions intentionally denied minority citizens the right to register and to vote – is sufficient to support the 2006 Reauthorization of Section 5.  Pl.'s Reply Mem. 25-26.  As explained previously, however, the techniques Congress described as second generation barriers are nothing new; these techniques were used by the covered jurisdictions both before and after the enactment of the VRA in 1965 to minimize the effectiveness of minority voters.  See AG Mem. 57-60.  Congress intended the preclearance process set forth in Section 5 not only to prevent the kinds of practices that directly prevented minority citizens from registering and voting, but also to prevent the implementation of all manner of practices with the purpose or effect of limiting minority voting rights.  And the persistence of such dilutive mechanisms was cited by both Congress and by the Supreme Court to explain why Section 5 preclearance remained appropriate when the statute was reauthorized previously.  A review of this history, and

---

[4]  Contrary to plaintiffs' contention, the Attorney General does not depend primarily on the size of the legislative record or the fact that Congress relied upon the same sources in 2006 as it had previously.  See Pl.'s Reply Mem. 34-35, 38.

of the Court's decisions, makes it clear that plaintiff is wrong in contending that evidence in the 2006 record does not support the 2006 Reauthorization.

As the Court explained in *Allen* v. *State Board of Elections*, 393 U.S. 544, 548 (1969), Congress enacted Section 5 because it "feared that the mere suspension of existing tests would not completely solve the problem, given the history some States had of simply enacting new and slightly different requirements with the same discriminatory effect."  After reviewing the text and legislative history of the 1965 Act, *Allen* held that Congress intended Section 5 to apply to dilutive techniques, such as a change from district to at-large elections:  "The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race. Moreover, *compatible with the decisions of this Court*, the Act gives a broad interpretation to the right to vote, recognizing that voting includes 'all action necessary to make a vote effective.'"  *Id.* at 565-566 (footnote omitted; emphasis added).  The Court recognized that these dilutive techniques were just the sort of "new rules" that the covered states had adopted in the past "for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees. Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself."  *Id.* at 566 n.30 (quoting *South Carolina* v. *Katzenbach*, 383 U.S. 301, 335 (1966)).

Significantly, before each of the previous reauthorizations of Section 5, Congress found that, as barriers to minority participation fell, covered jurisdictions turned to more subtle means, including dilutive mechanisms, to minimize the effectiveness of minority voters.  See AG Mem. 21, 59.  In 1969, the House Judiciary Committee reported that "as Negro voter registration has increased under the Voting Rights Act, several jurisdictions have undertaken new, unlawful ways

to diminish the Negroes' franchise and to defeat Negro and Negro-supported candidates."  H.R. Rep. No. 397, 91st Cong., 1st Sess. 7 (1969) (1969 House Report).  Such practices, the Committee reported, included changes from district to at-large elections and "consolidation of predominantly white and predominantly Negro counties."  *Ibid*. (citing, *inter alia*, U.S. Comm'n on Civil Rights, *Political Participation*, 21-84 (1968)).[5]  The House Judiciary Committee also took note of recent objections interposed by the Attorney General, including objections to at-large elections in Mississippi and Louisiana.  *Ibid.*  Reauthorization of Section 5 was thus necessary, the Committee concluded, to block such changes in voting practices:  "Federal review of voting law changes insures that, with discrimination in registration and at the voting booth blocked, the affected States and counties cannot, by employing changes in legislation undo or defeat the rights recently won by nonwhite voters."  *Id.* at 8; see also *Joint View of 10 Members of the Judiciary Committee Relating to the Extension of the Voting Rights Act of 1965*, 116 Cong. Rec. 5517, 5520-5521 (1970) (citing examples of legislation designed to limit the effectiveness of black voters).  Two years later, the Supreme Court once again upheld the constitutionality of Section 5, and specifically applied it to a statewide redistricting plan, emphasizing that "voting includes 'all action necessary to make a vote effective.'"  *Georgia* v. *United States*, 411 U.S. 526, 533 (1973) (quoting *Allen*, 393 U.S. at 565-566).

In 1975, Congress again learned that, as "registration and voting of minority citizens increases, other measures may be resorted to which would dilute increasing minority voting strength."  H.R. Rep. No. 196, 94th Cong., 1st Sess. 10 (1975) (1975 House Report); see also S.

----

[5] *Political Participation*, submitted to Congress in May 1968, reported on the use of redistricting to restrict black participation in the political process as early as 1877 in North Carolina, as well as in Mississippi and Alabama after the enactment of the VRA.  *Political Participation* 7, 21-39, 171-172.

Rep. No. 295, 94th Cong., 1st Sess. 16 (1975) (1975 Senate Report).  In particular, the House

and Senate Committees reporting on the legislation cited recent objections interposed by the

Attorney General to at-large election plans, majority voting requirements, and discriminatory

redistricting plans.  1975 House Report 10; see also 1975 Senate Report 16-17.  The House and

Senate Reports noted that one-third of the Attorney General's objections had involved

redistricting plans and emphasized the need to extend Section 5 to prevent discrimination during

upcoming redistricting following the next Census.  1975 House Report 10-11; see also 1975

Senate Report 18.

The Supreme Court specifically relied upon this review of Section 5 objections when it

upheld the 1975 reauthorization in *City of Rome* v. *United States*, 446 U.S. 156, 180-182 (1980).

In plaintiff's view, *City of Rome* did little more than rely upon the evidence compiled in 1965

and determine that it was too soon to dispense with the preclearance obligation.  Pl.'s Reply

Mem. 36-37.  This characterization cannot be squared with the decision.  To be sure, the Court

relied upon the reasoning underlying its decision upholding the 1965 Act in *South Carolina*.  See

*City of Rome*, 446 U.S. at 173-178.  But the Court also specifically declined to overrule

Congress's determination that the preclearance requirement was still needed.  *Id.* at 180-182.

After reviewing the legislative record compiled by Congress when it reauthorized the Act in

1975, the Court acknowledged the gains in both minority voter participation and the election of

minority officials.  *Id.* at 180-181.  But the Court explained that Congress had decided to

reauthorize Section 5 "[a]fter examining information on the number and types of submissions

made by covered jurisdictions and the number and nature of objections interposed by the

Attorney General."  *Id.* at 181.  The Court quoted from the House Report:  "The recent

objections entered by the Attorney General . . . to Section 5 submissions clearly bespeak the

continuing need for this preclearance mechanism.  As registration and voting strength of minority citizens increases [*sic*], other measures may be resorted to which would dilute increasing minority voting strength."  *Ibid.* (quoting 1975 House Report 10).

Again in 1982, the Congressional Committees examining the enforcement of Section 5 noted the continued progress made, particularly in minority registration and participation and in the election of minority officials.  H.R. Rep. No. 227, 97th Cong., 1st Sess. 7 (1981) (1981 House Report); see also S. Rep. No. 417, 97th Cong., 2d Sess. 10 (1982) (1982 Senate Report). But, as the House Committee found, that progress was "fragile," 1981 House Report 7, and "discrimination continues today to affect the ability of minorities to participate effectively within the political process," *id.* at 11.  The Senate Report explained that "[t]he initial effort to implement the Voting Rights Act focused on registration," and that "[m]ore than a million black citizens were added to the voting rolls from 1965 to 1972."  1982 Senate Report 6.  "But registration is only the first hurdle to full effective participation in the political process. * * * Following the dramatic rise in registration, a broad array of dilution schemes were employed to cancel the impact of the new black vote."  *Ibid*; see 1981 House Report 18 (explaining that a variety of procedures are used, in combination with racially polarized voting, to dilute "emerging minority political strength," and noting that "many of these devices were used to limit political participation of newly enfranchised blacks more than a century ago").  "Congress anticipated this response," the Senate Committee wrote, and the Section 5 preclearance process was "designed to halt such efforts."  *Ibid.*  Both House and Senate Committees again reviewed data on Section 5 submissions and objections interposed by the Attorney General.  1981 House Report 12-13; 1982 Senate Report 10-12.  As the Senate Report explained, the most common objections involved dilutive mechanisms.  1982 Senate Report 10.  A review of the objections, the Senate Report

17

stated, "reflects the fact that, since the adoption of the Voting Rights Act, covered jurisdictions have substantially moved from direct, overt impediments to the right to vote to more sophisticated devices that dilute the minority vote." *Id.* at 10. "The continuing problem with reapportionments," the Senate Report stated, "is one of the major concerns of the Voting Rights Act." *Id.* at 12 n.31.

Plaintiff also casts doubt on the significance of the vote dilution evidence by arguing, for the first time, that the Fifteenth Amendment protects only the right to cast a vote, and does not prohibit racially discriminatory vote dilution. Pl.'s Reply Mem. 47-49.[6]  As explained above, this contention cannot be reconciled with the Court's express reliance on evidence of dilutive mechanisms to uphold Section 5 in *City of Rome*, 446 U.S. at 181.  Moreover, while it is true that the Court has not squarely held that vote dilution violates the Fifteenth Amendment, see *Reno* v. *Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000) (*Bossier II*), there are strong arguments to be made that it does.[7]

---

[6]  Plaintiff is wrong (Pl.'s Reply Mem. 47) in asserting that the Attorney General defends Section 5 solely as an exercise of Congress's authority under the Fifteenth Amendment.  See AG Mem. 17 ("Section 5 of the Voting Rights Act enforces the protections at the core of the Fifteenth Amendment and Fourteenth Amendment[].  The primary purpose of both amendments was to prohibit race discrimination, and both Amendments protect the right to vote.").  That Congress did not state that it was acting to enforce the Fourteenth Amendment is irrelevant.  See *Woods* v. *Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948) ("The constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."); *EEOC* v. *Wyoming*, 460 U.S. 226, 243 n.18 (1983) (same).

[7]  Neither *City of Mobile* v. *Bolden*, 446 U.S. 55 (1980), nor *Rogers* v. *Lodge*, 458 U.S. 613 (1982), supports plaintiff's argument in this regard. In *Mobile*, four justices expressed the view that the Fifteenth Amendment prohibits only interference with the right to register and vote.  See 446 U.S. at 65 (plurality).  Several courts of appeals, having carefully considered the various opinions in *Mobile*, have concluded that the majority of the justices in that case disagreed with the plurality opinion and found that vote dilution is cognizable under the 15th Amendment.  See *United States* v. *Marengo Cnty. Comm'n*, 731 F.2d 1546, 1555-1556 (11th Cir.) ("[W]e have since held that a majority of the Court in *Mobile* concluded that the Fifteenth Amendment, as

(continued…)

The Court long ago recognized vote dilution as a problem to be remedied by the Section 5 preclearance process.  See *Allen*, 393 U.S. at 565-566; *Georgia*, 411 U.S. at 532-533.  And that recognition was rooted not only in Congress's, but also in the Court's inclusive definition of the term "vote."  See *Allen*, 393 U.S. at 565-566 ("Compatible with the decisions of this Court, the Act gives a broad interpretation to the right to vote, recognizing that voting includes 'all action necessary to make a vote effective.'") (citation omitted);  *id.* at 569 ("The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot.

_____

(…continued)

well as the Fourteenth, protects not only against denial of the right to vote but against dilution of that right as well."), cert. denied & appeal dismissed, 469 U.S. 976 (1984);  *Lodge* v. *Buxton*, 639 F.2d 1358, 1372-1373 (5th Cir. 1981) ("We conclude, therefore, that five Justices believe the Fifteenth Amendment creates a right of action in voting dilution cases."); *Perkins* v. *City of W. Helena*, 675 F.2d 201, 205-206 (8th Cir.) ("Five justices indicated that the Fifteenth Amendment also protects against vote dilution."), aff'd, 459 U.S. 801 (1982).  In *Rogers*, the Court expressly declined to decide whether the Fifteenth Amendment prohibits vote dilution. See 458 U.S. at 619 & n.6.  And while this Court need not decide this question, it is nonetheless important to note Congress's authority under Section 2 of the Fifteenth Amendment to prohibit state action that, though in itself not violative of Section 1, "perpetuates the effects of past discrimination."  *City of Rome*, 446 U.S. at 176.  As *City of Rome* implicitly recognized, dilutive mechanisms, in combination with racially polarized voting, are among the practices and procedures that perpetuate the effects of past purposeful discrimination.  See *id.* at 160 (submissions at issue included change from district to at-large elections, numbered posts, majority vote requirements, and staggered terms); *id.* at 173-178 (rejecting contention that effects prong of Section 5 exceeds Congress's powers to enforce the 15th Amendment); *Dillard* v. *Baldwin Cnty. Comm'n*, 694 F. Supp. 836, 841 (M.D. Ala. 1988) ("In a very real sense, therefore, racially polarized voting perpetuates the effects of past discrimination.") (citing *Thornburgh* v. *Gingles*, 478 U.S. 30, 44 n. 9 (1986)).  Indeed, dilutive mechanisms are not merely present-day phenomena that incidentally have a discriminatory effect.  Such mechanisms were an integral part of the network of practices adopted by the now-covered jurisdictions to intentionally defeat the effectiveness of minority voters both before and after the enactment of the VRA in 1965.  See AG Mem. 57-59; see also, *e.g.*, *White* v. *Regester*, 412 U.S. 755, 765-770 (1973) (upholding finding that multi-member legislative districts in two Texas counties were adopted with the purpose of diluting the minority vote); *Gingles* v. *Edmisten*, 590 F. Supp. 345, 360 (M.D. N.C. 1984) (describing "voting mechanisms designed to minimize or cancel the potential voting strength of black citizens," including the 1955 enactment by North Carolina of an anti-single shot voting law that had "the intended effect of fragmenting a black minority's total vote between two or more candidates in a multi-seat election and preventing its concentration on one candidate.").

See *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964)).  Indeed, in *Wright* v. *Rockefeller*, 376 U.S. 52, 56-58 (1964), the Court granted certiorari to determine whether a lower court had erred in ruling that a districting plan violated neither the Fourteenth Amendment nor the Fifteenth Amendment by diluting minority voting strength.  The Court affirmed the judgment below, but it did so on factual grounds, by accepting the lower court's finding that plaintiffs had failed to prove that the plan was either motivated by race or drawn on racial lines.  *Id.* at 56-58.  The Court did not suggest that plaintiffs did not state a valid claim under the Fifteenth Amendment.

Plaintiff contends that the *Allen* Court's citation to *Reynolds* indicates that it viewed vote dilution claims as cognizable only under the Fourteenth Amendment.  Pl.'s Reply Mem. 48 n.14. But *Reynolds*, which upheld a finding of a Fourteenth Amendment violation for a legislative apportionment scheme, involved claims of discrimination based on population distribution, not race discrimination, and thus did not implicate the Fifteenth Amendment.  See *Reynolds*, 377 U.S. at 536-542 (describing plaintiffs' claims).  Moreover, language in the *Reynolds* decision presumes that race-based vote dilution would violate the Fifteenth Amendment.  First, in reaching the conclusion that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise," *Reynolds* relied upon a line of cases involving voting rights protected by the Fifteenth Amendment as well as the Fourteenth Amendment.  *Id.* at 555 (citing, *inter alia*, *Gomillion* v. *Lightfoot*, 364 U.S. 339 (1960) (racial gerrymandering); *Smith* v. *Allwright*, 321 U.S. 649 (1944) (white primary); *Terry* v. *Adams*, 345 U.S. 461 (1953) (white primary)).  Second, *Reynolds* cited a statement in an earlier decision that vote dilution based on race or sex would violate the Fifteenth Amendment or the Nineteenth Amendment, respectively.  See *Reynolds*, 377 U.S. at 557 (citing *Gray* v. *Sanders*, 372 U.S. 378, 379 (1963)).

20

In any event, it is clear that districting plans "violate the Fourteenth Amendment if 'conceived or operated as purposeful devices to further racial discrimination' by minimizing, cancelling out, or diluting the voting strength of" racial minorities.  *Rogers* v. *Lodge*, 458 U.S. 613, 617 (1982) (citation omitted).  As explained previously (AG Mem. 21-23, 59-60) and above, pp. 13-18, *supra*, Congress heard evidence that covered jurisdictions were employing techniques such as at-large voting and racial gerrymandering of voting districts to dilute the effectiveness of the newly enfranchised minority voters when it reauthorized Section 5 in 1970, 1975, and 1982.  In 2006, Congress heard evidence and determined that vote dilution continued to limit minority voting rights in the covered jurisdictions.  That evidence supports the 2006 Reauthorization, whether vote dilution is viewed as a violation of the Equal Protection Clause or of the Fifteenth Amendment.

2.  Plaintiff seeks to diminish the significance of the objections interposed by the Attorney General by arguing that these objections are not evidence of intentional discrimination. Pl.'s Reply Mem. 55-62.  As explained above, however, Congress examined the number and types of Section 5 submissions and objections each time it reauthorized Section 5 in the past. See pp. 15-18, *supra*.  And the Supreme Court expressly relied upon this evidence in upholding the 1975 Reauthorization in *City of Rome*, 446 U.S. at 181; see p. 16, *supra*.

Further, as set forth previously, a substantial portion of the objections during the relevant period were based upon discriminatory purpose.  See AG Mem. 27-31.  Plaintiff contends that, before the Court's decision in *Reno* v. *Bossier Parish School Board*, 528 U.S. 320 (2000), a portion of these objections were based upon discriminatory, but not retrogressive, purpose.  See Pl.'s Reply Mem. 59.  But this contention is irrelevant.  Discriminatory purpose is the Supreme Court's test for identifying unconstitutional discrimination.  See *Rogers*, 458 U.S. at 617-618 &

21

n.5; *Village of Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977); *Washington* v. *Davis*, 426 U.S. 229, 242 (1976).  Thus, election practices adopted for a discriminatory purpose are unconstitutional, whether or not they are retrogressive.  Accordingly, to obtain preclearance under the purpose prong of Section 5 before the decision in *Bossier Parish* or after the 2006 Reauthorization, a covered jurisdiction was required to show that the proposed voting change did not violate the Constitution.

Plaintiff also contends that the preclearance statistics are unreliable, claiming that a number of objections during the 1990's were based upon the Attorney General's purported "'black-maximization' policy."  Pl.'s Reply Mem. 59 (quoting *Miller* v. *Johnson*, 515 U.S. 900, 921 (1995)).  According to plaintiff, the sharp drop in the number of objections between 1994 and 1996 can be explained by the Court's intervening decision in *Miller*, which held that, when a jurisdiction adheres to traditional districting principles, its resulting failure to create additional majority-minority districts does not constitute intentional discrimination and does not violate Section 5.  *Miller*, 515 U.S. at 924.  But a closer look at the yearly data on Section 5 submissions and objections indicates that the decline in the number of objections was more likely due to the winding down of the redistricting cycle.  See 2006 House Report 22.  In each year during the 1990's, the number of objections to redistricting plans constituted a significant proportion of the total number of objections, particularly during the peak redistricting years at the beginning of the decade.  *Ibid.*[8]  The number of redistricting submissions peaked in 1992 with 974 submissions, then fell annually to 67 in 1999.  *Ibid.*  The number of total objections similarly peaked in 1992 with 77 objections, and fell each year.  *Ibid.*  While the correlation is not perfect, there is an

---

[8]  In 1992, for example, 67 out of 77 objections were to redistricting plans.  2006 House Report 22.

obvious relationship between the decline in the number of redistricting submissions and the decline in the number of objections.  In 1994, *before* the decision in *Miller*, the number of redistricting submissions had fallen to 325 and the total number of objections had fallen to 61. *Ibid.*  The drop in objections to redistricting submissions was even sharper – from 67 in 1992 to just 10 in 1994.  *Ibid.*  In 1995 – half of which had passed before the June 29, 1995, decision in *Miller*, see 515 U.S. at 900 – the number of redistricting submissions had fallen to 213, and the number of total objections had fallen to 19, 7 of which involved redistricting.  2006 House Report 22.  By 1996, the number of redistricting submissions was only 116, while objections fell to 7, 3 of which were objections to redistricting submissions.  *Ibid.*  The number of objections, therefore, appears to vary with the number of redistricting submissions.

        3.  Plaintiff also challenges the significance of the persistence of racially polarized voting.  Pl.'s Reply Mem. 54-55.  As explained previously, this persistence is strong evidence of the need to reauthorize Section 5 because polarized voting is a necessary component of vote dilution.  See AG Mem. 49-53.  Contrary to plaintiff's contention, this is not a "newly minted theory."  Pl.'s Reply Mem. 55.  The Supreme Court repeatedly has explained the central role played by racial bloc voting in diluting the effectiveness of minority voting strength.  See *e.g.*, *City of Rome*, 446 U.S. at 183-184; *Rogers*, 458 U.S. at 616; *Thornburgh* v. *Gingles*, 478 U.S. 30, 46-51 (1986).  Indeed, proof of racial bloc voting is a prerequisite to establishing a violation of Section 2 of the Voting Rights Act in the vote dilution context.  *Ibid.*  In addition, Congress received evidence of the significance of polarized voting in 2006 and before previous reauthorizations.  See AG Mem. 49-50; 2006 House Report at 23, 34-35; 1981 House Report 18; U.S. Comm'n on Civil Rights, *The Voting Rights Act:  Ten Years After* 204-206 (1975); U.S.

Comm'n on Civil Rights, *The Voting Rights Act:  Unfulfilled Goals* 38-39 (1981).[9]  Moreover, through the use of dilutive techniques, state actors effectuate the private discrimination evidenced by racial bloc voting.  See AG Mem. 60; cf. *City of Richmond* v. *Croson*, 488 U.S. 469, 492 (1988) (when a State has "essentially become a 'passive participant' in a system of racial exclusion practiced" by private parties within its jurisdiction, it may "take affirmative steps to dismantle such a system.").

4.  Plaintiff next challenges the significance of Section 2 litigation on the ground that these cases often do not involve findings of intentional discrimination.  Pl.'s Reply Mem. 62-64.  The significance of the Section 2 litigation, however, is two-fold.  First, the extent of Section 2 litigation is a measure of continuing voting discrimination in the covered jurisdictions.  AG Mem. 40-42, 44-49, 68-69.  Second, one of the important functions of Section 5 is to preserve the gains made by minority voters, including gains achieved through litigation.  See 2006 House Report 53 ("Section 5, and the other temporary provisions have been and continue to be a shield that prevents backsliding from the gains previously won."); AG Mem. 32-34, 41-42.  Thus, to the extent that Section 2 litigation continues to be widespread in the covered jurisdictions, it provides an additional indication that this preservative function of Section 5 remains necessary.

As plaintiff notes, it is not necessary to prove intentional discrimination to establish a violation of Section 2.  Pl.'s Reply Mem. 62.  Thus, it is not surprising that most Section 2 cases do not include such a finding.  The large number of Section 2 cases in which minority plaintiffs have been successful, however, is nonetheless significant.  That is because the standard for

---

[9] The Reports of the Commission on Civil Rights were submitted to Congress in advance of the 1970, 1975, and 1982 Reauthorizations of Section 5.

proving a violation of Section 2 includes many of the same factors required to make a finding of intentional discrimination.

To establish a violation of Section 2 in a vote dilution case, a plaintiff must first prove that "a bloc voting majority [will] *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group."[10] *Gingles*, 478 U.S. at 49. The ultimate finding of a violation, however, depends upon the "totality of circumstances," including the following factors:

> 1.  the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2.  the extent to which voting in the elections of the state or political subdivision is racially polarized;

---

[10] Section 2, 42 U.S.C. 1973, provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in [section 4(f)(2), as provided in subsection (b)].
>
> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

    3.  the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

    4.  if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

    5.  the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

    6.  whether political campaigns have been characterized by overt or subtle racial appeals;

    7.  the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 36-37 (quoting 1982 Senate Report 28-29).  Additional factors may include "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group," and "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."  *Id.* at 37 (quoting 1982 Senate Report 28-29).

    These components of the Section 2 "totality of circumstances" analysis are the very factors that led the Supreme Court to uphold a finding of intentional and unconstitutional vote dilution in *Rogers*, 458 U.S. at 624-627.  More generally, it is settled law that the discriminatory results of an official action are an important aid in identifying purposeful discrimination. See *Arlington Heights*, 429 U.S. at 266 ("[t]he impact of the official action whether it 'bears more heavily on one race than another' * * * may provide an important starting point"). Other factors include "[t]he historical background of the decision * * * particularly if it reveals a series of official actions taken for invidious purposes," *id.* at 267; and "[t]he legislative or administrative history" of the action, *id.* at 268. The court in a Section 2 case need not find that

the voting practice was adopted for intentionally discriminatory reasons.  See *Gingles*, 478 U.S. at 35.  But the court must find, "based on the totality of circumstances * * * that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) [] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. 1973.

In short, a violation of Section 2 must be based upon more than simple proof that the challenged voting practice has a discriminatory effect.  Rather, Section 2 litigation identifies facially neutral practices that are likely to be intentionally discriminatory.  Successful Section 2 litigation is thus a good measure of likely intentional discrimination.  Cf. *City of Rome*, 446 U.S. at 177 ("Congress could rationally have concluded that * * * electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination.").

5.  Finally, plaintiff contends that some of the evidence cited by the Attorney General and the defendant-intervenors is "legally irrelevant" because it was not part of the legislative record.  Pl.'s Reply Mem. 53 n.18.  Plaintiff cites no authority for this proposition.  Nor could it, since there is no such rule.  In numerous cases involving Congress's authority to enact legislation, the courts have considered factual materials outside the legislative record.  In *Gonzales* v. *Raich*, 545 U.S. 1 (2005), for example, the Court held that the Controlled Substances Act, as applied to intrastate growers and users of marijuana, was within Congress's powers under the Commerce Clause.  In upholding the statute, which was enacted in 1970, the Court cited authority documenting the commercial and interstate nature of the market for marijuana, including a study of marijuana use published in 2000.  *Id.* at 19 n.28, 21 n.31.  In upholding Title II of the

Americans with Disabilities Act as valid Section 5 legislation in *Tennessee* v. *Lane*, 541 U.S. 509, 524-525 & nn.6-12 (2004), the Court relied in part on extensive post-enactment evidence of discrimination against people with disabilities.  In *Katzenbach* v. *Morgan*, 384 U.S. 641, 656 nn.16-17 (1966), the Court upheld Section 4(e) of the Voting Rights Act, relying, in part, on affidavits documenting the availability of Spanish-language newspapers and affidavits from candidates who had campaigned among non-English speakers.  See also *Woods* v. *Cloyd W. Miller, Co*., 333 U.S. 138, 143 n.6 (1948) (citing post-enactment census data to supplement information in the legislative record, in holding that the Housing and Rent Act of 1947 was a valid exercise of Congress's War Power); *Nevada Dep't of Human Res.* v. *Hibbs*, 538 U.S. 721, 733-734 & nn.6-9 (2003) (canvassing state laws concerning family leave to illustrate shortcomings of state-law protections); *Groome Res., Ltd.* v. *Parish of Jefferson*, 234 F.3d 192, 206 n.18 (2000) (citing post-enactment census data documenting the commercial nature of the real estate market in holding that Fair Housing Amendments Act of 1988 was a valid exercise of Congress's Commerce Power).  Indeed, in its motion for summary judgment, plaintiff submitted information on voter turnout in the 2000 and 2004 elections, based upon Census data published in 2010, and relies upon that data for its argument that Section 4(b) is unconstitutional.  See Pl.'s SMF ¶¶ 4-5; Pl.'s Mem. at 38.  Plaintiff also submitted information concerning the Attorney General's 2009 objection to voting changes submitted by the City of Calera, as well as other information about the history of Section 5 compliance in the county, and relies upon this information for its argument that the bailout provision does not provide a workable means of permitting jurisdictions to terminate their coverage by Section 5.  See Pl.'s SMF ¶¶ 9-10; Pl.'s Mem. at 41 n.8; see also Pl.'s Reply Mem. 33 (citing Pl.'s Mem. at 41 n.8).

The record underlying the 2006 Reauthorization of Section 5, together with the additional information cited by the Attorney General and the intervenors, includes abundant evidence of voting discrimination in the covered jurisdictions, based upon Attorney General objections, Section 5 enforcement actions, Section 2 litigation, and witness testimony.  The record includes evidence not only of practices that dilute the effectiveness of minority voters, but also of vote suppression.  See, *e.g.*, AG Mem. 29-31, 39-40, 41-42, 44-47.  The record also includes evidence that Section 5 deters many discriminatory voting changes (AG Mem. 53-55), and that Section 2 litigation alone is inadequate to protect minority voting rights (AG Mem. 55-57).  Congress rationally concluded in 2006 that the Section 5 preclearance requirement was still appropriate.

## III

### CONGRESS RATIONALLY DECIDED TO CONTINUE APPLICATION OF SECTION 5 TO THE JURISDICTIONS DESIGNATED IN SECTION 4(b)

Congress designed the coverage formula in Section 4(b) to encompass the jurisdictions with the worst records of discrimination.  AG Mem. 65.  Congress's decision, in 2006, to continue to apply Section 5 to those same jurisdictions was appropriate not only because those were the jurisdictions where "voting discrimination has been most flagrant," *South Carolina* v. *Katzenbach*, 383 U.S. 301, 315 (1966), but also because Congress specifically found that Section 5 preclearance was still warranted in the covered jurisdictions.  See AG Mem. 5-6.

1.  Plaintiff's first criticism of this justification is that it would result in the application of the formula "in perpetuity."  See Pl.'s Reply Mem. 23.  But this contention simply ignores the second reason the formula remains appropriate – Congress's finding that Section 5 preclearance remains necessary in the covered jurisdictions.  Nor is there any basis for plaintiff's contention that continued application of Section 5 to the covered jurisdictions is intended to "punish" those jurisdictions.  Pl.'s Reply Mem. 23.  This contention cannot be squared with the nearly

unanimous vote in favor of passage, including the votes of legislators from the covered jurisdictions.  See AG Mem. 20.  Moreover, the Supreme Court has specifically held that limiting the application of the special provisions of the Voting Rights Act to these jurisdictions was "a permissible method of dealing with the problem."  *South Carolina*, 383 U.S. at 328.  In light of Congress's 2006 finding that discrimination is still occurring and that Section 5 is still needed in these jurisdictions, continued application of the coverage formula for a time-limited period is still appropriate.  See AG Mem. 67-68.

2.  Plaintiff seeks to discount Congress's finding that preclearance remains necessary by arguing that much of the discrimination in the covered jurisdictions involved "second generation barriers" such as vote dilution.  Pl.'s Reply Mem. 27.  As explained above, and in the Attorney General's opening brief, it is not surprising that the kinds of blatant disenfranchisement that existed in 1965 have diminished and that different and more subtle methods of discrimination have taken their place, since the use of tests and other devices were banned by other provisions of the Act.  See pp. 13-18, *supra*; AG Mem. 11, 67-68.  The purpose of Section 5 is to prevent the implementation of new and "ingenious" methods of discrimination.  *South Carolina*, 383 U.S. at 309.  Thus, Congress's finding that such methods are still prevalent in the covered jurisdictions fully justifies its decision to continue application of Section 5 to those jurisdictions.

3.  Further, as demonstrated previously, the legislative record indicates that voting discrimination is more prevalent in the covered jurisdictions than elsewhere in the nation.  AG Mem. 68-69.  Plaintiff attacks this conclusion first, by contending that Congress made no finding to that effect.  Pl.'s Reply Mem. 27.  But while Congressional findings are helpful in examining the constitutional basis for legislation, Congress is not required to make any findings.

*Katzenbach* v. *McClung*, 379 U.S. 294, 299 (1964); *United States* v. *Morrison*, 529 U.S. 598, 612 (2000).

Plaintiff next contests the evidence that successful Section 2 cases by minority plaintiffs are more prevalent in the covered jurisdictions.  Pl.'s Reply Mem. 28-31.  Data presented to Congress revealed that during the period between the 1982 and 2006 Reauthorizations of Section 5, 56% of the Section 2 cases with outcomes favorable to minority plaintiffs were filed in the covered jurisdictions, which, in turn, had less than 25% of the nation's population.  See AG Mem. 68.  Plaintiff contends that about half of the African-American population lives in the covered jurisdictions, and thus that the number of Section 2 actions in these jurisdictions is proportionate.  Pl.'s Reply Mem. 30.  But because plaintiff's premise is wrong, its conclusion is also wrong.  In fact, in 2000, only 40% of non-Hispanic Blacks and 33% of all minorities resided within Section 5 covered jurisdictions.  See Brinegar Dec. ¶¶ 6-7.  In any event, regardless of the reason why there are more Section 2 actions in the covered jurisdictions, the concentration of these cases in those areas is nonetheless indicative of a higher level of voting discrimination there than in the remainder of the nation.

In addition, the Attorney General submitted the results of a more comprehensive study, which provided evidence regarding court-approved settlements, as well as reported decisions in all Section 2 cases nationwide.  When court-approved settlements are included, along with reported court decisions on liability, fully 81% of successful outcomes in Section 2 cases were brought in the covered jurisdictions during the relevant time period.  AG Mem. 68.  Plaintiff urges this court to disregard the Attorney General's study on the ground that it was not part of the legislative record.  Pl.'s Reply Mem. 28, 53 n.18.  As explained above, however, pp. 27-28, *supra*, there is no rule limiting this court's consideration to evidence that was before Congress.

Moreover, as explained in the McCrary Declaration, information about most of the cases underlying the study's results *was* part of the legislative record.  See McCrary Dec. ¶¶ 14, 21 & Att.  To compile as comprehensive a list of Section 2 cases in both covered and non-covered jurisdictions as possible, Dr. McCrary began with the two studies of Section 2 cases that were before Congress, then identified an additional 99 court-approved settlements in Section 2 cases in non-covered jurisdictions.  *Id*. at ¶¶ 14-21.  Of these 99 settlements, 61 were documented in the legislative record.  *Id.* at ¶ 21.  Thus, the more comprehensive study, which built upon and confirmed the results of the studies before Congress, is competent evidence of the existence of voting discrimination in the covered, as compared to the non-covered jurisdictions.

        4.  Plaintiff next contends that Section 3(c) of the VRA fails to cure any underinclusiveness in the coverage formula.  Pl.'s Reply Mem. 31-32.  Section 3(c) provides that a jurisdiction found to have violated the voting guarantees of the Fourteenth or Fifteenth Amendment may be subjected to the same preclearance requirements required by Section 5.  42 U.S.C. 1973a(c).  In *South Carolina*, 383 U.S. at 330-331, the Supreme Court specifically cited Section 3 as one of the remedies available for voting discrimination in the non-covered jurisdictions in response to the argument that the coverage formula was underinclusive.  Plaintiff nonetheless argues that recognizing Section 3(c) as a cure for underinclusiveness would permit Congress to "randomly select jurisdictions for coverage, but then immunize such random selection from constitutional scrutiny through bail-in."  Pl.'s Reply Mem. 31.  But this contention is nonsensical.  Congress did not randomly select jurisdictions for Section 5 coverage.  Rather, it chose to continue coverage for those jurisdictions with the worst historical records of voting discrimination, after finding that discrimination persisted in those jurisdictions and that Section 5 was still needed in those jurisdictions.  See p. 29, *supra*; AG Mem. 5-6, 65.

5.  Plaintiff  next contends that the bailout provision – which permits jurisdictions that have not engaged in voting discrimination for a period of ten years to terminate coverage under Section 5 – fails to cure any overinclusiveness in the coverage formula.  Pl.'s Reply Mem. 32-33; see 42 U.S.C. 1973b(a)(1).  Plaintiff first argues that this provision does not actually terminate coverage because the declaratory judgment terminating coverage may be reopened during a ten year period if there is evidence that the jurisdiction has engaged in voting discrimination.  42 U.S.C. 1973b(a)(5); see Pl.'s Reply Mem. 32.  Contrary to plaintiff's characterization, however, Section 5 coverage is terminated during this 10-year period because the jurisdiction is relieved of the requirement that it submit voting changes for preclearance.  Moreover, the mere possibility that the declaratory judgment might be vacated if the jurisdiction engages in voting discrimination is hardly an undue burden.[11]

Plaintiff also complains that the original requirements for bailout were "much simpler and more straightforward" than the present criteria.  Pl.'s Reply Mem. 32.  But the original requirement – that the jurisdiction prove that it had not used a test or device with the purpose or effect of denying or abridging the right to vote on account of race or color during the previous 5 years – stretching back to before passage of the Act – was nigh impossible for the covered jurisdictions to meet, since nearly all of them had, in fact, used tests and devices to disenfranchise minority voters during the relevant time period.  See *South Carolina*, 383 U.S. at 329-330.  Under this standard, the only jurisdictions that could and did bail out were those that could show they should not have been covered in the first place because they did not discriminate at the time the Act was passed.  Indeed, when Congress amended the bailout

---

[11]  Since 1965, bailout has been rescinded pursuant to this provision in only one case. See AG Mem. 72; Supp. Berman Dec., Att. A., Bailout Cases Before Aug. 5, 1984, ¶ 8; *City of Rome*, 446 U.S. at 199 n.8.

provision in 1982, it did so to make bailout a realistic option for all covered jurisdictions based on their record of recent behavior and to provide an incentive to covered jurisdictions to comply fully with the Act.  See 1982 House Report 32.  As explained previously (AG Mem. 71), the current bailout criteria correspond closely to the very purpose of the preclearance requirement.  It is thus appropriate to require jurisdictions seeking to terminate coverage to satisfy those criteria.

Finally, plaintiff disputes the data submitted by the Attorney General on the numbers of jurisdictions that have successfully bailed out and the information submitted regarding the workings of the bailout process.  Pl.'s Reply Mem. 33 n.8.  Plaintiff contends, first, that the numbers differ from those submitted to the district court in the *Northwest Austin* litigation in May 2007.  But this is not surprising since several jurisdictions have sought and achieved bailout in the intervening years.  Indeed, the Supreme Court's decision in that case significantly expanded the number of jurisdictions eligible to seek bailout.  See *Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 129 S. Ct. 2504, 2514 (2009).  Covered jurisdictions have responded accordingly, seeking to bailout in increasing numbers.  It simply is no longer true that the only jurisdictions to bail out are counties or independent cities in Virginia.  Supp. Berman Dec. ¶¶ 7-9 & Att. A, Bailout Cases After Aug. 5, 1984, ¶¶ 19-21.  Plaintiff also contends that this court should simply ignore the updated data and other information about bailout submitted by the Attorney General because it was not a part of the legislative record.  Pl.'s Reply Mem. 53 n.18.  But turning a blind eye to current information indicating how the bailout process actually works, see AG Mem. 70-73, is neither required as a matter of law nor appropriate, see pp. 27-28, *supra*.

The bailout provision remedies any overbreadth in the coverage formula by providing a workable mechanism to enable jurisdictions that do not discriminate to terminate coverage under Section 5.  See AG Mem. 69-74.

Congress's decision to continue application of Section 5 preclearance to the covered jurisdictions was appropriate enforcement legislation.

**CONCLUSION**

The Attorney General's cross-motion for summary judgment should be granted and plaintiff's motion for summary judgment should be denied.

Date:  January 14, 2011                          Respectfully submitted,


RONALD C. MACHEN, JR.                    THOMAS E. PEREZ
  United States Attorney                     Assistant Attorney General
  District of Columbia                      SAMUEL R. BAGENSTOS
                                         JULIE A. FERNANDES
                                           Deputy Assistant Attorneys General

                                          _/s/ Linda F. Thome_
                                         T. CHRISTIAN HERREN, JR.
                                         DIANA K. FLYNN
                                         RICHARD DELLHEIM (lead counsel)
                                         LINDA F. THOME
                                         ERNEST A. MCFARLAND
                                         JARED M. SLADE
                                         JUSTIN WEINSTEIN-TULL
                                           Civil Rights Division
                                           U.S. Department of Justice
                                           950 Pennsylvania Avenue, N.W.
                                           NWB-Room 7264
                                           Washington, D.C. 20530
                                           Telephone: (202) 305-1734
                                           Facsimile: (202) 307-3961

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 14, 2011, I served a true and correct copy of the foregoing Attorney General's Consolidated Reply Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment, and accompanying exhibits, via the Court's ECF filing system to the following counsel of record:

William S. Consovoy
Thomas R. McCarthy
Brendan J. Morrissey
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
Phone: (202) 719-7434
Fax: (202) 719-7049
*Counsel for Plaintiff*

Arthur B. Spitzer
American Civil Liberties Union
1400 20th Street, NW
Suite 119
Washington, DC 20036-5920
Phone: (202) 457-0800 x113
Fax: (202) 452-1868
*Counsel for Movant-intervenors*

Kristen M. Clarke
NAACP Legal Defense
& Education Fund, Inc.
1444 Eye Street, NW
10th Floor
Washington, DC 20005
Phone: (202) 682-1300
Fax: (202) 682-1312
*Counsel for Movant-intervenors*

                                        */s/ Richard Dellheim*
                                        Richard Dellheim
                                        Voting Section
                                        Civil Rights Division
                                        U.S. Department of Justice
                                        950 Pennsylvania Avenue, N.W.
                                        Washington, D, C, 20530
                                        (202) 305-1734