**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHELBY COUNTY, ALABAMA<br><br>        Plaintiff,<br><br>    v.<br><br>ERIC H. HOLDER, JR., in his official capacity<br>as Attorney General of the United States of<br>America, *et al.*,<br><br>        Defendants. | Civil Action No. 1:10-CV-651<br>(JDB) |

**REPLY BRIEF IN SUPPORT OF DEFENDANT-INTERVENOR
BOBBY LEE HARRIS' MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I.   Introduction

Congress based its 2006 decision to reauthorize Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, upon detailed findings that Section 5 remains necessary in the covered jurisdictions to remedy and prevent racial discrimination affecting the right to vote.

Plaintiff's case rests upon the extreme theory that Section 5 could not constitutionally be reauthorized unless Congress was presented with pervasive findings that, to the same extent as in 1965, covered jurisdictions persist in intentionally denying minority persons the opportunity to register to vote and cast ballots, on the basis of race.  Plaintiff asserts that this novel test is a consequence of the Supreme Court's decisions in *City of Boerne v. Flores*, 521 U.S. 507 (1997), and subsequent cases applying *Boerne*, and that Congress exceeded its powers because the legislative record before Congress does not pass this test.

Plaintiff's case fails because the facts and conclusions upon which Congress based its 2006 reauthorization require the Court to rule against Plaintiff as a matter of law, both under the Supreme Court's Section 5 decisions in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), and *City of Rome v. United States*, 446 U.S. 156 (1980), as well as under the Court's *Boerne* line of decisions.  For purposes of this case there is no meaningful distinction between these lines of authority.  First, the *Boerne* cases repeatedly cited with approval to the holdings in *Katzenbach* and *City of Rome*, and *Katzenbach* and *Rome* specifically require a deferential, "rational means" review in assessing Congress' Fifteenth Amendment enforcement authority.

Moreover, the *Boerne* cases have relied heavily on the teaching of *Katzenbach* and *Rome* that "[t]he constitutional propriety" of legislation enacted pursuant to the Civil War Amendments "must be judged with reference to the historical experience which [the legislation] reflects," 383 U.S. at 308, and have made this a central part of the *Boerne* analytic framework.  *E.g.*, *Boerne*,

521 U.S. at 530.  In so doing, the *Boerne* cases have cited to, and approved, the historical

analysis conducted in *Rome*, where the Court relied on the post-1965 history of Section 5

enforcement to hold that Congress had appropriately acted under the Fifteenth Amendment in

reauthorizing Section 5 in 1975.  That analysis, in turn, governs this Court's review of the

legislative record underlying the 2006 reauthorization and, contrary to the arguments put forward

by Plaintiff, *Rome* specifically recognized Congress's authority, in reauthorizing Section 5, to

rely on the full range of voting discrimination and types of voting practices covered by Section 5.

The record Congress compiled in 2005 and 2006 includes numerous instances of voting

discrimination prevented by Section 5, together with extensive indicia of the potential for future

discriminatory conduct.   This record demonstrates, as the Supreme Court has posed the issue,

that Section 5's "current burdens . . . [are] justified by current needs," and that Section 5's

"disparate geographic coverage [remains] sufficiently related to the problem that it targets."  *Nw.*

*Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2512 (2009).   As a matter of law,

therefore, this Court must deny Plaintiff's claims and enter summary judgment upholding the

constitutionality of the 2006 reauthorization.[1]

## I.   "Rational Means" Remains the Standard of Review

In *South Carolina v. Katzenbach*, *supra*, and *City of Rome v. United States*, *supra*, the

two primary Supreme Court decisions upholding the constitutionality of Section 5 of the Voting

Rights Act, the Court grounded its rulings on what the Court declared is the "one fundamental

principle" of Fifteenth Amendment jurisprudence:  "As against the reserved powers of the States,

Congress may use *any rational means* to effectuate the constitutional prohibitions of racial

---

[1] Defendant-Intervenor Harris does not concede that this Court is required to conduct its review according to the *Boerne* framework.  For purposes of establishing that Plaintiff is not entitled to relief on its claim, however, this Reply Brief addresses the record in terms of the governing *Katzenbach/Rome* decisions, and in terms of the *Boerne* doctrine.

discrimination in voting."  *Katzenbach*, 383 U.S. at 324 (emphasis added); *accord*, *City of Rome*, 446 U.S. at 174-75.[2]

        In its attack on the constitutional underpinnings of Section 5, Plaintiff ignores *Katzenbach's* and *City of Rome's* reliance on this "fundamental principle."  In particular, since *City of Rome* is the principal case in which the Supreme Court has addressed the analysis required when the constitutionality of a Section 5 reauthorization is challenged, this Court is obligated to apply the same deferential review to Congress' 2006 reauthorization that the Supreme Court applied to Congress' 1975 reauthorization of Section 5.  *See Nw. Austin Mun. Util. Dist. No.One  v. Mukasey*, 573  F. Supp. 2d 221, 241 (D.D.C. 2008).  Plaintiff's studious avoidance of this standard of review is a glaring omission.

        Rather than address *Katzenbach* and *City of Rome*, Plaintiff attempts to rebut the "rational means" standard by mischaracterizing the Supreme Court's reading of *Katzenbach v. Morgan*, 384 U.S. 641 (1966), in *City of Boerne v. Flores, supra*.  Response Br. at 12-13, n. 3.  Plaintiff argues that *Boerne* rejected a "rational means" reading of *Morgan*, and that therefore that standard of review does not apply here.[3]  This argument is mistaken not only because Plaintiff neglects *Katzenbach* and *City of Rome* in favor of tilting at *Morgan,* but also because *City of Boerne* in fact did not hold what Plaintiff claims.  The reading of *Morgan* that the Supreme Court rejected in *City of Boerne* did not concern the standard of review for the legislative means selected by Congress, but rather the possibility that *Morgan* "acknowledg[ed] a power in

---

[2] *See also Oregon v. Mitchell*, 400 U.S. 112, 132-33 (opinion of Black, J.), 144-47 (opinion of Douglas, J.), 216-17 (opinion of Harlan, J.), 231-36 (opinion of Brennan, White, and Marshall, JJ.), 282-84 (opinion of Stewart, J., joined by Burger, C.J., and Blackmun, J.) (1970) (unanimously upholding Congress' nationwide five-year ban on literacy tests, adopted in 1970, based on Congress' determination that it was a rational means for remedying racial discrimination in voting).

[3] In *Morgan*, the Supreme Court upheld a different provision of the Voting Rights Act, Section 4(e), 42 U.S.C. § 1973b(e), which prohibits the use of English-only elections for persons educated in American flag schools in Puerto Rico.

Congress to enact legislation that expands the rights contained in § 1 of the Fourteenth Amendment." 521 U.S. at 527-28. That is to say, in *Boerne* the Supreme Court rejected congressional power to define the *ends* of Fourteenth Amendment legislation; it did not address the continued force of the "rational means" standard of review employed in *Katzenbach* and *City of Rome*.

The *Boerne* cases provide no support for Plaintiff's demand that this Court extend less deference to Congress' findings, or credit a narrower range of evidence, than the Supreme Court did in *City of Rome*. Those cases cited with approval to *Katzenbach* and *City of Rome*; they did not disavow or cast doubt on the "rational means" test employed in both cases. *E.g.*, *Tennessee v. Lane*, 541 U.S. 509, 518-19 n.4 (2004); *City of Boerne*, 521 U.S. at 518, 525-27.[4]

## II. Section 5 Must be Upheld Based on *Katzenbach/Rome*, and the Same Result Would Occur Applying the *City of Boerne* Cases

### A. The Right to Vote Free From Racial Discrimination is a Core Constitutional Right Explicitly Protected by the Fifteenth Amendment

There is no dispute in this case that the Fifteenth Amendment explicitly provides a right to vote free from governmental racial discrimination, which Congress may act to enforce. "The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy … not to be discriminated against as voters in elections to determine public

---

[4] Plaintiff also makes the contradictory assertion that *City of Boerne* both reaffirmed and rejected the application of *McCulloch v. Maryland*, 4 Wheat. 316, 421 (1819), to the Civil War Amendments. Response Br. at 12-14. The first assertion is correct: *Boerne* cited with approval to *McCulloch*, 521 U.S. at 516, as well as to *Ex parte Virginia* 100 U.S. 339, 345-46 (1879), *id.* at 517-18 (the case in which the Court first applied *McCulloch* to the Civil War Amendments). The latter assertion is wrong: the Supreme Court affirmed in both *Katzenbach* and *City of Rome* that Congress' Fifteenth Amendment authority is "no less broad than its authority under the Necessary and Proper Clause," *City of Rome*, 446 U.S. at 175, and that the "classic formulation" of that authority set forth in *McCulloch* is "[t]he basic test to be applied in a case involving § 2 of the Fifteenth Amendment." *Katzenbach*, 383 U.S. at 326. Nothing in *Boerne* suggested that the Court, without saying so, overruled *Ex parte Virginia*, *Katzenbach*, and *City of Rome* in this regard. Plaintiff asserts that *Boerne* rejected the *McCulloch* formulation in the process of addressing the legislative history of the Fourteenth Amendment. 521 U.S. at 520-24. As with its discussion of *Morgan*, Plaintiff mistakes the Supreme Court's review of the ends of Fourteenth Amendment legislation as a rejection of deference to Congress' choice of the appropriate means to achieve a constitutionally valid remedial objective.

governmental policies or to select public officials, national, state, or local." *Terry v. Adams,* 345 U.S. 461, 467 (1953).

This corresponds with, and clearly satisfies, the requirement under the *Boerne* cases to identify the constitutional right at issue.  "The first step of the *Boerne* inquiry requires us to identify the constitutional right or rights that Congress sought to enforce . . . ." *Tennessee v. Lane*, 541 U.S. at 522.

Plaintiff mistakenly claims that Congress misread the nature and scope of the Fifteenth Amendment by relying on vote dilution concerns as one of the bases on which to reauthorize Section 5.  Response Br. at 47-50.  The Fifteenth Amendment, however, expressly prohibits not only the outright "denial" of the right to vote on account of race or color, but also its "abridgement."  Moreover, in upholding the 1975 reauthorization of Section 5 based on the Fifteenth Amendment, the Supreme Court in *City of Rome* specifically found that Congress had properly reauthorized Section 5 based on the concern that covered jurisdictions would continue to enact discriminatory "measures   . . . [to] dilute increasing minority voting strength."  446 U.S. at 181 (quoting the 1975 House Report).[5]  This holding in *Rome* followed directly from the Supreme Court's prior Section 5 ruling in *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969). There, the Court reaffirmed that "[t]he [Voting Rights] Act was drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens," *id.* at 556, and held that voting changes with the potential to dilute minority voting strength are covered under Section 5 because "[t]he right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot," and thus "[t]his type of change could . . . nullify [minority

---

[5] As Congress further explained in the 1975 House Report, "[s]uch . . . measures may include switching to at-large elections, annexations of predominantly white areas, or the adoption of discriminatory redistricting plans."  H.R. Rep. No. 94-196 (1975), at 10.

voters'] ability to elect the candidate of their choice just as would prohibiting some of them from voting." *Id.* at 569.[6]

### B. Congress Properly Found that Section 5 Has Prevented and Deterred Discrimination and Is Still Needed for These Purposes

Congress, in reauthorizing Section 5 in 2006, compiled an extensive legislative record which examined "the historical experience which [Section 5] reflects," *Katzenbach*, 383 U.S. at 308, and the nature "of the evil presented," *Boerne*, 521 U.S. at 530.  And, in accord with *City of Rome*, Congress focused that historical review upon the implementation of Section 5 that had occurred after the most recent previous reauthorization, in 1982.  446 U.S. at 180-82.

Based on this review, Congress found that "instances of discrimination and efforts to discriminate against minority voters continue" in covered jurisdictions, H.R. Rep. No. 109-478, at 25 (2006), that allowing Section 5 to expire would "jeopardize 40 years of progress made by minority citizens," *id.* at 57, and that "the substantial volume of evidence warranting [reauthorization] . . . far exceeds the quantum of evidence found adequate in other contexts . . . to justify Congressional action to remedy discrimination." *Id.*

These findings, in turn, were based upon an extensive evidentiary record that included, but was not limited to, the hundreds of instances in which Section 5 blocked voting changes with a discriminatory purpose. Congress also found substantial probative evidence in retrogressive

---

[6]Plaintiff also challenges Congress' reliance on the Fifteenth Amendment by making a cursory claim that Congress, in the 2006 reauthorization, improperly sought to guarantee minority electoral success and thus insert racial considerations into redistricting decisions.  Response Br. at 50-51.  Plaintiff  is referring to Congress' inclusion in the 2006 enactment of an amendment that re-adopts the discriminatory "effect" analysis that had been applied for 27 years by the District of Columbia District Court and the Attorney General before the Supreme Court's decision in *Georgia v. Ashcroft*, 539 U.S. 461 (2003).  H.R Rep. No. 109-478, at 68-72 (2006).  That analysis did not guarantee minority electoral success; rather, it prohibited covered jurisdictions from reducing the *pre-existing* opportunity for minority voters to elect their preferred candidates, based upon a case-by-case analysis of all relevant electoral factors.  Revision of Procedures for the Administration of Section 5, 52 Fed. Reg. 486, 488 (Jan. 6, 1987) ("any determination of retrogression must go beyond a simple numerical analysis and include the consideration of all the factors that could be relevant to an understanding of the impact of the change.").   In *Ashcroft*, the Court simply modified the focus of the pre-existing inquiry to add consideration of other electoral opportunities (including the ability to "influence" election outcomes), 539 U.S. at 482-85, and Plaintiff has offered no basis for concluding that covered jurisdictions will consider race any differently under the two versions of the "effect" standard.

voting changes that, under *Beer v. United States*, 425 U.S. 130, 141 (1976), violated Section 5 by having "the effect of denying or abridging the right to vote on account of race, color, or [language minority status]," 42 U.S.C. § 1973c(a); in Section 5's deterrent effect; in covered jurisdictions' noncompliance with the preclearance requirement; in widespread  racially polarized voting; in successful actions under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973; and in the dispatch of federal observers. *See* Harris Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment [Doc. 56], at 32-41 ("Harris Br.").

Plaintiff, on the other hand, argues that Congress' evaluation of the record of discrimination could not reach beyond findings that the covered jurisdictions engaged in intentional voting discrimination after 1982 of the same type that existed prior to 1965.  Plaintiff variously asserts, depending upon what class of evidence it is trying to impeach, that such findings may only take the form of final judicial judgments, and that they may only concern prohibitions on registering to vote and casting a ballot.  Thus, Plaintiff seeks to deny Congress the ability to legislate based on the actual "historical experience" of Section 5 enforcement that followed the 1982 reauthorization of Section 5.

1. **This Court must credit all legislative record evidence relating to the risk of continuing discrimination prohibited by Section 5.**

Plaintiff's general contention that Congress could only consider findings of intentional discrimination is flatly contradicted by the Supreme Court's decision in *City of Rome*.  There, the Court upheld the 1975 reauthorization by reviewing the record of post-Act discrimination Congress relied on – which was not restricted to findings of intentional discrimination – and did not discuss whether, or to what extent, that record demonstrated a pattern of ongoing intentional voting discrimination.  The record of discrimination specifically mentioned by the *Rome* Court

that justified reauthorization was: (1) the number and nature of the objections imposed by the Attorney General; (2) disparities in minority and white registration rates; (3) the disproportionately low number of minority election officials; and (4) the 95 years of pervasive voting discrimination that preceded the enactment of the Voting Rights Act. *City of Rome*, 446 U.S. at 180-82. Indeed, the preclearance dispute that was before the Court in *Rome* dealt solely with whether the City of Rome's voting changes violated the Section 5 effect standard. 446 U.S. at 183. Accordingly, Plaintiff's single-minded focus on voting changes that had a discriminatory purpose cannot be reconciled with the Court's review in *Rome*.

Plaintiff argues that a Section 5 reauthorization can only be justified by post-1965 discrimination identical to that in *Katzenbach*. Response Br. at 34-37. That is wrong. *Katzenbach* upheld Section 5 only a few months after its initial enactment, and it did not address the types of evidence Congress might rely on in reauthorizing Section 5 in the future. Instead, it was in *City of Rome* that the Court addressed the nature and scope of the historical information that may support a reauthorization of Section 5. Moreover, *Katzenbach* clearly supports the Court's deference to Congress' evidentiary choices in *City of Rome*. *See Katzenbach*, 383 U.S. at 330 ("In identifying past evils, Congress obviously may avail itself of information from *any probative source*.") (emphasis added).[7]

---

[7] Plaintiff wrongly asserts that *City of Rome* may be disregarded as a mere reiteration of *Katzenbach*. Response Br. at 36-37. Plaintiff's claim is that *Rome* upheld the 1975 reauthorization based on the "same kind of evidence" cited by *Katzenbach* to uphold the 1965 enactment of Section 5, Response Br. at 36, and that *City of Rome* largely relied on the 1965 legislative record of intentional discrimination. *Id.*. at 36-37. This is misleading and incorrect. What Plaintiff conspicuously ignores is that *City of Rome* found that Congress' reauthorization decision was substantially based on its examination of "information on the number and types of submissions made by covered jurisdictions and the number and nature of objections interposed by the Attorney General." 446 U.S. at 180. That "kind of evidence," of course, could not have been the basis for the *Katzenbach* decision, and it was precisely that evidence which demonstrated that there was a post-Act history of purposeful and effect-based discrimination, and it was that evidence which the Court thought unnecessary to parse to isolate indicia of intentional discrimination. In addition, while *Rome* and *Katzenbach* both examined evidence relating to minority voter registration, the nature of that evidence in the two cases was entirely different; while *Katzenbach* cited to the systematic pre-Act denial of the opportunity to register and vote, *Rome* found that "largely as a result of the Act, Negro voter registration had improved dramatically since 1965." *Id.*

As noted by Plaintiff, Response Br. at 3, the *Boerne* cases have required that the historical record demonstrate a pattern of unconstitutional conduct.  *E.g., Lane*, 541 U.S. at 523-24.  However, for several reasons, that does not require that this Court restrict the legislative record to evidence of intentional discrimination in voting.

First, as noted above, the *Boerne* cases have cited with approval to the historical analysis relied upon by the Court in *Rome*, which did not involve any search for a pattern of post-Act unconstitutional conduct by covered jurisdictions.

Second, the fact that the Fifteenth Amendment is a core constitutional protection that triggers the highest level of scrutiny is crucial to considering the manner in which the *Boerne* cases might apply to a Section 5 reauthorization.  This is because the *Boerne* framework is highly sensitive to the nature of the constitutional protection being remedied.  As the Supreme Court observed in *Lane* in discussing its past *Boerne* decisions: "We explained [in *Hibbs*] that because the FMLA was targeted at sex-based classifications, which are subject to a heightened standard of judicial scrutiny, 'it was easier for Congress to show a pattern of state constitutional violations' than in *Garrett* or *Kimel*, both of which concerned legislation that targeted classifications subject to rational-basis review." 541 U.S. at 528-29 (quoting *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 735-37 (2003)).[8]

---

[8]  Indeed, a case-by-case review of the post-*Boerne* decisions and *Boerne* bear out the proposition that the nature of the right at issue has a strong bearing on whether the challenged legislation is upheld.  The Court in *Tennessee v. Lane* upheld Title II of the ADA, as it applies to access to the courts, where Congress sought to enforce "basic constitutional guarantees, infringements of which are subject to more searching judicial  review," including due process, Sixth Amendment, and First Amendment rights.  541 U.S. at 522-23.  Similarly, in *Hibbs* the Court upheld the Family and Medical Leave Act, which sought to "protect the right to be free from gender-based discrimination in the workplace," and thus addressed "classifications . . . subject to heightened scrutiny."  538 U.S. at 728.

On the other hand, in all the cases in which the Court concluded that the Fourteenth Amendment did not support Congress' enactment of particular civil rights remedies, the Court found that Congress either was seeking to enforce a constitutional right that was relatively insubstantial or had misapprehended the nature of the right in question.  *See Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (Fourteenth Amendment does not require "special accommodations for the disabled, so long as [States'] actions towards such individuals are rational."); *United States v. Morrison*, 529 U.S. 598, 621-25  (2000) (Congress sought to remedy gender discrimination by private individuals, which is not regulated by the Fourteenth Amendment); *Kimel v. Fla. Bd. of Regents,* 528 U.S.

Indeed, in *Hibbs* and *Lane*, the two *Boerne* cases where Congress passed legislation targeting state action that triggered an elevated level of constitutional scrutiny, the Supreme Court relied upon a substantial amount of indirect evidence to find a pattern of unconstitutional conduct. In *Lane*, the Court relied heavily on a survey conducted regarding access to public buildings across the country, and testimony of individual persons with disabilities regarding their experiences, to conclude that the pattern of disability discrimination had persisted to the present day. *Lane*, 541 U.S. at 527.[9]  And the Court in *Lane* also observed that the pattern of discrimination found sufficient in *Hibbs* "contained little specific evidence of a pattern of unconstitutional discrimination on the part of the States," but instead the evidence before Congress "related primarily to the practices of private-sector employers and the Federal Government." *Id.* at 527 n.16.[10]

Third, the nature of the constitutional challenge presented here is different, in one fundamental respect, from the constitutional challenges addressed in the *Boerne* cases.  Plaintiff here is disputing Congress' authority to reauthorize a civil rights remedy whose constitutionality has repeatedly been upheld, whereas the *Boerne* cases all dealt with the enactment of new civil

---

62,  83-84 (2000) (the Fourteenth Amendment allows States to "discriminate on the basis of age . . . if the age classification" is rational; States may rely on "broad generalizations with respect to age"); *City of Boerne*, 521 U.S. at 512-16 (Congress sought to apply the Supreme Court's *Sherbert* test to neutral laws of general applicability that incidentally burden the free exercise of religion although the Court had held this test inapplicable to such laws).

[9]  The Supreme Court in *Lane* summarized the pattern of unconstitutional conduct in the case before it as "judicial findings of unconstitutional state action, and statistical, legislative, and anecdotal evidence of the widespread exclusion of persons with disabilities from the enjoyment of public services." *Lane*, 541 U.S. at 528.

[10] Thus, the analysis in *Hibbs* and *Lane* reflects that when, as here, the statute at issue is designed to protect a core constitutional right, the *Boerne* analysis is akin to rational basis review.  This is understandable because there is a reduced danger that Congress is overstepping its bounds by attempting to "determine *what constitutes* a constitutional violation," *Kimel*, 528 U.S. at 81 (quoting *Boerne*, 521 U.S. at 519) (emphasis in original), when it is enforcing a right that the Court has found  merits heightened constitutional protection.

rights remedies.[11]  The Supreme Court's prior Section 5 decisions already have established that Section 5 enforces a valid constitutional protection and that its initial enactment and subsequent reauthorization were constitutional.  None of the *Boerne* cases to date had a comparable judicial predicate, and the Supreme Court therefore fashioned its analysis in those cases – specifically the "second step" – to ensure that the challenged laws were remedial measures and not substantive redefinitions of the Fourteenth Amendment.  That question has been asked and answered with respect to Section 5.

In addition, because the *Boerne* cases did not consider reauthorized provisions, Congress by definition had no record in those cases of blocked or deterred discrimination to consider, whereas Section 5 has an extensive record of such successes.[12]  Plaintiff nonetheless proposes to permit Congress to reauthorize an existing remedy only if there continues to exist, unabated, the same amount and type of discrimination that prompted enactment of the remedy in the first place.  Such a rule is nonsensical on its face, since it would prevent Congress from reauthorizing civil rights statutes that have successfully blocked or deterred unconstitutional conduct.  To negate the authority of Congress to re-enact successful remedial statutes would open the door to even more widespread discriminatory conduct.[13]

---

[11] *Tennessee v. Lane, supra* (Title II of the Americans with Disabilities Act); *Nev. Dep't of Human Res. v. Hibbs, supra* (Family and Medical Leave Act); *Bd. of Trustees of the Univ. of Ala. v. Garrett, supra* (Title I of the Americans with Disabilities Act); *Kimel v. Fla. Bd. of Regents, supra* (Age Discrimination in Employment Act); *United States v. Morrison, supra* (Violence Against Women Act); *City of Boerne, supra* (Religious Freedom Restoration Act).

[12] In both *Lane* and *Hibbs*, the Court noted that prior legislative efforts by Congress to address the "evil presented" had been unsuccessful and thus the pattern of unconstitutional conduct had persisted.  *Lane*, 541 U.S. at 526; *Hibbs*, 538 U.S. at 729-30.  Thus, the Court recognized that successful legislative remedies will necessarily minimize the continuing incidence of unconstitutional conduct, but the Court hardly was saying that this in turn should preclude Congress from having the authority to maintain such remedies in place.

[13] Indeed, while *Boerne* itself did not raise the deterrence question since the Court was reviewing a new enactment, the Court was careful to note the potential relevance of deterrence in conducting an analysis of whether a particular civil rights remedy is constitutional.  521 U.S. at 532.

**2.   Congress was not required to rely on judicial findings of discrimination.**

In *Katzenbach* itself, the Supreme Court specifically approved of Congress' reliance on evidence beyond judicial findings.  Thus, in addressing the constitutionality of the Section 5 coverage formula, the Court noted Congress had relied on judicial findings of discrimination in three covered States, but for three others had relied on "evidence of recent voting discrimination mainly adduced by the Justice Department and the Civil Rights Commission."  *Katzenbach*, 383 U.S.  at 329-30.

Plaintiff claims that Congress was precluded from relying on Section 5 objections because they are not interposed after a trial or other hearing.  Response Br. at 58.  But in *City of Rome* the Supreme Court emphasized the probative value of "'recent objections entered by the Attorney General,'" 446 U.S. at 181 (quoting the 1975 House Report), terming Congress' reliance on the objections a "ringing endorsement" of the continuing need for Section 5.  *Id.*[14]

Similarly, the *Boerne* cases upholding congressional legislation did not hinge exclusively, or even primarily, on judicial findings as the basis for concluding that a history of unconstitutional conduct supported Congress' decision that prophylactic legislation was appropriate.  *Supra* at 10 (discussing the evidence relied upon in *Lane* and *Hibbs*).

---

[14] Although the Attorney General's administrative reviews are not conducted as adversarial proceedings, the Attorney General conducts these reviews pursuant to a detailed set of procedures included in the Code of Federal Regulations.  Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. pt 51.

**3.   Section 5 appropriately reaches voting conduct with either a discriminatory purpose or a discriminatory effect.**

Section 5 always has prohibited voting changes that have either a discriminatory "purpose" or a discriminatory "effect."   In 2006 Congress relied heavily upon evidence of hundreds of Section 5 objections since 1982 for its findings of continued voting discrimination and the current for Section 5.  While Plaintiff erroneously argues that Section 5 objections generally are irrelevant because they are not judicial findings, even Plaintiff does not appear to dispute that Section 5 objections finding discriminatory purpose are generally probative to Congress' review (as noted in the prior Harris brief, over 400 post-1982 objections citing purpose were before Congress; Harris Br. at 34).[15]

Plaintiff, furthermore, makes no mention at all of the approximately 250 post-1982 objections (see *id.*) that cited retrogression but not discriminatory purpose.  Retrogression is a valid basis for objections under the statute, and Congress would have been remiss had it *not* considered such evidence, because it may represent backsliding by jurisdictions with histories of intentional discrimination and because it is indicative of the potential for future intentional discrimination.

In *City of Rome*, the Supreme Court not only upheld the reauthorization of Section 5 generally, but specifically affirmed that the Section 5 effect standard appropriately prohibited

---

[15] Plaintiff does argue that some classes of purpose objections must be discounted, but these arguments are misplaced.  For example, Plaintiff argues that because the Supreme Court reinterpreted the purpose standard in *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 341 (2000), non-retrogressive purpose objections should be ignored.  Response Br. at 59.  Such objections were not invalidated, however, since they applied the governing law at the time they were interposed.  Moreover, Congress re-instituted the pre-*Bossier Parish* purpose standard in the 2006 reauthorization, a standard that is co-extensive with the constitutional purpose requirement. H.R. Rep. No. 109-478 (2006), at 66-68.  In sum, the post-1982, pre-*Bossier Parish* purpose objections continue to provide evidence of intentional racial discrimination in voting by covered jurisdictions.

Plaintiff also argues again in its Response Brief, at 59-60, that some unspecified number of purpose objections should be discounted because of the Supreme Court's finding in *Miller v. Johnson*, 515 U.S. 900 (1995), that a few specific objections to the State of Georgia's post-1990 congressional redistricting plan were the product of a wrongful effort by the Attorney General to maximize minority voting strength.  This claim was fully addressed in the prior Harris brief.  Harris Br. at 36.

covered jurisdictions from implementing retrogressive voting changes.  446 U.S. at 177-78.
*Rome* held that Congress properly prohibited voting changes that have a discriminatory effect in
order to prevent backsliding by covered jurisdictions that have a long history of intentional
discrimination in voting.  *Id.  See also LULAC v. Perry*, 548 U. S. 399, 440 (2006) (evidence that
congressional redistricting plan violated the Section 2 results standard also indicated that the plan
bore "the mark of intentional discrimination that could give rise to an equal protection
violation"); and *compare Thornburg v. Gingles*, 478 U.S. 30, 44-45, 48-51 (1986) *with Rogers v.
Lodge*, 458 U.S. 613, 622-27 (1982) (similarity between Section 2 results factors and factors that
may establish discriminatory purpose)..

     *Rome* therefore established – if put in terms of *Boerne* – that the Section 5 "effect"
remedy is "congruent" to the harms the statute seeks to address.  *Boerne* provides no reason to
conclude that objections blocking such backsliding are not probative of the current need for
Section 5.  *See Boerne*, 521 U.S. at 532 (approving the *Rome* holding).

     Because Congress is entitled to prohibit voting changes with a discriminatory effect, it
would be perverse to prevent Congress from taking the incidence of such objections into account
during a reauthorization.

     **4.  Plaintiff misapplies a federalism argument to this case.**

     Plaintiff also mistakenly argues that federalism concerns require this Court to apply the
*Boerne* test in the manner Plaintiff is urging.  Plaintiff contends that "Section 5 uniquely
interferes with the machinery of local government and targets a function of governance that the
Constitution specifically insulated from federal encroachment: the regulation of state and local
elections."  Response Br. at 16.  Plaintiff's real complaint is against the Fifteenth Amendment

itself, which specifically "supersedes contrary exertions of state power." *Katzenbach*, 383 U.S. at 325.[16]

The federalism aspect of this case, as the Supreme Court stated in *Nw. Austin*, is that the pre-implementation federal review of proposed voting changes constitutes a federalism "burden" that requires the 2006 reauthorization be grounded on "current needs." 129 S. Ct. at 2512. The Supreme Court has thrice upheld Section 5 against claims that it violates principles of federalism, *Lopez v. Monterey County*, 525 U.S. 266, 282-85 (1999); *City of Rome*, 446 U.S. at 179-80; *Katzenbach*, 383 U.S. at 323-25, and Plaintiff's decades-old federalism objection provides no new basis to question the preclearance remedy.[17]

### 5. Congress' reliance on dilution evidence is fully consistent with the terms of Section 5.

Lastly, Plaintiff seeks to evade the post-1982 "historical experience" on which Congress relied in 2006 by arguing that the Section 5 remedy itself requires that this Court disregard all but a narrow subset of the voting practices covered by Section 5.[18] Specifically, Plaintiff claims that Congress could not consider vote dilution concerns in 2006 because of an alleged "mismatch" between that evidence and the basis for the initial Section 5 coverage determinations. This claim falls under its own weight.

---

[16] Plaintiff relies upon *Oregon v. Mitchell*, 400 U.S. 112, 125 (1970) (Justice Black's separate opinion, concerning Congress' effort to regulate the minimum age for voting), and *Gregory v. Ashcroft*, 501 U.S. 452 (1991) (concerning Congress' regulation of the retirement age for state court judges). Response Br. at 16. Those cases, however, concerned Congress' constitutional authority to regulate age discrimination (which is not based upon the Fifteenth Amendment and does not involve a constitutional concern which triggers heightened judicial scrutiny), and therefore implicated a different analysis as to the scope of congressional authority as against the States. Plaintiff does not cite the portion of *Oregon v. Mitchell* in which the Court unanimously upheld, under the Fifteenth Amendment, Congress' "regulation of state and local elections" by imposing a five-year, nationwide ban on the use of any voter registration test or device for registering for federal, state, or local elections. See fn.2 *supra*.

[17] Neither *Lopez*, which was decided two years after *Boerne*, nor *Boerne* itself, which cited both *City of Rome* and *Katzenbach* with approval, identified a federalism component of the "congruence and proportionality" analysis.

[18] As indicated above, Plaintiff also mistakenly claims that Congress was precluded from relying on vote dilution concerns in basing reauthorization on the Fifteenth Amendment.

Plaintiff appears to argue that Congress could reauthorize Section 5 only if the original

coverage conditions prescribed by Section 4(b) of the Act, 42 U.S.C. § 1973b(b), still existed in

2006, *i.e.*, the covered states and political subdivisions still utilized a "test or device" for

registration or voting, and the registration or voting rates still fell below the statute's 50 percent

benchmark.  Response Br. at 21, 24-27.  But if this was the standard, Congress never could have

reauthorized Section 5, be it in 1970, 1975 or 1982.  None of these reauthorizations could have

been justified on the ground that the factual predicates for initial coverage continued to exist at

the time of reauthorization.[19]  Yet, as this Court recently noted, the Supreme Court has upheld

the constitutionality of each of these pre-2006 reauthorizations.  *Laroque v. Holder*, No. 10-0561

(D.D.C. Dec. 20, 2010), Memorandum Op. at 3.

There is another fundamental problem with the Plaintiff's "mismatch" claim: the *Nw.*

*Austin*-mandated determinations of whether Section 5 is justified by "current needs," and

whether Section 5 still is sufficiently geographically tailored "to the problem that it targets,"

necessarily implicate the full range of voting practices covered by Section 5.  Otherwise,

Congress would be placed in the nonsensical position of having been required to evaluate

Section 5 based on something that is only a fraction of what Section 5 substantively addresses.

And, despite Plaintiff's assertion to the contrary, Response Br. at 26, Section 5 always has

---

[19] Initial coverage determinations resulted from the 1965 enactment, and then from the 1970 and 1975 amendments to Section 5, and coverage was continued as to the prior enactments by the 1970, 1975, and 1982 reauthorizations. Harris Br. at 7-9.  Each of the pre-2006 reauthorizations could not have been based on a finding that the covered jurisdictions were continuing to implement a voting "test or device" since, when the reauthorizations occurred, the covered jurisdictions had been barred by the Voting Rights Act from continuing to implement any such "test or device."  Pub. L. No. 89-110, 79 Stat. 437, 438, § 4 (1965) (prohibited covered jurisdictions from implementing any "test or device" for five years); Pub. L. 91-285, 84 Stat. 314, 315 § 201 (1970) (enacted a nationwide, five-year ban on implementation of any "test or device"); Pub. L. No. 94-73, 89 Stat. 400, § 102 (1975), *codified at* 42 U.S.C. § 1973aa(a)  (imposes a permanent, nationwide ban on any "test or device"); Pub. L. No. 94-73, 89 Stat. 400, 401-02 § 202 (1975), *codified at* 42 U.S.C. §§ 1973b(f)(3) and (4) (prohibits use of English-only elections in jurisdictions covered pursuant to the 1975 extension of the coverage formula).  Likewise, as a result of the remedial measures adopted in the Voting Rights Act, minority voter registration rates dramatically increased after 1965 which, in turn, resulted in most, if not all, of the covered states exceeding the 50 percent overall registration benchmark.  H.R. Rep. No. 97-227 (1981),  at 7; H.R. No. 94-196 (1975), at 6.

covered every type of standard, practice, and procedure that affects voting, including many types of provisions that deal with issues other than voter registration and turnout.  *Presley v. Etowah County*, 502 U.S. 491,  502-03 (1992) (cataloguing  the types of voting changes covered and citing past Court decisions); 28 C.F.R. § 51.13 (listing types of covered voting changes).  Thus, while the 1965 coverage formula, as well as the 1970 and 1975 extensions of the formula, identify the jurisdictions with a history of racial discrimination in voting, they do not define the substantive scope of the Section 5 preclearance requirement or the conditions under which Congress may reauthorize Section 5.

## C.  Section 5 Coverage Continues to Rationally Focus on the Jurisdictions That Show a Significant Risk of Intentional Discrimination

Congress reauthorized Section 5 in 2006 without requiring a new set of coverage determinations.  Congress made extensive findings, however, that the threat of voting discrimination remains concentrated in the Section 5 covered jurisdictions, and so Congress determined that new coverage determinations were not needed.  Congress also reauthorized Section 5 for a limited term, and retained the bailout and judicial bail-in procedures to address potential overinclusiveness and underinclusiveness, which measures were designed to ensure that Section 5 coverage remained tailored to the risk of discrimination.[20]  The record evidence demonstrates that Congress had a rational basis to conclude that the existing coverage determinations closely tracked the documented extent of voting discrimination. Thus, applying

---

[20] *Katzenbach* recognized that the provisions that allow for an adjustment of coverage in response to changing conditions contribute to the statute's constitutionality.  383 U.S. at 330-31. The "bailout" provision was modified after *Katzenbach* (in the 1982 reauthorization) to make bailout available to political subdivisions within fully covered states which had not been eligible to bail out under the original provision, *see Nw. Austin*, 573 F. Supp. 2d. at 231, and to provide that bailout will focus on current conditions in covered jurisdictions.  Harris Br. at 8.

*City of Rome* to this case, Section 5's "disparate geographic coverage [remains] sufficiently related to the problem that it targets." *Nw. Austin*, 129 S. Ct. at 2512.[21]

Finally, if this issue is analyzed from the perspective of the *Boerne* cases, the same conclusion must be reached. Congress properly concluded that application of the Section 5 remedy to the existing covered jurisdictions was in effect "proportional" to the ongoing risk of unconstitutional conduct. The expiration date, bail-in and judicial coverage provisions likewise are readily understood as measures that will keep coverage "proportional" over time. The conclusions by Congress are entitled to great weight – if not rational basis scrutiny – in this case because racial discrimination in voting is subject to the highest level of judicial scrutiny. Therefore, the record when viewed in terms of the *Boerne* doctrine leads to the same conclusion as under *Rome*: that there is no reason for this Court to overturn Congress' findings and determinations as to the appropriate scope of Section 5 coverage. [22]

## CONCLUSION

For the reasons set forth above, as well as the reasons set forth in his initial brief, Defendant-Intervenor Bobby Lee Harris respectfully urges this Court to grant summary judgment that Congress' 2006 reauthorization of Section 5, and the Section 4 coverage

---

[21] As explained in the initial Harris brief, at 7-9, Section 5's current geographic coverage is not determined solely by the coverage provisions of Section 4(b) of the Act, 42 U.S.C. § 1973b(b), although that is that provision at which Plaintiff directs its attack. Section 5's current geographic coverage is based on a combination of three factors: the provisions of Section 4(b) which, relying on a formula "rational in both practice and theory," *Katzenbach*, 383 U.S. at 330, identify those states and localities with a history of discrimination in voting; the current and past provisions of Section 4(a), which have enabled, and continue to enable, jurisdictions to bail out of coverage based on an appropriate showing of nondiscrimination in voting; and the four reauthorizations of Section 5, wherein Congress concluded that there is a continuing need for the preclearance remedy in the jurisdictions covered pursuant to Section 4.

[22] Plaintiff makes a variety of arguments that the comparative evidence no longer shows the evil of voting discrimination to remain predominantly in covered jurisdictions. These arguments are rebutted in detail in the joint reply brief of the *Pierson* and *Cunningham* Defendant-Intervenors. Mindful of the Court's desire to avoid duplicative briefing, Defendant-Intervenor Harris incorporates by reference that discussion. Harris also refers the Court to his initial brief, at 42-43, where the disparate coverage issue is addressed.

provisions that apply to Section 5, are a constitutional exercise of Congress' Fifteenth

Amendment authority.  For this reason, Plaintiff Shelby County's motion should be denied.

January 14, 2011                                    Respectfully submitted,

                                                    */s/ Mark A. Posner*
                                                    Jon M. Greenbaum (D.C. Bar No. 489887)
                                                    Robert A. Kengle
                                                    Marcia Johnson-Blanco
                                                    Mark A. Posner (D.C. Bar No. 457833)
                                                    Lawyers' Committee for Civil Rights
                                                    1401 New York Avenue, NW
                                                    Suite 400
                                                    Washington, DC 20005
                                                    Tel. (202) 662-8325
                                                    Fax (202) 783-0857
                                                    jgreenbaum@lawyerscommittee.org
                                                    bkengle@lawyerscommittee.org
                                                    mblanco@lawyerscommittee.org
                                                    mposner@lawyerscommittee.org

                                                    John M. Nonna
                                                    Autumn Katz
                                                    Daniel Stabile
                                                    David Cooper
                                                    DEWEY & LEBOEUF LLP
                                                    1301 Avenue of the Americas
                                                    New York, NY 10019
                                                    Tel. (212) 259-8311
                                                    Fax (212) 649-9461

<u>Certificate of Service</u>

I hereby certify that on January 14, 2011, I served a true and correct copy of the foregoing via the Court's ECF system, on counsel of record.

<u>*Mark A. Posner*</u>