# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHELBY COUNTY, ALABAMA

*Plaintiff*,

v.

ERIC H. HOLDER, JR., in his official capacity
as Attorney General of the United States of
America

*Defendant*,

EARL CUNNINGHAM, HARRY JONES,
ALBERT JONES, ERNEST MONTGOMERY,
ANTHONY VINES and WILLIAM WALKER;
BOBBY PIERSON, WILLIE GOLDSMITH
SR., KENNETH DUKES, MARY PAXTON-
LEE, and the ALABAMA STATE
CONFERENCE OF THE NAACP

*Defendant-Intervenors*.

Civil Action No. 1:10-CV-651
(JDB)

## CONSOLIDATED REPLY MEMORANDUM OF POINTS AND AUTHORITIES OF CUNNINGHAM DEFENDANT-INTERVENORS AND PIERSON DEFENDANT-INTERVENORS IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

I.   *CITY OF BOERNE* AND ITS PROGENY DO NOT CONTROL THIS CASE BECAUSE CONGRESS'S REMEDIAL PURPOSE IS CLEAR AND WELL-SUPPORTED ..............................................................................................................1

II.  THE 2006 REAUTHORIZATION SATISFIES THE SUPREME COURT'S CONGRUENCE-AND-PROPORTIONALITY ANALYSIS ....................................3

    A.  The Right at Issue in this Case—Unlike in the *City of Boerne* Line of Cases—Is Expressly Guaranteed by the Constitution (*Boerne* Step One)............................3

    B.  All Evidence of Discriminatory Voting Practices, Including Evidence of Minority Vote Dilution, Is Relevant to the Constitutional Question Here (*Boerne* Step Two).........4

    C.  The *City of Boerne* Line of Cases Repeatedly Points to Section 5 Preclearance as the Exemplar of Appropriate Enforcement Legislation (*Boerne* Step Three) ....................9

III. THE LEGISLATIVE RECORD OF WIDESPREAD PERSISTENT DISCRIMINATION IN COVERED JURISDICTIONS CONCLUSIVELY ESTABLISHES THAT SECTIONS 5 AND 4(b) REMAIN CONSTITUTIONAL ..............11

    A.  The Record Contains Compelling and Extensive Evidence of Intentional Discrimination and Gamesmanship ..................................................................11

        1.   Objection and MIR Statistics ...............................................................13

        2.   Election Data and the Lack of Minority Electoral Success ...................16

        3.   Section 2 Litigation..............................................................................18

        4.   Racially Polarized Voting .....................................................................19

        5.   Observer Deployments..........................................................................20

    B.  The Legislative Record Supports the Constitutionality of Section 4(b)...........21

        1.   The Michigan Law School Study ........................................................21

        2.   State Reports and Other Evidence ........................................................23

        3.   The Bailout and Bail-In Provisions Confirm the Constitutionality of the Coverage Provision ...........................................................................24

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Allen v. State Board of Elections*,
   393 U.S. 544 (1969) .............................................................................................6, 7

*Bartlett v. Strickland*,
   129 S. Ct. 1231 (2009)....................................................................................6, 9, 16

*City of Boerne v. Flores*,
   521 U.S. 507 (1997)............................................................................................ *passim*

*City of Mobile v. Bolden*,
   446 U.S. 55 (1980)..................................................................................................6

*City of Rome v. United States*,
   446 U.S. 156 (1980)............................................................................................ *passim*

*County Council of Sumter County v. United States*,
   No. 82-0912, 1983 U.S. Dist LEXIS 20145 (D.D.C. Jan. 10, 1983)..........................17

*Dillard v. Crenshaw County*,
   640 F. Supp. 1347 (M.D. Ala. 1986) ................................................................ 22-23

*Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*,
   527 U.S. 627 (1999)................................................................................................2

*Georgia v. Ashcroft*,
   539 U.S. 461 (2003)................................................................................................9

*Georgia v. United States*,
   411 U.S. 526 (1973)................................................................................................2

*Hurtado v. California*,
   110 U.S. 516 (1884)................................................................................................6

*Lopez v. Monterey County*,
   525 U.S. 266 (1999)......................................................................................1, 2, 21

*League of United Latin American Citizens v. Perry*,
   548 U.S. 399 (2006)..........................................................................................6, 18

*Miller v. Johnson*,
   515 U.S. 900 (1995)..........................................................................................15, 19

*Nevada Department of Human Resources v. Hibbs*,
   538 U.S. 721 (2003)............................................................................................ *passim*

*Northwest Austin Municipality Utility District Number One v. Holder*,
   129 S. Ct. 2504 (2009)..............................................................................4, 11, 21, 22

*Northwest Austin Municipality Utility District Number One v. Mukasey*,
   573 F. Supp. 2d. 221 (D.D.C. 2008) ................................................................ *passim*

*Oregon v. Mitchell*
   400 U.S. 112 (1970)................................................................................2

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
   490 U.S. 477 (1989)................................................................................2

*Rogers v. Lodge*,
   458 U.S. 613 (1982)............................................................................5, 18

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966)...................................................................... *passim*

*Tennessee v. Lane*,
   541 U.S. 509 (2004)...................................................................... *passim*

*Turner Broadcasting Sys. v. F.C.C.*,
   520 U.S. 180 (1997)..............................................................................14

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)................................................................................18

*United States v. Blaine County*,
   363 F.3d 897 (9th Cir. 2004) ................................................................18

*United States v. Uvalde Consol. Indep. Sch. Dist.*,
   625 F.2d 547 (5th Cir. 1980) ..................................................................6

*U.S. Postal Serv. v. Gregory*,
   534 U.S. 1 (2001)..................................................................................16

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008)................................................................................9

## DOCKETED CASES

*Laroque v. Holder*,
   No. 10-0561 (D.D.C. Dec. 20, 2010)................................................... 9-10

## STATUTES

42 U.S.C. § 1973c(a)..................................................................................8

42 U.S.C. § 1973l(c)(1)..............................................................................6

120 Stat. 577, § 2(b)(3) (2006) ................................................................19

Pub. L. No. 109-246, § 2(b)(3) (2006)......................................................19

## LEGISLATIVE MATERIALS

S. Rep. No. 97-417 (1982) ...................................................................................8, 18

H.R. Rep. No. 94-196 (1975) ....................................................................................8

H.R. Rep. No. 94-478 (2006) ....................................................................................8

H.R. Rep. No. 109-478 (2006) ......................................................................... *passim*

*Voting Rights: H.R. 6400 and Other Proposals to Enforce the 15th Amendment to the
Constitution of the United States:  Hearings Before Subcomm. No. 5 of the H.
Committee on the Judiciary*, 89th Cong. (March 18, 1965) .........................................8

*Extension of the Voting Rights Act of 1965:  Hearing Before the S. Subcommittee on
Constitutional Rights of the Committee on the Judiciary,* 94th Cong.
(Apr. 10, 1975) ..........................................................................................................8

*To Examine the Impact and Effectiveness of the Voting Rights Act:  Hearing before the
Subcomm. on the Constitution of the H. Comm. on the Judiciary,* 109th Cong. (Oct.
18, 2005) ....................................................................................................................23

*Voting Rights Act:  Section 5 of the Act - History, Scope & Purpose:  Hearing before the
Subcomm. on the Constitution of the H. Comm. on the Judiciary,* 109th Cong. (Oct.
25, 2005) ..............................................................................................................7, 15

*Voting Rights Act:  The Continuing Need for Section 5:  Hearing before the Subcomm.
on the Constitution, H. Comm. on the Judiciary,* 109th Cong. (Oct. 25, 2005) ..........7

*Voting Rights Act:  Evidence of Continuing Need:  Hearing before the Subcomm. on the
Constitution of the H. Comm. on the Judiciary,* 109th Cong. (Mar. 8, 2006) ...7, 16, 23

*An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues
Relating to Reauthorization:  Hearing before the S. Comm. on the Judiciary,* 109th
Cong. (May 9, 2006) ................................................................................................14

*The Continuing Need for Section 5 Pre-clearance: Hearing before the S. Comm. on the
Judiciary,* 109th Cong. (May 16, 2006) ..................................................................25

*Renewing the Temporary Provisions of the Voting Rights Act:  Legislative Options after
LULAC v. Perry:  Hearing before the Subcomm. on the Constitution, Civil Rights and
Property Rights of the S. Comm. on the Judiciary,* 109th Cong. (July 13, 2006) ........20

## OTHER AUTHORITIES

Black's Law Dictionary (2d ed. 1996) ...............................................................................6

Ellen D. Katz et al., *Documenting Discrimination in Voting,*
39 Mich. J.L. Reform 643 (2006) ............................................................................22

Wikipedia, *United States Attorney General: List of Attorneys General,*
http://en.wikipedia.org/wiki/United_States_Attorney_General ...........................20

## INTRODUCTION

The Cunningham and Pierson Defendant-Intervenors submit this brief to clarify three points crucial to the resolution of the pending summary judgment motions. *First*, the congruence-and-proportionality framework of *City of Boerne v. Flores*, 521 U.S. 507 (1997), does not control this case. *Second*, even if, as Plaintiff argues, that framework is applicable, Sections 5 and 4(b) of the Voting Rights Act are constitutional. And *third*, by any measure the legislative record supporting the 2006 reauthorization of Sections 5 and 4(b) is compelling. Plaintiff improperly ignores the actual evidence in the record, gliding over it at a distance that permits broad brush and misleading characterizations. Plaintiff seeks to dismiss clear evidence of intentional discrimination before Congress, even though the 2006 record is substantially similar to that which led the Supreme Court to sustain the 1975 reauthorization of Section 5 in *City of Rome v. United States*, 446 U.S. 156 (1980), and far exceeds the records that led the Court to sustain other remedial statutes in two recent decisions.

I.   *CITY OF BOERNE* AND ITS PROGENY DO NOT CONTROL THIS CASE BECAUSE CONGRESS'S REMEDIAL PURPOSE IS CLEAR AND WELL-SUPPORTED.

Contrary to Plaintiffs' contention, Pl. Reply at 2, congruence-and-proportionality is not the governing standard in this case. Rather, the Supreme Court has applied a rational means standard in previous cases concerning the constitutionality of Section 5,[1] including *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), *City of Rome*, and *Lopez v. Monterey County*, 52 U.S. 280 (1999), a case that post-dates and cites *City of Boerne*, but contains no mention of "congruence and proportionality." This Court is bound by those decisions; if a new standard is to apply now, it is for the Supreme Court to clarify that different authority should control. *See*

---

[1] The Cunningham and Pierson Defendant-Intervenors have conferred with the Attorney General and the Harris Defendant-Intervenor in an effort to avoid duplication.

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.* 490 U.S. 477, 484 (1989). Notably, the *City of Boerne* line of cases consistently identify Section 5 as the exemplar congressional enforcement legislation,[2] while never stating nor remotely suggesting that *Katzenbach* and *City of Rome* no longer govern constitutional challenges to statutes aimed at racial discrimination in voting.

    The congruence-and-proportionality framework is intended to ferret out those situations where Congress, putatively under its Fourteenth Amendment authority, enacts legislation that substantively redefines and expands constitutional rights. *See City of Boerne*, 521 U.S. at 519-29 (*citing*, *inter alia*, *Oregon v. Mitchell*, 400 U.S. 112 (1970)); *see also Katzenbach*, 383 U.S. at 326 (recognizing this distinction). This is not such a case. The legislative record makes clear that, in enacting and reauthorizing the Voting Rights Act, Congress was focused, with a great deal of seriousness and care, on "banish[ing] the blight of racial discrimination in voting"—the very problem that animated the need for the Fifteenth Amendment. *Katzenbach*, 383 U.S. at 308*; cf. City of Boerne*, 521 U.S. at 518. In 2006 as before, Congress sought to "enforce the provisions of th[e Fifteenth Amendment] by appropriate legislation." *Katzenbach*, 383 U.S. at 328-30, 335; *Georgia v. United States*, 411 U.S. 526 (1973); *City of Rome*, 446 U.S. at 183; *Lopez*, 525 U.S. at 283-84. Congress's legislative judgment was informed by both its prior experience in remedying voting discrimination, as well as the settled law recognizing its authority to do so. "When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis,* and contrary expectations must be disappointed." *City of Boerne,* 521 U.S. at 536.

---

[2] *See, e.g.*, *City of Boerne*, 521 U.S. at 530-33; *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Banks*, 527 U.S. 627, 639, 640 (1999); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 737-38 (2003); *id.* at 756-57 (Kennedy, J., dissenting).

## II.   THE 2006 REAUTHORIZATION SATISFIES THE SUPREME COURT'S CONGRUENCE-AND-PROPORTIONALITY ANALYSIS.

If this Court departs from controlling precedents and applies the three-pronged congruence-and-proportionality analysis from *City of Boerne*, Sections 5 and 4(b) of the VRA remain comfortably within Congress's constitutional powers based upon *current* demonstrated necessity. Of course, even the congruence-and-proportionality analysis set forth in *City of Boerne* is not intended as an open invitation for courts to stand in the shoes of Congress to determine how they would craft enforcement legislation as if doing so were their constitutionally granted charge. Indeed, such an improper reading of that precedent would threaten enforcement powers that the Constitution consciously and expressly vested in the legislative branch. *See City of Boerne*, 521 U.S. at 535 ("When Congress acts within its sphere of its power and responsibilities, it has not just the right but the duty to make its own informed judgment on the meaning and force of the Constitution."). As we demonstrate below, when measured against the record of persisting intentional efforts to discriminate against minority voters (described in Cunningham Br. at 10-21, Pierson Br. at 11-32, and in *infra* at 11-25), Sections 5 and 4(b) are not "so out of proportion to a supposed remedial or preventive object that [they] cannot be understood as responsive to, or designed to prevent, unconstitutional behavior," *id*. at 532, and thus satisfy *City of Boerne's* congruence-and-proportionality analysis.

### A.   The Right at Issue in this Case—Unlike in the *City of Boerne* Line of Cases— Is Expressly Guaranteed by the Constitution (*Boerne* Step One).

"The first step in the *Boerne* inquiry [is] to identify the constitutional right or rights Congress sought to enforce…" *Tennessee v. Lane*, 541 U.S. 509, 522 (2004). There is no dispute that the constitutional right at issue in this case is the right to vote free from racial discrimination. *See* Pl. Opening Br. at 20. Plaintiff does not deny that, in both enacting and reauthorizing

Sections 5 and 4(b), Congress acted at the zenith of its enforcement powers, because the statute is targeted at the intersection of a suspect classification (race) and a fundamental right (voting). *See* Cunningham Br. at 27. This fact distinguishes this case from those in which the Supreme Court struck down legislation that attempted to substantively redefine the scope of constitutional protections. *See id.*; Pierson Br. at 42-44. "[T]he appropriateness of the remedy depends on the gravity of the harm [Congress] seeks to prevent." *Lane*, 541 U.S. at 524. The Court has applied the congruence-and-proportionality framework in only two cases involving legislation designed to prevent discrimination based on classifications that trigger heightened judicial scrutiny; in both, the Court sustained the legislation at issue. *See Hibbs*, 538 U.S. at 728, 737; *Lane*, 541 U.S. at 522-23, 533-34.[3] But this case involves even more serious concerns than did *Lane* or *Hibbs*, because it implicates Congress's express constitutional authority to remedy racial discrimination in voting—which lies at the heart of the Reconstruction Amendments. *See Nw. Austin Mun. Util. Dist. No. One v. Mukasey*, 573 F. Supp. 2d 221, 270 (D.D.C. 2008), *rev'd and remanded on other grounds sub nom. Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504 (2009); Cunningham Br. at 27. Because remedial legislation "'must be judged with reference to the historical experience which it reflects,'" *Lane*, 541 U.S. at 523 (quoting *Katzenbach*, 383 U.S. at 308), heightened deference to Congress's considered policy judgments is warranted here.

**B.   All Evidence of Discriminatory Voting Practices, Including Evidence of Minority Vote Dilution, Is Relevant to the Constitutional Question Here (*Boerne* Step Two).**

The second step in the *City of Boerne* inquiry is to evaluate the legislative record of discrimination compiled by Congress. *See Lane*, 541 U.S. at 524-28. Here, rather than conducting any meaningful analysis of the evidence of discrimination found in the congressional

---

[3] Although Plaintiff claims that *City of Boerne* similarly involved efforts to secure a constitutional right, it does not deny that *City of Boerne* involved Congressional efforts to "attempt a substantive change in constitutional protections," 521 U.S. at 533. Such an attempt is not at issue here.

record,[4] Plaintiff instead dismisses the relevance of the record, describing the examples of discrimination found within it as "isolated and outdated," without so much as examining even a single specific act of discrimination. Pl. Reply at 20. By failing to seriously consider the evidence presented to Congress, Plaintiff seeks license to second-guess Congress's well-founded policy judgments about the need for and nature of appropriate remedies. As described *infra* at 11-21, however, the breadth and scope of the 2006 reauthorization record contains "far more than the statistical evidence considered sufficient [to uphold the reauthorization of Section 5] in *City of Rome*." *Nw. Austin*, 573 F. Supp. 2d at 266. It also surpasses the legislative records in *Lane* and *Hibbs*. *See id.* at 271 (noting that the records in *Lane* and *Hibbs* "pale[] in comparison to the extensive record Congress compiled when extending Section 5").

Unable to answer the legislative record directly, *see infra* at 11-21, Plaintiff instead argues that much of the evidence of ongoing and intentional discrimination in covered jurisdictions is irrelevant, by redefining the constitutional right at issue as one limited only to measures that deny minority voters "access to the ballot." Pl. Reply at 18, 25. That view, which enjoys only the scarcest endorsement in the Supreme Court's jurisprudence concerning Section 5 of the VRA (*see* Justice Thomas' lone dissent in *Nw. Austin*), is unavailing for two reasons.

*First*, Plaintiff's position is foreclosed by *City of Rome*, which upheld the 1975 reauthorization of Section 5, in part, on the basis of vote dilution evidence. *See* 446 U.S. at 181-82, 183-84. Discriminatory efforts to dilute the voting power of minority voters are plainly unconstitutional. *See, e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 617 (1982). As the Supreme Court has recognized, "[t]he right to vote can be affected by a dilution of voting power as well as by an

---

[4] *See* Pl's Response to Numbered Paragraphs in Def-Intervenors' Joint Stmnt. of Mat. Facts ¶¶ 1-413 ("Shelby County has not independently verified the accuracy of the Defendant-Intervenors' representation of the legislative record"). Plaintiff's blatant disregard of the record is remarkable given that Plaintiff itself repeatedly has recognized that the constitutionality of Section 5—a core civil rights statute—turns on the record before Congress. Tr. of Status Hr'g at 41 (Sept. 10, 2010).

absolute prohibition on casting a ballot…. This type of change could therefore nullify [minority voters'] ability to elect the candidate of their choice *just as would prohibiting some of them from voting*." *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969) (emphasis added). Put more simply, the right to vote "includes 'all action necessary to make a vote *effective*,'" *id.* at 566 (quoting 42 U.S.C. 1973l (c)(1)) (emphasis added). Thus, efforts to minimize the effectiveness of a vote are, by necessity, infringements on the right to vote itself. Indeed, both the text of the Fifteenth Amendment (which prohibits both the "abridge[ment]" of the right to vote as well as the "den[ial]" of it)[5] and relevant case law[6] confirm that vote dilution on the basis of race is properly understood as a Fifteenth Amendment concern.[7]

Where a jurisdiction intentionally deprives minority voters of the opportunity to elect candidates of choice, it has violated core fundamental rights, which are at the heart of the Reconstruction Amendments. As noted *infra* 11-21, the record contains literally hundreds of examples of such unconstitutional conduct during the 1982-2006 reauthorization period. In one case, state legislators referred to an alternative redistricting plan as containing "nigger districts,"

---

[5] "Abridge" is defined as "to reduce or diminish," *see Black's Law Dictionary* at 2 (2d pocket ed. 1996). That is precisely how Plaintiff itself describes the manner in which vote dilution schemes infringe on the right to vote. *See* Pl. Reply at 47-48 ("vote dilution … undermines the weight of the vote"). Plaintiff's interpretation of the Fifteenth Amendment, which would limit its protections to outright "den[ial]" of the ballot, would violate a basic "canon of interpretation, especially applicable to formal and solemn instruments of constitutional law, [that courts] are forbidden to assume, without clear reason to the contrary, that any part of this most important amendment is superfluous." *Hurtado v. California*, 110 U.S. 516, 534 (1884).

[6] *See City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality op.) ("allegations of a racially motivated gerrymander of municipal boundaries state[] a claim under the Fifteenth Amendment"); *see also United States v. Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d 547, 552 n.8 (5th Cir. 1980) (observing that, in *Bolden*, "a majority of the court believe[d] that a fifteenth amendment claim can be made out against vote-diluting at-large districting if discriminatory purpose is proved"). Furthermore, Plaintiff concedes that "[v]ote dilution is redressable under Section 2" of the VRA, Pl. Reply at 52, apparently unaware that the range of discriminatory voting practices prohibited by Section 2 "track[s] … the text of the Fifteenth Amendment." *Bartlett v. Strickland*, 129 S. Ct. 1231, 1240 (2009).

[7] In any event, Plaintiff cannot deny that evidence of intentional vote dilution is unconstitutional because it plainly violates the Fourteenth Amendment, and therefore is a proper subject of congressional enforcement legislation. *See*, *e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("*LULAC*").

*October 25, 2005 (Need) Hearing at* 80,[8] and, in another, a key state legislator testified *in 2001* that he regularly used the term "nigger" and did not think it was wrong to do so, *see March 8, 2006 Hearing* at 1693-94. Local jurisdictions also engaged in similar efforts. For instance, Selma, Alabama (where violent resistance to minority voting ultimately gave birth to the Voting Rights Act) engaged in repeated, purposeful efforts to pack Black voters, who represented 58% of the population, into a minority of city council districts. The record also reveals that Augusta, Georgia implemented a racial quota system, requiring that, each time the city annexed a Black residential area, a corresponding number of white residents be annexed in order to prevent increasing the percentage of the city's Black population. *See October 25, 2005 (History) Hearing at* 391-92, 642-43. Plaintiff's contention that this evidence of *intentional* racial discrimination against minority voters is irrelevant here flouts the plain text of the Reconstruction Amendments and decades of settled Supreme Court precedent.

*Second*, vote dilution schemes are the quintessential example of so-called "gamesmanship"—discriminatory practices enacted in response to minority enfranchisement in order to cancel out minority voting power. *See Allen*, 393 U.S. at 569 (observing that, shortly after passage of the VRA, "it soon became apparent that guaranteeing equal access to the polls would not suffice to root out other racially discriminatory voting practices.… [to] reduce or nullify minority voters' ability, as a group, 'to elect the candidate of their choice.'"); *see also* Pl. Reply at 49 (acknowledging that jurisdictions responded to minority enfranchisement with the "manipulative use of redistricting, annexation, and other techniques" to "undermine minority voting rights."). Indeed, the very purpose of Section 5—which covers not only laws that govern registration and turnout, but any "standard, practice, or procedure with respect to voting," 42

---

[8] Specific Congressional Hearings are cited herein by date.

U.S.C. § 1973c(a)—is to prevent those states with a history of discrimination in voting from employing *any* means to prevent minority voters from exercising political power.

Thus, during the 1975 reauthorization, Attorney General Katzenbach explained that Section 5 preclearance was in part originally designed to combat discriminatory mechanisms, enacted in response to minority enfranchisement, aimed at diluting minority votes:

> When we drafted this legislation, we recognized that increased black voting strength might encourage a shift in the tactics of discrimination. Once significant numbers of blacks could vote, communities could still throw up obstacles to … make it difficult for a black to win elective office.… Section 5 has had its broadest impact … in the areas of redistricting and reapportionment. A substantial majority of the objections have been directed at this type of change…. Objections to this type of change, more than any other, have allowed blacks to achieve a greater measure of political self-determination … [and] have played such a central role in stimulating black political participation…

*April 10, 1975 Hearing* at 123-24.[9] The goal in enacting Sections 5 and 4(b) was to eradicate discrimination in voting, not merely to shift its form. Thus, during the 1975 reauthorization, Congress expressly stated that one purpose of Sections 5 and 4(b) is to prevent the use of "at-large elections, annexations of predominantly white areas, or the adoption of discriminatory redistricting plans." H.R. Rep. No. 94-196, at 10 (1975). During the 1982 reauthorization, Congress similarly found that "covered jurisdictions have substantially moved from direct, over[t] impediments to the right to vote to more sophisticated devices to dilute minority voting strength." S. Rep. No. 97-417, at 10 (1982). And, the 2006 reauthorization revealed "voting changes devised by covered jurisdictions [which] resemble those techniques and methods used in 1965, 1970, 1975, and 1982" *Nw. Austin*, 573 F. Supp. 2d at 254 (quoting H.R. Rep. No. 94-478, at 36 (2006)).

---

[9] During the original 1965 authorization hearings, Attorney General Katzenbach declined to enumerate the types of voting changes that would be subject to preclearance because "there are an awful lot of things that could be started for purposes of evading the 15th amendment if there is the desire to do so." *March 18, 1965 Hearing* at 95.

Accordingly, vote dilution is a constitutional concern, and evidence in the legislative record concerning such schemes constituted a proper basis for the 2006 reauthorization.[10] Plaintiff cannot simply dismiss entire categories of discriminatory voting practices—the very types of practices enacted as a discriminatory response to Black enfranchisement, which have been expressly relied on by the Supreme Court in affirming the constitutionality of Section 5—as irrelevant based on the contradictory view of a single Justice.

C.    **The *City of Boerne* Line of Cases Repeatedly Points to Section 5 Preclearance as the Exemplar of Appropriate Enforcement Legislation (*Boerne* Step Three).**

The third step in the *City of Boerne* inquiry is to determine whether the remedial legislation at issue is "appropriate" in light of the record of discrimination. *Lane*, 541 U.S. at 530. In the congruence-and-proportionality line of cases, the Supreme Court has always identified Section 5 as the paradigm of "appropriate" legislation to enforce the guarantees of the Reconstruction Amendments. *See, e.g.*, *City of Boerne*, 521 U.S. at 520, 533; Pierson Br. at 41-44 (citing cases). Plaintiff's only response is to assert that Section 5 is a more extensive remedy than the legislation sustained in *Lane* and *Hibbs*. That claim is unavailing for three reasons.

*First*, Plaintiff's argument implicitly acknowledges that some remedy is justified; it questions only whether the Section 5 remedy is "appropriate." But Plaintiff cannot seriously claim that this remedy, which has been repeatedly upheld by the Supreme Court, *see Laroque v.*

---

[10] Contrary to Plaintiff's remarkable suggestion, *see* Pl. Reply at 51, nothing in *Georgia v. Ashcroft*, 539 U.S. 461 (2003), suggests that Congress lacks constitutional authority to remedy minority vote dilution under Section 5 of the VRA. Instead, that case addresses, as a matter of statutory interpretation, the question of whether a new districting plan has a retrogressive effect within the meaning of Section 5. Congress reasonably decided to clarify the statutory definition of retrogressive effect and abrogate *Georgia v. Ashcroft*. In so doing, Congress chose a very similar standard to the one the Supreme Court later held to be the appropriate standard for liability under Section 2 of the VRA, *see Bartlett*, 129 S. Ct. at 1245, and which raises no constitutional concerns. But, in any event, Congress's *Ashcroft* amendment only affects a small subset of voting changes; any claims about that amendment have no bearing on whether Section 5 is *facially* constitutional, but rather should be raised in an as-applied challenge. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (a statute is facially constitutional unless it is constitutional in all its applications or lacks a plainly legitimate sweep).

*Holder*, No. 10-0561, at 3 (D.D.C. Dec. 20, 2010) (Mem. Op.) (citing cases), is now "'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Lane*, 541 U.S. at 533 (quoting *City of Boerne*, 521 U.S. at 532).

*Second*, Plaintiff ignores that Section 5 is a more limited remedy than the legislation at issue in *Hibbs* and *Lane* in important respects, and that Congress carefully considered the effect of Section 5 on covered jurisdictions during the reauthorization process. *See Nw. Austin*, 573 F. Supp. 2d at 275 (noting that Section 5, unlike the statutes at issue in *Hibbs* and *Lane*, "is geographically targeted, temporary, and applies only to *changes* in voting procedures, not to all political or election-related activities") (emphasis in original); *see also City of Boerne*, 521 U.S. at 533 (noting that Section 5 is limited to voting-related laws only and permits bailout); *Hibbs*, 538 U.S. at 744-45 (Kennedy, J., dissenting) (noting absence of damages remedy for Section 5 violations). *See also* Cunningham Br. at 28-29 (discussing Section 5's limited burden on and substantial benefits for covered jurisdictions).

*Third*, the magnitude of the harm in this case is different. Here, the gravity of the constitutional harm—involving persistent, widespread violations of an express constitutional guarantee (right to vote) based on a suspect classification (free from racial discrimination), *see supra* at 3-4—merits broader latitude for remedial legislation than was required in *Lane*, *Hibbs*, or any of the other *City of Boerne* cases. "Difficult and intractable problems often require powerful remedies." *Lane*, 541 U.S. at 524 (internal quotation marks and citation omitted).

\*         \*         \*

Resolution of the constitutional claims at issue in this case is clear: Sections 5 and 4(b) of the VRA remain valid enforcement legislation under the Fourteenth and Fifteenth Amendments,

because they withstand scrutiny under both *Katzenbach*'s rationality standard and, even assuming it is applicable, under *City of Boerne*'s congruence-and-proportionality analysis.

### III. THE LEGISLATIVE RECORD OF WIDESPREAD PERSISTENT DISCRIMINATION IN COVERED JURISDICTIONS CONCLUSIVELY ESTABLISHES THAT SECTIONS 5 AND 4(b) REMAIN CONSTITUTIONAL.

Under any standard of review, this court's analysis must turn in large measure on the gravity of the harms addressed by Sections 5 and 4(b). The legislative record—with which Plaintiff refuses to grapple in any meaningful way—demonstrates that voting discrimination persists in covered jurisdictions and that the Section 5 remedy remains "appropriate." Plaintiff's brief ultimately rests on two unfounded assertions: (1) that the extensive record of intentionally discriminatory voting practices merely contains "isolated and outdated" examples, Pl. Reply at 20; and (2) that only limited forms of evidence, such as election data on participation rates and the success of minority candidates, can form a valid basis for Section 5 coverage, Pl. Reply at 21. These assertions are belied by any careful examination of the legislative record, and are fatally flawed under governing Supreme Court precedent.

### A. The Record Contains Compelling and Extensive Evidence of Intentional Discrimination and Gamesmanship.

As the Supreme Court observed, there was a "sizable record in support of [Congress's] decision to extend the preclearance requirements, a record the District Court determined 'document[ed] contemporary racial discrimination in covered states'" *Nw. Austin*, 129 S. Ct. at 2513 (quoting 573 F. Supp. 2d at 265). Plaintiff's claim that "[t]he present case parallels *City of Boerne*," Pl. Reply at 9, a case that involved a "legislative record lack[ing] examples of modern instances of generally applicable laws passed because of religious bigotry," 521 U.S. at 530, is refuted by the Congressional record itself. The *Nw. Austin* court described numerous specific

11

instances of intentional discrimination from the legislative record contained in, *inter alia*: (i) specific Section 5 objections, *see* 573 F. Supp. 2d at 252-54 (three "particularly revealing" examples from Mississippi), 289-301 (a "representative sample" of voting changes exhibiting "discriminatory intent" from throughout covered jurisdictions); (ii) preclearance suits, *see id.* at 255-56 (examples arising from Alabama and Louisiana that "reveal evidence of intentional discrimination); (iii) enforcement actions, *see id.* at 257-58 (examples of "defiant covered jurisdictions" in South Dakota and Texas); and (iv) Section 2 suits, *see id.* at 259-62 ("particularly egregious example[s]" from Alabama, South Carolina, Texas, and Virginia). Defendant-Intervenors have also identified numerous additional examples of intentional discrimination. *See, e.g.*, Cunningham Br. at 10-21; Pierson Br. at 11-18. These examples are far from exhaustive, as Plaintiff concedes that there is additional evidence "of intentional discrimination in the record." Pl. Reply at 42 n.11. In sum, far from supporting Plaintiff's characterization that the record presents "mere anecdotes," an actual review of the record unquestionably supports the conclusion that "systematic resistance to the Fifteenth Amendment" remains a widespread problem in covered jurisdictions even more than 45 years after powerful remedies were first employed. *Nw. Austin*, 573 F. Supp. 2d at 252-53 (internal citations and quotation marks omitted).

Moreover, although the Court has never held that so-called "gamesmanship," Pl. Reply at 40, is a constitutional prerequisite for prophylactic legislation, *see* Cunningham Br. at 20-21, Pierson Br. at 39-40, Plaintiff ignores that many of these intentionally discriminatory voting practices were only addressed by multiple enforcement efforts—either repeated Section 5 objections, or at least one Section 5 objection in conjunction with litigation. *See* Cunningham Br.

at 20 n.9 & 10. This evidence demonstrates precisely the serial voting rights violation evidence that Plaintiff acknowledges is sufficient to sustain Sections 5 and 4(b).

Furthermore, Plaintiff fails to acknowledge additional categories of evidence, discussed in detail in Defendant-Intervenors' opening briefs, including the following:

### 1.   Objection and MIR Statistics.

Among the evidence in the legislative record ignored by Plaintiff are over 600 Section 5 objections during the reauthorization period, with more objections in nine of the sixteen covered states than during the previous reauthorization period. More than two-thirds of all objections— *over four hundred objections between 1982 and 2005*—were based in whole or in part on discriminatory intent. *See Nw. Austin*, 573 F. Supp. 2d at 250-51; Cunningham Br. at 6-7; Pierson Br. at 11. Many of these objections involved statewide voting changes, which implicated the voting rights of millions of people. *See Nw. Austin*, 573 F. Supp. 2d at 285 (Map 5B, listing dozens of statewide objections). Congress properly determined that these objections constituted compelling evidence of ongoing intentional discrimination in covered jurisdictions. *See* 573 F. Supp. 2d at 249-53. Moreover, beyond the objections themselves, there were over 800 submissions withdrawn due to more information request letters ("MIRs"). Lacking any support in the legislative record and without citation to any source, Plaintiff engages in "unfounded speculation" that such withdrawals indicate a "desire to forgo the heavy burden of this bureaucratic process." Pl. Reply at 61. But, as this court has recognized and as the legislative record clearly demonstrates, a withdrawal in response to an MIR "has the same effect as an objection" and constitutes "strong [evidence] of continued efforts to discriminate." *Nw. Austin*, 573 F. Supp. 2d at 254 (quoting H.R. Rep. No. 109-478, at 36 (2006)).

While the objection rate is itself low, it has *always* been low. *See Nw. Austin,* 573 F. Supp. 2d at 250-51 (observing that low objection rate "hardly means Section 5 has outlived its usefulness," and noting that nature of objections and types of submissions are far more telling of the ongoing problems) (citing, *inter alia*, *May 9, 2006 Hearing* at 219, *City of Rome*, 446 U.S. at 181). Contrary to Plaintiff's assertions, it is the *volume and nature* of objections, and not the rate, that is the relevant metric here. If there has been a discriminatory voting change, it is not absolved because there have been ten or one hundred non-discriminatory changes; the act of discrimination is still odious. In *Lane*, for instance, the Court looked strictly at "the sheer volume" of discriminatory conduct, and not at the rate of discrimination, in determining that remedial legislation was justified. 541 U.S. at 528. Indeed, in neither *Lane* nor *Hibbs* did the Court regard the number of times that governments had *not* discriminated as a relevant consideration, or even attempt to calculate that figure. *See* 541 U.S. at 524-29; 538 U.S. at 729-32. In any event, one of the few legislative sources upon which Plaintiff relies acknowledges that the rate was lowest immediately prior to *City of Rome*. *See May 9, 2006 Hearing* at 219.

Plaintiff also argues that objection statistics are irrelevant because they are not formal adjudications of intentional discrimination. That contention is wrong for two reasons. *First*, "[t]he Constitution gives to Congress the role of weighing conflicting evidence in the legislative process." *Turner Broadcasting Sys. v. F.C.C.*, 520 U.S. 180, 199 (1997). Thus, contrary to Plaintiff's unsupported assertion, Pl. Reply at 35 n.9, courts do not review *de novo* the evidence before Congress to determine whether it is probative of intentional discrimination. Rather, courts defer to Congress's reasonable judgments about the evidence presented during the legislative process, in part because Congress is "far better equipped than the judiciary to amass and evaluate … vast amounts of data," *id*. at 195 (citations and internal quotations omitted).

14

As Plaintiff itself must acknowledge, the Court has placed no specific limitations on evidence that is probative of the need for prophylactic legislation, *see* Pl. Reply at 35 ("Congress obviously may avail itself of any [sic] information,") (quoting *Katzenbach*, 383 U.S. at 330). While Plaintiff would limit the scope of Congress's fact-finding powers to consideration of judicial findings of intentional discrimination, the Supreme Court has repeatedly upheld enforcement legislation based exclusively or primarily on evidence before Congress that was *not* contained in judicial decisions. *See*, *e.g.*, *City of Rome*, 446 U.S. at 180-82; *Hibbs*, 538 U.S. at 731-32 ; *Lane* 541 U.S. at 527-28.

*Second*, Plaintiff fails to acknowledge that judicial findings of intentional discrimination in covered jurisdictions are relatively rare precisely because, in light of the remedial and deterrent effects of Sections 2 and 5 of the VRA, formal findings of intent are unnecessary in order to block voting discrimination. In Plaintiff's view, evidence that Section 5 remains necessary would amount to evidence that Section 5 is not functioning properly. This contention improperly "reduces Congress's Fourteenth and Fifteenth Amendment enforcement authority to a Catch-22." *Nw. Austin*, 573 F. Supp. 2d at 274; *see also* Pierson Br. at 41.

Plaintiff also argues that many of the objections from the reauthorization period are invalid under *Miller v. Johnson*, 515 U.S. 900, 921 (1995). *See* Pl. Reply at 59. Plaintiff, however, ignores the fact that the record demonstrates very few objections even arguably resulted from a so-called "max-Black" DOJ policy during the 1990 redistricting, which *Miller* subsequently rejected. *See* Cunningham Br. at 7 n.5 (citing *October 25, 2005 (History) Hearing* at 225-2595). Indeed, since the Court's opinion in *Miller*, there have been *no* such objections. The fact that DOJ made a few erroneous objections during the early 1990s neither substantiates Plaintiff's claim that all objections during that decade were premised on *Miller*, nor warrants

15

invalidating Section 5 on the unfounded assumption that DOJ will defy *Miller* and make unwarranted objections in the future. *Cf. U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("a presumption of regularity attaches to the actions of government agencies"). This contention is particularly specious in what Plaintiff strenuously argues is a facial challenge as opposed to an as-applied challenge to a specific proposed voting change where DOJ's actions could be examined in a particular context.

### 2. Election Data and the Lack of Minority Electoral Success.

Given some of the discriminatory practices described above, it is hardly surprising that there has been a lack of success of minority candidates in covered jurisdictions. Plaintiff concedes that this form of evidence "can establish the constitutional necessity of Section 5." Pl. Reply at 37. Plaintiff also acknowledges statistics showing that minority electoral success remains elusive, noting that African Americans are represented in the state legislatures of six Section 5-covered states at a rate that is approximately 60% of their proportion of the population (21% to 35%). *See* Pl. Reply at 46; Pierson Br. at 24. The record showed that this continuing underrepresentation was the result of "strong anti-black attitudes that continue to find expression in virtually every aspect of American life, and racially polarized attitudes on a host of policy questions that loom large in the American political universe." *March 8, 2006 Hearing* at 159; *Bartlett*, 129 S. Ct. at 1249 (noting that "racial discrimination and racially polarized voting are not ancient history"). Success rates for Latino and Asian American candidates have similarly lagged. *See Nw. Austin*, 573 F. Supp. 2d at 249 (citing H.R. Rep. No. 109-478, at 18). While proportionality is neither a constitutional or statutory requirement, the fact that minority electoral success in covered jurisdictions "f[alls] far short of being representative of the number of

[minorities] residing in the covered jurisdictions" is certainly *probative* of the ongoing need for Section 5. *City of Rome*, 446 U.S. at 181.

Unable to contest the numbers, Plaintiff argues that "[t]he issue is whether minority officials remain relegated to relatively minor positions," Pl. Reply at 46 (internal quotation marks and citation omitted). But this mode of analysis further confirms the reasonableness of Congress's decision to reauthorize Sections 5 and 4(b). As Congress recognized in 2006, "gains by minority candidates remain uneven, both geographically and by level of office," and no African American has achieved statewide office in three Section 5-covered states. H.R. Rep. No. 109-478, at 33. *See also see Nw. Austin*, 573 F. Supp. 2d at 249. Moreover, Plaintiff ignores the fundamental fact that the "overwhelming majority" of the successful Black elected officials identified by Plaintiff hail from single-member majority-Black districts, *see* Pierson Br. at 24-26, which are protected by Section 5 of the VRA, and that African Americans have been elected in fewer than 1% of all Congressional elections in majority-white districts, *see* Cunningham Br. at 25. Language minority citizens have fared even worse: as of 2000, no Native Americans or Hispanics had been elected to office from a majority-white district. *See* H.R. Rep. No. 109-478, at 34. Thus, while there has been undeniable progress, the evidence shows there remains a "ceiling" on minority electoral success in covered jurisdictions. *Id*.

Finally, contrary to Plaintiff's contention, Defendant-Intervenors do not claim that participation rates are "irrelevant," Pl. Reply at 25, but that Section 5 "had a much larger purpose than to increase voter registration." *Cnty. Council of Sumter County v. United States*, 1983 U.S. Dist. LEXIS 20145, at *32 (D.D.C. Jan. 10, 1983). Despite improvements, disparities in participation rates persist in some covered jurisdictions. *See Nw. Austin*, 573 F. Supp. 2d at 265-66. Both Congress and the courts have made clear that participation rates were not themselves

17

the chief evil that the VRA was designed to address, but were used to identify those jurisdictions with high incidences of voting discrimination. *See* Cunningham Br. at 31-32. The fact that Congress relied in part on sources of evidence of discrimination other than participation rates is not constitutionally problematic.

### 3.       Section 2 Litigation.

Section 2 litigation "offer[s] powerful evidence of continuing intentional discrimination" *Nw. Austin*, 573 F. Supp. 2d at 258-59 (describing cases), contrary to Plaintiff's claim that such litigation lacks probative value. *See* H.R. Rep. No. 109-478, at 2 (Congress found that "[p]resent day discrimination experienced by racial and language minority voters is contained in evidence, including … section 2 litigation filed to prevent dilutive techniques from adversely affecting minority voters[.]"). Beyond those Section 2 cases that include formal adjudications of intentional discrimination, Section 2 litigation is often probative of intentional discrimination absent such formal findings. *See, e.g.*, *LULAC*, 548 U.S. at 440 (finding Section 2 liability and noting, without a formal finding of intent, that Texas state legislative redistricting plan "bears the mark of intentional discrimination").[11] Indeed, in vote dilution cases, there is substantial overlap between the factors necessary to prove unconstitutional discrimination and liability under Section 2. *See* Cunningham Br. 34 (citing *Rogers,* 458 U.S. 613*,* and *Thornburg v. Gingles,* 478 U.S. 30 (1986)). Therefore, the over 650 successful Section 2 suits in nine states covered by Section 5 are certainly probative of widespread ongoing discrimination. *See* Cunningham Br. at

---

[11] Formal findings of intent do not appear as frequently as they might otherwise precisely because Section 2's results test was adopted in order to avoid "placing local judges in the difficult position of labeling their fellow public servants 'racists,'" *United States v. Blaine County*, 363 F.3d 897, 908 (9th Cir. 2004). Congress determined that such a requirement would be "divisive, threatening to destroy any existing racial progress in a community." S. Rep. No. 97-417, at 36 (1982).

35 n.19; *see also infra* at 21-23 (comparing Section 2 litigation in covered and non-covered jurisdictions).[12]

### 4.    Racially Polarized Voting.

Plaintiff does not contest that covered jurisdictions suffer from extremely high rates of racially polarized voting (RPV), and that the degree of racial polarization is increasing. *See Nw. Austin*, 573 F. Supp. 2d at 263; Pierson Br. at 21-22. Instead, Plaintiff simply repeats the mantra that RPV is not state action and therefore is irrelevant to the constitutional questions here. Pl. Reply at 54. That precise argument, however, was raised by a dissenter in *City of Rome*, *see* 446 U.S. at 161-62 (Rehnquist, J., dissenting), but rejected by the majority, which recognized that courts may take RPV into account in order to determine if a voting change—which is state action—is discriminatory. *See id.* at 183. RPV is relevant to the need for Section 5 because it is "a necessary precondition for vote dilution," and enhances "[t]he potential for discrimination" *Nw. Austin*, 573 F. Supp. 2d at 263 (citing H.R. Rep. 109-478, at 34-35).

Furthermore, ongoing RPV in covered jurisdictions refutes Plaintiff's assertion that Congress relied on mere assumptions about racial attitudes in covered jurisdictions. Pl. Rep. Mem. at 53. To the contrary, Congress found that "[t]he continued evidence of racially polarized voting in each of the jurisdictions covered by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and language minorities remain politically vulnerable, warranting the continued protection of the Voting Rights Act of 1965." Pub. L. 109-246, 120 Stat. 577, §2(b)(3) (2006). To take but one notable example, the legislative record noted that voter referenda in 2003 and 2004 to remove expressly segregationist aspects of the Alabama

---

[12] Plaintiff repeats the canard that the record included six cases of intentional discrimination against white voters, ignoring that these "gerrymandering" cases are "analytically distinct" from claims of intentional discrimination against a particular group; rather, they are based on the conclusion that voters of all races have suffered a constitutional harm. *See* Cunningham Br. at 34 n.18 (citing *Miller*, 515 U.S. at 911-13).

Constitution[13] were unsuccessful; they were defeated in large part because of ongoing racially polarized voting that is "indicative of the racial cleavage that exists in Alabama to this day." *July 13, 2006 Hearing* at 367, 372.

### 5.    Observer Deployments.

Plaintiff simply ignores the following facts: (1) five covered states have accounted for 66% of all observer deployments since 1982, *see* Pierson Br. at 21; and (2) of the jurisdictions that were certified for federal observer coverage prior to 2006 and that remain certified at present, 98.7% are covered jurisdictions, *see* Cunningham Br. at 39. Contrary to Plaintiff's suggestion, these deployments are not reflective of "speculat[ion]." Pl. Reply at 64. Observers are sent to covered jurisdictions precisely because minority voters have faced "tactics to disenfranchise, such as harassment and intimidation inside polling locations." H.R. Rep. No. 109-478, at 44-45. These deployments, therefore, are probative of precisely the kind of first-generation discrimination that Plaintiff acknowledges is relevant here. Plaintiff cannot seriously dispute that the collective judgments of seven Attorneys General spanning 25 years across four administrations[14] are, if not dispositive, *probative* of the presence of intentional discrimination.

*          *          *

In sum, the record undeniably establishes that Congress reasonably concluded that Section 5 remains necessary to remedy and deter voting discrimination in covered jurisdictions. By its own admission, Plaintiff has not even reviewed that record. Nonetheless, it asks this Court to substitute its judgment for that of Congress, which would flout settled precedent about the respective roles of the judiciary and Congress in enforcing the Reconstruction Amendments. *See*

---

[13] The proposed constitutional amendments would have removed language requiring racial segregation of schools, repealed the poll tax provisions, and removed language inserted in 1956 as part of Alabama's campaign of massive resistance to school desegregation. *See July 13, 2006 Hearing*, at 372.

[14] For a complete list of United States Attorneys General, *see* Wikipedia, Attorney General: List of Attorneys General, http://en.wikipedia.org/wiki/United_States_Attorney_General.

*City of Boerne*, 521 U.S. at 517-18; *Lopez*, 525 U.S. at 284-85; *City of Rome*, 446 U.S. at 173-75. It would also leave victims of voting discrimination with no remedy but the case-by-case method long deemed ineffective because voting suits are "unusually onerous to prepare," litigation is "exceeding slow," and, following favorable judicial decisions, some jurisdictions enact new "discriminatory devices not covered by the federal decrees." *Katzenbach*, 383 U.S. at 314; *see also* Cunningham Br. 21-22; Pierson Br. 39-40 (noting inadequacy of case-by-case method).

**B.      The Legislative Record Supports the Constitutionality of Section 4(b).**

Plaintiff's argument against the coverage provision comes down to one contention: that it "was a far more precise fit to the conditions that existed at the time of the VRA's initial enactment." Pl. Reply at 32. Surgical precision, however, has never been the standard for valid enforcement legislation. *See* Cunningham Br. at 30-31. And the legislative record contained ample evidence demonstrating real differences between covered and non-covered jurisdictions sufficient to support the constitutionality of the coverage provision.

**1.   The Michigan Law School Study.**

As noted above, *supra at* 18-19, incidence of Section 2 litigation is probative of unconstitutional discrimination. Plaintiff concedes that the Michigan Study revealed that "56% of reported Section 2 suits 'with outcomes favorable to minority voters' were in covered jurisdictions" Pl. Reply at 28. However, and without citing any support, Plaintiff asserts that, "if any measure of comparative population were relevant, it would be the minority population." Pl. Reply at 30. This is incorrect. The constitutional question is whether Section 4(b)'s geographic coverage provision is appropriately related to the problem of racial discrimination in voting. *Nw. Austin*, 129 S. Ct. at 2512. It is surely reasonable for Congress to implement a specific remedy

for those jurisdictions where, as here, the evidence before Congress shows that this problem is concentrated in certain states and localities.

But, in any event, Plaintiff's claim that roughly the same number of minority voters live in covered as the non-covered jurisdictions, *see* Pl. Reply at 30, is simply false. In fact, the significant majority of minority voters live in non-covered jurisdictions, which are home to over 50% more African Americans, over twice as many Hispanics, and three times as many Native Americans as are covered jurisdictions.[15] The substantially higher rate of successful Section 2 suits in covered jurisdictions, when accounting for the distribution of our nation's minority population, is surely enough to show that the coverage formula is "sufficiently related" to the problem of voting discrimination.

Moreover, Plaintiff never contests that the substantially higher incidence of Section 2 litigation in covered jurisdictions is "particularly striking." *Nw. Austin*, 573 F. Supp. 2d at 276. One would expect *less* Section 2 litigation in covered jurisdictions because Section 5 "preclearance has blocked hundreds of intentionally discriminatory changes in recent years," *id.* at 258, and prevents others "by quietly but effectively deterring" them. *Nw. Austin*, 129 S. Ct. at 2513 (internal quotation marks and citation omitted).

And, contrary to Plaintiff's claims, *see* Pl. Reply at 29, the Study actually *understates* the number of favorable Section 2 outcomes for plaintiffs in covered jurisdictions because it relies only on published opinions. The record shows many more Section 2 cases in covered jurisdictions that ended without a published judgment, but which still provided relief for plaintiffs. For instance, the *Dillard v. Crenshaw County* litigation, in which plaintiffs

---

[15] *See* Ellen D. Katz et al., *Documenting Discrimination in Voting*, 39 Mich. J. L. Reform 643, 655 n.44 (2006) ("census data shows that 39.3% of African Americans in the United States live in Section 5-covered areas, 31.8% of Hispanics or Latinos live in covered areas, and 25% of Native Americans live in covered jurisdictions.").

successfully demonstrated discriminatory intent, *see* 640 F. Supp. 1347, 1356 (M.D. Ala. 1986), led to challenges to similar practices in many additional Alabama jurisdictions, most of which settled favorably for plaintiffs without producing published opinions. *See October 18, 2005 Hearing* at 1153-54; Pierson Br. at 29-30.

Finally, Plaintiff also ignores the fact that the Michigan Study revealed starker levels of RPV in covered jurisdictions, and more Section 2 cases in covered jurisdictions involved findings of racial appeals and discriminatory election devices. *See Nw. Austin*, 573 F. Supp. 2d at 276 (citing *October 18, 2005 Hearing* at 998, 1003); Cunningham Br. at 37-38. This evidence is certainly probative of ongoing discrimination and further supports the reasonableness and constitutionality of the statute's coverage provision.

### 2. State Reports and Other Evidence.

The record also contained state-by-state reports on covered jurisdictions and reports on various non-covered jurisdictions. Those reports showed substantial evidence of intentional discrimination in covered jurisdictions,[16] but little to no evidence of such discrimination in the non-covered jurisdictions, contrary to Plaintiff's baseless claim. *See* Cunningham Br. at 40-41. As noted *supra* at 11-21, there is substantial evidence in the record of discrimination in covered jurisdictions in various forms, such as the absence of minority candidate success, vastly higher rates of federal observer deployments, and more severe RPV; but there is no corresponding evidence of such factors in covered jurisdictions. The only evidence in the reports for non-covered jurisdictions concerned participation rates, but, as explained above, participation rates

---

[16] *See*, *e.g.*, *March 8, 2006 Hearing, at 45; e.g., id.* at 1612, Voting Rights in Louisiana: 1982-2006 (finding that thirty-three—more than half—of Louisiana's 64 parishes and 13 of its cities and towns have proposed discriminatory voting changes since 1982, many more than once). Other reports contained comparable information regarding ongoing and intentional discrimination in the states of Alabama, Alaska, Arizona, California, Florida, Georgia, Mississippi, New York, North Carolina, South Carolina, South Dakota, Texas, and Virginia—a representative sampling geographically and demographically of jurisdictions covered in whole or in part by Section 5. *Id.*

were not themselves the chief evil that the VRA sought to remedy. *See supra* at 16-18. In sum, the record showed sustained differences between covered and non-covered jurisdictions.

### 3.   The Bailout and Bail-In Provisions Confirm the Constitutionality of the Coverage Provision.

Significantly, Plaintiff concedes that bailout is an appropriate means of alleviating any purported problems of overbreadth "at the margins of an otherwise permissible coverage formula." Pl. Reply at 32. Rather than challenge the bailout mechanism directly, Plaintiff argues that the coverage provision is fundamentally flawed—a position that can only be maintained by denying the volumes of evidence of discriminatory conduct described above and identifying a few jurisdictions that, in Plaintiff's unsupported view, no longer warrant Section 4(b) coverage. *See* Pl. Opening Br. at 39. However, "[t]he way out" for a jurisdiction with a clean record "is not a blanket order from this Court declaring section 5 unconstitutional but rather [a] declaratory judgment[] allowing bailout," *Nw. Austin*, 573 F. Supp. 2d at 276.

Plaintiff also alleges that bailout is inadequate because bailed-out jurisdictions are subject to a temporary re-coverage period and the current bailout mechanism is not as "straightforward" as the original provision. Pl. Reply at 32. Plaintiff, however, simply ignores the record evidence which shows that: (1) every jurisdiction that has sought bailout since 1982 has successfully done so; (2) not a *single* bailed-out jurisdiction has been subject to re-coverage during that time; (3) bailout is easy, inexpensive and achievable; and (4) the current bailout regime following the Court's ruling in *Nw. Austin* has rendered virtually every covered jurisdiction eligible to seek bailout. *See* Cunningham Br. at 42-43.

The mere fact that many jurisdictions have not sought bailout is indicative of the minimal costs associated with Section 5 compliance and that some covered jurisdictions plainly *favor* and support the scope of the existing coverage provision. *See* Cunningham Br. at 29 (citing brief

from covered jurisdictions in favor of existing preclearance process). That Plaintiff now alleges it is ineligible for bailout illustrates not that the requirements for bailout are onerous, but rather that Plaintiff itself believes it has engaged in discriminatory or otherwise disqualifying conduct. *See* Cunningham Br. at 43-44, Pierson Br. at 17.

Plaintiff refers to the purported "severe underinclusiveness" of the coverage provision, Pl. Reply at 31, but it makes no effort to substantiate that characterization beyond simply identifying a few jurisdictions, such as New Mexico and Arkansas, that, in Plaintiff's view, warrant Section 4(b) coverage. *See* Pl. Reply at 27. Plaintiff ignores, however, that those very states have been subject to preclearance obligations under the bail-in provision. *See Nw. Austin*, 573 F. Supp. 2d at 275; Cunningham Br. at 45 (citing *May 16, 2006 Hearing* at 13). While Plaintiff effectively concedes the constitutionality of the bail-in provision, the evidence makes clear that it can only be activated on a limited, case-by-case basis and is therefore not an adequate substitute for Section 4(b) coverage.

Congress's considered judgment of the continuing need for Section 5's protections was based on and supported by a compelling, thorough, and well-developed record revealing ongoing intentional discrimination throughout covered jurisdictions. Here, although Plaintiff has failed to conduct any serious examination of that record, it nonetheless asks this Court to overturn this vital statutory remedy, and a provision that appropriately and reasonably limits its geographic scope and reach. In the face of this evidence, Plaintiff's claims fail as Section 5 remains necessary to protect the fundamental constitutional rights of minority voters.

## <u>CONCLUSION</u>

For the reasons set forth above and in prior memoranda submitted by Defendant-Intervenors, summary judgment should be granted to Defendants.

January 14, 2011

Respectfully submitted,

s/ Kristen Clarke_____
John Payton
 *Director-Counsel*
Debo P. Adegbile
Kristen M. Clarke (D.C. Bar No. 973885)
Ryan P. Haygood
Dale E. Ho
NAACP Legal Defense and
 Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, New York 10013
(212) 965-2200

Samuel Spital
Squire, Sanders & Dempsey, L.L.P.
30 Rockefeller Plaza
New York, New York 10112
(212) 872-9800

*Counsel for Cunningham Defendant-Intervenors*


s/ Laughlin McDonald__
Laughlin McDonald
Nancy G. Abudu
American Civil Liberties
 Union Foundation, Inc.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303-1227
(404) 523-2721
(404) 653-0331 (fax)
lmcdonald@aclu.org
nabudu@aclu.org


s/ Arthur B. Spitzer____
Arthur B. Spitzer (D.C. Bar. No. 235960)
American Civil Liberties Union of the
 Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel. (202) 457-0800

Fax (202) 452-1868
artspitzer@aol.com

*Counsel for Pierson Defendant-Intervenors*


Kim M. Keenan
General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
(410) 580-5791
(410)358-9350 (fax)
lblackburne@naacpnet.org

Victor L. Goode
Assistant General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
(410) 580-5120
(410) 358-9350 (fax)
vgoode@naacpnet.org

*Attorneys for Defendant-Intervenor Alabama State Conference of the NAACP.*


Allison E. Neal
American Civil Liberties Union of Alabama
207 Montgomery Street, Suite 910
Montgomery, AL 36104
(334) 265-2754
(334) 269-5666 (fax)
anaclual@bellsouth.net

*Of Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2011, I served a true and correct copy of the *Consolidated Reply Memorandum of Points and Authorities of Cunningham Defendant-Intervenors and Pierson Defendant-Intervenors in Support of Cross-Motion for Summary Judgment* through the appellate CM/ECF system on all counsel of record.

<u>s/ Kristen Clarke</u>
Kristen M. Clarke
(D.C. Bar No. 973885)

28