IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHELBY COUNTY, ALABAMA<br><br>    Plaintiff,<br><br>  v.<br><br>ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States of America, *et al.*,<br><br>    Defendants. | Civil Action No. 1:10-CV-651<br>(JDB) |

**BRIEF OF DEFENDANT-INTERVENOR
BOBBY LEE HARRIS CONCERNING COVERAGE
UNDER SECTION 4(B) OF THE VOTING RIGHTS ACT**

Defendant-Intervenor Bobby Lee Harris respectfully submits the following response to this Court's Order of February 4, 2011, which directed the parties to address "why Section 4(b) is or is not rational 'in practice' and why Section 4(b) is or is not rational 'in theory.'"[1]  Section 4(b) is rational in theory and practice because: 1) Congress rationally concluded that the covered states and the covered political subdivisions had exhibited widespread voting discrimination since 1982 and their continued coverage under Section 5 was necessary to prevent future discrimination; 2) bailout from Section 4(b) coverage remedies the limited amount of overbreadth because it is workable and available to any covered governmental unit; and 3) Section 3(c) of the Act effectively tailors coverage for underbreadth.

Congress determined in 2006 that there is a continuing problem with racial discrimination in voting.[2]  Congress further found that pre-implementation federal review (preclearance) remains needed to prevent and deter such discrimination,[3] and that the risk of such discrimination makes it necessary to continue to augment antidiscrimination laws of general application within jurisdictions that have a heightened risk of discrimination.[4]  These findings form a predicate to the Court's consideration of whether Congress employed a rational means to

---

[1] "Rational means" review accords substantial deference to factual determinations by Congress.  Congress "need not articulate its reasoning at the moment a particular decision is made." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001).  Plaintiff is required to negate "any reasonably conceivable state of facts that could provide a rational basis for [Congress' decision]." *Id*. (internal quotation marks omitted).

[2] Section 2(b)(2) of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 ("VRARA"), P.L. 109-246, states that "vestiges of discrimination in voting continue to exist as demonstrated by second generation barriers constructed to prevent minority voters from fully participating in the electoral process."

[3] "The record compiled by Congress demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years." VRARA at § 2(b)(9).

[4] *See* H.R. Rep. No. 109-478, at 57 (2006) ("2006 House Rep.") ("The Committee knows from history that case-by-case enforcement alone is not enough to combat the efforts of certain States and jurisdictions to discriminate against minority citizens in the electoral process.  Moreover, the Committee finds that Section 2 would be ineffective to protect the rights of minority voters, especially in light of the increased activity under Sections 5 and 8 over the last 25 years.").

distinguish covered from non-covered jurisdictions after 2006.

Congress prefaced the 2006 legislation with specific findings – based primarily upon the post-1982 record of Section 5 objections, successful Section 5 enforcement actions, denied requests for Section 5 declaratory judgments, successful Section 2 cases, findings of racially polarized voting, observer coverages, and Section 5 submissions withdrawn after the Department of Justice had sent a more information request – which showed that the jurisdictions identified by the existing provisions of Section 4(b) continue to require the preclearance remedy, *see* VRARA §§ 2(b)(3)-(5), (8), as complemented by the bailout provisions of Sections 4(a) of the Act, *see* 2006 House Rep. at 58.  Congress' theory, therefore, can be stated in brief as being that the States and most political subdivisions described by Section 4(b) present a heightened risk of voting discrimination, and that any which do not may obtain release from coverage under Section 4(a).[5]  That Congress might have employed other rational theories or approaches does not negate the rationality of Congress's decision to retain the existing determinations.[6]

In *Katzenbach* the Supreme Court assessed the rationality of the original Section 4(b) coverage provisions in terms of whether they were "relevant to the problem of voting discrimination."  *Katzenbach*, 383 U.S. at 329.  The Court concluded that Section 4(b) was

---

[5]  While the primary basis of continued coverage is the post-1982 record, the heightened risk of future discrimination rationally includes the history of official discrimination which prompted enactment of the Voting Rights Act in 1965, the subsequent extensions of and additions to coverage in 1970 and 1975, and the 1982 extension of those provisions.  Section 5 was enacted because Congress concluded that jurisdictions with a history of voting discrimination "might try . . . maneuvers in the future" to perpetuate voting discrimination.  *South Carolina v. Katzenbach*, 383 U.S. 301, 335 (1966).  The pre-1982 history of voting discrimination is a rational consideration in assessing the risk of future discrimination, even though Congress focused primarily upon post-1982 discrimination, because there remains a distinctive motive for these jurisdictions to "roll back the clock."

[6]  Congress of course had the option of devising a new coverage formula.  Such a formula would not, as Plaintiff appears to believe, be restricted simply to rerunning the 1965, 1970 and 1975 tests using more recent registration and turnout data.  Instead, a new formula that set aside the existing coverage provisions would rationally take into account precisely the same evidence of discrimination -- including discriminatory structural changes (*i.e.*, vote dilution) – as Congress considered in concluding that the existing determinations should be retained.  There is no reason to conclude that a new coverage formula taking into account the post-1982 record of discrimination before Congress would have yielded results so demonstrably superior as to impeach the rationality of Congress' choice.

relevant to the problem at hand because it provided a logical means for identifying the States and political subdivisions which the evidence before Congress demonstrated had a history of widespread and persistent racial discrimination in voting. *Id.* at 329-30 ("Congress began work" in 1965 with evidence demonstrating the jurisdictions that should be covered and the coverage formula then "eventually evolved to describe these areas" in a manner that was "rational in . . . theory").[7]

Thus, the Supreme Court has understood Section 4(b) from the beginning as rationally "describ[ing] those areas" in which Congress had identified a pattern of discriminatory conduct. In this respect the logic of the 2006 reauthorization mirrors that of the 1965 coverage provisions that were so strongly upheld in *Katzenbach*: the Section 4(b) coverage provisions describe the jurisdictions that Congress found to have a current heightened risk of voting discrimination. Thus, there is no theoretical coverage problem posed by the fact that the Act employs registration and turnout information (used in the initial coverage determinations) as a means to identify jurisdictions where there is a pattern of recent voting discrimination.[8]

Any method of identifying jurisdictions for purposes of Section 5 coverage has the potential for overinclusion and underinclusion. The Supreme Court has not demanded exact tailoring on either dimension of "fit" for Section 4(b) coverage. In *Katzenbach*, the Court concluded that the 1965 coverage determinations were not overinclusive because Congress determined that the "great majority of the States and political subdivisions affected by the new remedies of the Act" had engaged in "substantial voting discrimination" or "there was more

---

[7] *See also Briscoe v. Bell*, 432 U.S. 404, 405-06 (1977) (Congress enacted the 1975 coverage formula to identify the jurisdictions where it found "'overwhelming evidence' showing 'the ingenuity and prevalence of discriminatory practices that have been used to dilute the voting strength and otherwise affect the voting rights of language minorities.'").

[8] As the intervenors and the Justice Department previously have emphasized, the purpose of the coverage formulas never has been to define the nature and scope of the voting discrimination that Section 5 was enacted to remedy. *Allen v. State Board of Elections*, 393 U.S. 544, 564, 566 (1969).

fragmentary evidence of recent voting discrimination."[9]  *Id.*

Focusing on where the "great majority" of covered jurisdictions are located – the nine covered States and North Carolina (40 covered counties) – the record in 2006 unquestionably showed repeated, varied, and widespread patterns of "substantial voting discrimination" after 1982 in Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Texas. In each of these States there were: 1) more than 40 objections (including at least six objections to statewide changes) and 2) more than 100 instances where the Department of Justice, or plaintiffs in a lawsuit, successfully utilized the Voting Rights Act to prevent or change a voting practice that was challenged as, or determined to be, discriminatory. *See* Attachment 1.[10]  Arizona and Virginia each showed multiple instances of "substantial voting discrimination" and/or "more fragmentary evidence of recent voting discrimination" after 1982, including at least 15 objections each and more than 30 instances each where the Department of Justice, or plaintiffs in a lawsuit, successfully utilized the Voting Rights Act to prevent or change a voting practice that was challenged as, or determined to be, discriminatory. *Id.*  Although the numerical metrics are less compelling for Alaska, Congress nonetheless received sufficient evidence to show continuing voting discrimination in Alaska and that Section 5 remains needed there as well.[11]

---

[9]  Bailout under the original Section 4(a) was available only to states and to political subdivisions in states not covered as a whole.  *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2515-16 (2009).  For that reason, the *Katzenbach* standard may be more demanding than what should be required here, given that any covered jurisdiction can seek bailout today.

[10]  Attachment 1 summarizes the evidence of discrimination by State as presented to Congress by the National Commission on the Voting Rights Act, as part of its 2006 report "Protecting Minority Voters, The Voting Rights Act at Work, 1982-2005."  *See Nw. Austin Mun. Util. Dist. No. One v. Mukasey*, No. 06-1384 (D.D.C. May 30, 2008, as amended Sep. 11, 2008), slip op. at 54, 56, 69, & 72 [Doc. 143].

[11]  The record evidence concerning Alaska included Section 5 objections to post-1990 state house and senate redistricting plans, which retrogressed Alaskan Natives' electoral opportunities, and testimony that these objections then had a continuing effect on the State's post-2000 legislative redistricting, when the State instituted measures to better account for participation of Alaskan Native voters. *Modern Enforcement of the Voting Rights Act, Hearing Before S. Comm. on the Judiciary*, 109th Cong., at 125-26 (May 10, 2006) (testimony of Natalie Landreth).  The record also included a separate 43-page report on voting discrimination in Alaska. *Voting Rights Act: Evidence of Continued Need, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong., vol. 1, at 1308-62 (Mar. 8, 2006).  That report documented, *inter alia*, Alaska's continuing use of English-only

Congress also can rationally rely upon bailout under Section 4(a) of the Act to address the limited overbreadth that exists, as it has in the past. There are two classes of covered jurisdictions for purposes of considering overbreadth. The first – covered jurisdictions that fail the Section 4(a) bailout standards because they cannot satisfy specific rational indicia of the potential for future discrimination – presents no theoretical overbreadth concern. The second is comprised of covered jurisdictions able to meet the substantive Section 4(a) standards to bail out, but which have not done so. The Supreme Court's expansive interpretation of Section 4(a) in *Nw. Austin* maximized the number of such jurisdictions with standing to bail out, commensurately reducing overbreadth concerns. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504 (2009). As a result, every covered governmental unit – not just states or political subdivisions – that satisfies the substantive bailout criteria now holds in its pocket the key to its release from Section 5 coverage, if it so desires.[12]

---

elections. Since reauthorization, the federal district court in Alaska found that the State had, for many years, failed to comply with the Voting Rights Act by not providing language assistance to Alaskan Native voters, and had knowingly postponed instituting measures needed to comply with the Act. *Nick v. Bethel*, No. 3:07-cv-0098 (D. Aka. July 30, 2008) (order granting preliminary injunction, Doc. 327). After the issuance of the *Nick* injunction, the Attorney General, for the first time, certified a portion of the State for federal election observers, http://www.justice.gov/crt/about/vot/examine/activ_exam.php (last visited Feb. 16, 2011). In 2008 the State also withdrew a Section 5 submission proposing a reduction in the number of polling places in Alaskan Native areas after a request for additional information ("MIR") by the Attorney General. *See N.W. Austin,* Br. Of Amici Curiae Alaska Native Voters and Tribes in Support of Appellees (Section 5 correspondence attached at App. 1-5, App. 14-15), *available at* http://www.americanbar.org/content/dam/aba/publishing/preview/publiced_preview_briefs_pdfs_07_08_08_322_AppelleeAmCuAKVotersandTribes.authcheckdam.pdf.

[12] The Section 4(a) standards are rational indicia of the potential for future voting discrimination. Plaintiff asserts that bailout is an inadequate tailoring mechanism based upon the number of jurisdictions that have availed themselves of bailout, the claim that bailout is overly complicated and the presence of the judicial recapture provision, 42 U.S.C. 1973b(a)(5) (which Plaintiff derisively calls "clawback"). However, as noted above, Congress found that a series of political subdivisions had successfully bailed out since 1984, and Congress encouraged more subdivisions to do so, refuting any assertion that bailout is overly complicated or infeasible in practice, or that bailout is contrary to the Congressional purpose. Moreover, jurisdictions have continued to bail out since 2006, including individual governmental units (as opposed to counties) and jurisdictions outside Virginia. *See* United States Department of Justice, *Terminating coverage under the Act's special provisions*, http://www.justice.gov/crt/about/vot/misc/sec_4.php#bailout (last visited February 16, 2010). Nor is there any evidence that obtaining bailout has required more than a nominal expense compared to other legal work routinely performed for counties and municipalities. With respect to the recapture provision, it is remarkable (and unfounded) for Plaintiff to suggest that acts of post-bailout voting discrimination should not serve as a basis to reinstitute

Furthermore, because voting discrimination may take "subtle" forms, *Allen*, 393 U.S. at 565, it was rational for Congress to rely upon a case-by-case approach to bailout. The Section 4(b) standards for bailout carefully screen jurisdictions using objective criteria that take into account specific local circumstances. An alternative approach might rationally have exempted one or another category of previously covered jurisdictions from Section 5 coverage, but at the expense of this focused consideration. The fundamental nature of the right to vote free from racial discrimination weighs strongly against second-guessing Congress's reliance upon case-by-case bailout.

Underinclusion was a lesser concern in *Katzenbach*, since Congress was not required to "deal with all phases of [the] problem [of voting discrimination] in the same way, so long as the distinctions drawn have some basis in practical experience." 383 U.S. at 331. Moreover, the Court stated that "[i]t is irrelevant that the coverage formula excludes certain localities which do not employ voting tests and devices but for which there is evidence of voting discrimination by other means." *Id.* at 330-331.[13] Congress could appropriately address one phase of the problem through Section 5, and other phases by "strengthen[ing] existing remedies for voting discrimination in other areas of the country." *Id.*

Congress therefore could rationally rely upon judicial coverage under Section 3(c) of the Act to address potential underinclusion. Plaintiff identifies no theoretical flaw with Section 3(c) that would make it unsuitable for Congress to rely upon. Indeed, by requiring a judicial finding of a constitutional violation as the predicate for federal preclearance review, Section 3(c)

---

Section 4(b) coverage, particularly because the decision to reinstitute coverage rests upon determinations by this and other federal courts. *Id.*

[13] Texas provides a good practical example of the limited constitutional relevance of underinclusion. Despite "overwhelming" evidence of discrimination against language minorities, Congress chose not to cover Texas until 1975. *Briscoe v. Bell*, 432 U.S. at 405-06. Congress's decision not to cover Texas in 1965 or 1970 did not concern the Supreme Court in *Katzenbach* or *Georgia v. United States*, 411 U.S. 526 (1973) (upholding the 1970 reauthorization and extension of Section 5).

satisfies even Plaintiff's overly restrictive coverage standards. Nor, in a case based upon the claim that Congress *exceeded* its enforcement powers, is a claim that Congress did not go *far enough* well-framed for constitutional review. Plaintiff has offered no precedent for Congress having acted unconstitutionally by failing to subject a governmental body to prophylactic legislation, and underinclusion does not implicate federalism concerns, because a failure to cover does not impose a burden on a noncovered jurisdiction.

In practice, the overall record[14] shows that no non-covered state has a record of voting discrimination that even remotely approaches the records of the "great majority" of covered States (Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina and Texas), or exceeds the records in Virginia and Arizona.[15] If the overall record had shown otherwise, Congress would have had the discretion to address underbreadth by taking some step beyond Section 3(c).

The Congressional record was weighted overwhelmingly with evidence of post-1982 discrimination. Congress' conclusions based upon that record clearly did not rest upon a mere presupposition that bad actors in 1965, 1970, and 1975 were bad actors in 2006. Section 4(b) accordingly remains a rational and constitutionally permissible targeting device. It would elevate form over substance to conclude that the Section 4(b) coverage provisions cannot provide an appropriate fit to the present-day risk of voting discrimination simply because those provisions describe jurisdictions by reference to voting tests and devices, and voter registration and turnout data, dating from 1964 to 1972.

---

[14] The "overall record," as used here, is made up of the quantifiable metrics contained in Attachment 1. It is important to look at an overall record because no single metric, such as Section 2 litigation, provides a complete basis to compare covered versus non-covered jurisdictions. For example, Section 2 litigation on its own underrepresents the extent of discrimination in the covered jurisdictions because a substantial portion of the voting changes blocked by Section 5 would be expected to result in Section 2 litigation, if not for Section 5.

[15] As discussed above, the numerical indicia for Alaska are less compelling than the other covered States but its record nonetheless provides a rational basis for its coverage.

- 8 -

February 16, 2011  Respectfully submitted,

*/s/ Mark A. Posner*
Jon M. Greenbaum (D.C. Bar No. 489887)
Robert A. Kengle
Marcia Johnson-Blanco
Mark A. Posner (D.C. Bar No. 457833)
Lawyers' Committee for Civil Rights
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
Tel. (202) 662-8325
Fax (202) 783-0857
jgreenbaum@lawyerscommittee.org
bkengle@lawyerscommittee.org
mblanco@lawyerscommittee.org
mposner@lawyerscommittee.org

John M. Nonna
Autumn Katz
Daniel Stabile
David Cooper
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Tel. (212) 259-8311
Fax (212) 649-9461

Certificate of Service

I hereby certify that on February 16, 2011, I served a true and correct copy of the foregoing via the Court's ECF system, on counsel of record.

*Mark A. Posner*

## ATTACHMENT 1

### Post-1982 Evidence Sorted by Total Number of Objections

| State | Objections | Statewide Objections | Objections + Sub. W/drawals + DJ Actions Favorable to Minorities | Section 5 Enforcement Actions with DOJ Participation | Section 2 Successful Cases (reported & unreported) | Observer Coverages |
|---|---|---|---|---|---|---|
| MS | 120 | 11 | 155 | 7 | 67 | 250 |
| TX | 105 | 10 | 165 | 13 | 206 | 10 |
| LA | 103 | 13 | 129 | 6 | 17 | 15 |
| GA | 83 | 16 | 123 | 6 | 69 | 55 |
| SC | 74 | 6 | 96 | 9 | 33 | 23 |
| AL | 46 | 7 | 62 | 7 | 192 | 67 |
| NC | 43 | 10 | 56 | 1 | 52 | 6 |
| AZ | 19 | 5 | 24 | 5 | 2 | 40 |
| VA | 15 | 2 | 19 | 0 | 15 | 0 |
| AK | 2 | 2 | 3 | 0 | 0 | 0 |

The data set forth in this table were submitted to Congress by the National Commission on the Voting Rights Act, as part of its 2006 report "Protecting Minority Voters, The Voting Rights Act at Work, 1982-2005." 1 *Voting Rights Act: Evidence of Continued Need*, *Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong., 2d Sess., at 104, 251, 259-60, 273, 275 and 281 (2006). Maps prepared by the National Commission, setting forth the state-by-state data for the table's first four columns of data, also were included and cited with approval in the district court's opinion in *Nw. Austin Mun. Util. Dist. No. One v. Mukasey*, No. 06-1384 (D.D.C. May 30, 2008, as amended Sep. 11, 2008), slip op. at 54, 56, 69, & 72 [Doc. 143]. All data are for the period 1982 to 2004, except the Section 2 case data, which are for the period 1982 to 2005.