## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHELBY COUNTY, ALABAMA

              *Plaintiff*,

    v.

ERIC H. HOLDER, JR., in his official capacity
as Attorney General of the United States of
America

        *Defendant*,

EARL CUNNINGHAM, HARRY JONES,
ALBERT JONES, ERNEST MONTGOMERY,
ANTHONY VINES and WILLIAM WALKER;
BOBBY PIERSON, WILLIE GOLDSMITH
SR., KENNETH DUKES, MARY PAXTON-
LEE, and the ALABAMA STATE
CONFERENCE OF THE NAACP

        *Defendant-Intervenors*.

Civil Action No. 1:10-CV-651
(JDB)

## CONSOLIDATED SUPPLEMENTAL MEMORANDUM OF POINTS AND
## AUTHORITIES OF CUNNINGHAM AND PIERSON DEFENDANT-INTERVENORS
## IN SUPPORT OF CROSS-MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................... ii

INTRODUCTION ........................................................................................................................1

I.  THE REAUTHORIZATION OF THE EXISTING COVERAGE PROVISION
    WAS RATIONAL IN THEORY ..........................................................................................1

    A.  Congress Reauthorized Section 4(b) Because the Effort to Dislodge More
        Prevalent, Concentrated and Repetitious Discriminatory Voting Practices in
        Covered Jurisdictions Remains Incomplete ........................................................................1

    B.  Congress's Rationale in Reauthorizing Section 4(b) Was Consistent with Prior
        Reauthorizations .................................................................................................................7

II. THE REAUTHORIZATION OF THE EXISTING COVERAGE PROVISION IS
    RATIONAL IN PRACTICE ..................................................................................................9

    A.  The Original 1965 Coverage Provision Was Deemed Rational in Practice
        Because It Generally Captured the Correct Jurisdictions ....................................................9

    B.  The Record Contains Substantial Evidence Demonstrating the Practical
        Rationality of Congress's Reauthorization of the Existing Coverage Provision ..............13

CONCLUSION ..........................................................................................................................15

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Assigned Car Cases,*
274 U.S. 564 (1927) ................................................................................................... 10

*Ayotte v. Planned Parenthood of Northern New England,*
546 U.S. 320 (2006) .................................................................................................. 13

*City of Rome v. United States*,
446 U.S. 156 (1980) ..................................................................................................... 7

*County Council of Sumter County v. United States,*
555 F. Supp. 694 (D.D.C. 1983) .............................................................................. 4, 9

*Currin v. Wallace,*
306 U.S. 1 (1939) ..................................................................................................... 10

*Heller v. Doe,*
509 U.S. 312 (1993) ..................................................................................................... 1

*Fitzgerald Racing Association of Central Iowa,*
539 U.S. 103 (2003) .................................................................................................. 12

*Free Enterprise Fund v. Public Co. Accounting Oversight Board,*
130 S. Ct. 3138 (2010) ............................................................................................. 13

*Lopez v. Monterey County,*
525 U.S. 266 (1999) ..................................................................................................... 9

*Nevada Department of Human Resources v. Hibbs,*
538 U.S. 721 (2003) .................................................................................................. 10

*Northwest Austin Municipality Utility District Number One v. Holder*,
129 S. Ct. 2504 (2009) ....................................................................................... *passim*

*Northwest Austin Municipality Utility District Number One v. Mukasey,*
573 F. Supp. 2d. 221 (D.D.C. 2008) ......................................................... 3, 12, 14, 15

*Railroad Retirement Board v. Fritz,*
449 U.S. 166 (1980) .................................................................................................. 12

*South Carolina v. Katzenbach,*
383 U.S. 301 (1966) ........................................................................................... *passim*

*United States v. Darby,*
312 U.S. 100 (1941) .................................................................................................. 10

*Williamson v. Lee Optical Co.,*
348 U.S. 483 (1955) .................................................................................................. 10

## STATUTES

42 U.S.C. § 1973l(c)(3)...................................................................................................7

## LEGISLATIVE MATERIALS

H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437 ...............................2

H.R. Rep. No. 91-397 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3277 ...............................5

S. Rep. No. 94-295 (1975) .............................................................................................7, 8

H.R. Rep. No. 94-196 (1975)..............................................................................................8

S. Rep. No. 97-417 (1982) ..................................................................................................9

H.R. Rep. No. 109-478 (2006)................................................................................... *passim*

H.R. Rep. No. 109-516 (2006).............................................................................................5

152 Cong. Rec. H5131-H5224 (daily ed. July 13, 2006) .......................................... *passim*

152 Cong. Rec. S7949-S8093 (daily ed. July 20, 2006)......................................................7

*Voting Rights: H.R. 6400 and Other Proposals to Enforce the 15th Amendment to
the Constitution of the United States: Hearings Before Subcomm. No. 5 of
the H. Committee on the Judiciary,* 89th Cong. (March 18, 19, 23, 24, 25, 29,
30, 31; and April 1, 1965)...........................................................................3, 4, 11, 10

*Extension of the Voting Rights Act of 1965: Hearing Before the S. Subcommittee
on Constitutional Rights of the Committee on the Judiciary,* 94th Cong.
(April 10, 1975) ...........................................................................................................5

*Extension of the Voting Rights Act: Hearing before the Subcomm. on Civil and
Constitutional Rights of the H. Comm. on the Judiciary,* 97th Cong. (July 13,
1981) ...........................................................................................................................8

*To Examine the Impact and Effectiveness of the Voting Rights Act: Hearing
before the Subcomm. on the Constitution of the H. Comm. on the Judiciary,*
109th Cong. (October 18, 2005) ...........................................................................13, 14

*Voting Rights Act: Evidence of Continuing Need: Hearing before the Subcomm.
on the Constitution of the H. Comm. on the Judiciary,* 109th Cong. (March 8,
2006) .....................................................................................................................11, 15

*An Introduction to the Expiring Provisions of the Voting Rights Act and Legal
Issues Relating to Reauthorization: Hearing before the S. Comm. on the
Judiciary,* 109th Cong. (May 9, 2006)..........................................................6, 8, 13, 15

*Modern Enforcement of the Voting Rights Act: Hearing Before the S. Comm. on
the Judiciary,* 109th Cong. (May 10, 2006)...................................................................6

*The Continuing Need for Section 5 Pre-clearance: Hearing before the S. Comm.
on the Judiciary,* 109th Cong. (May 16, 2006).................................................. *passim*

*Understanding the Benefits and Costs of Section 5 Pre-clearance:  Hearing before the S. Comm. on the Judiciary*, 109th Cong. (May 17, 2006) .................. *passim*

*Reauthorizing the Voting Rights Act's Temporary Provisions: Policy Perspectives and Views from the Field:  Hearing before the Subcomm. on the Constitution, Civil Rights and Property Rights of the S. Comm. on the Judiciary*, 109th Cong. (June 21, 2006) ...................................................................................6, 7, 9, 15

*Renewing the Temporary Provisions of the Voting Rights Act:  Legislative Options after LULAC v. Perry:  Hearing before the Subcomm. on the Constitution, Civil Rights and Property Rights of the S. Comm. on the Judiciary,* 109th Cong. (July 13, 2006) .................................................................6, 15

## **OTHER AUTHORITIES**

Ellen Katz, et al., *Documenting Discrimination in Voting Under Section 2 of the Voting Rights Act, List of Successful Section 2 Lawsuits Reported Since 1982, available at* http://sitemaker.umich.edu/votingrights/files/violationlocations.pdf. .........................11

Nina Perales *et al.*, *Voting Rights in Texas, 1982-2006*, Dkt. No. 100-12, Ex. 8, *Nw. Austin,* 555 F. Supp. 2d 221 (No. 06-1364) .................................................................15

U.S. Census Bureau, State and County QuickFacts, *available at* http://quickfacts.census.gov/qfd/index.html .................................................................11

U.S. Dep't of Justice, Civil Rights Division, *Section 5 Covered Jurisdictions*, http://www.justice.gov/crt/about/vot/sec_5/covered.php (last visited Feb. 15, 2011) .........................................................................................................7

"[A] departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is *sufficiently related* to the problem that it targets," not *perfectly related* to it. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2512 (2009) (emphasis added). *See Heller v. Doe*, 509 U.S. 312, 320 (1993) (rational basis standard satisfied "'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification'") (citation omitted). As stated in this Court's order, a "rational" but not a perfectly calibrated coverage provision is required.

The Cunningham and Pierson Defendant-Intervenors submit that Congress's decision to stay the course by reauthorizing the coverage provision easily meets that standard. Whether to change or maintain 4(b) coverage was a subject of intense debate and careful assessment during the 2006 reauthorization. That debate included the consideration and rejection of a coverage amendment on the House floor, and intensified during the Senate Judiciary Committee hearings, where almost every witness appearing before the Committee offered testimony specifically about the coverage provision. *See infra* at 6. Read as a whole, the record demonstrates that Congress's decision to maintain the coverage provision was well-supported in both theory and practice, and that it was consistent with the original enactment and subsequent reauthorizations of the VRA, all of which have been sustained against previous constitutional challenges.

## I.   THE REAUTHORIZATION OF THE EXISTING COVERAGE PROVISION WAS RATIONAL IN THEORY

### A.   Congress Reauthorized Section 4(b) Because the Effort to Dislodge More Prevalent, Concentrated and Repetitious Discriminatory Voting Practices in Covered Jurisdictions Remains Incomplete

Congress's reauthorization of the existing coverage provision was premised on the overwhelming evidence before it, which revealed that the jurisdictions identified in 1965 and 1975 as possessing many of the worst histories of voting discrimination continue to suffer from

ongoing discrimination as of 2006. Although racial discrimination in voting was not confined exclusively to covered jurisdictions in 2006 (or in 1965, 1975, or 1982), long experience demonstrated that racial discrimination was particularly difficult to dislodge in Section 5-covered jurisdictions. It was rational in theory for Congress to reauthorize a special remedy targeted at covered jurisdictions, leaving other legal remedies to resolve problems elsewhere.

1.   The logic underlying the initial adoption of the coverage provision in 1965 was not that there was an *a priori* link between voting discrimination and turnout rates in particular elections but, rather, that the coverage provision captured particular "States and political subdivisions which in most instances were familiar to Congress by name" because of their long histories and ongoing problems with voting discrimination. *South Carolina v. Katzenbach*, 383 U.S. 301, 328 (1966). All parties agree that the coverage provision was reverse-engineered for this purpose: that, in 1965, Congress "began … with reliable evidence of actual voting discrimination" in particular jurisdictions, and that the Section 4(b) "formula eventually evolved" to cover those jurisdictions. *Id.* at 329. *See* Pl. Opening Br. at 35 ("Congress 'worked backwards' from the evidence of widespread voting discrimination….") (citation omitted).

Thus, Congress in 1965 expressly acknowledged that a particular threshold for turnout was generally a reliable indicator, though not necessarily itself dispositive, of the presence or absence of voting discrimination. The 1965 House Report observed that "[i]t is possible, of course, that there may be areas covered under the formula of Section 4 where there has been no racial discrimination…." H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2445.[1] What was crucial, however, was that the results of the coverage provision conformed reasonably well to the actual evidence of discrimination before Congress.

---

[1] Conversely, Attorney General Katzenbach admitted, when asked if a 51% turnout rate meant that a jurisdiction had a clean record, that "one could not say there had been no discrimination in those areas."

2.   The rationale underlying the 2006 reauthorization of the existing coverage provision was no different. Congress in 2006 heard testimony explaining that, when prior Congresses adopted the coverage provision, "depressed turnout and registration levels were an indicator of the larger problem of entrenched discrimination in voting … and not the end itself." *May 17, 2006 Hearing*, at 33 (D. Days). *See also id*. at 73 (A. Derfner); *id*. at 130 (N. Persily). Congress maintained the existing scope of Section 5 coverage in 2006 in a manner consistent with the initial 1965 enactment, basing its decision on a determination that, as a group, covered jurisdictions: (1) historically have had the worst problems of voting discrimination; and (2) continue to have serious problems with discrimination today, with voting discrimination remaining both *concentrated in* and *prevalent throughout* covered jurisdictions. *See, e.g*., *Nw. Austin Mun. Util. Dist. No. One v. Mukasey*, 573 F. Supp. 2d 221, 283-300 (D.D.C. 2008) (maps and appendix listing statistics and instances throughout all covered states), *rev'd and remanded on other grounds*, 129 S. Ct. 2504 (2009). *See also infra* at 13-15 (describing evidence in the legislative record comparing covered and non-covered jurisdictions).

Thus, then-Chairman of the House Judiciary Committee James Sensenbrenner explained that Congress's decision to retain the existing coverage provision was, "I repeat 'not' predicated on [participation] statistics alone," but rather "on recent and proven instances of discrimination in voting rights compiled in the … 12,000-page record." 152 Cong. Rec. H5181-82 (daily ed. July 13, 2006); *see also id*. at H5185; *id*. at H5183 (Rep. Chabot) (similar); *id.* (Rep. Scott) (similar); *id.* at H5182 (Rep. Watt) (similar). Consistent with the Supreme Court's subsequent guidance, Congress found that "despite substantial improvements, there is a demonstrated and continuing need" for preclearance in covered jurisdictions, H.R. Rep. No. 109-478, at 53 (2006),

---

*1965 Hearing*, at 27. References to specific Congressional Hearings are cited by date. For full Congressional Hearing citations, please refer to the Table of Authorities at iii-iv.

and reauthorized the existing coverage provision on that basis. *Compare with Nw. Austin*, 129 S. Ct. at 2511-12 (Congress "may" determine that "improvements [in covered jurisdictions] are insufficient and that conditions continue to warrant preclearance under the Act.").

The rationale underlying Congress's determination was also consistent with a previous decision from this court in *County Council of Sumter County v. United States*, 555 F. Supp. 694, 707 (D.D.C. 1983) upholding the 1982 reauthorization.[2] There, the plaintiff, making essentially the same argument as Plaintiff here, challenged Sections 5 and 4(b) alleging that "Congress failed to make current factual findings about the extent of voting registration" in more recent elections. *Id.* This court, however, noted that "the preclearance requirements … had a much larger purpose than to increase voter registration … to more than 50 percent," and, pointing to evidence of ongoing discrimination in the plaintiff jurisdiction, held that "[w]e are not persuaded that the difference between the background circumstances which prevailed in [the plaintiff jurisdiction] in 1964 … and those obtaining today, justify our re-examination of the firm conclusions made by Congress in extending the Act." *Id.*

3.   Plaintiff's contention that the 2006 reauthorization record is "mismatch[ed]" to the original coverage provision, Tr. of Motions Hr'g at 57 (Feb. 2, 2011), ignores the well-documented, unbroken line connecting "first generation" discriminatory devices underlying the original coverage trigger to discriminatory practices that covered jurisdictions employ today. During hearings in 1965, then-Attorney General Katzenbach warned of strategies that could be used for "purposes of evading the 15th Amendment." *1965 Hearing*, at 95. That prediction proved prescient: as Congress observed in 2006, covered jurisdictions resorted to "second-generation" forms of discrimination precisely *as a response* to growing minority

---

[2] A full text of the opinion as reported in the Federal Supplement is available online through Westlaw, but not through Lexis.

enfranchisement. *See* H.R. Rep. No. 109-478, at 21 (noting evidence of "calculated decisions to keep minority voters from fully participating in the political process…" "employed by covered jurisdictions," revealing "that attempts to discriminate persist and evolve…").

Indeed, Congress learned of new forms of gamesmanship and evasion of the Act's requirements beginning with the very first reauthorization. *See, e.g.*, H.R. Rep. No. 91-397 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3277, 3283 (As registration rates increase, covered jurisdictions "have undertaken new, unlawful ways" to discriminate); *April 10, 1975 Hearing*, at 123-24 (N. Katzenbach observing that progress might "encourage a shift in the tactics of discrimination."). *See also* AG Reply at 13-18. In other words, the symptoms of discrimination have changed, but the underlying disease remains the same in the very jurisdictions that have been the subject of Section 5 since its original enactment. Thus, it is not by "a happy accident," Tr. of Motions Hr'g at 137 (Feb. 2, 2011), but by design, that the coverage formula continues to capture the correct jurisdictions.

4.   Because the jurisdictions where discrimination is most prevalent have remained largely the same, but the techniques of discrimination have changed, Plaintiff's suggestion that Congress should have altered the coverage provision to "replace[]" registration data with that from more recent elections, *id.* at 54, would have been *irrational*. There is no meaningful connection – theoretical or otherwise – between more recent participation rates and long-standing voting discrimination that persists today. Thus, while Representative Norwood proposed an amendment along the lines suggested by Plaintiff, *see* H.R. Rep. No. 109-516, at 2 (2006),[3] the majority of witnesses appearing before the Senate Judiciary Committee – including

---

[3] Consistent with Plaintiff's views, the Norwood proposal would have predicated coverage on "a rolling test based off of the last three presidential elections," under which "there would be a minimum of 1,010 covered jurisdictions all across the country in 39 States." 152 Cong. Rec. H5179-81 (daily ed. July 13, 2006). But as Plaintiff notes, the only fully-covered State would have been Hawaii, *see* Tr. of Motions

past and former federal officials, leading academics, and other advocates – testified that this proposal would have produced an irrational outcome, untethering Section 5 from places where voting discrimination is most prevalent today. *See May 9, 2006 Hearing*, at 160-61 (T. Shaw); *id.* at 76 (S. Issacharoff); *May 10, 2006 Hearing*, at 62 (W. Kim); *id.* at 74 (N. Landreth); *id.* at 86 (R. McDuff); *May 16, 2006 Hearing*, at 41-42 (A. Earls); *id.* at 99 (P. Karlan); *id.* at 110 (R. Pildes); *May 17, 2006 Hearing*, at 32 (D. Days) *id.* at 73-74 (A. Derfner); *id.* at 135 (N. Persily); *June 21, 2006 Hearing*, at 117 (D. Wright); *June 21, 2006 Hearing*, at 56 (D. Adegbile); *July 13, 2006 Hearing*, at 29-30 (J. Avila); *id.* at 50-51 (S. Ifill).[4]

Specifically, whereas the initial use of registration and turnout rates taken together with tests and devices were markers of intentional discrimination in the past, today, low registration or turnout in jurisdictions without established histories of racial discrimination reflect problems of a different degree and kind. Thus, as Representative Sensenbrenner recognized, linking coverage to recent participation rates would "sever[] its connection to jurisdictions with proven discriminatory histories." 152 Cong. Rec. H5181 (daily ed. July 13, 2006). *See also id.* H5182 (Rep. Watt) (same); *id.* at H5183 (Rep. Chabot) (same). The irrationality of such a theory is further underscored by how such an "updated" coverage provision would work in practice. For instance, Louisiana would not have been covered despite "substantial evidence in [the] record of

---

Hr'g at 55 (Feb. 2, 2011), a state that lacked "any history of discrimination." 152 Cong. Rec. H5184 (daily ed. July 13, 2006) (Rep. Case).

[4] In response to pointed questions from Senators Cornyn and Coburn, the witnesses expressed a range of views on the coverage question. As indicated in the text above, the majority of witnesses testified that maintaining the existing scope of Section 4(b) was appropriate in both theory and practice. But the Senate also heard testimony from witnesses with different views, including those who favored some sort of change, *see May 10, 2006 Hearing*, at 52 (G. Coleman); *May 16, 2006 Hearing,* at 76 (R. Gaddie); *May 17, 2006 Hearing,* at 138-39 (A. Thernstrom); *June 21, 2006 Hearing,* at 104-05 (G. Reynolds); *id.* at 112 (C. Swain); *July 13, 2006 Hearing,* at 45 (M. Carvin); as well as others who articulated various considerations without opining as to whether the coverage provision should include data from recent elections, *see, e.g.*, *May 9, 2006 Hearing,* at 38 (R. Hasen). In sum, Congress considered a wealth of different views on this issue and reached a rational determination to maintain the existing coverage provision.

ongoing and recent voting discrimination in Louisiana." 152 Cong. Rec. S8010 (daily ed. July 20, 2006) (Sen. Kennedy). *Cf. March 8, 2006 Hearing*, at 1592-1708 (*Voting Rights in Louisiana: 1982-2006*). In sum, proposals to tie coverage to recent participation rates would "not only gut[] the bill, but turn[] the Voting Rights Act into a farce." 152 Cong. Rec. at H5181 (daily ed. July 13, 2006) (Rep. Sensenbrenner). For these reasons, after floor debate and careful consideration, Congress rationally decided to reject the Norwood Amendment (by a vote of 318 to 96) in favor of the existing coverage provision. *See id.* at H5204.[5]

**B.   Congress's Rationale in Reauthorizing Section 4(b) Was Consistent with Prior Reauthorizations**

1.   Maintaining the existing scope of coverage was also consistent with the rationale underlying Congress's last modification of the coverage provision, during the 1975 reauthorization.[6] In 1975, Congress was faced with substantial evidence that entire groups suffering from voting discrimination had been left unprotected under the coverage provision— "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage," 42 U.S.C. § 1973l(c)(3)—and that an expansion of the geographic reach of Section 5 was therefore necessary. *See* S. Rep. No. 94-295, at 17 (1975).[7] Congress heard significant evidence on this issue: "[i]n 7 days of hearings and testimony from 29 witnesses, the Subcommittee

---

[5] Similarly, one witness even proposed expanding Section 5 coverage nationwide, *June 21, 2006 Hearing*, at. 26-27 (C. Swain), but others testified that such an expansion was both unworkable in practice and unwarranted based upon the record. *See id.* at 97-98 (D. Cannon). In any event, even if one could identify other rational alternatives to the existing scope of coverage, doing so would not demonstrate that Congress's decision in this instance was irrational.

[6] States added for coverage in 1975 were Alaska, Arizona and Texas, in addition to individual counties in California, Florida, New York, North Carolina, and South Dakota. *See* U.S. Dep't of Justice, Civil Rights Division, *Section 5 Covered Jurisdictions*, http://www.justice.gov/crt/about/vot/sec_5/covered.php (last visited Feb. 15, 2011).

[7] Previous to the 1975 reauthorization, Congress expressly acknowledged that any coverage provision would have the potential to be over-inclusive in some respects. *See* S. Rep. No. 94-295, at 35 (1975) ("It is possible, of course, that there may be areas covered by this title where there has been no voting discrimination"). That fact, however, had no bearing on the Supreme Court's subsequent decision to sustain the Act on constitutional challenge in *City of Rome v. United States*, 446 U.S. 156 (1980).

documented a systematic pattern of voting discrimination and exclusion against minority group citizens who are from environments in which the dominant language is other than English." *Id.* at 24. Substantial portions of the House and Senate Reports from 1975 included evidence and findings underscoring this unmet need. *See id.* at 24-39; H.R. Rep. No. 94-196, at 16-22 (1975). In the face of this overwhelming evidence, Congress responded by amending the coverage provision to include new areas previously excluded from Section 5's reach.[8]

In 2006, however, Congress learned there was no such analogous pattern of concentrated discrimination that would justify expanding Section 5 coverage. *See May 17, 2006 Hearing*, at 15, 33 (D. Days). Indeed, Congress in 2006 would have been hard-pressed to argue that an expansion was necessary, as it heard little evidence of long-standing problems in non-covered jurisdictions and received testimony that "there is *no evidence* of significant and continuing violations of minority voting rights at the state and local level in non-covered jurisdictions," beyond "isolated incidents." *May 16, 2006 Hearing*, at 47-48 (A. Earls) (emphasis added). *See also May 9, 2006 Hearing*, at 162 (T. Shaw).

2. Congress's 2006 determination to maintain the existing coverage provision was also consistent with its 1982 decision to leave the provision intact. During hearings prior to the 1982 reauthorization, Congress again considered and rejected proposals to change the provision, as there was no evidence indicating that change was necessary. *See July 13, 1981 Hearing*, at 2123-24 (D. Days); *May 17, 2006 Hearing*, at 34 (D. Days). In maintaining the existing scope of coverage, Congress in 1982 cited evidence and made findings concerning ongoing discrimination

---

[8] Notably, Congress in 1975 considered but rejected a proposal from Senator Thurmond, "making virtually the same arguments" about the need to "update" the coverage trigger by tying it to rolling turnout rates. 152 Cong. Rec. H5182 (daily ed. July 13, 2006) (Rep. Watt). *Cf.* S. Rep. No. 94-295, at 73 (1975) (views of Sens. Eastland, McClellan, Thurmond, and Scott, arguing against maintaining the coverage provision on the ground that, as of 1975, the trigger's reliance on conditions from the "base date" of 1964 "is of little evidential value.")

in covered jurisdictions, without receiving extensive evidence comparing covered and non-covered jurisdictions. *See* S. Rep. No. 97-417, at 9-15 (1982); *see also June 21, 2006 Hearing*, at 30, 47, 57 (D. Adegbile). Therefore, the 2006 record—which includes an extensive comparison of covered and non-covered jurisdictions, *see infra* at 13-15—is far more thorough than the record from the 1982 reauthorization, which was sustained against constitutional challenges.[9]

## II. THE REAUTHORIZATION OF THE EXISTING COVERAGE PROVISION IS RATIONAL IN PRACTICE

As an initial matter, Defendant-Intervenors respectfully submit that the Supreme Court in *Katzenbach* did not go so far as to hold that the coverage provision must be rational in *both* theory and practice to withstand constitutional scrutiny, but required only that coverage determinations have "some basis in *practical experience*." *Katzenbach*, 383 U.S. at 330-31.[10] Thus, by itself, the practical rationality of the coverage provision's scope – as demonstrated below both by an independent examination of the 2006 legislative record, and by a comparison of that record to the original 1965 record – is sufficient to establish its constitutionality.

### A. The Original 1965 Coverage Provision Was Deemed Rational in Practice Because It Generally Captured the Correct Jurisdictions

Contrary to Plaintiff's baseless assertion, no court has ever held that the "constitutionality of the coverage formula has always turned on the formula's close tailoring." Pl. Opening Br. at 36. In fact, the original coverage provision has repeatedly been acknowledged as both over- and under-inclusive in some respects. Nevertheless, the Court in *Katzenbach* considered this "irrelevant" – finding the statute rational in practice. 383 U.S. at 330.

---

[9] *See Nw. Austin*, 129 S. Ct. at 2510 (citing *Lopez v. Monterey County*, 525 U.S. 266 (1999)); *County Council of Sumter County*, 555 F. Supp. at 707-08.

[10] Indeed, one witness who testified in favor of modifying the statute admitted that whether "the formula came from 1964" was irrelevant if, in practice, it is "successful in singling out those jurisdictions that continue to engage in intentional discrimination." *See May 9, 2006 Hearing*, at 39 (R. Hasen).

1.   Although Plaintiff claims that, in 1965, Section 4(b) "covered *every* jurisdiction for which there was evidence of the evil necessitating preclearance," Pl. Opening Br. at 36 (emphasis added), the original coverage provision was deemed potentially under-inclusive at the time it was enacted. Indeed, Congress identified several jurisdictions with ongoing racial discrimination in voting that were not ultimately subject to coverage. *See e.g.*, *1965 Hearing*, at 714 (Rep. Schweiker noting the exclusion of Newton County, Arkansas, where no African Americans were registered). Thus, the Supreme Court in *Katzenbach* held that "[i]t is irrelevant that the coverage formula excludes certain localities … for which there is evidence of voting discrimination by … means [other than the use of tests and devices]." 383 U.S. at 330-31. In support, the Court cited, *inter alia*, *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488-89 (1955), which holds that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *See Katzenbach*, 383 U.S. at 331.[11]

2.   The Court in *Katzenbach* also acknowledged that the original coverage provision might be over-inclusive in some respects: it did not require evidence of discrimination in *every* covered jurisdiction, but rather found it sufficient that there was "reliable evidence of actual voting discrimination in a great *majority*" of covered jurisdictions. *Id.* at 329 (emphasis added). And, information before Congress made clear the potential over-inclusiveness of the coverage

---

[11] This principle makes particularly good sense in the enforcement legislation context. Given that, notwithstanding federalism principles, Congress may enact nationwide legislation in response to evidence of discrimination in only certain jurisdictions, *see Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 729-35 (2003), surely Congress may seek to confine remedial legislation to those jurisdictions where such legislation is especially needed, even if there results some level of arguable under-inclusiveness. Any other rule would perversely encourage Congress to apply nationwide remedies even where the evidence reveals need only in certain parts of the country. Moreover, it is well-settled that the legislature may paint with a broader brush than the courts and may take into account practical experience in drawing the boundaries of regulation. *See Currin v. Wallace*, 306 U.S. 1 (1939); *United States v. Darby*, 312 U.S. 100, 121 (1941); *see also Assigned Car Cases*, 274 U.S. 564, 583 (1927) (in establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness with respect to every scenario to which it will be applicable).

provision. *See 1965 Hearing,* at 61 (N. Katzenbach observing little evidence of discrimination in Alaska "that I know of in any kind of concrete way"); *id.* at 86 (Rep. Cramer acknowledging that the 50% registration benchmark may cover "some counties that may have conformed to … nondiscriminatory standards"); *id.* at 27 (N. Katzenbach, similar and observing that "*in general* we have caught those States and counties which have discriminated…") (emphasis added).

3.     Plaintiff acknowledges that, under an ideal coverage provision, some currently covered jurisdictions would remain covered, and argues only that "not all of them would, and in fact some outside would." Tr. of Motions Hr'g at 63 (Feb. 2, 2011). As just explained, however, this same argument could have been made in 1965, and it falls far short of satisfying Plaintiff's burden. Plaintiff's argument turns on the cherry-picking of a handful of jurisdictions that, in its view, should or should not have been covered,[12] but *Katzenbach* demonstrates that, in determining whether coverage is rational in practice, the question is not whether every metric points in one direction, or even whether every jurisdiction is appropriately reached by the statute, but, rather, whether the provision has "*some basis* in practical experience," *Katzenbach*, 383 U.S. at 330-31 (emphasis added), or, as the Supreme Court reaffirmed in *Nw. Austin*, is "sufficiently related" to the problem of voting discrimination, 129 S. Ct. at 2512. *See also May 16, 2006*

---

[12] For example, Plaintiff baselessly asserts that California "has twice as much Section 2 litigation as South Carolina," Tr. of Motions Hr'g at 141 (Feb. 2, 2011), but the Katz Study actually showed that there were *as many successful Section 2 cases* in South Carolina (3 determinations of liability) as there were in all of California (3 total – 2 determinations of liability and 1 settlement). *See* Ellen Katz, *et al.*, *Documenting Discrimination in Voting Under Section 2 of the Voting Rights Act*, *List of Successful Section 2 Lawsuits Reported Since 1982*, *available at* http://sitemaker.umich.edu/votingrights/files/violationlocations.pdf. That fact is astonishing given that South Carolina (with 4.6 million inhabitants) is approximately only one-eighth the size of California (nearly 37 million). *See U.S. Census Bureau, State and County QuickFacts*, *available at* http://quickfacts.census.gov/qfd/index.html. Plaintiff also ignores the fact that these statistics do not include unreported cases, of which there were many more throughout covered jurisdictions, nor does it take account of Section 5 objections, which blocked **80** discriminatory changes in South Carolina between 1982 and 2004. *See March 8, 2006 Hearing*, at 1944. And, even if Plaintiff's math were correct, no single metric is dispositive here – the question is whether, on the whole, the coverage provision is rational, which the evidence well demonstrates. *See infra* at 13-15.

*Hearing*, at 99 (P. Karlan) (noting coverage trigger has always been "slightly over- and under-inclusive," but generally accurate); *May 17, 2006 Hearing*, at 130 (N. Persily) (similar).

Congress has never been required to show evidence of discrimination across all covered jurisdictions, or that each covered jurisdiction individually has a worse record than the non-covered jurisdictions along every conceivable metric. *See Katzenbach*, 383 U.S. at 329-30 (upholding coverage provision based on evidence only from a "majority" of covered jurisdictions, and acknowledging that evidence of discrimination in South Carolina and North Carolina "was more fragmentary" than in other covered states). Legislative line-drawing always entails exercises of judgment that will be imperfect in some respects, but it is not the role of the judiciary to second-guess those determinations so long as they are rational. *See Katzenbach*, 383 U.S. at 331; *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 108 (2003) ("'[T]he fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'") (quoting *R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).

4.   Other statutory provisions address imperfections in the coverage provision that may exist "at the margins." Pl. Reply at 32. As the three-judge district court noted in *Nw. Austin*, the "'bailout' provision, as subsequently amended, addresses potential statutory over-inclusiveness, allowing jurisdictions with clean records to terminate their section 5 preclearance obligation." 573 F. Supp. 2d at 226. The subsequent decision of the Supreme Court established that any covered jurisdiction is entitled to seek bailout. *Nw. Austin*, 129 S. Ct. at 2516. Furthermore, the district court explained that the "judicial 'bail-in' provision," which extends Section 5 to non-covered jurisdictions, "addresses the formula's potential under-inclusiveness." *Nw. Austin,* 573 F. Supp. 2d at 226. *See also* Cunningham-Pierson Reply at 24-25. Even if arguments about the margins of the coverage provision persist, such concerns would not implicate the *facial*

constitutionality of Section 5, and should be addressed through as-applied challenges. *See* Cunningham Opening Br. at 31.[13]

**B.      The Record Contains Substantial Evidence Demonstrating the Practical Rationality of Congress's Reauthorization of the Existing Coverage Provision**

In 2006, Congress also went beyond what it did in 1965, compiling comparative evidence aggregating differences between covered and non-covered jurisdictions, which, as described below and in more detail in prior filings, *see, e.g.*, Cunningham Opening Br. 33-45, Pierson-Cunningham Reply at 21-25, leave no doubt that the coverage formula is rational in practice.

1.  Section 2 litigation, as documented in Professor Katz's Study, demonstrated persisting and meaningful differences between covered and non-covered jurisdictions:

- *Volume of cases.* Congress found that most successful Section 2 cases occurred in covered jurisdictions. *See* H.R. Rep. No. 109-478, at 53 (2006).

- *Comparative Rates of Success.* The record demonstrated that "[p]laintiffs in covered jurisdictions also won a higher percentage of the cases decided than did those in non-covered ones." *October 18, 2005 Hearing,* at 974 (Katz Study).

The record also demonstrated that these statistics substantially *understate* the level of discrimination in covered compared to non-covered jurisdictions, because of:

- *Population numbers.* **Compared to non-covered jurisdictions, covered jurisdictions have a far smaller total population** (less than ¼ of national population, *see October 18, 2005 Hearing,* at 974) **and a smaller minority population** (39% of African Americans, 31.8% of Latinos, and 25% of Native Americans, *see May 9, 2006 Hearing*, at 43-44 (C. Davidson)), which indicates "that there is actually more of a problem in the covered jurisdictions," *May 16, 2006 Hearing*, at 13 (P. Karlan); and

---

[13] Similarly, any constitutional concerns about bail-out or bail-in would be the appropriate subject of an as-applied challenge, not a facial one. Plaintiff's claim that bailout is too stringent—which was rejected in *Katzenbach, see* 383 U.S. at 332, and is refuted by the actual legislative record, *see* Cunningham-Pierson Reply at 24-25—amounts to an objection to the constitutionality of the bailout provision's imputation of a sub-jurisdiction's violations to the larger jurisdiction, not to the constitutionality of the statutory scheme as a whole. *See Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010) ("'when confronting a constitutional flaw in a statute, we try to limit the solution to the problem … while leaving the remainder intact.'") (*quoting Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006)).

- *The Operation of Section 5*. **Section 5 blocks and deters discrimination in covered jurisdictions and, consequently, one would expect to see** *fewer* **Section 2 cases there.** *See Nw. Austin*, 573 F. Supp. 2d at 264 (Section 5 "quietly but effectively deter[s]" discriminatory changes); *id.* at 258 ("preclearance has blocked hundreds of intentionally discriminatory changes").

2.  Other statistical evidence and reports provided indicia of discrimination more prevalent in covered jurisdictions. Notably, the Katz Study indicated that, despite having only a quarter of the nation's population and a third of the nation's minority population, covered jurisdictions suffered from other disproportionate problems relating to:

- *Minority Candidate Success*. A majority of the reported cases (57.6%) that found "a lack of minority candidate success" arose from covered jurisdictions, *October 18, 2005 Hearing*, at 1008. *See also* H.R. Rep. No. 109-478, at 33-34 (2006); Cunningham-Pierson Reply at 16-17;

- *Racial Appeals*. A majority of the reported cases (54.8%) that found racial campaign appeals arose from covered jurisdictions; *id.* at 1003.

Moreover, although racially polarized voting (RPV) exists in both covered and non-covered jurisdictions, evidence showed two key facts about RPV in covered jurisdictions:

- *Severity*. The extent of polarization was worse in covered jurisdictions. *See May 16, 2006 Hearing*, at 48 (in nearly 90% of biracial elections in covered jurisdictions, "80 percent of white voters voted exclusively for white candidates", whereas only 40% of biracial elections in non-covered jurisdictions exhibited such polarization);

- *Trends*. Congress found that the "'degree of racially polarized voting in the South is increasing, not decreasing.'" H.R. Rep. No. 109-478, at 34 (2006) (citation omitted).

Congress heard additional testimony that "[t]his wide divergence in racially polarized voting between covered and non-covered jurisdictions is an important empirical finding demonstrating that minorities have less ability to participate equally in the political process in covered jurisdictions." *May 16, 2006* Hearing, at 48 (A. Earls). *See also id.* at 102 (P. Karlan) and 131 (T. Arrington) (noting "substantial evidence" of greater RPV in covered jurisdictions compared to non-covered); *May 17, 2006 Hearing*, at 132-33 (N. Persily) (same).

14

3.   Evidence of observer deployments also demonstrated persisting differences between covered and non-covered jurisdictions. Two facts are crucial:

- Congress found that "five of the six States originally covered [by Section 5] … accounted for approximately 66 percent of all the observer coverages since 1982," H.R. Rep. 109-478, at 24-25 (2006), and

- Over 90% of counties currently certified for observer coverage are Section 5-covered jurisdictions, *see* Cunningham Opening Br. at 38-39.

4.   Qualitative evidence also points to significant differences between covered and non-covered jurisdictions.[14] Congress received into evidence state-by-state reports documenting current conditions in 11 covered jurisdictions.[15] These reports, along with other evidence in the record, demonstrated substantial ongoing discrimination, including literally hundreds of specific examples. *See Nw. Austin*, 573 F. Supp. 2d at 252-62, 284-301 (citing legislative record); *see also* Cunningham Opening Br. at 10-21 (same); Pierson Opening Br. at 11-18 (same). This stands in stark contrast to the record before Congress concerning non-covered jurisdictions which, as discussed above and in previous filings, see Cunningham Opening Br. at 40-41, presented little to no comparable evidence.

## CONCLUSION

For the reasons identified above and in earlier briefs, we respectfully urge this Court to find the 4(b) coverage provision a rational exercise of Congress's powers to carry out the clear mandate of the Fifteenth Amendment.

---

[14] Numerous expert witnesses testified that, based on their experience, it was rational to conclude that differences persist between covered and non-covered jurisdictions. See, e.g., *May 9, 2006 Hearing*, at 159 (T. Shaw); May *16, 2006 Hearing* at 26, 28 (T. Arrington); *id.* at 55 (A. Earls); *May 17, 2006 Hearing*, at 38 (D. Days); *June 21, 2006 Hearing*, at 98 (D. Cannon).

[15] *See March 8, 2006 Hearing*, at 1308-1362 (Alaska); *id.* at 1363-1453 (Arizona); *id.* at 1456-1498 (Florida); *id.* at 1499-1591 (Georgia); *id.* at 1592-1708 (Louisiana); *id.* at 1709-1727 (Mississippi); *id.* at 1728-1835 (North Carolina); *id.* at 1836-1927 (New York); *id.* 1928-1985 (South Carolina); *id.* at 1986-2029 (South Dakota); *id.* at 2030-2092 (Virginia); *July 13, 2006 Hearing*, at 103-119 (California); *id.* at 365-402 (Alabama); Perales *et al.*, *Voting Rights in Texas*, *1982-2006*, Dkt. No. 100-12, Ex. 8, *Nw. Austin,* 555 F. Supp. 2d 221 (No. 06-1364) and *July 13, 2006 Hearing*, at 357 (Texas).

February 16, 2011

Respectfully submitted,

s/ Kristen M. Clarke
John Payton
 *Director-Counsel*
Debo P. Adegbile
Kristen M. Clarke (D.C. Bar No. 973885)
Ryan P. Haygood
Dale E. Ho
NAACP Legal Defense and
  Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, New York 10013
(212) 965-2200

Samuel Spital
Squire, Sanders & Dempsey, L.L.P.
30 Rockefeller Plaza
New York, New York 10112
(212) 872-9800

*Counsel for Cunningham Defendant-Intervenors*

s/ Laughlin McDonald
Laughlin McDonald
Nancy G. Abudu
American Civil Liberties
 Union Foundation, Inc.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303-1227
(404) 523-2721

s/ Arthur B. Spitzer
Arthur B. Spitzer (D.C. Bar. No. 235960)
American Civil Liberties Union of the
 Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel. (202) 457-0800

*Counsel for Pierson Defendant-Intervenors*

Kim M. Keenan
General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
(410) 580-5791

Victor L. Goode
Assistant General Counsel
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215-3297
(410) 580-5120

*Attorneys for Defendant-Intervenor Alabama State Conference of the NAACP.*

Allison E. Neal
American Civil Liberties Union of Alabama
207 Montgomery Street, Suite 910
Montgomery, AL 36104
(334) 265-2754

*Of Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 16, 2011, I served a true and correct copy of the

*Consolidated Supplemental Memorandum of Points and Authorities of Cunningham and Pierson*

*Defendant-Intervenors in Support of Cross-Motions for Summary Judgment* through the

appellate CM/ECF system on all counsel of record.


s/ Kristen M. Clarke
Kristen M. Clarke
(D.C. Bar No. 973885)