# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHELBY COUNTY, ALABAMA,<br><br>         Plaintiff,<br><br>v.<br><br>ERIC H. HOLDER, JR.,<br>in his official capacity as<br>ATTORNEY GENERAL OF THE<br>UNITED STATES,<br><br>         Defendant.<br><br>EARL CUNNINGHAM, BOBBY PIERSON,<br>BOBBY LEE HARRIS, *et al*.,<br><br>         Defendant-Intervenors. | Civil Action No. 1:10-cv-00651-JDB |

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S AND DEFENDANT-INTERVENORS' CROSS-MOTIONS FOR <u>SUMMARY JUDGMENT</u>

Bert W. Rein (D.C. Bar No. 067215)
William S. Consovoy* (D.C. Bar No. 493423)
Thomas R. McCarthy (D.C. Bar No. 489651)
Brendan J. Morrissey (D.C. Bar No. 973809)
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Tel.: (202) 719-7000
Fax: (202) 719-7049

Frank C. Ellis, Jr.
WALLACE, ELLIS, FOWLER & HEAD
113 North Main Street
Columbiana, AL  35051
Tel.: (205) 669-6783
Fax: (205) 669-4932

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

I.   INTRODUCTION ............................................................................................................. 1

II.  LEGAL STANDARD ........................................................................................................ 1

III. SECTION 4(B)'S COVERAGE FORMULA IS NOT RATIONAL IN THEORY ............. 3

IV.  SECTION 4(B)'S COVERAGE FORMULA IS NOT RATIONAL IN PRACTICE .......... 6

    A.  Basing Coverage on Outdated Registration and Turnout Is Not Rational in Practice ................................................................................................................... 6

    B.  The Legislative Record Demonstrates That "Second Generation Barriers" Are Not Concentrated in the Jurisdictions Selected for Coverage ........................... 7

        1.  Congress Did Not Study Whether "Second Generation Barriers" Are Concentrated in the Jurisdictions Selected for Coverage .............................. 8

        2.  The Coverage Formula Cannot Be Upheld Based on Aggregated Statistics Comparing Covered and Non-Covered Jurisdictions .................. 10

        3.  A State-by-State Comparison Further Demonstrates That "Second Generation Barriers" Are Not Concentrated in the Jurisdictions Selected for Coverage ................................................................................ 13

V.   CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Board of Trustees of University of Alabama v. Garrett*,
    531 U.S. 356 (2001)................................................................................................3

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)..............................................................................................10

*Hayden v. Pataki*,
    449 F.3d 305 (2d Cir. 2006)....................................................................................3

*Morrison v. United States*,
    529 U.S. 598 (2000)..............................................................................................10

*Northwest Austin Municipal Utility District Number One v. Holder*,
    129 S. Ct. 2504 (2009)................................................................................. passim

*Reno v. Bossier Parish School Bd.*,
    528 U.S. 320 (2000)................................................................................................5

*Shelby County v. Holder*,
     270 F.R.D. 16 (D.D.C. 2010).................................................................................3

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966)..................................................................................... passim

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)..................................................................................................5

## STATUTES AND REGULATIONS

42 U.S.C. § 1973aa ........................................................................................................4

42 U.S.C. § 1973d.........................................................................................................11

42 U.S.C. § 1973f .........................................................................................................11

Pub. L. No. 94-73, 89 Stat. 400 (1975).........................................................................4

Pub L. No. 109-246, 120 Stat. 577 (2006)...........................................................4, 5, 9, 11

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**LEGISLATIVE MATERIALS**

151 Cong. Rec. H5131 (daily ed. July 13, 2006)................................................7, 9, 12, 15

*An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization, Hearing Before the S. Comm. on the Judiciary*, 109th Cong., 2d Sess. (May 9, 2006)...........................................................12

Ellen Katz & The Voting Rights Initiative, *VRI Database Master List* ..........11, 12, 14, 15

H.R. Rep. No. 109-478 (2006)................................................................................4

\**The Continuing Need for Section 5 Preclearance: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d. Sess. (May 16, 2006) ........................ passim

*To Examine the Impact & Effectiveness of the Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (Oct. 18, 2005) ..........................................................................11

*Voting Rights Act: An Examination of the Scope of Criteria for Coverage Under the Special Provisions of the Act*, 109th Cong., 1st. Sess. (Oct. 20, 2005) ...................8

*Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess. (Mar. 8, 2006) .................................................................................9, 11, 12, 13

*Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess. (May 4, 2006).........................9

*Voting Rights Act: Section 5 of the Voting Rights Act – History, Scope, and Purpose: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess. (Oct. 25, 2005) ................................12

*Voting Rights Act: Sections 6 and 8 – The Federal Examiner and Observer Program: Hearing Before the House Subcomm. on the Constitution of the Comm. on the Judiciary*, 109th Cong., 1st Sess. (Nov. 15, 2005)................................11

I.      INTRODUCTION

The Court has asked: "[I]n considering the reauthorization of Section 5 of the Voting Rights Act in 2006, was it 'rational in both practice and theory,' *South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966), for Congress to preserve the existing coverage formula in Section 4(b) of the Act?"  As Shelby County has previously explained, and for the additional reasons set forth below, the decision to retain Section 4(b)'s outdated coverage formula is not rational in theory or practice.  It is not rational in theory to rely on decades-old voting data to locate the existence of current voting discrimination or to use that metric, which only correlates to the ability to cast a ballot, to find a pattern of "dilution" affecting the weight of the vote once cast.  It is not rational in practice because the jurisdictions it selects for preclearance are not those that the record before the enacting Congress showed to exhibit the most prevalent "second generation barriers" to minority voting.  Indeed, it appears that Congress failed even to study whether the formula was subjecting the proper jurisdictions to coverage for another 25 years.  For all these reasons, Section 4(b)'s coverage formula is unconstitutional.

II.     LEGAL STANDARD

The Supreme Court first addressed the constitutionality of Section 4(b)'s coverage formula in *South Carolina v. Katzenbach*.  *See* 383 U.S. at 329-31.  In upholding the coverage formula, the Court explained that "Congress began work with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act."  *Id*. at 329.  These jurisdictions "share[d] two characteristics incorporated by Congress into the coverage formula: the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average."  *Id*. at 330.  "Tests and devices [were] relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate [was] pertinent for the obvious reason that

1

widespread disenfranchisement must inevitably affect the number of actual voters. *Accordingly, the coverage formula [was] rational in both practice and theory.*" *Id*. (emphasis added). Indeed, the legislative record showed that "widespread and persistent discrimination in voting during recent years ha[d] typically entailed the misuse of tests and devices, and this was the evil for which the new remedies were specifically designed." *Id*. at 331. Importantly, there were "no States or political subdivisions exempted from coverage under § 4(b) in which the record reveal[ed] recent racial discrimination involving tests and devices. This fact confirm[ed] the rationality of the formula." *Id*.

Under *Katzenbach*, then, Section 4(b)'s coverage formula (as reauthorized in 2006) must be rational *both* in theory *and* practice to withstand constitutional challenge. The Supreme Court recently reaffirmed this requirement, explaining that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2512 (2009). Moreover, the Court identified reasons why the formula is constitutionally problematic both in theory and practice: "The evil that § 5 is meant to address may no longer be concentrated in the jurisdictions singled out for preclearance. The statute's coverage formula is based on data that is now more than 35 years old, and there is considerable evidence that it fails to account for current political conditions." *Id*.

Finally, it is important to again emphasize that resolution of this question must be based on the legislative record compiled by Congress. Defendant Attorney General has sought to rely on evidence outside the legislative record, *see* Pl.'s Consolidated Reply ("Pl. Reply") at 53 n.18 (compiling evidence), including a study of Section 2 litigation by Dr. Peyton McCrary, a Department of Justice ("DOJ") employee, that was "conducted since the 2006 Reauthorization"

2

of the VRA, *see* AG's Mem. of Law in Opp. to Pl.'s Mot. for S.J. ("AG Opp.") at 68-69; AG's Consolidated Reply ("AG Reply") at 32.  The Court, however, has directed the parties "to point to specific instances in the legislative record that support their position."  Moreover, the Court already has ruled that "a facial challenge to the 2006 extension of the VRA is limited to assessing whether the 2006 legislative record contain[s] sufficient evidence of contemporary discrimination" to uphold Section 4(b) and Section 5 as constitutional.  *Shelby County v. Holder*, 270 F.R.D. 16, 19 (D.D.C. 2010) (internal citations and quotations omitted) (emphasis added).  In other words, "a court's analysis is limited to *the actual evidence Congress considered*."  *Id.* (internal quotations omitted) (emphasis added).

The Court's ruling is not only the law of the case, it is indisputably correct.  In this setting, the pertinent question is "whether *Congress* identified a history and pattern of unconstitutional" governmental action sufficient to warrant exercise of its Fourteenth or Fifteenth Amendment enforcement authority.  *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 368 (2001) (emphasis added); *see also Hayden v. Pataki*, 449 F.3d 305, 331 (2d Cir. 2006) (Walker, J., concurring).  As a consequence, the Attorney General cannot rely on studies, reports, declarations, or any other evidence that was not included in the legislative record before the Congress when it reauthorized the VRA in 2006.

## III.   SECTION 4(B)'S COVERAGE FORMULA IS NOT RATIONAL IN THEORY.

The *Katzenbach* Court found Section 4(b)'s formula rational in theory because the triggers for coverage—"the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average"—correlated to blatant and systematic frustration of Fifteenth Amendment rights: the "widespread and persistent" use of intentionally discriminatory tactics to prevent minorities from voting.  *Katzenbach*, 383 U.S. at 330-31.  However, the coverage formula no longer correlates to the problem Congress sought to

3

address in 2006. The discriminatory tests and devices invoked in Section 4(b) have been permanently banned for over 35 years, *see* Voting Rights Act Amendments of 1975, Pub. L. No. 94-73, § 102, 89 Stat. 400 (codified at 42 U.S.C. § 1973aa), and the rates of minority registration and voting in 1964, 1968, and 1972 do not represent the "current political conditions" across the country, *Nw. Austin*, 129 S. Ct. at 2512. The Attorney General has offered no argument for why it was rational in theory to use this outmoded voting data as a trigger for coverage, *see* AG Opp. at 66-67, and one Defendant-Intervenor flatly concedes that relying on this formula was irrational in theory, *see* Cunningham Interv. Opp. to Pl.'s Mot. for S.J. ("Cunningham Opp.") at 31-32 ("[R]egistration and turnout rates . . . did not form the basis for Congress's decision to maintain the Section 4(b) coverage provision.").

Moreover, the coverage formula suffers from another fundamental flaw in theory. Although the statutory coverage factors are tied to the ability to cast a ballot, Congress did not reauthorize Section 5 based on evidence of interference with ballot access. *See* H.R. Rep. No. 109-478, at 12 (2006) ("The record reveal[ed] that many of the first generation barriers to minority voter registration and turnout that were in place prior to the VRA ha[d] been eliminated."). Quite the opposite, Congress found that "[s]ignificant progress has been made in eliminating first generation barriers experienced by minority voters, including increased numbers of registered minority voters, minority voter turnout, and minority representation in Congress, State legislatures, and local elected offices." Voting Rights Act Reauthorization and Amendments Act of 2006 ("VRARAA"), Pub. L. No. 109-246, § 2(b)(1), 120 Stat. 577, 577 (2006). The Attorney General thus has defended the reauthorization by relying on the so-called "second generation barriers" that Congress pointed to as evidence of current voting

4

discrimination. *Id*. § 2(b)(2); *see also* Pl. Reply at 47-64 (cataloging the Attorney General's reliance on vote dilution evidence and other "second generation barriers").

As a result, there is a serious mismatch between the conduct targeted by Congress and the factors that trigger coverage under Section 4(b). Vote dilution and the other "second generation" barriers that Congress relied on do not deny minorities access to the ballot box and thus do not "inevitably affect the number of actual voters." *Katzenbach*, 383 U.S. at 330. As the Attorney General has acknowledged, dilutive techniques instead affect minority voting effectiveness. *See* AG Opp. at 57-62 (emphasizing the "dilutive techniques and other means of minimizing the effectiveness of minority voters that Congress relied upon in 2006"); *see also Thornburg v. Gingles*, 478 U.S. 30, 48 (1986) (explaining that vote dilution "operates to minimize or cancel out [the minority voters'] ability to elect their preferred candidates"); *Reno v. Bossier Parish School Bd*., 528 U.S. 320, 334 n.3 (2000). It is simply not rational to employ a formula that identifies long-past interference with the ability to cast a ballot in an effort to single out jurisdictions that uniquely employ electoral practices undermining the effectiveness of the ballot once cast. In other words, Section 4(b)'s statutory triggers for coverage bear no rational relationship to the "second generation" evidence that Congress relied on to purportedly identify the locus of current voting discrimination.

Importantly, the Attorney General has so far declined to argue that there is a theory under which it is rational to attack vote dilution via a formula addressed to an entirely different problem. AG Opp. at 67 (conceding that the "correlation" between the coverage formula and the kind of evidence relied on by Congress "had become attenuated"). Instead, all of the Attorney General's arguments in defense of the coverage formula have asserted that the formula is serendipitously rational in practice. *See* AG Opp. at 66-68; AG Reply at 30-32. As explained

5

below, all of the Attorney General's arguments defending the coverage formula as rational in practice are unsustainable. *See infra* at 6-15. But even if any of these arguments had merit, which they do not, his failure to defend the coverage formula as rational in theory is itself dispositive. *Katzenbach* makes clear that Section 4(b)'s coverage formula must be rational in *both* theory *and* practice to withstand constitutional scrutiny. The coverage formula's obvious and uncontested theoretical irrationality alone renders it unconstitutional.

## IV.     SECTION 4(B)'S COVERAGE FORMULA IS NOT RATIONAL IN PRACTICE.

The Attorney General has offered three arguments for why the coverage formula is rational in practice. First, he argues that Section 4(b) applies to those "jurisdictions where, historically, 'voting discrimination has been most flagrant.'" AG Opp. at 67 (quoting *Katzenbach*, 383 U.S. at 315). Second, the Attorney General argues that "Congress heard abundant evidence and specifically found that Section 5 preclearance was still necessary in the covered jurisdictions." *Id*. Third, he argues "that voting discrimination, as measured by successful Section 2 litigation, is much more prevalent in covered than in non-covered jurisdictions." *Id*. As explained below, each of these arguments misses the mark.

### A.     **Basing Coverage on Outdated Registration and Voting Data is Not Rational in Practice.**

The formula was originally upheld as rational in practice because it accurately captured those jurisdictions that had "misuse[d] . . . tests and devices" as "this was the evil for which the new remedies were specifically designed." *Katzenbach*, 383 U.S. at 331. That "no States or political subdivisions [were] exempted from coverage under § 4(b) in which the record reveal[ed] recent racial discrimination involving tests and devices . . . confirm[ed] the rationality of the formula." *Id.* By 2006, however, the tests and devices had been permanently banned and the measurable indicators of voting interference no longer indicated a problem. "[T]he racial gap

6

in voter registration and turnout is lower in the States originally covered by § 5 than it is nationwide." *Nw. Austin*, 129 S. Ct. at 2512; Pl.'s Mem. in Support of Mot. for S.J. ("Pl. Mem.") at 25-27; Pl. Reply at 26-27, 44-47.  In fact, if Congress had sought to impose preclearance based on voting data from the 1996, 2000, and 2004 presidential elections, Hawaii would have been the only covered State.  *See* 151 Cong. Rec. H5131, H5181 (daily ed. July 13, 2006).  For this reason alone, the "disparate geographic coverage" of Section 4(b) is not "sufficiently related to the problem that it targets." *Nw. Austin*, 129 S. Ct. at 2512.

> **B.     The Legislative Record Demonstrates That "Second Generation Barriers" Are Not Concentrated in the Jurisdictions Selected for Coverage.**

Instead of defending the coverage formula as addressing ballot interference, the Attorney General mainly argues that the formula is rational in practice because these States have the worst history of voting discrimination and there is sufficient evidence of "second generation barriers" in the covered jurisdictions to impose preclearance on them for another 25 years irrespective of the political conditions in the rest of the country.  *See* AG Opp. at 67.  As Shelby County has explained at length, this argument is unsustainable.  *See* Pl. Mem. at 23-30; Pl. Reply at 39-53. Section 5 imposes "current burdens" and must be justified by "current needs," and Section 4(b)'s "disparate geographic coverage" formula demands a comparison of covered and non-covered jurisdictions to ensure that the "evil § 5 is meant to address" is "concentrated in the jurisdictions singled out for coverage." *Nw. Austin*, 129 S. Ct. at 2512.[1]

---

[1] Even if the Attorney General's argument was not foreclosed, the "second generation barriers" are not sufficient to sustain a prophylactic remedy as intrusive as preclearance; and, even if they could sustain it in the abstract, Congress failed to demonstrate the existence of a campaign by any covered jurisdiction to use dilutive techniques to systematically violate Fifteenth Amendment rights.  *See* Pl. Mem. at 20-35; Pl. Reply at 17-22, 33-65.  Thus, even if *Northwest Austin* did not require a comparison of covered and non-covered jurisdictions, preclearance still is not an appropriate response to the legislative record compiled in support of reauthorization.

7

Thus, the relevant question is not whether the covered States were appropriately targeted by Congress in 1965, or whether there are "second generation barriers" to voting in some of the covered jurisdictions. The constitutional issue is whether the coverage formula properly identifies the jurisdictions for which preclearance is an appropriate legislative response. *See Katzenbach*, 383 U.S. at 331; *Nw. Austin*, 129 S. Ct. at 2512. In other words, does the legislative record demonstrate that the coverage formula captures the proper jurisdictions? Acknowledging the importance of this question, the Attorney General goes to great lengths (even to the point of attempting to introduce evidence outside the legislative record) to demonstrate that these "second generation" barriers are "much more prevalent in the covered than in non-covered jurisdictions." AG Opp. at 67. However, whether data is aggregated or (more appropriately) analyzed state-by-state, the legislative record does not demonstrate systematic differences between covered and non-covered States with respect to the existence of "second generation barriers."

    1.    <u>Congress Did Not Study Whether "Second Generation Barriers" Are Concentrated in the Jurisdictions Selected for Coverage.</u>

Congress was alerted that "identify[ing] continuing problems in the covered jurisdictions, such as racially polarized voting, in complete isolation from consideration of whether similar problems exist in non-covered sites" was constitutionally problematic. *The Continuing Need for Section 5 Preclearance: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong., 2d. Sess., at 200 (May 16, 2006) ("*Continuing Need for Section 5 Preclearance*") (testimony of Pildes); *see also Voting Rights Act: An Examination of the Scope of Criteria for Coverage Under the Special Provisions of the Act*, 109th Cong., 1st. Sess., at 92 (Oct. 20, 2005) (statement of Hebert) (testifying that "most seem to agree that [the formula] is outdated" and that "[t]his is an area that Congress should give serious consideration and study to"). But the issue was never "addressed in any detail in the [Senate] hearings or in the House" and "little evidence in the

[legislative] record examines whether systematic differences exist between the currently covered and non-covered jurisdictions." *Continuing Need for Section 5 Preclearance* at 200-01 (testimony of Pildes); *Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the House Committee on the Judiciary*, 109th Cong., 2d Sess., at 21-22 (May 4, 2006) ("[V]ery little if any of the evidence compares covered jurisdictions to noncovered jurisdictions, and what comparisons there are undermine the bill.") (testimony of Clegg); *Voting Rights Act: Evidence of Continued Need: Hearing. Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess., at 202 (Mar. 8, 2006) ("*Evidence of Continued Need*") ("There is no comprehensive account of Section 2 enforcement."); *id*. at 215 ("[N]o comprehensive study of the extent of racially polarized voting in recent years exists.").[2]

It thus is unsurprising that Congress made no finding of a meaningfully greater incidence of "second generation barriers" in the covered jurisdictions. *See* VRARAA, § 2(b)(4), 120 Stat. at 577. Nor is it surprising that the Attorney General is attempting to introduce studies completed *after* the VRA was reauthorized to vindicate his position. *See supra* at 2-3. Congress

---

[2] At least one Defendant-Intervenor has pointed to the rejection of an amendment to update the coverage formula with more recent registration and turnout data as signaling Congress's diligence. *See* Cunningham Opp. at 32 n.15. But that amendment was not rejected because Congress had carefully studied Section 4(b) and concluded that the existing formula accurately singled out for coverage the jurisdictions where "second generation barriers" were dominant. Rather, the amendment was rejected on the now-discredited ground that it was constitutional to continue to cover the "jurisdictions with the most serious *histories* of discrimination" as long as there was some evidence of voting discrimination in the covered jurisdictions generally (without any consideration as to whether the second generation barriers existed to an equal or greater extent in many non-covered States). 151 Cong. Rec. H5181-82 (remarks of Rep. Sensenbrenner) (emphasis added). As the Supreme Court recently noted, perhaps "'[t]he most one can say in defense of the [coverage] formula is that it is the best of the politically feasible alternatives or that changing the formula would . . . disrupt settled expectations.'" *Nw. Austin*, 129 S. Ct. at 2512 (quoting Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 Yale L.J. 174, 208 (2007)). Congress also may have declined to study the covered-versus-non-covered problem based on counsel it received from at least one legal expert that it was under no constitutional obligation to do so. *See Continuing Need for Section 5 Preclearance* at 95 ("I do not believe that [*Boerne*] requires Congress to engage in a new and detailed comparison of voting practices and procedures and levels of minority participation and electoral success in covered and non-covered jurisdictions before renewing section 5.") (statement of Karlan).

cannot rationally exercise its enforcement authority if it does not even seriously study whether the "statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Nw. Austin*, 129 S. Ct. at 2512.[3]

### 2. The Coverage Formula Cannot be Upheld Based on Aggregated Statistics Comparing Covered and Non-Covered Jurisdictions.

The Attorney General's attempt to defend the coverage formula based on aggregated statistics comparing covered and non-covered jurisdictions misses the mark. AG Opp. at 67. Section 4(b)'s "departure from the fundamental principle of equal sovereignty," *Nw. Austin*, 129 S. Ct. at 2512, requires a careful state-by-state analysis of "second generation barriers" to ensure Congress has afforded each State the sovereign dignity to which it is entitled. Congress cannot use evidence from one State to justify coverage of another State. But even if the legislative record is evaluated in the Attorney General's preferred manner, the evidence still fails to identify any "systematic differences between the covered and the non-covered areas of the United States[;] . . . in fact, the evidence that is in the record suggests that there is more similarity than difference." *Continuing Need for Section 5 Preclearance* at 10 (testimony of Pildes) (quoted in *Nw. Austin*, 129 S. Ct. at 2512).

---

[3] Contrary to the Attorney General's assertion, *see* AG Opp. at 11, AG Reply at 29-30, the failure to carefully study the need for a new coverage formula (or the need to perhaps abandon a formula-based approach to coverage altogether) cannot be remedied by deferring to Congress's decision to retain the current formula. In *Morrison v. United States*, 529 U.S. 598 (2000), for example, the Supreme Court struck down as unconstitutional Congress's exercise of its Commerce Clause and Fourteenth Amendment enforcement authority to enact the Violence Against Women Act. In that case, Congress carefully built a voluminous record and made specific findings supporting the statute's constitutionality. *See id*. at 614. But even this careful and studious exercise of legislative authority did not merit deference to Congress's judgment. A statute's constitutionality "is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." *Id*. (citations and quotations omitted). If Congress's unexplained decision to retain this outdated coverage formula could provide the foundation for a judicial decision upholding Section 4(b), it would be "difficult to conceive of a principle that would limit congressional power." *City of Boerne v. Flores*, 521 U.S. 507, 529 (1997).

The Section 2 and racially polarized voting statistics in the legislative record—the only "second generation barriers" that can plausibly bear on this question—confirm the irrationality of the coverage formula.[4] There were more Section 2 lawsuits filed, as well as more Section 2 suits that resulted in findings of intentional discrimination, in non-covered jurisdictions than in covered jurisdictions. *See* Ellen Katz & The Voting Rights Initiative, *VRI Database Master List* (cited in *To Examine the Impact & Effectiveness of the Voting Rights Act: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess., at 974, 1019-20 (Oct. 18, 2005) ("*Impact & Effectiveness*")).[5] In particular, the Katz Study found

---

[4] The other claimed evidence of "second generation barriers" is Section 5 preclearance actions, preclearance statistics, and federal election observers. VRARAA, § 2(b)(4)-(5), 120 Stat. at 577. Section 5 preclearance actions and statistics provide no basis for a comparative analysis of covered and non-covered States for the obvious reason that non-covered jurisdictions are not subject to preclearance. The rate at which DOJ dispatched federal election observers also provides no insight into this question. Before 2006, DOJ only had the authority to send observers to covered jurisdictions or non-covered jurisdictions that were subject to coverage by a federal court order under Section 3 of the VRA. *See* 42 U.S.C. § 1973f; 42 U.S.C. § 1973d (repealed in 2006, *see* VRARAA, § 3, 120 Stat. at 580). Federal observer data thus may be useful in comparing covered jurisdictions or perhaps in identifying non-covered jurisdictions with the most flagrant instances of voting discrimination. But it is not useful in determining where "second generation barriers" are most prevalent. Regardless, federal election observer statistics only underscore the irrationality of the coverage formula. *See Evidence of Continued Need* at 181 ("The more recent pattern of coverages among the states is somewhat different from patterns in previous maps . . . Map 10B shows a fairly high number in New Mexico, a state not covered by Section 5 but rather by Section 203 . . . On the other hand, there were relatively few in Texas."); *Voting Rights Act: Sections 6 and 8 – The Federal Examiner and Observer Program: Hearing Before the House Subcomm. on the Constitution of the Comm. on the Judiciary*, 109th Cong., 1st Sess., at 196 (Nov. 15, 2005) ("[T]he great bulk of our recent enforcement cases since, say, 1993, have involved jurisdictions (*e.g.,* Massachusetts, California, New York, New Jersey, Florida, Washington, and Pennsylvania) where there is no statutory authority to send Federal observers.") (statement of Schlozman).

[5] This is the only study included in the legislative record that provides any information useful in examining this question. The draft version was presented to Congress in October 2005 and the data in the study was updated throughout the legislative process. *See Impact & Effectiveness* at 964. The final dataset, from which the figures herein are directly taken, is available at a website link included in the legislative record, http://sitemaker.umich.edu/votingrights/files/%20masterlist.xls. The Attorney General has relied on the study conducted by the National Commission on the Voting Rights Act, *see* AG Opp. at 40-41; AG Reply at 31-32, which found 653 Section 2 cases (both reported and unreported cases) in 8 covered States plus North Carolina that resulted in outcomes "favorable" to minority voters since 1982. However, this study does not bear on the present analysis because it made no effort to survey unreported cases in non-covered States, much less determine the number of reported and unreported cases with "favorable" outcomes in non-covered States.

11

21 reported Section 2 lawsuits that resulted in findings of intentional discrimination in non-covered jurisdictions compared with only 12 in covered jurisdictions; the Katz Study also found 171 Section 2 suits filed in non-covered jurisdictions compared with only 160 in covered jurisdictions.  *See id.*[6]  Moreover, of the 105 instances of racially polarized voting since 1982 identified in the Katz Study, only 52 were in covered jurisdictions.  *See id.*[7]  At bottom, the aggregated statistics do not show more Section 2 litigation in the covered jurisdictions, let alone that Section 2 litigation is concentrated in the jurisdictions selected for coverage.

---

[6]  *See also Continuing Need for Section 5 Preclearance* at 202 ("[T]hese [Section 2] violations are not overwhelmingly or systematically concentrated in Section 5 areas; [the Katz] report itself documents that these violations arise in many places with significant minority populations. . . . Since 1990, for example, there are as many judicial findings of Section 2 violations in Pennsylvania as in South Carolina—and more in New York.") (testimony of Pildes); *An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization, Hearing Before the S. Comm. on the Judiciary*, 109th Cong., 2d Sess., at 30 (May 9, 2006) ("*Introduction to the Expiring Provisions*") ("If you look at the history of recent Section 2 litigation under the Voting Rights Act, one sees Section 2 moving more and more to areas where you have recent immigrants coming into the country, and those tend to be as likely as not, as best I can tell, places that are not under covered jurisdictions, places like Lawrence, Massachusetts, some of the smaller towns of Pennsylvania.") (testimony of Issacharoff); 151 Cong. Rec. H5182 (daily ed. July 13, 2006) ("There is no basis for continuing to single out certain States, especially when more than half of the findings of liability on Section 2 claims have come from States outside the covered jurisdictions.") (remarks of Rep. Westmoreland); *Evidence of Continued Need* at 4335 ("More than two-thirds of Ohio's 15% minority population is urban and African American.  Consequently, most of the state's voting rights challenges—as evidenced by the many lawsuits brought under the Voting Rights Act—have centered on allegations of African American disenfranchisement and influence or vote dilution."); *id.* at 321 ("[In] Idaho, Illinois, Indiana, Kansas, Michigan, Minnesota, Missouri, Montana, Nebraska, North Dakota, South Dakota, Ohio, Wisconsin, and Wyoming . . . [a]t least sixty-eight lawsuits were filed in these Midwestern states since 1982 alleging discrimination against minority voters.").

[7]  *See also Continuing Need for Section 5 Preclearance* at 201 (citing the National Commission's report and concluding that "the problems identified, such as racially polarized voting, are similar in many places throughout the country where sizable minority populations exist") (statement of Pildes); *Introduction to the Expiring Provisions* at 29 ("[T]here are significant problems, racially polarized voting and other problems that exist across the Nation and not just in the covered jurisdictions.") (testimony of Hasen); 151 Cong. Rec. H5180 (daily ed. July 13, 2006) ("The scope of racially polarized voting is not confined to the Section 5 states or to the South, but indeed occurs in places such as Wisconsin."); *Voting Rights Act: Section 5 of the Voting Rights Act – History, Scope, and Purpose: Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 1st Sess., at 3272 (Oct. 25, 2005) ("[R]acial discrimination exists across New England in the electoral systems for local and state government.  Voting patterns are racially polarized, and black voters do not have an equal opportunity to elect representatives of their choice.") (statement of Walton).

To combat this conclusion, the Attorney General leans heavily on the fact that 56% of the Section 2 suits "with outcomes favorable to minority voters" occurred in covered jurisdictions. AG Opp. at 68. As Shelby County has explained, this is a highly questionable and self-serving characterization of this evidence. The phrase "outcomes favorable to minority voters" vastly overstates the significance of this evidence. Many of these Section 2 cases involved no finding of intentional discrimination, were not resolved on the merits, or both. And some of the "outcomes" deemed "favorable to minority voters" actually were not favorable judicial outcomes at all, but merely reflected changes in voting laws. *See* Pl. Reply at 29-30.

In any event, aggregated statistics showing slightly more Section 2 litigation with "favorable outcomes" in covered jurisdictions as a group is not a rational basis for subjecting individually-targeted States to another 25 years of preclearance. Such a narrow covered-versus-non-covered split cannot possibly provide a legitimate basis for "depart[ing] from the fundamental principle of equal sovereignty," *Nw. Austin*, 129 S. Ct. at 2512, especially given that the National Commission on the Voting Rights Act acknowledges that a "significant" number of Section 2 cases "resolved favorably to plaintiffs" occurred in non-covered jurisdictions, *Evidence of Continued Need* at 208. To subject a State to preclearance for 25 years under *Katzenbach*, there must be evidence that it has a record of voting discrimination that makes it obviously distinguishable from non-covered States. AG Op. at 67. The Attorney General's "favorable outcome" statistics do not come close to meeting this standard.

    3.    <u>A State-By-State Comparison Further Demonstrates That "Second Generation Barriers" Are Not Concentrated in the Jurisdictions Selected for Coverage.</u>

A state-by-state comparison of Section 2 and racially polarized voting statistics confirms the irrationality of using Section 4(b)'s formula to address "second generation barriers." The Katz Study conclusively demonstrates that Congress did not single out the correct States for

13

coverage.  This is true whether one considers the total number of Section 2 lawsuits filed or any subset thereof.  For example, of the States with the highest number of Section 2 lawsuits filed since 1982, the nine covered States make up only 5 of the top 10, 6 of the top 14, and 7 of the top 26.  *See VRI Database Master List*.  In fact, New York had more Section 2 lawsuits filed since 1982 than all but two covered States.  *See id*.  Notably, one covered State (Alaska) did not have a single reported Section 2 suit filed during the entire period covered by the legislative record.  *See id*.  Thus, if reported Section 2 suits were a proper basis for coverage, then the inclusion of Alaska would require inclusion of every State in the nation.

Similarly, of the States with adjudicated Section 2 violations, covered States make up only 5 of the top 10, 6 of the top 18, and 7 of all 25.  *See id*.  In particular, Illinois had more Section 2 violations than five of the covered States.  *See id*.  Moreover, only 4 of the 20 States with Section 2 lawsuits that resulted in findings of intentional discrimination are covered States.  *See id*.  And, of the 6 States with more than one finding of intentional discrimination, only 2 were covered States.  *See id*.  In fact, Illinois and Tennessee each had more Section 2 lawsuits that resulted in findings of intentional discrimination than all but two covered States.  And, of the States with Section 2 suits with "outcomes favorable to minority voters" (the Attorney General's preferred classification), covered States make up only 4 of the top 8, 5 of the top 11, and 7 of all 30.  *See id*.  In fact, Illinois and New York also had more "outcomes favorable to minority voters" than 5 covered States.  *See id*.

The outcome is the same for racially polarized voting.  Because neither Congress nor any supporter of reauthorization conducted a comprehensive study of racially polarized voting across the nation, *see supra* at 9, the only source of data on covered versus non-covered States is the Katz Study.  Of the 105 instances of racially polarized voting identified by that study, only 48

occurred in covered States.  *See VRA Database Master List*.  Among those 105 instances, only 4 of the 10 States with the highest number of instances of racially polarized voting are covered.  *See id*.  New York, Tennessee, and Illinois each had more instances of racially polarized voting than five of the nine covered States.  *See id.*  And, two covered States (Arizona and Alaska) did not have a single reported suit with a finding of racially polarized voting.  *See id*.  Thus, if reported instances of racially polarized voting were a proper basis for coverage, then targeting Arizona and Alaska for coverage would require coverage of every State in the nation.  Finally, the relative frequency of racially polarized voting in covered States is decreasing; of the 16 instances of racially polarized voting identified by the Katz Study as having occurred in the 2000s, only 5 (or 31%) occurred in covered States.  *See id*.

## V. CONCLUSION

"There is a lot of paper, but not many facts or statistics to show why Georgia is different from Tennessee or why Texas is different from Oklahoma or why racially polarized voting in Wisconsin shouldn't be addressed with a remedy such as [Section 5]."  151 Cong. Rec. H5182 (daily ed. July 13, 2006) (remarks of Rep. Westmoreland).  Indeed, many (if not most) of the nine covered States would not have been covered had Congress chosen to individually identify those States with the highest incidence of "second generation barriers."  But States like New York, Illinois, and Tennessee clearly would have been on that hypothetical coverage list.  If Congress genuinely considered Section 2 litigation and racially polarized voting legitimate barometers for whether a State should be subject to preclearance until 2031, it would not have retained this defective formula, and it certainly would not have targeted these nine States for coverage.  It simply was not rational in theory or practice to impose preclearance on the covered jurisdictions through 2031 based on voting statistics from 1964, 1968, and 1972.  Accordingly, Section 4(b)'s coverage formula is unconstitutional.

Dated: February 16, 2011

Respectfully submitted,

/s/ William S. Consovoy
Bert W. Rein (D.C. Bar No. 067215)
William S. Consovoy* (D.C. Bar No. 493423)
Thomas R. McCarthy (D.C. Bar No. 489651)
Brendan J. Morrissey (D.C. Bar No. 973809)
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Tel.: (202) 719-7000
Fax: (202) 719-7049
Frank C. Ellis, Jr.
WALLACE, ELLIS, FOWLER & HEAD
113 North Main Street
Columbiana, AL  35051
Tel.: (205) 669-6783
Fax: (205) 669-4932

*Counsel of Record*