IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHELBY COUNTY, ALABAMA, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| ERIC H. HOLDER, Jr., | ) |
| in his official capacity as | ) |
| Attorney General of the | ) |
| United States, | ) |
| | ) |
| Defendant | ) |
| | ) |

Civil Action No.
1:10-cv-00651-JDB

## ATTORNEY GENERAL'S SUPPLEMENTAL MEMORANDUM

RONALD C. MACHEN, JR.
  United States Attorney
  District of Columbia

THOMAS E. PEREZ
  Assistant Attorney General

SAMUEL R. BAGENSTOS
JULIE A. FERNANDES
  Deputy Assistant Attorneys General

T. CHRISTIAN HERREN, JR.
DIANA K. FLYNN
RICHARD DELLHEIM (lead counsel)
LINDA F. THOME
ERNEST A. MCFARLAND
JARED M. SLADE
JUSTIN WEINSTEIN-TULL
  Civil Rights Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, N.W.
  NWB-Room 7264
  Washington, D.C. 20530
  Telephone:  (202) 305-1734
  Facsimile:  (202) 307-3961

## TABLE OF CONTENTS

**PAGE**

ARGUMENT

I        PRESERVATION OF THE EXISTING COVERAGE
         FORMULA WAS RATIONAL IN THEORY ........................................................4

II       PRESERVATION OF THE EXISTING COVERAGE
         FORMULA WAS RATIONAL IN PRACTICE ....................................................9

         CONCLUSION....................................................................................................15

# TABLE OF AUTHORITIES

**CASES:**                                                                        **PAGE**

*City of Rome* v. *United States*, 446 U.S. 156 (1980) ....................................................6

*Minnesota* v. *Clover Leaf Creamery*, 449 U.S. 456 (1981) ..........................................14

*Northwest Austin Mun. Util. Dist. No. One* v. *Holder*,
    129 S. Ct. 2504 (2009) ...........................................................................................14

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) ......................................... *passim*

*United States* v. *Board of Comm'rs of Sheffield, Ala.*, 435 U.S. 110 (1978)...................1

*United States* v. *Carolene Prods. Co.*, 304 U.S. 144 (1938) ........................................14

*Vance* v. *Bradley*, 440 U.S. 93 (1979) ..........................................................................14

*Washington State Grange* v. *Washington State Republican Party*,
    552 U.S. 442 (2008)................................................................................................15

**STATUTES:**

Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437......................................1
    § 4(b), 79 Stat. 438.................................................................................................1

42 U.S.C. 1973..............................................................................................................9

42 U.S.C. 1973a(a).......................................................................................................11

42 U.S.C. 1973a(c)......................................................................................................2, 9

42 U.S.C. 1973b(a) ........................................................................................................8

42 U.S.C. 1973b(a)(1) ................................................................................................8-9

42 U.S.C. 1973f(2)........................................................................................................12

**LEGISLATIVE HISTORY:**

*Voting Rights Act:  Evidence of Continued Need:*
    *Hearing Before the Subcomm. on the Constitution of the*
    *House Comm. on the Judiciary*, 109th Cong., 2d Sess. (2006) ...............9-10, 11

**LEGISLATIVE HISTORY (continued):**                                        **PAGE**

*Voting Rights Act Extension:  Hearing Before Subcomm.*
   *No. 5 of the House Comm. on the Judiciary,*
   91st Cong., 1st Sess. (1970)...............................................................................3

*Voting Rights:  Hearings Before the Senate Comm. on the Judiciary,*
   89th Cong., 1st Sess. (1965) ..............................................................................2

74 Fed. Reg. 51,320 (Oct.6, 2009)...............................................................................11

152 Cong. Rec. 14,271-14,280, 14,300-14,301 (July 13, 2006)........................... 4, 7-8

H.R. Rep. No. 165, 94th Cong., 1st Sess. (1975) ..........................................................6

H.R. Rep. No. 439, 89th Cong., 1st Sess. (1965) ................................................... 1-2

## ATTORNEY GENERAL'S SUPPLEMENTAL MEMORANDUM

This memorandum is submitted in response to the court's February 4, 2011, minute order, directing the parties to submit additional briefing on the following question:  "in considering the reauthorization of Section 5 of the Voting Rights Act in 2006, was it 'rational in both practice and theory,' *South Carolina* v. *Katzenbach*, 383 U.S. 301, 330 (1966), for Congress to preserve the existing coverage formula in Section 4(b) of the Act?"

As originally enacted, Section 4(b) included any jurisdiction that:  (1) maintained a test or device on November 1, 1964; and (2) had registration or turnout rates below 50% of the voting age population in November 1964.  Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (1965 Act) § 4(b), 79 Stat. 438.  Congress designed the original formula to describe those states with the worst records of voting discrimination.  *South Carolina* v. *Katzenbach*, 383 U.S. 301, 329-330 (1966); *United States* v. *Board of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 119 (1978) (coverage formula was based on Congress's finding that "that there was a high probability of pervasive racial discrimination in voting in areas that employed literacy tests or similar voting qualifications and that, in addition, had low voter turnouts or registration figures").  Indeed, Congress knew, when it enacted the formula, which States and counties it would encompass. H.R. Rep. No. 439, 89th Cong., 1st Sess. 13 (1965) (1965 House Report); *South Carolina*, 383 U.S. at 328 (coverage formula includes "a small number of States and political subdivisions which in most instances were familiar to Congress by name").[1]  The 1965 House Report explained that "many of the States and political subdivisions to which the formula applies have engaged in widespread violations of the 15th amendment over a period of time," and that each of "the six Southern States which appear to be covered by [the formula] * * * has had a general

---

[1]  Indeed, opponents of the formula complained that the jurisdictions to be targeted by the formula had been identified before the formula was devised.  1965 House Report 41, 45.

public policy of racial segregation evidenced by statutes in force and effect in the areas of travel, recreation, education, and hospital facilities."   1965 House Report 14.

Congress also knew, in 1965, that there was not a perfect fit between the coverage formula and the jurisdictions for which there was evidence of voting discrimination.  In testimony supporting the Act, Attorney General Katzenbach explained that "voting discrimination ha[d] unquestionably been widespread" in six of the southern states captured by the formula.  *Voting Rights:  Hearings Before the Senate Comm. on the Judiciary*, 89th Cong., 1st Sess. 17 (1965).  But in South Carolina and Virginia, and in some covered counties in North Carolina, "other forms of discrimination" were merely "suggestive of voting discrimination." *Ibid.*  If such jurisdictions in fact had not engaged in voting discrimination, he stated, they could take advantage of the bailout provision to escape coverage.  *Ibid.*; *id.* at 246.  The Attorney General also acknowledged that there was evidence of voting discrimination in jurisdictions that would not be covered by the formula, including northern Florida, Tennessee, and Arkansas.  *Id.* at 240.  If constitutional violations were subsequently proven in any non-covered jurisdictions, of course, they could become subject to the preclearance requirement pursuant to the bail-in provision.  42 U.S.C. 1973a(c).

Congress did not, however, intend the original coverage formula to be recalculated with each subsequent reauthorization.  When Congress reauthorized the Voting Rights Act (VRA) in 1970, 1975, and 1982, it carefully examined the evidence of continued voting discrimination in the specific jurisdictions it had previously chosen to cover, and concluded that, although barriers to registration and turnout were declining in those jurisdictions, Section 5 preclearance remained necessary to prevent those and other forms of voting discrimination.  AG Mem. 20-23; AG

Reply Mem. 14-18.[2]  In 1970, for example, Congress learned that basing coverage on turnout

data from the 1968, instead of the 1964 election, would have resulted in the removal of the then

fully-covered states of Alabama, Louisiana, Mississippi, Louisiana, and Virginia from

coverage—even though those states continued to demonstrate a significant pattern of

discrimination.  *Voting Rights Act Extension:  Hearing Before Subcomm. No. 5 of the House

Comm. on the Judiciary*, 91st Cong., 1st Sess. 93 (1970).  Congress thus added new covered

jurisdictions in 1970 and 1975,[3] but it saw no sufficient basis to stop covering any of the existing

ones.  Congress also amended the bailout provision in 1982, shifting the focus of the bailout so

that it would reward jurisdictions that had not engaged in voting discrimination for a period of

ten years.  AG Mem. 4.

Similarly, when Congress reauthorized Section 5 in 2006, it chose to continue covering

the jurisdictions that it had already subjected to the preclearance requirement and that had not

bailed out.  Congress acted based on findings that voting discrimination continued to exist in

those specific jurisdictions and that Section 5 preclearance remained necessary to protect

minority voting rights there.  That determination alone was sufficient.  Having lawfully covered

a set of jurisdictions in 1965 (including Alabama and all of its counties), and having lawfully

---

[2]  Citations to "AG Mem." refer to the Attorney General's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment.  Citations to "AG Reply Mem." refer to the Attorney General's Consolidated Reply Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment.  Citations to "Tr." refer to the February 2, 2011 transcript of the motions hearing in this case.

[3]  The 1970 and 1975 reauthorizations expanded Section 4(b) to include jurisdictions that maintained a prohibited test or device on November 1, 1968, or November 1, 1972, and had voter registration or turnout of less than 50% of eligible residents in the Presidential elections of 1968 or 1972.  AG Mem. 4 & n.1.  The 1975 Reauthorization also expanded the definition of "test or device" to include a practice of providing voting materials only in English in jurisdictions in which at least 5% of the voting age population were members of a single-language minority.  AG Mem. 4 & n.1.

3

extended the preclearance requirement in those jurisdictions in 1970, 1975, and 1982, Congress was entitled in 2006 to ask simply whether those jurisdictions, to the extent they had not bailed out, had sufficiently eliminated the pattern of discrimination that justified their coverage in the first place.  But Congress did more than simply ask whether the *covered jurisdictions* had purged their violations.  Congress also considered comparative evidence establishing that voting discrimination was more prevalent in those jurisdictions than in the non-covered jurisdictions. AG Mem. 5-6, 68-69; AG Reply Mem. 30-32.  Congress also considered and rejected an amendment that would have covered only those jurisdictions in which registration or turnout fell below 50% in the 1996, 2000, and 2004 elections.  See 152 Cong. Rec. 14,271-14,280, 14,300-14,301 (July 13, 2006).  Under this amendment, the only fully covered state would have been Hawaii.  *Id.* at 14,274.  More fundamentally, because the Voting Rights Act itself eliminated many of the discriminatory barriers to registration and turnout, a focus on current registration and turnout numbers would fail to target those jurisdictions with both a history and a current pattern of discrimination, thereby "sever[ing] [the statute's] connection to jurisdictions with proven discriminatory histories."  *Ibid.* (Rep. Sensenbrenner).

Accordingly, in the context of the 2006 reauthorization, the coverage formula remains rational in theory because it identified those jurisdictions with the most deeply-rooted patterns of voting-related discrimination.  It is rational in practice because Congress relied upon compelling evidence demonstrating that voting-related discrimination remains concentrated in those jurisdictions.

# I

## PRESERVATION OF THE EXISTING COVERAGE FORMULA WAS RATIONAL IN THEORY

As we explain in Part II, the coverage formula in fact reaches those jurisdictions with both a longstanding history and a continuing pattern of voting discrimination.  And that is no mere "happy accident."  Tr. 137.  Rather, that formula was always designed to reach just those jurisdictions.  Although the statute originally covered the jurisdictions that both used a test or device and had less than 50% registration or turnout in the 1964 elections, the coverage formula was, as plaintiff acknowledges, "reverse-engineered."  Tr. 56.  Congress "began work with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act," and then "evolved" a formula to capture those areas.  *Katzenbach*, 383 U.S. at 329.

The jurisdictions described by the formula had a long history of racial discrimination in voting.  The *South Carolina* Court described "the variety and persistence" of methods of discrimination in the covered jurisdictions, including methods that denied minorities the opportunity to register and cast ballots (such as "[g]randfather clauses," "[p]rocedural hurdles," "[i]mproper challenges," and the "discriminatory application of voting tests") and methods that diluted the effectiveness of minority votes (such as the "white primary" and "[r]acial gerrymandering").  383 U.S. at 311-312.  Although the "widespread and persistent discrimination in voting" in the covered jurisdictions "*during recent years* ha[d] typically entailed the misuse of tests and devices," *id.* at 330-331 (emphasis added), Congress recognized that the long history in those jurisdictions gave reason to believe that, once it outlawed those tests or devices, they would seek new means of discriminating.  Upholding Section 5 in 1966, the Supreme Court explained that because the covered jurisdictions "had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees," Congress could

rationally "suppose that these States might try similar maneuvers in the future." *Id.* at 335. Again upholding the preclearance requirement in 1980, the Court relied on the "demonstrable history of intentional racial discrimination in voting" in the specific jurisdictions that Congress chose to cover. *City of Rome* v. *United States*, 446 U.S. 156, 177 (1980).

Because the 1964 registration and turnout data in the original coverage formula were not relevant for their own sake but because they, along with the test or device requirement, described those jurisdictions with a history of "widespread and persistent discrimination in voting," *South Carolina*, 383 U.S. at 328-329, it should be no surprise that in 2006 those same jurisdictions – except for the ones that had bailed out – still had a record of voting discrimination warranting continued application of the preclearance requirement.  As the 1965 Congress anticipated, the *form* of discrimination in those jurisdictions changed to a large extent.  Because Congress prohibited tests and devices, discrimination no longer focused as heavily on keeping minorities from registering to vote.  See AG Mem. 21, 59; AG Reply Mem. 14-18; *City of Rome*, 446 U.S. at 181 ("As registration and voting of minority citizens increases [*sic*], other measures may be resorted to which would dilute increasing minority voting strength.") (quoting H.R. Rep. No. 165, 94th Cong., 1st Sess. 10 (1975)).  As had been the case in previous reauthorizations, covering jurisdictions according to a formula that looked at registration and turnout figures from *recent* elections would not be a sound way of identifying jurisdictions that continued to discriminate.  Nor would recent discrimination, absent the longstanding history and pattern that justified imposition of the preclearance requirement on the original covered states like Alabama, necessarily call for application of that requirement to newly identified jurisdictions.  But, as in 1970, 1975, and 1982, all of the evidence before Congress in 2006 demonstrated that the same jurisdictions with a longstanding history of discrimination in voting – those described by a

formula that originally looked to turnout in the 1964 election – were the ones in which discrimination persisted.  See Part II, *infra*; AG Mem. 23-64, 68-69; AG Reply Mem. 30-32.

As noted, the House of Representatives in 2006 explicitly rejected an amendment that would have covered all and only those jurisdictions in which voter registration or turnout was less than 50% in the most recent three presidential elections.  See p. 4, *supra*.  The debate over that amendment highlights the rationality of maintaining the Act's original coverage formula. Representative Sensenbrenner, then the Chair of the House Judiciary Committee and a lead sponsor of the reauthorization, explained that a formula that relied on recent registration and turnout would "render the [bill] unconstitutional" by "radically altering the coverage formula of the Voting Rights Act in a way that severs its connection to jurisdictions with proven discriminatory histories."  152 Cong. Rec. 14,274 (July 13, 2006).  Such a formula would reach only "random scattershot jurisdictions across the country that do not have the century-long history of discrimination that the covered States do, and which the Supreme Court requires for the application of the preclearance and Federal observer conditions contained in the VRA." *Ibid.*[4]

The supporters of continuing to cover the same jurisdictions recognized that those jurisdictions were described by a statutory formula that looked to registration and turnout data from as early as 1964.  But, as Representative Sensenbrenner emphasized, "coverage is not, and I repeat 'not' predicated on these statistics alone."  152 Cong. Rec. 14,275 (Jul. 13, 2006).  Rather,

---

[4]  See also 152 Cong. Rec. 14,275 (Jul. 13, 2006) (Rep. Watt) (basing coverage on registration or turnout in the last three presidential elections would "unhinge[] section 5 from its historical connections, disrupt[] the delicate balance embodied by the act, and make[] it likely that the act would be declared unconstitutional"); *id.* at 14,276 (Rep. Chabot) (basing coverage solely on registration or turnout in the last three presidential elections "undermine[s] the policy of protecting minority voters who have been historically discriminated against, the central crux behind the Voting Rights Act" and also "threatens the constitutionality of the" VRA).

the coverage formula – with the test or device requirement – was designed to bring those "jurisdictions with the most serious histories of discrimination under Federal scrutiny."  *Ibid.* See also *id.* at 14,276 (Rep. Chabot) ("While the [statutory] formula utilizes neutral registration and turnout data from the 1964, 1968 and 1972 elections, coverage is really about the documented history of discriminatory practices.").  That is why bailout is tied to the elimination of discriminatory practices and not exclusively to evolving political participation rates.  See 42 U.S.C. 1973b(a).

Supporters of maintaining the statute's current coverage also recognized that voting discrimination is not limited to the covered jurisdictions but that Section 2 of the Voting Rights Act provides remedies for discrimination nationwide.  See *ibid.* (Rep. Watt) (noting that outside of the covered jurisdictions, "[v]oters may seek redress for recent voting rights infractions under existing provisions of the Voting Rights Act").  And, as Representative Watt observed, "where a court finds sufficient justification based on actual evidence, it may impose [under Section 3(c) of the Act] the identical preclearance requirements that covered jurisdictions must satisfy currently."  *Ibid.*

As this discussion highlights, continuing the original coverage formula was rational in theory.  That formula was designed to describe jurisdictions – "which in most instances were familiar to Congress by name," *South Carolina*, 383 U.S. at 328 – with such a longstanding and continuing history of discrimination as to justify imposition of the special remedy of preclearance.  As Congress anticipated in 1965, those jurisdictions were the ones where discrimination has persisted though in some respects changed in form.  Congress rationally determined that the Act's special provisions should continue to apply to the same jurisdictions – while continuing to provide individual jurisdictions the opportunity to bail out if they establish a

clean record for ten years, 42 U.S.C. 1973b(a)(1).  And Congress rationally concluded that more recent instances of discrimination in jurisdictions without such a longstanding record of constitutional violations were best addressed in the first instance by Section 2's nationwide remedy, 42 U.S.C. 1973, and should warrant imposition of the preclearance requirement only if a court so ordered under Section 3(c), 42 U.S.C. 1973a(c).  As the quoted statements of Representatives Sensenbrenner, Watt, and Chabot make clear, Congress's decision to continue to cover the same jurisdictions reflected a responsible attentiveness to the constitutional limits on congressional action.  That decision was a rational one.

## II

### PRESERVATION OF THE EXISTING COVERAGE FORMULA WAS RATIONAL IN PRACTICE

Congress's decision to continue application of Section 5 to the covered jurisdictions was rational in practice for the same reasons:  continued evidence of voting discrimination in the covered jurisdictions, evidence that discrimination continued to be more prevalent in the covered than in the non-covered jurisdictions, and the availability of Sections 3(c) and 4(a) as workable remedies to cure any under- or overinclusiveness in the existing formula.  See Supp. Berman Dec. (Att. A to Attorney General's Reply brief) and 2d Supp. Berman Dec. (Att. A hereto) for lists of jurisdictions affected by Sections 3(c) and 4(a), respectively.

The evidence of continued discrimination in the covered jurisdictions is set out at length in the previous briefs filed by the Attorney General and the defendant-intervenors in this case. See, *e.g.*, AG Mem. 23-64, 68-69; AG Reply Mem. 30-32.  The following table summarizes evidence for several indicia of voting discrimination, based on data submitted to Congress by the National Commission on the Voting Rights Act, for the nine states that are currently fully covered by Section 5 as well as North Carolina, in which 40 counties are covered.  See *Voting*

*Rights Act:  Evidence of Continued Need:  Hearing Before the Subcomm. on the Constitution of the House Comm. on the Judiciary*, 109th Cong., 2d Sess. 250-251, 272-273, 275, 282 (2006) (*Evidence of Continued Need*).

| State | Section 5 Objections | Section 5 Objections, Withdrawals, and Declaratory Judgment Actions | Section 5 Enforcement Actions | Reported and Unreported Section 2 Actions With Outcomes Favorable to Minority Plaintiffs | Elections with Observer Coverage |
|---|---|---|---|---|---|
| Alabama | 46 | 62 | 22 | 192 | 67 |
| Alaska | 2 | 3 | 0 | N/A | N/A |
| Arizona | 19 | 24 | 3 | 2 | 40 |
| Georgia | 83 | 123 | 17 | 69 | 55 |
| Louisiana | 102 | 129 | 5 | 17 | 15 |
| Mississippi | 120 | 155 | 15 | 67 | 250 |
| North Carolina | 43 | 56 | 3 | 52 | 6 |
| South Carolina | 74 | 96 | 10 | 33 | 23 |
| Texas | 105 | 165 | 29 | 206 | 10 |
| Virginia | 15 | 19 | 1 | 15 | 0 |

As this table demonstrates, there is evidence of voting discrimination based on multiple indicia for most of the fully-covered states (Alabama, Arizona, Georgia, Louisiana, Mississippi, South Carolina, and Texas), as well as for North Carolina.  Where one indicator of voting discrimination is relatively low in these states, another indicator is high.  For example, while there were relatively few Section 2 actions in Louisiana, that state had the third largest number of Section 5 objections among the covered states.  Similarly, while there were only two Section 2 actions in Arizona, that state had a substantial number of elections with observer coverage.  Texas had only ten elections with observer coverage, but accounted for 206 of the Section 2 actions, 105 Section 5 objections, and 29 Section 5 enforcement actions.  There were a substantial number of Section 5 objections in almost all of the covered states.  The exceptions are

Virginia and Alaska.  Notably, Virginia is the home of the vast majority of sub-jurisdictions that have bailed out since 1984.  See Supp. Berman Dec. Att. A.[5]  And, although there were only two objections in Alaska, both involved statewide submissions.  *Evidence of Continued Need* 260.[6]

Congress also received abundant evidence that voting discrimination was more prevalent in the covered jurisdictions than in the non-covered jurisdictions.  In particular, the evidence demonstrates that:

- 81% of Section 2 cases with outcomes favorable to minority plaintiffs occurred in covered jurisdictions.  AG Mem. 68-69; AG Reply Mem. 31-32.

- The extent of racially polarized voting is more severe and racial appeals during campaigns were more common in covered jurisdictions.  Cunningham Consolidated Mem. of Points and Authorities in Opposition to Pl's Mot. for Summ. J. and in Support of Cross-Mot. for Summ. J. 36-38 (Cunningham Mem.).

- The vast majority of elections to which election observers have been assigned have been in the covered jurisdictions.  Cunningham Mem. 38-40; *Evidence of Continued Need* 275.[7]

---

[5]  Virginia may be eligible to bail out in the near future.  The last objection within Virginia occurred in 2003, to one of a series of redistricting plans submitted by Northampton County.  http://www.justice.gov/crt/about/vot/sec_5/va_obj2.php.  Because the Department of Justice has not conducted an investigation, the Attorney General does not have sufficient information to state how this objection, or other factors, would affect the State's eligibility to bail out.  Cf. AG Mem. 73-74.

[6]  In addition, in 2008, a district court entered a preliminary injunction against the State of Alaska in *Nick* v. *City of Bethel*, No. 3:07-CV-0098, Doc. 327 at 5, 7-10 (July 30, 2008) (D. Alaska), finding that plaintiffs were likely to succeed on the merits of their claims against the State under Sections 203, 4(f)(4) and 208 of the VRA.  And the Attorney General recently certified Bethel, Alaska, for observer coverage.  74 Fed. Reg. 51,320 (Oct. 6, 2009).

[7]  Under Section 3(a), a court may certify a non-covered jurisdiction for observer coverage if it finds such relief appropriate to remedy Fourteenth or Fifteenth Amendment violations that have occurred in the jurisdiction.  42 U.S.C. 1973a(a).  Under Section 8, observers are assigned to covered jurisdictions when the Attorney General certifies either that he "has

When the data on Section 2 cases is broken down by state, the same pattern persists.  The following tables report the number of reported and unreported Section 2 cases with outcomes favorable to plaintiffs for the period August 1982 through 2005:

| Jurisdictions | Reported Section 2 Cases With Outcomes Favorable to Minority Plaintiffs | All Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported & Unreported) |
|---|---|---|
| **Covered States** | | |
| Alabama | 12 | 192 |
| Alaska | 0 | 0 |
| Arizona | 0 | 2 |
| Georgia | 3 | 69 |
| Louisiana | 10 | 17 |
| Mississippi | 18 | 67 |
| South Carolina | 3 | 33 |
| Texas | 7 | 206 |
| Virginia | 4 | 15 |
| *Total (covered states)* | *57* | *601* |

| Non-Covered States | | |
|---|---|---|
| **Non-Covered States** | | |
| Arkansas | 4 | 28 |
| Colorado | 2 | 3 |
| Connecticut | 1 | 2 |
| Delaware | 1 | 1 |
| Hawaii | 1 | 1 |
| Idaho | 0 | 0 |
| Indiana | 1 | 4 |
| Iowa | 0 | 0 |
| Illinois | 9 | 11 |
| Kansas | 0 | 0 |
| Kentucky | 0 | 0 |
| Maine | 0 | 0 |
| Maryland | 2 | 5 |
| Massachusetts | 1 | 3 |
| Minnesota | 0 | 0 |

received written meritorious complaints * * * that efforts to deny or abridge the right to vote under the color of law on account of race or color, or in contravention of the guarantees [of the language minority provisions] are likely to occur," or that the assignment of observers is "necessary to enforce the guarantees of the 14th or 15th amendment."  42 U.S.C. 1973f(2).

| Missouri | 1 | 2 |
|---|---|---|
| Montana | 2 | 5 |
| Nebraska | 1 | 1 |
| Nevada | 0 | 0 |
| New Jersey | 1 | 2 |
| New Mexico | 0 | 7 |
| North Dakota | 0 | 1 |
| Ohio | 2 | 2 |
| Oklahoma | 0 | 0 |
| Oregon | 0 | 0 |
| Pennsylvania | 3 | 4 |
| Rhode Island | 1 | 2 |
| Tennessee | 4 | 6 |
| Utah | 0 | 1 |
| Vermont | 0 | 0 |
| Washington | 0 | 0 |
| West Virginia | 0 | 0 |
| Wisconsin | 1 | 1 |
| Wyoming | 0 | 0 |
| | | |
| *Total (non-covered states)* | *38* | *92* |

Supp. McCrary Dec. (Att. B, hereto).[8]  As these tables demonstrate, almost all the fully covered

states had more successful Section 2 actions than any of the non-covered states.  The non-

covered states with the most Section 2 actions were Arkansas, with 28, and Illinois, with 11; no

other non-covered state had more than 7.  Arkansas and a county in Illinois have been required

by court order to preclear certain changes pursuant to Section 3(c).  See 2d Supp. Berman Dec.

In contrast, except for Alaska and Arizona, the number of Section 2 actions in the fully-covered

states ranged from 15 in Virginia to 206 in Texas.

Moreover, as the Court recognized in upholding the original formula, there need not be a

perfect fit between the coverage formula and the evidence of discrimination.  *Katzenbach*, 383

at 330-331.  Congress "need not deal with all phases of a problem in the same way." *Id.* at 331.

---

[8]  For the sake of completeness, the Supplemental McCrary Declaration also includes data for covered and non-covered counties and townships in the partially-covered states.  This data has limited utility for comparison purposes, however, because, except in North Carolina, there are many more non-covered than covered counties in each of these states.

Thus, Congress could rationally choose to respond to voting discrimination in non-covered states through other means, including Section 2 actions or the Section 3(c) bail-in provision. *Id.* at 330-331.  In applying rational basis analysis, the court's role is not to reweigh the evidence before Congress and make its own determination of the legislative facts.  Legislation subjected to the rational basis test must be upheld "so long as 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.'"  *Minnesota* v. *Clover Leaf Creamery*, 449 U.S. 456, 464 (1981) (quoting *United States* v. *Carolene Prods. Co.*, 304 U.S. 144, 154 (1938)); see *Vance* v. *Bradley*, 440 U.S. 93, 108 (1979) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required.") (citations & internal quotation marks omitted); *id.* at 109 ("Whether we, or the District Court, think Congress was unwise in not choosing a means more precisely related to its primary purpose is irrelevant.").

Further, as set forth previously (AG Mem. 69-74; AG Reply Mem. 33-34), the bailout provision provides a workable path by which covered jurisdictions that have not engaged in voting discrimination for ten years may escape coverage.  Since the Court's decision in *Northwest Austin Municipal Utility District Number One* v. *Holder*, 129 S. Ct. 2504 (2009), the Department of Justice has seen an increased interest in bailout from a wide variety of jurisdictions.  Moreover, while no state has yet bailed out under the criteria enacted in 1982, it is not impossible that a state could do so in the near future.

Once Congress found that the Section 5 preclearance requirement remained necessary to guarantee minority voting rights in the covered jurisdictions, its decision to continue the requirement in those jurisdictions was rational.  Congress accomplished this by leaving the

coverage formula unchanged.  It is a measure of the rationality of that decision that neither plaintiff nor the Congressional opponents of the existing formula have proposed a workable alternative means of designating the jurisdictions to be covered.

Finally, since plaintiff contends that Section 4(b) is unconstitutional on its face, it must demonstrate that the coverage formula is unconstitutional in all its applications, or at a minimum, that it lacks "a plainly legitimate sweep."  *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 449 (2008) (citation & internal quotation marks omitted).  This plaintiff cannot do, since there is abundant evidence of voting discrimination for the vast majority of covered jurisdictions.

## CONCLUSION

The Attorney General's cross-motion for summary judgment should be granted and plaintiff's motion for summary judgment should be denied.

Date:  February 16, 2011                    Respectfully submitted,

RONALD C. MACHEN, JR.                THOMAS E. PEREZ
  United States Attorney                      Assistant Attorney General
  District of Columbia                         SAMUEL R. BAGENSTOS
                                                       JULIE A. FERNANDES
                                                         Deputy Assistant Attorneys General
                                                        *s/ Linda F. Thome*
                                                       T. CHRISTIAN HERREN, JR.
                                                       DIANA K. FLYNN
                                                       RICHARD DELLHEIM (lead counsel)
                                                       LINDA F. THOME
                                                       ERNEST A. MCFARLAND
                                                       JARED M. SLADE
                                                       JUSTIN WEINSTEIN-TULL
                                                         U.S. Department of Justice
                                                         950 Pennsylvania Avenue, N.W.
                                                         NWB-Room 7264
                                                         Washington, D.C. 20530
                                                         Telephone:  (202) 305-1734
                                                         Facsimile:  (202) 307-3961

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 16, 2011, I served a true and correct copy of the foregoing Supplemental Memorandum and accompanying attachments via the Court's ECF filing system to the following counsel of record:

William S. Consovoy
Thomas R. McCarthy
Brendan J. Morrissey
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
Phone: (202) 719-7434
Fax: (202) 719-7049
*Counsel for Plaintiff*

Arthur B. Spitzer
American Civil Liberties Union
1400 20th Street, NW
Suite 119
Washington, DC 20036-5920
Phone: (202) 457-0800 x113
Fax: (202) 452-1868
*Counsel for Movant-intervenors*

Kristen M. Clarke
NAACP Legal Defense
& Education Fund, Inc.
1444 Eye Street, NW
10th Floor
Washington, DC 20005
Phone: (202) 682-1300
Fax: (202) 682-1312
*Counsel for Movant-intervenors*

*/s/ Richard Dellheim*
Richard Dellheim
Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D, C, 20530
(202) 305-1734

# ATTACHMENT  A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHELBY COUNTY, ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. |
| ERIC H. HOLDER, Jr., | ) | 1:10-cv-00651-JDB |
| in his official capacity as | ) | |
| Attorney General of the | ) | |
| United States, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Second Supplemental Declaration of Robert S. Berman

    I, Robert S. Berman, pursuant to 28 U.S.C. 1746, declare as follows:

1. I am an attorney who currently serves as a Deputy Chief in the Voting Section of the Civil Rights Division of the United States Department of Justice.  I have supervisory responsibility for the administrative review of voting changes submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c.  I have been employed as an attorney in the Department of Justice for 32 years with over 20 years of service in the Voting Section.

2. I have personal knowledge of the information contained in this declaration based upon my review of relevant records maintained by the Department of Justice, as well as my professional experience with, and personal knowledge of, Department of Justice policies and procedures.

3.  The following is a list of cases where a court entered an order granting relief pursuant to

Section 3(c) of the Voting Rights Act, 42 U.S.C. 1973a(c):

a.  United States v. Thurston County, C.A. No. 78-0-380 (D. Neb. May 9, 1979)

b.  McMillan v. Escambia County, C.A. No. 77-0432 (N.D. Fla. Dec. 3, 1979)

c.  Woodring v. Clarke, C.A. No. 80-4569 (S.D. Ill. Oct. 31, 1983)

d.  Sanchez v. Anaya, C.A. No. 82-0067M (D.N.M. Dec. 17, 1984)

e.  United States v. McKinley County, No. 86-0029-C (D.N.M. Jan. 13, 1986)

f.  United States v. Sandoval County, C.A. No. 88-1457-SC (D.N.M. filed Dec. 5, 1988)

g.  Brown v. Board of Commissioners of the City of Chattanooga, No. CIV-1-87-388 (E.D. Tenn. Jan. 11, 1990)

h.  Cuthair v. Montezuma-Cortez School District Number RE-1, No. 89-C-964 (D.Col. Apr. 9, 1990).  See also 7 F. Supp. 2d 1152 (D. Colo. 1998).

i.  Jeffers v. Clinton, 740 F. Supp. 585 (E.D. Ark. 1990), appeal dismissed, 498 U.S. 1129 (1991)

j.  Garza and United States v. Los Angeles County, C.A. Nos. CV 88-5143 KN (Ex) and CV 88-5435 KN (Ex) (C.D. Cal. Apr. 26, 1991)

k.  United States v. Cibola County, C.A. No. 93-1134-LH/LFG (D.N.M. filed Oct. 22, 1993)

l.  United States v. Socorro County, C.A. No. 93-1244-JP (D.N.M. filed Oct. 22, 1993)

m.  United States v. Alameda County, C.A. No. C 95-1266 (SAW) (N.D. Cal. filed Apr. 13, 1995)

n.  United States v. Bernalillo County, C.A. No. 93-156-BB/LCS (D.N.M. filed Feb. 26, 1998)

o.  Kirke v. Buffalo County, C.A. No. 03-CV-3011 (D.S.D. filed Mar. 20, 2003)

p.  Blackmoon v. Charles Mix County, C.A. No. 05-CV-4017 (D.S.D. filed Jan. 27, 2005)

q. <u>United States</u> v. <u>Village of Port Chester</u>, C.A. No. 06-CV-15173 (S.D.N.Y. filed Dec. 15, 2006)

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of February 2011.

Robert S. Berman

# ATTACHMENT  B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHELBY COUNTY, ALABAMA,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>ERIC H. HOLDER, Jr.,  )<br>in his official capacity as  )<br>Attorney General of the  )<br>United States,  )<br><br>Defendant  ) | Civil Action No.<br>1:10-cv-00651-JDB |

Supplemental Declaration of Dr. Peyton McCrary

Pursuant to 28 U.S.C. 1746, I, Peyton McCrary, make the following declaration:

1. My name is Peyton McCrary, and I reside in Arlington, Virginia.  I am an historian

employed since August, 1990, by the Voting Section, Civil Rights Division, of the Department

of Justice.  My responsibilities include the planning, direction, coordination, or performance of

historical research or statistical analysis in connection with litigation.  On occasion I am asked to

provide written or courtroom testimony on behalf of the United States.

2. My initial declaration in this case was filed November 15, 2010.  I incorporate by

reference the summary of professional qualifications provided in that declaration, including the

attached Curriculum Vitae, which I prepared and know to be accurate.

3. In this court's Minute Order dated February 4, 2011, the parties were directed to brief

the following question: "in considering the reauthorization of Section 5 of the Voting Rights Act

in 2006, was it 'rational in both practice and theory,' South Carolina v. Katzenbach, 383 U.S.

301, 330 (1966), for Congress to preserve the existing coverage formula in Section 4(b) of the

Act?"  As a result, attorneys for the Department of Justice have asked me to clarify certain

empirical facts regarding the course of Section 2 litigation that were part of the record before

Congress in 2005-2006.  Because Section 2 litigation is nationwide and not restricted to

jurisdictions covered by Section 5, it offers a means of comparing racial discrimination affecting

voting in covered with non-covered jurisdictions.

4. In my initial declaration I documented two key characteristics of Section 2 litigation:

1) the volume of cases settled in favor of minority plaintiffs was substantially larger in

unreported cases than in cases with reported decisions; and 2) the volume of cases settled in

favor of minority plaintiffs in both reported and unreported cases was substantially larger in

jurisdictions covered by Section 5 than in non-covered jurisdictions.  In that declaration I also

documented that this pattern was evident in the record before Congress when it reauthorized

Section 5 in 2006.

5. In this supplemental declaration I have broken these data into separate patterns by state

and, within partially covered states, I have separated the findings for covered and non-covered

counties.  The purpose is to provide empirical evidence – from the record before Congress in

2006 – concerning the issues posed by the court's order.

6. Table 1 provides the number of reported Section 2 cases with outcomes favorable to

minority plaintiffs in states that are entirely covered by the formula set forth in Section 4(b) of

the Voting Rights Act.  These data are taken from Ellen Katz, et. al., *Documenting

Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982*

(2005), *reprinted in To Examine Impact and Effectiveness of the Voting Rights Act: Hearing

Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong. 16,

2

964-1124 (2005), and finalized as published at 39 U. Mich. J.L. Reform 643 (2006).  I have used the numbers from the finalized database.  Table 1 also identifies for each of the covered states the number of favorable outcomes in unreported Section 2 cases, taken from Nat'l Comm'n on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005* (2006), *reprinted in Voting Rights Act: Evidence of Continuing Need: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 109th Cong. 104-289 (2006).[1] Table 1 does *not* consider the pattern for covered jurisdictions in partially covered states, which is examined separately below.

Table 1: State-by-state Pattern of Section 2 Outcomes in States Entirely Covered by Section 5

| Jurisdictions | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported) | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported & Unreported) |
|---|---|---|
| **Covered States** | | |
| Alabama | 12 | 192 |
| Alaska | 0 | 0 |
| Arizona | 0 | 2 |
| Georgia | 3 | 69 |
| Louisiana | 10 | 17 |
| Mississippi | 18 | 67 |
| South Carolina | 3 | 33 |
| Texas | 7 | 206 |
| Virginia | 4 | 15 |
| | | |
| ***Total (covered states)*** | ***57*** | ***601*** |

[1] In its analysis the National Commission report utilized a version of the Michigan study directed by Professor Katz – known as the Voting Rights Initiative (VRI) – available on the VRI website as of Jan. 16, 2006.  Thus the numbers in Table 5 of the National Commission report drawn from the Michigan study differ slightly from both the numbers on the record before Congress and the finally published version cited in the text above.  In this supplemental declaration I have relied on the numbers for partially covered states from the finalized Michigan database – the only version available electronically – and the number of outcomes in unreported cases listed in Table 5 of the National Commission report.  The slight differences in the numbers reported in different versions of the Michigan study do not affect the conclusions to be drawn from the data.

7. Table 2 (see next page) relies on the Michigan study once again for outcomes in reported cases in non-covered states.  The numbers for outcomes in unreported cases in non-covered states are taken from Attachment B to my initial Declaration of November 15, 2010, relying in part on summaries of cases in the record before Congress (cited in my initial declaration).

8. As the data in Tables 1 and 2 make clear, looking only at liability findings of a Section 2 violation gives a skewed picture of Section 2 litigation.  In states entirely covered by Section 5 (see Table 1) the 57 favorable outcomes in reported decisions represented only 9.5% of the total outcomes (601) in both reported and unreported cases.  For Alabama, reported decisions account for only 6.3% of the total favorable outcomes.

9. The data reported in Table 2 below also reflect a disparity between reported and unreported cases.  The number of favorable outcomes in reported cases (38) represents 41.3% of total outcomes (92).

10. A comparison of the data in Tables 1 and 2 makes clear that minority plaintiffs brought many more successful Section 2 cases in covered states than in non-covered states.  Looking just at reported cases, covered states accounted for 57 favorable outcomes and non-covered states for only 38.  Looking at the total of both reported and unreported cases, the disparity was much greater: states covered by Section 5 accounted for 601 Section 2 cases with favorable outcomes to minority plaintiffs – *more than six times* the 92 favorable outcomes in non-covered states.

Table 2: State-by-State Pattern of Section 2 Outcomes in States Not Covered by Section 5

| Jurisdictions | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported) | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported & Unreported) |
|---|---|---|
| **Non-Covered States** | | |
| Arkansas | 4 | 28 |
| Colorado | 2 | 3 |
| Connecticut | 1 | 2 |
| Delaware | 1 | 1 |
| Hawaii | 1 | 1 |
| Idaho | 0 | 0 |
| Indiana | 1 | 4 |
| Iowa | 0 | 0 |
| Illinois | 9 | 11 |
| Kansas | 0 | 0 |
| Kentucky | 0 | 0 |
| Maine | 0 | 0 |
| Maryland | 2 | 5 |
| Massachusetts | 1 | 3 |
| Minnesota | 0 | 0 |
| Missouri | 1 | 2 |
| Montana | 2 | 5 |
| Nebraska | 1 | 1 |
| Nevada | 0 | 0 |
| New Jersey | 1 | 2 |
| New Mexico | 0 | 7 |
| North Dakota | 0 | 1 |
| Ohio | 2 | 2 |
| Oklahoma | 0 | 0 |
| Oregon | 0 | 0 |
| Pennsylvania | 3 | 4 |
| Rhode Island | 1 | 2 |
| Tennessee | 4 | 6 |
| Utah | 0 | 1 |
| Vermont | 0 | 0 |
| Washington | 0 | 0 |
| West Virginia | 0 | 0 |
| Wisconsin | 1 | 1 |
| Wyoming | 0 | 0 |
| ***Total (non-covered states)*** | ***38*** | ***92*** |

5

11.   The pattern in states only partially covered by the formula in Section 4(b) is more complex.  Only one of the partially covered states contains more than a handful of covered jurisdictions: North Carolina.  Forty of North Carolina's 100 counties are subject to Section 5 review.  According to the 2000 Census, these covered counties contain only 36.2% of the state's population.[2]  Looking at reported decisions, six of the 10 favorable outcomes (60%) were in covered counties.  The disparity is even greater when examining all Section 2 cases, both reported and unreported; 36 of 55 favorable outcomes (65.5%) occurred in covered counties.[3] Thus the pattern of Section 2 litigation in North Carolina is similar to that when comparing covered and non-covered states.

| Jurisdictions | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported) | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported & Unreported) |
|---|---|---|
| North Carolina        (40 covered ) | 6 | 36 |
| (60 non-covered counties) | 4 | 19 |

12. To compare Section 2 litigation in California's four covered counties with outcomes in the state's other 54 counties is not particularly informative; non-covered California counties contain 97.6% of the state's population and thus dwarf the number of people in areas covered by Section 5.  Not surprisingly, the number of favorable outcomes in the rest of the state (15) is much greater than in the four covered counties (1).[4]

---

[2] These and all references to the population of jurisdictions are taken from Census 2000, Summary File 1, Table P1.

[3] See the case summaries for North Carolina in *Voting Rights Act: Evidence of Continuing Need: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 109th Cong. 923-33, 937-42, 944, 947, 951-60, 1769-77, 1779, 1781-95, 1797-98, 1800-02 (2006) [hereinafter *Evidence of Continuing Need*].

[4] See Declaration of Dr. Peyton McCrary, November 15, 2010, Attachment B.

| Jurisdictions | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported) | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported & Unreported) |
|---|---|---|
| California      (4 covered counties) | 0 | 1 |
| (54 non-covered counties) | 3 | 15 |

13. Similarly, only 5 of Florida's 67 counties are subject to Section 5 review and account for only one of eighteen favorable outcomes.[5]  These counties contain only 8.7% of the state's population.  Only three of New York's 62 counties are covered, but they contain 28.1% of the state's population.   The covered counties account for four of the seven favorable outcomes, however. [6]  In South Dakota only two of 66 counties are covered, containing 2.7% of the state's population; they account for one of the four outcomes favorable to minority plaintiffs.[7]

| Jurisdictions | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported) | Section 2 Cases With Outcomes Favorable to Minority Plaintiffs (Reported & Unreported) |
|---|---|---|
| Florida       (5 covered counties) | 1 | 1 |
| (62 non-covered counties) | 6 | 17 |
| New York      (3 covered counties) | 1 | 4 |
| (59 non-covered counties) | 4 | 7 |
| South Dakota (2 covered counties) | 1 | 1 |
| (64 non-covered counties) | 0 | 4 |

14. In Michigan only two townships (out of 1242) are covered under the formula in Section 4(b), and in New Hampshire only 10 towns (out of 246) are covered.  The covered townships include less than one percent of Michigan's population.  The covered towns in New

---

[5]  *Evidence of Continuing Need*, 477-81, 491-92, 498-502, 1482 n. 137, 1484-85; Declaration of Dr. Peyton McCrary, November 15, 2010, Attachment B.

[6]  *Evidence of Continuing Need*, 1837, 1855-56, 1874-75, 1878;  Declaration of Dr. Peyton McCrary, November 15, 2010, Attachment B.

[7]  *Evidence of Continuing Need*, 1161-63, 1171-73;  Declaration of Dr. Peyton McCrary, November 15, 2010, Attachment B.

Hampshire contain less than two percent of that state's population. Neither state has had any successful Section 2 litigation, either in covered or non-covered jurisdictions.

15.  Pairing individual states – covered vs. non-covered states – can present a misleading view of the pattern of Section 2 outcomes, especially if one looks only at reported decisions. Illinois, for example, accounts for nine favorable outcomes in reported decisions – more than several states entirely covered by Section 5.  When examining unreported as well as reported cases, however, all of the covered states except one (Arizona) have more favorable outcomes than the 11 in Illinois (comparing Tables 1 and 2).  Georgia and South Carolina have three favorable outcomes apiece in reported cases – fewer than Arkansas, Tennessee, and Illinois. Looking at unreported as well as reported cases, however, reveals that Georgia has 69 favorable outcomes and South Carolina, 33, more than the 28 in Arkansas and far more than any other non-covered state.

16.  In short, examining the pattern of outcomes in Section 2 litigation broken down by state – and by county within partially covered states – reinforces the assessment that the coverage formula set forth in Section 4(b) of the Voting Rights Act targets those areas of the country where racial discrimination affecting voting is most concentrated.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 16th day of February, 2011.

Peyton McCrary