UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


SHELBY COUNTY, ALABAMA,          .
                                 .
            Plaintiff,           .
                                 .  CA No. 10-0651 (JDB)
       v.                        .
                                 .
ERIC H. HOLDER, JR.,             .  Washington, D.C.
                                 .  Tuesday, February 2, 2011
            Defendant.           .  9:30 a.m.
                                 .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:            BERT W. REIN, ESQ.
                              WILLIAM S. CONSOVOY, ESQ.
                              THOMAS R. MCCARTHY, ESQ.
                              Wiley Rein, LLP
                              1776 K Street NW
                              Washington, DC 20006
                              202-719-7080


For the Defendant:            SAMUEL R. BAGENSTOS, ESQ.
                              RICHARD A. DELLHEIM, ESQ.
                              ERNEST A. MCFARLAND, ESQ.
                              U.S. Department of Justice
                              Civil Rights Division
                              950 Pennsylvania Avenue, NW
                              Washington, DC 20530
                              202-305-1734


For Intervenor Defendants:    JON M. GREENBAUM, ESQ.
                              MARK A. POSNER, ESQ.
                              ROBERT KENGLE, ESQ.
                              Lawyers' Committee For Civil
                              Rights Under Law
                              1401 New York Avenue, NW
                              Suite 400
                              Washington, DC 20005
                              202-662-8325

KRISTEN M. CLARKE, ESQ.
DEBO P. ADEGBILE, ESQ.
NAACP Legal Defense & Educational
Fund, Inc.
1444 Eye Street, NW
10th Floor
Washington, DC 20005
202-682-1300

LAUGHLIN MCDONALD, ESQ.
American Civil Liberties Union
230 Peachtree Street, NW
Atlanta, Georgia 30303-1513
404-523-2721

Court Reporter:                    BRYAN A. WAYNE, RPR, CRR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6714
                                   333 Constitution Avenue, NW
                                   Washington, DC 20001
                                   202-354-3186

**Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.**

```
 1                    P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Your Honor, we have civil action

 3     10-651, Shelby County, Alabama versus Eric Holder, et al.  I

 4     would ask that counsel please approach the lectern, identify

 5     yourself and those at your respective tables, starting with the

 6     plaintiffs.

 7          MR. REIN:  Good morning, Your Honor.  I am Bert Rein.

 8     I'm one of the counsel for Shelby County, and with me at counsel

 9     table are Will Consovoy, Tom McCarthy, and Frank Ellis, who's

10     the county attorney of Shelby County.

11          THE COURT:  And will you be presenting the entirety of

12     the argument?

13          MR. REIN:  No, Your Honor.  As we advised chambers

14     before, I'm going to deal with two issues and Mr. Consovoy is

15     going to deal with a separate issue.  But we've divided that

16     time and we'll stay within those boundaries.

17          THE COURT:  Thank you.

18          MR. BAGENSTOS:  Your Honor, I'm Samuel Bagenstos.  I

19     represent the United States.  Along with me at counsel table,

20     also representing the United States, is Richard Dellheim.  I'll

21     let the intervenors' counsel introduce themselves.

22          MR. GREENBAUM:  Good morning, Your Honor.  Jon

23     Greenbaum for defendant-intervenor Bobby Lee Harris, and with me

24     just behind counsel table are Robert Kengle and Mark Posner.

25          MS. CLARKE:  Good morning, Your Honor.  Kristen
```

 1     Clarke, NAACP legal defense fund, on behalf of the Cunningham

 2     intervenors.  And with me at counsel table is Debo Adegbile.

 3              MR. MCDONALD:  I'm Laughlin McDonald, Your Honor, and

 4     I represent the Pierson defendant-intervenors.

 5              THE COURT:  All right.  Well, good morning to

 6     everyone.  The introductions are almost as long as the briefs,

 7     which are almost as long as the legislative record.  We've got a

 8     fair amount to do today.  I don't have any particular opening

 9     instructions other than to ask that while I know that you're

10     going to have lots of references to the legislative record,

11     because it is essential here, please be sure that we do cover

12     the -- they're not all legal issues, but some of the issues in

13     the case, including the proper analytical standard or framework,

14     be it the rationality test or the congruence and proportionality

15     test.  Also what evidence is appropriate for the Congress and

16     hence the Court to consider, the types of evidence.  I'd like

17     you to touch on the 4(b) coverage formula and also on the length

18     of the extension.  With that, Mr. Rein.

19              MR. REIN:  Thank you, Your Honor.  And good morning.

20              THE COURT:  Good morning.

21              MR. REIN:  I'll explain that I'll be addressing two of

22     the issues that you just mentioned quite specifically, and that

23     is the standard to be used by this court in making a

24     determination of constitutionality of the extended VRA, and also

25     talk a little bit about preclearance and whether the record

1    compiled by the Congress was sufficient to justify the extension

2    of preclearance for another 25 years.

3        Mr. Consovoy is going to focus specifically on the coverage

4    formula and whether that coverage formula remains viable under

5    the record compiled by the Congress in this go-round.  If that's

6    acceptable, we'll just proceed.

7            THE COURT:  Please do so.

8            MR. REIN:  I'd just like to make a couple of threshold

9    points.  The Court will remember the prior hearing in which we

10   stated that this challenge is on its face, and you instructed us

11   to adhere to that guidance, and we have.  I think it's fair to

12   say that we presented this challenge squarely as to whether the

13   legislative record, when properly judged under the appropriate

14   standard, requires a finding that the Congress has exceeded the

15   powers delegated under Section 2 of the Fifteenth Amendment.

16       So we're not asking for anything else, and we'll reiterate

17   that the information that we submitted specific to Shelby County

18   was for the purpose of establishing its standing and explaining

19   why it was not seeking bailout, and it continues to be in that

20   posture.

21       Now, I think that we have to focus first on the Supreme

22   Court's decision in the case that's popularly known as NAMUDNO,

23   called Northwest Austin by Mr. Consovoy so he'll avoid saying

24   "MUNDO," and look at how the Court, which did not decide the

25   issues which you've raised, framed them, because I think the

1   Court has given us guideposts that would help to assess those

2   issues.

3         First of all, in NAMUDNO, the Court highlighted -- and this

4   is eight members of the Court, and I'll leave Justice Thomas to

5   the side because his opinion is separate.  But the Court

6   highlighted the unique and intrusive remedy, the nature of the

7   preclearance remedy, and pointed out that it was justified

8   historically because exceptional conditions could justify

9   legislative measures not otherwise appropriate.

10        So it's pointed us to the unique nature of the remedial

11  scheme in the Voting Rights Act.  The Voting Rights Act differs

12  from conventional enforcement of constitutional guarantees which

13  are normally done by adding remedies to be applied in a judicial

14  process in which a court makes findings of violation and then

15  remedy is applied.  And that of course was the historic

16  framework until the Voting Rights Act was passed.  Civil rights

17  legislation relied upon judicial findings and judicial remedies.

18  And it was the alleged ineffectiveness of those remedies that

19  led Congress to go further.

20        But the Court here has recognized that that is an exception

21  to our normal constitutional process and that it requires a

22  finding of an exceptional circumstance.  And I think that's

23  something that we need to bear in mind.

24        The Court also --

25              THE COURT:  The Supreme Court has found those

1      exceptional circumstances every time it's looked at the Voting

2      Rights Act.

3              MR. REIN:  And we can discuss those cases, and we

4      intend to.  I think what we would say is that the Superior Court

5      found those exceptional circumstances in South Carolina, the

6      Katzenbach case, and it found that Congress had appropriately

7      identified them and had moved to a remedy which was appropriate

8      in those circumstances.  That's the word of the Fifteenth

9      Amendment.

10             I think that if you look at the remaining cases, three of

11     them -- or two of them, so we have three together, fall within

12     that initial period.  That is to say, a first determination, the

13     Georgia case followed on it and really didn't take much of a

14     hard look.  Just said Katzenbach is still operative.  And City

15     of Rome, at least in our view, largely found that with 95 years

16     of ingenious defiance, it was unlikely to be cured within the

17     period of time that Congress had originally specified, which is

18     five years, five more and then seven, and that there was warrant

19     under Katzenbach for continuing the remedy in effect until the

20     job had been done.

21             And then of course we've had further extensions.  I think

22     Lopez is a different case because I'm not sure Lopez really went

23     into any detail on the constitutional validity.  It simply

24     assumed it and was largely a case of breadth of application and

25     whether California could be accountable when it was not covered

```
 1    but had a covered jurisdiction within it whose practices it was

 2    affecting.  So I think we do agree, and we're not challenging

 3    Katzenbach --

 4              THE COURT:  So what you want to do is guide me with

 5    the language from the recent Supreme Court decision that didn't

 6    reach the constitutional issue, but set aside the Supreme Court

 7    cases that did reach the constitutional issue.

 8              MR. REIN:  Well, it's not fair to say set aside the

 9    cases, because what it did was recognize that current needs are

10    what governs, so that those cases may be very good law, and

11    we're not challenging the propriety of those determinations, but

12    they were based on a different record.

13              THE COURT:  Absolutely.

14              MR. REIN:  So I don't think the Supreme Court was

15    telling us they're no good.  The Supreme Court's saying, well,

16    they teach you something, look again and see if the

17    circumstances present today warrant the same kind of intrusive

18    relief.

19         And I'm not going further than that.  I'm not claiming that

20    the Court decided anything.  It was careful not to decide

21    anything.  And that's why I said this is guidance as to how to

22    address it, not necessarily resolution.

23              THE COURT:  But the Northwest Austin majority doesn't

24    help us in choosing the rationality versus the congruence and

25    proportionality test, does it?
```

 1            MR. REIN:  It specifically says that -- well, it does

 2    say -- flatly says we're not deciding today.

 3            THE COURT:  That's right.

 4            MR. REIN:  But it recognizes that there is at least a

 5    bona fide question.  I mean, as the government would have it,

 6    there's no question, it's all rationality, and there's no

 7    argument for the other side.

 8            THE COURT:  Questions are presented by briefing, and

 9    the briefing obviously presented that question in Northwest

10    Austin and it presents it here today.

11            MR. REIN:  And the Court went on to say there were

12    serious issues whichever standard you adopted.  And the Court

13    didn't really indicate whether those standards -- which the

14    briefing has treated as a dichotomy, it's either/or -- really

15    represented the best view of the evolution of the case law.  And

16    we would say to you that those alleged differences are smaller

17    than one would think when you use the labels, to wit, in our

18    view, what Boerne did was really to refine an analytical

19    framework that had developed through Katzenbach and Rome and

20    more precisely pose the questions that were actually addressed

21    in those cases.

22        So Boerne is a more rigorous framework, it's a more

23    structured framework, but it doesn't really ask questions

24    different from the ones the Court answered in Katzenbach and its

25    successors and certainly go into that.

1          THE COURT:  There may not be a great deal of

2    difference between the two tests, but the parties have spent a

3    great deal of effort and paper on choosing one test or another.

4    And which test are you advocating and why?

5          MR. REIN:  I think we believe that Boerne being the

6    more recent standard is the best explication.  And what it does

7    is it says let's focus on three things that matter.  One,

8    Congress is presumably using an enforcement power.  That's the

9    word of Section 2.  It's to enforce.

10          THE COURT:  Whether it's under the Fifteenth

11   Amendment, Section 2, or the Fourteenth Amendment, Section 5,

12   it's an enforcement power.

13          MR. REIN:  Correct.  And enforcement has a

14   significance --

15          THE COURT:  Indeed the language is almost identical.

16          MR. REIN:  Yes.  And in fact it was pointed out in

17   many cases, and I think it's fair to say it's hard to find a

18   difference based on language.  And to enforce really suggests

19   that you've targeted some kind of constitutional violation,

20   because what you're enforcing by the language, by appropriate

21   legislation, you are enforcing that the rights, the guarantees

22   of that amendment, against violations thereof.

23       And I think that Katzenbach goes through that.  Katzenbach

24   finds that there's a horrendous violation, a continuing

25   violation of people's -- of the ability to vote, to register to

vote.  That's what they called primary factors.  But Katzenbach looks at the world and says something is grossly wrong.  The right to vote exists in name but not in fact.  And the statistics are frightening.

And clearly Katzenbach is the tip of the iceberg.  And why I say that is if you think about the time of Katzenbach, the Court identifies devices that could be used to block minority registration, but devices are one part of the problem.  There's much more to it.  There was physical intimidation, there was violence.  Those low numbers were not just the product of devices.  They were assisted by devices when somebody actually managed to get to the registration or to the polling booth.

But the climate in the country was totally different; it was a crisis, and the right to vote was suppressed.  There's no doubt about it.  The core -- what the government would call the core right under the Fifteenth Amendment, the right to register and go into the ballot and use the ballot box, was not effective, and in the jurisdictions that Congress singled out for remedial treatment.

THE COURT:  Well, let's get down to this issue, the Fifteenth versus Fourteenth Amendment issue.  Is there any case that you're aware of that you can cite to me where the congruence and proportionality test that City of Boerne -- is how I usually say it -- test was applied where the Fifteenth Amendment enforcement power was at issue?  Any case?

1          MR. REIN:  I don't think we have an express case on

2     that, Your Honor.  We didn't claim that, but there's been really

3     no test of it until the argument started in NAMUDNO, and I think

4     the reason this court said it's an open issue is because it

5     hasn't been --

6          THE COURT:  Well, Lopez arguably was a test of it

7     because Lopez actually came down about two years after City of

8     Boerne.

9          MR. REIN:  Right.  But I think if we look at the --

10         THE COURT:  And they favorably cited Katzenbach,

11    favorably cited City of Rome.

12         MR. REIN:  Right.  I understand that.  I think if you

13    look at Lopez and you look at the briefs, this issue was not

14    squarely raised by the parties, and Lopez had a somewhat

15    different dimension because the State of California wasn't

16    covered, and so you have --

17         THE COURT:  I understand it was a different context.

18         MR. REIN:  So you have a very different analytical

19    framework in Lopez, and the Court's basically answering the

20    question what do you do with an uncovered state affecting the

21    way voting takes place --

22         THE COURT:  But you still have a situation where, in

23    every case involving the enforcement power under Section 2 of

24    the Fifteenth Amendment, the rationality test has been used.

25    The City of Boerne line of cases, the congruence and

1    proportionality test has arisen in cases dealing with the

2    Fourteenth Amendment.  Indeed, in large part in cases not

3    dealing with race issues under the Fourteenth Amendment.  And in

4    none of those cases, although there's favorable citation to the

5    Voting Rights Act line of cases, in none of those cases do any

6    of the justices give a hint of an indication that, whoops, maybe

7    the test used in those cases is the wrong test.  Maybe

8    rationality is not the right test.

9        Of course, you have Justice Scalia totally abandoning the

10    congruence and proportionality test and saying he's not going to

11    apply that in any setting.

12        MR. REIN:  But of course Justice Scalia is one

13    justice, and it would be the same as saying Justice Thomas

14    thinks the Voting Rights Act is unconstitutional in NAMUDNO.

15        THE COURT:  Fair point, but we've got a lot of

16    justices who haven't indicated any adherence to applying the

17    congruence and proportionality test when the Fifteenth Amendment

18    is involved.

19        MR. REIN:  I understand that, and I don't think we

20    have argued to the contrary, and that's why we believe that the

21    Court was willing to say this is an open issue in NAMUDNO, but I

22    think I can give you reasons why it ought to apply.

23        One preliminary matter is that of course the government

24    says that the Voting Rights Act, especially under so-called

25    secondary considerations, incorporates concepts from the

1    Fourteenth Amendment.  That is to say -- and this is important,

2    and the reason it's important is this.  There are two aspects to

3    the remedy in the Voting Rights Act.  One is taking Section 2,

4    for example, pretty square enforcement of the guarantee of the

5    right to vote itself.  The idea being we can identify the

6    constitutional violation and we can enforce and create new

7    remedies for that violation.

8         One of the cases that Justice Scalia wrote, in the Georgia

9    case, Georgia v. U.S., really makes that principle very

10   apparent, because what he says is where someone alleges a direct

11   violation of the Eighth Amendment, I don't have the trouble that

12   I have in cases like Boerne with the congruence and

13   proportionality.  I don't have to get there.  Because you're

14   directly enforcing against a violation by standard judicial

15   means.

16        So to the extent that the VRA was looking at direct

17   violations -- I'm suppressing the right to vote, that has one

18   dimension, it's the Fifteenth Amendment.  Now, when you get into

19   other restrictions, like dilution restrictions, or restrictions

20   on tests that are not on their face unconstitutional, which has

21   been a lot of the litigation and concern starting right after

22   Katzenbach, you're in a different dimension, and the reason

23   you're in a different dimension is because if those provisions

24   are strictly remedial --

25             THE COURT:  But in those cases you're referring to

1    after Katzenbach, the rationality test was still what was

2    applied.  And indeed, you have cases as clear as the other

3    Katzenbach case, Katzenbach v. Morgan, which was a Fourteenth

4    Amendment Section 5 case in which rationality was applied.

5              MR. REIN:  Well, and I think -- and all I'm

6    indicating, Your Honor, is that to the extent that the VRA is

7    supported by the Fourteenth as well as the Fifteenth

8    Amendment --

9              THE COURT:  Let's assume it is.  Therefore what?

10             MR. REIN:  Which is the government's argument, then of

11   course you can't say that we don't have direct precedent because

12   Boerne is an interpretation of how the Fourteenth Amendment is

13   to be evaluated, Section 5 thereof.  And it's pretty clear, at

14   least on its language, that you really can't distinguish from a

15   language or contemporaneity -- if I can say that right -- point

16   of view between Section 5 and Section 2.

17             THE COURT:  So if we have a hybrid situation where you

18   have an enforcement power with the Voting Rights Act that

19   involved both the Fifteenth Amendment Section 2 and the

20   Fourteenth Amendment Section 5, it's your view that that should

21   push us towards the congruence and proportionality test.

22             MR. REIN:  Well, because largely, if you look at the

23   way Congress attempted to justify the continuation, it really

24   doesn't go to the primary factor, which is suppression of the

25   right to vote, lack of registration, lack of voting access,

turnout.

THE COURT:  Why does that primary factor matter so much to you?  The language of the Fifteenth Amendment does not distinguish, does it?  It uses two terms, the second of which is abridge, which means to diminish or dilute.  So why -- what is this primary issue that --

MR. REIN:  Certainly this is language that has been used by all parties to the case, because I think there's some lack of clarity in the word "abridged."  "Deny" means you can't vote.  "Abridge" can be looked at in various ways.  One way to abridge, for example, is you can vote in certain elections, but you can't vote in others.  You can't be in a white primary. That would abridge the right to vote.

I think there's an argument that it has a sweeping meaning and it says anything that might affect the effectiveness of the vote is somehow an abridgment.  But then --

THE COURT:  All right.  So?

MR. REIN:  Well, I think that that's probably not a fair reading.  I don't think we have any history of the amendment that would suggest that abridgment goes that far.  And that is why the government has said what you're incorporating concepts under the Fourteenth Amendment which deals with the weight of the vote, and has been the framework for litigation over the weighting of the vote.

So I think that -- and this is probably more technical

1    argument than I think we've made in our briefs, but to the

2    extent that the VRA provisions are justified under the

3    Fourteenth Amendment -- and I think that makes a difference,

4    there is direct precedent, Boerne is the governing analytical

5    framework.  But if I looked at Katzenbach independently, the

6    so-called rational basis, I think one could say the Court did

7    exactly what Boerne was talking about, and that's why the Court

8    in Boerne was able to rely on Katzenbach.

9        The Court identified what it considered to be a huge gap in

10   the constitutional regime, a square violation of the right to

11   vote, and didn't have to get to abridgment.  It looked for a

12   pattern and it said in the jurisdictions we're covering it's not

13   just random; it's a historic pattern, there's ingenious

14   defiance, there's a serious and continuing problem that needs to

15   be cured, and it calls for a form of action more effective than

16   what has gone before.

17       So in that sense the Court has determined in Katzenbach

18   this remedy, which is clearly controversial, unusual, not in

19   harmony with the usual precepts of the federal system, and

20   actually causes Justice Black to dissent, saying it's too far,

21   it goes beyond what the Constitution ever contemplated in the

22   compact between the states -- but that remedy is in fact a

23   necessary remedy for what we've experienced and what is likely

24   to go on in the absence of some direct federal control.  That's

25   the holding of Katzenbach.

1          THE COURT:  The problem I have with this reliance on

2   Katzenbach and the hybrid argument to steer us towards the City

3   of Boerne test is that this is a Fifteenth Amendment case at its

4   core, is it not?

5          MR. REIN:  Well, I think that it's a Voting Rights

6   Act.  One would assume that this is a Fifteenth Amendment case

7   at its core.

8          THE COURT:  And for Fifteenth Amendment cases, the

9   Supreme Court has consistently applied the rationality test, has

10  it not?

11         MR. REIN:  Well, I don't want to characterize Lopez

12  that way because Lopez is not a detailed explanation in any

13  sense.

14         THE COURT:  It certainly didn't apply any other test,

15  did it?  It relied, cited Katzenbach, City of Rome.  It didn't

16  say a lot, but --

17         MR. REIN:  I think the premise of the case was there's

18  a valid VRA in effect.  The question is whether it should be

19  interpreted to cover the actions of a noncovered state that

20  affect a covered jurisdiction.  It's a central issue in Lopez,

21  and I think that it could have been pushed harder on the

22  question, well, if you do reach a noncovered state remedially

23  and affect its actions, albeit as focused on the single

24  jurisdiction, does that form of remedy so depart from the

25  constitutional framework that one can say, well, let's test that

```
 1    and see whether that is congruent and proportional to the
 2    problem.  I think it would have survived on that as well,
 3    Your Honor.
 4             THE COURT:  But the focus on Lopez is really getting
 5    me off of my question.  The other Voting Rights Act cases
 6    certainly --
 7             MR. REIN:  Yes.  And the earlier Voting Rights Act
 8    cases --
 9             THE COURT:  -- use Fifteenth Amendment.
10             MR. REIN:  -- are of a piece.  And I think they're of
11    a piece in that --
12             THE COURT:  Let me go on with my question.
13             MR. REIN:  Okay.
14             THE COURT:  That's an observation.  And looking back
15    at Katzenbach, Katzenbach puts some emphasis on its observation
16    that Section 2 of the Fifteenth Amendment was indicative of the
17    intent of Congress, that Congress, not the courts, would be
18    chiefly responsible for implementing the rights that were
19    created in Section 1 of the Fifteenth Amendment.
20        Doesn't that also steer us towards a rationality test?  If
21    Congress is to be chiefly responsible, doesn't that almost by
22    definition carry a deference that would lead us to the
23    rationality test?
24             MR. REIN:  I think the reason for Boerne needs to be
25    explained, and I think that will help respond to your question.
```

What <u>Boerne</u> did was say look, Congress is responsible, has the power, it has constitutional authority to deal with the enforcement of the rights under the amendment.  The risk that was perceived in <u>Boerne</u> --

THE COURT:  The amendment being the Fourteenth Amendment.

MR. REIN:  And I think the Fifteenth as well.

THE COURT:  They weren't speaking of the Fifteenth.

MR. REIN:  They weren't speaking to it, but I think what the risk that was perceived was, look, because we've accorded to the Congress more than the direct enforcement, we've accorded to the Congress the right to use prophylactic measures. That is, deal with things that are not unconstitutional and bar them.  In order to make more effective the remedy against the unconstitutional, we've got to carefully guard against Congress using that power to go further than enforcement and to create new rights, to essentially usurp the Article III role of the Court.  I think that's one key to <u>Boerne</u>, in determining when there is a violation of the right of free expression.

So the Court is looking and saying, okay, we can accord them discretion as to the means they choose, but when those means are so detached from the underlying problem, they're not congruent or proportional to it, then what we get when we have these remedies is the creation of rights that are not to be adjudicated in the Congress.

1          THE COURT:  The context giving rise to that analysis

2     by the Supreme Court was a Fourteenth Amendment context in that

3     case and in later cases, and the Fourteenth Amendment is a much

4     broader amendment.  It has a broader sweep.  It deals with lots

5     and lots of different kinds of issues and issues far beyond

6     race-related issues.

7          MR. REIN:  Correct.

8          THE COURT:  And the Supreme Court has focused on that

9     in the evolution of that standard in those cases.  That's not

10    true, obviously, with the Fifteenth Amendment.  The Fifteenth

11    Amendment is a much more specific, focused amendment dealing

12    with what some feel is the primary right, to vote, and that most

13    important in the development of these amendments and the law, of

14    all the concerns, and that is the concern about race

15    discrimination in voting.

16          MR. REIN:  And certainly that's the government's

17    point, that you've got --

18          THE COURT:  It's not only the government's point.

19    It's evolved somewhat in the Supreme Court teaching.

20          MR. REIN:  But I think it is true that a wider variety

21    of violations may occur under the Fourteenth Amendment --

22          THE COURT:  And that's why the Court in those cases is

23    saying, wait a minute, we've got to make sure that Congress

24    isn't enacting substantive law and is only enacting remedial

25    law.  And there's a particular danger of that with the

1    Fourteenth Amendment, a danger that doesn't exist, at least not

2    to the same degree, with the Fifteenth Amendment.

3            MR. REIN:  It's depending, Your Honor, on how one

4    defines the word "abridgment."  Because if you use abridgment to

5    bring into the Fifteenth Amendment all of the concepts that have

6    been litigated under the Fourteenth Amendment, then the

7    situation has become much more parallel under the Fourteenth and

8    the Fifteenth.  That is, the broader the scope of things that

9    are deemed to violate the substance of the Fifteenth Amendment,

10   the closer one gets to questions that arise under the Fourteenth

11   Amendment.  Just to be clear --

12           THE COURT:  That's a fair point.

13           MR. REIN:  If, for example, we deal with, not with

14   registration and voting, but we deal with the ability to elect a

15   candidate of one's choice, it would be hard to say that the

16   right to vote is abridged because I don't get to elect the

17   candidate of my choice.  It happens to me all the time.  I'd be

18   the first complainant, just by geography.

19       But that being said, I think that you have to put some

20   bound on abridgment or else you've actually just said, well,

21   we'll drag in the Fourteenth Amendment litigation through the

22   back door into the Fifteenth, and now we'll declare it's narrow.

23   So that risk, that Congress goes beyond and says, well, you have

24   a right to, you know, max-black, which was one of the criteria

25   that Justice used for a while, that raises the question, is

1    that -- in the Fifteenth Amendment, is that a remedial

2    provision?  Is that an abridgment?  And those lines have to be

3    drawn.

4         And what Boerne does is just disciplines, in a more

5    tempered way, what the Court was doing in Katzenbach.  Because

6    in Katzenbach, whether you call it rational basis, whatever name

7    you put on it, there still was an exploration of whether this

8    particular remedy, because of the sensitivity of the remedy in

9    the federal system, costs of federalism which have been

10   identified throughout all of this, whether that particular

11   remedy was appropriate to the circumstances.  And in urgent

12   circumstances and widespread violation, I think the Court was

13   going to give Congress latitude, saying you've identified a

14   major issue squarely under the Fifteenth Amendment.  You know,

15   people can't register, they can't vote.  Nothing else has

16   helped.  Maybe this will do it.

17        I think when we get to -- all the way through Rome, where

18   the Court says, look, there was a huge problem.  It went on for

19   95 years.  There's a lesson in history, when Reconstruction was

20   ended too early, it fell apart -- that Congress has the ability

21   to say well, it's not yet done; we need to keep it into effect.

22             THE COURT:  I need to let you get on to other points,

23   but let me see if I can understand exactly where you are on this

24   issue.  You agree that this case, as well as the other Voting

25   Rights Act challenges that the Supreme Court has seen, are at

```
 1    their core Fifteenth Amendment cases?

 2              MR. REIN:  I think that's a fair statement,

 3    Your Honor.

 4              THE COURT:  Is it your position that the evolving

 5    Supreme Court test first articulated in City of Boerne applies

 6    to pure Fifteenth Amendment cases as well as to pure Fourteenth

 7    Amendment cases?

 8              MR. REIN:  I think the answer to that is yes.

 9              THE COURT:  So it is the test in your view now that

10    should be applied in any Voting Rights Act case, whether it be a

11    Fifteenth Amendment case, hybrid case or just a Fourteenth

12    Amendment case?

13              MR. REIN:  Yeah, and when I say -- I think the word

14    "test" is a little unfair, because it's not a test.

15              THE COURT:  I agree with you.  I think that is a

16    little unfair, but we use shorthands.

17              MR. REIN:  It's an analytical methodology.  It is a

18    three-step analysis.  It asks three questions:  What is the

19    specific constitutional right that this legislation is intended

20    to target, one.  Two, has the Congress identified a pattern of

21    constitutional violation which needs to be remedied, and three,

22    is the remedy congruent and proportional.

23              THE COURT:  But obviously it's a little different, is

24    it not, than the rationality test?  It's a little more

25    demanding.  Certainly Justice Scalia believes that.
```

1        MR. REIN:  It's more rigorous, but I think for Justice

2    Scalia, if I take his view, is, putting aside an area he didn't

3    want to get into, voting rights and other direct enforcement, he

4    doesn't like balancing tests.  He realizes that any effort to

5    supervise and determine whether something is truly remedial or

6    perhaps --

7        THE COURT:  He's giving people like me too much of an

8    ability to be an activist.

9        MR. REIN:  I think that's a view he's held across the

10   board.  So I think he is finding a way to exercise that view

11   without challenging -- by things that he thinks are *stare*

12   *decisis*.  Because if you just took his view, you might not have

13   Katzenbach.  And he realizes that that's well settled law.  When

14   I say his view, his view of the absence of balancing might say,

15   you know, you can do what you do in Georgia v. U.S., you can

16   enforce direct rights, have a court find a violation, and then

17   Congress has latitude on the remedies.

18      But I think the discretion of Congress --

19        THE COURT:  I don't want to get off on Justice Scalia

20   too much.  I just want to finish this.  You're basically saying

21   apply City of Boerne.  It may not be much different -- it's a

22   series of questions as an analytical methodology.  It may not be

23   much different than a rationality test, but that newly evolved

24   test from the Supreme Court is the one that should be applied

25   here.

1          MR. REIN:  Yes, Your Honor, and I think the word

2     "evolved" is important.

3          THE COURT:  But does this mean that I would be saying,

4     inconsistent with Supreme Court cases that have actually

5     grappled with the constitutionality of the Voting Rights Act,

6     inconsistent with my fellow district court decision from the

7     lower court in Northwest Austin, I would be saying that the City

8     of Boerne congruence and proportionality test is the one that

9     should be applied, even though the Supreme Court sort of says,

10    well, changing a test should be the job of the Supreme Court.

11         If you have cases that are directly in a line of authority,

12    you as a lower court need to follow that line of authority and

13    leave it to the Supreme Court to take this new line of authority

14    and apply it there.  Don't I have to follow that guidance from

15    the Supreme Court?

16         MR. REIN:  You do, but that also means you have to

17    take into account what it said in NAMUDNO.  And what the Court

18    said in NAMUDNO --

19         THE COURT:  It didn't really say anything other than

20    this is an issue.

21         MR. REIN:  I understand that, but by saying it's an

22    issue, if this were well settled, if there was a line -- the

23    Court could have said we have resolved the issue of standing on

24    Voting Rights Act in the past, and it is up to us to change it

25    if we deem it appropriate.  Could have said exactly what you're

1    saying now.  I think by opening it and saying this is an issue

2    to be litigated, the Court has asked essentially for the views

3    of the -- and I don't like the word "lower," but other courts on

4    how that issue --

5         THE COURT:  I'm just thinking of the way I would write

6    that.  That would be an interesting thing for me to write.

7         MR. REIN:  Well, we can help Your Honor.

8    (Laughter)

9         THE COURT:  You've tried already.

10         MR. REIN:  I think the way one would write that is by

11    saying that Boerne and rationality are not opposite poles.  They

12    are really ways to restate a process of examination.  You have

13    the question of latitude, but there are certain things to which

14    latitude is appropriate.  The selection of the remedy is

15    something -- what is the best way to enforce?  There are a whole

16    variety of techniques that could be used.  I think it's pretty

17    clear that the precedent says Congress has some discretion in

18    figuring out what would be effective.  And if that remedy falls

19    within this boundary of -- and we call it congruence and

20    proportionality, they call it rationality -- but if it seems

21    like it's actually directed at the violation, courts need to

22    understand that Congress has primary power to enforce.

23         So, I don't want to get hung up as to we can only win in

24    this case if it's congruence and proportionality.  I think we

25    believe that's the right standard.  It's an evolving standard.

1        If you look at the first time the Court dealt with the

2   linguistic history of the Fourteenth and Fifteenth Amendment

3   enforcement clauses was Justice Brennan, who said, well,

4   "necessary and proper" used to be in it, so it must mean it.  In

5   Boerne the Court came back and said, wait, it was taken out, and

6   it was taken out for a reason.

7        So there is an evolution, a change in thinking there from

8   that original opinion, which is Allen, I believe, written by

9   Justice Brennan, where he said, well, it used to be in there, it

10  must mean the same thing, to the current position, which is it

11  doesn't mean the same thing because it was intentionally -- and

12  it was certainly controversial, that language was taken out and

13  replaced with appropriate legislation.  So I think I've

14  exhausted that vein.

15        THE COURT:  I think so, too.  Let's move on to your

16  next issue.

17        MR. REIN:  So the next issue then is however we frame

18  the test, we still have to ask the same three questions.  Those

19  questions are, what is the constitutional violation that's being

20  remedied in the Voting Rights Act?  How widespread is this

21  violation?  Is there something going on that says you've got

22  more than incidental violations which are not systemic?  And if

23  one identifies the extent of that, then is the remedy at least

24  something that appears to address the problem?

25        And I think that's how we'd have to look at preclearance

1    and that's what we wanted to talk about.  And that largely turns

2    on the objectives in the record.

3        So, preclearance.  When we think about preclearance, and

4    going back even to --

5            THE COURT:  Now, the record is extensive, right?

6            MR. REIN:  There's certainly no question about volume

7    of the record.  I've picked it up.  I will testify that it's

8    extensive.  The question is what's it about.  I think that one

9    thing really isn't --

10           THE COURT:  Does the volume of record matter at all?

11   Should it weigh on me at all that Congress went through a

12   process with dozens of hearings, if you combine both the House,

13   two committees of the House and the Senate, 50 or more witnesses

14   if you combine both, I think there were -- I think it turned out

15   to be 46 in each, but I'm not sure if they're identical

16   witnesses in the two chambers -- and a legislative record of

17   15,000 or more pages, and then you have, I think it's fair to

18   say, a pretty overwhelming congressional vote.  Unanimity from

19   the Senate, 390 to 33 from the House.

20       With that kind of volume of a record, indicating a pretty

21   exhaustive review by Congress, and that overwhelming vote -- and

22   indeed it's a vote that is more overwhelming than the original

23   vote for the Voting Rights Act, which in Katzenbach was noted as

24   being important and overwhelming -- should all of that weigh on

25   me?  Is that part of the analysis here as I look at this and

1    determine whether to sustain the extension of the Voting Rights

2    Act?

3             MR. REIN:  Well, Your Honor, you've asked the

4    question, which would suggest it's weighing on you a little bit,

5    but the question is --

6             THE COURT:  But should it?

7             MR. REIN:  Let me put it this way.  If the Voting

8    Rights Act extension had been passed by a narrower margin, would

9    it be less constitutional?  I mean, I don't think these

10   gentlemen on this side of the table and this lady would be

11   arguing that it's not constitutional because there were more

12   dissenting votes.  I think that it's politically popular.

13   There's no question about it.

14       The breadth of the record has some significance in

15   indicating that Congress is not being arbitrary, that it is at

16   least endeavoring to find out what is the -- what are the

17   current needs, what's the condition of the country.  But the

18   scope of the record can't answer the question, what did you find

19   when you did all that looking?  Because that's really what we're

20   testing.  It's not how hard did you look, but what did you find.

21             THE COURT:  So ultimately the scope or size of the

22   record, and indeed the size of the majority really are just

23   interesting items but not of any significance?

24             MR. REIN:  Well, yeah.  I think that -- I would

25   certainly say -- I don't want to cast Congress aside.

1          THE COURT:  I think it would be difficult to do that,

2     given some of the observations from the Supreme Court, including

3     from the Northwest Austin majority, that this is the gravest and

4     most delicate duty that a judge can engage in.

5          MR. REIN:  And therefore you have to honor what

6     Congress engaged in.  And the more seriously they do it, the

7     more you have to think very hard about anything that would

8     impede --

9          THE COURT:  Certainly the more seriously they do it,

10    the more overwhelmingly they do it.

11         MR. REIN:  I don't think the vote count really -- in

12    none of the cases I see, other than just recounting history and

13    consensus, is there an indication that you can determine

14    constitutionality by vote.  Otherwise, Congress could vote all

15    kinds of things unanimously and say, well, the RFRA, for

16    example, which was addressed in Boerne, had an overwhelming

17    vote.  And I think that in a sense is a risk dimension.  Things

18    that become politically popular, whether or not they're

19    constitutional, is a risk dimension, because it's not just do we

20    like it, it's whether it's compatible.

21         And I think to be fair -- and I've always thought this when

22    we've looked at it -- the cost here, the heavy cost of

23    federalism is not a bleeding cost.  So when Congress, which is a

24    political body, acts, that dimension becomes much harder to

25    bring to the table.  But in the courts, all the way back to

1    Katzenbach, it's been recognized that one bastion of the

2    Constitution is the courts.  They support the constitutional

3    system.

4        So that interest in preserving division of powers,

5    preserving the sovereignty of the states, is a court interest,

6    not likely to be weighed in the Congress.  Congress doesn't sit

7    as a constitutional adjudicatory body.  It decides what it wants

8    to do.

9        THE COURT:  I'm not sure that that's giving Congress

10   enough credit.  I think many members of our current Congress are

11   quite concerned with intrusions on states' rights, on the

12   equality of states, on all the principles that make up the

13   federalism concern in this setting.  So I'm not sure that I

14   could agree with you.

15       MR. REIN:  But I don't think the record indicates a

16   detailed examination of those issues.  It's looking toward what

17   we would call current need, which is what the Supreme Court did.

18   So I think the question --

19       THE COURT:  But the current burdens, which is the

20   other side of the equation the Supreme Court identified, is in

21   fact in part the federalism concern.

22       MR. REIN:  I agree.  And certainly that's the burden

23   on which we have focused.  There's been some discussion in the

24   briefs about how administratively the Justice Department has

25   eased the process of preclearance.  That doesn't ease the

federalism burden.  The question is not how quickly you can fill

out the form, it's why you're filling it out in the first place.

And if you look at the progress of the cases, with more

dissents arising after Katzenbach, they're all addressing that

issue.

THE COURT:  So let's get to the quality rather than

the quantity of the record.

MR. REIN:  Right.  And I think that's right.  It's the

quality of the record.  And one of the questions is are the

things that are being explored -- and I think most fundamental

to us is the question, are the issues that Congress is

exploring -- racially polarized voting to take an example --

really germane -- they may be politically germane, but are they

germane to a finding of constitutional violation.

And that issue is certainly an important one, because

racially polarized voting is one of the criteria that was used

by the district court in the NAMUDNO decision that was reversed.

It's certainly highlighted in some of the briefs, and initially

it looked like a factor of its own, and it was indeed part of

the congressional findings.

But if you think about that, it's now been kind of agreed

between the parties that it's not a violation in itself because

it's private conduct.  It isn't state action.  The state doesn't

polarize voting.  What it said is --

THE COURT:  And indeed, the various groups among the

 1    voters engage in polarizing voting.

 2              MR. REIN:  Correct.  But they do that on their own,

 3    and therefore you can't bring that activity within the framework

 4    of either the Fourteenth or the Fifteenth Amendment.

 5              THE COURT:  It's only because of its linkage to vote

 6    dilution that it becomes arguably relevant.

 7              MR. REIN:  Yes.  It is said that, well, if you know

 8    there's polarized voting, then you have the ability to set

 9    districts or processes of election with a more predictable

10    outcome, because you say, well, I know there's polarized voting.

11    If I change the ratio of African Americans or Latinos in any

12    particular community, in different ways, and either add more

13    whites or concentrate -- there's a whole bunch of techniques

14    that are discussed, I can predictably get to a result that may

15    deny the ability to elect a candidate of choice.

16        But certainly none of it goes to, does that have anything

17    to do with the ability of those voters to register and cast

18    their ballot.  It doesn't go to the right to vote.  And so you

19    have to take that position that abridgment includes electing a

20    candidate of choice.  And certainly the Supreme Court, even in

21    the Fourteenth Amendment cases on redistricting, has kind of

22    said, well, it kind of matters but it doesn't, and race should

23    not be the primary criteria in redistricting.

24        And one thing the Supreme Court pointed out is that

25    tension, that in Fourteenth Amendment reapportionment cases,

race cannot be the predominant factor.  But under the VRA, race becomes a critical factor, and that makes these two competing interests hard to sort out.  That was specifically called out in NAMUDNO.

THE COURT:  What types of evidence do you think are of import?

MR. REIN:  I think that the evidence that matters targets the question, do you have the right to vote?  Now, what you can say is, where devices or other contrivances, albeit constitutional on their face, are used to support a denial of the ability to register and go to the polls and vote, which was the case in Katzenbach, then they become important and cognizable as evidence that more remedy is needed, because you're analyzing what's cutting off the right to vote.

THE COURT:  But you seem, in the way you're articulating this and in your desire not to give "abridge" too broad a scope, you seem to be giving it no meaning whatsoever.  Because you're saying it's only the denial of the right to vote that matters.  That's just the first of the two words used.

MR. REIN:  I think we're saying if one moves, uses devices, you can either cut up through it absolutely, or if you go to the point of intentionally structuring voting, voting practices, in a way that makes the vote meaningless, that has no significance.  Gomillion v. Lightfoot.  At that point you've got a violation because it affects the underlying right to vote.

1          And yes, it's a line-drawing exercise, Your Honor, as to

2     how broadly one wants to take abridgment, because if abridgment

3     goes to all of the weight of the vote considerations, then of

4     course we walk right back into whether you've identified a

5     problem that's that broad.

6          Because I think that what really happens, you look at this

7     record, and you can scour it and it has all kinds of things in

8     it, some of it's anecdotal, some of it's more systemic.  The

9     Supreme Court has already said if you're looking for evidence

10    that people cannot register and cast their votes, you're going

11    to have to look a long way to get it.  You're nowhere near

12    Katzenbach.  Nor have you got evidence that people are being cut

13    off indirectly from exercising that right, intimidated or

14    subject to devices that say yes, you showed up but we're not

15    going to count it.

16         So what you now have is you've moved on to what they call

17    the second generation, and that second generation really deals

18    with the weight of the vote.  And let me just explain why we

19    think there's a risk in that, because it really comes back to

20    why we have this analytical framework --

21              THE COURT:  Well, you're going to tell me why there's

22    a risk and are you going to tell me that that shouldn't be

23    considered?

24              MR. REIN:  I think that what we're saying is these

25    factors, if they don't come back to the ability to vote in a

1   meaningful way, just because you lose elections, are not

2   sufficient to warrant the highly intrusive --

3           THE COURT:  How about objections by the Attorney

4   General?  Where do those fit?

5           MR. REIN:  Objections, as you know with objections,

6   they can be on several grounds.  They can either be because the

7   Attorney General believes there's an unconstitutional action

8   taking place, or because the Attorney General believes that

9   there are violations of other provisions, or simply that the

10  change has not been justified.

11          THE COURT:  All right.  So they have to be analyzed

12  with some care, but are they irrelevant evidence?

13          MR. REIN:  Well, I think if they are indications that

14  there are still efforts afoot to deny the right to vote, then

15  they have significance because they're part of history.  But the

16  Attorney General is not an adjudicatory power.  He does not

17  determine, yes, this is a constitutional violation.

18      And what makes this difficult is you've got to avoid

19  bootstrapping.  And what I mean by bootstrapping is if the

20  Congress has the remedial power to set prophylactically

21  standards that are not constitutional violations themselves but

22  might contribute, you can't turn around and say, oh, those

23  violations now become the basis of finding a basis for

24  constitutional error.

25      And let me be a little more clear about that.  There's this

1    kind of phenomenon in which you say, if I can identify what is

2    an agreed violation of somebody's constitutional rights and

3    there's a pattern of it, and remedy's required, the Court has

4    said remedy can be broader than a direct.  Now, if I set up a

5    remedial test, you have to preclear.  That's a remedial

6    function.  The absence of preclearance is not a constitutional

7    violation.

8        But now I count up the number of times people had to be

9    brought to court because they failed to preclear.  And I've

10   identified -- slated this.  I can do two things with that.  One

11   of them would be to say, well, that's just evidence that further

12   violation sets a basis for further remedy.  That's one thing.

13   And I think that just is bootstrapping, because now you've taken

14   a provision that's not a constitutional violation and

15   transformed it.  It becomes a remedy if it becomes a violation,

16   and there's some of that in this record.

17       And the second thing you can say is, well, okay, if that's

18   happening, perhaps it's caused by an effort to avoid scrutiny

19   and go forward with other unconstitutional actions.  That would

20   be far more significant because --

21            THE COURT:  You seem to be saying -- correct me if I'm

22   wrong in what I'm understanding, but you seem to be saying that

23   the number and the types of -- well, I guess both of the

24   submissions by covered jurisdictions and the objections by the

25   Attorney General are not relevant evidence.

```
 1          MR. REIN:  I think what we would say is you have to
 2   analyze them further to determine --
 3          THE COURT:  That may be.  That may be.  It may be that
 4   they require some care in terms of analysis, but is that a
 5   relevant body of evidence?
 6          MR. REIN:  Well, it's certainly a body of evidence
 7   that can be analyzed, and one can extract from it relevant
 8   information.
 9          THE COURT:  Now, in City of Rome, when the Supreme
10   Court used exactly that language and cited favorably in
11   upholding the extension at that point of the Voting Rights Act,
12   and cited Congress's consideration of the number and types of
13   submissions from covered jurisdiction and the number and types
14   of -- number and nature of objections by the Attorney General,
15   what further analysis did the Supreme Court do of Congress's
16   reliance on that?
17          MR. REIN:  Well, I think City of Rome poses a somewhat
18   different issue, because what Congress --
19          THE COURT:  It may pose a different issue, but answer
20   my question.  What further analysis did the Supreme Court do?
21          MR. REIN:  They applied that count to their
22   determination that Congress, having put in place a remedy
23   against the 95-year established practice, had the right to see
24   that remedy become effective over time.  And they said, look,
25   we're looking for indicia that the underlying problem, the will
```

1    to deny the right to vote, is still there.

2         So, yes, when we count up, we're going to look and we're

3    going to say, gee, people are still trying to get away with it.

4    We don't have to look too hard because all that's happening here

5    is the extension of a remedy that perhaps couldn't operate as

6    quickly as the five-year optimistic forecast.  And I think they

7    start with, you know, the picture is mixed.  It's mixed on

8    registration, it's mixed on casting votes.

9         And the question in Rome is do we want to cut it off now?

10   Do we want to say, gee, let's ignore 95 years of history?  We're

11   a lot further down the line.  And when the Supreme Court tells

12   us that current needs must justify current burdens, it's saying,

13   look at this differently.  You can't justify this by looking at

14   that history.

15                THE COURT:  Alone.

16                MR. REIN:  So I think that when we look at the

17   criteria which have been put before the Court and were certainly

18   before the Court in the NAMUDNO three-judge panel decision,

19   certainly we would say registration and voting are the direct

20   indication of suppression.  I think there's no question.  But

21   the question then becomes the quantum of the evidence, is there

22   a problem in registration and voting.  And I think, Your Honor,

23   you've seen enough of that in the briefs to know that it

24   doesn't.

25         The number of elected minorities has -- something that

people have focused on.  It tends to say has the vote been

effective?  Have people been able to actually participate in the

process in a meaningful way.  That number is growing very

rapidly, but it's kind of an indirect measure, if you will.

It's an indirect measure saying, okay, if people can vote, you

would expect to see that they would elect candidates of their

choice.  Has it happened?  Or is there some other set of devices

being used to restrict it.  And I think the enormous, thousand

percent growth in the number of elected minorities is saying the

vote has become quite effective.

THE COURT:  But that issue was further analyzed by the

three-judge panel to point out that it wasn't quite so

convincing as you would put it, and that's exactly the kind of

further analysis of the evidence that you're advocating,

correct?

MR. REIN:  Yes.  And I think what the panel did was to

try to determine, okay, to what extent is dilution in one form

or another impacting that, that is, the way that districts are

apportioned, is that impacting the significance of the vote?

When people are actually coming out to register and vote, are

they being defeated in their ability to have a meaningful vote?

And one could argue about that.  I don't think that, again,

it was properly analyzed because it was attached to the

question, is this vote meaningful.

The Attorney General's objections certainly was a factor in

1    Rome in saying is there still a need?  Is this supervisory

2    mechanism significant?  Is something happening that tells us

3    that the remedy is having a bite?  And certainly in Rome, the

4    Court said, yeah, it's having a bite.  The AG is a bulwark, the

5    AG is preventing people who have adverse motives from doing it.

6         THE COURT:  Why is the record here so much different

7    than the record there on that issue?

8         MR. REIN:  Because I think if you look at the trends

9    in the record that we've described, the number of objections

10   continuously declined.  It's virtually down to nothing.  And one

11   can argue about how this is happening and why, but it is not a

12   picture of ingenious defiance.  It's not a picture of massive

13   resistance of the right to vote.

14        THE COURT:  There still are a lot of objections that

15   took place over the 25-year period between 1982 and 2006.

16        MR. REIN:  Well, that's a long time.

17        THE COURT:  I know it's a long time.  Long time is a

18   theme that I'm sure I'll hear a little bit more about this

19   morning.

20        MR. REIN:  There are a number of objections.  Again,

21   they haven't been analyzed and parsed to see how many were

22   objections to actions that would be deemed unconstitutional in

23   their own right, how many were objections based on the broader

24   criteria which are used by the AG to review.  And at the end

25   they are AG objections.  If we went five years and the AG hadn't

1    objected to anything, I think we would be before you saying this

2    remedy is ineffective, it doesn't do anything, and we'd hear the

3    other side saying, well, no, it's effective because people

4    aren't doing bad things anymore.

5        I think the bottom line of that is we don't believe that

6    the number of objections, especially the percentage of changes

7    objected to --

8        THE COURT:  But Congress in one committee report

9    concluded that -- or observed that more Section 5 objections

10   were lodged between '82 and 2004 than were lodged between '65

11   and '82, and that those objections didn't just encompass minor

12   or inadvertent voting changes, but included calculated decisions

13   to keep minority voters from being able to participate fully in

14   the process.

15       I'm supposed to undercut that conclusion by Congress?  Why

16   isn't that a valid conclusion by Congress based on the evidence

17   that was before it?

18       MR. REIN:  There are a couple of things.

19       THE COURT:  And I recognize that's not stated by

20   Congress as a body; that's in one of the committee reports.

21       MR. REIN:  Right.  But it was certainly the subject of

22   argument in this case, and it is a fact.  First of all, you're

23   comparing 17 years to 25.  So there's a baseline question.

24       THE COURT:  All right.

25       MR. REIN:  It's just numerical.  Secondarily, we've

1    identified at least two sources of objection that were deemed

2    ultimately to be not valid sources.  Those are objections based

3    on purpose -- on effect without discriminatory purpose, which

4    has now been added back, but was not a proper basis of objection

5    at the time.  And there's the Miller question of the so-called

6    max-black strategy, which Justice pursued, which was really

7    deemed to be outside of constitutional boundaries under the

8    Fourteenth Amendment.

9          THE COURT:  I've heard a little bit about that, and

10   maybe the Justice Department will have more of an answer to

11   this, so what percentage of the objections fall into that

12   category that was struck down in Miller v. Johnson?

13         MR. REIN:  We really haven't made a count, nor is

14   there anything in the briefs that tells you how to count them.

15   I think what we're saying is once those sources have been

16   removed, and certainly in the last few years before the

17   enactment, the rate of objections and the number of objections

18   is way, way down.

19       Now, there's still a lot of submissions.  And that's the

20   other side of this coin, Your Honor.  The burden on federalism

21   is signaled by the number of submissions, the number of

22   preclearances submitted, where a state now becomes subordinate

23   to an administrative officer, an executive officer of the

24   United States government, and they're not violating the act.

25       And those numbers are very, very big, and they have to be

weighed as well because they measure federalism cost.  All of
these things being submitted, some of them are quite trivial --

THE COURT:  Although there's some evidence in the
record before Congress that many jurisdictions don't consider
that really to be much of a burden at all.

MR. REIN:  Well, are you talking about --

THE COURT:  And some jurisdictions welcome it.

MR. REIN:  Well, two different issues.  One is the
administrative burden.  How hard is it to fill out the form?  I
think you could make your 1040 very easy to fill out.  The
burden is when you pay your taxes.  I think the federalism
burden is being placed under that kind of direct supervision,
and really doesn't have to deal with how much form you have to
fill out.

And I understand, from the point of view of a single
individual who may feel that the more comfort I have, meaning
the more big bad wolves are looking over my shoulder, the easier
it is for me to do my job and satisfy other people that I'm
doing it right, that's an idiosyncratic view, and I don't think
that alone establishes it.

But I think what we have said is that if you look at the AG
objections, no one has established a pattern of constitutional
violation, and that's important.  We've had discussion of more
information request letters, and I think the question on those,
that you can count those up, but do they signal that there was

 1   something wrong that would have been objected to, or simply you

 2   haven't justified it fully enough, and the fact that somebody in

 3   the face of that says, you know, the game's not worth the

 4   candle, it needs to be analyzed, and it hasn't been analyzed.

 5   It's just been counted.

 6          THE COURT:  Now, evidence that goes to vote dilution

 7   is relevant evidence for Congress.  Do you agree with that?

 8          MR. REIN:  I think to the extent that Congress wants

 9   to use its Fourteenth Amendment power --

10          THE COURT:  Whether you call it Fourteenth or

11   Fifteenth Amendment, evidence that goes -- you're returning to

12   an issue -- evidence that goes --

13          MR. REIN:  I just want to make sure you don't forget

14   it, Your Honor.

15          THE COURT:  You're doing a good job.  Is that relevant

16   evidence for Congress to consider?

17          MR. REIN:  Well, I think to the extent that Congress

18   is concerned about the effectiveness of the vote and evidence of

19   vote dilution, it can certainly explore it.  It's important.

20   The question is does it form the kind of pattern which suffices

21   to support preclearance as a remedy.  Because you can't detach.

22   I mean, clearly there is remedy against vote dilution; you can

23   move directly under the Fourteenth Amendment, there is Voting

24   Rights Act consideration, there are numerous ways to challenge

25   it.

1          THE COURT:  That would seem like it might be returning

2     to the inefficient ways that gave rise to the Voting Rights Act

3     in the first instance.

4          MR. REIN:  I understand that, Your Honor.  But I would

5     only say that the question of efficiency depends on the nature

6     of the violation.  People clearly do find injunctive actions,

7     actions directly on this, to be efficient.  I think the courts

8     are able to police that kind of activity, because it's

9     structural, much more than they could police the kinds of things

10    that were happening before Katzenbach, which were pervasive,

11    which were varying.  And I don't think that it's quite the same

12    thing.

13         Clearly, the number of submissions and the amount of

14    activity does vary, as we've all agreed.  With the census and

15    redistricting, it becomes more controversial.  And I think one

16    other thing I'd just say about the question of objection, one of

17    the things that's a cost of this system of preclearance is it

18    has risks of its own.  Because polarized voting is in part

19    defined by race, but it's also defined by, as the Court said,

20    different attitudes, different politics.  And when you start

21    looking at effectiveness in terms of political divisions, I

22    think you're running the risk of getting into partisanship.

23         And that's inherent here when you starting going into

24    apportionment and questions of dilution, and when you measure it

25    by who did you elect.  Because the differences that polarize the

1    races are not necessarily only race.  They may be quite

2    political, different social views, different attitudes.  And to

3    try to deal with those, they're not the subject of these

4    amendments.

5         So there are a couple of other things --

6         THE COURT:  Are annexations relevant only because of

7    the polarized voting?

8         MR. REIN:  To the extent that one says the annexation

9    is an intentional effort to suppress the effectiveness of the

10   vote of a minority, yes, then they're important, because one

11   would say that when you did it, and you brought in voters of a

12   different race, you knew what you were doing, it shows intent.

13   But annexation after all is a normal process.  Annexation poses

14   difficulties of its own, because one reason cities annex is to

15   improve their tax base.  And if people have moved around in ways

16   that --

17        THE COURT:  So what do we do with annexations as a

18   part of this legislative record?

19        MR. REIN:  I think you've got to say, do we see

20   annexation forming a pattern that suggests that its use is to

21   effect a constitutional violation.  That's what you need to do.

22   And unfortunately, it's the Court that has to do it.  Congress

23   is not really constrained to do it.  Congress enumerates

24   factors, but you have to look at them and adjudicate them.

25        THE COURT:  So if a given jurisdiction over the course

```
1    of 25 years does eight annexations, four of which can be
2    targeted to tax reasons, and four of which can be targeted to
3    race-based voting reasons, that's irrelevant or relevant
4    evidence?
5            MR. REIN:  I think it's certainly relevant.  Certainly
6    in a bail-in case, for example, where you raise directly has
7    there been a constitutional violation, that would be relevant to
8    say, well, you've taken these actions, they may individually
9    create a constitutional violation.  And in bail-in, one of the
10   available remedies is a very narrow and targeted preclearance.
11      That's a very different concept from a sweeping
12   preclearance based on a general record.  Because that's what's
13   at issue here; a general record, a designation -- and
14   Mr. Consovoy will deal with it -- of certain jurisdictions as
15   covered without regard to their individual histories, and then a
16   very stringent remedy of oversight.  And I don't want to use up
17   Mr. Consovoy's time on an issue --
18           THE COURT:  We're going to get to him in one second.
19           MR. REIN:  I'm not trying to escape, Your Honor.  I
20   just want to make sure we cover --
21           THE COURT:  I know.  You don't have anything to escape
22   from.
23           MR. REIN:  -- the coverage formula.
24           THE COURT:  The issue of anecdotal or isolated
25   instances that you referred to earlier and that Justice Thomas
```

1    refers to in his dissenting opinion in <u>Northwest Austin</u>, do you

2    agree that that's what the record shows, just occasional

3    isolated interferences with the right to vote?

4         MR. REIN:  Well, we would say there's certainly

5    anecdotal evidence in the record, and Congress didn't preclude

6    people from coming forward with anecdotal evidence.  Similarly,

7    there are the reported Section 2 cases which, when they go to

8    verdict, show you that there's not much in finding intentional

9    discrimination over this period in Section 2 cases.  That's six

10   cases out of, you know, 25 years.

11        So I think we would say there's anecdotal evidence, but the

12   test is not was there anecdotal evidence, it's whether Congress

13   could find a pattern of violation, something endemic, something

14   that needed to be cured by a wholesale remedy of the type that

15   preclearance --

16        THE COURT:  Just focus for a second on objection

17   letters.  What would be a pattern?  How many objection letters

18   that were based on discriminatory intent would there have to be

19   for there to be the kind of pattern that you're looking for?

20        MR. REIN:  Certainly, without dancing on the head of a

21   pin and counting the angels, I would say --

22        THE COURT:  But that's what you're asking me to do,

23   though.

24        MR. REIN:  No.

25        THE COURT:  You're saying I have to assess it and come

1  to some conclusion as to whether there's a pattern.  How should

2  I do that?

3           MR. REIN:  Certainly more than we have in the record

4  today.

5           THE COURT:  That's a nonanswer, isn't it?  What does

6  the record have?

7           MR. REIN:  The record has several hundred objections,

8  752 I think, over a period of 25 years, not all of which have

9  been analyzed to determine are they objections on a

10  constitutional ground.  I think if we compare that again --

11  because Katzenbach is kind of a marker.  Compare that to the

12  number of violations ongoing in the covered jurisdictions in

13  Katzenbach, it's de minimis.  It doesn't signal a wholesale

14  rebellion because, as Justice Roberts said in the opinion for

15  eight justices, the South has changed.  That's what's not being

16  accepted.

17      And if I have one final word, I think that when you read

18  the briefs, Your Honor, it's fair to say that a concern of the

19  other parties and a concern in the Congress is deterrence, not

20  so much what has gone on, but what might have gone on if we

21  didn't have the remedy, and what might go on tomorrow if the

22  remedy is withdrawn.  And I understand that concern, but I think

23  that --

24           THE COURT:  Is it a valid concern for Congress?  You

25  understand it.  Is it valid?

1          MR. REIN:  For Congress I believe it is.  I think that

2    Congress is looking at a situation where people's expectations

3    influence what the Congress ought to do.  I don't believe that

4    deterrence is lacking, for two reasons.  Number one, there's

5    bail-in.  So if these jurisdictions start resorting, going back

6    to their old tricks, so to speak, they can be bailed in and

7    placed back under preclearance.

8          And second, the Congress isn't going away.  So if, absent

9    this legislation, the same pattern of serious constitutional

10   violation existed, Congress would then have a record, say we

11   gave you a chance, we tested you, we're bringing it back, and

12   there would be a foundation.

13         THE COURT:  That's an approach that does create some

14   concern.  Basically, it's okay if we take away these remedies,

15   Section 5 in particular, because if we fall back as a country or

16   in parts of the country into this pattern of suppressing the

17   vote, the voting rights of some members of the country, we can

18   just reenact the Voting Rights Act.  I don't find that to be a

19   very comforting approach.  What happens in the meantime?

20         MR. REIN:  Well, I think what we're saying, we do not

21   expect, and I don't think there's anything in the record that

22   suggests there is going to be a restoral of ingenious defiance

23   and massive resistance.  It isn't going to happen.  We're just

24   saying that the absence of a fact record that supports the

25   remedy doesn't mean that you're foreclosing the issue forever.

1        And I think that -- it's important because Congress can

2   politically act out of fear.  We don't have the record, but

3   we're not sure we wouldn't have it because, as the Court pointed

4   out, what we have in front of us is very much influenced by the

5   existence of the remedy.

6        So how do you determine why the number of objections is

7   going down?  Is it going down because the remedy has made people

8   say this is fruitless, let's stop trying, or is it going down

9   because attitudes have changed, political power has changed and

10  we have a very different situation.  I think you can't presume

11  that it's the former.

12       And the only point we're making is if it's all wrong, if

13  we're grossly wrong, if things have not changed, we're not

14  abolishing the amendment.  We're not doing away with Section 2,

15  we're not doing away with bail-in, we're not doing away with the

16  ability of the Congress to say we now have a record upon which

17  we can act.

18       And I'll turn over to Mr. Consovoy because I don't want to

19  miss talking about the formula.

20            THE COURT:  Thank you, Mr. Rein.  Mr. Consovoy.

21            MR. CONSOVOY:  Good morning, Your Honor.

22            THE COURT:  Good morning.

23            MR. CONSOVOY:  The reason why we have emphasized

24  Section 4(b) both in briefing and in argument is because Shelby

25  County believes it is both the narrowest and most obvious basis

for granting a complete relief in this case.  In 2006 Congress

reauthorized a coverage formula that predicates coverage for the

jurisdiction on election data from 1964, 1968, and 1972.  As the

Supreme Court explained in <u>Northwest Austin</u>, that choice raises

constitutional problems in several respects.

First of all, using a formula based on data that old is

itself problematic, from two perspectives.  One, the data is

archaic, it's fossilized, it doesn't bear at all on the current

political conditions in the country.  And the Court was clearly

concerned with that.

But beyond that, I think it shows, and I think the record

reflects this, a lack of frankly diligence on Congress's part in

reexamining the formula and taking a hard look at it to

determine whether it really represents the best mechanism for

determining which jurisdictions in this country are going to be

subject to the most far-reaching prophylactic remedy Congress

has ever enacted.

THE COURT:  Would your concerns have been cured if

Congress had simply added another sentence -- and I use that

word intentionally, because that's what 4(b) talks of -- another

sentence that incorporated a more recent year than 1964, 1968,

or 1972?

MR. CONSOVOY:  No.  I think replacement would

potentially have solved the problem.  As 4(b) works now, it's

additive, as you suggest.  So once you were captured in '64 --

1          THE COURT:  That's how 4(b) has evolved.  It simply

2     adds additional jurisdictions through these additional

3     assessments, but it doesn't eliminate the early --

4          MR. CONSOVOY:  That's right.  So if you were added in

5     based on '72 data, they didn't go back and look at the '64

6     jurisdiction to determine whether they should be out.  Had they

7     done so, there would have been a lot of changes along the way.

8          Had Congress actually replaced it with 2004, I believe the

9     record shows and the briefing shows, from the intervenors,

10    agreeing with our position, the only fully covered state would

11    have been Hawaii.  That alone stands as a stark example of a

12    massive disconnect between the current record, at least with

13    respect to voter registration and turnout, which again remain

14    the inputs for the formula.

15         The Attorney General and intervenors attempt to move away

16    from that and simply suggest that the inputs don't matter.  I

17    think one brief actually says that voter participation is no

18    longer the chief evil that Congress is trying to aim at.  We

19    dispute that proposition.  But even if you accept that

20    proposition, the formula still does, and the formula cannot be

21    ignored from a theoretical level.  In fact, in Katzenbach the

22    Court made clear that the reason it upheld the formula was

23    because it was rational in both theory and in practice.

24         THE COURT:  So which is, or are they both the problem?

25    Is the problem the things that the formula looks at, or is the

1    problem that it looks at outdated information?

2            MR. CONSOVOY:  It's both.  Either are sufficient to

3    strike it down, but it's both.

4            THE COURT:  With respect to the things that it looks

5    at, the Supreme Court has upheld the formula, has it not?

6            MR. CONSOVOY:  It was only examined in one case, in

7    Katzenbach, and the Court took a very close look at it, devoted

8    several pages to it, and did uphold it.  But it upheld it,

9    again, to repeat the language of the Court, because it was

10   rational in theory and in practice.  It was rational in theory

11   because the problem Congress was identifying was interference

12   with the ability to cast a vote.  And the Court found that

13   looking to the use of voting tests and voter registration

14   turnout was a rational means of identifying and trying to solve

15   that problem.

16       And it was rational in practice because even if it was

17   reverse-engineered, which it really was, it got the right

18   jurisdictions, because Congress was -- and I think this was the

19   final sentence in their discussion of the coverage formula --

20   what confirms its rationality is the fact that they captured

21   every jurisdiction that that problem was identified.

22           THE COURT:  Now, would you agree that that is the test

23   that I should apply in examining 4(b) now, rationality?

24           MR. CONSOVOY:  No.  Certainly not.

25           THE COURT:  Even though Katzenbach did that, I should

 1    do something else.

 2              MR. CONSOVOY:  In all honesty, I don't think it drives

 3    the analysis on this issue at all.

 4              THE COURT:  You may be right.

 5              MR. CONSOVOY:  I don't think there is a rational

 6    basis.  So again, this is why we believe it is both the

 7    narrowest and most obvious basis for striking down the statute.

 8    I don't think the Court needs to -- we believe that Boerne is

 9    certainly nothing more than elaboration on what Katzenbach had

10    done, that Boerne merely put some discipline on an analysis that

11    had some broader language in it.

12         And not to go over issues that have already been discussed,

13    but you mentioned Katzenbach v. Morgan.  The Supreme Court had a

14    concern with Katzenbach v. Morgan in the Boerne decision.  They

15    spent a little time discussing it.  And they said we recognize

16    that decision had broad language.  It cites McCulloch, it cites

17    In Re: Virginia.  They said, but we're not giving those

18    decisions in that discussion the broad reading that others would

19    suggest.  And I think that really does form a conceptual tie

20    between the older cases and the newer ones.

21         So the theoretical problems here are on two levels really.

22    We've identified one, which is the data is old.  But the second

23    one, which is a massive mismatch between what Congress is aiming

24    at now and what the formula looks at.

25              THE COURT:  If the legislative record established --

1    and I know you don't think it does, but if it established that

2    the bulk of voting discrimination, however you define that term,

3    took place in the covered jurisdictions, would that be enough to

4    support the 4(b) coverage formula?

5              MR. CONSOVOY:  It would perhaps solve the

6    reverse-engineering problem.  But again, that is accepting your

7    premise.  We do not accept the premise.  In fact, one of the

8    main problems with the formula is that it doesn't -- the

9    problems Congress identified, are not concentrated in the

10   covered jurisdictions.  That really goes to both the mismatch

11   problem and to the equal sovereignty point the Court stressed in

12   Northwest Austin.

13        If Congress had decided that vote dilution is the principal

14   concern that exists at the current time -- and I don't think,

15   based on your questions to Mr. Rein and the briefing in this

16   case, that anyone can dispute that most of the record evidence

17   goes to dilution; it deals with racially polarized voting, which

18   has now been argued as merely a predicate to dilution, deals

19   with Section 2 cases which are almost all dilution cases, and

20   most of the objections deal with redistricting, which in turn

21   almost all deal with dilution questions.

22        I don't think there's any question that whether Congress

23   could or could not -- and we don't think they really can use

24   this remedy to get a dilution -- even if they could, that has

25   nothing to do with voter registration and turnout.  It's not

1    probative.  It's not the kind of probative evidence that forms a

2    rational relationship between this formula and that problem.

3        If Congress is concerned with vote dilution, Congress was

4    required to craft a formula that identified the jurisdictions

5    that have a vote dilution problem.  They didn't.

6            THE COURT:  So, Senator Consovoy, what is the right

7    formula for the Voting Rights Act?  What should the formula be?

8    If not what's set forth in 4(b), what is a rational formula?

9            MR. CONSOVOY:  I'm not sure there is.  And I'm not

10   sure that there needs to be a formula to get at the problems

11   Congress is looking at.  Section 3(c), bail-in, would impose,

12   could impose preclearance on any jurisdiction that has been

13   adjudicated in a court to have violated either the Fourteenth or

14   Fifteenth Amendment.

15       I believe there are perhaps six cases since 1982 where

16   there's been an adjudicated Section 2 dilution claim for

17   intentional discrimination.  You don't need a formula --

18           THE COURT:  So your answer is we don't need a Section

19   4(b) and therefore don't need a Section 5.

20           MR. CONSOVOY:  I think that's one answer.  And there's

21   a strong basis in --

22           THE COURT:  Let's assume that Section 5 is going to

23   stay alive.  What kind of coverage formula in a 4(b) provision

24   would be appropriate?

25           MR. CONSOVOY:  I wouldn't get into specific

1   language --

2           THE COURT:  Don't get into specifics.  Just give me a

3   concept.

4           MR. CONSOVOY:  I think you would have to focus on

5   dilution.  So you would have to move away from voter

6   registration and turnout, look at the record and determine what

7   kind of formula can we craft that will identify.  Congress would

8   have to take some time and care to figure that out.  It's not an

9   easy task.  But the task shouldn't be easy, because you're using

10  these formulas to impose preclearance on every voting change in

11  the jurisdiction based on a dilution problem.  That in itself is

12  highly problematic.

13          THE COURT:  If you're right that most of the record

14  relates to voter dilution, then looking, for example, at

15  something like the Senate Judiciary Committee appendix, that

16  large, 300, 280-page appendix, a good portion of that, I would

17  say a disproportionate portion of that relates to summary

18  descriptions of evidence of discrimination in the nine covered

19  jurisdictions.  That would seem, just on a superficial look, to

20  indicate that there's more of a problem in covered jurisdictions

21  than in noncovered jurisdictions.

22          MR. CONSOVOY:  I would respectfully disagree.  If you

23  look --

24          THE COURT:  I know it's very superficial, but why --

25          MR. CONSOVOY:  When the Court takes a long look at

that appendix, you'll see that most of those instances are from
the earlier -- from the '80s.  Almost none of it is recent.
There's no suggestion that something that happened in '82 is
equally relevant to the decision in 2006 as something that
happened in 2000.  That wouldn't seem to make sense.

Beyond that, there's nothing in that record -- and this
goes I think back more towards Section 5, but it also bears on
Section 4(b) -- suggesting a pattern of discrimination.  And
that's what matters.  That's what mattered in Katzenbach.
Katzenbach said that absent ingenious defiance and the
manipulation by the covered jurisdictions, preclearance and
coverage would be unconstitutional.  It is a measure of last
resort.

There is nothing in that appendix that suggests that those
instances couldn't be resolved on a case-by-case basis.  And
moreover, that when those practices were eradicated, that those
same jurisdictions kept repeating and repeating and repeating
and looking for new problems.  They are the stringing together
of disparate examples to attempt to form a pattern.  And our
position is they fell short.

THE COURT:  Now, it's your view that there's no
evidence, or Congress made no finding that there's evidence of
greater discrimination in the covered jurisdictions than in
noncovered ones.  Correct?

MR. CONSOVOY:  Correct.  It's more than the findings.

1    It's what the record itself shows.

2         THE COURT:  Just give me your reaction to these two

3    pieces -- and they're only two pieces -- of the legislative

4    record.  You've got six states originally covered by Section 5,

5    and five of those six states, which are still all covered

6    jurisdictions, account for 66 percent of the federal observer

7    coverage since 1982.  Why isn't that an indication of some

8    greater problem in the covered jurisdictions than in the

9    noncovered jurisdictions?

10        MR. CONSOVOY:  Two reasons.  One, we don't believe, as

11   we say in our briefs, that federal election coverage is a strong

12   basis for determining infringement with the right to vote.

13   Federal election coverage is triggered by a concern that there

14   might be in those jurisdictions a violation that might occur.

15        THE COURT:  But it nonetheless is a relevant basis

16   because the Supreme Court has already considered that to be a

17   relevant --

18        MR. CONSOVOY:  It is relevant, but not all relevant

19   bases are created equal.  I think it falls on the far end of the

20   scale in terms of what the Court would look at in terms of

21   holding.  In other words, if, when you cut through everything

22   else, if all you're left with is federal election coverage, it

23   might be enough to allow for some prophylactic remedy, but it

24   wouldn't be enough to allow for this prophylactic remedy.

25        THE COURT:  What's your second reason?

1          MR. CONSOVOY:  It's unfair also, or I think a mistake

2    to look at simply covered jurisdictions versus noncovered.  And

3    I think this may have been lost a little bit in the back and

4    forth in the briefing.  It's conceivable that if Congress went

5    back and took a careful look and came up with a more accurate

6    formula, or simply chose jurisdictions for coverage based on

7    evidence as to them -- which is another way Congress could act

8    here, is simply identify the jurisdictions where it believes

9    there's a problem -- that's not to say that none of the covered

10   jurisdictions would fall within coverage.  It just suggests that

11   not all of them would, and in fact some outside would.

12        So, for example, I believe with respect to three of the

13   jurisdictions -- and it's in our brief, I don't remember which

14   three it was -- New Jersey has three times more election

15   observers than those three states combined.  So maybe some of

16   the covered jurisdictions have election observer problems, but

17   not all of them, and some of them not nearly as much as New

18   Jersey.  So the formula may capture some of them, but it won't

19   capture all of them.

20        And that point goes down the line with all their evidence.

21   Section 2 litigation, the Attorney General says the principal

22   study identified 114 instances of Section 2 cases in which there

23   was a favorable outcome for the plaintiffs.  First of all,

24   favorable outcome isn't the right standard, because there are a

25   whole host of quote-unquote favorable outcomes that do not

require a finding of intentional discrimination.

THE COURT:  And the record would also show that a higher proportion of those were in covered jurisdictions.

MR. CONSOVOY:  Marginally.  64 to 50.  Again, that kind of gap may allow Congress some measure of prophylactic remedy, but not this one.  The same thing with racially polarized voting.  The principal study relied on identified 105 instances of racially polarized voting over a 25-year period. 53 of those were in noncovered jurisdictions; 52 were in covered jurisdictions.  Congress identified racially polarized voting as the leading example of the need to reauthorize the statute.

So as the Supreme Court explained in Northwest Austin, this is a serious problem.  Congress didn't take a careful examination of where the problems it has identified still exist. And by any measure, whether some of those problems still exist in some of the covered jurisdictions, they're not concentrated there, and they exist to a large extent outside them.

THE COURT:  For a court, what's the right analysis under a rationality test that was applied in Katzenbach?  Just assume for a second that's where we are.  What's the right assessment?  How do I assess whether there's enough of a showing of a greater problem in covered jurisdictions than in noncovered jurisdictions for purposes of analyzing whether 4(b) in its coverage formula is rational?

MR. CONSOVOY:  I think there is some line drawing.

1    There's no question about that.  And I think the line, you have

2    to look at the language and the decision in <u>Katzenbach</u> as a

3    guide, particularly if the Court is going to rely on rational

4    basis.  There the Court said the coverage formula

5    constitutionality was confirmed because every state for which

6    the problem identified existed was captured by the formula.

7    Every single one of them.

8        Here, even if the Court said I'm not going to hold to an

9    every state example, even if it was some sort of substantial

10   difference between the two, this record falls far short.  It's

11   not even in the same ballpark.

12          THE COURT:  Why isn't part of the problem cured by the

13   bailout provision?  The bailout provision allows jurisdictions

14   that believe that they shouldn't still be covered to come in and

15   bail out --

16          MR. CONSOVOY:  For several reasons.

17          THE COURT:  -- unless they have a problem.

18          MR. CONSOVOY:  I think bailout doesn't solve the

19   problem for several reasons.  It doesn't solve

20   underinclusiveness at all, and at most deals with

21   overinclusiveness.  And underinclusiveness is a serious problem.

22   That in fact is the principal problem the Court was concerned

23   about when it said that the coverage formula doesn't appear to

24   account for political conditions throughout the country.  It was

25   underinclusiveness.

 1          But even with respect to overinclusiveness, first of all,

 2     bailout isn't complete relief because jurisdictions that are

 3     granted bailout are still under continuing jurisdiction of a

 4     court for at least a number of years.  Bailout is granted or

 5     denied based on considerations that go far beyond evidence of a

 6     constitutional violation.  It is simply -- it is, for lack of a

 7     better term, it is parole, I suppose, from preclearance.  But

 8     the question here is whether Congress had enough evidence to

 9     convict in the first place, and they did not.

10          And with respect to --

11          THE COURT:  I don't think that's actually your

12     position.  I think that in 1965 Congress did have enough

13     evidence to convict.

14          MR. CONSOVOY:  That's right.  But again, the record is

15     looked at anew.  And that really is the principal point of the

16     Northwest Austin opinion, which is the reviewing courts should

17     look at the evidence in this legislative record, determine

18     whether it requires this remedy.  And it is not a historical

19     examination.  If the opinion stands for anything, it stands for

20     that.

21          THE COURT:  So your view is I should strike down 4(b)

22     as unconstitutional, whether under a rationality or a congruence

23     and proportionality test.  And what would that mean?

24          MR. CONSOVOY:  That would mean that the jurisdictions

25     currently subject to coverage are no longer covered, which is

 1    why we would afford complete relief to Shelby County.  It would

 2    mean that Section 3(c) remains intact.  It includes its own

 3    preclearance provision.  So even if there was a question about

 4    Section 5's validity in light of Section 4 being struck down,

 5    Section 3(c) includes its own preclearance requirements.  It

 6    would still remain a viable remedy to eradicate discrimination

 7    where it's found by a court.  And Congress, if it so chooses,

 8    can go back to the drawing board and come up with a formula.  It

 9    is not an opinion that suggests -- if the opinion was limited to

10    that --

11           THE COURT:  But you seem to feel that Congress might

12    have an impossible task in front of it, in coming up with such a

13    formula.  You certainly haven't given me any hint of what an

14    acceptable formula might be.

15           MR. CONSOVOY:  I think it being acceptable moves along

16    two axes, is the problem.  I think if Congress went back, for

17    instance, and said we're going to impose preclearance on any

18    jurisdiction that has this amount of dilution claims against it,

19    I think that -- and I'm not prejudging that issue -- that may

20    move closer to solving the formula problem.  But then the

21    question would still arise whether that kind of formula is

22    responsive to the massive preclearance obligation itself.

23        But there's nothing that says that Congress has to use a

24    formula at all.  3(c) doesn't use a formula.  3(c) requires

25    proving a violation, much like Section 2 does.  And beyond that,

1    Congress could in fact identify jurisdictions where it believes

2    the problems exist, and build a record as to those

3    jurisdictions.

4        In 1964 that necessarily wasn't required.  It was obvious

5    where the jurisdictions were.  Again, Congress captured every

6    jurisdiction that had used a prohibited voting test or device,

7    and where voter registration lagged behind the national average

8    by 12 percent.

9        If you use those metrics today, you would not come up with

10   these same jurisdictions.  You simply would not.  For that

11   principal reason, we believe the coverage formula is

12   unconstitutional.

13       Unless you have any further questions, Your Honor.

14           THE COURT:  Are you going to address the 25-year

15   issue?  Or is that not on your --

16           MR. CONSOVOY:  Absolutely.  The 25-year issue I think

17   is wrapped up into how the Court analyzes the evidence itself.

18   In 1982 it was reauthorized for 25 years.  Congress did so again

19   here.  It depends on the record.  Here, if this is the record --

20   and I think this was the final point we made in our final brief

21   to the Court -- if this is the kind of evidence that can sustain

22   the act, then it isn't a 25-year authorization anyway.  It's

23   forever.

24           THE COURT:  That's a different issue, because you'd be

25   making that same argument if it were a five-year extension.  But

1    is there a problem with it being 25 years instead of five years?

2         MR. CONSOVOY:  We haven't briefed it in that way.  We

3    certainly think that it being 25 years --

4         THE COURT:  Is it irrational for Congress to have

5    chosen 25 years as opposed to five or seven or 10 years?

6         MR. CONSOVOY:  We haven't briefed the issue in that

7    way.  Our position is that if it's this evidence, then certainly

8    25 years is too long.  But frankly, as you just noted, on this

9    evidence, another year is too long as well.

10        THE COURT:  All right.  Thank you.  I don't really

11   have the lineup in mind as to who's going to be arguing and what

12   they're going to be arguing.  So Mr. Bagenstos, why don't you

13   first inform me of that.

14        MR. BAGENSTOS:  Okay.  So to the extent I understand

15   it, I will be arguing for 45 minutes.

16        THE COURT:  I hope you understand.

17        MR. BAGENSTOS:  And I will address all the issues on

18   behalf of the United States, at which point the intervenors will

19   proceed, I believe in the order they're sitting.  So

20   Mr. Greenbaum will speak first, and he will address I think

21   really what is the first or first and second issues that you've

22   identified, Your Honor.  Ms. Clarke will speak next, and she

23   will address, I think, some combination of the second issue that

24   you identified and some of the others, and then Mr. McDonald

25   will speak and talk again about the record and the application

1    of Section 5.

2            THE COURT:  Please.

3            MR. BAGENSTOS:  If I might, Your Honor, I would like

4    to begin by talking about Northwest Austin, and then address in

5    order each of the issues that Your Honor has raised.  Because

6    Northwest Austin I think does say four things that are relevant

7    to this court.  Obviously did not decide the constitutional

8    issue, which is why we're here, but the Court did first note

9    absolutely that Section 5 and its coverage formula raised

10   serious constitutional questions.  I think that's been actually

11   rather settled since South Carolina.  That's why there's been so

12   much litigation about it.

13       But the Court also did say a number of things that are

14   relevant to framing the issues before this court.  The Court

15   said that the coverage formula must be justified by current

16   needs, without a doubt.  The Court noted that some of the

17   conditions have unquestionably improved that justified the

18   statute originally, but also noted that it might be that these

19   improvements are insufficient and that conditions continue to

20   warrant preclearance under the act.  And that's really the

21   question that this court has to decide.

22           THE COURT:  If they hadn't said that, they would have

23   decided the question.

24           MR. BAGENSTOS:  I think that's right, but I think it's

25   also important to note, this is an opinion of the Supreme Court,

of eight justices, that says a number of different things.
Certainly frames the issues, but does not actually put a thumb
on the scale one way or the other.  The Court also said that the
coverage has to be sufficiently related to the purpose it
serves.  But again, as Your Honor has noted, it didn't decide
what "sufficiently related" means, and that's what we're talking
about.

And the Court did reaffirm, by citing Justice Holmes in
Blodgett v. Holden about the gravest and most delicate duty, and
by just talking about the Fifteenth Amendment itself, that it's
up to Congress, not the courts, to determine in the first
instance what legislation is needed to enforce it, and that
Congress did amass a sizable record here in support of its
decision to extend the preclearance requirements.  And I think
that frames the issues before this court.

As to the question of congruence and proportionality versus
rational basis, I think Your Honor has identified a number of
the relevant issues here.  The most basic point is that when the
Supreme Court has addressed Congress's efforts to enforce racial
discrimination -- the prohibition against racial discrimination
in voting, it has applied a rationality test.  It said in South
Carolina that as against the reserved powers of the states,
Congress may use any rational means to effectuate the
constitutional prohibition of race discrimination in voting.

And it continued to apply the same standard in Rome.

1   Certainly in Lopez, when addressing the constitutionality of

2   Section 5 after City of Boerne --

3           THE COURT:  Is the reason that that's a different

4   standard than under the City of Boerne line of cases because

5   it's Fifteenth Amendment versus Fourteenth Amendment?

6           MR. BAGENSTOS:  I think that certainly is a part of

7   it, Your Honor.  I think the other part of it is --

8           THE COURT:  Because every once in a while the Supreme

9   Court gets a little confused, doesn't it, on that issue?

10          MR. BAGENSTOS:  Well, I would never suggest that the

11  Supreme Court is confused.

12          THE COURT:  In Hibbs it seemed like they were

13  indicating that the Voting Rights Act prophylactic provisions

14  were really valid exercises of the Fourteenth Amendment.

15          MR. BAGENSTOS:  Right.  And there's definitely that

16  language in the discussions, in the various discussions in the

17  Boerne line of cases.  I think the fact that it is Fifteenth

18  Amendment versus Fourteenth Amendment is one significant factor

19  here.  Certainly the Court has never applied congruence and

20  proportionality to Fifteenth Amendment cases.

21          THE COURT:  Have they had a case before them since --

22          MR. BAGENSTOS:  Except for Lopez.

23          THE COURT:  -- City of Boerne?  And in Lopez the issue

24  really was not presented.

25          MR. BAGENSTOS:  I think it's fair to say it was a

glancing blow at the issue.  The Court certainly did decide the question that was before it, but it was not an extensive focus of the parties' briefing in the case.

But the Fifteenth Amendment is a piece of it, and I think it's a very significant piece, because the Fifteenth Amendment cases that remain on the books are South Carolina and City of Rome.

But it's more than just the Fifteenth Amendment, because in the City of Boerne cases the Court expressed a concern, and in Boerne itself, that the Fourteenth Amendment is so broad, it protects a wide array of different rights that cover a wide array of different state conduct, and impose a wide array of different levels of scrutiny, and it's easy to get concerned that Congress is acting to change the substance of the constitutional right rather than enforce the substance of the constitutional right.

It articulated the congruence and proportionality test precisely for the reason -- and the Court explains this, Justice Kennedy in the majority opinion in Boerne explains this -- articulated the congruence and proportionality test there precisely for the reason that we have to in these cases figure out has Congress enforced or has Congress tried to change the substance.

And so -- and here of course, when Congress is responding to race discrimination, core concern of the Fourteenth and

1    Fifteenth Amendments, and voting, again, core concern of the

2    Fourteenth and Fifteenth Amendments, there is no need to engage

3    in this more difficult analysis as to whether Congress has

4    enforced or merely -- or instead has tried to change the

5    substance of the constitutional right.

6         THE COURT:  Why does the Supreme Court keep referring

7    to those Voting Rights Act cases in the City of Boerne line of

8    cases seemingly in a way that would indicate that the same

9    analytical framework is being applied?

10        MR. BAGENSTOS:  Well, I think what the Court is

11   saying, the analytical framework that is being applied certainly

12   is the analytical framework of is Congress enforcing or is it

13   instead changing the substance.  And in City of Boerne when the

14   Court cites South Carolina as an example of a case that showed

15   Congress acting to enforce constitutional rights, the Court

16   didn't suggest that congruence and proportionality had applied

17   there, but just suggested that this is a case where Congress was

18   responding to a record of discrimination and acting in a manner

19   appropriate as a response to it.

20        In a case like City of Boerne or in the other Boerne line

21   of cases that struck down federal enactments, what the Court

22   held was that it was not a case where Congress was responding to

23   a record of constitutional violations, and trying to enforce

24   constitutional rights.  Boerne is a great example where Congress

25   was trying to reverse a constitutional decision of the Supreme

Court, which is obviously not what we have in the extension of
the Voting Rights Act.

THE COURT:  The United States has been accused,
through Northwest Austin and this case, of changing its position
a little bit with respect to whether rationality or City of
Boerne congruence and proportionality is the proper test.  What
is the United States's position today?

MR. BAGENSTOS:  Our position today is the same as the
position we took before the Supreme Court in Northwest Austin,
which is that rational basis is the test.  The test is the test
articulated in South Carolina and in Rome.

THE COURT:  Now, in the -- I think in your statement
of material facts is where it really appears, there seems to be
a suggestion that the standard of review for assessing the
constitutionality of an extension of Section 5 might be somewhat
different than the standard of review for assessing the
constitutionality of Section 5 when it was originally passed.
Is that your position?

MR. BAGENSTOS:  The standard of constitutional review
being different?  I don't know where we suggested that.  We
certainly didn't mean to suggest that the standard of
constitutional review would be different.  It's the same
standard.

THE COURT:  All right.

MR. BAGENSTOS:  And the point is that Congress may act

1    in a way that rationally responds to the problem of race

2    discrimination in voting.

3         Now, Your Honor asked in addition the question of --

4         THE COURT:  What if the Voting Rights Act were under

5    the Fourteenth Amendment, under Fourteenth Amendment Section 5

6    rather than Fifteenth Amendment Section 2?  Would that make a

7    difference in terms of what standard applies?

8         MR. BAGENSTOS:  I don't think it would in the end.

9    Certainly it would remove the one point that I discussed with

10   Your Honor earlier, that this is certainly a Fifteenth Amendment

11   statute.  On the other hand, because Congress would still be

12   enforcing a right that is at the core really this intersection

13   of rights at the core of the Fourteenth Amendment as well,

14   prohibiting race discrimination, prohibiting discrimination in

15   voting -- and certainly there's a long line of voting rights

16   cases under the Fourteenth Amendment as well as the Fifteenth

17   Amendment -- still the same lack of concerns that the Court had

18   in Katzenbach and in Rome would exist.

19        So we would think the same standard applies.  Our case is

20   easier than that, I think, because this is in very significant

21   measure the Fifteenth Amendment statute.  It's certainly, even

22   entirely as applied to Shelby County, Alabama, Fifteenth

23   Amendment statute for reasons we articulate in our briefs.

24        THE COURT:  I'm not sure we can parse it like that.

25   It's certainly these days, it has elements of Fourteenth

1    Amendment.  I suppose the easiest place to look would be the

2    language minorities.  Many people feel that is a Fourteenth

3    Amendment exercise.

4          MR. BAGENSTOS:  Right.  And of course the coverage of

5    Shelby County, Alabama was not because of language minority

6    status.

7          THE COURT:  I understand.

8          MR. BAGENSTOS:  So I'm saying that here, in the

9    context of Shelby County, I'm not sure Shelby County would have

10   standing to challenge coverage under the subsequent

11   reauthorizations after '65.

12        But in any event, here certainly we have Fifteenth

13   Amendment problems.  We have race discrimination in voting.

14   Even the kind of vote dilution that we've talked about that has

15   been discussed in the argument of this case is a Fifteenth

16   Amendment problem as well as a Fourteenth Amendment problem.

17        And I think the problem is not, as Mr. Rein suggested, that

18   a group of people just continues to lose elections or has lost

19   an election, but as the Supreme Court has made clear in cases

20   like Rogers v. Lodge, as five justices made clear in Mobile v.

21   Bolden, when there's intentional action by the state or a state

22   actor to adopt or maintain a voting plan or other state action

23   in order to dilute minority voting strength, that is a

24   Fourteenth Amendment violation as well as a Fifteenth Amendment

25   violation.  And that's the kind of thing we're talking about

1    Congress responding to here.

2         THE COURT:  Now, I think in your brief you argue --

3    I'm not finding it right away, but I think your argument is that

4    the constitutionality of Section 5 can be upheld either by

5    looking facially or by looking just at Shelby County.

6         MR. BAGENSTOS:  It's certainly the case that when a

7    plaintiff brings a facial challenge to a federal statute, the

8    plaintiff has to establish that, depending on which case you

9    read, whether it's Washington Grange or whether it's Salerno,

10   that in all the applications or in all but a very legitimate

11   sweep of applications, the statute is unconstitutional.

12        One way of responding to a facial challenge always is that

13   this -- except in the First Amendment area -- is that this

14   statute is constitutional as to the plaintiff.  So the plaintiff

15   can't challenge the statute as applied to anyone else because

16   it's constitutional as applied to this party, this plaintiff.

17        That's the analysis that the Court applied in U.S. v.

18   Raines -- it was the defendant, but the defendant was raising

19   the challenge -- and has been a continuous part of the facial

20   challenge analysis articulated by the Supreme Court.

21        Certainly when we talk about Alabama and Shelby County, a

22   lot of the concerns that I heard in the first half of the

23   argument about the overbreadth of the coverage or the

24   underbreadth of the coverage sort of fall out.  Alabama of

25   course is a state with not only a long history leading up to

1    1965 of violations of the Constitution that would later be

2    addressed by the Voting Rights Act, but also a continuing record

3    of violations under the Voting Rights Act.  And Shelby County as

4    well.  We talked about the record some in our briefs.

5         So certainly this court could resolve Shelby County's

6    challenge by saying maybe if we had some other jurisdiction that

7    did not have the history, they might be able to proceed on a

8    facial challenge in the sense that in Northwest Austin the

9    municipal utility district there didn't even exist at the time

10   the Voting Rights Act had been enacted, and had a very clean

11   bill of health, and that's why we bailed them out on remand,

12   after the remand from the Supreme Court.  In the context of

13   Shelby County and Alabama, they can't make the same argument.

14        Of course, it's in our interest for you to uphold the

15   statute as a whole.

16             THE COURT:  I understand, but it does concern me

17   somewhat.  Should I first look at the narrower way with respect

18   to Shelby County before I look at the facial challenge?

19             MR. BAGENSTOS:  Well, Your Honor, I think that would

20   be appropriate.  Your Honor could certainly do that.  I think

21   that is sort of the steps of analysis --

22             THE COURT:  How does that differ from an as-applied

23   challenge?

24             MR. BAGENSTOS:  I think the way it would differ from

25   an as-applied challenge is really what the plaintiff is saying

1   as opposed to what the defendants are saying.  That is, it's

2   always a proper response to a facial challenge that the statute

3   can't be unconstitutional on its face, it can only be

4   unconstitutional as applied to you.

5           THE COURT:  Analytically for the Court, how does it

6   differ --

7           MR. BAGENSTOS:  Analytically, I think it's the same

8   point.  I think a party that undertakes to make a facial

9   challenge to a statute really is carrying a very heavy burden,

10  because they have to establish two things; they have to

11  establish it's unconstitutional as to them, and they have to

12  establish that it's unconstitutional as to everybody in order to

13  get the kind of injunction that they want.  Neither prong of

14  that has been satisfied here.

15      We cite in our brief a number of examples about Alabama and

16  about Shelby County in particular, both predating the

17  reenactment in 2006 and even in the last couple of years with

18  the City of Calera in its response, its gamesmanship after

19  getting out of the Dillard consent decree.

20      So there's all that evidence there that this court can rely

21  on.  I think the first half of the argument certainly focused on

22  the broad constitutionality of the Voting Rights Act extension,

23  and that's certainly what I'm happy to talk about as well.

24      One more point on congruence and proportionality versus

25  rational basis, unless the Court has further questions about

1    that.  Another sort of theme or set of questions in the first

2    half of the argument was, what's the significance?  Who cares

3    what the standard is?  Is it rationality or is it congruence and

4    proportionality?  And what I heard the plaintiff say was, well,

5    it's actually not that different.  It's not that different

6    because South Carolina really always applied a Boerne standard.

7         Not surprisingly, I think you might imagine the

8    United States takes kind of the opposite view, that to the

9    extent there is a difference in the context of race

10   discrimination, where Congress is enforcing rights not only to

11   trigger heightened scrutiny, but to trigger the highest scrutiny

12   in our Constitution, that Congress has a much easier time of

13   satisfying even the congruence and proportionality test.  And

14   that's just an *a fortiori* from Hibbs and from Lane, which said

15   there where heightened scrutiny existed Congress had an easier

16   time --

17        THE COURT:  What's the difference between congruence

18   and proportionality and the following language:  Let the end be

19   legitimate.  Let it be within the scope of the Constitution, and

20   all means which are appropriate which are plainly adapted to

21   that end, which are not prohibited but consistent with the

22   letter and spirit of the Constitution, our Constitution?

23        MR. BAGENSTOS:  I think the best sort of mature

24   understanding and discussion of that question really is in

25   Justice Scalia's dissenting opinion in the Lane case, where he

says I can't apply congruence and proportionality anymore.  It's too gauzy.  I'm going to look simply to whether this is a statute that enforces an actual violation either by prohibiting a violation, providing damages for it, or reporting requirements facilitating enforcement outside of the race context.  In the race context I won't apply congruence and proportionality either.  I'll apply the lesser standard of McCulloch, and he cites that language from McCulloch.

And I think that is the proper way to understand it.  When the Court has, in a case like South Carolina or a case like Morgan, relied on the McCulloch-like language to support the rationality analysis, I think that's right.  And I think that's the standard that ought to apply here.

THE COURT:  That's what you want me to do here?

MR. BAGENSTOS:  Absolutely.  If the Court has no further questions about the standard of review, I'd like to move to the record.

THE COURT:  Go ahead.

MR. BAGENSTOS:  So as to the record, a couple of initial points before kind of moving to some of the more specific arguments.  First, the breadth of the record, we heard counsel for the plaintiff say shows that Congress has not acted in an arbitrary way.  We think that would be sufficient to establish a rational basis; if it's not arbitrary, it's not irrational under the standards of South Carolina.

1          Secondly -- and I think this is especially important

2     because it frames the analysis of all the evidence in the

3     legislative record -- Congress is not a lower court.  Congress

4     is not subject to the standards of gathering evidence of a lower

5     court.  Congress can look to evidence from any probative source.

6               THE COURT:  That's what Katzenbach says.

7               MR. BAGENSTOS:  That's what Katzenbach says.  So when

8     we look at the evidence that is probative of constitutional

9     violations, and I think it has to be probative of continuing

10    constitutional violations in the covered jurisdictions, it

11    doesn't have to be findings of courts that there were continuing

12    constitutional violations.  It can be any probative evidence

13    that is relevant to that fact.

14         And I think that's what the Court looked to in Katzenbach

15    as well.  In Katzenbach there was some evidence of adjudicated

16    violations, some evidence of just a lot of facts that seemed

17    very consistent and hard to explain other than race, but they

18    didn't require, and the Court did not require Congress to comply

19    with the standards that a court would.

20         Also, I think it's important to note that Congress does

21    have very significant constitutional responsibilities.  They

22    take an oath to defend the Constitution, just like Your Honor

23    does and I do.  And they are entitled to deference as to their

24    assessment of the constitutional issues.  And I think it's not

25    appropriate to say it's very popular therefore we have

1    heightened concern about its constitutionality.

2        The overwhelming vote in favor of passage of the amendments

3    is certainly probative.  I wouldn't say it's a ticket to the

4    best seat in the house, but it's certainly a piece of

5    evidence suggesting that it fits within the scheme --

6        THE COURT:  So it's a different analysis for a court

7    with the overwhelming vote here than it would be if it was a

8    bare majority in each house?

9        MR. BAGENSTOS:  I think it's something that at the

10   extreme margins the Court would look to.  I don't think it's

11   much more than that, honestly, in the analysis.  But I do think

12   it is something, because when you have members of Congress and

13   the Senate and the President who take the oath to comply with

14   the Constitution and they all think it's constitutional because

15   they voted for it, that certainly suggests something.  Now,

16   obviously this court has to make an independent --

17       THE COURT:  Some voted for it and then gave some

18   observations in the congressional record questioning their

19   votes.

20       MR. BAGENSTOS:  A couple of them did.  It's definitely

21   true.  But nonetheless, it's not something that we should look

22   more skeptically on, see as more risky.  It is an act of

23   Congress signed by the President.

24       THE COURT:  Now, do you agree with the

25   characterization given by plaintiff's counsel that this is much

1    more a voting dilution record than anything else these days?  Is

2    that an evolution that has taken place, fairly?

3         MR. BAGENSTOS:  I think there is an evolution that has

4    taken place.  I don't think the evolution is to the point where

5    you can say it's more a voting dilution record than something

6    else, because I think if you look in the record for Congress of

7    2006, there's a lot of evidence of voting dilution -- I'm happy

8    to talk about why that matters -- but there's also evidence of

9    voter intimidation, voter suppression on the basis of race

10   continuing even in the 2000s in front of Congress.  So there's

11   really all of that going on in front of Congress.

12        Now, whether it's a vote dilution record or it's a record

13   of voter suppression, it's not the crucial question that the

14   Court sets up in its constitutional analysis.  The crucial

15   question is, is Congress enforcing constitutional rights.

16   There's certainly a constitutional right against race-based

17   voter suppression, race-based voter intimidation, without

18   question.  There's also a constitutional right against

19   intentionally discriminatory vote dilution, where a jurisdiction

20   maintains a voting practice knowing and because they want to, in

21   part, that it will suppress minority voting strength, dilute

22   minority voting strength.

23        THE COURT:  How strong is the record on tying the

24   voter dilution evidence to intentional discrimination?

25        MR. BAGENSTOS:  I think the evidence is quite strong.

1    Let me go through a little bit of it.  I think the most -- there

2    are two categories of evidence that are very significant here in

3    finding voting discrimination, a lot of which is vote dilution.

4    One is the Attorney General objections.  The Attorney General's

5    objections, either the number of over 700 in the last

6    argument -- if you look throughout the legislative history, the

7    numbers differ a little bit, but they're all north of 600

8    between 1982 and 2006, a very substantial number of which were

9    based on discriminatory purpose that is unconstitutionality

10   grounds.

11       That is evidence also in the legislative record.  Up to 70

12   percent in one decade were based in whole or in part on a

13   determination by the Attorney General that the discriminatory

14   purpose prong of Section 5 had not been satisfied by the

15   jurisdiction.

16       So that's very probative evidence, directly probative

17   evidence of whether there was voting discrimination that

18   violated the Constitution, because intentional discrimination

19   does violate the Constitution.  And it's not a case where this

20   court has to examine each of the objections and say would I

21   agree or disagree with them.  Of course, covered jurisdictions

22   have the option always of going to court to get judicial

23   preclearance, and that would be probative evidence, what

24   happened in those judicial preclearance suits.  And there is

25   evidence of 25 of those in the record which show overwhelmingly

1    that the jurisdictions are not -- are violating Section 5 in

2    their submission.

3        But in any event, this court does not have to sort of parse

4    each Attorney General objection, which of course doesn't result

5    in a judicial opinion, it results in a letter, isn't based on

6    the practices of a court.  But the sheer number is very

7    significant, because we're talking about, even if you assume

8    half of the 600, 700 or so of objections were based on

9    discriminatory intent, even a third, which would be counting out

10   some of the ones that plaintiffs say we shouldn't count, that's

11   still talking about over 200 --

12            THE COURT:  Why should I put any stock in the estimate

13   of a half or a third or 1/10?

14            MR. BAGENSTOS:  Well, the evidence in the record -- so

15   there's evidence in the legislative record that 74 percent of

16   the objections between 1990 and the Bossier decision in 2000

17   were based in whole or in part on discriminatory intent.  I'm

18   extrapolating there's 75 percent, and I'm lowering that number

19   quite a lot.  There's other evidence in the record that it's 40

20   or 50 percent over the period is based on discriminatory intent.

21       I'm saying this court could take a low bound estimate of

22   that and could cut that down even further, and we'd still have

23   hundreds of cases in which the Attorney General objects on

24   discriminatory purpose grounds.  And that is something that

25   Congress can be aware of and take into account and say do we

1    want hundreds of plaintiffs to have to file hundreds of Section

2    2 lawsuits -- with all the attendant burdens of time and

3    expense, which Congress discussed quite extensively, and which

4    the Northwest Austin district court panel discussed quite

5    extensively -- do we want to put plaintiffs to that?

6         Well, this is a very large number of cases in which we

7    don't want to do that, in which we've seen the preclearance

8    process work.

9         Now, I think you know you could take an even higher number

10   than that.  I think the evidence in the record is consistent

11   with it.  What I'm saying is even if you take the most

12   conservative estimate in the record, and even if you lower it a

13   little bit, you still have many, many cases in which there's a

14   purpose objection, and that is evidence of unconstitutional

15   discrimination.

16        The other category of evidence -- and there's much more in

17   the legislative record about preclearance, about withdrawals of

18   preclearance submissions, about 200 of them, about jurisdictions

19   that are affected by more information requests, about 800 of

20   them.  But aside from that, the other significant category of

21   evidence on continuing intentional discrimination in a covered

22   jurisdiction is the evidence of Section 2 cases.  And of course

23   those cases don't require a finding of unconstitutionality in

24   order for a plaintiff to prevail, and so courts typically apply

25   constitutional avoidance and don't reach the constitutional

1    question, but instead when they find for a plaintiff they find

2    for the plaintiff on Section 2 statutory grounds.

3         Nonetheless, when you look at those cases, when you look at

4    both the adjudicated cases and the settlements, there are about

5    I think 651 in the covered jurisdictions after 1982, whereas in

6    the noncovered jurisdictions you have substantially less.  Even

7    looking just at the evidence in the legislative record, 85

8    percent of the successful, either in litigated judgments or in

9    settlements, Section 2 cases, were in the covered jurisdictions,

10   even though the covered jurisdictions have about 24 percent of

11   America's population and 33 percent of America's minority

12   population.

13        THE COURT:  There aren't many of those Section 2 cases

14   that wind up with published decisions of unconstitutional

15   discrimination.

16        MR. BAGENSTOS:  No.  Absolutely not.  Because courts

17   do apply constitutional avoidance.  But what's important is that

18   the factors that the Supreme Court has looked to in finding

19   intentional discrimination and vote dilution -- in Rogers v.

20   Lodge, a case upholding a finding of intentional discrimination,

21   intentional dilution -- are the same factors that courts have to

22   look at in the totality of the circumstances analysis in a

23   Section 2 case.  So it's certainly probative evidence.

24        Now, again, if Congress were a lower court and this were a

25   reviewing court to a lower court, you might look at that

evidence and say, well, but is this actually based on a finding

of discrimination?  But Congress can look at any probative

evidence, and certainly that evidence is probative, because

where there's a Section 2 case, a successful Section 2 case,

that's suggestive of, although not conclusive of intentional

discrimination.  Where there are a lot of successful Section 2

cases, that's suggestive of quite a lot of intentional

discrimination.

THE COURT:  Now, things have gotten better.  Is that a

fair characterization?

MR. BAGENSTOS:  I think things have gotten better in

many significant ways, yes.

THE COURT:  Indeed, the majority in Northwest Austin

pointed out some of the ways that seemed to it to be

improvements in conditions.  Under a rationality review, is

there some point at which things have gotten better enough so

that Section 5 isn't --

MR. BAGENSTOS:  I think there definitely could be such

a point.  One can imagine, one hopes for such a point honestly.

That's the purpose of the statute, of the preclearance

provision, is to accelerate its own obsolescence.  So there's no

question that that's the goal and there ought to be such a

point.

Now, the question is whether that point's been reached.

Unfortunately, there's no mathematical standard for rationality

1    review.  There's no mathematical standard, honestly, for a

2    congruence and proportionality review.  This is something that a

3    court has to assess.  Looking at the record of the problems that

4    Congress is responding to which are constitutional violations or

5    suggestive of constitutional violations, is now the time when

6    it's no longer rational?  I think it would be very difficult to

7    make that argument, that now is the time when it's no longer

8    rational, when you have these literally hundreds of instances of

9    either purpose-based objections or successful Section 2

10   litigation in the covered jurisdictions, which suggests that

11   Congress's decision to shift the burden of time and inertia

12   continues to make sense.  And it doesn't -- a constitutional

13   violation is a constitutional violation for these purposes.

14        So another thing, I just want to talk a little bit about

15   some of the other evidence.  A lot of it's in our briefs.  I

16   don't want to dwell too much on it.  Racially polarized voting

17   is relevant for what reason?  It's relevant for one and only one

18   reason.  It's relevant because it shows -- which is the entire

19   reason of the case -- it shows that this is a context where the

20   adoption of voting practices like cracking districts in the

21   LULAC case, like at-large elections in Rogers and other cases,

22   this is a context where, if a jurisdiction wants to dilute

23   minority votes, it can do it because there is racially polarized

24   voting.  It enables the intentional vote dilution.  And I think

25   that is very significant.

1    I think it's also significant that -- and I don't want to
2    lose the thread of the Fifteenth Amendment discussion in the
3    first part of the argument.  I think the Fifteenth Amendment
4    says "deny or abridge."  I think everything that the plaintiffs
5    have suggested comes within the word "abridge" would also come
6    within the word "deny."  "Abridge" means to minimize, to lessen,
7    to dilute.  That's what we have here.  And that's what five
8    justices explained in <u>Mobile v. Bolden</u>, although in separate
9    opinions.
10        I don't know if there are further questions about the state
11   of the legislative record.  The legislative record is a very
12   substantial record --
13            THE COURT:  I suppose we could have questions all day
14   about the state of the legislative record.  It's big enough.
15            MR. BAGENSTOS:  It is a very big record, and I think
16   what's important about it is it's not appropriate to go through
17   that record in every case and say would I as a federal judge
18   have found discrimination in this case, in the hundreds of
19   examples cited.  This is statistical evidence.  There's also
20   findings of courts.  There's also testimony from individuals who
21   have been involved in election processes.
22        That's the way that either Congress or even plaintiffs in
23   cases establishing systemic discrimination prove it, with a
24   combination of statistics, with a combination of individual
25   findings, and with individual testimony that brings the numbers

1   to life.  And I think that's all there, and it's all discussed

2   in our briefs.

3        I think it's also -- I'd like to spend some time talking

4   about the coverage formula as well.  I think the coverage

5   formula is -- obviously that was a question that Your Honor had

6   posed, and I think it's a very important and relevant question.

7   I think some common ground here.  Plaintiffs agree that the

8   coverage formula in 1965 was reverse-engineered, that is, the

9   problem that Congress went to solve wasn't just a problem of

10   registration or turnout being below 50 percent and the existence

11   of a test or device.

12        The problem Congress was trying to resolve was systemic

13   race discrimination, which took many different forms.  It

14   sometimes took the form, particularly in the years leading up to

15   the Voting Rights Act, took the form of intimidation and denial

16   of the opportunity to register to vote.

17        But it also often took the form of other kinds of

18   discrimination, whether the Gomillion example of redrawing

19   district boundaries so that people couldn't effectively vote for

20   a black, or whether the examples that we discuss in our brief of

21   Alabama in the state shifting between at-large and

22   district-based elections for local officials, as blacks were

23   more or less enfranchised.  During periods of time when blacks

24   were able to register and cast ballots, Alabama had at-large

25   elections and moved toward at-large elections.  Then, after a

1   disenfranchisement in 1901, Alabama moved toward district-based

2   elections.  Then, after the white primary cases in 1944, it

3   moved back to at-large elections with other dilutive practices.

4       All of this was going on at the time Congress acted, and

5   Congress was responding to all of it.  What Chief Justice Warren

6   says in the South Carolina case is the coverage formula itself

7   applies to a number of jurisdictions that Congress itself knew

8   by name.  It wasn't that they were simply mathematically trying

9   to figure out where registration gaps were.

10      And they always recognized, Congress always recognized and

11  the Court always recognized that the kinds of discrimination

12  might change, that one symptom might be eliminated, but the

13  underlying disease would express itself with another kind of

14  symptom.

15          THE COURT:  Indeed, that's the genius of Section 5.

16          MR. BAGENSTOS:  That is the genius and the purpose of

17  Section 5, absolutely.  Congress in 1965 defined voting as all

18  action necessary to make a vote effective, which the Court

19  relied on in 1969 in the Allen case, before even the first

20  reauthorization, and said therefore we know Congress wasn't just

21  talking about casting ballots and registering; Congress was also

22  talking about all of the action that might minimize or cancel

23  out or dilute the ability to vote.

24          THE COURT:  But while the type of coverage formula

25  might make some sense -- indeed, the Supreme Court has held it

1    made sense, was rational, in terms of a means back in 1965,

2    given the primary problems, to steal some of the language from

3    the plaintiffs, does that type of coverage formula still make

4    sense today?

5            MR. BAGENSTOS:  I think the proof, as it was in 1965

6    and in 1966 when South Carolina was cited, the proof is really

7    in who does it cover.  Is the coverage formula identifying a

8    series of jurisdictions that have a history and a continuing

9    pattern of voting discrimination that's unconstitutional?  I

10   mean, that's the question.

11           THE COURT:  History may not be enough there.  It seems

12   to me that if you go to the current language of the Supreme

13   Court in Northwest Austin, it has to be more than just history.

14           MR. BAGENSTOS:  I meant the conjunctive intentionally.

15   It has to be the history and the continuing pattern, because I

16   think when we talk about what's unusual about Section 5, other

17   jurisdictions may lose a Section 2 lawsuit, may be found to have

18   violated some federal statute, but without the history and the

19   continuing line that you can draw, it might be more difficult

20   for Congress to say we can constitutionally apply a preclearance

21   requirement there.

22       Here we're talking about jurisdictions that have this

23   history.  And certainly the plaintiff before this court is a

24   county and in a state that has this history.  But also, I think

25   it's very important, after Northwest Austin especially, also the

continuing pattern.  And that's the question.  Of course it
captures states with a history.  We know that because in 1965 we
know what states it captured, and the Supreme Court said that
was the states that had the history, and those are all still
covered.  But do they have the continuing pattern?  I think the
answer is yes.  And the evidence --

THE COURT:  Continuing pattern of what?  Not
continuing pattern of low percentages of voter registration, not
continuing pattern of tests, which are the two parts of the
coverage formula, but a continuing pattern of something else.

MR. BAGENSTOS:  Right.  No, I agree.  And of course, a
continuing pattern of tests, Congress eliminated the tests in
the covered jurisdictions in 1965, and eliminated them
nationwide in 1975.  No one has a continuing pattern of tests
anymore, except in sort of outrageous cases.

THE COURT:  Can anyone say that this coverage formula,
applied today, captures those jurisdictions and only those
jurisdictions that have that continuing problem that you're
alluding to?

MR. BAGENSTOS:  The coverage formula that's written in
the statute as applied today.  So in 1964 there was a test or
device and less than 50 percent.  Yes.  I think that's the very
question that's the right question before the Court.

THE COURT:  And does it?

MR. BAGENSTOS:  Yes, it does, absolutely.

1          THE COURT:  Why?

2          MR. BAGENSTOS:  For all of the reasons that are

3    discussed.  Number one, the very extensive record of voting

4    discrimination in the covered jurisdictions, identified through

5    the preclearance process.  Obviously that's not comparative, but

6    that does show a very large absolute number of instances of

7    discrimination or instances that raise serious suggestions of

8    unconstitutional discrimination.

9         But also there's the comparative evidence in the record,

10   particularly with regard to Section 2 cases, which I think it's

11   very significant, in the legislative record of the successful

12   Section 2 cases, 85 percent -- and we think the number is

13   actually lower, and that's the McCrary declaration we submitted,

14   which says it's 81 percent.  81 percent of successful Section 2

15   cases, whether in litigated judgments or in consent decrees and

16   settlements, were in the covered jurisdictions, even though the

17   covered jurisdictions are a very small part of America.

18          THE COURT:  Is it just an astounding coincidence or is

19   there a logic to the fact, as you put it, that this test, based

20   on 1964, 1968, 1972 circumstances, and not one replacing the

21   other but just adding to, that that test captures today the

22   jurisdictions that are most involved in a different kind of

23   voting discrimination than was the focus in 1965?  Is that just

24   a coincidence, or is there some logic that I can look to that

25   would explain why that is true, if it is factually true?

1          MR. BAGENSTOS:  I think there is logic.  I think it's

2     the very logic of Section 5 from the beginning.  The logic of

3     Section 5 from the beginning was that in 1965 Congress was

4     identifying jurisdictions that had such a significant history,

5     going back, but also extending very recently, of voting

6     discrimination, that the problems of voting discrimination would

7     not so easily be eliminated, would not be eliminated right away,

8     and would not be eliminated by eliminating the particular

9     practices that instantiated voting discrimination in those

10    states.

11         Congress recognized at that point that these are the states

12    that are the problem.  These are the states that have very

13    significant histories and very significant threats of future

14    changing of the kinds of discrimination, just as they had in the

15    past.  That's the genius of Section 5, as Your Honor says.

16         So it's not surprising that the jurisdictions that had that

17    history in 1965 are the jurisdictions -- and Alabama was one of

18    them -- are the jurisdictions that today are the jurisdictions

19    where we have different kinds of voting discrimination problems,

20    but we still have very significant voting discrimination

21    problems.  And that's what Congress expected.

22         THE COURT:  It's not surprising that that would be

23    true for some jurisdictions.  It is surprising, if it is a fact

24    as you say it is, that we would be capturing through this arcane

25    test exactly those jurisdictions that continue to be a problem,

1    and no jurisdictions that don't continue to be a problem.  That

2    seems a little bit --

3              MR. BAGENSTOS:  I understand.  And that places a lot

4    of weight on the word "exactly," of course.  And the question is

5    whether that's the test before Congress.  Congress has to

6    legislate in a manner that draws lines.

7              THE COURT:  How did Congress legislate here?  What

8    should I look to in the record to exhibit Congress's analysis of

9    this 4(b) coverage formula issue?  What did Congress say about

10   it?  What was Congress's analysis of why it made sense to

11   continue it exactly as it was back as early as 1975?  Because it

12   hasn't changed since then.

13             MR. BAGENSTOS:  I think the most extensive discussion

14   of this really is in the House report, which explains very much

15   what I've been saying, that the coverage formula itself

16   identified a set of jurisdictions.  The question in 2006 was do

17   we think these jurisdictions should continue to be covered?  Not

18   do we think anything about registration or turnout or test or

19   devices, but do we think that these jurisdictions, which we know

20   what they are because it's been clear since we adopted the

21   statute and we adopted the coverage formula, can these

22   jurisdictions continue to be covered?  And the answer is yes

23   because we continue to see very significant problems in the

24   covered jurisdictions.

25             Now, I will agree, there are probably patterns that have

shifted in various ways among different jurisdictions.  There

may well be jurisdictions that are not covered by Section 5 -- I

mean, there certainly are jurisdictions not covered by Section 5

where there is voting discrimination that has happened or been

adjudicated.  But that's really not the question.  The question

is can Congress say this set of jurisdictions, which we've known

for a long time, which we've extensively studied, we see an

overall pattern in this set of jurisdictions that is very

different from the pattern outside of these jurisdictions;

should we continue to cover these jurisdictions?  And the answer

to that is yes.

Requiring the kind of precision of should Congress have

made clear that some jurisdictions might have moved a little

bit, I don't think that's what's required of Congress and I

don't think that's an appropriate judicial role in measuring

Congress.  Congress gets a great deal of latitude under either

City of Boerne or rational basis on precisely the point of

designing the remedial scheme, when we know they're responding

to very significant threats of constitutional violations.  And

here the question of whether it should have been tailored a

little more or a little less or a little differently is really

something within the --

THE COURT:  But even for Section 4(b), to return to

Northwest Austin, there's still the question of current needs

and current burdens.  And "current" is a term that's used.  And

1    we have, in 4(b), we have a coverage formula first devised in

2    1965 and then added to.  It's not that these additional points

3    that focus on '68 statistics and '72 statistics eliminated any

4    jurisdictions.  All they did was add jurisdictions.

5        And we're now looking at a situation where that information

6    is at least, what, 45 years out of date?  At least 45 years out

7    of date.  And by the time the 2006 extension of the Voting

8    Rights Act runs its course, they'll be 70 years out of date.

9    That wouldn't seem to be a current coverage formula, would it?

10       MR. BAGENSTOS:  I think there are two aspects to

11   what's current here.  Certainly it relies -- it doesn't even

12   really rely on any old statistics anymore.  What it relies on is

13   a determination made a long time ago by the director of the

14   census and by the Attorney General that these jurisdictions

15   should be covered.  And if what the statute had said is we're

16   going to recodify this, it's too confusing, '64, '68, '72, let's

17   just list the jurisdictions that have been covered, and we're

18   going to extend the statute as to those jurisdictions, and list

19   them.  Alabama, Mississippi, Louisiana, Georgia, South Carolina,

20   et cetera.  And Congress had passed a law which would have

21   exactly the same effect indeed, in legal effect, exactly the

22   same thing that Congress did, the question would not be were the

23   states initially chosen in 1965 based on a formula that doesn't

24   work anymore, but the question would be is there continuing

25   discrimination in those identified states.

1    And the answer is yes.  That's what Congress was

2  considering during the period of time, during the 16,000 pages

3  of the legislative record, Congress was considering what is it

4  that could continue to justify, can we continue to justify

5  applying this remedy to the states, which we know.  We know what

6  the states are.  The formula that we used to identify

7  discrimination in 1965 is a formula that was relevant to showing

8  the states with a very significant history and a very

9  significant threat that they would continue to violate the

10  statute.  Of course jurisdictions do have clean hands.  They can

11  bail out.  That's a very important point.  And in the Northwest

12  Austin case --

13    THE COURT:  It's very hard for a state to bail out

14  given the fact that any jurisdiction within that state, over

15  which the states really have very little control, if any, does

16  something, then the state can't bail out.

17    MR. BAGENSTOS:  It might be difficult for a state to

18  bail out, although I would reject the empirical premise that the

19  state has very little control over the local officials.  That

20  may or may not be true.

21    THE COURT:  It may or may not, but often it is not.

22    MR. BAGENSTOS:  States may not be able to bail out,

23  but certainly localities can bail out.  And we have since the

24  time of Northwest Austin taken seriously what the Supreme Court

25  said there.  At the Department of Justice we've taken that very

seriously.  The Court said that the bailout standard has to be
interpreted more broadly to provide a meaningful opportunity for
bailout.  And that's something -- we've substantially expanded
what we've done to try to encourage jurisdictions to bail out.
And that option is very much available.  We've bailed out a
number of --

THE COURT:  No state has ever bailed out.  I'm not
sure any state has ever sought to bail out.

MR. BAGENSTOS:  Not under the 1982 test.  I think
under the earlier tests a couple states bailed out and bailed
in.

THE COURT:  Since 1982, under the 1982 test, no state.

MR. BAGENSTOS:  That's right.

THE COURT:  Any county?

MR. BAGENSTOS:  Have any counties?  Yes.  We have a
number of counties that have bailed out.  Indeed before --

THE COURT:  The Virginia group or others?

MR. BAGENSTOS:  Well, it was the Virginia group before
Northwest Austin.  Northwest Austin sort of changed the way the
Department of Justice understood bailouts.  We had interpreted
the bailout standard to mean essentially you had to have a
county level or higher jurisdiction to bail out, unless it
registered its own voters, because that's what the text of the
statute said.

And what the Court said is, no, any jurisdiction that's

covered can bail out no matter what kind of subjurisdictions.
Since then we have bailed out subjurisdictions.  We bailed out a
city in Georgia, we bailed out the Northwest Austin Municipal
Utility District, a city in North Carolina, and we are looking
at and working informally with a very large number of
jurisdictions and trying to get the message out that this is
something that's a viable option for folks.

     And it is something that is a viable option.  All the
jurisdiction effectively has to show is that for the last 10
years it hasn't discriminated.  And now that it can be that
jurisdiction itself and not other jurisdictions it's tied to,
that is broadened.  So that is a way of trimming the
overbreadth.

     Now, the underbreadth that the Court talked about, I don't
think there is significant underbreadth.  However, it is also
true, as the intervenors point out, under Section 3, and as
actually the plaintiffs point out, under Section 3 even now, new
jurisdictions can come in.  Most recently one was brought in in
2009 under Section 3.

     So there are means -- there is a broad standard that
Congress adopted that paints not with a very broad brush, but
paints with a brush that has certain limitations but is very
well tied to a history and pattern of discrimination.  And there
is a means that Congress adopted to provide a remedy for
possible over- and underbreadth.  That is, under either City of

1    Boerne or under a rationality test, that is something the Court

2    should take account of.

3        And I did not hear the plaintiffs to challenge the 25-year

4    extension per se as being too long, but I heard that challenge

5    as being mixed in with all their challenges to the extensions

6    per se.  So therefore I don't think we need to say more than we

7    said in our brief on that subject.

8            THE COURT:  Say a little more on 25 years.

9            MR. BAGENSTOS:  Okay.  That's why I asked, Your Honor.

10   So a couple points on that.  First of all, 25-year

11   extension was the length of the extension in 1982, so they had

12   something to look to.  25-year extension makes sense because,

13   Congress thought, because it will provide enough information

14   when we're reconsidering the statute later.  If we just have one

15   redistricting cycle or a few years, that's not going to provide

16   sufficient information --

17           THE COURT:  Is Congress right that a lot of the

18   Section 5 activity takes place because of the redistricting that

19   takes place on the decennial basis?

20           MR. BAGENSTOS:  I think yes, that's definitely right

21   because -- Section 5 applies to all voting changes, but because

22   of the census and all of the dominos that start falling after

23   the census -- reapportionment, redistricting, changing precinct

24   boundaries, et cetera, et cetera -- there are lots of voting

25   changes in the few years after a census.

1    And if you look at the statistics in the House report --

2    they're very good -- there are humps every 10 years just after

3    the census.  The biggest hump of course was after the first

4    redistricting period when Section 5 covered.  Not surprising.

5    But yes, that is definitely true.  And it made sense for

6    Congress to say we need to evaluate this through a couple of

7    these humps, so we can see whether there continues to be the

8    problem.

9    Previous rounds of redistricting, previous years had shown

10   that after the census there are objections, which are indicative

11   of unconstitutional discrimination.  There are examples that we

12   talk about.  Kilmichael, Mississippi in 2001, blacks become a

13   majority in the town and they cancel elections.  We found that

14   as purposeful discrimination.  That is relevant evidence that

15   Congress wants to look at later.

16   Of course, Congress gets a great deal of deference in

17   setting time limits, so long as there is an end date that

18   Congress would have to pass the statute.  Eldred v. Ashcroft is

19   a great example of that, where the Supreme Court said setting

20   those kinds of dates is something that's within Congress's

21   general power.  If they could extend the statute, they could

22   extend it for 25 years.

23              THE COURT:  All right.  Thank you.

24              MR. BAGENSTOS:  Thank you, Your Honor.

25              THE COURT:  Mr. Greenbaum.

1          MR. GREENBAUM:  Thank you, Your Honor.  As

2    Mr. Bagenstos mentioned, I'm primarily going to focus on the

3    proper legal standard, though that does bleed into the other

4    three questions, because you look at the other three questions

5    in the context of what's the proper legal standard.

6          We agree that the proper legal standard here is the

7    rational means standard.  And there's several reasons for that,

8    some of which have been articulated already.  First of all, it's

9    the standard in the two cases that dealt with this question

10   directly, as to the constitutionality of Section 5, Katzenbach

11   and Rome, where the Court clearly, in both of those cases,

12   articulated the rational basis standard.

13         Secondly, Katzenbach and Rome are cited to a number of

14   times in the Boerne cases, and not once is there the suggestion

15   that -- and they're cited to positively.  Not once is there a

16   suggestion that they got the standard wrong in Katzenbach or

17   Rome.

18         THE COURT:  That positive citation would also arguably

19   indicate a belief that the same standard was being or should be

20   applied in the two situations.

21         MR. GREENBAUM:  Well, primarily positively cited to as

22   examples as to what Congress -- how Congress should act

23   appropriately in terms of using its Fourteenth and Fifteenth

24   Amendment enforcement powers, as opposed to going beyond its

25   enforcement powers and trying to substantially redefine the act.

1    But nothing in there at all suggesting that rationality wasn't

2    the way to look at these particular types of cases.

3         THE COURT:  There's certainly nothing explicit

4    suggested in that.

5         MR. GREENBAUM:  Okay.  Rome's the only case of all of

6    these cases involving a reauthorization.  So if there's one case

7    to really look to as to -- if there's one case the Court should

8    follow here, it's Rome, which applied rational basis, which

9    looked at the evidence after the point in time in Katzenbach

10   where you didn't have the tests anymore, where you had a large

11   decrease in the disparity of registration rates, and where the

12   Court specifically looked at the dilution evidence as being an

13   essential part of justifying this as a proper use of Congress's

14   Fifteenth Amendment powers.

15        THE COURT:  But you've got this similarity in the

16   enforcement provisions of the Fourteenth and Fifteenth

17   Amendments.  Indeed, it's more than a similarity; it's almost an

18   identity.  Slightly different order of the words.  And you do

19   have several justices -- well, Katzenbach itself, the majority

20   decision -- Katzenbach v. Morgan I guess it was, and some other

21   cases, really talking about the identity of this enforcement

22   provision, and then several dissenting justices more recently,

23   Justice Scalia in Hibbs and Justice Thomas in Lopez, Justice

24   Rehnquist in City of Rome, all talking about the identity of the

25   enforcement provisions.

1    Why shouldn't the same standard apply when you're looking

2    at them?  How can they be identical and yet totally different

3    standards be applied in analyzing enforcement actions under the

4    two provisions?

5              MR. GREENBAUM:  The big difference is the right at

6    issue.  This is something you actually hit on earlier.  That

7    here we're talking about race and voting.  Core Fifteenth

8    Amendment right.  There's less of an issue in terms of has

9    Congress redefined the right.  Whereas when you're talking about

10   some of the Fourteenth Amendment protections that were at issue

11   in the Boerne cases, they did not involve fundamental rights.

12   That anybody can always bring some type of a Fourteenth

13   Amendment challenge, or say that something violates the

14   Fourteenth Amendment, because almost with any law you can

15   discriminate between different classes of people.  But the

16   question is when you're treating -- does the class of people

17   that's being treated differently, are they entitled to some form

18   of heightened protection?  And that's when you look at the

19   Boerne cases, particularly the five --

20             THE COURT:  So what you would say is that whether it's

21   under the Fourteenth Amendment or the Fifteenth Amendment that

22   the enforcement proceeds, if it is a race issue, it's a

23   rationality test.

24             MR. GREENBAUM:  Race issue, race discrimination,

25   voting, rationality test.

1          THE COURT:  So it's only if it's race and voting that

2     it's a rationality test.  Everything else, under the Fourteenth

3     Amendment at least, is a City of Boerne analysis.

4          MR. GREENBAUM:  It gets a lot closer if you're talking

5     about race specifically or voting specifically, but where you

6     have race and voting, it's a rationality test.  I would agree

7     with the plaintiff to the extent that they say that in this

8     context there isn't a lot of difference between the two.

9          Boerne asks the questions a little bit differently, but if

10    you look at how the courts actually applied the Boerne test,

11    when you've dealt with protecting a right that merits heightened

12    scrutiny, hasn't dealt with it all that differently.

13         And that goes back to what's really at issue in these

14    cases.  And that is, is Congress enforcing a constitutional

15    right, or is it attempting to substantively redefine that right?

16    And you look at Boerne as being the prototypical example of

17    that, where what Congress tried to do and said in its preamble

18    regarding the statute that they were doing this, they

19    essentially said, Supreme Court interpreted the First Amendment,

20    the free exercise clause, incorrectly in the Smith case.  And so

21    what we are going to do is legislatively bring what we think the

22    proper test should be into play.

23         So you can look at that and very clearly say Congress is

24    redefining -- attempting to redefine a constitutional right as

25    opposed to using its enforcement powers.

 1          The other Boerne cases, the issue is actually quite a

 2     narrow one.  And that is, you had all these statutes that were

 3     passed under Congress's Article I powers.  Included in these

 4     statutes was -- gave people the right to sue governmental

 5     entities that had violated the law, including states.  You had

 6     the Supreme Court in 1996 say, in Seminole Tribe case, say the

 7     Eleventh Amendment does not enable Congress to use its Article I

 8     powers to allow people to sue states, that you have to look

 9     someplace else for the congressional authority.  And of course

10     one of those places where you could look was the Fourteenth

11     Amendment.

12          So you had all these statutes that had been passed prior to

13     1996, primarily passed under the commerce clause justification,

14     and then it's a matter of going back and saying, okay, was there

15     enough of a Fourteenth Amendment justification to justify why

16     you should be able to bring lawsuits against the states?  And in

17     the cases dealing with, where you didn't have a heightened

18     protection, the Court said no.  And the Court was pretty

19     demanding on what the Congress had to have as a record in those

20     cases.

21          Where you had the heightened scrutiny, the answer was

22     different.  And in fact, if you look at Hibbs and Lane, you will

23     see very little to no evidence of proof of unconstitutional

24     conduct by the states.

25               THE COURT:  But you think the proper test in those

1    cases, obviously what the Supreme Court applied, is still the

2    City of Boerne test because those were not voting cases.  Even

3    though there was heightened scrutiny because race was involved,

4    they were not voting cases and therefore rationality test

5    doesn't apply.

6            MR. GREENBAUM:  Race wasn't involved in either of

7    those cases, but yes, there were -- one was gender

8    discrimination --

9            THE COURT:  Right.  But they were heightened scrutiny.

10           MR. GREENBAUM:  -- and one was access to the courts.

11   Yes.  Race discrimination and voting is different, and the

12   Supreme Court has, not just in Katzenbach and Rome, but we've

13   seen in some of the other cases too, like Katzenbach v. Morgan,

14   where rationality was applied.

15       I think where there is a big difference between where the

16   plaintiffs are and where we are on the standard of review is,

17   well, what does rational basis mean?  And what I hear in the

18   plaintiff's argument is a relatively high level of scrutiny that

19   seems to be inconsistent with what the Court has defined as

20   rational basis.  And I'll read something from Garrett.

21       "The burden is upon the challenging party to negative 'any

22   reasonably conceivable state of facts that could provide a

23   rational basis'."

24       I think it's hard to look at what we have here and say that

25   they negatively -- that they've negatived any reasonably

conceivable state of facts that could provide a rational basis

here.  And maybe now I'm starting to bleed into the second

question a little bit, and that is, well, how do you actually

apply this to the record?

What Congress did -- and the record is voluminous here --

is it attempted to receive all the evidence of voting

discrimination or a lack of voting discrimination that was out

there.  The number of witnesses, the amount of reports that were

admitted.  I don't think anybody can say that I wanted to submit

something into this congressional record and Congress wouldn't

let me.

So Congress has this enormous record, and they look at it,

and Congress made some judgments as to what it should do.  And

it's hard to look at the level activity, the voting rights

activity that had occurred in the jurisdictions that are

covered, and the briefs go through all the different measures --

THE COURT:  With a focus on a different kind of

discrimination than might have been the case in '65.

MR. GREENBAUM:  Yes.  But as the Court in City of Rome

made clear, evidence of dilution and evidence of objections

based on a racially discriminatory effect are things that are

relevant in the record.  So it sifted through this enormous pile

of evidence and basically said, look, we've done a reasonably

good job of identifying where the statute should apply in the

past, and it's working.  And it's working by looking at all --

1    it's working by looking at all these different measures.

2         And that's really all Congress needs to do in terms of

3    rational basis.  We may all have different views as to who

4    should be covered or who shouldn't be covered, but the question

5    is did Congress have a rational basis to stay the course on

6    this?  And I think the answer to that is unquestionably yes.

7         Specifically on that --

8              THE COURT:  Can you foresee a day when there would not

9    be a rational basis to continue Section 5?

10             MR. GREENBAUM:  Certainly.

11             THE COURT:  When there wouldn't be jurisdictions that

12   would be every 10 years engaged in redistricting, where there

13   wouldn't be an isolated perhaps jurisdiction in this state or

14   another state that wouldn't be doing some annexations?  Can you

15   really foresee that day?

16             MR. GREENBAUM:  Well, of course there are going to

17   continue to be voting changes, but the question is, does there

18   remain a risk that voting changes are being made with a

19   discriminatory purpose out there.  So you'd look at the same

20   types of evidence that Congress looked at in this record to say

21   have we reached that day?  We'd look at the objections, we would

22   look at Section 2 cases, we would look at the observer coverage.

23   We would look at all of the different elements of voting rights

24   activity.

25        And just going back to the question, the whole issue about

racially polarized voting, if you're going to have vote
dilution, you have to have racially polarized voting.  Congress
would have been remiss if it hadn't analyzed the issue of
racially polarized voting.  But certainly if you look at this
record and you look at Congress's findings, it wasn't as though
racially polarized voting was the only thing that Congress had
found.

So you would look at these same pieces of evidence that
Congress looked at in 2005 and 2006, and you'd make your
judgment based on that.

I don't know if you have any further questions for me.

THE COURT:  Let's hear from Ms. Clarke.

MR. GREENBAUM:  Thank you.

MS. CLARKE:  Your Honor, I'd like to turn your
attention back to an observation that you made earlier, that
it's not the quantity of evidence in the record but rather the
quality of the record.  And it's here I'd like to turn the
Court's attention.

The questions before the Court in this case turn in large
part on the record that was developed before Congress.  And it's
a record that the plaintiff hasn't truly engaged in any
meaningful way.

We believe that even a cursory review of that record,
Your Honor, makes clear the following:  That notwithstanding
tremendous progress, ongoing discrimination remains in the

covered jurisdictions; that the case-by-case method of dealing with and confronting that discrimination remains plainly inadequate; and that the discrimination is especially concentrated in the covered jurisdictions.  And that's how Congress concluded that the strong remedy afforded by Section 5 remains necessary.

THE COURT:  Can I be confident, and the second question is do I need to be confident, but can I be confident that the nine states that are subject to Section 5 are the nine of our 50 states that have the worst problems?  Have we captured the nine worst, if you will, covered jurisdictions?  Can I be confident of that?

MS. CLARKE:  Indeed, Your Honor.  The standard I believe that should be employed by the Court in this case is one that has been set forth by the Court in <u>Katzenbach</u>, that we've got to look to see whether the coverage provision is relevant to the problem and an appropriately tailored remedy.  No surgical precision is required, as counsel for the government noted. There's no requirement that Congress go hamlet by hamlet to identify a record of discrimination in each and every one of the political subunits throughout the 16 jurisdictions covered in whole or in part.

Rather, the Court should look to see whether the coverage provision bears a plainly legitimate sweep.  And we believe in looking through the extensive record of discrimination revealed

throughout the covered jurisdictions, that remains current to the present day, justified Congress's decision to maintain the coverage provision.

And there are a few points that I'd like to make about the coverage provision. The Supreme Court has always pointed to and regarded the coverage provision as what weighs in favor of the statute's constitutionality. This is an observation made by the Court in Boerne, in Garrett, in Morrison and Florida Prepaid.

THE COURT: I think they pointed to two things, the geographic limitation as weighing in favor of the constitutionality, also the temporal limitation weighing in favor of constitutionality. 25 years may raise a question there. But keeping focus on the geographic, is there a better formula, do you think? Do you think that there's a coverage formula that would be, perhaps not surgically precise, but more precise, that would capture, in this day and age, where vote dilution is more of a focus than it was back in 1965? Is there a formula that would better capture the jurisdictions that are most problematic?

MS. CLARKE: I think it's difficult to answer that hypothetical question, Your Honor, but certainly it was rational for Congress to choose to stay the course and continue to see Section 5 do the work necessary to root out discrimination in the covered jurisdictions where it applies, based on the record showing ongoing --

1          THE COURT:  I mark that down as it's difficult and

2     you're not going to do it.

3          (Laughter)

4          MS. CLARKE:  Well, I will note, Your Honor, that this

5     is a question that Congress took up very carefully.  There was

6     an amendment introduced by Representative Norwood that proposed

7     changing the coverage provision, and that was soundly rejected

8     by a vote of 318 to 96.  And Representative Sensenbrenner made

9     very clear that the coverage provision does not -- and he

10    emphasized "does not" -- turn on participation statistics alone;

11    that the coverage position is based on the record showing

12    ongoing discrimination in the covered jurisdictions.

13         So I think there's been an improper focus on the coverage

14    provision as initially adopted in 1965.  What Congress sought to

15    do in 2006 was look to see whether Section 5 remained necessary

16    today in the covered jurisdictions, and found a contemporary

17    record and meaningful differences between the covered and

18    noncovered.

19         THE COURT:  If I analyze the record -- and I know this

20    is a difficult context for a judge, because of the deference to

21    Congress and lots of things that have already been said this

22    morning -- but if I analyze the record and conclude that the

23    record does not show that these covered jurisdictions are any

24    worse than some other jurisdictions -- it may not be all the

25    other states, but some other states -- where does that leave me?

1          MS. CLARKE:  Again, Your Honor, I don't think there's

2    a requirement that this court seek a surgical precision, or a

3    requirement that --

4          THE COURT:  I just said it wasn't very surgically

5    precise.

6          MS. CLARKE:  Right.  There's no requirement for

7    perfect calibration.  But I think it would be certainly rational

8    for Congress to have concluded that Section 5 remained

9    necessary, given the record showing ongoing discrimination and

10   real meaningful differences between covered and noncovered

11   jurisdictions.

12         THE COURT:  So there have to be real meaningful

13   differences between covered and noncovered?

14         MS. CLARKE:  We need to show that the coverage

15   provision bears a legitimate sweep, is the language used by the

16   Supreme Court, plainly legitimate sweep to the problem.

17         And the Katz study which has been referenced earlier I

18   think underscores the meaningful differences between covered and

19   noncovered jurisdictions.  There's a higher success rate of

20   Section 2 cases brought in the covered jurisdictions.  More than

21   one half of those cases were brought in covered jurisdictions

22   even though less than 25 percent of our nation's minority

23   population resides in the covered jurisdictions.  Findings of

24   high levels of racially polarized voting in Section 2 cases

25   brought in covered jurisdictions relative to noncovered

1    jurisdictions.  Indeed, 90 percent of all Section 2 cases

2    showing an RPB rate of 80 percent or higher were in -- that

3    those Section 2 cases in the covered jurisdictions.

4            THE COURT:  But that legitimate sweep has to be tied

5    to current circumstances.

6            MS. CLARKE:  Indeed, Your Honor.  And I think we --

7            THE COURT:  Because it is, after all, a test under

8    4(b) that is way out of date.  But we -- taking Mr. Bagenstos's

9    argument, the way out of date test happens to also, for some

10   reasons, but happens to also mirror the current circumstances in

11   terms of which jurisdictions are engaged in the worst

12   discrimination.

13           MS. CLARKE:  Indeed.  And again, I think Congress was

14   very careful in looking at this question.  There were state

15   reports presented into the record, 11 covered jurisdictions that

16   were carefully analyzed.  The problems on the ground were

17   carefully assessed between '82 and '06.  And state reports

18   offered on some noncovered jurisdictions, including Arkansas,

19   Oklahoma, Tennessee, and Wisconsin.  And the records of

20   discrimination revealed in those reports simply paled in

21   comparison to the overwhelming evidence of ongoing

22   discrimination in the covered jurisdictions.

23       I think that evidence yielded from the Katz study is

24   especially notable, given the fact that Section 5 was in place

25   and doing work to block and deter much of the discrimination

happening in covered jurisdictions.  And as Your Honor noted,

the observer provision also underscores the notable differences

between covered and noncovered jurisdictions.  98.7 percent of

those jurisdictions certified for coverage are Section 5 covered

jurisdictions.

So, again, as Representative Sensenbrenner noted, coverage

is not predicated on statistics alone.  It was not the chief

evil that Congress sought to address in renewing Section 5 and

keeping that coverage provision intact.  They renewed Section 5

based on a record of ongoing problems, some of which I'd like to

highlight for the Court, because it hasn't been wrestled with by

plaintiff.

A lot of the evidence before Congress showed and

underscored the point that the case-by-case method simply

remains inadequate, that Section 2 alone is not enough to ferret

out and block and deter the ongoing discrimination.  The Supreme

Court, in recent case of LULAC v. Perry, for example, observed

in the state of Texas severe, what they described as especially

severe and ongoing discrimination; found the congressional

redistricting plan there to violate Section 2 and to bear the

mark of intentional discrimination that in its eyes rose to the

level of an equal protection violation.

And even after a remedial plan was put in place from the

Section 2 case, Section 5 remained necessary because state

officials sought to limit early voting under that remedial

1     district in a way that would have been discriminatory for

2     minority voters.  So but for voters on the ground mounting a

3     Section 5 enforcement action after the Supreme Court's Section 2

4     ruling, discrimination would have been rampant there.

5         The Charleston, South Carolina, another very recent case,

6     found the county board of elections to employ a discriminatory

7     method of election system that harmed minority voters.  And even

8     after the Section 2 remedy there, officials for the school board

9     of elections sought to put in place the same discriminatory

10    system.  And because the Justice Department interposed a

11    Section 5 objection, the discrimination was blocked there.

12        Plaintiff has placed a great deal of attention on barriers

13    to the ballot box.  In this particular court case, the court

14    made findings, judicial findings of intentional discrimination

15    that violates the Fourteenth and Fifteenth Amendment experienced

16    by minority voters.  The Court observed that black voters

17    received different treatment inside polling places relative to

18    white voters.  That's judicial findings from a federal court.

19        In the state of Mississippi we have the PUSH case, where a

20    federal court found discriminatory use of a dual registration

21    requirement against minority voters.  And even after the

22    Section 2 case there, Section 5's protections remained necessary

23    several years later when the state sought to revive this

24    discriminatory dual registration requirement.

25        The record abounds with examples, Your Honor.  And some of

1    the evidence shows repetitious violations among the covered

2    jurisdictions.  In Arizona, Louisiana, and Texas --

3              THE COURT:  Does it also show repetitious violations

4    by noncovered jurisdictions?

5              MS. CLARKE:  No, Your Honor.  For example, the covered

6    states of Arizona, Louisiana, and Texas all adopted state

7    legislative plans that drew Section 5 objections every decade

8    since they've been covered.  This record stands again in stark

9    contrast to the evidence that was presented to Congress about

10   the problems in noncovered jurisdictions.

11   Counsel for the government referenced the Kilmichael,

12   Mississippi, another recent example of officials employing --

13   decided to cancel elections in the face of significant minority

14   population growth.  And this is also a pattern that we see

15   throughout the covered jurisdictions today, that in those areas

16   where the population of blacks and Latino voters is growing is

17   precisely the moment where officials step in with discriminatory

18   devices and actions, to cancel out their newfound political

19   power, necessitating the need for Section 5 in many of these

20   areas.

21   We have also evidence of the evasion of compliance with

22   Section 5's requirements.  The state of South Dakota, for

23   example, failing to submit voting changes for an extended period

24   of time.  And Section 5 declaratory judgments also doing work to

25   block discrimination.

1      One recent example comes out of the state of Louisiana,

2  where they sought to preclear before this court a discriminatory

3  redistricting plan that eliminated a majority black district in

4  the city of New Orleans and made other discriminatory

5  reductions.  And after seeing the writing on the wall, they

6  restored that opportunity district and withdrew the declaratory

7  judgment action.

8      But in looking at the evidence, Your Honor, we've got to

9  look beyond just objections, to also the work of Section 5

10  enforcement actions, declaratory judgments, and Section 2 cases

11  working in tandem with Section 5 to root and ferret out ongoing

12  discrimination.

13      Finally, Your Honor, I would come back to your point about

14  how long do we need Section 5's protections in place, and just

15  note that this again was another question that Congress looked

16  at very carefully.  Representative Gohmert introduced an

17  amendment that would have limited reauthorization to 10 years,

18  and that also was soundly rejected after careful debate and

19  deliberation among Congress, by a vote of 134 to 288.

20      Congress concluded that Section 5's protections remain

21  necessary for another 25 years, in part so that we could get

22  through two redistricting cycles and really assess how much

23  progress we're making.  It's during redistricting periods where

24  we tend to see a spike in the number of objections and a

25  drop-off in the middle of the decade.  So 25 years will really

1    allow Congress to come back to the drawing board and figure out

2    how much progress we've made and whether or not we continue to

3    need Section 5.

4            THE COURT:  What are the two redistricting cycles that

5    we're talking about?

6            MS. CLARKE:  The present redistricting cycle that

7    we're entering now.

8            THE COURT:  Which we would label by what year?

9            MS. CLARKE:  2011 to 2013, in large part.  And 2021 to

10   2023.  So two redistricting cycles to really assess whether

11   progress will continue on an upward trajectory, or whether we'll

12   continue to see a pattern reminiscent of what we've seen in the

13   past.  Jurisdictions were abandoning overt means of

14   discrimination and resorting to subtle and sophisticated forms

15   of discrimination that have the same desired effect, canceling

16   out minority voting strength.

17       So in closing, Your Honor, I would just note that in Rome

18   the plaintiffs mounted an attack on the Section 5 preclearance

19   provision that was premised much on the same claim that

20   plaintiffs present now, that things have changed.  And while

21   Congress noted progress then, they noted that a bleaker side of

22   the picture still exists.

23       Again, in 2006, in the face of ongoing discrimination,

24   Congress was faced with a similar choice:  Turn its back on the

25   progress, stand down, or confront the evidence of ongoing

discrimination.  And after very careful deliberation they chose to renew Section 5 and make real the guarantees afforded by the Fourteenth and Fifteenth Amendments.  And we think that's a judgment that this court should give deference to.

And I think Congress was especially surprised that the problems remain as severe as they have, but at the end of the day, after careful study, they chose to renew Section 5 by a tremendous bipartisan margin.  And we hope that's a judgment that this court will give deference to.  Thank you, Your Honor.

THE COURT:  Thank you, Ms. Clarke.

Mr. McDonald.

MR. MCDONALD:  Your Honor, I'm going to try my best not to be repetitive.  But I would like to respond to one of your questions:  How much longer will we need Section 5?  I think that if the constitutionality of it is upheld, that if Congress were to extend it again, it would have to compile the same kind of record that it did in 2005 and 2006.

But I also recall the words of the great American poet Bob Dylan, how many years can a mountain exist before it's washed in the sea, and how many years have some people gotta live before they have the right to be free.  The answer, my friend, is blowing in the wind.

I think that we don't know the ultimate answer to that question because we remain human beings.  We remain capable of much that's disinterested, much that's noble, much that's ideal,

but we also are the victims of our own experience, our own
needs, our own biases and prejudices.

I think the real answer to the question is that the best
way we can go about securing the equal right of all people to
vote and participate in the democratic process is to have strong
laws that are fully enforced.  I think that the necessity of
that is critical now because we stand on the cusp of a
redistricting process that's not going to simply affect Congress
or state houses and senates, but counties, municipalities,
school boards, and public service districts that elect their
boards.

I think it's absolutely critical in the covered
jurisdictions that we have Section 5 oversight, because I am
convinced that without that we will see substantial
retrogressions and the diminishment of the ability of language
minorities and racial minorities to participate effectively.

THE COURT:  I appreciate that, but that sounds more
like a plea to Congress than a plea to this court.  What you're
convinced of.

MR. MCDONALD:  I think that Congress proceeded on
those assumptions, and as Your Honor has pointed out frequently
during the course of the exchanges, the courts must give
deference to Congress because it's given by our U.S.
Constitution the authority to implement the Fourteenth and
Fifteenth Amendments by appropriate legislation.  And I don't

1    think the court can second-guess the conclusion of Congress, the

2    overwhelming conclusion that the extension was appropriate

3    legislation to implement the Fourteenth and Fifteenth

4    Amendments.

5         And I must say that I've been doing voting rights cases for

6    a long time, and I don't have any doubt that if we did not have

7    Section 5 that we would see enormous retrogressions in minority

8    voting strength.  During the 2000 round of redistricting in

9    Georgia, for example, the state of Georgia was involved in

10   several lawsuits and they filed briefs, one in the U.S. Supreme

11   Court, in which they said that racial minorities should not be

12   allowed to participate at all in the Section 5 preclearance

13   process.  It's quite extraordinary that the state would take the

14   position that the very group for whose benefit the statute was

15   enacted should play no role in the decision-making process.

16        The state also made the argument in the U.S. Supreme Court

17   that the retrogression standard of Section 5 should be abolished

18   in favor of a standard based on Section 2.  Now, that would have

19   allowed the state to abolish all of its majority-minority

20   districts.  If we did not have Section 5, I don't think there's

21   any doubt that minorities would become the victims of

22   partisanship.  The Democrats would have a great interest in --

23             THE COURT:  Let me take you back into the

24   congressional record a little bit, rather than that case and

25   whatever the record was in that case, which I don't think was

1    before Congress.  I think it's your brief that refers to the

2    alternative to the existing coverage formula, and the fact that

3    the alternative that was proposed based on current voter

4    registration and turnout rates would have resulted in only one

5    state being covered, only Hawaii?

6              MR. MCDONALD:  Hawaii.  I think that's correct,

7    Your Honor.

8              THE COURT:  How does that cut?  We have a coverage

9    formula that is based on old information, if you will, '64, and

10   even '68 and '72 information, and it leads to one group being

11   within the coverage of Section 5.  But if current statistics on

12   those same factors were applied, only one state would be within

13   the coverage under the formula of Section 4(b).  How does that

14   cut?  Does that mean that we should keep on the old rather than

15   the new?

16             MR. MCDONALD:  Well, Your Honor, I think that only

17   addresses the issue of levels of registration and turnout.

18             THE COURT:  That's what the coverage formula is based

19   on.

20             MR. MCDONALD:  That's correct.

21             THE COURT:  Testing is not really a part of the

22   formula as currently would be applied.

23             MR. MCDONALD:  But it was designed to identify the

24   jurisdictions that needed to be covered, and I think that the

25   record compiled by Congress during all the times it has

considered amending and extending the Voting Rights Act, in '70,
'75, '82, 2005 and '6, clearly substantiate the continuing need
for those jurisdictions to be covered.  The coverage formula
simply was a way of identifying the jurisdictions that needed
Section 5 supervision, and the subsequent congressional records
have simply confirmed that continuing need.

THE COURT:  That again is assuming that Mr. Bagenstos
and his colleagues and you are right that the jurisdictions
captured by the coverage formula as it exists wind up closely
mirroring the jurisdictions that should be captured in terms of
where the most discrimination is occurring.  Even though the
types of discrimination focus more now on vote dilution than was
true in the past, we're capturing the same group of
jurisdictions which are those most responsible for voting
discrimination.

MR. MCDONALD:  I believe that's true, and everything
that has happened since the authorization of Section 5 in 1965
has confirmed that.

THE COURT:  What if we weren't?  What if this formula,
looking at the record, it was clear that it was not really
capturing the right group of jurisdictions?  In other words,
instead of capturing the nine states -- just focusing on states
for the moment -- under the existing coverage formula, what
if -- let me go back a step.

What if the record established that the coverage formula as

currently applied captured not the nine states where most of the

voting discrimination was occurring, but four states where a lot

was occurring, three states where only an average amount was

occurring, and two states where a very low amount was occurring.

Would Congress still be rational in choosing the coverage

formula that it has rather than coming up with a more

sophisticated current coverage formula?

MR. MCDONALD:  Well, I think that the act addresses

those concerns which Your Honor raises.  If they're

jurisdictions that don't need to be covered, as you pointed out,

they can bail out.

THE COURT:  For states that's not a very easy task.

MR. MCDONALD:  I think we're going to see more of

that.  The first jurisdiction in Georgia bailed out, what, two

months ago, the city of Sandy Springs, and I think the first

jurisdiction in North Carolina bailed out several months ago.

THE COURT:  But in terms of a state, looking at the

criteria for bailout and the legislative record for the 2006

extension, I'm not sure that I see a state among the nine that

could bail out.

MR. MCDONALD:  I think that's right.  I think that

we're not going to see the states bail out because there are

still jurisdictions that violate Section 5, don't comply with

it, in which there are Section 2 violations.  So the states

won't bail out, but I don't think they ought to bail out.

1        I would say, Your Honor, just to go back to, the overriding

2   significance of having Section 5 remain in effect is not just

3   the statewide and the congressional level redistricting, not the

4   fact that states have taken the positions that they don't need

5   to draw majority-minority districts.  If we did not have

6   Section 5, it's absolutely clear, I think, based on the prior

7   experience and the most recent statements from the states that

8   they ought not to have to draw majority-minority districts, that

9   we would see states and counties and municipalities go back to

10  their at-large systems, we would see them fragment the minority

11  populations of majority black districts, which would give

12  control of those districts to the white majority.

13        THE COURT:  To the extent that Congress made that

14  assessment and determination based on the record before it, then

15  that would be an assessment that I would give deference to.

16        MR. MCDONALD:  Thank you.  Well, Your Honor, I think

17  unless you have any more questions for me, that's the point I

18  wanted to make.

19        THE COURT:  All right.  Thank you.

20        MR. MCDONALD:  Thank you.

21        THE COURT:  Mr. Rein, will it be you?

22        MR. REIN:  Yes, Your Honor.  Mr. Consovoy initially

23  addressed the issue of the formula, he has some more to say.  I

24  hope you'd indulge him.  I'll try to be brief.

25        THE COURT:  I'll indulge him as long as it doesn't

1    wind up being too long.

2           MR. REIN:  I know.  And we're not going to repeat.  I

3    think that you've asked questions that have really probed the

4    parties and we greatly appreciate the opportunity to be heard.

5    So I'm going to just make a few small points in response.

6           The government suggested that you could decide this case by

7    analyzing Shelby County and assuming there was some basis on

8    which Congress could have found that Shelby County should be

9    subject to preclearance individually.  Of course, Shelby County

10   was not analyzed individually, it's subject to preclearance by

11   the 1964 formula, along with everybody else.  I don't think we

12   can litigate Shelby County -- I think you've said that before --

13   because Shelby County is one of the many, many jurisdictions

14   that fall within the coverage of the renewed Voting Rights Act.

15          THE COURT:  I'll have to admit that while I understand

16   the legal principles and precedent that are being relied on to

17   say that I could look at Shelby County alone.  And if the act

18   was constitutional as to Shelby County based on the facts before

19   Congress and now before me relating to Shelby County, then you

20   lose.  There's a certain discomfort that I have with that

21   approach, given the fact that this is clearly, and can't be any

22   mistake about it, a facial challenge, not an as-applied

23   challenge, and no discovery to probe the facts with respect to

24   Shelby County was permitted.  So I do have a little bit of

25   discomfort, but I understand what Mr. Bagenstos is relying on

1    when he says that.

2         MR. REIN:  And he's got the decision in Lane, which

3    kind of indicates if a statute has some applications that are

4    constitutional and some not.  But I think that here the base

5    question is no application can be appropriate unless it meets

6    the standard, which we say is Boerne, and whether you say it's

7    rational basis or the like, but the base question, can there be

8    preclearance, applies to all the jurisdictions.

9         THE COURT:  And to the extent that cases have dealt

10   with either the facial constitutionality of the Voting Rights

11   Act or of an extension of the Voting Rights Act, they haven't

12   gone off on this assessment of the particular jurisdiction, be

13   it South Carolina or the city of Rome, that was before the

14   courts.

15        MR. REIN:  That's correct, Your Honor.  And I think

16   they looked at what Congress looked at, which is an overall

17   assessment:  Where are there flagrant abuses and what do we need

18   to do to cure them, and tried to determine has that been found.

19   And that's certainly what the Court suggested in NAMUDNO.  So I

20   think there's no basis for that kind of analysis where we have a

21   trial of Shelby County.  That's a 3(a) problem.  That's a

22   situation of bail-in.  You can try an individual, you can

23   determine that that individual jurisdiction has violated

24   Fourteenth and Fifteenth Amendment rights, and they can be

25   subject to preclearance.

1       But Congress made it clear the mechanism for that is a

2   judicial trial based on the activities of that jurisdiction.

3   There's nothing in this record that singles out Shelby County

4   before the Congress and says that's not part of the formula,

5   it's not just a designation of Shelby County.  I just wanted to

6   mention that, and I think Your Honor understands that point.

7       A lot has been said about Section 2 cases.  There's one

8   point in that and we can -- I'm not going to argue the counts

9   anymore and what they do or don't show.  But one thing that's

10  interesting about Section 2 is it highlights the fact that the

11  target of preclearance is ingenious defiance.  That is, it

12  targets not just a bad system, because the government tells us

13  there were bad things being done in districting prior to the

14  enactment.  Congress didn't provide for reclearance, it provided

15  for preclearance.

16      What I mean by that is those existing systems, had they

17  been not appropriate and in violation of the Fourteenth

18  Amendment, were dealt with by Section 2.  They weren't dealt

19  with by preclearance.  Preclearance deals with the problem of

20  repetitious ingenious defiance.  A few isolated anecdotes, but I

21  think you can search that record and say is there a pattern, has

22  it been established that post Section 2 cases, there's recurring

23  need to object under Section 5.

24      That might be a different kind of finding.  That's not

25  really before the Court.  And it really is important to note

that the evil being attacked by preclearance, as opposed to the
statute as a whole, was continuous shifts that were designed to
evade prior mandates.  Congress has some confidence in Section 2
because Section 2 is the vehicle through which you can attack --

THE COURT:  But isn't that continuous shifting
precisely what supports, if you will, looking at vote dilution
and new means of discrimination that have arisen and evolved
over the years, rather than being locked in, as to some extent
you suggest, to the original focus of the Voting Rights Act?

MR. REIN:  I think to the extent that you want to say
this enactment is based on Fourteenth Amendment vote dilution --
and I don't want to reargue where it falls -- and that Congress
independently assessed that we have a new problem and that
problem needs to be the subject of preclearance, yes, you can
make that argument.  I think that shift would then suggest,
well, where's the formula analyzing that kind of activity as
opposed to the kind of activity that was originally addressed.
And that creates an enormous problem.

THE COURT:  If -- and I may be stepping on your
colleague's rebuttal argument --

MR. REIN:  If I'm wrong he'll correct me.

THE COURT:  That's right.  But if Mr. Bagenstos and
others are correct that this coverage formula, whether by
happenstance or logic, captures the jurisdictions of most
concern, then is that good enough?

1          MR. REIN:  Well, if one says is there a happy

2     accident, the question is what did Congress find in Katzenbach?

3     Congress found the points of flagrant violation.  If you just

4     accidentally say, well, gee, maybe it's true, although we don't

5     know because the record never tried to answer this question,

6     looking at the evil we perceive today, which is really in

7     redistricting and dilution, have we captured it?  We'll throw it

8     at a dartboard and maybe we're right.

9          THE COURT:  The record will say something on that, and

10     if the record -- if what the record says to Congress, and in my

11     review then to me, if the record says yes, the right

12     jurisdictions are still the covered jurisdictions, then what's

13     the problem?

14          MR. REIN:  Well, I think -- I would think that if this

15     formula somehow hit it, you'd have to determine that, you'd have

16     to look through.  And I think our position is it doesn't, it

17     doesn't accurately assess the current situation; it's just based

18     on history, and it really doesn't differentiate other

19     jurisdictions which have been the subject of Section 2

20     litigation, constitutional litigation.  I don't think Congress

21     set out to do that task.  I don't think that that's the basis.

22     That's not where the pattern is found.

23          So Mr. Consovoy may want to add, but I think the idea of

24     random happiness I don't think is the standard of review here

25     when you're looking at the formula.

1          THE COURT:  It's not a very comforting standard.

2          MR. REIN:  And it goes on for 25 years, and therefore

3     one would have to say that it's not only been found that these

4     jurisdictions are, let's say, the most flagrant dilution

5     violators, but it's likely they will be for the next 25 years.

6          THE COURT:  I think it only has to be some likelihood,

7     because no one can perfectly accurately predict the future.

8          MR. REIN:  And I'm not demanding that.  But there were

9     factors involved in the selection of the jurisdictions in 1964

10    that suggested they had a long history and were likely to

11    continue.  We don't have those same factors in dilution.  The

12    kind of voting patterns that lead people to see whether they can

13    gain advantage can exist all over the country, and they do.

14    Polarized voting is not a phenomenon unique to the South.  So

15    that would have had to be analyzed.

16         I do want to say just one word about the standard.  Just

17    point out what the Supreme Court has said, because I think that

18    is significant.  In Boerne itself, you have to ask how was

19    Katzenbach viewed in Boerne.  And on the most important of the

20    three prongs of Boerne, congruence and proportionality, here's

21    what the Court said.

22         It said, "While preventive rules are sometimes appropriate

23    remedial measures, there must be a congruence between the means

24    used and the ends to be achieved."  That's the congruence and

25    proportionality test.  "The appropriateness of remedial measures

 1    must be considered in light of the evil presented."  And what do

 2    they cite?  They cite Katzenbach, because it asks that question:

 3    What was the relationship?

 4        So I think that it's fair to say that Boerne is an

 5    elaboration, a precise elaboration of the teaching of Katzenbach

 6    about the method of review.  And I thought that was worth

 7    bringing to the Court's attention.

 8        Now, you've asked about the bulk of the evidence before the

 9    Congress, and I think that when I said that Congress acted with

10    some amount of effort and deliberation, I wanted to be fair to

11    the Congress.  But the real test is not how hard they tried, but

12    what was the probative value of the evidence that they produced.

13    What does it address and how effectively does it address it?

14        THE COURT:  Would you agree there's a pretty broad

15    standard as to what's probative, given the language in

16    Katzenbach and what Congress undertakes in these kinds of

17    assessments?

18        MR. REIN:  It's not bound to rules of evidence.

19        THE COURT:  They can look to anything.

20        MR. REIN:  It can look to anything.  The type of

21    evidence is very different.  The legislative process, one of its

22    virtues is that it's not confined to the kind of evidence we

23    have in court.  We're not disputing that.  But what it proves is

24    a different question from how did you get it.

25        And I think we're not fighting about could they have taken

1    into account all the testimony they received and the various

2    studies that were kind of quasi hearsay.  Yes, they can.  But

3    what does it show when it's all said and done?  That's the

4    issue.

5         I think that one of the things that certainly Boerne states

6    and I think is important is that you can't base legislation and

7    a sweeping remedy, an intrusive remedy, on isolated acts.  You

8    have to show a pattern that suffices to do it.  If you look at

9    the RFRA case, there the Court said, well, it's possible, it is

10    possible that there are some neutral statutes that are actually

11    intended to suppress free exercise.  So somewhere in the vast

12    realm of things that could be brought under the RFRA, there may

13    be some constitutional violations, but there's no pattern that

14    warrants the kind of intrusion that was before the Congress and

15    passed in the RFRA by an overwhelming majority.

16         So I think, without trying to test your patience anymore,

17    those are things that weren't in the original argument.  And I'd

18    be happy to answer any further questions.

19         THE COURT:  Thank you, Mr. Rein.  I'll give

20    Mr. Consovoy a couple of your minutes.

21         MR. CONSOVOY:  Thank you, Your Honor.  I'd like to

22    answer your question about the happy accident and make one other

23    point, and that'll be all.

24         The answer is, if there was a happy accident and they

25    landed on the right jurisdictions, would that be enough?  The

answer is no.  Katzenbach says no.  Katzenbach says the formula

has to be rational in theory and in practice.  That would

solve -- perhaps solve the practice problem, not the theory one.

One of counsel for intervenors said that Congress used voter

registration and turnout because they were trying to solve a

problem.  That's right.  The problem was interference with the

ability to cast a vote.

There would be no other relationship between those metrics

and that output if that's what Congress was not trying to solve.

That's what the Voting Act tried to solve, that's what the

Voting Act did solve.

The only other point I would like to make is you asked what

I think cuts to the heart of the Section 4(b) question.  Did

Congress arrive in practice at the right jurisdictions.  Counsel

for defendant says you could scrap the formula, if they had

listed these nine jurisdictions, that would be the right ones.

The record demonstrates that's not true.

If you look at California, for instance, has twice as much

Section 2 litigation as South Carolina.  Illinois has more

Section 2 litigation than three or perhaps four of the either

fully or partially covered jurisdictions.  If you look at the

top 10 jurisdictions with Section 2 litigation throughout the

country, five are fully covered, four are either partially or

noncovered, and one is noncovered.  Five and five.

So at the bottom, when you cut through everything else and

1   you look at Section 2 litigation and racially polarized voting,

2   which are the two principal sources of evidence for defending

3   this coverage formula, the evidence splits about equally between

4   covered and noncovered jurisdictions.

5       I would just conclude with I think the question that cuts

6   through all the issues in this case, Section 5 and Section 4(b)

7   and even the Boerne question, which is if this record was

8   presented to the Katzenbach court, would they have upheld the

9   statute.  And there is nothing in that opinion that suggests,

10  given how extreme they thought the remedy was under that record,

11  that it would have survived under this one.

12      Thank you, Your Honor.

13          THE COURT:  If this record were the equivalent of the

14  record before Katzenbach -- in other words, the '65 record -- or

15  before City of Rome, do you lose?

16          MR. CONSOVOY:  Sorry?

17          THE COURT:  If this record were the equivalent of the

18  record before the Supreme Court in City of Rome or in

19  Katzenbach, do you lose?

20          MR. CONSOVOY:  No, we don't lose.  If the Katzenbach

21  record were here now, is that what you're asking, then I think

22  Katzenbach still holds true.  I think Rome is a more complicated

23  case, as Mr. Rein explained, because they were looking at the

24  evidence there through the prism of a very recent experience.

25  As we explained, the same governor of Alabama was still in

1    office when the '75 act was passed.  It was a very different

2    situation.

3        And as you discussed in the 56(f) hearing, there was

4    nothing wrong with Congress looking at the evidence through a

5    historical prism.  The point of Northwest Austin is that

6    historical prism is no longer reflective of today's country.

7    Thank you.

8            THE COURT:  All right.  Thank you.  And thank you all

9    for the presentations today, for the excellent and lengthy

10   briefs.  And I will be chewing on this.  It'll take me more than

11   a couple of days, obviously.  But I'll try to give it diligent

12   attention.  And again, thank you very much for your efforts.

13       Please excuse the sound system.  At least for me there was

14   a ringing that was occurring.  I hope it wasn't interfering too

15   much for any of you or for the audience, but I think everyone

16   spoke through that obstacle very well today.  Thank you.

17       (Proceedings adjourned at 12:50 p.m.)

18

19

20

21

22

23

24

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE