## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**SHELBY COUNTY, ALABAMA,**

    **Plaintiff,**

      **v.**

**ERIC H. HOLDER, Jr., in his official capacity as Attorney General of the United States,**

    **Defendant.**

---

**Civil Action No.  10-0651 (JDB)**

## MEMORANDUM OPINION

Section 5 of the Voting Rights Act of 1965 ("the Act") prevents certain "covered" jurisdictions from implementing any change to voting practices or procedures unless and until the jurisdiction demonstrates to federal authorities that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color."  42 U.S.C. § 1973c.  Praised by some as the centerpiece of the most effective civil rights legislation ever enacted, Section 5 has been condemned by others as an impermissible federal encroachment on state sovereignty.  In 2009, the Supreme Court addressed Congress's 2006 extension of Section 5 and, although avoiding the merits of a facial constitutional challenge to Section 5's "preclearance" obligation, nonetheless expressed concern about the provision's continued vitality, noting that "[t]he Act's preclearance requirements and its coverage formula raise serious constitutional questions."  Nw. Austin Mun. Util. Dist. No. One v. Holder, 129 S. Ct. 2504, 2513 (2009) ("Nw. Austin II").

Today, those serious constitutional questions can no longer be avoided.  Shelby County,

Alabama ("Shelby County" or "plaintiff"), a jurisdiction covered by Section 4(b) of the Act, 42

U.S.C. § 1973b(b), has brought this suit against the Attorney General ("defendant") seeking a

declaratory judgment that Section 5 and Section 4(b) are facially unconstitutional, and a

permanent injunction prohibiting defendant from enforcing these provisions.  Compl. ¶¶ 1, 44(a)-

(b).  Specifically, Shelby County alleges that Section 4(b)'s coverage formula and Section 5's

preclearance obligation for covered jurisdictions exceed Congress's enforcement authority under

the Fourteenth and Fifteenth Amendments, and violate the principle of "equal sovereignty"

embodied in the Tenth Amendment and Article IV of the U.S. Constitution.  Id. ¶¶ 36-43.

This Court is mindful that "judging the constitutionality of an Act of Congress is 'the

gravest and most delicate duty that [it] is called on to perform.'"  Nw. Austin II, 129 S. Ct. at

2513 (quoting Blodgett v. Holden, 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring)).  That

duty is all the more sensitive where, as here, the challenged statute seeks to enforce the core

Fifteenth Amendment prohibition against denial of the franchise on the basis of race.  The

Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not

be denied or abridged by the United States or by any State on account of race, color, or previous

condition of servitude."  U.S. Const. amend. XV, § 1.  Yet 95 years after the Amendment's

ratification, the struggle for the realization of this constitutional guarantee was far from complete.

See H.R. Rep. No. 89-439, at 2439 (1965).  In 1965, literacy tests, poll taxes, and other devices

were still being "widely used" in certain regions of the country as part of "a calculated plan to

deprive Negroes of their right to vote."  Id. at 2443.  When traditional litigation proved

ineffective to counter "those determined to circumvent the guarantees of the 15th amendment,"

id. at 2441, Congress decided that "the wrong to our citizens is too serious -- the damage to our

national conscience is too great not to adopt more effective measures than exist today," id. at 2442. Hence, almost a century after the Fifteenth Amendment was ratified, Congress passed the Voting Rights Act of 1965 -- with Section 5 at its core -- in order "to make the guarantees of the Fifteenth Amendment finally a reality for all citizens." Allen v. State Bd. of Elections, 393 U.S. 544, 556 (1969). Congress reauthorized the Act three times (in 1970, 1975 and 1982), and the Supreme Court upheld each reauthorization against constitutional challenges. See Nw. Austin II, 129 S. Ct. at 2510.

Certainly, today Section 5's continued constitutionality "must be judged with reference to the historical experience which it reflects." South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966). But the Supreme Court has also made clear that history alone cannot provide a valid basis for upholding Section 5 indefinitely; rather, "the Act imposes current burdens and must be justified by current needs." Nw. Austin II, 129 S. Ct. at 2512. This Court has now carefully reviewed the extensive 15,000-page legislative record that Congress amassed in support of its 2006 reauthorization of Section 5 and Section 4(b). It is, of course, Congress that is charged in the first instance under the Fifteenth Amendment with formulating the legislation needed to enforce it. Id. at 2513. Bearing in mind both the historical context and the extensive evidence of recent voting discrimination reflected in that virtually unprecedented legislative record, the Court concludes that "current needs" -- the modern existence of intentional racial discrimination in voting -- do, in fact, justify Congress's 2006 reauthorization of the preclearance requirement imposed on covered jurisdictions by Section 5, as well as the preservation of the traditional coverage formula embodied in Section 4(b). Applying the standard of review articulated by the Supreme Court in City of Boerne v. Flores, 521 U.S. 507 (1997), this Court finds that Section 5

remains a "congruent and proportional remedy" to the 21st century problem of voting discrimination in covered jurisdictions.

## **BACKGROUND**

### I.    **The History of the Voting Rights Act of 1965**

The Voting Rights Act of 1965 "was designed by Congress to banish the blight of racial discrimination in voting." Katzenbach, 383 U.S. at 308.  Although the Fifteenth Amendment guaranteed African-American citizens the right to vote as early as 1870, southern states quickly responded by creating a series of voting qualifications and devices to perpetuate black disenfranchisement.  See id. at 310-311; see also H.R. Rep. No. 89-439, at 2439-40.  None of this new voting legislation mentioned race on its face, but it was nonetheless "motivated entirely and exclusively by a desire to exclude the Negro from voting." H.R. Rep. No. 89-439, at 2443, 2451. Southern states imposed poll taxes, which disproportionately burdened African-Americans as a result of their comparatively lower incomes.  See id. at 2451-53.  They enacted literacy requirements as a precondition to voting "based on the fact that as of 1890 . . . more than two-thirds of the adult Negroes [in southern states] were illiterate while less than one-quarter of the adult whites were unable to read or write." Katzenbach, 383 U.S. at 311.  And they adopted alternate tests, such as grandfather clauses and property qualifications, in order to "assure that white illiterates would not be deprived of the franchise." Id.

Not only were these tests intentionally discriminatory in their design, but southern voting officials were given unfettered discretion to administer them in a discriminatory fashion. Officials would refuse to accept poll taxes from blacks seeking to pay them, or would withhold poll tax exemption certificates from otherwise-qualified black applicants.  See H.R. Rep. No. 89-

439, at 2452.  They would provide whites with "easy versions" of literacy tests or excuse them altogether, but demand that blacks pass "difficult versions . . . without the slightest error." Katzenbach, 383 U.S. at 312-13.  Other voting qualifications -- including the infamous "good-morals requirement" and "constitutional interpretation" tests -- were so inherently "vague and subjective" that they "constituted an open invitation to abuse at the hands of voting officials."  Id.

In addition to these methods of direct disenfranchisement, southern officials before 1965 also enacted laws designed to dilute black voting strength, if and when blacks were able to register and cast ballots.  Specifically, southern officials "gerrymandered election districts, instituted at-large elections, annexed or deannexed land as it fit their racial and partisan interests, and required huge bonds of officeholders."  J. Morgan Kousser, The Strange, Ironic Career of Section 5 of the Voting Rights Act, 1965-2007, 86 TEX. L. REV. 667, 678-79 (2008); see also To Examine the Impact and Effectiveness of the Voting Rights Act, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 1138 (Oct. 18, 2005) ("Impact and Effectiveness") (Chandler Davidson and Bernard Grofman, eds., Quiet Revolution in the South: The Impact of the Voting Rights Act 1965-1990 (Princeton University Press 1994)). These tactics aimed at reducing the ability of blacks to elect candidates of their choice -- sometimes referred to as "[d]isenfranchisement by indirection" -- were widely employed throughout the South in the late nineteenth century, and they reemerged during the "Second Reconstruction" of the mid-twentieth century as well.  See 1 Voting Rights Act: Evidence of Continued Need, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 142 (Mar. 8, 2006) (hereinafter, "1 Evidence of Continued Need") (National Commission on the Voting Rights Act, Protecting Minority Voters: The Voting Rights

Act at Work 1982-2005 (Feb. 2006) (hereinafter, "Nat'l Comm'n Report")); see also An Introduction to the Expiring Provisions of the Voting Rights Act and Legal Issues Relating to Reauthorization, Hearing Before the S. Comm. on the Judiciary, 109th Cong. 206 (May 9, 2006) ("Introduction to Expiring Provisions") (prepared statement of Chandler Davidson).

The Supreme Court eventually responded to these attempts to evade the requirements of the Reconstruction Amendments by striking down some of the most egregious practices used to impede blacks from effectively exercising their right to vote. See Katzenbach, 383 U.S. at 311-12 (internal citations omitted). The Court invalidated grandfather clauses in 1915, see Guinn v. United States, 238 U.S. 347 (1915); Myers v. Anderson, 238 U.S. 368 (1915); outlawed the so-called "white primary" in 1944, see Smith v. Allwright, 321 U.S. 649 (1944); and condemned racial gerrymandering in 1960, when the city of Tuskegee, Alabama, attempted to transform its square-shape into "a strangely irregular twenty-eight-sided figure," which had the effect of removing "from the city all save four or five of its 400 Negro voters while not removing a single white voter or resident," Gomillion v. Lightfoot, 364 U.S. 339, 341 (1960).[1]

Congress also responded to southern states' sophisticated disenfranchisement strategies by enacting civil rights legislation in 1957, 1960, and 1964, which sought to "facilitat[e] case-by-case litigation against voting discrimination." Katzenbach, 383 U.S. at 313. But it soon became apparent that "case-by-case" litigation would not be sufficient to protect African-Americans' access to the ballot. See H.R. Rep. No. 89-439, at 2440-41. Not only was litigation expensive and slow, but even where it proved successful, southern officials would often ignore court orders,

---

[1] Reversing the lower court's dismissal of the case, the Supreme Court emphasized that the Fifteenth Amendment "nullifies sophisticated as well as simple-minded modes of discrimination." Gomillion, 364 U.S. at 342 (internal quotation marks and citation omitted).

"close[] their registration offices to freeze the voting rolls," or "merely switch[] to discriminatory devices not covered by the federal decrees." Katzenbach, 383 U.S. at 314.  As Congress explained, "[b]arring one contrivance too often has caused no change in result, only in methods." H.R. Rep. No. 89-439, at 2441.  Hence, in 1965 Congress decided that "sterner and more elaborate measures" were needed to combat the "insidious and pervasive evil which had been perpetrated in certain parts of our country through unremitting and ingenious defiance of the Constitution." Katzenbach, 383 U.S. at 309.

To craft these measures effectively, the Senate and House Committees on the Judiciary held hearings for nine days, during which they discussed 122 proposed voting rights bills and heard testimony from 67 witnesses.  See id.; see also H.R. Rep. No. 89-439, at 2438.  The House debated the legislation for three full days, while the Senate discussed the Act for almost a month. See Katzenbach, 383 U.S. at 308.  Ultimately, when it came time to vote, "the verdict of both chambers was overwhelming": the Voting Rights Act of 1965 passed by a margin of 328-74 in the House, and 79-18 in the Senate.  Id.; see also Voting Rights Act of 1965 ("1965 Act"), Pub. L. No. 89-110, 79 Stat. 437 (codified as amended at 42 U.S.C. § 1973 et seq.).

The Act's basic prohibition against racial discrimination in voting is contained in Section 2, which provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  42 U.S.C. § 1973.  Although Section 2 echoes the language of the Fifteenth Amendment, at least since 1982 it has been interpreted to prohibit a broader category of conduct than that which the Amendment itself proscribes, as it forbids all electoral practices with

discriminatory "results," not just those enacted with a discriminatory purpose.  Compare City of Mobile v. Bolden, 446 U.S. 55, 62 (1980) (holding that Section 2 merely restates "the prohibitions already contained in the Fifteenth Amendment" and that "racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation") with S. Rep. No. 97-417, at 28 (1982) (explaining Congress's intent to amend Section 2 in response to City of Mobile to make clear that a plaintiff can establish a Section 2 violation "without proving any kind of discriminatory purpose").  Other provisions of the Voting Rights Act ban poll taxes, 42 U.S.C. § 1973h, prohibit voter intimidation and coercion, 42 U.S.C. § 1973i(b), and establish civil and criminal sanctions for the deprivation of rights secured by the Act, 42 U.S.C. § 1973j.

In addition to these permanent provisions -- which apply nationwide -- the Act sets forth "a complex scheme of stringent remedies aimed at areas where voting discrimination has been the most flagrant."  Katzenbach, 383 U.S. at 315.  These targeted provisions are temporary, and only apply to jurisdictions that are "covered" under Section 4(b).  For example, Section 4(a) of the Act bans the use of voting tests in all covered jurisdictions, see 42 U.S.C. § 1973b(a), while Section 8 authorizes the Attorney General to send federal observers to enter polling places and monitor elections in covered jurisdictions when "necessary to enforce the guarantees of the 14th or 15th amendment," 42 U.S.C. § 1973f(a)(2); see also H.R. Rep. No. 109-478, at 91 (2006).[2]

Section 5, however, remains the most innovative -- and the most controversial -- of the Act's targeted, temporary provisions.  Under Section 5, a covered jurisdiction cannot make any changes to its voting qualifications, standards, practices, or procedures unless those changes are

---

[2] Under Section 3(a) of the Act, federal observers may also be assigned to non-covered jurisdictions where it is deemed "appropriate to enforce the voting guarantees of the fourteenth or fifteenth amendment."  See 42 U.S.C. § 1973a(a); see also H.R. Rep. No. 109-478, at 91.

first "submitted to and approved by a three-judge Federal District Court in Washington, D.C., or the Attorney General." See Nw. Austin II, 129 S. Ct. at 2509; 42 U.S.C. § 1973c.  Preclearance under Section 5 will only be granted if a jurisdiction can show that its proposed voting change "neither 'has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.'" Nw. Austin II, 129 S. Ct. at 2509 (quoting 42 U.S.C. § 1973c(a)).

Section 5 constituted a direct response to the "common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down." Beer v. United States, 425 U.S. 130, 140 (1976).  Prior to 1965, such novel methods of minority disenfranchisement would continue to operate "until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory." Id.  But with the passage of Section 5, Congress "shift[ed] the advantage of time and inertia from the perpetrators of the evil to its victim," Katzenbach, 383 U.S. at 328.  Rather than requiring minority voters to sue to challenge discriminatory voting practices after their implementation, Section 5 places the burden on covered jurisdictions to show their voting changes are nondiscriminatory before those changes can be put into effect.  See id.

If a jurisdiction covered by Section 5 chooses to submit its proposed electoral change to the Attorney General for preclearance, and the Attorney General does not interpose an objection to the change within 60 days, the change may be implemented as proposed.  See 42 U.S.C. § 1973c(a); see also City of Rome v. United States, 446 U.S. 156, 170 (1980).  If the Attorney General does interpose an objection, the submitting jurisdiction "may at any time request the Attorney General to reconsider an objection," see 28 C.F.R. § 51.45(a), or it may institute a declaratory judgment action before a three-judge panel of this Court, seeking "*de novo*

consideration of whether the method of election violates rights protected by the Voting Rights Act or the Constitution," Cnty. Council of Sumter Cnty. v. United States, 555 F. Supp. 694, 706-07 (D.D.C. 1983) (three-judge court); see also City of Rome v. United States, 450 F. Supp. 378, 381-82 (D.D.C. 1978) (three-judge court), aff'd, 446 U.S. 156 (1980) (explaining that "even if . . . the Attorney General objects to certain proposed electoral changes, the applicant-jurisdiction can always seek . . . a declaratory judgment from a three-judge court in this District . . . "); 28 C.F.R. § 51.11 (noting that "[s]ubmission to the Attorney General does not affect the right of the submitting authority to bring an action in the U.S. District Court for the District of Columbia for a declaratory judgment").  However, if the jurisdiction does not receive federal preclearance from either the Attorney General or a three-judge panel of this Court, the change to its voting practice or procedure may not be implemented.

Section 4(b) establishes the formula that determines which jurisdictions are subject to Section 5's preclearance requirements (and the other temporary provisions of the Act).  As originally enacted, a jurisdiction was "covered" under Section 4(b) if it maintained a voting test or device as of November 1, 1964, and had less than 50% voter registration or turnout in the 1964 presidential election.  See 1965 Act § 4(b).[3]  Congress found that the combined presence of one of these "tests or devices" and low voter registration or turnout in a particular jurisdiction made it "a strong probability that low registration and voting are a result of racial discrimination in the use of such tests."  H.R. Rep. No. 89-439, at 2444.  The jurisdictions originally covered by

---

[3]  A voting "test or device" was defined by statute as a requirement that a person "(1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class."  Id. § 4(c).

this formula were Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia.

See 28 C.F.R. pt. 51 app.  Thirty-nine counties in North Carolina and one county in Arizona also

qualified for coverage as separately designated political subdivisions.  Id.

It was no coincidence that the six states originally covered in their entirety by Section

4(b) -- and therefore subject to preclearance under Section 5 -- were those southern states with

the worst historical records of racial discrimination in voting.  The drafters of the Act

purposefully designed its coverage formula "to pick up the core Southern states that had been

bastions of Jim Crow."  Introduction to the Expiring Provisions 221 (statement of Samuel

Issacharoff).  As one scholar has explained, "those who wrote the legislation knew the states they

wanted to 'cover' and, by a process of trial and error, determined the participation level that

would single them out."  1 Voting Rights Act: Section 5 of the Act – History, Scope, and

Purpose, Hearing before the Subcomm. on the Constitution of the H. Comm. on the Judiciary,

109th Cong. 68 (Oct. 25, 2005) ("1 History, Scope, & Purpose") (Abigail Thernstrom, Whose

Votes Count? Affirmative Action and Minority Rights (Harvard University Press 1987)).  The

reverse-engineered, percentage-based "trigger" for coverage under the Act was, in other words, "a

formally neutral device for capturing a more historically based truth."  The Continuing Need for

Section 5 Pre-Clearance, Hearing before the S. Comm. on the Judiciary, 109th Cong. 99 (May

16, 2006) ("Continuing Need") (responses of Pamela S. Karlan to questions submitted by

Senators Leahy, Kennedy, Kohl, Cornyn, and Coburn) ("Karlan Responses").

But Congress also recognized the potential that Section 4(b)'s coverage formula would be

over- or under-inclusive, and hence created mechanisms whereby jurisdictions could "bail out" of

or "bail-in" to Section 5's requirements.  See 1965 Act § 4(a), § 3(c).  In order to successfully

"bail out" under the version of Section 4(a) now in effect, a jurisdiction must obtain a declaratory judgment from a three-judge court confirming that "for the previous ten years it has not used any forbidden voting test, has not been subject to any valid objection under § 5, and has not been found liable for other voting rights violations." Nw. Austin II, 129 S. Ct. at 2509.  The jurisdiction must also show "that it has 'engaged in constructive efforts to eliminate intimidation and harassment of voters,' and similar measures." Id. (quoting 42 U.S.C. § 1973b(a)(1)(A)-(F)). By the same token, a court can require a jurisdiction to "bail-in" to the requirements of Section 5 if it finds that "violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision." 42 U.S.C. § 1973a(c). Specifically, a court presiding over a voting discrimination suit against a state or political subdivision may retain jurisdiction over the suit "for such a period as it may deem appropriate," and may, during that time, require that the defendant-jurisdiction be subject to preclearance. Id.

Shortly after Congress enacted the Voting Rights Act, South Carolina brought suit challenging the constitutionality of Section 5's preclearance requirement, Section 4(b)'s coverage formula, and several of the Act's other temporary provisions, on the grounds that they exceeded Congress's Fifteenth Amendment enforcement authority and violated "[t]he doctrine of the equality of the states." Katzenbach, 383 U.S. at 323, 328.  Rejecting these arguments, the Supreme Court explained that "[a]s against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." Id. at 325.  Although recognizing that Section 5 "may have been an uncommon exercise of congressional power," the Court noted that "exceptional conditions can justify legislative measures not otherwise appropriate." Id. at 334.  With respect to the coverage formula in Section

4(b), the Court found that Congress had considered "reliable evidence of actual voting discrimination in a great majority of the States . . . affected by the . . . Act," and had created a formula that was "relevant to the problem of voting discrimination." Id. at 329. "No more was required," the Court said, "to justify the application to these areas of Congress' express powers under the Fifteenth Amendment." Id. at 330.

Although Section 5 was originally intended to be in effect for only five years, Congress has reauthorized Section 5 on four occasions -- first in 1970 (for five years), then in 1975 (for seven years), again in 1982 (for 25 years), and most recently in 2006 (for 25 years). See Nw. Austin II, 129 S. Ct. at 2510. When Section 5 was reauthorized in 1970 and again in 1975, Section 4(b)'s coverage formula was amended each time, first to include (1) jurisdictions that maintained a voting test or device as of November 1, 1968, and had less than 50% voter registration or turnout in the 1968 presidential election; and then to add (2) jurisdictions that maintained a voting test or device as of November 1, 1972, and had less than 50% voter registration or turnout in the 1972 presidential election. See Pub. L. No. 91-285, 84 Stat. 314, 315 (1970) ("1970 Amendments"); Pub. L. No. 94-73, 89 Stat. 400, 401 (1975) ("1975 Amendments"). In the 1975 Amendments, Congress also added Section 4(f) to the Act, which bars voting discrimination against language minorities and expands the definition of "test or device" in Section 4 to include the provision of English-only voting materials in jurisdictions where more than 5% of the voting-age population are members of a single language minority. See 1975 Amendments § 203, 89 Stat. at 401-02 (codified as amended at 42 U.S.C. § 1973b(f)).

Five years after the enactment of the 1975 Amendments, the Supreme Court was again confronted with a challenge to the constitutionality of Section 5, and confirmed that the

provision's reauthorization constituted a permissible exercise of Congress's Fifteenth Amendment enforcement authority.  See City of Rome, 446 U.S. at 182.  Just as Shelby County has argued here with respect to the 2006 reauthorization of Section 5, Rome, Georgia, argued there that "even if the Act and its preclearance requirement were appropriate means of enforcing the Fifteenth Amendment in 1965, they had outlived their usefulness by 1975, when Congress extended the Act for another seven years."  446 U.S. at 180.  The Supreme Court, however, declined Rome's "invitation to overrule Congress' judgment that the 1975 extension was warranted."  Id.  Acknowledging the significant gains that had been made in minority political participation since 1965, the Court nonetheless expressed concern that "'[a]s registration and voting of minority citizens increases [sic], other measures may be resorted to which would dilute increasing minority voting strength.'"  Id. at 181 (quoting H.R. Rep. No. 94-196, at 10-11 (1975)).  The Court emphasized that the Voting Rights Act had been enacted to remedy nearly a century of racial discrimination in voting, and that the 1975 extension of the Act's temporary provisions occurred just ten years after the Act's passage.  Id. at 182.  Thus viewed, the Court found "Congress's considered determination that at least another 7 years of statutory remedies were necessary to counter the perpetuation of 95 years of pervasive voting discrimination" to be both "unsurprising and unassailable."  Id.

Two years after City of Rome, Congress reauthorized Section 4(b) and Section 5 a third time, and in so doing liberalized the procedures for bailout in several significant ways.  Prior to 1982, only covered states (such as Alabama) or separately-covered political subdivisions (such as individual North Carolina counties) were eligible to seek bailout -- even though all political subdivisions within covered states were required to seek preclearance for their proposed electoral

changes.  See Nw. Mun. Util. Dist. No. One v. Holder, 573 F. Supp. 2d 221, 227-28 (D.D.C.

2008) ("Nw. Austin I"), *rev'd and remanded*, Nw. Austin II, 129 S. Ct. 2504 (2009).  After the

1982 Amendments, political subdivisions within covered states (such as, for example, Shelby

County) could themselves petition for bailout.  See Pub. L. No. 97-205 § 2(b)(2), 96 Stat. 131,

131 ("1982 Amendments") (codified as amended at 42 U.S.C. § 1973b(a)(1)).  Moreover, the

1982 Amendments changed the substantive criteria for bailout so that jurisdictions with "clean"

voting rights records over the previous ten years were bailout-eligible; under prior versions of the

Act, there had been no such "bailout opportunity for jurisdictions that eliminated discriminatory

voting tests and practices that [had been] used at the time of initial coverage." Nw. Austin I, 573

F. Supp. 2d at 228 (internal quotation marks and citation omitted) (brackets in original).  In this

manner, the 1982 Amendments created an incentive for "those jurisdictions with post-1965

histories of discrimination . . . to improve their voting rights records." Id.

        The 1982 Amendments also extended the Act's temporary provisions for the longest

period of time to date.  Whereas the 1970 and 1975 Amendments had extended the Act's

temporary provisions for only five and seven years, respectively, the 1982 Amendments extended

Section 5 and Section 4(b) for a full 25 years.  See Nw. Austin II, 129 S. Ct. at 2510.  The 1982

Amendments did not, however, change the coverage formula in Section 4(b).  See 1982

Amendments, 96 Stat. at 131-133.

## II.     The 2006 Reauthorization of Section 5 and Section 4(b)

        As a result of the 25 year extension imposed by the 1982 Amendments, Section 5 and the

Act's other temporary provisions were set to expire in 2007.  Hence, in the fall of 2005, the

House Committee on the Judiciary began to examine "the effectiveness of the temporary

provisions of the VRA over the last 25 years" in order to determine whether another renewal of

the Act's temporary provisions was warranted.  <u>See</u> H.R. Rep. No. 109-478, at 5.  The result was

"one of the most extensive legislative records in the Committee on the Judiciary's history."  <u>Id.</u>

　　　From October 2005 through May 2006, the House Judiciary Committee held ten

oversight hearings and two legislative hearings before the Subcommittee on the Constitution, at

which it heard from 46 witnesses and assessed over 12,000 pages of testimony, documentary

evidence, and statistical analyses.  <u>Id.</u>  The Subcommittee on the Constitution received and

incorporated into the legislative record lengthy reports from several civil rights organizations and

voting rights scholars, including: (1) a report by the ACLU's Voting Rights Project, assessing 293

cases involving allegations of voting discrimination since 1982, <u>see</u> 1 <u>Evidence of Continued</u>

<u>Need</u> 378-1270 (Laughlin McDonald and Daniel Levitas, <u>The Case for Extending and Amending</u>

<u>the Voting Rights Act: Voting Rights Act Litigation, 1982-2006</u> (Mar. 2006)) (hereinafter,

"ACLU Report"); (2) a report by the National Commission on the Voting Rights Act, compiling

evidence of voting discrimination since 1982 based on testimony gathered at ten field hearings

across the country, as well as "governmental, legal, media and scholarly sources," <u>see id.</u> at 121

(Nat'l Comm'n Report); and (3) a study conducted by Professor Ellen Katz and the Voting Rights

Initiative of the University of Michigan Law School, which analyzed 323 post-1982 lawsuits that

raised claims under Section 2 of the Voting Rights Act, <u>see</u> <u>Impact and Effectiveness</u> 974 (Ellen

Katz, <u>Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting</u>

<u>Rights Act Since 1982</u> (Nov. 2005)) (hereinafter, "Katz Study").

　　　The Senate Judiciary Committee held nine of its own hearings to discuss the

reauthorization of the Act's temporary provisions, at which it, too, received testimony from 46

witnesses, including experienced civil rights litigators, law professors, and Department of Justice attorneys.  See S. Rep. No. 109-295, at 2-4, 10 (2006).  All told, the legislative record compiled by the two houses is over 15,000 pages in length, and includes "statistics, findings by courts and the Justice Department, and first-hand accounts of discrimination."  See id. at 10.  On the basis of this extensive record, Congress determined that "40 years has not been a sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment."  See Pub. L. No. 109-246, § 2(b)(7), 120 Stat. 577, 578 (2006) ("2006 Amendments").  Despite the effectiveness of Section 5 in deterring some attempts at voting discrimination, the House Judiciary Committee found that "instances of discrimination and efforts to discriminate against minority voters continue, thus justifying reauthorization of the VRA's temporary provisions."  H.R. Rep. No. 109-478, at 24-25.

As evidence of continued discrimination in voting, Congress pointed to the "hundreds of objections" to voting changes that were interposed by the Attorney General since 1982; the number of voting changes withdrawn from consideration after so-called "more information requests" from the Attorney General; the number of "section 5 enforcement actions undertaken by the Department of Justice in covered jurisdictions since 1982," in which the Department has sought to compel jurisdictions to submit their voting changes for preclearance; the number of requests for preclearance that have been denied by three-judge panels of this Court; the "continued filing of section 2 cases" in covered jurisdictions; the existence of racially polarized voting "in each of the jurisdictions covered by the expiring provisions" of the Act; and "the tens of thousands of Federal observers dispatched to monitor polls" in covered jurisdictions. See 2006 Amendments § 2(b)(3)-(4), (8), 120 Stat. at 577-78.  Such evidence, Congress found,

"demonstrates that, without the continuation of the Voting Rights Act of 1965 protections, racial and language minority citizens will be deprived of the opportunity to exercise their right to vote, or will have their votes diluted, undermining the significant gains made by minorities in the last 40 years."  2006 Amendments § 2(b)(9), 120 Stat. at 578.

Hence, Congress passed H.R. 9 -- entitled the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 -- which reauthorized Section 5 (and the coverage formula in Section 4(b)) for another 25 years.  See 2006 Amendments § 4; 42 U.S.C. § 1973b(a)(8).  The congressional support for the Act's 2006 reauthorization was even more "overwhelming" than it had been for the Act's passage in 1965.  Whereas the 1965 Act passed by a vote of 328 to 74 in the House and 79 to 18 in the Senate, see Katzenbach, 383 U.S. at 309, the 2006 Amendments passed by a vote of 390 to 33 in the House and 98 to 0 in the Senate, see 152 Cong. Rec. H5207 (daily ed. July 13, 2006); 152 Cong. Rec. S8012 (daily ed. July 20, 2006).  President George W. Bush then signed the bill into law on July 27, 2006.  See 120 Stat. at 581.

In addition to extending the operation of Section 5, the 2006 Amendments made two substantive changes to the Act's preclearance standard.  First, Congress clarified its intent with respect to the meaning of the word "purpose" in Section 5 in response to the Supreme Court's decision in Reno v. Bossier Parish Sch. Bd., 528 U.S. 320 (2000) ("Bossier II").  Section 5, by its terms, only allows a voting change to be precleared if the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color."  See 42 U.S.C. § 1973c(a).  Prior to Bossier II, this provision was interpreted to bar preclearance of voting changes that either (1) were enacted with a discriminatory purpose; or (2) had a

-18-

discriminatory, <u>retrogressive</u> effect -- <u>i.e.</u>, changes that worsened the position of minority voters

relative to the status quo.  <u>See</u> <u>Bossier II</u>, 528 U.S. at 324 (explaining that a redistricting plan

only has a prohibited discriminatory "effect" under Section 5 if it is retrogressive); <u>Beer</u>, 425 U.S.

at 141 (noting that "the purpose of s[ection] 5 has always been to insure that no voting-procedure

changes would be made that would lead to a retrogression in the position of racial minorities with

respect to their effective exercise of the electoral franchise").  In <u>Bossier II</u>, however, the

Supreme Court -- for the first time -- held that the "purpose" prong of Section 5 only prohibits

electoral changes that are enacted with a discriminatory <u>and</u> retrogressive purpose.  <u>See</u> 528 U.S.

at 341.  In other words, after <u>Bossier II</u>, a redistricting plan that was passed for purely

discriminatory reasons (such as to purposefully avoid the creation of a new majority-minority

district), but that was not intended to make minority voters any worse off than they had been

under the preexisting plan (which, say, had no majority-minority districts), would not run afoul

of Section 5's "purpose" prong.  <u>See id.</u> (holding that Section 5 "does not prohibit preclearance of

a redistricting plan with a discriminatory but nonretrogressive purpose").

    <u>Bossier II</u> thus had the effect of reading the "purpose" prong "almost entirely out of

Section 5."  <u>See</u> <u>Voting Rights Act: Section 5 – Preclearance Standards, Hearing before the</u>

<u>Subcomm. on the Constitution of the House Comm. on the Judiciary</u>, 109th Cong. 12 (Nov. 1,

2005) (hereinafter, "<u>Preclearance Standards</u>") (prepared statement of Mark A. Posner)

(hereinafter, "Posner Prepared Statement").  As was the case prior to <u>Bossier II</u>, if a jurisdiction

enacted an electoral change that reduced the ability of minority voters to elect candidates of their

choice, the change would be denied preclearance under Section 5's "effects" prong (because it

would have a retrogressive effect).  Under <u>Bossier II</u>, then, the "purpose" prong would only serve

as an independent bar to discriminatory voting changes where a jurisdiction "intend[ed] to cause

retrogression, but then, somehow, messe[d] up and enact[ed] a voting change that [did] not

actually cause retrogression to occur (the so-called 'incompetent retrogressor')." Id.

In 2006, the House Judiciary Committee explained that Bossier II's limitation of the

"purpose" prong had been inconsistent with Congress's intent that Section 5 prevent not only

purposefully retrogressive discriminatory voting changes, but also those "[v]oting changes that

'purposefully' keep minority groups 'in their place.'" See H.R. Rep. No. 109-478, at 68.

Accordingly, as part of the 2006 Amendments, Congress restored the pre-Bossier II "purpose"

standard by adding a provision to the statute that defined "purpose" in Section 5 to mean "any

discriminatory purpose." See 2006 Amendments § 5(c), 120 Stat. at 581; 42 U.S.C. § 1973c(c)

(emphasis added).

In a similar vein, Congress also responded to the Supreme Court's decision in Georgia v.

Ashcroft, 539 U.S. 461 (2003), which had altered the preexisting standard for determining

whether a voting change had a prohibited retrogressive effect under Section 5's "effects" prong.

Prior to Georgia v. Ashcroft, the standard for assessing whether an electoral change violated the

Section 5 "effects" test was "whether the ability of minority groups to participate in the political

process and to elect their choices to office is . . . diminished . . . by the change affecting voting."

Beer, 425 U.S. at 141 (quoting H.R. Rep. No. 94-196, at 10).  In Georgia v. Ashcroft, however,

the Court endorsed a less rigid, "totality of the circumstances" analysis for examining

retrogressive effects, explaining that "any assessment of the retrogression of a minority group's

effective exercise of the electoral franchise depends on an examination of all the relevant

circumstances, such as the ability of minority voters to elect their candidate of choice, the extent

of the minority group's opportunity to participate in the political process, and the feasibility of creating a nonretrogressive plan."  539 U.S. at 479.  In reauthorizing the Act in 2006, Congress expressed concern that the Georgia v. Ashcroft framework had introduced "substantial uncertainty" into the administration of a statute that was "specifically intended to block persistent and shifting efforts to limit the effectiveness of minority political participation."  See H.R. Rep. No. 109-478, at 70 (internal quotation marks and citation omitted).  Hence, in an attempt to restore the simpler, "ability to elect" analysis articulated in Beer, see id. at 71, Congress added new language to the Act, stating that all voting changes that diminish the ability of minorities "to elect their preferred candidates of choice" should be denied preclearance under Section 5.  See 2006 Amendments § 5(b), 120 Stat. at 581; 42 U.S.C. § 1973c(b).

For present purposes, even more significant than the substantive changes that Congress made in 2006 to Section 5's preclearance standard were the proposed changes that Congress considered -- but ultimately, did not make -- to Section 4(b)'s coverage formula.  During the 2006 reauthorization hearings, there was extensive discussion of the potential need to revise the Act's coverage formula to take account of changed circumstances since 1975, when the formula had last been updated.  Several Senators asked members of the academic community whether they believed Section 4(b)'s "trigger" should be based on voter registration and turnout data from the 2000 and 2004 presidential elections, rather than data from the 1964, 1968, and 1972 elections. See, e.g., Continuing Need 48-49 (responses of Anita S. Earls to questions submitted by Senators Coburn, Cornyn, Leahy, and Kohl) ("Earls Responses"); id. at 76, 85-86 (responses of Ronald Keith Gaddie to questions submitted by Senators Kohl, Cornyn, and Coburn) ("Gaddie Responses"); id. at 99-100, 103-04 (Karlan Responses); id. at 110-12 (responses of Richard H.

Pildes to questions submitted by Senators Specter, Cornyn, Coburn, and Kohl) ("Pildes

Responses"); Introduction to Expiring Provisions 36, 38 (responses of Richard L. Hasen to

questions submitted by Senators Specter, Cornyn, and Sessions) ("Hasen Responses"); id. at 76

(responses of Samuel Issacharoff to questions submitted by Senators Specter, Sessions, and

Cornyn) ("Issacharoff Responses").

  Many voting rights scholars expressed the view that some sort of "updated trigger is

called for."  See, e.g., Continuing Need 85 (Gaddie Responses); Introduction to Expiring

Provisions 36 (Hasen Responses) (explaining that "*Congress should update the coverage

formula* based on data indicating where intentional state discrimination in voting on the basis of

race is *now* a problem or likely to be one in the *near future*"); Introduction to Expiring Provisions

13 (statement of Samuel Issacharoff) (noting that a trigger based on "voter turnout figures from

1964 . . . risks appearing constitutionally antiquated by the proposed next expiration date of

2032").  But almost all agreed that updating the formula on the basis of voter turnout and

registration data from the 2000 and 2004 presidential elections would be ill-advised.  As one law

professor explained, such a proposal "rest[s] on a fundamental misperception of the triggers,"

since Congress "did *not* pick the 1964, 1968, or 1972 elections as triggers because it thought

something distinctive happened in any of those elections."  See Continuing Need 99 (Karlan

Responses).  Rather, the use of election data from those years -- in conjunction with the presence

of a prohibited voting test or device -- had served only as a proxy for identifying those

"jurisdictions that had a long, open, and notorious history of disenfranchising minority citizens

and diluting their voting strength whenever they did manage to register and cast ballots."  Id.; see

also Continuing Need 110 (Pildes Responses).  For this reason, most scholars who testified

-22-

before Congress were skeptical as to whether "tinkering with the coverage dates is necessarily the best way to make the Act more current."  Introduction to Expiring Provisions 76 (Issacharoff Responses); see also Continuing Need 110 (Pildes Responses) (stating that "[m]echanically updating the coverage formula in this way would . . . not tie coverage appropriately to where problems are occurring today").

Nevertheless, the only amendment that was ultimately offered as a possible means of making Section 4(b)'s coverage formula more "current" proposed to do just that.  Specifically, Representative Charlie Norwood of Georgia introduced an amendment that would have created a "rolling test" for coverage based on voter turnout in the three most recent presidential elections. See H. R. Rep. No. 109-554, at 2 (2006).  Under the Norwood Amendment, a jurisdiction would only be subject to preclearance if it had "a discriminatory test in place or voter turnout of less than 50% in any of the three most recent presidential elections."  See id.

The House's reaction to the Norwood Amendment was overwhelmingly negative. Representative James Sensenbrenner, Chairman of the House Judiciary Committee, decried the Amendment, claiming that it "not only guts the bill, but turns the Voting Rights Act into a farce." See 152 Cong. Rec. H5181 (daily ed. July 13, 2006).  Although over 1,000 counties still would have been subject to preclearance under the Norwood Amendment's proposed formula, Hawaii would have been the only state covered in its entirety -- even though Hawaii has no discernible history of voting discrimination.  See 152 Cong. Rec. H5179-81.  Opponents of the Amendment condemned such results as evidence of the Amendment's "absurdity," and expressed concern that by severing Section 4(b)'s "connection to jurisdictions with proven discriminatory histories," the Amendment would place Section 5 in constitutional jeopardy.  See 152 Cong. Rec. H5181.

Ultimately, the Norwood Amendment was defeated, and the existing coverage formula in Section 4(b) remained intact.  See 152 Cong. Rec. H5204; see also James Thomas Tucker, The Politics of Persuasion: Passage of the Voting Rights Act Reauthorization Act of 2006, 33 J. LEGIS. 205, 254-55 (2007) (describing the debate over the Norwood Amendment).  Under that formula, which remains in existence today, a jurisdiction is subject to preclearance if it maintained a voting test or device in 1964, 1968, or 1972, and had voter turnout or registration below 50% in that year's presidential election.  See 42 U.S.C. § 1973b(b).  Currently, there are 16 states covered in whole or in part by Section 4(b), and therefore subject to preclearance under Section 5.  See 28 C.F.R. pt. 51, app.  Alabama, Alaska, Arizona, Georgia, Louisiana, Mississippi, South Carolina, Texas, and Virginia are covered in their entirety, while portions of California, Florida, Michigan, New Hampshire, New York, North Carolina, and South Dakota are also covered.  Id.

### III.    Northwest Austin

Shortly after the 2006 Amendments became effective, a Texas municipal utility district brought suit, seeking to bail out of the Act's requirements or, in the alternative, to challenge Section 5 on its face as "an unconstitutional overextension of Congress's enforcement power to remedy past violations of the Fifteenth Amendment."  See Nw. Austin I, 573 F. Supp. 2d at 230 (internal quotation marks and citation omitted).  Because the plaintiff-district sought a declaratory judgment that it was eligible for bailout, a three-judge panel of this Court was convened to hear the case.  See id. (citing 42 U.S.C. § 1973b(a)(5)).  The court first concluded that the district was not a "political subdivision" under Section 14(c)(2) of the Act, and thus could not petition for bailout pursuant to Section 4(a), which only authorizes states and "political

subdivisions" to seek bailout.  See id. at 230-35; see also § 1973b(a)(1).

The court then proceeded to address the merits of the plaintiff's facial constitutional challenge to the 2006 reauthorization of Section 5.  Nw. Austin I, 573 F. Supp. 2d at 235-79. The court began by identifying the types of evidence of voting discrimination upon which Congress had relied in deciding to reauthorize Section 5 in 2006, which included evidence of (1) racial disparities in voter registration and turnout; (2) the number of minority elected officials; (3) objections to proposed voting changes under Section 5; (4) "more information requests" by the Attorney General in response to Section 5 preclearance submissions; (5) judicial preclearance suits brought by covered jurisdictions; (6) Section 5 enforcement actions brought by the Attorney General; (7) Section 2 litigation; (8) the dispatch of federal election observers; (9) racially polarized voting; and (10) Section 5's deterrent effect.  Id. at 247.  In a lengthy opinion replete with citations to the legislative record, the court analyzed each of these categories of evidence to determine whether there was sufficient proof of "contemporary discrimination in voting to justify Congress's decision to subject covered jurisdictions to section 5 preclearance for another twenty-five years."  Id. at 265.  Concluding that the legislative record did, in fact, contain "extensive contemporary evidence of intentional discrimination," id. at 266, the court decided there was "no basis for overturning Congress's judgment that preclearance - 'a vital prophylactic tool[]' - remains necessary," id. at 279 (quoting H.R. Rep. No. 109-478, at 21).

On appeal, however, the Supreme Court reversed and remanded.  In a decision that has since been criticized by some as "a questionable application of the doctrine of 'constitutional avoidance,'" see Richard L. Hasen, Constitutional Avoidance and Anti-Avoidance by the Roberts Court, 2009 SUP. CT. REV. 181 (2009); see also Ellen Katz, From Bush v. Gore to NAMUDNO:

A Response to Professor Amar, 61 F<span>LA</span>. L. R<span>EV</span>. 991, 992-93 (2009) (describing the Court's

"statutory construction" of the bailout provision in Nw. Austin II as "contrived"), Justice Roberts,

writing for an eight-justice majority, sidestepped the "big question" of Section 5's

constitutionality by instead resolving the case on narrower, statutory grounds, see Nw. Austin II,

129 S. Ct. at 2508.  Specifically, the Court found that the plaintiff-district qualified as a "political

subdivision" eligible to petition for bailout -- even though it did not register voters and was

therefore not a political subdivision as that term is defined in Section 14(c)(2) of the Act.  See 42

U.S.C. § 1973*l*(c)(2) (defining "political subdivision" to include "any county or parish" or "any

other subdivision of a State which conducts registration for voting").

According to the Court, "the statutory definition of 'political subdivision' in § 14(c)(2)

does not apply to every use of the term 'political subdivision' in the Act."  Nw. Austin II, 129 S.

Ct. at 2515.  Rather, the Court explained, the phrase "political subdivision" in Section 4(a) has a

"broader" meaning than that set forth in Section 14(c)(2), and hence "all political subdivisions -

not only those described in § 14(c)(2) - are eligible to file a bailout suit" under Section 4(a).  Id.

at 2515-17 (emphasis added).  As a political subdivision of Texas "in the ordinary sense of the

term," the plaintiff-district was thus eligible to seek bailout.  Id. at 2513.  And because the district

had framed its constitutional challenge to the 2006 reauthorization of Section 5 "as being 'in the

alternative' to its statutory argument" for bailout, the majority saw no need to resolve the merits

of the district's constitutional challenge.  Id.

But the majority did take the opportunity to voice some concerns about the

constitutionality of Section 5 and Section 4(b), and thereby presaged future challenges to Section

5 like that raised here by Shelby County.  The Court in Nw. Austin II emphasized the substantial

"federalism costs" imposed by Section 5, as well as the "dramatic improvements" in minority voter turnout and registration since the Act's passage.  Id. at 2511.  "Things have changed in the South," the Court wrote, explaining that minorities now register and vote at rates that "approach parity" with those of non-minorities, and that minority candidates "hold office at unprecedented levels."  Id.  The Court conceded that these "improvements are no doubt due in significant part to the Voting Rights Act itself, and stand as a monument to its success," but made clear that "[p]ast success alone . . . is not adequate justification to retain the preclearance requirements."  Id.

The Court also raised concern about the continued constitutionality of the Act's coverage formula, noting that it is "based on data that is now more than 35 years old, and there is considerable evidence that it fails to account for current political conditions."  Id. at 2512.  The Court cited the fact that the "racial gap in voter registration and turnout is lower in the States originally covered by § 5 than it is nationwide."  Id.  Although the Court did not specify the precise nature of the differences between covered and non-covered jurisdictions that would be constitutionally necessary to justify Section 5's continued selective application, it did state that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets."  Id. at 2512.

After identifying "serious constitutional questions" raised by the Act's coverage formula and preclearance requirement, however, the majority refrained from answering them.  Id. at 2513.  But Justice Thomas did not.  Writing separately as the lone dissenter, he explained that he would have "decided the constitutional issue presented" and concluded "that the lack of current evidence of intentional discrimination with respect to voting renders § 5 unconstitutional."  Id. at 2517, 2519 (Thomas, J., concurring in judgment in part, dissenting in part).  According to Justice

Thomas, "the constitutionality of § 5 has always depended on the proven existence of intentional discrimination so extensive that elimination of it through case-by-case enforcement would be impossible." Id. at 2524.  He went on to explain that this kind of extensive intentional discrimination in voting -- which led the Court to uphold the constitutionality of Section 5 on prior occasions -- "no longer exists," citing the high minority voter registration rates in states such as Alabama, Louisiana, and Mississippi.  Id. at 2525.  Justice Thomas dismissed evidence of the so-called "second generation barriers" to voting upon which Congress had relied, noting that evidence of Section 5 enforcement actions, Section 2 suits, and federal observer coverage "bears no resemblance to the record initially supporting § 5, and is plainly insufficient to sustain such an extraordinary remedy." Id. at 2526.  With respect to evidence of intentional voting discrimination contained in the 2006 legislative record and cited by the three-judge court, Justice Thomas found that these "discrete and isolated incidents" fell short of a "coordinated and unrelenting campaign to deny an entire race access to the ballot." Id.  "Perfect compliance with the Fifteenth Amendment's substantive command is not now - nor has it ever been - the yardstick for determining whether Congress has the power to employ broad prophylactic legislation to enforce that Amendment," he explained.  Id.

## IV.    Shelby County, Alabama

Echoing the arguments of Justice Thomas, Shelby County brought this suit on April 27, 2010, asserting that "it is no longer constitutionally justifiable for Congress to arbitrarily impose on Shelby County and other covered jurisdictions disfavored treatment by forcing them to justify all voting changes to federal officials in Washington, D.C. for another twenty five years." See Compl. ¶ 35.  Shelby County's history under the Voting Rights Act is extensive and forms a

relevant backdrop to this case.  As a political subdivision of Alabama, Shelby County has been subject to preclearance since 1965, based on the Attorney General's determination that Alabama used a prohibited voting test or device on November 1, 1964, and had voter turnout of less than 50% in the 1964 presidential election.  See 28 C.F.R. pt. 51 app.; 30 Fed. Reg. 9897 (Aug. 7, 1965); see also 42 U.S.C. § 1973b, § 1973c, § 1973*l*(c)(2); Compl. ¶¶ 28-29.  From 1965 to the filing of this suit, the Department of Justice has received at least 682 preclearance submissions from Shelby County and jurisdictions located wholly or partially within Shelby County.  See Def.'s Mot. for Summ. J. ("Def.'s Mot.") [Docket Entry 54], Ex. 4, Decl. of Robert S. Berman ("Berman Decl.") ¶ 4.  Shelby County itself has submitted at least 69 proposed voting changes to the Attorney General for preclearance.  Id. ¶ 5.

Since 1965, the Department has lodged objections to five proposed voting changes submitted by jurisdictions located wholly or partially within Shelby County.  Id. ¶ 8.  Shelby County was also a defendant in the so-called Dillard litigation in the 1980s, in which black residents of Alabama challenged the at-large system used to elect Alabama county commissioners as a violation of Section 2 of the Voting Rights Act.  See Dillard v. Crenshaw Cnty., 640 F. Supp. 1347, 1352-54 (M.D. Ala. 1986); see also Dillard v. Baldwin Cnty. Bd. of Educ., 686 F. Supp. 1459, 1461 (M.D. Ala. 1988) (reviewing history of Dillard litigation); Dillard v. Crenshaw Cnty., 748 F. Supp. 819, 821-23 (M.D. Ala. 1990) (describing Shelby County's involvement in Dillard).  Although Shelby County was not one of the original nine defendants in Dillard, see Dillard, 640 F. Supp. at 1352, the plaintiffs in Dillard eventually raised claims against a total of 183 Alabama cities, counties, and school boards that employed at-large methods of election, including Shelby County, see Dillard, 686 F. Supp. at 1461.

In the original <u>Dillard</u> lawsuit, the court concluded that the Alabama legislature had "engaged in a pattern and practice of using at-large election systems as an instrument for race discrimination." 640 F. Supp. at 1361. The court explained that the challenged at-large electoral systems had been created against the backdrop of Alabama's "unrelenting historical agenda, spanning from the late 1800's to the 1980's, to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." <u>Id.</u> at 1357. Moreover, the court noted, the Alabama legislature had "consistently enacted at-large systems for local governments during periods when there was a substantial threat of black participation in the political process." <u>Id.</u> at 1361. When viewed in light of the state's "undisputed history of racial discrimination," it became clear that the creation of at-large methods of election -- which did, in fact, have an "adverse racial impact" -- "was not adventitious but rather racially inspired." <u>Id.</u> Hence, the court found that preliminary injunctive relief with respect to the counties then defending their at-large election systems was warranted. <u>Id.</u> at 1373.

Despite the adverse judgment against the other Alabama counties with at-large electoral systems in place, Shelby County continued to deny that its at-large method for electing county commissioners violated Section 2, and the related case against it proceeded to trial. <u>See</u> <u>Dillard</u>, 748 F. Supp. at 822. While the case was under submission, however, Shelby County entered into a consent decree with the plaintiffs, under which it agreed to change its at-large electoral system to a "single-member district scheme" with one majority-black district. <u>Id.</u>

Most recently, on August 25, 2008, the Attorney General objected to a redistricting plan and 177 annexations submitted by the city of Calera, located within Shelby County. <u>See</u> Berman Decl. ¶¶ 9-10; <u>id.</u>, Att. A. Calera's redistricting plan and annexations would have eliminated the

city's sole majority-black district, which had been created pursuant to the consent decree in

<u>Dillard</u>, and which had elected an African-American councilman for the past 20 years.  <u>See</u>

Berman Decl., Att. A.  In its preclearance submission to the Attorney General, Calera conceded

that it had, in fact, already adopted the 177 annexations without receiving advance preclearance

for them.  <u>See</u> <u>id.</u>; <u>see also</u> Berman Decl. ¶ 9.  After the Attorney General lodged an objection to

the annexations and the city's 2008 redistricting plan, Calera nonetheless proceeded to conduct

elections based on these unprecleared voting changes.  <u>See</u> Berman Decl. ¶ 11; <u>id.</u>, Att. B

("Calera Compl.") ¶ 18.; <u>id.</u>, Att. C ("Calera Consent Decree") at 3.  The elections held under the

objected-to plan and annexations resulted in the defeat of the African-American incumbent

councilman.  <u>See</u> <u>id.</u>, Att. D.

　　　　The Attorney General responded by bringing a Section 5 enforcement action, seeking to

prohibit Calera from certifying the results of its elections "based on the district boundaries and

electorate to which the Attorney General ha[d] interposed a timely objection unless and until

preclearance under Section 5 . . . is obtained."  Calera Compl. at 7.  The case was temporarily

resolved through a consent decree, and the Attorney General subsequently withdrew his objection

to the 177 annexations.  <u>See</u> Calera Consent Decree; <u>see also</u> Berman Decl. ¶ 15; <u>id.</u>, Att. F.  The

Attorney General did not, however, withdraw his objection to the 2008 redistricting plan.  <u>See</u>

Berman Decl. ¶ 15; <u>id.</u>, Att. F.

　　　　Because of the Attorney General's objection to Calera's proposed voting changes, Shelby

County argues that it is not eligible for bailout.  Compl. ¶ 34(b) (citing 42 U.S.C. §

1973b(a)(1)(E)).[4]   As a result of its alleged ineligibility for bailout and the 2006 reauthorization

of Section 5, Shelby County claims that it now "will have to regularly seek preclearance in the

near future" -- a process that, historically, has required the expenditure of "significant taxpayer

dollars, time, and energy."  See id. ¶¶ 32-33; Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") [Docket Entry

5], Decl. of Frank C. Ellis, Jr. ("Ellis Decl.") ¶¶ 7-8.

Shelby County does not challenge any specific application of Section 5 to one of its

proposed voting changes; rather, it seeks a declaration that Section 5 and Section 4(b) are facially

unconstitutional, as well as a permanent injunction prohibiting the Attorney General from

enforcing these provisions.  See Compl. ¶¶ 1, 44(a)-(b).  In Count I, Shelby County alleges that in

reauthorizing Section 5 "for another twenty-five years in 2006, Congress lacked the evidence of

intentional discrimination that warranted the enactment of the VRA in 1965 and its extensions in

1970, 1975, and 1982."  Id. ¶ 38(c).  Hence, Shelby County argues, because there is neither

"'congruence and proportionality' . . . nor even a 'rational relationship' between the evidence

compiled in support of the latest extension of Section 5 and the burdens imposed by that

provision . . . Section 5 . . . exceeds Congress's authority under the Fourteenth and Fifteenth

Amendments," id. ¶ 38(d) (internal citations omitted), "and, therefore, violates the Tenth

Amendment and Article IV of the Constitution," id. ¶ 37.  In Count II, Shelby County similarly

---

[4]  Shelby County also maintains that it is ineligible for bailout because it held several
special elections under the authority of Act 65-816 (the "Planning Act" of 1965) between 1965
and 2003.  See Compl. ¶ 34(a)(i)-(iii).  During that time, the Planning Act had not been
precleared by the Department of Justice.  Id. ¶ 34(a)(ii)-(iii).  Under Section 4(a), a covered
jurisdiction is only eligible for bailout if it has complied "with the requirement that no change
covered by . . . [Section 5] has been enforced without preclearance."  See 42 U.S.C. §
1973b(a)(1)(D).  Because Shelby County held special elections under the authority of the
Planning Act (i.e., "enforced" the Act) without first receiving preclearance, Shelby County
maintains that it is also ineligible for bailout pursuant to 42 U.S.C. § 1973b(a)(1)(D).

challenges the constitutionality of the 2006 reauthorization of Section 4(b)'s coverage formula, arguing that "Congress's reliance . . . on voting practices, voter registration data, and presidential election data from 1964, 1968, and 1972 as the trigger for the preclearance obligation of Section 5 is not an 'appropriate' means of enforcing the Fifteenth Amendment." Id. ¶ 42(a).  Because "Section 4(b)'s coverage formula is not 'sufficiently related to the problem that it targets,'" Shelby County maintains that Section 4(b), like Section 5, exceeds Congress's Fourteenth and Fifteenth Amendment enforcement authority, and violates the principle of equal sovereignty embodied in the Tenth Amendment and Article IV.  Id. ¶ 43(c).

Shortly after filing its complaint, Shelby County filed a motion for summary judgment. Several civil rights groups and Shelby County residents responded by filing motions seeking to intervene as defendants, which the Court granted.  See 8/25/10 Order [Docket Entry 29]. Defendant and defendant-intervenors then asked the Court to deny Shelby County's summary judgment motion as premature, or, in the alternative, to grant limited discovery pursuant to Fed. R. Civ. P. 56(f).  Denying the request, this Court found that there was no need for discovery on any of the three issues upon which discovery was sought.  With respect to the first issue -- Shelby County's standing to sue -- the Court explained that no discovery was warranted since defendant "was unable to articulate any reason why a covered jurisdiction subject to Section 5's preclearance requirement - such as Shelby County - would lack standing to bring this type of action."  Shelby Cnty. v. Holder, 270 F.R.D. 16, 18 (D.D.C. 2010).  The Court next rejected defendant's contention that discovery was needed to determine whether Shelby County was, in fact, eligible for bailout, since Shelby County did not seek bailout.  Id. at 19.  Finally, the Court held that there was no need for discovery on Shelby County's constitutional challenge because it

was purely facial -- not "as applied" -- and it therefore must "rise or fall on the record that

Congress created when it extended [the Voting Rights Act's temporary provisions] in 2006." Id.

at 21.  Accordingly, the Court set a schedule for the filing of dispositive motions, which

generated over 1,000 pages of briefs and exhibits and culminated in a lengthy motions hearing on

February 2, 2011.

* * * * *

This Court does not write on a clean slate in assessing plaintiff's facial constitutional

challenge to the 2006 reauthorization of Section 5 and Section 4(b).  To date, one Supreme Court

Justice has declared that he would strike down Section 5 as an unconstitutional exercise of

Congress's Fifteenth Amendment enforcement power, see Nw. Austin II, 129 S. Ct. at 2517-27

(Thomas, J., concurring in judgment in part, dissenting in part), while several other Justices have

voiced concerns about the continued vitality of the Act's coverage formula, see, e.g., Nw. Austin

II Oral Arg. Tr. at 36 (Apr. 29, 2009) (Alito, J., asking, "[w]ouldn't you agree that there is [sic]

some oddities in this coverage formula"); id. at 22 (Kennedy, J., inquiring whether there is

"anything in the record" addressing whether "these States that are now covered . . . are markedly

different from the noncovered jurisdictions"), and about the apparent never-ending nature of the

preclearance obligation, which was originally intended to last only through 1970, but which is

now scheduled to last through 2032, id. at 32 (Roberts, C.J., stating with respect to Section 5, "at

some point it begins to look like the idea is that this is going to go on forever").  At the same

time, a three-judge panel of this Court, after undertaking an exhaustive review of the legislative

record, concluded that there was sufficient evidence of modern-day, intentional discrimination in

voting to justify Congress's 2006 reauthorization of the preclearance obligation on covered

-34-

jurisdictions for another 25 years.  See Nw. Austin I, 571 F. Supp. 2d at 221-83.  Keeping all

these views in mind, the Court will undertake its own assessment of the legislative record in

order to determine whether Congress exceeded its enforcement authority under the Fourteenth

and Fifteenth Amendments when it reauthorized Section 5 and Section 4(b) in 2006.

## DISCUSSION

I.      **Threshold Issues**

Three threshold issues are presented by this suit: (1) plaintiff's Article III standing; (2)

plaintiff's eligibility for bailout; and (3) the facial rather than as-applied nature of plaintiff's

claims.  These three issues were, to some extent, already addressed in the prior Memorandum

Opinion in this case.  See Shelby Cnty., 270 F.R.D. at 18-21.  Nevertheless, given the "'well-

established principle . . . that normally the Court will not decide a constitutional question if there

is some other ground upon which to dispose of the case,'" Nw. Austin II, 129 S. Ct. at 2513

(quoting Escambia Cnty. v. McMillan, 466 U.S. 48, 51 (1984)), the Court will briefly revisit each

of these issues to explain why none provides a valid basis for avoiding the merits of the facial

constitutional challenge raised here.

A.      Standing

To establish the "irreducible constitutional minimum of standing," a plaintiff must allege

(1) an "injury in fact" that is "(a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct

complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks and

citations omitted).  As a jurisdiction covered by Section 4(b), Shelby County maintains that it

must expend "significant taxpayer dollars, time, and energy to meet its obligations under Section 5 of the VRA."  Ellis Decl. ¶ 7.  Shelby County's expenditure of time and money to ensure compliance with Section 5 constitutes a "concrete and particularized" injury that is caused by the continued operation of the statute, and that would be redressed by a decision declaring Section 5 facially unconstitutional and permanently enjoining its enforcement.

The mere fact that Shelby County does not challenge any specific objection to one of its proposed electoral changes does not serve to render its claims "conjectural or hypothetical" for purposes of Article III.  See LaRoque v. Holder, --- F.3d ----, 2011 WL 2652441, at *10 (D.C. Cir. 2011) (noting that a plaintiff need only demonstrate a "'substantial probability' of imminent injury" to establish Article III standing to bring a facial constitutional challenge to Section 5). Because Shelby County is a jurisdiction subject to Section 5, it will be forced to expend resources obtaining preclearance for all of its future electoral changes, absent a decision from this Court granting its requested relief.[5]  Shelby County therefore has alleged an injury that is both "credible and immediate, and not merely abstract or speculative."  See Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C. Cir. 1997); see also Steffel v. Thompson, 415 U.S. 452, 459 (1974) (permitting plaintiff to challenge the legality of his potential arrest under a criminal trespass statute where the plaintiff alleged threats of prosecution that were neither imaginary nor speculative).  Accordingly, Shelby County has standing to pursue its facial constitutional challenges to Section 5 and Section 4(b).

---

[5]  In fact, Shelby County represented to the Court in July 2011 that it was in the process of completing its decennial redistricting plan, and that it would need to expend time and resources preparing a preclearance submission for the plan as early as last month, in the event that the Court denied its motion for summary judgment.  See Notice to the Court [Docket Entry 79].

B.      Bailout

Unlike the Texas municipal utility district in Nw. Austin, Shelby County has not framed

its constitutional challenge "as being 'in the alternative' to its statutory argument" for bailout.

Nw. Austin II, 129 S. Ct. at 2513.  Indeed, Shelby County has expressly chosen not to petition for

bailout, based on its determination that such a petition would be futile.  See Compl. ¶ 34.

Because Shelby County has not sought bailout under Section 4(a), a finding that Shelby County

was bailout-eligible would not obviate the need for this Court to assess the merits of Shelby

County's constitutional challenge, as was the case in Nw. Austin II.  The Supreme Court's finding

in Nw. Austin II that the plaintiff-district was eligible for bailout served to "afford [the plaintiff-

district] all the relief it s[ought]," see 129 S. Ct. at 2513; here, however, a determination that

Shelby County was eligible for bailout would only relieve Shelby County of its preclearance

obligation if defendant or this Court could somehow "force Shelby County to accept bailout,"

which, as defendant correctly concedes, cannot be done.  See Shelby Cnty., 270 F.R.D. at 19.[6]

_____

        [6]  Although the Court did not permit discovery into the question of Shelby County's
bailout-eligibility, it is clear -- based on undisputed facts in the record -- that Shelby County is
not eligible for bailout.  Under Section 4(a)(1)(E), a jurisdiction is only eligible for bailout if,
during the ten years preceding its bailout request, "the Attorney General has not interposed any
objection . . . with respect to any submission by or on behalf of the plaintiff or any governmental
unit within its territory." 42 U.S.C. § 1973b(a)(1)(E) (emphasis added).  The Attorney General
concedes that, in 2008, he interposed an objection to the proposed redistricting plan and
annexations submitted by the city of Calera, a "governmental unit" within Shelby County.
See Def.'s Mot. at 8; Berman Decl. ¶¶ 9-10.  As a result of this objection, Shelby County would
not be eligible for bailout under Section 4(a)(1)(E), even if -- like the Texas municipal utility
district in Nw. Austin II -- it had chosen to pursue such a course as an "alternative" to its facial
constitutional challenge.  Similarly, Shelby County concedes that it held several special elections
under the authority of Act 65-816 (the "Planning Act" of 1965) between 1965 and 2003.
See Compl. ¶ 34(a)(i)-(iii).  During that time, the Planning Act had not been precleared by the
Department of Justice.  Id. ¶ 34(a)(ii)-(iii).  Under Section 4(a), a covered jurisdiction is only
eligible for bailout if it has complied "with the requirement that no change covered by . . .
[Section 5] has been enforced without preclearance."  See 42 U.S.C. § 1973b(a)(1)(D).  Because

C.    The Facial Nature of Plaintiff's Challenge

Finally, it is important to remember that Shelby County's suit presents only a facial -- and not an as-applied -- challenge to the constitutionality of the 2006 reauthorization of Section 5 and Section 4(b).  The "distinction between 'as-applied' and 'facial' challenges is that the former ask only that the reviewing court declare the challenged statute or regulation unconstitutional on the facts of the particular case," Sanjour v. E.P.A., 56 F.3d 85, 92 n.10 (D.C. Cir. 1995), whereas the latter ask the court to conclude that "'no set of circumstances exists under which [the statute] would be valid,' or that the statute lacks any 'plainly legitimate sweep,'" United States v. Stevens, 130 S. Ct. 1577, 1587 (2010) (internal citations omitted).  When a plaintiff brings both a facial and an as-applied challenge to a statute, "the court must 'determine first whether the law is constitutional as applied to the challenging party's conduct, and then only if the as-applied challenge fails, . . . determine whether it is necessary to consider the facial challenge.'"  Heller v. Dist. of Columbia, 698 F. Supp. 2d 179, 188 n.10 (D.D.C. 2010) (internal citations omitted); see also Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 485 (1989) (explaining that "for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first").

Here, however, Shelby County has made clear that it is only seeking to challenge the constitutionality of Section 5 and Section 4(b) on their face, and not as they have been applied to Shelby County in any particular instance.  See, e.g., Compl. ¶ 1 (seeking a declaratory judgment that Section 4(b) and Section 5 "are facially unconstitutional") (emphasis added); Pl.'s Mot. at 17

---

Shelby County held special elections under the authority of the Planning Act, Shelby County is also ineligible for bailout under 42 U.S.C. § 1973b(a)(1)(D).

n.2 (describing plaintiff's challenge as facial); Shelby Cnty., 270 F.R.D. at 19 (finding that

discovery was "unwarranted" because "Shelby County brings only a facial challenge").  Because

Shelby County has chosen not to raise an as-applied challenge -- and indeed, has explicitly

waived its right to bring such a challenge, see Shelby Cnty., 270 F.R.D. at 19 -- the Court's

consideration of Shelby County's facial challenge is not premature.  See Stevens, 130 S. Ct. at

1587 n.3 (rejecting contention that the Court's consideration of a facial constitutional challenge

was "premature" where "the constitutional argument [wa]s a general one" and there was no

"separate attack on a defined subset of the statute's applications").

## II.    Standard of Review

The Court must first determine the appropriate standard of review to use in evaluating

whether Congress exceeded its enforcement authority under the Fourteenth and Fifteenth

Amendments when it reauthorized Section 5 and Section 4(b) in 2006.[7]  The Attorney General,

relying on cases in which the Supreme Court has previously assessed the constitutionality of

Section 5, argues that "when Congress is legislatively enforcing the Fifteenth Amendment's

prohibition on race discrimination with respect to voting, the Court reviews the appropriateness

of that legislation under a deferential rationality standard."  See Def.'s Mot. at 12 (citing

---

[7]  In addition to challenging the 2006 reauthorization of Section 5 and Section 4(b) as
exceeding Congress's Fourteenth and Fifteenth Amendment enforcement authority, Shelby
County argues that Section 5 and Section 4(b) impermissibly intrude on state sovereignty in
violation of the Tenth Amendment and Article IV of the Constitution.  See Compl. ¶¶ 39, 41, 43.
The Supreme Court, however, has repeatedly rejected such federalism-based challenges to
Section 5, recognizing that the Reconstruction Amendments "were specifically designed as an
expansion of federal power and an intrusion on state sovereignty."  See City of Rome, 446 U.S.
at 179; see also Lopez v. Monterey Cnty., 525 U.S. 266, 282 (1999) (noting that "the
Reconstruction Amendments by their nature contemplate some intrusion into areas traditionally
reserved to the States").  To the extent that Section 5 and Section 4(b) constitute "appropriate"
remedial enforcement legislation, then, their encroachment on state sovereignty is permissible.

Katzenbach, 383 U.S. at 324; City of Rome, 446 U.S. at 175-77; Georgia v. United States, 411

U.S. 526, 535 (1973); Lopez, 525 U.S. at 282-85).  Shelby County, on the other hand, urges this

Court to apply the "congruence and proportionality" framework first articulated by the Supreme

Court in City of Boerne v. Flores, 521 U.S. at 520, to assess legislation enacted pursuant to § 5 of

the Fourteenth Amendment, asserting that Boerne "applies just the same in Fifteenth Amendment

cases" because "[t]he enforcement clauses of the Fourteenth and Fifteenth Amendments are co-

extensive."  See Pl.'s Mot. at 19; see also Pl.'s Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s

Reply") at 2 (explaining that "[t]he Supreme Court has made clear that all enforcement

legislation is subject to congruence and proportionality review, and it has specifically relied on

the voting rights cases in adopting and applying this test").

     The parties in Nw. Austin engaged in the same dispute regarding the proper standard of

review to apply in assessing the constitutionality of Section 5.  See Nw. Austin II, 129 S. Ct. at

2512.  Although the Supreme Court ultimately declined to resolve the issue, see id.; but see id. at

2524-25 (Thomas, J., concurring in judgment in part, dissenting in part) (suggesting that

Boerne provides the framework for reviewing the constitutionality of Section 5), the three-judge

court below held that "Katzenbach's rationality standard governs this case," Nw. Austin I, 573 F.

Supp. 2d at 241.

     That court described Katzenbach's "rationality standard" and Boerne's "congruence and

proportionality test" as "two distinct standards for evaluating the constitutionality of laws

enforcing the Civil War Amendments."  573 F. Supp. 2d at 235-36.  After summarizing what it

characterized as "these two lines of cases," the court said that "the time has come to choose

between them."  573 F. Supp. 2d at 241.  The court ultimately "chose" Katzenbach for two

reasons (although it went on to find that Section 5 passed muster under both <u>Katzenbach</u> and the congruence and proportionality framework outlined in <u>Boerne</u>).  First, the court noted that <u>City of Rome</u>, which had "applied <u>Katzenbach</u>'s rationality test," constituted controlling precedent directly on point.  <u>Id.</u>  Although <u>City of Rome</u> pre-dates <u>Boerne</u>, the <u>Nw. Austin I</u> panel reasoned that because neither <u>Boerne</u> nor any case since had questioned the standard of review utilized in <u>City of Rome</u>, that standard had not been overruled.  <u>See id.</u> at 242.  Hence, the court concluded that the type of review enunciated in <u>Katzenbach</u> and employed in <u>City of Rome</u> still governed the plaintiff's challenge to the 2006 extension of Section 5, even assuming that <u>Boerne</u> had "cast some doubt" on <u>Katzenbach</u> and <u>City of Rome</u>.  <u>Id.</u> at 246.  Second, the court pointed to the fact that <u>Boerne</u> involved a challenge to Congress's enforcement authority under § 5 of the Fourteenth Amendment, <u>id.</u> at 517, whereas <u>Katzenbach</u> and <u>City of Rome</u> involved challenges to Section 5, which, "at its core," constitutes legislation enacted under § 2 of the Fifteenth Amendment, <u>id.</u> at 243-44.  "Even if the <u>City of Boerne</u> cases changed the test for *all* statutes enacted pursuant to the Fourteenth Amendment," the court explained, "those cases leave the Fifteenth Amendment standard untouched."  <u>Id.</u> at 243.

This Court respectfully disagrees.  A close analysis of the Voting Rights Act cases, <u>Boerne</u>, and cases following <u>Boerne</u> reveals that the Supreme Court has not left the standard of review for Fifteenth Amendment enforcement legislation "untouched"; moreover, it has not established a "distinct standard" for evaluating Fourteenth Amendment enforcement legislation different from that traditionally employed in the Fifteenth Amendment context.  Rather, <u>Boerne</u> merely explicated and refined the one standard of review that has always been employed to assess legislation enacted pursuant to <u>both</u> the Fourteenth and Fifteenth Amendments.  <u>See</u>

Appellant's Br., <u>Nw. Austin II</u>, 2009 WL 453246, at *33 (Feb. 19, 2009) (explaining that "<u>Boerne</u>

and the cases following it do no more than elaborate and clarify the standard for reviewing

Congress's efforts to enforce the Reconstruction Amendments").  The question is not, then,

whether this Court, as "a district court bound by Supreme Court precedent," should follow

"<u>Katzenbach</u> and <u>City of Rome</u> even if . . . the <u>City of Boerne</u> cases cast some doubt on those

cases," <u>Nw. Austin I</u>, 573 F. Supp. 2d at 246.  If this Court viewed <u>Boerne</u> and its enunciation of

the congruence and proportionality test as merely "casting doubt" on <u>Katzenbach</u> and <u>City of

Rome</u>, it would, indeed, still be obligated to follow those earlier cases, and leave to the Supreme

Court "the prerogative of overruling its own decisions," <u>Rodriguez de Quijas v. Shearson/Am.

Express, Inc.</u>, 490 U.S. 477, 484 (1989).  Rather, the question is whether, given the <u>elaboration</u>

of the <u>Katzenbach</u> standard that was undertaken by the Supreme Court in <u>Boerne</u>, this Court

should nonetheless adhere to the standard as first articulated in <u>Katzenbach</u>, simply because the

<u>Boerne</u> elaboration occurred in the Fourteenth Amendment context, not the Fifteenth.  Such a

course would, in this Court's view, constitute a misunderstanding of <u>Boerne</u>.  This Court will

therefore review the Supreme Court's evolving descriptions of the nature of Congress's

enforcement powers under the Reconstruction Amendments, as explicated in <u>Katzenbach</u>,

<u>Boerne</u> and later cases, to show that <u>Boerne</u>'s congruence and proportionality framework reflects

a refined version of the same method of analysis utilized in <u>Katzenbach</u>, and hence provides the

appropriate standard of review to assess Shelby County's facial constitutional challenge to

Section 5 and Section 4(b).

A.    The "Virtually Identical" Enforcement Clauses of the Fourteenth and Fifteenth
       Amendments

Section 5 of the Fourteenth Amendment provides that "Congress shall have the power to

enforce, by appropriate legislation, the provisions of this article," U.S. Const. amend. XIV, § 5,

while § 2 of the Fifteenth Amendment states that "Congress shall have power to enforce this

article by appropriate legislation," U.S. Const. amend. XV, § 2.[8]  Given the nearly identical

language and similar origin of these two Reconstruction Amendments, there would seem to be

"no reason to treat the enforcement provision of the Fifteenth Amendment differently than the

identical provision of the Fourteenth Amendment, and the Supreme Court has not held to the

contrary."  Mixon v. State of Ohio, 193 F.3d 389, 399 (6th Cir. 1999); see also Hayden v. Pataki,

449 F.3d 305, 331 n.5 (2d Cir. 2006) (finding "no indication in Supreme Court precedent, or in

logic, that the Congress and the legislatures that enacted and ratified the Fourteenth and Fifteenth

Amendments intended that they be 'enforced' in different ways").

In fact, the Supreme Court has repeatedly emphasized -- both before, in, and after

Boerne -- that the nature of the enforcement power conferred by § 5 of the Fourteenth

Amendment is "virtually identical" to that conferred by § 2 of the Fifteenth Amendment.  See Bd.

of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 373 n.8 (2001); see also Boerne, 521 U.S. at

518 (comparing Congress's Fourteenth Amendment enforcement authority to its "parallel power

to enforce the provisions of the Fifteenth Amendment"); Katzenbach v. Morgan, 384 U.S. 641,

651 (1966) (explaining that "Section 2 of the Fifteenth Amendment grants Congress a similar

---

[8]  In this Opinion, the Court uses "Section 5" to refer to Section 5 of the Voting Rights
Act, and "§ 5" to refer to the enforcement clause of the Fourteenth Amendment.  Similarly, the
Court uses "Section 2" to refer to Section 2 of the Voting Rights Act, and § 2 to refer to the
enforcement clause of the Fifteenth Amendment.

power to [that of § 5 of the Fourteenth Amendment]," as both sections permit Congress to

"enforce by 'appropriate legislation' the provisions of that amendment"); Dep't of Human Res. v.

Hibbs, 538 U.S. 721, 742 n.1 (2003) (Scalia, J., dissenting) (noting that "Section 2 of the

Fifteenth Amendment is practically identical to § 5 of the Fourteenth Amendment"); Lopez, 525

U.S. at 294 n.6 (Thomas, J., dissenting) (explaining that while "City of Boerne involved the

Fourteenth Amendment enforcement power, we have always treated the nature of the

enforcement powers conferred by the Fourteenth and Fifteenth Amendments as coextensive");

City of Rome, 446 U.S. at 208 n.1 (Rehnquist, J., dissenting) (stating that "the nature of the

enforcement powers conferred by the Fourteenth and Fifteenth Amendments has always been

treated as coextensive").

     Hence, when the Supreme Court in Katzenbach first examined whether Congress's

enactment of the Voting Rights Act exceeded its power to "enforce" the Fifteenth Amendment

"by appropriate legislation," the Court looked for guidance to Ex Parte Virginia -- a case

involving Congress's parallel enforcement power under § 5 of the Fourteenth Amendment.  See

Katzenbach, 383 U.S. at 326-27 (citing Ex Parte Virginia, 100 U.S. 339, 345-46 (1879)).  In Ex

Parte Virginia, the Supreme Court assessed the nature of Congress's power under the

enforcement clauses of the Thirteenth and Fourteenth Amendments,[9] and explained that

"[w]hatever legislation is appropriate, that is, adapted to carry out the objects the amendments

have in view, whatever tends to enforce submission to the prohibitions they contain, and to

secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of

---

     [9] Section 1 of the Thirteenth Amendment abolishes slavery, and § 2 provides, in terms identical to those in § 2 of the Fifteenth Amendment, that "Congress shall have power to enforce this article by appropriate legislation."  See U.S. CONST. amend. XIII.

the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power." Ex Parte Virginia, 100 U.S. at 346.  Quoting this language, the Supreme Court in Katzenbach rejected the contention that § 2 of the Fifteenth Amendment permits Congress to "do no more than to forbid violations of the Fifteenth Amendment in general terms." 383 U.S. at 327.  Rather, the Court explained, § 2 of the Fifteenth Amendment -- like § 5 of the Fourteenth Amendment -- provides Congress with "full remedial powers" to enforce the Amendment by "appropriate" legislation; that is, to pass legislation to make the Amendment's protections "'fully effective.'"  See id. at 326 (quoting Ex Parte Virginia, 100 U.S. at 345).

According to the Court in Katzenbach, "[t]he basic test to be applied in a case involving s[ection] 2 of the Fifteenth Amendment" is the same as that to be applied "in all cases concerning the express powers of Congress with relation to the reserved powers of the States." Id.  As Chief Justice Marshall said in McCulloch v. Maryland: "'Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.'" Id. (quoting McCulloch v. Maryland, 4 Wheat. 316, 421 (1819)).

After setting forth Congress's Fifteenth Amendment enforcement authority in these broad terms, the Supreme Court in Katzenbach proceeded to engage in a careful analysis of whether Section 5 and Section 4(b) constituted "appropriate" enforcement legislation, as that word is defined in McCulloch v. Maryland and Ex Parte Virginia.  With respect to the coverage formula in Section 4(b), the Court acknowledged that Congress had confined the Act's most stringent remedies -- such as preclearance -- to "a small number of States and political subdivisions which in most instances were familiar to Congress by name." See Katzenbach, 383 U.S. at 328.  The

decision to target only certain sections of the country and not others was based on "evidence of actual voting discrimination" in these areas, and the Court found it "acceptable" for Congress to "limit its attention to the geographic areas where immediate action seemed necessary." Id. at 328-29. "Legislation need not deal with all phases of a problem in the same way," the Court explained, "so long as the distinctions drawn have some basis in practical experience." Id. at 331. Because the distinctions drawn by the coverage formula in Section 4(b) had such a basis, the Court found that the formula was "rational in both practice and theory." See id. at 330.

The Court also concluded that Section 5's preclearance requirement constituted a "permissibly decisive" response to the problem of states "contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." Id. at 335. Given the "voluminous" legislative record amassed by Congress during its consideration of the Act, id. at 308, which contained ample evidence of "obstructionist tactics" in covered jurisdictions, id. at 328, the Court noted that "Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself," thereby justifying the need for a prophylactic measure like Section 5, see id. at 334-35. The Court determined, then, on the basis of the evidence of voting discrimination in the record, that Congress had "exercised its powers under the Fifteenth Amendment in an appropriate manner" when it enacted Section 5 and Section 4(b). Id. at 324.

The same year that it decided Katzenbach, the Supreme Court had occasion to re-examine the nature of Congress's enforcement authority under § 5 of the Fourteenth Amendment, and in so doing made clear that the test for reviewing exercises of Congress's Fourteenth and Fifteenth

Amendment enforcement powers is the same.  See Katzenbach v. Morgan, 384 U.S. at 651.[10]  In

Katzenbach v. Morgan, the Supreme Court addressed a Fourteenth Amendment challenge to

Section 4(e) of the Voting Rights Act, which guaranteed the right to vote to persons educated in

Puerto Rico who satisfied certain educational criteria but who could not read or write English.

Registered voters in New York challenged Section 4(e) insofar as it forbid New York from

enforcing its state election laws, which made the ability to read and write English a precondition

to voting.  See id. at 643-45.  Rejecting this challenge, the Supreme Court explained that § 5 of

the Fourteenth Amendment is a "positive grant of legislative power," which permits Congress to

"enforce" the Amendment by enacting legislation to prevent state action even if that state action

would not otherwise be "prohibited by the provision of the Amendment that Congress sought to

enforce."  Id. at 648.  Because there was a "basis" upon which Congress could have found that

New York's application of its English literacy requirement to deny the right to vote to non-

English speakers educated in Puerto Rico "constituted invidious discrimination in violation of the

Equal Protection Clause," id. at 656, Congress was entitled to respond to this state-sponsored

discrimination by passing Section 4(e), even assuming that Section 4(e) would prevent some

applications of New York's state election law that did not, in and of themselves, violate the

substantive provisions of the Fourteenth Amendment, see id. at 648.

The Supreme Court in Katzenbach v. Morgan explained the nature of Congress's

Fourteenth Amendment enforcement power with reference to South Carolina v. Katzenbach,

noting that § 2 of the Fifteenth Amendment "grants Congress a similar power to enforce by

_____

[10]  The Court uses the shorthand "Katzenbach" to refer to Katzenbach v. South Carolina,
but employs the full case name for Katzenbach v. Morgan.

'appropriate legislation' the provisions of that amendment; and we recently held . . . that '[t]he basic test to be applied in a case involving s[ection] 2 of the Fifteenth Amendment is the same as in all cases concerning the express powers of Congress with relation to the reserved powers of the States'": namely, the test identified in McCulloch v. Maryland.  Id. at 651 (internal citations omitted).  Hence, the Court confirmed, the meaning of "appropriate," as stated in McCulloch v. Maryland and Ex Parte Virginia, governs Congress's enforcement authority under both § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment.  See id.

When the Supreme Court next addressed a facial challenge to the constitutionality of Section 5 in City of Rome, it again held that McCulloch v. Maryland and Ex Parte Virginia provide the basic framework for assessing whether legislation is "appropriate" under § 2 of the Fifteenth Amendment.  See City of Rome, 446 U.S. at 174-75.  The Court also elaborated on its discussion in Katzenbach v. Morgan by describing the precise nature of Congress's authority to "enforce" the Reconstruction Amendments.  According to the Court, "even if § 1 of the [Fifteenth] Amendment prohibits only purposeful discrimination," id. at 173, Congress may, under the authority vested in it by § 2, "prohibit state action that, though in itself not violative of § 1, perpetuates the effects of past discrimination," id. at 176.

As one scholar has pointed out, this "reference to 'past discrimination' suggests that Congress is authorized to prohibit [discriminatory] effects only if the Court believes it is reasonable to infer discriminatory *purposes* in the past."  Paul Winke, Why the Preclearance and Bailout Provisions of the Voting Rights Act Are Still a Constitutionally Proportional Remedy, 28 N.Y.U. Rev. L. & Soc. Change 69, 80 (2003).  In other words, City of Rome implies that Congress may exercise its § 2 enforcement powers by prohibiting electoral practices that do not

themselves violate § 1 of the Fifteenth Amendment only as a means of "attacking the perpetuation of earlier, purposeful racial discrimination."  See City of Rome, 446 U.S. at 177 (describing the Supreme Court's holding in Oregon v. Mitchell, 400 U.S. 112 (1970)) (emphasis added).  But City of Rome made clear that when Congress does legislate pursuant to § 2 of the Fifteenth Amendment in response to earlier, purposeful voting discrimination, such legislation need only be "'appropriate' as that term is defined in McCulloch v. Maryland and Ex Parte Virginia."  Id. at 177.  The Supreme Court in City of Rome thus framed the specific question before it as whether, in re-authorizing Section 5 in 1975, "Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact."  Id. (emphasis added).

To answer this question, the Court looked to the evidence upon which Congress had relied in deciding to reauthorize Section 5 in 1975.  See id. at 180-82.  The Court noted that Congress had given "careful consideration to the propriety of readopting § 5's preclearance requirement" and had considered evidence such as racial disparities in voter registration, the number of minority elected officials, and "the number and types of submissions made by covered jurisdictions and the number and nature of objections interposed by the Attorney General."  Id. at 181.  After considering such evidence, Congress "not only determined that § 5 should be extended for another seven years," but gave Section 5 a "ringing endorsement," explaining that Section 5 had been largely responsible for the increased minority political participation in the ten years since the Voting Rights Act's passage, and for ensuring that such progress was not "'destroyed through new procedures and techniques.'"  Id. (quoting H.R. Rep. 94-196, at 10-11).

Citing Congress's finding that Section 5 was "necessary to preserve the 'limited and fragile' achievements of the Act and to promote further amelioration of voting discrimination," the Court found that, based on the evidence in the congressional record, the 1975 extension of Section 5 "was plainly a constitutional method of enforcing the Fifteenth Amendment." Id. at 182.

> B.     *Boerne*'s Refinement of *Katzenbach* and *City of Rome*

Then came City of Boerne.  There, the Supreme Court addressed a challenge to the Religious Freedom Restoration Act ("RFRA"), a statute that Congress had enacted pursuant to § 5 of the Fourteenth Amendment, and which prohibited states from imposing a "substantial burden" on the free exercise of religion unless they could show that the burden was (1) in furtherance of a "compelling" governmental interest; and (2) the "least restrictive means" of furthering that interest.  521 U.S. at 515-16.  The Court in Boerne began its analysis of RFRA by quoting the familiar passage from Ex Parte Virginia on the meaning of "appropriate" § 5 enforcement legislation.  See id. at 517-18.  After noting that Ex Parte Virginia had only outlined "the scope of Congress' § 5 power in . . . broad terms," id. at 517, the Court proceeded to expand on these "broad terms" by confirming what Katzenbach v. Morgan and City of Rome had already made clear: namely, that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress's enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." Id. at 518.

But the Court in Boerne went on to explain that Congress's power under § 5 is not unlimited.  "Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause," the Court said, since Congress "has been given the power 'to enforce,'" but "not the power to determine what constitutes a constitutional violation." Id. at 519.  The

Court acknowledged that there is a fine line "between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law," and it explained that while Congress "must have wide latitude in determining where [the line] lies," ultimately it is for the Court to decide whether Congress has overstepped the bounds of its authority by attempting to "decree the substance of the Fourteenth Amendment's restrictions on the States." Id. at 519-20.  Hence, the Court concluded, in order for legislation to be upheld as a valid exercise of Congress's § 5 power, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Id.

But in making this statement, the Supreme Court in Boerne did not purport to overrule Katzenbach, nor did it seek to distinguish between the standards of review to be applied in the Fourteenth and Fifteenth Amendment enforcement contexts.  To the contrary, the Court cited Katzenbach as a paradigmatic example of a case that had "revolve[d] around the question whether § 5 legislation can be considered remedial," see Boerne, 521 U.S. at 525 (citing Katzenbach, 383 U.S. at 808) -- despite the fact that Katzenbach involved § 2 legislation, not § 5 legislation.  The Boerne Court also discussed Katzenbach v. Morgan and City of Rome in great detail, see, e.g., Boerne 521 U.S. at 527-28, 533, without providing any indication that it was departing from the method of analysis it had used to assess Congress's exercise of its Fourteenth and Fifteenth Amendment enforcement authority in those cases.  Instead, the Supreme Court in Boerne cited Katzenbach v. Morgan and City of Rome as illustrative of the principle that Congress may, consistent with § 5, enact "strong remedial and preventative measures to respond to the widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination." See Boerne, 521 U.S. at 526.  Because it had previously upheld

challenged provisions of the Voting Rights Act only on the basis of actual evidence of unconstitutional voting discrimination by states, see id. at 526-28, the Court found no reason to view its Voting Rights Act jurisprudence under § 2 of the Fifteenth Amendment as inconsistent with the pronouncement that "[t]he appropriateness of remedial measures must be considered in light of the evil presented," id. at 530 (citing Katzenbach, 383 U.S. at 308).

Applying this standard to RFRA, however, the Court decided that RFRA was "so out of proportion to a supposed remedial or preventative object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Boerne, 521 U.S. at 532.  In reaching this conclusion, the Court found a comparison between RFRA and the Voting Rights Act to be "instructive." Id. at 530.  Whereas the Voting Rights Act had been passed on the basis of an extensive legislative record replete with instances of state-sponsored voting discrimination in violation of the Fifteenth Amendment, RFRA's legislative record lacked "examples of modern instances of generally applicable laws passed because of religious bigotry." Id.  Indeed, the record contained no documented episodes of religious persecution that had occurred in the past 40 years. Id.  And unlike the Voting Rights Act -- which was limited both in terms of the "discrete class of laws" that it affected (voting laws) and in the states that it covered (those where "constitutional violations were most likely") -- RFRA's "[s]weeping coverage" displaced laws in every state, "of almost every description and regardless of subject matter." Id. at 532.  Finally, while Section 5 of the Voting Rights Act was enacted as a temporary provision, with a procedure by which jurisdictions could bail out of its requirements, RFRA had "no termination date or termination mechanism." Id. at 532-33.

The Supreme Court in Boerne made clear that a statute need not contain these kinds of

limiting features in order to be sustained as congruent and proportional § 5 legislation.  Id. at

533.  But it explained that where "a congressional enactment pervasively prohibits constitutional

state action in an effort to remedy or to prevent unconstitutional state action, limitations of this

kind tend to ensure Congress' means are proportionate to ends legitimate under § 5."  Id.

(emphasis added).  Given the lack of any such limitations in RFRA, together with the absence of

any recent documented instances of religious persecution in the legislative record, the Court in

Boerne held that "RFRA cannot be considered remedial, preventative legislation."  Id. at 532.

"Simply put, RFRA is not designed to identify and counteract state laws likely to be

unconstitutional because of their treatment of religion."  Id. at 534-35.

    After Boerne, the Supreme Court continued to refine the congruence and proportionality

framework in a series of cases addressing whether Congress had validly abrogated state

sovereign immunity pursuant to § 5 of the Fourteenth Amendment.  See Nw. Austin I, 573 F.

Supp. 2d at 240-41.  In the first of these cases, the Court struck down the Patent and Plant

Variety Protection Remedy Clarification Act, which subjected states to patent infringement suits,

on the ground that Congress had failed to identify any "pattern of patent infringement by the

States, let alone a pattern of constitutional violations" that could justify the Act as an appropriate

remedial measure under § 5.  See Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav.

Bank, 527 U.S. 627, 640 (1999).  Instead, Congress appeared to have enacted the legislation only

in "response to a handful of instances of state patent infringement that do not necessarily violate

the Constitution."  Id. at 645-46.  The Act also did not contain any of the "various limits that

Congress [had] imposed in its voting rights measures," which the Court deemed "particularly

incongruous in light of the scant support for the predicate unconstitutional conduct that Congress

intended to remedy." Id. at 647. Accordingly, given both the insufficient historical record of constitutional violations and the broad scope of the Act's coverage, the Court found "it clear that the Patent Remedy Act cannot be sustained under § 5 of the Fourteenth Amendment." Id.

The following year in Kimel v. Fla. Bd. of Regents, 528 U.S. 62 (2000), the Court similarly held that Congress's abrogation of state sovereign immunity in the Age Discrimination in Employment Act, which permitted suits for money damages against state employers alleged to have discriminated on the basis of age, exceeded Congress's authority under § 5. While reaffirming that "Congress' power 'to enforce' the [Fourteenth] Amendment includes the authority both to remedy and deter violations of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct" than that which the Amendment itself proscribes, 528 U.S. at 81, the Court nonetheless found that Congress had exceeded this enforcement power by failing to identify "any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation," id. at 88.

Then, in Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001), the Court again applied congruence and proportionality review to strike down § 5 enforcement legislation, finding that the provision of Title I of the Americans with Disabilities Act ("ADA") that permitted individuals to sue states for money damages exceeded Congress's Fourteenth Amendment enforcement authority. See 531 U.S. at 374. As in Boerne, the Supreme Court in Garrett compared the legislative record amassed by Congress in support of the ADA with that considered by Congress in enacting the Voting Rights Act. Whereas Congress in passing the Voting Rights Act had documented "a marked pattern of unconstitutional action by the States," id., Congress in enacting the ADA had cited only "half a dozen examples" of state-sponsored

discrimination against the disabled, id. at 369.  These incidents fell "far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based."  Id. at 370. The Court also contrasted the ADA's sweeping nation-wide mandate "for the elimination of discrimination against individuals with disabilities" with the Voting Rights Act's more "limited remedial scheme designed to guarantee meaningful enforcement of the Fifteenth Amendment in those areas of the Nation where abundant evidence of States' systematic denial of those rights was identified."  Id. at 373 (internal quotation marks and citation omitted).  This comparison of the ADA to the Voting Rights Act made clear "[t]he ADA's constitutional shortcomings." Id.

But after using congruence and proportionality review to strike down four separate pieces of § 5 enforcement legislation, the Court most recently held that two statutes enacted pursuant to Congress's Fourteenth Amendment enforcement authority were, in fact, congruent and proportional.  See Hibbs, 538 U.S. at 724; Tennessee v. Lane, 541 U.S. 509, 533-34 (2004).  In Hibbs, the Court upheld the constitutionality of the family-care provision of the Family and Medical Leave Act ("FMLA"), and in Lane the Court found that Title II of the ADA -- as applied to claims by the disabled alleging that they had been denied access to the courts because of their disability -- constituted a valid exercise of Congress's § 5 enforcement power.  See Hibbs, 538 U.S. at 724; Lane, 541 U.S. at 533-34.  Significantly, both statutes sought to protect a class or right that receives heightened judicial scrutiny: namely, "suspect gender classifications (the FMLA) and the fundamental right of access to the courts (ADA Title II)."  See Nw. Austin I, 573 F. Supp. 2d at 241.  As a result, "'it was easier for Congress to show a pattern of state constitutional violations' than in Garrett or Kimel, both of which concerned legislation that targeted classifications subject to rational-basis review."  Lane, 541 U.S. at 529 (quoting Hibbs,

538 U.S. at 736).  Given the nature of the classification at issue, the Court in Hibbs compared the

showing needed to uphold the FMLA to that necessary to sustain the Voting Rights Act.

Congress was "similarly successful" in demonstrating a pattern of unconstitutional conduct in the

voting rights context, the Hibbs Court explained, because racial classifications, like gender

classifications, "are presumptively invalid," so "most of the States' acts of race discrimination

violated the Fourteenth Amendment."  Hibbs, 538 U.S. at 736.

After Hibbs, Lane, and the other cases that have applied and clarified Boerne, it is now

clear that the standard for reviewing Congress's enactment of remedial, prophylactic legislation

under § 5 of the Fourteenth Amendment involves three steps.  See Nw. Austin I, 573 F. Supp. 2d

at 268-69.  First, the court must "identify the constitutional right or rights that Congress sought to

enforce" when it enacted the challenged legislation.  Lane, 541 U.S. at 522; see also Garrett, 531

U.S. at 365 (explaining that the court must "identify with some precision the scope of the

constitutional right at issue"); Fla. Prepaid, 527 U.S. at 652 (noting that "the first step of the

inquiry . . . is to determine what injury Congress sought to prevent or remedy with the relevant

legislation").  Second, it must "examine whether Congress identified a history and pattern of

unconstitutional [conduct] by the States" that justified the enactment of the remedial measure.

Garrett, 531 U.S. at 368.  Finally, the court must decide whether the challenged legislation

constitutes "an appropriate response" to the identified "history and pattern" of unconstitutional

conduct, Lane, 541 U.S. at 530 -- in other words, whether is it "congruent and proportional to the

targeted violation," Garrett, 531 U.S. at 374; Hibbs, 538 U.S. at 737.

C.       *Boerne* Governs Challenges to Congress's Enforcement Power Under Both § 2 of
         the Fifteenth Amendment and § 5 of the Fourteenth Amendment

The only remaining question, then, is whether, notwithstanding the Court's articulation

and refinement of the congruence and proportionality framework in the context of challenges to

Congress's enforcement power under § 5 of the Fourteenth Amendment, a different standard of

review nonetheless governs Congress's exercise of its "parallel power" to enforce § 2 of the

Fifteenth Amendment.  Although Boerne and "the cases that define the limits of Congress's

enforcement power have focused primarily on that power as granted by Section 5 of the

Fourteenth Amendment," this Court agrees with the Second Circuit's determination that there is

"no significant reason to conclude that the scope of the enforcement power under the two

amendments is different."  See Hayden, 449 F.3d at 331 n.5.

To begin with, the language of the enforcement clauses of the Fourteenth and Fifteenth

Amendments is almost identical, as they both reference Congress's ability to enforce the

Amendment through the enactment of "appropriate" legislation.  See id.; compare U.S. CONST.

amend. XIV, § 5 ("Congress shall have the power to enforce, by appropriate legislation, the

provisions of this article") with U.S. CONST. amend. XV, § 2 ("Congress shall have power to

enforce this article by appropriate legislation").  Moreover, the two amendments have similar

origins and histories.  See, e.g., Pamela S. Karlan, Two Section Twos and Two Section Fives:

Voting Rights and Remedies After Flores, 39 WM. & MARY L. REV. 725, 725 n.5 (1998)

(explaining that "because the two amendments are rough contemporaries and their enforcement

power provisions are articulated in similar terms, the [Boerne] analysis surely carries over" to the

Fifteenth Amendment context).  And perhaps most importantly, the Supreme Court has expressly

"equated Congress's enforcement power under the two amendments" on a number of occasions, both before and after Boerne.  See Hayden, 449 F.3d at 331 n.5 (citing Garrett, 531 U.S. at 373 n.8; Boerne, 521 U.S. at 517-18; Katzenbach v. Morgan, 384 U.S. at 650-51).

Far from implying that the Fourteenth and Fifteenth Amendments were intended to be "'enforced' in different ways," Hayden, 449 F.3d at 331 n.5, Boerne itself is also best read to mean that the nature of Congress's enforcement powers under the two amendments is the same. In Boerne, the Supreme Court relied on the Voting Rights Act as upheld in Katzenbach and City of Rome as a paradigmatic example of legislation that satisfies the congruence and proportionality test, contrasting the Voting Rights Act with RFRA in order to illustrate RFRA's constitutional deficiencies.  See, e.g., 521 U.S. at 518, 525-26, 530-33.  Shelby County is correct to point out that Boerne's repeated reliance on Katzenbach and City of Rome -- both of which were decided under § 2 of the Fifteenth Amendment -- would be "misplaced," see Pl.'s Mot. at 19, to say the least, if § 5 enforcement legislation "were to be judged against an entirely different constitutional metric" than that applicable to § 2 enforcement legislation, see Pl.'s Reply at 12; see also Evan Caminker, "Appropriate" Means-Ends Constraints on Section 5 Powers, 53 STAN. L. REV. 1127, 1191 (2001) (stating that Boerne "strongly suggests that Section 2 measures designed to enforce the Fifteenth Amendment are subject to stringent congruence and proportionality analysis as well"); Mark A. Posner, Time is Still On its Side: Why Congressional Reauthorization of Section 5 of the Voting Rights Act Represents a Congruent and Proportional Response to Our Nation's History of Discrimination in Voting, 10 N.Y.U. J. LEGIS. & PUB. POL'Y 51, 89 (2006) (noting that Boerne "strongly intimated that the same analysis applies when assessing Congress's authority under the two amendments to enact prophylactic legislation").

Boerne's characterization of Katzenbach as a case that "revolve[d] around the question whether § 5 legislation can be considered remedial," see Boerne, 521 U.S. at 525 (emphasis added), also cannot be reconciled with the contention that different modes of analysis govern judicial review of § 5 and § 2 enforcement legislation.  Again, this is because the Court in Katzenbach upheld the challenged provisions of the Voting Rights Act not as a valid exercise of Congress's power under § 5 of the Fourteenth Amendment, but as "a valid means of carrying out the commands of the Fifteenth Amendment." Katzenbach, 383 U.S. at 337.  Indeed, the Supreme Court in Katzenbach never even mentioned § 5 of the Fourteenth Amendment.  To the extent that Katzenbach "revolve[d] around" the issue of what constitutes appropriate § 5 legislation, then, it could only be because the test for determining the validity of § 5 legislation is the same as that for determining the validity of § 2 legislation.

It is also significant that the Supreme Court in Boerne did not purport to overrule Katzenbach v. Morgan, or the half-century of precedent that has treated the nature of the enforcement power conferred by the Fourteenth and Fifteenth Amendments as coextensive. See Katzenbach v. Morgan, 384 U.S. at 651 (explaining that McCulloch v. Maryland and Ex Parte Virginia provide the definition of what constitutes "appropriate" enforcement legislation in both the Fifteenth and Fourteenth Amendment contexts).  The Supreme Court in Boerne began its analysis by quoting Katzenbach v. Morgan's acknowledgment that "§ 5 is 'a positive grant of legislative power.'"  Boerne, 521 U.S. at 517 (quoting Katzenbach v. Morgan, 384 U.S. at 651). And it then recited the traditional articulation of "the scope of Congress' § 5 power" as laid out in Ex Parte Virginia, thereby suggesting that the congruence and proportionality framework was a mere elaboration of those "broad terms."  See Boerne, 521 U.S. at 517-18.

Under Katzenbach and City of Rome, Ex Parte Virginia's definition of "appropriate"
legislation under the Thirteenth and Fourteenth Amendments also governs what constitutes
"appropriate" legislation under the Fifteenth Amendment.  See Katzenbach, 383 U.S. at 326; City
of Rome, 446 U.S. at 174-75.  Hence, the Supreme Court's elaboration of Ex Parte Virginia in
Boerne would seem to apply just the same in the Fifteenth Amendment context, at least in the
absence of any indication that Katzenbach and City of Rome were incorrect to rely on a § 5 case
in delineating the scope of Congress's § 2 power.  But the Supreme Court in Boerne gave no such
indication.  In fact, it suggested just the opposite, by itself relying almost exclusively on § 2 cases
in delineating the scope of Congress's § 5 power.  See Karlan, 39 Wm. & Mary L. Rev. at 725
n.5 (noting that "most of the cases Justice Kennedy cited relied on Congress's use of its
enforcement power under Section 2 of the Fifteenth Amendment").

The Supreme Court's failure in Boerne to announce any departure from Katzenbach and
City of Rome can be explained by the fact that the congruence and proportionality test does not
constitute a novel alternative to the standard of review employed in those earlier cases; rather, it
reflects a more detailed articulation of the same standard that the Court has always applied to
assess Congress's exercise of its Fifteenth Amendment enforcement power.  In Katzenbach, the
Court began with the first step of the Boerne framework, determining "what injury Congress
sought to prevent or remedy" when it enacted the challenged provisions of the Voting Rights Act.
Fla. Prepaid, 527 U.S. at 652; see Katzenbach, 383 U.S. at 308 (explaining that the Act was
designed "to banish the blight of racial discrimination in voting").  The Court then proceeded to
the second step of Boerne, looking to whether Congress had "identified a history and pattern of
unconstitutional [conduct] by the States," Garrett, 531 U.S. at 368.  In so doing, the Supreme

Court made clear that the "constitutional propriety" of the Act "must be judged with reference to the historical experience it reflects," Katzenbach, 383 U.S. at 308, and it pointed to historical evidence of state-sponsored voting discrimination in the legislative record to justify the need for the Act, id. at 310 (describing states' use of tests and devices that were "specifically designed to prevent Negroes from voting").  Although the Court in Katzenbach did not use the words "congruent" and "proportional" when assessing the challenged provisions of the Act, it did closely analyze whether Section 5 and Section 4(b) constituted "an appropriate response" to the "history and pattern" of unconstitutional voting discrimination that Congress had identified, see Lane, 541 U.S. at 530.  So, too, did the Court in City of Rome engage in a Boerne-like analysis, upholding the 1975 reauthorization of Section 5 only after describing the evidence of voting discrimination upon which Congress had relied in reauthorizing the Act's temporary provisions. See City of Rome, 446 U.S. at 182 (finding that "at least another 7 years of statutory remedies" was "necessary to counter the perpetuation of 95 years of pervasive voting discrimination").

To the extent that the analysis undertaken in Katzenbach and City of Rome was somewhat less rigorous than that applied in cases since Boerne, that may only be a reflection of the fact that where a remedial statute is designed to protect a fundamental right or to prevent discrimination based on a suspect classification, it is "easier for Congress to show a pattern of state constitutional violations," as required at the second step of Boerne.  See Hibbs, 538 U.S. at 736; Lane, 541 U.S. at 529.  Because Section 5 seeks to protect the right to vote -- a "fundamental political right," Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) -- and to prohibit discrimination based on race -- an "immediately suspect" classification, see Johnson v. California, 543 U.S. 499, 509 (2005) -- the showing needed to substantiate Section 5 was easier

to make in Katzenbach and City of Rome than in Kimel or Garrett, which involved

classifications subject to less stringent levels of constitutional scrutiny.  See Nw. Austin I, 573 F.

Supp. 2d at 241.

The Attorney General relies heavily on Lopez, a Section 5 case decided shortly after

Boerne, in arguing that congruence and proportionality review does not govern Shelby County's

challenge to the constitutionality of Section 5.  See Def.'s Reply in Supp. of Def.'s Mot. for

Summ. J. [Docket Entry 67] at 6.  But such reliance is unwarranted.  In Lopez, the Supreme

Court examined an as-applied challenge to Section 5 brought by Monterey County, California, a

political subdivision covered by Section 4(b).  See Lopez, 525 U.S. at 282.  Monterey County

alleged that Section 5 did not apply to its implementation of a voting change required by state

law, since enactment of the change was non-discretionary and California -- the source of the

change -- was not itself a covered jurisdiction subject to Section 5.  Id.  Rejecting this argument,

the Court held that "the Act's preclearance requirements apply to measures mandated by a

noncovered State to the extent that these measures will effect a voting change in a covered

county." Id. at 269.  The Court then briefly addressed the plaintiff's contention that Section 5 was

unconstitutional to the extent that it was interpreted to apply "to voting measures enacted by

States that have not been designated as historical wrongdoers in the voting rights sphere." Id. at

283.  Citing Katzenbach and City of Rome, the Court explained that it had previously upheld

Section 5 as a valid exercise of Congress's Fifteenth Amendment enforcement authority -- despite

its "intrusion into areas traditionally reserved to the States" -- and that no different result was

required just because Section 5 "is held to cover acts initiated by non-covered States." Id.  The

Court then referenced Boerne as having held that Congress may, under the Fourteenth

Amendment, "'intrude[] into legislative spheres of autonomy previously reserved to the States.'" Id. (quoting Boerne, 521 U.S. at 518).  Nowhere in Lopez did the Supreme Court mention either "congruence and proportionality" or "rational basis" review, or purport to apply either standard to Section 5.  To the extent that Lopez cuts in either direction, then, the Court regards it as reaffirming that Katzenbach, City of Rome, and Boerne are consistent in their evolving descriptions of Congress's enforcement power under the Fourteenth and Fifteenth Amendments.

Because the Court finds no basis upon which to differentiate between the standards of review to be applied in the Fourteenth and Fifteenth Amendment enforcement contexts, it need not decide whether the 2006 reauthorization of Section 5 and Section 4(b) constituted an exercise of Congress's Fourteenth or Fifteenth Amendment enforcement authority, or a kind of hybrid legislation enacted pursuant to both amendments.  Shelby County correctly points out that to date "[t]he Fifteenth Amendment has been the exclusive basis for upholding Section 5."  See Pl.'s Reply at 47, 49 n.15; see also City of Rome, 446 U.S. at 173; Katzenbach, 383 U.S. at 327; Allen, 393 U.S. at 588 (Harlan, J., concurring in part, dissenting in part) (explaining that "Congress consciously refused to base s[ection] 5 of the Voting Rights Act on its powers under the Fourteenth Amendment").  But in adopting the Act's protections for language minorities in 1975 and then extending them in 2006, Congress expressly relied on its Fourteenth Amendment enforcement power as well, since the Fifteenth Amendment speaks only of discrimination on the basis of "race."  See Nw. Austin I, 573 F. Supp. 2d at 243-44; see also S. Rep. No. 94-295, at 814-15 (1975) (explaining that "[t]he Fourteenth Amendment is added as a constitutional basis for these voting rights amendments" in order to "doubly insure the constitutional basis for the Act," even though the Department of Justice has taken the position that "'language minorities' are

members of a 'race or color' group protected under the Fifteenth Amendment"); 42 U.S.C. §

1973aa-1a (finding that, because "citizens of language minorities have been effectively excluded

from participation in the electoral process," it is necessary to prescribe remedial measures "to

enforce the guarantees of the fourteenth and fifteenth amendments").

Some have argued that this reliance on the Fourteenth Amendment was unnecessary, and

that Congress "could have relied solely on its Fifteenth Amendment authority" in extending the

Act's protections to language minorities, since the Supreme Court has "strongly suggested" that

language minorities "qualify as racial groups" within the meaning of the Fifteenth Amendment.

See, e.g., Nw. Austin I, 573 F. Supp. 2d at 243-44.  Regardless, there are additional reasons to

question whether Section 5 can still be viewed as pure Fifteenth Amendment enforcement

legislation.  Section 5 is designed to combat not only outright denials of the right to vote, but also

vote dilution -- "defined as a regime that denies to minority voters the same opportunity to

participate in the political process and to elect representatives of their choice that majority voters

enjoy."  Bossier II, 528 U.S. at 359 (Souter, J., concurring in part, dissenting in part).  Although

there is an argument that measures that dilute minorities' voting strength violate the Fifteenth

Amendment's guarantee against "abridgment" of the right to vote, see id., the Supreme Court thus

far has "dealt with vote dilution only under the Fourteenth Amendment," id., and has "never held

that vote dilution violates the Fifteenth Amendment," Bossier II, 528 U.S. at 334 n.3.  To the

extent that the Attorney General seeks to rely on evidence of vote dilution to justify the 2006

reauthorization of Section 5, then, it might be necessary to find that Section 5 constitutes valid

Fourteenth Amendment -- as opposed to Fifteenth Amendment -- enforcement legislation.  But

again, this issue need not be decided, in light of the Court's conclusion that Boerne provides the

proper mode of analysis to assess challenges to Congress's enforcement power under both § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment.  Hence, irrespective of whether Section 5 is considered § 2 enforcement legislation, § 5 enforcement legislation,[11] or a kind of hybrid legislation enacted pursuant to both amendments, it can only be upheld if it is "congruent and proportional" to the problem of unconstitutional racial discrimination in voting.

**III.    Application of <u>Boerne</u> to the 2006 Extension of Section 5**

    A.    <u>The Scope of the Constitutional Right At Issue</u>

The first step in determining whether the 2006 extension of Section 5 passes muster under <u>Boerne</u> is "to identify with some precision the scope of the constitutional right at issue." <u>See</u> <u>Garrett</u>, 531 U.S. at 365; <u>see also</u> <u>Lane</u>, 541 U.S. at 522.  Where a statute is designed to protect a fundamental right or to prevent discrimination based on a suspect classification, it is "easier for Congress to show a pattern of state constitutional violations," as required at the second step of the <u>Boerne</u> analysis.  <u>See</u> <u>Hibbs</u>, 538 U.S. at 736.  In other words, Congress is more likely to be able to identify unconstitutional state action justifying remedial, prophylactic enforcement legislation when it seeks to protect against discrimination based on a classification like gender, "which triggers heightened scrutiny," <u>see</u> <u>Hibbs</u>, 538 U.S. at 736, than when it seeks to protect against discrimination based on a trait such as disability, which "incurs only the minimum 'rational-basis' review," <u>see</u> <u>Garrett</u>, 531 U.S. at 366.  This is because "the heightened

---

    [11]  In <u>Hibbs</u>, the Supreme Court noted that it had previously upheld "certain prophylactic provisions of the Voting Rights Act as valid exercises of Congress' § 5 power, including the literacy test ban and preclearance requirements for changes in States' voting procedures."  <u>Hibbs</u>, 538 U.S. at 737-38.  In support of this proposition, however, the Supreme Court cited only one case that dealt with preclearance requirements, and that case -- <u>Katzenbach</u> -- upheld Section 5 as a valid exercise of Congress's § 2 power, not its § 5 power.  <u>See id.</u> (citing <u>Katzenbach v. Morgan</u>, 384 U.S. 641; <u>Oregon v. Mitchell</u>, 400 U.S. 112; <u>Katzenbach</u>, 383 U.S. 301).

level of constitutional scrutiny" that accompanies a suspect classification or a fundamental right means that "the historical problems" identified by Congress with respect to that class or right are more likely to amount to constitutional violations, and a history of constitutional violations is a necessary predicate for the enactment of remedial enforcement legislation under the Reconstruction Amendments.  See Posner, 10 N.Y.U. J. Legis. & Pub. Pol'y at 87.  It is for this reason that "the Court gives Congress significant leeway to craft broad remedial prohibitions when fundamental rights or protected classes are at stake." Nw. Austin I, 573 F. Supp. 2d at 270.

Significantly, Section 5 not only seeks to protect the right to vote -- a "fundamental political right, because [it is] preservative of all rights," Yick Wo, 118 U.S. at 370 -- but also seeks to protect against discrimination based on race, "the classification of which we have been the most suspect," see M.L.B. v. S.L.J., 519 U.S. 102, 135 (1996) (Thomas, J., dissenting). Because Section 5 is designed to protect "*both* the quintessential suspect classification (race) *and* the quintessential civil right (the franchise)," defendant-intervenors are correct that Congress acted at the "zenith of its constitutional enforcement authority" when it reauthorized Section 5 in 2006.  See Harris Def.-Ints.' Mot. for Summ. J. ("Harris Mot.") [Docket Entry 55] at 22; see also Nathaniel Persily, The Promise and Pitfalls of the New Voting Rights Act, 117 Yale L.J. 174, 176 (2007) (explaining that Congress "acted at the apex of its power to enforce the guarantees of the post-Civil War Amendments" when it enacted the Voting Rights Act).  Just as in Hibbs and Lane, then, it is "easier for Congress to show a pattern of state constitutional violations" justifying the need for Section 5 than when Congress seeks to enforce rights subject to lesser levels of constitutional review, since "racial classifications and restrictions on the right to vote - like gender discrimination (Hibbs) and access to the courts (Lane) - are 'presumptively invalid.'"

Nw. Austin I, 573 F. Supp. 2d at 270 (quoting Hibbs, 538 U.S. at 736).

      B.      Evidence of Unconstitutional Voting Discrimination in the Legislative Record

Having determined "the metes and bounds of the constitutional right[s] in question," the core issue is whether Congress succeeded in identifying "a history and pattern" of unconstitutional, state-sponsored voting discrimination to justify the 2006 reauthorization of Section 5.  See Garrett, 531 U.S. at 368.  Shelby County argues that the evidence of so-called "second generation barriers" to voting upon which Congress relied in 2006 when it re-authorized Section 5 -- including evidence of racially polarized voting, preclearance statistics, the continued filing of Section 2 cases, and the dispatch of federal observers -- cannot justify the extension of Section 5, since "none of this evidence comes close to proving the existence of pervasive, intentional discrimination."  See Pl.'s Mot. at 32.  Instead, Shelby County contends, there are only two types of evidence that can be used to establish the constitutional necessity of Section 5: "(1) direct evidence of widespread, intentional voting discrimination and gamesmanship; and (2) registration data, turnout statistics, and the election of minorities to public office."  Pl.'s Reply at 37 (emphasis added).  This argument is flawed in several respects.

To begin with, "[i]n identifying past evils, Congress obviously may avail itself of information from any probative source."  Katzenbach, 383 U.S. at 330.  To be sure, there must be an established "pattern of constitutional violations" in order to justify remedial, prophylactic legislation like Section 5, see Fla. Prepaid, 527 U.S. at 640, and discriminatory intent is a necessary element of a Fourteenth or Fifteenth Amendment violation, see, e.g., City of Mobile, 446 U.S. at 62, 67.  Shelby County is therefore correct that some evidence of purposeful state-sponsored voting discrimination is needed to sustain Section 5.  But Shelby County is incorrect

to suggest that such evidence must be "direct."  See Pl.'s Reply at 37.  To the contrary, the

Supreme Court has repeatedly recognized that unconstitutional "discriminatory intent need not be

proved by direct evidence."  See Rogers v. Lodge, 458 U.S. 613, 618 (1982) (emphasis added)

(citing Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 265 (1977); Washington

v. Davis, 426 U.S. 229, 242 (1976)).  Rather, "an invidious discriminatory purpose may often be

inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears

more heavily on one race than another."  Washington v. Davis, 426 U.S. at 242.  Moreover, as

the Supreme Court in Katzenbach made clear, Congress is not bound by the standards of proof

applicable in judicial proceedings "when it prescribes civil remedies against other organs of

government under s[ection] 2 of the Fifteenth Amendment."  See Katzenbach, 383 U.S. at 330.

Because the discriminatory effects of a challenged practice can constitute "powerful evidence of

the intent with which it was adopted or maintained," Continuing Need 186 (prepared statement of

Pamela S. Karlan), this Court would be remiss if it were to limit its examination of the legislative

record to judicially proven instances of discriminatory intent.

Shelby County's suggestion that circumstantial evidence of voting discrimination cannot

justify the 2006 reauthorization of Section 5 is also belied by City of Rome.  There, in upholding

the 1975 extension of Section 5, the Supreme Court pointed to no recent "direct" evidence of

intentional voting discrimination by covered jurisdictions.  Instead, it found that Section 5's

reauthorization was justified based on the country's history of intentional discrimination in

voting, together with more recent circumstantial evidence of continued voting discrimination,

which included evidence of racial disparities in voter registration and turnout, the number of

minority elected officials, and the nature and number of Section 5 objections.  See City of Rome,

446 U.S. at 181.  Clearly, then, such evidence is -- at the very least -- relevant in assessing

whether Section 5 remains "justified by current needs."  Nw. Austin II, 129 S. Ct. at 2512.

Not only is Shelby County incorrect to suggest that Section 5 can only be sustained on the

basis of recent "direct" evidence of intentional voting discrimination, but it is also wrong to

suggest that Congress lacked such evidence when it reauthorized Section 5 in 2006.  Having

examined the 2006 legislative record, this Court -- like the three-judge court in Nw. Austin I --

has found ample evidence of purposeful voting discrimination by covered jurisdictions.  The

record describes one instance in which Mississippi state legislators opposed a redistricting plan

that would have given African-Americans an increased opportunity to elect representatives of

their choice, referring to the plan "on the House floor as the 'black plan' and privately as 'the n-

plan.'"  S. Rep. No. 109-295, at 14.  On another occasion, Georgia's Chair of its House

Reapportionment Committee told his colleagues in the Georgia legislature that he was uncertain

as to the outcome of the state's redistricting process, "because the Justice Department is trying to

make us draw nigger districts and I don't want to draw nigger districts."  See Busbee v. Smith,

549 F. Supp. 494, 501 (D.D.C. 1982); see also H.R. Rep. No. 109-478, at 67; Voting Rights Act:

The Judicial Evolution of the Retrogression Standard, Hearing Before the Subcomm. on the

Constitution of the H. Comm. on the Judiciary, 109th Cong. 54 (Nov. 9, 2005) (prepared

statement of Laughlin McDonald).  In Shelby County's home state of Alabama, there were

reports of voting officials "closing the doors on African-American voters before the . . . voting

hours were over," see 1 Evidence of Continued Need 182 (Nat'l Comm'n Report), and of white

voting officials using racial epithets to describe African-American voters in the presence of

federal observers, see S. Rep. No. 109-295, at 130, 132.  In both Texas and South Carolina,

witnesses described various kinds of intimidation and harassment being directed at blacks at the polls, see 1 Evidence of Continued Need 138 (Nat'l Comm'n Report); S. Rep. No. 109-295, at 307, 311, while one witness from Virginia testified that "hate literature" had been distributed in his neighborhood, threatening to "lynch" African-Americans who voted in particular ways, see S. Rep. No. 109-295, at 355.  All these examples of intentional voting discrimination took place not in the 1950s or 1960s, but in the 1980s, 1990s, and 2000s.

Yet Shelby County argues that even this kind of evidence carries little weight, as it is merely "anecdotal" and such "anecdotal examples of intentional discrimination" cannot justify the continued operation of Section 5.  See Pl.'s Reply 39.  Again, this Court disagrees.  As Professor Theodore Arrington explained in his 2006 testimony before the Senate Judiciary Committee, "[t]he examination of specific cases cannot be dismissed as mere anecdotes," because "anecdote is the singular of data."  Continuing Need 26 (responses of Theodore S. Arrington to questions submitted by Senators Cornyn, Coburn, Leahy, Kennedy, and Kohl) ("Arrington Responses"); see also Understanding the Benefits and Costs of Section 5 Pre-Clearance, Hearing Before the S. Comm. on the Judiciary, 109th Cong. 19 (May 17, 2006) ("Benefits and Costs") (testimony of Drew S. Days III) (explaining that to characterize "examples that are quite concrete . . . violations of the Voting Rights Act . . . as anecdotes, I think, is really to miss the point" since these "so-called anecdotes go right to the very heart of the matter").  Taken together, the large collection of anecdotes in the legislative record constitutes a valid form of data that must be assessed and weighed -- not dismissed as "isolated examples" of voting discrimination, see Pl.'s Reply at 39.

Anecdotes are by no means the only form of data in the legislative record that shows the

continued existence of unconstitutional voting discrimination by covered jurisdictions.  One

study relied on by Congress found that 89% of the 209 objections to redistricting plans in the

1990s were based, at least in part, on discriminatory intent.  See Preclearance Standards 181

(Peyton McCrary et al., "The End of Preclearance As We Knew It: How the Supreme Court

Transformed Section 5 of the Voting Rights Act") (hereinafter, "McCrary Study").  In other

words, the Justice Department determined that discriminatory purpose was a motivating factor in

no less than 186 of the redistricting plans proposed by covered jurisdictions during the 1990s.  Id.

at 177, 181.  Another study in the legislative record identified 24 lawsuits involving more than

one hundred instances of intentionally discriminatory conduct in voting since 1982.  See Impact

and Effectiveness 986 (Katz Study).  Such evidence can hardly be dismissed as "anecdotal."

Ultimately, an assessment of all the evidence in the legislative record confirms that

Congress was, in fact, responding to what it reasonably perceived to be a continuing history and

pattern of unconstitutional conduct by covered jurisdictions when it reauthorized Section 5 in

2006.  Although some scholars voiced concern during the 2006 reauthorization hearings that "the

Act has been so effective it will be hard to produce enough evidence of *intentional*

*discrimination by the states* so as to justify the extraordinary preclearance remedy for another 25

years," see, e.g., Introduction to Expiring Provisions 216 (prepared statement of Richard L.

Hasen) ("Hasen Prepared Statement"); id. at 221 (prepared statement of Samuel Issacharoff)

("Issacharoff Prepared Statement"), Congress succeeded in doing just that.  Despite the marked

improvements in minority political participation over the last several decades -- due, in large

part, to the effectiveness of the Voting Rights Act -- the 2006 legislative record reveals that, just

as in 1975, "'a bleaker side of the picture yet exists.'"  City of Rome, 446 U.S. at 180 (internal

citations omitted).

This Court will begin, as did the three-judge court in <u>Nw. Austin I</u>, by examining the three types of evidence relied on by the Supreme Court in <u>City of Rome</u> when it upheld the 1975 reauthorization of Section 5 -- evidence of (1) racial disparities in voter registration (and turnout); (2) the number of minority elected officials; and (3) the nature and number of Section 5 objections.  The Court will then assess the other types of evidence cited by Congress when it reauthorized Section 5 in 2006, including evidence of (4) more information requests; (5) Section 5 preclearance suits; (6) Section 5 enforcement actions; (7) Section 2 litigation; (8) the dispatch of federal observers; (9) racially polarized voting; and (10) Section 5's deterrent effect.  In the course of its review, the Court will call particular attention to the evidence of intentional, state-sponsored voting discrimination contained in the legislative record, keeping in mind that there must be "a history and pattern of unconstitutional [conduct] by the States" to justify a remedial, prophylactic measure like Section 5.  <u>See</u> <u>Garrett</u>, 531 U.S. at 368.

### 1.    *Minority Voter Registration and Turnout*

Shelby County points to the "dramatic rise in African-American voter registration and turnout rates" since 1965 as evidence that Section 5's protections are no longer constitutionally justified.  <u>See</u> Pl.'s Reply at 44; <u>see also</u> Pl.'s Mot. at 25-26.  It is true that there has been a substantial increase in black voter registration and turnout in the South since the Voting Rights Act was first enacted.  <u>See</u> 1 <u>Evidence of Continued Need</u> 156-57 (Nat'l Comm'n Report).  In 1964, the year before the Act's passage, the black voter registration rate was only 32% in Louisiana, 23% in Alabama, and a meager 6.7% in Mississippi.  <u>Id.</u>  In each of these states, the white voter registration rate was at least 50 percentage points higher than the corresponding rate

for blacks.  See Katzenbach, 383 U.S. at 313.  Only ten years later, however, black voter registration rates in the South had already increased substantially -- no doubt as a result of the Act's prohibition of those tests and devices that had previously been employed to deny blacks access to the ballot.  See S. Rep. No. 94-295, at 779.  In Mississippi, for example, the percentage of blacks who were registered to vote multiplied almost tenfold in the seven years following the Act's passage, jumping from 6.7% in 1964 to 63.2% in 1971-1972.  Id.

But in spite of these significant improvements, the Supreme Court in City of Rome remained troubled by the "[s]ignificant disparity" that "persisted between the percentages of whites and Negroes registered in at least several of the covered jurisdictions."  446 U.S. at 180.  In 1975, black voter registration rates in Alabama, Louisiana, and North Carolina continued to lag behind those of whites by as much as 23.6, 16, and 17.8 percentage points, respectively.  See S. Rep. No. 94-295, at 779.  Hence, while "the City of Rome Court acknowledged the dramatic progress the South had made since 1965," it still "found the evidence of continued discrimination sufficient to justify the 1975 extension" of the Act's temporary provisions.  See Nw. Austin I, 573 F. Supp. 2d at 247.  After City of Rome, then, the question is not whether there has been substantial improvement in minority voter registration and turnout since the Act's passage in 1965 (or even since the Act's reauthorization in 1975 or 1982), but whether, in spite of this substantial improvement, there remained significant racial disparities in voter registration and turnout when Congress reauthorized Section 5 in 2006.  See id.

Just as in 1975, Congress in 2006 did find that significant disparities persisted between minority and non-minority voter registration and turnout in several jurisdictions subject to preclearance under Section 5.  In Virginia, for example, Congress reported that the black voter

-73-

registration rate in 2004 was almost 11 percentage points behind the corresponding rate for whites, while the racial disparity in voter turnout was even greater, with only 49% of blacks turning out to vote, as compared to 63% of whites.  See H.R. Rep. No. 109-478, at 25.  Similarly, in Texas, Congress found a 20 percentage point gap in voter registration between whites and Hispanics, id. at 29, with an even greater gap in voter turnout, see S. Rep. No. 109-295, at 11.  Nationwide, the 2004 voter registration and turnout rates for Hispanics were approximately half the corresponding rates for whites, with only 34.3% of Hispanics registering and 28% turning out to vote, as compared to 67.9% and 60.3% for whites.  Id.  Although the difference between black and white voter registration and turnout rates was less significant, blacks nationwide still registered and turned out to vote at rates below those of whites in 2004, with only 64.3% of blacks registering, and 56.1% of blacks turning out to vote.  Id.

Moreover, as the three-judge court in Nw. Austin I pointed out, these statistics understate the true disparities between minority and non-minority voter registration and turnout.  That is because in computing the voter registration and turnout rates for whites, Congress included Hispanics.  See Nw. Austin I, 573 F. Supp. 2d at 248.  Given the low registration and turnout rates of Hispanic voters, the inclusion of these voters in the "white" category served to lower the overall white voter registration and turnout rates reported by Congress, thereby reducing the true disparity between black and white voter registration and turnout (as well as the disparity between Hispanic and white voter registration and turnout).  See id.; see also Persily, 117 YALE L.J. at 197 (explaining that "once Hispanics are taken out of the white category the picture changes considerably").  For instance, Congress reported that in five of the 16 states covered in whole or in part by Section 4(b) (California, Georgia, Mississippi, North Carolina, and Texas), voter

registration and turnout in 2004 was <u>higher</u> among blacks than whites.  <u>See</u> S. Rep. No. 109-295,

at 11.  But when black voter registration and turnout rates are compared to the rates for <u>non-</u>

<u>Hispanic</u> whites, only one of these states (Mississippi) had higher black than white voter

registration and turnout in 2004.  <u>See</u> <u>Nw. Austin I</u>, 573 F. Supp. 2d at 248.  In each of the other

states covered in whole or in part by Section 4(b) for which comparative data was available,

voter registration was lower for blacks than for non-Hispanic whites.  <u>See</u> U.S. Census Bureau,

Voting and Registration in the Election of November 2004 tbl. 4a., Reported Voting and

Registration of the Total Voting-Age Population, by Sex, Race and Hispanic Origin, for States,

*available at* http://www.census.gov/population/www/socdemo/voting/cps2004.html (hereinafter,

"2004 U.S. Census Bureau Report") (last visited September 19, 2011); <u>see also</u> S. Rep. No. 109-

295, at 11 (relying on 2004 U.S. Census Bureau Report).[12]

     In many covered states, the disparities between black and non-Hispanic white voter

registration and turnout were stark: in both Arizona and Florida, for example, voter turnout rates

among non-Hispanic whites were more than 20 percentage points higher than voter turnout rates

among blacks, while in Louisiana and Texas, voter registration rates among non-Hispanic whites

were more than five percentage points higher than voter registration rates among blacks.  <u>See</u>

2004 U.S. Census Bureau Report.  When the data for non-Hispanic whites are used, the

disparities between black and white voter registration and turnout rates in Virginia become even

---

     [12]   In North Carolina and Alabama, for which the 2004 voter <u>registration</u> rate for blacks was lower than the rate for non-Hispanic whites, the voter <u>turnout</u> rate for blacks was higher than the rate for non-Hispanic whites.  <u>See</u> 2004 U.S. Census Bureau Report.  Aside from North Carolina, Alabama and Mississippi, all of the remaining 14 states covered in whole or in part by Section 4(b) had lower voter registration <u>and</u> turnout rates for blacks than for non-Hispanic whites.  <u>See</u> <u>id.</u>

more pronounced than those reported by Congress.  Whereas Congress found that Virginia had a 10.8 percentage point racial disparity in voter registration and a 14 percentage point racial disparity in voter turnout, see H.R. Rep. No. 109-478, at 25, the racial disparities become 14.2 and 16.6 percentage points, respectively, when black voter registration and turnout rates are compared to the rates for non-Hispanic whites.  See 2004 U.S. Census Report.

The 2004 disparities between Hispanic and white voter registration also become more severe when Hispanics are taken out of the "white" category.  Although Congress reported a 20 percentage point gap in voter registration between Hispanics and whites in Texas in 2004, see H.R. Rep. 109-478, at 29, the gap increases to 32.1 percentage points when the rate for Hispanics is compared to the rate for non-Hispanic whites, see 2004 U.S. Census Report.  Even greater gaps between Hispanics and non-Hispanic whites existed in other covered jurisdictions, with Hispanics in Arizona, California and Virginia registering in 2004 at rates more than 40 percentage points lower than the corresponding rates for non-Hispanic whites.  See id.  In Georgia and North Carolina, the racial disparities in registration rates between Hispanics and non-Hispanic whites were the highest of any covered jurisdictions, with only 9.6% of Hispanics registering to vote in Georgia and 13.4% of Hispanics registering to vote in North Carolina, as compared to 68% and 73.2% of non-Hispanic whites, respectively -- in other words, there was almost a 60 percentage point gap in voter registration between Hispanics and non-Hispanic whites in both Georgia and North Carolina.  See id.

As the three-judge court in Nw. Austin I explained, these disparities in voter registration and turnout are "comparable to the disparity the City of Rome Court called 'significant.'"  573 F. Supp. 2d at 248 (quoting City of Rome, 446 U.S. at 180).  In City of Rome, the Court deemed as

"significant" the 16, 17.8, and 23.6 percentage point disparities in voter registration rates then-existing between blacks and whites in Louisiana, North Carolina, and Alabama.  See S. Rep. No. 94-295, at 779; City of Rome, 446 U.S. at 180.  In 2004, there were 14.2, 17.8, and 19.2 percentage point disparities between black and white voter registration rates in Virginia, Arizona, and Florida, respectively (using the data for non-Hispanic whites).  See 2004 U.S. Census Report.  Moreover, there were far greater gaps between Hispanic and non-Hispanic white voter registration rates than even those held "significant" in City of Rome, with disparities nearing 60 percentage points in two covered jurisdictions.  See id.

### 2.   *Minority Elected Officials*

Shelby County next points to the dramatic increase in the number of African-American elected officials since 1965 as proof that Section 5 has outlived its usefulness.  See Pl.'s Mot. at 27-28; Pl.'s Reply at 46-47.  Again, however, the number of African-American elected officials had already risen substantially by the time that Section 5 was reauthorized in 1975.  Whereas there were only 72 black elected officials in the 11 southern states when the Voting Rights Act was first passed in 1965, there were 963 black elected officials in the seven southern states subject to preclearance by 1974, including 68 black state legislators.  See S. Rep. No. 94-295, at 780.  Yet the Supreme Court in City of Rome did not regard this progress as fatal to the 1975 reauthorization of the Act's temporary provisions.  Although the Court recognized that "the number of Negro elected officials had increased since 1965," see City of Rome, 446 U.S. at 180, the Court nonetheless heeded Congress's advice "not to be misled by sheer numbers."  See S. Rep. No. 94-295, at 780.  Instead, it examined the nature of the positions to which African-Americans had been elected, and found that "most held only minor positions, none held statewide

office, and their number in the state legislatures fell far short of being representative of the number of Negroes residing in the covered jurisdictions." See City of Rome, 446 U.S. at 181.

As of 2000, 35 African-Americans held statewide office -- certainly an improvement from 1975 -- but the percentage of statewide elected officials who were African-American (5%) was still significantly below the African-American proportion of the voting-age population (11.9%). See 1 Evidence of Continued Need 156-58 (Nat'l Comm'n Report); H.R. Rep. No. 109-478, at 33. The House Committee on the Judiciary found that in Mississippi, Louisiana, and South Carolina -- all of which have been subject to preclearance since 1965 -- no African-American had ever been elected to statewide office. See H.R. Rep. No. 109-478, at 33. And in Alabama, only two African-Americans had ever been elected to statewide office as of 2006. See S. Rep. No. 109-295, at 133 (citing Benefits and Costs 97 (responses of Fred D. Gray to questions submitted by Senators Cornyn, Leahy, Coburn, and Kennedy) ("Gray Responses")).

Congress also heard evidence in 2006 that blacks were under-represented in state legislatures in the South based on their percentage of the population. Specifically, the House Committee on the Judiciary reported that in Alabama, Georgia, Louisiana, Mississippi, South Carolina, and North Carolina, blacks comprised 35% of the population, but only 20.7% of the state legislators. See H.R. Rep. 109-478, at 33. The House Committee on the Judiciary similarly found that the number of Latino elected officials had "failed to keep pace with [their] population growth." See id. at 33-34. Shelby County objects to the Court's reliance on such evidence in assessing the continued need for Section 5, arguing that "proportional representation is not a constitutional aim." See Pl.'s Reply at 46. That may be true. But in upholding the constitutionality of the 1975 reauthorization of Section 5 in City of Rome, the Supreme Court

noted that the percentage of black elected officials in covered jurisdictions still fell short of their

total percentage of the population.  See City of Rome, 446 U.S. at 181.  Following City of Rome,

then, it is at least relevant that the percentage of minority elected officials continued to lag behind

the minority percentage of the population when Congress reauthorized Section 5 in 2006.

   3.   *Section 5 Objections*

   The Supreme Court in City of Rome cited "'[t]he recent objections entered by the

Attorney General . . . to Section 5 submissions'" as a clear indication of the "'continuing need for

this preclearance mechanism.'"  446 U.S. at 181 (quoting H.R. Rep. No. 94-196, at 10-11).  So,

too, did Congress in 2006 point to the "hundreds of objections interposed" by the Attorney

General in recent years as "[e]vidence of continued discrimination in voting" that warranted the

reauthorization of Section 5.  See 2006 Amendments § 2(b)(4)(A), 120 Stat. at 577.  Shelby

County, however, argues that objection-related data cannot sustain the constitutionality of

Section 5 for two reasons.  First, Shelby County points to the fact that the number of Section 5

objections "has become exceedingly small" over the past several decades, as the Attorney

General objected to less than 1% of all preclearance submissions between 1982 and 2004.  See

Pl.'s Reply at 56 (internal citations omitted).  Second, Shelby County contends that objections are

not "legitimate proxies for the type of purposeful discrimination needed to reauthorize Section

5."  Pl.'s Mot. at 32.  Both of these contentions are somewhat misleading.

   With respect to Shelby County's first argument, it is undeniable that the percentage of

preclearance submissions resulting in an objection -- which has always been low -- has continued

to decline steadily over time.  See 1 Evidence of Continued Need 197 (Nat'l Comm'n Report).

Whereas the Justice Department objected to 4.06% of all preclearance submissions from 1968 to

1972, the objection rate dropped in each successive five-year interval between 1972 and 2002,

reaching a low of .05% during the 1998 to 2002 time-frame.  See Introduction to Expiring

Provisions 219 (attachment to Hasen Prepared Statement).  Since 2002, the objection rate has

remained below 1%, with the Justice Department issuing only eight objection letters in response

to 4,628 preclearance submissions in 2003, three objection letters in response to 5,211

preclearance submissions in 2004, and one objection letter in response to 4,734 preclearance

submissions in 2005.  See S. Rep. No. 109-295, at 13-14.

The decline in objection rates does not tell the full story, however.  Notwithstanding the

low rates of objections in recent years, the Justice Department still objected to more than 700

proposed voting changes between 1982 and 2006.  See H.R. Rep. No. 109-478, at 21; S. Rep.

No. 109-295, at 13.  Moreover, the National Commission on the Voting Rights Act reported that

more objections were interposed by the Attorney General between 1982 and 2004 than between

1965 and 1982, with nine of the 16 states covered by Section 4(b) receiving more objections after

1982 than before.  See 1 Evidence of Continued Need 172-73 (Nat'l Comm'n Report); see also

H.R. Rep. No. 109-478, at 21.  To be sure, the two time-periods (1965 to 1982 and 1982 to 2004)

are not equal in length, but it remains true that a substantial number of objections have been

lodged since the 1982 reauthorization of Section 5.  According to the National Commission on

the Voting Rights Act, the Justice Department objected to an average of more than four

preclearance submissions per month from August 1982 through December 2004.  Id. at 172.

It is also significant to recall that a single objection can often affect thousands of voters,

as objections are lodged not only in response to small-scale electoral changes such as the moving

of a polling place, but also in response to large-scale changes such as state-wide redistricting

plans.  See Continuing Need 58 (Earls Responses).  For example, in Alabama, the Justice

Department objected to 39 preclearance submissions from 1982 through 2004, see 1 Evidence of

Continued Need (Nat'l Comm'n Report) 259 (Map 5C), but these 39 objections included an

objection to a congressional redistricting plan and several objections to county-wide redistricting

plans, see 1 History, Scope, & Purpose 109-17 (appendix to statement of Bradley J. Schlozman,

Complete Listing of Objections Pursuant to Sections 3(c) and 5 of the Voting Rights Act of

1965).  In Louisiana, the Justice Department objected to 88 voting changes between 1982 and

2004, see 1 Evidence of Continued Need (Nat'l Comm'n Report) 264 (Map 5F), including every

Louisiana House of Representatives redistricting plan that was submitted for preclearance.

Indeed, from the passage of the Voting Rights Act in 1965 through its reauthorization in 2006,

"[n]o Louisiana House of Representatives redistricting plan . . . has been precleared as initially

submitted."  Introduction to Expiring Provisions 152 (responses of Theodore M. Shaw to

questions submitted by Senators Specter, Cornyn, Leahy, Kennedy, and Schumer) ("Shaw

Responses").

　　　　Alabama and Louisiana are by no means unique among covered jurisdictions with respect

to the receipt of objections in response to their redistricting plans.  Even though redistricting

plans accounted for only 2.4% of the preclearance submissions from 1982 through 2004, they

accounted for 16.4% of the Section 5 objections during that time-frame.  See U.S. Commission

on Civil Rights, Voting Rights Enforcement & Reauthorization: The Department of Justice's

Record of Enforcing the Temporary Voting Rights Act Provisions 33 (May 2006), available at

http://www.usccr.gov/pubs/051006VRAStatReport.pdf (last visited September 19, 2011).  Given

that many of these redistricting plans were state- or county-wide, it is perhaps unsurprising that

Section 5 objections from 2000 through May 2006 have aided an estimated 663,503 minority

voters.  Continuing Need 58 (Earls Responses).  According to data compiled by one expert, a

mere nine objections to South Carolina preclearance submissions during this time-frame served

to protect 96,143 African-American voters, while six objections to Texas preclearance

submissions served to protect 359,978 African-American and Hispanic voters.  Id.  Irrespective

of the decline in objection rates, then, there is strong evidence that Section 5 has remained a

"vital prophylactic" tool in "protecting minority voters from devices and schemes that continue to

be employed by covered States and jurisdictions."  H.R. Rep. No. 109-478, at 21.

There are many plausible explanations for the recent decline in objection rates, aside from

the optimistic one urged by Shelby County -- i.e., that "the discriminatory agenda of the covered

jurisdictions that existed in 1965 . . . no longer exists," Pl.'s Mot. at 29.  To begin with, Section 5

submissions (and associated objections) are always greatest in the years immediately following

redistricting cycles, which occur at the beginning of the decade.  See, e.g., Continuing Need 54

(Earls Responses); Introduction to Expiring Provisions 165-66 (Shaw Responses).  It is therefore

to be expected that the number of preclearance submissions -- and hence, objections -- would be

low in a mid-decade year like 2005.  See Continuing Need 54 (Earls Responses).

In addition, many have speculated that the Supreme Court's 2000 decision in Bossier II is

at least partially responsible for the post-2000 decline in objection rates.  See, e.g., id. at 54, 69-

70; Preclearance Standards 14 (Posner Prepared Statement); 1 Evidence of Continued Need 198-

99 (Nat'l Comm'n Report).  As previously explained, the Supreme Court in Bossier II "held that

discriminatory purpose under Section 5 no longer is co-extensive with the ordinary meaning of

discriminatory purpose or with the meaning of discriminatory purpose under the Fourteenth and

Fifteenth Amendments."  See Preclearance Standards 12 (Posner Prepared Statement).  Instead, in Bossier II the Supreme Court found that discriminatory purpose under Section 5 encompasses only "the intent to cause retrogression."  Id.  Therefore, in order to object to a voting change under the "purpose" prong of Section 5 after Bossier II, the Justice Department needed to find "not simply that the jurisdiction officials' purpose was to discriminate, but that it was to make the situation for minorities worse than before – i.e., that the officials intended to 'retrogress.'" 1 Evidence of Continued Need (Nat'l Comm'n Report) 198.  The difficulty of proving that state officials intended to retrogress could explain the decline in purpose-based objections (and hence, total objections) in the wake of Bossier II.  As one voting rights lawyer has pointed out, if the Bossier II interpretation of "discriminatory purpose" had applied prior to 2000, it would have required the Justice Department to preclear even the redistricting plan proposed by the notorious Georgia "state legislator who openly declared his opposition to drawing a 'nigger district,'" because the plan -- though motivated by an unabashed intent to discriminate -- was not retrogressive.  Id. at 199.

Other potential explanations for the recent decline in objection rates include under-enforcement of Section 5 by the Justice Department, which some former attorneys in the Voting Section believe to be the case, see 1 Evidence of Continued Need 197-98 (Nat'l Comm'n Report); Continuing Need 54 (Earls Responses) (suggesting that there have been "circumstances where the Department should have objected, but failed to"), or the possibility that the Justice Department has increasingly relied on "more information requests" and other types of informal communications with covered jurisdictions -- rather than objection letters -- as the primary means of preventing discriminatory voting changes, Continuing Need 57 (Earls Responses).  Finally,

even if the decline in objection rates does reflect increased compliance with the Voting Rights Act on the part of covered jurisdictions, as some have suggested, see, e.g., 1 History, Scope, & Purpose 12 (prepared statement of Bradley J. Schlozman) (stating that the "tiny objection rate reflects the overwhelming – indeed, near universal – compliance with the Voting Rights Act by covered jurisdictions"), that is not necessarily indicative of a widespread change in racial attitudes.  Rather, it could just as easily mean that "covered jurisdictions have accepted Section 5 as a principle they *must* comply with whenever they make a voting change, like it or not, and they have developed procedures for substantially increasing the likelihood of preclearance." 1 Evidence of Continued Need 200 (Nat'l Comm'n Report).

But whatever the explanation for the declining objection rate in recent years, the fact remains that the Justice Department issued 754 objection letters between 1982 and 2006, see S. Rep. 109-295, at 13, many of which were based on findings of discriminatory intent, see Nw. Austin I, 573 F. Supp. 2d at 221.  Shelby County is correct that not all objection letters "involve actual intentional discrimination," see Pl.'s Reply at 58, given that Section 5 prohibits a "somewhat broader swath of conduct," see Kimel, 528 U.S. at 81, than the Fifteenth Amendment itself proscribes.  But the Attorney General only denies preclearance to a voting change under Section 5 if he cannot conclude that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color."  See 42 U.S.C. § 1973c(a). In its attempt to minimize the significance of the objection-related data in the legislative record, Shelby County ignores the substantial number of objections that the Attorney General has made under Section 5's "purpose" prong in recent years -- even though, as the Nw. Austin I three-judge court recognized, these intent-based objections "provide particularly salient evidence of

potentially unconstitutional state action."  573 F. Supp. 2d at 252.

According to one study in the legislative record, as many as 43% of all Section 5 objections in the 1990s were based solely on discriminatory intent, while another 31% of objections were based at least in part on discriminatory intent.  See Preclearance Standards 136, 180 tbl. 2 (McCrary Study).  In other words, "the intent prong was involved in a remarkable 74 percent of all objections in that decade."  Id.  Congress also heard testimony that until Bossier II was decided, "the clear trend line, from the 1970s to the 1980s to the 1990s, was that discriminatory purpose increasingly was the basis on which Section 5 objections were being interposed."  Id. at 13 (Posner Prepared Statement).  From 1980 to 2000, the Attorney General lodged as many as 421 objections that were at least partially based on discriminatory intent, with 234 of those objections based solely on discriminatory intent.  Id. at 180 tbl. 2 (McCrary Study).  Purpose-based objections were particularly prevalent in the redistricting context, as approximately 80% of the Justice Department's objections to post-1990 redistricting plans were based on discriminatory intent.  Id. at 13 (Posner Prepared Statement).  In light of this data, the House Committee on the Judiciary had ample support for its conclusion in 2006 that the voting changes being sought by covered jurisdictions "were calculated decisions to keep minority voters from fully participating in the political process."  H.R. Rep. No. 109-478, at 21.

The legislative record contains countless examples of objection letters since 1982 in which the Justice Department has denied preclearance to a jurisdiction's proposed voting change because the jurisdiction failed to establish the absence of a discriminatory purpose for its change.  For instance, in 2001, the all-white Board of Aldermen in Kilmichael, Mississippi, cancelled a general election three weeks before it was scheduled to occur -- with no notice to the community

-- after Census data showed that the town had recently become majority African-American, and after a significant number of African-Americans had been qualified as candidates in the aldermen and mayoral races. See H.R. Rep. No. 109-478, at 36-37; Continuing Need 60, 67 (Earls Responses); S. Rep. No. 109-295, at 225, 230-32; 1 History, Scope, & Purpose 1617 (appendix to statement of Bradley J. Schlozman, Copies of Objection Letters, by State, from 1980 to October 17, 2006) (hereinafter, "Schlozman Appendix").  The Justice Department objected to the town's decision to cancel the election, noting the suspicious "context in which the town [had] reached its decision" -- that is, "only after black persons had become a majority of the registered voters" and "only after the qualification period for the election had closed, and it [had] bec[o]me evident that there were several black candidates for office."  1 History, Scope, & Purpose 1617 (Schlozman Appendix).  Because "[t]he town's purported non-racial rationales for the decision d[id] not withstand scrutiny," id., the Justice Department forced Kilmichael to reschedule the election, whereupon the town elected its first African-American mayor, as well as three African-American aldermen, see H.R. Rep. No. 109-478, at 37.

The year after it objected to Kilmichael's cancelled election, the Justice Department objected to a redistricting plan proposed by the city of Albany, Georgia, based on its determination that Albany, too, had not "carried its burden of showing that its proposed plan was not designed with the intent to limit and retrogress the increased black voting strength."  See 1 History, Scope, & Purpose 846 (Schlozman Appendix).  The Justice Department examined Albany's history of redistricting with respect to Ward 4, which, it found, revealed an "intent to maintain Ward 4 as a district that remains at the . . . level of 70 percent white, thus eliminating any ability of black voters to elect a candidate of choice in this district."  Id.  After the black

-86-

population in Ward 4 doubled from 20% to 40% during the 1980s, Albany adopted a redistricting plan that reduced the Ward's population to 30% black.  Then, after the black population in Ward 4 increased from 30% to almost 51% during the 1990s, the city sought preclearance for another redistricting plan that would have reduced the population in Ward 4 to 30% black.  Id. at 846-47. The Justice Department objected to the proposed plan, noting that "implicit" in the plan was "an intent to limit black political strength in the city to no more than four districts."  Id. at 847.

Another intent-based objection was lodged against the 2001 redistricting plan proposed by Milden, Louisiana, in which the city "explicitly decided to eliminate one of the three existing majority minority districts," even though "it was not compelled to redraw the district," and had been "presented with an alternative that met all of its legitimate criteria while maintaining the minority community's electoral ability."  Id. at 1150-52.  The Justice Department interposed yet another intent-based objection to a redistricting plan submitted by Sumter County, South Carolina, that same year, after the county council "explicitly decided to . . . eliminate one of the four existing majority minority districts" despite the fact that the district's elimination had been "easily avoidable."  See 2 Voting Rights Act: Section 5 of the Act – History, Scope, and Purpose, Hearing before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 2082-84 (Oct. 25, 2005) (hereinafter, "2 History, Scope, & Purpose") (Schlozman Appendix).  In explaining the basis of its objection, the Justice Department noted that the county had not been forced to redraw the district and that it had rejected an alternative, non-retrogressive plan.  Id. at 2083-84.  Under the circumstances, the Justice Department was unable to conclude "that the action in question was not motivated by a discriminatory intent to retrogress."  Id. at 2084.

These are just a few examples of the post-1982 objections to redistricting plans that have

been lodged -- at least in part -- on the basis of discriminatory intent.  There are many others.

See, e.g., 1 History, Scope, & Purpose 433 (Schlozman Appendix) (objecting to 1998 redistricting plan by Tallapoosa County, Alabama, because "the history of the instant redistricting process and its results raise serious concerns that the county . . . purposely impaired the ability of black voters to elect a candidate of choice"); id. at 412 (objecting to Greensboro, Alabama's 1993 redistricting plan on the ground that "the opportunity for black voters to elect a representative of their choice . . . appears to have been constrained deliberately"); id. at 1410 (objecting to Mississippi's 1991 statewide legislative redistricting plan where it appeared "that the proposed plan is calculated not to provide black voters in the Delta with the equal opportunity for representation required by the Voting Rights Act"); id. at 830 (objecting to 2000 redistricting plan for Webster County, Georgia's board of education, where the plan was created shortly after the county had elected its first majority-black board, and the county's proffered reasons for the plan appeared to be "merely pretexts for intentionally decreasing the opportunity of minority voters to participate in the electoral process"); id. at 1611 (objecting to 1997 redistricting plan by Grenada, Mississippi, based on "substantial direct and circumstantial evidence of discriminatory purpose"); id. at 1516 (refusing to withdraw objection to Greenville, Mississippi's 1991 redistricting plan, which "appeared to have been motivated by a desire on the part of white city councilmembers to retain white control of the city's governing body," and explaining that since the plan's proposal, "white city officials [have] continue[d] to engage in race-based decisionmaking and to design schemes the purpose of which is to avoid black control of city government").

The Justice Department's intent-based objections over the last few decades have not been

limited to redistricting plans.  On several occasions, the Justice Department has suspected that

discriminatory purpose was a motivating factor in a covered jurisdiction's change of a polling

location.  In 1992, for example, the Justice Department objected to Johnson County, Georgia's

decision to move a polling place from the county courthouse to the American Legion.  In its

objection letter, the Justice Department noted that the American Legion had "a wide-spread

reputation as an all-white club with a history of refusing membership to black applicants" and

that "the American Legion hall, itself, is used for functions to which only whites are welcome to

attend."  Id. at 727.  Given its reputation and history, the American Legion created an obviously

"hostile and intimidating" atmosphere for black voters, and had "the effect of discouraging black

voters from turning out to vote."  Id.  Because Johnson County failed to meet its burden of

proving that its relocation of the polling place had neither a discriminatory purpose nor effect, the

Justice Department denied preclearance to the proposed change.  See id.; see also 2 History,

Scope, & Purpose 2428 (Schlozman Appendix) (objecting to 1994 polling place change by

Marion County, Texas, where the change "appear[ed] to be designed, in part, to thwart recent

black political participation"); id. at 2579 (objecting to 1999 polling place change by Dinwiddie

County, Virginia, in part because "the sequence of events leading up to the decision to change the

polling place . . . tends to show a discriminatory purpose"); id. at 2302 (objecting to 1991 polling

place change proposed by district in Lubbock County, Texas, where polling "site selections . . .

would seem calculated to discourage turnout among minority voters").

 So, too, has the Justice Department denied preclearance to jurisdictions' proposed

changes to their methods of election where there has been reason to believe that the changes were

racially inspired.  For instance, the Justice Department objected to Bladen County, North

Carolina's 1987 attempt to change its method of election for its board of county commissioners from at-large elections to three double-member and one at-large district.  Although the Justice Department found that the change would not have a retrogressive effect, it nonetheless denied preclearance to the change based on its inability to conclude "that the proposed election system is free from discriminatory purpose."  Id. at 1761.  According to the Justice Department, the evidence presented by the county demonstrated that "the responsible public officials [had] desired to adopt a plan which would maintain white political control to the maximum extent possible and thereby minimize the opportunity for effective political participation by black citizens."  Id. at 1762.  Indeed, the Justice Department explained, "it appears that the board undertook extraordinary measures to adopt an election plan which minimizes minority voting strength."  Id.  A similar intent-based objection was interposed in response to Wilson County, North Carolina's 1986 change to its system for electing county commissioners, in light of the Justice Department's determination that the county's method of election had been purposefully "designed and intended to limit the number of commissioners black voters would be able to elect."  Id. at 1731.

The legislative record also contains examples of objection letters issued in response to jurisdictions' proposed annexations, in which the Justice Department has denied preclearance based on its inability to conclude that the annexation was free from discriminatory animus.  In 1990, for example, the Justice Department objected to the decision by Monroe, Louisiana, to annex certain wards for the Monroe City Court, explaining that the annexations would have reduced the black percentage of the City Court's jurisdiction from 48.4% to 39.2%.  1 History, Scope, & Purpose 927 (Schlozman Appendix).  The Justice Department also expressed concern

regarding the timing of the annexations, noting that one of the annexed wards "had been eligible to be added to the City Court jurisdiction since at least 1970," but that there had been "little or no interest in implementing this change until immediately prior to the 1984 City Court primary election, which we understand was marked by the presence of the first black candidate for the City Court."  See 1 History, Scope, & Purpose 927-28 (Schlozman Appendix); see also H.R. Rep. No. 109-478, at 23.  Similarly, the Justice Department in 1997 objected to the annexations proposed by the city of Webster, Texas, where "the city's annexation choices appear[ed] to have been tainted, if only in part, by an invidious racial purpose."  2 History, Scope, & Purpose 2492 (Schlozman Appendix).

Given these and the many other intent-based objections in the 15,000-page legislative record, the House Committee on the Judiciary had good reason to conclude in 2006 that Section 5 was still fulfilling its intended function of preventing covered jurisdictions from implementing voting changes "intentionally developed to keep minority voters and candidates from succeeding in the political process."  H.R. Rep. No. 109-478, at 36.

4.    *More Information Requests*

In reauthorizing Section 5 in 2006, Congress did not rely only on objection letters to evaluate the continued existence of voting discrimination by covered jurisdictions; it relied as well on so-called "more information requests" ("MIRs") by the Attorney General.  See H.R. Rep. No. 109-478, at 40; 2006 Amendments § 2(b)(4)(A), 120 Stat. at 577.  An MIR is a formal letter issued in response to a preclearance submission when the submission contains insufficient information for the Attorney General to determine whether the proposed voting change violates Section 5.  See H.R. Rep. No. 109-478, at 40.  When a covered jurisdiction receives an MIR, it

can either (1) supply the requested information; (2) withdraw the proposed voting change; (3) submit a new proposed change that supersedes the prior change; or (4) choose not to respond. Id.; see also 2 Voting Rights Act: Evidence of Continued Need, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 2545 (Mar. 8, 2006) (hereinafter, "2 Evidence of Continued Need") (Luis Ricardo Fraga & Maria Lizet Ocampo, The Deterrent Effect of Section 5 of the Voting Rights Act: The Role of More Information Requests) (hereinafter, "Fraga & Ocampo Study"). In its 2006 examination of MIRs, the House Committee on the Judiciary found that "[t]he actions taken by a jurisdiction [in response to an MIR] are often illustrative of a jurisdiction's motives." H.R. Rep. No. 109-478, at 40. In particular, a covered jurisdiction's decision to withdraw its proposed change, submit a superseding change, or not respond to an MIR frequently constitutes a "tacit admission" that its originally-proposed change was, in fact, discriminatory. See 1 Evidence of Continued Need 178 (Nat'l Comm'n Report).

It is significant, then, that between 1982 and 2003, at least 205 proposed voting changes were withdrawn by covered jurisdictions after receipt of an MIR. Id.; see also H.R. Rep. No. 109-478, at 41. According to one study in the legislative record, MIRs resulted in a total of 855 withdrawals, superseding changes, and "no responses" by covered jurisdictions from 1990 through 2005. See 2 Evidence of Continued Need 2553 (Fraga & Ocampo Study). To be sure, not all of these withdrawals, superseding changes, or "no responses" represent concessions on the part of the covered jurisdiction that its initially-proposed voting change had an impermissible discriminatory purpose or effect. It is plausible that covered jurisdictions choose to withdraw their proposed electoral changes or not respond to MIRs for other reasons -- for example, because "responding is more costly than not implementing the change." See, e.g., Continuing Need 113

(Pildes Responses).  But Shelby County is wrong to characterize voluntary withdrawals or "no responses" to MIRs as showing only that "bureaucratic hurdles to preclearance erected by DOJ have deterred covered jurisdictions from making nondiscriminatory voting changes."  See Pl.'s Mot. at 46.  Although it is unlikely that all withdrawals, superseding changes, and "no responses" represent successfully-thwarted attempts by covered jurisdictions to implement purposefully discriminatory voting changes, Congress found that, together "[t]he increased number of objections, revised submissions, and withdrawals over the last 25 years are strong indices of continued efforts to discriminate."  H.R. Rep. No. 109-478, at 36; see also Continuing Need 112-13 (Pildes Responses) (explaining the need for "more qualitative information on the *reasons* jurisdictions respond as they do [to MIRs] to know what percentage of these responses in fact do signal changes that would have violated the VRA," but recognizing the likelihood that at least "some of these non-responses reflect the fact that the jurisdiction's proposed change would have violated the VRA").

5.    *Judicial Preclearance Suits*

Even more probative of the continued existence of voting discrimination than withdrawals or "no responses" to MIRs, however, are the lawsuits in which a three-judge court has denied preclearance to a covered jurisdiction's proposed voting change.  As previously explained, a covered jurisdiction may seek a declaratory judgment from a three-judge panel of this Court that its proposed voting change has neither a discriminatory purpose nor effect instead of submitting its change to the Attorney General for preclearance.  See, e.g., Nw. Austin II, 129 S. Ct. at 2509; 42 U.S.C. § 1973c.  Although most jurisdictions choose the latter route, some have filed declaratory judgment actions seeking approval of their proposed voting changes since

the passage of the Voting Rights Act in 1965.  See Nw. Austin I, 573 F. Supp. 2d at 255.  Forty-two of these declaratory judgment actions have been unsuccessful -- meaning that the three-judge court either denied preclearance to the proposed change, the jurisdiction withdrew the change, the case was dismissed, or a consent decree that cured the problem was reached.  See 1 Evidence of Continued Need 177, 235 (Nat'l Comm'n Report).  Of these 42 unsuccessful declaratory judgment actions, 25 occurred after 1982.  Id. at 178, 270.

Most importantly, as the three-judge court in Nw. Austin I pointed out, "the legislative record contains several examples of judicial decisions denying preclearance that reveal evidence of intentional discrimination."  573 F. Supp. 2d at 255.  In one particularly egregious example, which occurred shortly before the 1982 reauthorization of Section 5, a three-judge panel of this Court denied preclearance to Georgia's proposed 1981 congressional redistricting plan based on its finding that the plan had a discriminatory purpose under Section 5.  See 1 Evidence of Continued Need 503-508 (ACLU Report); Busbee, 549 F. Supp. at 517.  Georgia began its congressional redistricting process after the 1980 census showed that the state's ten existing districts -- all of which were majority-white with the exception of the Fifth District -- had become severely malapportioned.  Under the leadership of Joe Mack Wilson, Chair of the state's House Reapportionment Committee, Georgia created a redistricting plan that maintained its nine majority-white districts, and split the large, contiguous black population of the Atlanta metropolitan area between the Fourth and Fifth Districts, thereby ensuring that blacks would still comprise a majority of the Fifth District, but would only constitute 46% of the registered voters there.  See Busbee, 549 F. Supp. at 498-99.  Because Georgia's plan increased the percentage of blacks in the Fifth District, however, it was not retrogressive, and therefore "technically . . . [did]

-94-

not have a discriminatory effect, as that term has been construed under the Voting Rights Act."

Id. at 516-17.

The three-judge court nonetheless denied preclearance to the plan based on its conclusion

that the plan had been "the product of purposeful racial discrimination." See id. at 517-18.  In

reaching this determination, the court made an express finding that "Representative Joe Mack

Wilson is a racist."  Id. at 500.  The court cited Wilson's now-infamous statement that he did not

want to draw "nigger districts," id. at 501, as well as testimony from other Georgia legislators,

who conceded that they, too, had intentionally sought to "keep the Fifth District 'as white as

possible . . . but just within the limits . . . to satisfy the Voting Rights Act . . . .'"  Id. (internal

citation omitted).  As one state legislator explained, "'the motivation of the House leadership' in

creating the Fifth District . . . was to 'increase [the percentage of the black population] just

enough to say they had increased it [and] so that it would look like they had increased it, but they

knew they had not increased it enough to elect a black."  Id. (internal citation omitted).  Another

state senator admitted that he had felt obliged to vote for the plan because he "'[didn't] want to

have to go home and explain why I . . . was the leader in getting a black elected to the United

States Congress.'"  Id. at 514 (internal citation omitted).  These "[o]vert racial statements,"

together with Georgia's history of racial discrimination in voting, and the absence of any

legitimate non-racial reasons for the redistricting plan, convinced the three-judge court that the

plan had been enacted with a discriminatory purpose, and hence had "'no legitimacy at all under

our Constitution or under (Section 5).'"  Id. at 517 (alteration in original) (quoting City of

Richmond v. United States, 422 U.S. 358, 378-79 (1975)).

In another, more recent declaratory judgment action, the Louisiana House of

Representatives sought preclearance for its 2001 statewide redistricting plan, which eliminated a majority-black district in Orleans Parish, and failed to create a comparable district anywhere else in the state.  See Def.'s Mot. at 37; Nw. Austin I, 573 F. Supp. 2d at 256; Continuing Need 28 (Arrington Responses); Introduction to Expiring Provisions 152 (Shaw Responses); Reauthorization of the Act's Temporary Provisions: Policy Perspectives and Views from the Field, Hearing Before the Subcomm. on the Constitution, Civil Rights and Property Rights of the S. Comm. on the Judiciary, 109th Cong. 42-44 (June 21, 2006) (hereinafter, "Policy Perspectives") (responses of Debo Adegbile to questions submitted by Senators Kennedy, Leahy, Cornyn, and Coburn) (hereinafter, "Adegbile Responses").  In the course of defending their plan, Louisiana officials admitted that they had intentionally "'obliterated'" the majority-black district in order to achieve what they characterized as "proportional" representation for white voters in Orleans Parish.  See Def.'s Br. in Supp. of Mot. for Summ. J., La. House of Reps. v. Ashcroft, Civ. A. No. 02-62 (D.D.C. Jan. 17, 2003); see also Policy Perspectives 43 (Adegbile Responses). But in selectively applying the theory of "proportional representation" to advantage only white voters in a particular area of the state, Louisiana officials ignored the fact that it was the black population in Orleans Parish, not the white population, that had increased during the preceding decade.  See Continuing Need 28 (Arrington Responses).  Moreover, the state made no attempt to remedy blacks' statewide under-representation in proportion to their percentage of the population, despite its avowed desire to achieve proportional representation for white voters in a particular area of the state.  See Def.'s Br. in Supp. of Mot. for Summ. J., La. House of Reps. v. Ashcroft, Civ. A. No. 02-62 (D.D.C. Jan. 17, 2003); Policy Perspectives 43 (Adegbile Responses); Nw. Austin I, 573 F. Supp. 2d at 256.  Although the suit ultimately settled on the

eve of trial when Louisiana agreed to restore the majority-black district, it nonetheless constitutes

a recent example of a covered jurisdiction's thwarted attempt to enact a voting change with the

express purpose of diminishing black electoral opportunity.  See Policy Perspectives 43

(Adegbile Responses); Introduction to Expiring Provisions 152 (Shaw Responses).  The case also

illustrates the need to look beyond preclearance-related data in assessing the continued

prevalence of intentional voting discrimination by covered jurisdictions, as the suit's eventual

resolution through a settlement agreement means that "there is no firm objection statistic or

declaratory judgment ruling that resulted from the litigation."  Introduction to Expiring

Provisions 152 (Shaw Responses).

6.   <em>Section 5 Enforcement Suits</em>

Yet another type of evidence that Congress relied on as illustrative of the continued

existence of voting discrimination by covered jurisdictions was section 5 enforcement actions

undertaken by the Justice Department in covered jurisdictions since 1982.  See 2006

Amendments § 2(b)(4)(A), 120 Stat. at 577.  The Voting Rights Act authorizes the Justice

Department -- as well as private citizens -- to bring suit under Section 5 to compel a covered

jurisdiction to submit its proposed voting change for preclearance.  See Nw. Austin I, 573 F.

Supp. 2d at 256.  Since 1982, there have been at least 105 successful Section 5 enforcement

actions in which a covered jurisdiction has either been ordered to submit its proposed voting

change for preclearance, or has voluntarily agreed to do so after a Section 5 enforcement suit was

filed.  See 1 Evidence of Continued Need 186 (Nat'l Comm'n Report).  Based on its review of

these cases, the House Committee on the Judiciary found that the failure by covered jurisdictions

to submit voting changes for preclearance under Section 5 often reflects more than a mere

oversight.  "[C]overed jurisdictions continue to resist submitting voting changes for preclearance," the Committee noted in its 2006 report, explaining that "many defiant covered jurisdictions and State and local officials continue to enact and enforce changes without the Federal Government's knowledge."  See H.R. Rep. No. 109-478, at 41.

Historically, the most "defiant" of all the covered jurisdictions has been South Dakota, where former South Dakota Attorney General William Janklow notoriously described the preclearance requirement as "a facial absurdity" and advised against compliance, remarking, "I see no need to proceed with undue speed to subject our State laws to a 'one-man' veto by the United States Attorney General."  Id. at 42.  In accordance with Janklow's advice, South Dakota sought preclearance for less than five of the more than 600 voting changes that it enacted between 1976 and 2002.  Id.  Many of these voting changes "negatively impacted" the state's Native American population, some of whom eventually filed an enforcement action to compel the state to submit its voting changes for preclearance.  Id.  The suit resulted in a consent decree, under which South Dakota finally agreed to fulfill its obligations under Section 5.  Id.

The legislative record contains many examples of Section 5 enforcement suits initiated in response to covered jurisdictions' implementation of voting changes without preclearance, including several examples of suits in which the unprecleared voting changes appeared to have been motivated by discriminatory animus.  For instance, a Section 5 enforcement action was filed in response to Prairie View, Texas's attempt to reduce the availability of early voting during its racially-charged 2004 elections in Waller County.  After two black students from historically black Prairie View A&M University announced their intent to run for local office (one for the Waller County Commissioners' Court, the county's governing body), the white district attorney

threatened to prosecute all Prairie View A&M students who voted in the elections, claiming that the students were not legal residents of the county.  See 1 Evidence of Continued Need 185 (Nat'l Comm'n Report); id. at 300 (Highlights of Hearings of the Nat'l Comm'n on the Voting Rights Act) (hereinafter, "Nat'l Comm'n Hearing Highlights").  Shortly thereafter, the county sought to reduce the availability of early voting at the polling places that were located closest to the Prairie View A&M campus.  This reduction in early voting opportunities would have made it much more difficult for students to vote in the election's primary, because it was scheduled to take place during the university's spring break, and students therefore had to vote in advance if they planned to be out of town during their vacation.  1 Evidence of Continued Need 186 (Nat'l Comm'n Report).  The university chapter of the NAACP filed suit under Section 5, seeking to enjoin Waller County from making this change to its voting practices without first receiving preclearance, which prompted the county to agree to restore the early voting opportunities that had previously been in place.  Id.  As a result, five times as many Prairie View A&M students were able to vote in the primary, in which the African-American student seeking election to the County Commissioners' Court won a narrow victory.  Id.

Another Section 5 enforcement suit was brought in 1995 when Mississippi sought to revive its dual voter registration system, which had originally been enacted "as part of the 'Mississippi Plan' to deny blacks the right to vote following the Constitutional Convention of 1890."  Operation Push v. Allain, 674 F. Supp. 1245, 1251 (N.D. Miss. 1987), aff'd sub nom., Operation Push v. Mabus, 932 F.2d 400 (5th Cir. 1991); see also S. Rep. No. 109-295, at 223; 1 Evidence of Continued Need 176 (Nat'l Comm'n Report); H.R. Rep. No. 109-478, at 39.  In 1987, a federal district court invalidated a revised version of Mississippi's dual registration

system that the state had adopted in 1984, based on evidence that the revised system, like the

original one, "result[ed] in a denial or abridgment of the right of black citizens in Mississippi to

vote and participate in the electoral process." Operation Push, 674 F. Supp. at 1253.

Nevertheless, Mississippi proceeded to implement yet another dual registration system in 1995,

purportedly in an attempt to comply with the requirements of the National Voter Registration Act

("NVRA") of 1993. See H.R. Rep. No. 109-478, at 39. State officials "refused to submit the

change for preclearance" despite the fact that Mississippi's "maintenance of two registration

systems had previously been struck down as discriminatory." Id.

      Private plaintiffs responded with a Section 5 enforcement action, as did the United States,

and the two cases were consolidated before a three-judge court. See Young v. Fordice, 520 U.S.

273, 280 (1997). The case eventually reached the Supreme Court, which unanimously held that

Mississippi was required to submit its dual registration system for preclearance. Id. at 291. Once

compelled to seek preclearance, Mississippi received an objection, based on the Attorney

General's inability to find that "the State's submitted NVRA procedures are not tainted by

improper racial considerations." Preclearance Standards 83 (appendix to statement of Brenda

Wright). As the Attorney General explained, the state's decision "to implement the requirements

of the NVRA in a manner that would cause the State to revert to a form of dual registration" was

"particularly noteworthy," given that "it occurred only a few years after a federal court had found

that a similar requirement had led to pronounced discriminatory effects on black voters." Id.

      Of course, the reasons behind a failure to seek preclearance under Section 5 are not

always easy to discern. And there is no data in the legislative record revealing the percentage of

successful Section 5 enforcement actions that have ultimately resulted in a denial of preclearance

on the basis of discriminatory intent.  But as demonstrated by Mississippi's 1995 attempt to revive its dual registration system, at least some of the 105 successful Section 5 enforcement suits since 1982 have been initiated in response to covered jurisdictions' voting changes that were subsequently found to be purposefully discriminatory.

7.      *Section 2 Litigation*

Section 2 of the Voting Rights Act prohibits the imposition of any voting practice or procedure "in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973.  Although a violation of Section 2 does not require a showing of unconstitutional discriminatory intent, "Section 2 cases have documented evidence that reveals a wide range of unconstitutional conduct by state and local officials." See Impact and Effectiveness 971 (Katz Study).  Based on its review of several studies of Section 2 cases in the legislative record, the Senate Judiciary Committee identified six reported Section 2 cases that resulted in either a judicial decision or a consent decree reflecting that a covered jurisdiction had unconstitutionally discriminated against minority voters.  See S. Rep. No. 109-295, at 13, 65.  A study conducted by Professor Ellen Katz and the Voting Rights Initiative of the University of Michigan Law School identified an additional eight published Section 2 cases since 1982 in which a court determined that a covered jurisdiction had engaged in intentional discrimination against minority voters.  See Impact and Effectiveness 986-91 (Katz Study); see also Nw. Austin I, 573 F. Supp. 2d at 258.  Hence, as the three-judge court in Nw. Austin I explained, Congress "knew of a combined total of fourteen judicial findings of intentionally discriminatory or unconstitutional state action" by covered jurisdictions since 1982 when it chose to reauthorize Section 5 in 2006.  573 F. Supp. 2d at 258.

The Nw. Austin I court recognized that 14 "is not a great number of cases," especially

when compared to the 421 intent-based objection letters lodged by the Attorney General during

this time-frame.  See id.  But the court offered two explanations for the "relative scarcity" of

judicial findings of intentionally discriminatory or unconstitutional conduct by covered

jurisdictions.  First, given Section 5's effectiveness in deterring covered jurisdictions from

enacting discriminatory voting changes in the first place, it is understandable that there would not

be many Section 2 cases challenging such practices.  In other words, because most intentionally

discriminatory voting practices are blocked by Section 5 prior to their implementation, they are

unlikely to be the subject of a subsequent Section 2 challenge.  See id. (citing Introduction to

Expiring Provisions (Shaw Responses 160)); see also Continuing Need 143 n.18 (Earls

Responses).  Second, both the Senate Judiciary Committee and Professor Katz's study examined

only reported Section 2 cases.  Yet as Professor Katz acknowledged, "[t]hese lawsuits, of course,

represent only a portion of the Section 2 claims filed or decided since 1982," given the high

number of Section 2 cases that settle or are resolved without a published opinion.  See Impact

and Effectiveness 974 (Katz Study); see also Continuing Need 143 (Earls Responses).  Indeed,

according to one witness who testified before the Senate Judiciary Committee, there have been

66 reported cases of Section 2 violations since 1982 in the nine states that are "substantially

covered" by Section 5, but there have been 587 unreported cases documenting such violations --

i.e., more than eight times as many unreported cases than reported cases revealing Section 2

violations by covered jurisdictions.  See Continuing Need 143 (Earls Responses).  It is to be

expected, then, that an analysis of intentional or unconstitutional discrimination based solely on

reported Section 2 cases would "seriously understate[] the findings."  Id.

Finally, it is significant to recall that courts will avoid deciding constitutional questions if a case can be resolved on narrower, statutory grounds.  See, e.g., Nw. Austin II, 129 S. Ct. at 2508.  Courts therefore tend to refrain from finding that a jurisdiction engaged in unconstitutional voting discrimination if there is another basis upon which to invalidate the jurisdiction's challenged voting practice -- e.g., if the voting practice is found to violate the Section 2 "results" test.  See Continuing Need 143-44, 144 n.19 (Earls Responses); see also Escambia Cnty. v. McMillan, 466 U.S. 48, 51 (1984) (declining to decide whether evidence of discriminatory intent was adequate to support finding that at-large system of elections violated the Fourteenth Amendment, given the lower court's conclusion that the system also violated Section 2); White v. Alabama, 74 F.3d 1058, 1071 n.42 (11th Cir. 1996) (explaining that "[b]ecause we dispose of the district court's judgment on the ground that it violates the Voting Rights Act, we need not, and indeed, should not, discuss whether the judgment violates the Equal Protection Clause"); United States v. Charleston Cnty., 316 F. Supp. 2d 268, 306-07 (D.S.C. 2003), aff'd, 365 F.3d 341 (4th Cir. 2004) (acknowledging that "the General Assembly's adoption of the at-large system raises suspicions," but refusing to "disparage" those who enacted the system by finding a constitutional violation absent more "compelling evidence" of discriminatory intent, and instead, enjoining the at-large system as a violation of Section 2).  As Professor Pamela Karlan explained during her 2006 testimony before the Senate Judiciary Committee, "when courts decide cases on [Section 2] effects test reasons, they don't reach the question whether there is also a discriminatory purpose.  But let me tell you from my own experience that if we had to show discriminatory purpose in lots of these cases, we could do it."  Continuing Need 6 (statement of Pamela S. Karlan).  As a result, many instances of unconstitutional voting

discrimination likely escape formal judicial condemnation.

Still, there have been at least 14 reported Section 2 cases involving judicial findings of intentional or unconstitutional voting discrimination by covered jurisdictions since 1982.  See Nw. Austin I, 573 F. Supp. 2d at 258.  Because the three-judge court in Nw. Austin I described most of these Section 2 decisions in great detail, see 573 F. Supp. 2d at 259-62, this Court will not endeavor to repeat the facts of all those cases here.  But since Section 2 cases do offer very "powerful evidence of continuing intentional discrimination," id. at 259, a few such cases warrant mention, one of which was not addressed by Nw. Austin I.

In 2003, a federal district court assessing a Section 2 challenge to Charleston County, South Carolina's at-large method of elections for its County Council declined to find that the system had been adopted with an unconstitutional discriminatory purpose, but nonetheless enjoined the system as a violation of Section 2.  See Charleston Cnty., 316 F. Supp. 2d at 306.  In so doing, the court noted that county officials had engaged in many other forms of purposeful voting discrimination in recent years.  See id. at 290 n.23; see also Impact and Effectiveness 987-88 (Katz Study).  The court described the persistent problem of white poll officials "intimidating and harassing" black voters in need of assistance at the polls, and quoted one member of the Charleston County Election Commission, who said that she had "received complaints from African-American voters concerning rude or inappropriate behavior by white poll officials in every election between 1992 and 2002."  See id. at 287 n.23.  At one point, the official harassment of elderly black voters at the polls became so egregious that it "prompted a Charleston County Circuit Court to issue a restraining order against the Election Commission requiring its agents to cease interfering with the voting process."  Id. at 288 n.23.

The court in Charleston Cnty. also noted two "recent episodes" of racial discrimination in voting that it found particularly troubling.  In the first, which occurred in 1991, the Charleston County Council decided to "reduce[] the salary for the Charleston County Probate Judge . . . following the election of the first and only African-American person elected to that position." Id. at 289 n.23.  That same judge had been forced to sue to have his election upheld by the South Carolina Supreme Court, and even after the court affirmed the validity of the election, the judge had to seek Justice Department intervention in order to be sworn into office.  Id. at 289-90 n.23. The second episode occurred after the 2000 Charleston County School Board elections, in which African-Americans won a majority of the seats on the board for the first time in the county's history.  The county immediately responded by sponsoring "several pieces of legislation to alter the method of election for the school board." Id. at 290 n.23.  None of the five African-American members of the board were consulted regarding their views on the change to the board's method of election, id., and every African-American member of the legislative delegation voted against the proposed change, S. Rep. No. 109-295, at 309.  It later became apparent that the change would have the effect of making the school board's method of election "an exact replica of the old County Council structure" that the court in Charleston Cnty. had struck down as a violation of Section 2.  See Continuing Need 27-28 (Arrington Responses); see also S. Rep. No. 109-295, at 309.  This method of election was subsequently denied preclearance by the Attorney General. Continuing Need 28 (Arrington Responses).

In a Section 2 case not discussed by the three-judge court in Nw. Austin I, Native American residents of South Dakota challenged the state's 2001 legislative redistricting plan as diluting Native American voting strength in violation of Section 2.  See Bone Shirt v. Hazeltine,

336 F. Supp. 2d 976 (D.S.D. 2004); see also Impact and Effectiveness 988-89 (Katz Study).  In

assessing the plaintiffs' Section 2 challenge, the court described several recent instances of

intentional state-sponsored voting discrimination against Native Americans in South Dakota.

See Bone Shirt, 336 F. Supp. 2d at 1023-26.  For example, in 2002 the state passed a law

requiring photo identification as a prerequisite to voting.  When concerns were raised about the

effect of the law on the state's Native American population, one state legislator responded: "I'm

not sure we want that sort of person in the polling place."  Id. at 1026 (internal quotation marks

and citation omitted).  Another legislator conceded that the measure had been passed as a means

of "retaliating" against the recent rise in registration among Native American voters, after the

Native American vote had proven particularly significant in a close senate race.  Id.  The court

also described a 2003 challenge to a redistricting plan by Buffalo County, South Dakota, which

had "confined virtually all of the county's Indian population to a single district containing

approximately 1500 people."  Id. at 1024.  When members of the Crow Creek Sioux Tribe

brought suit, alleging that the plan had been "drawn and maintained for a discriminatory

purpose," the parties reached a settlement agreement, "with the county admitting that the plan

was discriminatory."  Id.  The court in Bone Shirt went on to list many other reports of

intentional voting discrimination against Native Americans in South Dakota, including cases in

which local poll officials "refused to register Indians," or "refused to provide them with enough

voter registration cards to conduct a voter registration drive."  Id.

     The legislative record describes several other Section 2 cases since 1982 that contain

judicial findings of purposeful voting discrimination by covered jurisdictions.  See Impact and

Effectiveness 975-76, 987-94 (Katz Study).  Two such cases from Shelby County's home state of

Alabama warrant specific mention.  Following the <u>Dillard</u> litigation, <u>see</u> <u>supra</u> pp. 29-30, in

which Alabama residents challenged the at-large electoral systems used by many cities, counties,

and school boards throughout the state (including in Shelby County), the town of North Johns

admitted that its at-large system for electing commissioners violated Section 2 and entered into a

consent decree, under which it agreed to implement a new electoral system with five single-

member districts.  <u>See</u> <u>Dillard v. Town of North Johns</u>, 717 F. Supp. 1471, 1473 (M.D. Ala.

1989).  When two African-American candidates for office sought "to take advantage of the new

court-ordered single-member districting plan," <u>id.</u> at 1476, the mayor refused to provide them

with the necessary financial disclosure forms that he had provided to all of the other candidates,

and that all candidates were required to complete in order to run for office under state law.  <u>Id.</u> at

1474-76; <u>Impact and Effectiveness</u> 990 (Katz Study).  The two African-American candidates

nonetheless remained on the ballot without completing the forms, and proceeded to win their

respective elections, whereupon the mayor refused to swear them into office.  <u>North Johns</u>, 717

F. Supp. at 1475.  The candidates then filed suit under Section 2, alleging purposeful

discrimination and seeking a court order certifying them as duly-elected members of the town

council.  <u>Id.</u> at 1476.  Granting this request, the federal district court found "that North Johns,

through its mayor, intentionally discriminated against [the candidates] because of their race."  <u>Id.</u>

The court explained that the election of the two candidates would have resulted in a majority-

black town council, and that the mayor had "acted as he did in order to prevent this result, or at

least not to aid in achieving it."  <u>Id.</u>  The court was "convinced that, but for [the candidates'] race,

[the mayor] would have acted toward them as he acted toward other candidates; he would have

provided to them, in a timely manner, the [necessary] information and forms."  <u>Id.</u>

Similarly, a federal district court in Harris v. Siegelman, 695 F. Supp. 517 (M.D. Ala. 1988), found that intentional discrimination persisted in Alabama as late as the 1980s.  In assessing a Section 2 class action filed by black residents of the state, who alleged that the manner in which poll officials had been appointed violated Section 2, the court described how Alabama's "history of racial inhumanity continues into today." 695 F. Supp. at 525.  Specifically, the court found that "white poll officials continue to harass and intimidate black voters," and it went on to cite "numerous instances" in which "white poll officials refused to help illiterate black voters or refused to allow them to vote, where they refused to allow black voters to cast challenged ballots, and where they were simply rude and even intimidating toward black voters." Id.  Although acknowledging that these occurrences are "much less frequent today than in the past," the court found that "their impact is still dramatic and widespread in the black community in light of this state's not-so-distant history of open and violent discrimination." Id.

8.      *Dispatch of Federal Observers*

Additional evidence of intentional state-sponsored discrimination against minority voters is revealed by the continued dispatch of federal observers to covered jurisdictions.  Under Section 8, the Attorney General may send federal observers to monitor any state or local elections when "necessary to enforce the guarantees of the 14th or 15th amendment."[13]  See 42 U.S.C. §

---

        [13]  Under the original version of the Act, federal observers could only be sent to monitor elections in jurisdictions for which "federal examiners" had been appointed.  See 1965 Act § 8. Federal examiners "in the early days of the Act were empowered to help register minority voters," 1 Evidence of Continued Need 179, and could be dispatched either to jurisdictions that were covered by Section 4(b), or to non-covered jurisdictions that were subject to coverage by federal court order, see 1965 Act §§ 3(a), 6.  When Congress reauthorized the Act's temporary provisions in 2006, it repealed the sections of the Act pertaining to federal examiners, and amended Section 3(a) of the Act to authorize the direct assignment of federal observers to non-covered jurisdictions where "appropriate to enforce the voting guarantees of the fourteenth or

1973f(a)(2).  Between 1982 and 2006, 300 to 600 federal observers were assigned annually to observe elections in covered jurisdictions.  See H.R. Rep. No. 109-478, at 44; S. Rep. No. 109-295, at 96.  Five of the six states originally covered by Section 5 -- Louisiana, Georgia, Alabama, South Carolina, and Mississippi -- accounted for 66% of the 622 total federal observer coverages[14] during this time-frame, 1 Evidence of Continued Need 181 (Nat'l Comm'n Report), with Mississippi alone accounting for 40% of all such coverages, H.R. Rep. No. 109-475, at 44.  In reauthorizing Section 5 in 2006, Congress cited the "tens of thousands of Federal observers that have been dispatched to observe elections in covered jurisdictions" during the past 25 years as evidence of "the continued need for [the] Federal oversight" provided by the temporary provisions of the Voting Rights Act.  See 2006 Amendments § 2(b)(5), 120 Stat. at 578.

Shelby County attempts to minimize the significance of this evidence, however, by arguing that the dispatch of federal observers "indicates only that it was predicted that there *might* be conduct with the effect of disenfranchising minority citizens, which *might* or *might not* be purposeful discrimination."  Pl.'s Mot. at 35.  As a technical matter, Shelby County is correct.  But observers are not assigned to a particular polling location based on sheer speculation; they are only dispatched if "there is a reasonable belief that minority citizens are at risk of being disenfranchised."  H.R. Rep. No. 109-478, at 44 (emphasis added); see also 1 Evidence of Continued Need 180 (Nat'l Comm'n Report) (explaining that "observers are sent because there are reasonable grounds in the opinion of the Department of Justice to expect discrimination on

---

fifteenth amendment."  42 U.S.C. § 1973a(a); see also H.R. Rep. No. 109-478, at 91.

[14]  For purposes of this Opinion, each occasion when federal observers are dispatched to a jurisdiction is referred to as one "observer coverage," although several individual observers may have been present.

Election Day") (emphasis added).  It may be that some of the 622 observer coverages since 1982 have ultimately proven unnecessary, but the legislative record reveals many instances of intentional voter discrimination at the polls, where the presence of federal observers has been needed to protect access to the ballot for racial and language minorities.

Congress heard testimony from Alabama state senator Bobby Singleton as to the importance of federal observers in preventing the intimidation of black voters at the polls in Alabama.  See 1 Evidence of Continued Need 182 (Nat'l Comm'n Report).  Singleton described one incident in 1992 in which he was taken to jail after attempting to prevent white poll officials from "closing the doors on African-American voters . . . whom they did not want to come in, [because] [they] . . . would have made a difference in the . . . votes on that particular day."  Id. at 298 (Nat'l Comm'n Hearing Highlights).  Barry Weinberg, former Deputy Chief of the Voting Section of the Civil Rights Division of the Justice Department, similarly described the harassment of black voters by white poll officials in Alabama, including one instance in which a local poll official remarked in the presence of a federal observer that "niggers don't have principle enough to vote and they shouldn't be allowed."  See Voting Rights Act: Sections 6 and 8 – The Federal Examiner and Observer Program, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 30 (Nov. 15, 2005) (prepared statement of Barry H. Weinberg).  Weinberg also described various forms of discrimination faced by language minority voters at the polls, who have sometimes "been denied the ballot because they identified their street name according to common Spanish usage rather than the formal English name."  Id. at 34.  On other occasions, prospective Hispanic voters have been "admonished not to use Spanish when talking in the polling places," or have been asked to

provide "on-the-spot evidence of their citizenship before being given a ballot," even though such evidence is not required from Caucasian voters.  Id.  The legislative record describes one such example of discrimination against Latinos in Arizona, in which men wearing "military or tool belts" and black T-shirts reading "U.S. Constitutional Enforcement" approached Latinos waiting in line to vote, demanding proof of citizenship.  See 3 Voting Rights Act: Evidence of Continued Need, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 3976 (Mar. 8, 2006) (hereinafter, "3 Evidence of Continued Need") (Arizona Report for the Nat'l Comm'n on the Voting Rights Act).

Congress heard evidence that in 1990, on the eve of an election marked by the presence of an African-American candidate for one of North Carolina's Senate seats, 125,000 African-American voters in North Carolina received postcards falsely informing them that if they had moved within thirty days they could not vote.  See 2 Evidence of Continued Need 1755 (appendix to statement of Wade Henderson).  As recently as 2004, a sheriff in Alamance County, North Carolina, "took a list of registered voters in his county that had Spanish surnames, and said publicly that he would send deputies to the homes of each of those voters to verify that they were citizens." Continuing Need 18 (testimony of Anita S. Earls).  That same year, there were reports of police being stationed outside polling sites in an "overwhelmingly Latino" area of Texas -- a more subtle, yet "familiar form of voter intimidation."  See S. Rep. No. 109-295, at 344.

The record contains several other examples of state-sponsored discrimination against minority voters in Texas, including the 2004 closing of a polling place in a predominantly-black precinct, despite the fact that "voters remained in line" and the closing was "contrary to state law."  Id. at 343.  There were additional reports of minority voters "being turned away from their

polling locations and asked to return at a later time" for no apparent reason.  Id.  And during the

Southern Regional Hearing of the National Commission of the Voting Rights Act, Professor

Vernon Burton testified that there had been "various kinds of intimidation and misinformation"

directed at black voters in Texas during the 2000 and 2002 elections, as well as "late change[s] of

polling places; dropping individuals from poll lists without cause; [and] not allowing individuals

to file challenge ballots."  See 1 Evidence of Continued Need 298 (Nat'l Comm'n Hearing

Highlights).  Professor Burton went on to describe a particularly disturbing incident in Wharton

County, Texas, in which the home of a campaign staff treasurer for an African-American

candidate for sheriff was burned.  Id.  As Professor Burton explained, the incident occurred

shortly after the treasurer had received "'threatening calls saying what would happen to her if she

did not get [the candidate's] – and we won't use the N word – sign out of her yard.'"  Id.

### 9.    *Racially Polarized Voting and Vote Dilution*

Congress also relied on evidence of racially polarized voting in reauthorizing Section 5 in

2006, noting that the persistence of racially polarized voting "in each of the jurisdictions covered

by the expiring provisions of the Voting Rights Act of 1965 demonstrates that racial and

language minorities remain politically vulnerable, warranting the continued protections of the

[Act]."  See 2006 Amendments § 2(b)(3), 120 Stat. at 577.  Racially polarized voting "occurs

when voting blocs within the minority and white communities cast ballots along racial lines."

H.R. Rep. No. 109-478, at 34.  The House Committee on the Judiciary in 2006 found that the

continued existence of racially polarized voting presented a "serious concern," id., for two

reasons.  First, racially polarized voting effectively creates an "election ceiling" for minority

voters, as it renders them "powerless" to elect candidates of their choice in non-majority-minority

districts.  Id.  Second, "[t]he potential for discrimination in environments characterized by racially polarized voting is great."  Id. at 35.  That is because, as the three-judge court in Nw. Austin I explained, racially polarized voting is "a necessary precondition for vote dilution to occur," since it is racially polarized voting that "enables the use of devices such as multi-member districts and at-large elections that dilute the voting strength of minority communities."  See 573 F. Supp. 2d at 263 (internal quotation marks and citations omitted).  In other words, where minorities and non-minorities tend to prefer different candidates, the ability of minorities to elect their candidates of choice can be intentionally reduced through the adoption of a wide variety of dilutive techniques, including the manipulation of district boundaries, the enactment of discriminatory annexations, and the implementation of majority-vote requirements.  See 2 Evidence of Continued Need 1721 (appendix to statement of Wade Henderson).

Hence, Congress was concerned by the evidence in the legislative record indicating that "the degree of racially polarized voting in the South is increasing, not decreasing." 1 Evidence of Continued Need 215 (Nat'l Comm'n Report).  Congress heard testimony that in Shelby County's home state of Alabama, there were 35 black representatives serving in the state legislature, only one of whom had been elected from a majority-white district.  See Benefits and Costs 97 (Gray Responses).  Evidence in the congressional record also revealed "high degree[s]" of racially polarized voting in South Carolina and Louisiana.  See H.R. Rep. No. 109-478, at 35.  As one expert on voting trends in Louisiana testified, "the racial differences in candidate preferences are pervasive across offices.  It doesn't matter whether the office at issue is state Representative, state Senator, Governor, Mayor, District Attorney, or Public Service Commissioner.  It could be for a position as Recorder of Mortgages or Register of Conveyances"; regardless of the nature of the

elected position, "[r]acially polarized voting remains pronounced and pervasive in Louisiana." Voting Rights Act: The Continuing Need for Section 5, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong 59 (Oct. 25, 2005) (hereinafter, "Continuing Need for Section 5") (prepared statement of Richard Engstrom).

A report in the legislative record on voting rights in Mississippi confirmed that racially polarized voting remained pronounced and pervasive there as well, with blacks in Mississippi "overwhelmingly tend[ing] to vote for blacks and whites almost unanimously vot[ing] for whites in most black versus white elections." See 2 Evidence of Continued Need 1721 (appendix to statement of Wade Henderson) (internal quotation marks omitted). Moreover, the report explained, "[n]o black candidate has won election to Congress or the state legislature from a majority-white district in Mississippi." Id. at 1722. And Mississippi is by no means unique among southern states in this respect. Another study in the legislative record found that during the 1980s and 1990s, "not a single black candidate won a majority-white district in the South." Benefits and Costs 69 (responses of Drew S. Days III to questions submitted by Senators Cornyn, Coburn, Kennedy, Leahy, and Schumer). According to the National Commission on the Voting Rights Act, only 8% of all black U.S. representatives in 2000 were elected from majority-white districts. 1 Evidence of Continued Need 159 (Nat'l Comm'n Report).

Shelby County objects to this Court's reliance on evidence of racially polarized voting in assessing the continued need for Section 5, arguing that racially polarized voting constitutes private conduct, not "governmental discrimination -- the only type of discrimination Congress is empowered to remedy under the Fifteenth Amendment." See Pl.'s Mot. at 31. But Shelby County fails to recognize the close link between racially polarized voting and intentional, state-

sponsored minority vote dilution.  It is only because of the continued existence of racially

polarized voting that covered jurisdictions can structure their electoral processes so as to

intentionally diminish the ability of minority voters to elect candidates of their choice.  See

Continuing Need for Section 5 59 (prepared statement of Richard Engstrom).  Although the

persistence of racially polarized voting -- in and of itself -- does not provide evidence of

unconstitutional voting discrimination by covered jurisdictions and their officials, the persistence

of measures that are intentionally designed to "dilute minority voting strength" does provide such

evidence, and these measures can only be effective in areas that are marked by racially polarized

voting.

Shelby County argues, however, that the Attorney General is incorrect to rely even on

evidence of intentional minority vote dilution in justifying the 2006 reauthorization of Section 5,

since "Section 5 enforces the Fifteenth Amendment" and "claims alleging purposeful vote

dilution are cognizable under the Equal Protection Clause of the Fourteenth Amendment – not

under the Fifteenth Amendment."  See Pl.'s Reply at 47.  The Supreme Court has never

"explicitly decided[] that the Fifteenth Amendment applies to dilution claims."  See Bossier II,

528 U.S. at 359 n.11 (Souter, J., concurring in part, dissenting in part); see also supra pp. 63-64.

But the Court in City of Rome relied on evidence of minority vote dilution in upholding the

constitutionality of the 1975 reauthorization of Section 5 as a valid exercise of Congress's

Fifteenth Amendment enforcement authority.  See 446 U.S. at 181 (quoting Congress's finding

that "'[a]s registration and voting of minority citizens increases [sic], other measures may be

resorted to which would dilute increasing minority voting strength'") (internal citation omitted).

Regardless of whether intentional state-sponsored minority vote dilution violates the Fifteenth

-115-

Amendment, then, Shelby County's argument that such evidence cannot be used to sustain the 2006 reauthorization of Section 5 is directly refuted by City of Rome.[15]

Shelby County's position on the irrelevance of intentional dilutive measures is also at odds with the history and purpose of Section 5.  According to Shelby County, the so-called "second generation barriers" to voting that "do not interfere with the right to vote, but instead limit the effectiveness of that vote," cannot be used to justify Section 5's constitutionality, see Pl.'s Reply at 21, because Section 5 was intended to combat only those tactics that were aimed at direct disenfranchisement, rather than indirect "dilutive mechanisms," id. at 48.  But Section 5 never had such a limited purpose.  To the contrary, Congress specifically designed the preclearance requirement in order to prohibit covered jurisdictions from implementing any and all discriminatory voting changes, regardless of the form they might take.  See, e.g., Continuing Need 41 (Earls Responses) (explaining that "Section 5 was not intended merely to increase minority registration rates, but rather to make sure that covered jurisdictions did not put in place .

---

[15]  In City of Rome, Justice Rehnquist, joined by Justice Stewart in dissent, voiced concerns as to the majority's reliance on evidence of vote dilution in justifying the 1975 reauthorization of Section 5, arguing that any "disparate impact associated with nondiscriminatory electoral changes . . . result[ing] from bloc voting" cannot establish "congressional power to devise an effective remedy for prior constitutional violations."  Id. at 217 (Rehnquist, J., dissenting).  But Justice Rehnquist's objection to the use of such evidence stemmed from the fact that, in City of Rome, the city had proven that its dilutive electoral changes were not purposefully discriminatory.  Id. at 214.  Justice Rehnquist went on to explain that where states seek "to prevent the participation of blacks in local government by measures other than outright denial of the franchise," Congress can "of course remedy and prevent such purposeful discrimination."  Id. (emphasis added).  Here, Shelby County has not proven -- nor even alleged -- that all instances of state-sponsored minority vote dilution in the legislative record are free from discriminatory animus.  Hence, even under the more limited view of Congress's enforcement authority endorsed by Justice Rehnquist in City of Rome, the evidence of purposefully dilutive measures in the 2006 legislative record could provide valid grounds for the reauthorization of Section 5.

. . a host of other practices that would negate or dilute the voting strength of newly enfranchised black voters.").  Prior to the enactment of Section 5, covered jurisdictions were able to perpetuate minority disenfranchisement by adopting new, deceptive discriminatory techniques as soon as the old ones had been struck down.  Although the primary focus of Section 5 in 1965 may have been those techniques that were being used to prevent blacks from entering polling places and casting ballots, "the preclearance requirement was not enacted to authorize covered jurisdictions to pour old poison into new bottles."  See Bossier II, 528 U.S. at 366 (Souter, J., concurring in part, dissenting in part).  It is for this reason that the Supreme Court in Allen held that Section 5 bars not only those voting changes that interfere with minorities' access to the ballot, but also those changes that interfere with the weight of the ballots cast.  See Allen, 393 U.S. at 569 (recognizing that "[t]he right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot"); see also Continuing Need 36 (Arrington Responses) (explaining that the Act has always been "about more than just the mere ability to cast a vote . . . The vote must be counted and must count").

Although Shelby County seeks to portray "second generation barriers" to voting as novel creations of the 1980s and 1990s, such dilutive measures have long been employed by covered jurisdictions as a means of intentionally discriminating against minority voters.  See, e.g., Evidence of Continued Need 209 (explaining that vote dilution "consists of mechanisms employed by whites since the First Reconstruction in the nineteenth century"); Introduction to Expiring Provisions 206 (prepared statement of Chandler Davidson) (noting that dilutive tactics were "widely used in the Nineteenth Century when black males could vote" and "began to be used once more in the mid-Twentieth Century, particularly after the abolition of the white

primary, as increasing numbers of blacks began to be able to exercise the franchise").  Indeed,

Congress relied on evidence of these purposefully dilutive mechanisms in each of its previous

reauthorizations of Section 5.  See H.R. Rep. No. 109-478, at 36.  In its 2006 report, the House

Committee on the Judiciary specifically found that the voting changes being sought by covered

jurisdictions -- which included "enacting discriminatory redistricting plans; switching offices

from elected to appointed positions; relocating polling places; enacting discriminatory

annexations and deannexations; setting numbered posts; and changing elections from single

member districts to at-large voting and implementing majority vote requirements" --

"resemble[d] those techniques and methods used in 1965, 1970, 1975, and 1982."  Id.  This Court

sees no reason, then, why the continued existence of these dilutive techniques, as well as the

continued existence of racially polarized voting -- a necessary precondition for such techniques to

be effective -- cannot support the 2006 reauthorization of Section 5.

10.    *Section 5's Deterrent Effect*

Any assessment of the persistence of intentional voting discrimination by covered

jurisdictions must also take into account "the number of voting changes that have never gone

forward as a result of Section 5."  See H.R. Rep. No. 109-478, at 24.  In 2006, the House

Committee on the Judiciary found that Section 5 has deterred covered jurisdictions "from even

attempting to enact discriminatory voting changes," as covered jurisdictions "'tend to understand

that submitting discriminatory changes is a waste of taxpayer time and money and interferes with

their own timetables, because the chances are good that an objection will result.'"  Id. (quoting 1

Evidence of Continued Need 177 (Nat'l Comm'n Report)).  In light of Section 5's substantial

deterrent effect, any evaluation of the continued existence of purposeful voting discrimination by

covered jurisdictions cannot be based solely on the number of intent-based objections lodged by
the Attorney General, or the number of lawsuits in which a three-judge court has denied
preclearance to a covered jurisdiction's racially-motivated voting change.  Rather, the assessment
of the continued need for Section 5 must also account for those intentionally discriminatory
voting changes that have been abandoned by covered jurisdictions prior to the formal
preclearance process, simply as a result of Section 5's existence.

Congress in 2006 heard testimony from a number of voting rights practitioners and
scholars as to how Section 5 has prevented the enactment of discriminatory voting changes
"'under the radar screen [in ways] that may not appear easily in statistics.'"  See Nw. Austin I, 573
F. Supp. 2d at 264 (quoting Introduction to Expiring Provisions 17 (testimony of Theodore
Shaw)).  As one civil rights lawyer in Alabama testified, "Section 5 provides a powerful deterrent
. . . and based on my experience, I strongly believe that the continued Section 5 coverage in
Alabama is not only necessary but it is imperative."  Benefits and Costs 4 (statement of Fred D.
Gray).  Other witnesses similarly expressed the view that "[t]he number of objections does not
capture the Act's tremendous deterrent effect."  Continuing Need 100 (Karlan Responses); id. at
141 (prepared statement of Anita S. Earls); Introduction to Expiring Provisions 166 (Shaw
Responses); Impact and Effectiveness 66 (prepared statement of Joseph D. Rich).  One witness
interpreted the decline in objection rates not as an indication that Section 5 is no longer needed,
but as a sign of Section 5's success in preventing covered jurisdictions from submitting
discriminatory voting changes for preclearance in the first place.  As she explained, "[i]f there
was an environmental regulation that limited pollution levels, cleaner air would not signify that it
is no longer needed, but that it is sufficiently serving its purpose and must be renewed."

Continuing Need 68 (Earls Responses).

The three-judge court in Nw. Austin I provided "several concrete examples" of cases in which "formal objections were unnecessary to thwart discriminatory voting changes," because the mere existence of Section 5 served to deter covered jurisdictions from "proposing certain changes once they realized the proposals would prompt objections." See 573 F. Supp. 2d at 265. Several witnesses highlighted the significance of Section 5 not just as a deterrent to the enactment of discriminatory voting changes, but also as a kind of "bargaining chip" for minority voters, ensuring that minority political participation remains a "central consideration" in the structuring of electoral processes. See Continuing Need 190-91 (prepared statement of Pamela S. Karlan); see also Impact and Effectiveness 66 (prepared statement of Joseph D. Rich).

Unfortunately, it is simply not possible to determine the number of purposefully discriminatory voting changes that have been deterred by Section 5. See, e.g., Continuing Need 114 (Pildes Responses) (noting that "the extent to which the existence of § 5 creates an effective deterrent effect is extremely difficult, perhaps impossible, to quantify"); Introduction to Expiring Provisions 73 (Hasen Responses) (explaining that the magnitude of Section 5's "deterrent effect cannot be quantified from the record"). Nor is it possible to determine -- at least to any reasonable degree of certainty -- whether, in the absence of Section 5, covered jurisdictions would resort to a host of unconstitutional, discriminatory voting practices. See Introduction to Expiring Provisions 39-40 (Hasen Responses); see also Nw. Austin I, 573 F. Supp. 2d at 267 (recognizing that "no one can know for sure what would happen if section 5 were allowed to expire"). Nevertheless, in examining whether Section 5 remains "justified by current needs," Nw. Austin II, 129 S. Ct. at 2512, it is significant to recall Congress's finding in 2006 that the

preclearance requirement has continued to deter covered jurisdictions from even attempting to adopt discriminatory voting changes in the first place.  See H.R. Rep. No. 109-478, at 24.  It therefore seems fair to assume that the instances of intentional voting discrimination documented in the legislative record represent only a fraction of those instances that otherwise would have occurred in the absence of Section 5, given the number of "discriminatory voting changes that have never materialized" as a result of the preclearance requirement.  See id. at 36.

C.     Section 5 as a Congruent and Proportional Response to a Continuing History and Pattern of Unconstitutional Conduct by Covered Jurisdictions

1.     _A Continuing History and Pattern of Unconstitutional Conduct_

Having reviewed the evidence of unconstitutional voting discrimination in the 2006 legislative record, the Court must now answer the central question posed by this case: "does the 2006 legislative record contain sufficient evidence of contemporary discrimination in voting to justify Congress's decision to subject covered jurisdictions to section 5 preclearance for another twenty-five years?"  See Nw. Austin I, 573 F. Supp. 2d at 265.  In other words, did Congress possess the requisite "evidence of a pattern of constitutional violations on the part of the States," Hibbs, 538 U.S. at 729, which is needed to satisfy the second step of the three-part Boerne analysis?  For several reasons, this Court agrees with the three-judge court in Nw. Austin I that "the 2006 legislative record is plainly adequate to justify section 5's 'strong remedial and preventive measures.'"  573 F. Supp. 2d at 271 (quoting Boerne, 521 U.S. at 526).

First, the legislative record amassed by Congress in support of the 2006 reauthorization of Section 5 is at least as strong as that held sufficient to uphold the 1975 reauthorization of Section 5 in City of Rome.  See Nw. Austin I, 573 F. Supp. 2d at 265-66, 270-71.  In City of Rome, the

Supreme Court looked to three types of evidence in evaluating whether Section 5 remained

justified by current needs: evidence of (1) continued racial disparities in voter registration; (2) the

number of minority elected officials; and (3) the nature and number of Section 5 objections.  In

1975, there were 16, 17.8, and 23.6 percentage point disparities in voter registration rates

between blacks and whites in Louisiana, North Carolina, and Alabama -- disparities that the

Supreme Court characterized as "significant."  See S. Rep. No. 94-295, at 779; see also City of

Rome, 446 U.S. at 180.  In 2004, there were 14.2, 17.8, and 19.2 percentage point disparities in

voter registration rates between blacks and non-Hispanic whites in Virginia, Arizona, and

Florida, and disparities of over 40 percentage points in voter registration rates between Hispanics

and non-Hispanic whites in Arizona, California, Virginia, Georgia, and North Carolina.

See 2004 U.S. Census Report.  These disparities are certainly comparable to those deemed

"significant" by the Supreme Court in City of Rome.

    With respect to minority elected officials, in 2006, just as in 1975, Congress recognized

the significant progress that had been made as far as the number of African-American elected

officials in covered jurisdictions, but also found that African-Americans remained under-

represented in state legislatures in the South based on their percentage of the population.

See H.R. Rep. No. 109-478, at 33.  Congress additionally found that three of the covered states

that had never elected a black representative to statewide office as of 1975 (Mississippi,

Louisiana, and South Carolina) still had never elected a black representative to statewide office

as of 2006.  Id.

    In terms of the objection-related statistics in the legislative record -- the third category of

evidence relied on by the Supreme Court in City of Rome -- Congress in 2006 acknowledged that

the objection rate had been lower in recent years than in the years immediately prior to the 1975

reauthorization of Section 5.  But Congress also received evidence indicating that the objection

rate has always been below 5%, see Introduction to Expiring Provisions 219 (attachment to

Hasen Prepared Statement), and that there were still more than 700 objections lodged by the

Attorney General since 1982, see H.R. Rep. No. 109-478, at 21, with more objections lodged

after 1982 than before, see 1 Evidence of Continued Need 172-73 (Nat'l Comm'n Report).  In

light of this data, the House Committee on the Judiciary had good reason to conclude that the

evidence of voting discrimination in the 2006 legislative record still "resemble[d]" the evidence

before Congress when it reauthorized Section 5 in 1975.  See H.R. Rep. No. 109-478, at 6.  This

"resemblance" of the 2006 legislative record to the 1975 legislative record is critical, given that

Boerne and later cases applying the congruence and proportionality framework have repeatedly

cited the legislative record at issue in City of Rome as containing precisely the kind of evidence

needed to sustain remedial, prophylactic enforcement legislation like Section 5.  See Nw. Austin

I, 573 F. Supp. 2d at 271 (citing Boerne, 521 U.S. at 530; Fla. Prepaid, 527 U.S. at 640; Garrett,

531 U.S. at 369, 373-74).

     In addition to the three categories of evidence relied on by the Supreme Court in City of

Rome, Congress in 2006 identified several other forms of evidence that bear directly on the

persistence of unconstitutional voting discrimination by covered jurisdictions.  As previously

mentioned, one study in the legislative record revealed that there were 421 objections lodged

between 1982 and 2006 in which the Attorney General denied preclearance to a covered

jurisdiction's proposed voting change based on his inability to find that the change was not

motivated by a racially discriminatory purpose.  See Preclearance Standards 180 tbl. 2 (McCrary

Study).  Another study found that 205 voting changes were withdrawn by covered jurisdictions

after receipt of an MIR, thereby suggesting that the covered jurisdiction may have known that its

change could not withstand federal scrutiny.  See 1 Evidence of Continued Need 178 (Nat'l

Comm'n Report).  There were 25 unsuccessful judicial preclearance suits filed since 1982,

including some in which preclearance was denied on the basis of discriminatory intent.  See Nw.

Austin I, 573 F. Supp. 2d at 266.  And there were at least 105 successful Section 5 enforcement

actions between 1982 and 2006, some of which led to the abandonment of unprecleared voting

changes by covered jurisdictions, while others led to intent-based denials of preclearance after

covered jurisdictions were forced to submit their voting changes for federal review.  See 1

Evidence of Continued Need 185-86 (Nat'l Comm'n Report); see also Preclearance Standards 83

(appendix to statement of Brenda Wright).  From 1982 to 2006, there were tens of thousands of

federal observers dispatched to monitor elections in covered jurisdictions, see 2006 Amendments

§ 2(b)(3)-(4), (8), 120 Stat. at 577-78, many of whom played a key role in preventing the

attempted intimidation and harassment of minority voters at the polls, see H.R. Rep. No. 109-

478, at 44.  And perhaps most importantly, there were at least 14 reported Section 2 cases since

1982 involving judicial findings of intentional or unconstitutional voting discrimination by

covered jurisdictions.  Nw. Austin I, 573 F. Supp. 2d at 258.  As the three-judge court in Nw.

Austin I pointed out, "all this evidence becomes even more compelling given Congress's finding

that section 5's preclearance requirement has deterred covered jurisdictions from even attempting

to implement an unknown and unknowable number of [voting] changes."  Id. at 266.

It is noteworthy that the evidence of unconstitutional voting discrimination in the 2006

legislative record far exceeds the evidence of unconstitutional discrimination found sufficient to

uphold the challenged legislation in both <u>Hibbs</u> and <u>Lane</u>.  See <u>Nw. Austin I</u>, 573 F. Supp. 2d at

271.  In <u>Hibbs</u>, a male employee of the Nevada Department of Human Resources brought suit

under the FMLA after he was discharged for failing to return to work because he had been caring

for his ailing wife.  Nevada contended that Congress had exceeded its Fourteenth Amendment

enforcement authority by abrogating state sovereign immunity in the FMLA.  Rejecting this

challenge, the Supreme Court held that Congress "had evidence of a pattern of constitutional

violations on the part of the States in this area," which justified enactment of the remedial § 5

legislation.  538 U.S. at 729.  In so holding, the Supreme Court relied on just four pieces of

evidence:

> (1) a Senate Report citation to a Bureau of Labor Statistics survey revealing disparities in private-sector provision of parenting leave to men and women; (2) submissions from two sources at a hearing on the Parental and Medical Leave Act of 1986 . . . that public-sector parental leave policies "diffe[r] little" from private-sector policies; (3) evidence that 15 States provided women up to one year of extended maternity leave, while only 4 States provided for similarly extended paternity leave; and (4) a House Report's quotation of a study that found that failure to implement uniform standards for parenting leave would "leav[e] Federal employees open to discretionary and possibly unequal treatment."

<u>Lane</u>, 541 U.S. at 528 n.17 (citation omitted) (summarizing <u>Hibbs</u>, 538 U.S. at 728-33).

In other words, the Supreme Court upheld the challenged provision of the FMLA as

responsive to a documented history and pattern of unconstitutional conduct by the states, based

solely on (1) a survey that found discriminatory parental leave practices by <u>private</u>-sector

employers, not state employers; and (2) three other forms of evidence of employers'

discriminatory practices with respect to <u>parental</u> leave, despite the fact that the FMLA provision

at issue provided for <u>family</u> leave, not parental leave.  See <u>Hibbs</u>, 538 U.S. at 746-48 (Kennedy,

J., dissenting).  The majority concluded that evidence relating to parental leave was "relevant

because both parenting and family leave provisions respond to 'the same gender stereotype: that women's family duties trump those of the workplace.'" Id. at 748 (quoting 538 U.S. at 731 n.5). But as Justice Kennedy pointed out in dissent, "the question is not whether the family leave provision is a congruent and proportional response to general gender-based stereotypes in employment . . . [but] whether it is a proper remedy to an alleged pattern of unconstitutional discrimination by States in the grant of family leave." Id. at 749.

In Lane, the Supreme Court upheld Title II of the ADA as applied to claims by the disabled alleging that they had been denied access to the courts based on "statistical, legislative, and anecdotal evidence of the widespread exclusion of persons with disabilities from the enjoyment of public services." Lane, 541 U.S. at 529. Significantly, however, the Supreme Court in Lane identified only "*two* reported cases finding that a disabled person's federal constitutional rights were violated" as a result of being denied access to the courts. Id. at 544 (Rehnquist, C.J., dissenting) (citing 541 U.S. at 525 n.14). Aside from those two cases, the only evidence that the Court identified with respect to "due process 'access to the courts'" violations was (1) the testimony of two witnesses before a House subcommittee as to the "'physical inaccessibility' of local courthouses," even though neither witness "reported being denied the right to be present at constitutionally protected court hearings"; and (2) a report by the ADA Task Force on the Rights and Empowerment of Americans with Disabilities, which contained "a few anecdotal handwritten reports of physically inaccessible courthouses." Id. at 545. As Chief Justice Rehnquist noted in dissent, these types of anecdotes do "not state a constitutional violation," since "[a] violation of due process occurs only when a person is actually denied the constitutional right to access a given judicial proceeding." Id. at 546. Yet the majority in Lane

-126-

found this evidence sufficient to establish "a pattern of unconstitutional treatment in the administration of justice," at least when viewed against the "backdrop of pervasive unequal treatment in the administration of state services and programs." Id. at 524.

The evidence relied on by the Supreme Court to uphold the challenged legislation in Hibbs and Lane "pales in comparison to the extensive record Congress compiled when extending section 5." Nw. Austin I, 573 F. Supp. 2d at 271. Just on the subject of formal judicial findings of unconstitutional conduct, Congress in 2006 identified three times as many reported cases since 1982 in which covered jurisdictions committed unconstitutional voting discrimination against minority voters (6) than the number of cases Lane identified in which a state unconstitutionally denied a disabled person access to the courts (2). Compare S. Rep. No. 109-295, at 65 with Lane, 541 U.S. at 544 (Rehnquist, C.J., dissenting) (citing 541 U.S. at 525 n.14). This is particularly remarkable, as the Nw. Austin I court noted, "given that section 5 was actively deterring constitutional violations throughout the period under review." 573 F. Supp. 2d at 272.

But, of course, there is much more in the 15,000-page record supporting the 2006 reauthorization of Section 5. The circumstantial evidence of unconstitutional voting discrimination relied on by Congress also far outweighs the circumstantial evidence of unconstitutional discrimination relied on by the Supreme Court in Hibbs and Lane. In Lane, for example, the Court cited as circumstantial evidence of unconstitutional discrimination the testimony of several disabled persons as to the physical inaccessibility of local courthouses -- even though physical inaccessibility, in and of itself, does not reflect a constitutional violation. See 541 U.S. at 546 (Rehnquist, C.J., dissenting) (explaining that "[w]e have never held that a person has a *constitutional* right to make his way into a courtroom without any external

assistance").  By contrast, many of the examples of voting discrimination cited by Congress in support of the 2006 reauthorization of Section 5 are highly suggestive of unconstitutional conduct: whether it be Kilmichael, Mississippi's decision to cancel its 2001 local elections in which a significant number of African-Americans sought office immediately after new Census data revealed that African-Americans recently had become a majority of the town's population; Charleston County, South Carolina's sudden decision in 2000 to change the method of election for its school board to one that had recently been struck down as discriminatory, just after African-Americans won a majority of seats on the board for the first time; Alabama poll officials' 1992 attempts to "close the doors" on African-American voters before the voting hours were over; Louisiana's 2001 decision to purposefully "obliterate" a majority-black district in Orleans Parish; South Dakota's passage of a photo identification law in 2002 that state legislators conceded was adopted in order to "retaliate" against the recent rise in Native American voter registration; Mississippi's 1995 attempt to revive its dual registration system without seeking preclearance, even though prior versions of the system had all been invalidated as discriminatory; or Waller County, Texas's suspiciously-timed reduction in voting opportunities for Prairie View A&M students immediately before a 2004 election that was marked by the presence of two black Prairie View A&M students as candidates for office.  None of these incidents resulted in a formal judicial finding of unconstitutional voting discrimination.  Yet each case -- and many others like them in the 15,000-page legislative record -- supports the conclusion that unconstitutional voting discrimination persists in covered jurisdictions, notwithstanding the deterrent effect of Section 5.

In evaluating whether Congress properly found a history and pattern of unconstitutional conduct sufficient to justify the 2006 reauthorization of Section 5, it is also significant to recall

the deference to which Congress is entitled when it legislates to enforce the substantive

guarantees of the Fifteenth Amendment.  As the Supreme Court acknowledged in Nw. Austin II,

"[t]he Fifteenth Amendment empowers 'Congress,' not the Court, to determine in the first

instance what legislation is needed to enforce it."  129 S. Ct. at 2513.  And as explained earlier,

Congress acts at the pinnacle of its constitutional enforcement authority when it legislates to

protect a fundamental right, or when it legislates to prohibit discrimination against a suspect

class.  See supra pp. 65-66.  In reauthorizing Section 5 in 2006, Congress did both.

Moreover, Congress's determination that there is a continued need for Section 5 was not

based on a perfunctory review of a few isolated examples of voting discrimination by covered

jurisdictions.  Instead, Congress "approached its task seriously and with great care."  Nw. Austin

I, 573 F. Supp. 2d at 265.  It held 22 hearings over the course of eight months, and heard

testimony from 92 witnesses, including Justice Department attorneys, law professors, social

scientists, and civil rights litigators.  In addition to that testimony, the evidence that Congress

collected consisted of statistical and other analyses, objection letters, law review articles, judicial

decisions, and first-hand accounts of discrimination.  Ultimately, Congress amassed a 15,000-

page legislative record in support of its decision to renew Section 5 -- a record that the Supreme

Court has described as "sizeable," Nw. Austin II, 129 S. Ct. at 2513, and that dwarfs those

deemed sufficient in Lane and Hibbs.  Shelby County points out that "[i]t is the quality of the

evidence that matters – not the quantity of evidence."  See Pl.'s Reply at 38.  But the Supreme

Court has often acknowledged the quantity of the evidence considered by Congress in the course

of assessing the sufficiency of that evidence.  See, e.g., Katzenbach, 383 U.S. at 309 (describing

the legislative history of the Act as "voluminous").  And surely Congress's judgment that

"extending the expiring provisions of the Voting Rights Act is still necessary," S. Rep. No. 109-295, at 2, is all the more valuable given the "sheer bulk of the record showing both continued problems and significant improvements," id. at 15, which Congress reviewed prior to reaching its conclusion.

There are additional reasons to accord significant weight to Congress's 2006 decision to renew Section 5.  First, Congress in 2006 did not enact new legislation, but instead reauthorized legislation that had already been in effect for more than 40 years.  During those 40 years, the Supreme Court upheld the constitutionality of Section 5 on four separate occasions, each time finding that "circumstances continued to justify the provision[]."  See Nw. Austin II, 129 S. Ct. at 2510 (citing Georgia, 411 U.S. 526; City of Rome, 446 U.S. 156; Lopez, 525 U.S. 266); see also Katzenbach, 383 U.S. at 334.  Twice, the Supreme Court has assessed facial challenges to Section 5 like the one raised here by Shelby County, and both times the Court has found that Section 5 passed constitutional muster based on evidence of continued voting discrimination by covered jurisdictions.  See Katzenbach, 383 U.S. at 334; City of Rome, 446 U.S. at 182.

The Supreme Court in Nw. Austin II made clear that past discrimination alone cannot sustain Section 5, see 129 S. Ct. at 2511, but the Court by no means suggested that history was irrelevant to the constitutional analysis.  In Boerne and the cases applying the congruence and proportionality framework since Boerne, the Supreme Court has acknowledged the significance of an established history of unconstitutional discrimination in evaluating the need for remedial enforcement legislation, often citing examples of discrimination at least several decades old in order to justify the challenged legislation.  See, e.g., Lane, 541 U.S. at 524 (describing the historical "backdrop" of discrimination against the disabled, and citing examples of such

discrimination dating from the late 1970s); Hibbs, 538 U.S. at 729 (recognizing "[t]he history of the many state laws limiting women's employment opportunities," and providing examples of cases upholding the validity of such laws as far back as 1873); Richard L. Hasen, Congressional Power to Renew the Preclearance Provisions of the Voting Rights Act After Tennessee v. Lane, 66 OHIO ST. L.J. 177, 200 (2005) (interpreting Lane to mean that "old" evidence of voting discrimination could be used to support a reauthorization of Section 5).

When courts assess individual instances of alleged voting discrimination like those described in the 2006 legislative record -- for example, in the context of a Section 2 suit or a direct constitutional challenge -- they also look to historical evidence to determine whether there has been intentionally discriminatory, unconstitutional conduct.  As the Supreme Court explained in Rogers v. Lodge, "[e]vidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases . . . where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by the courts or made illegal by civil rights legislation, and that they were replaced by practices which, though neutral on their face serve to maintain the status quo."  458 U.S. at 625; see also Charleston Cnty., 573 F. Supp. 2d at 305 (explaining that under Arlington Heights, "[t]he historical background of the jurisdiction's decision" must be considered in determining whether "discriminatory intent was in fact a motivating factor in a jurisdiction's enactment of legislation").  Given the significance of historical context in assessing both the general need for remedial, prophylactic enforcement legislation and whether particular instances of alleged voting discrimination do, in fact, amount to constitutional violations, it is clear that any assessment of the continued need for Section 5 cannot be undertaken in a historical vacuum.

This Court agrees with the three-judge court in Nw. Austin I that Congress's "predictive judgment" as to the continued need for Section 5 warrants "particular respect," given that it was a prediction based "on experience, requiring less in the way of conjecture than when Congress enacts legislation for the first time." 573 F. Supp. 2d at 267. In reauthorizing Section 5 in 2006, Congress could not be certain as to whether unconstitutional voting discrimination would increase in the absence of Section 5, and whether, just as in 1965, private enforcement actions would once again prove insufficient to protect minorities' voting rights if Section 5 were allowed to expire. But courts "must accord substantial deference to the predictive judgments of Congress . . . particularly when, as here, those predictions are so firmly rooted in relevant history and common sense." Id. (quoting McConnell v. FEC, 540 U.S. 93, 165 (2003)) (internal quotation marks and citations omitted). As the Supreme Court noted in Nw. Austin II, Congress is a co-equal Branch that is empowered under the Fifteenth Amendment "to determine in the first instance what legislation is needed to enforce it," and courts must be cautious when engaging in the grave and delicate role of assessing the constitutionality of carefully-considered legislation. See 129 S. Ct. at 2513. And in 2006, Congress concluded after many months of deliberation and compilation of a massive record that "a failure to reauthorize the temporary provisions [of the Voting Rights Act], given the record established, would leave minority citizens with the inadequate remedy of a Section 2 action," which, in light of past experience, would not be "enough to combat the efforts of certain States and jurisdictions to discriminate against minority citizens in the electoral process." H.R. Rep. No. 109-478, at 57.

Congress's predictive judgment was based not only on the established pre-1965 history of unconstitutional state-sponsored voting discrimination in the South, but also on evidence of

Section 5's substantial deterrent effect over 40 years.  Most importantly, it was based on the

extensive 15,000-page legislative record replete with direct and circumstantial evidence of

contemporary voting discrimination by covered jurisdictions -- voting discrimination that

occurred <u>despite</u> the existence of Section 5.  This Court finds, then, that Congress satisfied its

burden in 2006 of identifying a continuing "history and pattern of unconstitutional . . .

discrimination by the States," <u>Garrett</u>, 531 U.S. at 368, which was sufficient to justify the

reauthorization of Section 5 as remedial, prophylactic enforcement legislation.

2.     <u>*The Congruence and Proportionality of Section 5*</u>

The third and final step of the <u>Boerne</u> analysis requires the Court to decide whether

Section 5 still constitutes a "congruent and proportional" response to the problem that it targets.

Shelby County casts Section 5 as an unduly broad remedial measure, arguing that "[l]ike RFRA,

Section 5's 'sweeping coverage ensures its intrusion at every level of government, displacing laws

and prohibiting official actions' regarding any change in voting laws."  Pl.'s Reply at 21 (quoting

<u>Boerne</u>, 521 U.S. at 532).  In a sense, Shelby County is correct: Section 5 does require covered

jurisdictions to seek preclearance for <u>all</u> changes to their voting practices or procedures,

regardless of how trivial or innocuous those changes may be.  <u>See, e.g.</u>, <u>Nw. Austin II</u>, 129 S. Ct.

at 2511 (noting that "the preclearance requirement applies broadly").  But Section 5 is

nonetheless limited in meaningful ways.  Indeed, the Supreme Court in <u>Boerne</u> praised Section 5

as an exemplary congruent and proportional remedy, pointing to the Act's temporal and

geographic limits as a means of distinguishing it from RFRA, which lacked a "termination date

or termination mechanism."  <u>See Boerne</u>, 521 U.S. at 532-33.  For purposes of assessing the

congruence and proportionality of Section 5 as reauthorized in 2006, then, it is significant that

"the limiting features of section 5 the Court believed so compelling in the City of Boerne cases all remain in place today." Nw. Austin I, 573 F. Supp. 2d at 274.

Despite Shelby County's suggestion that Section 5 has been transformed from an "emergency" provision into a "permanent" intrusion on state sovereignty, see Pl.'s Reply at 43, Congress in 2006 did not choose to make Section 5 permanent.  Instead, it extended the preclearance requirement for 25 years, and provided for congressional reconsideration of the Act's temporary provisions in 15 years.  See S. Rep. No. 109-295, at 5; 42 U.S.C. § 1973b(a)(7), (8).  Although 25 years is longer than the 7 year extension of Section 5 upheld by the Supreme Court in City of Rome, the 2006 extension is the same length as the 1982 extension.  And Congress had at least two good reasons for selecting 25 years as the length of the extension. First, a renewal period of more than 20 years was needed to cover two decennial redistricting cycles.  Because "most section 5 activity 'occurs during redistricting, which only happens every ten years following each census,' a shorter extension would [have] 'capture[d] only one redistricting cycle,'" which would not have provided as much "'evidence . . . to allow Congress to make the same reasoned determination regarding renewal'" that the 2006 Congress was able to make as a result of the previous 25-year renewal of Section 5 in 1982.  See Nw. Austin I, 573 F. Supp. 2d at 267 (internal citation omitted); see also Introduction to Expiring Provisions 167 (Shaw Responses).  Second, a shorter extension period would not have encouraged as many covered jurisdictions to seek bailout.  Under the 1982 Amendments, a covered jurisdiction petitioning for bailout must demonstrate that it has complied with the Act's requirements for the past ten years.  See 42 U.S.C. § 1973b(a).  Any renewal of Section 5 for a period of less than ten years therefore "'would [have] completely nullif[ied] the current incentive [for] covered

jurisdictions to maintain clean voting records."  Nw. Austin I, 573 F. Supp. 2d at 267 (internal

citation omitted).

For these reasons, Congress decided that "another 25 years of remedial measures (for a

total of 67 years of remedial measures under the VRA until 2032) remains appropriate given the

near century of discrimination the Act is designed to combat."  H.R. Rep. No. 109-478, at 58.

Like the three-judge court in Nw. Austin I, this Court "see[s] no basis for questioning this

quintessentially legislative judgment."  573 F. Supp. 2d at 268.  Although the 25-year renewal

period is substantial, the fact that Section 5 continues to be temporally limited distinguishes it

from every piece of legislation that has been struck down by the Supreme Court as lacking

congruence and proportionality under Boerne.

In addition to its termination date, Section 5 also remains limited by its termination

mechanism, as jurisdictions may bailout of Section 5 coverage if they meet certain statutory

requirements.  See Nw. Austin II, 129 S. Ct. at 2509; 42 U.S.C. § 1973b(a).  The Court in Boerne

pointed to the existence of this termination mechanism, which "ensure[d] that the reach of the

Voting Rights Act was limited to those cases in which constitutional violations were most

likely," as indicative of Section 5's congruence and proportionality.  See 521 U.S. at 533.  Since

Boerne, the bailout provision has remained in effect.  See H.R. Rep. No. 109-478, at 55 (noting

that "H.R. 9 preserves those same provisions" that were cited approvingly by the Court in

Boerne, as covered jurisdictions may still "escape coverage by showing the danger of substantial

voting discrimination has not materialized during the preceding (now ten) years").  Under 42

U.S.C. § 1973b(a), a jurisdiction may seek to terminate its coverage under Section 5 by filing a

declaratory judgment action demonstrating that, for the past ten years, "it has not used any

forbidden voting test, has not been subject to any valid objection under § 5, and has not been found liable for other voting rights violations; it must also show that it has 'engaged in constructive efforts to eliminate intimidation and harassment' of voters, and similar measures." Nw. Austin II, 129 S. Ct. at 2509 (quoting §§ 1973b(a)(1)(A)-(F)).

Shelby County questions whether bailout is "a realistic option," citing the fact that only 6% of the jurisdictions originally covered by the Act have successfully bailed out since 1965. See Pl.'s Reply at 33. But this statistic is misleading. Since 1984 -- when the 1982 Amendments liberalizing the bailout procedure went into effect -- the Attorney General has consented to every bailout action that has been filed. See Berman Decl. ¶¶ 27, 29. Indeed, since the initiation of this lawsuit in April 2010, the Attorney General has consented to an additional seven bailout suits that have been filed by covered jurisdictions. See Def.'s Second Notice of Supp. Info. [Docket Entry 81] at 2; Def.'s Mot. at 72; Berman Decl. ¶ 27. Congress heard testimony during the 2006 reauthorization hearings from J. Gerald Hebert, former Acting Chief of the Civil Rights Division of the Justice Department, who, at the time of his testimony, had represented all of the covered jurisdictions to successfully bail out since 1984. See Voting Rights Act: An Examination of the Scope and Criteria for Coverage Under the Special Provisions of the Act, Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary, 109th Cong. 90 (Oct. 20, 2005) (hereinafter, "Scope and Criteria") (prepared statement of J. Gerald Hebert) (hereinafter, "Hebert Prepared Statement"). According to Hebert, the reason for the low number of successful bailout actions is not that "jurisdictions are applying and being denied" but that "jurisdictions are just not applying." Id.

There are several plausible explanations for this failure to seek bailout. As Professor

Karlan noted during her 2006 testimony before the Senate Judiciary Committee, it is possible that "jurisdictions have not sought bailout because they have not satisfied all the conditions . . . and see no point in a futile effort to bail out." Continuing Need 93 (Karlan Responses).  This, of course, could mean that the criteria for bailout are overly rigorous; but Congress in 2006 heard testimony that "[m]ost of the factors to be demonstrated are easily proven for jurisdictions that do not discriminate in their voting practices."  See Scope and Criteria 90 (Hebert Prepared Statement) (rejecting the contention that "the criteria [for bailout] are . . . too difficult to meet").  Accepting that the bailout requirements are appropriately tailored to identify those jurisdictions with "clean" voting rights records, which appears to be the case, see id. at 104 (describing the bailout requirements as "perfectly tailored"), the failure of so many covered jurisdictions to seek bailout likely means that these jurisdictions -- or governmental units within these jurisdictions -- have, in fact, committed voting rights violations in recent years, thereby justifying their continued coverage under the Act.

Another possible reason for the low bailout rate is the minimal administrative cost associated with preclearance, and the fact that covered jurisdictions see no need to avoid the preclearance requirement.  Congress in 2006 heard testimony from Donald Wright, General Counsel of the North Carolina State Board of Elections, who indicated that most preclearance submissions "are routine matters that take only a few minutes to prepare using electronic submission formats" that are "readily available." Policy Perspectives 313 (prepared statement of Donald M. Wright).  Wright characterized the practical cost of preclearance as "insignificant" -- with the exception of redistricting submissions, which tend to be relatively infrequent -- and he went on to explain that the "consensus" among election officials in North Carolina is that Section

5 imposes "a manageable burden providing benefits in excess of costs and time needed for

submissions." Id.  Other witnesses similarly testified that the benefits of Section 5 far outweigh

its costs, given that the preparation of a preclearance submission is no more than "a small

administrative act." See Benefits and Costs 25 (testimony of Fred D. Gray); Continuing Need 64

(Earls Responses) (explaining that "the majority" of officials "did not find Section 5 requirements

to be burdensome").[16]

 Indeed, in the Nw. Austin litigation, six states covered in whole or in part by Section 4(b)

-- Louisiana, California, North Carolina, Arizona, Mississippi, and New York -- submitted an

amicus brief in which they urged the Supreme Court not to strike down Section 5, arguing that

"the benefits of Section 5 greatly exceed the minimal burdens that Section 5 may impose on

States and their political subdivisions." See Amicus Br. for North Carolina, Arizona, California,

Louisiana, Mississippi and New York, Nw. Austin II, 2009 WL 815239, at *2, 17 (Mar. 25,

2009).  According to these states, Section 5 does not constitute "an undue intrusion on state

sovereignty," because the administrative preclearance process is both "expeditious and cost-

effective," and any burden that Section 5 imposes on covered jurisdictions is more than justified

by Section 5's "substantial benefits." Id. at *1-2.  Section 5's minimal administrative burden -- at

least according to these six states -- stands in stark contrast to the "heavy litigation burden"

---

 [16]  The Court recognizes that administrative costs of compliance are not the only costs
imposed by Section 5. See, e.g., Bossier II, 528 U.S. at 336 (referring to "the 'substantial'
federalism costs that the preclearance procedure already exacts") (quoting Lopez, 525 U.S. at
282).  Nevertheless, an assessment of a remedial statute's practical costs is relevant in
determining whether it constitutes congruent and proportional legislation. See, e.g., Boerne, 521
U.S. at 534 (describing the "substantial costs RFRA exacts, both in practical terms of imposing a
heavy litigation burden on the States and in terms of curtailing their traditional general regulatory
power").

imposed by RFRA.  See Boerne, 521 U.S. at 534.[17]

    In addition to the evidence indicating that the practical cost of Section 5 compliance is low, Congress in 2006 received evidence indicating that the practical cost of Section 2 litigation is high.  As one expert explained during her 2006 testimony before the Senate Judiciary Committee, Section 2 litigation is both time-consuming and costly, as it requires attorneys "to assemble plaintiffs with standing, file a case and engage in discovery," and "even on an expedited schedule, trial will be months and possibly a year after the new law is put in place."  Continuing Need 61 (Earls Responses).  Section 2 litigation places a heavy burden on minority plaintiffs, who not only must fund the litigation, but also must prove that particular voting practices are, in fact, discriminatory (unlike Section 5, which shifts the burden to covered jurisdictions to prove that their voting changes are non-discriminatory).  See Katzenbach, 383 U.S. at 328.  Moreover, even if minority plaintiffs are able to satisfy this evidentiary burden, Section 2 -- unlike Section 5 -- can only eradicate discriminatory voting practices after they have already been implemented to the detriment of minority voters.  See Def.'s Mot. at 55-57.

    For all these reasons, several witnesses who testified during the 2006 reauthorization hearings speculated that in the absence of Section 5, Section 2 would prove insufficient to protect minority voting rights.  See, e.g., Benefits and Costs 80 (responses of Armand Derfner to questions submitted by Senators Cornyn, Coburn, Leahy, Kennedy, and Schumer) (describing Section 2 cases as "expensive and time-consuming to litigate and hard to win," and refuting the position that "Section 5 is not needed because other litigation will do the job"); Continuing Need

---

    [17] No states have sought to join in Shelby County's well-publicized challenge to Section 5.

15 (testimony of Pamela S. Karlan) (explaining that Section 2 suits demand "huge amounts of resources" and that Section 2 litigation is not "an adequate substitute in any way" for Section 5). The inadequacy of alternative remedies like Section 2 in combating continued voting discrimination by covered jurisdictions further confirms that Section 5 is "congruent and proportional" to the problem that it targets.  Cf. Garrett, 531 U.S. at 373 (noting that the Voting Rights Act was only enacted after "traditional litigation had proved ineffective" in the course of describing why the Act reflects an appropriately "detailed but limited remedial scheme").

Perhaps the most significant way in which Section 5 remains limited, however, is through its application to only "those states with the most severe histories of discrimination" in voting. See Nw. Austin I, 573 F. Supp. 2d at 274.  Since it was first enacted in 1965, Section 5 has never applied nationwide, but has always targeted specific jurisdictions with a "long history of racial disenfranchisement and dilution."  Continuing Need 103 (Karlan Responses); see also supra pp. 11, 22.  Boerne and its progeny have repeatedly highlighted Section 5's selective coverage in explaining why it constitutes appropriately tailored remedial legislation.  See, e.g., Boerne, 521 U.S. at 532-33 (comparing RFRA's nationwide application to the provisions of the Voting Rights Act upheld in Katzenbach, which "were confined to those regions of the country where voting discrimination had been most flagrant"); Garrett, 531 U.S. at 373 (explaining that the Voting Rights Act, unlike Title I of the ADA, was targeted at "those areas of the Nation where abundant evidence of States' systematic denial of [voting] rights was identified"); Fla. Prepaid, 527 U.S. at 647 (contrasting the "various limits" contained in the Voting Rights Act with the absence of any such limits in the Patent and Plant Variety Protection Remedy Clarification Act).  And like the other limiting features of Section 5 that were lauded by the Supreme Court in Boerne, the

-140-

coverage formula embodied in Section 4(b) remained unchanged when Congress reauthorized Section 5 in 2006.

Given that Congress preserved all of Section 5's traditional limiting features when it reauthorized Section 5 in 2006 (including its selective geographic scope, its termination date, and its termination mechanism), after it heard testimony as to the low administrative costs imposed by preclearance and the inability of Section 2 litigation to effectively prevent unconstitutional voting discrimination, this Court sees no reason to question Congress's considered judgment that Section 5 remains congruent and proportional to the problem that it targets.[18]  The question remains, however, whether the geographical limitation of Section 5 through the coverage formula of Section 4(b) is itself vulnerable to challenge.

## IV.    The Constitutionality of Section 4(b)

Shelby County challenges Section 4(b) on the ground that it unconstitutionally differentiates between states in violation of "the principle of equal sovereignty" embodied in the Tenth Amendment and Article IV of the Constitution, and that, like Section 5, it does not constitute "'appropriate' enforcement legislation."  See Pl.'s Mot. at 35; Compl. ¶ 43(c).  Since Katzenbach, it is well-established that "[t]he doctrine of the equality of States . . . does not bar [the] approach" of selectively applying remedial legislation to only those "geographic areas where immediate action seem[s] necessary."  383 U.S. at 328-29.  Nevertheless, the Supreme Court in Nw. Austin II made clear that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently

_____

[18]  To the extent that Katzenbach's rationality standard rather than Boerne's congruence and proportionality test provides the proper mode of analysis, the Court finds for the same reasons that the 2006 reauthorization of Section 5 withstands scrutiny under Katzenbach.

related to the problem that it targets." See 129 S. Ct. at 2512.  According to Shelby County, "the decades-old data fossilized in the coverage formula bear no relation whatsoever to 'current political conditions' in those jurisdictions'" and "the 'evils' identified by Congress as a basis for reauthorizing Section 5 are not 'concentrated in the jurisdictions singled out for preclearance.'" Pl.'s Reply at 23 (quoting Nw. Austin II, 129 S. Ct. at 2512).  Hence, Shelby County contends, Section 4(b)'s coverage formula is no longer "sufficiently related" to the problem that it targets.

The Supreme Court in Nw. Austin II did not explicate the precise nature of the showing needed to determine whether Section 5's disparate geographic coverage remains "sufficiently related" to the problem that it targets.  Several justices during oral argument seemed to suggest that Congress might have to undertake a comparative analysis of unconstitutional voting discrimination in covered versus non-covered jurisdictions and prove that the "States that are now covered . . . are markedly different from the noncovered jurisdictions" in order to justify Section 5's continued selective application.  Nw. Austin II Oral Arg. Tr. at 22 (Apr. 29, 2009) (Kennedy, J.); see also id. at 48 (Roberts, C.J., asking whether it is counsel's "position that today southerners are more likely to discriminate than northerners"?); id. at 54 (Alito, J., asking counsel whether "there is no [greater] discrimination in voting in Virginia than in North Carolina or in Tennessee or in Arkansas or in Ohio"?); id. at 30 (Scalia, J., pressing counsel as to whether the legislative record shows only that section 5 is still "needed" in covered jurisdictions, or also that Section 5 is needed more in covered jurisdictions than in "the rest of the country").  Significantly, however, the Supreme Court in Katzenbach did not conduct any detailed comparative analysis of voting discrimination in covered versus non-covered jurisdictions when it upheld Section 4(b) in 1966, nor did the Court in City of Rome undertake such a comparative analysis when it upheld

Section 5 (and its selective application) in 1980.

Hence, the Attorney General argues that it was sufficient for Congress in 2006 to choose "to continue covering the jurisdictions that it had already subjected to the preclearance requirement and that had not bailed out . . . based on findings that voting discrimination continued to exist in those specific jurisdictions and that Section 5 preclearance remained necessary to protect minority voting rights there." Def.'s Supp. Mem. [Docket Entry 75] at 3. No comparative showing as to the precise degree of voting discrimination in covered versus non-covered jurisdictions was necessary, the Attorney General contends, given that a set of jurisdictions was lawfully subjected to preclearance in 1965 -- and in subsequent reauthorizations of the Voting Rights Act -- and Congress learned that those same jurisdictions continued to warrant coverage in 2006. See id. Ultimately, however, this issue need not be parsed further here, because Congress in 2006 did examine both (1) whether voting discrimination persisted in the jurisdictions traditionally covered by Section 4(b), and (2) whether voting discrimination remained more prevalent in these jurisdictions than in the jurisdictions not subject to preclearance under the Act. See Def.'s Supp. Mem. at 4.

This Court has already described in great detail the evidence in the legislative record documenting the contemporary existence of unconstitutional voting discrimination by covered jurisdictions. In assessing whether this evidence is sufficient to justify the continued application of Section 5 to these jurisdictions, it is useful to start with Katzenbach -- the only Supreme Court case in which the Court has outlined the precise nature of the showing needed to sustain Section 4(b). There, South Carolina argued -- like Shelby County does here -- that the coverage formula was "awkwardly designed in a number of respects," 383 U.S. at 329, and it criticized the formula

-143-

for excluding "certain localities which do not employ voting tests and devices, but for which there is evidence of voting discrimination by other means," id. at 330-31.  But the Supreme Court dismissed these arguments as "largely beside the point."  Id. at 329.  Congress was not required to create a perfect fit between the coverage formula and the states where voting discrimination was the most prevalent, the Court explained, "so long as the distinctions drawn have some basis in practical experience."  Id. at 331 (emphasis added).

The Court in Katzenbach further suggested that Congress was not even required to document evidence of unconstitutional voting discrimination in each of the states covered by Section 4(b).[19]  According to the Court, Congress began working "with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act," and it created a formula that "was relevant to the problem of voting discrimination."  Id. at 329 (emphasis added).  That formula -- based on the presence of a voting test or device in a particular jurisdiction as well as low voter registration or turnout in that

_____

[19]  This view would also seem to be supported by cases like Hibbs, in which the Supreme Court upheld remedial enforcement legislation with nationwide application without requiring a showing of unconstitutional conduct by every state to which the legislation applied.  See, e.g., United States v. Blaine Cnty., Mon., 363 F.3d 897, 906 (9th Cir. 2004) (explaining that, based on Hibbs, "it is clear that Congress need not document evidence of constitutional violations in every state to adopt a statute that has nationwide applicability"); but see Hibbs, 538 U.S. at 741-43 (Scalia, J., dissenting) (criticizing the majority's failure to "even attempt to demonstrate that each one of the 50 States covered by [the challenged legislation] was in violation of the Fourteenth Amendment"); Lane, 541 U.S. at 564 (Scalia, J., dissenting) (stating that he "would not . . . abandon the requirement that Congress may impose § 5 prophylactic legislation only upon those particular States in which there has been an identified history of relevant constitutional violations").  It certainly would seem odd to place a higher evidentiary burden on Congress when it seeks to tailor its remedies to those states where the remedies are most needed than when it chooses to forego any attempt at tailoring, and instead simply enacts remedial legislation on a nationwide scale.  On the other hand, one could argue that a higher evidentiary showing is justified in all circumstances in which Congress departs "from the fundamental principle of equal sovereignty." 129 S. Ct. at 2512.

jurisdiction -- was "relevant" because of the "long history" of states using these tests and devices as a tool for perpetuating minority disenfranchisement.  See id. at 330.  Once Congress had constructed this "relevant" formula -- which was rational "in both practice and theory," id. -- Congress was "entitled to infer a significant danger of the evil in the few remaining States and political subdivisions covered by s[ection] 4(b) of the Act," id. at 329, "at least in the absence of proof that they have been free of substantial voting discrimination in recent years," id. at 330.

Shelby County argues that the coverage formula is no longer "relevant" in 2006 because it is based on voter registration and turnout data that "is now 38 years old and will be 59 years old when the 2006 reauthorization expires," Pl.'s Mot. at 37, and because the "statutory coverage factors are tied to the ability to cast a ballot" whereas Section 5 today is directed primarily at so-called "second generation barriers" to voting, and not at states' attempted "interference with ballot access."  Pl.'s Supp. Mem. [Docket Entry 74] at 4; see also Pl.'s Mot. at 38.  Certainly the continued reliance on arguably outdated data is fair cause for concern.  But ultimately Shelby County misses the point.  As previously explained, see supra pp. 11, 22, the specific election years that have come to be used as "triggers" for coverage under Section 4(b) were never selected because of something special that occurred in those years; instead, they were chosen as mere proxies for identifying those jurisdictions with established histories of discriminating against racial and language minority voters.  See, e.g., Continuing Need 99 (Karlan Responses); id. at 110 (Pildes Responses).  Notwithstanding the passage of time since the coverage formula was last updated, "[t]he identity of the jurisdictions with that pervasive history and contemporary voting discrimination has not changed."  Id. at 103 (Karlan Responses).  It is for this reason that Chairman Sensenbrenner was so vigorously opposed to the Norwood Amendment's proposed

"updating" of Section 4(b) in 2006, which would have made the coverage formula dependent on voter turnout and registration data from the three most recent presidential elections.  As Chairman Sensenbrenner explained, any "updating" of the coverage formula along these lines would eviscerate Section 5, since the coverage formula "is not, and I repeat 'not' predicated on these [voter turnout and registration] statistics alone."  <u>See</u> 152 Cong. Rec. H5181.  In 1965, states were only covered by Section 4(b) if "they applied discriminatory voting tests.  And it was this aspect of the formula that brought these jurisdictions with the most serious histories of discrimination under Federal scrutiny," Chairman Sensenbrenner explained.  <u>Id.</u>

It is also this aspect of the coverage formula -- that is, its link to jurisdictions with proven histories of racial discrimination in voting -- that the Supreme Court has repeatedly cited in noting that Section 5 constitutes an appropriate congruent and proportional remedy.  <u>See, e.g.,</u> <u>Boerne</u> 521 U.S. at 533 (contrasting Section 5's limited application with RFRA's nationwide scope, and noting that the preclearance requirement "was placed only on jurisdictions with a history of intentional discrimination in voting"); <u>Hibbs</u>, 538 U.S. at 741-43 (Scalia, J., dissenting) (suggesting that the Court in <u>City of Rome</u> upheld "the most sweeping provisions of the Voting Rights Act of 1965 . . . as a valid exercise of congressional power under § 2 of the Fifteenth Amendment" only because those provisions "were restricted to States 'with a demonstrable history of intentional racial discrimination in voting'") (quoting <u>City of Rome</u>, 446 U.S. at 177).

By preserving Section 4(b)'s existing coverage formula in 2006 -- under which jurisdictions are subject to preclearance if they maintained a voting test or device in 1964, 1968, or 1972, and had voter turnout or registration below 50% in that year's presidential election, <u>see</u> 42 U.S.C. § 1973b(b) -- Congress ensured that Section 4(b) would continue to focus on those

jurisdictions with the worst <u>historical</u> records of voting discrimination.  At the same time,

Congress did not merely extend the preclearance requirement to these jurisdictions as a

"[p]unishment for long past sins," <u>Nw. Austin II</u>, 129 S. Ct. at 2525 (Thomas, J., concurring in

judgment in part, dissenting in part).  Rather, Congress found substantial evidence of

contemporary voting discrimination by the very same jurisdictions that had histories of

unconstitutional conduct, which, it concluded, justified their continued coverage under the Act.

Finally, Congress found that any over- or under-inclusiveness in Section 4(b) could be remedied

through use of the bailout provision in Section 4(a), and the bail-in provision in Section 3(c).

<u>See</u> <u>Nw. Austin I</u>, 573 F. Supp. 2d at 274.

To the extent that an additional showing of a meaningful difference in voting

discrimination between covered and non-covered jurisdictions was nonetheless required to

demonstrate that the Act's coverage remains "sufficiently related to the problem that it targets,"

the legislative record does contain such evidence.  For example, the study of Section 2 litigation

conducted by Ellen Katz and the Voting Rights Initiative at the University of Michigan Law

School found that 64 of the 114 reported Section 2 cases with outcomes favorable to minority

voters were filed in covered jurisdictions.  <u>See</u> <u>Impact and Effectiveness</u> 974 (Katz Study).

Although a Section 2 violation does not require proof of unconstitutional discriminatory intent,

"many of the same factors required to make a finding of intentional discrimination" are the

factors used to determine whether there has been a violation of Section 2.  <u>See</u> Def.'s Reply at 25;

<u>see also</u> <u>Impact and Effectiveness</u> 986 (Katz Study).  Accordingly, the fact that more than 56% of

the successful Section 2 suits since 1982 have been filed in covered jurisdictions -- even though

those jurisdictions contain only 39.2% of the country's African-American population, 31.8% of

the Latino population, 25% of the Native American population, and less than 25% of the overall population -- suggests that unconstitutional discrimination remains more prevalent in covered than in non-covered jurisdictions.  See Impact and Effectiveness 974; see also Introduction to Expiring Provisions 43-44 (responses of Chandler Davidson to questions submitted by Senators Cornyn and Leahy).  The disproportionate number of successful Section 2 suits in covered jurisdictions is all the more remarkable considering that "Section 5 blocks and deters discrimination in covered jurisdictions, and, consequently, one would expect to see *fewer* Section 2 cases there."  Def.-Int. Cunningham and Pierson's Supp. Mem. [Docket Entry 73] at 14.

There is also evidence in the legislative record indicating that five of the six Deep South states originally covered by Section 5 (namely, Louisiana, Mississippi, Alabama, Georgia, and South Carolina) accounted for as many as 66% of all federal observer coverages since 1982.  See H.R. Rep. No. 109-478, at 24-25.  This would certainly seem to suggest that minority voter intimidation and harassment continues to pose a greater problem in covered than in non-covered states -- and that it continues to pose a particularly severe problem in the Deep South.  In addition, Congress received evidence in 2006 suggesting that minority candidates are less likely to succeed in elections in covered than in non-covered jurisdictions, see Impact and Effectiveness 1008 (Katz Study) (explaining that the majority of Section 2 cases finding a lack of minority candidate success have arisen in covered jurisdictions), and that racial appeals in elections were more prevalent in covered than in non-covered jurisdictions, see id. at 1003 (Katz Study) (noting that 63.2% of the Section 2 suits that found political campaigns to be characterized by racial appeals arose in covered jurisdictions).  Finally, there is evidence in the record indicating that racially polarized voting is much more pronounced in covered than in non-covered jurisdictions.

See Continuing Need 48 (Earls Responses).  One study that assessed elections involving both minority and white candidates found that "virtually all such elections in covered jurisdictions had levels of white bloc voting at 70% or above while less than two thirds of such elections in non-covered jurisdictions had white bloc voting at 70%." Id.  In other words, there was a "wide divergence" in the severity of racial bloc voting in covered and non-covered jurisdictions, which reflects "an important empirical finding demonstrating that minorities have less ability to participate equally in the political process in covered jurisdictions." Id.

Hence, although the legislative record is primarily focused on the persistence of voting discrimination in covered jurisdictions -- rather than on the comparative levels of voting discrimination in covered and non-covered jurisdictions -- the record does contain several significant pieces of evidence suggesting that the 21st century problem of voting discrimination remains more prevalent in those jurisdictions that have historically been subject to the preclearance requirement.  Like the three-judge court in Nw. Austin I, this Court declines to second-guess Congress's 2006 determination to preserve the traditional coverage formula -- targeting those jurisdictions with proven histories of racial discrimination in voting -- which was upheld in Katzenbach and "discussed with approval in the City of Boerne cases," 573 F. Supp. 2d at 279, particularly given the 2006 legislative record demonstrating a continued prevalence of voting discrimination in covered jurisdictions notwithstanding the considerable deterrent effect of Section 5 in those jurisdictions over the preceding 25 years.  Accordingly, this Court finds that Section 4(b)'s disparate geographic coverage remains "sufficiently related" to the problem that it targets.

## CONCLUSION

On the eve of the 2006 reauthorization of Section 5, many academics wondered whether, given the effectiveness of Section 5 in deterring unconstitutional conduct, Congress would be able to compile a sufficient record of recent unconstitutional voting discrimination to support Section 5's continued existence; in other words, had Section 5 become "a victim of its own success." See, e.g., Samuel Isaacharoff, Is Section 5 of the Voting Rights Act a Victim of Its Own Success?, 104 COLUM. L. REV. 1710 (2004). One scholar characterized this phenomenon as the "Bull Connor is Dead" problem: given the fact that "[m]ost of the original racist elected officials are out of power," and that "those who remain in power . . . have for the most part been deterred by preclearance," would Congress be able to point toward "a record of recent state-driven discrimination . . . supporting renewal" of Section 5 in 2006? Hasen, 66 OHIO ST. L.J. at 177. Based on the evidence contained in the 15,000-page legislative record, this Court concludes that Congress did just that. Despite the effectiveness of Section 5 in deterring unconstitutional voting discrimination since 1965, Congress in 2006 found that voting discrimination by covered jurisdictions had continued into the 21st century, and that the protections of Section 5 were still needed to safeguard racial and language minority voters. Understanding the preeminent constitutional role of Congress under the Fifteenth Amendment to determine the legislation needed to enforce it, and the caution required of the federal courts when undertaking the "grave" and "delicate" responsibility of judging the constitutionality of such legislation -- particularly where the right to vote and racial discrimination intersect -- this Court declines to overturn Congress's carefully considered judgment.

For the foregoing reasons, the Court will deny Shelby County's motion for summary

judgment, and grant the motions for summary judgment filed by the Attorney General and the

defendant-intervenors.  A separate order has been filed on this date.


                                          _____/s/_____
                                               JOHN D. BATES
                                          United States District Judge


Dated: <u>September 21, 2011</u>