# EXHIBIT A



U.S. Department of Justice

Office of Legislative Affairs

---

Office of the Assistant Attorney General  *Washington, D.C. 20530*

April 12, 2006

The Honorable F. James Sensenbrenner
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

    This responds to your letter dated February 28, 2006, requesting information about the Civil Rights Division. You first requested information about the Division's procedures in Voting Rights Act cases.

    The Voting Section of the Civil Rights Division employs a consistent and straightforward decision-making process. Regardless of the type of decision to be made – whether to file a lawsuit, to make a determination under Section 5, or to provide legal arguments – the decision-making process begins with a careful analysis of the facts and the legal elements at issue. Justice Department attorneys have great legal skill and knowledge. They are expected to identify all of the relevant facts, legal issues and other concerns that bear upon a law enforcement decision. This process often begins with a search for relevant and reliable evidence. Voting Section attorneys interview potential witnesses; locate, authenticate and review documents; corroborate potential facts; and track back from the many second- and third-hand allegations, regularly received by the Section, in order to identify trustworthy evidence. After identifying and obtaining evidence that bears upon a particular course of action, Section attorneys identify and explore potential defenses. They are responsible for making recommendations that follow the law as written by the Congress and interpreted by the judiciary. Varied and sometimes contradicting views are encouraged. Only after this careful process, does a matter move forward for decision.

    Each stage of the decision-making process is interactive. The activity of Department attorneys is guided and encouraged at every step by more senior attorneys, typically Special Litigation Counsel and Deputy Section Chiefs, as well as by the Chief of the Voting Section. Each of these supervisors is a career attorney, as well, with significant experience in civil rights and voting rights litigation. The current Voting Section Chief has been with the Civil Rights Division for over 30 years. The Section Chief is responsible for presenting the Section recommendation to Division leadership. Under 28 C.F.R. 51.3, the Chief of the Voting Section

The Honorable F. James Sensenbrenner
Page Two

has the authority to preclear state voting redistricting plans submitted under Section 5 of the Voting Rights Act.

The Department of Justice rightly expects the highest standards and strict adherence to the law by its attorneys. Nowhere is such fidelity more important than when addressing the sensitive areas touched on by the Voting Section, where we strive to maintain the highest standards of professionalism.

Citing *Johnson v. Miller,* 864 F. Supp. 1354 (S.D. Ga. 1994); *Miller v. Johnson,* 515 U.S. 900 (1995); *Abrams v. Johnson,* 521 U.S. 74 (1997); and *United States v. Jones,* 125 F.3d 1418 (11th Cir. 1997), you also requested information of any "instances, past or present, where the Civil Rights Division's legal work was either admonished in a court opinion or where the Division paid attorneys' fees or settlement fees over its involvement in a lawsuit." The following cases arguably contain "admonish[ments]" similar in degree to those in the cases that you cited or involve the payment of attorneys' or settlement fees for purportedly unfounded litigation. While the Department fully respects and accepts the court rulings, judicial statements, dispositions and payments in these matters, we do not concede by listing them here that each was warranted.

1. *Johnson v. Miller.* In 1992, the Voting Section of the Civil Rights Division precleared a legislative redistricting plan in Georgia, after rejecting two previous plans because there were only two majority black districts. In 1994, voters challenged the constitutionality of the state's Eleventh Congressional District, contending that it was a racial gerrymander, and sought to enjoin its use in congressional elections. Shortly after the case was filed, the Voting Section intervened as a defendant. The plaintiffs prevailed. 864 F. Supp. 1354 (S.D. Ga. 1994) (Copy of opinion enclosed as Attachment A). As relevant to your request, the court stated, "[d]uring the redistricting process, [the ACLU attorney] was in constant contact with . . . the DOJ line attorneys overseeing preclearance of Georgia's redistricting efforts. . . . The Court was presented with a sampling of these communiques, and we find them disturbing. It is obvious from a review of the materials that [the ACLU attorney's] relationship with the DOJ Voting Section was informal and familiar; the dynamics were that of peers working together, not of an advocate submitting proposals to higher authorities." *Id.* at 136; *see also id.* (Voting Section attorneys' "professed amnesia [about their relationship with the ACLU attorney] less than credible"); *id.* at 1364 ("Though counsel for the United States objected to Plaintiffs' 'characterization that the Justice Department "suggested things" [to the General Assembly],' it is disingenuous to submit that DOJ's objections were anything less than implicit commands.") (citation omitted); *id.* at 1367-68 ("the Department of Justice had cultivated a number of partisan 'informants' within the ranks of the Georgia

legislature". . . ."We find this practice disturbing."); *id.* at 1368 ("the considerable influence of ACLU advocacy on the voting rights decisions of the United States Attorney General is an embarrassment"); *id.* ("It is surprising that the Department of Justice was so blind to this impropriety, especially in a role as sensitive as that of preserving the fundamental right to vote.").

In 1994, the United States appealed *Johnson v. Miller* to the U.S. Supreme Court, arguing that evidence of a legislature's deliberate use of race in redistricting is insufficient to establish a racial gerrymander claim. The Court found for the plaintiffs-appellees. *Miller v. Johnson*, 515 U.S. 900, 910 (1995) (Copy of opinion enclosed as Attachment B). As relevant to your request, the Court stated, "[i]nstead of grounding its objections on evidence of a discriminatory purpose, it would appear the Government was driven by its policy of maximizing majority-black districts. Although the Government now disavows having had that policy and seems to concede its impropriety, the District Court's well-documented factual finding was that the Department did adopt a maximization policy and followed it in objecting to Georgia's first two plans." *Id.* at 924-25 (citations omitted). *See also id.* at 926 ("The Justice Department's maximization policy seems quite far removed from [Section 5 of the VRA]'s purpose."); *id.* at 927 ("the Justice Department's implicit command that States engage in presumptively unconstitutional race-based districting brings the Act, once upheld as a proper exercise of Congress' authority under [Section] 2 of the Fifteenth Amendment into tension with the Fourteenth Amendment.") (citation omitted). In 1995, the Department agreed to pay $202,000 to settle plaintiffs' interim claims for attorneys' fees. In 1997, the Department agreed to pay an additional $395,000 to settle plaintiffs' remaining claims for attorneys' fees, expenses and costs.

2. *Hays v. State of Louisiana.* In 1992, the Voting Section of the Civil Rights Division precleared a redistricting plan for Louisiana. The same year, voters sued Louisiana, contending, among other things, that the plan constituted impermissible gerrymandering in violation of the Equal Protection Clause. The Voting Section initially participated as *amicus curiae* in September 1992 and subsequently intervened as a defendant in July 1994. The district court held the plan to be unconstitutional. 839 F. Supp. 1188 (W.D. La. 1993) (Copy of opinion enclosed as Attachment C). As relevant to your request, the court stated, "neither Section 2 nor Section 5 of the Voting Rights Act justify the [U.S. Attorney General's Office's] insistence that Louisiana adopt a plan with two safe, black majority districts." *Id.* at 1196 n.21; *see also id.* (DOJ's position was "nothing more than...'gloss' on the Voting Rights Act – a gloss unapproved by Congress and unsanctioned by the courts."); *id.* ("[the Assistant Attorney General's Office] arrogated the power to use Section 5 preclearance as a sword to implement forcibly its own redistricting policies.").

The Honorable F. James Sensenbrenner
Page Four

        Louisiana enacted a new redistricting plan. The district court struck down the revised plan. 936 F. Supp. 360 (W.D. La. 1996) (*per curiam*) (Copy of opinion enclosed as Attachment D). As relevant to your request, the court stated, "the Justice Department impermissibly encouraged -- nay, mandated -- racial gerrymandering." *Id.* at 369. The court also noted that "the Legislature succumbed to the illegitimate preclearance demands of the Justice Department." *Id.* at 372; *see also id.* at 363-64, 368-70. In 1999, the Department agreed to pay $1,147,228 to settle claims for attorneys' fees, expenses, and costs.

3.    *Scott v. Department of Justice.* On August 12, 1992, the Voting Section of the Civil Rights Division precleared a redistricting plan in Florida. In 1994, voters sued the Department and the State of Florida, contending that the state's configuration for a certain Senate district violated the Equal Protection Clause. After the Supreme Court's decision in *Miller v. Johnson*, 515 U.S. 900 (1995), and *United States v. Hays*, 515 U.S. 737 (1995), the parties agreed to proceed by mediation. The district court approved the mediated settlement (which did not address attorneys' fees) in March 1996. *Scott v. Department of Justice*, 920 F. Supp. 1248 (M.D. Fla. 1996). In 1999, the Department and plaintiffs settled plaintiffs' claims for attorneys' fees, expenses and costs for $95,000.

4.    *United States v. City of Torrance.* In 1993, the Employment Litigation Section of the Civil Rights Division brought suit, alleging that the City of Torrance, California, had engaged in a pattern or practice of discrimination in its hiring of new police officers and firemen. The defendant prevailed. The district court concluded that the Division's actions violated Rule 11 of the Federal Rules of Civil Procedure, or alternatively 42 U.S.C. 2000e-5(k), and awarded attorneys' fees. The Ninth Circuit affirmed the district court. 2000 WL 576422 (9th Cir. May 11, 2000) (Copy of opinion enclosed as Attachment E). The court stated that attorneys' fees may be awarded in a Title VII case when the plaintiff's action is "frivolous, unreasonable, or without foundation." *Id.* at *1 (citation quotation marks omitted). As relevant to your request, the court stated, "[i]n this case, the record amply supports the district court's determination that this standard was satisfied, that is, 'that the Government had an insufficient factual basis for bringing the adverse impact claim' and 'that the Government continued to pursue the claim . . . long after it became apparent that the case lacked merit.'" *Id.* The Ninth Circuit affirmed the district court's award, in 1998, of $1,714,727.50 in attorneys' fees.

5.    *United States v. Jones.* In 1993, the Voting Section of the Civil Rights Division sued county officials in Dallas County, Alabama, under Section 2 of Voting Rights Act and the Fourteenth and Fifteenth Amendments. The Division alleged that at least fifty-two white voters who did not reside in a black-majority district

The Honorable F. James Sensenbrenner
Page Five

    were improperly permitted to vote in that district. The defendants prevailed and the district court ordered the government to pay attorneys' fees under the Equal Access to Justice Act ("EAJA"), 22 U.S.C. 2412(d)(1(A). The Eleventh Circuit affirmed. As relevant to your request, the court stated that a "properly conducted investigation would have quickly revealed that there was no basis for the claim that the Defendants were guilty of purposeful discrimination against black voters. . . . The filing of an action charging a person with depriving a fellow citizen of a fundamental constitutional right without conducting a proper investigation of its truth is unconscionable. . . . Hopefully, we will not again be faced with reviewing a case as carelessly instigated as this one." 125 F.3d 1418, 1431 (11th Cir. 1997) (Copy of opinion enclosed as Attachment F). In 1995, the district court ordered the Department to pay $73,038.74 in attorneys' fees and expenses. In 1998, the appellate court ordered the Department to pay an additional $13,587.50 in attorneys' fees.

6. *Motoyoshi v. United States.* In 1993, the Office of Redress Administration of the Civil Rights Division denied compensation to a Japanese-American man relocated during World War II. He filed suit challenging the denial. The district court granted the plaintiff's motion for summary judgment. As relevant to your request, the court stated that the Department's "failure to consider and determine plaintiff's eligibility for compensation . . . was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 33 Fed. Cl. 45, 52 (1995) (Copy of opinion enclosed as Attachment G). In 1995, the court ordered the Department to pay $8,437 in attorneys' fees under the EAJA.

7. *United States v. Tucson Estates Property Owners Association, Inc.* In 1993, the Housing and Civil Enforcement Section of the Civil Rights Division brought suit alleging that an owners' association in Tucson violated the Fair Housing Act. The defendants prevailed on summary judgment. *United States v. Tucson Estates Prop. Owners Ass'n, Inc.* No. 93-503, slip op. (D. Ariz. Nov. 7, 1995) (Copy of order is enclosed as Attachment H). As relevant to your request, the court stated, "it is not a reasonable *legal* basis that the United States lacked in this case; it was the *factual* basis upon which its legal theory rested that was unreasonable. Based on the totality of the circumstances present prior to and during litigation, this Court finds that the United States' position was not substantially justified." *Id.* at 5 (emphasis in original) (citation and quotation marks omitted). In 1995, the court ordered the Department to pay $150,333.07 in attorneys' fees and expenses under the EAJA.

8. *United States v. Laroche.* In 1993, the Housing and Civil Enforcement Section of the Civil Rights Division brought a Fair Housing Act suit in federal district court in Oregon. The defendants prevailed on summary judgment. The court awarded

The Honorable F. James Sensenbrenner
Page Six

        defendants $17,885.78 in attorneys' fees and costs. The United States appealed. During the pendency of the appeal, the parties entered into a settlement and filed a joint stipulation of dismissal on April 24, 1995. The district court withdrew and rendered void its rulings on summary judgment and attorneys' fees and dismissed the case on December 28, 1995.

9.   *Smith v. Beasley* and *Able v. Wilkins* (consolidated cases). In 1994, the Voting Section of the Civil Rights Division precleared South Carolina State House districts, and then precleared State Senate Districts in 1995. Voters challenged the constitutionality of South Carolina House and Senate districts created by the state legislature in two separate actions, which were consolidated. The Voting Section intervened as a defendant in the House action on May 3, 1996. On September 27, 1996, the court found that six of nine House districts and all three Senate districts were unconstitutional as they were drawn with race as the predominant factor. As relevant to your request, the court stated, "[t]he Department of Justice's advocacy position is evidenced in many memoranda, letters and notes of telephone conversations, but most particularly by the apparent epidemic of amnesia that has dimmed the memory of many DOJ attorneys who were involved with South Carolina's efforts to produce a reapportionment plan that would pass preclearance." 946 F. Supp. 1174, 1190-91 (D.S.C. 1996) (Copy of opinion enclosed as Attachment I); *see also id.* at 1208 ("[t]he Department of Justice in the present case, as it had done in *Miller*, misunderstood its role under the preclearance provisions of the Voting Rights Act. Here, Department of Justice attorneys became advocates for the coalition that was seeking to maximize the number of majority [black voting age population] districts in an effort to achieve proportionality. . . . It is obvious that the Voting Section of the Department of Justice misunderstands its role in the reapportionment process."). In 1996, the Department settled plaintiffs' claims for attorneys' fees and costs for $282,500.

10.   *United States v. Weisz.* In 1994, the Housing and Civil Enforcement Section of the Civil Rights Division initiated a religious discrimination suit under the Fair Housing Act. The district court granted defendant's motion for judgment on the pleadings. 914 F. Supp. 1050, 1055 (S.D.N.Y. 1996). In 1997, the Department settled the issue of attorneys' fees and costs for $7,857.50.

11.   *Abrams v. Johnson.* In 1996, the United States appealed a later proceeding in *Johnson v. Miller* to the Supreme Court, alleging that the district court's plan did not defer to the legislative preferences of the Georgia Assembly because it had only one majority-black district when all previous Assembly plans had two, and that it diluted minority voting strength by not adequately representing the voting interests of Georgia's black population, in violation of the Voting Rights Act. The Court found for the plaintiffs-appellees. 521 U.S. 74 (1997) (Copy of opinion

The Honorable F. James Sensenbrenner
Page Seven

enclosed as Attachment J). As relevant to your request, the court made a number of statements. *E.g., id.* at 90 ("Interference by the Justice Department, leading the state legislature to act based on an overriding concern with race, disturbed any sound basis to defer to the 1991 uncleared plan; the unconstitutional predominance of race in the provenance of the Second and Eleventh Districts of the 1992 precleared plan caused them to be improper departure points; and the proposals for either two or three majority-black districts in plans urged upon the trial court in the remedy phase were flawed by evidence of predominant racial motive in their design."); *id.* at 93.

In total, the Division was ordered to pay or agreed to pay $4,107,595.09 from 1993 to 2000 in the eleven cases specified above. In searching for instances where the "Division's legal work" has been "admonished in a court opinion," we have diligently searched through both published and unpublished judicial decisions available on electronic databases. In searching for instances "where the Division paid attorneys' fees or settlement fees over its involvement in a lawsuit," we also have diligently searched through financial records maintained by the Division for such expenditures of government funds. We note that these records are only complete for the past thirteen fiscal years. Consistent with your request, our summary does not include cases where the Department was only assessed costs pursuant to Fed. R. Civ. P. 54(d)(1), which provides for the prevailing party in an action to be awarded costs other than attorneys' fees by the losing side "as of course." Please be aware, however, that the amounts paid by the Division in seven of the eleven cases listed above may include such costs because those settlement agreements or court orders did not separate costs from attorneys' fees. In the event that we discover any additional information responsive to your February 28, 2006, letter, we will supplement this letter in a timely manner.

Thank you for the opportunity to address the work of the Civil Rights Division. Please do not hesitate to contact the Department of Justice if we can be of further assistance in this or any other matter.

Sincerely,

*William E. Moschella*
William E. Moschella
Assistant Attorney General

Attachments

cc:   The Honorable John Conyers, Jr.
      Ranking Minority Member