UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


SHELBY COUNTY, ALABAMA,          .
                                 .
     Plaintiff,                  .
                                 .   CA No. 10-0651 (JDB)
          v.                     .
                                 .   Washington, D.C.
ERIC H. HOLDER, JR.,             .   Friday, February 14, 2014
                                 .   2:00 p.m.
     Defendant,                  .
                                 .
          v.                     .
                                 .
EARL CUNNINGHAM, et al.,         .
                                 .
     Intervenor-Defendants.      .
. . . . . . . . . . . . . . .    .


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For Plaintiff:              BERT W. REIN, ESQ.
                            BRENDAN J. MORRISSEY, ESQ.
                            MICHAEL CONNOLLY, ESQ.

                            Wiley Rein, LLP
                            1776 K Street, NW
                            Washington, DC 20006
                            (202) 719-7000

For Defendant:              AVNER M. SHAPIRO, ESQ.
                            RICHARD A. DELLHEIM, ESQ.
                            ERNEST A. MCFARLAND, ESQ.

                            U.S. Department of Justice
                            Voting Section, Civil Rights Div.
                            950 Pennsylvania Avenue, NW
                            Room 7254-NWB
                            Washington, DC 20530
                            (202) 305-1840

```
For Intervenor-Defendants:      DALE E. HO, ESQ.
                                American Civil Liberties Union
                                125 Broad St
                                New York, NY 10013
                                (212) 549-2693

                                MARK A. POSNER, ESQ.
                                Lawyers' Committee For Civil Rights
                                1401 New York Avenue, NW
                                Suite 400
                                Washington, DC 20005
                                (202) 662-8389

Court Reporter:                 BRYAN A. WAYNE, RPR, CRR
                                U.S. Courthouse, Room 4704-A
                                333 Constitution Avenue, NW
                                Washington, DC 20001
                                (202) 354-3186
```

**Proceedings reported by stenotype shorthand.**
**Transcript produced by computer-aided transcription.**

<pre>
 1                    P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Your Honor, we have Civil Action

 3   10-651, Shelby County, Alabama, versus Eric H. Holder, Jr.

 4   Will counsel please identify yourselves and those at your

 5   respective tables.

 6          MR. REIN:  Hi.  I'm Bert Rein, counsel for Shelby

 7   County.  My colleagues are with me; that is Brendan Morrissey

 8   and Michael Connolly.

 9          THE COURT:  Good afternoon to you all.

10          MR. SHAPIRO:  Thank you, Your Honor.  Good afternoon.

11   My name is Avner Shapiro, appearing for the United States, and

12   I'm here with my colleagues Richard Dellheim and Ernest McFarland

13   with the Civil Rights Division of the U.S. Department of Justice.

14          MR. HO:  Good afternoon, Your Honor.  My name is

15   Dale Ho from the American Civil Liberties Union on behalf of the

16   defendant-intervenors.  With me is my colleague Mark Posner of

17   the Lawyers' Committee for Civil Rights.

18          THE COURT:  Good afternoon to all of you.

19       Now, I had indicated 45 minutes per side.  You don't need

20   to use it all if you don't want to use it all, but has a

21   decision been made between the United States and the intervenors

22   in terms of splitting that time?

23          MR. SHAPIRO:  Yes, Your Honor.

24          THE COURT:  And what is that decision, just so I'm

25   aware of it?
</pre>

1          MR. SHAPIRO:  Thirty-five minutes and 10 minutes.

2          THE COURT:  And with that, let's proceed.  It's Shelby

3     County's request, so let's hear from you first.

4          MR. REIN:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon again.

6          MR. REIN:  I don't want to belabor our points that

7     we've made in brief; I'm sure the Court's very familiar with

8     them.  So what I'd like to do is kind of crystallize where we

9     see the differences between the parties on this threshold issue

10    as to whether Shelby County is eligible under the Fees Provision

11    of the Voting Rights Act to have its fees assessed against the

12    government.  That's the principal argument.

13         There's a separate question which has been raised by the

14    intervenors as to whether the standard for the assessment of

15    fees should be different for the intervenors because they were

16    not the active party for enforcing that which Shelby complained

17    against.

18         Our position is premised squarely on the words of the

19    statute, the enabling words, which says that in a case brought

20    to enforce the guarantees of the Fourteenth or Fifteenth

21    Amendment, the prevailing party is entitled to attorney's fees.

22    The one exception in that statute which Congress included was

23    that the federal government is not entitled to collect attorney's

24    fees even if it is a prevailing party.

25         So Congress was quite conscious of the special role in this

1    kind of litigation that its actions are proceeding to enforce

2    voting guarantees, but specifically said that the government is

3    not entitled to attorney's fees.

4        I think it's important just to note that Congress saw the

5    role of the government, considered it, and created through the

6    statute an exception to the collection for the government, but

7    did not exempt the government from the payment of attorney's

8    fees where the government was the responsible party for the

9    action against which enforcement was sought.  And I think that

10   says something to the Court.

11       So the question is why do we think we're entitled under the

12   words of the statute, and I think what we've explained is quite

13   straightforward.  Shelby viewed its case, its challenge to

14   preclearance -- and I stress this was a challenge to preclearance.

15   That is the formula which triggered preclearance and Section 5

16   itself, and Your Honor will recall that, because we had extensive

17   argument.

18       Shelby believed that what it was doing was not to challenge

19   the way people exercise their right to vote, because we did not

20   challenge Section 2 of the Act.  We did not challenge any

21   constitutional doctrine about what is equal.  What we were

22   challenging was a procedure, a procedure by which Shelby's right

23   to change its election process was conditioned on going through

24   either preclearance by the Attorney General or pursuing a case

25   in this court for judicial preclearance.  We said that's an

1    unusual burden and it goes beyond the limitations that are

2    inherent in the Fourteenth and Fifteenth by their language.

3        THE COURT:  I understand that.  I guess the argument

4    there would be is it nonetheless an action to enforce the voting

5    guarantees of the Fourteenth or Fifteenth Amendment.

6        MR. REIN:  Yes.  And that's a question we tried to

7    answer in our briefing, in the following way:  As early as

8    Allen, the question was what are the guarantees of the Fifteenth

9    Amendment, where the Supreme Court had to decide whether a

10   change in voting procedure was in and of itself cognizable under

11   those amendments and under the VRA.

12       There was a narrow position advanced which was said, no,

13   it's the right to register, the right to vote, the right to have

14   your vote counted, and the rest doesn't count.  But in Allen the

15   Supreme Court said, no, any change in voting process falls

16   within the power of Congress to regulate under the Fourteenth

17   and Fifteenth Amendments.

18       Therefore, voting rights have been broadly defined by the

19   Supreme Court to go beyond the right to register, vote, and have

20   the vote counted.  It is the right to have a process in which

21   you meaningfully vote and have, in the government's words, the

22   opportunity to elect the candidate of your choice.

23       Well, that's what Shelby County was aiming at.  Shelby

24   County said that our citizens have the right to regulate the

25   electoral process on a local basis.  That's inherent in the

1   constitution, and it is protected under the amendments by the

2   limitation to appropriate enforcement.  We want that right, and

3   we think that's being stripped from us by preclearance which

4   imposes both a cost and a time barrier to the implementation of

5   changes that our citizens believe are essential.

6        THE COURT:  But what does the term "voting guarantees"

7   add to the language of the Attorney's Fees Provision?  Your

8   argument, it seems to me, would be pretty powerful based on

9   language that said "action or proceeding to enforce the

10  Fourteenth or Fifteenth Amendment."

11      What is it that the term "the voting guarantees," which is

12  a limitation, a specific portion of the Fourteenth and Fifteenth

13  Amendment, how does that change things?  It seems to me that

14  that limits it to certain enforcements and perhaps -- I'm not

15  saying it doesn't -- but perhaps doesn't include the kind of

16  action that Shelby County brought.

17      MR. REIN:  I think it's a very fair question and one

18  that we have certainly thought about a great deal.  That term

19  "voting guarantees" is not defined in the Act.

20      THE COURT:  No, it is not.

21      MR. REIN:  And so one reading -- and we think it's a

22  fair reading -- is it encompasses all that which is subsumed in

23  the Act, and when the Court broadened out, as early as Allen,

24  the whole notion of what you are guaranteed -- you know, what

25  voting rights are guaranteed to you, which is a means of

1    participating in the electoral process that's meaningful and

2    fairly protects the underlying power of your vote -- that, in

3    effect, can't be read out of the voting guarantees, because when

4    one side asserts it -- that is to say, in a preclearance case

5    where an intervenor says, I've contributed substantially to

6    defending against a change in a voting procedure -- that voting

7    procedure might have nothing to do with registration, voting,

8    counting of the vote, yet the courts have seemed to say, well,

9    that litigation involved a contest over voting guarantees.

10       So that term has been read broadly in the award of

11   attorney's fees to mean those rights which are incorporated in

12   the statute by virtue of their being encompassed within the

13   Fourteenth and Fifteenth Amendments.  So we're simply saying,

14   if that's the construction, and if <u>Allen</u> was right and the

15   subsequent case law is right and the awards to intervenors have

16   been right, then we're on equal footing.

17       Where the government differs with us is they tend to say,

18   well, you know, we were the ones -- we're the good guys; we were

19   enforcing the voting guarantees, because preclearance, in their

20   view, is a means of enforcing the voting guarantee.  And we say,

21   that's what you've argued.

22       We said we were enforcing the limitations of the Fifteenth

23   Amendment, which is a guarantee within that same scope, to the

24   local citizenry that they can regulate that locally unless

25   there's a basis for an intervention, and you don't have one at

1    the present time on the record before the congress.  And the

2    plain fact is, we won.  There's no doubt who the prevailing --

3                THE COURT:  There's no question of the prevailing

4    party here.

5                MR. REIN:  Right.

6                THE COURT:  How do I assess this action or proceeding

7    question?  Do I assess it from the perspective of the plaintiff

8    bringing the case, the prevailing party in the case, or in some

9    other way that is perhaps more neutral in neither of those two

10   ways?  And why the choice you make?

11               MR. REIN:  I think you cannot say plaintiff, although

12   here the plaintiff and the prevailing party were the same,

13   because Shelby was the plaintiff and the prevailing party.

14               THE COURT:  But there would be the argument as to

15   whether the plaintiff brought an action or proceeding to enforce

16   the voting guarantees as we've just been discussing.

17               MR. REIN:  Right.  That was the subject of our

18   discussion, and so I think --

19               THE COURT:  Whereas, if you discuss it from the

20   perspective of the prevailing party --

21               MR. REIN:  Right.  And the courts have certainly said

22   it has to be a proceeding which, independently construed -- that

23   is, from the point of view, let's say, of the court rather than

24   the prevailing party or the other party -- involves the

25   statutory phrase "the enforcement of voting guarantees."

1    I don't think you can have an asynchronous result necessarily

2    in a case of this kind, and let me explain what I mean.

3         An asynchronous result might occur where Jurisdiction A

4    sought preclearance within the terms of the VRA and said, we've

5    made a change, we think it's consistent with the standards of

6    the VRA, we don't contest the VRA, we don't challenge the

7    standards, but we don't think our specific conduct infringes

8    those standards.  The other side says, yes, we believe that your

9    conduct infringes the standards of the VRA and, in fact, the

10   standards of the Fourteenth and Fifteenth Amendments.

11        So in that situation, you may have an asynchronous posture.

12   That is to say the plaintiff/proponent of the change is saying

13   change is consistent with law, I'm not trying to change the law,

14   I think the facts fall my way; and the other side is saying, no,

15   to enforce these substantive guarantees -- because you've moved

16   beyond the question of is preclearance permissible.  You're in

17   preclearance, I'm right.  So there you might see an asynchronous

18   result, but in a case of this kind --

19        THE COURT:  And there, there's no question, because

20   whatever perspective you view it, it's an action or proceeding

21   to enforce the voting guarantees of the Fourteen and Fifteenth

22   Amendments.

23        MR. REIN:  Well, I think that, again, we would say

24   that.  I don't think the government would agree to that, because

25   they would say the party seeking preclearance is opposing the

guarantees; they're always the bad guys.  I think that's the way they view it.  I don't think that's right, but that's where we're in difference, if you will.  And we're saying this case also.

But if you look even at the government's past conduct in which they sent a letter in 2006 to Mr. Sensenbrenner talking about all the times that the Civil Division had agreed to payment, one pattern of cases in which they settled and paid were cases in which the party challenged took the position that the way the Act was going to be enforced would violate the equal protection guarantee; in other words, a Fourteenth amendment guarantee.  So you were setting right against right.

One side said, we have the right to equal protection.  The other said, no, to protect voting rights, we have got to enforce what they were calling their Max Black policy.  And leaving aside the merits of that, when the government was not successful in those cases, the government agreed to pay.  So if you look for comparability, that's about as close as you can get, setting right against right.

We say Shelby County is entitled to the protection that Congress built into the amendments by using the word "appropriate."  It was debated at the time.  There's a real debate as to whether they simply cede the power to the congress, whether to allow Congress to regulate voting procedures statewide as they did for federal elections, and the framers said, okay, we're going to concede a great deal of power,

substantive limitation on what the states can do, but only by
appropriate legislation.

Of course, that was the central issue in our complaint and
as the case was litigated was preclearance still appropriate
within the meaning of the amendments, and we said no.  That
infringes these rights to govern the electoral process.  Those
have been deemed to be part and parcel of voting, better or
worse, by the Supreme Court.

Now if you look, one of the cases that we cited dealt with
this question of what is the nature of a challenge that invokes
the Tenth Amendment, because that question was raised.  The
government says, look, you guys were not really talking about
voting rights; you were talking about Article IV and the Tenth
Amendment, and therefore your position is quite different.

We said, well, if you look at the complaint and the way the
litigation was framed from the beginning to the end, we were
talking about the words of the Fourteenth and Fifteenth
Amendments and the word "appropriate."  What we said was, other
policies that are in the Constitution need to be considered when
you look for the appropriate limitation, and the Supreme Court
said as much.

THE COURT:  You're talking about the limitations.
So that turns me to the question of what this term "voting
guarantees" means.  If it means something less than the entirety
of the two amendments, what is it?

1              MR. REIN:  Well, the Fourteenth Amendment, which is --

2              THE COURT:  Focus on the Fifteenth.  The Fourteenth is

3  sort of a tag-along.  Focus on the Fifteenth for a minute.

4              MR. REIN:  I don't ignore it only because, Judge Bates,

5  that has many guarantees which are totally independent of voting.

6  So if Congress had simply said, oh, this is a Fourteenth

7  Amendment, and incorporated in the Voting Rights Act a general

8  fees provision for any Fourteenth Amendment litigation, including

9  translating the Fourteenth through the Fifth --

10             THE COURT:  Focus on the Fifteenth for a second.

11  Maybe you can explain that language because of the existence of

12  the Fourteenth Amendment, but for a second, focus on the

13  Fifteenth.

14             MR. REIN:  That's one explanation, but if you look

15  even at the Fifteenth Amendment, that's kind of been a vexing

16  question.  From the very beginning, if you go back to the great

17  debate in Allen, and it was -- it split the Court, and there

18  were dissents from Allen.

19     Justice Harlan, who I treasure and honor because I worked

20  for him, had a different view, and he viewed the Fifteenth

21  Amendment as an amendment which said you've the right to

22  register to enable yourself to vote, you've a right to cast your

23  ballot, you have a right to have that ballot counted and not

24  thrown out; and that is the sum and substance of your rights

25  under the Fifteenth Amendment, and you cannot then use the power

1    of the Fifteenth Amendment to go beyond that.  And Chief Justice

2    Warren said, yes, you can.  However that came out.

3       And we had made, to be fair, an argument of the same kind

4    in the course of this case that this was exceeding the bounds of

5    the Fifteenth Amendment, that the VRA was not properly founded

6    under that amendment, and the court did not take that argument.

7       The court looked instead, assuming that under the Fifteenth

8    Amendment you could regulate voting procedures prophylactically --

9    because remember, you're regulating procedures which oftentimes

10   pass preclearance.  So it's a prophylactic measure that that

11   intervention intervened with the states, infringed on rights

12   that could not be deemed an appropriate limitation.

13      If you look at the cases that we've cited, none of them --

14   aside from the fights over Max Black, which have been settled so

15   we can't say they're precedential, I don't think either party

16   has come up with a case that's like this.

17          THE COURT:  No, I don't think there's a -- you would

18   agree there's not a case that deals with this issue precisely.

19          MR. REIN:  Right.  It didn't happen before.  And we

20   cited Bond.  That's a Commerce Clause case, but there the court

21   incorporated a general description of why the protection of the

22   great division of powers between the federal government and

23   states is not simply a matter of structure but a matter of

24   liberty, that federalism is intended to protect individual

25   liberties to ensure that people have rights to organize at a

local level and not be subject to a remote government.

What preclearance did was not to expand the rights as such, because they are the same rights that are set forth in the VRA; what preclearance did was to say we're going to change the power division, we're going to inhibit the ordinary right of citizens to organize locally and regulate their voting affairs, and we're going to do that by subjecting them to a process that may limit them in ways, even if what they want to do runs afoul of no voting guarantee.  In many cases it doesn't, because the preclearance is exercised.

But the fight was not about who's right and wrong on the substance; it was about whether that process, preclearance as such, infringed a voting guarantee that passed through to the citizens by the drafting of the two amendments.  And I think that's essentially the nub of our case, because if that's true, if we meet that language, then all that's left are certain arguments the government made which we think really have limited substance.

They said, oh, sovereign immunity.  You can't come against the United States in the face of the EAJA, which is an enabling act that says if you're entitled to those fees by statute and the government is not excluded, then the government will pay.  So we don't understand.  I mean, I think we did not anticipate the sovereign immunity to be fair, because it seemed so remote when you have an act of general waiver, the AJA, and a specific

entitlement in which the government was considered and was

considered by the congress not to be a fee recipient but not

excluded as a fee payer.

So that's one of their arguments.  The second is that --

and this is the one where I think it really crystallizes our

difference because they say, well, fees ought to follow

violation.  The fees should be assessed against the wrongdoer,

and of course in their view, what they were doing was right, even

though the Court said it was wrong.  I think we come apart on

that.

THE COURT:  No.  Right and wrong, if you're going to

Christiansburg, the actual language is "violator of federal

law," isn't it?

MR. REIN:  Well, I think Christiansburg was a

statutory case.

THE COURT:  Are you really arguing that the

United States here was a violator of federal law?  In other

words, a violator of the Voting Rights Act?  Is that part of

your argument?

MR. REIN:  No, because the statute reaches

constitutional violations, and what we said is, by the exercise

of preclearance, when it was not constitutionally justified, the

United States, through the Attorney General, was enforcing an

improper restriction.

THE COURT: You mean Congress violated the constitution.

 1          MR. REIN:  And we are entitled --

 2          THE COURT:  Isn't that the point, that Congress

 3   violated the constitution?

 4          MR. REIN:  Well, we are not saying the Attorney

 5   General was departing from the statutory framework.  He was

 6   constrained by the statute to exercise preclearance.  There is

 7   no question about that.  That isn't the issue.  And I think

 8   you're right to say, well, he can say, "I'm the servant of the

 9   congress."  That's why we sued him in his official capacity.

10       We were challenging the constitutionality of the Act, but

11   if the Act is unconstitutional, whether or not you're individually

12   blamed for it, whether you take -- because certainly in civil

13   rights cases, one distinguishes between conduct which is in an

14   official capacity.  I'm enforcing state law.

15          THE COURT:  All those cases which are talking about

16   whether the losing party was a violator of federal law are

17   talking about whether the employer violated Title VII, the

18   police department violated some civil rights law.  They're not

19   talking about the United States because of its position in

20   enforcing a statute that Congress has written has violated

21   federal law.  That seems to me to be a bit of a stretch, at

22   least a common-sensical stretch.

23          MR. REIN:  But I think it's the government's argument

24   that, after all, they were doing nothing that would offend the

25   courts, that is to say.  And we were saying, yes, you are.  You

1    may be doing it not only under color of law but mandate of law,

2    but still you are responsible because we are permitted to sue

3    the Attorney General in his official capacity, as the Court

4    recognized, to challenge the underlying statute.

5        No question we were challenging the statute.  We're not

6    saying Mr. Holder was a maverick who was enforcing the law, but

7    in civil rights cases, the fact that I might be acting directly

8    under state law to enforce a segregation law does not mean you

9    can't challenge the law and be a prevailing party.

10        So I think that in our view, that dispute where the

11   government really wants to take the position, we were the ones

12   who were trying to enforce voting rights and you were the ones

13   who were against it, really doesn't square with the Supreme

14   Court's decision that said, no, Shelby was trying to enforce a

15   right held by local citizens to organize their election

16   procedures in a manner they deemed appropriate, subject to review,

17   as they are under Section 2 or directly under the Fourteenth and

18   Fifteenth Amendments.

19        THE COURT:  Let's assume for a second that you are

20   successful on the entitlement issue under the language of the

21   provision.  Talk to me now about the Christiansburg standard and

22   why the government is not correct that that standard should be

23   applied here.  We'll get to further questions as you go.

24        MR. REIN:  I think that if you look at the legislative

25   history, which does talk Piggie Park, it indicates that the

person who successfully enforces the right is presumed to be entitled, absent special circumstances, to fees.  And that theory has been used by the courts.

Christiansburg is a case in which a defense was raised, statute of limitations within the confines of a law, and there was nothing in that case in which the party defending established any special right.  The party said the facts will not, because of passage of time, allow a challenge to my conduct.  So their premise was, we just prevailed.

Here, as that footnote in Dorn discusses, Shelby did something more.  It wasn't defending its individual conduct, not at all.  It was an on-face challenge.  It stood in the shoes of all of those who were subject to this intervention by preclearance and established a boundary under the Fourteenth and Fifteenth Amendments which we think is appropriate, to use the language of the amendments, and meaningful.

So this is a broader achievement from the point of view of those who support local authority and autonomy.

THE COURT:  Because this was a facial constitutional challenge that succeeded.

MR. REIN:  Yes.  If Shelby had merely said --

THE COURT:  So because of that, of the kind of claim that was made, even though there could be lots of similar cases with not as broad a claim, the breadth of the claim here entitles Shelby County to attorney's fees more in a Piggie Park

1   analysis than on a <u>Christiansburg</u> analysis.

2          MR. REIN:  That is the position we've taken.

3   We believe <u>Christiansburg</u> is a rule that says even if language

4   in the statute of entitlement is pretty broad, it's not a total

5   departure from the American rule.  A successful person defending

6   their own position pays their own cost.  So if we had come in

7   and said there was something special about Shelby which entitled

8   Shelby to relief that nobody else could get and we weren't

9   challenging, really, the constitutional boundary, that might --

10          THE COURT:  Or you were making an as-applied challenge?

11          MR. REIN:  If we were doing that, which we didn't.

12          THE COURT:  But if you had, you would be in the

13   <u>Christiansburg</u> setting, and I take it that your position with

14   respect to <u>Christiansburg</u> is that you don't meet that standard.

15          MR. REIN:  Well, we did not advocate the <u>Christiansburg</u>

16   standard.

17          THE COURT:  But if it applied, what is your position,

18   that you meet or don't meet it?

19          MR. REIN:  I don't think we claimed the government's

20   conduct met the standard of <u>Christiansburg</u>.  That's not our

21   claim.  As to an as-applied, it might depend on the nature of it

22   and the relief obtained, but that wasn't the case.  We're only

23   talking about this case.  So it wasn't as-applied.

24      We challenged the statute on its face.  We succeeded on

25   reinforcing a boundary that had been set in the language of the

amendments to the benefit of the people who want to regulate
their affairs locally.  That's the sum and substance of it.  And
as I say, I think the arguments on the other side, I don't think
the statute of limitations can really impose a barrier.

THE COURT:  But it seems to me that the Supreme Court,
and to a certain extent the D.C. Circuit, not in cases directly
dealing with this issue, but when you talk about Medina County
and Donnell and cases like that, it seems to me that courts are
saying, with this discretionary portion of the provision or
other attorney's fees provisions, that discretion is not
unlimited and there have got to be rules limiting that discretion.

Piggie Park sets out a rule.  It doesn't really reduce the
number of cases that attorney's fees are available in, but it
limits the discretion of the courts to deny attorney's fees
claims.  So too does Christiansburg.  Why, here, shouldn't this
court, in looking at the statute and these Supreme Court and
D.C. Circuit expressions, come to the conclusion -- taking into
account the purpose of the statute, et cetera -- come to the
conclusion that fees are not appropriate?

MR. REIN:  Yes.  I think that if fees are not
appropriate, we would certainly like the opposite conclusion.

THE COURT:  Well, I'm framing the question for you so
you can answer it.  I'm not telling you what my view is; I'm
just giving you a question to answer.

MR. REIN:  I'm just trying to be explicit and fair in

1    answering it.  And we thought about that quite a bit, because

2    clearly on its face the statute just says "in the discretion of

3    the Court."  So it could be anything.

4        The courts have adhered to the legislative history that

5    said, look, it's so important to protect the rights accorded by

6    those amendments that we believe that the prevailing party

7    should have the opportunity to recover fees unless there are

8    special circumstances, and I don't think anybody has said

9    "special circumstances" obtained here.

10       So the question is, well, this is a different kind of case.

11   As I said, the only cases that are comparable are the so-called

12   Max Black cases, because they said "right against right."

13   Constitutional right against constitutional right.

14       We believe that there ought to be the same incentive for

15   fighting over the legitimate boundaries of federal intervention

16   as there is for fighting over the application of the substantive

17   guarantees, because when you look at the intervenor cases,

18   that's what they're saying.  Congress wanted people to vigorously

19   protect the rights they were accorded by the amendments,

20   vigorously protect the rights that were established under the

21   VRA.  So Piggie Park is an incentive.

22       We believe that when Congress broadened the language here

23   and talked about voting guarantees of the amendments, it was

24   saying, we're not being discriminatory.  Anybody who seeks to

25   enforce what they consider their rights under those statutory

1    provisions and/or the constitutional text ought to be

2    incentivized to do it, because that's the way we advance to a

3    better understanding of how this federal-state relationship and

4    individual relationship in the area of voting rights should be

5    done.  So that's the way we look at it, and I think we have an

6    argument and a case of first impression.

7            THE COURT:  It is a case of first impression, I agree

8    with you.  It's a little easier to deal with this kind of case

9    in the context of Title VII, or even the traditional civil rights

10   cases, because there the plaintiff and the defendant -- I mean,

11   the roles are a lot clearer.  It's hard to say that the employee

12   isn't in one position and the employer in another position.

13           MR. REIN:  Yes.

14           THE COURT:  And the same thing for the individual

15   who's had a run-in with the local police and has a civil rights

16   claim.  It's hard to say that they aren't in clearly identified

17   positions.  Here, though, you have circumstances where the

18   procedural role can easily shift.

19           MR. REIN:  And it does, even under the Act, because in

20   a preclearance action -- it's not easily regulated by saying the

21   plaintiff has a certain claim and the defendant doesn't, because

22   that would undermine the logic of the way that proceedings are

23   destined to arise in this circuit.  I don't think you can come

24   to a conclusion based on who was the plaintiff.

25           THE COURT:  It does return somewhat to the point we

1  were talking about before.  If you look at <u>Medina County</u>, there's

2  a passage there that says, "It is thus clear from the case law

3  and the legislative history that when the procedural posture of

4  a case places the party who seeks to vindicate rights guaranteed

5  by the constitution in the position of defendant, the

6  restrictive <u>Christiansburg Garment</u> rule is not applicable."

7       The question, then, is whether -- that's when that party is

8  seeking attorney's fees.  The question is whether the D.C.

9  Circuit is also implicitly stating the converse, that when the

10  procedural posture of the case places the party who opposes

11  individual voting rights -- the government would argue that's

12  what Shelby County was doing -- in the position of a plaintiff,

13  the restrictive <u>Christiansburg Garment</u> standard should apply

14  when that party seeks attorney's fees.

15            MR. REIN:  Right.  And I'm not sure I would read that

16  into it, but I think even more fundamentally what you had in

17  this case was both parties believed they were coming forward for

18  the protection of voting rights.

19       Our belief was, as construed by the Court, those rights

20  encompass the right to regulate the electoral process.  The view

21  on the other side was, no, those rights, from the point of view

22  of those against whom discrimination might lie, encompass having

23  a procedure which ensures that the substance will be protected.

24       And in one sense, their position was more remote, because

25  they were protecting not a substantive right but a procedure,

1    and rights were I think more squarely in collision in the <u>Miller</u>

2    case where one party was saying, well, this legislature is

3    improperly constituted, the state has gone out of bounds, it's

4    not properly giving some citizens the right to elect candidates

5    of choice.

6         The other side said, no, you're trying to enforce upon us

7    the use of a racial characteristic in redistricting, and that

8    defies equal protection.  So you have collisions of rights, both

9    parties asserting rights, and the question is which has more

10    justification in this specific instance.  That's really the

11    nature of this case.

12         THE COURT:  Well, if you try to do that balancing,

13    why wouldn't you look to the congressional purpose of the Voting

14    Rights Act and which side was acting more consistently with what

15    Congress had set out in the Voting Rights Act?  And if you did

16    that, I think you'd probably lose, because you were challenging

17    what Congress did.  You were opposing what Congress had put into

18    place as the law.  Were you not?

19         MR. REIN:  Yes.  I think in one sense, sure, we were

20    challenging whether Congress had exceeded its powers in that

21    specific procedure.  That was the nature of the case.  I think

22    that had Congress wanted to do that, it could have said in this

23    language "any action or proceeding to enforce the voting

24    guarantees accorded by this Act."  Then you're entitled to fees

25    because that would have limited it right there.  But that's not

1    the language they chose.

2            THE COURT:  That's not what they did, but we're

3    still stuck, if you will, with Supreme Court and, to a certain

4    extent, D.C. Circuit case law that says, look, there's got to be

5    limitations in here about attorney's fees. The court's discretion

6    is limited, and so there are these principles that are applied

7    through these cases, through Piggie Park going one way, through

8    Christiansburg going another way, and through other cases, Zipes,

9    et cetera.

10       So you can't just say, oh, Congress could have written

11   the statute differently, because the Supreme Court has said,

12   even with the statute written the way it is, there's still going

13   to be limits on the court's discretion to award fees.

14           MR. REIN:  I think that's fair, but you might ask the

15   question, would Congress have intended to foreclose those who

16   wanted to assert that the Act, as construed, should not properly,

17   because of the limitation, exceed the boundaries of what is

18   appropriate, because, you remember, it's a court construction in

19   Allen that broadened it out.

20       So when the congress is looking at it, they might well have

21   considered, look, yes, we pass laws; we usually don't incentivize

22   people to overturn the laws we pass, although one could say a

23   responsible congress would say these laws need to be tested

24   under the amendments.

25       There's nothing really that told us in the legislative

1    history which way they went, but even leaving that aside, that

2    question may have been foreclosed in <u>Allen</u> by the expansion of

3    the notion of voting guarantees, and I think in fairness, I'm

4    not sure that Congress really believed when it was writing the

5    Act that <u>Allen</u> was going to come out the way it did.  But it

6    did, and that of course sets the whole boundary of this case.

7        So I think that it's not improper to say Congress should

8    accord an incentive to those who seek to ensure proper balance

9    in its activities, ensure that it stays within the limits of its

10   power and doesn't abuse that power, and that's what we were

11   fighting about.  And I think I will shut up after that.

12           THE COURT:  Do you want to say anything -- I'll give

13   you five minutes of rebuttal.  If you want to take any time on

14   the issues you need to the defendant-intervenors, you could, or

15   you could save that for --

16           MR. REIN:  Well, I think the intervenors -- we see

17   them under <u>Zipes</u> in a different posture, because in a sense they

18   are not defending some individual action of theirs.  They're

19   not the acting party.  The Attorney General enforces preclearance.

20       We understand the intervenors' position, which is, look,

21   we're really more in the nature of an amicus; we're fighting the

22   broad issue because it's an on-face challenge, but we cannot

23   individually exercise preclearance.  That's the role of the

24   Attorney General.  So I think we had always focused this on the

25   government, and we understand <u>Zipes</u>.

1          THE COURT:  If the government had sovereign immunity,

2    what would your position be?

3          MR. REIN:  That would be different because, as we

4    said, Zipes says if the government is responsible, you don't

5    chase the intervenors, and we respect that principle.  We don't

6    believe the government has sovereign immunity here.  It should

7    be settled on that basis.

8          THE COURT:  All right.  Thank you, Mr. Rein.

9          MR. REIN:  Thank you.

10         THE COURT:  Mr. Shapiro?

11         MR. SHAPIRO:  Thank you, Your Honor.  Your Honor asked

12   the question a number of times what was meant by the phrase "the

13   voting guarantees."

14         THE COURT:  Is that where you want to start?  You want

15   to skip sovereign immunity?  I'm happy if you want to skip

16   sovereign immunity, but take your shot if you want to take your

17   shot.

18         MR. SHAPIRO:  Well, I'm happy to start with a concern

19   that Your Honor had raised.

20         THE COURT:  Because I would have to address that

21   first.  If the government's continuing to say that there is

22   sovereign immunity here, isn't that the first issue I have to

23   deal with?  That's a jurisdictional argument you're making.

24         MR. SHAPIRO:  I think the eligibility issue can also

25   decide the case, Your Honor.

1          THE COURT:  So I may be able to decide the case, but

2    I can't reach that issue unless I reject your sovereign immunity

3    argument, can I?

4          MR. SHAPIRO:  Your Honor, to some extent, the

5    eligibility issue comes together with the sovereign immunity.

6          THE COURT:  Oh, let's not do that.  I mean, there are

7    jurisdictional issues and there are issues that are not

8    jurisdictional, and the Supreme Court has been very clear lately

9    -- lately, meaning the last decade -- to say don't call things

10   jurisdictional if they're not jurisdictional.  I don't see the

11   eligibility issue as a jurisdictional issue, whereas is there

12   any doubt that the sovereign immunity issue is jurisdictional?

13         MR. SHAPIRO:  Your Honor, with regard to the -- there

14   is a jurisdictional issue with regard to the sovereign immunity

15   issue.  There's also a question as to whether there's a waiver

16   of sovereign immunity with regard to the fee provision itself.

17         THE COURT:  It's not a waiver of sovereign immunity,

18   because sovereign immunity can't be waived.  Sovereign immunity

19   isn't their claim, so they can't waive it.  So it's not a waiver

20   of sovereign immunity; it's a waiver of their objection to your

21   sovereign immunity claim.  Quite frankly, I don't understand

22   that argument.  I mean, I understand it, but I don't see how it

23   has any legs.  Sovereign immunity has been stated to be in the

24   nature of a defense.  Why are they obliged to anticipate every

25   defense that you may or may not raise?  Why are they?

1          MR. SHAPIRO:  Well, in this case, this is a fundamental

2    defense, Your Honor.

3          THE COURT:  Calling it a fundamental defense doesn't

4    answer the question.  Why are they obliged to anticipate and

5    brief every defense that you may raise?  Is there any case law

6    that you rely on?

7          MR. SHAPIRO:  No, Your Honor.  And I think, Your Honor,

8    we would concede that is not -- while it was mentioned in the

9    brief, we would not rest our hat on that point.

10         THE COURT:  Then why does the Equal Access to Justice

11   Act not constitute, in combination with the attorney's fees

12   statute under the Voting Rights Act, a waiver of sovereign

13   immunity?

14         MR. SHAPIRO:  Your Honor, there are two reasons.

15   Number one, for the waiver in EAJA 2412(b) to apply to this fee

16   provision, by its own terms a fee provision itself must

17   encompass this action.  The fee provision must be one -- this

18   action must be one to enforce the voting guarantees of the

19   Fourteenth and Fifteenth Amendment.  That's where this

20   eligibility issue comes up, because this is just not an action

21   to enforce the voting guarantees of the Fourteenth and Fifteenth

22   Amendment.

23       The second issue is there needs to be an underlying merits

24   liability which runs with the fee liability that has a direct

25   relationship with the fee liability.

1          THE COURT: All right. Why don't you move on. I'm sorry.

2          MR. SHAPIRO:  Returning to the issue of whether this

3     is an action to enforce the voting guarantees of the Fourteenth

4     or Fifteenth Amendment, the government's answer to that is that

5     voting guarantees refers to the historic commitment promise

6     guarantee of the federal government to address discrimination in

7     voting, as enunciated in Section 1 of the Fifteenth Amendment

8     and the Equal Protection Clause, and not to the language in the

9     enforcement provisions of those amendments and the appropriate

10    legislation.

11         THE COURT:  And, therefore, this is not an action or

12    proceeding to enforce the voting guarantees of the Fourteenth

13    and Fifteenth Amendment?

14         MR. SHAPIRO:  Yes, Your Honor.  That's correct.

15         THE COURT:  Now, there are several D.C. Circuit cases

16    that proceed on the assumption that a case like this is an

17    action or proceeding to enforce the voting guarantees of the

18    Fourteenth or Fifteenth Amendment.  Aren't there?

19         MR. SHAPIRO:  Is Your Honor referring to Medina,

20    Donnell --

21         THE COURT:  Medina, Donnell, Castro County.  Aren't

22    those all proceeding -- I know that they're not cases in which

23    the precise same party as here is seeking the fees, but they're

24    cases that are the same kind of action and they proceed without

25    addressing or giving any hint that this would not be an action

1    or proceeding to enforce the voting guarantees of the Fourteenth

2    or Fifteenth Amendment.  Don't they?

3         MR. SHAPIRO:  Your Honor, the government's position

4    is that those cases can be distinguished from this one.  Those

5    cases were actions to enforce the voting guarantees, because in

6    each of those cases, those were cases where the Department of

7    Justice objected to actual changes that were discriminatory,

8    violations of the statute, and the defendant-intervenors were

9    also involved in the process of objecting to those changes.

10   There were allegations of discriminatory voting practices, and

11   that is what instigated the litigation.

12        THE COURT:  Well, actually, factually that underlies

13   this litigation too, which is not what was being litigated.

14        MR. SHAPIRO:  Your Honor, respectfully, in this case

15   Shelby has emphasized from the outset that there was no

16   discriminatory changes involved, in fact, that there was no

17   change involved.  For them, this is about the imposition of the

18   preclearance regime.  So in that respect it is different.  This

19   is not a case that involves, as they have emphasized throughout,

20   discrimination in voting.

21        THE COURT:  When you get to the application of

22   limitations like Christiansburg, they're arguing that the

23   breadth and nature of their case is what keeps them out of

24   Christiansburg, but your argument is that the breadth and nature

25   of this case and the kind of case that was brought is what keeps

1   them out of being an action or proceeding to enforce the voting
2   guarantees of the Fourteenth or Fifteenth Amendment in the first
3   instance.

4           MR. SHAPIRO:  Yes, Your Honor. I would agree with that.

5           THE COURT:  Very case-specific assessment.

6           MR. SHAPIRO:  Well, Your Honor, yes.  It is specific
7   to this case, and this case is distinguishable for the reason
8   that we stated.  This is not a case that involves allegations of
9   discrimination in voting, which is what one needs for it to fall
10  in the ambit of this provision.  This provision involves cases
11  involving allegations of violations of federally protected
12  voting rights, particularly discrimination in voting.

13          THE COURT:  The fact that those D.C. Circuit cases
14  were, like this case, all actions under Section 5 of the Voting
15  Rights Act, brought by a covered jurisdiction against the
16  Attorney General, is not enough because this is a little bit
17  different kind of case under Section 5, brought by a covered
18  jurisdiction against the Attorney General.

19          MR. SHAPIRO:  Your Honor, the government would
20  maintain the difference is very significant.  All of those cases
21  involved -- while you had nominal plaintiffs in those cases,
22  what brought them to the D.C. District Court was the federal
23  government and the Justice Department objecting to changes that
24  were determined to be violations of federal protections against
25  discrimination in voting, namely Section 5 of the Voting Rights

1    Act.  That is not the case in this instance.

2              THE COURT:  Okay.

3              MR. SHAPIRO:  Your Honor, Shelby County has pointed to

4    Allen as illuminating.

5              THE COURT:  Seems to be relying on Allen quite a bit.

6              MR. SHAPIRO:  Quite a bit.  And understandably,

7    Your Honor, because there is actually a reference to the

8    guarantees of the Fifteenth Amendment in Allen.  Allen predates

9    the adoption of the fee provision in '75 and is a seminal case,

10   and it is fair to assume that Congress was thinking about Allen

11   and the language in Allen when it adopted this provision.

12        What is massively clear from the reference to the

13   guarantees of the Fifteenth Amendment in Allen is that, in

14   point of fact, the court was talking about the need to have

15   broad protections against discrimination in voting and to

16   address the historical problem of discrimination in voting on

17   the basis of race.

18        That's why it said it was necessary to have a powerful

19   federal answer like Section 5 and Section 4 of the Voting Rights

20   Act and a broad understanding of what Section 5 preclearance

21   meant.  That's the context under which the reference to

22   guarantees of the Fifteenth Amendment was made in the Allen case.

23        And to the extent that there's any ambiguity about what is

24   meant by the phrase "voting guarantees," there's also the 76

25   cases that we attached to our opposition where there were

actually fee awards.  In every single one of those cases, every single one, they dealt with allegations that there had been violations of federally protected voting rights.  Without exception.  That's not this case.

THE COURT:  They say there are cases.  They attached to their brief the 2006 letter saying that you've paid attorney's fees in lots of cases that are just like this.

MR. SHAPIRO:  So with regard to that letter, a couple points, Your Honor.  Number one, it is a fact that the United States has never paid an award under 1973l(e) to any party.

THE COURT:  What do you mean when you say that? I guess I don't understand.

MR. SHAPIRO:  There's never been an award under 1973l(e) by the --

THE COURT:  You mean none of the cases referenced in this letter would have been cases dealing with attorney's fees entitlement under 1973l(e), or do you mean something different?

MR. SHAPIRO:  If I may be precise, no court has awarded fees under 1973l(e) against the United States.

THE COURT:  All right.  That's different from the United States has never paid.

MR. SHAPIRO:  I'm sorry if I mangled that.  Let me be precise about the cases that are listed there.  Many of those cases, Your Honor, are housing cases, so they do not relate to 1973l(e).  There are six voting cases.  One of them is a Section

2 case where there was an award of fees by a court on the basis
of EAJA 2412(d).  It wasn't a 1973l(e) case, and the court
determined the government's position was not substantially
justified, it's not relevant to this matter.

Then the remaining cases are all under the sort of
analytically distinct framework of the Shaw v. Reno litigation
involving individual voters who are claiming discrimination
under the Equal Protection Clause, and each of those cases also
involve claims under EAJA 2412(d), as well as an array of other
claims.  We know of only one that also had within it embedded a
1973l(e) claim.  All of those cases were settled, and in no case
was there an admission of liability by the United States.

THE COURT:  The fact that they were settled without an
admission of liability, I'm not sure which way that cuts.  Why
is that important if you paid fees?

MR. SHAPIRO:  Well, Your Honor --

THE COURT:  I mean, if the government pays fees where
they settle Case A, but they resist paying fees where they lose
Case B, but there's no distinction between those two cases, then
why isn't the fact that you paid fees of some importance to
whether you should pay fees in Case B?

MR. SHAPIRO:  Yes, Your Honor.  Had the United States
admitted liability, let's say under 1973l(e), that I guess would
be informative here, but in this instance there were a number of
claims that the plaintiffs were making as to why they were

1   entitled to fees, including claims that the government's position

2   was not substantially justified under EAJA 2412(d), claims under

3   1988 --

4           THE COURT:  So there's a different potential basis for

5   the attorney's fees claim.

6           MR. SHAPIRO:  Yes, Your Honor.  And again, all those

7   cases involved individual voters with claims that were squarely

8   under the Equal Protection Clause of the Fourteenth Amendment.

9           THE COURT:  All right.  Go ahead.

10          MR. SHAPIRO:  Your Honor, returning to the entitlement

11  issue, the United States' position is that Shelby is not

12  eligible for fees, but were the Court to determine it was

13  eligible to fees, then it's not the simple formula that Shelby

14  County has suggested.

15          THE COURT:  Let me ask you this question:  Assume for

16  a moment that the Attorney General had succeeded in the Supreme

17  Court and had won this case.  What's your position on whether

18  the defendant-intervenors could have sought attorney's fees from

19  Shelby County?

20          MR. SHAPIRO:  Our position is that it would be

21  ineligible for fees.

22          THE COURT:  Is that consistent with Donnell and

23  Medina County?

24          MR. SHAPIRO:  Yes, it is, because again, in those

25  cases --

```
1          THE COURT:  Because those cases are slightly
2    distinguishable, and I know I threw the term "slightly" in.
3          MR. SHAPIRO:  Yes.  That would be our position.
4        With regard to the entitlement issue --
5          THE COURT:  Now, that's not going to be the defendant-
6    intervenors' position, I'm sure, with some confidence -- I'll let
7    them address that -- but with some confidence.  So they would be
8    arguing that they could seek fees there, and their entitlement
9    to fees would necessarily rest on a determination that the action
10   or proceeding was one to enforce the voting guarantees of the
11   Fourteenth or Fifteenth Amendments.  Otherwise, they couldn't
12   get fees.
13         MR. SHAPIRO:  Yes, Your Honor.
14         THE COURT:  And if the action is one that fits that
15   statutory language when they're seeking fees -- I know this is a
16   hypothetical -- is there some reason that it wouldn't fit when
17   Shelby County's --
18         MR. SHAPIRO:  Yes, Your Honor.
19         THE COURT:  Can you have a situation where it's an
20   action or proceeding to enforce the voting guarantees of the
21   Fourteenth or Fifteenth Amendment if the United States wins the
22   case but not if the United States loses the case?
23         MR. SHAPIRO:  Your Honor, the United States would
24   answer the question in this way:  We believe the defendant-
25   intervenors would not be able to get fees in this matter, were
```

1    the United States to prevail, because of the eligibility issue.

2        But there are two other barriers here that don't apply to

3    defendant-intervenors were the Court to conclude that eligibility

4    is not an issue, and that is the sovereign immunity issue, which

5    obviously would not have been relevant but yet a significant

6    barrier, and the other one would be the entitlement barrier.

7        Clearly, were the Court to conclude that the eligibility

8    barrier had been surmounted, defendant-intervenors do fall more

9    into sort of a category of a type of a party that would get fees

10   under the Piggie Park standard.  They're representing individual

11   voters.

12           THE COURT:  On a purposive analysis.

13           MR. SHAPIRO:  Yeah.  And Shelby County is trying to

14   suggest on the entitlement standard there's sort of a simple

15   formula; that is, if you are a plaintiff and you prevail, then

16   you're entitled to fees.  But that is not --

17           THE COURT:  That's consistent with the language of

18   Piggie Park, which is --

19           MR. SHAPIRO:  Your Honor, the government's --

20           THE COURT:  -- the bare language.

21           MR. SHAPIRO:  Your Honor, the government's view is

22   that's consistent with a reading of Piggie Park that relies on

23   extracting just a part of that case.  There's just some of the

24   language from that case.  The case emphasizes the importance of,

25   first of all, looking at Congress's purpose behind the fee

1   provision.  The case emphasizes the fact that in the ordinary

2   case the plaintiff is going to be acting as a private attorney-

3   general seeking to -- acting as an instrument of Congress to

4   vindicate the highest priorities of Congress in addressing

5   discrimination.

6          THE COURT:  Except for the "instrument of Congress"

7   part of it, why didn't Shelby County write that they were sort

8   of acting on behalf of a broad category and indeed achieved a

9   result that benefitted thousands of municipalities and states?

10         MR. SHAPIRO:  There are a number of answers to that

11  question.  Number one, Shelby County was --

12         THE COURT:  And therefore the voters, at least some of

13  the voters, in those places.

14         MR. SHAPIRO:  Firstly, Your Honor, to the extent that

15  they were advancing the public good generally or helping voters

16  generally, that does not go to advancing the federal civil rights

17  commitment related to discrimination in voting and the guarantees

18  of the Fourteenth and Fifteenth Amendments.  That's a more

19  diffuse general good.  That was what Congress was focused on.

20      This fee provision, in point of fact, was passed at the

21  very moment that Congress came together with legislation to

22  reauthorize Section 5 and Section 4 of the Voting Rights Act

23  and to add additional protections for language minorities in

24  1975.  The impetus behind this provision was in fact to

25  encourage litigation by private attorney generals on behalf of

these federal protections, and that is not this case.

The point also needs to be made, Shelby has mentioned cases like Bond v. U.S. where there is a recognition by the Supreme Court that the beneficiaries of federalism may not be just state actors but also could be individuals.  But those cases were brought by individuals.  Shelby County doesn't have standing here to assert that it's benefiting individual rights.

This case, first and foremost, was about Shelby's rights and the injury to Shelby.  Shelby argued for three years that it had been injured because of violations of states'-rights principles, principles such as the equal sovereignty of states, and principles that it said were embedded in the Tenth Amendment Article IV and the framework of --

THE COURT:  It frequently referred to the Fourteenth and Fifteenth Amendments as well.

MR. SHAPIRO:  It referred to them.  But, Your Honor, it did not state that the rights that had been violated were located in the Fourteenth and Fifteenth Amendment.  Nowhere --

THE COURT:  But on the eligibility question, this again is sort of the prevailing party-based analysis, and I know you think those D.C. Circuit cases don't matter because they're distinguishable.  But it seems to me that what does matter is the statute, and there's nothing in the statute that gives any hint that this analysis of whether it is an action or proceeding to enforce the voting guarantees of the Fourteenth or Fifteenth

Amendment turns on looking at the prevailing party.  There's
nothing in the statute that would indicate that.

MR. SHAPIRO:  Your Honor, I was not suggesting that it
turns on looking at who's the prevailing party or the character
of the party, but what I was suggesting in the three cases --
Medina, Donnell, and Castro -- is that in all those cases, those
actions, they were instigated by allegations of discrimination
in voting.  There was an effort to enforce the voting guarantees
of the Fourteenth and Fifteenth Amendment in those cases, and
that's a very clear distinction.

THE COURT:  I know that, but I thought you were just
making an argument that it was really a party-specific focus for
determining whether it's an action or proceeding to enforce the
voting guarantees of the Fourteenth and Fifteenth Amendments --

MR. SHAPIRO:  My last argument --

THE COURT:  -- that it matters and may be different
depending upon the prevailing party.

MR. SHAPIRO:  My last argument was that this was not
an action brought by Shelby County to enforce not just the
voting guarantees of the Fourteenth and Fifteenth Amendment.
I don't believe this was even an action to enforce the
Fourteenth or Fifteenth Amendment on any level, because you
enforce the law to prevent violations.  Shelby County identified
violations in its complaint: violations of the Tenth Amendment,
violations of Article IV, violations of the framework of the

1    Constitution.

2        Nowhere in its complaint does it identify a violation of

3    the Fourteenth and Fifteenth Amendment, and that's true all the

4    way through this litigation until we get to this fee dispute.

5    In the last hour, the last moments of the litigation, they are

6    trying to re-imagine their case as one about the Fourteenth and

7    Fifteenth Amendment, which they are not free to do.

8        If I may, in closing, if there are no further questions,

9    the Seventh Circuit put it simply in the King case that 1973l(e),

10   as with Section 1988, its purpose is to encourage citizens to --

11       If I may read the language:  Its purpose is "to encourage

12   private citizens to initiate court actions to address violations

13   of the nation's civil rights laws."  That's the way they simply

14   put it.  That purpose has not been served by this litigation.

15   In that respect, it's very clear that Shelby County's claim for

16   fees in this matter is debarred.

17           THE COURT:  You mean because they're not eligible, or

18   they're not entitled?  Is that an argument that goes to whether

19   this is an action or proceeding to enforce the voting guarantees

20   of the Fourteenth or Fifteenth Amendments, or is that an

21   argument that goes to whether the Christiansburg standard

22   applies and whether it's met here?

23           MR. SHAPIRO:  Your Honor, I believe that ultimately

24   goes to both issues.

25           THE COURT:  Focusing on the second issue, let's assume

1    for a second that you've been unsuccessful on the eligibility

2    issue.  Is there any precedent that you want to point me to for

3    why the Christiansburg standard applies?

4         MR. SHAPIRO:  Why the Christiansburg -- well, if the

5    standard were -- if eligibility were to be found here, then the

6    more rigorous standard in Christiansburg would be the standard

7    that Shelby County would have to meet.

8         Shelby has essentially said that its situation's analogous

9    to the Section 5 preclearance actions and the other actions

10   presumably brought under 1973l(b) by state actors.  There's not

11   a single one of them -- there have been roughly 150 such cases

12   before the D.C. District Court, and there have been many cases

13   where changes have been precleared.  Not in a single one of them

14   has there been fees awarded.

15        THE COURT:  That may be a weighty argument here, but

16   there are circumstances where all of a sudden a light goes off

17   in a particular attorney's mind, and they bring a novel

18   application and it turns out to be accepted by the courts.  So

19   aside from the fact that it's never occurred before, why is it

20   that the fees should be denied on an entitlement basis by

21   applying Christiansburg?

22        MR. SHAPIRO:  Your Honor, the reason is because,

23   ultimately the Court, in our view, should look to that standard

24   which is asking is the party acting as the instrument of

25   Congress in vindicating high priorities of Congress related to

civil rights.  Is the party that's prevailed upon a violator of
the law.  These are the sorts of questions that, once they're
answered, it's clear that Shelby's not entitled to the Piggie
Park standard, and the situation is much more analogous to a
state actor that is opposing cases brought by private attorney
generals seeking to vindicate federal civil rights laws.

THE COURT:  All right.  Thank you, Mr. Shapiro.

MR. SHAPIRO:  Thank you, Your Honor.

THE COURT:  Mr. Ho.

MR. HO:  Good afternoon again, Your Honor.  You've
already heard at some length from the Department of Justice on
the threshold questions in this case, that is, Shelby County's
eligibility and entitlement to fees.  So I won't belabor those
points except to say --

THE COURT:  Is this an action, in your view, or
proceeding to enforce the voting guarantees of the Fourteenth or
Fifteenth Amendment?

MR. HO:  No.  We would agree with the Department of
Justice that it's not an act to enforce the voting guarantees of
the Fourteenth and Fifteenth Amendments.

THE COURT:  So you would agree that if the United
States had prevailed in the Supreme Court, you would not have
been entitled to seek attorney's fees from Shelby County?

MR. HO:  Well, unfortunately, we're not in that
situation, so we're not confronted with that.

1          THE COURT:  I know, but I'm asking you a question.

2          MR. HO:  I understand.  It's not something that we

3     have taken a firm position on, Your Honor, in this brief, and

4     I can't say here today --

5          THE COURT:  You have sought attorney's fees in similar

6     contexts, have you not?

7          MR. HO:  Well, other clients represented by the

8     American Civil Liberties Union have, Your Honor, before I was

9     counsel there, so unfortunately I can't speak from personal

10    experience about those cases.  But here's what I would say about

11    those kinds of cases, Your Honor.

12         The first question that the Court would have to confront

13    is the D.C. Circuit's ruling in Donnell, that in order for

14    defendant-intervenors to be able to obtain fees, we would have

15    to have contributed substantially to the outcome of the

16    litigation, because the need to encourage private citizens to

17    enforce the civil rights statutes diminishes when the Attorney

18    General is already a party to a case.

19         Now, that being said, the closest analogy I can think of in

20    which defendant-intervenors may have been eligible for fees in a

21    case would be the preclearance cases, which is what Shelby County

22    points to.  But that would go, I think, to the question of their

23    entitlement to fees, and if we're really going to adopt and take

24    seriously the preclearance cases, Donnell, Medina County, which

25    did not squarely confront the question presented here, I think

what's key about those cases is that they would only demonstrate
that the Christiansburg standard should apply here.

The defendant-intervenors were determined to be eligible
for fees in those cases because they were the party which the
D.C. Circuit had understood to be enforcing the voting guarantees
of the Fourteenth and Fifteenth Amendments and the provisions of
the Voting Rights Act itself.

That's consistent with the 1975 Senate Report, when
1973l(e) was added to the statute, that defendant-intervenors
may in fact, in some cases, really be in the position of a
plaintiff in a normal Voting Rights Acts case and should obtain
fees under the normal Piggie Park standard.

Now, if that tells you anything, it would mean that the
plaintiff jurisdiction in a preclearance case is really more --
although nominally the plaintiff, is really more like a
defendant who's interests are adverse to the statute itself and
the voting guarantees of the Fourteenth and Fifteenth
Amendments.  If that's the cases that Shelby County would like to
analogize this one to, then that would only suggest that the
Christiansburg standard should apply here.

The purpose of fees provisions is to incentivize enforcement
of federal law.  The Seventh Circuit case that Mr. Shapiro cited,
the King v. Illinois State Board of Elections case, actually,
the exact language in that case is even better than Mr. Shapiro
stated.  It's not simply to encourage private citizens to

1   initiate court action to correct violations of the nation's

2   civil rights laws.  The Court actually specifically says "the

3   nation's civil rights statutes."

4       If that's in fact the case, then what Shelby County has

5   sought to do here, in tearing down a civil rights statute and

6   acting adverse to express congressional policy, would really

7   place it more in the position of a defendant.  But what I'd like

8   to spend the bulk of my time addressing, Your Honor, specifically

9   is the question of defendant-intervenors' potential liability

10  for fees.

11      Now, under Zipes, our clients -- Mr. Pierson, ten other

12  private individuals, the nonprofit Alabama NAACP -- cannot be

13  liable for fees absent a showing their position was frivolous,

14  objectively unreasonable, or without foundation, and the

15  government's sovereign immunity here is really irrelevant to the

16  determination.

17          THE COURT:  It can't be because of what case?

18          MR. HO:  Zipes, Your Honor.  The issue of the

19  government's sovereign immunity is really irrelevant to the

20  principal rationale in Zipes, which is that there is, in the

21  majority opinion's words, "a crucial connection between

22  liability for violations of federal law and liability for

23  attorney's fees."  Here, obviously, Mr. Pierson and the Alabama

24  NAACP haven't violated any federal statutes or constitutions.

25  The Court's judgment isn't binding on them in any way.

1   Assessing any fees against them certainly would not deter any

2   future violations of constitutional rights.  So that's really

3   the principal rationale in Zipes.

4        THE COURT:  So if sovereign immunity were successful

5   in this case as a bar to any attorney's fees against the United

6   States, you would argue that, under Zipes, fees cannot be

7   collected against the defendant-intervenors.

8        MR. HO:  That would be our position, Your Honor.

9   I mean, Zipes does, of course, reference the fact that fees can

10  be available from the actual defendant in a case, but it's not

11  the only or even principal rationale in the case.  The only

12  thing that awarding fees against the defendant-intervenors in

13  this case would accomplish, potentially, is discouraging

14  intervention in future cases concerning the constitutionality of

15  federal civil rights statutes.  I don't think that that is --

16       THE COURT:  Well, I suppose an argument can be made --

17  indeed, I think it has been made -- that this case should

18  actually be an encouragement to those who want to challenge

19  the constitutionality of some government provision, that it

20  shouldn't discourage anyone from asserting their rights;

21  especially asserting rights here by the plaintiff should be an

22  encouragement.

23       MR. HO:  It would certainly encourage challengers to

24  the constitutionality of federal civil rights statutes, but I

25  think that would actually run counter to the very purpose of

1    establishing the fees provision.  In the normal American system

2    of civil litigation, we don't just assess fees in favor of the

3    winners of cases, even if the winners have worthy goals of

4    advancing constitutional rights.

5         Congress creates fee provisions specifically to encourage

6    private attorneys-general to enforce congressional objectives.

7    Here that's the Voting Rights Act.  I think it would be contrary

8    to the purposes of the fees provision to incentivize actions

9    that seek to defeat congressional imperatives.

10        There are really only two arguments that Shelby County

11   raises in its reply brief in response to our assertion that

12   Zipes applies here.  The first is that, according to Shelby

13   County, determining whether or not the defendant-intervenors

14   can be liable for fees would be premature at this time.

15        But the Court's bifurcation order I think very clearly

16   states that the issue that we're confronted with right now is

17   whether or not Shelby County has a legal entitlement to an award

18   of fees, leaving only the question of the amount of fees for a

19   later time.  So determining defendant-intervenors' liability

20   I think is no more premature at this stage than would be

21   determining whether or not sovereign immunity prohibits the

22   recovery of fees against the Department of Justice.

23        The other argument that Shelby County makes in its reply

24   brief is that Zipes, if it applies here, would suggest that the

25   Piggie Park standard would be available here for Shelby County

because that is, in fact, what the plaintiff obtained fees under in <u>Zipes</u>.

I think the difference here, though, as I think Your Honor noted, is that in a case like <u>Zipes</u>, the plaintiff was a normal Title VII plaintiff that was suing for a violation of a statute against a violator of the statute, and that's obviously not the case here. <u>Zipes</u> didn't really have an occasion to confront the question of what sort of legal standard would be applicable in this sort of unique procedural posture of this case.

If I may, Your Honor, the last point that I would make is that your question earlier today, your very first question was what are the voting guarantees of the Fourteenth and Fifteenth Amendments. I think the Fifteenth Amendment is quite clear that it prohibits the denial or abridgment of any citizen's right to vote on account of race, color. Whatever interests Shelby County sought to advance in this case, however valid they may be, those interests are of a very, very different nature than the ones protected --

THE COURT: Why is it reasonable to conclude that what Congress meant or the reason that it put in voting guarantees is because the Fourteenth Amendment has a number of guarantees in it and so it was trying to make it clear that attorney's fees were only available with respect to actions or proceedings to enforce the voting guarantees? That may be the only guarantee in the Fifteenth Amendment, but not in the Fourteenth Amendment.

1   So why isn't it reasonable to say that's why that language was

2   inserted?

3           MR. HO:  Well, I think the prohibitions in the

4   Fourteenth Amendment with respect to voting are certainly --

5   obviously, the prohibition on racial discrimination like in the

6   Fifteenth, Rogers v. Lodge, I think makes that clear.  There's

7   also the prohibition on malapportionment, the Reynolds v. Sims

8   line of cases.  There's a prohibition on unequal treatment of

9   citizens from the Bush v. Gore line of cases.

10          These are all interests that are of a very different kind

11  and nature than the interests that Shelby County has advanced in

12  this case, and I think it would turn the reconstruction

13  amendments on their head.  These are amendments which, by

14  design, expand federal and particularly congressional power at

15  the expense of the states.

16          It would turn those amendments on their head to suggest

17  that they are enforced by an action which seeks to preserve

18  state prerogatives against federal intrusion, and that's not in

19  any way to diminish the interest that Shelby County sought to

20  advance in this case; they're just not the interests that

21  Congress sought to incentivize the enforcement of in adopting

22  1973l(e).

23          THE COURT:  All right.  Thank you, Mr. Ho.

24          MR. HO:  Thank you, Your Honor.

25          THE COURT:  Mr. Rein.

1          MR. REIN:  Thank you, Your Honor.

2          Your Honor, the Court gave me five minutes, so I'll try

3     to use them judiciously.  I just want to clear up one thing.

4     We're talking here, well, what was the nature of Shelby's

5     complaint and what did it invoke?  If you look at the document,

6     the complaint, it says, "The preclearance obligation of Section 5

7     exceeds Congress's enforcement authority under the Fourteenth

8     and Fifteenth Amendments, and therefore violates the Tenth

9     Amendment."

10         So the authority of Congress to regulate voting procedures

11    in derogation of local authority was squarely in the case.  We

12    raised it with both Section 5 and Section 4(b).  Section 5

13    became moot, but there's no doubt how the complaint was framed.

14    It speaks for itself.  So I think that's one point to indicate

15    that, yes, we always saw this was a case about enforcing what

16    were the appropriate limits.

17         This case was also brought under the Voting Rights Act

18    jurisdictionally, and nobody objected to that.  So, again,

19    there's the situation where Congress provided a special forum

20    for the very action that Shelby was bringing, and that was not

21    disputed at any level -- not by the government, not all the way

22    up through the Supreme Court.  This court had jurisdiction of

23    the action under the Voting Rights Act.  So I think those are

24    something to consider in looking at the nature of this action

25    and the rights at issue.

1    Your Honor, you've raised a number of hypotheticals.  One

2    thing that I think would be an interesting question is, suppose

3    that Shelby County, acting on its own, said, you know what, we

4    think that the congress has exceeded its power in preclearance,

5    so we're going to start implementing changes to our voting

6    procedures that have been democratically agreed to by the

7    majority of the citizens here, acting through their government.

8    So we're going to do it.

9    Now somebody brings an action for violation of the

10   preclearance obligation.  Says you've got to enforce this;

11   they're violating the law.  Would that action be one in which

12   there was fee eligibility?  Would the intervenors of the

13   government say, well, there's no fee eligibility in that case

14   because it's not about the protection of voting rights?  I think

15   the answer would be clearly no.  They would say that that's a

16   case in which voting rights are being protected, the very

17   protections that Congress put in place.

18   So I think if you're looking for the characteristic of the

19   action, a fight over preclearance is a fight about a procedure

20   that's an impediment to the exercise of local sovereignty over

21   voting decisions, which the Supreme Court has said are

22   absolutely part and parcel of guarantee.  So it is a fight of

23   voting guarantees.  We just happen to be on different sides of

24   it, but change the character of the action.

25   The government has said, and said again, well, this wasn't

on behalf of individual voters.  I think if you look at what the
Court said in Bond, if you look at the way this case was argued,
it was all about the rights of the citizens of Shelby.

THE COURT:  Even if it was, was it an action to
enforce or advocate the purposes that were behind Congress's
enactment of the Voting Rights Act?  Seems to me that that's
where your argument is weakest.  If you get to that point and we
get into that analysis on the entitlement, it's hard to
conclude, it seems to me, that Shelby County's action was really
consistent with Congress's purpose.

MR. REIN:  Well, Your Honor, Congress's purpose is
always best set forth in the words that it used.  So if you look
at the words that are enforcing the guarantees of the Fourteenth
and Fifteenth Amendments, I think we squarely fit within that.
I don't think that you can override those by saying, well, in
the ordinary case, what Congress wanted to encourage were people
to come forward and say, look, these rights have been enumerated
and put into statute and I want my rights enforced, to be sure.

But Congress created a broader jurisdictional foundation
and used words in drafting which went beyond, and I think that
the government says, well, settlement cases don't count.  But I
think they indicate that there has not been a consistent view,
even in the Department of Justice, about situations where rights
are in collision, and I think Congress has as much an interest
in staying within constitutional boundaries as it does in

enforcement within those boundaries.

        THE COURT:  That may be, as an abstract matter, but in terms of a fee provision, the cases really look at it as, okay, what's the purpose of this fee provision?  The purpose of the fee provision is to encourage actions to be brought to enforce, apply, and uphold Congress's statutory determinations.

    Here, that's not the case, because you -- Shelby County, that is -- was not bringing an action to really enforce and apply the provisions of the Voting Rights Act.  It was bringing an action to eliminate them.

        MR. REIN:  Your Honor, I mean, as we said, that's a fair question, and if Congress had drafted this to say that one who takes action to enforce the rights granted under the Voting Rights Act is entitled to fees, and limited it that way, that's what it would be, and that's how the civil rights statutes are framed.

        THE COURT:  You're right.  That's not the way the Act is written, the fee provision of the Act.  The question is whether the gloss that the cases have put on it -- Supreme Court cases, including cases by very conservative justices of the Supreme Court, saying that discretion has its limits, and there have to be these kinds of limitations that are expressed in Zipes, even expressed in Piggie Park, expressed in Christiansburg, on the discretion that courts have in awarding fees.

        MR. REIN:  Again, this is a case of first impression.

1          THE COURT:  It is.

2          MR. REIN:  It's unusual, but I think as far as we're

3    concerned, I think we have a clear chain of, if you will, steps

4    under the language of the Act itself that says the characteristic

5    of this proceeding was one to enforce.  It was a struggle over

6    enforcing potentially conflicting rights: one, the right of

7    preclearance, which may or may not be, but I think the government

8    would say is a voting right.  The right to have the Attorney

9    General supervise and to stop things absent a judicial

10   determination is a right, a derivative right.

11        It protects other rights and the rights of the citizens of

12   Shelby County who were represented here, and you'll remember the

13   government initially challenged Shelby's standing saying, oh, it

14   should be individuals.  I think here we were the private

15   attorney general.  We were acting on behalf of a constituency.

16   Just as the government has said in its papers it acts on behalf

17   of citizens, Shelby County acts on behalf of its citizens and

18   brings a broader action for the benefit, as you said, of

19   thousands of other constituencies and their citizens.

20        So I think that the question is, as I think you said in

21   questioning, you know, is this something that Congress would

22   have contemplated or encompassed within the language, or is it

23   so detrimental to the purposes that the language should be

24   ignored.  We're saying the language is what Congress passed.

25   They could have passed it differently.  They could have

restricted it in different ways.

It's worthwhile that in Northwest Austin, which was a prior challenge on the same ground, the intervenors asked for fees.  Same question, you know, which way is the shoe pinching. I don't think that any of these things really determine it. It's got to be determined --

THE COURT:  There are interesting little points along the way, but not necessarily determinative, I agree.

MR. REIN:  And I think, you know, what we believe here is central is that Shelby asserted rights on behalf of its citizens and other citizens.  It said that what we are relying on is limiting language in the Fourteenth and Fifteenth Amendments, and we believe both Allen and Bond are pertinent.

One says those issues under that amendment, the rights that are at issue are the rights of governing the process as well as the simple right to register and vote, and Bond I think emphasizes that individuals have a protected interest in ensuring mechanisms that prevent overriding federal supervision in matters that go to the states.

So unless you have any further questions, Your Honor, I think I've used my five minutes.

THE COURT:  I think that'll do it, Mr. Rein.

MR. REIN:  Thank you very much.

THE COURT:  I thank you all for the quality of the briefing and the arguments today.  The issues are submitted, and

1    I will have something out in the future.  I won't even say "near

2    future" because I'm not sure exactly what my schedule is, but it

3    shouldn't take all that long.  Thank you all.

4                    (Proceedings adjourned at 3:23 p.m.)

*   *   *   *   *   *

CERTIFICATE

     I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*Bryan Wayne*
BRYAN A. WAYNE