## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SHELBY COUNTY, ALABAMA,**<br><br>    **Plaintiff,**<br><br>       **v.**<br><br>**ERIC H. HOLDER, Jr., in his official capacity as Attorney General of the United States,**<br><br>    **Defendant,**<br><br>**EARL CUNNINGHAM, et al.,**<br><br>    **Defendant-Intervenors.** | **Civil Action No. 10-651 (JDB)** |

## <u>MEMORANDUM OPINION</u>

Before the Court is [94] plaintiff Shelby County, Alabama's ("Shelby County") motion for attorney's fees. Shelby County seeks $2,000,000 in fees under 42 U.S.C. § 1973*l*(e), a provision of the Voting Rights Act ("VRA") that permits an award of reasonable attorney's fees, in a district court's discretion, to the prevailing party in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." The United States and defendant-intervenors oppose the requested fee award. Both Shelby County's fee petition and section 1973*l*(e) present a series of interpretive challenges, for which there is often little or no binding precedent. But ultimately, for the reasons set forth below, the Court will deny Shelby County's motion for attorney's fees. Shelby County's attorneys won an impressive victory before the U.S. Supreme Court. But as is true in most litigation, that victory came at a price. Shelby County and its attorneys, not the American taxpayer, must foot the bill.

## BACKGROUND

Shelby County brought this action against the Attorney General as a facial challenge to the constitutionality of Section 4(b) and Section 5 of the Voting Rights Act of 1965. Section 5 of the VRA "required States to obtain federal permission before enacting any law related to voting," and Section 4(b) created a coverage formula that "applied that requirement only to some States." Shelby Cnty., Ala. v. Holder, 133 S. Ct. 2612, 2618 (2013). Shelby County alleged that Section 4(b)'s coverage formula and Section 5's preclearance obligation for covered jurisdictions violated the principle of "equal sovereignty" embodied in the Tenth Amendment and Article IV of the United States Constitution, and that it exceeded Congress's enforcement authority under the Fourteenth and Fifteenth Amendments. See Compl. [ECF No. 1] ¶¶ 36-43. Shelby County included a request for "reasonable attorneys' fees and costs" in the prayer for relief in its complaint. Id. ¶ 44(c).

Defendant-intervenors—a group of voters from Shelby County, Alabama who believed in the constitutionality of the challenged provisions of the VRA—intervened on the side of the Attorney General. Together, both the Attorney General and defendant-intervenors pointed to "the extensive 15,000-page legislative record that Congress amassed in support of its 2006 reauthorization of Section 5 and Section 4(b)," Shelby Cnty., Ala. v. Holder, 811 F. Supp. 2d 424, 428 (D.D.C. 2011), as evidence that the challenged provisions remained "justified by current needs," Nw. Austin Mun. Util. Dist. No. 1 v. Holder, 557 U.S. 193, 203 (2009). After a review of the legislative record, extensive briefing, and oral argument, this Court agreed, holding that the challenged provisions "remain[ed] a congruent and proportional remedy to the 21st century problem of voting discrimination in covered jurisdictions," and granted summary

judgment in favor of the United States.  Shelby County, 811 F. Supp. 2d at 428 (internal quotation marks omitted).

The Court of Appeals for the District of Columbia Circuit affirmed.  Judge Tatel, writing for himself and Judge Griffith, acknowledged that "[t]he legislative record is by no means unambiguous," but ultimately held that "Congress drew reasonable conclusions from the extensive evidence it gathered and acted pursuant to the Fourteenth and Fifteenth Amendments" in reauthorizing the challenged provisions.  Shelby Cnty., Ala. v. Holder, 679 F.3d 848, 884 (D.C. Cir. 2012).  Judge Williams dissented.  Troubled by Section 4(b)'s reliance on aging data, he concluded that Section 4(b)'s coverage formula was "irrational" and, therefore, unconstitutional.  Id. at 885 (Williams, J., dissenting).

The United States Supreme Court reversed.  Chief Justice Roberts, writing for a five-justice majority, first acknowledged that "voting discrimination still exists; no one doubts that." Shelby County, 133 S. Ct. at 2619.  Nevertheless, the Chief Justice repeated the Supreme Court's earlier admonition that the VRA "imposes current burdens and must be justified by current needs.'"  Id. (quoting Northwest Austin, 557 U.S. at 203).  Ultimately, the Court held that the Section 4(b) coverage formula—"an extraordinary departure from the traditional course of relations between the States and the Federal Government," id. at 2631—was unconstitutional. Justice Ginsburg (joined by Justices Breyer, Sotomayor, and Kagan) dissented, claiming that the majority "err[ed] egregiously by overriding Congress' decision."  Id. at 2652 (Ginsburg, J., dissenting).

After the mandates issued from the courts above, this Court entered a final judgment in Shelby County's favor on October 11, 2013.  See Oct. 11, 2013 Order [ECF No. 92].  Shelby County filed its motion for attorney's fees two weeks later, within the timeline provided for by

the Federal Rules.  See Fed. R. Civ. P. 54(d)(2)(B)(i).  Shelby County asked for $2,000,000 in

fees and $10,000 in costs.  Shortly thereafter, the parties—acknowledging that Shelby County's

motion "appears to present a legal issue of first impression"—filed a joint motion to bifurcate the

issues of fee entitlement (that is, whether Shelby County is entitled to any attorney's fees) and fee

amount (that is, assuming Shelby County is entitled to a fee award, what the proper size of that

fee award is).  Joint Mot. for Bifurcation [ECF No. 96].  This Court granted the motion, delaying

resolution of the "fee amount" question until after resolution of the "fee entitlement" issue.  See

Nov. 5, 2013 Order [ECF No. 98].  The United States opposed Shelby County's fee request,

arguing (1) that sovereign immunity barred the claim, (2) that this was not the sort of "action or

proceeding" in which the VRA authorized a fee award, and (3) that even if it were, Shelby

County was not entitled to a fee award.  Defendant-intervenors mostly agreed with the arguments

advanced by the United States.  After full briefing, the Court held a motions hearing on February

14, 2014.

## LEGAL STANDARD

The fee-shifting provision of the Voting Rights Act provides:

> In any action or proceeding to enforce the voting guarantees of the fourteenth or
> fifteenth amendment, the court, in its discretion, may allow the prevailing party,
> other than the United States, a reasonable attorney's fee, reasonable expert fees,
> and other reasonable litigation expenses as part of the costs.

42 U.S.C. § 1973*l*(e).

## DISCUSSION

All agree that this fee petition presents several challenging legal questions, some of

which are issues of first impression.  After a careful review of the parties' briefs, their

presentations at oral argument, and the entire record in this case, and for the reasons discussed

below, the Court holds that the United States waived its sovereign immunity in the Equal Access

to Justice Act, but that Shelby County is not entitled to a fee award—even if this is the sort of "action or proceeding" in which the Court could award fees (a question the Court does not decide).  Despite Shelby County's creative efforts to show otherwise, its fee petition is too square a peg for section 1973*l*(e)'s round hole.

## I.   THE UNITED STATES WAIVED ITS SOVEREIGN IMMUNITY.

The first matter to be resolved is the issue of sovereign immunity, because "[j]urisdiction must be established before a federal court may proceed to any other question," Galvan v. Fed. Prison Indus., Inc., 199 F.3d 461, 463 (D.C. Cir. 1999) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998)), and the issue of "[s]overeign immunity is jurisdictional: a court's jurisdiction to entertain a suit against the sovereign is circumscribed by the limits of the legislature's waiver of sovereign immunity."  In re Al Fayed, 91 F. Supp. 2d 137, 138 (D.D.C. 2000); accord United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").  Although this fee petition presents several novel and challenging questions of law, the question of sovereign immunity is not one of them: the United States plainly waived its sovereign immunity for attorney's fees claims in section 2412(b) of the Equal Access to Justice Act.

### A.  Shelby County did not forfeit the argument that the United States has waived its sovereign immunity.

The United States takes the aggressive position that because "Shelby County's [opening] brief is completely silent on the essential question of the sovereign immunity," Shelby County has forfeited any argument that the United States has waived sovereign immunity, which "by itself, is a fatal defect that must lead to denial of Shelby County's fee petition."[1]  Gov't's Opp'n to

---

[1] Of course, sovereign immunity would not bar a fee award against defendant-intervenors.

Pl.'s Mot. for Attorney's Fees ("Gov't's Opp'n") [ECF No. 103-1] at 5-6; see also id. at 5 ("The United States should not be required to guess about the possible arguments Shelby County might have made but did not make.").  In response, Shelby County points out that "sovereign immunity is a defense, and Shelby County is under no obligation to anticipate a defense and raise it on behalf of the United States."  Pl.'s Reply [ECF No. 104] at 14 n.5.

Shelby County is correct.  The D.C. Circuit has consistently (and intuitively) classified sovereign immunity as a "defense."  See, e.g., World Wide Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1161 n.10 (D.C. Cir. 2002) (analyzing "the defense of sovereign immunity").  A plaintiff seeking relief has no obligation to anticipate and negate a possible affirmative defense by the defendant.  See, e.g., Flying Food Grp., Inc. v. NLRB, 471 F.3d 178, 183 (D.C. Cir. 2006).  That general principle applies to a sovereign immunity defense.  Owens v. Republic of Sudan, 412 F. Supp. 2d 99, 104 (D.D.C. 2006) ("Because sovereign immunity is in the nature of an affirmative defense, the plaintiff need not prove the absence of sovereign immunity in the first instance; rather, the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.") (internal quotation marks and emphasis omitted), aff'd, 531 F.3d 884 (D.C. Cir. 2008).  Likewise, a party seeking attorney's fees against the government has no obligation to address the issue of sovereign immunity unless and until the government raises it.

Here, the government raised a sovereign immunity defense in its opposition brief.  Gov't's Opp'n at 5.  Shelby County timely responded in its next filing.  Pl.'s Reply at 12.  Because Shelby County had no obligation to preemptively respond to a possible affirmative defense that the

government might (or might not) choose to raise, Shelby County has not forfeited the argument that the United States waived sovereign immunity.[2]

### B. The United States waived its sovereign immunity from attorney's fees claims in the Equal Access to Justice Act.

"[T]he United States may not be sued without its consent," Mitchell, 463 U.S. at 212, so, "[e]xcept to the extent it has waived its immunity, the Government is immune from claims for attorney's fees" under general principles of sovereign immunity.[3]  Ruckelshaus v. Sierra Club, 463 U.S. 680, 685 (1983).  The Equal Access to Justice Act ("EAJA") includes a generic waiver of sovereign immunity by the United States for attorney's fees claims: sovereign immunity is waived wherever the United States would have been liable for fees at common law or under some other statute, but for the doctrine of sovereign immunity.  The relevant provision reads:

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys . . . to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action.  The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

28 U.S.C. § 2412(b).  This provision "eliminated the absolute sovereign immunity bar to attorney fee awards against the government. . . . [T]he plain meaning of the EAJA is that an attorney fees award is not barred or made less likely simply because the offending party is the government." Aero Corp. v. Dep't of the Navy, 558 F. Supp. 404, 419 (D.D.C. 1983); see also Unification Church v. INS, 762 F.2d 1077, 1080 (D.C. Cir. 1985) (accepting the government's argument that "[t]he usual grant of sovereign immunity to the United States from fees awarded under a

---

[2] When pressed at oral argument, counsel for the United States came close to—but ultimately stopped short of—conceding this argument.  See Feb. 14, 2014 Hr'g Tr. ("Hr'g Tr.") [ECF No. 106] at 30 ("[W]hile it was mentioned in the brief, we would not rest our hat on that point.").

[3] Because Shelby County sued the Attorney General of the United States in his official capacity, this case is treated as a suit against the United States for purposes of sovereign immunity.  See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).

particular statute would . . . now be waived even in the absence of a particular provision in the fees statute to that effect"). [4]

A quick read of the statute would seem to decide the waiver question in Shelby County's favor, but the United States resists.  To begin with, it concedes that "Section 2412(b) works a partial waiver of sovereign immunity through application to the United States of certain other federal fee-shifting statutes that allow fees to prevailing parties."  Gov't's Opp'n at 8.  It then offers a two-part test, claiming that "Section 2412(b) authorizes reasonable attorney's fees against the United States under the terms of any statute that: (1) expressly permits suit against the United States for its violation of the statute, and (2) also provides for the award of attorney's fees against the losing party without mentioning the United States."  Id.  So both parties agree that sovereign immunity is waived by the EAJA when read in conjunction with generally applicable fee-shifting provisions in other statutes.  And both agree that "Section 1973*l*(e) of the VRA constitutes a fee-shifting provision that does not expressly prohibit obtaining fees from the United States."  Id. at 9.  Nonetheless, the United States insists that sovereign immunity still shields it from fee liability in this case, relying on the first prong of its proposed test.  See id. (asserting that the EAJA waives sovereign immunity only for a statute that "expressly permits suit against the United States for its violation of the statute").  None of the government's arguments on this score are persuasive.

---

[4] Section 2412(b) of the EAJA is used less often than its better known cousin, section 2412(d)(1)(A), which provides for a fee award to a party prevailing against the United States in most civil cases, with the important caveat that the United States can escape a fee award under that provision if it can show that its (losing) position was "substantially justified."  See Am. Hosp. Ass'n v. Sullivan, 938 F.2d 216, 219 (D.C. Cir. 1991) ("[The EAJA] waived the sovereign immunity of the United States against attorneys' fees in two distinct manners.  Most EAJA litigation arises under 28 U.S.C. § 2412(d)(1)(A), which provides for the award of fees against the United States in most types of civil litigation unless the court finds that the position of the United States was substantially justified . . . . There is, however, a lesser used waiver of sovereign immunity against attorneys' fees in 28 U.S.C. § 2412(b).  That section makes '[t]he United States . . . liable for [attorneys'] fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.'").

The United States claims that Shelby County's lawsuit fails its proposed test for a waiver of sovereign immunity under section 2412(b) of the EAJA because there is no "merits liability in this case by the United States for violations of the voting guarantees of the constitution or the statutes that enforce them," and, similarly, because "fee liability runs with merits liability."  Id. at 9-10 (citing Graham, 473 U.S. at 168).  Shelby County responds by pointing out, first, that the government cites no authority for its supposed requirement that the statute containing the secondary fee-shifting provision "expressly permits suit against the United States."  Pl.'s Reply at 13.  Shelby County also argues that, even if there were such a requirement, it "is of course met here—Section 1973*l*(b) [of the VRA] expressly authorized this suit against the United States."  Id.

Again, Shelby County has the better of this argument.  Shelby County cited 48 U.S.C. § 1973*l* in its complaint as one of the bases for subject-matter jurisdiction in this Court.  Compl. ¶ 4.  And section 1973*l*(b) provides for exclusive jurisdiction in the U.S. District Court for the District of Columbia for "any declaratory judgment" or "any restraining order or temporary or permanent injunction against the execution or enforcement of any provision" of the Voting Rights Act.  Shelby County filed its suit pursuant to the terms of the Voting Rights Act, and it prevailed, so the government's argument that the Voting Rights Act does not "permit[] suit against the United States," Gov't's Opp'n at 9, and that there can be no merits liability for the United States, is disproved by this very lawsuit.[5]

---

[5] The government makes an unforced error in asserting that "the United States cannot be held substantively liable under [the] voting guarantees of the Fourteenth or Fifteenth Amendments themselves or under any of the statutes that enforce the voting guarantees" because they "regulate the conduct of voting by states (and localities like Shelby County), not the United States."  Gov't's Opp'n at 10-11.  As Shelby County correctly responds, the text of "[t]he Fifteenth Amendment itself conclusively refutes the Government's contention: 'The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state . . . .'"  Pl.'s Reply at 3 (quoting U.S. Const. amend. XV).  And section 1973*l*(b) authorizes a declaratory judgment action against the Attorney General under the VRA.

Further support for this conclusion comes from the Supreme Court's decision in <u>Allen v. State Board of Elections</u>, 393 U.S. 544 (1969).  There, the Supreme Court called section 1973*l*(b) one of the Voting Rights Act's "enforcement provisions," even though this type of "injunctive action is one aimed at prohibiting enforcement of the provisions of the Voting Rights Act, and would involve an attack on the constitutionality of the Act itself."   <u>Id.</u> at 558; <u>see also</u> <u>Katzenbach v. Morgan</u>, 384 U.S. 641, 645 (1966) (noting that section 1973*l*(b) provides exclusive jurisdiction in the U.S. District Court for the District of Columbia for such actions).  For this reason, even if the Court accepted the government's (unsupported) assertion that sovereign immunity is not waived under the EAJA without another statutory provision that "expressly permits" a lawsuit against the United States, there <u>is</u> such a provision here, and Shelby County sued under it.  Put another way, even though "fee liability runs with merits liability," the United States lost this case on the merits.  Hence, sovereign immunity is no bar to Shelby County's motion.

## II.   FEE ELIGIBILITY: WAS THIS AN "ACTION OR PROCEEDING TO ENFORCE THE VOTING GUARANTEES OF THE FOURTEENTH OR FIFTEENTH AMENDMENT"?

Section 1973*l*(e) gives a district court discretion to award attorney's fees only in certain cases.  Specifically, the district court's "discretion" to award attorney's fees to the "prevailing party"[6] is limited to "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment."[7]  42 U.S.C. § 1973*l*(e).  The problem is this.  In any given "action or proceeding," the plaintiff and the defendant may have vastly different goals—indeed, they are often diametrically opposed.  For example, in a murder prosecution, the government is

---

[6] The United States concedes that Shelby County is the "prevailing party."

[7] Individual amendments to the United States Constitution are typically capitalized.  <u>See</u> <u>The Bluebook: A Uniform System of Citation</u> R. 8(c)(ii), at 85 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010).  For whatever reason, in section 1973*l*(e), they are not.  In this opinion, the Court will (mostly) adopt the statute's convention.

"enforcing" the legal prohibition on murder, but the criminal defendant is not.  In a constitutional tort action, a victim of government abuse is "enforcing" individual rights protections in the Constitution or 42 U.S.C. § 1983, but the state-official defendant is not.  Section 1973*l*(e), however, seemingly requires the Court to describe an "action or proceeding"—rather than a party—as either "enforc[ing] the voting guarantees" of the relevant amendments, or not.

There are three plausible ways to interpret this ambiguous statutory language: (1) a "plaintiff-specific" interpretation, which would ask whether the plaintiff filed the lawsuit "to enforce the voting guarantees of the fourteenth or fifteenth amendment"; (2) a "party-specific" interpretation, which would ask whether the party seeking attorney's fees was participating in the lawsuit "to enforce the voting guarantees of the fourteenth or fifteenth amendment"; or (3) a "neutral" interpretation, in which the Court would assess whether, overall, the "action or proceeding" was "to enforce the voting guarantees of the fourteenth or fifteenth amendment." The Court will consider each of these three possibilities in turn.

## A.  The Plaintiff-Specific Interpretation

Conceptually, it is difficult to assess whether a particular "action or proceeding" was one "to enforce" the relevant amendments without thinking about who filed it.  The character of a lawsuit, after all, is shaped most significantly by the plaintiff's complaint.  Cf. Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63 (1987) ("It is long settled law that a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law."). Recognizing this, the plaintiff-specific interpretation would call on a court to ask whether the plaintiff filed the lawsuit in order to "enforce the voting guarantees of the fourteenth or fifteenth amendment."  If so, the "action or proceeding" is the type envisioned by the statute, and the

"prevailing party" is eligible for attorney's fees (subject to the district court's "discretion," see infra Section III).

To illustrate: under the plaintiff-specific interpretation, Shelby County would not be eligible for attorney's fees, because the plaintiff, Shelby County, did not file this lawsuit in an attempt "to enforce the voting guarantees of the fourteenth or fifteenth amendment."  Instead, it filed this lawsuit to enforce "the Tenth Amendment and Article IV of the Constitution," Compl. ¶ 39, and to vindicate federalism interests and the "fundamental principle of equal sovereignty," id. ¶ 43, among the states.  Those were the bases for Shelby County's arguments in this Court, before the D.C. Circuit, and ultimately before the Supreme Court.

To be sure, Shelby County has always argued that Section 5 and Section 4(b) of the VRA "exceed[ed] Congress's enforcement authority under the Fourteenth and Fifteenth Amendments." Id. ¶¶ 39, 43.  So in support of its motion, Shelby County argues that these arguments show that its lawsuit was indeed designed to "enforce" those amendments.  See Pl.'s Mot. at 6 ("Shelby County enforced the 'appropriate legislation' limitation that the Fourteenth and Fifteenth Amendments include to ensure individual liberty and protect meaningful participation in the electoral process."); see also id. at 3 ("The ordinary meaning of 'enforce' is 'to compel obedience to.'  That is precisely what Shelby County has done here: it has compelled the Government's obedience to the outer limits of congressional enforcement authority under the Fourteenth and Fifteenth Amendments . . . .") (internal citation omitted).

A clever argument, but it misses the mark.  The fee-shifting provision in the VRA requires that the "action or proceeding" be designed to enforce "the voting guarantees of the fourteenth or fifteenth amendment," not just "the fourteenth or fifteenth amendment."  By using the phrase "voting guarantees," Congress made clear that it was referring to the individual voting

rights protections that appear explicitly in the Fifteenth Amendment, see U.S. Const. amend. XV ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude."), and implicitly in the Fourteenth Amendment, see U.S. Const. amend. XIV (Equal Protection Clause). By contrast, the limitations on Congress's enforcement powers under those amendments—which is what Shelby County's challenge to the VRA rested on—are not individual "voting guarantees"; they address the power of Congress.  See U.S. Const. amend. XV ("The Congress shall have power to enforce this article by appropriate legislation."); U.S. Const. amend. XIV ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."). For this reason, though Shelby County argues at length that its lawsuit was designed to "ensure individual liberty and protect meaningful participation in the electoral process," Pl.'s Mot. at 6, its interpretation essentially reads the words "voting guarantees" out of the statute.

Furthermore, Shelby County cites no case for the proposition that there is a generic constitutional right to "meaningful participation in the electoral process."  In fact, the "voting guarantees" of the Fourteenth and Fifteenth Amendments are targeted at a narrower, more specific set of individual voting rights—none of which Shelby County was seeking to enforce through its federalism-based, Tenth Amendment facial challenge to the VRA.  Shelby County did not file this lawsuit to "enforce" the "voting guarantees" of the Fourteenth and Fifteenth Amendments; in fact, it restricted Congress's ability to legislate protections for those guarantees.[8]

---

[8] Shelby County cites heavily to Supreme Court opinions extolling the virtues of federalism and its connection to individual liberty.  See, e.g., Pl.'s Mot. at 5 (quoting Bond v. United States, 131 S. Ct. 2355, 2634 (2011) ("[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power.")).  The Court has no quarrel with the proposition that federalism protects individual liberty.  But even so, that does not mean that Shelby County's federalism-based lawsuit was filed "to enforce" the "voting guarantees of the fourteenth or fifteenth amendment."  Once again, those "voting guarantees" refer to a narrower set of rights than the broad notions of "individual liberty" referenced in Shelby County's brief.

In any event, the plaintiff-specific interpretation has much to recommend it—most notably, its consistency with the statutory text and its relative administrability.  But despite those advantages, it runs into one major hitch: three D.C. Circuit decisions implicitly reject this approach.  Although none of these cases actually considered this precise issue, their logic makes it difficult for this Court to adopt the plaintiff-specific interpretation.

In 1980, "the Commissioners of Medina County, Texas . . . instituted a declaratory judgment action against the United States pursuant to Section 5" of the VRA, seeking "a declaration that two redistricting plans . . . which had failed to obtain preclearance from the Attorney General" were legal.  Comm'rs Court of Medina Cnty., Tex. v. United States, 683 F.2d 435, 437-38 (D.C. Cir. 1982).  Three "Mexican-American citizens residing and registered to vote in Medina County[] intervened as party defendants in the County's suit against the United States."  Id. at 438.  The United States and the defendant-intervenors prevailed in part when the County decided to abandon its plan, and the defendant-intervenors moved for fees.  See id.  The D.C. Circuit ultimately remanded for further analysis of the question of whether the defendant-intervenors were "prevailing parties."  But its analysis rests entirely on the assumption that had they truly "prevailed," they would be entitled to attorney's fees.  See id. at 444.

Similarly, in Donnell v. United States, 682 F.2d 240 (D.C. Cir. 1982), the D.C. Circuit cabined the discretion of a district court to award attorney's fees to defendant-intervenors in a preclearance declaratory judgment action under Section 5 of the VRA.  But in doing so, it held that prevailing defendant-intervenors can be awarded attorney's fees, even in a VRA "action or proceeding" filed by a covered jurisdiction seeking to obtain preclearance for a plan opposed by the Attorney General.  See, e.g., id. at 248-49 ("[A]n intervenor should be awarded attorneys' fees only if it contributed substantially to the success of the litigation.").  Finally, in a third

example, the D.C. Circuit reaffirmed <u>Donnell</u> and <u>Medina County</u> in 1996.  <u>See</u> <u>Castro County,</u>

<u>Tex. v. Crispin</u>, 101 F.3d 121, 126 (D.C. Cir. 1996) (holding that "a party intervening as a

defendant in a section 5 action may be a prevailing party," and thus, may be entitled to attorney's

fees) (citing <u>Medina County</u>, 683 F.2d at 439-40).

Although none of these opinions explicitly analyzed the issue of how to describe a

particular "action or proceeding" under section 1973*l*(e), all three make clear that in the D.C.

Circuit, defendant-intervenors may be entitled to attorney's fees if they prevail in a lawsuit filed

under Section 5 of the VRA, by a covered jurisdiction, against the Attorney General—that is, in

a lawsuit that was <u>not</u> filed to vindicate individual voting rights.  And because the fee-shifting

provision of the VRA allows for attorney's fees only in an "action or proceeding to enforce the

voting guarantees of the fourteenth or fifteenth amendment," logic dictates that each of those

lawsuits must have been, in the eyes of the D.C. Circuit, an "action or proceeding to enforce the

voting guarantees of the fourteenth or fifteenth amendment."  Were they not, no fees could have

been awarded; under the "American Rule," courts generally may not award attorney's fees

without some specific congressional authorization.  <u>See</u> <u>Alyeska Pipeline Serv. Co. v.</u>

<u>Wilderness Soc'y</u>, 421 U.S. 240, 247 (1975) ("In the United States, the prevailing litigant is

ordinarily not entitled to collect a reasonable attorneys' fee from the loser.").

Hence, a district court in the D.C. Circuit cannot adopt the plaintiff-specific

interpretation, whatever its merits.  None of the complaints in <u>Medina County</u>, <u>Donnell</u>, or

<u>Crispin County</u> were filed for the purpose of enforcing "the voting guarantees" of the Fourteenth

or Fifteenth Amendments.  Like this one, those cases were filed by those who sought to <u>oppose</u>

enforcement of those individual voting rights protections, in favor of other interests, like

federalism and local sovereignty—legitimate interests that are, importantly, beyond the scope of

section 1973*l*(e).  Nevertheless, the D.C. Circuit was not troubled by the prospect of awarding

fees to a prevailing party.  So although the D.C. Circuit has never expressly rejected the plaintiff-

specific approach, those holdings seriously undermine its viability.

### B.  The Party-Specific Interpretation

The next alternative is the "party-specific" interpretation, in which a court would ask

whether the <u>party seeking attorney's fees</u> was participating in the "action or proceeding" in order

"to enforce the voting guarantees" of the relevant amendments.[9]  Unlike the plaintiff-specific

interpretation, this one is not foreclosed by D.C. Circuit case law, since all three of the D.C.

Circuit cases on this issue involved a fee request from defendant-intervenors who were

supporting the enforcement of individual voting rights.  Of course, none of those cases actually

discussed the issue, so they do not offer strong support for either conclusion.

Although this interpretation may not be foreclosed by D.C. Circuit precedent, it has other

problems.  Most importantly, it is in strong tension with the text of the statute.  Section 1973*l*(e)

calls for a determination about a particular "action or proceeding"—that is, whether the "action

or proceeding" was "to enforce the voting guarantees" of the relevant amendments—rather than a

determination about the intent of the "prevailing party."  As Shelby County puts it, the text of the

statute calls for two distinct questions: (1) what type of "action or proceeding" was this, and (2)

which party prevailed?  The plaintiff-specific interpretation and the neutral interpretation

(discussed below) are faithful to this feature of the statute (the plaintiff-specific interpretation, by

analyzing the lawsuit at the moment of filing, is still about describing the "action or proceeding"

<u>ex ante</u>, rather than asking who is the "prevailing party," <u>ex post</u>).  The party-specific

---

[9] For the same reasons discussed above with respect to the plaintiff-specific interpretation, Shelby County would not be eligible for fees under the party-specific interpretation.

interpretation is not: it asks for an <u>ex post</u> determination about one of the litigants, rather than an <u>ex ante</u> determination about the "action or proceeding."

A hypothetical illustrates this flaw in the party-specific interpretation. Imagine that one vote had switched at the Supreme Court, and the challenged provisions of the VRA had been upheld. Then, as prevailing parties, defendant-intervenors would likely have sought attorney's fees.[10] They would have been eligible for such fees under established D.C. Circuit precedent. <u>See, e.g.</u>, <u>Crispin</u>, 101 F.3d at 126. And this Court presumably would have awarded fees, if it determined that defendant-intervenors "contributed substantially to the success of the litigation." <u>Donnell</u>, 682 F.2d at 248-29.[11] By awarding fees, however, the Court would necessarily be deciding that this lawsuit was an "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment"—otherwise, there would be no legal basis for the fee award. <u>See</u> <u>Alyeska</u>, 421 U.S. at 247. Shelby County puts it sharply: if this lawsuit "is an 'action or proceeding' under Section 1973<i>l</i>(e) when the defendants or defendant-intervenors prevail, it also must be [such] an 'action or proceeding' when the plaintiff prevails." Pl.'s Reply at 7 n.3. Describing an "action or proceeding" differently based on who prevailed after the fact does violence to the statutory text. Either the "action or proceeding" was "to enforce the voting guarantees" of the amendments, or it was not. That question cannot turn on which party is seeking attorney's fees, determinable only after years of litigation. Thus, the party-specific interpretation does not hold up well under scrutiny.

---

[10] Counsel for defendant-intervenors refused to make this concession at oral argument. <u>See</u> Hr'g Tr. at 45-46. The Court notes that similarly situated defendant-intervenors—represented by many of the same attorneys at the NAACP Legal Defense Fund, the ACLU, and the Lawyers Committee for Civil Rights as these defendant-intervenors are—indicated their intent to do so after prevailing in a previous challenge to the constitutionality of Section 5 of the VRA. <u>See</u> <u>Nw. Austin Mun. Util. Dist. No. 1 v. Mukasey</u>, No. 06-1384, ECF No. 136 (D.D.C. June 13, 2008).

[11] This standard is unique to prevailing defendant-intervenors in VRA litigation, and will be discussed in more detail below in the course of analyzing how Supreme Court and D.C. Circuit precedent cabin district court discretion to award fees under the statute. <u>See</u> <u>infra</u> Section III.

### C.  The Neutral Interpretation

Finally, the neutral interpretation would permit a fee award to any prevailing party, as long as the <u>lawsuit</u> could be described as "an action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment"—without regard to who filed the case or who was seeking fees.  This interpretation has much to offer.

Most importantly, it is faithful to the statutory text.  As discussed above, section 1973*l*(e) calls for a determination about the "action or proceeding," not about a particular litigant.  The neutral interpretation is congruent with that textual command, which is an advantage over the party-specific interpretation.  When Congress wishes to favor particular litigants in an attorney's fee provision, it knows how to do so: many statutes explicitly limit fee eligibility to certain favored litigants.  <u>See</u> Pl.'s Mot. at 8 n.3 (collecting examples).  Section 1973*l*(e) is written from a neutral perspective with respect to the "prevailing party," so it should be treated that way.  And the neutral interpretation is also consistent with circuit precedent.  Unlike the plaintiff-specific interpretation, no D.C. Circuit cases foreclose it.

Further, the only other federal court to have interpreted the "action or proceeding" language adopted the neutral interpretation.  In that case, plaintiffs had proposed a ballot initiative for which no Spanish translation would be provided to voters.  <u>In re Cnty. of Monterey Initiative Matter</u>, 2007 WL 1455869 (N.D. Cal. May 17, 2007).  The County of Monterey refused to put the initiative on the ballot, arguing that failing to include a version for Spanish-speakers would violate the County's obligations under the VRA.  <u>Id.</u> at *1.  The plaintiffs prevailed when the court found that the VRA did not prevent it from putting the referendum on the ballot.  <u>Id.</u> at *2.

When the plaintiffs sought attorney's fees under section 1973*l*(e), the County resisted on the grounds "that the Plaintiffs did not bring an action to enforce voting guarantees." <u>Id.</u>  The court rejected the County's argument, and awarded fees to the proponent of the English-only ballot initiative.  <u>Id.</u> at *3.  The court acknowledged that plaintiffs had not initially filed the suit with the VRA in mind and that, indeed, it was the County that first injected federal voting rights into the litigation.  <u>Id.</u>  Even so, the court held that "[w]hen the County invoked the Voting Rights Act, the . . . actions became actions to enforce the voting guarantees of the Fourteenth Amendment.  Accordingly, as the prevailing parties, Plaintiffs are entitled to reasonable fees and costs." <u>Id.</u>

In awarding fees to the proponents of the English-only ballot initiative, the <u>County of Monterey</u> court necessarily adopted the neutral interpretation, because the plaintiffs unquestionably had not been the ones "enforcing" individual voting rights.  Indeed, voting rights were irrelevant to the litigation until the County used the VRA as a justification for its refusal to put the referendum on the ballot.  So the only court to have considered the issue adopted the neutral interpretation.

This is not to say that the neutral interpretation is perfect.  One flaw is that it presents a difficult interpretive task: how should a court decide whether a particular "action or proceeding" was "to enforce the voting guarantees" of the relevant amendments without considering who filed the lawsuit and who is seeking attorney's fees?  The best answer, as suggested by <u>County of Monterey</u>, is to label any "action or proceeding" in which <u>at least one</u> of the litigants is seeking "to enforce the voting guarantees" of the relevant amendments as an "action or proceeding" that

triggers fee eligibility for the prevailing party.[12]  See id.  At that point, the court could move on to an assessment of fee entitlement.  That approach solves the administrability problem and is still consistent with the neutrally-written statutory text.

\*       \*       \*

As the above analysis demonstrates, interpreting the phrase "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment" presents a host of difficulties—some due to inartful statutory drafting, some due to D.C. Circuit opinions that, with the benefit of hindsight, appear not to have grappled with the full logical implications of their holdings.  But this interpretive puzzle can be left for another day.  As discussed below, even if this is the sort of "action or proceeding" in which Shelby County is eligible for attorney's fees, the Court, in its discretion, holds that Shelby County is not entitled to attorney's fees under the circumstances of this case.

### III.    FEE ENTITLEMENT: IS SHELBY COUNTY ENTITLED TO ATTORNEY'S FEES AS A MATTER OF "DISCRETION"?

Even in the right sort of "action or proceeding," no prevailing party is guaranteed a fee award under section 1973*l*(e).  Instead, "the court, in its discretion, may" award fees.  42 U.S.C. § 1973*l*(e).  The text appears to offer broad discretion to a district court to award attorney's fees as it sees fit.  But a long line of Supreme Court and D.C. Circuit precedent indicates that this discretion is far more limited.  Specifically, those courts have examined the broad purposes of the relevant statute—frequently in the civil rights context—and concluded that Congress intended attorney's fees to be awarded only in circumstances consistent with the statute's purpose.  Although this is a question of first impression, that line of cases strongly suggests that

---

[12] Under this interpretation, Shelby County would be eligible for fees as the "prevailing party" in an "action or proceeding" in which the United States and defendant-intervenors were seeking "to enforce the voting guarantees of the fourteenth or fifteenth amendment."

the demanding <u>Christiansburg</u> standard should apply in this case, under which Shelby County may recover fees only if its opponents' position was "frivolous, unreasonable, or without foundation." <u>Christiansburg Garment Co. v. EEOC</u>, 434 U.S. 412, 421 (1978).  Today, the Court so holds.

To reach this conclusion, the Court will begin by exploring the Supreme Court and the D.C. Circuit case law adopting purposive interpretations of discretionary, textually neutral fee-shifting provisions—particularly, those found in federal civil rights statutes.  Next, following the lead of this precedent, the Court will consider the purpose of section 1973*l*(e), the fee-shifting provision in the Voting Rights Act.  Then, with this statutory purpose in mind, the Court will select the appropriate legal standard to apply when exercising discretion in considering Shelby County's fee petition.  And finally, the Court will apply that standard to this case, and decide whether Shelby County is entitled to a discretionary award of attorney's fees.

Ultimately, the Court finds that the purpose of section 1973*l*(e) is to encourage private attorneys general to bring lawsuits vindicating individual voting rights.  Shelby County does not fit that statutory paradigm, so it cannot recover attorney's fees unless it meets a higher bar: the <u>Christiansburg</u> standard, under which it may recover fees only if it can show that the position taken by its opponents was frivolous or unreasonable.  And because Shelby County cannot make that showing, it is not entitled to a discretionary award of attorney's fees.

### A. The Supreme Court and the D.C. Circuit have repeatedly used purposive considerations to cabin district court discretion in awarding attorney's fees.

Although the text of section 1973*l*(e) "does not specify any limits upon the district courts' discretion to allow or disallow fees, in a system of laws discretion is rarely without limits." <u>Indep. Fed'n of Flight Attendants v. Zipes</u>, 491 U.S. 754, 758 (1989).  The Supreme Court and the D.C. Circuit have cabined this discretion by considering "the large objectives" of the relevant

statute, id. at 759, and have endorsed "the practice of using 'several nonexclusive factors' in determining whether to award attorneys' fees so long as the factors are faithful to the statutory purpose." Eddy v. Colonial Life Ins. Co. of Am., 59 F.3d 201, 204 (D.C. Cir. 1995) (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 n.19 (1994)).   This is particularly common for statutes that protect individual civil rights, and the D.C. Circuit has used this approach in applying this very fee-shifting provision, section 1973*l*(e) of the VRA.  See Medina County, 683 F.2d at 435; Donnell, 682 F.3d at 240.  This Court will follow suit.

The first example of the Supreme Court adding an interpretive gloss on statutory "discretion" to award attorney's fees came in 1968 (before the 1975 enactment of the VRA's fee-shifting provision).  In Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400 (1968), the Court interpreted the fee-shifting provision of Title II of the Civil Rights Act of 1964, which provides that: "In any action commenced pursuant to this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee . . . ." Id. at 401 n.1 (quoting 42 U.S.C. 2000a-3(b)).  That provision is even more neutral, on its face, than the fee-shifting provision of the VRA.   Nevertheless, finding that Congress intended "to encourage individuals injured by racial discrimination to seek judicial relief," the Supreme Court held that any prevailing plaintiff "should ordinarily recover attorney's fees unless special circumstances would render such an award unjust." Id. at 402.  In doing so, the Supreme Court reduced district court discretion to deny attorney's fees to prevailing plaintiffs who were victims of racial discrimination—even though the statute is written neutrally with respect to "the prevailing party."  See id. at 401-02.  And it did so based on purposive considerations and a value judgment about the subjective intent of Congress.

The Supreme Court reaffirmed this approach in 1973, with respect to an identically worded fee-shifting provision in the Emergency School Aid Act of 1972, under which plaintiffs had prevailed in "litigation aimed at desegregating the public schools of Memphis, Tennessee." Northcross v. Bd. of Educ. of the Memphis City Schs., 412 U.S. 427, 427 (1973).  The Court, in a step that it would repeat in later cases, noted that the "similarity of language" in the statute and the fee-shifting provision in the Civil Rights Act was "a strong indication that the two statutes should be interpreted pari passu."  Id. at 428.  It then explained that "plaintiffs in school cases are 'private attorneys general' vindicating national policy in the same sense as are plaintiffs in Title II actions.  The enactment of both provisions was for the same purpose—'to encourage individuals injured by racial discrimination to seek judicial relief.'"  Id. (quoting Piggie Park, 390 U.S. at 402).  For this reason, it held that prevailing plaintiffs "'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'"  Id. (quoting Piggie Park, 390 U.S. at 402).

In 1978, the Supreme Court, for the first time, had occasion to apply this methodology to a prevailing defendant in a civil rights case—that is, to a party that was opposing enforcement of the principles that the statute was designed to vindicate.  In Christiansburg Garment Co. v. EEOC, an employer-defendant prevailed in a race discrimination suit under Title VII of the Civil Rights Act.  434 U.S. at 414.  As "the prevailing party" in "an action or proceeding under" Title VII, the defendant sought attorney's fees.  Id. at 414-15.

In rejecting the defendant's fee claim, the Supreme Court first described the set of statutes that had become subject to this purposive interpretive methodology:

> Some of these statutes make fee awards mandatory for prevailing plaintiffs; others make awards permissive but limit them to certain parties, usually prevailing plaintiffs.  But many of the statutes are more flexible, authorizing the award of attorney's fees to either plaintiffs or defendants, and entrusting the effectuation of

the statutory policy to the discretion of the district courts.  Section 706(k) of Title VII of the Civil Rights Act of 1964 falls into this last category, providing as it does that a district court may in its discretion allow an attorney's fee to the prevailing party.

Id. at 415-16 .

Next, the Supreme Court proceeded to outline the process by which the district courts should carry out this "effectuation of the statutory policy" in interpreting a discretionary fee-shifting provision.  Id.  It acknowledged candidly that the text of the statute itself "provide[s] no indication whatever of the circumstances under which a plaintiff or a defendant should be entitled to attorney's fees," but then noted that "a moment's reflection reveals that there are at least two strong equitable considerations counseling an attorney's fee award to a prevailing Title VII plaintiff that are wholly absent in the case of a prevailing Title VII defendant."  Id. at 418.  First, a Title VII "plaintiff is the chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority.'"  Id. (quoting Piggie Park, 390 U.S. at 402).  "Second, when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law."  Id.

For these reasons, the Supreme Court insulated unsuccessful Title VII plaintiffs from most attorney's fee claims, holding that "a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case" only if "the plaintiff's action was frivolous, unreasonable, or without foundation."  Id. at 421.  The Court reasoned that if fees were too readily available to prevailing Title VII defendants, it "would substantially add to the risks inherent in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII."  Id. at 422.

The Christiansburg interpretive approach was reaffirmed by the Supreme Court in the 1989 decision in Independent Federation of Flight Attendants v. Zipes, 491 U.S. 754 (1989).  In

<u>Zipes</u>, Justice Scalia's opinion for the Court opens with a strong endorsement of the general practice of purposive, judge-made tests to cabin district court discretion in awarding attorney's fees under the federal civil rights laws:

> Although the text of [Title VII's fee-shifting] provision does not specify any limits upon the district courts' discretion to allow or disallow fees, in a system of laws discretion is rarely without limits.  In the case of [Title VII] and other federal fee-shifting statutes . . . , we have found limits in "the large objectives" of the relevant Act, which embrace certain "equitable considerations."

<u>Id.</u> at 758-59 (quoting <u>Christiansburg</u>, 434 U.S. at 418) (internal citations omitted).

<u>Zipes</u> involved a fee request against a "losing" defendant-intervenor in a Title VII case. Following the lead of <u>Christiansburg</u>, the Supreme Court examined the role of an intervenor in a Title VII suit, pointing out that "assessing fees against blameless intervenors . . . is not essential to [the] purpose" of Title VII's fee-shifting provision, which is "to vindicate the national policy against wrongful discrimination by encouraging victims to make the wrongdoers pay at law—assuring that the incentive to such suits will not be reduced by the prospect of attorney's fees that consume the recovery."  <u>Id.</u> at 761.  Furthermore, "losing intervenors . . . have not been found to have violated anyone's civil rights," and "[a]warding attorney's fees against such an intervenor would further neither the general policy that wrongdoers make whole those whom they have injured nor Title VII's aim of deterring employers from engaging in discriminatory practices."  <u>Id.</u> at 762.  Thus, the Court reasoned, a party seeking attorney's fees against a Title VII defendant-intervenor must meet a high bar before obtaining a fee award; it must satisfy the <u>Christiansburg</u> standard, by demonstrating that "the intervenors' action was frivolous, unreasonable, or without foundation."  <u>Id.</u> at 761.[13]

---

[13] To be sure, in recent years some have criticized this approach as outdated and inappropriately based on atextual considerations.  <u>See, e.g.</u>, <u>Fogerty</u>, 510 U.S. at 538 (Thomas, J., concurring) ("The Court goes astray, in my view, by attempting to reconcile this case with <u>Christiansburg</u>.  Rather, it should acknowledge that <u>Christiansburg</u> <u>mistakenly cast aside the statutory language to give effect to equitable considerations</u>.") (emphasis in original);

In contrast to the purposive analysis it conducts when interpreting fee-shifting provisions in the civil rights laws, the Supreme Court has taken a slightly different approach when faced with fee-shifting provisions in purely economic statues.  In <u>Fogerty v. Fantasy, Inc.</u>, 510 U.S. 517 (1994), the Court interpreted the fee-shifting provision in the Copyright Act.  It ultimately held that all prevailing parties under the Copyright Act should be treated equally—but in doing so, relied on the differences between a purely economic statute like the Copyright Act and the civil rights statutes it normally subjects to a purposive value judgment.  The Supreme Court explained that "in the civil rights context, impecunious 'private attorney general' plaintiffs can ill afford to litigate their claims against defendants with more resources." <u>Id.</u> at 524.  And despite the textually neutral fee-shifting provision in the Civil Rights Act, it justified the <u>Christiansburg</u> decision as follows: "Congress sought to . . . provide incentives for the bringing of meritorious lawsuits, by treating successful plaintiffs more favorably than successful defendants in terms of the award of attorney's fees." <u>Id.</u>  Although the Supreme Court's use of the words "plaintiff" and "defendant" in this context seems a bit imprecise, <u>see, e.g.</u>, <u>Zipes</u>, 491 U.S. at 761 (protecting defendant-intervenors from most fee requests based on the same purposive considerations), the Court reaffirmed its purposive methodology in interpreting textually neutral fee-shifting provisions in federal civil rights statutes.[14]

---

<u>Eddy</u>, 59 F.3d at 212 (Randolph, J., dissenting) ("Instead of giving deference, it usurps the district court's discretion. And instead of applying § 1132(g)(1) in a neutral fashion, . . . it tilts decidedly in favor of the plaintiffs' side of these controversies.").  But finding these criticisms only in concurring and dissenting opinions implies the continued legitimacy of the approach, as understood by majorities of both the Supreme Court and D.C. Circuit panels to have considered the issue.  In addition, at least with respect to section 1973*l*(e) of the VRA, the explicit statutory grant of "discretion" to a district court in considering a fee petition offers a textual basis for this approach.

[14] After oral argument on Shelby County's motion, the Supreme Court decided another case interpreting a fee-shifting provision, this time in the Patent Act.  It relied primarily on the plain text of the relevant fee-shifting provision to define the nature of an "exceptional" patent case in which fee-shifting was warranted.  <u>See</u> <u>Octane Fitness, LLC v. ICON Health & Fitness, Inc.</u>, 134 S. Ct. 1749, 1755 (2014) ("Our analysis begins and ends with the text of § 285.").  Although Shelby County might read <u>Octane Fitness</u> as a rejection of purposive considerations when interpreting fee-shifting provisions, it can also be read consistently with the Supreme Court's distinction between statutes—like the Patent Act and the Copyright Act—that merely reshuffle economic burdens and benefits, and

The D.C. Circuit has followed the Supreme Court's lead, and has used this purposive methodology on several occasions to interpret neutrally worded fee-shifting provisions—including the fee-shifting provision in the VRA.  First, in <u>Donnell</u>, the D.C. Circuit crafted a standard to apply when a prevailing defendant-intervenor, who is seeking to enforce individual voting rights by opposing an allegedly discriminatory voting plan submitted by a covered jurisdiction, seeks attorney's fees.  The D.C. Circuit noted that "the purpose of this provision," that is, the fee-shifting provision of the VRA, section 1973*l*(e), "is the familiar one of encouraging private litigants to act as 'private attorneys general' in seeking to vindicate the civil rights laws."  <u>Donnell</u>, 682 F.2d at 245.  The court then pointed out the unusual procedural posture, noting that "[h]ad this been a successful suit by these intervenors as plaintiffs against the [covered jurisdiction], then, their entitlement to attorneys' fees would hardly be in doubt."  <u>Id.</u> This was because "[t]he result of the litigation furthered the purpose of the Voting Rights Act." <u>Id.</u>  Ultimately, the D.C. Circuit concluded that Congress intended an award of fees to successful intervenors to be made "only if [the intervenor] contributed substantially to the success of the litigation," <u>id.</u> at 248-49, reasoning that the Attorney General was already available in such cases to vindicate voting rights, and fearful that "private litigants [would] ride the back of the Justice Department to an easy award of attorneys' fees."  <u>Id.</u> at 249.  Although the particulars of the role of a prevailing defendant-intervenor are not critical to resolving this fee dispute (defendant-intervenors lost this case), the interpretive method employed by the D.C. Circuit is instructive: the <u>Donnell</u> decision rests on reading section 1973*l*(e) with a heavy purposive gloss.

---

statutes—like the Civil Rights Act and the Voting Rights Act—that protect individual civil rights.  <u>Octane Fitness</u>, a brief and unanimous decision, contains no hint that the Supreme Court intended to overrule or modify cases like <u>Christiansburg</u> and <u>Piggie Park</u> <u>sub silentio</u>; indeed, both opinions are cited favorably.  <u>See Octane Fitness</u>, 134 S. Ct. at 1758 (citing <u>Christiansburg</u>, 434 U.S. at 419; <u>Piggie Park</u>, 390 U.S. at 402 n.4).  Unless and until the Supreme Court or the D.C. Circuit suggests otherwise, this Court will continue to treat the <u>Christiansburg</u> line of cases as good law.

Medina County offers additional elaboration on how to apply the Supreme Court's purposive methodology in interpreting fee-shifting statutes—specifically, section 1973*l*(e) of the VRA.  There, the D.C. Circuit quoted approvingly a district court decision holding that "'the attorneys' fees statute [in the VRA] is to be liberally construed to effectuate its purposes,'" and that "'the procedural posture of the case should not be dispositive.'"  Medina County, 683 F.2d at 439 (quoting Baker v. City of Detroit, 504 F. Supp. 841, 850 (E.D. Mich. 1980)).  In other words, a court should look beyond the simplistic labels of "plaintiff" and "defendant" in determining how freely to award attorney's fees to a prevailing party.  The D.C. Circuit concluded: "It is thus clear from the case law and the legislative history that when the procedural posture of a case places the party who seeks to vindicate rights guaranteed by the Constitution in the position of defendant, the restrictive Christiansburg Garment rule is not applicable," id. at 440, when that party seeks attorney's fees.

Finally, arguably going one step further than the Supreme Court has, the D.C. Circuit has employed this purposive approach even in economic statutes outside of the civil rights context. See, e.g., Eddy, 59 F.3d at 204 (adopting a multi-factor balancing test constraining district court discretion in awarding attorney's fees under ERISA, noting that "[t]he Supreme Court recently validated the practice of using 'several nonexclusive factors' in determining whether to award attorneys' fees so long as the factors are faithful to the statutory purpose." (quoting Fogerty, 510 U.S. at 517 n.19)); Metropolitan Wash. Coal. for Clean Air v. District of Columbia, 639 F.2d 802, 804 (D.C. Cir. 1981) (noting that the key consideration in awarding fees under the Clean Air Act is "whether the suit was of the type that Congress intended to encourage when it enacted the citizen-suit provision").  These cases provide strong support for the use of this purposive methodology when interpreting the VRA in this Circuit, because the Supreme Court has shown

greater caution in expanding this approach beyond the civil rights laws.  See Fogerty, 510 U.S. at 524 (contrasting purposive interpretation of fee-shifting provisions under civil rights statutes with neutral interpretation of fee-shifting provision under the Copyright Act); see also Octane Fitness, 134 S. Ct. at 1755-56 (employing a textually focused analysis of the fee-shifting provision in the Patent Act).

To summarize: "Christiansburg teaches that even a neutrally-worded fee statute does not necessarily have an identical application to every prevailing party.  Rather, when the statute establishes a flexible standard, a consideration of policy and congressional intent must guide the determination of the circumstances under which a particular party, or class of parties (such as plaintiffs or defendants), is entitled to fees."  Dorn's Transp., Inc. v. Teamsters Pension Trust Fund of Phila. & Vicinity, 799 F.2d 45, 49 (3d Cir. 1986).  The Court will now apply the teachings of the Christiansburg line of cases to section 1973*l*(e).

**B. The purpose of section 1973*l*(e) is to encourage private attorneys general to bring lawsuits vindicating individual voting rights.**

To carry out the preferred approach of the Supreme Court and the D.C. Circuit in interpreting discretionary fee-shifting provisions in civil rights statutes, this Court must consider the purpose of the VRA's fee-shifting provision, 42 U.S.C. § 1973*l*(e).  Unlike for the other questions in this case, the case law offers substantial guidance here.  "The purpose of this provision . . . is the familiar one of encouraging private litigants to act as 'private attorneys general' in seeking to vindicate the civil rights laws."  Donnell, 682 F.2d at 245; accord King v. Ill. State Bd. of Elections, 410 F.3d 404, 412 (7th Cir. 2005) ("The purpose of § 1973*l*(e) . . . is to ensure effective access to the judicial process for persons with . . . voting rights grievances.") (internal quotation marks omitted); Francia v. White, 594 F.2d 778, 781 n.1 (10th Cir. 1979) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have

proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

As confirmation of this common-sense understanding of the purpose of the provision, "the legislative history of section[] 1973*l*(e) . . . emphasizes over and over again the critical goal of enabling private citizens to serve as 'private attorneys general' in bringing suits to vindicate the civil rights laws." Donnell, 682 F.2d at 246. The 1975 Senate Committee Report discussed the "private attorneys general" rationale at length, and called on the judiciary to adopt similar standards as had already been adopted with respect to the fee-shifting provisions in other civil rights laws:

> [Section 1973*l*(e)] allows a court, in its discretion, to award attorneys' fees to a prevailing party in suits to enforce the voting guarantees of the Fourteenth and Fifteenth amendments, and statutes enacted under those amendments. . . . Such a provision is appropriate in voting rights cases because there, as in employment and public accommodations cases, and other civil rights cases, Congress depends heavily on private citizens to enforce the fundamental rights involved. Fee awards are a necessary means of enabling private citizens to vindicate these federal rights. . . . [P]rivate attorneys general should not be deterred from bringing meritorious actions to vindicate the fundamental rights here involved by the prospect of having to pay their opponent's counsel fees should they lose.

S. Rep. 94-295, at 40-41 (1975). This point is largely undisputed. See Pl.'s Reply at 18 n.7 (acknowledging that the Senate Report reflects "Congress's acceptance of both the Piggie Park and Christiansburg Garment standards," but maintaining that the Senate Report "does not indicate which standard should apply in this instance").

**C. Shelby County must satisfy the <u>Christiansburg</u> standard to obtain a fee award.**

With the well-settled purpose of section 1973*l*(e) in mind—that is, incentivizing private attorneys general to bring lawsuits vindicating individual voting rights—the Court now turns to the question of how Shelby County fits within that paradigm. Unfortunately for Shelby County, its lawsuit was about as far as possible from the lawsuit the drafters of section 1973*l*(e) were

hoping to incentivize.   Accordingly, for the reasons discussed below, as a result of Shelby County's failure to fit the statute's preferred profile, the Court concludes that to obtain a fee award in this case, Shelby County will need to satisfy a higher bar: the <u>Christiansburg</u> standard.

In most VRA lawsuits, an individual plaintiff, perhaps with the assistance of the Attorney General, is suing a state government entity for taking an action that violates the plaintiff's individual voting rights.  These suits fall squarely within the wheelhouse of the VRA fee-shifting provision, so in such a case, a prevailing plaintiff "'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'"  <u>Donnell</u>, 682 F.2d at 245 (quoting <u>Piggie Park</u>, 390 U.S. at 402).   Similarly, in such a typical case, "[g]enerally, a defendant may not recover attorneys' fees unless the court finds that the plaintiff's suit was frivolous, vexatious, or without foundation."   <u>Medina County</u>, 683 F.2d at 439 (citing <u>Christiansburg</u>, 434 U.S. at 421-22).

But not all cases are "typical," and sometimes, the plaintiff/defendant lineup is more complex—or is wholly reversed.  In the words of the D.C. Circuit in <u>Medina County</u>, it is "clear from the case law and the legislative history that when the procedural posture of a case places the party who seeks to vindicate rights guaranteed by the Constitution in the position of defendant, the restrictive <u>Christiansburg Garment</u> rule is not applicable." <u>Id.</u> at 440.  By the same token, "when the procedural posture of a case places the party who seeks to" <u>oppose</u> enforcement of individual voting rights "in the position of" a plaintiff, "the restrictive <u>Christiansburg Garment</u> rule" <u>is</u> applicable, <u>id.</u>, when that party seeks attorney's fees.  That, of course, is the situation here.[15]

_____

[15] To be precise, the <u>Medina County</u> language quoted above uses the phrase "rights guaranteed by the Constitution," <u>Medina County</u>, 683 F.2d at 440, and Shelby County's facial challenge did, of course, rely on the Constitution.  But context makes clear that the constitutional rights the D.C. Circuit was concerned about in <u>Medina County</u> are the individual "voting guarantees" of the Fourteenth and Fifteenth Amendments, rather than the

In fact, section 1973*l*(e)'s legislative history—relied upon heavily by the D.C. Circuit in Medina County—specifically addresses a scenario that is highly analogous to this litigation. After explaining that prevailing plaintiffs are typically entitled to attorney's fees under the lenient Piggie Park standard—that is, they should recover fees "unless special circumstances would render such an award unjust," 390 U.S. at 402—the report explains that this rule should be interpreted pragmatically by looking at the actual motivations of the plaintiff and the defendant in a particular case.  "In the large majority of cases the party or parties seeking to enforce [voting] rights will be the plaintiffs. . . . However, in the procedural posture of some cases (e.g., a declaratory judgment suit under Sec. 5 of the [VRA]) the parties seeking to enforce such rights may be the defendants and/or defendant intervenors."  S. Rep. 94-295, at 40 n.42 (1975) (quoted in Medina County, 683 F.2d at 439-40).  This passage provides powerful support for the conclusion that plaintiff/defendant labels are not dispositive: the key question is whether a party is seeking to enforce individual voting rights.

Cases from outside the D.C. Circuit also provide support, relying on this legislative history.  See, e.g., King, 410 F.3d at 413 ("The legislative histor[y] of § 1973*l*(e) . . . reflect[s] Congress' expectation that, in some circumstances, defendants or defendant-intervenors would be prevailing parties entitled to attorneys' fees."); League of United Latin-American Citizens Council No. 4434 v. Clements, 923 F.2d 365, 368, 368 n.2 (5th Cir. 1991) (en banc) ("Given the Supreme Court's apparent rationale for applying different standards to plaintiffs and defendants, any such reclassification of a party's role must hinge upon whether the parties in question acted as private attorneys general within the scope of the statutes under which Congress provided fee

---

federalism-based, Tenth Amendment interests vindicated by Shelby County in this case.  See id. at 439-40 (quoting the Senate Report's example of defendant-intervenors being the party "seeking to enforce" voting rights in a Section 5 declaratory judgment action brought by a covered jurisdiction).  Importantly, and as discussed at length above, those constitutional interests—while equally legitimate—are not mentioned in section 1973*l*(e).

entitlement. . . . For example, in section 5 declaratory judgment actions under the [VRA], the parties positioned as 'defendants' may actually be the parties charging civil rights violations and seeking to assert their civil rights.").

Finally, Christiansburg itself offers support.  The Supreme Court in Christiansburg drew a distinction between the classic Title VII plaintiff—the "chosen instrument of Congress to vindicate a 'policy that Congress considered of the highest priority,'" Christiansburg, 434 U.S. at 418 (quoting Piggie Park, 390 U.S. at 402)—and a prevailing Title VII defendant.  It pointed out that "when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law." Id.  Despite Shelby County's best efforts to argue the contrary, a fee award in this case would not run "against a violator of federal law" in the manner contemplated by Christiansburg.  To be sure, the Constitution is "federal law," and Supreme Court held in this case that Congress exceeded its constitutional authority in passing the latest Voting Rights Act reauthorization.  But Christiansburg's reference to a "violator of federal law" is a reference to a violator of individual civil rights (in that case, Title VII)—not the passage of a federal statute through the normal legislative process.  Counsel for Shelby County essentially conceded as much at oral argument.  See Hr'g Tr. at 17-18 ("[W]e are not saying the Attorney General was departing from the statutory framework.  He was constrained by the statute to exercise preclearance.  There is no question about that. . . That's why we sued him in his official capacity. . . . We're not saying Mr. Holder was a maverick . . . .").  Put another way, "in contrast to losing Title VII defendants who are held presumptively liable for attorney's fees, losing" parties like the United States and the defendant-intervenors in this case "have not been found to have violated anyone's civil rights." Zipes, 491 U.S. at 762 (citing Christiansburg, 434 U.S. at 418).

Although <u>Shelby County v. Holder</u> was in many ways a unique case, it was not entirely unprecedented; as in other VRA cases, "the parties positioned as 'defendants'" and defendant-intervenors were "actually . . . the parties charging civil rights violations and seeking to assert their civil rights." <u>Clements</u>, 923 F.2d at 368 n.2. And Shelby County, the plaintiff, was not acting as a "private attorney general" seeking to vindicate individual voting rights. Instead, Shelby County was essentially the opposite of the "chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority,'" <u>Christiansburg</u>, 434 U.S. at 418 (quoting <u>Piggie Park</u>, 390 U.S. at 402)—its position was openly <u>hostile</u> to Congress's policy choices, attacking them as unconstitutional.

True, those attacks were successful. But that does not mean that Congress would have wanted attorney's fees to be easily available to someone bringing such a challenge.[16] And congressional intent governs here, even though, on the merits, the Supreme Court found that Congress had overreached in other, unrelated provisions of the statute. Shelby County pejoratively refers to such an inference about congressional preferences as impermissibly creating a "judge-made ranking of rights"—an approach it claims was outlawed by Justice Scalia's opinion in <u>Zipes</u>. <u>See</u> Pl.'s Reply at 15 (quoting <u>Zipes</u>, 491 U.S. at 763 n.4). But Shelby County ignores the rest of Justice Scalia's footnote, which ultimately (and candidly) acknowledges that "[h]ere, as elsewhere, the judicial role is to reconcile <u>competing rights</u> that Congress has established and competing interests that it normally takes into account." <u>Zipes</u>, 491 U.S. at 763 n.4 (emphasis added). The Court has done so here and, accordingly, will hold

---

[16] Counsel for Shelby County seems aware of this flaw in the argument. <u>See</u> Hr'g Tr. at 26 (acknowledging that Congress "might well have considered, look, yes, we pass laws; we usually don't incentivize people to overturn laws we pass"). Shelby County's response—that "a responsible Congress would say that these laws need to be tested under the amendments," <u>id.</u>—is wishful thinking. Even if correct as a normative matter, it seems highly implausible, as a descriptive matter, that Congress would have wanted to incentivize lawsuits like this one with the prospect of a fee award.

Shelby County to the Christiansburg standard, under which the Court, "in its discretion," will award fees only if Shelby County can demonstrate that the United States or defendant-intervenors took positions that were "frivolous, unreasonable, or without foundation." Christiansburg, 434 U.S. at 421.[17]

**D. Shelby County cannot satisfy the Christiansburg standard.**

To its credit, Shelby County does not argue that the United States (or defendant-intervenors) took a position in this case that was "frivolous, unreasonable, or without foundation." See Hr'g Tr. at 20 ("I don't think we claimed the government's conduct met the standard of Christiansburg. That's not our claim."). That concession was appropriate: this Court, two judges on the D.C. Circuit, and four Justices of the U.S. Supreme Court agreed with the position advanced by the Attorney General, and the challenged provisions of the VRA had been upheld in previous decisions of the Supreme Court. Hence, the Court will deny fees to Shelby County "in its discretion," 42 U.S.C. § 1973*l*(e), for failure to satisfy the Christiansburg standard.

## CONCLUSION

For the reasons set forth above, the Court will deny Shelby County's motion for attorney's fees. A separate order accompanies this Memorandum Opinion.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: May 28, 2014

---

[17] Shelby County's final argument to avoid the application of Christiansburg is an attempt to show that there is an "exception" to the Christiansburg standard when the party seeking attorney's fees "'has vindicated a constitutional right or benefitted a large number of people.'" Pl.'s Mot. at 9 (quoting Dorn's, 799 F.2d at 50 n.6). But neither the Supreme Court nor the D.C. Circuit has ever hinted at the existence of such an exception, and the primary support for it comes from a passing dictum in a footnote of a Third Circuit ERISA decision—a decision that not only applied the Christiansburg standard, see id. at 50, but, more importantly, predates the Supreme Court's suggestion that civil rights fee-shifting provisions should be interpreted differently than those found in economic statutes like ERISA, see Fogerty, 510 U.S. at 524.